E-SERVED
02/18/04
03:50 PM ET
Baycol MDL 1431

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| **IN RE: BAYCOL PRODUCTS LIABILITY LITIGATION** | : | **MDL No. 1431 (MJD/JGL)** |
| **This Document Relates to All Cases** | : | |

**PLAINTIFFS' RESPONSE AND OBJECTIONS**
**TO PROPOSED PTO NO. 102**

COME NOW, the Shannon Law Firm Plaintiffs, by and through counsel and respectfully submit their Response and Objections to Proposed PTO No. 102, as follows:

1. The proposed PTO No. 102 attempts to shift the burden from the Defendants to the Plaintiffs in what can be seen as an ill-disguised attempt at a motion for summary judgment. This "narrowing" protocol is a substitute method to achieve summary judgment in a mass amount of cases. This is simply not allowed under the Federal Rules of Civil Procedure. A party seeking dismissal of a case must either file a motion to dismiss or a motion for summary judgment under Rule 56 (c) of the Federal Rules of Civil Procedure. Furthermore, the burden of showing there is not any genuine issue of material fact is on the moving party. The Federal Rules of Civil Procedure do not authorize the use of a "narrowing protocol" in place of a motion for summary judgment. Instead, the Rule *requires* the moving party file a summary judgment motion in cases they believe lack proof. Instead of trying to force a strictly construed protocol on the Plaintiffs, Defendants should be made to follow the Rules of Civil Procedure and file any motions they deem necessary. Moreover, in the case *sub judice*, this Court is being asked to require this "narrowing" protocol be applied before discovery is even complete! The proper way for these cases to be "narrowed down" would be for Bayer, once

E-SERVED
02/18/04
03:50 PM ET
Baycol MDL 1431

discovery is completed or near completion, and *after* each case has been reviewed, to file a motion for summary judgment on each case deemd by Bayer to be deficient in proof concerning a Baycol related injury. Accordingly, this "narrowing" protocol should not be instituted as it usurps the federal rule which governs this subject.

2. The proposed PTO No. 102 requires documentation of sudden onset of severe muscle pain and due to this, Baycol was discontinued. This is vague, overly broad and unduly burdensome. There are many reasons why these criteria cannot be implemented. In this day of extremely busy doctors, many doctors document the bare minimum in their medical notes. Even if the Plaintiff complained to the doctor of muscle pain, the doctor may not have documented it, or may not have noted it as "severe." Furthermore, the term "severe" is subjective. If this Court wants to utilize any sort of protocol, it must use a protocol with objective standards. What is severe to one person may not be severe to another. What one doctor considers severe may not be considered by another doctor to be severe. More often, what has been found among our Plaintiffs is that, since Bayer did not distribute all the information they had on the adverse effects of Baycol, plaintiffs either did not complain of severe muscle problems that they believed were an adverse event due to Baycol, or the doctors did not write that they discontinued the Baycol due to these muscle problems. The doctors, themselves, allegedly did not realize that the muscle problems the Plaintiffs were experiencing were actually adverse events due to their use of Baycol. Plaintiffs understand that there must be some standard whether it be the plaintiff's testimony, an elevated liver enzyme test or something in their medical records to substantiate their claim of a Baycol related injury. However, to be

E-SERVED 02/18/04 03:50 PM ET Baycol MDL 1431

held to the standard of the exact wording of the proposed PTO No. 102 is holding plaintiff to a standard that is objectionable, subjective and overly restrictive.

3. There are many definitions of rhabdomyolysis. Attached as Exhibit "A," are three definitions taken from highly reputable medical journals. As the Court can see, the definition of rhabdomyolysis is not restricted to what Bayer has defined rhabdomyolysis to be. When this Court reviews these definitions, this Court should see that there is no way any person, Court or proposed PTO can define "rhabdo," because even the medical community cannot come up with a standard definition! In fact, this Court should see that rhabdomyolysis can be defined as *any* manifestation of muscle pain and/or weakness with or without elevated liver enzymes, any elevation of liver enzymes with or without manifestation of muscle pain, or a combination thereof.

