E-SERVED 02/19/04 05:32 PM ET Baycol MDL 1431

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| **In re BAYCOL PRODUCTS LITIGATION** | : | **MDL No. 1431 (MDL/JGL)** |
| | : | |
| **This Document Relates to:** Weitz & Luxenberg's Clients | : | |

# WEITZ & LUXENBERG'S RESPONSE TO ORDER TO SHOW CAUSE: OBJECTIONS AND SUGGESTIONS FOR MODIFICATIONS TO THE PROPOSED NARROWING PROTOCOL AND SUPPLEMENTAL DISCOVERY OBLIGATION PURSUANT TO PTO NO. 102

## Background and Introduction

At the January 15, 2004 monthly status conference the PSC, defendants and the Court announced discussions about narrowing the MDL Baycol caseload. Thereafter, Weitz & Luxenberg received a copy of the proposed narrowing protocol. Weitz & Luxenberg has carefully reviewed the protocol and embraces the opportunity the Court is allowing for parties to make suggestions for improving same. Herein, we outline our objections and suggestions and respectfully request that they be given consideration. We have also reviewed many of the valuable suggestions made by other law firms and do not necessarily incorporate all herein.

## *I. Supplemental Plaintiffs' Fact Sheet*

It is currently proposed that the supplemental discovery obligations process will require a plaintiff's signature. Weitz & Luxenberg suggests that this is not an efficient or appropriate manner to achieve these goals.

E-SERVED 02/19/04 05:32 PM ET Baycol MDL 1431

## OBJECTIONS

First, it is partially duplicative of information already provided and signed to by the plaintiffs in the Plaintiff's Fact Sheet. Specifically, the plaintiff already stated their Baycol use dates in the Plaintiff's Fact Sheet. (Objecting to supplemental form question I.A.) This form requires documentation supporting those dates. Most plaintiffs are not going to be able to attest to the medical record that supports this request as they did not prepare the form - it's a record produced by either their physician or their pharmacy. As such, production of this form should not require the sign off by a plaintiff attesting to a third-party's statement.

A similar objection is made to Proposed Protocol section I.B (1)(a)-(i) "Rhabdomyolysis that led to the discontinuation of Baycol use; or (ii) sudden onset, severe muscle pain that led to the discontinuation of Baycol use." Again, the plaintiffs already stated that they sustained one of these, *or other injuries*, in the Plaintiff's Fact Sheet.

## SUGGESTIONS

Presentation of a medical record that documents these complaints and their timing is generated by someone other than the plaintiff, and the plaintiff cannot attest to its veracity. Likely they do not even have a copy of it. More than likely, this is a document that the plaintiff's counsel has collected via the discovery process. As such, it is inappropriate to ask the plaintiff to sign off on these documents. This will certainly cause to confuse the plaintiffs as they will undoubtedly believe they have already provided this information in the form of a Fact Sheet and essentially they are correct.

E-SERVED 02/19/04 05:32 PM ET Baycol MDL 1431

These elements are really proof requirements that should be left to the attorney to research, supply and sign off on. They are not within the purview of individual plaintiff's knowledge or ability to obtain without significant hardship.

## ***II. The Injuries Referred To In The Supplemental Discovery Obligation In Paragraph I.B 1a (i)(ii) Are Too Narrow And Limiting And Do Not Reflect Many Of The Meritorious Injuries Sustained By Baycol Users.***

**OBJECTIONS**

Weitz & Luxenberg objects to the very limited selection of injuries that are reflected in terms of the Plaintiffs' Supplemental Discovery Obligation. We do not object specifically to the Rhabdomyolysis category, albeit there are incidents of Rhabdomyolysis that may or may not be "diagnosed" as such in medical records, but we do object to the category (ii) "Sudden onset, severe muscle pain that led to the discontinuation of Baycol use," for multiple reasons addressed below.

First, to limit the Baycol litigation to two categories of injuries is too limiting and inaccurately reflects the inventory of Baycol injuries. Specifically, to even qualify the muscle pain category as currently stated is ineffective. To require that the muscle pain be of "sudden onset" is far too subjective. Undoubtedly, the defense and plaintiffs' counsel, the plaintiffs, and the plaintiffs' treating physicians, not to mention experts, will all have very differing definitions of "sudden onset". Additionally, the language in this section implies that the medical record would have to state that the muscle pain had a "sudden onset". This qualification is unlikely to be met in the vast majority of cases, and not necessarily due to the quality of the injury, but the quality of a medical record.

