E-SERVED 01/19/05 03:29 PM ET Baycol MDL 1431

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| In re: BAYCOL PRODUCTS LITIGATION | ) | MDL No. 1431 (MJD/JGL) |
| This Document Relates To: | ) | |
| All Actions | ) | |

**PLAINTIFFS' COMPREHENSIVE CASE MANAGEMENT PROPOSAL**

The Plaintiffs' Steering Committee, by and through the undersigned Co-Lead Counsel, respectfully submits this Comprehensive Case Management Proposal, for the Court's consideration, to promote and facilitate completion of the MDL 1431 proceedings, and the resolution or remand of all actions by September 1, 2005. Plaintiffs request an early meeting with the Court, or Special Masters, and defendants to discuss the options proposed herein.

## I. INTRODUCTION

At the beginning of this case, defendants argued that this MDL's sole function was to conduct common discovery and then to remand all cases pursuant to *Lexecon*. That position then changed to arguing that a single legal standard could apply to all claims for purposes of expert discovery and that some individual discovery into individual claims would be appropriate in this Court. Now, the defendants claim that this Court has jurisdiction and the obligation to conduct discovery in **all** individual cases and to apply a single, undefined legal standard for adjudging the sufficiency of expert reports, *Daubert* motions, and summary judgment motions. The time has come to propose alternatives for bringing this MDL to a resolution.

E-SERVED 01/19/05 03:29 PM ET Baycol MDL 1431

Plaintiffs' proposal includes the following alternative or additive suggestions:

- Suspension of all PTO 114, 127 and 131 deadlines;
- Determination of range of case values for existing or refined categories of muscle injury cases through test-case trial(s);
- A common questions and punitive damages trial;
- Immediate remand to state courts of claims where plaintiffs stipulate to a value less than $75,000;
- Require a report from defendants outlining categories of cases they consider compensable beyond rhabdomyolysis cases;
- Presentation of science tutorials to mediators;
- Create a program for resolution of large blocks of cases;
- Renewed motion for class certification to facilitate common questions trial;
- Remand to the various federal district courts of unresolved cases whose value is more than $75,000 if MDL Litigation has not been resolved by September 1, 2005;
- Summary jury trials.

Plaintiffs respectfully submit that these proposed techniques may be conducted concurrently, on an expedited basis, such that this Court, with the intensive assistance of counsel, may wind up its MDL 1431 duties by September 1, 2005.

## II. GUIDING PRINCIPLES

The tools that are available to this Court to complete the MDL task are described, inter alia, in the Manual for Complex Litigation (Fourth) (Federal Judicial Center 2004) § 22.91, "Judicial Role and Settlement," and § 22.314, "Obtaining Information About Common Issues and Case Values," which present a menu of techniques and procedures. Some of these are already familiar to this Court, since various parties have previously suggested them. Others have already begun to be implemented. Still others are as yet untried.

E-SERVED
01/19/05
03:29 PM ET
Baycol MDL 1431

This Court's efforts at promoting settlement have reached an impasse. It may be that this impasse stems from a lack of external case value data and that the only way to break the impasse is to move forward with valuation of cases. Thus, scheduling trials in the MDL, and granting remands to facilitate state court trials of claims not included within an MDL class, consolidated, or test-case trial framework, or cases with values under $75,000 is necessary.

## III. THE PROCEDURES OF PTOS 114, 127 AND 131 SHOULD BE HELD IN ABEYANCE

The procedures of PTO's 114, 127 and 131 ("Categorization Process"), which require case-specific expert reports and may lead to dismissals with prejudice if such expert reports are not filed or are not deemed satisfactory, should be held in abeyance indefinitely. The purpose of the Categorization Process was to provide information to the parties thereby aiding case management and facilitating settlement. This has not worked. It is time to remove the heavy burden this new and untested procedure has caused the claimants. While the procedure mandated by PTO's 114, 127 and 131 is obviously beneficial from the defendants' perspective, its operation has greatly prejudiced the plaintiffs and has impeded settlement discussions.

