E-SERVED
02/02/05
05:52 PM ET
Baycol MDL 1431

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

---

In re BAYCOL PRODUCTS LITIGATION

MDL No. 1431
(MJD/JGL)

This Document Relates to:

ALL CASES

---

# BAYER AND GSK'S OPPOSITION TO PSC's (a) MOTION TO STAY ENFORCEMENT OF PTOs 114, 127 & 131; (b) MOTION TO IMPOSE A CASE-SPECIFIC EXPERT REPORTING REQUIREMENT UPON DEFENDANTS; AND (c) LATEST COMPREHENSIVE CASE MANAGEMENT PROPOSAL

Rather than keep its promise to narrow this MDL, the PSC now seeks to insulate no-injury cases from scrutiny by proposing that PTOs 114, 127 and 131 be stayed indefinitely. In place of these orders, the PSC proposes that the Court revisit class certification and consider other previously-rejected methods for placing a "value" on cases that could not withstand individual scrutiny.

The Court should deny plaintiffs' motion and, instead, move this litigation forward by enforcing the Court's carefully considered and painstakingly negotiated "narrowing" orders. Specifically, plaintiffs should be required to evaluate their cases and to file case-specific expert reports for the cases that remain. *See* PTOs 114 & 131. Having filed thousands of uninvestigated claims, plaintiffs should not now be heard to complain about the "burden" of sorting through their own case inventories. Instead, plaintiffs

E-SERVED 02/02/05 05:52 PM ET Baycol MDL 1431

should take this opportunity to fulfill their obligations by dismissing cases without evidentiary support.

Plaintiffs' recently-filed motion for class certification does not provide a basis for insulating individual cases from review; in fact, individual trials (and therefore individual discovery) would still be necessary under plaintiffs' (meritless) class plan. Pl. Mem. in Support of Class Cert. at 32-34. Moreover, plaintiffs should not be allowed to stall review of their cases in the name of securing additional "external case value data," Pl. Comprehensive Case Management Proposal ("Pl. Mgt. Proposal") at 3, when a long history of dismissals and defense verdicts demonstrates that most of these cases have no value. *The overriding issue in this litigation is not "valuation"; it is whether plaintiffs are willing to stand behind these cases after evaluating them. The first step in making that determination is enforcement of PTO 131.*

Plaintiffs' proposal to impose a parallel case-specific reporting requirement upon defendants also should be rejected. Defendants – unlike plaintiffs – cannot question plaintiffs or their physicians about their cases outside of the discovery process. Until case-specific discovery of plaintiffs and their physicians is conducted and until plaintiffs have submitted their final expert reports, defendants will not have the basic information necessary to serve case-specific expert reports on causation. In addition, defendants bear no burden of proof, and therefore are not required to submit expert reports – now or in the future – under applicable state law.

E-SERVED 02/02/05 05:52 PM ET Baycol MDL 1431

In sum, it is time to put the individual plaintiffs in this MDL to their proof. The first step in that process is enforcement of this Court's narrowing orders. Plaintiffs' motion for relief from those orders therefore should be denied.

## I. THIS COURT'S NARROWING ORDERS WERE ENTERED BECAUSE, AMONG OTHER REASONS, EXPERIENCE HAD SHOWN THAT FOCUS ON THE FACTS OF INDIVIDUAL CASES WOULD ADVANCE THIS LITIGATION.

In plaintiffs' revisionist history, PTOs 114, 127 and 131 were entered to facilitate a sweeping settlement of cases in this MDL. *See* Pl. Mgt. Proposal at 3 ("The purpose of [PTOs 114, 127 and 131] was to provide information to the parties thereby aiding case management and facilitating settlement"). Plaintiffs may have had their hopes, but defendants have never suggested – let alone agreed – that they would settle cases just because plaintiffs filed form reports.

