E-SERVED
02/14/05
05:13 PM ET
Baycol MDL 1431

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

**In re: BAYCOL PRODUCTS LIABILITY LITIGATION** — **MDL No. 1431 (MJD/JGL)**

**This Document Relates to:**
***ALL CASES***

**BAYER AG'S REPLY IN SUPPORT OF ITS MOTION FOR A PROTECTIVE ORDER PRECLUDING DEPOSITIONS OF BAYER AG'S TOP EXECUTIVES**

Bayer AG ("Bayer") respectfully submits this reply in support of its motion for a protective order precluding the depositions of Werner Wenning and Dr. Manfred Schneider, Bayer AG's most senior officers ("Motion"). The Plaintiffs' Steering Committee ("PSC") has not made the showing required to justify its request to depose these two men, and its brief in opposition to Bayer's Motion ("Opp.") does not counter Bayer's showing that the requested depositions would be unreasonably burdensome.

The PSC does not seriously dispute the governing legal standard: a party seeking to depose senior executives must show that the proposed deponents have "some unique knowledge pertinent to the issues in this case" and the requesting party cannot "obtain the same information through a less intrusive means." *Cardenas* v. *Prudential Ins. Co. of Am.*, No. Civ. 99-1421, 2003 WL 21293757, at *1 (D. Minn. May 16, 2003). Instead, the PSC contends that it can satisfy the *Cardenas* standard—that it can show "that unique information will be obtained from these witnesses." Opp. at 1. But the PSC makes no such showing. The PSC asserts only that Bayer AG's Board of Management, of

E-SERVED
02/14/05
05:13 PM ET
Baycol MDL 1431

which Dr. Schneider was the chairman and Mr. Wenning a member, made the final decision to withdraw Baycol from the U.S. and other markets.[1]

That is true (and consistent with the declarations in support of Bayer's Motion) but irrelevant. A deposition of a top executive cannot be justified merely by showing that the executive possesses unique decision-making *authority*. Indeed, that would turn the rule in *Cardenas* on its head. It goes without saying that top corporate officers possess unique authority. The case law requires the requesting party to show that the proposed deponent possesses unique *knowledge* of *facts* relevant to the litigation. *Salter* v. *Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979) (affirming order barring deposition of Upjohn's president pending depositions of lower-level employees who may have "more knowledge of the facts" pertinent to the case); *Cardenas*, 2003 WL 21293757 at *1 (denying request to depose Prudential executives because plaintiffs had not shown the executives had "unique knowledge pertinent to the issues in the case"). As this Court has explained, "unique knowledge" means, at a minimum, knowledge of "information that could not be obtained from lower level employees or other sources." *Id.* at 2. And the PSC has utterly failed to establish that Mr. Wenning or Dr. Schneider possesses such knowledge.

## I. THE DEPOSITIONS CITED BY THE PSC PROVIDE NO BASIS FOR CONCLUDING THAT MR. WENNING OR DR. SCHNEIDER POSSESSES THE "UNIQUE KNOWLEDGE" REQUIRED TO JUSTIFY A DEPOSITION.

The PSC cites the depositions of five Bayer AG and Bayer Corporation executives, purportedly as evidence of its need for Mr. Wenning's and Dr. Schneider's testimony. Opp. at 5-11. But not one of the proffered excerpts suggests that Mr. Wenning or Dr.

[1] The PSC evidently has abandoned its prior position (*see* Motion at 9-10) that it required Mr. Wenning's and Dr. Schneider's testimony on the issue of corporate control.

E-SERVED 02/14/05 05:13 PM ET Baycol MDL 1431

Schneider has unique knowledge of relevant facts. On the contrary, to the extent they are relevant at all, the cited depositions reinforce Bayer's showing that what relevant information Mr. Wenning and Dr. Schneider could provide can be obtained—and has been obtained—from other Bayer personnel.

1. *Ernst Weidmann*. The PSC quotes the testimony of Dr. Weidmann (Bayer AG's head of global drug safety) that the final decision to withdraw Baycol from the market was referred to, and formally made by, the Board of Management. *See* Opp. at 5. But that, of course, does not establish that the members of the Board of Management—and in particular Mr. Wenning and Dr. Schneider—possess any unique knowledge of pertinent facts.

