E-SERVED
02/14/05
05:13 PM ET
Baycol MDL 1431

# Exhibit A

02/14/05
05:13 PM ET
Baycol MDL 14

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

**In re: BAYCOL PRODUCTS LIABILITY LITIGATION**

MDL No. 1431 (MJD/JGL)

**This Document Relates to:**
***ALL CASES***

**DECLARATION OF GERALD ROSENBERG**

I, Gerald Rosenberg, declare the following under penalty of perjury:

1. I have been employed by Bayer Corporation since July 1971. I am currently the Senior Vice President Executive Development.

2. I was deposed in the Baycol Multidistrict Litigation on January 8-9, 2003.

3. During my January 2003 deposition, I was questioned about the decision to develop and market the 0.4 mg of Baycol beginning in 1995. I testified that, to my knowledge, that decision had been made chiefly by Dr. Horst Meyer, who in 1995 was the head of Bayer AG's Pharmaceutical Division Worldwide, "and other senior management in Germany." *See* Deposition of Gerald Rosenberg (Jan. 8, 2003) at 182:11-20.

4. My reference in that context to "senior management in Germany" was a reference to senior management of Bayer AG's Pharmaceutical Business Group, not to Bayer AG's Board of Management. To my knowledge, the decision to market the 0.4 mg dose of Baycol was made by Bayer AG's Pharmaceutical Business Group, not by the Board of Management.

02/14/05
05:13 PM ET
Baycol MDL 14

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on February 8, 2005

Gerald Rosenberg

02/14/05
05:13 PM ET
Baycol MDL 1431

# ACKNOWLEDGMENT

**State of Connecticut** )
) **SS** West Haven, CT
**County of New Haven** )

On this the 8th day of February, 2005, before me, the undersigned, personally appeared **Gerald Rosenberg**, known to me to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purpose therein contained.

In Witness whereof, I hereunto set my hand and official seals.

Elaine Porter
Notary Public

**Elaine Porter**
*Notary Public*
My Commission Expires June 30, 2006

E-SERVED
02/14/05
05:13 PM ET
Baycol MDL 1431

# Exhibit B

E-SERVED 02/14/05 05:13 PM ET Baycol MDL 1431

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| In re: BRIDGESTONE/FIRESTONE, INC., ATX, ATX II AND WILDERNESS TIRES PRODUCTS LIABILITY LITIGATION | : | Master File No. IP 00-9373-C-B/S<br>MDL No. 1373<br>(centralized before the Honorable Sarah Evans Barker) |
| THIS DOCUMENT RELATES TO THE CLASS ACTION MASTER COMPLAINT | : | |

**PLAINTIFFS' RESPONSE TO FORD MOTOR COMPANY'S OBJECTIONS TO MAGISTRATE JUDGE'S ORDER COMPELLING THE DEPOSITION OF WILLIAM CLAY FORD JR.**

## I. INTRODUCTION

This Court should reject the objections of Defendant Ford Motor Company ("FMC") to Magistrate Judge Shields's order compelling the deposition of William Clay Ford Jr. Plaintiffs have established a sufficient likelihood that Mr. Ford has unique personal knowledge relevant to this case. Thus, there is nothing "clearly erroneous" or "contrary to law" about letting Plaintiffs seek that knowledge through Mr. Ford's deposition.

## II. STANDARD OF REVIEW

FMC parrots the applicable standard for reviewing Magistrate Judge Shields's order: The order should be upheld unless "clearly erroneous" or "contrary to law," 28 U.S.C. § 636(b)(1)(A), Fed. R. Civ. P. 72(a). FMC fails, however, to explain that this standard requires considerable deference to the Magistrate Judge's assessment of the parties' factual showings. "[R]eview under the 'clearly erroneous' standard is significantly deferential, requiring a 'definite and firm conviction that a mistake has been committed." Concrete Pipe & Prods. v. Construction Laborers Pension Trust, 508 U.S. 602, 623 (1993). "Ordinarily, under clearly

E-SERVED
02/14/05
05:13 PM ET
Baycol MDL 1431

erroneous review, if there are two permissible views, the reviewing court should not overturn the decision solely because it would have chosen the other view." American Motors Corp. v. Great American Surplus Lines Insurance Co., No. 87 C 2496, 1988 U.S. Dist. LEXIS 173, at *4 (N.D. Ill. Jan. 5, 1988) (upholding magistrate judge's discovery orders with minor corrections); see also Anderson v. Bessemer City, 470 U.S. 564, 573-74 (1985) ("This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. . . . Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

