# Exhibit B

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
MDL NO. 1431
(MJD/JGL)

In re BAYCOL PRODUCTS LITIGATION

This Document Relates to:

ALL CASES

____________________________________/

*****CONFIDENTIAL*****

VIDEOTAPED DEPOSITION OF HARLAND AUSTIN, D.Sc.
February 17, 2004
8:43 a.m. - 4:15 p.m.

1615 Clifton Road
Atlanta, Georgia

REPORTED BY:
Sharon A. Gabrielli, RPR, CCR
Esquire Deposition Services
Atlanta Office Job #412611
Phone - 404.872.7890

MS. MEADERS: Kim Meaders on behalf of pharmacies.

THE VIDEOGRAPHER: Is that all?

MR. ISMAIL: Yes.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

HARLAND AUSTIN, D.Sc.,

having been first duly sworn, was deposed and testified as follows:

EXAMINATION

BY MR. ISMAIL:

Q. Good morning, Dr. Austin. My name is Tarek Ismail. I'm going to ask you some questions today on behalf of Bayer.

Sir, have you ever been deposed before?

A. No, I have not.

Q. Sir, have you ever served as an expert witness before?

A. I've been involved in a legal -- I've been involved in lawsuits, but I don't believe I've been named as an expert witness before.

Q. What has been your involvement in lawsuits previously?

A. I have served as a consultant in biostatistical methods and epidemiological methods on

Confidential



Q. Are there -- are there certain factors that may cause the voluntary reports of one drug to be more frequent than other drugs in the class?

MR. BRIDGERS: Object to the form.

THE WITNESS: In some circumstances, one could imagine, yes.

Q. (By Mr. Ismail) The secular reporting trend would be one such factor, correct?

A. Yes.

Q. The newer the drug, the more likely it is that a healthcare provider will make a voluntary report, correct?

A. I believe that is correct.

Q. Two drugs could have the exact same safety profile, but if one was introduced ten years ago and one was introduced five years ago, you may observe a difference in the rate of voluntary reports, correct?

A. You may, and for a number of reasons.

Q. Have you ever heard of the term publicity bias before?

A. Yes.

Q. What is that, sir?

A. My understanding of the term is that more spontaneous reports would occur, if, in fact, there was publicity pertaining to that drug and its adverse

events and -- and adverse events thought to be associated with it.

Q. When did you first hear the term "publicity bias"?

A. As it pertains to this or -- in general, in epidemiology, that would be a concern that one would have. If you were to conduct a case control study, another form of epidemiology, publicity bias could, in fact, affect the recall of cases with respect to controls.

And publicity bias is -- is not unique to, as you use the term, pharmacoepidemiology. It's a problem in general.

Q. Do you believe publicity bias to be a limitation of the FDA database?

A. It could be.

Q. Do you believe the secular trend reporting bias to be a limitation of the FDA database?

A. That's a limitation that could be dealt with in various ways, but that -- it's a difficult question. It doesn't have to be a limitation because there are ways to analytically deal with it.

Q. So the publicity bias, theoretically, you could have two drugs in a class and have more publicity about -- an adverse event in association

with one of the drugs can stimulate a higher rate of voluntary reports; correct?

A. Theoretically, yes. It's not clear that it wouldn't stimulate the adverse reports to the other drug as well, if it's in the same class.

Q. Well, the publicity -- the term "bias" is part of the concept, correct?

A. I don't know. You use the word "publicity bias," and I said I had heard of it.

Q. Well, let me make sure we're in agreement. The theory behind publicity bias is that it can be a confounder when you analyze the FDA database, correct?

A. No.

MR. BRIDGERS: Object to the form.

THE WITNESS: No, it's not. It's not -- the word "confounder" would not be applied in this case. You used the word "bias." That's a better use of -- that's a better term to describe it.

Q. (By Mr. Ismail) To educate me, sir, what's the difference between a bias and a confounder?

A. The confounder is a specific type of bias arising because you did not control or did not consider a factor which is associated both with the disease and is a determinate of the outcome. We're

not talking about things that cause the outcome now. We're talking about publicity bias.

Q. Okay. The theory behind publicity bias is that it can -- withdrawn.

You could have two drugs with the same safety profile and yet observe a difference in their rate of voluntary reports because of the publicity bias, correct?

MR. BRIDGERS: Object to the form.

THE WITNESS: Well, you -- your use of the word "safety profile," I'm not exactly sure. And then -- then you follow the use of the word "safety profile" and imply that we're talking about a specific disease.

