**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : | MDL No. 1431 (MJD) |
| This Document Relates to: | : | |
| *All Actions* | : | |

**BAYER AND GSK's MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXCLUDE EXPERT TESTIMONY OF CHARLES E. BOULT**

Plaintiffs have designated Charles E. Boult, M.D., a geriatrician, as a general causation expert in support of their muscle injury claims. Dr. Boult asserts that (1) "clinical criteria" independent of objective findings permit the *post hoc* diagnosis of muscle injury allegedly caused by Baycol, and (2) Baycol causes muscle pain after patients have stopped taking the medicine. *See* Report of Charles E. Boult (Ex. A) ¶¶ 23, 26. Neither opinion rests on sound, accepted scientific methodology or data.

Dr. Boult's opinions suffer a distinct and fatal scientific flaw: They cannot be tested and have not been accepted by – or even presented to – the scientific community. Dr. Boult readily acknowledged that his "clinical criteria" "are not anywhere in the literature," and conceded that he would not submit his opinion for publication because it "is too preliminary," and that "proof in a scientific sense has not been collected yet" for his "persistent myopathy" theory. Deposition of Charles E. Boult (Ex. B) at 252:4-9; 254:7-13; 223:4-6. Accordingly, these opinions should be excluded pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

## ARGUMENT

### I. DR. BOULT'S CAUSATION OPINIONS, GENERATED SOLELY FOR THIS LITIGATION, LACK SCIENTIFIC FOUNDATION.

As a preliminary matter, Dr. Boult's background makes him ill-equipped to opine about Baycol. His medical specialty is geriatrics. He has never conducted any studies or other research on Baycol to support his novel theory of injury; indeed, his research on statins was limited to the literature review he undertook to write his report. Boult Dep. (Ex. B) at 330:9-331:1. His opinions, which flow neither from his background nor his research, have no independent standing but exist and were formed only for purposes of this litigation. Boult Dep. (Ex. B) at 253:9-10, 12-20. Courts are wary of such "expert" opinions:

> One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying . . . . [I]n determining whether proposed expert testimony amounts to good science, we may not ignore the fact that a scientist's normal workplace is in the lab or the field, not the courtroom or the lawyer's office.

*Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("*Daubert II*"); *see also Lauzon* v. *Senco Prods., Inc.*, 270 F.3d 681, 687 (8th Cir. 2001) (citing *Daubert II*, noting impetus for opinion as a factor in considering the admissibility of expert testimony); *Wagner v. Hesston Corp.*, 2005 WL 1540135 (D. Minn. June 30, 2005), at *6 (citing *Daubert II*, noting that expert testing conducted almost entirely within the context of litigation "increase[d] the unreliability of [the expert's] opinions").

**A. The Scientific Literature Does Not Support Dr. Boult's Speculation about Persistent Myopathy.**

Dr. Boult opines that "people in whom muscle pain or weakness began on cerivastatin (Baycol) and persisted after stopping it suffer from moderate to severe cerivastatin-induced myopathy." Boult Rep. (Ex. A) ¶ 26. Dr. Boult's rationale is that this "seems biologically reasonable." Boult Dep. (Ex. B) at 281:1. Dr. Boult takes comfort in what seems "reasonable" because there is no scientific literature that supports his opinion, and he conducted no research of his own. However, a causal link between cerivastatin and persistent or chronic muscle injury has *not* been drawn, and causation of persistent or chronic muscle injury by statins is *not* a generally accepted scientific conclusion.

In fact, the United States District Court for the District of Georgia recently excluded the testimony of a putative expert, who contended that statins cause "prolonged or even permanent damage" through a "milder form of diffuse muscle ailment" than rhabdomyolysis. The Court disagreed, concluding that "[t]he statin side effect recognized in the medical community is a temporary one that ends when the patient stops taking the drug" and that plaintiff's "attempts to extrapolate this temporary side effect to establish general causation of a much more serious, permanent illness" constituted "'leaping from an accepted scientific premise to an unsupported one.'" *Leathers v. Pfizer, Inc.*, __ F.R.D. __, 2006 WL 708571 (N.D. Ga. Mar. 10, 2006) at *3 (quoting *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1314 (11th Cir. 1999)).

Here, too, Dr. Boult leaps from an accepted scientific premise to an unsupported one, by grounding his opinion regarding persistent or chronic myopathy on reports that do not provide sound scientific evidence to support his opinion.

**1. The England report contradicts Dr. Boult's opinion.**

The first report Dr. Boult cites is a 1995 case report by J.F. England *et al.* concerning simvastatin. This is not a study about Baycol; indeed, England's work was done before Baycol was even on the market. England's report examined only 15 patients who reported muscle stiffness and tenderness and concluded that "*all symptoms and signs resolved on cessation of the drugs*." England J, *et al.*, "Mitochondrial myopathy developing on treatment with HMG CoA reductase inhibitors-simvastatin and pravastatin [letter]," *Aust. NZ J. Med*. 1995;25:374-75 (Ex. C) (emphasis added.) Thus, England contradicts Dr. Boult's opinion that it "seems biologically reasonable" that pain would persist after cessation of Baycol.

