"The Effects of Outpatient Geriatric Evaluation and Management on Elders' Functional Ability," AY 1994-96, American Academy of Family Physicians Foundation, Principal Investigator: C. Boult, $15,000

"Comparison of Methods for Screening Elderly Populations," AY 1994-95, American Federation for Aging Research, Principal Investigator: C. Boult, $1,250

"Case Management in HMOs," AY 1994, Group Health Foundation (The Robert Wood Johnson Foundation), Principal Investigator: C. Boult, $45,248

"A Trial of Outpatient Geriatric Evaluation and Management (GEM)," AY 1993-98, National Institute on Aging, U.S. Agency for Health Care Policy and Research, Health Care Financing Administration, Principal Investigator: C. Boult, $1,839,073

"Reducing Functional Limitation in the Next Century," AY 1993-94, All-University Council on Aging, University of Minnesota, Principal Investigator: C. Boult, $3,000

"Physician Case Management of Frail Elderly Minnesotans: Results of an Interdisciplinary Pilot Program," AY 1992-93, All-University Council on Aging, University of Minnesota, Principal Investigator: C. Boult, $3,000

"Reliability of an Instrument for Estimating Elders' Probability of Future Hospitalization," AY 1992-93, Division of Epidemiology, School of Public Health, University of Minnesota, Co-investigator, $1,717

"Identifying Elders at Risk," AY 1991-92, Minnesota Medical Foundation, Principal Investigator: C. Boult, $5,000

"Identifying Elders at Risk," AY 1991-92, Center for Urban and Regional Affairs, University of Minnesota, Principal Investigator: C. Boult, $4,687

"NIA Academic Award: Predictors of Functional Ability," 1990-95, National Institute on Aging, AY Principal Investigator: C. Boult, $361,000

"Identifying Elders at Risk," AY 1990-91, Center for Urban and Regional Affairs, University of Minnesota, Principal Investigator: C. Boult, $9,706

"Dependency Implications of Future Demographic Trends: Simulated Possibilities," AY 1988-91, Alfred P. Sloan Foundation, Principal Investigator of project component: C. Boult, $19,977

[Funded effort (5-25%) on numerous other grants and contracts from NIH, HCFA and private foundations for which the Principal Investigators were members of the faculty of the University of Minnesota]

## ACADEMIC SERVICE

Johns Hopkins University, 2001-

Served: member, Center on Aging and Health, 2001-

*Bloomberg School of Public Health*

Served: member, search committee for Chair of Department of Population and Family Health Sciences, 2002-

member, Appointments and Promotions Committee, 2002-

member, Ad-hoc Committee to Review Aging Training, 2002-

member, Brookdale National Fellowship Program Review Panel, 2002

Department of Health Policy and Management
Directed: Lipitz Center for Integrated Health Care, 2001-
Served: chair, search committee for tenure-track faculty position, 2002-
member, Finance Committee 2002-
member, Appointments and Promotions Committee, 2002-
member, Health Services Research and Development Center, 2001-

Department of Mental Hygiene
Served: member, search committee for tenure-track positions (2), 2002-

*School of Medicine*

Department of Medicine
Served: preceptor, Beacham Ambulatory Care Center, 2001-
member, Geriatric Education Center's Advisory Committee. 2002-
chair, search committee for deputy director of Division of Gerontology and Geriatric Medicine, 2003-
director, health services research, Division of Gerontology and Geriatric Medicine, 2003-
chair, working group on future clinical services development, Division of Gerontology and Geriatric Medicine, 2003-

University of Minnesota, 1990-2001

Served on the faculties of:
the Medical School
the School of Public Health (Division of Epidemiology, Institute for Health Services Research)
the Graduate School, examining member of the graduate minor program in gerontology
the Hubert H. Humphrey Institute of Public Affairs

*Medical School*

Created (1991) and directed (1991-1993) the School's first Geriatrics Clinic
Created and directed (1994-1996) a second geriatrics clinic (at Bethesda Lutheran Hospital) that served as the base for a randomized clinical trial of outpatient geriatric evaluation and management (GEM)
Provided care to high-risk frail elderly patients in clinics, a nursing home, a transitional care unit, and Fairview-University Medical Center
Served: member, Dean's Council
member, Education council
member, Dean's Committee on Primary Care
member, Coordinating Committee for the Dean's Scientific Seminar
member, Steering Committees of Clinical Medicine I, II, and IV, including the Evaluations and Health Care Delivery Systems Subcommittees (chair)
member, Primary Care Education Committee
Served: faculty leader, groups of first-year medical students
Chair, the Health Care Delivery Systems Task Force

co-director, Office of Primary Care Research and Education
Department of Family Practice and Community Health
Served: member, Geriatrics Advisory Committee
member, Faculty Development Committee
member, Community Medicine Committee
member, Electronic Medical Records Committee
member, Senior Research Council
member, Peer Review Panel, UCare Minnesota Foundation

*School of Public Health*
Served: member, search committee, Clinical Outcomes Research Center
member, Executive Committee, NIA Training Program

**PRESENTATIONS**

*Scientific Meetings*

Spiers N, Matthews RJ, Jagger C, Brayne C, Boult C, Matthews F, Robinson T. Forecasting future disability levels under changing patterns of diseases. Annual Scientific Meeting of the British Geriatrics Society, 2003.

Boyd C, Darer J, Wu A, Boult C, Fried L. The challenges of following clinical practice guidelines in the care of older patients with multiple comorbid conditions. Annual Scientific Meeting of the American Geriatrics Society, 2003.

Young Y, Fan M, Boult C, Hebel J. Validation of the "successful aging" construct. Annual Scientific Meeting of the Gerontological Society of America, 2002

Young Y, Fan M, Hebel JR, Boult C. Concurrent validity of administering the functional independence measure (FIM) by interview. Annual Scientific Meeting of the American Public Health Association, 2002

Boult C, McCaffrey D. Association between funding and findings: does sponsorship bias results? Annual Scientific Meeting of the American Geriatric Society, 2002

Young Y, Fan M, Boult C, Parrish JM. Actively engaging with life: associations with functional independence and quality of life. Annual Scientific Meeting of the American Geriatric Society, 2002

Boult C. An epidemiologic tool that improves health care for older people. Annual Scientific Meeting of the Gerontological Society of America, 2001.

