**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : | MDL No. 1431 (MJD) |
| This Document Relates to: | : | |
| *All Actions* | : | |

## BAYER AND GSK's MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXCLUDE EXPERT TESTIMONY OF BRUCE CARLSON

Dr. Bruce Carlson is a clinical researcher on muscle regeneration, embryology, and gerontology. Deposition of Bruce Carlson (Ex. B) at 11:5-8. Although Dr. Carlson has conducted independent research on various topics, he never has done so with regards to Baycol or any other statin. *Id*. at 19:7-9. Moreover, Dr. Carlson never has practiced medicine and, consequently, never has prescribed Baycol or treated patients suffering statin-induced injuries. *Id*. at 11:19-12:5. These limitations notwithstanding, Dr. Carlson offers four primary opinions:

(1) Baycol is less safe than other statins, and causes a higher incidence of myopathy whether used by itself or in combination with other drugs;

(2) Baycol causes long-term or permanent muscle damage even after discontinuation of the drug;

(3) Myopathy induced by Baycol can occur in the absence of any clinical symptoms or corroborating laboratory data; and

(4) Bayer should have studied and/or publicized myotoxicity tests of Baycol in preclinical or clinical trials.

*See* Report of Bruce Carlson (Ex. A) ¶¶ 8, 14, 15, 17, 51; Supplemental Report of Bruce Carlson (Ex. C) ¶¶ 4; 8.

Each of these opinions should be excluded. The first opinion, as Dr. Carlson readily concedes, is derivative of adverse event report ("AER") data, which he has not studied. Carlson Dep. (Ex. B) at 14:6-8; 143:2-146:24; 175:7-176:1. His reliance on AERs for comparative safety data also is improper for reasons set forth in defendants' AER Motion.

As for his second opinion, Dr. Carlson repeatedly acknowledges that he knows of no study that supports his hypothesis about long-term effects of Baycol use. *See id.* at 167:9-172:8; 230:22-23:1; 303:24-304:7. Another court recently has excluded testimony similar to Dr. Carlson's. *See Leathers v. Pfizer, Inc.*, __ F.R.D. __, 2006 WL 708571 (N.D. Ga. Mar. 10, 2006).

Dr. Carlson's third opinion is based on data – not about Baycol – but about other statins. Carlson Dep. (Ex. B) at 131:10-23; Carlson Rep. (Ex. A) ¶ 19. Not only is Dr. Carlson unable to cite to any research that would allow such an extrapolation, but such reasoning conflicts with Dr. Carlson's fundamental premise that Baycol somehow is different from other statins.

Finally, Dr. Carlson's ruminations about what Bayer should have done should be excluded because, as he admitted, he has no foundation for his views. Carlson Dep. (Ex. B) at 16:1-18:10; 29:14-25; 51:13-18; 108:2-109:16; 107:20-108:1; 166:22-23. In short, Dr. Carlson's opinions about Baycol or Bayer's conduct simply lack the necessary indicia of reliability under *Daubert* and its progeny, and Rule 702 of the Federal Rules of Evidence.

## ARGUMENT

### I. DR. CARLSON'S OPINIONS ABOUT THE COMPARATIVE SAFETY OF BAYCOL DO NOT REST ON RELIABLE SCIENTIFIC DATA AND MERELY PARROT THE VIEWS OF OTHER PURPORTED EXPERTS.

Dr. Carlson offers the following opinion about the comparative safety of Baycol versus other statins: "[C]erivstatin [Baycol], whether used in monotherapy or in combination with other drugs, especially gemfibrozil, is responsible for a much higher incidence of muscle pathology. . . and a death rate 16-80 times greater than that of the other statin drugs." Carlson Rep. (Ex. A) ¶ 8. His opinion that Baycol is more dangerous than other statins should be excluded, because (1) Dr. Carlson is not qualified to render any opinion about the comparative safety of Baycol, and (2) the opinion rests entirely on AER-based literature, which is an unsuitable source for determining medical causation.

