# Exhibit B

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
MDL No. 1431
(MJD/JGL)

COPY

-----------------------------------------------

In Re: BAYCOL PRODUCTS LITIGATION
This Document Relates to:
ALL CASES

-----------------------------------------------

* * * * * * * * * * * * * * * * * * * * * * * * * * *

VIDEOTAPED DEPOSITION OF
DR. BRUCE M. CARLSON

* * * * * * * * * * * * * * * * * * * * * * * * * * *

DATE TAKEN: 02/03/04 BY: CINDY M. TRATTLES

Piorkowski, Jr. I'm with Shook, Hardy & Bacon. I represent Bayer Corporation. Also with me is Matt Morton from Shook, Hardy & Bacon.

MS. FLEISHMAN: Wendy Fleishman for the plaintiffs.

MR. HOPPER: Randy Hopper for the plaintiffs.

THE WITNESS: Bruce Carlson.

MR. MUNNO: Thomas F. Munno, Dechert, LLP, for defendant SmithKlineBeecham.

MR. PIORKOWSKI: Would counsel on the phone please identify themselves.

MR. EARLY: Loyd Early, counsel for several pharmacists.

MR. HOPPER: Hi, Loyd.

MR. EARLY: Hello.

THE VIDEO TECHNICIAN: You may remain seated and the court reporter will swear you in.

* * *

DR. BRUCE M. CARLSON,

called as a witness, being first duly sworn,

was examined and testified as follows:

* * *

EXAMINATION

BY MR. PIORKOWSKI:

on aspects of social aging.
Q Okay. Is it mostly what we would call bench research as opposed to clinica; research?
A Yes, that is correct.
Q Okay. Would you agree that embryology, muscle regeneration and gerontology are the main areas of expertise that you hold?
A Those are my principal areas of expertise, yes.
Q All right. You are a medical doctor; is that right?
A Yes, I am.
Q Okay. Have you practiced medicine in the last ten years?
A I have never practiced medicine.
Q Okay. So you graduated from medical school and then embarked on an academic research career basically?
A That is correct, yes.
Q Okay. Did you ever complete an internship?
A No, I did not.
Q Are you licensed to practice medicine?
A No, I am not.
Q Are you credentialed at any institution to do any kind of practice of medicine?
A No, I am not.
Q Would you view yourself as being competent today to practice medicine?

A I would not at this point practice medicine, no.
Q Okay. Is it correct then --. Would it be fair to say that I assume you've never prescribed any Baycol or any other statin for that matter; is that right?
A No, I have not.
Q Okay. You've never diagnosed a case of rhabdomyolysis; is that true?
A No, I have not, not on humans.
Q Let me ask you: You've read a lot of the expert reports that have been offered in this case by other experts for the plaintiff; is that right?
A Yes, I have.
Q Okay. You've seen reference from time to time to adverse event reports, that term?
A Yes, I have.
Q Okay. And are you familiar with what an adverse event report is in the post-marketing context?
A Yes.
Q Yes?
A Yes.
Q Okay. Have you ever worked in an FDA office that handles processing of post-marketing adverse event reports?
A No, I have not.
Q Have you ever had responsibility as an employee or a

on any other statins?
A No, I did not. May I clarify something? You're asking about reports that would have been sent in to the FDA, in other words, primary sources; is this what you mean?
Q Are you familiar with what an adverse event report looks like?
A I've never seen one.
Q Okay.
A I've seen summaries based on that, but not the actual reports.
Q That actually answers my question. You've never seen an adverse event report ever; is that fair?
A No.
Q I asked the question poorly. Is it correct that you've never seen an adverse event report?
A Yes, it is correct.
Q Okay. Do you view analysis and interpretation of spontaneous post-marketing adverse event data as outside your area of expertise?
A I am competent to deal with some of this information.
Q You're competent to deal with some of this information. What training do you have that permits you to understand how spontaneous post-marketing

adverse event reports are analyzed?
A Well, I've had medical training, No. 1. I have had courses in statistics.
Q Okay. Do you hold yourself out as an expert in interpretation of adverse event report data?
A Would you please define expert for me.
Q Have you ever held yourself out to any organization or any group as having special expertise in pharmacoepidemiology?
A No, and I have never been asked either.
Q Okay. But I mean you've never advertised or sent out letters to any group or organization advertising yourself as a pharmacoepidemiologist; is that right?
A That is correct, I have not.
Q Okay. And I assume you've never personally filled out an MedWatch adverse event report form if you've never seen one; is that right?
A That is correct, I have not.
Q Do you have any publications in the area of epidemiology?
A No, I do not.
Q Have you made any presentations to medical groups or scientific groups on any subject related to epidemiology?
A No, I have not.

Q Have you ever worked for the FDA in any capacity?
A No, I have not.
Q Have you ever been a member of --. Have you ever been a consultant to the FDA?
A No, I have not.
Q Have you ever been a member of an FDA advisory committee?
A No, I have not.
Q Have you ever been an employee of a pharmaceutical company?
A I was involved about five years ago in a Phase III clinical trial. This is doing electron microscopy.
Q Okay. And what company were you consulting with?
A Hoffman - La Roche.
Q And what was your role in the clinical trial?
A I was running a large research program.
Q And as part of the Phase III clinical trial they were doing electron microscopies on patients?
A Yes.
Q And your role was to oversee the performance of electron microscopies?
A To oversee performance of the entire project, which involved electron microscopy and very sophisticated image analysis.
Q Were you involved with design of the trial itself?

