93. Rather than recognize the problem for what it potentially was (and did in fact turn out to be), Bayer took the approach of trying to minimize what happened.

> Other than a transient appearance of myoglobin in both serum (380 mg/l) and urine (9.89 mg/l, which rapidly cleared), the remaining laboratory evaluations including serum creatinine and renal marker enzymes were normal throughout his course. The subject showed no abnormality on physical examination and had no complaint except for moderate pain over the left thumb increasing with extension, first reported on day 3 and completely resolved by day 18 [page 58].

The company's narrative, which states that nothing really bad happened, avoids considering the risks to the patient. Myoglobinuria entails a significant risk of renal damage and failure, which can cause very serious disease. Myalgia in the thumb implies a risk of losing thumb strength and function, at least temporarily, which may not be lethal but would be significant. Such problems, occurring in 2% of patients, as the results of the phase I trial suggest, would affect a large number of people.

94. Bayer could not have argued, at this juncture, that the problems occurring in a single patient constituted an isolated rare event. Two other patients in the same study also experienced CK abnormalities. Moreover, in the same version of the IB, the company reports one study of the effect of food on blood levels of cerivastatin and another study of dose-proportionality. Remarkably, increases in CK occurred in six subjects (> 20%) in the former study and two subjects in the latter (13%). The greatest increase observed (1341 u/l) was more than 5 times normal. It should have been a significant warning to the company that CK abnormalities occurred in high percentages of patients in three separate studies, and in two of those studies, at least one patient experienced a high CK abnormality. One of the cardinal rules of good science is that scientifically valid findings are confirmed as true by repetition in several separate investigations. Bayer should have concluded at this point that its drug was unusually toxic to muscle tissue.

95. Bayer reported on the patient #1301, who experienced a CK of 150 times normal, to Dr. Stephen Aurecchia, the FDA reviewer, on August 9, 1991, according to a contact memo of that date in the company records. The company gave the FDA assurances at this point that in order to avoid further risk to patients, it would limit cerivastatin doses in phase II to 0.2 mg. That in fact did not happen. The company went on to develop Baycol at doses of 0.3, 0.4, and 0.8 mg, and even to test doses as high as 1.6 mg.

96. Thus, we see that the company missed an opportunity to avoid the problems that have since developed. If Bayer had kept their commitment on dosing, made in the 8/9/91 assurance to FDA, future problems would probably not have been as frequent or severe. Given the repeated indications that myotoxicity with Baycol was unusually frequent and in some instances dangerous, one cannot doubt but that an attitude of minimization and denial of Baycol problems played a role in the company's decision to proceed. However, since this minimizing attitude was incorporated into the Investigator's Brochure, it was not directed only at personnel within Bayer, it was also directed at the investigators and the FDA reviewers.

**C. Phase IIb Studies, Investigators Brochure, Version 9, June 1997**

97. Bayer had designated one dose-ranging and long-term extension study as pivotal, one of the major human trials supporting the NDA. Thus, clinical data from this trial would likely have been subject to close scrutiny by the FDA. During the double-blind period, one patient on a relatively low dose, 0.2 mg, developed elevated CK up to 99 times normal. Here is what the company reports about this patient:

> The patient was a sedentary 34-year old white male with a baseline CK value of 62 UA. Twelve days after randomization, he began a weight lifting programme. Two days later he returned for his study visit and at this time his CK value was 44 times the ULN (>5000 U/l). ...Two days later (after 16 days an active drug), his CK value peaked at 99 times the ULN (11,830 U/l). ...Although the investigator had advised the patient to

> stop medication, the patient continued until day 18 when his CK had decreased to 13 times the ULN (2736 U/l). When study medication was finally stopped on day 19, the CK had dropped to 10.4 times the ULN (1249 U/l). The patient's only clinical symptom was soreness in the muscle group used while weight lifting [page 101].

In this instance, another serious event, occurring in a patient in a pivotal trial, is explained by Bayer as not due to their drug, but due to the patient lifting weights. Moreover, the company focuses on the fact that despite continuing on Baycol, the patient's CK returned toward normal.

98. The point to be taken is not that the company is necessarily wrong in its conclusion about the role of weight lifting or the importance of reporting that the abnormality decreased. Rather, it tried to deflect the impression of serious toxicity away from its drug. This attitude of denial is the real problem.

99. Even if weight lifting did play a role in this adverse event, many people lift weights and do strenuous things. What is also quite possible is that Baycol played an important role in this adverse event, combining synergistically with the exercise to create a dangerous situation. But Bayer did not wish to consider the possibility that its drug might exacerbate the natural and normal muscle injury of exercise to create a problem. Instead, Bayer wished to deflect the investigators and the FDA reviewers away from the risk created by the drug in this situation, by focusing exclusively on the patient's behavior.

100. Similarly, in another phase IIb study, a dose-titration investigation performed in Canada, the company reports,

> Only two patients experienced CK elevation greater than 10 times the upper limit of normal. Both of these increases could be explained by the sudden onset of strenuous exercise [page 108].

These elevations occurred at doses of 0.05 and 0.1 mg. There is no indication that the company is alarmed or even concerned about "only two patients." In the IB, they do not report how high the CKs

went, indicating only that they were > 10 times ULN, and there is no follow up reported to indicate what happened to the patients. The events are dismissed as exercise induced. But are not patients with high cholesterol often advised to exercise as part of a treatment program, and does that not suggest that the risk that Baycol might interact badly with exercise should have been taken more seriously?

101. We can see that the company was consistently dismissing signals of possible toxicity and putting a favorable spin on the safety of its product. In this version of the IB, Bayer was dealing with the problem of how it should report this information to investigators and the FDA, and it decided to try to dismiss the problem and explain it away. The deception is a form of concealment, as a magician might conceal a hidden card or rabbit by talk that diverts the attention of the watchers.

