Exhibit A

# RESUME

Name: Richard M. Kapit, M. D.
Address: P.O. Box 1 Garrett Park, MD 20896
Telephone: (301) 933-1425
Fax: (301) 929-6014
Email: kapit@MD-writer.com
Birth date: July 14, 1945

1997-Present Freelance medical writer. Areas of specialization: Drug-development, medications, biotechnology products, adverse drug reactions, psychiatry, obesity, general medical topics.

1991-2002 Center for Biologics Evaluation and Research, Food and Drug Administration
*Position: Medical Officer, Epidemiology Branch*
*Work: Analysis of postmarketing adverse drug reactions.*

- Reviewed adverse reactions associated with monoclonal antibodies, interferons, thrombolytic agents, and growth factors.
- Developed system for monitoring and reviewing adverse drug reactions.
- Developed Quarterly Reports for adverse drug reactions.
- Developed system for monitoring lot-specific reporting adverse reaction rates for vaccines.
- Chief, Adverse Events Section, CBER (1997-2000).
- Representative (1995-96) to the International Conference on Harmonisation of Requirements for Registration of Pharmaceuticals for Human Use (ICH), topic E2.
- Fraud Policy Working Group (1991-1992).

1990-1991 Medication Development Division, National Institute on Drug Abuse
*Position: Medical Officer, Clinical Trials Branch*
*Work: Development of medications to treat substance abuse.*

- Project officer for the development of buprenorphine as treatment for opiate addiction.
- Initiated study of bupropion as a new treatment for cocaine abuse.
- Established relationship with Polish medical authorities for research into drug abuse.
- Surveyed U.S. pharmaceutical manufacturers on research into drugs to treat mental illnesses.

1984-1989 Center for Drug Evaluation and Research, Food and Drug Administration
*Position: Clinical Reviewer, Psychopharmacology Group*
*Work: Medical review of new drug applications.*

- Reviewed more than 100 Investigational New Drug applications.
- Reviewed the New Drug Applications for Prozac, Clozaril, and Prosom.

Psychiatrist positions

1979-1984 Bureau of Forensic Psychiatry, Government of the District of Columbia.
1977-1980 Psychiatrist, in private practice in Northern Virginia.
1975-1977 Washington Veterans Administration Medical Center.
1975-1977 Department of Psychiatry, Georgetown University School of Medicine.
1975-1977 Department of Psychiatry, George Washington University Medical School.
1972-1975 National Institute of Mental Health (Psychiatric residency).

Education

1967-1972 New York University School of Medicine, New York, NY 10016.
1963-1967 Columbia College, Columbia University, New York, NY 10027.

Awards FDA Cash Awards, FDA Commendable Service Award, FDA Group Recognition Award
Medical licenses Maryland and Virginia
Certification National Board of Psychiatry and Neurology, 1978

Professional societies
American Academy of Pharmaceutical Physicians
International Society of Pharmacoepidemiology
American College of Clinical Pharmacology
American Association for the Advancement of Science
American Medical Writers Association
D.C. Science Writers Association

Community organizations
Past President, Garrett Park Citizens Association;
Garrett Park Oral History Project
Referee, Montgomery County Swim League

PUBLICATIONS:

1. Joh TH, Kapit R, Goldstein M. A kinetic study of bovine adrenal tyrosine hydroxylase, Biochim. Biophys. Acta, 171:378-80, 11 Feb 1969, Cit. no. 3523766
2. Kapit RM. Schizophrenia and Tardive Dyskinesia: Is schizophrenia also a denervation hypersensitivity?, Medical Hypotheses, 3:207-210, Sep-Oct, 1977
3. Shapiro T, Kapit R. Linguistic Negation in Autistic and Normal Children, J. Psycholing. Research, 7:337-51, Sep 1978
4. Kapit R. Corporal Punishment and the Court, Am. J. Orthopsychiatry, 48:185-86, Jan 1978
5. Prandoni JR, James GC, Kapit RM, Jones JM, Ridley BA. The use of an Interagency Team Approach and Mental Health Referral Criteria to Improve the Effectiveness of Pre-Parole Mental Health Evaluations, J. Offender Counseling, Services, and Rehabilitation, 9:5-18, 1985
6. Scribner CL, Kapit RM, Phillips ET, Rickels NM, Aseptic Meningitis and Intravenous Immunoglobulin Therapy, Annals of Internal Medicine, 121(4): 305-306 (15 August 1994)
7. Gaines A, Varricchio F, Kapit R, Pierce L. Renal Insufficiency and Failure Associated with Immune Globulin Intravenous Therapy -- United States, 1985-1998, MMWR Weekly, 48(24):518-521 (June 25, 1999)

PRESENTATIONS:

1. Phase I Trials: Is It Better to Use Patients or Normal Volunteers? Society for Clinical Trials, Brussels, Belgium, July 8-12, 1991
2. Association of Thrombolytic Agents and Adverse Embolic Events: FDA Chapter Sigma Xi, Bethesda, MD, May 21-22, 1992
3. FDA Monitoring of Adverse Events Reported to the Vaccine Adverse Event Reporting System (VAERS): Quantitative assessment of lot-specific reporting rates. Vaccine and Related Biologic Products Advisory Committee, Rockville, MD, August 24, 1994.
4. FDA Monitoring of Adverse Events Reported to the Vaccine Adverse Event Reporting System (VAERS): Quantitative assessment of lot-specific reporting rates. Advisory Committee on Childhood Vaccines, Rockville, MD, September 28, 1994.
5. Tracking and Evaluating Post-Marketing Adverse Biologic Event Reports at CBER. PhRMA Education and Research Institute, Bethesda, MD, October 18, 1994.
6. Biologic Adverse Event Reporting Programs, Regulatory Affairs Professionals Society, Washington, DC, October 24, 1994.
7. New Developments in Vaccine Safety Monitoring, Twenty-ninth National Immunization Conference, Los Angeles, May 18, 1995.
8. CBER's New Regulations for Postmarketing Adverse Event Reports, PhRMA Education and Research Institute, Washington, DC, June 13, 1995.
9. CBER's Final Rule for Adverse Experience Reporting, Satellite video teleconference sponsored by The Food and Drug Law Institute, Washington, DC, June 15, 1995.
10. Non-Vaccine Adverse Event Review at CBER, FDA Epidemiology Workshop: Surveillance Systems & Strategies, Rockville, MD, January 23 and 24, 1996.
11. International Conference on Harmonisation (ICH) Initiatives in Postmarketing Surveillance, FDA Epidemiology Workshop: Surveillance Systems & Strategies, Rockville, MD, January 23 and 24, 1996.

