**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : | MDL No. 1431 (MJD) |
| This Document Relates to: | : | |
| *All Actions* | : | |

# BAYER AND GSK's MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXCLUDE EXPERT TESTIMONY OF R. SAMUEL MAYER

R. Samuel Mayer, M.D. specializes in physical rehabilitation. As he readily conceded in his deposition, he is not an expert in epidemiology, pharmacology, or toxicology. Nor is he qualified to opine on comparative safety of drugs based on their metabolic profile, bioavailability, or regulatory actions by the FDA. Plaintiffs' counsel himself declared of Dr. Mayer, "He's not a drug safety expert. He's not an FDA expert." Deposition of R. Samuel Mayer (Ex. B) at 249:8-9. Before writing his report, he had never studied Baycol, any other statin, or done any other work that would render him qualified to offer a novel theory of permanent Baycol injury, let alone an opinion on Baycol's comparative safety profile. These limitations notwithstanding, Dr. Mayer offers two primary opinions:

(1) Baycol causes long-term or permanent muscle damage even after discontinuation of the drug, regardless of a lack of verification by laboratory data; and

(2) Baycol is less safe than other statins, and causes muscle damage more frequently and with greater severity than other statins, especially when taken with gemfibrozil or cyclosporin.

Dr. Mayer's opinions lack the necessary indicia of reliability under *Daubert* and its progeny, and under Rule 702 of the Federal Rules of Evidence. Dr. Mayer has acknowledged that he knows of no study that supports his hypothesis about long-term effects of Baycol use, and readily conceded that his views on safety likewise have no support in the scientific literature – and that he has conducted no study of his own.

## ARGUMENT

### I. DR. MAYER'S OPINION THAT BAYCOL CAN HAVE LONG-TERM ADVERSE EFFECTS ON MUSCLE IS SPECULATION MASQUERADING AS SCIENCE, AND SHOULD BE EXCLUDED.

Dr. Mayer's primary opinion is that use of Baycol can cause permanent myopathy – muscle pain and weakness – long after use of Baycol has ended, and that such injury can occur even when laboratory measurement of the creatine kinase (CK) enzyme (indicative of muscle injury) is within normal limits. Specifically, Dr. Mayer opines:

- "In [some persons taking Baycol], a more profound amount of muscle cell death occurs, and muscle weakness develops. These individuals typically take months to recover, and may suffer permanent damage." Report of R. Samuel Mayer (Ex. A) ¶ 17.
- "Myopathy causes significant, and often long-lasting functional limitation." *Id.* ¶ 30.
- Statins can cause myopathy that does not involve cell death of muscles, and, consequently, does not raise the levels of CK. Mayer Dep. (Ex. B) at 85:21-86:6.

Dr. Mayer's opinion is pure conjecture, unsupported by any scientific findings. A causal link between cerivastatin and persistent or chronic muscle injury has *not* been drawn, and causation of persistent or chronic muscle injury by statins is *not* a

generally accepted scientific conclusion. In fact, it is the opposite of the accepted scientific view. A federal district court recently invoked *Daubert* to reject testimony linking statin use to persistent muscle injury. *See Leathers v. Pfizer, Inc.*, __ F.R.D __, 2006 WL 708571 at *3 (N.D. Ga. Mar. 10, 2006) (excluding proposed expert testimony positing persistent muscle injury from a statin, explaining that "[t]he statin side effect recognized in the medical community is a temporary one that ends when the patient stops taking the drug" and that plaintiff's "attempts to extrapolate this temporary side effect to establish general causation of a much more serious, permanent illness" constituted "leaping from an accepted scientific premise to an unsupported one") (internal quotation omitted).

Like the expert in *Leathers*, Dr. Mayer grounds his opinion regarding persistent or chronic myopathy on reports that do not provide sound scientific evidence to support his opinion:

First, he points to a 2002 report by Phillips, *et al*. (the "Phillips report") that reports on four patients taking a statin. Dr. Phillips and his team studied these four patients to assess whether patients experiencing muscle symptoms with normal CK levels could distinguish the statin from a placebo.

