# Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| In re: BAYCOL PRODUCTS LITIGATION | ) | MDL No. 1431 (MJD/JGL) |
| | ) | |
| | ) | |
| | ) | |
| This Document Relates To All Actions | ) | |

# EXPERT WITNESS REPORT OF R. SAMUEL MAYER, MD

## Baycol (Cerivastatin) Induced Toxic Myopathy: An Analysis of Causation, Diagnosis, Functional Impact, and Prognosis

## BACKGROUND AND QUALIFICATIONS

1. I am Medical Director of Inpatient Rehabilitation at the Johns Hopkins Hospital ("JHH"), and Clinical Associate in the Department of Physical Medicine and Rehabilitation, Johns Hopkins University School of Medicine. I am the Physician Advisor for the Department, which makes me responsible for quality assurance, billing compliance, and credentialing. I am certified by the American Board of Physical Medicine and Rehabilitation, the American Board of Electrodiagnostic Medicine, and the American Board of Independent Medical Examiners. I am licensed to practice medicine in the states of Maryland and Illinois. I serve on the JHH Clinical Performance Improvement and Compliance Committees, on the Pain Management Task Force, and on the Clinical Subcommittee of the Curriculum Committee for the School of Medicine. I was one of approximately 100 physicians who participated in the Annual Planning Retreat for Johns Hopkins Medicine in 2003.

2. I earned my Bachelor of Science and Doctor of Medicine degrees from the Honors Program in Medical Education of Northwestern University in 1986. This is a six year combined baccalaureate/medical degree program. I served as National



EXHIBIT
Mayer 1
1-29-04 mv

Chair of the Medical Education Committee of the American Medical Students Association during 1986. In 1990 I completed my residency in Physical Medicine and Rehabilitation ("PM&R") at Rush Medical College in Chicago. During the last year of my residency I served as Chief Resident

3. After completing my residency in 1990 I became assistant professor in the Department of PM&R at Rush Medical College. I served from 1992 to 2001 as the Medical Director of the Illinois Municipal Retirement Fund (reviewing disability claims among 125,000 employees) and as a Medical Consultant to Healthcare Compare, Inc. I was the Medical Director of the Employee Health Service at Rush-Presbyterian-St. Luke's Medical Center from 1994 to 2001. I was the Residency Program Director of the Department of PM&R at Rush Medical College in 1996 to 2001, and the Acting Chair of the Department from 1998 through 2001. I left Rush Medical College to move to Johns Hopkins in 2001.

4. In 1990 I received the Elkins Award from the American Board of Physical Medicine and Rehabilitation for achieving the highest score on the Board Exam nationally that year. I have been listed in Marquis Who's Who in American Healthcare since its inaugural edition in 2000, in America's Best Doctors since 1998, Top Doctors in America since 2000, and was one of three specialists in PM&R to be listed as a Top Doctor by Baltimore magazine in 2002. I have been an invited participant in Renaissance Weekend since 1999.

5. I have published 17 peer-reviewed papers and abstracts, and 3 book chapters, many of them related to the area of abnormal muscle tone, and also in the

area of epidemiology of disability. One abstract was a case series of 3 patients with rhabdomyolysis after taking cyclosporin and simvastatin.

6. In addition to my clinical practice and research I teach at the Johns Hopkins University School of Medicine, where I am course director for Physical Medicine and Rehabilitation and an instructor in the Introduction to Clinical Medicine course as well. I have given numerous lectures on a regional and national basis, and have served as a Course Director four times at the annual meetings of the American Academy of Physical Medicine and Rehabilitation.

7. A current copy of my curriculum vitae, which includes a list of all my publications, is attached as Exhibit A.

8. The terms of my retention by the Baycol MDL Plaintiffs Steering Committee are set forth in a November 21, 2003 letter from attorney Bert Black, a copy of which is attached as Exhibit B.

9. A list of the materials I reviewed in preparing this report is attached as Exhibit C.

10. A list of cases in which I have given deposition testimony during the past four years is attached as Exhibit D. To the best of my recollection, I have not testified at trial during that period.

## INTRODUCTION

11. Baycol (cerivastatin) was withdrawn from the U.S. market by Bayer, Inc. on August 8, 2001, after 1579 reports of toxic rhabdomyolysis (severe muscle damage) and 99 deaths worldwide. The rate of these catastrophic events was up to 43 times higher than with other medications in its class, according to the European Agency for the Evaluation of Medicinal Products, and the rate of rhabdomyolysis deaths was up to 80 times more frequent, according to Adverse Event Reports (AERs) to the U.S. Food and Drug Administration (FDA). This report will discuss the toxic effects of the drug on muscle, the methods for diagnosing toxic myopathy (muscle disease), functional limitations that result from myopathy, and the prognosis for recovery after withdrawal of the medication.

12. For the purposes of this report, cerivastatin induced myopathy will be operationally defined as muscle damage characterized by: (1) pain and/or weakness in the proximal muscles of new onset associated with the concurrent use of cerivastatin, (2) which results in significant functional limitations, and (3) which either persists at the same level or diminishes after discontinuation of cerivastatin. This definition is not meant to describe a new syndrome. It is only meant as an accurate description of the continuum of muscle damage associated with cerivastatin. There have been a number of proposed definitions, and none have reached wide acceptance in the literature.

13. Many have relied heavily on laboratory data, in particular creatine kinase (CK) levels, in describing this damage. However, as I demonstrate later in this report, such over-reliance on laboratory data is misguided, since creatine kinase is an inaccurate and crude "snapshot" of muscle damage at one moment in time. Drawing

"cut-offs" using a single laboratory value ignores the sensitivity and specificity of this diagnostic test. The definition proposed in the preceding paragraph attempts to encompass the wide range of severity of muscle injury due to cerivastatin.

14. Pasternak et al have defined three levels of severity of myopathy. "Myalgia – muscle ache or weakness without CK elevation; myositis – muscle symptoms with increased CK levels; rhabdomyolysis – muscle symptoms with marked CK elevation and creatine elevation." These definitions were meant for use in determining the continuation or discontinuation of statin use in the face of muscle symptoms, and to advise clinicians regarding monitoring laboratory tests during therapy. These definitions were not meant for purposes of diagnosis or prognosis, as the paper clearly recognizes that serial monitoring of CK is necessary due to the transitory nature of its elevations in myopathy.

15. All opinions contained herein are expressed with reasonable medical certainty.

**OPINIONS**

16. Cerivastatin clearly injures muscle in many individuals. To understand how this damage occurs, we will first briefly consider cerivastatin toxicity at a chemical and a cellular level. Then we will look at the impact of this toxic muscle damage on individuals. We know the drug has toxic effects from epidemiological data, pharmacological analysis, and muscle biopsy pathology. The rate of this myopathy is 1% of individuals who took cerivastatin at the 0.4 mg dose in Phase III clinical trials performed by Bayer for the FDA. Data from the FDA AERs show even higher rates of myopathy, when measured by symptoms accompanied by laboratory abnormalities. In elderly women, this rate exceeded 5%. AERs notoriously underreport side effects, as the FDA relies on data provided to it by individual physicians, who must take the time to make reports. These rates probably include primarily patients with the most severe symptoms. The myopathy occurrence rate is likely much higher, therefore.

17. Cerivastatin causes a continuum of muscle damage. In animal studies, statins induced changes in the histology (microscopic appearance) of muscle cells in virtually all animals tested. In humans, this probably represents asymptomatic subclinical pathology. When muscle cell death occurs, there is associated myalgia. The larger, proximal muscles of the trunk, hips, shoulders, and calves are typically the most involved. In many individuals, these symptoms will abate within days to weeks after discontinuation of cerivastatin. In others, a more profound amount of muscle cell death occurs, and muscle weakness develops. These individuals typically take months to recover, and may suffer permanent damage. The most severely affected individuals develop rhabdomyolysis, a condition in which there is massive muscle cell death,

resulting in severe atrophy and fibrosis of the muscles. Shortening of the muscles, known as contracture, often results, leading to joint stiffness and loss of range of motion. The breakdown products of the muscles (particularly a large protein known as myoglobin) enter the bloodstream and can clog the kidneys, resulting in renal failure requiring dialysis. Deaths have occurred in a number of patients due to complications of rhabdomyolysis.

