# Exhibit A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| In re: BAYCOL PRODUCTS LITIGATION | ) | MDL No. 1431 (MJD/JGL) |
| | ) | |
| | ) | |
| | ) | |
| This Document Relates To All Actions | ) | |

**<u>EXPERT WITNESS REPORT OF STEPHEN RASKIN, M.D.</u>**

I, Stephen Raskin, M.D. hereby state as follows:

1. I am a practicing cardiologist in Alameda, California. I have been Board Certified in Internal Medicine since June, 1976, with a subspecialty Certification in Cardiovascular Diseases since October, 1977. I am currently serving as an Associate Clinical Professor of Medicine at the University of California, San Francisco Medical Center, San Francisco, California. Since 1977, I have served as the Director of the Coronary Care Unit at Alameda Hospital in Alameda, California. I am an Attending Physician at the Highland Hospital, Oakland, California, and the Veterans Administration Medical Center, San Francisco, California. I am a member of the active medical staff of Summit Medical Center, Oakland, California, Alta Bates Hospital, Berkeley, California, and the San Leandro Hospital, San Leandro, California. I am a fellow of both the America College of Cardiology and the American College of Chest Physicians. I have served on the American Heart Association's Council on Arteriosclerosis and Thrombosis and its Council on Clinical Cardiology. I am also a member of the American College of Physicians, the American Society of Echocardiography, and the Society of Atherosclerosis Imaging. A true and correct copy of my curriculum vitae, further outlining my training, publications and experience, is attached as Exhibit 1.

EXHIBIT
Raskin 2
2-2-04

2. I have a cardiology practice, research and continuing education interest in preventive cardiology, including the identification of novel coronary risk factors and, in particular, the treatment of hyperlipidemia (high cholesterol). I recently co-authored, "Genetic analysis of a polymorphism in the human apolipoprotein A-V gene: effect on plasma lipids," Journal of Lipid Research in 2003. I have been a frequent invited lecturer on lipid management and pre-clinical coronary artery disease detection. Venues have included: the Advanced Cardiovascular Risk Management Training Course (Berkely HeartLab and Cholesterol, Genetics, and Heart Disease Institute), on October 18, 1997; the 4th Annual Stanford University School of Medicine's Program for the Atherosclerosis and Cardiovascular Therapies (PACT), on February 21, 1999; and the Electron Beam International Symposium, New Orleans, September 20-22, 2002.

3. I was invited by Bayer to participate in its September, 1999 program, "Emerging Trends in the Management of Dyslipidemia: An Update for Speakers of the Baycol Clinical Advisory Panel." The meeting was sponsored by Bayer, for the purpose of providing physicians with information about Baycol and to provide these physicians, the "Baycol Clinical Advisory Panel," with communication skills for anticipated future presentations to medical professionals about Baycol and statin therapy.

4. In forming my opinions in this case, I have reviewed the information Bayer shared with health care professionals regarding Baycol, in the form of package inserts and letters to health care professionals. I have also reviewed a number of Bayer's internal documents and communications, some of which are discussed specifically below and all of which are listed on Exhibit 2 to this Report. I have also reviewed the materials provided to me by Bayer in connection with the "Baycol Clinical

Advisory Panel." A list of previous testimony and my fee schedule are attached as Exhibit 3.

5. As a treating cardiologist who regularly prescribes medications to patients, I reasonably and necessarily rely upon drug manufacturers to provide accurate and complete information regarding the efficacy and safety of their pharmaceuticals.

6. Based upon my review of the information known to Bayer internally, and of the information the company provided to the medical community, I and other physicians were not informed about key and very material concerns relating to Baycol's efficacy and safety. In particular, Bayer failed to disclose to the medical community important information about the risk of muscle injuries associated with the use of Baycol. This information, which is described more fully below, is and was precisely the type of information I and other practitioners reasonably expect and rely upon drug manufacturers to provide to us.

7. Bayer's public communications repeatedly stated that there were no cases of rhabdomyolysis during "extensive clinical studies" of Baycol. For example, packaging information dated November, 1998, disclosed that rhabdomyolysis has been reported only "since market introduction." As another example, Bayer's "Dear Health Care Professional" letter of December, 1999 regarding the contraindication with gemfibrozil stated that, "While no cases of rhabdomyolysis were reported during the extensive clinical trials of Baycol (cerivastatin sodium tablets) there have been a number of cases reported during the post-marketing period, ..." (BAYCORP01973816). Likewise, in its original packaging materials and PDR information for Baycol, dated September, 1997, Bayer stressed that, "Rare cases of rhabdomyolysis with acute renal

failure secondary to myoglobinuria have been reported with other HMG-CoA reductase inhibitors." (emphasis supplied).

8. Contrary to Bayer's repeated representations about having no cases of rhabdomyolysis during the clinical trials, at least one patient, Patient 1301, did develop rhabdomyolysis during a pre-marketing clinical study. This patient suffered an extreme elevation in CPK, which reached a peak of 36,650. The patient also suffered myoglobinuria. Because of this condition, the patient was discontinued from Baycol. (See BAYCOPR00000892, BAYCORP00141991 and BAYCORP02695739).

9. Bayer began receiving post-marketing reports of rhabdomyolysis and myopathy in association with Baycol use almost as soon as the drug went on the market, in early 1998. Bayer had received at least seven reports of "rhabdomyolysis and similar reports," with elevated CPKs ranging from 3,180 to 71,500 by May 28, 1998. (BAYCORP01435512). By March 31, 1999, reports of rhabdomyolysis with Baycol had jumped to thirty-five, including some with renal failure. (BAYAG00025695). By that point, Bayer had also pulled four female patients from its clinical study of a 1.6 mg dose due to CPK elevations. (BAYAG00025698). By May, 1999, Bayer was aware of at least fifty-eight cases of rhabdomyolysis in patients taking Baycol, only about half of which involved combination therapy with gemfibrozil. (GSK_BL_00448252).

10. Perhaps in response to the growing reports of rhabdomyolysis in patients taking Baycol, in February, 1999, Bayer requested information from the FDA on rhabdomyolysis adverse event reports for other statins. (BAYCOPR00247032). With this data, Bayer compared the rhabdomyolysis and increased CPK reports from Baycol patients versus patients taking other statins. The results were significant. Comparison of

the adverse event reports received by the FDA through March, 1999, demonstrated a markedly higher reporting rate of rhabdomyolysis with Baycol as compared to the other statins. (BAYAG01055749, BAYAG01055750).

11. The increased adverse event reporting rates for Baycol did not disappear, but grew over time. Bayer's chart comparing adverse event reporting data through June, 1999, vividly demonstrated that compared to other statins, Baycol was associated with between 5 and 67 times as many reports of rhabdomyolysis. (BAYCORP02878488). An email from May 6, 1999 referenced Baycol's "recently acknowledged greater incidence of rhabdomyolysis" based upon the report of the Bayer safety department's rhabdomyolysis surveillance information. (GSK_BL_00448252). Bayer's comparison of spontaneous reporting data from the World Health Organization through September, 1999 showed that Baycol use was associated with between 14 and 59 times as many reported cases of rhabdomyolysis in the United States. (BAYAG01060224).

12. During the entire time that Baycol was on the market, Bayer never informed me, nor the medical community as a whole, about the very important data showing that Baycol was more dangerous than other statins. Doctors and patients had a right to know these facts in order to make informed decisions about which of the six available statin medications would provide the greatest benefit and the lowest risk of adverse events. Bayer's failure to disclose is not justified by the fact that the data is based on adverse event reports; any doubts about the precision of such data pale by comparison to the overwhelming evidence of greater risk demonstrated by reporting rates orders of magnitude higher for Baycol than for other statins. This is particularly true

where the reporting rate for Baycol was many times higher than the rate for Lipitor, a statin that went on the market at about the same time as Baycol. Comparing the adverse event reporting rate for Baycol with the rate for Lipitor refutes any argument that Baycol's higher rate was due to a "new drug" reporting bias.

