**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : | MDL No. 1431 (MJD) |
| This Document Relates to: | : | |
| *All Actions* | : | |

# BAYER AND GSK's MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXCLUDE EXPERT TESTIMONY OF DAVID RICHMAN

Dr. Richman is a neurologist who has virtually no experience with statin-induced myopathy or rhabdomyolysis. *See* Report of David Richman, M.D., (Ex. A); Deposition of David Richman, M.D., (Ex. B) at 199:20-24. Nevertheless, Dr. Richman offers four primary opinions:

(1) Baycol is the "most toxic" statin;

(2) Statins may cause persistent and on-going injury after therapy has stopped and absent clinical indication of such injuries;

(3) Rhabdomyolysis can be diagnosed retrospectively, despite the absence of contemporaneous elevated CK levels; and

(4) Baycol may affect cell membranes differently than other statins.

*See* Richman Rep. (Ex. A) ¶¶ 8, 9, 11, 20, 23, 25, 35; *see also* Richman Dep. (Ex. B) at 210:19-24; 52:23-53:8.

Dr. Richman's opinions should be excluded because plaintiffs cannot carry their burden of demonstrating that his proposed testimony is based upon a reliable scientific foundation. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 (1993); Fed. R. Evid. 702; *see also United States v. Williams*, 95 F.3d 723, 729 (8th Cir.

1996); *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 988-89 (8th Cir. 2001). Dr. Richman is not an expert on the subjects on which he has been offered to testify. Rather, his opinions are untested hypotheses concocted just for this litigation, based upon Dr. Richman's speculation about and improper extrapolation from articles by other scientists.

## ARGUMENT

### I. THE COURT SHOULD EXCLUDE DR. RICHMAN'S TESTIMONY THAT BAYCOL IS MORE TOXIC THAN OTHER STATINS.

Among Dr. Richman's opinions is that Baycol is the "most toxic" statin. More specifically, he opines that:

- "Baycol was associated with a far greater risk of fatal rhabdomyolysis." Richman Rep. (Ex. A) ¶ 8;
- "'rhabdomyolysis with cerivastatin . . . seems to be at least tenfold higher than with first generation statins . . .'," *id.* ¶ 9;
- "The muscle injuries caused by various statins are similar, although the literature suggests that Baycol has a higher attack rate," *id.* ¶ 20;
- "Baycol had a higher rate of muscle toxicity than the rest of the statin class." Richman Dep. (Ex. B) at 134:1-4.

The attempt to draw comparisons between Baycol and other statins is the stuff of epidemiology,[1] a subject on which Dr. Richman has no more experience than a family doctor:

Q. Sir, are you an expert in epidemiology?

---

[1] Epidemiology is "[t]he study of the distribution and determinants of health-related states or events in specified populations, and the application of this study to control of health problems." Stedman's Concise Medical Dictionary for the Health Professions, J. Dirckx, ed. (4th ed. 2001).

> A. I've had an epidemiology course in medical school. I, as a physician, deal with some issues of epidemiology. So, I think as much as I'm a physician, I'm an expert in epidemiology. *It's not an area of my research or my focused effort.*

*Id.* at 128:14-19 (emphasis added).

Under Rule 702, a proffered expert must have specific expertise in the particular issue to which he will testify, especially in medicine: "[G]iven the increasingly specialized and technical nature of medicine, there is no validity, if there ever was, to the notion that every licensed medical doctor should be automatically qualified to testify as an expert on every medical question. Such a rule would ignore the modern realities of medical specialization." *Broders v. Heiss*, 924 S.W.2d 148, 152 (Tex. 1996) (applying *Daubert*). This Court has confirmed the importance of specialization to expert testimony. *See, e.g., Medalen v. Tiger Drylac U.S.A., Inc.*, 269 F. Supp. 2d 1118, 1127-29 (D. Minn. 2003) (refusing to permit a toxicologist to opine on the etiology of basal cell carcinoma, noting that an expert in one subject may not be qualified to testify beyond that expertise).[2] Given his lack of expertise, Dr. Richman should be foreclosed from offering epidemiological conclusions.

