**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : | MDL No. 1431 (MJD) |
| This Document Relates to: | : | |
| *All Actions* | : | |

## BAYER AND GSK's MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXCLUDE EXPERT TESTIMONY OF ERICH F. SCHINAGL

Dr. Erich F. Schinagl's report is filled with argumentative language, assumptions, and unsupported statements. At bottom, his opinions represent his post hoc application of personal standards of conduct to defendants – not scientific, technical or other specialized knowledge that would be of assistance to the jury. Purported experts who "lend their credentials and reputations to the party who calls them without bringing much if any relevant knowledge to bear on the facts" have no place in the federal courtroom. *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 538 (S.D.N.Y. 2004). Dr. Schinagl should not be permitted to testify about whether Bayer met his personal standards of conduct under the mantle of science simply because he has an M.D. after his name.

## ARGUMENT

Dr. Schinagl's report reviews selected portions of the chronology of the development of Baycol, beginning with pre-clinical testing in animals and progressing through approval of different strengths up to the 0.8 mg dose, the highest dose approved by the FDA. His chronology is sprinkled with editorial comments and judgment-laden

terminology about Bayer's state of mind, but it culminates in seven summary opinions. Report of Erich F. Schinagl (Ex. A) at 11. These seven opinions, in turn, can be boiled down to two basic opinions: (1) that Bayer's testing of Baycol was inadequate to prove its safety in light of the signals that were present during its development; and (2) that Bayer's monitoring of the drug's safety after it was approved by the FDA was inadequate and conducted "without a proper understanding of the respective roles of the company and the regulatory authorities." *Id*. at 11. His basic opinions, and each of the seven opinions they subsume, fail to meet the standards of Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

Much of what is wrong with Dr. Schinagl's opinions from a scientific standpoint can be explained by the fundamental flaw in the way he approached his subject. A basic tenet of science is that the scientist must be disinterested and objective. By definition, scientific conclusions must be based on evidence that can be tested and standards that are objective and meaningful.

Dr. Schinagl's approach is the antithesis of this method. For example, Dr. Schinagl disclosed that he first sought out plaintiffs' counsel to offer his services upon reading newspaper reports about the withdrawal of Baycol from the market. Schinagl Dep. (Ex. B) at 126:17-21. He did so because, based solely on accounts in the popular press, he had formed an opinion that it was an "open and shut case." *Id.* at 128:9. From this preconceived idea about the merits of the case, he proceeded to look for evidence to support his opinions. This absence of objectivity is pervasive in his report. Thus, despite

his scientific and medical background, Dr. Schinagl had made up his mind before he read any of the relevant evidence or background information.

In addition to this methodological flaw, Dr. Schinagl's opinions fail to meet the *Daubert* standard for two basic reasons. First, many of his opinions are not in fact scientific opinions at all. Instead they are arguments, speculation, and subjective characterization of Bayer's conduct or state of mind coupled to vague standards of behavior. Second, several of his opinions boil down to a view that either Bayer misled the FDA by not conducting more testing or by not providing the FDA with more information about the drug, or that the FDA made a mistake in approving the drug as safe and effective based on the information before it. Opinions that Bayer misled the FDA or that the FDA made a mistake are inadmissible because any state law claim based upon such opinions would be preempted by federal law. Any conclusions as to what the FDA would have done are speculative. Ultimately, each of Dr. Schinagl's seven summary opinions is inadmissible for these reasons and as discussed below.

## I. DR. SCHINAGL'S OPINION THAT BAYER FAILED TO PAY ADEQUATE HEED TO THE RESULTS OF EARLY ANIMAL TEST RESULTS IS BASED ON FLAWED SCIENCE AND AN UNASCERTAINABLE STANDARD OF CARE.