In addition, there are many different definitions of "myopathy." Even the American College of Cardiology/American Heart Association/National Heart, Lung and Blood Institute (hereinafter "ACC/AHA/NHLBI"), have stated that the "general terminology used to describe muscle toxicity is inconsistent." Pasternak RC, Smith SC, Jr., Bairey-Merz CN, Grudy SM, Cleeman JI, Lanfant C., *ACC/AHA/NHLBI Clinical Advisory on the Use and Safety of Statins*, J. Am. Coll. Cardiol. 2002; 40:567-72. Typically, myopathy is defined as any abnormality of or any and all disease of the muscle. PDR MEDICAL DICTIONARY 1170 (1st ed. 1995), NATIONAL INSTITUTE OF NEUROLOGICAL DISORDERS AND STROKE, *at* http://accessible.ninds.nih.gov/health_and_medical/disorders/myopathy.htm#What_is_Myopathy. Myopathy has also been defined as "any pathology of the muscles that is not attributable to nerve dysfunction." WEBSTER'S ONLINE DICTIONARY, *at*

E-SERVED 02/18/04 03:50 PM ET Baycol MDL 1431

http://www.websters-online-dictionary.org/definition/english/My/Myopathy.html. As the Court can see, each Plaintiff's case must be reviewed on a case by case basis. This Court should not exclude someone simply because his doctor defined myopathy as something different than Bayer's definition. Specific terms would preclude these patients from their right to the Courts and violate their rights of due process.

This Court could go to a variety of labs and a variety of medical journals and discover quite a difference in what is considered a normal range for Creatinine Kinase ("CK" or "CPK") levels. In Ferri's Clinical Advisor: Instant Diagnosis and Treatment, the normal range for CPK is 0-130 U/L. FERRI'S CLINICAL ADVISOR: INSTANT DIAGNOSIS AND TREATMENT (2003 ed.). It is highly contested in the scientific community exactly what would be considered abnormal; therefore, this Court should not accept Bayer's definition of an abnormal CK or CPK rate to be 10 times greater than 185. Furthermore, there are now discussions of whether an elevated CPK level needs to be present for statin toxicity to occur. Paul S. Phillips, et al, *Statin-Associated Myopathy with Normal Creatine Kinese Levels*, *in* ANN. INTERN. MED. 581-E585 (Volume 137 Number 7, October 2002). The conclusion of the Phillips' article holds that some patients "who develop muscle symptoms while receiving statin therapy have demonstrable weakness and histopathologic findings of myopathy *despite normal serum creatinine kinase levels." Id.* at 581. (*emphasis added)*.

4. According to the language of the proposed PTO No. 102, a "sudden onset" must be documented in the medical records. Once again, the term "sudden" is subjective, ambiguous and nebulous. "Sudden onset" is not a medical term; nor is it a term that is in any doctor's "protocol" of how a complaint must be medically noted. To one doctor or

E-SERVED 02/18/04 03:50 PM ET Baycol MDL 1431

Plaintiff, it may be abrupt pain; and to another "sudden" may indicate a problem that has recently occurred. Nonetheless, any type of muscle pain complained of and documented in the medical records should meet the threshold of an arguable fact of whether Baycol caused the Plaintiff's injuries. In addition, it is highly contested in the scientific community if there needs to be a "sudden onset" or if Baycol muscle problems could come on gradually. As it stands, there are more questions then answers, and although Bayer tries to say that they have the answers to these questions, this Court cannot trust such self-serving answers; therefore, this Court cannot put forth a standard that is as subjective, unreasonable and capricious as the proposed PTO No. 102.

5. According to the proposed PTO No. 102, Plaintiffs who continued to take Baycol up through its withdrawal must have an expert report. This arbitrary standard violates the Plaintiffs' constitutional rights to due process and free access to the courts. The Court knows that expert reports often run thousands of dollars. The majority of these Plaintiffs are not financially able to hire an expert. The proposed PTO No.102 is essentially telling these people that unless they have enough money to hire an expert, they will not have their day in court. Due to the unscrupulous behavior of Bayer in hiding the tremendous amount of information concerning the adverse events caused by Baycol, many physicians prescribed and many plaintiffs took Baycol up until its withdrawal. Their claims are not any more questionable then the claims of the Plaintiffs that stopped taking Baycol prior to its withdrawal. In a multitude of these cases, Plaintiffs had just begun taking Baycol in the immediate months, and sometimes days, prior to its withdrawal! Just because it was their misfortune to still be on this toxic drug at the point of its withdrawal, is not any reason to place such a heavy burden on these