E-SERVED 02/19/04 05:32 PM ET Baycol MDL 1431

Second, to limit the definition of muscle pain with the qualifier "severe" is also overly limiting. Similar to the first argument, it is simply too subjective and will create more questions than answers. Additionally, one plaintiff's "severe" is not necessarily the "severe" of another plaintiff. Most importantly, many physicians are not inclined to include adjectives such as "severe," however, could provide compelling evidence via their Fact Sheet or other discovery that *does* satisfy this requirement. In their patient's medical records, and many plaintiffs will not be able to provide a medical record that necessarily documents that muscle pain was "severe". In essence, this category of injury is creating a hurdle that cannot be overcome in the reality of the litigation, unreasonably dismissing valid injury claims from moving forward.

## SUGGESTIONS

Additionally, the categories of Rhabdomyolysis and sudden onset, severe muscle pain do not include other significant injuries that many plaintiffs suffered while using Baycol. Specifically, the descriptions should include at a minimum:

**(i) Rhabdomyolysis…**

**(ii) Muscle Pain…**

**(iii) Muscle weakness…**

**(iv) Abnormal test results…**

**(v) Other…**

One of the most serious complaints made by Baycol users concurrent with their use of Baycol is the significant muscle weakness they suffered. Often, this was the complaint that was registered in their medical records and led their physicians to stop the

E-SERVED 02/19/04 05:32 PM ET Baycol MDL 1431

use of Baycol. (See sample list of cases that support this category attached hereto as Exhibit A).[1] Certainly, muscle pain was often also experienced with muscle weakness, however, the two are not necessarily always intertwined. Often, muscle weakness was the most debilitating result of the use of Baycol causing falls, inability to ambulate unassisted, difficulty climbing stairs and getting into and out of a seated position.

Additionally, many clients were told to stop their use of Baycol not necessarily because of muscle pain or Rhabdomyolysis, but due to a blood test or urine analysis which revealed abnormal results. Many of these abnormal results were linked, or can be linked, specifically to Baycol. Most important is an elevation in CK that does not necessarily result in the diagnosis of Rhabdomyolysis. (See sample list of cases that support this category attached hereto as Exhibit B). Additionally, elevations in liver enzyme tests, ALT and AST, are also an indicator of a Baycol injury. (See sample list of cases that support this category attached hereto as Exhibit C.) Other blood and urine tests could also reveal protein in the urine or blood in the urine which were could also be related to Baycol. These are significant results which should be reflected in the litigation and not merely glossed over, or, in fact summarily cause a plaintiff's case to be dismissed.

There are also other categories that could be included. These should be reflected in a category called "other" so that particular plaintiffs' complaints could be supported

---

[1] Because Weitz & Luxenberg has numerous cases before this Court, it is impossible to list all of the clients that will be affected by this proposal. Accordingly, in support of our categories we have attached exhibit lists that show a small sample of each group. If the Court requires us to provide more examples, we will do so.

E-SERVED 02/19/04 05:32 PM ET Baycol MDL 1431

with the appropriate documents. Some examples include: myalgia, myositis, muscle injury, muscle degeneration (or wasting/atrophy) to name only a few.[2] (See sample list of cases that support this category attached hereto as Exhibit D.)

### *III. Procedural Objections and Suggestions.*

#### A. Weitz & Luxenberg suggests a two-step-process.

**OBJECTIONS**

The procedure that is proffered is no doubt an expansive and time-consuming process. Accordingly, Weitz & Luxenberg suggests that it would be more efficient to reach the same goals by making this single process a two-step process.

**SUGGESTIONS**

For example, we suggest that the first step would be the completion of the form amended as previously suggested. This form could be completed by the plaintiffs' counsel and served on the defendants. Thereafter, once that process has been completed for a given set of cases, it would make more sense then to move on to the procurement of expert report for the cases that so require. This would allow all parties to see how this process sorts out –to let the dust settle. Then, each case could be considered by the plaintiff and their lawyers as to whether it merits expert evaluation. For those that reach that threshold, experts could be consulted, reports procured and subsequently served, and the others could be voluntarily discontinued.

Weitz & Luxenberg suggests that forty-five to sixty days would be appropriate in order to provide the expert reports required. Please note, we do not suggest that the

---

[2] To "lump" all of these injuries into a category called "sudden onset, severe muscle pain" is inaccurate and will surely lead to more debate and clarification.

E-SERVED 02/19/04 05:32 PM ET Baycol MDL 1431

remainder of the cases halt their process in terms of completing the supplemental information. Essentially, there would be several tracks running alongside each other at varying levels of maturity.