As an example, a person who has suffered muscle injury must expend up to several thousand dollars to obtain an expert report without any certainty that it will be deemed satisfactory to the defendants or to the Court. If such a PTO 131 report does not pass muster to the defendants for any reason, the defendants will move to have the case dismissed with prejudice by this MDL court pursuant to PTO 131. This is true even though the particular plaintiff's state law in question may not require such expert reports and even though the case otherwise may have been subject to remand to the District from which it came and from there to state court.

E-SERVED 01/19/05 03:29 PM ET Baycol MDL 1431

At the present time, the Categorization Process is a burden to the plaintiffs that cannot be justified. Defendants continue to attack the credibility of the effort by plaintiffs and seek more and more detail that is simply not the purpose of the process. The purpose always was to categorize the cases for ADR, trial and settlement.

Defendants are entirely disincentivized to even discuss settlement on a group basis since they know that as long as they wait and attack virtually all expert reports (as they are doing) on any and all bases, many plaintiffs will lack the financial resources to obtain further reports or supplemental reports, and many muscle injury claims will thus be dismissed with prejudice.

Plaintiffs submit that this situation is manifestly unfair and counter productive to any meaningful settlement negotiations.

## IV. TRIALS AND SUMMARY JURY TRIALS

Defendants have already told the Court that one test case trial will not affect defendants' thinking. Therefore, a single trial at this point will not be as beneficial as more comprehensive data for a range of cases from a number of cases tried together and/or a number of trials. This range of cases data is more important to all of us, for any single case will be distinguished by either side. Data from many sources, as the Manual suggests, is the better approach.

### A. Introduction

Section 22.91 of the Manual states that "parties that are unable to agree on a global settlement may still be able to agree on a process for resolving the litigation. For example, in cases involving immature torts, the parties may agree to use test-case trials to establish a range of values for resolving similar claims. Alternatively, they may agree to draw a representative sample of claims and resolve the sample through mediation, arbitration, or another

E-SERVED 01/19/05 03:29 PM ET Baycol MDL 1431

form of alternative dispute resolution." This PSC proposal encompasses several such approaches. It is Plaintiffs' hope that "information generated through trials or ADR processes might enable the parties to arrive at a reasonable estimate of the value of the aggregate claims from which they drew the sample. Alternative Dispute Resolution techniques (e.g., summary jury trials) may assist the parties in valuing cases for settlement purposes and give the court and parties information about the viability of various trial options." Id.

### B. Dispersed Trials in State Courts

Some courts have suggested the use of the state courts as a dispersed laboratory within which to develop a "marketplace" of case values. See, e.g., In re Bridgestone/Firestone Inc. Tires Products Liability Litigation, 288 F.3d 1012 (7th Cir. 2002).[1] Controlled remand immediately (of cases where plaintiffs stipulate that damages will not meet the $75,000 threshold), to facilitate the development of case value data — or wholesale remand later, if comprehensive settlement in the MDL is not possible — is a particularly effective method for determining values for lower-end muscle injury cases.

### C. Test-Case Trials and Summary Jury Trials

Remand is not the only way to accomplish, in an accelerated and cost-effective manner, a usable body of case settlement value data. As the above-quoted Manual passages and other sections of the Manual indicate,[2] this Court can replicate market conditions through test-

[1] While the Bridgestone/Firestone "market model" has been subject to criticism, its thesis, that "a decentralized process of multiple trials, involving different juries, and different standards of liability, in different jurisdictions . . . will yield the information needed for accurate evaluation of mass tort claims," 288 F.3d at 1020, may have utility here. As Bridgestone observes, "markets . . . use diversified decisionmaking to supply and evaluate information." Id.

[2] See, e.g., discussions of bellwether/test cases and Summary Jury Trials in Manual §§ 20.132; 22.315; 22.56; 22.93 and 22.317-22.318.