In the PSC's tunnel vision focus on settlement, plaintiffs ignore the broader, stated purposes of these PTOs[1] and their provenance. These orders

---

[1] For instance, the preamble to PTO 114 identifies a number of judicial objectives:

> In order to promote the fair and efficient administration of this litigation and to comply with its continuing obligations as an MDL court, the Court has determined that it is necessary to: (1) supplement discovery procedures and deadlines for the parties, (b) identify, evaluate, and categorize the claims of those plaintiffs who have *and those who do not have* factually and legally sufficient support for their alleged claims and injuries or damages, (c) review available medical documents and submitted expert reports, (d) expand the pool of cases for potential trial in this MDL, (e) further develop an efficient and effective settlement and mediation program, and (f) prepare cases for the transfer back to transferor courts for trial. (Emphasis added.)

E-SERVED 02/02/05 05:52 PM ET Baycol MDL 1431

were proposed by plaintiffs, negotiated by the parties and the Court's officers, and entered by the Court because, among other reasons, the history of this litigation had shown this MDL to be burdened with thousands of cases that never should have been filed. Indeed, from the outset of this litigation, the parties and the Court have known that case-by-case review would be required to sort any wheat from the chaff.

The following chronology establishes two patterns pertinent to disposition of plaintiffs' present motion. First, thousands of plaintiffs – both in this MDL and in state court – have chosen to dismiss their claims (or allow their claims to be dismissed) when discovery deadlines have required them to examine the basis for their allegations. Second, plaintiffs' present motion is part of a continuing PSC pattern of first acknowledging the need to focus on case-specific evidence of injury and causation to manage these cases and then thwarting efforts actually to examine the facts of individual cases. Specifically:

- ***March 4, 2002:*** This Court enters PTO 4, which was jointly submitted by the parties. That order provides for case-specific discovery to be conducted in this MDL, starting in the spring of 2002 – prior to resolution of plaintiffs' first class certification motion. *See* PTO 4 § VI.F (depositions of plaintiffs and their physicians to begin in April and July, respectively; *id.* § IV.E. (plaintiffs' initial brief on class certification due by May 15, 2002).

- ***March 19, 2002:*** The Court enters PTO 10 which, with its successors, requires plaintiffs to respond to written discovery and establishes procedures for enforcing written discovery requirements.

  *Approximately 3,000 plaintiffs have chosen to dismiss their cases in the face of this written discovery requirement. The claims of an additional 3,126 plaintiffs who failed to comply have been dismissed by this Court with prejudice.*

E-SERVED 02/02/05 05:52 PM ET Baycol MDL 1431

- ***May 15, 2002:*** Plaintiffs move for class certification, conceding that injury and causation are individual issues that can only be resolved on a plaintiff-by-plaintiff basis. *See* Memorandum of Law in Support of Plaintiffs' Motion for Class Certification at 2 ("If Plaintiffs are successful on common issues [of liability and punitive damages], *individual issues such as individual causation and quantum of compensatory damages* can be litigated in follow-on trials in this or other courts." Emphasis added).

- ***February and March 2003:*** Defendants win the first two Baycol trials, *Haltom* and *Hardy*.

- ***Spring and Summer 2003:*** Defendants begin noticing the depositions of plaintiffs, pursuant to PTO 4 § VI.F. As plaintiffs begin dismissing cases, rather than appear for depositions, (a) defendants move for a *Lone Pine* order and (b) the PSC and Weitz & Luxenberg seek protective orders to block the depositions entirely. *See* Bayer and GSK's Motion for Entry of a Pretrial Order Requiring Plaintiffs to Produce Case-Specific Expert Reports on Injury and Causation, May 30, 2003; PSC's Motion for Protective Order, July 3, 2003; Weitz & Luxenberg Motion for Protective Order, July 1, 2003.

- ***July 18, 2003:*** The Court enters PTO 89, which establishes a pilot program pursuant to which 210 cases were slated for discovery. To date, 16 rhabdomyolysis cases in that pilot program have been settled and two non-rhabdomyolysis cases remain active. Plaintiffs have discontinued the other 192 cases, either prior to the commencement of discovery or once depositions had been scheduled or taken.

- ***July and August, 2003:*** The PSC moves for a protective order that would shield plaintiffs from producing fact sheets, documents, or authorizations for release of medical records. Plaintiffs withdraw the motion at 4 o'clock on the afternoon before a hearing scheduled before Judge Lebedoff. *See* PSC's Notice of Withdrawal (September 16, 2003).