Moreover, Dr. Weidmann's deposition itself establishes that others who have already been deposed in this litigation were deeply involved in the decision to withdraw Baycol from the market. For example, when asked who "participated in that decision," Dr. Weidmann responded:

> I think it is clear that it is not just the head of drug safety that would take the decision to withdraw a product from the market on his own and alone, but this is a decision which is taken *by the management of the Pharma Division*, and when we took the decision, there was the involvement of Dr. Ebsworth [then the head of Bayer AG's pharmaceutical division], Dr. Tim Shannon [then Global Medical Director of Bayer AG], and the head of our legal department.

Deposition of Ernst Weidmann (April 2, 2003) at 25:22–26:7 (emphasis added); *see also id*. at 27:8-13 (describing a teleconference in which the withdrawal decision was discussed) ("It must have been Dr. Ebsworth, Dr. Shannon, Dr. Buchmeier from the legal department, also an attorney from the American subsidiary, Baycorp. Those were the most important participants."). That is, Dr. Weidmann testified that the withdrawal

E-SERVED
02/14/05
05:13 PM ET
Baycol MDL 1431

decision was made in the first instance by the management of the Pharmaceutical Division, including in particular Dr. Ebsworth, Dr. Shannon, and Dr. Weidmann, and that they formulated the recommendation and passed it along to the Board of Management. Dr. Weidmann's testimony provides no basis for concluding that Mr. Wenning or Dr. Schneider has any unique knowledge that would justify a deposition.

2. *David Ebsworth*. The same is true of Dr. Ebsworth's testimony. He testified in detail about the exhaustive deliberations within Bayer AG's Pharmaceutical Division during the first week of August 2001, which culminated in the decision to recommend the withdrawal of Baycol from the U.S. and other markets. *See* Deposition of David Raymond Ebsworth (May 19, 2003) at 273:24–275:22. That decision, after it had been fully vetted within the Pharmaceutical Division, was referred to the Board of Management "on August the 7th in the morning. And the Board of Management approved, that we then implemented with an announcement to physicians and to the general marketplace early on August the 8th." *Id*. at 275:23–276:3.

Here again, this testimony provides no basis for concluding that Mr. Wenning, Dr. Schneider, or any other member of the Board of Management has knowledge about the withdrawal that is not shared by Dr. Ebsworth and others in the Pharma Division. The testimony thus provides no basis for a deposition.

3. *Gerald Rosenberg*. The excerpt from Mr. Rosenberg's deposition (Opp. at 6-7) likewise provides no basis for deposing Mr. Wenning or Dr. Schneider. That testimony has nothing to do with the withdrawal of Baycol from the market, and does not even mention the Board of Management. The quoted passage has to do with the decision in 1995 (before Mr. Wenning joined the Board of Management) to develop and

E-SERVED
02/14/05
05:13 PM ET
Baycol MDL 1431

market Baycol in a 0.4 mg dosage. And Mr. Rosenberg's testimony is unequivocal that that decision was made within the Pharmaceutical Division:

> A. [O]ur senior management . . . said, we're going to develop this drug.
>
> Q. Senior management being whom?
>
> A. It was probably mostly Dr. Meyer — Professor Meyer, . . . who was the head of the Pharmaceutical Division World-wide, and Professor Meyer and other senior management in Germany said, we know what you're saying, but we disagree with you. . . . We want you do develop this, and, you know, it's — they are the bosses, so we agreed to go through the development.
>
> Q. So they could override a decision not to do it made by you or Dr. Posner?
>
> A. Absolutely . . . They were our — they were subsequent — ultimate bosses.

Deposition of Gerald B. Rosenberg (Jan. 8, 2003) at 182:11–183:1.[2]

4. *Frank Armstrong*. The PSC's lengthy excerpt from Dr. Armstrong's deposition (Opp. at 7-9) also has nothing to do with the Board of Management. It concerns instead Baycol-related decisions made by the Management Committee of the Pharma Division, and the financial importance of Baycol to Bayer.

5. *Joachim Ippen*. The excerpt from Dr. Ippen's deposition (Opp. at 9-10) likewise provides no basis for deposing Mr. Wenning or Dr. Schneider. That excerpt consists of an exchange between Dr. Ippen and PSC lawyer Danny Becnel about the circumstances of Dr. Schneider's retirement as Chairman of Bayer AG's Board of Management and assumption of the chairmanship of the Supervisory Board; Dr. Ippen testified that it

---

[2] Mr. Rosenberg's reference to "senior management" in this passage "was a reference to senior management of Bayer AG's Pharmaceutical Business Group, not to Bayer AG's Board of Management." Declaration of Gerald Rosenberg ¶ 4 (Exhibit A hereto). As Mr. Rosenberg attests, "the decision to market the 0.4 mg dose of Baycol was made by Bayer AG's Pharmaceutical Business Group, not by the Board of Management." *Id*.