Furthermore, this Court should review the Magistrate Judge's order in light of the policy of liberal discovery embodied in the Federal Rules of Civil Procedure. See Stout v. Illinois Farmers Ins. Co., 150 F.R.D. 594, 602 (S.D. Ind. 1993) ("[A]ny doubts, ambiguities, uncertainties, or silences as to the scope of the work product Rule should be resolved in favor of the Rules' overall policy of liberal discovery."); SEC v. National Student Marketing Corp., 18 Fed. R. Serv. 2d 1302, 1974 U.S. Dist. LEXIS 7910, at *24 (D.D.C. 1974) ("In attempting to comport with the spirit of the new discovery rules, any and all close questions and reasonable doubts raised throughout these motions have been resolved in favor of requiring discovery.").

## III. CONTRARY TO FMC'S SUGGESTION, NO ABSOLUTE RULE BARS PLAINTIFFS FROM DEPOSING MR. FORD NOW.

FMC incorrectly suggests that some absolute rule bars Plaintiffs from deposing Mr. Ford until they seek discovery from all other sources first. Whether restrictions should be placed on the deposition of a high-ranking corporate official must be decided under the particular circumstances of the case. "When a witness has personal knowledge of facts relevant to the lawsuit, even a corporate president is subject to deposition. Further, the general rule provides that a claimed lack of knowledge does not provide sufficient grounds for a protective order."

E-SERVED 02/14/05 05:13 PM ET Baycol MDL 1431

Digital Equip. Corp. v. System Indus., 108 F.R.D. 742, 744 (D. Mass. 1986) (citation omitted); see also Alexander v. FBI, 186 F.R.D. 60, 64 (D.D.C. 1998) (denying motion to quash subpoena) ("A professed lack of knowledge typically does not constitute good cause and is insufficient to warrant the quashing of a deposition."); Naftchi v. New York Univ. Med. Ctr., 172 F.R.D. 130, 132 (S.D.N.Y. 1997) (denying protective order barring deposition) ("Nor, in ordinary circumstances, does it matter that the proposed witness is a busy person or professes lack of knowledge of the matters at issue, as the party seeking the discovery is entitled to test the asserted lack of knowledge.").

As the court observed in Steadfast Insurance Co. v. Auto Marketing Network, Inc., No. 97 C 5696, 1999 U.S. Dist. LEXIS 6897, (N.D. Ill. Apr. 29, 1999), however, "an exception [to the general rules] has sometimes been made where the deponent is a very senior corporate officer . . . ," id. at *4, and where there is a sufficient showing of the deponent's lack of knowledge and the burden that would be imposed by the deposition, see id. at *5. The burden of proving lack of knowledge falls on the party opposing the deposition. The party seeking the deposition has no burden to prove the deponent has relevant information. See Speakmark, Inc. v. Federated Dep't Stores, Inc., 176 F.R.D. 116, 118 (S.D.N.Y. 1997) (refusing to stop deposition of company's chairman and chief executive officer because [A]n order barring a litigant from taking a deposition is most extraordinary relief. It is the party seeking such an order that bears the burden of proving that the proposed deponent has nothing to contribute.") (citation omitted). In denying the requested protective order in Steadfast Ins. Co., the court observed that "Steadfast has offered no affidavit from [Steadfast affiliate president] Mr. Amore attesting to a lack of knowledge and burden that would be imposed by the deposition . . . ". 1999 U.S. Dist. LEXIS 6897, at *5.