You could have two drugs whose association is the same with a particular disease at issue, and publicity bias could be an issue. It could, in fact, cause a problem in a study, yes. The answer to that question is yes.

Q. (By Mr. Ismail) Have you ever heard of the Webber effect?

A. Not specifically, no.

Q. Have you ever heard of the new drug effect?

A. I assume --

Q. Are there other -- are there other events analyzed in Table 1?
A. Yes. There appears to be, on one of the lines, I don't want to count them right now, but myopathy from Australia.
Q. Other than the Australian data, is it true that all the other analyses in Table 1 relate to rhabdomyolysis?
A. I think that's true, but I -- I would like to look at it more carefully. But I think that's true.
Q. And then you have the term "RRR." What is that, sir?
A. That is the reporting rate ratio.
Q. And what is that figure, sir?
A. How do I obtain that figure or --
Q. Yeah. What is it? Is it a derived figure?
MR. BRIDGERS: Are you asking him to define --
Q. (By Mr. Ismail) Well, I don't know. Your -- it's your table. How did you come up with 11.4 in the first line?
A. Okay. It's -- it's --
Q. You can answer, sir.
MR. BRIDGERS: To speed this along, are you

asking him what RRR stands for, how it's calculated, or are you asking him about the specific values that are listed in the RRR column?

MR. ISMAIL: Well, I'm not sure this is speeding it along. But I want to know how RRR is calculated.

THE WITNESS: How is it calculated? You take the 114 for Baycol and divide by the number of prescriptions that were -- that do not -- do not appear in the table, but they certainly are in those tabulations provided by Baycol. And you do the same for the other statins. You divide that 557 by the number of prescriptions of the other statins.

You now have two reporting rates. You divide one by the other, and you have what I am calling a reporting rate ratio. And that's the 11.4 for the first row of this table.

Q. (By Mr. Ismail) So the 11.4 is the reporting rate for Baycol divided by the cumulative reporting rate for the other statins?

A. Yes, the aggregate reporting rate for the other statins, yes.

Q. And then the last column, you have 95 percent. Is that confidence interval?

A. Yes, it is.

intervals, you can eliminate bias as an explanation for what you show in Table 1, correct?

A. I wouldn't want the jury to be mislead in that and anything else.

Q. What did you do -- strike that.

I understand you used confidence intervals to eliminate, in your mind, chance as a plausible explanation, correct?

A. Yes, of this particular data, yes.

Q. What did you do to eliminate bias as a possible explanation of what you show in Table 1?

A. Well, I've written about it a little bit in -- in my report. I didn't do anything specifically because I didn't have anything but these tabulations. So I just took the tabulations, and I computed the reporting rate ratio, and I constructed these confidence intervals.

And then, I think if you look through my report, you see that I speculate, and I try to ascertain what -- some other explanations of -- of these elevated rate -- reporting rate ratios.

Q. Would you agree that the generally accepted methodology for epidemiology is to investigate biases into your database?

A. Yes, I think that in practicing

MR. BRIDGERS: Object to the form, the term "fundamental assumption."

THE WITNESS: Well, it -- it is an assumption inherent in Table 1. You called it my assumption. Anyone who looks at those reporting rate ratios is making that assumption. Yes, that is an assumption.

Q. (By Mr. Ismail) And there are certainly biases that would, if true, undermine that assumption, correct?

A. Well, yes, the -- the assumption could be wrong, yes.

Q. And we've talked about several of those biases already today?

A. Well, recall -- please recall what they are.

Q. Well, the secular reporting trend is a bias that can undermine the assumptions you made in Table 1, correct?

A. No, it can't bias it if you can make the comparative drug Lipitor because I'm -- I'm -- all right, I'm sorry.

The secular trend, no. You can adjust to that by doing an analysis that looks at specific small units of time. Therefore, the secular trend could

MR. ISMAIL: Let's go ahead and change the video.

THE VIDEOGRAPHER: This concludes Tape one of the deposition. The time is 10:43 a.m., and we are off the record.

(Whereupon, there was a brief recess.)

THE VIDEOGRAPHER: This is Tape 2 of the deposition. The time is 10:56 a.m., and we are back on the record.

Q. (By Mr. Ismail) Dr. Austin, just prior to the break, you indicated, in an answer in regards to the proportionate reporting rate ratio analysis, that it has limitations, perhaps it has more limitations than the reporting rate ratio, I think that would be generally accepted.

What did -- what limitations do you believe to be a part of PRR analysis?