**2. The Phillips report contradicts Dr. Boult's opinion.**

The second report Dr. Boult cites is a 2002 case series by Phillips *et al.* about four patients taking statins. Each experienced muscle symptoms while receiving statin therapy but showed a normal CK level. Rather than supporting Dr. Boult's theory that Baycol can cause persistent myalgia, the Phillips report supports the opposite conclusion — that muscle effects cease upon statin discontinuation. Phillips PS, *et al.*, "Statin-associated myopathy with normal creatine kinase levels," *Ann. Int. Med*. 2002;137(7):581-86 (Ex. D) at 583. In each of the four patients Phillips studied,

"symptoms and histologic changes occurred only during statin use. . . . [T]he pathologic abnormality reversed upon discontinuation of statin therapy." *Id.* at 582, 583.

**3. The Hildebrand abstract also contradicts Dr. Boult.**

The third segment of Dr. Boult's review of the literature report is an abstract by Hildebrand *et al.* published in 2003. Like England and Phillips, Hildebrand does not support Dr. Boult's musings about what is "reasonable."

The abstract reports a retrospective study of 30 patients who were taking statins – again, not Baycol – and experienced myopathy or myalgia. The purpose of the study was to define the course and severity of statin-induced myopathy. Five of twenty persons tested did not show elevated CK levels. The study concluded:

> [M]ost subjects with musculoskeletal symptoms attributed to statin therapy experienced resolution of symptoms within six months of therapy cessation. . . . Most patients with elevated CPK, even when greater than 10,000, had complete and rapid recovery with supportive care and statin discontinuation. . . . *[O]ur findings indicate a benign clinical course with discontinuation of the offending statin and supportive care."*

Hildebrand J, *et al.*, "The Natural Course of Stain Induced Myopathy [abstract]," *Arthritis & Rheumatism*. 2003;48(9)Suppl:730 (Ex. E) (emphasis added). Dr. Boult concedes that the Hildebrand abstract "doesn't say" – as Dr. Boult's report opines – that a patient might have normal CK levels but persistent pain after cessation of the drug. Boult Dep. (Ex. B) at 204:15-22.

**4. The Argov article does not support Dr. Boult.**

The last thin reed on which Dr. Boult relies is a review by a Dr. Argov. That article is not a study of any patient population at all. It does not mention Baycol.

But Dr. Argov does comment that "[s]topping the medication will usually result in return of serum CK to normal levels" and that myalgia unrelated to activity "is almost always associated with elevated serum CK. *Withdrawal of the drug usually leads to full recovery*." Argov Z., "Drug-induced myopathies," *Current Opinion in Neurology*. 2000;13: 541 (Ex. F) at 541. Dr. Argov also noted that anecdotal experience of slow or incomplete recovery "has not been formally reported." Boult Dep. (Ex. B) at 542. As Dr. Boult himself observed, none of this has sufficient reliability to be "written up in the scientific literature." *Id.* at 232:17-18. Instead, the Argov article is just another report "in preliminary form [that] hasn't been subjected to these more rigorous types of investigation." *Id*. at 234:8-9.

Moreover, nothing in the Argov article even suggests the lingering pain or weakness "severe enough to cause significant functional limitation" that Dr. Boult defines as one of the criteria for persistent myopathy. Boult Rep. (Ex. A) ¶ 23(a), 26. Dr. Argov's comment describes only unspecified "complain[ts] of muscle aches." Argov (Ex. F) at 542. Further, Dr. Argov's observations pertain only to patients who have shown elevated CK levels.

In short, the Argov article is not a scientific study of anything, and offers no reliable, scientifically – accepted support for Dr. Boult's opinion that Baycol-induced myopathy might persist after stopping use of the medicine, despite the absence of any record of elevated CK levels.

**B. The Scientific Literature Does Not Support Dr. Boult's Subjective Clinical Criteria To "Deduce" Myopathy.**

Dr. Boult opines that one may diagnose a patient as having Baycol-induced myopathy in the absence of objective clinical evidence if (1) the muscle pain is severe enough to cause significant functional limitations; (2) the symptoms began after the statin was ingested; and (3) the symptoms diminish or remain the same after the statin is discontinued. Boult Report (Ex. A) ¶ 23. Under this standard, a weekend athlete who pulled a muscle shortly before discontinuing Baycol could be diagnosed as suffering Baycol-induced myopathy.