Fillenbaum GG, Hanlon JT, Dowd B, O'Connor H, Landerman LR, Artz M, Gross C, Boult C, Garrard J, Schmader K. Impact of inappropriate drug use defined by Beers criteria on health service use. Annual Scientific Meeting of the Gerontological Society of America, 2001

Hanlon JT, Fillenbaum GG, Dowd, B, Landerman LR, Artz MA, Gross C, O'Connor H, Boult C, Garrard J, Schmader K. Impact of inappropriate drug prescribing defined by DUR criteria on health services utilization in community dwelling elders. Annual Meeting of the American College of Pharmacotherapy, 2001

Hanlon JT, Fillenbaum GG, Kuchibhatla M, Ruby C, Gross C, Boult C, Garrard J, Schmader K. Impact of inappropriate drug prescribing on mortality and decline in functional status in community dwelling elders. Annual Scientific Meeting of the American Geriatric Society, 2001

Pacala JT, Boult C. An alternative method for risk-adjusting capitation rates for Medicare Plus Choice plans. Annual Scientific Meeting of the American Geriatric Society, 2001

Pacala JT, Boult C. Effects of a care management program on costs and satisfaction in an open-access health plan. Annual Scientific Meeting of the American Geriatric Society, 2001

Hanlon JT, Fillenbaum GG, Kuchibhatla M, Boult C, Gross C, Garrard J, Schmader K. Inappropriate drug use, functional status decline and mortality among community dwelling elderly residents. Annual Scientific Meeting of the Gerontological Society of America, 2000

Boult C, Rassen J, Rassen A, Moore RJ, Bouquillon S. Does case management save money in Medicare HMOs? Annual Scientific Meeting of the American Geriatric Society, 2000

Pacala JT, Boult C, Urdangarin C. Prediction of future Medicare costs based on self-report. Annual Scientific Meeting of the American Geriatric Society, 2000

Hanlon JT, Fillenbaum G, Hu W, Gross C, Garrard J, Ruby C, Schmader K, Boult C. Inappropriate drug prescribing for community dwelling elderly. Annual Scientific Meeting of the American Geriatric Society, 2000

Boult C, Boult LB, Morishita L. Outpatient geriatric evaluation and management: a randomized clinical trial. Annual Scientific Meeting of the American Geriatric Society, 1999

Weuve JL, Boult C, Morishita L. Effects of outpatient geriatric evaluation and management on caregiver burden. Annual Scientific Meeting of the American Geriatric Society, 1999

Urdangarin C, Boult C, Morishita L. The effects of outpatient geriatric evaluation and management (GEM) on function, affect and mortality. Annual Scientific Meeting of the American Geriatric Society, 1999

Goodlin SJ, Boult C, Bubolz TA. Risk of developing a need for long-term care. Annual Scientific Meeting of the American Geriatric Society, 1998

Skarin V, Boult C. Older adults at high nutritional risk. Annual Scientific Meeting of the American Geriatric Society, 1997

Smith S, Morishita L, Boult C. Promoting completion of advance directives in community-dwelling elders. Annual Scientific Meeting of the American Geriatric Society, 1997

Boult L, Boult C, Morishita L, Smith S. The process of outpatient geriatric evaluation and management (GEM). Annual Scientific Meeting of the American Geriatric Society, 1997

Boult C, Boult L, Morishita L, Pirie P. Recruiting high-risk older participants for a randomized clinical trial. Annual Scientific Meeting of the American Geriatric Society, 1997

Pacala JT, Boult C, Reed R, Aliberti E. Predictive validity of the $P_{ra}$ among older recipients of managed care. Annual Scientific Meeting of the American Geriatric Society, 1997

Morishita L, Boult C, Boult L, Smith S, Pacala JT. Satisfaction with outpatient geriatric evaluation and management. Annual Scientific Meeting of the American Geriatric Society, 1997

Boult C, Kane RL. Future human and economic effects of reducing six chronic diseases. Annual Scientific Meeting of the American Geriatric Society, 1995

Boult C, Altmann M, Gilbertson D, Yu C, Kane RL. Decreasing disability in the 21st century. Annual Scientific Meeting of the American Geriatric Society, 1995

Pacala JT, Boult C, O'Brien J, Bland C. The "Aging Game" improves medical students' attitudes toward caring for elders. Annual Scientific Meeting of the American Geriatric Society, 1995

Murphy C, Reuben D, Boult C. Comparison of two screening instruments that identify elders for comprehensive assessment. Annual Scientific Meeting of the American Geriatric Society, 1995

Pacala JT, Boult C. A typology of case management in large scale HMOs with Medicare TEFRA risk contracts. Annual Scientific Meeting of the Gerontological Society of America, 1994

Morishita L, Ebbitt B, Boult C. Telephone reliability of the physical functioning dimension of the sickness impact scale and the geriatric depression scale. Annual Scientific Meeting of the Gerontological Society of America, 1994

Boult C, Gilbertson D. The effects of four diseases on the number of functionally limited elders in the next century. Annual Scientific Meeting of the American Geriatric Society 1993

Boult C, Dowd B, McCaffrey D, Boult L. Predictive validity of a questionnaire that identifies elders at risk for hospital admission. Annual Scientific Meeting of the American Geriatric Society 1993

Boult L, Boult C, Pirie P. Test-retest reliability of a questionnaire that identifies elders at risk for hospital admission. Annual Scientific Meeting of the American Geriatric Society 1993

Murphy C, Boult C, Boult L, Ebbitt B, Luptak M, Kane RL. Targeted outpatient GEM: results of a pilot study. Annual Scientific Meeting of the American Geriatric Society 1993

Loret de Mola F, Boult C. Characteristics of elders who under-use health care. Annual Scientific Meeting of the American Geriatric Society 1993

Luptak MK, Boult C. Encouraging elders to record advance directives: results of an outpatient pilot program. Annual Scientific Meeting of the Gerontological Society of America, 1992

Boult C, Boult L, McCaffrey D. Chronic conditions that lead to functional limitation in the elderly. Annual Scientific Meeting of the American Geriatric Society 1992

Boult CE, Hernandez R, Dowd B, McCaffrey D, Keenan J. A model that estimates elders' probability of admission to a hospital within two years. Annual Scientific Meeting of the Gerontological Society of America, 1991

*Invited Seminars* – Professional societies

European Union Geriatric Medicine Society's *Second Congress*, Florence, Italy, "Integrated Systems of Care for the Frail Elderly"

International Association of Gerontology's *International State of the Art Conference: Geriatric Assessment Technology*, Florence, Italy, "A Questionnaire That Identifies Elders at Risk: How Well Does it Predict Use of Health Services?"