Dr. Carlson repeatedly denies any expertise on the subject of the comparative safety of Baycol versus other statins. Rather, he admits to parroting the conclusions of others who have analyzed AER data (*i.e.*, *Staffa* and *Thompson* articles). Carlson Dep. (Ex. B) at 143-47; Carlson Rep. (Ex. A) ¶ 8. He acknowledges that he has not conducted any independent research on the subject and also admits that he is not aware of any controlled studies that show a higher incidence of myopathy for Baycol versus other statins. *Id*. at 143-46. Given that Dr. Carlson lacks expertise and that there is no scientific support for his opinion, Dr. Carlson's intended testimony about Baycol's comparative safety should be excluded as precisely the type of "junk" science *Daubert* made inadmissible.

### A. Dr. Carlson Does Not Have the Necessary Expertise To Opine about the Comparative Safety of Baycol.

Rule 702 requires that an expert be qualified by "knowledge, skill, experience, training, or education" to express an opinion on a particular issue. The proffered expert must have specific expertise in the particular issue to which he will testify. Courts have recognized that the expert's qualifications are particularly important in the field of medicine: "given the increasingly specialized and technical nature of medicine, there is no validity, if there ever was, to the notion that every licensed medical doctor should be automatically qualified to testify as an expert on every medical question. Such a rule would ignore the modern realities of medical specialization." *Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996) (applying *Daubert*). This Court also has recognized the importance of specialization to expert testimony on medical causation. *See, e.g., Medalen v. Tiger Drylac U.S.A., Inc.*, 269 F. Supp. 2d 1118, 1127-29 (D. Minn. 2003) (refusing to permit a toxicologist to opine on the etiology of basal cell carcinoma, noting that an expert in one subject may not be qualified to testify beyond that expertise).[1]

---

[1] *See also Wilson v. City of Chicago*, 6 F.3d 1233, 1238-39 (7th Cir. 1993) (excluding pathologist's testimony on issues of neurology, psychiatry, and physiology); *Wehling v. Sandoz Pharm. Corp.*, No. 97-2212, 1998 WL 546097, at *4 (4th Cir. Aug. 20, 1998) (pharmacist and toxicologist not qualified to opine on causation in context of alleged drug interaction or adequacy of warnings); *Burton v. Danek Medical, Inc.*, 1999 WL 118020, *3-5 (E.D. Pa. Mar. 1, 1999) (excluding proffered neurologist's testimony based on lack of knowledge of spinal surgery); *Alexander* v. *Smith & Nephew, P.L.C.*, 98 F. Supp. 2d 1310, 1315 (N.D. Okla. 2000) ("blanket qualification for all physicians to testify as to anything medically-related would contravene the Court's gate-keeping responsibilities").

Here, Dr. Carlson is not qualified to testify regarding the epidemiological and pharmacological properties of statins. Carlson Dep. (Ex. B) at 15:7-14; 97:18-20; 175:10-23. Dr. Carlson is a clinical researcher on muscle regeneration, embryology, and gerontology. *Id*. at 11:5-8. Despite his experience in clinical research, Dr. Carlson never has conducted any independent studies on statins or Baycol. *Id*. at 19:7-9. Nor does Dr. Carlson have any experience in prescribing statins or treating statin-induced problems, as Dr. Carlson never has practiced medicine. *Id*. at 11:19-12:5. Not surprisingly, plaintiffs' attorneys have stated that Dr. Carlson is not being offered as an epidemiological expert. *Id*. at 175:21-23.

Dr. Carlson admits that he has never conducted any independent research on muscle pathology in Baycol users versus other statins:

> Q: You haven't done any independent research about the incidence of muscle pathology in Baycol versus other statins; have you?
>
> A: No, no independent original research; no.
>
> Q: And basically the statements that are in Paragraph 8 are statements that are contained in the references that you've cited?
>
> A: That is absolutely correct.
>
> Q: And you are merely citing those references?
>
> A: Yes.