A No, I was not.
Q Were you listed as a principal investigator?
A I was more in the range of a subcontractor. So I think from the standpoint of the company, I was not.
Q Okay. Let me back up and make sure I understand because I think what you told me is that in that capacity that you just described you were a consultant to a pharmaceutical company; is that fair?
A I think a subcontractor is more accurate.
Q Okay. You have never been an employee of a pharmaceutical company?
A Not directly, no.
Q Okay. And are there any other instances in which you have served as a subcontractor or a consultant to a pharmaceutical company other than with respect with the electron microscopy project?
A The only other time --. Not a pharmaceutical company, no.
Q Was there something else?
A Just by biotech companies, yes.
Q Okay. You've before a consultant to biotech companies?
A Just coming in and giving talks. They consider that a consultant. I've done that a couple times.

Q Okay. And what sort of subjects have you given talks to biotech companies on?
A To Medtronic involving cardiac muscle transplantation and to the Genetics Institute in Boston regarding muscle pathology.
Q Am I correct that you've never been a consultant to a pharmaceutical company with respect to any issue dealing with product labeling or approval of new drug applications?
A You are correct.
Q You've done extensive research in your CV --. Actually, let me back up and ask you about your CV. The copy that I've handed you is a copy that was provided to us that you have in front of you that's marked as Exhibit 1. Is that a current, up-to-date copy of your CV?
A Let me look at it, please. This would be accurate as of about October 2003.
Q As of three months ago?
A Roughly, yes.
Q Okay. Are there additional changes or modifications that would need to be made to Exhibit 1 to bring it fully up to date?
A Only if there might be an extra publication or two.
Q Do you know whether there has been an extra

publication or two?
A I'd have to check my files to see. I'd have to check my files I guess.
Q Okay. Your CV reflects several publications dealing with muscle regeneration; true?
A That is true.
Q Am I correct that you have never done any research or published any research with respect to statins?
A That is correct.
Q Am I also correct that you have not published any research with respect to rhabdomyolysis specifically?
A It's a question of whether you are speaking of human rhabdomyolysis or animals. I've done extensive research on rhabdomyolysis in animals.
Q Okay. Let me back up. I appreciate the clarification. Is it correct that you've never done any research on human rhabdomyolysis?
A That is correct.
Q Okay. And with respect to animal rhabdomyolysis, have you done any research on animal rhabdomyolysis that's specifically related to statin use?
A No, I have not.
Q Okay. Have you ever done --. Well, I assume you've never done a muscle biopsy on a patient with

experienced myotoxic effects?
A I have not seen any specific quantitative data.
Q Do you have an rough estimate? Is it 50% of statin users? Is it 75%? Is it 1?
A The difficult with this is the reporting. If you look at the reported data, it's relatively small. And the issue that has come up in the literature several times is the amount of potentially unreported cases.
Q Do you recognize --. I'll come back to that. Now, did you conduct a review of the Bayer Baycol New Drug Application?
A Application to whom?
Q Do you know what a new drug application is?
A I've heard the term.
Q Okay. What's your understanding of what a new drug application is?
A If it's what I think it is, it would be an application that is sent to the FDA. I'm trying to determine whether you're talking about an application to a European group or the American group.
Q I'm talking about a U.S. new drug application to the FDA.
A No, I have not seen that.

Q Okay. You don't have an understanding of what the standards are; is that right?
A Not specifically, no.
Q I mean if I sat here and said: Tell me what a company has to do to go through preclinical trials, you couldn't tell me; is that right?
A I could tell you quite a few things that have to be done. And I've been involved with this more in the past in relation to teratologic effects of drugs because in my career over 40 years I deal with birth defects quite a bit. But it's not been in regard to a specific study or a specific case.
Q Okay. Apart from the knowledge you gained in dealing with teratologic drugs, do you have any other knowledge of what the standards are for conducting preclinical trials on pharmaceutical products?
A Not official standards.
Q Okay. After the meeting in San Francisco did you ask that specific documents be sent to you or did plaintiffs' counsel select the documents that were sent to you?
A The first packet of documents was sent me unsolicited. After having read that, I did ask for one specific document concerning the in vitro

Q Okay. It doesn't necessarily mean that the doctor made the wrong decision; that's what you're saying?
A He may have made the wrong decisions if there are other alternatives which would have been better that would accomplish the same purpose.
Q Did you look at the drug interaction profile of Baycol versus other statins?
A I've looked at what's in the published literature. I haven't analyzed it carefully. But I'm aware of many other drugs which interact with Baycol, yes.
Q My question is how the drug interaction profile of Baycol compares to other drugs, other statins.
A You know, I've looked at that information. But, again, I did not focus on that in my report.
Q Okay. Do you know whether Baycol interacts with digoxin?
A That I don't know. I remember seeing that with respect to some of the statins. I honestly don't know if it was with Baycol or not.
Q Do you know whether or not digoxin interacts with other statins besides Baycol?
A My guess --. I won't even guess.
Q I don't want you to guess.
A I think I will say I don't know.
Q Do you know whether Baycol interacts with Coumadin?