**D. Pivotal Study of 0.8 mg, Investigators Brochure, Version 12, February 2001**

102. In the last version of the Investigator's Brochure, prepared by Bayer at the beginning of 2001, the company reports on a group of particularly vulnerable patients, elderly women. As a demographic group known for frailty, muscular weakness, and difficulty with mobility, elderly women would be considered especially susceptible to disability from drug-related myopathy. In summarizing the results of the pivotal study of the 0.8 mg dose of Baycol, which was launched a half-year earlier in August 2000, Bayer notes that elderly women suffered an unusually high rate of myotoxicity.

> There appeared to be a greater incidence of CK elevations >10*ULN in women over 65 years old treated with cerivastatin 0.8 mg compared with the other sex and age groups in any treatment group. This subgroup represented only 12% of the patients in the cerivastatin 0.8 mg group (n=90). These women also accounted for half of the cases of CK elevations >10*ULN with muscle-related symptoms in this treatment group. The majority of these women (4 out of the 5) had LDL-C lowering near or >50% and all CK elevations were noted within the first 8 weeks of treatment [page 59].

This statement in IB version 12 is identical to one that appeared in the study report of the 0.8 mg pivotal study, prepared in September 1999, with the difference that the company omitted the last

sentence about CK lowering in the latter document. So, in reporting to investigators the higher rate of myotoxicity in elderly women, Bayer does not at this juncture go on to point out the unusual vulnerability of this group or ask investigators to take special precautions with them; rather the next sentence mentions a potential benefit (LDL-C lowering around 50%), one that might be seen as compensating for increased risk.

103. A page later in the IB, the company does caution investigators about elderly women, and yet at the same time tries to counterbalance caution by making a puzzling claim:

> ...some caution should be applied when prescribing cerivastatin 0.8 mg to elderly females. Study #0182 required patients to start treatment directly on 0.8 mg daily. In a normal clinical setting, **elderly females over 60 are considered at relatively low cardiovascular risk. They would be unlikely require the major degrees of lipid lowering provided by cerivastatin 0.8 mg** [page 60, bold added].

Yet, according to the CDC, heart disease is the leading cause of death of women over 65, with more than 300,000 elderly women dying from that cause in the year 2000 (http://webapp.cdc.gov/sasweb/ncipc/leadcaus10.html). There is no basis for stating that elderly women are at "relatively low cardiovascular risk" or that they are "unlikely to require major degrees of lipid lowering." These statements were incorrect, and one can only assume that Bayer inserted them in the IB in order to spin the information, throw a curve, to investigators and perhaps FDA reviewers, about the risk to this vulnerable population.

104. It is perhaps noteworthy that version 11 of the IB, prepared in January 2000, did not mention the special risk to elderly women, even though the report of the 0.8 mg pivotal study had mentioned it in 1999 and the information would have been important for investigators to know. Yet the company did add it to version 12. The FDA itself had taken note of the vulnerability of these patients in the summer of 2000, requiring that a warning be added to labeling. It was after the FDA acted that Bayer chose to add the information to IB version 12, which appeared the following winter.

In waiting until the FDA acted, Bayer was not putting forth the kind of forthright and pro-active effort in regard to important safety information, as ought to be expected of an ethical pharmaceutical company.

105. In August 1999, at about the same time that the study report of the 0.8 mg pivotal study was written, there was a meeting of the Bayer project team in charge of developing cerivastatin for a different purpose, to treat osteoporosis. It had been shown that statin drugs may exert a beneficial effect in patients with in that disease. Of all patients, osteoporosis affects older women most severely, and therefore older women would be the main population studied in the osteoporosis development program. Aware of the risk to older women, the Bayer osteoporosis project team recommended removing the Baycol 0.8 mg dose from the protocol of the major osteoporosis clinical trial. Rather than start the patients on Baycol 0.8 mg, the team proposed to continue patients on Lipitor, the comparator drug used in the study. It seems to have been a case of Bayer's right hand not knowing (or ignoring) what its left hand was doing. In studying Baycol 0.8 mg for cholesterol treatment, the company pushed forward and did not inform investigators of the danger to older women, but in studying osteoporosis, other company employees worried about the danger, recommended removing the dose from the clinical trial, and using a competitor drug instead.

**E. Pivotal study, 0.4 mg Dose, Integrated Safety Summary**

106. In the 0.4 mg Integrated Safety Summary (ISS), Bayer repeatedly and consistently tried to portray Baycol as being the same as other statin drugs with respect to myotoxicity. This was not so; it was clear to the company throughout the human testing process, that cerivastatin was significantly more toxic. Indeed, even during the preclinical animal investigations, it was clear that cerivastatin showed the most toxicity of all the drugs tested and the smallest dose difference between pharmacological effects and toxic effects.

107. At the 24-week time point, the end of double-blind treatment in the pivotal study D96-008A of the 0.4 mg dose, rates of CK elevation were as follows:

**Percentage of Patients with a Normal or Low Serum Electrolyte Chemistry Value at Baseline Who Developed an Abnormality Greater than the ULN Through Week 24 [page 63, table 44]**

| Lab Variable | CER 0.3 mg (n=225) | CER 0.8 mg (n=448) | PLA/FLU 40 (n=220) |
|---|---|---|---|
| CK | 25% | 26% | 18% |

The table shows that the rate of CK elevation of the 0.4 mg Baycol treatment arm was more than 40% higher than that of the control arm, where patients received placebo for 8 weeks and fluvastatin (Lescol) for 16 weeks. Discussing these results, the company writes that the "percentage of patients with treatment emergent elevations of serum CK was mildly greater" and the "relative differences were small."