12. **International Conference on Harmonisation (ICH) Initiatives in Postmarketing Surveillance, World Health Organization, Annual Meeting of National Pharmacovigilance Centres, Lisbon. Portugal, September 15-18, 1996.**

# RESUME OF FREELANCE MEDICAL AND SCIENTIFIC WRITING

Name: Richard M. Kapit, M. D.
Address: P.O. Box 1, Garrett Park, MD 20896
Telephone: (301) 933-1425
Fax: (301) 929-6014
Email: kapit@MD-writer.com
Birth date: July 14, 1945

Freelance medical/science writer since 1997.

Remunerated writing:

- More than a dozen news articles on medical developments in the U.S. published in *Australian Doctor*, a newspaper for Australian physicians.
- *Best Practice of Medicine Report* on treatment of acute psychosis, for Praxis Press.
- Articles on individual scientists at the National Institute of Arthritis, Muscle, and Skin (NIH), done for the NIAMS website (in process of web publication).
- Articles for the Gale Encyclopedia of Mental Disorders, and the Gale reference Drugs and Controlled Substances: Information for Students.

Samples of writing from each of these projects are attached to this resume.

As a clinical reviewer at the U.S. Food and Drug Administration, I authored numerous reports on medical subjects, including analyses of adverse reactions of licensed drugs and biological agents. In the late 1980s, I reviewed the New Drug Applications for Prozac, Clozaril, and Prosom, and I authored the Safety Reviews of these drugs.

U.S. Agencies Announce Plan to Combat Antimicrobial Resistance
(for *Australian Doctor*)

Departments and agencies of the United States have put forward a plan to reduce the development of antimicrobial resistance (AR) in pathogenic microorganisms. The plan provides for coordinated efforts made by nine federal agencies, led by the Centers for Disease Control and Prevention (CDC), the Food and Drug Administration (FDA), and the National Institutes of Health (NIH).

Many species of clinically important bacteria have developed resistance to antimicrobial drugs, including Streptococcus pneumoniae, Staphylococcus aureus, Escherichia coli, and Salmonella and Klebsiella spp. At present 11% of S. pneumoniae in the U.S. are resistant to third generation cephalosporins. Bacterial resistance to fluoroquinolones has also occurred, and resistance to vancomycin has arisen among strains of S. aureus and enterococci.

Released on January 19, 2001, the plan results from the work of the Interagency Taskforce on Antimicrobial Resistance, created in 1999. Although it does not identify specific factors contributing to AR, the document identifies four focus areas for intervention: surveillance, prevention and control, research, and product development. It assigns lead agencies responsible for addressing each of 82 separate action items, and it calls attention to thirteen of these items for top priority effort.

At the present time, no coordinated national system for tracking AR currently exists in the U.S. Top priorities will include developing and implementing a national monitoring system that defines and coordinates the roles of federal, state, and local agencies, clinics, and laboratories. Such a system will survey the occurrence of AR, as well as the patterns of use of antimicrobials in clinical and veterinary medicine, and in agricultural and consumer product use.

Educational programs are also assigned top priority under the plan. Campaigns directed at patients and health professionals will aim to promote the appropriate use of antimicrobials. These efforts will include the development of culturally appropriate materials to help physicians explain to patients the benefits and limitations of antimicrobial treatment, and to promote patient adherence to prescribed treatment. Databases of drug resistant organisms and guidelines for proper antimicrobial treatment will be created to aid physicians in making decisions about use of these drugs. In conjunction with these efforts, a program will be established for evaluating current infection control practices and assessing the effectiveness of new strategies.

Another priority item will be the refinement and implementation of a proposed FDA framework for approving new antimicrobials for use in agricultural food-animals and, when appropriate, for re-evaluating currently approved veterinary drugs. Drugs will be classified according to their importance in human medicine, and procedures will be developed for assessing the risks for human health of using important human antimicrobials in food-animals.

Top priorities in scientific research will include the application of genomics and other powerful technologies to the development of new diagnostic methods and preventive and therapeutic interventions. The plan directs the conduct of human clinical studies of antimicrobial resistance, especially when such investigations are unlikely to be done in the private sector. It also supports the development and testing of accurate, affordable, and easily implemented methods of rapid diagnosis of infection, for use in point-of-care settings. In each of the areas targeted by the plan, the governmental agencies will cooperate with and coordinate similar efforts by private industry and academia. An Interagency AR Product Development Working Group will pinpoint needs for new drugs, vaccines, disinfectants, diagnostics, and devices to combat infections.

OBESITY CALLED A PUBLIC HEALTH CRISIS IN U.S.
(for *Australian Doctor*)

Approximately 97 million people, more than half the adult population of the United States, are overweight, and more than one-fifth of the population is obese. These statistics are derived from household-based surveys, which used the criteria of body-mass index (BMI) of 25 or more for overweight and 30 or more for obesity. Done repeatedly since 1960, the surveys showed that national prevalence rates remained stable between 1960 and 1980, but increased sharply since that year, with the rate for overweight rising by 20% and that for obesity jumping 50%, according to data from the most recent survey completed in 1994.