Second, Dr. Mayer relies on a 2003 abstract published in *Arthritis & Rheumatism*, the journal of the American College of Rheumatology (the "ACR abstract") about the "time course" of myalgia in 30 selected patients taking a statin.

Third, Dr. Mayer cites a 1991 study of patients taking AZT, a drug used in the treatment of HIV infection.

And fourth, Dr. Mayer draws support from reports of unspecified origin about the muscle condition of astronauts returning from extended time in weightless space.

By Dr. Mayer's own admission, none of these reports provides any reliable basis for his opinions. Those opinions remain hypotheses, speculative conjecture that has not been tested by Dr. Mayer or anyone else.

### A. Dr. Mayer Has Admitted that His Opinions about Persistent Muscle Pain After Cessation of Baycol Use Have No Support in the Scientific Literature.

Dr. Mayer's core opinion is that Baycol causes long-term, permanent muscle damage. Yet Dr. Mayer's discussion in his own report about the long-term effects of Baycol usage includes a telling concession: "To date, there are no specific longitudinal studies of recovery from cerivastatin-induced myopathy." Mayer Rep. (Ex. A) ¶ 29. Dr. Mayer's deposition revealed exactly how fragile his opinions are. Simply, there is no scientific support for his views about persistent and permanent muscle injury, or any injury not signaled by elevation of the levels of the creatine kinase ("CK") enzyme released when muscle cells die:

> Q: Are you aware of any research that supports the notion that Baycol in particular can cause a muscle injury other than cell death?
>
> A: I don't know that I can cite you a specific article, no.
>
> * * *
>
> Q: Are you aware of any medical literature that would support the notion that in patients with normal CK, during the statin use, that muscle symptoms can persist following discontinuation of the statin?
>
> A: I'm not aware of any literature that states that.

* * *

Q: That is, there's no research directly on statin myopathy that would support that view [that patients with normal CK can have persistent pain]; correct?

A: That's correct.

* * *

Q: Now, Dr. Mayer, are you aware of any medical research that would support the notion that a patient with normal CK can have muscle symptoms persist after the discontinuation of a statin?

A: I don't know that anybody has studied that at this point.

Q: You're not aware of any such research?

A: That's correct.

* * *

Q: Are you aware of any scientific study demonstrating that muscle injury in a patient with normal CK can persist, say, greater than six months after stopping a statin?

A: I'm not aware of any specific study that shows that.

Mayer Dep. (Ex. B) at 104:1-5; 108:1-6; 126:8-10; 186:9-16; 215:12-17.

In short, Dr. Mayer concedes that the fundamental core of his opinion – that a patient could experience Baycol-induced myalgia after discontinuing Baycol and in the presence of normal CK levels – has no support in the medical literature. Dr. Mayer's candor is fully warranted when one examines the literature to which he refers as support for his speculation.

**B. The Phillips Report Does Not Support Dr. Mayer's Opinions.**

The 2002 report by Phillips, *et al.* (an expert previously retained but then dropped by plaintiffs' counsel in this litigation) concerns four patients taking statins.

These patients were selected because they self-reported muscle symptoms while receiving statin therapy, even though each had a normal CK level. Dr. Mayer cites this report as evidence that Baycol can cause persistent myalgia even though CK levels are normal and the patient has stopped taking Baycol.

The Phillips report, however, directly contradicts this opinion, because in each of the four patients at issue (including the one who used Baycol), muscle symptoms ended after the statin use was discontinued: "[S]ymptoms and histologic changes occurred only during statin use. . . . [T]he pathologic abnormality reversed upon discontinuation of statin therapy." Phillips PS, *et al*. "Statin-associated myopathy with normal creatine kinase levels." *Ann. of Intern. Med*. 2002;137(7):581-86 (Ex. C) at 582, 583. Dr. Mayer admitted this as well:

> Q. So my question is with respect to Dr. Phillips' work, all four of the patients, the muscle symptoms stopped when the statin was discontinued, correct?
>
> A: That's correct.