18. Cerivastatin belongs to a class of serum cholesterol lowering medications known as HMG Co-A reductase inhibitors, referring to the enzyme upon which these medications act. These medications are commonly referred to as "statins". Other drugs in this class include Lipitor (atorvastatin), Pravachol (pravastatin), Zocor (simvastatin), Mevacor (lovastatin), and Lescol (fluvastain). Lowering cholesterol is generally considered desirable because high blood levels of this substance, particularly LDL cholesterol, have been associated with heart disease and stroke. Several drugs in the statin class of medications have been shown to be more effective in lowering cholesterol than older classes of medications, such as niacin and gemfibrozil.

19. Though all statins are in the same pharmaceutical class, they are far from equal in terms of efficacy or safety. All statins can cause muscle damage, but cerivastatin causes it much more frequently than the other medications in this class, indeed up to 43 times more frequently. The degree of muscle damage is also worse than other statins. Patients presented with rhabdomyolysis more often, and there were more deaths than with any other statins. Cerivastatin differs markedly from other statins in its potency, bio-availability, and pathways of metabolism, and these differences very plausibly explain the far higher rates of muscle damage with the drug.

20. Muscle is made up of strand-like fibers. Mature muscle fibers have multiple nuclei within each cell. The nuclei contain DNA. Muscle fibers require a great deal of energy to perform work. This energy is provided by fuel generators within the cells called mitochondria, and there are many mitochondria in each muscle fiber. The muscle fibers are surrounded by satellite cells. These are stem cells which can mature into myoblasts (precursors to muscle fiber cells) or fibroblasts, which make scar tissue. This distinction is important to understanding the repair of damaged muscle cells, and may explain why many individuals do not recover completely after toxic insult.

21. Though it is clear that cerivastatin causes muscle damage, the mechanism through which it does so is still being researched. At least three mechanisms have been suggested as likely explanations for how the drug damages muscle cells, and these may act either independently or together. The first involves adverse effects on cell membranes, which can result in killing muscle cells. The second involves interference with the cell's uptake of energy, which also can lead to cell death. The third involves inappropriate activation of apoptosis, or programmed cell death. Whatever the actual cause, the more cells that die, the weaker the muscle becomes.

22. A number of co-morbidities can increase the risk of developing cerivastatin-induced myopathy, and can exacerbate and prolong symptoms once they occur. Women and the elderly appear to be far more sensitive to the medication, with higher rates of myopathy. Impaired liver and kidney function make it more difficult for the body to break down the medication. Hypothyroidism, diabetes, and rheumatoid arthritis are relatively common diseases that are associated with myopathy. A subclinical myopathy in these patients could be greatly exacerbated by cerivastatin. Peripheral

vascular disease would likely lead to decreased ability of muscle to clear toxins, potentiating myopathy. Frailty, which afflicts many elderly individuals, is characterized by a loss of muscle mass. Further damage from cerivastatin-induced myopathy can have disastrous results in these individuals.

23. Concomitant use of some medications with cerivastatin can potentiate even more severe myopathy. Examples include gemfibrozil, niacin, cyclosporin, clopidogrel, diltiazem, fluconazole, erythromycin, AZT, and St. John's wort. This may be partly due to the additive myotoxic effects of these medications, and partly due to metabolism increasing serum levels of both the cerivastatin and the concomitant medication. Over 50% of the cases of severe rhabdomyolysis in the FDA AERs involved drug interactions, especially with gemfibrozil and cyclosporin.

24. When diagnosing myopathy there is no single "gold standard" test. Objective evidence may include elevated creatine kinase (CK) levels, myoglobinuria, EMG, muscle biopsy, and quantitative strength testing. Each of these tests, however, has significant limitations in their sensitivity and specificity for the diagnosis. They are also of limited value in the prediction of prognosis. In the following paragraphs I discuss each in more detail.

25. **CK and myoglobinuria**. When muscle cells die, their contents are released into the bloodstream. One of the chemicals released early in myocyte death is creatine kinase (CK). It is a good marker of early cell death, but it should be noted that once a cell has died, it will no longer release this protein, and the CK levels measured in blood will decrease with time. This bears no relationship to recovery of muscle function. Another protein released during acute muscle damage can be more deleterious.

Myoglobin builds up rapidly in the blood stream. Myoglobin is a very large protein molecule, and it will essentially plug up the kidneys, which try to clean it out of the bloodstream. It is excreted in the urine where it can easily be measured. This is termed myoglobinuria. Measurements of these two chemicals can be useful when damage initially occurs. CK can be measured in the blood, and myoglobin can be measured in the urine. However, the levels of both these proteins will dissipate once damage is has been completed. They tell us little about prognosis.

26. **Muscle biopsy**. A muscle biopsy can tell us what the cells look like. We can see dead cells, or cells with damaged mitochondria. Biopsies, however, depend on getting a specimen right from the area of muscle that is damaged. Often a muscle biopsy will appear normal even if there is severe muscle disease because the injured portion of tissue was missed. The injury occurs at a microscopic level, so the exact location of damage may be missed by the biopsy.

27. **Electromyography (EMG).** EMG measures muscle function through the electrical activity the muscle generates while contracting. This is done by measuring the size of the motor unit potential (MUP), which reflects the activity of one nerve ending on a group of muscle fibers. In myopathy the number of muscle fibers with which each nerve ending communicates (innervates) is reduced. Therefore, the MUP is smaller. This test can also measure when a muscle is irritable, signaling acute damage. It involves sticking a needle into the muscle, and it can be a painful test. Moreover, it can miss muscle injury if the proper muscles are not tested. It is also quite tricky to diagnose myopathy in older individuals with EMG. This is because with aging, the nerve endings die off, leaving each nerve ending with more muscle fibers to innervate. This means that

with normal aging, the MUPs get larger. Thus what may be a normal sized MUP in a younger patient may actually be myopathic in an older individual.

28. Muscle cells can regenerate (grow back), but this is a slow process, taking months, and often it is incomplete if damage is severe. The regeneration occurs in several steps. The dead muscle cells release byproducts into the bloodstream. These include creatine kinase (an enzyme that can be easily measured by a routine laboratory test), and myoglobin, a large protein that can clog the kidneys. Next, macrophages (cells that clean up waste products) consume the dead cells, and release a chemical called prostaglandin, which signals pain to the brain. Over the course of weeks and months, special stem cells develop into myoblasts, which then form myotubes. Myotubes are weak and immature muscle fibers. It takes additional weeks and months for these myotubes to mature into muscle fibers. In many cases, the stem cells form fibroblasts instead of myoblasts. These fibroblasts make scar tissue. In older individuals, the regeneration process is even slower and more incomplete, and fbroblasts are more likely to form. We know this from experiments in mice. This very likely applies to humans as well; however, obvious ethical concerns limit this type of experimentation in human subjects.

29. Clinical recovery from muscle cell death can take months. To date, there are no specific longitudinal studies of recovery from cerivastatin-induced myopathy. However, we can infer much information regarding prognosis based on empirical support from other kinds of scientific data. There have been a number of case series with a consistent range of outcomes. We can also infer information based on the time course of cellular regeneration in the laboratory. We know that mitochondrial

damage without cell death is usually reversible in days to weeks in mammalian models. Furthermore, we know much about recovery from other forms of myopathy. For example, we know in one case series of AZT induced myopathy, 20% of patients had long-term muscle weakness. Similar results are seen in studies of steroid induced myopathy. In the initial weeks of recovery from significant muscle damage, the individual may actually become even weaker before regaining strength. We know this from experiments performed on astronauts after returning from space flight. Muscles are weakened in space by prolonged periods of lack of use due to zero gravity. When an astronaut returns to earth, this muscle damage ends, but he/she actually becomes weaker over the first week back on earth because the high energy demands on the weakened muscle overloads the mitochondria, re-injuring the muscle. Muscle strength, in the absence of fibrosis and scarring, will generally recover approximately 3% per week in healthy young adults. In older and frailer individuals with multiple medical problems, this recovery takes much longer and is less complete.

30. Myopathy can result in serious and significant functional limitations. It disproportionately affects the large proximal muscle of the trunk, hips, and shoulders; the neck and calves are also commonly involved. Pain and weakness are the two main symptoms. There is poor endurance and exercise tolerance. This leads to marked fatigue. The muscles become very tender. Because these muscles are critical to all gross movements of the body, simple activities like getting out of bed or up from a chair may become excruciating, and if weakness is severe, impossible to do without assistance. Patients may have difficulty with such simple everyday activities as getting dressed or getting on and off the toilet. Climbing stairs is difficult for most patients.