13. Indeed, Bayer's own scientists found the adverse event data strong enough to state,

> The findings indicate that in patients receiving mono-therapy, cerivastatin substantially elevates the risk for rhabdomyolysis compared with other statins. In combination with gemfibrozil, cerivastatin patients were also found to be at a remarkable disadvantage compared with patients receiving gemfibrozil and another statin.

(BAYCORP 00135576). I am confident that I would have reached the same conclusion if Bayer had disclosed their data to me, and I would have prescribed one of the other available statins to my patients.

14. Information about adverse event reporting rates is important to practicing physicians. Indeed, continuing medical education materials on statins prepared by the Vascular Biology Working Group ("VBWG"), after Baycol was withdrawn from the market, contain exactly the kind of comparisons that Bayer did not disclose to the medical community. I am a member of the VBWG, an organization that serves as a forum for the periodic review, exchange, and assimilation of findings from vascular biology research for dissemination to the clinical medicine community for the purpose of facilitating a consensus on what implications recent research findings have for present and future practices in patient care. Bayer could have and should have provided this information to practitioners years earlier.

15. Rather than providing its material and important knowledge about comparative adverse event rates for the various statins to the medical community, Bayer's packaging information in 1998 and early 1999 stated only that, "Rare cases of

rhabdomyolysis (some with renal failure secondary to myoglobinuria) have been reported with cerivastatin and other drugs in this class." The only change Bayer eventually made in response to this compelling data of which it was well aware was to omit the word "rare" beginning in December 1999 – so that the warning read, "Cases of rhabdomyolysis, some with acute renal failure secondary to myoglobinuria, have been reported with cerivastatin and other drugs in this class." Nothing in this packaging information suggested that adverse event reporting data revealed a significantly higher reporting rate of rhabdomyolysis with Baycol versus other statins.

16. In September, 1999, I attended a conference of the "Speakers of the Baycol Clinical Advisory Panels," hosted by Bayer, at Dana Point, California. The documents I have reviewed indicate that by the time of this conference, Bayer had performed the data analysis of adverse event reports described above, showing that Baycol was more dangerous than other statins. Despite this knowledge, Bayer's presentation to the approximately 65 cardiologists who attended made no mention of their analysis, nor the higher reporting rates of rhabdomyolysis with Baycol. Instead, the presentation continued to portray Baycol as a safe drug, with no more risk of rhabdomyolysis than other statins. An article distributed during the meeting, "Efficacy and Safety of Cerivistatin, 0.2 mg and 0.4 mg, in Patients with Primary Hypercholesterolaemia: a Multinational, Randomized, Double-Blind Study," stated that the adverse events reported during the study, including CK elevations, were "consistent with the adverse events reported during previous studies involving other HMG-CoA reductase inhibitors." While this may have been true with respect to the limited population of relatively younger and healthier subjects of the clinical trial, it was misleading for Bayer to present only this type of data, while concealing their data analysis showing much higher reporting rates of muscle toxicity for Baycol than for other statins among the more typical population of higher risk, older patients with multiple co-morbidities who were prescribed the drug. In practice, drug therapy is

targeted for the higher risk patients. Also included in the conference were presentations by communication experts to train the attendees for anticipated future presentations about Baycol. It is simply wrong for Bayer to have misled the cardiology community by concealing the adverse event analysis, and equally wrong to recruit cardiologists to further mislead other doctors who Bayer hoped and intended would portray Baycol as safe and effective medication, contrary to the information Bayer had at the time.

17. On December 15, 1999, Bayer distributed a letter to health care professionals recommending against concomitant use of Baycol with gemfibrozil (Lopid). This letter was false and misleading, both in its content and its omissions. First, the letter stated that there were no cases of rhabdomyolysis in Baycol clinical trials. As noted above, patient 1301 was a Baycol clinical trial rhabdomyolysis case. Second, the letter stated that all statins are associated with increased risk of myopathy in combination with gemfibrozil, while failing to disclose that the risk of combination use was greater with Baycol than with other statins. (See, for example, J.Dubb, memo dated 11/24/99, "Earlier this year, Bayer safety noted that there seemed to be a greater number of spontaneous adverse event reports of rhabdomyolysis associated with combined use of Baycol and Gemfibrozil than with other statins;" also indicating that the rate of adverse event reports was ten times greater for Baycol than for Lipitor, and that about half of the adverse event reports were associated with combination use. (GSK_BL_00267862)). Third, the December 15, 1999 letter misleadingly gave the impression that the problem was only with combination use, when in fact the same data showed a much higher risk with Baycol monotherapy than for other statins in monotherapy. Since Bayer apparently found the adverse event data to be a sufficiently reliable indicator of greater risk to issue the recommendation against combination use, there is no justification for failing to disclose the higher risk shown by the data in regard to monotherapy. Finally, it is highly significant that, by no later than November, 1999, Bayer knew of at least eight to ten cases of patients who were stable on other statins but

developed rhabdomyolysis shortly after switching to Baycol. (GSK_BL_00267862). This is highly suggestive of a greater risk with Baycol, yet the company's December 15, 1999 letter made no mention of it.

18. In conjunction with the issuance of the December 15, 1999 letter, Bayer warned the sales force not to, "unduly alarm physicians" by starting their Baycol presentation with the contraindication issue. (GSK_BL_00040275-76, BAYCORP01973799-800). Rather than encouraging an open and honest discourse about Baycol's risks, Bayer urged its sales force to emphasize that, "Baycol has been shown to be safe and well tolerated."

19. Moreover, by at least November 24, 1999, internal documents show that Bayer was aware of evidence that CPK elevations in its clinical trials for .8 mg dose appeared to impact elderly women in particular. (GSK_BL_00267862). Bayer never informed practitioners of this significant information. Again, this information is the type that doctors reasonably rely upon manufacturers to provide.

20. By February, 2000, Bayer was aware of at least 125 cases of rhabdomyolysis according to internal emails, including a number of deaths. (BAYCORP01437831).

21. Bayer did not communicate the increasing evidence of Baycol's toxicity to the medical community, even though this is the kind of information medical providers expect from drug manufacturers. Perhaps indicative of Bayer's attitude, in a string of emails from February, 2000 regarding rumors in the field of Baycol-related deaths, Patricia Stenger wrote, "So much for keeping this quiet." (BAYCORP01437832).

22. A Bayer chart comparing the confirmed U.S. rhabdomyolysis cases according to FDA data from October 1, 1999 through May 15, 2000 graphically demonstrated that Baycol resulted in markedly increased reporting rates of myoglobinuria, renal failure, CPK increases, serious muscle symptoms and

rhabdomyolysis. (BAYAG01306787). When only monotherapy cases resulting in rhabdomyolysis were compared, the risks of Baycol versus other statins was even more prominent. (BAYAG01306789, BAYAG01306790). This analysis confirmed the higher risk of toxicity that had been apparent in the data analyzed by Bayer in 1999 (see paragraphs 10 -15, above).

23. In July, 2000 and May, 2001, however, Baycol's packaging information still only stated that, "Cases of rhabdomyolysis, some with acute renal failure secondary to myoglobinuria, have been reported with cerivastatin and other drugs in this class." Bayer's "Dear Health Care Professional" letters dated May, 2001 and June 2001, which discussed labeling changes regarding the .8 mg dose and the dangers associated with combined therapy with gemfibrozil, stated that, "Rhabdomyolysis has been reported with all statins and is reflected in the corresponding prescribing information for all statins." (BAYCORP02012860; BAYCORP03192431). Again, nothing suggested the strong evidence of Baycol's greater toxicity compared to other statins.