---

2 *See also Wilson v. City of Chicago*, 6 F.3d 1233, 1238-39 (7th Cir. 1993) (excluding pathologist's testimony on issues of neurology, psychiatry, and physiology); *Wehling v. Sandoz Pharm. Corp.*, No. 97-2212, 1998 WL 546097, at *4 (4th Cir. Aug. 20, 1998) (pharmacist and toxicologist not qualified to opine on causation in context of alleged drug interaction or adequacy of warnings); *Burton v. Danek Medical, Inc.*, 1999 WL 118020, *3-5 (E.D. Pa. Mar. 1, 1999) (excluding proffered neurologist's testimony based on lack of knowledge of spinal surgery); *Alexander v. Smith & Nephew, P.L.C.*, 98 F. Supp. 2d 1310, 1315 (N.D. Okla. 2000) ("blanket qualification for all physicians to testify as to anything medically-related would contravene the Court's gate-keeping responsibilities").

Moreover, given his lack of experience with epidemiology, it is not surprising that Dr. Richman's conclusions are based upon flawed methodology. Dr. Richman did not examine clinical trial or any other controlled data. *Id.* at 130:16-21; 152:12-16. He arrived at his opinions entirely by extrapolating from articles discussing AERs. *See id.* at 135:17-22 (PSC counsel stating "he's relying on what he perceives to have been stated in the peer review literature. He's not going to offer any independent analysis"). As described below, the articles upon which Dr. Richman relies do not provide sound grounding in science to support his view that Baycol was the "most toxic" statin:

1) Dr. Richman cites to several articles which present only adverse event data.[3] Defendants already have explained that the FDA and the courts have

---

[3] Those articles include:

- Staffa, *et al.*, "Cerivastatin and Reports of Fatal Rhabdomyolysis," *NEJM*. 2002;346:539-40 (Ex. C);
- Farmer, "Learning from the Cerivastatin Experience," *Lancet*. 2001;358:1383-84 (Ex. D);
- Davidson, "Controversy surrounding the safety of cerivastatin," *Expert Opin. Drug Saf.* 2002;1:207-12 (Ex. E);
- Hamilton-Craig, "Statin-associated myopathy," *MJA*. 2001;175:486-89 (Ex. F), and
- Thompson, *et al.*, "Statin-Associated Myopathy," *JAMA*. 2003;289:1681-90 (Ex. G).

*See* Richman Rep. (Ex. A) ¶¶ 8-9; Richman Dep. (Ex. B) at 133:25-134:11; 133:11-17.

rejected reliance on AERs to make comparisons between drugs because AERs do not provide a scientifically sound database from which such conclusions can be drawn. *See* Defendants' AER Motion.

Dr. Richman's attempt to extrapolate from articles on AERs is particularly problematic, given that he had no prior experience with adverse event reports. Tellingly, he had not even previously heard the expression "spontaneous adverse event." Richman Dep. (Ex. B) at 135:12-14. Dr. Richman's willingness to opine based on AERs — knowing nothing about them — shows that Dr. Richman failed to employ the "'intellectual rigor'" required of a professional in his field. *Group Health Plan, Inc. v. Philip Morris U.S.A.*, 344 F.3d 753, 760 (8th Cir. 2003) (quoting *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996), *cert. denied*, 519 U.S. 819 (1996)).

2) Dr. Richman cites to 11 case reports that purport to show the continuum of injury that he claims Baycol can cause at "a higher attack rate" than other statins. Richman Rep. (Ex. A) ¶ 20(a)-(k); *see also* Richman Dep. (Ex. B) at 143:15-16 (citing Ravnan, *et al.*, "Cerivastatin-Induced Rhabdomyolysis: 11 Case Reports," *Pharmacother*. 2002;22:533-37 (Ex. H)). These case reports do not support Dr. Richman's opinions for the following reasons:

- None of these studies provides a comparative analysis of statins, and therefore none supports the proposition that Baycol is the "most toxic" of all statins.