SCHINAGL SUMMARY OPINION NO. 1:
*"IN THE CLINICAL DEVELOPMENT OF BAYCOL, BAYER FAILED TO APPROPRIATELY HEED THE WARNING SIGNS PRODUCED BY THEIR OWN PRECLINICAL EXPERTS, INDICATING THAT THE NEW DRUG WAS SUBSTANTIALLY DIFFERENT FROM AND POTENTIALLY MORE MYOTOXIC THAN EARLIER STATINS."*

Dr. Schinagl opines that Bayer failed to "appropriately heed" the results of animal tests early in the development of Baycol based on a statement by two Bayer scientists concerning cerebral hemorrhage in dogs given high doses of Baycol, a problem that never occurred in humans. Schinagl Rep. (Ex. A) at 11; Schinagl Dep. (Ex. B) at 286:24-287:20. At issue in this litigation is muscle injury in humans, specifically rhabdomyolysis, not cerebral hemorrhage in dogs. Thus, for Dr. Schinagl's reference to these studies to have any relevance to this litigation, jurors would have to conclude that cerebral hemorrhage in dogs receiving high doses of Baycol was predictive of unduly high risks of rhabdo in humans receiving therapeutic doses. Dr. Schinagl's report and deposition testimony do not and cannot make a scientific connection between the high-dose dog studies and human experience because there is none. His opinion is inadmissible for lack of scientific relevance. *See General Elec. Co. v. Joiner*, 522 U.S. 136 (1997) (offering animal studies showing one type of cancer in mice to establish causation of another type of cancer in humans is "simply too great an analytical gap between the data and the opinion offered.")

In fact, the unique event of cerebral hemorrhage in dogs was considered by Bayer in its testing of the drug and was never seen in human experience.[1] Schinagl Dep. (Ex. B) at 287. More importantly, as Dr. Schinagl admitted, the animal and clinical testing, including the results of the dog testing he relies upon, was disclosed to FDA as part of the New Drug Application ("NDA"), considered by the FDA and, with knowledge of these results, the drug was approved as safe and effective. *See id.* at 181; 185-86; 219-20.[2]

[1] Dr. Schinagl admitted that he did not read the depositions of the Bayer toxicologists. Schinagl Dep. (Ex. B) at 166-67.

[2] Elsewhere in his report, Dr. Schinagl speculates about the state of mind or intent of Bayer employees with regard to the animal testing of Baycol. For example, Dr. Schinagl states that: "Dr. Sprenger, a Bayer AG employee, *may not have been aware* of a memo regarding the preclinical toxicology program, and [h]ad he been, he might have been more cautious in his interpretation and analysis of the many spontaneous adverse event reports he reviewed." Schinagl Rep. (Ex. A) at 2 (emphasis added). Such speculation is inadmissible. *See Rezulin*, 309 F. Supp. 2d at 547 ("[t]he question of intent is a classic jury question and not one for the experts.") (quoting *In re Diet Drugs*, 2000 WL 876900, at *9 (E.D. Pa. June 20, 2000)). *See Daubert*, 509 U.S. at 590 ("the word 'knowledge' connotes more than subjective belief or unsupported speculation"). The jury – not plaintiffs' experts – is charged with deciding questions of intent and motive if those issues are relevant at all.

## II. DR. SCHINAGL'S OPINION THAT BAYER MINIMIZED NEGATIVE INFORMATION IN MEDICAL ARTICLES IS BASED ON ERRORS OF FACT AND IMPROPER PROJECTIONS ON TO BAYER OF PRACTICES HE FOLLOWED WHILE EMPLOYED BY ANOTHER PHARMACEUTICAL COMPANY

SUMMARY OPINION NO. 2:
*"THROUGHOUT THE PUBLISHED REPORTS OF CLINICAL STUDIES, BAYER MINIMIZED NEGATIVE FINDINGS IN ORDER TO MAKE BAYCOL APPEAR SAFER THAN IT REALLY WAS."*

Several pages of Dr. Schinagl's report are devoted to a critique of four articles in medical journals that appeared at about the time Baycol was initially available in the U.S. These 1998 articles discussed the results of the clinical studies of the drug, and Dr. Schinagl contends that they misled doctors about the safety of the drug. Schinagl Rep. (Ex. A) at 3-6. He imputes responsibility for their misleading content to Bayer. His opinion that Bayer somehow suppressed negative information in these articles is not based on fact but instead on his own practices while working for a Swedish pharmaceutical company more than 10 years ago. Schinagl Dep. (Ex. B) at 223-27. As Dr. Schinagl admitted in his deposition, his opinion that Bayer was responsible for the content of the articles was something he pieced together from evidence that does not support the conclusion. Schinagl Rep. (Ex. A) at 11.