E-SERVED 02/18/04 03:50 PM ET Baycol MDL 1431

Plaintiffs. Moreover, many doctors did not document in the records that their patients were taken off of Baycol due to any particular problem or the withdrawal of the drug, but primarily the name of the new prescribed statin was noted in their records and orders to "D/C Baycol." An expert medical evaluation and report is something that a plaintiff may choose to obtain to rebut a motion for summary judgment, to help prove his or her case, or for a variety of other reasons. A plaintiff should not be forced to pay this great expense and obtain an expert witness report simply to satisfy some arbitrary standard. Once again, the Defendants already have a built-in safeguard for contesting the injuries of any of the Plaintiffs, including the ones that took the drug after its withdrawal. This safeguard is called a motion for summary judgment.

6. Plaintiffs believe that this proposed standard implicates their Seventh Amendment jury trial rights. Furthermore, Plaintiffs believe this narrowing criterion will affect the idea of "our deep-rooted historic tradition that everyone should have his own day in court." C. WRIGHT, A. MILLER, & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4449, p. 417 (1981). Although many of the cases that cite to MILLER & COOPER § 4449, are based upon parties not being joined in actions, that situation is analogous to the situation before this Court in that the proposed PTO 102 does not let a party have his case heard by a court or jury. As the proposed criterion stands now, it is designed to be narrowly construed against Plaintiffs. There is no flexibility when looking at the records and measuring the records against this strict criterion. Furthermore, there is no overwhelming interest that would make it permissible to override the rights of the Plaintiffs.

E-SERVED
02/18/04
03:50 PM ET
Baycol MDL 1431

WHEREFORE, PREMISES CONSIDERED, the Plaintiffs pray this Honorable Court refrain from entering PTO No. 102 as proposed.

Respectfully submitted,

THE SHANNON LAW FIRM PLAINTIFFS

By: *Original signature on file with filing attorney*
Colleen S. Welch

OF COUNSEL:

James D. Shannon (MSB # 6731)
Colleen S. Welch (MSB # 100807)
**SHANNON LAW FIRM, PLLC**
100 West Gallatin Street
Hazlehurst, Mississippi 39083
Telephone: (601) 894-2202
Facsimile: (601) 894-5033

E-SERVED
02/18/04
03:50 PM ET
Baycol MDL 1431

**CERTIFICATE OF SERVICE**

I do, hereby, certify that this day, February 18, 2004, a true and correct copy of the above was electronically served to counsel of record via Verilaw.

*Original signature on file with filing attorney*
Colleen S. Welch

E-SERVED
02/18/04
03:50 PM ET
Baycol MDL 1431

**Definitions of Rhabdomyolsis**

"The clinical manifestations of rhabdomyolysis range from severe muscle pain, profound weakness, muscle tenderness, stiffness, swelling, and rarely muscular paralysis and diaphragm failure to a relatively asymptomatic state with no abnormal muscle findings despite extensive rhabdomyolysis". BRENNER & RECTOR'S THE KIDNEY pg. 1093 (6th ed. 2000 W. B. Saunders Company).

Rhabdomyolysis is a syndrome characterized by muscle necrosis and the release of intracellular muscle constituents into the circulation. The severity of illness ranges from asymptomatic elevations of muscle enzymes in the serum to life-threatening cases associated with extreme enzyme elevations, electrolyte imbalances, and acute renal failure. Mark Miller, Editor
UP TO DATE; (Volume 11.3, 2003).

Rhabdomyolysis is a syndrome that results from destruction of skeletal muscle. It is usually diagnosed from laboratory findings that are characteristic of myonecrosis. . . . there are *no standard CK values that establish the diagnosis of rhabdomyolysis* . . . studies have also shown that there is a poor correlation between CK elevations and the morphologic degree of muscle damage. GOLDMAN: CECIL TEXTBOOK OF MEDICINE pg. 523 (21st ed. 2000, W. B. Saunders Company) (*emphasis added*)

**Exhibit "A"**