**B. Weitz & Luxenberg Suggests a Revised Initial Due Date.**

**OBJECTIONS**

Weitz & Luxenberg is concerned that this process as currently written is not a process at all, but is in fact a contest. It is a race to sort the cases into a yes or no category. This does not allow plaintiffs' lawyers to fairly represent their clients, particularly when they represent several clients. Our firm is dedicated to representing well our large number of Baycol clients, and predict we would need more time to meet all of these goals.

**SUGGESTIONS**

First, we suggest that given this period of consideration and adaptation to the process, the initial due date for the first group of cases be by June 20, 2004 at the earliest. We also suggest that there should be at least 90 days if not 120 between each group of cases' initial form due dates. (Please see above regarding the two-step process that would allow these multiple tracks to move alongside each other). Furthermore, Weitz & Luxenberg suggests that the groups should be divided into smaller groups. The current recommendation is divided into only three groups, and this is simply overwhelming for any firm that has a significant number of Baycol clients.

E-SERVED
02/19/04
05:32 PM ET
Baycol MDL 1431

**C. Limiting The Number Of Submissions Due On Any Particular Date.**

Another option to be included along with the smaller groupings spread out over a longer period of time is to create a maximum number of submissions that would be due by any one firm at any one time. This certainly would assist the firms that have larger case loads to adequately and accurately meet the due date requirements.

For example, it could be more reasonable to have a maximum of 300 forms due every 90 or 120 day period (essentially 100 per month) followed by the commensurate 45-plus days within which to serve the expert report, when necessary. A solution like this would make the current groupings by docket number no longer viable for the firms that carry larger numbers. This suggestion does not make the program fail, it improves it.

**D. Weitz & Luxenberg addresses the suggestions for processing overdue responses.**

The protocol as it currently exists is similar to the Plaintiff's Fact Sheet system. While that process is now, approximately a year after it was implemented, running rather smoothly, it certainly faced its own problems getting started. We should learn from those mistakes instead of repeating them. The deadlines as currently implemented are simply too short to serve the needs of the plaintiffs in this litigation. For example, mailing the discovery alone could allow some submissions to be " served" timely, however, not reach the defendants within five days of the deadline. As such, the defendants would designate this plaintiff as having not complied with discovery. Once the name gets on the list, the list needs to be revised and these are procedural matters that could be avoided if the time frame is longer. For instance, it should be thirty days before the defendants seek the

E-SERVED 02/19/04 05:32 PM ET Baycol MDL 1431

overdue discovery. Thereafter, overdue discovery would be requested and the PSC notified. It would also be appropriate to extend the submission of the supplemental discovery list from ten to twenty days. This extension, again, while not affecting the nature of the process will assist in limiting the number of procedural pitfalls.

**E. Extension of discovery deadlines.**

**OBJECTIONS**

The current protocol states that "nothing in this PTO shall be interpreted as a restriction upon the ability of: (a) the parties to stipulate to an extension of discovery of deadlines in a particular case; or (b) the plaintiff to move for an extension of discovery deadlines in a particular case based on a showing of good case." If the history of the Fact Sheet process is at all telling, the ability of the plaintiffs to secure extensions from defendants in terms of submission dates is essentially impossible. Weitz & Luxenberg has requested numerous extensions on Fact Sheets with specific reasons given. The number of extensions actually agreed upon were extremely few and far between.

**SUGGESTIONS**

The main point here is that the extensions should be anticipated and built into the process because the defendants will not engage in a simple extension request process. They will send numerous letters stating that the extension request is inadequate, and eventually engage in motion practice. To force motion practice is to create yet again another unnecessary step in this process.

E-SERVED
02/19/04
05:32 PM ET
Baycol MDL 1431

## CONCLUSION

Accordingly, Weitz & Luxenberg respectfully requests that the parties and the Court consider our suggestions for amending the narrowing protocol. We encourage enlisting us in any discussions that might help facilitate this process.

Dated: February 19, 2004
New York, New York

Respectfully submitted,

Victoria J. Maniatis, Esq.
**WEITZ & LUXENBERG, P.C.**
Attorneys for Plaintiff(s)
180 Maiden Lane
New York, NY 10038
(212) 558-5906

T:\DMDL\Baycol\Motions via verilaw\WL_OSC_PROTOCOL_PTO_102.doc

E-SERVED
02/19/04
05:32 PM ET
Baycol MDL 1431

**CERTIFICATE OF SERVICE**

I, Meredith Kimmel, certify that a true and correct copy was electronically served to counsel of record via Verilaw on February 19, 2004.

Meredith Kimmel