E-SERVED 01/19/05 03:29 PM ET Baycol MDL 1431

case and summary jury trial techniques,[3] which enable a meaningful sample of claims from each category to be tested in trial conditions. It may well be that the parties and their counsel in this proceeding will not be able to have meaningful negotiations until both sides — and the Court — have been exposed to the assessments of real world decision makers (jurors) either in binding trials or in trial-like ADR procedures (e.g., summary jury trials). Trying a grouping of five to ten cases at a time in group trials provides the most cost-effective use of judicial resources to provide prompt answers. Such trials would help establish "the likely range of values of the various claims." Manual, § 22.314 at p. 359. Test-case candidates can be selected from the large group of claims that have already been categorized. Commencement of the trial phase does not require completion of the categorization process, and, indeed, Plaintiffs propose that that the categorization process be placed in abeyance while the Court and the parties focus on determining, in test-case trials and summary jury trials, which categories of claims have real world settlement value to justify further investment of transaction costs. As the Manual advises, test-cases may be scheduled and conducted "while holding other cases or claims in abeyance." Id. This process should thus be initiated and completed sooner, rather than later. Plaintiffs' proposal is for completion of such a trial phase by September 1, 2005.

One step down from test-case trials, in terms of planning, cost, and complexity, is the summary jury trial. This is a non-binding ADR technique, which could be conducted on a confidential basis. Summary jury trials would generate special verdicts on liability and causation questions, and create a range of values for each side effects category. Parties could determine, on a relatively expeditious basis, which categories of claims, and which types of symptoms and

[3] See, e.g., Manual § 22.318, n. 1080, citing In re Telectronics Pacing Systems, Inc., Accufix Atrial "J" Leads Products Liability Litigation, 137 F. Supp. 985, 993 n. 8 (S.D. Ohio 2001) as a

E-SERVED 01/19/05 03:29 PM ET Baycol MDL 1431

side effects, have real world trial value. Such data could be of value in guiding ethical and principled settlement discussions.

**D. Common Questions Trial**

Another alternative is a classwide common questions trial. The class jury would be asked to answer questions regarding liability issues, such as defendants' knowledge, conduct, duty to warn, and failure to warn, as well as questions of general causation for each of the symptoms and side effects at issue in this litigation.[4] Plaintiffs' forthcoming renewed motion for class certification will discuss this procedure. Alternatively, a common questions trial similarly focusing on defendants' conduct and general causation could be done through consolidation, as was accomplished in the Bendectin litigation.[5] Either alternative provides transparency as to which state's law and procedural rule will apply to each claim in stark contrast to the nebulous and undeclared standard being advocated by defendants in the Categorization Process.

---

successful example of a one-week summary jury trial that demonstrated trial manageability and provided information instrumental in the negotiation of the successful resolution of the case.

[4] As will be explored in greater detail in the renewed motion for class certification, the class trial would culminate in answers to detailed jury interrogatories that would determine all issues, save for specific causation and damages, under the laws of this forum, the defendants' headquarters states, and the states in which most Baycol claimants reside. Thus, this detailed special verdict would qualify for collateral estoppel/res judicata effect, and could be used by the individual class members, on remand, to determine the remaining individual questions of specific causation and damages without replicating, ad infinitem, evidence and testimony on common questions. This would enable the "market model" of multiple trials in multiple jurisdictions to operate with dispatch, rather than as a war of attrition, and would facilitate ultimate resolutions in the specific cases, and provide accurate information upon which to resolve the rest.

[5] The Bendectin consolidated general causation trial conducted in MDL 486, and affirmed on appeal as comporting with due process, is described in In re Richardson-Merrell, Inc. "Bendectin" Products Liability Litigation, 624 F. Supp. 1212 (S.D. Ohio 1985), affirmed sub nom In re Bendectin Products Liability Litigation, 857 F.2d 290 (6th Cir. 1988).