- ***September 17, 2003***: This Court denies class certification, holding, among other things, that individual issues on injury, causation, the learned intermediary doctrine and comparative fault bar certification. *In re Baycol Prods. Litig.*, 218 F.R.D. 197, 205 (D. Minn. 2003).

- ***December 9, 2003:*** Defendants win the third Baycol trial, *Slaughter.*

- ***December 9, 2003:*** As a result of the experience with PTO 89, it becomes clear a docket management device is needed to winnow out cases lacking evidentiary support. Plaintiffs, in fact, propose negotiating a narrowing order, conceding that some cases pending in the MDL never should have been filed. *See* Tr. at 13 ("Mr. Zimmerman: [W]e have expanded the MDL to

E-SERVED 02/02/05 05:52 PM ET Baycol MDL 1431

22,900 cases and we will try to work to narrow it to what's really going to be at issue, and that is what we determine to be compensable muscle injury cases. And I think that's just our responsibility to everybody and to the Court, that we have what is really appropriate to be before the Court in terms of compensable cases. . . .")

- ***December 12, 2003:*** Days later, Judge Ackerman grants defendants' motion to enter a narrowing order in Philadelphia.

  *Of more than 4,000 Baycol cases filed in Philadelphia, 62 active cases remain pending (as a result of settlements of rhabdo cases, the narrowing order, case-specific discovery deadlines, and one trial).*

- ***February 25-26, 2004:*** After the parties have completed negotiations on the proposed narrowing order that became PTO 114, the PSC makes an eleventh hour request to abandon the negotiated order, which called for Rule 26(a)(2) case-specific expert reports, and to substitute form reports. Defendants object. *See* Exs. A and B. The Court enters an order similar to that negotiated by the parties. The PSC nevertheless develops and promotes use of a 2-page form report. Defendants lodge their first objections to the form report in correspondence with the special master in May 2004.

  *The claims of 3,745 plaintiffs have been or are being dismissed under PTO 114, either by stipulation or by Court order. (Eight rhabdo cases have been identified and settled. ) However, approximately 6,000 plaintiffs were never required to comply with the PTO 114 deadlines, either because of extensions granted by the Court or because of various Weitz motions pending before this Court.*

- ***July 8, 2004:*** The Court enters PTO 127, which provides for categorization of cases based on the presence or absence of certain evidence in plaintiffs' medical records.

- ***July to October 2004:*** After defendants move to compel with respect to form reports served under PTO 114 (July 8), the Court directs the parties to engage in new negotiations, which produce a proposal that forms the basis for PTO 131 (entered October 27). The order contains, among other things, deadlines for service of reports negotiated by the parties.

- ***November 23, 2004:*** Defendants win the fourth Baycol case tried, *Pauley*, which involved allegations of a serious muscle injury, an elevated test result, and discontinuation of Baycol therapy.

E-SERVED 02/02/05 05:52 PM ET Baycol MDL 1431

- ***January 25, 2005:*** Six days prior to the first deadline (January 31) under the newly-negotiated PTO 131, the PSC moves for relief from that order.

## II. THIS COURT'S NARROWING ORDERS WILL MOVE THIS LITIGATION FORWARD IN A COST-EFFECTIVE MANNER.

This Court has laid the groundwork for an efficient wrap-up of this litigation: (a) by encouraging plaintiffs' counsel, through the Court's narrowing orders (PTOs 114 and 131), to sort through their case inventories and to dismiss cases devoid of evidentiary support on injury and causation; (b) by emphasizing that discovery will be completed and cases trial-ready prior to remand; (c) by requiring *Daubert* motions to be filed in this MDL (PTO 120); and (d) by ordering pre-remand mediation of all cases (PTOs 51, 59, and 64). These orders will allow the parties to conclude most of this litigation in this MDL promptly and efficiently.

Plaintiffs now want the Court to abandon the narrowing process, on the ground that it unduly burdens plaintiffs. Pl. Stay Mem. at 4. Far from imposing an undue burden, however, the narrowing orders provide an efficient and necessary means of minimizing case-specific discovery costs.