E-SERVED 02/14/05 05:13 PM ET Baycol MDL 1431

was a routine retirement and had nothing to do with Baycol. There is no mention (aside from Mr. Becnel's insinuations) of Baycol's withdrawal from the market or of the Board of Management's level of involvement in that decision.

In sum, it is absurd to say that these witnesses "passed the buck" to Mr. Wenning and Dr. Schneider (Opp. at 1), or that their deposition testimony evidenced a "lack of personal knowledge" (*id.*) relating to Baycol's withdrawal from the market. Far from passing the buck or disclaiming knowledge, these witnesses fully recounted the deliberations surrounding the withdrawal decision; and they ascribed responsibility for the main deliberations and the recommendation to withdraw Baycol, not to the Board of Management on which Mr. Wenning and Dr. Schneider sat, but to their own division of Bayer, the Pharmaceutical Division.

Moreover, as Bayer explained in its Motion (at 6-9), the Bayer AG executives most intimately familiar with the withdrawal of Baycol from the market have already been deposed at great length. These include two men who have headed both the worldwide and North American Pharmaceutical Divisions—Dr. Ebsworth and Dr. Wolfgang Plischke—as well as the head of pharmaceutical development during the period Baycol was marketed (Dr. Armstrong), Bayer's Global Medical Director (Dr. Timothy Shannon), the head of global drug safety (Dr. Weidmann), and several other witnesses previously identified by Bayer. *See* Motion at 7-8.

## II. THE CASES CITED BY THE PSC CONFIRM THE IMPROPRIETY OF ITS REQUEST.

A comparison with the authorities cited by the PSC (Opp. at 11) also underscores the impropriety of the requested depositions under the standard applied by this Court in

E-SERVED 02/14/05 05:13 PM ET Baycol MDL 1431

*Cardenas*.[3] For example, *General Star Indemnity Co.* v. *Platinum Indemnity Ltd.*, 210 F.R.D. 80 (S.D.N.Y. 2002), concerned an event referred to as "the Unicover situation" and a set of internal company guidelines (the "MGA guidelines") issued by General Re-insurance (General Star's parent company). One of the defendants, Bank of America, sought to depose the president of General Re, but conditionally accepted as a substitute deponent a lower-level executive of General Re named Roberts. *Id.* at 81. Roberts, however, "admitted numerous times during his deposition that he did not have knowledge concerning either the Unicover incident or the reasons behind the issuance of the MGA guidelines." *Id.* at 83 (citation omitted). "He also testified that *the only people* within General Re who dealt with the Unicover situation *were top executives*." *Id.* at 82 (emphasis added). Furthermore, it was disclosed that General Re's president, as well as

---

3 There is no merit to the PSC's oblique suggestion (Opp. at 2, 13) that the rule applied in *Cardenas* is limited to slip-and-fall type cases. In *Salter*, which this Court followed in *Cardenas*, the plaintiff (like the PSC here) sought testimony about "the manufacture, approval and marketing" of a prescription drug. 593 F.2d at 600. Yet the requested deposition of Upjohn's president was *disallowed* pending proof that the same information could not be obtained from other sources. *Id.* at 651-52. Similarly, *Baine* v. *General Motors Corp.*, 141 F.R.D. 332 (M.D. Ala. 1991) (also cited in *Cardenas*) involved a company-wide memo relating to an automobile safety feature—a matter that obviously had ramifications beyond the particulars of the litigation. Yet the court precluded the deposition of the memo's author, a vice president of GM, because the plaintiffs had failed to establish that the information sought could not be obtained from other sources, such as interrogatories or depositions of lower-level employees. *Id.* at 335.