E-SERVED 02/14/05 05:13 PM ET Baycol MDL 1431

FMC argues against Mr. Ford's deposition here by likening this case to a personal-injury, discrimination, or other individual suit in which the plaintiff wants to depose a senior corporate officer who lacks particular knowledge about the product or conduct at issue. For instance, FMC cites Thomas v. IBM, 48 F.3d 478, 482-83 (10th Cir. 1995) (individual employment discrimination case); Salter v. Upjohn Co., 593 F.2d 649, 651 (5th Cir. 1979) (individual case alleging inadequate testing and labeling of drug); Consolidated Rail Corp. v. Primary Industries Corp., No. 92 Civ. 4927 (PNL), 1993 U.S. Dist. LEXIS 12600 (S.D.N.Y. Sept. 10, 1993) (action by railroad seeking freight charges from coal producer); Baine v. General Motors Corp., 141 F.R.D. 332, 335-36 (M.D. Ala. 1991) (individual personal-injury case); Mulvey v. Chrysler Corp., 106 F.R.D. 364 (D.R.I. 1985) (individual personal-injury case); Hughes v. General Motors Corp., 18 Fed. R. Serv. 2d (Callaghan) 1249 (S.D.N.Y. 1974) (individual case involving plaintiff's vehicle); and Liberty Mutual Insurance Co. v. Superior Court, 13 Cal. Rptr. 2d 363 (Ct. App. 1992) (individual case alleging insurer defrauded and intentionally inflicted emotional distress on insured). Under such circumstances, it is reasonable to conclude that useful testimony is more likely to be obtained from the company personnel more directly involved, such as the engineers who designed the allegedly defective product or the managers who evaluated or took action against the employee.[1]

[1] FMC inaccurately describes Lewelling v. Farmers Insurance, 879 F.2d 212 (6th Cir. 1989), and First Fidelity Bancorporation v. National Union Fire Insurance Co., Civil No. 90-1866, 1992 U.S. Dist. LEXIS 3367 (E.D. Pa. Mar. 5, 1992). In Lewelling, the district court granted the request for a protective order based on defendant's assertion that the deponent had no relevant knowledge and plaintiffs' earlier promise "that they would cancel the deposition requests if [the deponent] . . . would agree to meet with plaintiffs regarding possible settlement of their action." 879 F.2d at 218. In First Fidelity, the district court ordered plaintiff to depose lower-level employees before deposing senior officers, but did not require plaintiff to prove the inadequacy of the testimony of the lower-level employees as a condition to deposing the senior officers. Instead, the court left it to plaintiff's discretion whether to proceed. See 1992 U.S. Dist. LEXIS 3367, at *15 ("If, after taking the other depositions FIRG is still not satisfied and still feels that it needs the testimony of Maurice and Jeffrey Greenberg, FIRG may then schedule

E-SERVED 02/14/05 05:13 PM ET Baycol MDL 1431

This case, however, does not concern just a single vehicle, tire, or incident. The flaws in the Firestone tires and Explorer sport-utility vehicles complained of by Plaintiffs are the subject of NHTSA investigation, congressional inquiry, and intense media coverage, and are hurting Firestone's and FMC's finances, damaging their reputations, and in the case of Firestone, threatening its very existence as a brand. It would strain credulity to assert that Mr. Ford has had no substantial involvement in FMC's decisions on how to respond to this situation. Indeed, Mr. Ford would be derelict in his duties as chairman if he were not so involved.

## III. PLAINTIFFS HAVE SHOWN A SUFFICIENT LIKELIHOOD THAT MR. FORD HAS UNIQUE PERSONAL KNOWLEDGE.

Plaintiffs placed before Magistrate Judge Shields these and other public statements by Mr. Ford demonstrating that he has knowledge about the Firestone tire recall, the Explorer safety issues, how FMC has addressed these matters, and the data informing the company's responses.

> On Sunday's "60 Minutes," Ford criticized Firestone for not turning over data that showed a problem with the tires on the Explorer, the country's best-selling sport-utility vehicle.
>
> "We did repeatedly ask for the data that would enable us to make the right decision and we didn't get it," Ford said.
>
> Jennifer Dixon, Ford Chairman Defends Recall Actions; CEO Blames Tire Maker Firestone, Detroit Free Press, Oct. 9, 2000

---

> NAUGHTON: Do you think any mistakes were made in the design of the Ford Explorer?
>
> FORD: No. When I look at the data, it suggests that it is safer than other SUVs on the road and that it is safer in a rollover than other SUVs.
>
> A Ford Behind The Wheel: The Chairman Steps Up His Defense Of The Family Firm, Newsweek, Sept. 25, 2000.

---

their depositions.").

E-SERVED 02/14/05 05:13 PM ET Baycol MDL 1431

---

NAUGHTON: Why haven't you been more visible?