A. The major one that comes to mind, as I sit here, is that you must assume in a PRR analysis that the rate of occurrence of other adverse events is equal for -- well, in this case, let's look at Baycol and Lipitor. You need a quality of rate of occurrence of other adverse events in the two groups. That's a -- that's a strong assumption.

Q. When you say it's a strong assumption, what

do you mean by that?
A. I would rather not make it, and the reporting rate ratio doesn't make -- well, it's an assumption. You're assuming that the rate of other adverse events is the same for Baycol and Lipitor.
Q. And if it's not, you can potentially show a difference in regards to rhabdomyolysis that is not truly part of the drugs in question?
A. In the PRR, the PRR could be wrong. Which way it would be wrong would depend upon the nature of the association of the particular drugs with the other events. It could be too low, it could be too high.
Q. Are there other limitations that are a part of a PRR?
A. Not that I recall sitting -- as -- as compared to the reporting rate ratio itself, no, not that I can recall. That's its limitation compared to the reporting rate ratio.
Its strength is that it does not require -- it's not subject to an overall increase of the rate of reporting of adverse events. That gets divided out, and it's not subject to bias from that source.
Q. When you say it gets divided out, are you saying that -- withdrawn.
Why don't you just explain what you mean by

now, that he has some experience, considerable experience at the FDA.

Q. In epidemiology?

A. I don't know his credentials specifically, but I assume that he's a physician. I don't know what his training in epidemiology is.

Q. You didn't know that he was the chief epidemiologist at FDA?

MR. BRIDGERS: Are you asking him if he knows?

MR. ISMAIL: Yeah, that's my question.

Q. (By Mr. Ismail) Do you knows that?

A. In the present or past, in either event, no, I don't recall that, as I sit here now.

Q. In the balance of the paragraph, you describe the signal of a higher risk with Baycol monotherapy to be very strong. Do you see that?

A. Yes.

Q. Do you have an opinion as to when the signal on monotherapy risk first appeared?

A. My own analysis would indicate that it appeared as early as 1998 since I looked at the PRR and found a monotherapy effect, I believe, as early as 1998.

Q. When in 1998?

apparent with regards to monotherapy and Baycol from the adverse event data, would you agree that it was a good idea for Bayer to want to do a study such as the Pacificare study?

A. I think it was an appropriate -- yes. Yes.

Q. I think you started to -- to say this, but let's make sure we can agree. The Pacificare study, at least the conception of the study, was an appropriate response to the signal generated by the spontaneous data?

MR. BRIDGERS: Object to the form.

THE WITNESS: Let me back up a little bit. Appropriate -- the study itself was a -- I considered had the -- the potential to add meaningful scientific information pertaining to myopathy and statins.

Now, the use of the word "appropriate" would sort of imply that I'm saying that the timing of when the study was conducted and under what circumstances it was conducted was also appropriate. I don't mean to imply that in my answer.

The fact that a study was done, I think, was the appropriate response.

Q. (By Mr. Ismail) I take it you're not implying the opposite, that the study was -- was -- the timing was defective or -- or the manner in which

the study was initiated was defective?
A. I'm not making any infer -- I'm not making any suggestion that, yes, that the timing was inappropriate one way or the other.
Q. Okay. Are you aware of any other study using follow-up cohort analysis comparing the risk of myopathy in the statin class other than the Pacificare study?
A. I have seen some information gleaned from the clinical studies that were conducted by -- by Baycol, which I believe did include the myopathy as an outcome. I did not review those studies -- I did not carefully review those studies.
Q. And your report does not contain any opinions about the clinical trials regarding the statins, correct?
A. That's correct.
Q. So the only data comparing the risk of Baycol to the other statins that you are aware of is the Pacificare study, the clinical trial data, and the spontaneous adverse events, correct?
A. Yes, that I reviewed carefully, yes.
Q. Are you aware of any other data that exists that you didn't review?
A. To the extent that I've seen citations and

your Table 5?
A. My Table 5.
Q. Okay. And your Table 5 is what?
A. Page 21.
MR. BRIDGERS: 21.
Q. (By Mr. Ismail) Okay. So your Table 7, then, is an adjustment of the actual risk rate from Table 13 of the Pacificare study adjusted to incorporate the average duration of statin use for each of the statins?
A. You said the wrong table here. Let me try to say it because there's some confusion here. I think it would be easier to go back and start at Table 5. Table 5, that value for Baycol, that 1.76, that value is obtained by me by hand from Table 13. Anyone can go look at that data and calculate 1.76.
When I make the correction to it, I go to 2.5. And that's clearly displayed in Table 5 of my report.
Q. Okay.
A. Moving along to Table 7 of my report, you see, once again, the 1.76. That's the crude value that can be obtained from Table 13 of the Pacificare study. Next to it in Column 2 is the adjusted rate ratio which was obtained from their Table 15.