Not surprisingly, Dr. Boult's opinion fails under *Daubert*. The opinion has not been accepted by the scientific community; indeed, it has never been tested – nor could it be tested because, by definition, this diagnostic definition is unencumbered by any "objective findings." *Id*. Second, Dr. Boult admits that even he could not apply these criteria without a thorough differential diagnosis to determine whether a statin or something else caused a particular patient's pain.

**1. Dr. Boult's "clinical criteria" have not been scientifically accepted.**

Among the indicia of reliability described in *Daubert* are whether the opinion has been tested; whether it has been the subject of peer review; and whether it enjoys a general acceptance in the relevant scientific community. *Daubert*, 509 U.S. at 593-94. *See also Glastetter* v. *Novartis Pharm. Corp.*, 252 F.3d 986, 988-89 (8th Cir. 2001) (same); *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1207-08 (8th Cir. 2000)

(same). Dr. Boult admits that his opinion bears none of these indicia. Indeed, these criteria cannot be found in any of the medical literature:

Q. Well, can you show me where your criteria are used in the medical literature to deduce a statin-induced myopathy?

A. No.

Q. They are not anywhere in the literature?

A. No. . . . I didn't feel it was appropriate to, for one individual to publish and say that this is the way it is; in other words, that the process should be very rigorous, look at all the evidence with people from multiple perspectives and then, you know, come out with something that is very rich textured like that.

* * *

Q: Have you communicated your criteria to any other treating physician?

A: No, it's all stayed within this context here.

Q: Well, how is it going to be useful to other physicians if you don't communicate it?

A: It's a process, you know, it's – in the future it may be useful to other clinicians. Right now I haven't submitted it for publication because I haven't gone through the rigorous process that I mentioned to you.

This is a first step, you write it down, you put together the evidence as best that the evidence seems to indicate and then you get perspectives from other people. And once you've debated it all out, then you submit it for publication. *This is too preliminary.*

Boult Dep. (Ex. B) at 252:4-9; 253:17-254:13 (emphasis added).

Dr. Boult purports to take his "first step" toward scientific credibility by turning this Court into a proving ground. That is not this Court's function under *Daubert*. "What is required is that when experts 'testify in court they adhere to the same standards of intellectual rigor that are demonstrated in their professional work.'" *Group Health*

*Plan* v. *Philip Morris U.S.A., Inc.*, 344 F.3d 753, 760 (8th Cir. 2003) (quoting *Rosen* v. *Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996)). The Court should not permit Dr. Boult to offer opinions that he admits are "too preliminary" for his own medical colleagues.

**2. Dr. Boult qualifies his own "clinical criteria" with the need for a differential diagnosis.**

Not even Dr. Boult believes that statin-induced myopathy can be diagnosed without objective findings and by reliance on his three criteria. Instead, when faced with a patient complaining of muscle pain after taking a statin, Dr. Boult would consider the patient's medical history and other events that might explain the muscle weakness. As Dr. Boult said, "we begin with a history," Boult Dep. (Ex. B) at 130:16, consider when the pain began in relation to when the statin was first ingested, and assess the location of the pain – "it's all a series of changing probabilities as you add more information. . . . We start with a whole pallet of diseases to draw on." *Id*. at 133:4, 21-22. In short, differential diagnosis, including lab tests where warranted, is the core methodology for diagnosing statin-induced myopathy, not rote application of Dr. Boult's three non-objective clinical criteria. *Id*. at 134-42.[1]

Ultimately, Dr. Boult asks that, even though the scientific community has not tested his ideas in any "rigorous type of investigation," or accepted them in any manner at all, this Court should allow his opinions to be offered anyway, as if they had

1 *See also In re Baycol Prods. Litig.*, 321 F. Supp. 2d 1118, 1125-27 (D. Minn. 2004) (holding that a differential diagnosis, ruling out alternative causes, is essential to establishing causation in this litigation).

some scientific credibility. They do not, and the Court should not permit them to be heard.

## II. DR. BOULT'S REMAINING OPINIONS ARE NOT ADMISSIBLE.

At his deposition, Dr. Boult offered two further opinions that are not included at all, or alluded to in only the most veiled way, in his report. That alone is reason enough to exclude them. *See* Fed. R. Civ. P. 26(a)(2)(B). But these opinions should be rejected on the merits as well.

### A. Dr. Boult's Opinion About the Comparative Risk of Baycol Has No Accepted Scientific Foundation.

Dr. Boult opines that Baycol exposed patients to a higher risk of adverse effects than other statins. Boult Dep. (Ex. B) at 86:3-8; 95:20-96:3; 182:3-12. In particular, Dr. Boult focused on a rate of rhabdomyolysis 16-80 times greater than with other statins. *Id*. at 46:14-17; 162:18-22. The sole support for this is an article by Thompson, which lifts data from a Staffa letter, which in turn relies exclusively on adverse event data. Dr. Boult readily acknowledged this:

> Q. Your opinion regarding the comparative muscle toxicity of Baycol versus the other statins is based entirely upon reporting rates of adverse events, correct, postmarket?
>
> A. Yes.