International Center for the Analysis of Social Development's, *Primary Health Care: Issues and Trends in the Era of Privatization*, San Juan, PR, "The Role of Research in Primary Care"

American Public Health Association's *Annual Meeting*, Indianapolis IN, "Using Managed Care to Provide Effective Chronic Care"

Gerontological Society of America's *Annual Meeting*, Washington, DC, "Meeting the Care Needs of Older Persons Across Health Care Settings"

Gerontological Society of America's *Annual Meeting*, Philadelphia, PA, "Emerging Systems of Care for Older Persons" (Presidential Symposium) and "Symposium on Cognitive Impairment"

American Society on Aging's *Annual Meeting*, Los Angeles, CA, "Identification and Management of Health Risk"

American Geriatrics Society's *Annual Meeting*, Washington, DC, "What's New in Geriatric Assessment?"

American Geriatrics Society's *Annual Meeting*, Philadelphia, PA, "A Randomized Trial of Outpatient Geriatric Evaluation and Management"

American Geriatrics Society's *Annual Meeting*, Nashville, TN, "Does Case Management Save Money in Medicare HMOs?"

American Medical Directors Association's *Annual Meeting*, San Antonio, TX, "Innovative Systems of Care for Older Populations"

American Academy of Family Physicians' *Scientific Assembly*, San Francisco, CA, "Therapeutic and Preventive Approaches for Major Health Problems Affecting Older Adults"

Society for Prospective Medicine's *Annual Meeting*, Newport, RI, "Identifying High-Risk Seniors"

Minnesota Gerontological Society's *Long Lives in the New Millennium*, St. Paul, MN, "Preparing for the Pandemics: Chronic Illness and Disability"

American Society on Aging's *2000 Summer Series on Aging*, St. Paul, MN, "Ten Promising Health Care Interventions for Chronically Ill Elders"

*Invited Seminars* - Academic institutions

Georgetown University's *The 31st Century Challenge: Providing and Paying for Long-Term Care*, Washington, DC, "Integrating Medical and Supportive Continuing Services"

Purdue University's *Symposium on Life Course Inequality: Antecedents and Consequences*, West Lafayette, IN, "The Future of Health Care for Older People: Will the Disadvantaged be Left Behind?"

Harvard Medical School/Beth Israel Deaconess Medical Center's *Geriatrics Grand Rounds*, Boston, MA, "Improving the Health Care of Older People"

Johns Hopkins Bloomberg School of Public Health's *Lipitz Seminar*, Baltimore, MD, "Stemming the Tide of Disability among Older Americans"

University of Rochester Geriatric Education Center's *Annual Geriatrics Symposium*, Rochester, NY, "Cost-Effective Care of Older Populations in the Future"

University of Alberta's *Medical Grand Rounds*, Edmonton, Alberta, Canada, "Good Medicine for Old People: What will it Demand of Us?"

University of Pittsburgh's *Internal Medicine Grand Rounds*, Pittsburgh, PA, "Improving the Health Care of Older Populations"

University of Kansas Center on Aging's *Visiting Professor*, Kansas City, KS, "Research Seminar" and "Future Care of Older Populations"

Dartmouth Medical School's *Internal Medicine Grand Rounds*, Hanover, NH, "Geriatrics in the 21st Century"

Albert Einstein Medical Center's *Internal Medicine Grand Rounds*, Philadelphia, PA, "Risk Assessment in Medicare Patients"

University of Puerto Rico School of Medicine's *2nd Conference on Health Promotion*, San Juan, PR, "Innovative Systems of Care for Older Populations"

*Invited Seminars* - Governmental agencies

Capital Health Association's 2002 *Geriatric Services Planning Session*, Edmonton, Alberta, "Integrating Acute Geriatric Services"

Medicare-Medicaid Integration Program's 2002 *Annual Meeting*, Baltimore, MD, "Case Management for Dual Eligibles"

Health Care Financing Administration's 1996 *National Research Conference on Managed Care and Persons with Disability*, Harbourtowne, MD, "Identifying High-Risk Medicare HMO Members"

Veterans Administration Medical Center's *Medical Grand Rounds*, Minneapolis, MN, "Stemming the Tide of Disability among Older Americans"

Veterans Administration Medical Center's 1996 *Seminar on Aging*, Minneapolis, MN, "Monitoring and Modifying Health Risks in Older Populations"

*Invited Seminars* - Trade associations

National Chronic Care Consortium's *Primary Care Team: Cornerstone of the CCN*, Detroit, MI, "Innovations in Chronic Care"

The HMO Group's *Clinical Management of the Senior Population in an HMO Environment*, San Francisco, CA, "Identifying the Special Needs of the Senior Population in Managed Care: Assessment Strategies"

The HMO Group's *Clinical Management of the Senior Population in an HMO Environment*, Boston, MA, "Identifying the Special Needs of the Senior Population in Managed Care: Assessment Strategies"

Blue Cross Blue Shield Association's *Best Practices in Medical Management*, San Francisco, CA, "Identification of and Appropriate Interventions for High-Risk Seniors"

American Association of Health Plans' *1996 Institute: Defining Health Care for the 21st Century*, New Orleans, LA, "Classifying the Risk Level of Older Health Plan Members"

Blue Cross Blue Shield Association's *Senior Care Best Practices Forum*, Chicago, IL, "Targeting Elders for Geriatric Evaluation and Management"

*Invited Seminars* - Extramural continuing education conferences

Johns Hopkins School of Nursing's *Hot Topics in Advance Practice Nursing*, Baltimore, MD "The Role of Nursing in the Future Care of Older People with Chronic conditions"

Case Western Reserve University School of Medicine's *Family Practice Review*, Cleveland, OH, "Future Health Care for Older People with Chronic Illness"

Kaiser Permanente's *2000 Elder Care Symposium*, Long Beach, CA, "Evidence-Based Geriatric Medicine--What Works and What Doesn't?"