*Id.* at 143:3-12.

Moreover, although Dr. Carlson opines about Baycol and its interaction with other drugs, he admits in his deposition that his only exposure to the subject involved a cursory review of the drug interaction profile:

Q: Did you look at the drug interaction of Baycol versus other statins?

A: I've looked at what's in the published literature. I haven't analyzed it carefully. But I'm aware of many other drugs which interact with Baycol, yes.

Q: My question is how the drug interaction profile of Baycol compares to other drugs, other statins.

A: You know, I've looked at that information. But, again, I did not focus on that in my report.

Q: Okay. Do you know whether Baycol interacts with digoxin?

A: That I don't know. I remember seeing that with respect to some of the statins. I honestly don't know if it was with Baycol or not.

Q: Do you know whether or not digoxin interacts with other statins besides Baycol?

A: My guess--. I won't even guess.

*Id*. at 72:6-22.

As Dr. Carlson readily admits, he has no basis for his opinions other than his cursory reviews of drug profiles, which he could not even recall at his deposition. When pressed again about whether he was aware of any study that shows that Baycol had a greater propensity than other statins to cause muscle pain, Dr. Carlson admitted, "The answer is, no, I am not aware. But I did not specifically look at that literature because that was not my area of concentration." *Id*. at 175:7-13. Given his dearth of knowledge about the subject, ultimately, Dr. Carlson virtually retracted his opinion:

Q: [Y]ou're not going to be offering any opinions at trial that Baycol has a greater propensity to cause myalgia than other statins based on any of the literature you've reviewed?

A: On the basis of literature I've reviewed, no, I would not.

*Id*. at 176:1-6.

By his own admission, Dr. Carlson lacks the expertise to opine on the comparative safety of Baycol. Moreover, he cannot support his opinion with a single study or any research on the topic. Nor has he conducted any independent studies of his own. Rather, in his deposition, Dr. Carlson tried to deflect questions about Baycol's comparative safety to the other experts retained by plaintiffs in a vain attempt to bootstrap his unsupported conclusions to the opinions of others. *Id*. at 143:2-12. Given his lack of knowledge on the subject, Dr. Carlson's proffered testimony must be excluded under Rule 702 and *Daubert*.

### B. AER Data Cannot Support an Opinion about the Comparative Safety of Drugs.

Notwithstanding his lack of expertise and his admission that he never has seen an AER (Carlson Dep. (Ex. B) at 14:6-8), Dr. Carlson opines that Baycol has a higher incidence of myopathy and death than other statins. Carlson Rep. (Ex. A) ¶ 8. To support this conclusion, he relies exclusively on AER data, even though the FDA has stated:

> Accumulated case reports cannot be used to calculate incidence or estimates of drug risk. . . Comparisons of drugs cannot be made from these data.

Brief Description with Caveats of System at 2 (Oct. 18, 1999) (Ex. D). *See also* Defendants' AER Motion.

In focusing his opinions on AER data rather than Baycol's drug interaction profile and controlled studies, Dr. Carlson chose not to focus on evidence that the scientific community would accept. Rather, he chose to rest his opinion on the shaky

ground of spontaneous anecdotal reports, which are submitted by doctors, consumers, lawyers, and the general public without independent verification of causation. Indeed, when asked whether he knew of the FDA's position on the use of AERs to make drug comparisons, Dr. Carlson responded, "If they made a specific statement, no." Carlson Dep. (Ex. B) at 144:25. This highlights the flawed methodology that supports Dr. Carlson's entire intended testimony. Plainly, he has failed to employ the "intellectual rigor" required of a professional in his field. *See Group Health Plan, Inc. v. Phillip Morris U.S.A.*, 344 F.3d 753, 760 (8th Cir. 2003).