the same time. I think you say that in your report.
MR. HOPPER: Is there a question pending?
MR. PIORKOWSKI: Yes, he answered it.
Q (By Mr. Piorkowski) Okay. So they're not mutually exclusive. And I understand that what you're talking about is a hypothesis. But with that in mind, why don't you describe for me what the hypothesis is about how a statin can cause a mitochondrial-based myopathy.
A The most commonly referred to mechanism there is an interference with the synthesis of ubiquinone or what's often called coenzyme Q. And this affects the --. This essentially is a respiratory chain of enzymes, which is a very complicated one that's located in mitochondrial.
Q Is that --. You've actually described that here in your report?
A I haven't gotten into the pharmacotoxicology because other people have done that, but I've mentioned the ubiquinone pathway and that's as far as I've gone.
Q Okay. All right. And how is it that when you interfere with coenzyme Q that that causes a mitochondrial myopathy?
A Essentially what this would do is interfere with the respiration of the muscle cell. Again, we're

of them -- but the drugs we talked about on 6, it's fair to say that the vast majority of the drugs on that list don't cause rhabdo in the sense that we've defined it; is that right?
A Not having seen the list, I can't comment. But I would be amazed if 500 drugs cause rhabdomyolysis.
Q I mean it's actually a pretty narrow range of drugs that cause rhabdomyolysis from your review of the literature?
A That's my understanding.
Q And statins being in that group?
A Yes.
Q All right. Let me go back one last time to Paragraph 14 because I realize I didn't ask you all the things I needed to ask you on that.
MR. HOPPER: In his report?
Q (By Mr. Piorkowski) In your report. I'm sorry, yes. Which is Exhibit 5; is that right?
A Yes, it is. Correct.
Q When you refer to --. When you say it's difficult to understand why Bayer did not conduct or publicize results of thorough myotoxicity tests, do you know how the tests that Bayer did on cerivastatin compare with the myotoxicity tests that the manufacturer of atorvastatin did?

A No, I don't.
Q Are you criticizing --. In Paragraph 14 are you criticizing the FDA for approving Baycol without sufficient myotoxicity tests?
A Not having seen the information that was provided to the FDA, I'm not in a position to criticize them.
Q If you assume for the purposes of my question that all of the information that you reviewed in the way of company documents concerning preclinical testing and clinical testing that was performed prior to 1998 was made available to the FDA, under that circumstance are you criticizing the FDA for having approved Baycol?
A I don't think at this point I would criticize the FDA.
Q Is that because you aren't sure what the standards are that the FDA uses?
A It's partly because until I see exactly what was provided to the FDA, I'm not really in a position to criticize them.
Q And as you sit here today, you don't know what was or wasn't provided to the FDA with respect to preclinical or clinical studies?
A Not to the very specifics, no.
Q Has anybody provided you with a copy of the --.

Well, let me back up. Are you familiar with the fact that when a new drug application is approved, the FDA issues certain documents in connection with that approval and evaluation?
A I know they send out documents, yes.
Q Right. And one of the documents that they publish is something called a medical officers' review of the new drug?
A Yeah, I'm aware of that; but I've never seen one.
Q You've never seen one on Baycol?
A No.
Q Have you reviewed a pharmacology/toxicology review on Baycol?
A FDA generated?
Q Yes.
A No, I have not.
Q Okay. We had talked about several causes of myalgia earlier, dehydration, exertion, infection such as the flu and other drugs. What other causes of myalgia are you aware of?
A Well, there are some reports from the neurological literature that talk about muscle pain, not myalgia. And, again, whether that means the same thing to the authors, I don't know.
Q Okay. We did talk about the fact that in some

report. It says under Statin-Induced Myopathy --. In fact, the title of this paragraph is Statin-Induced Myopathy, not Cerivastatin-Induced Myopathy; correct?
A Yes, that is correct.
Q It says, "Myopathy associated with the use of cerivastatin appears at some interval after the patient has been taking the drug and is often found manifested as pain or weakness in the proximal muscles." Did I read that correctly?
A You did.
MR. HOPPER: No, you did not because he did not use the word found, not often found. The word found is not in there. He says is often manifested.
A I thought he had said that.
Q (By Mr. Piorkowski) I thought I had said that, too. But, in any event, with that clarification did I read that correctly?
A Yes.
Q Okay. And that is true of all statins; is that correct?
A Yes, it would be and, again, on an individual basis.
Q Right. The same is true of the following sentence which we already discussed, the fact that it could

represent a mitochondrial-based myopathy and/or actual breakdown of muscle fibers; that's also true of all statins?
A Yes. Now, what I could not say there from my reading of the literature is whether mitochondrial myopathy has been specifically described for all of the other statins. I've certainly seen it in a number of cases, but I did not make a table indicating that.
Q Are you saying mitochondrial myopathy has been described for Baycol?
A Yes.
Q And what paper are you relying on for that?
A I'd have to go back and check.
Q Why don't you check.
A Okay. I may be wrong on that. But if you give me a minute or two, I'll check.
Q Certainly. Take your time.
I don't want to interrupt your look. Is the Phillips paper the one you're looking for, Doctor?
A No, it isn't. Because, if I remember correctly, Phillips was investigating simvastatin.
Q Yes. I didn't mean to interrupt.
A It's possible that I have not seen one for

cerivastatin.
Q On the subject of Phillips -- we'll come back and talk about him in a little more detail -- but is it correct that what Phillips was describing was a mitochondrial-based myopathy in his paper?
A It would appear to be. And, again, I think we could dissect that paper later.
Q Okay.
A He certainly mentioned that in the paper.
Q He provided slides that talked about mitochondrial changes; right?
A Yes.
Q Okay. Back to your report at Paragraph 17 where we left off, it says, "Upon discontinuation of cerivastatin therapy, improvement of muscular symptoms often occurs"; is that right?
A Yes.
Q And that's also true of every other statin; right?
A Yes.
Q Okay. And then the next several sentences up to the word particularly do not describe anything that's specific to cerivastatin; is that right?
A Let me read these.
Q Sure, take your time.
MR. HOPPER: You're saying starting with