But a >40% increase cannot be considered mild or small; it is substantial and significant. Suppose that during one influenza season, 40% more patients contracted the disease than the previous year. The CDC would consider that a large increase. In the case of a statin drug given to 1 million people, the difference between 26% and 18% would amount to an additional 80,000 people.

108. A few pages later in the 0.4 mg ISS, the company shows that the 0.4 mg treatment arm developed 50% more sustained CK elevations than the control arm, and a maximum CK that nearly quadrupled the control maximum. These data should have indicated to Bayer that Baycol was likely to produce more myotoxicity and more serious myotoxicity than the control treatment.

**Percentage of Patients Who Developed An Increased CK Through Week 24 Regardless of Baseline Status in US Placebo Active Controlled Short-Term Study D96-008A [page 68, table 48]**

| Lab Variable | CER 0.3 mg (n=223) | CER 0.4 mg (n=448) | PLA/FLU 40 (n=219) |
|---|---|---|---|
| Sustained CK elevation | 17% | 20% | 14% |
| Max CK | 2024 | 2550 | 713 |

109. The "our-drug-is-just-like-the-others" spin, which Bayer was pitching by asserting that the differences were small and mild, should have demonstrated to the company that there was a significant problem with its drug. Other drugs to lower lipids had already been approved, and Bayer's drug was clearly worse than those in regard to muscle toxicity.

110. Writing of study D96-008B, the long-term extension of study D96-008A, which went to 52 weeks, the company notes that among patients developing CK > 3xULN,

> Of interest, all except three of these elevations occurred in male patients and most were in younger (< *65* years) patients [page 76].

This statement contradicts the statement in IB #12, where the claim is made that CK elevation is mainly seen in older women who are unlikely to require the higher doses of Baycol for lipid lowering. The point here again seems to be to suggest that the problem of myotoxicity occurs most frequently in population groups, who would be at reduced risk of Baycol toxicity for one reason or another. The impression given is that Bayer will say whatever it can to make its product seem less toxic and less problematic.

111. In concluding the written report of the 0.4 mg ISS, Bayer acknowledges:

> For all patients with evaluable data, CK elevations were higher in CER 0.4 mg-treated patients than in patients receiving PLA/FLUVA 40mg over 24 and 52 weeks and also numerically higher than in PLA-treated patients over eight weeks.

This is clearly a statement that casts doubt on the safety of Baycol, but rather than discuss this and explain it further, the company minimizes the scope of the problem:

> Most CER 0.4 mg-related CK elevations occurred within the first six months of therapy and were less than three times the upper limit of normal.

The obvious point, not addressed in this quotation, is that when it comes to CK elevations, concern should not focus on what happens to MOST patients, but to the minority that do develop myotoxicity. Nevertheless, Bayer ends the safety report with the statement,

> In conclusion, CER 0.4 mg has an acceptable short and long-term safety profile [pages 102-104].

112. In the ISS, therefore, the company hopes that the FDA will readily accept this view and not peer too deeply into the data, and Bayer tries to persuade the Agency that Baycol is no more toxic to muscle tissue than other statins. In doing so, Bayer is taking advantage of an inescapable difference of perspective. The company is intimately familiar with the drug it has been researching for many years. Company scientists know all the characteristics of the drug in great detail. In contrast, the FDA knows only what the company reports, and Agency reviewers are aware that they are much less knowledgeable about the drug than the company. There is, therefore, a strong tendency for FDA reviewers to defer to the company's judgments about their drug. In trying to convince the Agency that cerivastatin was just like other statins, Bayer knew that it was arguing from an advantageous position vis-à-vis the Agency.

## IX. <u>Post-Marketing Data and Myopathic Toxicity of Baycol</u>

113. In the previous section, I discussed pre-marketing submissions from Bayer to the FDA. We have seen that the company repeatedly tried to divert attention away from data showing that Baycol is associated with significantly more CK abnormalities and myopathies than other statin drugs.

In this section, I will discuss post-marketing reports and show that the company did not communicate to the FDA post-marketing information within its possession that pointed to excessive myotoxicity of its drug.

114. Bayer became aware at least as early as the spring of 1999 that Baycol was associated with more cases of rhabdomyolysis than other statins on the market. The company obtained adverse event reports from the FDA through use of the Freedom of Information Act (FOIA). A memo written by Laurie Simpson, a company employee, on April 28, 1999 shows that Bayer made the FOIA request in March, and that the purpose was to provide data "to examine the potential adverse event incidence rates associated with the combined use of individual statins and gemfibrozil." It seems clear that Bayer had become concerned about the interaction of Baycol and gemfibrozil, another lipid lowering drug that was often prescribed concomitantly with statin drugs.

115. Simpson addressed her memo to Mel Sorensen, a company employee, and Roger Celesk, Associate Director of Drug Safety. It displayed the numbers of cases of rhabdomyolysis that had been reported in association with combination treatment (cotherapy) of gemfibrozil and a statin drug. Despite the fact Baycol's market share was less than that of any other statin, the drug was associated with 40 reports, almost 4 times the number associated with any other statin.

116. By the end of 1999, other data in the company's possession confirmed the excess risk of Baycol in combination with gemfibrozil. Bayer obtained the data from the FDA and IMS, an American company that estimates prescription frequencies and market share. Tables prepared from this information showed numbers of reports of myopathy and numbers of prescriptions for all the statin drugs on the market. Other tables showed the reporting rate (RR, number of reports/number of prescriptions) of myopathy adverse events for each drug. The RR of Baycol was much higher than any other statin, ranging from 3 times that of Zocor to 9 times that of Lipitor. Although Baycol had a

market share of 2.38% of statin prescriptions, it was associated with 12.7% of the U.S. reports of statin-associated myopathy, a reporting rate ratio (RRR) of 5.3, which indicated that every prescription of Baycol generated 5 times as many reports of myopathy as an "average" prescription of a statin drug. For reports of cotherapy of statin + gemfibrozil, the FDA received 48% of the reports for Baycol (RRR = 20), indicating that cotherapy with Baycol + gemfibrozil generated 20 reports of myopathy for every report of an "average" statin + gemfibrozil.