Speaking at a conference on "Obesity: The Public Health Crisis" in Washington, D.C., Dr David Satcher, the U.S. Surgeon General, described overweight as an epidemic in the U.S. population and revealed that beginning in January 2000, rates of overweight will become one of the 10 leading indicators used to assess the overall health of the nation.

The public health epidemic can be attributed to several interacting causes, according to Janet Collins, Ph.D., of the Centers for Disease Control and Prevention (CDC). Among these, the most important appear to be increased dietary intake, especially in the form of "fast food", decreased physical activity, and increased levels of inactivity. She and other speakers were careful to explain that the epidemic cannot simply be attributed to higher caloric intake, and that increased inactivity should be distinguished as a concept from decreased physical activity. During recent decades the numbers of hours spent in sedentary activities, such as watching television, working at computers, and driving in cars has increased substantially. A number of studies have shown that weight loss consistently results from interventions that decrease time spent in inactivity, such as television watching, without specifically increasing physical activity or reducing intake.

Minority populations have been especially hard hit by the obesity epidemic, with significantly higher rates among non-whites and Hispanics than among non-Hispanic whites. Also women have shown a higher prevalence rate than men. A number of scientists speaking at the conference agreed that genetic differences are a major factor, contributing as much as 50% to the problem. Biological differences related to inheritance and sex may both cause certain groups to be more vulnerable to the changes in diet and lifestyle that have occurred in recent decades.

Collins said that obesity has increased 100% among U.S. children and adolescents in the last 25 years. One quarter are presently considered overweight, and more than 10% are obese. Obesity present in childhood has been reported to have a 70% likelihood of persisting into adult years. And type II diabetes mellitus in children now accounts for 16% of all childhood diabetes, reflecting a five-fold rise in prevalence during the same period in which childhood obesity has increased.

Dr. Robert Rubin, Professor of Medicine at Georgetown University and former Assistant Secretary of Health, described the medical and economic consequences of obesity. The condition is an important etiologic factor in cardiovascular disease, cancer, and many chronic diseases. In monetary terms, as much as 70% of the costs of treating an obese patient for cardiovascular disease or diabetes may be attributable to his weight, as may 30% of all the direct medical costs of treating that patient.

B. Diagnosis of Acute Psychosis
(from Best Practice Report on Acute Psychosis)

1. HISTORY

- An acutely psychotic patient may be agitated, incoherent, and unable to give a history. In the initial encounter with the patient, the physician may be required to respond immediately to the patient's agitated state without a clear understanding of the nature of the illness. An agitated or potentially violent patient should not be interviewed without the availability of staff trained to deal with violence. If the patient can be interviewed, do so in a quiet room, if possible, to diminish noise, distractions, and emotional distress.

- Ask about the immediate circumstances prior the patient's coming for treatment. Inquire about changes in the patient's usual mental, emotional, and physical state, and the circumstances of the patient's life leading up to the present encounter. Determine what brought the patient to treatment at this particular moment?

- Look for indications that the precipitating cause of the psychosis may be an underlying medical illness. One of the first judgments to be made is whether the psychosis results from an illness primarily requiring psychiatric treatment, such as schizophrenia or bipolar illness, or whether it results from brain dysfunction due to an organic cause, such as intrinsic brain pathology or medical disease occurring outside of the CNS.

- The sudden onset of psychiatric symptoms in a person who functioned well up to that time should raise the suspicion of underlying medical illness. Psychotic symptoms appearing for the first time in a patient over 30 years of age should also suggest this possibility, especially if the patient's level of consciousness or cognitive abilities are impaired. Even if a patient has a long history of mental illness, an abrupt change in the character of the illness and its symptomatology may indicate an underlying medical etiology.

- Follow standard medical format in obtaining a history of the psychotic episode: Chief complaint, history of present illness, past psychiatric and medical history, and family psychiatric and medical history. The form of the medical history does not change in the case of a patient with psychiatric illness; however, greater emphasis is placed on mental and emotional experiences, such as hallucinations, feelings of elation or depression, or loss of memory. It may not always be possible to obtain a complete history or to do a thorough interview with an acutely psychotic patient. The use of other sources of information is often necessary to make a differential diagnosis. Establish a more complete history in subsequent interviews, and refine or modify the diagnosis as additional information is gathered.

<u>Article for National Institue of Arthritis and Musculoskeletal and Skin Diseases (NIAMS) website</u>

The Chinese medicinal herb, *Tripterygium wilfordii Hook.F* (TwHF), is a vine-like plant with the common name of *lei gung teng* ("thunder god vine"). It is native to southern China, growing wild along the Yongzhi River and in Fujian Province. In traditional Chinese medicine, an herbal remedy made as a hot water extract of the vine has been used to treat chronic inflammatory diseases such as rheumatoid arthritis (RA), skin diseases such as contact dermatitis, and muscle and skeletal injuries. In the 1960s, uncontrolled clinical trials in three county hospitals in Fujian Province reported good therapeutic results in treating such disorders, but also many adverse effects. Consequently, pharmacological work began in China to develop effective preparations of TwHF with less toxicity. As a result, in the 1970s, two extracts of the plant became commercially available - a chloroform-methanol extract, known as T2, and an ethyl acetate extract, known as EA. In 1985, Jia reported in the Chinese medical literature that T2 was effective in a variety of autoimmune diseases. Medical conditions reported in numerous studies to be responsive to treatment with the TwHF extracts have included RA, psoriasis, systemic lupus erythematosis, ankylosing spondylitis, Behcet's disease, and a number of others.