Mayer Dep. (Ex. B) at 107:18-22. Substantively, therefore, the Phillips report supports the conclusion that the adverse effects of statin therapy cease upon discontinuation, in stark contrast to Dr. Mayer's opinion.

Moreover, although one of the patients in the Phillips report may have taken Baycol at some point, Dr. Mayer confirmed that no data or research supports his opinion that Baycol patients could have experienced Baycol-induced myopathy with normal CK levels:

Q: Are you aware of any research that supports the notion that Baycol in particular can cause a muscle injury other than cell death?

A: I don't know that I can cite you a specific article, no.

* * *

Q: You have opined that former Baycol patients could have had a Baycol-induced myopathy notwithstanding a normal CK test; is that true?

A: There's no data that I'm aware of of [sic] absolute numbers on that.

Q: Okay. Are there any data on the relative number of that?

A: No.

Q: Is there any data of a rate with which that occurs?

A: No.

* * *

Q: Do you know of any pathophysiological research other than Dr. Phillips' work that would support the notion that patients with normal CK can have persistent pain?

A: Not directly.

Q: That is, there's no research directly on statin myopathy that would support that view, correct?

A: That's correct.

Mayer Dep. (Ex. B) at 104:1-5; 125:5-15; 126:3-10.

In short, and consistent with the ruling in *Leathers*, the Phillips report confirms that statin-induced pain stops when use of the drug stops.

**C. The ACR Abstract Does Not Support Dr. Mayer's Hypothesis of Persistent Post-Baycol Pain.**

During his deposition, Dr. Mayer invoked an abstract published in *Arthritis & Rheumatology* to support his hypothesis that a patient's pain or weakness from a statin

can persist following termination of statin use. Mayer Dep. (Ex. B) at 152:7-16. However, Dr. Mayer's report was prepared without any knowledge of the abstract. ("Q: When you wrote your expert report in this case, you had never seen this research? *A: That's correct.*" *Id.* at 175:18-20.) Dr. Mayer read the four-paragraph abstract three days before his deposition, after it was discussed in a conference call arranged by the plaintiffs' counsel for the various plaintiffs' experts retained in this case. *Id.* at 161-172.

The abstract reports a retrospective study of 30 patients who were taking statins – but not Baycol – and experienced myopathy or myalgia. The purpose of the study was to define the course and severity of statin-induced myopathy. Five of twenty persons tested did not show elevated CK levels. The study concluded:

> [M]ost subjects with musculoskeletal symptoms attributed to statin therapy experienced resolution of symptoms within six months of therapy cessation. . . . Most patients with elevated CPK, even when greater than 10,000, had complete and rapid recovery with supportive care and statin discontinuation. . . . *[O]ur findings indicate a benign clinical course with discontinuation of the offending statin and supportive care."*

Hildebrand J, *et al*. "The Natural Course of Statin Induced Myopathy [abstract]." *Arthritis & Rheumatism*. 2003;48(9)Suppl:730 (Ex. D) at 3 (emphasis added).

As for the five patients who showed a normal CK level, Dr. Mayer agreed the abstract tells us nothing about their recovery rate:

> Q: Isn't it true that the abstract in exhibit 3 doesn't tell you anything about the rate of recovery for patients with normal CK?
>
> A: It doesn't specifically break down those 5, but I'm sure there's a way of getting that data.
>
> Q: It's not published, is it?
>
> A: It's not published.

Mayer Dep. (Ex. B) at 169:13-19.

Finally, the abstract does not concern patients who were using Baycol. ("Q: [W]ould you agree that none of the patients reflected in this abstract were taking Baycol? *A: As far as I know, that is true."* *Id*. at 174:13-16.) At best, and as the abstract's authors concluded, patients who suffer statin-induced myopathy experience "a benign clinical course with discontinuation of the offending statin and supportive therapy." Hildebrand (Ex. D) at 3. The ACR abstract does not lend any support to Dr. Mayer's hypothesis that Baycol patients could suffer persistent muscle pain after cessation of Baycol and even in the absence of elevated CK levels.