Heavy labor and sports can become next to impossible to perform. Thus it is incorrect to label cerivastatin-induced myopathy (short of rhabdomyolysis and death) as trivial. Myopathy causes significant, and often long-lasting, functional limitations.

**POSSIBLE ADDITIONAL ANALYSES AND AMENDMENT OF REPORT**

If I learn of additional information relevant to my opinions, I will submit an amended and/or supplemental report as appropriate.

R. Samuel Mayer

# EXHIBIT A

## CURRICULUM VITAE

---

Robert Samuel Mayer, M.D. November 2003

| | |
|---|---|
| CURRENT APPOINTMENTS: | University: Clinical Associate, Department of Physical Medicine and Rehabilitation, Johns Hopkins University School of Medicine<br>Hospital: Medical Director Inpatient Rehabilitation, Johns Hopkins Hospital |
| CONTACT INFORMATION: | 600 North Wolfe Street<br>Meyer 1-164<br>Baltimore, MD 21287<br>Phone # 410-614-4030<br>Fax # 410-614-4033<br>E-Mail rmayer2@JHMI.edu |
| EDUCATION: | Northwestern University Medical School<br>Chicago, IL<br>1980-1982<br><br>Bachelor of Science in Medicine<br>1984<br>Northwestern University Medical School<br><br>Doctor of Medicine<br>1986<br>Northwestern University Medical School |
| TRAINING: | Internship, Medicine<br>Rush-Presbyterian-St. Luke's Medical Center (RPSLMC)<br>Chicago, IL<br>1986 - 1987<br><br>Residency, Physical Medicine & Rehabilitation<br>Rush-Marianjoy-Oak Forest Residency Program<br>Chicago, IL<br>1987 – 1990 |
| HONORS: | Honors Program in Medical Education<br>Northwestern University<br>1980-1986<br><br>Earl Elkins Award for highest exam score on<br>American Board of Physical Medicine and Rehabilitation<br>1990<br><br>Best Doctors of America<br>1998-present<br><br>Invited Participant, Renaissance Weekend |

1999-present

Top Doctors in America
2000-present

Marquis Who's Who in American Medicine
Inaugural Issue
2000-present

Oral Examiner, American Board of Physical Medicine and Rehabilitation
2001, 2004

Invited Participant, Johns Hopkins Medicine, Annual Strategic Planning Retreat
2003

COMMITTEE APPOINTMENTS:

Chairperson, Standing Committee on Medical Education
American Medical Students Association
1985 – 1986

Center for Functional Outcomes Research, Marianjoy Rehabilitation Center, Committee to Revise PECS Rehabilitation Scale
1992 – 1996

Committee on Educational Appraisal
Rush Medical College
1992 – 1995

Medical Records Committee
Rush-Presbyterian-St. Luke's Medical Center
1993-1999

Chairperson, Subcommittee on Musculoskeletal Disorder, Prevention Task Force, Rush Medical College
1993 - 1994

Research Committee, Physiatric Association for Sports, Spine and Occupational Rehabilitation
1994 - 1998

Editorial Board, In Good Health, Employee Health Services, Rush Medical College
1994 – 2001

Health and Fitness Advisory Committee, RPSLMC
1994 – 2001

Editorial Advisory Board, Spine
1996 – 2001

Pre-Admissions Sub-Committee
Johnston R. Bowman Center at RPSLMC
1998 – 2001

Medical Affairs Management Committee
Rush Medical College
1998 – 2001

Rehabilitation Coordination Committee
Rush Presbyterian-St. Luke's Medical Center
1998 – 2001

Graduate Medical Education Review Committee
Rush Medical College
1998 – 2001

Medical Care Evaluation Committee
Rush-Presbyterian-St. Luke's Medical Center
1998 – 2001

Executive Committee, Department of Physical Medicine and Rehabilitation
Johns Hopkins Hospital
2001-present

Committee on Clinical Performance Improvement
Johns Hopkins Hospital
2001-present

Compliance Committee
Johns Hopkins Medicine
2002-present

Pain Assessment Task Force
Johns Hopkins Hospital
2002-present

Clinical Curriculum Subcommittee
Curriculum Committee, Johns Hopkins University School of Medicine
2003

HOSPITAL PRIVILEGES:

Attending Physician
Westlake Community Hospital
Melrose Park, IL
1990 - 1998

Attending Physician
RML Specialty Hospital
Hinsdale, IL
1997 – 1999

Consulting Physiatrist
Marianjoy Rehabilitation Center
Wheaton, IL
1990 – 2001

Attending Physician
Oak Park Hospital
Oak Park, IL
1990 – 2001

Attending Physician
Grant Hospital of Chicago
Chicago, IL
1991 – 2001

Attending Physician
Rush-Presbyterian-St. Luke's Medical Center
Chicago, IL
1997 – 2001

Attending Physician
Johns Hopkins Hospital
Baltimore, MD
2001-present

Attending Physician
Good Samaritan Hospital
Baltimore, MD
2001-present

Visiting Attending Physician
Johns Hopkins Bayview Medical Center
Baltimore, MD
2001-present

PROFESSIONAL APPOINTMENTS:

Consulting Medical Director
Physical Medicine & Rehabilitation
Health Care Compare Corporation
Downers Grove, IL
1990 – 1994

Medical Director
Rehabilitation Services
Vencor Hospital of Chicago
Northlake, IL
1991 – 1993

Medical Director
Illinois Municipal Retirement Fund
Oak Brook, IL
1992 – 2001

Medical Director
Employee Health Services
Rush Medical College
Chicago, IL
1994 – 2001

Associate Residency Program Director
Rush-Marianjoy Residency in PM&R
Rush Medical College
Chicago, IL
1994 – 1996

Residency Program Director
Rush-Marianjoy Residence in PM&R
Rush Medical College
Chicago, IL
1996 – 2001

Acting Chairman
Department of PM&R
Rush Medical College
Chicago, IL
1998 – 2001

Medical Director
Inpatient Rehabilitation
Department of PM&R
Johns Hopkins Hospital

FACULTY APPOINTMENTS:

Instructor
Loyola University Stritch School of Medicine
Department of Orthopedics & Rehabilitation
Maywood, IL
1990 – 1991

Assistant Professor
Rush Medical College
Department of Physical Medicine and Rehabilitation
Chicago, IL
1991 – 2001

Clinical Associate,
Johns Hopkins University School of Medicine
Department of Physical Medicine and Rehabilitation
Baltimore, MD
2001-present

EMPLOYMENT:

Physiatrist
Rehabilitation Medicine Clinic, Inc.
Oakbrook Terrace, IL 60181
1990 – 2001

RESEARCH PUBLICATIONS:

Mayer, R.S., Steiner, M.L. – Intrauterine cocaine exposure; developmental assessments of two infants. Arch PM&R 70:A-85, 1989. (abs)

Mayer, R.S., Steiner, M. L. – Axonal polyneuropathy complication traumatic spinal cord injury. Arch PM&R 70:A-68, 1989. (abs)

Mayer, R.S., Stambolis, V. – Hyperreflexic neurogenic bladder in a patient with Guillain-Barre Syndrome. Arch PM&R 71:823, 1990. (abs)

Pang, T.Y., Mayer, R.S., Nicholas, J.J. – Exposing medical students to physical medicine and rehabilitation; the functional assessment course. Arch PM&R 74:1237, 1933. (abs)

Logan, R.E., Stone, S.C, Jr., Mayer, R.S., Nicholas, J. J. – Epidural lipomatosis; an unusual case of leg weakness. Arch PM&R 74:1273, 1933. (abs)

Mayer, R.S., Chen, I.H, Lavender, S.A., Andersson, G.B., Trafinow, J. – Analysis of variance in the measurement of lumbar spine range of motion among examiners, subjects and instruments. Arch PM&R 74:1254, 1993. (abs)

Mayer, R.S., Oleske, D.M. – Prevalence of work disability among municipal employees. Arch PM&R 74:1254, 1993. (abs)

Mayer, R.S. – Spinal cord hemorrhage secondary to tissue plasminogen activator therapy for acute myocardial infarction. Arch PM&R 75:1060, 1994. (abs)

Mayer, R.S. – A preoperative and postoperative study of the accuracy and value of electrodiagnosis in patients with lumbosacral disc hemiation (letter). Spine 19:108-9, 1994.