24. Not only did Bayer fail to provide relevant, material information to doctors regarding the relative risks of Baycol, it pushed forward with plans to market even greater doses. Greater doses meant greater toxicity. Yet, in Bayer's .8 mg "Training Guide" for its sales force, the selling strategy for the .8 mg dose included the goal of establishing, "Baycol 0.8 mg efficacy as the new 'go-to' dose with significantly enhanced efficacy to compete with market leaders," and "that Baycol 0.8 mg is as well tolerated as 0.4 mg." (GSK BL 00142332). Bayer provided its field representatives with plenty of .8 mg free samples for doctors. In all, more than 26 million 0.8 mg tablets were distributed as free samples. (See, also, BAYCORP01995069, a case of such samples per field representative distributed starting in November, 2000). Between its launch in the late summer of 2000 and April 18, 2001, Baycol at 0.8 mg had received

169 adverse event reports for rhabdomyolysis worldwide, 13 of which resulted in death. (BAYCORP02392537).

25. Compounding the harm of Bayer's lack of accurate and complete reporting to physicians about the risks of Baycol compared with other statins is the fact that studies demonstrate that Baycol did not provide any greater benefits in cholesterol lowering properties. See, e.g. Weidmann, Ernst and Sprenger, Kuno, "Benefit-Risk Evaluation Report, CIOMS IV, Cerivistatin Sodium" at 22-29, 157 (BAYAG00915869 – 16089).

26. In summary, Bayer did not tell practicing cardiologists or the medical community what it knew about the risks of muscle toxicity associated with Baycol. In fact, Bayer misrepresented the risks as comparable to, or probably, safer than other statins on the market, in light of its supposedly advantageous dual pathways of metabolism, when in fact the data Bayer had collected showed a substantially higher risk of muscle toxicity and death. Had I known the information that Bayer possessed I would not have prescribed Baycol to my patients and I would not have agreed to participate on Baycol's Clinical Advisory Panel.

Dated:___________ ________________________________
STEPHEN RASKIN, M.D.

169 adverse event reports for rhabdomyolysis worldwide, 13 of which resulted in death. (BAYCORP02392537).

25. Compounding the harm of Bayer's lack of accurate and complete reporting to physicians about the risks of Baycol compared with other statins is the fact that studies demonstrate that Baycol did not provide any greater benefits in cholesterol lowering properties. See, e.g. Weidmann, Ernst and Sprenger, Kuno, "Benefit-Risk Evaluation Report, CIOMS IV, Cerivistatin Sodium" at 22-29, 157 (BAYAG00915869 - 16089).

26. In summary, Bayer did not tell practicing cardiologists or the medical community what it knew about the risks of muscle toxicity associated with Baycol. In fact, Bayer misrepresented the risks as comparable to, or probably, safer than other statins on the market, in light of its supposedly advantageous dual pathways of metabolism, when in fact the data Bayer had collected showed a substantially higher risk of muscle toxicity and death. Had I known the information that Bayer possessed I would not have prescribed Baycol to my patients and I would not have agreed to participate on Baycol's Clinical Advisory Panel.

Dated: 12-2-03

STEPHEN RASKIN, M.D.

# Stephen Raskin, M.D.

Fellow American College of Cardiology

2070 Clinton Avenue
Alameda, CA 94501
510.522.6323
FAX 510.522.5075

---

April 25, 1947
New York, New York

- *Training*

Queens College, City University of New York (1965-1969)
*Bachelor of Arts*

Medical College of Wisconsin (1969-1973)
*Doctor of Medicine*

Boston City Hospital (1973-1975)
*Medical Internship and Residency*

Mt. Zion Hospital, San Francisco, California (1975-1977)
*Fellowship in Cardiology*

- *Honors*

Alpha Omega Alpha Honor Medical Society (1973)

- *Organizations*

American College of Cardiology, Fellow
American College of Chest Physicians, Fellow
American College of Physicians
American Heart Association
*Councils on Arteriosclerosis and Thrombosis; Clinical Cardiology*
Alameda Contra Costa Medical Association
Duke University Cooperative Research Cardiovascular Society
American Society of Echocardiography
Society of Atherosclerosis Imaging
Vascular Biology Working Group

- *Certification*

The Medical Board of California (1975)
Certificate Number: *G 30547*

EXHIBIT
Raskin 3
2.2.04

American Board of Internal Medicine (1976)
American Board of Internal Medicine, Subspecialty *Cardiovascular Medicine* (1977)

American Board of Medical Examiners' Special Competency in Echocardiography (1996)

- *Hospital Affiliations*

UC San Francisco Medical Center, Attending Staff (1978-)
*Associate Clinical Professor of Medicine*

Alameda Hospital, Active (1977-)
*Director, Coronary Care Unit*

Summit Medical Center, Active (1977-)

Alta Bates Hospital, Active (1992-)

San Leandro Hospital, Active (1996-)

Highland Hospital, Oakland, CA, Attending Staff (1995-)

Veterans Administration Medical Center, San Francisco, Attending Staff (1999-)

- *Volunteerism*

Heart to Heart, An International Children and Adult Medical Alliance
*President*, 2001
Adult Team Coordinator, St. Petersburg, Russia (1992, 1993, 1995, 2000, 2002)

- *Publications*

Electrophysiological Induction of Sarcomerogenesis in the Canine Heart.
*Am J Cardiol.*1978;41:434

Determination of His-Purkinje Refractoriness in Man by Means of His Bundle Pacing.
*Circulation.*1979;60:956-960

Unusual Complicationsd of Epicardial Pacemakers. *Am J Cardiol.*1980;45:1088-1094

Effects of Integrelin, A Platelet Glycoprotein IIb/IIa Receptor Antagonist in Unstable Angina. A Randomized Multicenter Trial. *Circulation.*1996;94:2083-2089

Genetic Analysis of a polymorphism in the human apolipoprotein A-V gene: effect on plasma lipids. *Journal of Lipid Research.* 2003;44: 1167-1173.

*Named investigator:*

Effects of The Antiarrhythmic Agent Moricizine on the Survival After Myocardial Infarction. *N Engl J Med.*1992;327:227-233 (for the CAST Investigators)

An International Randomized Trial Comparing Four Thrombolytic Statagies for Acute Myocardial Infarction. *N Engl J Med.*1993;329:673-682 (GUSTO Investigators)

Randomized Trial of Intravenous Heparin versus Recombinant Hirudin for Acute Coronary Syndromes. *Circulation.*1994;90:1631-1637)

A Comparison of Recombinant Hirudin With Heparin for the Treatment of Acute Coronary Syndromes.. *N Engl J Med* 1996;335:775-782 (GUSTO IIb Investigators)

International, Randomized Controlled Trial of Lamifiban, Heparin, or Both in Unstable Angina. *Circulation.* 1998;97:2386-2395 (The PARAGON Investigators)

Early vs Delayed ACE inhibition Therapy in Acute Myocardial Infarction. The Healing and Early Afterload Reducting Therapy Trial. *Circulation.* 1997;95:2643-2651

- *Clinical Studies*

Nifedipine Open Protocl #79-N-249 *Pfizer*, 1979. Principal Investigator (PI)
Tocainide: Emegency Compassionate Study #221 *Astra*, 1980. PI
Beta Blocker Heart Attack Trial (BHAT), 1981
A Double-Blinded Dose Response Parallel Placebo-Controlled Comparison of Long-Acting Nifedipine in the Therapy of Chronic Stable Angina #84-N-0018 *Pfizer*, 1985. PI
Cardiac Arrhythmia Suppression Study (CAST) 1991
GUSTO 1992. PI
HEART 1994. PI
GUSTO II, IIb 1994-95. PI
PARAGON A 1995-96. PI
GUSTO III 1996-97. PI
ASSENT II 1997-99. PI
SYMPHONY 1997-98. PI
PACTS 1997-98. PI
Niaspan in The Community Study 1998-99. PI
SYMPHONY II 1999. PI
GUSTO IV and V 1999-01. PI
GAPin CAD 2000-
SYNERGY 2001-

# Exhibit B

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

--oOo—

| | | |
|---|---|---|
| In re: BAYCOL PRODUCTS LITIGATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MDL No. 1431 |
| | ) | (MJD/ JGL) |
| This Document Relates to Olander v. Bayer | ) | |
| Corporation, et al. Civil No. 03-1086 (MJD/ JGL) | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**CERTIFIED COPY**

DEPOSITION OF

## STEPHEN RASKIN, M.D., F.A.C.C.

(Pages 1 through 233)

February 2, 2004

REPORTED BY: JOHNNA PIPER, CSR 11268

JOB 1-635

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

--o0o--

In re BAYCOL PRODUCTS LITIGATION. )
)Case No. 1431
__________________________________) (MJD/JGL)

--o0o--

BE IT REMEMBERED that, pursuant to notice and on Monday, February 2, 2004, commencing at 1:08 p.m. at Lieff, Cabraser, Heimann & Bernstein, LLP, Embarcadero Center West, 275 Battery Street, 30th Floor, San Francisco, California, before me, JOHNNA PIPER, a Certified Shorthand Reporter, personally appeared

STEPHEN RASKIN, M.D., F.A.C.C.