- Case reports are recognized as inherently unreliable data by the Eighth Circuit. "Case reports are generally not considered reliable evidence of causation." *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1209 n.5 (8th Cir. 2000); *see also Willert v. Ortho Pharm. Corp.*, 995 F. Supp. 979, 981 (D. Minn. 1998) (same); *see also* Dep.

of Thomas Zizic (Ex. I) at 164:9-165:3 (stating that "[i]solated case reports" are the least reliable data, even less reliable than adverse event reports).

- Of the reports cited, 7 of the 11 case reports (cited in Richman Rep. (Ex. A) ¶ 20(e)-(k)) do not involve Baycol.
- Those case reports that do pertain to Baycol use involve rhabdomyolysis and do not suggest a continuum of muscle injury.

Thus, the articles to which Dr. Richman cites do not support his opinions regarding Baycol. Without adequate foundation in reliable data, Dr. Richman's opinions are merely speculation and should be excluded.

## II. DR. RICHMAN'S THEORY OF STATIN-INDUCED PERSISTENT INJURY IS UNTESTED AND SPECULATIVE.

Dr. Richman offers several untested hypotheses that statins may induce persistent myopathies and rhabdomyolysis-related muscle damage even after statin use has been discontinued and even in the absence of clinical indications of such injuries. In particular, Dr. Richman testifies that:

- "Muscle damage caused by statins can best be described in terms of a continuum, ranging from mild, temporary conditions to very severe *and permanent injuries* . . . " Richman Rep. (Ex. A) ¶ 11;
- "The severity of the injury [from rhabdomyolysis] and its persistence to date support the conclusion that the patient's injury is probably permanent," *id.*, ¶ 17;
- "'rhabdomyolysis due to other causes can also result in residual effects . . ." *id.*, ¶ 20.k; and
- "Baycol causes . . . permanent disability," *id.*, ¶ 35.

These assertions are based upon speculation, rather than sound scientific methodology, and should be excluded. As the United States Supreme Court explained in *General Electric Co. v. Joiner*:

> conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

522 U.S. 136, 146 (1997) (holding that trial court properly excluded expert opinions attributing a plaintiff's cancer to his exposure to PCBs, where the opinions were based, in part, upon four epidemiological studies that did not explicitly suggest a causal link between PCBs and cancer, despite correlative data); *accord Glastetter*, 252 F.3d at 989-90 (affirming exclusion of an expert opinion asserting that the stroke medication Parlodel caused intracerebral hemorrhage, where testimony inappropriately extrapolated from case studies, medical texts, and other sources, where the studies did not explicitly state that such a causative relationship existed).[4]

---

[4] *See also J.B. Hunt Transport, Inc. v. General Motors Corp.*, 243 F.3d 441, 444 (8th Cir. 2001) (expert testimony excluded that was "mere speculation and pure conjecture . . . [e]xpert testimony that is speculative is not competent proof and contributes nothing to a legally sufficient evidentiary basis") (internal quotations omitted); *Medalen v. Tiger Drylac U.S.A., Inc.*, 269 F. Supp. 2d 1118, 1134-1135 (D. Minn. 2003) ("We accept, under Eighth Circuit jurisprudence, that an expert in a toxic tort action, need not necessarily, support his or her causation opinion with published studies . . . Nevertheless, the expert must offer something other than rank conjecture, and his or her own say-so"); *accord Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996) (distinguished cardiologist's testimony "while expressing what may be an insightful, even an inspired, hunch concerning the cause of the heart attack . . . lacks scientific rigor . . . the deposition

Dr. Richman's opinions on permanent muscle injury are such impermissible *ipse dixit*. He admits he knows of no study that actually supports his conclusion of a causal relation between statins and ongoing myopathy or rhabdomyolysis-related injuries:

Q. Are you aware of a single article describing the possibility that a patient with normal CK can have muscle pain or weakness persist following discontinuation of the statin?

* * *

A. No, I'm not aware of any article that does that – that states that.

*See* Richman Dep. (Ex. B) at 87:15-21.

Q. Are you aware of a single article or case report of a patient having persistent elevations of CK following discontinuation of the statin?

A. No, I'm not.

*Id.* at 105:17-20. Similarly, he has not personally witnessed any such phenomenon, stating: "in terms of a patient that I've taken care of that was taking statins, had muscle symptoms, normal CK and then the statin was discontinued and the symptoms continued, no, I haven't treated a patient like that." *Id.* at 88:11-15.