The medical literature Dr. Schinagl characterizes as misleading *was not authored by Bayer employees*, but by physicians conducting the clinical trials. Schinagl Dep. (Ex. B) at 223:15-224:18. As he admitted, "I can't say that I critically examined the author list of each of these papers to see what relationship, if any, these authors had to Bayer." *Id.* at 224:1-14. Thus, a proper basis for his conclusion is absent.

Despite his lack of foundation, Dr. Schinagl concludes that these authors must have been acting on behalf of Bayer because "what you usually, as part of the industry, attempt to get is as much influence over the publication as you can get because a published paper is an important and critical marketing tool." *Id*. at 225:3-12.[3] He admitted that he "would lean on authors in terms of the way they presented their data on Pharmacia products." *Id.* at 228:6-11. "Well, I mean, yes, that's business." *Id.*

In other words, what Dr. Schinagl is doing is projecting his own specific experience gained as an employee of the Swedish company Pharmacia on to Bayer and the entire industry for that matter. *Id.* 226: 22-227:2 (only experience regarding this practice was his experience at Pharmacia, not what Bayer's experience was). But this case is not about what another company may have done or what was common in the industry; it is about what Bayer did or did not do. As he admitted, his opinion was supposition: "I don't have any specific information, but it would be extremely surprising to me if they didn't." *Id.* at 226:13-15; *see also* Schinagl Rep. (Ex. A) at 5 ("It is

[3] *See also* Schinagl Rep. (Ex. A) at 5-6 ("Pharmaceutical companies typically try to hold back publication of key papers prior to approval of a new drug and arrange with a reputable journal for combining them in a supplement to be available at launch to give salesmen a 'launch package.' Large numbers of reprints are typically ordered and distributed to potential prescribers. It is reasonable to assume that Bayer reviewed the manuscripts prior to publication and leaned on the authors present [sic] their data in the most favorable light.")

reasonable to *assume* that Bayer reviewed manuscripts prior to publication and leaned on authors to present their data in a most favorable light") (emphasis added).[4]

Assumptions such as these are not appropriate expert testimony. Instead, these assumptions are the basis for argument that Bayer is a bad company, testimony that is inadmissible under *Daubert*. *See Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001) ("[T]he district court's gatekeeping role separates expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge").

## III. DR. SCHINAGL'S OPINIONS CONCERNING THE ADEQUACY OF BAYER'S CLINICAL TRIALS ARE PREEMPTED BY FEDERAL LAW AND ARE INADMISSIBLE SPECULATION.

SUMMARY OPINION 3:
*"GIVEN THE WARNING SIGNS FROM BOTH THE PRECLINICAL AND CLINICAL STUDIES, BAYER DID NOT TEST THE DRUG IN A SUFFICIENTLY LARGE NUMBER OF PATIENTS TO ASSURE ITS SAFETY."*

SUMMARY OPINION 6:
*"THE 0.8 MG DOSAGE OF BAYCOL WAS TESTED, LAUNCHED AND PROMOTED IN A RECKLESS MANNER IN AN ATTEMPT TO MATCH THE EFFICACY OF COMPETITOR STATINS, WITHOUT REGARD TO THE PROPER PRECAUTIONS."*

Although Dr. Schinagl is critical of the medical journal articles about Baycol discussed above, he notes that at least two of the four studies, with complete data, were specifically discussed by the FDA reviewers and he is not aware, one way or the other, as to whether the other studies were considered. *See* Schinagl Rep. (Ex. A) at 4-5.