E-SERVED 01/19/05 03:29 PM ET Baycol MDL 1431

**E. Group Test-Case Trials**

An alternative to single test-case trials or a classwide or consolidated common questions trial would be a group of test-case trials, in which all issues (liability, causation, compensatory damages and punitive damages) are tried on a front-to-back basis with a sample of five to ten plaintiffs at a time. The Manual recommends such test cases as a valuable estimation/valuation technique:

> If individual trials, sometimes referred to as bellwether trials or test cases, are to produce reliable information about other mass tort cases, the specific plaintiffs and their claims should be representative of the range of cases. Some judges permit the plaintiffs and defendants to choose which cases to try initially, but this technique may skew the information that is produced. To obtain the most representative cases from the available pool, a judge should direct the parties to select test cases randomly or limit the selection to cases that the parties agree are typical of the mix of cases.
>
> Test cases should produce a sufficient number of representative verdicts and settlements to enable the parties and the court to determine the nature and strength of the claims, whether they can be fairly developed and litigated on a group basis and what range of values the cases may have if resolution is attempted on a group basis. The more representative the test cases, the more reliable the information about similar cases will be.

Manual, § 22.315, p. 360.

We have a sufficient body of claims, in the various categories, that a comprehensive sample may be selected, through the various techniques listed above for test-case trials. Moreover, virtually all of the common discovery necessary in preparation for such trials has now been completed: there are only two or three remaining depositions and these can be completed promptly.

E-SERVED
01/19/05
03:29 PM ET
Baycol MDL 1431

## V. CONCLUSION

Plaintiffs stand ready to participate in the establishment of real world values of these cases, to promote a case-by-case resolution, or global settlement, on fair terms.

Dated: January 19, 2005

LOCKRIDGE GRINDAL NAUEN, P.L.L.P.

s/ Richard A. Lockridge
Richard A. Lockridge
Robert K. Shelquist
Yvonne M. Flaherty
100 Washington Avenue South, Ste. 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900

ZIMMERMAN REED, P.L.L.P
Charles Zimmerman
651 Nicollet Mall
Suite 501
Minneapolis, MN 55401
Telephone: (612) 341-0400

*Plaintiffs' Co-Lead Counsel*

RODA & NAST, P.C.
Dianne M. Nast
801 Estelle Drive
Lancaster, PA 17601
Telephone: (717) 892-3000

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
Elizabeth J. Cabraser
Wendy R. Fleishman
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000

ALEXANDER HAWES & AUDET
William Audet
152 N. 3rd Street
Suite 600
San Jose, CA 95112
Telephone: (408) 289-1776

WAITE, SCHNEIDER, BAYLESS & CHESLEY CO., LPA
Stanley M. Chesley
Central Trust Tower, Suite 1513
One West Fourth Street
Cincinnati, OH 45202
Telephone: (513) 621-0267

BRANCH LAW FIRM
Turner W. Branch
2025 Rio Grande Blvd. N.W.
Albuquerque, NM 87104
Telephone: (505) 243-3500

LAW OFFICES OF DANIEL E. BECNEL, JR.
Daniel E. Becnel
106 West Seventh St., P.O. Drawer H
Reserve, LA 70084
Telephone: (985) 536-1186

E-SERVED
01/19/05
03:29 PM ET
Baycol MDL 1431

CLIMACO, LEFKOWITZ, PECA, WILCOX & GAROFOLI CO., L.P.A.
John R. Climaco
1226 Euclid Avenue, Suite 900
Cleveland, OH 44115-1891
Telephone: (216) 621-8484

SINGLETON LAW FIRM
W. James Singleton
4050 Linwood Ave.
Shreveport, LA 71108
Telephone: (318) 631-5200

CAULEY GELLER BOWMAN & COATES, LLP
Paul J. Geller
2255 Glades Road
Suite 421 Atrium
Boca Raton, FL 33431
Telephone: (561) 750-3000

*Plaintiffs' Steering Committee*