The need for such a cost-effective way of managing case-specific discovery process was one of the lessons learned from the PTO 89 pilot program. After the Court selected 210 cases for that program, plaintiffs and the PSC spent time reviewing those cases and determined that only 94 warranted discovery. As the parties invested additional resources to collect medical records and work up the 94 cases, discontinuances continued to pour in. Defendants noticed the depositions of 96 fact witnesses (plaintiffs and

E-SERVED 02/02/05 05:52 PM ET Baycol MDL 1431

doctors). The parties then proceeded to meet with witnesses (for plaintiffs) and prepare deposition outlines (for defendants). Plaintiffs continued to drop their cases as this process went forward. Ultimately, 27 plaintiffs actually were deposed. Only two of the muscle ache cases from the pilot program remain active today. For the others cases, the parties invested hundreds of thousands of dollars in discovery in cases that plaintiffs abandoned.

Consequently, the premise underlying PTOs 114 and 131 is that it is more cost-effective for plaintiffs to examine their cases sooner, rather than later. Contrary to the objections of the PSC, this does not require the investment of vast sums in a meaningless reporting requirement. The necessary first step is for lawyers to examine their own cases (which they should have done in the first place) and determine whether dismissal is warranted. Only those cases that counsel believe to be worth pursuing or in which the client is not satisfied with his or her own lawyer's advice need be submitted for expert review.

Indeed, plaintiffs in this MDL have dismissed or will be dismissing 3,700 claims pursuant to their review under PTO 114. And a number of firms have contacted defendants to advise them that they intend to file PTO 131 reports in a select number of cases and to dismiss the rest of their inventories pursuant to PTO 114 and 131 procedures or by stipulation. In short, the narrowing process is working and should be allowed to go forward, as ordered by this Court.

E-SERVED 02/02/05 05:52 PM ET Baycol MDL 1431

Plaintiffs cannot invoke "transaction costs" to avoid screening the cases that make up counsels' inventories. The sort of "transaction costs" that the judicial system has attempted to minimize are the costs of delivering payment from one party to another when a legitimate debt is owed because there has been an injury and there is liability. However, the judicial system does not have a legitimate interest in relieving an uninjured plaintiff of the duty to respond to discovery. To the contrary, subjecting such cases to discovery – starting with PTO 131 case review – compels plaintiffs and their lawyers to evaluate their cases to distinguish between cognizable cases and those that never should have been filed.[2]

Contrary to plaintiffs' assertions, defendants do not seek to impose undue costs on plaintiffs. But defendants have expended millions of dollars in answering complaints, pursuing fact sheets, and collecting medical records in cases that plaintiffs filed without investigation. Plaintiffs' counsel – who have obtained many millions of dollars in fees from rhabdo cases settled to date –

---

[2] Implementation of PTO 127 has demonstrated that more than half of the cases categorized to date fall in the D category or below. In addition, a very high percentage of B and C category cases are "no-injury" claims. That is because the PTO 127 categories were designed to sort those cases in which plaintiffs might have some evidence that they experienced muscle aches from those cases based entirely on post-hoc assertions by plaintiffs. However, the categories do not address whether those symptoms could reasonably be characterized as an "injury," much less whether that putative injury could have been caused by Baycol or whether any liability might accrue. For instance, a plaintiff who had documented arthritis or myalgia predating the use of Baycol but who also mentioned these aches to his or her doctor while taking Baycol or immediately after discontinuing Baycol may fall within categories B or C, even though those ailments had no link to Baycol.

E-SERVED
02/02/05
05:52 PM ET
Baycol MDL 1431

should not be heard to complain about reviewing their cases and, in due course, responding to discovery in the small subset that warrant litigation.

## III. DEFENDANTS SHOULD NOT BE REQUIRED TO FILE COUNTERPARTS TO PLAINTIFFS' 131 REPORTS.

Before their current effort to evade PTO 131, plaintiffs had filed a motion asking the Court to impose on defendants the duty to file a case-specific report on injury and causation for each case in which plaintiffs file a PTO 131 report. That motion should be denied for three reasons.