Nor is there any merit to the suggestion (Opp. at 13) that the principal concern underlying the *Cardenas* standard is the practice of "'jump[ing] to the top witness' at the beginning of the litigation." Several federal decisions have denied "apex" depositions where, as here, the opposing lawyers (appropriately) began with lower-level employees. *See, e.g.*, *Evans* v. *Allstate Ins. Co.*, No. 02-CV-935-H(J), 2003 WL 21382474 (N.D. Okla. June 13, 2003); *Harris* v. *Computer Assocs. Int'l, Inc.*, 204 F.R.D. 44 (E.D.N.Y. 2001). *Cardenas* and other such cases do not turn on what discovery has already been taken, but simply on whether the requested depositions are reasonably justified. The issue is not, as the PSC seems to suggest, whether the requesting party has jumped through enough hoops to earn a shot at the top officers, but whether depositions of the top officers can be expected to provide information not obtainable by other means.

E-SERVED 02/14/05 05:13 PM ET Baycol MDL 1431

a former CEO, had written policy memoranda pertaining directly to the corporate guidelines that were in issue, and Roberts testified that he knew nothing about that memo or what prompted it. *Id.* Given Roberts's lack of personal knowledge and the evidence of the senior executives' direct involvement in the matters underlying the lawsuit, the court allowed Bank of America to depose those executives. *Id.* at 84. Here, by contrast, the evidence clearly shows that Mr. Wenning and Dr. Schneider do *not* have unique knowledge of the matters the PSC wishes to explore.

*Travelers Rental Co.* v. *Ford Motor Co.*, 116 F.R.D. 140 (D. Mass. 1987), likewise supports Bayer's position. There, the plaintiff alleged collusion between Ford and the plaintiff's competitors, Hertz and Avis, in connection with disposal of rental car fleets. *Id.* at 141-42. The plaintiff sought to depose Ford's president and three other senior officers. *Id.* at 141. In support of its request, the plaintiff presented evidence that the proposed deponents had direct, hands-on involvement in the relevant aspects of Ford's relationship with Hertz: one had authored a memo about "our special proposal to Hertz" and was assigned responsibilities relating to the fleet disposal programs; one "was the representative of Ford who made the decision to proceed with the 1982 program"; another "was significantly involved in the administration and implementation of [a key] portion of the 1981 program"; and the fourth had conducted a comprehensive review of Ford's fleet disposal programs. *Id.* at 142-43. On this record, the plaintiff was permitted to depose the executives regarding corporate actions in which they had direct personal involvement—and therefore unique knowledge. *Id.* at 145-46.

Similarly, in *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 205 F.R.D. 535 (S.D. Ind. 2002), the plaintiffs were allowed to depose Ford's CEO only after producing "evidence that Mr. Ford has referred to his *personal knowledge* of and in-

E-SERVED 02/14/05 05:13 PM ET Baycol MDL 1431

volvement in certain relevant matters, including the Firestone tire recall, Explorer safety issues, and Ford's response to the tire and Explorer issues." *Id*. at 536 (emphasis added). That evidence included several public statements by the CEO affirming that he had personally "been involved every step of the way" in the matters underlying the litigation. *See In re Bridgestone/Firestone*, Plaintiffs' Response to Ford Motor Company's Objections to Magistrate Judge's Order Compelling Deposition of William Clay Ford Jr., at 5-9 (detailing CEO's public statements) (Exh. B hereto). In this litigation, Mr. Wenning and Dr. Schneider, far from thus proclaiming their hands-on involvement with the matters in issue, have submitted declarations disclaiming such close involvement. And the PSC has provided no evidence disputing that conclusion or, indeed, providing any other basis for their assertion of unique knowledge on their part.[4]

In each of these cases, the party seeking to depose senior corporate officers presented record evidence of the officers' unique personal knowledge of and involvement in matters relevant to the lawsuit. And the courts allowed the depositions after concluding that the proposed deponents could supply information not available from other sources.

---

[4] *Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, 203 F.R.D. 98 (S.D.N.Y. 2001), likewise supports Bayer's position. That case involved allegations of antitrust violations in connection with Sony's acquisition of the Loews and Cineplex movie chains. In support of its request to depose Sony's CEO, the plaintiff proffered detailed evidence of the CEO's unique personal knowledge of the issues in dispute. For example, there was evidence the CEO had extensive knowledge of a pricing arrangement between Sony and Loews that was relevant to the plaintiff's claims; was present at a board meeting in which key issues were discussed; took part in meetings of the acquired companies' governing bodies prior to the mergers; and had substantial involvement in the planning for both mergers, including overruling other executives' decisions. *See id*. at 103. There was also "ample evidence of [the CEO's] *hands-on involvement* in various aspects of the Loews-Cineplex merger, including some indication that he was aware that the merger was taking place in the context of an increasingly concentrated film exhibition industry." *Id*. at 104 (emphasis added). Given all of this, the court concluded that the plaintiff had presented "evidence sufficient for this Court to infer that [the CEO] has some unique knowledge on a number of relevant issues." *Id*. at 106. Here, by contrast, the PSC has failed to establish any unique knowledge.