FORD: This started off very much as a product recall. At some point, almost overnight, it flipped into a big public-relations and government-relations issue. But by then, Jac [Nasser] was already out front and doing a terrific job, and I thought it would be confusing, and perhaps even undermining, for me to step in at that point. That's why I've been behind the scenes on this. I've been involved in every step of the way. I ended up not taking any vacation this summer because of this.

A Ford Behind The Wheel: The Chairman Steps Up His Defense Of The Family Firm, Newsweek, Sept. 25, 2000 (emphasis added).

---

"It's a tire problem, not a vehicle problem," Ford Chairman William Clay Ford Jr. said last week, echoing the automakers' mantra since the tire recall erupted last month.

Mark Truby, Does Explorer Share Blame For Accidents? Ford Truck's Design Questioned As Factor In Tire Failures, Detroit News, Sept. 20, 2000

---

Mr. Ford insists his company has gone the extra mile: "We're the ones that crunched the data" that showed a strong pattern of defects in certain Firestone Wilderness AT tires built at the tire company's Decatur, Illinois plant.

Jeffrey Ball & Joseph B. White, Bridgestone/Firestone Recall: Ford Chairman Works to Repair Reputation -- Addresses Credibility Concerns, Continues Meetings With Activists, Asian Wall St. J., Sept. 18, 2000.

---

Naughton: Is Ford's board of directors becoming more involved in reviewing how the company is handling this crisis because it wants to double check your executives?

William Clay Ford Jr.: No, but prudence does dictate that we, as a board, are comfortable with all the answers. So far, everything we've found to date has been handled very well. But we're going to stay on top of it. That's our responsibility to the shareholders and to the public.

E-SERVED 02/14/05 05:13 PM ET Baycol MDL 1431

Business Steering Ford Through Its Crisis, Newsweek Int'l, Sept. 18, 2000 (emphasis added).

---

"When I look back, the only regret I have is that we didn't ask the right questions of Firestone. Otherwise, I am very impressed by the response of our team," Ford said.

Jeffery McCracken, Ford Chairman Finds It Difficult To Deal With Tire Recall, Detroit Free Press, Sept. 15, 2000 (emphasis added).

---

Ford Motors yesterday affirmed support for its top management after its board of directors completed a "detailed review" of the issues surrounding the Bridgestone/Firestone tyre recall. "The management team . . . is doing an outstanding job in a difficult situation, doing everything possible to get the bad tyres replaced with good tyres, and the board fully supports their efforts," said board chairman, Bill Ford.

City Briefing, The Guardian, Sept. 15, 2000

---

Nasser and Chairman William Clay Ford Jr. were kept informed as the Ford crisis team began analyzing the tire data. The "war room" hummed with activity as Ford experts spent 18-hour days crunching the huge volume of statistical information. "We pulled the team together very fast and said go, and they went," said Bill Ford.

Bill Vlasic, Tire Recalls, Tragedies Tax Ford, Firestone And Public Global Crisis Ensnares Companies, Feds In Safety Nightmare, Detroit News, Sept. 3, 2000

---

Ford Chairman William Ford Jr. said the deaths linked to the tires on Ford Explorers are unrelated to the design of the sport utility vehicles. "This isn't ours," he told The Detroit News for a story Thursday. "This has nothing to do with our SUVs. There's certainly a real problem out there and we're doing our best to address it. But it has nothing to do with our SUVs."

Tire Recall Hearings In Congress Likely, Charleston Gazette, Aug. 18, 2000

E-SERVED 02/14/05 05:13 PM ET Baycol MDL 1431

According to his own statements to the press, Mr. Ford knows that the events underlying this litigation are purely a tire problem and reflect no flaw in the Explorer. Mr. Ford claims knowledge of tire data that FMC unsuccessfully demanded of Firestone; data underlying FMC's claim that the Explorer is safer than other sport-utility vehicles; and data "crunching" by FMC concerning Firestone tires from the Decatur plant. Mr. Ford also portrays himself as being on top of the situation "every step of the way."

Moreover, Mr. Ford has a unique perspective on these matters. He is a great grandson of both Henry Ford, the founder of FMC, and Harvey Firestone, the founder of Firestone. The two companies had been doing business with each other for about 100 years, until they turned on each other in this crisis. The century-old relationship broke up in May of this year, when Firestone said it would no longer supply tires to FMC, and the latter immediately announced its recall of about 13 million Firestone tires not covered by the August 9 recall. It is reasonable to infer that the billion-dollar recall required Mr. Ford's approval, and that he was thoroughly briefed about the circumstances surrounding Firestone's decision to cut ties, including any actions by FMC that might have contributed to it. According to the media, even before these developments, Mr. Ford admitted the companies' sniping at each other had caused him personal pain. <u>See</u> Jennifer Dixon, <u>Ford Defends Recall Actions</u>, Detroit Free Press, Oct. 9, 2000.