They now have adjusted for a number of factors, and they're saying that the crude value 1.76 isn't the one to look at. It's the 1.37. Okay?

Now, I just want to make the comment that if they did a wrong analysis, then I'm not so sure how much weight one can apply to the 1.37. Maybe an argument could be made to adjust the 1.76.

But in Table 7, I give them the benefit of the doubt, and I make this correction for person time to the value 1.37, and I end up at 1.94. Okay?

Q. Okay. Going to Table 8, what have you done differently for Table 8 than you have done for the other tables?

A. Okay. Table 8 adds in a factor of 1.3 for misclassification of cases -- well, let me read it to you here so we don't -- table -- the last, final table, I inflate the monotherapy Baycol other risk by 30 percent for the failure of the investigators to eliminate false positives -- we talked at length about that -- and by 10 percent for the combination of misclassification of exposure, as well as this issue that we talked about of H -- HMG tolerance.

So I adjusted the values that started with just the adjustment for failure to do the correct analysis, and I added a little bit more. I multiplied

the values times 1.3 and then 1.1. And at -- so their final estimates for Baycol versus Pravachol with those three adjustments is 2.8, and Baycol versus all of the statins, it's 2.2.

Thus, my conclusion in looking at this study is that if the investigators had done a better study, if they had only done the correct analysis, then it is pretty clear that they would have found a statistically significant positive association for monotherapy Baycol use compared to monotherapy with either Pravachol or all -- all other statins. And the outcome in this particular study would not be rhabdomyolysis. The outcome basically is myalgia, which was the -- which was the most frequent diagnoses.

Q. Your false positives correction, do you just increase the rate for Baycol, or do you increase the rate for all the statins?

A. For Baycol.

Q. And why is that?

A. My interest was directed towards Baycol. You can multiply all the other ones by 1.1 as well.

Q. Well, I want to know why you, in your report, only increased the rate of Baycol because of this false positives concern and not the other

statins.

A. Because my task was to answer the question does monotherapy with Baycol -- is it -- is it worse than monotherapy with the other statins. My attention was directed towards Baycol.

Q. By multiplying the Baycol figure by 1.1, did you make the Baycol monotherapy rate look worse?

A. Yes, I did.

Q. Okay. You could have multiplied the Pravachol monotherapy rate by 1.1 and held Baycol constant, right?

MR. BLACK: Objection.

THE WITNESS: No, I'm not sure if that -- that comment is meaningful. The issue here is the bias towards the null, okay? If, in fact, there is no association between any of the statins in the outcome, then multiplying anything by 1.1 is not going to matter because we're multiplying 1 by 1.1. It wouldn't matter.

If basically the supposition here is that there is an association between Baycol and Baycol is -- there's an association between Baycol and the occurrence of myopathy and that because the study was done poorly, they missed that association. So multiplying it times the 1.1, that was my basis of

multiplying it times the 1.1.

Q. (By Mr. Ismail) So when you recalculated the Pacificare data, you did so upon a supposition that there was a association between Baycol and monotherapy and that it was higher for Baycol than the other statins?

A. In the context that if there were such a situation, that misclassification of exposure would obscure it, yes.

Q. Would the misclassification of exposure also obscure the situation where Zocor was higher than Baycol?

A. Yes.

Q. Can you have recalculated the Pacificare data comparing the rate of Baycol to Zocor and decided to bump up the Zocor monotherapy data?

A. For this misclassification, yes. For the duration, we'd have to look at the data and see what correction would be made based upon the duration, but for the misclassification, yes.

Q. Okay. Do you believe that the data that you show here in Table 7 and 8 to be reliable, or because of all the other flaws you have identified in the Pacificare report in terms of all these biases that you think are floating around, that none of these

data ultimately are that reliable?

MR. BRIDGERS: Object to the form.

THE WITNESS: The data in Table 7 and 8 are my best estimate of the effect of monotherapy Baycol relative to Pravachol or all the other statins. It is my best -- best faith effort to estimate that quantity.

I think I've eliminated some of the bias. I've made an attempt to eliminate some of the bias. But inherently, I -- I -- first of all, I would need the data myself to be able to do a better analysis. And certainly I can't correct the flaws, the inherent flaws of that study. I made an attempt to do that. Do some flaws still remain? Probably.