*Id*. at 294:16-20. As defendants already have explained, the use of adverse event data to draw opinions regarding the relative safety of a drug is not a generally accepted scientific methodology and has been rejected by the FDA and the courts. *See* Defendants' AER Motion; *see also* Farquhar Motion, Part IA (discussing Thompson and Staffa). The fact that Dr. Boult disagrees is quite beside the point. Dr. Boult's view is not "generally

accepted by the (scientific) community," and his comparative toxicity opinion should be excluded.

### B. Dr. Boult's Opinion About the Adequacy of the Baycol Labeling Is Neither Relevant Nor Competent.

Although the words "label" or "labeling" are found nowhere in his report, Dr. Boult purports to offer opinion testimony on the adequacy of Baycol labeling. In particular, he contends that Bayer should have warned doctors that clinical trials of Baycol did not sufficiently test the effects of the drug on the elderly. Boult Dep. (Ex. B) at 121:14-122:5; 79:17-80:4; 111:22-112:7. This opinion should be excluded for at least three reasons.

First, Dr. Boult sidesteps the only question that matters: whether the labeling complied with FDA requirements. He disavows any opinion on that, and any expertise on regulations regarding the content of labeling. *See* Boult Dep. (Ex. B) at 320:13-16; *id.* at 317:16-319:15 (admitting that he has never prepared a label or been consulted in the preparation or regulation of product labeling, and that he is not familiar with FDA labeling regulations and the labeling process). Nor does Dr. Boult claim any expertise about whether adverse event data should be included in label ("I don't really feel like I can comment on that because I'm not sure, I'm not an FDA expert and I don't really know what's appropriate to put in"). Boult Dep. (Ex. B) at 126:10-19.

Second, although Dr. Boult critiques the Baycol label for failing to disclose that the pre-approval clinical trials did not, in Dr. Boult's view, adequately test the effect of Baycol on geriatric patients, he admits that he did not actually review the Baycol

clinical trials data. Boult Dep. (Ex. B) at 62:20-63:3. Nor did he review the Baycol label itself. *Id*. at 123:4-125:4. Had he done so, he would have observed that the label approved by FDA did refer to geriatric use and noted that in the clinical trials "there were no clinically relevant effects of age." Package Insert (Sept. 1997) (Ex. G). When the geriatric use section of the label was amended in July 2000 based on post-approval studies, the label disclosed that one study of the 0.8 mg dose suggested that women over 65 of low body weight were at increased risk of myopathy. Package Insert (July 2000) (Ex. H).

Thus, Dr. Boult's uninformed ruminations about the Baycol labeling are mere argument, a function allocated to counsel, not experts. Dr. Boult may not "'supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence.'" *In re Rezulin Products Liability Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) (quoting *Primavera Familienstifung* v. *Askin*, 130 F. Supp. 2d 450, 527 (S.D.N.Y. 2001)). Dr. Boult's subjective belief about what a label should have said does not meet the test for "expert" testimony. *Glastetter*, 252 F.3d at 989 (a court must "separat[e] expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge"). Accordingly, Dr. Boult's opinions regarding Baycol labeling should be excluded.

## CONCLUSION

The opinions of Dr. Boult discussed above have support in neither scientific learning and literature, nor settled law. They do not meet the standard set forth in Rule

702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Therefore, defendants respectfully request that this testimony be excluded.

Dated: April 17, 2006

Respectfully submitted,

Philip S. Beck
Adam Hoeflich
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60610
(312) 494-4400

/signature on file/
Susan A. Weber
James W. Mizgala
James R.M. Hemmings
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000

Paul J. Zidlicky
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000

Catherine Valerio Barrad
Thomas P. Hanrahan
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
(213) 896-6000

Scott A. Smith
Tracy J. Van Steenburgh
HALLELAND LEWIS NILAN
SIPKINS & JOHNSON, P.A.
220 South Sixth Street, Suite 600
Minneapolis, MN 55402
(612) 338-1838

/signature on file/
Fred T. Magaziner
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000
*Counsel for SmithKline Beecham Corp. d/b/a GlaxoSmithKline*

Richard K. Dandrea
ECKERT SEAMENS CHERIN
& MELLOTT, LLC
USX Tower, 600 Grant St., 44th Floor
Pittsburgh, PA 15219
(412) 566-6000

Peter W. Sipkins (No.101540)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
(612) 340-2600

Douglas R. Marvin
WILLIAMS & CONNOLLY
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

Joseph D. Piorkowski, Jr.
THE PIORKOWSKI LAW FIRM, PC
910 17th Street, N.W. Suite 800
Washington, D.C. 20006
(202) 223-5535

*Counsel for Bayer Corporation and Bayer AG*