Scripps Clinic's *Medical Grand Rounds*, La Jolla, CA, "Innovative Care of Older People"

International Business Communications' *Personalized Health Management*, Beverly Hills, CA, "Screening and Preventive Programs for High-Risk Elderly Patients: Who is at Risk and What is Being Done About It?"

International Business Communications' *Managing the Senior Population in a Managed Care Environment*, Cambridge, MA, "Identifying High-Risk Members of Older Populations and Systems of Care for the 21st Century"

Institute for International Research's *Fourth Annual Medicare Managed Care Congress*, Coral Gables, FL, "Implementing a Health Risk Screening Tool--the First Step Toward Population Based Care"

International Business Communications' *Assessing and Reducing Health Risk in Medicare/Medicaid Populations*, Chicago, IL, "Early Identification of High-Risk Persons"

Alliance for Healthy Aging's *1995 Clinical Leadership Series Institute-- Managing Health Outcomes in an Aging Population: Risks and* for Healthy Aging's *Innovative Approaches to Caring for Older Persons,* Scottsdale, AZ, "Screening Populations to Identify High-Risk Elderly Persons"

*Community service*

Soccer coach, Mount Washington Recreation, Baltimore, MD, 2002-

Little league baseball coach, Roland Park Recreation, Baltimore, MD, 2002-

Little league baseball coach, Parks and Recreation, St. Paul, MN, 2000-2001

Gifted and Talented Parent Advisory Committee, St. Paul Public Schools, MN, 1998-2001

Health Commentator, WLTE-FM, Minneapolis, MN, 1994

Contributing author, Good Age, 1994

Contributing author, Minnesota Senior News, 1994

Health commentator, KARE-TV, Minneapolis, MN, 1994

Speaker, AMA-ABA program to prevent childhood substance abuse, St. Paul, MN, 1994

Panelist, "Health Talk and You," KTCI-TV, Minneapolis, MN, 1991-1996

Secretary-Treasurer and Member of the Board of Directors, National Public Telecomputing Network, 1989-93

Contributing author, Newsletter of Parenting, 1985

Health commentator (daily), WERE-AM, Cleveland, OH, 1984-85

*Educational Grants*

"Grants for Graduate Training in Family Medicine," DHHS #5D15PE19111-08, AY 1987-88, Principal Investigator, $84,240

"Family Practice Residency Education," California #80-75002A7, AY 1987-88, Principal Investigator, $103,230

"Interdepartmental Geriatrics Fellowship," California Academic Geriatric Resource Program, AY 1987-88, Principal Investigator, $16,697

"Family Medicine Geriatric Fellowship," California #86-20120 A1, AY 1987-88, Principal Investigator, $44,550

"Grants for Graduate Training in Family Medicine," DHHS #5D15PE19111-07, AY 1986-87, Principal Investigator, $84,240

"Family Practice Residency Education," California #80-75002 A4, AY 1986-87, Principal Investigator, $86,025

"Rural Family Practice Education, San Diego-Imperial County Rural Area Health Education Center, October 1986-September 1987, Principal Investigator, $12,960

"Family Medicine Geriatrics Fellowship," California Office of Statewide Health Planning and Development, AY 1986-87, Principal Investigator, $27,700

"Rural Family Practice Education," San Diego-Imperial County Rural Area Health Education Center, October 1985-September 1986, Principal Investigator, $21,600

"Grants for Graduate Training in Family Medicine," DHHS #5D15PE1534102, AY 1985-88, Co-author, $247,000

*Personal statement of research and research objectives*

My present research interest centers on the development and testing of novel approaches to organizing, financing and delivering health care to older populations. I am particularly interested in collaborating with others to improve the outcomes experienced by people whose chronic illnesses require care that spans the hospital, post-acute, and home care settings.

*Keywords:* health services research, geriatrics, post-acute care, outcomes research, interdisciplinary care

# Exhibit B

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - -x
In re: :
:
BAYCOL PRODUCTS LITIGATION. : MDL No.
: 1431 (MJD/JGL)
- - - - - - - - - - - - - - - - - - -x

Washington, D.C.
Friday, January 30, 2004

Video Deposition of:

CHARLES E. BOULT, M.D.

a witness, called for examination by counsel for Baycol, pursuant to notice and agreement of counsel, beginning at approximately 9:20 a.m., at Williams & Connolly, 725 Twelfth Street, N.W., Suite 1000, before Monica A. Voorhees, RPR/CSR, Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

P R O C E E D I N G S

Whereupon,

CHARLES E. BOULT, M.D.,

was called as a witness and, having been first duly sworn, was examined and testified as follows:

MR. MIZGALA: I just want to point out, there is someone on the telephone.

Go ahead and introduce yourself.

MR. EARLEY: And I should have jumped in there. Loyd Earley on behalf of some pharmacists.

EXAMINATION BY COUNSEL FOR BAYCOL

BY MR. MIZGALA:

Q. Okay. Dr. Boult, you've been deposed before, correct?

A. Yes.

Q. Okay. Just quickly then, well actually the only time, or the only record I have of you being deposed in the last 10 years was May of 2003 in a case Cardiac Surgery Associates V Mid Atlantic Cardiovascular Associates.

Is that correct?

A. That is.

Q. Well, Doctor, that all statins, all the statins cause muscle damage is one thing.

Providing a basis between the comparative risks of statins is another, correct?

A. I see what you're saying.

Yeah, I think the, I'm not sure which one of these now it came from, but the, well, actually I do know. One, the best summary is the Thompson article, which is on the second page, the fifth from the bottom, this was a review of the whole field of statin-induced myopathy and so it wasn't original data, but it's a summary of all the data that's out there, and that was published in 2003.

And in there they cite the risk of rhabdomyolysis as being something in the range of 15 to 80 times greater with Cerivastatin than the other statins and I believe the original article, or the original reports of that had to do with the reporting of adverse events in the post marketing era after the drug was released.

Q. So that's not, that's not incidence data, those are data related to reporting rates of adverse

statement and it's called materials reviewed. It's a two-page list of about 25 articles that I read.