## II. DR. CARLSON'S OPINION THAT BAYCOL CAN HAVE LONG-TERM ADVERSE EFFECTS IS SPECULATION MASQUERADING AS SCIENCE AND SHOULD BE EXCLUDED.

Dr. Carlson opines that the use of Baycol can cause permanent myopathy, even after the drug is discontinued and even when laboratory measurement of the CK enzyme (indicative of muscle injury) is within normal limits. Specifically, Dr. Carlson opines:

- "I feel that as a result of these factors some individuals will experience or have experienced prolonged recovery from muscle pathology or suffer(ed) permanent muscle damage as the result of their use of cerivastatin alone or in combination with other agents." Carlson Rep. (Ex. A) ¶ 15.

- "In the event of impaired muscle regeneration, the occurrence of fibrosis could lead to some degree of permanent impairment." *Id.* ¶ 17.

- "Because of the timing and nature of release of CK or myoglobin from damaged muscle, clinical determination of blood and urine levels of these proteins in a given patient may not fall within the range usually associated with severe muscle damage." *Id.* ¶ 9.

- "The duration of the ill effects [of Baycol] can be long-lasting." *Id.* ¶ 51.

- "In the case of statins and Baycol, one would have the potential and the likelihood of repeated insult so that one would have a cumulative effect. And in that circumstance, yes, the course of repair and recovery would be longer." Carlson Dep. (Ex. B) at 303:24-304:3.

Dr. Carlson finds support for these opinions, not in any research work of his own, but in unrelated studies, including animal research and muscle transplant cases – none of which, when examined, actually provides any reliable basis for his opinions. Such opinions remain speculative conjecture not tested by Dr. Carlson or anyone else. *See Leathers*, 2006 WL 708571, at *1-3 (excluding putative expert testimony that statins cause "prolonged and even permanent damage" through a "milder form of diffuse muscle ailment" than rhabdomyolysis, on the ground that "[t]he statin side effect recognized in the medical community is a temporary one" and that plaintiff's "attempts to extrapolate this temporary side effect to establish general causation of a much more serious, permanent illness" constituted "leaping from an accepted scientific premise to an unsupported one") (internal quotation omitted).

*Daubert* and Rule 702 foreclose testimony like that of Dr. Carlson, which leaps from an accepted scientific premise to an unsupported one. The extrapolation in which Dr. Carlson indulges is not scientific knowledge but conjecture that should be excluded. *See J. B. Hunt Transp., Inc.*, v. *General Motors Corp.*, 243 F.3d 441, 444 (8th Cir. 2001) (expert testimony that was "mere speculation and pure conjecture . . . is not competent proof and contributes nothing to a legally sufficient evidentiary basis") (internal quotation omitted).

**A. Dr. Carlson Has Admitted that His Opinions about Persistent Muscle Problems after Cessation of Baycol Use Have No Support in Scientific Literature.**

The discussion in Dr. Carlson's report includes a telling concession: "I am aware of no research studies that document the degree of restoration of muscle function after statin associated injury." Carlson Rep. (Ex. A) ¶ 41. Dr. Carlson's deposition revealed exactly how fragile his opinions are, as there is no scientific support for his views about persistent and permanent muscle injury:

> Q: Are you aware of any study or case report in the medical literature in which a patient using Baycol had persistent muscle weakness after discontinuing Baycol?. . .
>
> A: So the short answer to your question is: No, I do not have anything in this list that specifically states long-term effects other than the one article I mentioned [*Omar* article]. . .
>
> Q: That article did not make a reference to persistent muscle weakness specifically?
>
> A: No, it did not.
>
> Q: Anything else that you're aware of that you would contend is in the published medical literature that deals with potential permanent effects of Baycol after Baycol use has been discontinued?
>
> A: There's a remarkable absence in the literature of long-term studies on almost any type of muscle damage.