the sentence "A longer course"?
MR. PIORKOWSKI: Starting with "if muscular strength returns" and ending with "6 months to more than a year".
A No, these are generic sentences, yes.
Q (By Mr. Piorkowski) Okay. And then it says, "Particularly in the case of moderate to severe injury short of life-threatening rhabdomyolysis, cerivastatin-induced myopathy will almost certainly involve weakness leading to the limitation of function, which may be accompanied by or preceded by pain." Now, that is also true of any other statin-induced myopathy; correct?
A Yes, that would be my interpretation.
Q And then the last sentence is just generic again; right?
A Yes, that's generic.
Q In Paragraph 17?
A Yes, yes. Should we read that sentence for the record?
Q If you'd like to, go ahead.
A "In the event of impaired muscle regeneration, the occurrence of fibrosis could lead to some degree of permanent impairment."
Q Okay. Now, is that something you've actually seen

case reports about or are you describing that as a hypothetical possibility based on what you know as a scientist?

A No, I've seen this many times both in the laboratory and in humans.

Q You've seen fibrosis leading to the development of permanent impairments?

A Yes.

Q You've seen that in humans or in animals?

A In both.

Q Okay. What was the context in which you've seen that in humans?

A In humans mainly in the context of muscle transplantation.

Q Okay. Have you ever seen the occurrence of fibrosis leading to permanent impairment related to statin use in humans in your own experience?

A I have not seen any reports that indicate one way or the other on that.

Q Can you turn to Paragraph 18 for me then.

MR. PIORKOWSKI: Is lunch en route? I don't want to hold us up.

MR. HOPPER: Do you want to take a minute?

MR. PIORKOWSKI: Yeah. I don't want to

other evidence that cuts against that theory?
A Yes.
Q Has anyone shared with you an expert report of an expert whose name is Bliznakov?
A No.
Q Okay. I'd ask you to turn your attention to Paragraph 19. Just take a moment and read through that, if you would.
A Sure. All right, yes.
Q Okay. Now, your first sentence here says, "The near absence of published research or clinical reports that document the actual nature of cerivastatin-induced myopathy requires one to examine reports on muscle pathology associated with the use of other members of the statin family." Did I read that correctly?
A You did.
Q Does that mean that because there is no information in the medical literature concerning the mechanism by which cerivastatin can cause myopathy, that by necessity you have to extrapolate from data concerning other statins?
A Yes, this is correct.
Q Okay. And the data concerning other statins upon which you're relying are the articles that are

listed in the paragraph?
A This represents --. What I listed in the paragraph here are just examples of types of pathology that could occur. It's not exhaustive and it was not intended to be.
Q I'm sorry, types of pathology that could occur with statin exposure?
A Yes.
Q Okay. One of the articles that you list is the Phillips article; right?
A Yes.
Q And, there again, it says, "Of the few human studies that have included muscles biopsies, two, involving five patients, provided evidence of mitochondrial involvement", then you describe the specific findings, "in muscle fibers in patients with normal or elevated CK levels"; correct?
A Yes.
Q That's what we were referring to a few minutes back?
A Yes.
Q Now, with respect to Paragraph 20, Paragraph 20 is the paragraph in which you list the various Bayer Corp documents that you were referring to; is that right?
A Let me see. Yes, I listed quite a few there.

Q Okay. And just so I'm clear about this -- I think
we got this before, but let me make sure -- you
don't know whether the specific documents that
you've listed in this paragraph were or were not
provided to the FDA at the time of --
A -- No, I have copies of the portions of the
documents that I used, including the cover page. So
if you'd like to see them, I could show them to you.
Q No, that's not what I was asking. I'm just asking:
You don't know whether they were provided to the FDA
or not?
A No, because they were not provided to me in that
context.
Q I understand. All right. Let's take a minute --.
Do you have a copy of the Phillips article handy?
A Yes, I do. Okay. This is Phillips 2002, Annals of
Internal Medicine. Is this the one we're speaking
about?
Q It is.
A Yes, okay.
MR. PIORKOWSKI: You don't need to go off
the video record, but I'd like to just get copies of
his Phillips article and his Thompson article, the
one that he's marked up.
MS. FLEISHMAN: Sure, of course, no

A Sure. (Witness reviews said paragraph.) All right.
Q Now, am I correct that the conclusions --. Well, let me back up. You haven't done any independent research about the incidence of muscle pathology in Baycol users versus other statins; have you?
A No, no independent original research; no.
Q And basically the statements that are in Paragraph 8 are statements that are contained in the references that you've cited?
A That is absolutely correct.
Q And you're merely citing those references?
A Yes.
Q Okay. And let me ask you to turn to Page 46.
MR. HOPPER: That he relied upon for his opinion.
A Yes, I relied to them for my opinion.
MR. MUNNO: Objection to the sidebar.
Q (By Mr. Piorkowski) Paragraph 46, you have not done an analysis of the adverse event reports for Baycol compared to any other statins; have you?
A Now, when you say adverse event reports, the ones that would have been submitted to the FDA?
Q Yes.
A No, I have not.
Q Other than the medical articles that you cite in