117. A Bayer epidemiologist, S. Niemcryk, prepared an internal report for the company, which used the data obtained from the FDA. In the report, Niemcryk commented on tables composed by Dr. Kuno Sprenger, chairman of Bayer's Pharmacoepidemology Working Group, which compared cerivastatin with other drugs. He wrote:

> Primarily, the data for this analysis were obtained from the FDA's Spontaneous Reporting System (from 1969 through 10/97) and Adverse Event Reporting System (11/97 through 6/99). Dr. Sprenger's analysis is attractive because the incidence rates of rhabdomyolysis are estimated for several individual statins. These rates are also estimated for patients who are receiving both a statin and a fibrate. The findings indicate that in patients receiving monotherapy, cerivastatin substantially elevates risk for rhabdomyolysis compared with other statins. In combination with gemfibrozil, cerivastatin patients were also found to be at a remarkable disadvantage compared with patients receiving gemfibrozil and another statin.

118. An ethical pharmaceutical manufacturer in possession of such information and analysis about one it its drugs should have immediately advised the FDA of the findings and asked for guidance from the Agency. It would likely have been necessary to re-evaluate the safety of Baycol, particularly in regard to the interaction with gemfibrozil. Moreover, federal regulations at 21 CFR 312.50, and 314.50(d) clearly mandate the obligation of a company holding an IND or an NDA, both of which Bayer held for cerivastatin, to report such information.

IND Regulations – Sec. 312.50 General responsibilities of sponsors. ...ensuring that FDA and all participating investigators are promptly informed of significant new adverse effects or risks with respect to the drug.

NDA Regulations – Sec. 314.50 (d) Technical sections of NDA: The applicant shall, under section 505(i) of the act, update periodically its pending application with new safety information learned about the drug that may reasonably affect the statement of contraindications, warnings, precautions, and adverse reactions in the draft labeling and, if applicable, any Medication Guide.

119. It does not appear, however, that Bayer ever informed the FDA about this reporting rate data, which showed Baycol's very high myopathy-related RRs and RRRs, except possibly two years later, shortly before Baycol was withdrawn from the market and the company was called before the FDA to discuss the safety of the drug. Since regulations require submission of update reports at the time of an approvable letter, Bayer should have submitted this information to the FDA no later than the summer of 2000, when the FDA issued the approval of the NDA for the 0.8 mg dosage form. In addition to its obligation under the regulations, it is my opinion that Bayer also had an ethical obligation to bring the data to the FDA, since it is a company in business to advance the health and welfare of the public and the nation.

120. We now know that Bayer had reason to be concerned about the interaction of Baycol and gemfibrozil, which is dangerous and potentially deadly. The rate of myopathy and rhabdomyolysis, which can cause disability, kidney failure, or death, is dramatically increased when Baycol and gemfibrozil are taken concomitantly. Pharmacokinetic data shows that a strong interaction exists between gemfibrozil and cerivastatin, and that the blood levels of the latter are raised several fold when the drugs are taken together. Because of concern about this interaction, Bayer continually tracked rates of myopathies associated with its product from 1999 through 2001.

121. Analyses of these data were done by Prof. Dr. Kuno Sprenger, a physician employed by Bayer, who was in charge of the company's Global Drug Safety division, which had the job of monitoring the post-marketing safety information of Bayer products. Dr. Sprenger completed an analysis around the beginning of 2000, as indicated by a memo he wrote on February 25, 2000. His presentation to other company officials showed the comparative rates of rhabdomyolysis for statin drugs, including Baycol, when administered either alone or in combination with gemfibrozil. One table showing comparative RRs and RRRs of rhabdomyolysis reports in the U.S. For all reports of rhabdomyolysis (statin drug prescribed alone or with gemfibrozil), cerivastatin (Sprenger used the generic name) was associated with 10 to 67 times the rates of the five other statins. For cotherapy reports (statin with gemfibrozil) the RR for cerivastatin was 9 to 16 times the rates of the other statins. For cerivastatin cotherapy vs. cerivastatin monotherapy (without gemfibrozil), the RRR was 30, much higher than the corresponding ratio of any other statin drug. Moreover, the reporting rate of rhabdomyolysis adverse events for Baycol-gemfibrozil cotherapy was hundreds of times greater than that for gemfibrozil alone. Dr. Sprenger also noted that rhabdomyolysis is the *leading cause of death* with cerivastatin, with a rate 6-55 times higher than other statins.

122. On July 10, 2000, Dr. Sprenger sent an analysis to Rajeshwar Sharma, Associate Director of Drug Safety, which focused on monthly receipt of reports of rhabdomyolysis at Bayer's GDS division from May 1999 through June 2000. According to memos, the company was concerned whether reports of this adverse event due to cotherapy (Baycol + gemfibrozil) had started to decrease following a Package Insert (labeling) change, which added a contraindication for this combination of drugs. The numbers of reports rose through February 2000, and then decreased, suggesting that the label change had the desired effect, although it was not clear whether the decrease observed in the spring of 2000 may have been due to a reporting lag rather than fewer instances of cotherapy.

123. At this point, it should be noted that Bayer had a much better option than adding a contraindication for cotherapy. The company could have added a Black Box warning, a bold font statement surrounded by a black border inserted near the beginning of the labeling. Black box warnings, as they are called, command much more attention than contraindications. It is common to insert a black box warning when a serious safety concern should be brought to the attention of doctors, as was the case with gemfibrozil-cerivastatin cotherapy. Why did Bayer choose to insert a contraindication rather than a black box warning? Perhaps it was because Baycol would then have been the only statin drug with a black box in its label, and the company was worried that a black box would disadvantage the drug in competition with the other statins. If so, then Bayer was putting its commercial interests ahead of concerns about patients' safety.