Working in both China and the United States, Dr. T [name redacted] has been a leader in investigating and developing the therapeutic potential of TwHF. In 1985, at (Hospital) in (City), she directed the first prospective double-blind clinical trial of T2 in the

treatment of RA. T2 administered for 12 weeks was shown to improve clinical manifestations of RA and laboratory parameters of the illness, including acute phase reactants and serum immunoglobulins, including IgM-RF. Subsequently, Dr. T analyzed the active substances of the T2 and EA extracts and investigated the biochemical mechanisms of their therapeutic effects.

T2 and EA inhibit immune responses through a variety of mechanisms. Cellular immunity is diminished through an effect on gene transcription, resulting in diminished production of IL-2 by T-cells. Secretion of IFN-γ is also reduced, possibly by a similar mechanism. Inhibition of IL-2 and IFN-γ appear to result from interference with intracellular signal transmission following antigen binding at the T-cell receptor (TCR/CD3 complex). In this regard, T2 has been shown to inhibit activation of the IL-2 promoter and reduce production of IL-2 mRNA.

Humoral immunity is also diminished by T2 and EA. Proliferation of B-cells is inhibited at concentrations comparable to those inhibiting T-cell responses. Other work suggests that TwHF extracts may reduce formation of the proinflammatory mediator $PGE_2$. Evidence suggests that inhibition of IL-2 and COX-2 transcription factors, such as NF-κB and AP1, may be important mechanisms mediating the various effects of TwHF extracts on the immune system. While T2-induced inhibition of IL-2 and IFN-γ is similar to that induced by cyclosporin-A (CsA), none of the active substances in TwHF is structurally similar to CsA. Another major difference is that B-cells are sensitive to inhibition by T2, while CsA has no direct effect on B-cells.

<u>Article for Gale Encyclopedia of Mental Disorders</u>

<document>
<doc.head>

<title>Clomipramine</title>
<source>
<bibcitation>
<bibcit.composed>

<name>
<first>Richard</first>
<last></last>
<suffix>M.D.</suffix>
</name>

</bibcit.composed>
</bibcitation>
</source>
</doc.head>
<doc.body>

<head n="1">Definition</head>
<para> Clomipramine is an antidepressant drug used primarily to alleviate obsessions and compulsions in patients with obsessive-compulsive disorder. Clomipramine is also used in the treatment of depressive disorders and in a number of other psychiatric and medical conditions. In the United States, the drug has also been known by the brand name, Anafranil.</para>
<para></para>

<head n="1">Purpose</head>
<para> Clomipramine is principally used in the treatment of the obsessions and compulsions of obsessive-compulsive disorder (OCD), when these symptoms greatly disrupt the patient's daily activities. Obsessions are repetitive thoughts and impulses, and compulsions are repetitive behaviors. Patients with OCD find these experiences inappropriate, distressing, and time-consuming.</para>

<para>Clomipramine may also be used in the treatment of depressive disorders, especially when associated with obsessions and compulsions, in panic disorder, pain management, sleep attacks (narcolepsy and cataplexy), and anorexia nervosa. The drug may help to reduce compulsive behaviors in a variety of disorders with such symptoms, including

trichotillomania (hair-pulling), onychophagia (nail-biting), Tourette's disorder (tics and vocalizations), and childhood autism.</para>

<head n="1">Description</head>
<para> Clomipramine is one of the tricyclic antidepressants, so-called because of the three-ring chemical structure common to these drugs. In the 1940s and 1950s, pharmaceutical researchers synthesized a number of new compounds for possible medical use as antihistamines and sedatives. After testing in animal experiments, a few of these substances were selected for human study. One potential drug, a tricyclic compound called imipramine, was not useful in calming agitation, but it had a striking effect in improving the mood of certain patients with depression. </para>

<para>Since the discovery of imipramine, many other tricyclic antidepressants have been developed for somewhat differing pharmacological activities and side effect profiles. Within this group of drugs, clomipramine is exceptionally potent in affecting levels of serotonin in the brain. In this action, it is similar to serotonin-selective antidepressant drugs, like fluoxetine (Prozac), which act specifically on serotonin levels and are effective in OCD. Serotonin is a messenger chemical (neurotransmitter) involved in transmitting signals between nerve cells. The effects on serotonin neurotransmission of clomipramine and serotonin-selective antidepressants are thought to be related to the improvement the drugs produce in depression and OCD.</para>

<head n="1">Recommended dosage</head>
<para> For adults, clomipramine is administered in dosages up to a maximum of 250 mg per day. Starting with a dose of 25 mg, the dose is increased during the first two weeks to 100 mg per day. If needed, it is further increased gradually over the next several weeks to the maximum. The initial dose is low to avoid side effects, and it is increased slowly to permit the patient to develop tolerance or adapt to side effects that may occur.</para>

<para> Geriatric patients, children, and adolescents are more sensitive to the side effects and toxicities of tricyclic antidepressants. The maximum daily dose is usually lower for geriatric patients than adults. For children and adolescents, the maximum recommended daily dose is the lesser of 100 mg or 3 mg per kg of body weight.</para>

<head n="1">Precautions</head>
<para>Epileptic seizures are the most important risk associated with clomipramine. Among patients taking the drug for six months or more, more than 1% may experience seizures. The risk of seizure increases with larger doses, and seizures have been reported to occur following abrupt discontinuation of the medication. Caution is required if the patient has a history of epilepsy or some other condition associated with seizures, such as brain damage or alcoholism.</para>