**D. The AZT Study, Steroid-Induced Myopathy, and Astronaut Experience Do Not Support Dr. Mayer's Hypothesis.**

Faced with the patent inadequacy of the published literature about statins to support his permanent injury theory, Dr. Mayer seeks support in a study of another drug and even non-drug experience. First, he references a study about AZT-induced myopathy and unspecified reports about steroid-induced myopathy. Nothing in Dr. Mayer's report explains how one might reliably extrapolate from such data to a conclusion that Baycol causes permanent muscle injury and injury in the absence of CK elevation above normal.

The AZT study is a case series study of 23 patients with AZT-induced myopathy. Chalmers AC, *et al.* "Prognosis in AZT myopathy." *Neurology*. 1991;41:1181-84 (Ex. E). When queried about the scientific leap that reliance on the AZT study requires, Dr. Mayer conceded that his opinion has no precedent in any

scientific literature, and the leap therefore cannot be made to any conclusions about Baycol:

Q: Are you aware of any medical literature suggesting a similarity between AZT myopathy and statin myopathy?

A: They are similar only in the sense that they are both drug induced. In terms of the exact mechanism of injury to muscles, I don't know that we know that they are similar, but they are similar in the sense that a patient was taking a pill every day and got muscle damage. . . .

* * *

Q: Different, there are lots of different myopathies, right?

A: Correct.

Q: And different myopathies may have different prognoses?

A: Absolutely.

Q: So you're not saying that AZT myopathy is the same thing as statin myopathy?

A: No, I'm not.

Q: And you're not saying that the prognosis from AZT myopathy will tell us what the prognosis is for statin myopathy?

A: No.

Q: Have you written anywhere before you did the expert report in this case suggesting that AZT myopathies is informative of the prognosis from statin-induced myopathy?

A: No.

Q: And you're not aware of any other literature citation that has made that link, correct?

A: I don't believe it's been cited in other literature.

Mayer Dep. (Ex. B) at 200:14-22; 201:6-202:8.

To the extent the AZT study is instructive at all, it directly contradicts Dr. Mayer's hypothesis of persistent muscle injury after cessation of Baycol. The authors of the AZT study concluded:

> After stopping AZT, myalgia promptly resolved in all who had this symptom. . . .
>
> The major finding of this study was the reversibility of proximal muscle weakness and myalgia upon cessation of AZT therapy in all of the 17 patients with the clinical and histological picture of what we believe to be AZT-induced myopathy.

AZT study (Ex. E) at 1182, 1183.

Dr. Mayer's reliance on unspecified steroid-induced myopathy, Mayer Rep. (Ex. A) ¶ 29, is similarly misguided and unavailing. Again, Dr. Mayer conceded, steroid myopathy, like the AZT analogy, is not the same as statin-induced myopathy:

> Q: Now again, you're not suggesting that steroid-induced myopathy is the same thing as statin-induced myopathy, are you?
>
> A: No.

Mayer Dep. (Ex. B) at 206:1-4.

And, as with the AZT study, Dr. Mayer knows of no support in the scientific literature for his steroid analogy:

> Q: [P]rior to your expert report in this case, you've never seen anyone suggest in writing a similarity between steroid-induced myopathy and statin-induced myopathy, correct?
>
> A: Not that I'm aware of.

*Id.* at 206:17-21.

Finally, Dr. Mayer draws support for his Baycol hypothesis from the experience of astronauts returning from space, whose muscles, according to Dr. Mayer,

may get weaker before they get stronger. From this he concludes that "in older and frailer individuals with multiple medical problems, this recovery [from Baycol-induced myopathy] takes much longer and is less complete." Mayer Rep. (Ex. A) ¶ 29. But as with the other reports on which he relies, the leap Dr. Mayer would ask the Court to accept has no support in the science literature, as Dr. Mayer candidly admitted:

> Q: Prior to writing your expert report in this litigation, have you ever seen anyone suggest in writing a similarity between zero gravity muscle problems and statin-induced myopathy?
>
> A: No.