Lavender, S., Trafimow, J., Andersson, G.B., Mayer, R.S., Chen, I.H., - Trunk muscle activation. The effects of torso flexion, moment direction, and moment magnitude. Spine 19:771-8, 1994.

Mayer, R.S., Chen, I.H., Lavender, S.A., Trafimow, J.H., Andersson, G.B. – Variance in the measurement of sagittal lumbar spine range of motion among examiners, subjects, and instruments. Spine 20:1489-93, 1995.

Mayer, R.S., Nicholas, J.J. – Spinal infections: Diagnosis and rehabilitation. Arch PM&R 76:1079, 1995. (Poster)

Shekhani, N.A., Mayer, R.S. – Hereditary corporhyria and rehabilitation – A case review. Arch PM&R 77:947. 1996. (abs)

Thompson, C., Mayer, R.S., Goldberg, E. – Heterotopic ossification of gluteal muscles in a patient with lumbar spinal stenosis. Arch PM&R 10:81-88, 1998.

Mayer, R.S., Pacheco, M., Villarica, V. – "Toxic Myopathy in Concomitant Use of Simvastatin and Cyclosporine: A report of 3 Cases. Arch PM&R Vol. 81:1305. (abs) 2000.

Mayer, R.S.– Worker's Compensation In.emedicine.com, 2001

Mayer, R.S.– Spasticity and Other Disorders of Muscle Tone. In Wallace &Staats. Just the Facts: Pain Medicine and Management, in press.

| | |
|---|---|
| RESEARCH GRANT: | Innovation Grant, National Institute of Disability and Rehabilitation<br>Research. Amount $50,000.<br>1992 – 1993 |

EDUCATIONAL ACTIVITIES LECTURES:

"Acute Inflammatory Polyradiculoneuropathy", Grand Rounds
Marianjoy Rehabilitation Center
1989

"Low Back Pain: The Aggressive Conservative Approach: Grand Rounds, Department of Orthopedics and Rehabilitation
Loyola University Stritch School of Medicine
1990

"Function: The True Bottom Line in Health Care", Grand Rounds, Department of Medicine
Loyola University Stritch School of Medicine
1990

"Physiatric Considerations in the Care of the Elderly", American College of General Practitioners in Osteopathic Medicine and Surgery
1991

"Cancer Rehabilitation", Health Care Compare Corporation
1991

"Rehabilitation of Patients with Vascular Disorder", Resident Lectures Series
Rush-Marianjoy/Loyola-Marianjoy Residency Programs
1991

"Burn Rehabilitation:, Resident Lecture Series
Rush-Marianjoy/Loyola-Marianjoy Residency Programs

"The Role of PM&R in Acute Care", Annual Meeting, American Academy of Physical Medicine & Rehabilitation (AAPM&R)
1991

"Low Back Pain: The Aggressive-Conservative Approach"" Grand Rounds, Department of Physical Medicine & Rehabilitation
Rush Medical Center
1991

"Orthotics, Shoes and Assistive Devices", Resident Lecture Series
Rush-Marianjoy/Loyola-Marianjoy Resident Programs
1992

"Disability Evaluation: Grand Rounds, Department of Physical Medicine & Rehabilitation
Rush Medical College
1992

"Functional Assessment: Grand Rounds, Department of Internal Medicine
Rush Medical College
1992

"Pathomechanics of Stress Fractures: Annual Meeting, AAPM&R
1993

"Third Party Payor Review of Benefits for Medical Rehabilitation, Worker's Compensation and Disability Insurance", Course Director, Annual Meeting, AAPM&R
1993

Moderator, Functional Assessment and Outcomes Measurement Scientific Platform Session, Annual Meeting, AAPM&R
1993

Moderator, Rehabilitation Administration Scientific Platform Session, Annual Meeting AAPM&R
1994

"Disability Evaluation", Department of Family Medicine
Rush Medical College
1994

"Function: The True Bottom Line in Health Care", Grand Rounds Illinois Masonic Medical Center, Chicago, IL
1994

"Problem-Oriented Journal Clubs", Assistant Moderator, Annual Meeting, AAPM&R
1994

"The Aging Spine: Backache in Older Individuals", Course Director, Annual Meeting, AAPM&R
1994 – 1995

"The Aging Spine: Backache in Older Individuals"
Westlake Community Hospital, Melrose Park, IL
1995

"Physiatric Examination and Prescription Writing", Resident Lecture Series
Rush-Marianjoy/Loyola/RFI Residency Programs
Oakbrook Terrace, IL
1995 – 2000

"Epidemiology and Pathophysiology of Back Pain"
Ingalls Hospital, Harvey, IL
1995

Moderator, Spinal Cord Injury Scientific Platform Session, Annual Meeting AAPM&R, Orlando
1995

"New Frontiers in Spine Research", Course Director and Moderator, Annual Meeting AAPM&R Chicago
1996

"Worker's Compensation: The Employer's Perspective", Annual Meeting, AAPM&R Chicago
1996

"Ergonomics", Resident Lecture Series
Rush-Marianjoy/Loyola/RFI Residency Programs
Oakbrook Terrace, IL
1996 – 2000

"Back Pain and Disability", Grand Rounds
Oak Forest Hospital, Oak Forest, IL
1996

"The Physician's Role in Worker Compensation", National Ergonomics Conference
Rosemont, IL
1997

"Therapeutic Intensity: How Much is Necessary", Moderator, AAPM&R Annual Meeting, Seattle, Washington
1998

"Cancer Rehabilitation", Rush Presbyterian-St. Luke's
2000

"Controversies in Repetitive Motion Disorders" , Course Director, AAPM&R Annual Meeting, San Francisco, CA
2000

"Subacute Rehabilitation", Moderator, AAPM&R Annual Meeting, San Francisco, CA
2000

"Cancer Rehabilitation", Johns Hopkins University Dept. of PM&R
2001

"Disability Evaluation", Johns Hopkins University Pain Center
2002

"Abnormal Muscle Tone Disorders", Maryland Society of PM&R
2002

"Repetitive Motion Disorders", Association of Osteopathic PM&R
2002

"Introduction to Clinical Medicine", Course Preceptor, Johns Hopkins University School of Medicine
2002-2003

"Intrathecal Baclofen for Spasticity", Johns Hopkins University Dept. of PM&R
2003

| | |
|---|---|
| | "Stroke Complications", Johns Hopkins University Dept. of PM&R<br>2003 |
| BOARD CERTIFICATIONS & LICENSURE: | Drug Enforcement Administration Registration<br>1989<br>State of Illinois License (permanent)<br>1989<br>American Board of Physical Medicine & Rehabilitation<br>1991<br>American Board of Electrodiagnostic Medicine<br>1992<br>American Board of Independent Medical Examiners<br>1995 |
| ORGANIZATIONAL ACTIVITIES MEMBERSHIPS: | American Academy of Physical Medicine & Rehabilitation<br><br>Association of Academic Physiatrists |
| SERVICE: | Physicians, Disabled Veterans National Winter Sports Clinic, Grand Junction, CO<br>1991<br><br>United Cerebral Palsy Association Assistive Technology Application Center Research Advisory Committee<br>1991<br><br>Project Sandwich<br>1995 – 2001<br><br>Habitat for Humanity<br>1999-2003 |

# Exhibit B

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - -x
In re: :
:
BAYCOL PRODUCTS LITIGATION. : MDL No.
: 1431 (MJD/JGL)
- - - - - - - - - - - - - - - - - - -x

Washington, D.C.
Thursday, January 29, 2004

Video Deposition of:

ROBERT SAMUEL MAYER, M.D.

a witness, called for examination by counsel for Baycol, pursuant to notice and agreement of counsel, beginning at approximately 9:13 a.m., at Williams & Connolly, 725 Twelfth Street, N.W., Suite 1000, before Monica A. Voorhees, RPR/CSR, Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

P R O C E E D I N G S

Whereupon,

ROBERT SAMUEL MAYER, M.D.,

was called as a witness and, having been first duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR BAYCOL

BY MR. ISMAIL:

Q. Good morning, Dr. Mayer.
A. Good morning.
Q. Sir, can you state and spell your name for the record, please?
A. Yes, it's Robert Samuel Mayer, M-A-Y-E-R.
Q. Sir, have you been deposed before?
A. Yes, I have.
Q. How many occasions?
A. I believe about 10.
Q. Do all such occasions relate to work you have done as an expert witness?
A. No.
Q. What other subject matters have you given testimony on?
A. I was the subject of a malpractice case.

it wasn't there.
Q. Right, now let me make sure I understand.
In terms of being able to affirmatively diagnose muscle cell destruction in a patient, you need to do one of four things; either test for elevated CK, do a biopsy, do an EMG or do a quantitative strength test; is that correct?
A. Those are probably the four primary ways we could diagnose it, yes.
Q. Is there another way?
A. I think those are probably the four best ways of diagnosing muscle disease, yes.
Q. Is there another way?
A. Not that I can think of off the top of my head.
Q. I think we agreed that all statins can cause muscle cell death, correct?
A. Correct.
Q. That would include Baycol?
A. Of course.
Q. Do statins cause another type of muscle injury other than muscle cell death?