______________________________

called as a witness by the Defendant Bayer, who, having been first duly sworn, was examined and testified as follows:

--o0o--

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP, Embarcadero Center West, 275 Battery Street, 30th Floor, San Francisco, California 94111-3339, represented by DONALD C. ARBITBLIT, Attorney at Law,

other potential side effects of statins besides myopathy? 14:34:38 14:34:42

A. Yes. 14:34:43

Q. The data to which you are referring collected by Bayer and reported on by Dr. Staffa related solely to rhabdomyolysis, correct? 14:34:44 14:34:48 14:34:51

A. Correct. 14:34:54

Q. Are you aware, sir, of any data considering all the potential side effects of statins, not just rhabdo in isolation, that suggested Baycol was more dangerous than the class of medicine? 14:34:54 14:35:01 14:35:03 14:35:06

MR. ARBITBLIT: Objection. 14:35:09

THE WITNESS: I am not aware of data showing increased hazard risk based on other side effects. 14:35:13 14:35:17

MR. ISMAIL: Q. If the overall rate of spontaneous reports of death in the statin class were similar across the class including Baycol, would you withdraw your criticisms of Baycol, sir? 14:35:23 14:35:26 14:35:32 14:35:38

MR. ARBITBLIT: Objection. 14:35:42

THE WITNESS: If I understood you, you were asking about the overall rate of death? 14:35:43 14:35:44

MR. ISMAIL: Q. Let me ask it this way: You've made reference to Dr. Staffa, correct? 14:35:48 14:35:51

A. Yes. 14:35:54

Q. Now, Dr. Staffa, in her letter, reported on 14:35:55

A. Yes, sir. 15:03:43
Q. And you are -- would it be fair to say your understanding is that a new drug application is an extremely large production? 15:03:45 15:03:48 15:03:52
A. Well, by large, certainly by investment in money and resources and time, yes. 15:03:57 15:04:01
Q. In terms of product, work product that results from a new drug application, do you have an understanding that it is dozens, if not hundreds of boxes of material? 15:04:03 15:04:07 15:04:09 15:04:13
A. I imagine, yes. 15:04:15
Q. And that a sizable portion of a new drug application can be devoted to safety issues? 15:04:16 15:04:20
A. Of course. 15:04:25
Q. And that there are supplements to a new drug application filed with FDA? 15:04:26 15:04:29
A. Yes. 15:04:32
Q. And that each supplement may contain thousands of pages of safety-related information? 15:04:32 15:04:37
A. The degree of the number of pages, I had no idea, but I knew it was a major undertaking, taking often years in the assessment, but I am not an expert in FDA matters, of course. What matters to me is the timely reporting of potentially life-threatening side effects and not the withholding of those. 15:04:43 15:04:45 15:04:52 15:04:57 15:05:03 15:05:06

change being effected concept for drug labeling? 15:14:59
A. Yes, sir. 15:15:03
Q. Have you ever participated in a label change of any capacity for a pharmaceutical? 15:15:04 15:15:07
A. No, sir. 15:15:11
Q. I take it you have no firsthand experience with effecting a change being effected -- let me do that question again. 15:15:11 15:15:14 15:15:19
You have no firsthand experience participating in a changes being effected application to the FDA? 15:15:20 15:15:22 15:15:29
A. Not firsthand. 15:15:33
Q. When is the first time you heard of the concept of changes being effected label modifications? 15:15:34 15:15:36
A. In these proceedings, in preparation for this deposition, and for being involved in this as an expert, as a treating cardiologist. 15:15:46 15:15:49 15:15:55
Q. You submitted -- 15:16:01
A. But just -- and what I've learned is the Dear Doctor letter, for instance, occurred without the initial sanction of the FDA. This was done because Bayer was aware of a problem and needed a methodology to get that problem and that need to change the label or the practice of the use of that drug quickly to the doctors, so indirectly, I think I was aware of that. 15:16:01 15:16:03 15:16:08 15:16:14 15:16:20 15:16:23 15:16:30

effected mechanism? 15:21:01
MR. ARBITBLIT: Objection.
THE WITNESS: Or the manner in which the drug is used and what I'm suggesting is through the Dear Doctor letter mechanism. 15:21:05 15:21:06 15:21:11
MR. ISMAIL: Q. I want to talk about drug labeling. We'll talk about Dear Doctor letters in a moment, specifically about drug labeling. Let's see if we can cut this shorter. I won't say short. You are not an expert in FDA regulations, correct? 15:21:13 15:21:17 15:21:22 15:21:25 15:21:32
A. That is right. 15:21:35
Q. You are not an expert in what changes a drug company can or cannot make through a changes being effected process, correct? 15:21:36 15:21:40 15:21:43
A. I'm not an expert. I have a general understanding. 15:21:45 15:21:48
Q. And your general understanding began after you were retained to be an expert in this case, correct? 15:21:49 15:21:53 15:21:56
A. Correct. 15:21:58
Q. And your general understanding was obtained by reading the regulations, correct? 15:21:58 15:22:02
A. That is partially true and also looking at Dr. Kapit's expert report. 15:22:05 15:22:09
Q. When did you first see Dr. Kapit's expert 15:22:12

report? 15:22:15

A. Can't tell you exactly. I received a cd with various Plaintiff experts' reports. 15:22:16 15:22:21

Q. Was it in -- was it after the New Year or before the New Year? 15:22:27 15:22:35

A. It was before I wrote my expert report, I believe. 15:22:35 15:22:38

Q. You received other Plaintiff experts' reports before you wrote your report in this case? 15:22:38 15:22:43

A. The exact time is difficult for me to remember. I've looked at so many pieces of data. 15:22:48 15:22:50

MR. ISMAIL: Counsel, do you want to -- 15:22:56

MR. ARBITBLIT: I can clarify that. There was a cover letter. If it wasn't provided as part of Dr. Raskin's production, I have a similar letter that I was just about to send you as part of Dr. Schmidt's production that I could show you when and I believe sometime around December 18th or so, a cd was sent of the reports that have previously been prepared. If you would like, I'll get it on the break. 15:22:57 15:22:58 15:23:03 15:23:06 15:23:09 15:23:14 15:23:18 15:23:21

MR. ISMAIL: I just want the right date. 15:23:24

MR. ARBITBLIT: Sure. They were all sent to the experts on a disc simultaneous and it was after the reports had been served on December 3rd, sometime in mid to late December. 15:23:26 15:23:27 15:23:31 15:23:33

MR. ISMAIL: Q. Dr. Raskin, are you prepared to accept Counsel's representation -- 15:23:34 15:23:35
A. Yes. 15:23:38
Q. -- regarding when he sent you Dr. Kapit's report for the first time? 15:23:38 15:23:42
A. Uh-huh; yes, I am. 15:23:42
Q. So you did not have the benefit of Dr. Kapit's report -- 15:23:44 15:23:46
A. No. 15:23:49
Q. -- when you submitted your report? 15:23:49
A. That is correct. I had it in these proceedings. 15:23:49 15:23:52
Q. Now, did you -- 15:23:54
A. For these proceedings. 15:23:55
Q. Did you review the FDA regulation prior to the time you submitted your report which was marked as Exhibit 2 to this deposition? 15:23:57 15:24:00 15:24:02
A. That is correct. 15:24:05
Q. Okay. The first time counsel for the defense was notified that you had reviewed FDA regulations was on Friday, last week? 15:24:06 15:24:12 15:24:14
A. That could very well be. 15:24:24
Q. Do you recall, sir, preparing a list of materials that you reviewed for your opinions in this case? 15:24:24 15:24:27 15:24:31

A. Yes. 15:24:31

MR. ISMAIL: I'm going to mark, please, this 15:24:33
as Exhibit 4. 15:24:35

(Whereupon, Defendants' Exhibit 4 was marked
for identification.)