---

offers neither a theoretical reason . . . or any experimental, statistical, or other scientific data from which such a causal relation might be inferred or which might be used to test a hypothesis founded on theory"); *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998) (expert testimony excluded when it relied "on underground knowledge, untested and unknown to the scientific community. An opinion based upon such unsubstantiated and undocumented information is the antithesis of the scientifically reliable expert opinion admissible under *Daubert* and Rule 702."); *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005) (expert testimony excluded where medical literature did not support causation opinion and expert "simply substituted his own *ipse dixit* for scientific proof").

Dr. Richman's improper extrapolations are exemplified by the hypothesis he posits from his reading of an article by England: that *"it's quite conceivable"* rhabdomyolysis-related microscopic mitochondrial injuries can be permanent. *See id.* at 166:1-12 (emphasis added) *See* England J, *et al.*, Mitochondrial myopathy developing on treatment with HMG CoA reductase inhibitors-simvastatin and pravastatin [letter]. *Aust. NZ J. Med.*1995;25:374-75 (Ex. J). As Dr. Richman admits, however, the *England* article does not actually opine on the permanence of any clinical symptoms relating to mitochondrial changes:

> Q. And in those three patients [receiving biopsies following the cessation of statins], was there any clinical manifestation of the microscopic changes?
>
> * * *
>
> A. They don't comment on that.

*See* Richman Dep. (Ex. B) at 169:13-16. In fact, the *England* study's only definitive finding was that patients fully recovered following their initial statin therapy. *Id.* at 167:22-168:01. Yet, Dr. Richman fabricates from the *England* article a conclusion never stated by the author: that statin-related injuries may exist in the absence of any clinical symptoms. *Id.*

Dr. Richman's various untested theories and improper extrapolations, unsupported by any peer-reviewed studies, textual support or personal experience, and devised for litigation purposes, do not meet the requirement for a reliable methodology under *Daubert* and must be excluded on that basis. *See Joiner*, 522 U.S. at 146; *Glastetter*, 252 F.3d at 989-990; *Medalen*, 269 F. Supp. 2d at 1134-1135.

## III. THE COURT SHOULD EXCLUDE DR. RICHMAN'S UNTESTED THEORIES REGARDING DIAGNOSIS OF RHABDOMYOLYSIS AND MYOPATHY AS MERE SPECULATION, DEVISED SOLELY FOR LITIGATION PURPOSES.

Dr. Richman also proposes to testify to the novel and untested theories (1) that rhabdomyolysis may exist even when CK levels are normal; (2) that rhabdomyolysis can be diagnosed retrospectively using clinical information, absent contemporaneous elevated CK levels; and (3) that statin-induced myopathy can be diagnosed solely based upon strength testing. Specifically, Dr. Richman's opinions are:

- "rhabdomyolysis may be diagnosed retrospectively on the basis of clinical information, including exposure to a statin or other muscle toxin, complaints of muscle pain or weakness, and/or brownish discoloration of urine resulting from the presence of myoglobin . . ." Richman Rep. (Ex. A) ¶ 23;
- "Strength testing is an accepted method of diagnosing both acute and residual muscle injuries," *id*., ¶ 25;
- "There's still the injury to the muscle. But all of the CK has been cleared out of the blood, but they still have rhabdomyolysis." Richman Dep. (Ex. B) at 25:2-5.

It is quite clear from Dr. Richman's testimony that he relies upon nothing but his own speculative opinions for each of these theories.

Q. Are you aware, sir, of any article that uses the phrase "retrospective diagnosis" in regards to rhabdomyolysis?

* * *

A. No.

Q. Have you ever written in any article or a piece of medical literature your view regarding the criteria for retrospective diagnosis of rhabdomyolysis?

A. No, I have not.

*Id.* at 111:7-15.

> Q. Is there any statement in the [relied-upon article] that says, "A patient with normal CK can be diagnosed as having rhabdomyolysis . . . ?"
>
> A. I don't see that they've given a statement like that.

*Id.* at 115:12-18.