[4] In addition to imputing these articles to Bayer and assuming that the authors intended to mislead the readers, Dr. Schinagl also assumes that the doctors reading these articles would not be interested in the data being presented. *See, e.g.*, Schinagl Rep. (Ex. A) at 4 ("Thus the comparison, as presented in the paper is misleading, since *the readers would only be interested* in a comparison of dosages that provide equal benefit to the patient.")

He admitted that the FDA had all the preclinical data, far more than he had reviewed. Schinagl Dep. (Ex. B) at 219-20. Nevertheless, Dr. Schinagl expresses the opinion that these studies, and the subsequent clinical studies Bayer sponsored, were not enough to demonstrate the safety of the drug and that Bayer should have tested the drug in more patients. In essence, what Dr. Schinagl's opinion comes down to is that Bayer's submissions to the FDA were incomplete or misleading and that the FDA should not have approved the drug for marketing. Schinagl Rep. (Ex. A) at 11.

As an example, with regard to the original NDA Bayer submitted to the FDA, Dr. Schinagl states that the number of patients who had used the 0.3 mg dose in clinical trials for 12 or more months was "only a fraction of what most companies I am familiar with would consider adequate for the introduction of a new chemical to the market." *Id.* at 6. Thus, while the number of patients in the clinical studies met the FDA's standard – indeed the FDA characterized the number of patients as "substantial" (Schinagl Dep. (Ex. B) at 203:18-23) – they did not meet Dr. Schinagl's personal standard.

Not only does Dr. Schinagl think that the clinical trials were too small, he is also critical of the design of the clinical studies for various reasons including the fact that patients taking other cholesterol medications and patients with preexisting elevated muscle enzymes (CK) were excluded. Even in his report he acknowledges that these criteria were "entirely appropriate" but not sufficient in his opinion. Schinagl Rep. (Ex. A) at 7. He then notes that despite not meeting his criteria for clinical studies, "surprisingly, [Bayer] received marketing approval [from the FDA] on 6/26/97, in spite

of the scant patient numbers in the NDA. Even more surprisingly, the FDA approved prescribing information which, if anything, made Baycol appear safer than the other statins." *Id.* at 7. Similarly, Dr. Schinagl noted that "[t]here is no indication that the suggested studies were ever performed or that anyone either at Bayer or at the FDA ever considered the obvious safety measure[s], which would have mitigated if not prevented the unfortunate outcome described [above]." *Id.* at 9. In essence, Dr. Schinagl is second guessing the FDA's judgment as to the safety of the drug.

In similar fashion, Dr. Schinagl criticizes Bayer's data submitted for approval of the 0.8 mg dose, the highest dose approved by the FDA, and the FDA's decision to approve it for marketing in 2000. *Id.* at 7-9, 11. Here again, Dr. Schinagl criticizes the design of the clinical trials and the handling of the earlier preclinical data and concludes that in spite of warning signals, "the company went ahead with a major pivotal trial with the 0.8 mg dosage, eventually obtained FDA approval for it and marketed it aggressively, a fact that in my opinion within a reasonable degree of medical certainty to be primarily [sic] responsible for the disastrous outcome" described elsewhere in his report. *Id.* at 8. In his deposition, Dr. Schinagl admits that the basis for this opinion was his "emphatic" disagreement with FDA's decision to approve the 0.8 mg dosage. Schinagl Dep. (Ex. B) at 290:9-13.[5]

[5] Dr. Schinagl's disagreement with the tools of science is evident in this regard as well. For example, in discussing the analysis of the adverse events from the 0.8 mg clinical trial, he notes that statistically the differences in adverse events were most likely due to chance, but nevertheless argues that the statistically insignificant results should have been acted upon. Schinagl Rep. (Ex. A) at 8.

Dr. Schinagl's opinions about the adequacy of Bayer's clinical trial submissions to the FDA for approval of Baycol, and the adequacy of the FDA's response, are inadmissible because an alleged failure by a company to provide additional or different data to the FDA cannot form a basis for liability. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001). Because such a claim cannot form the basis for liability, the evidence is inadmissible as irrelevant and prejudicial, as discussed in greater detail in Bayer and GSK's Motion to Exclude Testimony by Plaintiffs' Expert Witness Richard Kapit at Part II.