First, unlike plaintiffs, defendants do not have access to plaintiffs, their prescribers, or their treating physicians. Defendants are barred from deposing these witnesses. *See* PTO 89. Therefore, unlike plaintiffs, defendants do not have access to the information to prepare a case-specific expert report.

Second, in PTO 114, this Court provided that plaintiffs could avoid the requirement of producing a case-specific expert report if they could show, under the law of their home states, that no such report would be required. *See* PTO 114 §1.F. No plaintiff asserting an injury claim could make this showing. *See* Order of June 10, 2004 (denying relief in *Edwin Ronwin*, No. 02-200, and other cases, and subsequent orders dated June 29, July 9, July 19, August 9, August 23, September 10 & October 19). However, defendants can make this showing as to every case, because defendants have no burden of proof. They can try these cases, as they did in the recent *Pauley* trial in Philadelphia, without calling any witnesses. Accordingly, there is no basis for imposing on defendants an early obligation to produce a case-specific expert report.

E-SERVED 02/02/05 05:52 PM ET Baycol MDL 1431

Third, plaintiffs ignore the litigation history that led to the entry of PTOs 114 and 131. Plaintiffs had filed thousands of cases and dismissed them in the face of written discovery requirements, under PTOs 10, 12, 16, 54 & 81, or under PTO 89 discovery obligations. *See supra*, Part I. The narrowing orders were designed, among other things, to encourage plaintiffs to review and dismiss their unsupportable cases. No such reasoning would support imposition of an early case-specific expert reporting requirement upon defendants.

As this litigation progresses, the Court will have the ability to order a case-specific discovery schedule that will include deadlines for completion of fact and Rule 26 expert discovery for both plaintiffs and defendants. Discussion of such a schedule should be deferred until the Court and the parties have information on the response rate under the first PTO 131 deadlines. This information will facilitate establishment of a rolling discovery schedule.

## IV. NEITHER PLAINTIFFS' NEW CLASS CERTIFICATION MOTION NOR ANY OF THE PSC'S OTHER CASE MANAGEMENT PROPOSALS PROVIDES A BASIS FOR ABANDONING THE COURT'S NARROWING ORDERS.

Plaintiffs recently have filed a new motion for class certification and yet another case management proposal, which plaintiffs propose the Court implement – individually or in combination – in the place of the Court's narrowing orders. The object of all of these proposals is to "value" plaintiffs' uninvestigated claims without focusing on their individual merits. Plaintiffs

E-SERVED 02/02/05 05:52 PM ET Baycol MDL 1431

ignore that a determination would need to be made in each instance whether each person suffered a Baycol-related injury. The only way to determine whether plaintiffs have any evidence of injury or causation is to focus on those cases individually.

**A. Plaintiffs' Retread Class Certification Motion Would Not Eliminate the Need for Case-Specific Discovery.**

Defendants will respond to the propriety of plaintiffs' recycled class certification motion in due course. For purposes of plaintiffs' motion to stay the Court's narrowing order, it is only necessary to note that plaintiffs again propose a class trial on discrete issues, to be followed by a series of individual trials for each member of the putative class. Pl. Class Cert. Mem. at 32-34. Accordingly, even if plaintiffs were allowed to pursue their class motion (which they should not be) and even if the motion were granted (which it should not be), case-specific discovery would still be required.

**B. This Court Should Not Remand Any Cases For Dispersed State Court Trials.**

Plaintiffs also propose immediate remand for trial of any cases in which plaintiffs stipulate that their damages will not meet the $75,000 threshold for jurisdiction. *See* Pl. Mgt. Proposal at 5. As a preliminary matter, plaintiffs fail to explain why a proposal to try cases should relieve them of basic discovery obligations; any case being readied for trial would be subject to full, case-specific discovery. In any event, the stipulations proposed by plaintiffs would not divest this Court of jurisdiction over such claims.