E-SERVED 02/14/05 05:13 PM ET Baycol MDL 1431

Here, the PSC has not shown such close involvement by members of the Board of Management. Rather, as the PSC's own deposition excerpts confirm, the substantive deliberations leading up to the recommendation to withdraw Baycol from the market took place within the Pharma Division, not the Board of Management; and the information on which the withdrawal decision was based came from the Pharma Division. The Board approved the recommendation and made the official decision, but Board members had nothing approaching the level of involvement found in *General Star*, *Travelers*, *Bridgestone/Firestone*, and other cases where "apex" depositions were allowed. Instead, all of the significant decisions and actions leading up to the withdrawal were consigned to their trusted senior managers—all of whom have been deposed in this litigation. The PSC has no legitimate need to take the depositions of Mr. Wenning and Dr. Schneider. This is bald harassment and should not be allowed.

## III. EVEN IF THE PSC HAD A LEGITIMATE NEED FOR INFORMATION FROM MR. WENNING AND DR. SCHNEIDER, IT SHOULD BE OBTAINED THROUGH LESS INTRUSIVE DISCOVERY METHODS.

In the alternative, should this Court conclude that the PSC has a legitimate need for information from Mr. Wenning and Dr. Schneider, the Court should direct the PSC to employ less burdensome methods to solicit that information in the first instance. For example, the PSC could secure any information it claims to need from Mr. Wenning and Dr. Schneider by means of interrogatories or requests for admission. Other federal courts have taken this sensible approach in similar cases. *See, e.g.*, *Baine* v. *General Motors Corp.*, 141 F.R.D. 332, 335 (M.D. Ala. 1991) (denying request to depose a GM vice president where the plaintiff had not established that the same information could not be obtained through other depositions or interrogatories); *Mulvey* v. *Chrysler Corp.*, 106 F.R.D. 364, 366 (D.R.I. 1985) (denying request to depose Chrysler's chair-

E-SERVED 02/14/05 05:13 PM ET Baycol MDL 1431

man and holding that "an orderly discovery process will be best served by resorting to interrogatories at this time, without prejudice to a subsequent oral deposition if the answers to the interrogatories so warrant"); *Community Fed. Sav. & Loan Ass'n* v. *FHLBB*, 96 F.R.D. 619 (D.D.C. 1983) (denying requested to depose high-level agency administrators absent a showing that interrogatories or other depositions would not yield the same information). This Court should do the same in the unlikely event it decides that Mr. Wenning and Dr. Schneider have something to add to the wealth of discovery already provided in this litigation.

## CONCLUSION

Bayer AG respectfully requests that this Court enter a protective order precluding plaintiffs from deposing Mr. Wenning and Dr. Schneider.

E-SERVED
02/14/05
05:13 PM ET
Baycol MDL 1431

February 14, 2005

Respectfully submitted,

/signature on file/

Peter W. Sipkins (#101540)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
(612) 340-2600

Philip S. Beck
Adam Hoeflich
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60603
(312) 494-4400

Susan A. Weber
Eugene A. Schoon
SIDLEY AUSTIN BROWN & WOOD LLP
Bank One Plaza
10 South Dearborn Street
Chicago, IL 60603
(312) 853-7000

Paul J. Zidlicky
Richard H. Menard Jr.
SIDLEY AUSTIN BROWN & WOOD LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

Richard K. Dandrea
ECKERT SEAMENS CHERIN & MELLOTT, LLC
USX Tower, 600 Grant St., 44th Floor
Pittsburgh, PA. 15219
(412) 566-6000

Douglas R. Marvin
Paul K. Dueffert
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC 20005-5901
(202) 434-5000

*Counsel for Bayer AG*

02/14/05
05:13 PM ET
Baycol MDL 14

CERTIFICATE OF SERVICE

I, David L. Barlett, certify that a true and correct copy of the foregoing Bayer AG's Reply In Support Of Its Motion For A Protective Order Precluding Depositions Of Bayer Ag's Top Executives was filed and served via Verilaw on February 14, 2005.

______________________________