Citing a declaration by William Clay Ford, Jr., FMC asserts that he has not one iota of relevant information that Plaintiffs could not obtain elsewhere. For instance, Mr. Ford avers that he personally played no role in the design of the Explorer or the design or selection of its tires. Mr. Ford also declares that FMC senior officers and their underlings, and not he, have "personally managed" the company's "response to the Firestone tire issue."

Although he disavows hands-on involvement in the nuts and bolts of how FMC has handled the Firestone matter, Mr. Ford is careful not to deny that he has had some personal

E-SERVED 02/14/05 05:13 PM ET Baycol MDL 1431

involvement in the company's decision to recall Firestone tires. Indeed, Mr. Ford has already admitted as much publicly. On May 22, 2001, at a news conference held by FMC Chief Executive Officer Jacques Nasser to discuss the company's decision to recall Firestone tires, Mr. Ford said, "I along with the rest of the board have been involved in and support this decision." Cable News Network, Transcript No. 01052201V00, May 22, 2001, 17:01. Similarly, in June 2001, Mr. Ford sent an e-mail to FMC employees saying, "The Board of Directors and I were involved in this decision [to recall Firestone tires from Ford vehicles] and fully support the efforts of Jacques Nasser and our team to resolve this issue and ensure the safety of our customers." Daniel Howes, Ford's Nasser Faces Biggest Challenge of His Automotive Life, Detroit News, June 19, 2001, Business, at 1.

It is hard to see how it could be otherwise. Facing a litigation and public-relations crisis tarring one of its most profitable models, the Explorer, FMC decided it would ultimately be better off spending $3 billion to recall Firestone tires on its own. FMC and Mr. Ford do not deny (nor could they credibly do so) that as the company's chairman, he has played an important role in its decision to spend billions of dollars recalling another company's product. FMC's broadside against its longtime tire supplier was all the more significant for Mr. Ford given his family ties to Firestone. "[A]s I'm sure you might guess, this decision is a painful one for me personally. The history between Ford and Firestone really goes back to the beginning of the two companies and to my two great-grandfathers, Harvey Firestone and Henry Ford." Cable News Network, Transcript No. 01052201V00, May 22, 2001, 17:01.

Furthermore, FMC and Mr. Ford do not deny he has personal knowledge of the basis for his and the company's position that rollovers involving Firestone-shod Explorers are "'a tire problem, not a vehicle problem.'" Mark Truby, Does Explorer Share Blame For Accidents?

E-SERVED 02/14/05 05:13 PM ET Baycol MDL 1431

Ford Truck's Design Questioned As Factor In Tire Failures, Detroit News, Sept. 20, 2000 (quoting Mr. Ford).

In Rolscreen Co. v. Pella Products, 145 F.R.D. 92 (S.D. Iowa 1992), the court denied a request for a protective order barring the deposition of Rolscreen's president, Bevis. Bevis had approved the issuance of a conditional notice terminating Rolscreen's distribution agreement with Pella Products, but submitted an affidavit in which he denied having any first-hand knowledge about the notice's creation. The court found this showing inadequate:

> The affidavit utterly fails to explain in detail Bevis' exact role in approving the issuance of the termination notice. The affidavit also does not indicate what second hand knowledge Bevis does have regarding the formulation of the conditions set out in the conditional termination notice. . . . Rolscreen's mere incantation of Bevis' status as president and his claim of limited knowledge cannot be a basis for insulating Bevis from appropriate discovery.

Id. at 97.

In Holman v. ICN Pharmaceuticals, Inc., No. 98 Civ. 0674 (AKH) (HBP), 1999 U.S. Dist. LEXIS 20017 (S.D.N.Y. Dec. 29, 1999), plaintiff alleged that Trisoralen, a drug formerly sold by ICN, had damaged his eyes. The court denied ICN's motion for a protective order precluding plaintiff from deposing its president, Milan Panic. Panic had averred a lack of personal knowledge about various matters.