Q. (By Mr. Ismail) Okay. Well, you've identified this sort of sampling flaw, you have this selection bias flaw, you have your case definition requiring a switch flaw. None of that's corrected in Table 7 and 8, right?

A. Let's go through -- let's go through them one at a time, and I'll -- I'll answer yes or no.

Q. Okay. Did you correct for the -- the sampling flaw in your Table 7 and 8?

A. Yes. As it states here, I think that was part of multiplying it by 10 -- 1.1.

# Exhibit C

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

In re: BAYCOL PRODUCTS LITIGATION ) MDL No. 1431 (MJD/JGL)
)

**EXPERT WITNESS REPORT OF BRIAN L. STROM, M.D., M.P.H.**

## Background and Qualifications

1. My name is Brian Strom, M.D., M.P.H. I am a medical doctor licensed to practice in the states of California and Pennsylvania. I am the George S. Pepper Professor of Public Health and Preventive Medicine at the University of Pennsylvania School of Medicine. I am also a Professor and Chair of the Department of the Biostatistics and Epidemiology at the University of Pennsylvania School of Medicine. I am also a Professor of Medicine and Professor of Pharmacology, both at the University of Pennsylvania School of Medicine. I also Director the Center for Clinical Epidemiology and Biostatistics at the University of Pennsylvania School of Medicine. A copy of my curriculum vitae, which sets forth my education, training, professional experience, and publications in greater detail is attached at Tab. A.

2. I have extensive expertise in the field of pharmacoepidemiology. I am the editor of a book entitled *Pharmacoepidemiology*, which is now entering its fourth edition, including multiple chapters on the use and interpretation of adverse drug reaction reports. At the Hospital of the University of Pennsylvania, I have run for many years the program responsible for collecting and interpreting adverse drug reaction reports, reviewing hundreds of such reports each year, as well as conducting drug use evaluations. I was President of the International Society for Pharmacoepidemiology, and I currently serve as Editor for the Americas for its official journal, *Pharmacoepidemiology and Drug Safety*.

3. I also serve on the drug Safety and Risk Management Advisory Committee to the United States Food & Drug Administration. In that capacity, I am called upon to interpret spontaneous adverse event data concerning pharmaceutical products and to make recommendations concerning further investigation of "signals" generated by the Medwatch System.

## The FDA's Medwatch System

4. The FDA's Spontaneous Adverse Event database (also referred to as the "Medwatch system") was designed to identify adverse events associated with use of pharmaceutical products, especially those that were not identified during the pre-marketing controlled clinical trials.

5. The FDA's Medwatch system was never intended to be used, and cannot be used in a scientifically valid manner, to determine the incidence rate of a particular adverse event in association with use of a particular pharmaceutical product.

6. Because the FDA's Medwatch system does not provide a reliable scientific basis for determining the incidence rate of a particular adverse event in association with use of a particular drug, the Medwatch system cannot be used to make scientifically valid comparisons of incidence rates between different pharmaceutical products. Rather, to be scientifically reliable, comparisons between products must be made on the basis of formal scientific studies with control groups.

7. The FDA's Medwatch system is intended to be a tool for manufacturers and regulators to assist in identifying a "signal" that a particular pharmaceutical product might be associated with a particular (usually previously unrecognized) adverse event. With rare exceptions, when such a "signal" is identified, the appropriate response is for a manufacturer

to investigate further by launching a formal study, which is usually epidemiological in design. Many "signals" suggesting potential associations, after further investigation with an epidemiological study, do not confirm the potential association.

8. The FDA does not allow pharmaceutical product manufacturers to make statements about incidence rates in product labeling based on adverse event report data alone. Similarly, the FDA does not allow manufacturers to make statements involving comparisons with other products based solely on adverse event report data. This is due to the fact that spontaneous adverse event reporting data are unreliable for these purposes.

**Bayer's Response to Adverse Event Reports Was Appropriate**

9. Rhabdomyolysis is known to be a class effect among HMG CoA reductase inhibitors ("statins"), and this adverse event was known to be associated with each of the five other statins on the market. Further, CPK elevation was well recognized with other statins, and with Baycol prior to its marketing. A rhabdomyolysis warning based on the experience with other statins was included in the original Baycol label at the time of launch in the United States. Because this adverse event was well known to be associated with the class of drugs of which Baycol was a member, the existence of reports of cases of rhabdomyolysis post-marketing was neither unexpected nor alarming.

10. Numerous factors are recognized as influencing reporting rates of adverse events including, but not limited to, the recency of the pharmaceutical products introduction to the market, publicity and/or communications with the medical community about the product and its potential adverse events, and variability in coding and diagnostic definitions with respect to the adverse event reported.