Q. Okay. And who compiled this?

A. I did.

Q. Doctor, you refer to the Thompson article on page 2, the one from JAMA?

A. Yes.

Q. Is it your testimony that that's an article relating to the clinical trials of Cerivastatin?

A. It's a summary.

MR. HOPPER: I'm sorry, could you point me to what you were referring to?

THE WITNESS: Thompson article.

MR. HOPPER: Oh, the Thompson article, excuse me, sorry.

THE WITNESS: It's a review article of, it includes a summary of the clinical trials as well as the myopathy that resulted.

BY MR. MIZGALA:

Q. Did you look at any of the primary publications of the clinical trials of Cerivastatin in the literature?

A. I don't believe I looked at the original articles. I relied on other peoples' reviews of the original articles.

Q. And do you believe Thompson said anything about whether or not geriatric patients were included in the clinical trials of Cerivastatin?

A. I honestly don't remember whether that Thompson article commented on that or not.

Q. Okay. And if it didn't, then, again, your assumption that there weren't any geriatric patients in the clinical trials or a small number is based on this general assumption you have about how clinical trials are done; is that correct?

A. No, I'm just, I want to be careful with the words.

It's not that there are no or few geriatrics patients, it's that there are few older people with multiple chronic diseases and multiple medication use, so that's what we are talking about.

And I do believe, I'm sorry, I just can't quote you the article, but I do recall that in my reviewing of these articles that I do believe that it

drug's likelihood of causing adverse effects."

So that's a general statement that would include reference to Baycol.

Q. Okay. You don't say that, despite that statement, you don't say that the labeling of Baycol was inadequate in any way; is that correct?

A. Actually the following sentence, "In the absence of complete information, and in the presence of pharmaceutical marketing, physicians may unknowingly prescribe drugs that are safe for younger, healthier people, but cause adverse effects in chronically ill older people."

So it's not exactly fitting your words, but the intent here is to point out how important complete labeling is, especially in the, when the drugs are to be used in these vulnerable people.

Q. Well, what information, specific information is missing from the Baycol labeling?

A. Well this goes back to our earlier conversation where the Baycol label doesn't say, you know, this drug has not been tested in older people with chronic illness and other medications and

have been more cautious in their use of this drug had they known it.

Q. When you say increased rate, Doctor, what are you referring to?

A. That the percentage of people who acquired muscle damage from Cerivastatin was greater than the percentage of people who got muscle damage from the other statins.

Q. Okay, by muscle damage, what do you mean?

A. Well it's a spectrum ranging from mild transients of pain that resolves when the drug is stopped to a, an intermediate form of moderate to severe myopathy where the, there again is pain and/or weakness that persists, it comes on when the drug is used and it, but it persists after the drug is stopped and that distinguishes it from the first, the mild cases.

And then there's the severe, or the fatal of rhabdomyolysis.

Q. Okay. And you're saying, Doctor, that the rate of -- do you see these as three distinct types of a reaction or do you think they are all part of the

MR. HOPPER: I'm sorry, did you ask him if that was his testimony?

MR. MIZGALA: Yeah.

THE WITNESS: No, I didn't --

BY MR. MIZGALA:

Q. Okay.

A. -- testify to that.

Q. Is that your opinion, do you think that Baycol had a higher rate of the mild form of what you defined as your, in your spectrum, the mild myopathy, do you feel that it had a higher rate of myopathy associated with it than the other statins?

A. I don't have information about that.

Q. Okay. How about the intermediate form, do you feel Baycol had a higher rate of the intermediate form of myopathy than the other statins?

A. As far as I know, there's no studies that even tell us that.

Q. Okay.

A. We just know that it had a higher rate of severe and sort of biological inference, if it tends to cause more higher rate or more frequent severe

damage, then it probably has a higher rate of the moderate to severe damage, as well, since it's all on a continuum.

Q. So you're relying on the rhabdo data; is that correct, when you talk about these other rates?

A. More likely to be the moderate to severe, yes. Yes, it's --

Q. There's no direct data on that, correct, comparing the statins?

A. Just the rhabdo data.

Q. Okay. So there is no direct data on the mild or the intermediate; is that correct?

A. There may, there probably is on the mild and I'm just not able to cite it for you right now.

Q. What would the nature of that data be?

A. Well it would be the combination of the data from clinical trials and then the post marketing data.

Q. And when you refer in your continuum, when you're talking about mild, the mild, are we calling this myopathy or muscle injury, what do you want to call it?

A. That's right.

Q. And, Doctor, going back to your report, Exhibit Number 4, there's nothing in your report regarding the conduct of Bayer Corporation, Bayer A.G. or GSK or any of their employees with respect to Baycol; is that correct?

A. Well, again, only by, in paragraph 20, it doesn't name the corporation; however, the, as I say, "In the absence of complete information," and what I mean there is that the prescribing physicians did not have complete information, didn't have adequate warnings and then the, in the presence of pharmaceutical marketing, they were marketing this drug.

And so both of those, although I don't use the name in the, in my report, that's what I'm talking about.

Q. And again, those are the same two sentences you said apply to all statins, and apparently all statin manufacturers, correct?

A. With different degrees of pertinence.

Q. Okay. What is the complete information

that was missing from the Baycol label?

A. Well first that this is a drug that has not been tested on large numbers of older people with chronic conditions and other medications and that, therefore, the use of this drug in such populations should be considered very carefully in weighing the risks of doing that, of using it in that population.

Q. Can I interrupt just for a second, Doctor.

Can you name me one drug that has that in its label?

A. I hesitate to specify a drug, but I know that the labels will often say things like, they do it with children and with older, they have categories of people for prescribing and they'll say use with particular caution in children or the elderly or in people with kidney disease or something like that. Those would be in there.

Q. So that's a little different, though, Doctor?

A. And they recommend using the lowest possible dose when starting.

Q. If the Baycol label talked about what had

got a problem with the marketing, he said this sentence with pharmaceutical marketing applied.

BY MR. MIZGALA:

Q. What do you know about the marketing of Baycol, Doctor, how was it marketed?

A. It was marketed the sort of standard way that most drugs are marketed, advertisements in medical journals and there was detailing to private physicians are the usual, you know.

Q. So just like any other drug is marketed?

A. Those were the channels for the marketing. It's the, my concern is with the content of the message that was sent in those marketing channels.

Q. What's your concern with the content, specifically, I want to know every specific concern you have with the content of the Baycol message?