Carlson Dep. (Ex. B) at 167:9-172:8. Ultimately, Dr. Carlson simply concedes that there is nothing in the medical literature to corroborate his novel claims of the long-term effects of Baycol after discontinuation of the drug.

> Q: [A]re you aware of any studies that document impairment of muscle function after statin-associated injury greater than six months after discontinuation?

A: No, if you use the six months, I'm not aware of any. . .

* * *

Q: But you don't have any clinical evidence or any biopsy evidence to support that proposition [that Baycol is likely to cause repeated insult with cumulative effect that that recovery would be longer in such a case]?

A: I'm not aware that much has been done, no.

*Id*. at 230:22-231:1; 303:24-304:7.

By Dr. Carlson's own admission, there is nothing accepted in the scientific community to support the notion that Baycol can have a long-term or permanent effect after discontinuation (*id*. at 230:11-231:1) or that Baycol can cause repeated injury resulting in a cumulative effect in a human being (*id*. at 302:20-305:1). Even the single research paper, the *Omar* article, which Dr. Carlson cites fails to link his hypothesis to reliable science. Dr. Carlson acknowledges that the *Omar* article did not make any reference to persistent weakness, and, in fact, deals with AERs of statin-associated rhabdomyolysis. *Id*. at 170:12-16; 173:9-12. *See* Omar MA, Wilson JP. "FDA adverse event reports on statin-induced rhabdomyolysis," *Ann. Pharmacother*. 2002;36:288-95 (Ex. E).

As discussed above, such an AER study cannot be used to support Dr. Carlson's theories of Baycol's long-term effects, especially when that study does not address persistent weakness. Dr. Carlson's use of such an article as a springboard to jump to his unfounded conclusions exemplifies precisely the type of improper extrapolations prohibited under *Daubert*. *See Glastetter* v. *Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001) (excluding testimony that was inappropriate extrapolation

from case studies, medical tests, and other sources, where the studies did not explicitly state that such a causal relationship existed).

**B. The *Phillips* Report Does Not Support Dr. Carlson's Opinion.**

The 2002 report by Phillips, *et al.* (another expert previously retained, but later abandoned by plaintiffs' counsel in this litigation) concerns four patients taking statins. These patients were selected because they self-reported muscle symptoms while receiving statin therapy, even though each had a normal CK level. The *Phillips* report, however, contradicts Dr. Carlson's opinion about persistent muscle injury after cessation of Baycol, because in each of the four patients on whom Phillips reported (including the one who used Baycol), muscle symptoms ended after the statin use was discontinued: "[S]ymptoms and histologic changes occurred only during statin use. . . . [T]he pathologic abnormality reversed upon discontinuation of statin therapy." Phillips PS, *et al.*, "Statin-associated myopathy with normal creative kinase levels," *Ann. of Int. Med.* 2002;137(7):581-86 (Ex. F) at 582, 583. Dr. Carlson admitted this as well:

> Q.: Now, according to Dr. Phillips, all of the cases that he describes in this paper once the statins were discontinued the symptoms resolved; is that right?
>
> A: In this particular paper . . . Yes.

Carlson Dep. (Ex. B) at 156:16-25.

**C. Dr. Carlson Relies upon Animal Studies that Do Not Provide a Reliable Basis for Opinions about Medical Causation.**

In his report and deposition, Dr. Carlson refers frequently to animal studies to support his persistent injury theory. *See, e.g.*, Carlson Rep. (Ex. A) ¶ 20; Carlson Dep. (Ex. B) at 155:5-8. It is well-established, however, that animal testing cannot prove

causation in humans because reactions in one species do not presumptively correspond to reactions in other species, especially given the extremely high doses of drugs generally given to animals in laboratory tests. *See Bourne v. E.I. DuPont de Nemours & Co*., 189 F. Supp. 2d 482, 496 (S.D.W. Va. 2002), *aff'd*, 85 Fed. Appx. 964 (4th Cir. 2004) (excluding expert testimony that purported to extrapolate from high-dosage single species *in vivo* testing to draw conclusions about harmfulness of drug in humans); *see also Soldo v. Sandoz Pharms*., 244 F. Supp. 2d 434, 547-48 (W.D. Pa. 2003) (animal studies held inadmissible because plaintiff's experts did not attempt to correlate the doses in animal studies to the doses for humans). *See generally* Motion to Exclude Martyn Smith, Part I (collecting further authorities on problems of using animal studies as evidence.)