Paragraph 8 and Paragraph 46, do you have any other basis for the opinions that you set forth concerning the relative toxicity of Baycol versus other statins?
A Let me see which --. These are representative of the papers that I would have read that indicate a higher incidence of myopathology in Baycol-treated patients.
Q Okay. Do you know that many of these --. Well, do you understand that all of these references in Paragraph 8 and Paragraph 46 are all based on analyses of spontaneous post-marketing adverse event reports?
A Yes, I am.
Q You do understand that?
A Yes.
Q Do you understand the inherent weaknesses of using adverse event reporting data for making drug comparisons?
A I'm familiar with the arguments and discussions, the pro and con on this, yes.
Q Are you familiar with what the FDA's position is about using spontaneous post-marketing adverse event data to make drug comparisons?
A Not --. If they have made a specific statement, no,

although I am using the statement by Staffa, who if I'm not too badly mistaken was with the FDA. And I'm assuming that that article would not be contrary to FDA policies.
Q And if that article says that comparisons of drugs should not be made on the basis of that data, you wouldn't take issue with that?
A If it says comparison of drugs should not be made on the basis.
Q Of adverse event reporting.
A Again, it's a question of if we're dealing with epidemiology.
Q We are.
A Yes. And it's a function again of what the purpose of the comparison would be.
Q Do you know the difference between an incidence rate and a reporting rate?
A My understanding of incidence rate is the rate of pathology against a specific denominator, whereas a reporting rate would not have as well defined a denominator.
Q Do you know or is that something you've just learned recently?
A No, this is a general definition I've been using for years.

Q Do you understand that an incidence rate is not the same thing as a reporting rate?
A That's my understanding, yes.
Q And you do understand that the data upon which the articles in Paragraph 46 are based are reporting rate data?
A Yes.
Q Are you aware of any controlled clinical study that shows a higher incidence of rhabdomyolysis when Baycol is used alone compared to other statins?
A I have not directly seen any reports or primary reports from clinical studies. I'm aware that there have been clinical studies done.
Q So as we sit here today, you're not aware of any controlled study that shows a higher incidence of Baycol monotherapy compared to monotherapy with other statins; is that fair?
A When you say controlled, no, I could not give you a reference to that.
Q Okay. Apart from just referring to these articles, are you in any other way interpreting them or are you bringing your expertise to bear on those articles apart from just citing their conclusions?
A No, this really represents the background. The specific thrust of my report is on muscle pathology

and the duration of the muscle pathology after the injury. I think it's necessary to put it in context. And some of these paragraphs in my opinion based on the literature are placing my specific expertise in context.
Q So those paragraphs are intended to provide context for the other opinions you're offering?
A Yes. But based on what I read, those are my opinions, that there is a high incidence and a higher reporting rate of Baycol-induced myopathy.
MR. HOPPER: And that's why I wanted to get on the record earlier when counsel for GSK objected to my statement as sidebar. It's taken out of context. Clearly his heading says Opinions and that's why you have to refer to it that way.
MR. PIORKOWSKI: Well, if the witness is not doing anything other than restating something that's in a medical article, you know, we'll have to take it up with the judge whether that's an independent opinion as to which he brings expertise to the table.
MR. HOPPER: No, but he's saying he relied on it. And that's what Rule 26 requires him to do, to state what he relies on with some specificity.

damage and regeneration I would not expect that to occur. I would expect persisting symptoms.
Q Well, let me ask you --. I'm sorry, back up. What research are you referring to there?
A This would be principally based on my own research, which I've worked on probably 10,000 mammals in terms of muscle regeneration studies and I have a very good idea of what the course would be.
Q And you're saying there is permanent muscle damage sometimes that does not resolve; is that what you're saying?
A No.
Q What are you saying?
A That is one option. There were also options of a prolonged course. Even the normal course of muscle regeneration is prolonged to the point that in a short-term experiment you might find persisting pathology even in a period where in this case a statin drug was not being administered.
Q But none of the research that you're relying on is related to statins; is that correct?
A That is correct.
Q Okay.
A Although --. No, I won't say that actually because it's not related to statins as a cause of damage.

But once the damage is caused, it doesn't make much difference whether it's caused by statins or other types of agents.

Q Let's back up a minute. And let's talk about what Dr. Phillips did find. One is he did find that in these particular cases --. Well, I'm sorry. Let me back up. What is --. The reason Dr. Phillips's research was viewed as being of any significance is because it dealt with situations where there was a biopsy-proven abnormality in the absence of a CK elevation; is that right?

A That's my understanding, yes.

Q And that's why this is of some significance to the medical community; is that right?

A Sure, yes.

Q All right. Now, according to Dr. Phillips, all of the cases that he describes in this paper once the statins were discontinued the symptoms resolved; is that right?

A In this particular paper.

Q In this particular paper. That's what I'm asking about.

A In these four cases?

Q That's right.