124. This analysis appears to have been done in preparation for an upcoming teleconference with the FDA on July 14, 2000, in which the labeling for the 0.8 mg dose of Baycol was to be discussed. Prior to the meeting, the company shared the analysis with Dr. Gerald Faich, a former director of safety surveillance at the FDA, who was at the time a freelance consultant to pharmaceutical companies. According to a company record of this meeting with Dr. Faich, the consultant had urged Bayer to show "due diligence to follow combination cases and take any action to avoid that gemfibrozil is combined with cerivastatin." Remarkably, although Bayer shared Dr. Sprenger's analysis with the former FDA official, Dr. Faich, the company does not appear ever to have shared the analysis with the FDA. Apparently, Bayer felt the need for an FDA perspective on the issue, but did not feel obligated to consult the FDA.

125. In June 23, 2000, a few days before company officials talked with Dr. Faich, and a few weeks before the Baycol project team was to meet with the FDA about labeling for the 0.8 mg dose, certain company officials were concerned that Bayer was not taking sufficient action to avoid

combination therapy. A memo was sent over the signatures of Patricia Stenger and her colleague, Bob (no last name). The document states that "there is an immediate need to provide more direction to Scientific Affairs Liaisons and Clinical Communications." The statement refers to those Bayer employees who communicate with doctors who were prescribing statins.

The memo continues:

> Despite everyone's best efforts, the contraindication has not been adequately communicated. ...there is an increase in comments from the providers regarding the inadequate response from Bayer. ...Lack of information has caused a heightened level of anxiety. ...More and more customers are asking for information.... MDs reporting cases recently have heard of other cases, appear to be more angry and concerned and feel that Bayer his hiding information [Sharma deposition, exhibit 12C].

These are excerpts selected out of context from the Stenger memo, but I think they do fairly reflect the deep level of concern of this employee and her colleague, Bob. It appears that Bayer was indeed withholding information from the FDA, and it is likely that if the company had leveled with the Agency about the highly elevated reporting rates, the FDA would have taken action to see that the word got out to doctors in unmistakable language.

126. For a few different reasons, the upcoming meeting with the Agency about the 0.8 mg dose would have provided an opportune moment to bring the reporting rate information forward. First, the subject of the meeting was labeling, and discussion of adverse reactions and the rates of adverse reactions is an integral part of all labeling discussions. Second, the regulations specifically require the company to update safety information at the time of an approval with any new information likely to affect labeling. Third, the consultant, Dr. Faich, had just advised the company to take any action to reduce combination therapy. The former FDA official would certainly have contemplated bringing the information to the FDA, as one action that Bayer could have taken. Lastly,

many officers of the company and officials of the Agency, the people who would have to consider what to do about the cotherapy problem, were to be present at the meeting.

127. These reasons notwithstanding, Bayer did not present the information at this meeting or even raise the issue. Moreover, at this time, company officials deliberately postponed presentation of an augmented version of the Patient Package Information (PPI) intended to reduce cotherapy by warning patients about the problem and the consequences.

128. The evidence of this decision to postpone submitting the strengthened PPI to the FDA is contained in the notes on a team meeting in the exhibits related to the deposition of Paul McCarthy, MD, Bayer's Director of Medical Affairs. Describing the meeting on June 27, 2000, Rajeshwar Sharma, who composed the notes and was one of the participants, writes:

> Patient information leaflet should be prepared before 12 July 2000 when a meeting is scheduled with the FDA to discuss labeling of the 0.8 mg tablet. Paul mentioned that this leaflet should not be distributed prior to 0.8 mg Baycol approval, otherwise it will most likely delay the approval [MacCarthy deposition, exhibit 11].

The augmented PPI would have been considered part of the labeling. It would have been appropriate to present it to the FDA at the upcoming labeling discussion. But the Medical Affairs director, Dr. McCarthy, vetoed this course of action. The changes to the PPI would have been new, and the FDA would not have had a chance to review them. That would likely have resulted in a postponement of the meeting and delay of approval. Furthermore, it was possible that the discussion of the cotherapy problem might have prompted the Agency to look deeper into problems with Baycol, with who-knows-what effect on the anticipated approval.

129. In connection with the 0.8 mg labeling meeting in July 2000, Bayer made two significant and revealing choices about what to communicate to the FDA. First, the company chose not to present information about highly elevated reporting rates of myopathy and rhabdomyolysis, and

second, the company chose to delay submission and distribution of a Patient Package Information that might have reduced the cotherapy problem by warning patients. It is likely that these decisions to withhold were related to marketing considerations – the company's desire to keep the 0.8 mg launch on schedule, and its need to keeps sales figures of Baycol on target.

130. In contrast to earlier events, Bayer did intend to present information about elevated reporting rates to the FDA on July 24, 2001, a few weeks before Baycol was withdrawn from the market. The meeting had been requested by the Agency due to concerns that had arisen about Baycol safety, probably in connection with an Urgent Marketing Restriction placed on the 0.8 mg dose in the U.K. A set of PowerPoint slides bearing the date of the meeting was prepared by the company and included one slide that compared Baycol to five other statins. It is not certain whether Bayer ever actually showed the set of slides to the FDA, since records of that meeting suggest that the Agency presented its own reporting rate data, which may have been shown rather than that of the company.