<para> Clomipramine and other tricyclic antidepressants may cause drowsiness. Activities requiring alertness, such as driving, may be impaired. Dizziness or lightheadedness may occur on arising due to sudden decreases in blood pressure. Fainting may occur. Some patients may experience difficulty urinating, especially men with prostate enlargement. Glaucoma may be aggravated. Sensitivity to ultraviolet light may be increased, and sunburns may occur more easily.</para>

<para> Tricyclics antidepressants, including clomipramine, should be used with caution in patients with heart disease, because of the possibility of adverse effects on heart rhythm. Adverse effects on the heart occur frequently when tricyclics are taken in overdose. Only small quantities of these drugs should be given to patients who may be suicidal.</para>

<para> Tricyclic antidepressants may cause dry mouth due to decreased saliva, possibly contributing to the development of tooth decay, gum disease, and mouth infections. Patients should avoid sweets, sugary beverages, and chewing gum containing sugar.</para>

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: BAYCOL PRODUCTS LITIGATION | ) |
| | ) MDL NO. 1431 (MJD/JGL) |
| This Document relates to All Actions | ) |

*********************************************

ORAL VIDEOTAPED DEPOSITION OF

DR. RICHARD M. KAPIT

JANUARY 21, 2004

*********************************************

ORAL DEPOSITION OF DR. RICHARD M. KAPIT, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on the 21st of January, 2004, from 9:10 to 7:00, before Susan S. Klinger, CSR in and for the State of Texas, reported by stenographic method, at 1201 Elm Street, Dallas, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

correspondence file. Is this a correspondence file that contains adverse event information? They said, yes. And I said, are there many adverse events in this correspondence file. And they said, yes. And I said, has this correspondence file ever been submitted to the FDA, and they said, no.

Q. Were you able to determine this failure to submit rather easily?

A. Yes, I did. Yes, it was. It was amazing how easy it was to discover.

Q. Okay. And in your review of the Baycol documents involving Bayer, were there serious adverse reactions that occurred during the clinical trials that were not reported to the FDA?

A. No. The adverse -- the occurrence of the adverse events were reported.

Q. All right. Now, what was the second episode of -- strike that.

Was there any criminal action taken in regard to this -- these events?

A. No.

Q. Were there any ramifications to the company in terms of future submissions?

MR. BLACK: Objection, form.

A. You're -- you're asking something that would have

Q. All right. So you're not offering any opinions that Bayer failed to file a particular adverse event or Med Watch with the FDA; is that right?
A. That's correct.
Q. All right. Were there any repercussions for the company when it failed to report the particular patients' events to the FDA?
A. As I said, it was submitted to citation. The citation included a number of requirements for that company's behavior that they had to live up to in the future.
Q. All right. And has Bayer ever received any kind of citation from the FDA regarding its reporting of adverse event reports of Baycol?
A. I do not know,
Q. And, in fact, do you know whether or not Bayer's system for reporting adverse event reports to the FDA has been audited by the FDA?
A. Yes, I believe it has been.
Q. How many different audits has the FDA done of Bayer's system of reporting adverse event reports?
A. I don't know.
Q. Has it been more than one?
A. I don't know.
Q. And the FDA essentially gave Bayer a clean bill

Are there any other categories of broad concerns other than what we just talked about?

MR. BLACK: He was clarifying an answer which you, I think, had not understood and --

Q. Go ahead.

MR. BLACK: -- and I don't think there was anything inappropriate.

A. I think there is a major issue that the FDA has in terms of the fact that it has taken a position all along of not comparing drugs to one another in terms of either efficacy or safety, that it's been very agnostic on that issue. In other words, there are times that it comes up as it has come up in this particular case, but comparisons of one drug to another are not an integral part of the whole FDA review process, and I think that that's another issue that needs to be looked at.

Q. All right. Any other broad areas?

A. Well, I think that's enough to start with.

Q. Well, my chance to get your opinions. So if you've got a couple of other broad areas, I want to hear them now.

A. Let me stop there at this point. I think I've given you enough.

Q. All right. Now, the issue of the time to review an NDA was not applicable to the approvals for Baycol;

is that right?

MR. BLACK: Objection, form.

A. Yes, it was.

Q. Well, what were the time frames for the Bayer -- Baycol NDA approvals?

A. Well, remember, the supplements were approved in less -- both supplements were approved in considerably less than a year.

Q. Okay.

A. And I think I do in my report go into the fact that I think this may have been a factor in the conclusions the FDA came to.

Q. All right. How long did the FDA take to review the original NDA?

A. It was under a year -- well, no, I think the first one was exactly a year.

Q. All right. And is your opinion the FDA should take longer than a year to review an NDA?

MR. BLACK: Objection, form.

A. In certain cases, yes.

Q. All right. What are those cases?

A. If there is a question that needs to be explored.

(Exhibit No. 5 marked.)

Q. I've had the court reporter mark as Deposition Exhibit Number 5 a document provided to us by Mr. Black.

A. You want to compare my understanding of morality and ethics with that of a criminal, for example? I think I'm better.

Q. Just -- let's do it this way: Just to the average person, you don't consider yourself more of an expert on ethics and morals than the average person?

MR. BLACK: Objection.

Q. Go ahead.

A. I think that actually in terms of my work at the FDA, I was -- and as a forensic psychiatrist, I was required to deal with questions of ethics and morality on a daily basis. And I believe that in this particular case, my experience as a forensic psychiatrist and my experience with the court in discussing the behaviors of criminal defendants probably -- in fact, I wrote an article at one point that you have a copy of on the ethics of punishing of teachers administering occasional physical punishment to students.

I think my particular area of experience as a forensic psychiatrist, as a physician, as an employee of the FDA put me into contact with questions of morality and ethics more often than the average person that I had to consider such questions more often than the average person. And so if you ask me to compare myself to the average person in that area, I think I probably am a



fa3c6e8b-6e52-413d-ae11-738e14686ad2

little bit better.