Mayer Dep. (Ex. B) at 207:6-10.

**E. Dr. Mayer's Remaining Opinions about Permanent Baycol Injury Are Contradicted or Unsupported by the Literature.**

Dr. Mayer's Report expressed two other notions that science does not sustain. First, he opined that muscle strength returns at the rate of about three percent per week, Mayer Rep. (Ex. A) ¶ 29, and after 33 weeks "most patients would be mostly recovered." Mayer Dep. (Ex. B) at 209:11-12. Dr. Mayer suggested this rate is "frequently cited in chapters regarding muscle damage." *Id*. at 207:17-21. The example he cites is a "surgically-induced slicing of the muscle in surgery." *Id.* at 209:1. The actual literature cited by Dr. Mayer on recovery from statin-induced muscle injury, however, shows complete resolution of muscle symptoms in two months (ACR abstract, Ex. D) and in a range of two weeks to five months (Phillips report, Ex. C). Whatever the weaknesses of those studies for other purposes, they contradict Dr. Mayer's attempt to

extrapolate from the recovery rate for surgical slicing injury to recovery from statin-induced injury.

Last, Dr. Mayer opines that some muscle may not recover at all from statin injury but may form fibroblasts – scar tissue. Mayer Rep. (Ex. A) ¶ 20; Mayer Dep. (Ex. B) at 211:19-212:21. Here again, there is no scientific literature that supports the hypothesis that this might be a consequence of statin-induced myopathy:

> Q: Can you cite to me a single study demonstrating formation of new scar tissue from an episode of statin-induced myopathy?
>
> A: I can't cite one off the top of my head, but I bet some of the other, many other colleagues could. I suggest you ask Dr. Carlson that, that's more his area of expertise than mine.

Mayer Dep. (Ex. B) at 213:4-10.

* * *

In sum, Dr. Mayer is unable to cite any research that actually supports his opinion that Baycol-induced myopathy might persist permanently after cessation of Baycol use, or that Baycol-induced myopathy occurs in the absence of elevated CK levels. Dr. Mayer's opinions are not founded on scientific knowledge or research, but instead rest on unproven extrapolations from unrelated studies that, to the degree they indicate anything, conclude that patients recover from drug-induced myopathy shortly after use of the drug stops. The extrapolation in which Dr. Mayer indulges is not scientific knowledge but conjecture that should be excluded as speculation. *See Glastetter* v. *Novartis Pharm. Corp.*, 252 F.3d 986, 989-90 (8th Cir. 2001) (excluding expert opinion inappropriately extrapolated from case studies, medical texts, and other

sources, where such studies did not explicitly state that such a causal relationship existed). *Accord*, *J. B. Hunt Transp., Inc.* v. *General Motors Corp.*, 243 F.3d 441, 444 (8th Cir. 2001) (expert testimony that was "mere speculation and pure conjecture… is not competent proof and contributes nothing to a legally sufficient evidentiary basis").

## II. DR. MAYER'S OPINIONS ABOUT THE COMPARATIVE SAFETY OF BAYCOL DO NOT REST ON RELIABLE SCIENTIFIC DATA AND MERELY PARROT THE VIEWS OF OTHER PURPORTED EXPERTS.

Notwithstanding counsel's stipulation that Dr. Mayer is "not a drug safety expert," Mayer Dep. (Ex. B) at 249:8, Dr. Mayer opines that Baycol was more dangerous than other statins. Specifically, he asserts that Baycol causes muscle damage "much more frequently than the other medications in this class, indeed up to 43 times more frequently. The degree of muscle damage is worse than other statins. Patients presented with rhabdomyolysis more often, and there were more death than with any other statins." Mayer Rep. (Ex. A) ¶ 19. Dr. Mayer has explained that this opinion rests on three considerations:

1. the number of adverse event reports ("AERs") involving Baycol;
2. the metabolic profile of Baycol – its "bioavailability";
3. Baycol's withdrawal from the market.