A. Yes.

Q. What type of injury is that?

A. You could have damage to the mitochondria, the energy factories of the cell that could make the cell less effective in working and the cell might still be living, but it's not working as effectively.

Q. You indicated previously that -- do you want to take a break?

MR. HOPPER: Whenever it's, I'm not in any rush. Off the record.

MR. ISMAIL: Understood, let me just do a couple quick questions here.

MR. HOPPER: Not a problem.

BY MR. ISMAIL:

Q. Dr. Mayer, you indicated previously that a patient may have CK testing within the normal range, but if higher than a baseline, you may think that's an indication of a muscle problem?

A. I think it likely, yes.

Q. Would you agree with me that a patient's CK varies from day to day?

A. Yes.

Q. Are you aware of any research that supports the notion that Baycol in particular can cause a muscle injury other than cell death?
A. I don't know that I can cite you a specific article, no.
Q. Now Dr. Phillips in reporting on these four patients was doing so in the context of what he believed to be a myopathy notwithstanding normal CK tests for four patients, correct?
A. Correct.
Q. Could you turn to the discussion section on page 2 that carries over to page 3.
A. Uh-huh. Yes.
Q. Dr. Phillips discusses that these four patients based on clinical pathological and biochemical features that he used to diagnose the myopathy; do you see that?
A. Is there a question there, I'm sorry.
Q. Let me start over.
Do you see the five factors that Dr. Phillips listed in the left column on page 3 of the article?

Q. You talk about persisting muscle symptoms even at the same level as that was occurring during the statin?

A. Correct.

Q. And you've also suggested that there is a type of myopathy associated with statins that does not involve cell death of the muscle?

A. Correct.

Q. And with regard to the latter opinion, you've directed me to Dr. Phillips' work, correct?

A. Yes.

Q. Now Dr. Phillips does report on four patients who had normal CK and --

A. Uh-huh.

Q. -- for whom he diagnosed a myopathy, correct?

A. Correct.

Q. So my question is with respect to Dr. Phillips' work, all four of the patients, the muscle symptoms stopped when the statin was discontinued, correct?

A. That's correct.

Q. Are you aware of any medical literature that would support the notion that in patients with normal CK, during the statin use, that muscle symptoms can persist following discontinuation of the statin?

A. I'm not aware of any literature that states that.

Q. And one of the reasons why Dr. Phillips diagnosed the myopathy was because the patient had the symptoms go away when he stopped the statin, right?

A. Yes.

Q. And in addition Dr. Phillips looked to abnormal biopsy results in the four patients to aid in the diagnosis of a myopathy, correct?

A. Correct.

Q. Have you seen any literature that would support the notion of a statin-induced myopathy with normal CK that did not have abnormal biopsies associated with it?

A. No, I'm not aware of any literature of that nature.

Q. What do you think of Dr. Phillips' research?

MR. ISMAIL: I don't want -- the rate of statin -- let me start again.
MR. HOPPER: Okay.
BY MR. ISMAIL:
Q. You have opined that former Baycol patients could have had a Baycol-induced myopathy notwithstanding a normal CK test; is that true?
A. There's no data that I'm aware of of absolute numbers on that.
Q. Okay. Are there any data on the relative number of that?
A. No.
Q. Is there any data of a rate with which that occurs?
A. No.
Q. Can a patient have persistent pain with no elevation in CK?
A. Yes.
Q. What's your support for that statement, sir?
A. Well I think the Phillips article shows that, but also from a pathophysiologic standpoint you

certainly could have a low level myopathy going on
that didn't elevate CK that could produce pain.
Q. Do you know of any pathophysiological research other than Dr. Phillips' work that would support the notion that patients with normal CK can have persistent pain?
A. Not directly.
Q. That is, there's no research directly on statin myopathy that would support that view, correct?
A. That's correct.
Q. Now it's certainly true that not all statin patients suffered an adverse event, right?
A. Certainly, yes.
Q. And in fact most patients on statins don't suffer an adverse event?
A. Statin as a class of drugs is a terrific class of drugs that has done a great deal of good for mankind.
Q. Certainly you would agree that not all Baycol patients suffered an adverse event?
A. That's true.
Q. Have you seen any report or literature

there are no specific longitudinal studies of recovery from Cerivastatin-induced myopathy; what does that mean, sir?

A. There is no published data on how long it takes to recover from Cerivastatin-induced at this time.

Q. Is there any literature that supports the idea that a patient's pain or weakness from a statin can persist following the termination of the statin?

A. Yes, as a matter of fact there is and if you had read the abstract that I submitted as a late abstract to you yesterday, you would see that there's been a study that's just been published, it's an abstract that's been published in the American College of Rheumatology that looks at long-standing chronic pain and weakness due to statins.

MR. ISMAIL: Can you please mark this.

(Mayer Deposition Exhibit No. 3 was marked for identification.)

BY MR. ISMAIL:

Q. Doctor, Exhibit 3 is a three-page document with a cover E-mail to you?

because I think most of the plaintiffs' experts were on the phone conference, but.

BY MR. ISMAIL:

Q. This was a conference, how long ago was this?

A. Three days ago.

Q. So this week?

A. Yeah.

Q. Was it Monday?

A. Yes.

Q. Tell me everyone who you recall being on the phone.

A. It was Dr. Zizic, Dr. Boult, Dr. Carlson, Dr. Farquar, Dr. Richman, Dr. Corpor -- Corbett, I'm sorry.

Q. Have you ever heard of a Dr. Kapit?

A. I think Dr. Kapit was, as well.

Q. Dr. Chengelis?

A. I don't recall that Dr. Chengelis was on the phone.

Q. Dr. Schinagl?

A. No.

Q. Dr. Austin?
A. Might have been, but I'm not sure.
Q. Dr. Raskin?
A. Again, I'm not sure.
Q. Who told you about the conference call?
A. I believe Stacy Hauer did.
Q. Was there any correspondence setting up the call?
A. Just an E-mail.
Q. Did you retain that E-mail?
A. No.
Q. You deleted it?
A. Yeah.
Q. Was there an agenda for the call?
A. No.
Q. What was the purpose as you understood it?
A. The purpose was that the -- well, just overall we were getting prepared for upcoming depositions and making sure that we had the latest evidence and we exchanged ideas kind of before.
Q. So the list of plaintiff experts that you just testified to had a conference call on

January 26th to discuss the upcoming depositions; is that fair to say?

A. That's fair to say.

Q. That would include the opinions expressed in the Baycol litigation?

A. Yes.

Q. And you in the context of this phone conference learned of this rheumatology abstract?

A. Yes, Dr. Zizic said by the way there's this new abstract that came out in the last month or two and I think you all should read it.

Q. Prior to the conference on Monday, you weren't aware of the rheumatology abstract?

A. That's correct.

Q. And Dr. Zizic suggested it may be useful in regards to your opinions in this case?

A. Yes.

Q. Did he suggest any other literature that you review?

A. No, he did not.

Q. Did any of the other experts on the phone call suggest other literature that you should review?

A. I believe this was the only article that came out of that conference that we decided would be worthwhile looking at that we hadn't looked at before.