MR. ISMAIL: Q. Something you want to add, 15:25:04
sir?

A. Well, I did find the documents when I did 15:25:05
get the cd. It was after. 15:25:08

Q. Do you have in front of you Exhibit 4, sir? 15:25:15

A. Yes. 15:25:15

Q. Is Exhibit 4 the documents you reviewed to 15:25:17
prepare your expert report in this case? 15:25:21

A. Yes. Of course, all of these are coded and 15:25:33
it looks like the same document, yes. 15:25:35

Q. None of these documents, sir are the Code of 15:25:40
Federal Regulations? 15:25:42

A. That is right. 15:25:44

Q. So I'm trying to find out which is the case. 15:25:47
Did you review the Code before your report or did you 15:25:50
not? 15:25:54

A. I did not. 15:25:55

Q. So let's see if we can tie this up. When 15:25:58
you submitted your report in this case, you had neither 15:26:00

Q. Okay. Let me try it this way: The sum total of your work to prepare an opinion regarding what label changes Bayer could have made to the Baycol label consisted of reading Dr. Kapit's expert report and reviewing the published Code of Federal Regulations, correct? 15:27:22 15:27:26 15:27:34 15:27:36 15:27:39 15:27:43
A. Yes. 15:27:47
Q. By the way, Doctor, there are, I don't know, maybe 100, possibly more documents listed in Exhibit 4. Did you review each one of these prior to preparing your report in this case? 15:27:50 15:27:53 15:27:57 15:28:01
A. Yes. I believe I have them all here. 15:28:09
Q. Well, there is a difference of having them all in your possession and reviewing them. 15:28:14 15:28:16
A. Yes, I did review them and I did bring them. 15:28:18
Q. If you go back to your bill, which is Exhibit 1, if November 24th was the first day you began substantive work on the Baycol litigation and December 3rd was the last time entry before you submitted your report, do you see that? 15:28:22 15:28:23 15:28:29 15:28:36 15:28:38
A. Yes. 15:28:43
Q. So in how many hours that is, you reviewed the materials listed on Exhibit 4, formulated your opinions, and drafted your report? 15:28:43 15:28:46 15:28:52
A. Yes, sir. 15:28:53

Q. So the total amount of time -- let's add it up. I have 13.7 hours. If you want to double check my math, I encourage you to do so. 15:28:54 15:28:58 15:29:18
A. It looks about right. 15:29:22
Q. Okay. So in -- when you began hour one of that 13.7 hours, you had not done any substantive work to prepare an expert opinion in the Baycol litigation, correct? 15:29:23 15:29:33 15:29:33 15:29:35
A. Other than my background knowledge, yes. 15:29:38
Q. Correct. And then you began on November 24th reviewing materials provided by Plaintiffs' counsel? 15:29:42 15:29:46 15:29:50
A. That is correct. 15:29:51
Q. And Plaintiffs provided you the materials listed in Exhibit 4? 15:29:52 15:29:54
A. Yes. 15:29:57
Q. And all these hundreds of pages of materials provided in Exhibit 4, you reviewed in those 13.7 hours? 15:29:57 15:30:00 15:30:07
A. I did review them all. That doesn't -- yes, it does. 15:30:07 15:30:11
Q. And, in addition, you reviewed the hundreds of pages of materials in Exhibit 4 and drafted your expert report, Exhibit 2? 15:30:12 15:30:14 15:30:18
A. Yes. 15:30:20

Q. How did you -- withdrawn. 15:30:35
Who selected which documents you were to 15:30:39
review before you submitted your report? 15:30:42
A. The documents were provided, all these 15:30:46
documents, by counsel. 15:30:52
Q. For Plaintiffs? 15:30:57
A. Yes. 15:30:57
Q. Are you aware, sir, that there are many 15:30:58
millions of other pages of documents produced by the 15:31:02
Defendants in this case? 15:31:05
A. I'm not aware. I presume there are more 15:31:07
documents. 15:31:09
Q. So -- 15:31:10
A. I did find the evidence here to be 15:31:11
appropriate to make the statements I made. 15:31:17
Q. Did you ask for any particular document to 15:31:19
be sent to you that is listed in Exhibit 4? 15:31:22
A. I don't believe I did ask for any specific 15:31:28
documents here. 15:31:32
Q. Are there any other materials that you used 15:31:33
to prepare your expert report that are not listed in 15:31:36
Exhibit 4? 15:31:40
MR. ARBITBLIT: Other than what he has 15:31:43
brought today or provided to you on Friday? I withdraw 15:31:44
that. Your correction was correct. Your statement was 15:31:49

characterized as a lecture. It was a several-day symposium. 15:33:07 15:33:10

Q. I didn't mean to exclude other species of events. 15:33:14 15:33:16

A. Okay. Yes. 15:33:17

Q. Let me start again. Other than the handout at the Baycol or Bayer-sponsored gathering that you reference in Exhibit 4, the only other documents you relied upon to prepare your expert report in this case were the documents Plaintiffs' counsel elected to send you? 15:33:17 15:33:23 15:33:29 15:33:32 15:33:36 15:33:39

A. Correct. 15:33:40

Q. Now, some time ago, we were talking about FDA authority over prescription drug labels in this country and I want to go back to that concept. Are you aware, sir, that the FDA can demand drug companies to make new warnings in its labels? 15:33:42 15:33:49 15:33:53 15:33:57 15:34:01

A. Yes. 15:34:04

Q. Are you aware, sir, that the FDA can demand drug companies to include certain data in its drug labels? 15:34:04 15:34:09 15:34:12

A. Yes. 15:34:12

Q. By whatever -- withdrawn. 15:34:20

You had described a changes being effected process. We had some dialogue about that. 15:34:24 15:34:26

withdrawn from the market. 15:51:38
Q. Certainly that was not the case in November 15:51:39
of 1998? 15:51:41
A. Correct. 15:51:43
Q. Do you have any expertise to opine as to 15:51:45
whether or not the FDA would have approved a change to 15:51:49
the Baycol label to list the number of spontaneous 15:51:53
events of rhabdomyolysis? 15:51:57
A. No, I don't have any particular knowledge of 15:52:00
that. 15:52:03
Q. Other than the seven cases of rhabdomyolysis 15:52:04
that had been reported postmarketing, do you have any 15:52:07
other criticism of Exhibit 6? 15:52:10
A. No. 15:52:14
Q. Other than the alleged omission of patient 15:52:14
1301 in the initial label, do you have any criticisms 15:52:20
of that label? 15:52:24
A. No. 15:52:25
Q. By the way, sir, do you, looking back at 15:52:29
what Bayer and the FDA knew at the time, have an 15:52:32
opinion whether or not Baycol should have been approved 15:52:37
originally in June of 1997? 15:52:42
MR. ARBITBLIT: Objection. 15:52:45
THE WITNESS: Yes. 15:52:53
MR. ISMAIL: Q. And what is that? 15:52:53