> Q. Are you aware, sir, of any article that has diagnosed a statin myopathy based solely on strength testing?
>
> * * *
>
> A. I'm not aware of it.

*Id.* at 117:6-10

Nor does Dr. Richman's personal clinical experience provide support for these untested diagnostic theories. He has virtually no experience with actual or purported muscle injuries related to statins, Richman Rep. (Ex. A) ¶¶ 4-5; Richman Dep. (Ex. B) at 199:20-24; never has prescribed a statin, *id.* at 199:8-9; never has retrospectively diagnosed a patient with rhabdomyolysis, *id.* at 112:2-5; has no clinical experience with patients suffering from statin-induced rhabdomyolysis, *id.* at 129:22-25; never has diagnosed a patient with having a statin myopathy based solely upon strength testing, and is not aware of a single time that a patient was diagnosed as having a statin-induced myopathy based solely upon strength testing, *id.* at 117:13-118:06. As a researcher, Dr. Richman has not done any work relating to statins, let alone cerivastatin, nor has he researched or published on the subject of statin-induced myopathy or rhabdomyolysis. *Id.* at 200:1-15; *see also id.* at 131:21-25; 200:16-19.

Q. Is the first time that you wrote about your understanding of pathogenic processes in your expert report for the Baycol litigation?

* * *

A. Yes.

*Id*. at 101:24-102:3

Given his lack of expertise on issues pertinent to this litigation, Dr. Richman has formed his opinions by reading articles and medical texts and extrapolating from them. *See*, *e.g.*, *id*. at 135:17-22; 142:13-143:17, 214:2-24. However, "[t]he mere recitation of a list of studies is not a magical incantation paving the way to the witness stand unless it is accompanied by reasoned and scientifically accepted analysis." *Pugliano v. United States*, 315 F. Supp. 2d 197, 200 (D. Conn. 2004) (quoting *O'Connor* v. *Commonwealth Edison Co*., 807 F. Supp. 1376, 1392 (C.D. Ill. 1992)).

Indeed, Dr. Richman's theory that rhabdomyolysis can exist without a contemporaneous elevated CK level is particularly indicative of his propensity to extrapolate improperly from medical literature. After Dr. Richman indicated he relies solely upon the *Mogyorisi* article for support for his theory, he was asked:

Q. Where in this article do the authors suggest that when the patient had normal CK, the patient still had rhabdomyolysis?

* * *

A. *I don't know whether that's relevant or not.* We could look through. But, you know, *I feel capable of reviewing these scientific data and making that conclusion*.

* * *

Q. Can we agree that nowhere in here do the authors suggest that a patient with normal CK has rhabdomyolysis?

* * *

> A. *I don't know whether that's relevant or not.* I would have to go through it again to see whether they state that or not. But that's – this article is communicating that. *Whether they state it in English words doesn't really, to me, seem relevant to my opinion.*"

*Id.* at 30:17-31:17 (emphasis added).

Thus, Dr. Richman blatantly ignores (and considers irrelevant) what *actually* is written in the studies he cites for his various theories, and instead substitutes his own conclusions which, inexplicably, he feels comfortable making. *Id.* At times, Dr. Richman discards *any* reliance upon medical studies, or even personal experiences, to support his untested hypotheses. For example, he acknowledges that there is no known literature or clinical practice to support use of strength testing in diagnosis of statin-induced myopathy, yet he indicates that such diagnosis is acceptable, even without a comparative strength-test baseline. *Id*. at 117:6-118:17.

Under *Daubert*, the Court should exclude such opinion evidence connected to the existing literature only by the *ipse dixit* of Dr. Richman. *Joiner*, 522 U.S. at 145-146 (rejecting opinion testimony that PCBs caused lung cancer, in part, where the relied-upon study did not explicitly state such a connection). The exclusion of Dr. Richman's opinion is even more compelling here, where his opinion clearly was formed entirely for purposes of this litigation, and within two days of his deposition. Richman Dep. (Ex. B) at 13:23-16:09; *see also id.* at 112:10-16 ("So, is it still correct to say the first time that you wrote down your view regarding the appropriate criteria for retrospective diagnosis

of rhabdomyolysis was your expert report in this case? . . . A. I don't think that I, in the past, have made the distinction”).