In addition, even if not preempted, such testimony calls for the jury to speculate because the issue of whether the FDA was misled by a company's submission would only matter if the agency would have reached a different conclusion if different or additional data had been available.[6] But Dr. Schinagl is not capable of making that determination. Indeed, as he admitted at his deposition, he did not even review the data the FDA had before it, acknowledging in connection with the 0.8 submission, for example, that the FDA had "much, much more" information than he did when it approved the dosage. Schinagl Dep. (Ex. B) at 288:21-23. As he further admitted, not only would the FDA have had much more information about Baycol than he had reviewed, but it also would have had information not available to Bayer or anyone else

---

[6] That Dr. Schinagl disagrees with the FDA's judgment in approving Baycol and is seeking to have the jury substitute his for that of the FDA is obvious from his deposition. *See* Schinagl Dep. (Ex. B) at 231:14-15 ("That was [FDA's] opinion, and I've given you mine").

about the toxicity, efficacy and safety of the other statins, information he did not even attempt to review. Schinagl Dep. (Ex. B) at 217-22.

Thus, not only would it be improper for the jury to speculate about what the FDA would have done under different circumstances, Dr. Schinagl cannot even provide the jury with the same facts that the agency actually considered at the time. Such opinions are of no help to the fact finding process but can only confuse and distort the process. *See* Kapit Motion, at Part II (collecting authorities excluding speculative testimony on what FDA might have done).

## IV. DR. SCHINAGL'S OPINION THAT THE INITIALLY APPROVED LABEL WAS MISLEADING IS NOTHING MORE THAN A DISAGREEMENT WITH THE FDA'S CONCLUSIONS.

SUMMARY OPINION 4:
*"IN DEVELOPING THEIR INITIAL PRESCRIBING INFORMATION, BAYER CLAIMED THAT BAYCOL WAS SAFER THAN OTHER STATINS, ALTHOUGH THE EVIDENCE POINTED IN THE OPPOSITE DIRECTION."*

Similar to his position on the adequacy of the clinical data supporting the approval of Baycol, Dr. Schinagl also contends that the initial Baycol labeling (package insert) was misleading because, in his view, it implied that Baycol was safer than other statins.[7] According to his deposition testimony (Schinagl Dep. (Ex. B) at 264:10-23) this opinion is a reference to the omission of a reference to Baycol in the first sentence of the following warning in the initial label:

---

[7] At his deposition, Dr. Schinagl recognized that there was a problem with his use of the term "claimed" in his report to describe what he thought Bayer's labeling did. Dr. Schinagl conceded that he should have said that the label "implied" or "suggested" that Baycol was safer. Schinagl Dep. (Ex. B) at 261:12-16.

> **Rare cases of rhabdomyolysis with acute renal failure secondary to myoglobinuria have been reported with other HMG-CoA reductase inhibitors.** Myopathy, defined as muscle aching or muscle weakness, associated with increases in plasma creatine kinase (CK) values to greater than 10 times the upper limit of normal, was rare (<0.2%) in U.S. cerivastatin clinical trials. Myopathy should be considered in any patient with diffuse myalgias, muscle tenderness or weakness, and/or marked elevation of CK. Patients should be advised to report promptly unexplained muscle pain, tenderness, or weakness, particularly if accompanied by malaise or fever. BAYCOL™ (cerivastatin sodium tablets) therapy should be discontinued if markedly elevated CK levels occur or myopathy is diagnosed or suspected. **BAYCOL™ (cerivastatin sodium tablets) should be temporarily withheld in any patient experiencing an acute or serious condition predisposing to the development of renal failure secondary to rhabdomyolysis, e.g., sepsis; hypotension; major surgery; trauma; severe metabolic, endocrine or electrolyte disorders; or uncontrolled epilepsy.**
>
> The risk of myopathy during treatment with other HMG-CoA reductase inhibitors is increased with concurrent administration of cyclosporine, fibric acid derivatives, erythromycin, azole antifungals or lipid-lowering doses of niacin.