E-SERVED 02/02/05 05:52 PM ET Baycol MDL 1431

The United States Supreme Court has long held that "[e]vents occurring subsequent to the institution of suit which reduce the amount recoverable below the statutory limit do not oust [federal court] jurisdiction." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289-90 (1938); *Kirby v. American Soda Fountain Co.*, 194 U.S. 141, 145-46 (1904) ("it is the general rule that when the jurisdiction of a [federal] court of the United States has once attached it will not be ousted by subsequent change in the conditions.").

In *St. Paul*, the defendant removed a diversity case to federal court, and the plaintiff later reduced the amount of damages claimed to an amount below the jurisdictional minimum. The Supreme Court held that even if "the plaintiff after removal, by stipulation, by affidavit, or by amendment of his pleadings, reduces the claim below the requisite amount, this does not deprive the district court of jurisdiction." 303 U.S. at 292. Numerous Circuit courts have had occasion to address this issue and have followed this analysis. *See* Ex. C (summarizing the most pertinent cases from each Circuit on the subject).[3] Accordingly, the stipulations proposed by plaintiffs would not support remand of cases to state courts.

**C. Test-Case Trials and Summary Jury Trials Are Unnecessary.**

The PSC again proposes test-case or summary jury trials. *See* Pl. Mgt. Proposal at 6. The PSC asserts that such procedures would allow the

[3] *See also* 14C Charles Alan Wright *et al., Federal Practice & Procedure* § 3725 at 115 (3d ed. 1998) (citing "numerous cases" holding that "once a case that has been initiated in state court has been removed properly, subsequent events that reduce the amount recoverable, such as the plaintiff's amendment of the complaint, will not defeat the federal court's subject matter jurisdiction").

E-SERVED 02/02/05 05:52 PM ET Baycol MDL 1431

parties to "determine, on a relatively expeditious basis, which categories of claims, and which types of symptoms and side effects, have real world trial value." *Id.* The sincerity of the PSC's enthusiasm for test case trials is doubtful, given (a) the number of cases abandoned under PTO 89 and (b) the recent decision of PSC members to dismiss four cases set for trial on March 14 in Philadelphia.[4] In any event, this argument should be rejected for three reasons.

First, to date, there have been four Baycol trials, involving injuries ranging from rhabdomyolysis to different types of aches and pains, and involving a variety of plaintiffs who took differing dosages. In each of those cases, juries returned defense verdicts after hearing the facts of the plaintiffs' particular claims. As the plaintiffs themselves recognize, "the state courts [can be] a dispersed laboratory from which to develop a 'marketplace' of case values." *Id.* at 5. These verdicts, the numerous settlements to date and the routine dismissal of cases in this MDL when plaintiffs are unable to prove their claims all make it obvious that plaintiffs are well aware of their case values. Given this vast "real world" experience, test case or summary jury trials would be a waste of time and judicial resources.

Second, test cases or summary jury trials would be inappropriate at this stage of the litigation because discovery is not complete and these cases are not ready for trial, summary or not. *See* Thomas D. Lambros, *Handbook*

---

[4] The cases, *Woolsey*, *Nicholson*, *Morse*, and *Cannon* were filed in Pennsylvania state court due to lack of diversity by PSC members Roda & Nast and Zimmerman Reed.

E-SERVED 02/02/05 05:52 PM ET Baycol MDL 1431

*and Rules of the Court for Summary Jury Trial Proceedings*, 103 F.R.D. 461, Appendix B (1984) (case must be "in a state of trial readiness when called for Summary Jury Trial"). Defendants must, at a minimum, depose the plaintiffs, one or more of the plaintiffs' treating physicians, and plaintiffs' case-specific expert(s) in the remaining cases. PTO 131 lays the groundwork for such discovery. Without this discovery, summary jury trials would produce meaningless verdicts.

Finally, summary jury trials are useful in promoting settlement only when all parties support the procedure. *See* Manual for Complex Litigation (Third) § 23.152 ("Because of the time and expense involved, and because the process is less likely to be productive with unwilling parties, it is not advisable to hold an SJT without the parties' consent"). Here, the PSC seeks to impose upon defendants a process in which defendants do not want to participate. Therefore, implementation of the PSC plan would have no impact on a "real world" assessment of the values of their cases.