> In support of its application, ICN has submitted a declaration from Panic in which he states he has no recollection of any issues being raised concerning Trisoralen at the time ICN acquired the product, was not involved in filing periodic reports concerning Trisoralen with the FDA and that he has no knowledge of the 1997 worldwide recall of Trisoralen and the decision not to put the product back on the market "other than what was reported to [him] by the ICN personnel who made these decisions."

Id. at *2 (quoting declaration).

Nonetheless, the court in Holman reasoned, ". . . I cannot conclude that Panic is so completely without knowledge that his deposition[ ] should be precluded altogether." Id. at *3.

E-SERVED 02/14/05 05:13 PM ET Baycol MDL 1431

"Panic's declaration states that he was informed about the decision to withdraw Trisoralen from the market by the individuals at ICN who made the decision; based on the current state of the record, I cannot conclude that this decision has no relevance to plaintiff's claims." Id. at *3-4. "In addition, the fact that Panic may

have no personal knowledge of the decision to withdraw Trisoralen and knows only what he was told by others does not affect the appropriateness of taking his deposition. Even hearsay is fair ground in discovery." Id. at *4 (citation omitted). "Moreover, Panic's testimony concerning the statements made to him by other ICN employees may well be admissible against ICN as admission testimony. Fed. R. Evid. 801(d)(2)." Id.

Similarly here, it cannot be said that FMC's decision to recall Firestone tires (which Mr. Ford at least knew about, if not played a part in) has no relevance to Plaintiffs' claims that the tires have an unreasonably dangerous propensity to shed their treads. Furthermore, even assuming Mr. Ford has no personal knowledge of the basis for the decision and knows only what he was told by others, his deposition would still be appropriate. "Even hearsay is fair ground in discovery." Id. Moreover, Mr. Ford's testimony concerning statements made to him by FMC employees may well be admissible against FMC as admission testimony. See Fed. R. Evid. 801(d)(2).

## IV. FMC DISTORTS THE MAGISTRATE JUDGE'S REASONING.

After weighing the parties' respective evidence and arguments, including those set forth above, Magistrate Judge Shields concluded Plaintiffs had shown a sufficient likelihood that Mr. Ford has unique personal knowledge relevant to this case. (See Entry Regarding Motion To Compel Deposition Of William Clay Ford, Jr. at 1.) In attacking the order, FMC seizes on this comment by the Magistrate Judge: "The magistrate judge suspects that Ford's assertion that

E-SERVED 02/14/05 05:13 PM ET Baycol MDL 1431

Mr. Ford has no unique personal knowledge relevant to this litigation is accurate." (Id.) FMC treats this remark as a finding that Mr. Ford lacks such knowledge.

FMC twists Magistrate Judge Shields' words. While speculating that ultimately Plaintiffs would not be able to get much out of Mr. Ford, the Magistrate Judge balanced the evidence and arguments, considered the particular circumstances of this case, and determined that Plaintiffs' showing in favor of Mr. Ford's deposition outweighed FMC's showing against it. Any close questions or reasonable doubts were properly resolved in favor of allowing the deposition. "[B]ased upon Mr. Ford's statements to the media, quoted by the plaintiffs in their brief in support of the instant motion, the magistrate judge determines that it would be unfair to prohibit the plaintiffs from deposing Mr. Ford and making that determination [as to his personal knowledge] themselves." (Id.) See Stout, 150 F.R.D. at 602 ("[A]ny doubts, ambiguities, uncertainties, or silences as to the scope of the work product Rule should be resolved in favor of the Rules' overall policy of liberal discovery."); National Student Marketing Corp., 18 Fed. R. Serv. 2d 1302, 1974 U.S. Dist. LEXIS 7910, at *24 ("In attempting to comport with the spirit of the new discovery rules, any and all close questions and reasonable doubts raised throughout these motions have been resolved in favor of requiring discovery."). There was no clear error here.

## III. CONCLUSION

William Clay Ford, Jr. has personal knowledge of relevant matters. Among other things, he has said publicly that FMC unsuccessfully demanded important tire data from Firestone; that FMC analyzed data about tires from Firestone's Decatur, Illinois plant (originally claimed to be the "bad apple" factory from which all the flawed tires came); and that FMC's data show the Explorer is safer than other sport-utility vehicles. As information of this sort bears on Plaintiffs'

E-SERVED
02/14/05
05:13 PM ET
Baycol MDL 1431

allegations that Explorers and Firestone tires harbor life-threatening flaws, Plaintiffs are entitled to depose Mr. Ford.