11. When questions were raised concerning Baycol and rhabdomyolysis based on reports to the Medwatch system, undertaking the Pacificare study was a responsible and appropriate response to those questions. The Pacificare study was the appropriate type of study to conduct to investigate these questions.

12. Scientific evidence can be arrayed in a hierarchy of reliability based on study design. The ranking of such study designs is as follows: (a) clinical trials; (b) cohort studies; (c) case control studies; (d) analysis of secular trends; (e) case series; and (f) case reports.

13. The Pacificare study was a cohort study and was an ideal study design for evaluating the signal raised by the Medwatch system. By contrast, the adverse event reports to the Medwatch system are case reports, which represent the lowest level of scientific reliability in terms of study design.

14. The Pacificare studies showed that Baycol was associated with an increased risk of rhabdomyolysis when used in combination with gemfibrozil as compared with other statins used in combination with gemfibrozil. The Pacificare study did not show, however, that the rhabdomyolysis rate was greater with Baycol monotherapy than with monotherapy with other statins.

15. The risk of rhabdomyolysis associated with the use of Baycol when prescribed in the absence of gemfibrozil (i.e., Baycol monotherapy) has not been proven to be different from the risk of rhabdomyolysis seen with other statins on the market in the United States when not prescribed with gemfibrozil.

16. I reserve the right to continue to review documents and depositions related to this matter, and thus expressly reserve the right to supplement the opinions, conclusions, and/or mental impressions disclosed herein. In addition, I may offer opinions and conclusions in

response to opinions and conclusions offered by rebuttal experts designated by any other party herein.

## Dr. Farquhar's Opinions

17. I have reviewed the report of Dr. John W. Farquhar M.D. filed in this action.

18. In his report, Dr. Farquhar compiled data from five different spontaneous reporting systems (including Medwatch), and performed a meta-analysis for the purpose of comparing rates of rhabdomyolysis across statins. However, the limitations noted above for the Medwatch system (#5 and #6) apply equally to the other spontaneous adverse event reporting systems as well. Specifically, data from these databases cannot be used to determine the incidence rate of a specific adverse event, nor can they be used to draw scientifically valid comparisons between different pharmaceutical products. Combining data from these various sources in a meta-analysis in no way reduces the inherent limitations of the individual databases. To the contrary, it is a method that is controversial when applied to studies other than randomized clinical trials, even when applied to good observational data, no less spontaneous reporting data. As such, no scientifically valid conclusions can be made on the basis of Dr. Farquhar's meta-analysis of spontaneous reporting data.

19. Dr. Farquhar suggests that the proportional reporting ratio (PRR) (i.e., the proportion of the adverse event of interest compared to all other adverse events for the same drug) calculated from two of the datasets supports the view that rates of rhabdomyolysis with Baycol are higher than with other statins. The PRR approach too is controversial. However, his suggestion that the PRR, because it reports the proportion of one adverse event to all other adverse events for a particular agent, is "...free of the uncertainty of inaccurate reporting (i.e., one statin is reported as toxic more than another statin – even if their rates of

toxicity are the same)...", is incorrect. Dr. Farquhar is overinterpreting this approach, which is simply intended to guide the review of spontaneous reports as case reports. To quote the same source referenced by Dr. Farquhar, which is my textbook (Wiholm BE et al, "Spontaneous Reporting Systems Outside the U.S.", Pharmacoepidemiology (Strom BL, Ed), 3rd Ed, 2000, pp.175-192), "...[the PRR] may be expected to counteract some of the biases related to variable reporting. For example, if the overall level of reporting is high because of new drug bias, this will not necessarily affect the proportion of all reactions for the drug that are of a specified type. ... It is important to recognize that PRRs are not a substitute for detailed review of cases, but an aid to deciding which series of cases most warrant further review. Also, PRRs and chi-squared values are measures of association and not causality." Indeed, factors recognized as influencing reporting rates of adverse events (e.g., the recency of the pharmaceutical products introduction to the market, publicity and/or communications with the medical community about the product and its potential adverse events), may vary for different types of adverse events. For example, if publicity surrounds a particular adverse event, this might be expected to lead to increased reporting of this adverse event (even in the absence of a true increased rate of the adverse event) without affecting reporting of other adverse events related to the drug. This would then lead to a falsely elevated PRR. Since the calculation of the PRR is based on spontaneous reporting data, it is susceptible to the same limitations noted previously for spontaneous reporting data in general. Calculation of the PRR can thus not be used in a scientifically valid manner to compare adverse events across drugs.