A. I think we've been over this, but it's the lack of acknowledgement that the drug had not been tested in adequate numbers of chronically ill old people with multiple other drugs and the risk, therefore, to prescribing it to those populations in post marketing was considerable, because it's

basically untested in the same populations for which it was being marketed.

That's, that's what I consider to be inappropriately meager disclosure of the risks of the drug.

Q. And again, you said that's, that applies to all the statins, correct?

A. Yeah, and as I said probably three times already, yes, to different degrees, depending on what the risks are. When the risks are higher, that is, the onus I believe is higher on the manufacturer to disclose the risk.

Q. Doctor, show me any scientific support you have that says that the risk of the use of Baycol was in any way greater to the geriatric population than the risks -- or the use of any other statin based on age?

A. The, the best evidence is the rate at which people acquired rhabdomyolysis and fatalities. That was extremely more common in users of Baycol than the other statins.

Q. Is that controlled for age, is that data

controlled for age?
A. Trying to remember, there were some controls. I don't believe that is controlled for age.
Q. Okay. So, Doctor, and again, if I look at your Exhibit 3 to your report, Exhibit 2 to your deposition, materials reviewed, none of the Baycol labels are listed on there; is that correct?
A. I believe that's -- Baycol labels, you mean?
Q. Yeah, I don't see anything that says Baycol labeling on there, right?
A. Oh, right, true.
Q. Do I see anything, do you see anything that says Baycol marketing materials?
A. No.
Q. Okay. Did you review any Baycol marketing materials?
A. No, I experienced those as a clinician.
Q. As a clinician?
A. As a clinician, practicing doctor.
Q. And can you cite me to any specifics about them, what you saw?

A. Just that terribly specific, just that I saw advertisements for the drug.
Q. Okay, you saw advertisements.
Can you remember anything about those advertisements that you had, you took issue with?
A. Only in retrospect now, that the risks weren't disclosed and it was advertised and promoted as a drug that was -- actually, there was something that was, supposedly it was going to be, there was some claim that it would be safer than other statins, but I'm a little fuzzy about what that was, something having to do with liver metabolism, but I don't remember.
It certainly was not disclosed that this drug had higher risks of rhabdo than the others and I believe it was actually claimed, the claim was actually in the other direction, that it was a safer drug. That's about as much as I remember.
Q. You think that that was in the marketing materials and in the label, that it was a safer drug?
A. The advertisements. I believe, I could be wrong on that, but I seem to recall there was a claim

that, there was something about the liver metabolism, that it was less likely to cause liver damage than the other statins and I'm really just stretching my memory now on this.

Q. Doctor, can you, do any of the statins currently on the market contain adverse effect data, report data in their labels?

A. Any of the current statins?

Q. Yeah.

MR. HOPPER: If you know.

THE WITNESS: Yeah, honestly I didn't go back and review the other statin labels to see. I don't know.

BY MR. MIZGALA:

Q. So it's just kind of fortunate you read the Thompson article and you're aware of that information; is that right?

A. I'm not sure what you mean.

Q. Well how would you get that information otherwise if it's not in the label?

A. Which information?

Q. On the relative, or the comparative rates

of adverse event reports?

A. Oh, well it's -- it was in the Thompson article, it was in probably quarterly articles is the same citation, Thompson is just the most comprehensive article, but it's in many of these articles.

Q. Are you saying Bayer should have put that in the label, in the Baycol label?

A. I'm saying they should have acknowledged this significant risk in the label.

Q. Do you think they should have put adverse event reporting data, comparative adverse event reporting data in the label?

A. I don't really feel like I can comment on that because I'm not sure, I'm not an FDA expert and I don't really know what's appropriate to put in. I'm talking more about the general intent and somewhere in the label the risks should have been, in my view, should have been acknowledged to the prescribing physicians.

Q. Okay. And just acknowledging that there's a risk of rhabdomyolysis, you don't feel that was enough?

readjourn.

So I'm agreeing if we are reconvening to continue the deposition.

MR. EARLEY: That's fine by me, right.

MR. HOPPER: Wait a minute, I agreed to readjourn.

BY MR. MIZGALA:

Q. Okay. Dr. Boult, welcome back from lunch.

You have a patient who's taking a statin, Simvastatin as you like to prescribe, correct?

A. Correct.

Q. Okay. That patient comes in complaining of muscle pain, proximal muscle pain and/or weakness.

How do you go about a diagnosis in that patient?

A. Well we begin with a history, we want to know when did the pain or weakness begin, when did the Simvastatin use begin, because that's an important temporal relationship.

Q. Well let's tease that out a little bit.

What about the relationship, are both of those variables important or is just --

the probability that this pain is related to their Simvastatin use.

Q. Okay.

A. It's all a series of changing probabilities as you add more information.

Q. What if they say going up, what if they say I've got pain in my calf?

A. It's more proximal, a little more likely.

Q. But what would you do to, it's probable, what would you do to further diagnose in that patient?

A. Well now is this a patient that I already know their past history on, otherwise, I mean if I already know that, then I don't have to gather more information about do they have other diseases that could be causing this.

But if it's a new patient to me, I've got to go back over all that. Do they have a history of other muscle diseases, other joint diseases, other things that could be going on, because obviously we don't just rule in or out one disease.

We start with the whole pallet of possible diseases to draw on.

Q. Okay. And you have to --

MR. HOPPER: Excuse me one moment, I just want to interject for the record to be sure that the record reflects and the jury knows, this is a hypothetical patient, not someone you've actually seen or treated, correct?

THE WITNESS: That's right.

BY MR. MIZGALA:

Q. And in doing the history, you also want to find out what's happened in this patient recently, too, right, pain in the calves, they could have started an exercise program recently?

A. Right, there's a lot of history we would ask about.

Q. Okay, you do the history and then would you do a physical exam?

A. Yes.

Q. Okay. What would you be looking for?

A. Well, if the pain were in the calf, let's say, like your hypothetical, I'd look at the calf, part of the examination is to just look at it and see is it red, is it swollen, is it deformed in any way,

the skin color and so on. Observation is the first step of a physical examination.