Here, not only does Dr. Carlson fail to cite a single study that provides methodological justification for using animal research to extrapolate long-term effects of statins on humans, the animal studies upon which Dr. Carlson relies do not even involve the use of statins. Carlson Dep. (Ex. B) at 19:7-23; 155:5-22. Rather, those studies relate to muscle regeneration in animals generally, not muscle regeneration from statin-associated myopathy. *Id*. It should go without saying that such animal studies do not have any relevance as to whether *Baycol* can cause long-term myopathy in a human being.

**D. Research from Muscle Transplant Cases Cannot Support Dr. Carlson's Hypothesis.**

In an effort to mask the total lack of scientific research on statins to support his permanent injury theory, Dr. Carlson seeks support in unrelated and random topics

from the realm of muscle transplants. When queried about the grounds for his opinion that fibrosis and impaired muscle regeneration can lead to permanent impairment, he states: "I've seen this many times both in the laboratory and in humans." Carlson Dep. (Ex. B) at 125:22-126:5. Unfortunately for Dr. Carlson, he subsequently admits that none of this occurred in the context of statins, but in *muscle transplant* cases. *Id*. at 126. Eventually, Dr. Carlson is forced to concede that in the context of statin use in humans, he never has seen any reports that indicate that fibrosis can lead to permanent impairment. *Id*. Again, Dr. Carlson offers no scientific authority to justify the scientific leap that his reliance on muscle transplant cases requires.

## III. THE COURT SHOULD EXCLUDE DR. CARLSON'S OPINION THAT BAYCOL INDUCES MYOPATHY EVEN WHERE THERE IS A LACK OF CLINICAL SYMPTOMS OR ELEVATED CK TEST RESULTS.

There are two reasons to exclude Dr. Carlson's opinion regarding the presence of myopathy without clinical symptoms or elevated creatine kinase ("CK") levels. First, as discussed previously, Dr. Carlson does not have the expertise to diagnose myopathy in humans, with or without laboratory data. He never has practiced medicine and never has researched muscle pathology in Baycol users or conducted any studies of Baycol. *See supra*, at 5-7. Indeed, given his lack of expertise, it is not surprising that Dr. Carlson cannot cite a single study to support his assertion that a person can have myopathy without symptoms or CK elevations:

> Q: Are you aware of any study in the medical literature that shows a case of myopathy in a human being exposed to a statin in which the patient did not have symptoms and did not have CK elevation?

A: I'm not aware of such an article and I doubt that such a thing would have happened because the patient would not have come to a doctor.

*Id*. at 298:9-15.

Second, Dr. Carlson relies for his opinion that Baycol-induced myopathy can occur in the absence of CK elevations exclusively on the 2002 *Phillips* report. *Id*. at 160:5-11. However, as previously noted, the patients in the *Phillips* resport were chosen because they had self-reported muscle symptoms while on statin therapy. *Phillips* (Ex. F) at 581. Consequently, this report does not support Dr. Carlson's theory that Baycol can cause myopathy without clinical symptoms and without CK elevations.

Further, the report involved only four patients who were not selected in a random or blinded manner and may have had "an underlying metabolic vulnerability." *Phillips* (Ex. F) at 584. Dr. Carlson acknowledged that this study was not blinded or controlled. Carlson Dep. (Ex. B) at 160:12-61:4. On this point, Dr. Carlson agrees with another of plaintiffs' experts, Dr. Thomas Zizic, who has recognized that the *Phillips* report is rife with methodological problems. *See* Deposition of Thomas Zizic (Ex. G) at 122:3-125:1.[2] As such, the *Phillips* report provides no scientifically reliable basis for Dr. Carlson's opinion, and he has nothing else to support it. Therefore, his opinion that Baycol induced myopathy in patients exhibiting no symptoms and not having elevated CK test results should be excluded.