A Yes.

you can have myopathy with the presence of a normal CK level; isn't that true?
A Not having looked at the entire medical literature, I can't say.
Q Well, based on what you've looked at in conjunction with the forming of your expert opinions, this is the only article you're aware of in which patients have been thought to have a statin-associated myopathy with normal CK levels; is that correct?
A Yeah, this is my opinion at this point; yes. I don't remember any others.
Q Now, am I also correct that the pathologist who read these slides was not blinded?
A If I remember right, he does state that the pathologist was not blinded. I'm quite sure that was explicitly stated. Yes, yes, on Page 583.
Q And what that means is that the pathologist knew which patients were using --. Well, the pathologist knew the fact that the patients were using placebo after statin use, is that right, when they say they're not blinded?
A In other words, they would know the circumstances surrounding the biopsies; yes.
Q Okay. Now, is it also correct that there was no control group used in Phillips' study? In other

words, he didn't biopsy any patients who were taking statins and then were continuing to take statins and have muscle pain; did he?
A I'm not aware that he did, no.
Q Okay. And you do recognize that the use of a control group is one of the methods that's used in the scientific process to make comparisons that allow you to draw inferences?
A It's a question of the kind of inferences. There are several different purposes for doing studies. Your line of questioning is really more along the epidemiological line, whereas my way of looking at this paper has been one to identify types of pathology that occur under any circumstances. And for that, which is more qualitative, the epidemiological considerations are not primary.
Q Okay. Now, this paper was published in the Annals of internal Medicine, is that right, in October of 2002?
A Well, yeah. It doesn't have the month, so all I know is 2002, Volume 137.
Q Look at Page 582.
A Okay, yeah, that does say October; yes.
Q Am I correct, October 1st, 2002?
A Yes, you are correct.

was withdrawn, yep.

MR. HOPPER: Okay.

MS. FLEISHMAN: Excuse me for a second. I don't think there's a report from Dr. Phillips.

MR. PIORKOWSKI: There is. There was.

MS. FLEISHMAN: Oh, okay. There was and then it was withdrawn?

MR. PIORKOWSKI: I guess, yeah.

MR. HOPPER: We withdrew it.

MS. FLEISHMAN: Okay.

Q (By Mr. Piorkowski) Now, I'd like to just --. Do you have Dr. Phillips' paper still handy?

A Yes, I do.

Q Am I correct that Dr. Phillips' paper is the only set of case reports that you're aware of where a statin was associated with a myopathy with a normal CK level?

A As far as I'm aware, yes.

Q Okay. Are you aware of any study or case report in the medical literature that shows that Baycol alone was associated with myopathy with a normal CK level?

A I am not, but I must say that I have not reviewed the entire medical literature relating to Baycol.

Q And for purposes of my question, Doctor, I'm not committing you to having reviewed the entire medical

literature. I'm just simply asking you we sit here today in your capacity as an expert what you're aware of.
A Okay.
Q I'm not asking you to represent that there may not be something out there that you didn't look at. Okay?
A Thank you.
Q Are you aware of any study or case report in the medical literature in which a patient using Baycol had persistent muscle weakness after discontinuing Baycol?
A I would have to go to my stack of Xerox reprints to check on that.
Q Do you have those here?
A I have some, yes.
Q Do you want to take a look at those then?
A I could, yes. Okay, now, I think I'll stick to monotherapy at this point.
Q Yes, my question is directed at monotherapy.
A All right. Most of what I've been reading have been review articles. I have some case studies. Oh, this is the Staffa report which I don't think got into persistence.
It's a review (indicating). Most of the

review articles don't go into that level of clinical detail. That's combination (indicating). My recollection of the literature is most of the clinical reports don't say much at all about the long-term course of patients.

That's combination (indicating). So just because it isn't in there doesn't mean it didn't happen. It could have occurred. It may not have occurred.

MR. PIORKOWSKI: I'm going to object to the nonresponsiveness.

THE WITNESS: Okay.

MR. HOPPER: Well, except your question is still pending; right?

MR. PIORKOWSKI: It is.

MS. FLEISHMAN: I believe he's answering it.

MR. HOPPER: Yeah, he's answering it.

MR. PIORKOWSKI: It's a sidebar that's nonresponsive.

MR. HOPPER: Well, it's not what you may want to hear, but he was responding to the question that was pending.

A It's definitely responsive to the question, but it's not a yes or no. I think the big issue in much of

this is the absence of something in the literature, does this mean that it's there or is not there.
Q (By Mr. Piorkowski) Well, Doctor, you remember I asked you in the beginning if you understood that I'm entitled to answers to my question whether you think that's the important question or not?
A Yes, and I'm still looking up to see whether I can give you a yes or no answer.
Q Okay.
MR. HOPPER: He's also entitled as an expert to give you an explanation for his answer, whether he gives a yes or no or not. You know that.
MR. PIORKOWSKI: Come on, Randy.
A And, again, here's another paper that doesn't say yes or no. Okay. Here is a paper by Omar and Wilson in Annals of Pharmacotherapy, 2002, Volume 36, Pages 288 through 295, which the title of the paper is FDA Adverse Event Reports on Statin-Induced Rhabdomyolysis. And there is a very long table which describes -- this is Table 2 specifically on Page 291 that lists a number of the statins and talks about a number of things. But one of the columns is outcomes. And one of the outcomes listed under cerivastatin is disability. And, again, it just says disability. So it doesn't give any

indication of the length. But normally when you say disability, it means something that is more than a transient event.

Okay. So the short answer to your question is: No, I do not have anything in this list that specifically states long-term effects other than the one article I mentioned.

Q (By Mr. Piorkowski) And the one article you mentioned was the Omar article; is that right? I think you said it on the record?

A It's on the record, yes.

Q And in that article there was not --. I think my original question was persistent muscle weakness. That article did not make a reference to persistent muscle weakness specifically?

A No, it did not.

Q What you said is that it made reference to disability of some kind?

A Yes, yes.

Q Now, that article was itself a summarization of --

MR. HOPPER: -- Well, excuse me for interrupting. I'm going to object as a mischaracterization of prior testimony. He's got to go back and read it because he didn't just say it was a disability. He qualified it.