131. Bayer's PowerPoint presentation would have showed that monotherapy with the Bayer drug was associated with confirmed cases of rhabdomyolysis at 5 to 17 times the RR of any other statin; for cotherapy with gemfibrozil, Baycol was associated with confirmed rhabdomyolysis at 28 to 259 times the RR. The database lock date for this slide was September 30, 2000, about 10 months earlier. Bayer had been continually monitoring such rates since late 1999 and perhaps earlier. Thus, similar data could have been presented to the Agency long before these slides were prepared for the July 2001 meeting.

132. Bayer had also presented similar data in June 2001 at meetings of the Australian Therapeutic Goods Agency, the U.K. Medicines Control Agency, the European Agency for the Evaluation of Medicinal Products, and the Japanese health ministry. The Australian data showed that cerivastatin was associated with 3 to 9 times as many reports of rhabdomyolysis as any other statin. In

the U.K. and Europe, postmarketing data based on the FDA database was presented, and in consequence, the marketing and distribution of the 0.8 mg dose was suspended. In Japan, a similar action was taken.

## X. Bayer's Priorities and the Company's Strategy for Baycol

133. Bayer's decisions about what information to submit to the FDA and when to submit it are related to federal regulatory requirements, with which the company is obliged to comply. Needless to say, however, those decisions are also related to the goals and strategies set by high-ranking company officials. There is substantial evidence that in a number of instances, Bayer's decisions about what to tell the FDA about the safety of Baycol were influenced more by marketing strategies and goals than by FDA requirements for forthrightness, accuracy, and completeness of safety information.

134. There is also evidence that Bayer's decisions about marketing strategies and goals outweighed concern about the health and safety of patients who would be taking the drug. In this section, I cite a number of documents that are revealing about these internal company plans.

a. On January 25, 2000, a meeting was held of Bayer's Scientific Relations Department to discuss strategies for marketing Baycol during the coming year, when the company expected the approval of the 0.8 mg dose. The department included staff whose job it was to promote Baycol to doctors and other health care providers. Handwritten notes by one staff person listed the right customers to approach – clinics, medical schools, geriatric facilities, etc. One of the notes reads:

> some are scared to uncover such data (bad data) because of launch of 0.8 mg. – If FDA asks for bad news, we have to give, but if we don't have it, then we can't give it to them [insert citation].

The scientific staff, of which the note writer was apparently a member, often receives reports of adverse events from the medical professions they contact. One can infer from the meeting notes taken by this writer that there was concern about the frequency or intensity of adverse event reports expected to follow the launch of the 0.8 mg dose. Scientific relations personnel were being instructed that if they did not uncover such information, then it would not have to be reported to the FDA. The point to be taken, evidently, was that contacts with health care providers should be conducted carefully in order to avoid the possibility of ascertaining undesirable information.

b. Another example of company goals and strategies affecting compliance with regulatory requirements is shown in the minutes of the Baycol U.S. Project Team meeting on July 19, 2000. A Bayer document dated July 26, 2000 recorded the minutes of the Baycol U.S. Project Team meeting that took place one week earlier. The meeting focused on the upcoming launch of the 0.8 mg dose, since the sNDA for that dosage was about to receive approval. A note in the minutes stated that approval of the new dose had been granted on July 21, 2000, two days after the meeting.

Here are some excerpts from the document [Sharma deposition, exhibit 14]:

> Baycol remains at 5% of market share for new prescriptions.... Key launch objectives are to build enthusiasm to make Baycol a significant player with 15% market share; to increase prescriber interest with a "go to" dose offering enhanced efficacy; and to introduce the .8 mg dose into the statin market within 3 weeks of approval.

The very next item:

> Rhabdomyolysis reports continue to be predominantly from cases with gemfibrozil (2/3 vs. with monotherapy). There is concern that physicians may not be taking the contraindication seriously. ...There is an indication of higher

incidence in elderly women. ... a patient information sheet has been drafted to reflect current labeling. This is in final review and will be submitted after approval of .8 mg.

i. Clearly, the Project Team wanted to put Baycol on the fast track. Introduction of the new dose was to occur within three weeks, and the goal was to triple market share. These marketing goals trumped cautionary concerns. Among these concerns, company officials knew that rhabdomyolysis was a dose-related adverse event and that 0.8 mg would certainly produce more cases of this severe condition, especially in elderly women, who often have high blood drug concentrations due to low body weight. Despite such knowledge, the minutes made clear that it was "full speed ahead" for Baycol.

ii. Even more telling, perhaps, is the fact that the company chose to postpone submission to the FDA of a patient information document until after approval. This document would likely have prevented some cases of rhabdomyolysis by alerting patients to the problem. Apparently, the Team was more concerned that approval and the rapid introduction of the 0.8 mg dose would be delayed by the submission. The planning for the patient information sheet had been underway for around two months, at least, prior to the actual approval on July 21, since a memo by Rajeshwar Sharma on May 27, 2000 discusses the patient document and notes that Dr. Paul MacCarthy, the Director of Medical Affairs, wanted distribution postponed till after approval. It appears that submission of the patient information sheet for approval was delayed for three months due to the priority of marketing goals.

iii. The U.S. Project Team minutes also discuss the presence and comments of Dr. W. Plischke, President of the Pharmaceutical Division of Bayer, and the highest-ranking company official at the meeting.

> Dr. W. Plischke attended the first half of the meeting and communicated his interest in the Baycol project directly to the team. He reiterated the need to drive future sales and his belief that we could achieve blockbuster status.

His presence at the meeting was obviously intended to motivate the project team to try to achieve the very highest goal for Baycol – blockbuster status, marketing success equivalent to that of a Prozac or a Prilosec. It is important to consider how Plischke's presence and statements might have affected the Project Team's concerns about problems with rhabdomyolysis. Clearly the president's words demonstrated that the company wanted no hesitation or reluctance on the part of team members in promoting Baycol.