Q. All right. Are you offering opinions that Bayer behaved immorally or unethically?

A. Yes are.

Q. All right. Now, are those in your report that we've marked as Deposition Exhibit Number 9?

A. Yes.

Q. Do you believe that you are more qualified than the people who might sit on a jury to assess ethical or moral behavior?

A. I can repeat the answers that I just gave you. I'm a physician, first of all. I was a forensic psychiatrist second. I worked at the FDA third. In all of those positions, questions of morality and ethics were important parts of the work that I did. And if you are saying a jury, you're talking about people -- average people that I don't mean to disparage average people in any way. But yes, I think that my particular background puts me in a better position to evaluate questions of morality and ethics than the average person, and in particular, in regard to pharmaceutical manufacturers and their behavior, I think I have some degree of expertise. Not only do I have some degree of expertise, but I want to point out in this regard that the Food and Drug Administration selected me personally

to review the submissions in two of those cases that I was reporting, those were not accidental things that I came up by myself. But, in fact, my employer asked me to be the person to sit in on those panels. One was called the fraud working group -- this panel was called the fraud working group, and they asked me personally to sit in on that panel and to evaluate the company's behavior. So, in fact, I think I'm -- I have a lot to justify my particular degree of expertise in the area of the behavior of pharmaceutical companies.

MR. ANIELAK: Okay. Move to strike as nonresponsive.

Q. Is there any FDA regulation that requires pharmaceutical manufacturers to perform spontaneous reporting analysis of adverse event reports?

MR. BLACK: Objection, form.

Q. Let me try that one again. Is there any FDA regulation that requires pharmaceutical manufacturers to perform reporting rate analyses of post-marketing spontaneous adverse event reports?

A. The regulation --

MR. BLACK: Objection.

Q. Go ahead.

MR. BLACK: Go ahead.

A. The regulations that require that the

A. Yes.
Q. All right. Now, is there -- I know you -- I understand your opinion about it being contemplated by the regulations. But my question is, is there a regulation by the FDA that states that a manufacturer must perform a reporting rate analysis of a spontaneous adverse event?
A. Probably not.
Q. All right.
A. And in those particular words.
Q. All right. Is there an FDA regulation that requires companies to compare reporting rate analyses of spontaneous adverse events with other products in the class?
A. Once again, I think that this kind of thing is contemplated within the regulations. But there is -- I will allow that specific language to that effect may not be there.
Q. All right. Is there any recommendation by the FDA that a company should perform comparative reporting rate analyses based on spontaneous adverse event reports?
MR. BLACK: Objection, form.
Q. Go ahead.
MR. BLACK: If you can answer, go ahead.

A. Again, I think the specific language is lacking, but that there are circumstances in which such analyses would be contemplated in the regulations.

Q. But the specific language requiring that is not in the FDA regulations?

A. Not to my knowledge.

Q. All right. Now, you, in fact, have been part of --

A. By the way, I just want to --

Q. Well, you know, if you want to add something at the end, your -- the lawyer for the plaintiffs can certainly ask you some questions.

A. Well, I --

MR. PAPADAKIS: Were you finished with the answer to your question?

MR. ANIELAK: I mean, "by the way" is not, you know, an additional answer.

A. I think -- I think I have an important addendum.

Q. Well, you know, I didn't ask you for any context. I asked you if there was a regulation, and you said no.

A. This is very close to a regulation. And that is I attended the International Conference of Harmonization conferences on post-marketing reporting reports.

Q. Okay.

A. And those post-marketing -- that was Topic E2C in



fa3c6e8b-6e52-413d-ae11-738e14686ad2

Q. All right. Did the FDA do its analysis of the data regarding Baycol's dose response curve?
A. Yes.
MR. BLACK: Objection, form.
Q. And did the NDA -- strike that.
Did the FDA use the raw data to calculate Baycol's therapeutic window?
MR. BLACK: Objection, form.
A. I don't know the answer to that question.
Q. Well, okay. You also mentioned lethal adverse events. Were you referring to adverse events with animals?
A. Yes.
Q. All right. Did Bayer provide the data with regard to lethal adverse events in animals to the FDA, the data?
A. I don't believe Bayer's deficiencies were in the realm of data.
Q. All right. My question was, based on your review, did Bayer provide the data regarding the animal studies and the lethal adverse events to the FDA?
A. Bayer did not -- was not remiss in withholding any data.
Q. Okay. Did Bayer, in fact, discuss with the FDA the dose response curve of Baycol?

manufacturer by consumers and/or members of the health profession in which have been entered into the AERS computer filing system since November 1st, 1997.

Q. Do you agree with that paragraph?

A. That is a true statement.

Q. All right. Can you read Paragraph Number 2?

A. The information contained in the reports has not been scientifically or otherwise verified.

Q. Do you agree with that?

A. It's only partially true. There are many reports, but nowhere near a majority in which an FDA employee does verify the contents of the reports. So this is a statement that's true. As a whole, it should not be construed as meaning that there are no reports that have been verified. There are a substantial number of reports that are verified by going back to the reporting physician or verified in some other way. This is basically a general statement. It's not meant to be true in any -- in every particular.

Q. Okay. The adverse event reports that are submitted to the FDA are often incomplete; is that right?

A. That's true.

Q. And there are frequently times when a company or the FDA may want to get more information about an

adverse event report, but for whatever reason, they can't; is that fair?

A. That happens.

Q. All right. And that's essentially what Paragraph 2 is alluding to; is that right?

MR. BLACK: Objection, form.

A. Yes.

Q. All right. Now, can you read Paragraph 3?

A. For any given report, there is no certainty that the suspected drug caused the reaction.

Q. Okay. I want to stop you there. Do you agree with that?

A. Again, I am going to have to say that this is a general statement that is not meant to apply to every particular report or every particular analysis of a report.