Mayer Dep. (Ex. B) at 254:1-17; 278:20-279:10; 281:6-12.

None of this is sound, reliable science. Indeed, some of it is demonstrably unreliable, and other considerations on which Dr. Mayer relied are untested conjecture that Dr. Mayer invented for his report.

### A. AER Data Cannot Support an Opinion About the Comparative Safety of Drugs.

As explained in depth in Defendants' AER Motion, AERs cannot be used to compare the safety of different medicines. *See* FDA Office of Postmarketing Drug Risk Assessment, "Adverse Event Reporting System (AERS): Brief Description with Caveats of System" (Oct. 18, 1999) (Ex. F) at 2 ("Comparisons of drugs cannot be made from these data"). Because of the inherent limitations of spontaneous reports that, by definition, do not contemplate any assessment of whether the drug caused the adverse event, courts have consistently rejected AERs as evidence of causation or relative risk.[1]

Aside from the inherent unreliability of AERs, Dr. Mayer should not be permitted to offer AER-based opinions for the independent reason that he is not qualified to interpret AER data. It is evident from his deposition testimony that Dr. Mayer has neither the experience nor qualifications to utilize AER data.

Q: [H]ave you investigated the potential biases that may impact statin adverse event reporting?

A: . . .I am aware of what those biases may be or some of those biases may be, but I haven't done any formal investigating into them….

Q: Have you made any effort to assess the relative reporting rate of spontaneous adverse events with statins by controlling for biases that are part of the data?

---

1 *See, e.g., Nelson v. American Home Prods. Corp.*, 92 F. Supp. 2d 954, 969 (W.D. Mo. 2000) (expert testimony based upon spontaneous reporting excluded because an AER "may be sufficient for formulation of a hypothesis that can later be tested and confirmed, but it is not proof of causation in the courtroom or the scientific community"). *Accord Brumbaugh v. Sandoz Pharm. Corp.*, 77 F. Supp. 2d 1153, 1156 (D. Mont. 1999) (expert opinion excluded because AERs were merely "compilations of occurrences, and have been rejected as reliable scientific evidence supporting expert opinion so as to meet the requirements set forth in *Daubert*").

A: No.

Q: Have you in any context for any drug made any investigation into biases that affect adverse event reporting?

A: No.

Q: Have you done a literature review either in this case or for any other exercise to determine what others have said about biases in spontaneous adverse event reporting?

A: I have read commentaries and editorials, et cetera, about Cerivastatin, but in terms of doing a formal review, no.

* * *

Q: Are you aware of any guidelines the FDA has put out regarding whether spontaneous adverse event data can be used to show the relative safety profile of drugs?

A: I'm not aware of that.

Mayer Dep. (Ex. B) at 270:1-272:2; 272:2-6.

Ultimately, Dr. Mayer concedes that his interpretation of the AER data for Baycol is based solely on what he has learned from Dr. Farquhar, another retained expert in this litigation, and "plain common sense." *Id*. at 272:13-19. As "plain common sense" in no way constitutes scientific, technical or specialized knowledge that would assist the trier of fact, Dr. Mayer's AER-based opinions must be excluded. Dr. Mayer simply lacks the requisite expertise to interpret AER data. *See also* Defendants' Motion to Exclude Plaintiffs' Putative Expert Witnesses from Invoking the Testimony of Other Testifying Witnesses.