Q. Did any of the plaintiff lawyers suggest that the plaintiff experts look at any other materials?

A. No.

Q. How long did the conference last?

A. I don't remember exactly, an hour.

Q. Did you take any notes?

A. No.

Q. Did you write anything in the margin of your own report?

A. No. Frankly it was a boring conference and it was hard to hear people because there were 10 people on at once.

Q. The abstract then is on the third page of Exhibit 3; is that correct?

A. That's correct.

Q. And the abstract in question, is that from, is that on the top of the left column?

A. Yes.

Q. The natural course of statin-induced myopathy?

A. That's correct.

Q. How would you describe the nature of this study?

A. Well I think it was a very good retrospective study. They reviewed 217 patients who had taken statins, found that 30 of them had muscle complaints. Found that out of those, 7 had weakness, or actually 10 had weakness and they found that 15 of 20 had elevated CPK levels, one patient had a severe rhabdo.

They looked at the patients, one of the nice parts is they followed the patients for nine months and looked at how many had symptoms at each point in time, which is the first time I'm aware of anybody doing this with statins.

They found that at two months 36 percent had their symptoms completely resolved, so two-thirds of them did not. And then at nine months, about 25 percent of the patients had ongoing symptoms, so.

It's very clear from this article

substantiating what I had clinically stated in my opinion that it takes months to recover from this and it exactly mirrored what I had said back in November before I had ever read the article from my clinical impressions of these patients.

So I found that reassuring that the scientific evidence supported my clinical suspicions.

Q. You understand that this study in Exhibit 3 was done using ICD 9 codes from a claims database?

A. Yes.

Q. Do you find that to be a reliable method of epidemiological study?

A. What they did was they identified the 217 patients who were taking the statins that way. They then looked at their charts in much more detail so that I think that's a very acceptable way of determining things.

Q. The subset of patients who are identified by using ICD 9 codes for myositis and myopathy due to an adverse reaction to a cholesterol lowering agent, correct?

A. There's no ICD 9 code that I'm aware of

that's that specific. What they did is they took ICD 9 codes of patients who had muscle disease and then they looked at those 217 patients and found that of those, 30 of them had been taking statins.

Q. Do you find the use of ICD 9 codes to identify the cohort of patients to look at a reliable method of epidemiological research?

A. That's a very standard way of measuring it.

Q. So you find it reliable?

A. Yes.

Q. So you understand that there were 217 patients identified from this database, right?

A. Correct.

Q. And 30 of the patients presenting with these muscle type symptoms were taking a statin?

A. Correct.

Q. And 20 patients had CK tests of the 30 -- I'm sorry, yes, 20 had CK tests?

A. 20 had CK tests and 15 of those 20 had elevated CKs, yes.

Q. And then they also talk about how 26 of the 30 patients discontinued their statin use?

A. That's correct.
Q. And then there were the statistics on recovery here.
A. Correct.
Q. Do you know how the author of this abstract determined recovery in the patients in the cohort?
A. I think it was predominantly by symptoms, judging from what the study says, but I have not personally spoken to the authors to know that.
Q. Did they speak to the patients?
A. Like I said, I do not know the details of that. I would probably refer you to Dr. Zizic who I did, I do know spoke directly to the authors of the paper and knows a lot more about the details of this study.
Q. Then you say that at two months, 11 out of 30 patients had completely resolved their muscle complaints?
A. Yes.
Q. And then at nine months, 16 of 21 returned to baseline?
A. Correct.

Q. Do you know of the patients in this group, there were only 5 that were on a statin and had normal CK?

A. 5 of 30, yes.

Q. Okay. And this article doesn't tell you anything about the rate of recovery of patients who had normal CK?

MR. HOPPER: Objection. There's no question pending. It's counsel testifying.

BY MR. ISMAIL:

Q. Isn't that correct, sir?

A. Is what correct?

Q. Isn't it true that the abstract in Exhibit 3 doesn't tell you anything about the rate of recovery for patients with normal CK?

A. It doesn't specifically break down those 5, but I'm sure there's way of getting that data.

Q. It's not published, is it?

A. It's not published.

(Recessed 1:38 p.m.)

(Reconvened 1:39 p.m.)

BY MR. ISMAIL:

Q. Dr. Mayer, I'd like to direct you to the conclusions reflected in the abstract.
A. Yes. Yes.
Q. In this retrospective study, most subjects with musculoskeletal symptoms attributed to statin therapy experienced resolution of symptoms within six months of therapy cessation?
A. Yes.
Q. Do you agree that it's true that most patients who have musculoskeletal symptoms from a statin experience resolution within six months of stopping the statin?
A. Well that's what the data shows. It also shows 25 percent still had symptoms at nine months, so some patients, a substantial proportion of patients had very long-standing problems and six months isn't a very short time, either. I mean to be sore and weak for six months is not trivial.
Q. Would you agree that most patients with statin-induced muscle complaints experience complete resolution of symptoms within six months of stopping the statin?

MR. HOPPER: Objection, asked and answered.

THE WITNESS: The data indicate that most patients were getting better by six months, but there was a subset that were not, which is exactly what we've said, there's a continuum of disease here.

So there's everything from the patients that got better at two months, which was a small proportion of the patients, about a third, to patients who had virtually permanent damage from this at nine months, including one patient who had severe rhabdo.

So, there's a whole spectrum here. The other thing that I would like to point out is that this study was conducted after Baycol was pulled from the market, so we are talking about people who are on other statins, not on Baycol. And given the fact that Baycol is probably 80 times worse than the other statins, I suspect these numbers are much worse than that for Baycol. Logic would dictate that, you know, given that it causes more severe muscle damage, the prognosis is probably worse.

So these are with the good statins that have very infrequent problems with myopathy, unlike

Baycol.

MR. ISMAIL: Non-responsive, move to strike.

BY MR. ISMAIL:

Q. Do you remember my question, Dr. Mayer?

A. Your question was regarding whether patients were better at six months and I responded to you.

Q. My question was whether you agreed whether or not most patients with statin-induced musculoskeletal complaints experienced resolution of their symptoms within six months?

MR. HOPPER: Objection, asked and answered, counsel is being argumentative and counsel is intimidating the witness. He's asked -- you've asked the question and he's answered it in his --

BY MR. ISMAIL:

Q. Dr. Mayer, can you answer my question, please?

A. I mean your question is just reading the statement from the abstract that I agree with.

Q. So you agree with that statement?

issue I would draw a little distinguishment with the authors about.

But clearly their data shows that most people get better, which is what we suspected and that's why my operational definition reads the way it does, which is that we suspect most people will get better and we don't expect people to get worse, which is a benign course, in the sense that they are not getting worse.

Q. Let's see if we can agree on what conclusions, if any, you can take away from Exhibit 3.

A. Uh-huh.

Q. First, would you agree that none of the patients reflected in this abstract were taking Baycol?

A. As far as I know, that is true.

Q. Second, the abstract does not publish any data with respect to the prognosis of patients who have normal CK while on the statin?

A. It doesn't differentiate out that subset of patients.

Q. Three, the authors of the study conclude

that myotoxicity from a statin has a benign clinical course with discontinuation of the statin and supportive therapy?

A. That's the words they used. I think what they meant by benign is that it didn't get worse.

Q. And you're saying what they meant even though you never have spoken to the researchers of this study, correct?

MR. HOPPER: You asked him if he agreed or not, Tarek, and he's telling you.

BY MR. ISMAIL:

Q. Dr. Mayer, can you answer my question?

A. I have never spoken to the authors and I'd refer you to Dr. Zizic, who has.

Q. And up until 48 hours ago, you had never even seen this research?

A. That's correct.

Q. When you wrote your expert report in this case, you had never seen this research?

A. That's correct. But I think it very much substantiates what I said in my report.

Q. And you don't know how the patients in this

that, I will end the deposition because --

MR. ISMAIL: I'm not asking him, I don't mean --

MR. HOPPER: Well I'm just giving you heads up, because I saw where you were going a moment ago and if you want to get back to your outline and back to the questions here, that's fine.

BY MR. ISMAIL:

Q. Now, Dr. Mayer, are you aware of any medical research that would support the notion that a patient with normal CK can have muscle symptoms persist after the discontinuation of a statin?

A. I don't know that anybody has studied that at this point.

Q. You're not aware of any such research?

A. That's correct.

Q. Correct? Thank you.

Are you expressing any opinions, sir, about the prognosis of patients who had normal CK contemporaneous with their statin use?

A. I'm not expressing an opinion about that particular subgroup of patients separately. What I've

informative of statin myopathy, right?