A. I feel there was nothing not to approve it, no evidence not to approve the drug based on what I've read. 15:52:54 15:52:56 15:52:59

Q. So you agree with the FDA's determination that Baycol was safe and effective back in June of '97, correct? 15:52:59 15:53:03 15:53:08

A. Correct. 15:53:09

Q. And fast forwarding to November of '98, do you have any reason to disagree with the FDA's assessment that Baycol was safe and effective? 15:53:12 15:53:20 15:53:22

A. With the caveat that I believe physicians should have been told in some mechanism that there was a spike. 15:53:29 15:53:32 15:53:36

Q. How do you measure a spike, sir? 15:53:39

A. I would look at the fact that the drug was new and I wasn't in that position to know the numbers of prescriptions and compare that with launch of other drugs, but it certainly -- and, again, this is in hindsight with me reviewing this data retrospectively -- that this was a -- this was a significant number of cases of rhabdo over a short period of time, given the very rare occurrence within the statin market of rhabdo. 15:53:46 15:53:48 15:53:53 15:53:57 15:54:02 15:54:07 15:54:21 15:54:21 15:54:25

Q. Is it fair to say, sir, you do not know the number of spontaneously reported cases of 15:54:26 15:54:29

rhabdomyolysis in the first year of marketing with any other statin? 15:54:33 15:54:35

A. Yes, that is true. 15:54:37

Q. And so you are not in a position to identify the seven cases with Baycol as a spike or not? 15:54:38 15:54:41

A. I don't, but I suspect the Merck folks did have an idea of whether this was higher than anticipated or not. 15:54:47 15:54:51 15:54:55

Q. The Merck folks? 15:54:58

A. Excuse me, the Bayer. 15:55:00

Q. Okay. 15:55:03

A. I misspoke. 15:55:07

Q. I want to separate what you -- well, your answer was you suspect that the Bayer folks had an idea whether the number of cases was anticipated or not? 15:55:08 15:55:11 15:55:15

A. Yes. 15:55:19

Q. Okay. I want to explore your opinions and not what you suspect Bayer knew. 15:55:19 15:55:24

Isn't it the case, Dr. Raskin, that you do not have sufficient information to characterize the seven cases of rhabdomyolysis in 1998 as a spike? 15:55:29 15:55:34 15:55:35

MR. ARBITBLIT: Objection. 15:55:41

THE WITNESS: I don't have absolute evidence, no. It is my impression. 15:55:42 15:55:44

MR. ISMAIL: Q. You don't have relative 15:55:46

original Baycol label that there should have been some information about patient 1301, correct?

A. Correct.

Q. And other than that, you are fine with the initial label, right?

A. Yes.

Q. Going forward, for all the other labels in existence, your only criticism of the Baycol label was the alleged nondisclosure of spontaneous adverse event data --

MR. ARBITBLIT: Objection.

MR. ISMAIL: Q. -- correct?

A. Yes. Well, let me rephrase that. When I say they should have disclosed that, they should have made it clear that there were -- was an increased incidence suspected, particularly when the 0.4 dose came out. We move down --

Q. I think I understand what your last answer was, but let me make sure I'm clear.

A. Yes.

Q. After the initial label, your only criticism of the Baycol labels was the alleged nondisclosure of spontaneous adverse event data and what inferences you believe can be drawn from that data?

A. Yes.

Q. The -- is it fair to say, sir, that you are of the opinion that Baycol has a higher risk of muscle toxicity than other drugs in the class? 15:59:07 15:59:11 15:59:15

A. Yes, sir. 15:59:18

Q. The only evidence you have of greater muscle toxicity for Baycol is the spontaneous adverse event data, correct? 15:59:22 15:59:25 15:59:29

A. Yes. And I should say I have the evidence of the Bayer Corporation themselves when they made changes to the package insert through the mechanism of the Dear Doctor letter using the very same data with combination therapy, so I'm also relying on their interpretation of data they had. I'm relying on Bayer's review of the aggregate data. The raw data, yes, was the adverse event rate reporting. 15:59:33 15:59:39 15:59:45 15:59:48 15:59:55 15:59:59 16:00:03 16:00:10

Q. When you say you were relying on Bayer's review of the aggregate data, are you referring to the label changes Bayer voluntarily initiated regarding Gemfibrozil use? 16:00:14 16:00:17 16:00:20 16:00:25

MR. ARBITBLIT: Objection. 16:00:27

THE WITNESS: No, I'm relying on Bayer's request through the Freedom of Information Act way back in February of '99 because they internally were aware of the increased reports that were accruing each month starting with what I believe was a spike and, yes, it 16:00:29 16:00:35 16:00:40 16:00:45 16:00:48

possible to make those decisions. I have looked at an innumerable number of drugs and like to be aware of what is happening postmarketing, as do most of my colleagues. 16:06:44 16:06:50 16:06:55 16:07:01

Q. Can you tell me one occasion in which you have compared the safety of two drugs using only spontaneous adverse event data? 16:07:01 16:07:06 16:07:10

A. That data is not -- I can't, other than the spontaneous reports that show up as either letters to the editor or in other peer-reviewed journals that may be isolated cases of a problem, but I particularly have not looked at the raw FDA Medwatch data in that regard. 16:07:16 16:07:19 16:07:23 16:07:27 16:07:32

Q. When you say, "Letters to the editor," are you talking about case reports? 16:07:39 16:07:41

A. I'm talking about spontaneous case reports, which in this case is a surrogate for looking at postmarketing isolated cases which may turn out to be important. 16:07:43 16:07:50 16:07:51 16:07:57

Q. The goal of published case reports is to alert the medical community about a potential side effect of a drug, right? 16:07:57 16:08:01 16:08:06

A. Right. 16:08:08

Q. What I'm talking about is making comparative assessments of safety between two drugs. Prior to being retained as an expert in the Baycol litigation, 16:08:10 16:08:13 16:08:18

Q. Would you agree that the adverse event database is subject to potential statistical biases? 16:35:18 16:35:21
A. Yes, across the entirety of the database. 16:35:31
Q. Would you agree it is an uncontrolled set of data? 16:35:35 16:35:39
MR. ARBITBLIT: Objection. 16:35:41
THE WITNESS: Only controlled in some fashions. Controlled -- and, again, if we're using this database so it can be controlled for like drugs, for instance, it can be controlled for certain periods of time that you want to do this analysis and it can be controlled for the specificity of the adverse event we're talking about. 16:35:43 16:35:44 16:35:52 16:35:57 16:36:00 16:36:05 16:36:10
MR. ISMAIL: Q. How do you control for the specificity of the adverse event? 16:36:12 16:36:14
A. Given the problems we just suggested are there with spontaneous event -- spontaneous adverse event reporting, with that as a given, what we're doing is we're looking at a universe of rhabdo reporting, for instance, and there are inconsistencies in that given because it is spontaneous. Many physicians don't report, different people reporting, but that noise is constant throughout a comparison of like drugs. 16:36:19 16:36:22 16:36:26 16:36:32 16:36:40 16:36:44 16:36:47 16:36:53
Q. How do you know -- withdrawn. 16:37:00
What is your support for the notion that the 16:37:03

for example, six months, then it becomes a reasonable way to say new drug overreporting can be reduced. New drug bias can be reduced by comparing within your variable comparables a certain time period. 16:39:08 16:39:15 16:39:26 16:39:33

Q. You would agree that there are many potential biases that affect the reporting rate of adverse events, correct? 16:39:45 16:39:46 16:39:49

A. Correct. 16:39:51

Q. What investigation have you made into how these biases affect the reporting rate of adverse events in the statin class? 16:39:57 16:40:03 16:40:07