## IV. DR. RICHMAN’S UNTESTED THEORY THAT BAYCOL AFFECTS CELL MEMBRANES DIFFERENTLY FROM OTHER STATINS IS EXCLUDABLE AS MERE SPECULATION.

Dr. Richman finally opines that Baycol affects cell membranes differently from other statins. Dr. Richman has testified:

> Q. Are you suggesting that Baycol caused a different type of muscle injury than the other statins?
>
> A. Yes, in the sense that it is more readily inside the cell.

Richman Dep. (Ex. B) at 52:23-53:2.

> A. I think it’s very *likely* that Baycol has more of an effect on the membrane of the muscle cell. And that *could* explain why there’s more rhabdomyolysis with Baycol.

*Id.* at 53:5-8 (emphasis added).

Dr. Richman extrapolates this untested theory from a single sentence from the *Davidson* article (Ex. E): “The noted myotoxicity and subsequent withdrawal of cerivastatin from the worldwide market in August 2001 has demonstrated that the safety of statins is not a class effect.” Richman Dep. (Ex. B) at 56:1-10. Thus, from a single comment in a single article concerning alleged *safety* differences in statins, Dr. Richman jumps to the conclusion that the actual *mechanisms* for muscle cell injury are different and more severe for Baycol:

> Q. [Y]ou read into that clause that there must be a different mechanism for Baycol than the other statins?

* * *

> A. I think that's the – first of all, the logical conclusion . . . the fact that Baycol is better able to get into the cell and to affect the membrane of the cell.

*Id.* at 57:11-23. Yet, even Dr. Richman readily acknowledges that mechanism of action underlying his theory is unknown.

> Q. Would you agree that there is no accepted mechanism of action regarding how statins cause muscle cell death?
>
> A. We know a number of effects, pathological effects, that statins have on muscle . . . But how these come together to produce the death isn't yet known.

*Id.*, at 50:12-25.

> Q. Can we agree that Dr. Davidson does not describe a muscle injury unique to Baycol?
>
> A. . . . Yes, I would agree with that.

*Id.* at 57:24-58:3. Nonetheless, Dr. Richman speculates that the mechanism for muscle cell injury is different in Baycol despite his admission that he *does not know what that mechanism is* and despite his admission that Baycol does not cause any muscle injuries unique from those caused by other statins. *See id.*, at 58:19-60:13.

Dr. Richman relied for this opinion upon only one article, which he saw for the first time the week prior to his deposition. *Id.* at 54:13-21, 55:10-25. The test of admissibility requires more. Such rank speculation should be excluded.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court exclude Dr. Richman's testimony on the topics discussed above as inadmissible under Fed. R. Evid. 702 and 703 and *Daubert*.

Dated: April 17, 2006

Respectfully submitted,

Philip S. Beck
Adam Hoeflich
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60610
(312) 494-4400

/signature on file/
Susan A. Weber
James W. Mizgala
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000

Paul J. Zidlicky
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000

Catherine Valerio Barrad
Linda S. Peterson
J.P. Pecht
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
(213) 896-6000

Richard K. Dandrea
ECKERT SEAMENS CHERIN
& MELLOTT, LLC
USX Tower, 600 Grant St., 44th Floor
Pittsburgh, PA 15219
(412) 566-6000

Scott A. Smith
Tracy J. Van Steenburgh
HALLELAND LEWIS NILAN
SIPKINS & JOHNSON, P.A.
220 South Sixth Street, Suite 600
Minneapolis, MN 55402
(612) 338-1838

/signature on file/
Fred T. Magaziner
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000

*Counsel for SmithKline Beecham Corp. d/b/a GlaxoSmithKline*

Peter W. Sipkins (No.101540)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
(612) 340-2600

Douglas R. Marvin
WILLIAMS & CONNOLLY
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

Joseph D. Piorkowski, Jr.
THE PIORKOWSKI LAW FIRM, PC
910 17th Street, N.W. Suite 800
Washington, D.C. 20006
(202) 223-5535

*Counsel for Bayer Corporation and Bayer AG*