*See* Package Insert (Sept. 1997) (Ex. C).

The first sentence of this warning does not refer to Baycol since no cases of rhabdomyolysis ("rhabdo") had been reported in patients taking the drug during the clinical trials.[8] Dr. Schinagl disagrees with Bayer's and the FDA's decision to omit reference to Baycol in that sentence because, in his opinion, a subject in the Phase I clinical trial had developed rhabdo. Schinagl Dep. (Ex. B) at 265:4-7. Neither the clinical investigators who actually examined the patient nor the FDA, which reviewed the study results, agreed with Dr. Schinagl that the patient had rhabdo. *See id.* at 266:21-24;

[8] As Dr. Schinagl conceded, the above warning was a class warning approved by the FDA for all the marketed statins. Schinagl Dep. (Ex. B) at 268:20-23.

267:1-2; 267:15-24. Dr. Schinagl is not qualified to second guess their judgment. Dr. Schinagl has not seen a patient since the 1960s, has never diagnosed or even seen a patient with rhabdo, and does not have any idea how the FDA defines rhabdo. *Id.* at 270:8-271:21. Thus, even if the above warning could be construed as misleadingly suggesting that Baycol could not cause rhabdo, the foundation for Dr. Schinagl's opinion is lacking.

This opinion should be excluded for the additional reason that it is preempted by federal law. To the extent this opinion is based on an argument that Bayer misled the FDA by not characterizing the subject as having rhabdo, it is preempted under *Buckman* as discussed above. To the extent the opinion is based on an argument that Bayer should have proposed and the FDA should have approved a different warning, it is also preempted by federal law. *See* Requirements on Content & Format of Labeling for Human Prescription Drug and Biological Products, Final Rule & Notices, 71 Fed. Reg. 3,922, 3935-36 (Jan. 24, 2006) (Ex. D)(FDA approved labeling establishes "both a 'floor' and a 'ceiling'" as to warnings.)

## V. DR. SCHINAGL'S OPINIONS CRITICIZING BAYER'S POST-MARKETING SAFETY MONITORING ARE NOT BASED ON ANY ASCERTAINABLE STANDARD BUT ARE INADMISSIBLE POST HOC JUDGMENTS ABOUT BAYER'S "UNDERSTANDING".

SUMMARY OPINION 5:
*"IN THEIR EARLY POST-MARKETING SURVEILLANCE, BAYER FAILED TO MAKE TIMELY COMPARISONS TO COMPETITOR DRUGS IN THE SAME CLASS TO DETERMINE THE RELATIVE RATE OF SERIOUS ADVERSE EVENTS."*

SUMMARY OPINION 7:
*"THE LATER POST-MARKETING SURVEILLANCE WAS CONSIDERED WITHOUT A PROPER UNDERSTANDING OF THE RESPECTIVE ROLES OF THE COMPANY AND THE REGULATORY AUTHORITIES."*

Moving from preclinical, to clinical trials, to labeling and NDA submissions, Dr. Schinagl concludes his report with opinions critical of Bayer's post-marketing monitoring of the drug and critical of Bayer personnel, particularly Dr. Kuno Sprenger, a Bayer AG employee in Germany. Dr. Schinagl contends that Bayer failed to make timely comparisons of the number of spontaneous reports of adverse events received by Bayer or FDA related to Baycol with the spontaneous adverse events received by other manufacturers and reported to the FDA. Schinagl Rep. (Ex. A) at 11. He further contends that Bayer should have "requested information from the FDA under the Freedom of Information Act, since some adverse events are reported to the FDA and not to the manufacturer and the FDA is not required to, and does not send their reports to the manufacturer." *Id.* at 10.