### D. Group Test-Case Trials Would Be Improper Because Individual Issues Of Fact And Law Predominate.

The PSC also proposes that this Court conduct a series of test trials containing "a sample of five to ten plaintiffs at a time." Pl. Mgt. Proposal. at 8. As the Court already recognized in denying class certification, individual issues of fact and law predominate in Baycol cases, making consolidation improper whether for a so-called "common questions" trial or a "group test case." *See Nieto v. Kapoor*, 210 F.R.D. 244, 249 (D.N.M. 2002) (rejecting consolidation because cases "not similar enough"); *Close v. American Honda*

E-SERVED 02/02/05 05:52 PM ET Baycol MDL 1431

*Motor Corp., Inc.*, 1994 U.S. Dist. LEXIS 17786, at *8 (D.N.H. Dec. 5, 1994) (refusing to consolidate four actions because individual issues predominated); *Scardino v. Amalgamated Bank*, 1994 U.S. Dist. LEXIS 10670, at *7 (E.D. Pa. Aug. 2, 1994) (common issues "not sufficiently predominant").

The factual scenarios of these cases are markedly different, involving plaintiffs who took different doses of Baycol, prescribed by different doctors, during different time periods, who all experienced different side effects, with different pre-existing conditions and different possible alternative causes for their alleged injuries. The issues of law are similarly individuated – each plaintiff's case must be tried according to the laws of his or her home state. *See* 218 F.R.D. 197, 207.[5] Furthermore, because the cases involve different issues of fact and law as well as the laws of different states, this Court would be required to overlay the evidentiary morass with complicated jury instructions.

Thus, grouping five to ten cases for trial would increase the likelihood that "the jury's verdict might not be based on the merits of the individual cases but could potentially be a product of cumulative confusion and prejudice." *Hasman v. G. D. Searle & Co.*, 106 F.R.D. 459, 461 (E.D. Mich. 1985); *see also King v. General Elec. Co.*, 960 F.2d 617, 627 (7th Cir. 1992)

---

[5] *See In re Consolidated Parlodel Litig.,* 182 F.R.D. 441, 445-47 (D.N.J. 1998) (benefits of consolidation "significantly reduced" when different state laws apply); *Close*, 1994 U.S. Dist. LEXIS 17786, at *7 (conflicting state laws weigh against consolidation); *cf. Castano v. American Tobacco Co.*, 84 F.3d 734, 742 n.15 (5th Cir. 1996) ("proliferation of disparate factual and legal issues is ompounded exponentially" when the law of multiple jurisdictions apply).

E-SERVED 02/02/05 05:52 PM ET Baycol MDL 1431

(consolidation resulted in a verdict based in part on "meager anecdotal evidence"); *Korren v. Eli Lilly & Co.*, 568 N.Y.S.2d 670, 672 (1990) (rejecting consolidation of pharmaceutical claims that would "tend to unfairly bolster the case against the defendants in an impermissibly prejudicial manner").

Indeed, the PSC's purpose for proposing group trials would seem to be creating a forum for demonizing defendants while inviting the jury to disregard case-specific factual distinctions that will be critical in determining both liability and damages. The prejudice engendered by the jury conflating the evidence relating to one claim with all of the claims makes a group trial improper. *See, e.g., Parlodel,* 182 F.R.D. at 445-47 ("admission of evidence of a misrepresentation by one sales person to one physician in a consolidated trial could significantly prejudice . . . [the] defense of other claims where no such evidence was admitted"); *Zacky Farms v. FMC Corp.*, 2001 U.S. Dist. LEXIS 24255, at *15 (E.D. Cal. Sept. 10, 2001) ("consolidated trial would force the parties to endure voluminous evidence . . . not pertinent to them"); *Flintkote Co. v. Allis-Chalmers Corp.*, 73 F.R.D. 463, 465 (S.D.N.Y. 1977) (consolidation would prejudice defendants and confuse jury by introducing "voluminous irrelevant evidence").

Moreover, the PSC's contention that virtually all of the discovery necessary to prepare for such trials is complete (Pl. Mgmt. Proposal at 8), is obviously wrong, given that the defendants have not yet had the discovery from the individual plaintiffs that they need to prepare these cases for trial.