Furthermore, there is no merit to FMC's vague complaints about the circumstances of Mr. Ford's deposition. (See FMC's Objections at 9-10 (referring to purported lack of "scheduling, time or scope regulations on the deposition").) Magistrate Judge Shields carefully limited the duration of the deposition, allowing the state court plaintiffs a total of seven hours for direct examination; the MDL plaintiffs a total of three hours for direct examination; Firestone one hour for direct examination; FMC one hour for cross-examination; and all plaintiffs two hours for redirect examination. (See Entry Regarding Motion To Compel Deposition Of William Clay Ford, Jr. at 1-2.) As for FMC's "scheduling" concerns, Plaintiffs will not demand that Mr. Ford sit for his deposition at midnight or any other unreasonable time.

As FMC has failed to show that Magistrate Judge Shields' order is clearly erroneous or contrary to law, this Court should uphold the order.

E-SERVED 02/14/05 05:13 PM ET Baycol MDL 1431

DATED: September 5, 2001

Respectfully submitted,

**COHEN & MALAD, P.C.**

Irwin B. Levin
Richard E. Shevitz

136 N. Delaware Street, Suite 300
P.O. Box 627
Indianapolis, IN 46206-0627
Telephone: (317) 636-6481
Facsimile: (317) 636-2593

*Liaison Counsel for Class Plaintiffs*

Don Barrett
Charles F. Barrett
**BARRETT LAW OFFICE, P.A.**
404 Court Square North
P.O. Box 987
Lexington, MS 39095
Telephone: (662) 834-2376
Facsimile: (662) 834-2628
*Lead Counsel for Class Plaintiffs*

Elizabeth J. Cabraser
Lisa J. Leebove
**LIEFF, CABRASER, HEIMANN & BERNSTEIN**
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Keith M. Fleischman
Elizabeth Bierney
Gerald Gardner
**MILBERG WEISS BERSHAD HYNES & LERACH LLP**
One Pennsylvania Plaza
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

Gordon Ball
**LAW OFFICES OF GORDON BALL**
550 Main Avenue
Suite 750
Knoxville, TN 37902
Telephone: (865) 525-7028
Facsimile: (865) 525-4679

Stephen Neuwirth
Cynthia Moore
**BOIES, SCHILLER & FLEXNER LLP**
570 Lexington Avenue, 16th Floor
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Executive Committee for Class Plaintiffs*

E-SERVED 02/14/05 05:13 PM ET Baycol MDL 1431

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| In re: BRIDGESTONE/FIRESTONE, INC. ATX, ATX II and WILDERNESS TIRES PRODUCTS LIABILITY LITIGATION | ) | MDL NO. 1373<br>Master File No. IP 00-9373-C-B/S |

This Document Relates to the
Class Action Master Complaint

## CERTIFICATE OF SERVICE

The undersigned Plaintiffs Liaison Counsel certifies that a copy of the foregoing document was served via hand delivery or facsimile upon the following local counsel for the Defendants and Intervenors in this MDL Proceeding, this 5th day of September, 2001:

Mr. Mark J. R. Merkle
KRIEG DeVAULT ALEXANDER
& CAPEHART, L.L.P.
One Indiana Square, Ste. 2800
Indianapolis, IN 46204-2017

Mr. Randall R. Riggs
LOCKE REYNOLDS BOYD & WEISELL
1000 Capital Center S. Tower
201 N. Illinois St.
Indianapolis, IN 46204-4210

Mr. Thomas G. Stayton
Ms. Ellen E. Boshkoff
BAKER & DANIELS
300 N. Meridian Street, Suite 2700
Indianapolis, IN 46204

Mr. Daniel P. Byron
McHALE, COOK & WELCH, P.C.
320 N. Meridian Street, Suite 1100
Indianapolis, IN 46204

______________________

Irwin B. Levin
Richard E. Shevitz
**COHEN & MALAD, P.C.**
136 N. Delaware Street, Suite 300
P.O. Box 627
Indianapolis, IN 46206-0627
Telephone: (317) 636-6481
Facsimile: (317) 636-2593