20. One of Dr. Farquhar's criticisms of the Pacificare study was that, in comparing the incidence of adverse events, the denominator "...should be based on not only the number

of patients taking each drug, but also on the duration of exposure to each drug." Dr. Farquhar argues that the Pacificare study, by not accounting for the duration of exposure, biased the results in favor of Baycol since patients receiving Baycol had a significantly shorter duration of exposure (259 days) compared to patients taking other statins (400 days). Dr. Farquhar's contention is that this difference in duration of exposure likely led to an under-representation of the true rate of rhabdomyolysis in patients who received Baycol. First, an appropriate analysis of the risk to a patient being newly started on therapy would not make such an adjustment. Further, based on my extensive review of 924 Medwatch cases of reported rhabdomyolysis in patients receiving Baycol, the vast majority of patients who developed rhabdomyolysis while on Baycol did so within the first 1-2 months after initiating therapy (well within the average duration of exposure of 259 days reported in the Pacificare study). The median duration of time from initiation of therapy with Baycol to onset of symptoms consistent with rhabdomyolysis was 31 days (95% confidence interval 30-32 days). Indeed, 88.0% of Medwatch cases had a duration of <180 days between the initiation of Baycol and onset of rhabdomyolysis. Based on these data, it is very unlikely that an average duration of follow up of 259 days for Baycol users in the Pacificare study resulted in substantial underrepresentation of rhabdomyolysis in this group. Further, performing an adjustment for duration would incorrectly underestimate the risk for the comparator products, as one would be including in the calculation time when the patients were truly not at risk of developing rhabdomyolysis. Thus, Dr. Farquhar's analysis is incorrect and unfair, for this adverse event that occurs early after the initiation of therapy.

21. Another criticism of the Pacificare study offered by Dr. Farquhar is that the results of the study were biased due to failure to account for the "healthy person effect". This

is because the Baycol group was comprised of a relatively greater percentage of people who had been switched from another statin due to a formulary conversion to Baycol. It is argued that these patients, who had already demonstrated tolerance to a statin, were less likely to demonstrate an adverse event to Baycol. While this is one plausible theory as to the impact of including a large proportion of patients who had switched statins, alternate theories may also be proposed. For example, Baycol was cheaper, and some patients may have been switched, in order to save money. Alternatively, some patients may have been switched to Baycol because of an adverse event to another statin, especially milder adverse events. These patients might then have an increased risk of an adverse event on Baycol, increasing the likelihood of finding an association between Baycol use and rhabdomyolysis. In addition, patients who switched may have been less likely to have their Baycol dose titrated up appropriately (i.e., were started at a higher dose) and may have thus been at greater risk of rhabdomyolysis. Suffice it to say, that there are several alternative interpretations of the potential impact of a greater proportion of Baycol users having been switched from another statin. None of this, of course, would affect the patients who were new users of Baycol or the comparator drugs. As such, the net effect of this is not possible to determine, without performing the requisite analyses.

22. Dr. Farquhar also notes the potential limitation of the Pacificare study with regard to misclassification of cases. Indeed, this is a potential bias in any study based on administrative claims data. It is likely that any such misclassification would be non-differential (i.e., equally likely to occur regardless of the type of statin prescribed), and would thus bias the study toward observing the absence of an effect. Arguing against an overwhelming misclassification in the Pacificare data is the fact that a statistically significant

difference was found when comparing rates of myotoxicity for various statins when used in combination with gemfibrozil. The occurrence of substantial misclassification bias would have decreased the likelihood of finding such a difference. Dr. Farquhar goes on to use data from spontaneous adverse event reporting databases to "correct" for the potential misclassification bias in Pacificare study. He uses these databases to calculate a relative risk of rhabdomyolysis for Baycol compared to other statins, separating those cases described as "confirmed" vs. "suspected". He then uses the ratio of the relative risks for "confirmed" and "suspected" cases to "correct" the calculations of the Pacificare data. This approach is not scientifically valid for several reasons. First, as discussed previously, spontaneous reporting data do not provide a reliable scientific basis for determining the incidence rate of a particular adverse event in association with use of a particular drug and cannot be used to make scientifically valid comparisons of incidence rates between different pharmaceutical products. Thus, the relative risks derived from these databases are not scientifically valid. Furthermore, the definitions of "confirmed" vs. "suspected" cases in a spontaneous reporting database are not relevant when comparing the use of various diagnosis codes in an administrative claims database as these two systems are fundamentally different. Thus, using data from one system to "correct" calculations from the other is not meaningful nor is it scientifically valid.