The second is to palpate it, touch it, feel it, is it tender, does it hurt when you touch it, does it seem the normal texture, does it seem hard, hot, cold, that sort of thing, and particularly examining for this specific anatomical part of that body. In other words, we know where the veins are, so you check, you press over the veins and see if that's more tender than other parts, we press on the parts that are in the muscle, there's parts that are the bone, parts that are the artery to kind of piece by piece palpate the body part in question to determine more specifically than just the calf, but which elements of the calf are probably the problem, including stretching the muscle by pushing the toes and the foot up.

There's a variety of things that you can do.

Q. Okay. Would you, knowing that the person is on a statin and that you've ruled in as a possibility that a statin could be involved, would you

want to check the more proximal muscles also?
A. Right.
Q. And how would you do that?
A. Palpate, press on to the other muscles such as I mentioned, the thighs, the buttocks, shoulders, neck, back, see if there's tenderness, if that elicits a complaint of pain upon pressing.
Q. Okay. If it was related to the statin, would you expect to find some tenderness in those proximal muscles?
A. Might or might not. Again, it's a series of changing probabilities. If I did find that there was tenderness in the muscle in question, yeah, that would elevate the probability. If there was tenderness in other muscles, especially proximal ones, that would elevate the probability, as well.
Q. If there was only, in this hypothetical, if there was only presence of tenderness in the calves and not any evidence of tenderness in the more proximal muscles, would that make it more or less probable that the statin was involved?
A. That would be less, but not ruling it out.

Q. Okay.

A. We don't check strength through the dimension of it. I'd want to assess the strength of these different muscle groups to see if they've been affected, especially if it seemed to be a problem related to the muscle compared to -- sometimes on examination you're making decisions all the way along the examination, so if it seems like the tenderness is most right over the bone, you emphasize the bone exam and less so the muscle. But if the tenderness is on the muscle, then you look more intensively at that muscle and other muscles. These are all series of branching algorithms.

Q. Would you order any laboratory tests?

A. Again, it's a clinician's job to determine what's the, what are the most likely things that are based on the probabilities from the information it's gathered so far and if based on the evidence that you've collected you think that it's likely enough, and that's a judgment call, that it's a muscle problem, your thinking looks that way, then you'd certainly want to get muscle blood tests, such as a CK

value.

Q. What do you in your opinion, what sort of evidence do you feel merits you ordering a CK test in a patient who's coming in on a statin complaining of muscle problems?

A. Well, I'm going to, this is by nature going to be an oversimplification because as you can tell from all the branching logic, you'd really have to specify, you know, give me the data from all those questions that I asked you, you know, like when I palpated all those muscles and ask all those questions, I would end up in my mind with a probability.

And so a typical case where I would, that would generate a high probability of a muscle problem that would make me order a CK would be somebody who was the typical case, so if they started, they didn't have any known muscle disease before, they started taking a statin, a few weeks later they got the onset of pain and/or weakness and on examination I found that their muscles were particularly, especially proximal muscles, were tender to the touch.

That would be a classic case that clearly probability of a muscle problem would be high and I would order that test.

Q. Okay. What if, what if the patient came in and you had that temporal relationship we talked about where they started the statin and within a month present with muscle pain, but it's only muscle pain in the calves.

That's what's tender. You know they started an exercise program, say, a month or so earlier and you can't find any pain or weakness anywhere else. Would you order a CK test?

A. I probably would.

Q. Would?

A. I probably would. That doesn't mean everyone would.

Q. Okay.

A. Like I said, there is no computer algorithm into which you put these answers except for the brain of the physician and we don't all use the same calculus and the same algorithms and come up with the same probabilities. We are not even all aware of all

the science.

I mean drugs come out, they are new, not, you know, there's a possibility that the physician seeing this hypothetical patient doesn't even remember that particular side effect, so they may have totally missed it.

Q. You order a CK test, it comes back normal, do you tell the patient to stop taking the statin, or have you already taken them off the statin?

A. Again, it would depend on the individual case with all the answers to all of those questions. The CK doesn't make the diagnosis, it's just one more piece, like one more question or one more part of the body to examine.

It's a test that you could say has a low sensitivity; in other words, it could, you know, miss a fair number of cases, depending on when the test is obtained because it's just a, it's a cross-sectional or a picture of a, the situation at the moment that you draw the blood, but it doesn't tell you anything about what was going on, say, in the weeks before, it doesn't tell you anything about in the weeks after.

It's an enzyme that is rapidly cleared from the blood, so you can have brief, even high elevations that don't last, and so your ability to diagnose based on it is dependent on when you happen to draw the test.

So if a person, for instance, has a, say a typical, maybe they started exercising and they tore some muscle fibers in their exercise program. If that happened to you, you would, if you had your CK measured at the right moment, you'd have an elevated CK. Three days later you might have a normal CK, but you still had the injury.

Q. Uh-huh.

A. So it's to be viewed as a snapshot of a situation at that moment that just tells you about that.

Q. Well, in a patient that's taking a statin who presents a month later who's complaining of pain and weakness, is the injury taking place, they say, you know, this started developing in the past week, would you expect the injury had taken place and stopped and you wouldn't get an elevated CK or that

the injury was ongoing?
A. I don't think there's a very tight correlation between the injury and the CK levels, for one thing.
And in other words, you can get the, you can get the injury from statin or for that matter from blunt trauma and have no CK elevation and likewise you can have a CK elevation that's temporary, so there's lots of different combinations, it's just not a 100 percent correlation that you can say if there's a CK, there's injury, if there's no CK elevation, there's no injury. You just can't draw that conclusion.
Q. Doctor, how do you believe or what's your opinion as to how statins injure muscle cells?
A. I don't have a good, clear idea of how that actually operates. I know that there's some different theories about it. I don't think anyone really knows what's going on, but it may involve damage to the nerve endings that innervate or stimulate the muscle to contract and with loss of the innervation, then the muscle fibers secondarily are damaged because they are

A. Well it was causing much higher death rates.

Q. Well on here if you look at the percentage of outcomes, that is not an absolute, but in terms of once you have an impact, the Cerivastatin 7.2, Simvastatin is 8.0, Atorvastatin is 9.5, Pravastatin is 7.9, Lovastatin is 10.9, Fluvastatin is 4.6; those are all relatively the same, aren't they, in terms of outcome?

That's a much more salient statistic, isn't it, when you're comparing it within the population?