---

[2] Dr. Zizic also conceded that Dr. Phillips' retention as an expert by plaintiffs in the Baycol litigation could present a conflict of interests, especially as nowhere in the Phillips report is this potential conflict disclosed. *Id.* at 132:10-22, 133:3.

## IV. THE COURT SHOULD EXCLUDE DR. CARLSON'S PERSONAL OPINION ABOUT BAYER'S CONDUCT.

Dr. Carlson's suggestion that Bayer should have conducted or publicized results of Baycol's myotoxicity should be excluded as it lacks foundation, expertise, or relevance and would be unduly prejudicial. Specifically, Dr. Carlson opines "it is difficult to understand why Bayer did not conduct or did not publicize results of thorough myotoxicity tests of cerivastatin in preclinical or clinical trials." Carlson Rep. (Ex. A) ¶ 14.

Dr. Carlson is not an expert on FDA regulations, new drug applications, or prescription drug labeling; moreover, he has no idea what the FDA standards are for preclinical studies of new drugs. Carlson Dep. (Ex. B) at 29:14-25; 51:13-18; 108:2-109:16. He never has worked or consulted for the FDA or any pharmaceutical company in relation to prescription drug labeling or drug development. *Id*. at 16:1-18:10. Not surprisingly, Dr. Carlson does not offer an opinion that the FDA should not have approved Baycol (nor would such an opinion be admissible). *Id*. at 108:14-15. He admits that he does not know how the studies Bayer conducted on Baycol's myotoxicity compare to that of other statins. *Id*. at 107:20-108:1. He further admits that he has not reviewed all the literature about Baycol. *Id*. at 166:22-23.

Given his admission that he does not know what studies were conducted or published, Dr. Carlson has no foundation for an opinion on what Bayer should have studied or published. Moreover, his personal consternation has no relevance to any of plaintiffs' claims in that his statement does not make any issue in the case more or less

probable. Thus, Dr. Carlson's purported "opinion" offers nothing to assist a trier-of-fact in understanding the scientific issues of this case. *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 542-44 (S.D.N.Y. 2004).

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court exclude Dr. Carlson's above-referenced testimony under *Daubert* and Rule 702.

Dated: April 17, 2006

Respectfully submitted,

Philip S. Beck
Adam Hoeflich
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60610
(312) 494-4400

/signature on file/
Susan A. Weber
James W. Mizgala
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000

Paul J. Zidlicky
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000

Scott A. Smith
Tracy J. Van Steenburgh
HALLELAND LEWIS NILAN
SIPKINS & JOHNSON, P.A.
220 South Sixth Street, Suite 600
Minneapolis, MN 55402
(612) 338-1838

/signature on file/
Fred T. Magaziner
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000

*Counsel for SmithKline Beecham Corp. d/b/a GlaxoSmithKline*

Catherine Valerio Barrad
Linda S. Peterson
Christine K. Son
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
(213) 896-6000

Richard K. Dandrea
ECKERT SEAMENS CHERIN
& MELLOTT, LLC
USX Tower, 600 Grant St., 44th Floor
Pittsburgh, PA 15219
(412) 566-6000

Peter W. Sipkins (No.101540)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
(612) 340-2600

Douglas R. Marvin
WILLIAMS & CONNOLLY
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

Joseph D. Piorkowski, Jr.
THE PIORKOWSKI LAW FIRM, PC
910 17th Street, N.W. Suite 800
Washington, D.C. 20006
(202) 223-5535

*Counsel for Bayer Corporation and Bayer AG*