Q (By Mr. Piorkowski) Did you just say in your testimony a few minutes ago that Omar listed cerivastatin under outcomes as a disability?

MR. HOPPER: He did and he said but not as a transient event and that's what the record shows.

MR. MUNNO: There is a record, so the record shows what the record shows and why don't we just move on.

A Yeah, what the record shows --. And I think we could just --. If I could find --. This is the one. There are a couple Omar articles. This may be the wrong one. Oh, yeah, this is just another version of the same article.

Okay. It lists the statin and then in parentheses the mean daily dose in milligrams and it says cerivastatin in parenthesis, 0.34, which I assume is the mean daily dose in the samples that were taken. The mean age of the individual is 67.6, 44.5% men. And then in the column that states Outcomes it lists a number of outcomes. Under cerivastatin it lists death, disability, hospitalization, life threatening, other and required intervention. But it's just a table without any further elaboration.

Q (By Mr. Piorkowski) All right. Anything else that you're aware of that you would contend is in the published medical literature that deals with potential permanent effects of Baycol after Baycol use has been discontinued?
A There's a remarkable absence in the literature of long-term studies on almost any type of muscle damage.
Q Is that a, no, I'm not familiar with anything?
A It's a, no, I'm not familiar with; but I'm qualifying it that there's a general lack in the literature of reports.
Q So you're saying it's possible. But to the extent that you're familiar with the literature, there's nothing that you can point to that shows specifically a permanent injury related to Baycol after Baycol use has been discontinued?
A What I'm saying that the absence of reference in the literature does not necessarily mean that there is an absence of problems.
Q That's not my question though.
A Oh, okay.
Q My question is not what does it mean that there's an absence. My question is: It's correct that there is an absence; is that right?

A Yes. As far as I'm aware, that is correct, yes.
Q And the references that you've given us in the two Omar articles make a generic reference to disability; is that right?
A Yes.
Q Without any kind of qualification or explanation of what that disability is?
A That is correct.
Q Okay. And the Omar articles as you understand them as you explained it deal with the FDA adverse event reports of statin-associated rhabdomyolysis; right?
A Yes.
Q And the source of that information is adverse event reports that were sent to the FDA; is that right?
A Presumably, yes.
Q You don't know I assume which adverse event reports involve these patients that were reported as having disability; is that right?
A No, I do not.
Q You don't know whether those adverse event reports were sent in by physicians, patients or lawyers; do you?
A No, I have no idea.
Q Do you realize that the adverse event reporting system does not limit the submission of reports to

or muscle pain. The Pasternak tacked on the CK. I did not.
Q Okay. But, in any event, using Pasternak's definition, okay, muscle aches in the absence of CK elevation; right?
A Uh-hum.
Q Are you aware of any study that shows that Baycol has a greater propensity to cause myalgia than other statins?
A No. But I need to qualify the answer. The answer is, no, I am not aware. But I did not specifically look at that literature because that was not my area of concentration.
Q What was not in your area of concentration?
A The epidemiological aspects of incidence or adverse event reporting.
Q So you're testifying that you did not look at the epidemiological literature?
A I looked at it but not enough --. I didn't look at it in depth. Let's put it that way.
MR. HOPPER: He's not being offered as an epidemiological expert. We have those experts and you'll have your chance to question them.
A I would defer to the experts on that.
Q (By Mr. Piorkowski) But so I'm clear as we sit here

today, you're not going to be offering any opinions at trial that Baycol has a greater propensity to cause myalgia than other statins based on any of the literature you've reviewed?
A On the basis of literature I've reviewed, no, I would not. And, again, I would stress up to this point.
Q Now, one of the articles you did review was an article --
A -- Excuse me, could I get that one back so we don't lose it. It's on the bottom.
Q Yes.
A Okay. Thank you.
Q Do you have with you a copy of the Thompson articles?
A Oh, the review? Yes, I do.
MS. FLEISHMAN: JAMA 2003?
MR. PIORKOWSKI: JAMA 2003.
A Let's see if I can find that. Yes, I do.
Q (By Mr. Piorkowski) Actually, let me just back up and ask one other question. Now, is it your testimony that the opinion offered in Paragraph 8 of your report is not an epidemiological opinion?
MR. HOPPER: Does he have time to go back and look at the report before he answers since he

Q Are you referring to strength there?
A Yes, because you could talk about biochemical function or metabolic function and I'm talking mechanical, yes.
Q Okay. Let me ask you a similar question. Are you aware of any research studies that document the degree of impairment of muscle function after statin-associated injury?
A No, it's mostly been case reports. There are numerous case reports.
Q Are there numerous case reports that set forth the degree of impairment more than six months after the acute statin injury --. Or let me start over. Are you aware of any case reports that document a muscle function impairment more than six months after the acute statin-induced injury has resolved?
A Most of them have been more short-term in terms of the frame of reference. And, again, I don't know whether these reports would indicate that complete resolution has occurred or if they just didn't go any further.
Q Okay. So are you aware of any studies that document impairment of muscle function after statin-associated injury greater than six months after discontinuation?