## XI. FDA's Expectations and Vulnerability to Erroneous Conclusions

135. The FDA approved New Drug Applications for Baycol on three separate occasions. In 1997, the Agency approved the original NDA for doses up to 0.3 mg. In 1999, the Supplementary NDA (sNDA) for the 0.4 mg dose was approved, and in 2000 the sNDA for 0.8 mg was approved. On each occasion, the FDA reviewers examined data on the efficacy and safety of Baycol and concluded that the product could be used safely and effectively for the intended use of treating hypercholesterolemia.

136. Nevertheless, in July 2001 the Agency raised serious questions about the overall safety of Baycol in relation large numbers of reports of patients experiencing toxic effects of Baycol on muscle tissue. The reports of toxicity included evidence of inflammation and pain in muscles

(myositis, myopathy, and myalgia); disability; weakness; rupture of muscle tissue, muscle protein in blood and urine, and kidney damage (rhabdomyolysis); and occasionally death. In response to these serious safety questions, raised by the Agency, Bayer decided to withdraw Baycol from the U.S. market in August 2001.

137. Given this ultimate outcome, the question may be asked whether the FDA bears primary responsibility for an error in judgment in approving Baycol. Before considering this question, it must be pointed out that Bayer had numerous opportunities to bring to attention of the Agency that Baycol was associated with greater evidence of myotoxicity and higher reporting rates of myopathic adverse events than any other approved statin drug. Nothing that may be surmised about possible FDA errors in judgment should be construed as negating, relieving, or reducing the company's responsibility to have brought this information explicitly to the Agency's attention.

138. Nevertheless, it is probably true that FDA reviewers believed that Baycol was not substantially different from other statin drugs, which have been shown to be both safe and effective for reducing risks associated with cardiovascular disease. Because heart disease and other cardiovascular disease, associated with elevated cholesterol and other lipids, is so very common in the American population, and so frequently disabling or deadly, the FDA may have assumed that the benefits of another statin, such as Baycol, would naturally outweigh the risks. If the Agency reviewers were operating under such a presumption, they may have not devoted as much attention to the Baycol data as they might usually have to a new drug of a different class.

139. There is evidence supporting this explanation in the FDA review of the original Baycol NDA, which was performed by Dr. David Orloff. In the Background section, Dr. Orloff wrote,

> The overall planning of the development of cerivastatin, and thus the review of this NDA, was clearly impacted by the extensive knowledge of the preclinical pharmacology and toxicology, as well as of the clinical safety and efficacy, of earlier marketed statins [page 2].

Moreover, in his introduction to the safety review on page 46, Orloff focuses almost completely on class adverse effects of statin drugs. Clearly the reviewer was approaching the review of cerivastatin as though it was one of a well-understood class.

140. There is also evidence supporting this explanation from contacts between FDA and Bayer officials in the spring of 1998, a year prior to the approval of the 0.4 mg dose NDA supplement. These contacts do indeed suggest that the Agency was expecting that Baycol would not be associated with any unusual problems and the application would proceed swiftly to approval.

141. On March 30, 1998, in a teleconference, Bayer contacted Orloff, requesting permission to shorten the duration of patient exposure to Baycol from 18 months to a year in a pivotal trial, D98-008, of the 0.4 mg dose. Bayer claimed that serious adverse reactions to Baycol were predicted well by data already accrued during the first 8 weeks of the study, and that this assessment was confirmed by the data available at 24 weeks. The company denied any unexpected adverse events and stated that data accumulating on 0.8 mg dose showed no safety issues. Orloff accepted the company's statements and agreed to limit exposure to one year.

142. We now know that serious muscle adverse events were an issue with Baycol, and that any reduction of patient exposure would reduce the opportunity for such adverse reactions to occur and be observed by the Agency. Moreover, Bayer's statements and representations that there were no unexpected adverse events and that data on 0.8 mg showed no safety issues, were highly misleading. Myopathy and rhabdomyolysis are well known adverse reactions, so that in saying there were no *unexpected* events, the company was avoiding any assurance about muscle toxicity. Nevertheless, myopathy and rhabdomyolysis can be very serious, and they occur more frequently at the higher doses, such as 0.4 and 0.8 mg. Due to Orloff's assent to the company's request, which he

based on the verbal reassurances from the company officials, we can conclude that the clinical reviewer did not anticipate anything unusual about Baycol.

143. The next day, April 1, 1998, Bayer called Orloff again, this time to ask permission to submit the 0.4 mg sNDA in increments – a procedure called a "rolling" submission. Full data would be submitted 6 months after the NDA was filed. At first, Orloff objected that the standard one-year review timeline required the entire submission at start of the time period. But the company official asserted that the efficacy and safety of statin drugs are well known. Clearly Bayer was making an effort in the telephone call to reinforce the idea that Baycol was not significantly different from any other statin.

144. In response, Orloff allowed that it should only take a "very short time" to complete the sNDA review process, and he stated that he anticipated that the review would take less than a year. In a second phone call that day, the company official explained that all efficacy and safety data up to 24 weeks would be included in the original submission, and safety data up to 52 weeks would be included for 250 patients (about 20% of the patients). He asserted that the data will be "more than enough" for efficacy and safety assessment. Responding to the company's reassurances and pressure, Orloff assented that the review would take a short time, and he was willing to reduce exposure data and accept the initial submission containing only 20% of 52-week safety data. Orloff went along with the view that the remainder of the data would "only" be a safety update, and he agreed to make judgments based on the data originally submitted, i.e., about 60% of the total.

145. In retrospect, we know that complete safety data would have been important for the FDA reviewer to have in hand at the time of the initial submission of the sNDA, since that is when the most intense scrutiny would have take place. Indeed, Dr. Orloff stated that he intended to come to conclusions based on partial data. It seems quite clear, therefore, that the FDA clinical reviewer was

anticipating that the drug would be not significantly different from other statins. In all likelihood, this assumption contributed to the FDA missing indications of excess myotoxicity associated with Baycol.