Q. All right.

A. There are many reports in which for one reason or another you are able to make the conclusion that the causality is well supported by the report. So that -- and there are many analyses of a report in which you are able to make the conclusion that causality is well supported.

Q. As a general --

A. As a broad generalization, it is true that

certainty in regard to specific reports is usually not available.

Q. In fact, you have stated that over half of the adverse event reports reported to the FDA are not related to the drug; right?

A. I said that?

Q. I'm -- haven't you said that?

A. Uh --

Q. Isn't that your opinion?

A. I'm not sure. Where did I say that?

Q. Well, is it your opinion that over half of the adverse event reports reported to the FDA are not related to the drug?

MR. BLACK: I'm going to object if there is allegation that he said it somewhere --

MR. ANIELAK: I'm asking him if that is his opinion.

A. I will go along and say that it's probably true that half are not -- are not related, but I'm not sure where else I said that.

Q. All right. Well --

A. And if I am going to allow and say that, then I've got to say that that's, you know, you can't come back to me and then say that I said that with any high degree of scientific certainty. I'm saying that's an

"most" means more than 51 percent, I can't say that for sure.

Q. All right.

A. I would have to say to clarify my report, and again, I apologize for having to modify my report, that it is true that in a large number of reports, there is no -- there is probably no relationship between the drug and the adverse event.

Q. All right. If you continue to read from Paragraph 3 on the caveats document where it says, this is because.

A. This is because physicians are encouraged to report suspected reactions. The event may have been related to the underlying disease for which the drug was given to the -- to concurrent drugs that -- to concurrent -- I'm sorry, to concurrent drugs that are being taken or may have occurred by chance at the same time the drug was taken.

Q. Do you agree with the remainder of Paragraph 3?

A. Yes.

Q. All right. Can you please read Paragraph 4?

A. Accumulated case reports cannot be used to calculate incidents or estimates of drug risk.

Q. Do you agree with Paragraph 4?

A. Now, you keep asking me whether I agree with



fa3c6e8b-6e52-413d-ae11-738e14686ad2

adverse event reports are reliable to calculate an incidents rate?

A. Well, incidents perhaps, no.

Q. All right.

A. But estimates of drug risk, which is what comes right after that, the answer is yes.

Q. Well, let me go back then. Accumulated case reports cannot be used to calculate incidents rates; is that right?

A. The whole statement that you asked me to read --

Q. Doctor, I'm not asking you to even look at this now. My question is, accumulated case reports cannot be used to calculate incidents rates; is that right?

A. Incidents rates, no, but estimates of drug risk, yes.

Q. All right. Do you believe that case for accumulated case reports --

A. Those are in the same sentence.

Q. Well, let me try one more time. I'm not talking about drug risk, but I will ask you that.

A. You're the one that picked this sentence out. I'm just saying there are these two things in this sentence.

Q. Doctor, don't even look at the --

MR. BLACK: Listen to the question now and



fa3c6e8b-6e52-413d-ae11-738e14686ad2

reported to the FDA as CK elevation when actually it's rhabdo; right? That would be an example of underreporting?

MR. BLACK: Objection.

A. That could be one way that underreporting occurs, yes.

Q. Okay. And overreporting could occur if a physician reported a case of rhabdomyolysis when actually it should have been reported as CK elevation; right?

MR. BLACK: Objection.

A. I -- well, there are a number of inaccuracies in the report. Now, you're classifying some of them as underreporting and overreporting.

Q. Let me make it easier.

A. Let me just say that I would agree that there are many inaccuracies in the report. I'm beginning to find it more and more difficult to agree when you -- when you use these terms to particularly classify them. I would simply say that there are incompletenesses and inaccuracies in adverse reaction reports.

Q. Okay. Another limitation of using reporting rates is that publicity surrounding a certain medication could, in fact, generate reports?

A. That's true.

MR. ANIELAK: Object to the form.
MS. FREIWALD: Object to the form.
A. I understand fully that a jury trial means that the jury makes these judgments, not me, and I would be in the position of giving my opinion on these matters for the jury to consider.
Q. There have been a number of questions about how adverse event data should or should not be used. Could you explain to us how some of the -- the kinds of decisions which are regularly based on adverse event data?
A. During the years that I worked at the FDA in the adverse event section, the FDA used adverse event reporting data to -- as a valid scientific basis for taking numerous actions. Those actions ranged from minor label changes to major label changes involving things like black box warnings to the issuing of dear doctor letters, and in some cases, there were adverse event reports that resulted in site inspections, in taking products off the market and major regulatory operations. And so the FDA considers adverse event reporting to be a valid scientific basis for doing all of those things.
I want to go on to say that the medical community also considers these adverse event reports and analyses

# Exhibit C

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - )

In Re: Baycol Products Litigation )

This Document Relates to: ) MDL No. 1431

All Cases )

ORIGINAL

- - - - - - - - - - - - - - - - - - )

Washington, D.C.

Wednesday, August 4, 2004

VIDEOTAPED Deposition of:

RICHARD M. KAPIT, M.D.,

a witness called in the above-entitled action, before CHERYL A. LORD, RPR, CRR, a notary public in and for the District of Columbia, taken at SHOOK HARDY & BACON L.L.P., 600 14th Street, N.W., Suite 800, Washington, D.C., beginning at 1:08 p.m.

Ron Meek, representing Brynteson Reporting, at 2404 Belle Haven Meadows Court, Alexandria, Virginia.

Will the court reporter please swear in the witness?