**B. The Other Factors to Which Dr. Mayer Anchors His Opinion About Safety Also are Scientifically Baseless.**

Dr. Mayer referred to the "bioavailability" of Baycol as a distinction from other statins that explains Baycol's greater alleged risk. But Dr. Mayer also admits that there is not a shred of scientific support for his theory:

> Q: Can you cite me to any scientific study establishing a link between the bio-availability of Baycol and any purported safety issue with the drug?
>
> A: I think other witnesses will point you in that direction.
>
> * * *
>
> Q: You are not prepared to make that link, are your, sir?
>
> A: I'm not prepared to make that link.
>
> * * *
>
> Q: And let's make sure that I actually get an answer to my question, which is are you aware of any scientific study establishing a link between the bio-availability of Baycol and any purported safety issue with the drug?
>
> A: I am not.

Mayer Dep. (Ex. B) at 254:14-18; 255:21-256:1; 256:7-12.

Dr. Mayer made the same concession about the "metabolic profile" of Baycol:

> Q: Would you agree with me that the dual metabolic profile for Baycol does not relate to the safety of the drug when used in monotherapy?
>
> A: I think it probably does not, . . . but it clearly has an impact on its relation to concomitant medication use, which is a huge issue in these patients . . .

Q: What study, sir, has demonstrated that Baycol's dual metabolic pathway increases the chances of a drug interaction when compared to other drugs in the class?

A: I believe Dr. Farqu[h]ar has gone through that information.

Q: Are you aware of any scientific study demonstrating that Baycol's dual metabolic profile increases the likelihood of any drug interaction?

A: I, I will not be testifying as to the specific of that. . . .

Q: Can you answer the question I asked?

A: The answer to the question that you asked is, no, I cannot specifically cite the study because it's not my area of expertise.

*Id*. at 257:5-258:14.

When pressed, Dr. Mayer ultimately agreed that he is not qualified to opine about the comparative safety of Baycol based on the drug's bio-availability, metabolic profile or voluntary actions by Bayer:

Q: It's fair to say, Dr. Mayer, that you are not qualified to give statements about comparative safety based upon a drug's bio-availability?

A: That's fair to say.

Q: Is it fair to say, sir, that you are not qualified to give opinions about a drug's comparative safety based upon the drug's metabolic profile?

A: That's fair to say as well.

Q: Is it fair to say that you are not qualified to give opinions about a drug's comparative safety based upon regulatory action taken by the FDA or voluntary action taken by a drug company?

A: That's correct.

*Id*. at 263:10-22.

In the end, Dr. Mayer has acknowledged that he lacks expertise to opine on safety, and that there is no scientific support for the links he hypothesizes between certain alleged characteristics of Baycol and the incidence of Baycol-induced injury. His safety opinion is not just junk science. It is not science at all and should be excluded under the *Daubert* standard.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court exclude certain of Dr. Mayer's testimony under *Daubert* and Rule 702.

Dated: April 17, 2006

Respectfully submitted,

Philip S. Beck
Adam Hoeflich
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60610
(312) 494-4400

/signature on file/
Susan A. Weber
James W. Mizgala
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000

Paul J. Zidlicky
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000

Scott A. Smith
Tracy J. Van Steenburgh
HALLELAND LEWIS NILAN SIPKINS & JOHNSON, P.A.
220 South Sixth Street, Suite 600
Minneapolis, MN 55402
(612) 338-1838

/signature on file/
Fred T. Magaziner
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000

*Counsel for SmithKline Beecham Corp. d/b/a GlaxoSmithKline*

Catherine Valerio Barrad
Thomas P. Hanrahan
Christine K. Son
SIDLEY AUSTIN LLP
555 West Fifth Street, 40th Floor
Los Angeles, CA 90013
(213) 896-6000

Richard K. Dandrea
ECKERT SEAMENS CHERIN
& MELLOTT, LLC
USX Tower, 600 Grant St., 44th Floor
Pittsburgh, PA 15219
(412) 566-6000

Peter W. Sipkins (No.101540)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
(612) 340-2600

Douglas R. Marvin
WILLIAMS & CONNOLLY
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

Joseph D. Piorkowski, Jr.
THE PIORKOWSKI LAW FIRM, PC
910 17th Street, N.W. Suite 800
Washington, D.C. 20006
(202) 223-5535

*Counsel for Bayer Corporation and Bayer AG*