A. I think it's a model to look at in terms of what the range of outcomes may be.

(Mayer Deposition Exhibit No. 4 was marked for identification.)

BY MR. ISMAIL:

Q. Dr. Mayer, is Exhibit 4 the AZT myopathy study to which you refer in your report?

A. I believe so. Let me check. Indeed it is, yes.

Q. Well, did you read this article before you submitted your report?

A. Of course.

Q. Are you aware of any medical literature suggesting a similarity between AZT myopathy and statin myopathy?

A. They are similar only in the sense that they are both drug induced. In terms of the exact mechanism of injury to muscles, I don't know that we know that they are similar, but they are similar in the sense that a patient was taking a pill every day and got muscle damage.

So in that sense, it's a model that's useful to look at. I don't mean this to substitute for a more comprehensive study of Cerivastatin-induced myopathy, but I think it's worthwhile looking at what other drug myopathies do.

Q. Different, there are lots of different myopathies, right?

A. Correct.

Q. And different myopathies may have different prognoses?

A. Absolutely.

Q. So you're not saying that AZT myopathy is the same thing as statin myopathy?

A. No, I'm not.

Q. And you're not saying that the prognosis from AZT myopathy will tell us what the prognosis is for statin myopathy?

A. No. What I am saying is that we know that drug-induced myopathies, in general, can produce long-term muscle weakness in some patients and that's merely the point I was making with this.

Q. Have you written anywhere before you did

the expert report in this case suggesting that AZT myopathies is informative of the prognosis from statin-induced myopathy?
A. No.
Q. And you're not aware of any other literature citation that has made that link, correct?
A. I don't believe it's been cited in other literature.
Q. Isn't it the case, Dr. Mayer, that every patient in the AZT myopathy study had abnormal CK?
A. Yes.
Q. So Exhibit 4 doesn't say anything about the prognosis of myopathy in patients with normal CK, correct?
A. That's true.
Q. On page 3, sir, under the first line under discussion.
A. I'm sorry, page 3 of the article?
Q. Yes, sir. Discussion?
A. Yes.
Q. The major finding in this study was the reversibility of proximal muscle weakness and myalgia

Q. Now again, you're not suggesting that steroid-induced myopathy is the same thing as statin-induced myopathy, are you?

A. No.

Q. In fact, steroid myopathy affects a much, is a much different mechanism than the hypothesized mechanism for statin myopathy?

A. Actually I don't know that it was much different, but I don't mean to say that steroid myopathy is the same as statin myopathy.

I think that it's certainly a different model. What I'm pointing out here is that drug-induced myopathies causes long-lasting weakness.

Q. But not all drug-induced myopathies are the same thing, are they, Doctor?

A. That's correct.

Q. And prior to your expert report in this case, you've never seen anyone suggest in writing a similarity between steroid-induced myopathy and statin-induced myopathy, correct?

A. Not that I'm aware of.

Q. You then talk about astronauts returning

from space flight?
A. Yes.
Q. And the effect that zero gravity may have on astronauts' muscles, correct?
A. Correct.
Q. Prior to writing your expert report in this litigation, have you ever seen anyone suggest in writing a similarity between zero gravity muscle problems and statin-induced myopathy?
A. No.
Q. You write in, towards the end of the paragraph, muscle strength in the absence of fibrosis and scarring will generally recover approximately 3 percent per week in healthy young adults.
Do you see that, sir?
A. Yes.
Q. Can you tell me what support you're relying upon for the 3 percent recovery rate?
A. That's frequently cited in chapters regarding muscle damage in general that it recovers at about a 3 percent per week rate.
Q. Does this rate of recovery depend upon the

surgically-induced slicing of a muscle in surgery, that that muscle will recover at a rate about 3 percent per week, so that each week they will get 3 percent stronger and it's a cumulative affect. It's kind of like an interest rate that you get from the bank that compounds itself.

Q. I'm just trying to understand sort of the end game here of this 3 percent recovery rate.

Is it 33 weeks, is the math wrong, I mean is that --

A. At 33 weeks you would be mostly, most patients would be mostly recovered, yes.

Q. Okay. Now how is it if that's the rate of recovery that Dr. Phillips' patients had their muscle symptoms resolve upon discontinuation of the statin in the short time frame that he was studying his patients?

MR. HOPPER: Objection, vague and compound.

THE WITNESS: I don't think that he was, first of all, he didn't show resolution of the muscle damage, he showed resolution of the symptoms, but that was resolution of the symptoms while they were on the

recovery rate, isn't it?
A. Well we already established that we don't know what was meant by resolution of symptoms in that study and I don't know whether they did quantitative strength testing, so just asking the patient if their strength felt normal is not the same as doing strength testing. It's very possible that many of those patients may have had a few percent loss of strength at the two month mark and felt pretty good, so they marked it as being normal, so.
Q. We don't know one way or another how the rheumatology abstract tested for muscle strength?
A. That's correct.
Q. Do you know of any literature that would support the idea that a patient can get scarring in the absence of cell death in a statin myopathy case?
A. I think scarring likely requires cell death.
Q. I was, if you turn to paragraph 20, bear with me for a second. You say, sir, that the muscle fibers are surrounded by satellite cells; do you see that in the fourth line down?

A. Yes.
Q. Then you say these are stem cells which can mature?
A. Yes.
Q. The these in that sentence is referring to the satellite cells that surround the muscle fibers?
A. That's correct.
Q. Is it your opinion, sir, that the satellite cells that surround muscle fibers can turn into fibroblasts?
A. That's correct.
Q. What support do you have for that assertion, sir?
A. I, stem cells are what are called multi-potential cells. They can develop either into -- they can develop into different tissue types and so, you know, its basic muscle physiology issue is that these cells as they repair damaged tissue can go one way or the other. So they can either become normal muscles or they can become scar tissue. That's how scar tissue is formed.
Q. Okay. Would new scar tissue in a patient

recovering from a statin-associated myopathy be discoverable by biopsy?

A. It could be.

Q. Can you cite me to a single study demonstrating formation of new scar tissue from an episode of statin-induced myopathy?

A. I can't cite one off the top of my head, but I bet some of the other, many other colleagues could. I suggest you ask Dr. Carlson that, that's more his area of expertise than mine.

Q. But you're not aware of any such study?

A. I'm aware in a generality, but I can't tell you the specific study, so I'd rather have, you know, you've got lots of experts in this case and you're asking me questions about basic science, which is not my area of expertise, admittedly, and --

Q. I'm asking you that because you talk about stem cells and scarring and this process of muscle regeneration.

A. Correct.

Q. So I want to make sure I understand the basis for your opinions in this case; is that fair?

clinically.

Q. Are you aware of, other than your clinical experience, are you aware of any study demonstrating that muscle injury from a statin can be permanent?

A. I think the evidence from the studies, for example, from the American College of Rheumatology paper shows 25 percent of patients had ongoing problems at nine months, that's pretty close to permanent. I would doubt that many of those patients recovered full function, ultimately. That's nine months, that's a long time.

Q. Are you aware of any scientific study demonstrating that muscle injury in a patient with normal CK can persist, say, greater than six months after stopping a statin?

A. I'm not aware of any specific study that shows that. That doesn't mean it might not be in individual cases.

Q. I think you agreed earlier that the extent of the muscle damage influences the rate of recovery?

A. Yes.

Q. And that patients may recover slower from a

MR. ISMAIL: Well then we are going to talk about it.

I've given you several opportunities to put some walls around it and I guess I'm not satisfied that we have.

MR. HOPPER: Well let me try it this way, I'll give you, I'll put some walls around it, then.

He's not a drug safety expert. He's not an FDA expert. And the questions you're going to ask and if you want to do it and go ahead and take up the time to do it, I'm going to object to every single one of them as being irrelevant and I think you're wasting time following this line of questions.

Quite frankly, I don't know that he knows the answers and I'm not going to stop him from answering, if he knows.

But it's a waste of time and it's irrelevant and you have two other experts and it's late in the day and he's not being offered as a drug safety expert and he's not being offered as an FDA expert.

BY MR. ISMAIL:

To support your opinion that Baycol was more dangerous than other drugs in the class, you have, you're relying on the reporting rates of spontaneous adverse events, the bio-availability of the various drugs, the metabolic profile of the drugs and the fact that Baycol alone was withdrawn from the market; is that correct?