A. I have reviewed Dr. Brian Straum's expert report. I've reviewed Dr. Farquhar's responses in this specific -- in a more specific question of the issue of adverse event reporting rates. 16:40:12 16:40:18 16:40:29 16:40:33

Q. You -- 16:40:38

A. Go ahead. I'm sorry. 16:40:40

Q. I want you to complete your answer, if you had more to say. 16:40:41 16:40:43

A. That is all. 16:40:47

Q. So the only investigation you made into how potential biases affect the reporting rate of adverse events for statins is to review the reports of Dr. Farquhar and Dr. Straum, correct? 16:40:47 16:40:51 16:40:56 16:41:00

A. That is correct. 16:41:02

Q. You obtained Dr. Farquhar's report after you submitted your report, correct? 16:41:03 16:41:06
A. Correct. 16:41:08
Q. You obtained Dr. Straum's report after you submitted your report? 16:41:08 16:41:11
A. Correct. 16:41:13
Q. Therefore, you submitted your report in this case without any investigation into the potential biases that could affect the reporting rate of adverse events in the statin class, correct? 16:41:15 16:41:18 16:41:21 16:41:26
A. Correct. That is because the data is so significantly in evidence of the increased rates of rhabdo with Ceriva; that all of these vagaries are there within the system itself. We know that. I have previously been aware of the adverse event reporting rate. I've been aware of issues of drug side effects and concerns voiced by others. 16:41:29 16:41:34 16:41:46 16:41:49 16:41:58 16:41:59 16:42:03
Q. What articles did you consult regarding the potential biases in adverse event reporting data? 16:42:11 16:42:12
A. I know of articles. I have not reviewed the entirety of these articles that talk to the validity of using this system to opine on significance or surrogates of causality. Again, in Dr. Farquhar's expert review, he noted several journal articles. He also commented on Dr. Straum's textbook in 16:42:20 16:42:26 16:42:31 16:42:37 16:42:46 16:42:52

pharmacoepidemiology, so as we sit here today -- I mean, I'm aware of the fact that this could be credible when you are dealing with extremely low event rates. 16:42:55 16:43:00 16:43:06

Q. If I understand your last answer, Dr. Farquhar characterized certain articles that he read, correct? 16:43:11 16:43:14 16:43:21

A. Correct. 16:43:21

Q. And Dr. Farquhar characterized a textbook written by Dr. Straum, correct? 16:43:22 16:43:25

A. Correct. 16:43:27

Q. Did you yourself read any portion of the article cited by Dr. Farquhar? 16:43:27 16:43:30

A. I read several abstracts which were available on Medline. 16:43:36 16:43:38

Q. Have you even seen Dr. Straum's book? 16:43:40

A. I have not. 16:43:42

Q. What articles did you read the abstract for? 16:43:43

A. There was an article by Brewer in JAMA, I believe, in 1999 that talked about the reporting ratios, essentially, and making statements about significance or lack of significance of adverse event reporting and I -- that was the only abstract I actually read. Other than that, I read the excerpted portions from Dr. Farquhar's report. 16:43:49 16:43:55 16:44:04 16:44:09 16:44:15 16:44:22 16:44:25

Q. So the only published material you've ever 16:44:30

read on the limitations of adverse event reporting rates is the Brewer abstract and JAMA, correct? 16:44:34 16:44:38
A. Correct. 16:44:44
Q. When is the first time you reviewed the Brewer abstract? 16:44:44 16:44:46
A. This is subsequent to my expert report. 16:44:48
Q. Was this in the last 30 days? 16:44:51
A. Yes. 16:44:53
Q. Would you mind giving a copy of the abstract to counsel for plaintiffs? 16:44:57 16:44:59
A. Sure. 16:45:01
Q. It is the first we've heard of the Brewer abstract in connection with your opinions. 16:45:03 16:45:07
A. Yeah. Well, that was just me getting a little more information out of the material that I believe you have from Farquhar. 16:45:10 16:45:10 16:45:13
Q. Prior to being retained as an expert in the Baycol litigation, you never read an article regarding the limitations of spontaneous data, correct? 16:45:19 16:45:23 16:45:26
A. I wouldn't say that is correct. In the past, I have been aware of reports. I believe I had read an article by Sydney Wolf in JAMA years ago. I've had a basic understanding of the system and some of its limitations. I've been to lectures where Dr. Woolsley, who I now believe is in Arizona -- this is years ago -- 16:45:29 16:45:32 16:45:39 16:45:48 16:45:53 16:45:58

Q. Would you agree that if drug companies -- if the statin manufacturers used different coding definitions for adverse events, that would be a potential bias in the reporting rate data? 16:56:05 16:56:08 16:56:13 16:56:14
MR. ARBITBLIT: Objection. 16:56:19
THE WITNESS: Yes. 16:56:24
MR. ISMAIL: Q. You have not controlled for that bias in the data you are relying upon in this case, correct? 16:56:25 16:56:27 16:56:30
A. I am not using that variable, correct. 16:56:32
Q. Have you seen any publications by the FDA containing any caveats for the use of spontaneous adverse event data? 16:56:52 16:57:01 16:57:06
A. I had seen something -- I've only heard and read statements from the FDA, I think chief drug and safety officer, about the limitations of adverse event reporting. Specifically I have not in-depth reviewed regulations and I believe there are people involved in this litigation who have who are expert in the FDA rules and regs. 16:57:15 16:57:24 16:57:30 16:57:36 16:57:44 16:57:50 16:57:54
Q. You are not an expert in FDA rules and regs, are you? 16:57:55 16:58:00
A. No, I'm not. 16:58:00
Q. Whether you have read them in-depth or superficially, have you read any publication of the FDA 16:58:01 16:58:04

containing caveats for the proper use of adverse event data? 16:58:07 16:58:10

A. No, I have not. 16:58:11

Q. All drug companies are required to collect adverse events voluntarily reported with their drugs, correct? 16:58:33 16:58:35 16:58:39

A. They are all required to report it to the FDA, yes. 16:58:41 16:58:43

Q. And you have prescribed a number of drugs over the years, haven't you, Doctor? 16:58:46 16:58:49

A. Yes, I have. 16:58:51

Q. Can you identify a single drug that has listed the number of spontaneous adverse events in its label? 16:58:52 16:58:59 16:59:01

A. Yes, I can. 16:59:09

Q. Which drug is that? 16:59:09

A. Well, with one little caveat, I'm aware of a drug where that occurs, but not a drug that I've prescribed. 16:59:12 16:59:14 16:59:17

Q. Which drug is that? 16:59:17

A. Fenfluramine. 16:59:19

Q. Fenfluramine. It is one of the diet drugs? 16:59:23

A. Yes. Because of a spike, meaning I think only four cases of fatal primary pulmonary artery hypertension, it became evident in the label and it was 16:59:26 16:59:31 16:59:36

surrogate, so I know the FDA regulates that very, very strongly. 17:38:17 17:38:21

Q. Let's try it this way: You do not hold yourself out as an expert regarding FDA regulations into what a drug company can and cannot say regarding comparisons to another drug? 17:38:21 17:38:24 17:38:34 17:38:38

A. I'm not an expert in many fields, but I have working knowledge that puts me in a position to speak to patients, to care for patients as an expert. I'm an intermediary between the drug company and my patients. While I'm not an expert in FDA regulations, I can tell my patients, and I do so, that drug companies have not only a moral, not a regulatory, but a moral responsibility to let me know and let you know, my patients, about real increase in risk. That data is only available postmarketing through this adverse event reporting system. 17:38:43 17:38:48 17:38:59 17:39:03 17:39:07 17:39:12 17:39:15 17:39:24 17:39:28 17:39:36 17:39:42