Dr. Schinagl's opinion that Bayer failed to make timely comparisons of adverse event reports between Baycol and other statins and failed to make FOIA requests to the FDA for reports of adverse events is not scientific or based on any specialized

knowledge. Indeed, it is not based on any grounds whatsoever other than a personal opinion. Dr. Schinagl never conducted such an analysis when he was employed in the pharmaceutical industry, Schinagl Dep. (Ex. B) at 195, and Dr. Schinagl did not do so here. Dr. Schinagl did not even attempt to make a comparison of the statins based on the information that was available at the time to see whether such a comparison would have actually shown anything of significance. Schinagl Rep. (Ex. A) at 11. In explanation, he offers only that such a comparison would be "desirable," Schinagl Dep. (Ex. B) at 273:18-20, but he does not know to a reasonable degree of medical probability what the comparative analysis would have shown if it had been done at the time he claims it should have been. *Id.* at 275:17-276:5. Bayer is not to be judged by what may be "desirable" or what may be interesting. In order to be relevant, expert opinions must go to something that would have made a difference and this does not even come close.

As for Dr. Schinagl's opinion as to whether Dr. Sprenger or Bayer in general "had a proper understanding of the respective roles of the company and regulatory authorities," (Schinagl Rep. (Ex. A) at 11), this too fails the test of *Daubert.* For example, Dr. Schinagl concludes that "Dr. Sprenger had no idea how the drug safety system is supposed to work. Yes, the FDA could do their own data analysis, but it is obvious from this case that they do so only after the fact, no doubt because of a data overload and a lack of sufficient personnel." *Id.* at 10. In evaluating Dr. Sprenger's deposition testimony about how product safety reports are made to the FDA, in which the role of Regulatory Affairs specialists is explained, Dr. Schinagl concludes: "So, Dr. Sprenger has found someone else to shift the blame to." *Id.*

Despite these criticisms of Bayer's safety monitoring program, nowhere in his report does Dr. Schinagl point to any violation of any regulatory requirement or any other objective standard of conduct with respect to adverse event reporting. Bayer is held to the standards of the FDA and should not be subject to the personal standards of Dr. Schinagl, standards Dr. Schinagl first articulated after-the-fact and based on his selective view of the evidence. If Dr. Sprenger's subjective understanding of the respective role of the FDA and Bayer should ever become a relevant issue in the litigation, the jury may assess that understanding as competently as Dr. Schinagl. His opinions in this regard should be excluded.

## CONCLUSION

Dr. Schinagl's opinions were formed based on news accounts without the benefit of the facts, and he has demonstrated that he is incapable or unwilling to consider the facts objectively. His opinions fail for the dual reasons that they lack foundation and go to matters that are preempted by federal law. For these reasons, defendant Bayer respectfully submits that this Court should grant its motion to exclude Dr. Schinagl's proposed testimony.

Dated: April 17, 2006

Respectfully submitted,

Philip S. Beck
Adam Hoeflich
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60610
(312) 494-4400
/signature on file/

Susan A. Weber
Eugene A. Schoon
James W. Mizgala
Elizabeth Curtin
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000

Paul J. Zidlicky
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000

Catherine Valerio Barrad
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
(213) 896-6000

Richard K. Dandrea
ECKERT SEAMENS CHERIN & MELLOTT, LLC
USX Tower, 600 Grant St., 44th Floor
Pittsburgh, PA 15219
(412) 566-6000

Scott A. Smith
Tracy J. Van Steenburgh
HALLELAND LEWIS NILAN SIPKINS & JOHNSON, P.A.
220 South Sixth Street, Suite 600
Minneapolis, MN 55402
(612) 338-1838
/signature on file/

Fred T. Magaziner
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000

*Counsel for SmithKline Beecham Corp. d/b/a GlaxoSmithKline*

Peter W. Sipkins (No.101540)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
(612) 340-2600

Douglas R. Marvin
WILLIAMS & CONNOLLY
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

Joseph D. Piorkowski, Jr.
THE PIORKOWSKI LAW FIRM, PC
910 17th Street, N.W. Suite 800
Washington, D.C. 20006
(202) 223-5535

*Counsel for Bayer Corporation and Bayer AG*