E-SERVED 02/02/05 05:52 PM ET Baycol MDL 1431

**E. The PSC's Other Proposals Are Without Merit.**

In addition to the foregoing, plaintiffs propose other vague case management alternatives that will not advance the resolution of the cases pending in this MDL.

First, plaintiffs propose that defendants be required to outline categories of cases they consider compensable beyond rhabdomyolysis cases. But defendants' position on settlement is clear: they will only settle serious injury cases. Defendants certainly will not change their settlement position in response to a bid by plaintiffs to insulate no-injury cases from review and dismissal in this MDL.

Second, plaintiffs suggest the presentation of "science tutorials" to mediators. But this proposal puts the proverbial cart before the horse. The MDL docket must be narrowed and motion practice must go forward before consideration can be given to whether mediators might benefit from tutorials and, if so, on what issues.

Third, plaintiffs propose "a program for resolution of large blocks of cases." But defendants have repeatedly stated, and now reiterate, that they will not settle no-injury cases, which constitute the overwhelming majority of claims pending in this MDL.

Finally, the PSC proposes the remand to various federal district courts of the unresolved cases which plaintiffs value at more than $75,000 if this MDL proceeding is not resolved by September 1, 2005. But this Court has made plain that it does not intend to remand cases until they are ready for

E-SERVED 02/02/05 05:52 PM ET Baycol MDL 1431

trial. And that means plaintiffs must face up to their discovery obligations, starting with their duty to abide by the Court's PTO 131 narrowing order.

**CONCLUSION**

For the foregoing reasons, the Court should deny plaintiffs' motions to abandon its narrowing orders and to impose a case-specific expert reporting requirement upon defendants and should reject plaintiffs' comprehensive case management proposals. The way to move this MDL forward is to sort any wheat from the chaff among plaintiffs' filings. Enforcement of PTO 131 will advance that process.

*February 2, 2004*

Respectfully submitted,

Peter W. Sipkins (No.101540)
DORSEY & WHITNEY LLP
Suite 1500
50 South Sixth Street
Minneapolis, MN 55402
(612) 340-2600

Philip S. Beck
Adam Hoeflich
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60603
(312) 494-4400

/s/signature on file
Susan A. Weber
James W. Mizgala
SIDLEY AUSTIN BROWN & WOOD LLP
Bank One Plaza
10 South Dearborn Street
Chicago, IL 60603
(312) 853-7000

Tracy J. Van Steenburgh
HALLELAND LEWIS NILAN SIPKINS & JOHNSON, P.A.
220 South Sixth Street, Suite 600
Minneapolis, Minnesota 55402-4501
(612) 338-1838

/s/signature on file
Fred T. Magaziner
DECHERT LLP
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103
(215) 994-4000

*Counsel for SmithKline Beecham Corp. d/b/a GlaxoSmithKline*

E-SERVED
02/02/05
05:52 PM ET
Baycol MDL 1431

Gene C. Schaerr
SIDLEY AUSTIN BROWN & WOOD LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

Linda S. Peterson
Nitin Reddy
SIDLEY AUSTIN BROWN & WOOD LLP
555 West Fifth Street, 40th Floor
Los Angeles, CA 90013
(213) 896-6000

Richard K. Dandrea
ECKERT SEAMENS CHERIN & MELLOTT, LLC
USX Tower, 600 Grant St., 44th Floor
Pittsburgh, PA. 15219
(412) 566-6000

Douglas R. Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000

*Counsel for Bayer Corporation*

02/02/05
05:52 PM ET
Baycol MDL 14

CERTIFICATE OF SERVICE

I, David L. Barlett, certify that a true and correct copy of the foregoing Bayer and GSK's Opposition to PSC's Motion to Stay Enforcement of PTOs 114, 127 & 131; Motion to Impose a Case-Specific Expert Reporting Requirement Upon Defendants, and Latest Comprehensive Case Management Proposal was electronically served to counsel of record via Verilaw on February 2, 2005.

David L. Barlett