23. Dr. Farquhar also questions the possible impact of distribution of free samples of Baycol on the results of the Pacificare study. He notes that "...if a patient suffered a defined condition while taking Baycol samples, the accuracy of the study results could be impaired by improperly excluding that case from those associated with Baycol...". However, if free samples of Baycol were distributed during this time, (and there is no definitive

documentation in the Pacificare study that they were), it is also likely that free samples of other statins were distributed during the same time period. The same effect of underestimating the incidence of myotoxicity related to statin use would thus also apply to these other statins. Without data clearly describing the use of free samples, any hypotheses of the potential impact of use of these samples on the study results is purely speculative. Further, while these cases would have been missed, these individuals would also not be counted in the calculation of the number of people exposed. Thus, the incidence rates in those who were dispensed the drugs via normal routes would be unchanged.

24. Finally, Dr. Farquhar raises the issue of "claims lag" as a criticism of the Pacificare study. The use of a fixed study end date rather than a study end date for which claims are complete might in fact have resulted in missing claims for the most recent myopathy cases. The proportion of claims missed for each particular statin would depend on the level of use of each statin at the end of the study. While this might have resulted in a greater total number of Baycol users having missing claims data, claims for patients on other statins would also be lost at the end of the study. Further, if both drug claims and diagnosis claims lagged equally, then the incidence rates in those remaining in the study are still valid, i.e., there would be no underestimate of incidence in those still remaining in the study. Finally, it is unclear whether the impact of such a lag, if any, would be large enough to change the results substantively, or whether the larger number of people earlier in the study would dilute it out. To that end, as noted previously in my review of the Medwatch case reports, the duration of time from initiation of Baycol to the development of rhabdomyolysis was relatively short (i.e., median of 31 days), thus potentially lessening the possible impact of any bias introduced by a "claims lag". Thus, to know whether the loss was differential,

and would have changed the results, one would need to know whether there were more Baycol users at the end of the study, whether the diagnosis claims lagged more than the drug claims, and whether the net effect was large enough relative to the overall numbers in the study to change the results. None of this was provided. Without this information, any conclusion about the impact of a "claims lag" on the results of the study is speculation.

## Myalgia

25. Myalgia is a symptom that may be described by a patient as muscle aches, muscle pains, muscle soreness, and/or muscle cramps. Myalgia is a common complaint in the general population that can be caused by a wide variety of conditions and exposures encountered in everyday life ranging from exercise, fatigue, dehydration, and muscle strain, to viral infections, electrolyte abnormalities, and trauma, among many others. Additionally, based on information set forth in the PDR, there are over one hundred prescription medications that are associated with a "high incidence" of myalgia (defined by the PDR as greater than or equal to 3% based on clinical trial data) and over 400 prescription medications with a "low incidence" of myalgia (defined by the PDR as less than 3% based on clinical trial data).

26. The available data from the Phase 3 clinical trials demonstrate that myalgia was an adverse event associated with the use of Baycol. From the time Baycol was first marketed in the United States, the Baycol product labelling informed physicians that myalgia was an adverse event that could potentially be associated with the use of Baycol. The information contained in the Baycol product labelling accurately reflected the experience with Baycol during the Phase 3 clinical trials.

27. Using the clinical trial data set forth in the PDR for the different products, the relative risk of myalgia compared to placebo associated with the use of Baycol is comparable to

the relative risk of myalgia compared to placebo for other statin drugs that were available at the time Baycol was on the market.

## Materials Reviewed

28. I have reviewed the adverse event reports in the FDA's Spontaneous Adverse Event database (also referred to as "the Medwatch system") concerning Baycol. I have also reviewed the FDA's summary of the Baycol New Drug Application, including the FDA's review of the controlled clinical trials on Baycol. Further, I have reviewed various internal company documents concerning Bayer's analysis of the Baycol adverse event reports, among other things. Additionally, I have reviewed the reports of the cohort studies conducted by Pacificare. I have also reviewed the report of Dr. John W. Farquhar M.D. I have reviewed data set forth in the *Physicians' Desk Reference* concerning rates of myalgia for different statin drugs. Finally, I have reviewed various articles in the published medical literature to formulate my opinions in this matter. I base my opinions and conclusions on the documents I have as well as my education, training, background, and experience.

## Compensation

29. I charge $600 per hour for time spent in review, preparation, etc. I charge $800 per hour for deposition or $6400 per day of trial testimony.

January 12, 2004

Dr. Brian L. Strom, M.D., M.P.H.