A. We need to reconcile those numbers with the numbers for fatal rhabdo where Simvastatin -- I mean Cerivastatin has this much higher death rate.

Q. Well here under percentage of outcomes, though, for death, they are all basically pretty much the same, correct?

A. Yeah, I'm saying that that's, that's not checking with the other statement right below it that says that, you know, that Cerivastatin has a 16 to 80 percent times greater mortality rate than the other statins.

on that form of myopathy?

A. Not that I'm aware of.

Q. Okay. But, Doctor, this paragraph doesn't say anything about the comparative rate, it just says that in deducing a severe to -- moderate to severe statin-induced myopathy, you use these three clinical criteria and you would use those whether the statin was Cerivastatin, Simvastatin, Atorvastatin or any other statin, right?

A. Yes, I think that would be true, it's just that it would be much more likely to have this moderate to severe myopathy with Cerivastatin.

Q. And you're basing that as an off-chute of the fatality data from Staffa, correct?

A. Yes.

Q. Okay. Okay, the first thing you say, Doctor, is pain or weakness, pain is a subjective complaint, correct?

A. Yes.

Q. Okay. Why do you say or? You don't need both?

A. That's right, some of the cases have pain,

symptomology completely resolved upon cessation of drug use, correct?

A. In these three cases, they did.

Q. Are you aware of any other cases where they didn't?

A. Back in --

Q. Were normal CKs?

A. Back into the Hildebrand article.

Q. Show me where in the Hildebrand article --

MR. MIZGALA: Let's mark it right now, Exhibit Number 10.

(Boult Deposition Exhibit No. 10 was marked for identification.)

BY MR. MIZGALA:

Q. Show me in Exhibit Number 10, Doctor, where it says that a patient with a normal CK had a persistent, had persistent symptomology --

MR. HOPPER: I gave him my copy.

BY MR. MIZGALA:

Q. -- upon cessation of drug use.

A. Well as I said before, the, this doesn't say that.

or weakness of proximal muscles severe enough to cause functional, significant functional limitations after the use of a statin is discontinued?

A. So what you're calling for is high level proof in a scientific sense that has not been collected yet in the way that you're calling for it. What we have to deal with in reality in taking care of our patients is about three or four different lines of evidence that are not what you're describing.

I can design a study that would give you the answers you're looking for, but no one has done that study yet. So what we are left with is, as we often are in the emergence of a relatively newly-recognized condition, is we have incomplete data. We have data that show on the one hand that people can clearly have cell damage, muscle cell damage from statins with normal CKs. We know that.

We also know that people who have the clear temporal relationship between starting statins and getting the symptoms that you just described, we know that those people, 25 percent of them don't have elevated CKs and we know that 25 percent of them don't

call CLAM and that's, I think that's a special subset. These are people whose -- who had myalgia with activity. We haven't even talked about that, but people who are on statins sometimes get pain in their muscles only when they exercise and that's what this is about.

Again, it's all, it's all kind of different perspectives on the same thing. This, this author is saying that people with that syndrome, recovery is sometimes very slow and incomplete and continue to have pains long after the drug was stopped.

And then it goes on to say that the clinical experience has been reported to me by other neuromuscular experts, but has not been formally reported.

So it's kind of something that's known by experts, but not necessarily written up in the scientific literature.

Q. And they don't say anything about the CK patients or the CK in these people that he's seen in several patients, right, you have no idea what their values were?

is neither. It's just what it is.

Q. It's just sort of an off-the-cuff remark, basically?

A. No, I don't think so. I think it's --

Q. You think that's better than --

A. I think this is an expert trying to get information out to the scientific community in a preliminary form when it hasn't been subjected to these more rigorous types of investigations.

Q. So you don't, you think this is, do you think this is better than a case series or better presentation?

A. It's different, I don't think you can really rank order them. Each has a different purpose.

The purpose of this is to make the medical community aware of the observations that this, I think it's a neurologist, specializing in muscles, Department of Neurology.

MS. FAIRWEATHER: Can we just take a real quick break?

MR. HOPPER: Quick break.

MR. MIZGALA: Yeah.

of myalgia or for myositis, either. They are fairly arbitrary. They are useful, it's a way to communicate, but they are not like universal truths.

Q. Well can you show me where your criteria are used in the medical literature to deduce a statin-induced myopathy?

A. No.

Q. They are not anywhere in the literature?

A. No, I, as I stated earlier, I wrote those as intended to be useful guidelines for clinicians and I didn't feel that it was appropriate to, for one individual to publish and say that this is the way it is; in other words, that the process should be very rigorous, look at all the evidence with people from multiple perspectives and then, you know, come out with something that is very rich textured like that.

Q. Okay. And the ACC, what they were trying to do here, they acknowledge in the introduction that in the literature, the general terminology used to describe muscle toxicity is inconsistent?

A. Right.

Q. You would agree with that, correct?

A. Yes.

Q. And, therefore, they are, so they can all speak on the same page, they are adopting these definitions?

A. Exactly.

Q. Okay.

Don't you think that's a pretty good idea?

A. Yeah, for their purpose, it's fine.

Q. Okay. And what was the purpose of you coming up with your three criteria?

MR. HOPPER: Objection, asked and answered.

THE WITNESS: Yeah, just very briefly to create some guidance for clinicians in being able to determine whether a person has moderate to severe statin-induced myopathy.

BY MR. MIZGALA:

Q. Have you communicated your criteria to any other treating physician?

A. No, it's all stayed within this context here.

Q. Well how is it going to be useful to other physicians if you don't communicate it?

MR. HOPPER: Objection, calls for speculation.

THE WITNESS: It's a process, you know, it's -- in the future it may be useful to other clinicians. Right now I haven't submitted it for publication and I wouldn't because I haven't gone through the rigorous process that I mentioned to you.

This is a first step, you write it down, you put together the evidence as best that the evidence seems to indicate and then you get perspectives from other people. And once you've debated it all out, then you submit it for publication. This is too preliminary.

BY MR. MIZGALA:

Q. Okay, what do you think you need to do in order to make your criteria publication worthy?

A. What I just said, you need to convene a panel of experts with different expertise and make sure that it's a valid set of criteria for, from a variety of perspectives.

Q. And do you plan on doing this?

A. Yes.