A No, if you use the six months, I'm not aware of any.
Q Okay. Am I correct that with respect to Paragraph 42, that also applies not only to cerivastatin but to all of the statin drugs?
A Yes, I would say that is correct.
Q Okay. With respect to Paragraphs 43, 44, 45, am I correct that they are all general paragraphs that deal with fibrosis and rhabdomyolysis not specifically in the context of statin-induced myopathy?
A Let's go paragraph by paragraph.
Q Certainly.
A The first one is definitely generic because all these reports were done before the statins were on the market. 44 is just this would be summary of generic conditions, yes. 45 on rhabdomyolysis, the literature on this goes back roughly 62 years now and this would probably -- again, on general background regardless of the source or the stimulus for rhabdomyolysis, the results would be roughly the same.
Q Okay. In 47 you describe the mechanism underlying rhabdomyolysis; is that right?
A Yes.
Q And, again, this is a generic paragraph that's not

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

COPY

MDL No. 1431
(MJD/JGL)

-------------------------------------------
In re: BAYCOL PRODUCTS LITIGATION
This Document Relates to:
ALL CASES
-------------------------------------------

* * * * * * * * * * * * * * * * * * * * * * * * * * *

VIDEOTAPED DEPOSITION OF
DR. BRUCE M. CARLSON
VOLUME II

* * * * * * * * * * * * * * * * * * * * * * * * * * *

elevations at a cellular level?
A Yes, I said that.
Q Okay. But that by definition that would not rise to a clinical level because there are no symptoms?
A Not necessarily.
Q Not necessarily. Okay. Are you aware --. Is there --. Okay. Given the process that you're talking about --. Well, let me ask you another question. Are you aware of any study in the medical literature that shows a case of myopathy in a human being exposed to a statin in which the patient did not have symptoms and did not have CK elevation?
A I'm not aware of such an article and I doubt that such a thing would have happened because the patient would not have come to a doctor.
Q Okay. Am I correct that in order to confirm that kind of a process happening, you would have to have a muscle biopsy demonstrating myopathy?
A That would be the best way of doing it, yes.
Q Is there another way besides a biopsy of demonstrating that process?
A It would not be accurate as accurate. If it's at a very low level, a biopsy would definitely be the best.
Q Okay. Are there other alternative methods besides a

Q Well, let me be clear. Is it your position that in all cases where muscle fibers are damaged the effects persist for months?
A Yes, absolutely.
Q Whether it's caused by rhabdomyolysis, snake venom, trauma or statins?
A That's just a function of how muscles repair themselves.
Q Okay. So that's not anything unique to cerivastatin or even statins?
A No.
Q Okay. Okay. Now, you talk about in Paragraph 3 -- as you said, that paragraph does not deal with statins. That's background information; right?
A Yes, it is.
Q Okay. But you talk about the healing process in a situation where the toxicity occurs as a single synchronous event; right?
A Yes, I do.
Q Okay. Are you aware of any clinical study that shows that impairment of muscle function after an episode of statin-induced myopathy is more prolonged than myopathy related to trauma or to a single exposure to a myotoxic agent.
MR. HOPPER: Objection as to form. If

you understand the question.
THE WITNESS: Yes.
A I'm not aware that a clinical study of that nature has been done.
Q (By Mr. Piorkowski) Okay. So you don't know of anything one way or the other?
A No.
Q Are you aware of any biopsy evidence that shows that muscle pathology persists longer in patients who had myopathy due to statin use than myopathy due to mechanical trauma or single exposure to a myotoxic agent?
A Again, I'm not aware that that comparison has ever been done.
Q So it's fair to say that on an clinical level you're not offering any opinions that muscle deficits persist longer in myopathies that occur in patients who use statins than myopathies that occur for other reasons; is that right?
A I think we need to qualify something here. In the case of a single-event myopathy like trauma or some of these things that I indicated in No. 3, after the initial event there will be a very well ordered course of repair. In the case of statins and Baycol, one would have the potential and the

likelihood of repeated insult so that one would have a cumulative effect. And in that circumstance, yes, the course of repair and recovery would be longer.
Q Okay. But you don't have any clinical evidence or any biopsy evidence to support that proposition; is that right?
A I'm not aware that much has been done, no.
Q Okay. Now, as I heard what you said, you said that Baycol has the potential and the likelihood to --.
MR. PIORKOWSKI: Well, I'm sorry, could we repeat that.
MR. HOPPER: Let's have her read it back. That would be best.
(WHEREUPON, the answer appearing on Page 303, Lines 20 through 25 and Page 304, Lines 1 through 3 was read back by the court reporter.)
Q (By Mr. Piorkowski) Your statement as I understood it said that statins and Baycol have the potential and the likelihood of repeated insult; is that right?
A Yes, yes.
Q Okay. Do you know for certain --. Do you have any scientific evidence that on a cellular level Baycol in fact does cause a non-synchronous repair?

A I don't think such evidence exists in patients, no.
Q Okay. Are you aware of any evidence that exists in animals to that?
A Very well aware, yes.
Q You're aware of evidence that exists in animal that statin toxicity causes --
A -- That Baycol toxicity --
Q -- Let me back up.
A Okay.
Q Listen to --
A -- Excuse me. I'll let you finish, yes.
Q Okay. Are you aware of any evidence in animals that statin toxicity causes --. Let me start over. Are you aware of any study that has looked at the healing process following statin toxicity for muscles in animals?
A I have seen some internal Bayer documents that do document this, yes.
Q Okay. And are you referring to the study called Toxicity of lipid lowering drugs in primary skeletal muscle cells in vitro that is authored by Wasinska?
A It's Wasinska. It's a Polish name.
Q Wasinska-Kempka?
A Yes, I've read that one several times.
Q Okay. All right. My question is: Is that the