146. By the summer of 2001, it had become clear to the FDA that there were serious safety issues with Baycol, and the drug was significantly more toxic to muscle tissue than other statins on the market, especially when taken at the 0.8 mg dose. Throughout the year since approval of the 0.8 mg sNDA, the Agency had followed the mounting number of reports of rhabdomyolysis that ensued. In the first half of 2001, the Agency had corresponded with the company about labeling changes to ensure that Baycol was not co-prescribed with gemfibrozil, and that patients starting Baycol begin at a lower dose than 0.8 mg. In the correspondence, the numbers of adverse reaction reports were cited as reasons for the changes.

147. Then in late June, the Medicines Control Agency of the U.K. placed an urgent safety restriction on the use of cerivastatin (Lipobay, as it was known in Europe) at the 0.8 mg dose. About the same time – perhaps in response to the U.K. action – the FDA performed its own analysis of adverse event reports and reporting rates of statin drugs. The analysis was completed on July 24, the date of a scheduled teleconference with Bayer about the problem. In their analysis, FDA epidemiologists examined fatalities resulting from rhabdomyolysis. They concluded that Baycol was 42 times more likely to be associated with adverse reaction reports of fatal rhabdomyolysis than another statin, Lipitor. Also, the 0.8 mg dose was 21 times more likely than the 0.4 mg dose to be associated with fatal rhabdomyolysis reports.

148. When Dr. David Orloff, the director of the FDA division handling Baycol, became aware of how dangerous the drug was, he did not mince words. In a letter to the company on August 3, previously cited in this report, he expressed "grave reservations about the overall safety of this drug." And he demanded that Bayer "update your NDA by submitting all safety information you

now have regarding your new drug" including "in detail any significant changes or findings in the safety profile." Among other things, Orloff was asking about information that had never been previously submitted, including comparative reporting rate information that the company had withheld since 1999. Had Bayer been properly open and forthcoming in earlier submissions, such a demand would not have been necessary.

149. Although expectations regarding the safety of statin drugs played a major role in the FDA's assumptions about Baycol, there were other institutional reasons at the FDA that likely contributed the delay in the Agency's concluding that Baycol was more dangerous than other statins. The Inspector General of the Department of Health and Human Services prepared a report about the FDA in 2003. The report covered the preceding decade at the Agency, the years in which the Baycol NDAs were reviewed. During those years, the Agency had operated under a set of new procedures specified in the Prescription Drug User Fee Act and the FDA Modernization Act. Among many changes these laws mandated in the FDA, some of the most important were timelines and deadlines for governing the review process.

150. The IG report explains that the median time to review NDAs had decreased by one-third during those years from 27 to 19 months. Forty percent of FDA reviewers who had been on the job at least 5 years felt that the review process had become more difficult and less effective, due to lack of time. The reviewers particularly cited time constraints as a reason for being unable to raise scientific disputes with pharmaceutical companies about the information and data in their submissions.

151. In confirmation of the role that time constraints may have played in the FDA's review of the Baycol NDA, FDA memoranda, including one on June 26, 1997, show that the Baycol NDAs and sNDAs were reviewed in less than one-year, about half as long as the median review time of 19 months cited in the IG report for the year 2003. When faced with obligations for such a rapid

turn around of new drug applications, FDA reviewers may be especially willing to assume that a new drug is not significantly different from others of the same class which have been safely used in treatment for years. This would be particularly true if, as was the case with Bayer, the company withheld information about risk and repeatedly reassured Agency reviewers that the drug was safe just like the others.

## XII. <u>Conclusion</u>

152. The history of Baycol in the United States, or Lipobay as it was known in Europe and elsewhere, is a story of misfortune and sometimes tragedy for the patients who were injured and sometimes died from taking the drug. It is also a story of a company with ambitions to become a major player in one of the most lucrative pharmaceutical treatment markets of the present era of health care – the prevention of cardiovascular disease, the most frequent killer – through the reduction of blood levels of cholesterol and fat.

153. It is a story, however, of corporate ambitions for profit and prominence that overcame good judgment. Bayer drove relentlessly forward in its goal of making Baycol a "blockbuster" drug, as the Pharmaceutical Division president put it. To achieve this goal, the company ignored or played down a huge amount of information, much of it generated by the company itself, showing that Baycol was much more dangerous than other statins on the market, especially to the vulnerable treatment population of elderly women.

154. In addition to ignoring and minimizing information, high company officials misled the FDA about the safety of cerivastatin, asserting that it was as safe as other statins and repeatedly reaffirming their confidence in the safety of their drug in letters to the Agency. They withheld information about their analyses of adverse reaction reports and comparative reporting rate data. They withheld such information from the FDA; they withheld it from their own sales force and

their scientific communications department; they withheld it from physicians, sometimes deliberately redacting information from scientific papers. And they withheld the information from the patients, delaying the publication of a Patient Package Insert that could have warned patients.

155. Pharmaceutical companies are not just ordinary corporations. They are vital components of our health care system. Prescription of pharmaceutical treatment is probably the main intervention in a large fraction of patient-physician interactions, perhaps most of them. Thus pharmaceutical manufacturers have an additional responsibility beyond that which they owe to their corporate shareholders. They have an obligation to promote the health and well being of the public, who take their medications. That obligation is similar to that of physicians; indeed many high-ranking executives of Bayer and other pharmaceutical companies are physicians. It should be noted that in becoming doctors, physicians swear an oath in which the promise to "first do no harm." Bayer violated this precept.

**POSSIBLE ADDITIONAL ANALYSES AND AMENDMENT OF REPORT**

If I learn of additional information relevant to my opinions, I will submit an amended and/or supplemental report as appropriate.

Richard M. Kapit