Whereupon,

RICHARD M. KAPIT

was called as a witness and, having first been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. ANIELAK:

Q. Good afternoon.

A. Good afternoon.

Q. Please state your full name.

A. Richard M. Kapit.

Q. Dr. Kapit, what is your current business address?

A. Post office box 1, Garrett Park, Maryland, 20896.

Q. Dr. Kapit, you were deposed in this action about 6 months ago; is that right?

Q. Are you avail- -- are you an expert in prescription drug labeling?

A. I've done prescription drug labeling for psychiatric drugs.

Q. All right. So you consider yourself an expert in prescription labeling as it relates to psychiatric drugs; is that right?

A. I think that's fair.

Q. Fair to say that you don't consider yourself an expert in prescription labeling as it relates to statin therapy?

A. That's right.

Q. All right. Your report discusses the fact that you performed an on-site inspection of a company's postmarketing safety surveillance system.

A. Yes.

MR. HOPPER: Can you refer to where in the report, please, counsel?

MR. ANIELAK: It's paragraph 38.

MR. HOPPER: Thank you, counsel.

BY MR. ANIELAK:

Q. What was your experience at the FDA in

# Exhibit D

Adverse Event Reporting System (AERS)
Office of Postmarketing Drug Risk Assessment
Brief Description with Caveats of System
October 18, 1999

IMPORTANT INFORMATION:

The Adverse Event Reporting System (AERS) in the Office of Postmarketing Drug Risk Assessment (OPDRA), was implemented to take advantage of up-to-date methods for data entry and database design. AERS contains all reports received since November 1, 1997.

BACKGROUND:

The AERS database is a computerized system for storing adverse events reported by health professionals and others. The system contains adverse events detected and reported after marketing of the drug.

AERS relies on health professional to detect new clinical events, to attribute the appearance of the clinical event to the administration of a drug, and to report that clinical event.

The health professional may choose to report the adverse reaction to the FDA or to a drug firm, who must, by law, report to the FDA. Ninety percent of the FDA's reports are received from drug manufacturers. OPDRA receives the remaining ten percent directly from other reporters. (i.e., Health Professionals and consumers).

Data from all reports are entered into AERS and the report images are scanned into an Electronic Filing System (EFS). All reports are retrieved by accessing the Individual Safety Report (ISR) number.

Copies of individual case safety reports, which are summarized in this printout, may be obtained by submitting a separate FOI request. When requests are submitted for copies of report images, the ISR number should be listed in tabular format in ascending order as shown in the following example:

| ISR NUMBER |
| --- |
| 3000913-1 |
| 3000917-9 |
| 3001581-5 |

There is a $14.00/Hour search time and a $.50/page charge. Please note that there will be redactions made to all personal identifiers on the report.

CAVEATS:

There are some important things to remember when reviewing or analyzing data from AERS.

1. Reports contain only those reactions voluntarily submitted either directly to the FDA or to the drug manufacturer by consumers and/or members of the health profession and which have been entered into the AERS computerized filing system since November 1,1997.

2. The information contained in the reports has not been scientifically or otherwise verified.

3. For any given report, there is no certainty that the suspected drug caused the reaction. This is because physicians are encouraged to report suspected reactions. The event may have been related to the underlying disease for which the drug was given to concurrent drugs being taken or may have occurred by chance at the same time the suspected drug was taken.

4. Accumulated case reports cannot be used to calculate incidence or estimates of drug risk.

5. Numbers from these data must be carefully interpreted as reporting rates and not occurrence rates. True incidence rates cannot be determined from this database. Comparisons of drugs cannot be made from these data.

Definitions of the FOI Report

| | |
|---|---|
| Date | Date the report was received by the FDA. |
| ISR Number | Unique number for identifying an AERS report. |
| Report Type | The type of ISR received. Expedited (15-day) and periodic reports are from manufacturers; "direct" reports are voluntarily submitted to the FDA by non-manufacturers. |

| Report Type | Description |
|---|---|
| Expedited (15-day) | Mandatory reports received from the manufacturer informing the FDA of adverse events that are both serious and unexpected. By law, these reports must be delivered to the FDA, within 15 calendar days of the initial receipt by the manufacturer. |
| Periodic | These are mandatory reports that do not fall into the expedited category. These reports are delivered quarterly to the FDA. |
| Direct | These reports are from health professionals, private individuals or sources other than manufacturers. |

| | |
|---|---|
| Company Report Number | Manufacturer's unique report identifier. |
| Age | Numeric value of patient's age at event. |
| Gender | The gender of the patient (male, female, unknown, or Not specified). |
| Outcome | The results of the adverse event as. The following events are potential choices. |

| Outcome | DESCRIPTION |
|---|---|
| DE | Death |
| LT | Life-Threatening |
| HO | Hospitalization – Initial or Prolonged |
| DS | Disability |
| CA | Congenital Anomaly |
| RI | Required Intervention to prevent permanent impairment/damage |
| OT | Other |

| | |
|---|---|
| PT (Preferred Term) | The reported reaction, in medical terminology, describing the event. This is coded using the Medical Dictionary for Regulatory Activities (MedDRA). |
| Report Source | Identifies the initial source of the report. (I.e., Health Professional, Consumer, etc..) |
| Product | Name of drug. |
| Role | S = Suspect<br>C = Concomitant<br>PS = Primary Suspect<br>SS = Secondary Suspect |
| *Suspect Drug | The drug that the initial reporter deemed most likely to be associated with the reactions. |
| Concomitant Drug | A list of any drugs taken at the same time as the suspect medication, but not suspected of causing the adverse event. |
| Manufacturer | The company that manufacturers the drug. |
| Route | Route of administration of the drug. |
| Dose | Quantity of drug administered in a 24-hour period. |
| Units | Modifies the dose with units of measurements (e.g., mg, IU, ml, etc.). |
| Duration | Number of days the drug was used. |