A. That's correct.

Q. Is there any other support you have for your opinion that Baycol was more dangerous than other drugs in the class?

A. I think that's pretty good evidence.

Q. That's not what I asked, sir.

A. I said that would be what I would rely on.

Q. There's nothing else?

A. There's nothing else that I can point to right at this moment.

Q. Okay. Let's take them one by one.

Bio-availability, what study has demonstrated that differences in bio-availability results in Baycol being more dangerous than other drugs in the class?

MR. HOPPER: Objection, vague.

THE WITNESS: The bio-availability means the amount of drug that's in the system at a given time and one of the things that Baycol did in its initial testing of the drug was show that the bio-availability was much higher and insinuated that that would lead to a more dramatic lowering of cholesterol than with other agents.

I think the data will show that that wasn't correct, but what it did result in, in my opinion, is that it made the drug more available to cause side effects to the muscle cells.

BY MR. ISMAIL:

Q. Can you cite me to any scientific study establishing a link between the bio-availability of Baycol and any purported safety issue with the drug?

A. I think other witnesses will point you in that direction.

MR. HOPPER: Right.

BY MR. ISMAIL:

Q. You are not prepared to make that link, are you, sir?

A. I'm not prepared to make that link. You're better off talking to a pharmacologist who can do that better.

Q. That may be true, but you listed it as a basis to support your opinions in this case.

A. Correct.

Q. And let's make sure that I actually get an answer to my question, which is are you aware of any scientific study establishing a link between the bio-availability of Baycol and any purported safety issue with the drug?

A. I am not.

Q. You also talked about the metabolic profile; is that correct?

A. Yes.

Q. What specifically about the metabolic profile relates to the safety of Baycol?

A. Baycol is metabolized differently from other statins and there's a dual metabolism mechanism in the cytochrome B-450 system and what that does pharmacologically is it offers two opportunities to interact with other drugs, as opposed to one, and that

makes it less safe.

Q. Is the issue of dual metabolism for Baycol relate solely to its potential for drug interaction?

A. Yes.

Q. Would you agree with me that the dual metabolic profile for Baycol does not relate to the safety of the drug when used in monotherapy?

A. I think it probably does not, but I think that would be a better question for a pharmacologist, but it clearly has an impact on its relation to concomitant medication use, which is a huge issue in these patients. Patients are taking Baycol as a sole agent and these are patients that have heart disease and they are usually on multiple drugs.

Q. What study, sir, has demonstrated that Baycol's dual metabolic pathway increases the chances of a drug interaction when compared to other drugs in the class?

A. I believe Dr. Farquar has gone through that information.

Q. Are you aware of any scientific study demonstrating that Baycol's dual metabolic profile

increases the likelihood of any drug interaction?
A. I, I will not be testifying as to the specifics of that. I will let our pharmacologists testify to the specifics of that. So, you know, we've got a, there are a panel of experts here that cover a wide range of expertise and I think you will see a mosaic of evidence, overall. It's not all going to come from me or any one of our experts about how unsafe this drug is, but I think the overwhelming evidence is that it's a very unsafe drug.
Q. Can you answer the question I asked?
A. The answer to the question that you asked is, no, I cannot specifically cite the study because it's not my area of expertise.
Q. Okay. Now you pointed me to, for example, bio-availability as support for the testimony that Baycol was more dangerous, correct?
A. Yes.
Q. Yet you're not aware of any study making that connection, correct?
A. I said I couldn't cite a specific study making that connection because that's not my area of

A. In November and December.

Q. Was it early on after you got retained?

A. Within a few weeks of being retained.

Q. Well the dates of your report, is your report dated?

A. December 1st, I believe.

Q. I believe that's true, okay.

A. So I, I got those reports probably sometime in November.

Q. Is it fair to say, Dr. Mayer, that you are not qualified to give statements about comparative safety based upon a drug's bio-availability?

A. That's fair to say.

Q. Is it fair to say, sir, that you are not qualified to give opinions about a drug's comparative safety based upon the drug's metabolic profile?

A. That's fair to say as well.

Q. Is it fair to say that you are not qualified to give opinions about a drug's comparative safety based upon regulatory action taken by the FDA or voluntary action taken by a drug company?

A. That's correct.

that is, as part of your work in this case, have you investigated the potential biases that may impact statin adverse event reporting?

A. I'm not sure how you would define investigate. I, I am aware of what those biases may be or some of those biases may be, but I haven't done any formal investigating into them. That's not my role in this case.

Q. Have you made any effort to assess the relative reporting rate of spontaneous adverse events with statins by controlling for biases that are part of the data?

A. No.

Q. Have you in any context for any drug made any investigation into biases that affect adverse event reporting?

A. No.

Q. Have you done a literature review either in this case or for any other exercise to determine what others have said about biases in spontaneous adverse event reporting?

A. I have read commentaries and editorials,

et cetera, about Cerivastatin, but in terms of doing a formal review, no.

Q. Do you know what the FDA has said about the reliability of using spontaneous adverse event data to compare the safety of drugs in a class?

A. I am aware the FDA actually forbids it to be used for competitive advantage from a legal standpoint.

Q. Do you know of, when you say you're aware of that, in what context have you become aware of that FDA prohibition?

A. I've been aware of that for a while in the context of, for example, pharmaceutical representatives when they see you can't tell you, you know, their reporting rates versus other peoples' reporting rates in order to use that for a competitive advantage. That's an illegal activity.

Q. What is your understanding as to the reason why companies cannot use spontaneous adverse event data to compare themselves to other drugs in the class?

A. I think the FDA does not want to be used as

an advertising agency.

Q. Are you aware of any guidelines the FDA has put out regarding whether spontaneous adverse event data can be used to show the relative safety profile of drugs?

A. I'm not aware of that.

Q. Prior to your expert report in this case, have you ever written a safety assessment of a drug based on its spontaneous adverse event record?

MR. HOPPER: Objection, irrelevant.

THE WITNESS: No.

BY MR. ISMAIL:

Q. Is it fair to say, sir, that your interpretation that the relative reporting rate for Baycol says something about its safety profile is based in part upon what you've learned from Dr. Farquar, for example?

A. Yes, it is based in part on that. In part it's based on plain common sense.

I mean we are not talking small differences here. I mean if we were talking a reporting rate that was .1 percent different between the different

MR. HOPPER: He said he didn't know.

THE WITNESS: I don't know.

BY MR. ISMAIL:

Q. You are not being offered as an expert in the, in any supposed epidemiological flaws in the PacifiCare study, are you?

A. No, there are other experts for that.

Q. And you're not going to be opining at trial about any epidemiological flaws in the PacifiCare study, are you?

A. No, unless you ask me questions at trial about the PacifiCare study and want to, you know, have me agree with the PacifiCare study. I will have to point out what I perceive to be flaws in it.

You know, you asked me if I agree with something, I'm obligated to say why I disagree with it. But if you don't want to ask me about it, I won't opine any answers about it. If you ask me about it, I have to answer it some way.

Q. In paragraph 11, sir, the 43 times higher, that is a rate of spontaneous adverse events, correct?

A. Yes.

Q. And the 80 times more frequent is the, is, again, spontaneous adverse events?
A. Correct.
Q. Correct?
In Paragraph 19, sir, you again have the 43 times more frequently?
A. Yes.
Q. Again, that is a rate of spontaneous adverse events, correct?
A. That's correct.
Q. In paragraph 16, sir, you have myopathy rate of 1 percent for .4 dose?
A. Yes.
Q. Do you know where that comes from?
A. I believe I saw that data in the European agency information, which was summarized by the European agency.
Q. That's not a figure you took from the clinical trials themselves?
A. That's correct.
Q. And then you have 5 percent myopathy rate for elderly women?

they used, yes.
Q. Have you seen any data, sir, comparing the relative rate of statin-associated myopathy with normal CK?
A. No.
Q. If you look at paragraph 19 again, sir. You say the degree of muscle damage is worse than other statins.
A. Yes.
Q. What support did you have for making that statement?
A. The adverse event reports. The more severe the muscle damage is, the higher those ratios get, so the ratios of death is 80 times more, the ratio of rhabdo is 43 times more.
Q. Have you reviewed the clinical trials to see what the rate of muscle pain without CK elevations were for Baycol?
A. No, I have not.
Q. Have you seen any suggestion that for statins as a whole in the clinical trials muscle pain was reported no greater than the rate was with a