MR. ISMAIL: Move to strike as nonresponsive. 17:39:44 17:39:45

Q. Dr. Raskin? 17:39:47

A. Yes, sir. 17:39:49

Q. If you would be so kind as to answer this question yes or no. 17:39:55 17:39:58

A. Okay. 17:40:00

MR. ARBITBLIT: If it is a "Yes" or "No" 17:40:01

A. I do not. I believe these closely parallel the FDA reporting rates the way they were evaluated by Merck -- excuse me, by Bayer. 19:27:09 19:27:13 19:27:27
Q. But the answer to my question is you do not know what methods, how they controlled for biases, if at all, how they segregated the data, et cetera? 19:27:36 19:27:38 19:27:41
A. Correct. 19:27:44
Q. Okay. You can put that aside. Have you ever seen a patient, sir, or been aware of a patient who was stable on Baycol, but developed a myopathy on another statin? 19:27:44 19:28:05 19:28:09 19:28:14
A. No. 19:28:16
Q. Do you agree, sir, that the Baycol clinical trials showed Baycol to be safe and well tolerated? 19:28:36 19:28:39
MR. ARBITBLIT: Objection. 19:28:44
THE WITNESS: In their -- in the clinical trials I saw, yes. 19:28:47 19:28:50
MR. ISMAIL: Q. Paragraph 21, sir, I'm trying to get at why you listed this particular document. You write, "Perhaps indicative of Bayer's attitude," and you make reference to this e-mail string, correct? 19:28:51 19:29:13 19:29:15 19:29:18 19:29:22
A. Correct. 19:29:24
Q. You are not here to be an expert on Bayer's attitude, are you, sir? 19:29:27 19:29:30

MR. ARBITBLIT: Objection. 19:29:32
THE WITNESS: No. 19:29:35
MR. ISMAIL: Okay. 19:29:35
THE WITNESS: I'm here just to comment on what appear to be continued omission to the medical community about their own perceived concerns with the increasing reporting rates and their own data by February 2000. 19:29:43 19:29:43 19:29:49 19:29:56 19:30:02
MR. ISMAIL: Q. Part of my job at the deposition is to understand what you are going to be opining about at trial and what you are not and perhaps save us all a motion down the line. You are not going to go up on the stand and purport to offer opinions about what Bayer's attitude was, are you, sir? 19:30:07 19:30:12 19:30:14 19:30:20 19:30:22 19:30:26
A. I'm using the term "Attitude" loosely. No, I'm not going to say, "And the attitude." I'm going to say -- this is what I'm telling you is that I believe there was a conscious effort to withhold information that I, as a clinician, would deem very important, given the fact that I had a choice in statins, given the point that certainly by February 2000, there was ample evidence, I believe, of an increasing pattern of risk. These reports were continuing to come in and there were obviously comments made about the concern or perception of doctors in different parts of the country 19:30:30 19:30:34 19:30:36 19:30:40 19:30:46 19:30:51 19:30:56 19:31:05 19:31:13 19:31:21 19:31:25

being concerned from their own observations. 19:31:31
Q. You don't purport to be an expert on what 19:31:37
Bayer believed about the risk of Baycol at particular 19:31:42
points in time, correct? 19:31:46
MR. ARBITBLIT: Objection. 19:31:47
THE WITNESS: I would say exactly, I do not 19:31:53
know their perception. I know they did not let me know 19:31:53
about their concerns. 19:31:58
MR. ISMAIL: Q. Let's see if we can 19:31:59
summarize it this way: You are prepared to opine that 19:32:02
your personal perspective is you would have liked to 19:32:07
have seen particular types of data, correct? 19:32:11
A. Correct. 19:32:15
Q. And you have pointed to data you believe 19:32:15
Bayer had at particular points in time, correct? 19:32:17
A. Correct. 19:32:20
Q. You are not an expert in how Bayer assessed 19:32:20
that data internally, correct? 19:32:24
MR. ARBITBLIT: Objection. 19:32:27
THE WITNESS: I'm an observer of some key 19:32:28
documents noting that Bayer had a concern. 19:32:32
MR. ISMAIL: I had a different question. 19:32:39
Q. You are not an expert in how Bayer assessed 19:32:40
that data internally, correct? 19:32:43
MR. ARBITBLIT: Objection. 19:32:45

THE WITNESS: I do not know how they assessed the data internally. 19:32:45 19:32:47

MR. ISMAIL: Q. The men and women at Bayer who looked at the data in question can speak for themselves regarding how they interpreted the reliability of that data, correct? 19:32:49 19:32:52 19:32:58 19:33:01

MR. ARBITBLIT: Objection. 19:33:04

THE WITNESS: I'm sure you are correct. They know how they did it. I'm on the outside looking in here and see an increasing risk. 19:33:05 19:33:07 19:33:13

MR. ISMAIL: Q. Now, if -- as a clinician, you don't want a drug company to tell you its drug is more dangerous if the drug company, in fact, does not believe it to be the case, right? 19:33:18 19:33:36 19:33:40 19:33:43

MR. ARBITBLIT: Objection. 19:33:46

THE WITNESS: Correct, I want a drug company to be forthright and honest. 19:33:46 19:33:47

MR. ISMAIL: Q. So what we get down to, sir, is assuming Bayer interpreted its adverse event data as not reliable indications of a disparate risk with Baycol, in essence, you disagree with that conclusion, right? 19:33:55 19:33:55 19:33:58 19:34:03 19:34:06

MR. ARBITBLIT: Objection. 19:34:08

THE WITNESS: I believe I do and other people do as well. 19:34:09 19:34:10

MR. ISMAIL: Q. Well, I'm only asking you, sir. 19:34:11 19:34:13
A. Yes. 19:34:14
Q. Because I guess you get to speak only for yourself. 19:34:14 19:34:17
A. Correct. 19:34:18
Q. And your conclusion that Baycol had a disparate risk relative to other statins is based only on your retrospective analysis of certain adverse event data, correct? 19:34:19 19:34:26 19:34:29 19:34:34
A. Yes. 19:34:37
MR. ISMAIL: Counsel, I promised you, what seems like days ago, Mr. Black's e-mail to me regarding the drafting process for expert reports. I, on January 20th, wrote Mr. Black and said, "With respect to drafts, we agree that drafts should not be produced, but presumably this will not foreclose questions about the drafting process." 19:34:43 19:34:46 19:34:52 19:35:03 19:35:06 19:35:13 19:35:17
MR. ARBITBLIT: I've seen a copy that says, "Will foreclose the drafting process," so if you have a copy that says, "Will not," that is not what I've seen. 19:35:17 19:35:18 19:35:21
MR. ISMAIL: Okay. I presume you are not going to allow me to ask questions about the drafting process? 19:35:24 19:35:26 19:35:29
MR. ARBITBLIT: Correct. 19:35:30

expert with regard to issues related to a pharmacy dispensing Baycol in any of these cases; am I correct about that? 19:56:04 19:56:09 19:56:16

A. You are correct. 19:56:16

MR. FLORENCE: Thank you, sir. That is all I have. 19:56:17 19:56:18

MR. ISMAIL: Actually, I have now recalled one question I intended to ask, if you don't mind, Don. 19:56:19 19:56:20

MR. ARBITBLIT: Depends on the question. 19:56:25

MR. ISMAIL: All right. Stephen, go ahead. 19:56:26

EXAMINATION BY MR. FILIPOVITCH

MR. FILIPOVITCH: Q. Doctor, you are not offering any testimony about what any specific doctor should do in any specific case, are you? 19:56:31 19:56:33 19:56:34

A. No. 19:56:36

MR. FILIPOVITCH: Okay. Thank you. 19:56:38

MR. ISMAIL: Is that it, Stephen? 19:56:40

MR. FILIPOVITCH: That is it for me. Thanks. 19:56:42 19:56:44

FURTHER EXAMINATION BY MR. ISMAIL

MR. ISMAIL: Q. Dr. Raskin, have you reviewed any of the medical records or testimony of the Plaintiff in this case, Randy Pierce? 19:56:45 19:56:46 19:56:48

A. No, sir. 19:56:52

Q. Have you heard of that name before? 19:56:52