# Exhibit A

# ERICH F. SCHINAGL, M.D., CONSULTANT, PHARMACEUTICAL DRUG AND MEDICAL DEVICE DEVELOPMENT AND SAFETY

9902, 289th St.E
Myakka City, FL 34251
Phone (941) 322-9181
Fax (941) 322-9341
schinagl@att.net

**1. My Education and Experience:**

I obtained my M.D. in 1961 at the University of Vienna Medical School in Vienna, Austria. Subsequent to my graduation, I did my internship and residency in Internal Medicine at the same institution. My academic work during that time was concentrated in the field of Nephrology, with special emphasis on hemodialysis, a procedure now commonplace, but then still in its infancy.

In 1965 I was recruited by Pharmacia AB in Uppsala, Sweden, as Medical Director for their International Division. In that position my main responsibility was to investigate serious adverse events to the company's drugs all over the world and to recommend and implement measures to improve the company's clinical information services to prevent or mitigate adverse experiences in the future. After two years I moved to the company's Clinical Research Division and two years later I was asked to take on the responsibility of Medical Director of Pharmacia Inc. in Piscataway, NJ. In that position I had the responsibility for all clinical trials as well as for drug safety. Until my retirement from Pharmacia in 1996 I had the opportunity to participate in and contribute to the tremendous development of clinical trial and drug safety technology in the pharmaceutical industry. I had the privilege to represent Pharmacia in the Clinical Safety Surveillance Committee of the Pharmaceutical Manufacturers Association, thus being exposed to the procedures and experiences not only of Pharmacia, but all the major U.S. companies in the industry.

From 1996 to the present I have continued to work with clinical trials and drug safety issues as an independent consultant. Although I have occasionally assisted law firms with expert testimony, this has not been the focus of my activities. My rate of compensation is $250.00/ hour. In the last four years I have not testified at any trial and only give one deposition (Bender & Bender vs. Clarus et al., Case No.:98-2115CA, 12th Judicial Circuit, Sarasota, FL, Civil Division). My full C.V. and publications are appended as Exhibits A and B. A list of the documents I relied on is attached as Exhibit C.

**2. Baycol and Rhabdomyolysis: The Scope:**

Rhabdomyolysis is the most severe form of skeletal muscle complaints which can be induced by statins, a series of drugs first introduced in the 1980's to lower serum cholesterol levels. Although such muscle complaints have been reported with all statins, Baycol (cerivastatin) first introduced in 1997 stands out as by far the most dangerous in this respect. This was best illustrated by a report in the New England Journal of Medicine entitled "Cerivastatin and Reports of fatal Rhabdomyolysis" (Staffa et al., 2002) These authors reviewed reports in the Adverse Event Reporting System of the Food and Drug Administration and examined the number of prescriptions dispensed in the U.S. since the marketing of each drug began, according to the National Prescription Audit Plus (IMS HEALTH, Fairfield, CT). Including only U.S. cases reported to the FDA before 6/26/01 (six weeks prior to the withdrawal of Baycol from the U.S. market) the reporting rate of fatal rhabdomyolysis for Baycol was 3.16 deaths per million prescriptions. The comparable reporting rate for other statins ranged from 0 for fluvastatin to 0.19 for lovastatin. The most widely prescribed member of this class, atorvastatin, had a rate of 0.04 and was thus 79 times safer. I am not aware of any previous instance in the history of pharmaceutical drug development where there was such a discrepancy in the relative safety of one member of a class of drugs which remained undetected for more than four years.

Schinagl
EXHIBIT NO. 2
1.29.04
L. GOLKOW

3. The causes for this unique failure to recognize the magnitude of a known risk:

Many factors were involved. Given that the risk of muscle toxicity with the statin drugs had been recognized and the subject of extensive research for more than a decade prior to the introduction of Baycol many of the factors were predictable. Based on the extensive documentation I have reviewed since the withdrawal of the drug two years ago, it is my opinion within a reasonable degree of medical and scientific certainty that Bayer AG and its subsidiaries, agents and key medical personnel failed to timely or adequately warn the FDA, physicians, and the public of the magnitude of the risk regarding Baycol. The various contributing errors and omissions are best reviewed and understood by following the development of Baycol chronologically:

3.1. Preclinical Studies:

Near the end of the preclinical toxicology program and the beginning of the clinical studies in the U.S., Bayer convened an International R & D Conference in Wuppertal, Bayer' world headquarters. On 2/1/91 Dr. R. Ziegler wrote to Dr. MacCarthy in West Haven, CT.: (BAYAG 00153628-9):

"- Toxicology data to back treatment in humans exceeding 3 months will be provided by toxicology for 2 species in April 1992

- The highest daily dose which can be used in our clinical development program is 0.4 mg

- A pre-IND meeting with the FDA to discuss toxicological as well as clinical questions should be established as soon as possible

- A delay in submitting the IND must be avoided.

In regard to the upper dose limit for clinical development our experts from toxicology - Prof. Schluter/Dr. von Keutz - felt very strong (sic) not to allow to step up to higher daily doses because the slope of the dose response curve of BAY w 6228 is much steeper than that of lovastatin. The safety margin for our compound from the no-effect level to non-tolerable dose is less than 3-fold whereas for lovastatin it is at least 12-fold. Besides risks/benefit evaluations for our compound are based on 13 week studies whereas the data base of lovastatin is much stronger."

This letter is signed by Prof. Schluter and Prof. Kuhlmann as well as Dr. Ziegler.

Although a number of additional senior executives of Bayer AG received this memo, I have found no evidence that Dr. Sprenger, who apparently was primarily responsible for the safety monitoring of Baycol worldwide, was aware of it. Had he been, he might have been more cautious in his interpretation and analysis of the many spontaneous adverse event reports he reviewed.

Bayer's preclinical documents show that Bayer toxicologists clearly recognized that Baycol was more cytotoxic and more myotoxic than the other statins as a result of Baycol's unique combination of high potency, high bioavailability, high lipophilicity and high permeability. (BAYAG00153628, BAYCORP0000233, BAYAG00140412, BAYAG0014909, BAYAG00459401, BAYCORP01485731, BAYCORP 02415236-40, BAYAG00520407, BAYCORP00142638, BAYAG00144223). Inexplicably, the physicians who directed the clinical development of Baycol on behalf of Bayer were either unaware or ignored these preclinical findings.[1]

3.2. Clinical Development :

Based on the findings in the preclinical phase, indicating that Baycol was substantially different from and potentially more dangerous than earlier statins, caution was indicated when the first clinical studies were designed and their results were interpreted.

[1] I concur with the excellent analysis by Randall L. Tackett, Ph.D., Professor of Pharmacology and Toxicology at the University of Georgia College of Pharmacy. (Expert Witness Report to Olander vs Bayer Corporation, MDL No.1431, U.S. District Court, Minnesota).

This caution was appropriately exercised only in the very earliest studies I have reviewed.

3.2.1. Phase I:

This phase involves healthy volunteers and is therefore limited to a small number of subjects.

The first U.S. study I have found in the scientific literature (Mazzu et al., 1998) involved 32 elderly and 16 young male volunteers, who were randomized to receive either 0.1 mg of cerivastatin or a matching placebo daily for 7 days. Reported side effects were mild and equally distributed between the groups. Creatine phosphokinase (CK) levels, the most sensitive indicator of potential muscle damage, were mildly elevated in two elderly men taking placebo and one young man taking cerivastatin.

3.2.2. Phase IIa:

This phase is aimed at investigating appropriate dosage levels and dosage schedules for the new drug.

Two pilot dose ranging and one dose scheduling study were reported in one publication. (Hunninghake, 1998) In the dose ranging studies, Baycol in doses from 0.025 to 0.2 mg were compared to placebo and 40 mg lovastatin (U.S. study) or 20 mg simvastatin (European study) given nightly for 4 weeks. Baycol reduced total cholesterol and LDL ("Bad" cholesterol) and increased HDL ("Good" cholesterol) in a dose dependent fashion. Both control drugs were more effective than the highest dose of Baycol. No abnormalities in CK levels were seen in any group in these short-term low-dose studies. The dose scheduling study was conducted in the U.S. and randomized 319 patients with primary hypercholesterolemia to 4 weeks of treatment with either 0.1 mg Baycol twice daily, 0.2 mg with the evening meal, 0.2 mg at bedtime, or placebo. LDL reduction was 25% in the first treatment group and 30% in the others, compared to placebo. The author states that "a greater (but small) percentage of patients treated with cerivastatin compared with placebo experienced elevations in creatine phosphokinase, aspartate transaminase, and alanine transaminase that were normal at baseline". No further details are given in this report, but since the study involved only short term treatment with a low and clearly suboptimal dose of Baycol, these findings are the first indication in the clinic that the concerns and warnings from the preclinical scientists should have been heeded in the subsequent clinical development of Baycol.

3.2.3. Phase IIb/III:

One of the earliest studies which would fit into this category was performed in Japan. Mabuchi et al. (1998) treated 20 patients with heterozygous familial hypercholesterolemia with 0.2mg of cerivastatin per day alone for 4 weeks and were able to lower total serum cholesterol by 18-22 %. After adding 8 grams of cholestyramine or 1gram of probucol per day for a further 12 weeks, cholesterol levels were decreased by a further 16% and 17% respectively, giving a total reduction of 34 - 39%, which was comparable to results commonly achieved with other statins. Cerivastatin at this dosage level was well tolerated as were the two combinations, with no increases in CK levels. It is not clear to me why these Japanese scientists, at this early stage, opted to deal with the inadequate efficacy of Baycol at the 0.2 mg dosage in this unconventional manner. Instead of increasing the dose they combined it with two old bile acid sequestering agents which, although of proven efficacy, are no longer used widely in this country today. With the benefit of hindsight, however, their approach may have had merit. This study appears to have been done outside the Bayer clinical development plan, because it was never confirmed with a larger study or followed up in any other way.

Instead, Bayer opted for stepping up the dosage. While this was the logical approach, it was a risky one, given the warnings and red flags issued by the preclinical scientists. It could have succeeded with tight control over overenthusiastic clinicians and marketing personnel, but as events evolved, this control, if it ever was present, soon began to slip and both company personnel and outside investigators began to look for excuses rather than realistically assessing the facts.

Davignon et al., (1998), summarized the pivotal Phase IIb/III studies which were the basis for the regulatory approvals in the U.S. and elsewhere.

In the U.S. study, 939 male and female patients with primary hypercholesterolemia were randomized to 0.05, 0.1, 0.2 and 0.3 mg of Baycol, 40 mg lovastatin or placebo for 24 weeks. After that time, patients continued to receive active treatment for a period of up to 24 months, with those previously on placebo switched to 0.2 mg Baycol. Patients were permitted to take concomitant lipid lowering resin treatment during the extension phases if lipid control was unsatisfactory (LDL 130 mg/dl or higher). There was a dosage dependent decrease in LDL in the Baycol groups , but even the highest dose was inferior to lovastatin, both after the 24 week and 24 month treatment periods, in spite of the concomitant resin use, which, predictably, was highest (47%) in the lowest dosage group and lowest in the patients receiving 0.3 mg Baycol (17%) and lovastatin (15%). While this study design was obviously necessary in order to protect the patients, it reduced the reliability of the study for the assessment of the safety of Baycol. The published report states that "for patients with a normal creatine phosphokinase at baseline, the in incidence of treatment emergent increase to over 10 times the upper limit of normal was 0.4% for cerivastatin and 0.3% for placebo". I can think of no reason why the readers of this article would be interested in these figures rather than the comparative increase in CK in all patients treated.. Furthermore, looking at the analysis of this study by the FDA (Medical Review, pages 25-30, study identification D 91-031) one finds that patients with a CK of 3 times the upper limit of normal or over were a priori excluded from the study and that one of the 159 patients receiving 0.2 mg Baycol discontinued the drug because of arthralgia and myasthenia which resolved on discontinuation. Finally, the effect of the concomitant resins on this and other safety parameters is unknown. In summary, based on all the information on this study available to me, I am not convinced that the safety of even the relatively modest top dose in this study of 0.3 mg of Baycol, was demonstrated in this pivotal study, certainly not for the actual situation in the clinical practice, where the physician does not know the patient's preexisting CK level.

The same article also reports on a second pivotal study performed in Europe. This second study had a similar design, but the study was larger with 1158 patients randomized, Baycol dosages were lower at 0.025, 0.05, 0.1 and 0.2 mg, and the control drug was 20 mg of simvastatin . Also, the treatment periods were shorter at 12 weeks for the randomized and 88 weeks for the extension period.. The reporting of the key safety parameter for the purposes of this review, CK levels, was much better for this study, suggesting, once more, that the authors, or more likely the sponsor of the study, wanted to hide less than favorable information in the first study. For the European study, a table shows that CK increases (presumably of any magnitude) were 4.3% in the 955 patients receiving Baycol vs. 5.4% in the 186 patients receiving simvastatin. It is also stated in the text that " Slight increases in levels of hepatic transaminases and creatine phosphokinase occurred after treatment with both cerivastatin and simvastatin, but clinically significant increases above 3 times the upper limit of normal were rare (under 2%)". So we suddenly learn that these authors are well aware of the generally accepted limit for clinical significance of CK increases , but we are not offered an explanation why they chose the higher limit for reporting the safety results of the first pivotal study. In spite of my initial praise for the better reporting of the second study, I have to point out that even the comparison given in the second study is designed to create the impression the Baycol is safer for the musculature than simvastatin, when almost certainly the opposite is true. The 955 patients in the four Baycol dosage groups received an average dose of 0.09375 mg and obtained reductions in LDL cholesterol ranging from 11.5 to 29.1% (average reduction 19.9%), compared to a reduction of 38.3% observed in the simvastatin patients, all of whom received an effective, if not necessarily optimal dose. Thus the comparison, as presented in the paper is misleading, since the readers would only be interested in a comparison of dosages that provide equal benefit to the patient. There is no breakdown of the effect of the different dosages of Baycol on CK levels in the published report or in the FDA Medical Review quoted above, where this second study is identified as study 0120 and is analyzed on pages 31-33. The FDA review does, however, contain a table of withdrawals due to adverse events broken down by dosage group on pages 32 and 33. According to this table, one of 195 patients was withdrawn from the 0.1 mg Baycol group because of myasthenia and one patient each was withdrawn from the 0.025 and 0.1 mg groups because of CK increase. The narrative following the table includes one additional patient withdrawn for the same reason in the 0.025 mg group. This last patient presumably is not in the table because the investigators classified the relationship of the CK increase to the medication as remote. There were no discontinuations due to myasthenia or CK increase recorded in the 186 patients receiving simvastatin. The importance of these findings rests in the fact that the patients in the trial underwent periodic tests for CK and thus could be withdrawn before suffering serious damage, while the same benefit was not accorded to

the patients prescribed Baycol by their physicians after the drug was approved and marketed. Based on the limited information I have been able to find about this second pivotal study, it is my opinion within a reasonable degree of medical and scientific certainty that, even at this very early stage in the clinical development, that the investigators and Bayer as the sponsors, could and should have suspected that the adverse effect of Baycol on the musculature is greater than comparator drugs, even at these low dosages that were not even close to the latter's efficacy.

The third study reported in the Davignon et al. paper was a Canadian dose titration study comparing Baycol and simvastatin. In this study 387 patients with primary hypercholesterolemia were randomized to 32 weeks of treatment with either 0.05 mg of Baycol or 5 mg simvastatin in a ratio of 2:1 respectively. After 8, 16 and 24 weeks the dosage was titrated upwards to 0.1, 0.2 and 0.3 mg of Baycol and 10, 20 and 40 mg of simvastatin respectively if patient's LDL cholesterol remained above 130 ml/dl. Patients completing 32 weeks of therapy were eligible to receive an additional 72 weeks of the same drug provided LDL levels remained at 130 mg/dl or under. At the end of the 32 week dose titration phase, 60% of patients were on the highest Baycol dosage of 0.3 mg/day, while only 33% of the simvastatin patients required 40 mg of Simvastatin for adequate control of their LDL. The LDL reductions in the two groups were 25 and 34% respectively. The reporting of the safety parameters in this study is, again, inadequate, stating only that 8.5% of the patients in the Baycol group and 10% in the simvastatin group reported myalgia and that clinically significant increases in creatine phosphokinase were seen in under 2.5% of the patients. I have not found an analysis of this study in the FDA medical review. So, again, a less effective dose of Baycol seems to have caused nearly equal muscle damage compared to a more effective dose of simvastatin.

The fourth and final study reported in this publication was labeled the European Phase IIb Higher dose study and reports on 349 patients with primary hypercholesterolemia randomized to 0.3 or 0.4 mg Baycol or placebo for a short course of 8 weeks. The reduction in LDL cholesterol was 33 and 36% respectively in the two treatment groups. Surprisingly, given the findings in the three previous studies, the authors report no muscle related adverse events, no elevations of CK above 10x the upper limit of normal (ULN), and asymptomatic increases of CK below 3x the ULN of 2.8% in the placebo group, none in the 0.3 mg Baycol group and only 1.4% in the 0.4 mg group. This study, again, is not covered in the FDA Medical Review of the original NDA, the only one available to me at this writing, presumably because of the inclusion of the higher Baycol dose, which was not included in the original NDA. It is my professional opinion within a reasonable degree of certainty that the apparently more favorable safety profile of Baycol in this study was due to the shorter treatment period.

In their overall conclusions, the authors claim an adverse affect profile for Baycol similar to that of lovastatin or simvastatin. It is my opinion within a reasonable degree of medical and scientific certainty that this similarity was achieved, in part, by biased presentation of the data and, more importantly, was clinically misleading, since the comparator drugs proved to be much more effective than the Baycol doses used in these studies.

Evan Stein (1998), performed a global, pooled analysis of the efficacy, safety and tolerability of Baycol on data obtained from all randomized, double blind studies in which Baycol up to doses of 0.4 mg/day was compared with placebo or active comparator. In the tables and figures reporting efficacy, he lists the results for each dose level of Baycol, but leaves the comparator drugs out. In the tables dealing with the safety parameters, active comparators are pooled, but at least present. In table VII giving incidence rates of biochemical adverse effects, the CK increases from 5x to 10x of the upper limit of normal for the placebo group are given as 0.39%,, for Baycol 0.025 mg as 0.47, for Baycol 0.2 mg as 0.55% and for Baycol 0.4 mg as 0.88%. Nevertheless, the author states that "there was also no evidence to indicate that clinically significant increases in levels of creatine phosphokinase were related to increasing doses of cerivastatin. In summary, again we see highly biased, if not misleading reporting.

All three papers cited above were published on consecutive pages of a supplement to the American Journal of Cardiology shortly after the approval of Baycol by the FDA. Pharmaceutical companies typically try to hold back publication of key papers prior to approval of a new drug and arrange with a reputable journal for combining them in a supplement to be available at launch to give salesmen a "launch package". Large numbers of reprints are typically ordered and distributed to potential prescribers. It is reasonable to assume that Bayer reviewed the manuscripts prior to publication and leaned on the authors present their data in the

most favorable light. While this is also common practice in the pharmaceutical industry, it is my opinion within a reasonable degree of medical and scientific certainty that what happened in this case went way beyond the bounds of propriety and contributed materially to the complacency among their own staff that was so evident when reports of serious adverse events began rolling in shortly after the drug came on the market.

A fourth paper in the series in the same supplement, Farnier et al.,1998, compared three doses of Baycol with gemfibrozil in the treatment of primary mixed hyperlipidemia, in which high levels of both cholesterol and triglycerides are present. 751 patients were randomized to 0.1, 0.2 or 0.3 mg of Baycol daily or twice daily doses of 600 mg gemfibrozil. Much as would be expected given the mechanism of action of the two drugs, all doses of Baycol were more effective than gemfibrozil in lowering total cholesterol and LDL, while gemfibrozil was much more effective in lowering triglycerides. Myalgia was reported for both drugs, but less frequently than in the placebo group. Elevated CK levels were also reported for both drugs, with the highest incidence in the 0.2 mg Baycol group. The authors concluded that these findings were well within the range previously reported for this class of lipid lowering agents, without acknowledging the fact that Baycol in the dosages tested in this study was not as effective as the other agents.

To wrap up the early studies, Sasaki et al., 1998, performed a small study in Japan. 73 patients with severe primary hypercholesterolemia were randomly assigned to receive either 0.15 or 0.3 mg of Baycol once daily after the evening meal for 12 weeks. In 58 patients the same drug was continued at a flexible dosage for an additional 36 weeks or longer to assess its long term efficacy and safety. Contrary to the above American and European studies, these patients were apparently not pre-screened for abnormal levels of CK and therefore reflected what could be expected in normal clinical practice. Reductions in total cholesterol after 12 weeks averaged 20% in the lower dose group and 25% in the 0.3 mg group. While there were no serious adverse events reported, 3 of the 33 patients (9%) in the lower and 7 of the 40 patients (17.5%) in the higher dose group had increased CK values. This study indicates that the deleterious effect of Baycol on the musculature is much more common, even at low dosages, when the precautions employed in the other trials are removed.

### 3.3. The Original New Drug Application (NDA):

Bayer submitted their NDA for 0.05, 0.1, 0.2 and 0.3 mg Baycol on 6/26/96, largely based on the pivotal studies described above. Four other statins, chemically closely related to Baycol, were on the market at that time The first of them, lovastatin, had been introduced by Merck in 1987, after extensive investigation of the drug's potential for inducing muscle damage. As a result Merck had included extensive warnings and precautions to minimize that potential in its prescribing information. All of this literature was available to Bayer's scientists and physicians throughout the development of Baycol. Nevertheless, Bayer conducted only a few studies comparing Baycol with other statins. All of these studies showed Baycol to be less effective than the comparator statin and/or showed a higher incidence of muscle problems. All of this indicated that Baycol should have been tested on a larger number of patients than usual before the NDA was filed. In the introduction of his textbook of pharmacoepidemiology, Strom, 2000, states that "generally, between 500 and 3000 patients are exposed to a drug during Phase III". Instead, the original NDA for Baycol was submitted with only a minimal number of patients treated at the important dosage levels. At 0.3mg, only 342 patients had been treated for 12 months or more in clinical studies all over the world. This is only a fraction of what most companies I am familiar with would consider adequate for the introduction of a new chemical entity to the market.

In addition:

- Almost without exception, patients with elevated CK (a measure of damage to muscle tissue) were excluded from pivotal studies.

- Patients taking other lipid lowering substances which could damage muscle were also excluded from these studies

- Long term studies included periodic measurement of CK and patients who developed elevated CK discontinued treatment with Baycol

All of these measures were, of course, entirely appropriate to protect the early study subjects from harm. They had, however, the effect that the number and severity of muscle problems seen in the pivotal studies must have been lower than they would have been without these precautions.

Given this situation it is my opinion within a reasonable degree of medical and scientific certainty that Bayer should have conducted additional, open studies without those precautions to ascertain that Baycol was safe for use in general practice. Alternatively, Bayer should have included the precautions incorporated in the pivotal studies in their prescribing information. Bayer did neither of these and, surprisingly, received marketing approval on 6/26/97, in spite of the scant patient numbers in the NDA. Even more surprisingly, the FDA approved prescribing information which, if anything, made Baycol appear safer than other statins. Notwithstanding their NDA, Bayer opted to market only 0.2 and 0.3 mg tablets of Baycol with a recommended starting dose of 0.3 and the 0.2 dose recommended only for patients with significant renal impairment. However, the "Overdosage" section of the prescribing information states that the maximum single oral dose of Baycol received by healthy volunteers and patients is 0.4 mg. An ambitious salesman would thus have had little difficulty persuading an aggressive therapist that he could prescribe two 0.2 mg tablets if the response to the 0.3 mg starting dose proved inadequate: The market launch of Baycol 0.2 and 0.3 mg tablets took place on 1/26/98, but because of the actions of Bayer described above, now the full onus of establishing the conditions for the safe use of Baycol rested on the quality of Bayer's post marketing surveillance.

4. Early Post Marketing Surveillance:

Even with all the errors and omissions during the many years Baycol was in clinical development, corrections were still possible, had there been an effective postmarketing surveillance system in place from the day the drug was launched.

At the time of this writing, certain crucial Bayer documents are apparently not available. The critical documents are the Periodic Safety Update Reports (PSUR's), which regulations require the company to file at six monthly intervals during the first two years after approval then annually for two years and at five year intervals thereafter. I have so far only seen two PSUR's, #5, covering the period 3/1/99 - 8/31/99 and #6, covering 3/1/00 - 8/31/00. I have found both of these seriously flawed, apart from the fact that there is an unexplained 6-month gap between them, but will return to those flaws later in order not to break the chronology in this presentation.

Regarding the early adverse event reports, the only information I have at this writing is from the FDA Adverse Event Reporting System, which listed 40 Baycol related adverse events involving the musculature reported to them between 12/17/97 and 9/17/98. Many of them were of a serious nature involving rhabdomyolysis and renal failure but outcomes were not listed. I lack information on the number of patients exposed during this time period, which was required to be included in the PSUR's due to be filed during that period. Given that most of these events were triggered by the 0.3mg dose of Baycol, which was the highest dose then approved, but which could not achieve anywhere near the lipid lowering benefit available from the highest approved dosages of competitive products, this number of serious problems reported to the FDA in the first nine months of marketing should have triggered aggressive action by the Bayer physicians charged with post-marketing surveillance. At this time, I have seen no evidence that this did indeed happen. There was no change in the prescribing information until 1/4/99. The new section under "Post Marketing Adverse Event Reports" did not appear in the PDR until the 2000 edition and read: "While these events were temporally associated with the use of Baycol, a causal relationship....cannot be readily determined due to the spontaneous reporting of medical events, and the lack of controls..." This change, rather than drawing prescribers' attention to a serious problem, was obviously trying to minimize it.

5. The development of the 0.8 mg dose:

In spite of all the warnings from their own toxicologists Bayer apparently felt that they could make Baycol competitive in the market place only by a substantial increase in the dosage. It is my opinion within a reasonable degree of medical and scientific certainty that it was reasonable to explore if a higher dosage level could bring the efficacy of Baycol closer to the competitive statins, but it is my also opinion that it was a serious mistake to design the studies with 0.8 mg as the starting dose. It would have been much more

sensible to titrate the dosage up stepwise depending on the response of the patient, so that only the patients who really require higher dosages are exposed to their higher likelihood of adverse events.

In a memorandum from Bayer AG Toxicology dated 11/22/95 Drs. Schlüter and Krutz wrote:

" With this memorandum we express our strong concerns about the intention to test doses of BAY 6228 as high as outlined in in Dr. Ziegler's memo dated November 21, 1995. The now planned human doses are approaching the dose level which has reproducibly killed dogs in toxicological studies. A human dose of 800 mcg - corresponding to 16 mcg/kg b.w. for a 50 kg patient - is only 6 fold lower than the dose of 100 mcg/kg b.w. which has repeatedly induced severe and fatal bleedings including CNS-haemorrhages in dogs. Moreover, no indicators exist that would allow adequate monitoring of this toxicity. Due to this known toxicity of the drug we feel obliged to indicate our reservation towards the new clinical development plan which cannot be supported by toxicology." (BAYAG 00124275).

In spite of this warning, which went to Drs. Ziegler and McCarthy as well as the most senior Bayer executives the company went ahead with a major pivotal trial with the 0.8mg dosage, eventually obtained FDA approval for it and marketed it aggressively, a fact that in my opinion within a reasonable degree of certainty to be primarily responsible for the disastrous outcome described in paragraph 2 above.

The pivotal study supporting Bayer's proposal to extend the dosage range to 0.8 mg was published by Insull et al., 2000. In this trial, 1170 patients with primary hypercholesterolemia were randomized in a ratio of 1:1:4 to placebo, 0.4 and 0.8 mg Baycol once daily for 8 weeks. A long list of exclusion criteria relating to cardiovascular disease, endocrine and renal disorders included patients with significant abnormalities in CK. Again, while these precautions were justified in the interests of the participating patients, they rendered the study population completely non-representative of the patient population which was subsequently exposed to the high dose of Baycol in clinical practice. During the double blind treatment period patients were seen by the investigator and CK levels were measured every two weeks. LDL cholesterol decreased 35.6 and 41.8% in the 0.4 and 0.8 mg Baycol groups respectively, finally bringing the efficacy of the drug into the range achieved by other statins. As for adverse events, two patients in the 0.4 mg group discontinued due to myalgia and four in the 0.8 mg group due to either myalgia or myasthenia. In addition, two of the 195 patients (1.0%) randomized to 0.4 mg Baycol were withdrawn due to CK elevation, as were 10 of the 776 (1.29%) randomized to 0.8 mg Baycol. The statisticians will tell us that this difference is most likely due to chance. However, in the light of all the information which was available or should have been available to the Bayer drug safety experts and through them to their investigators, they should have concluded that this difference may well have been due to a real difference between the two dosages. Even more importantly, they should have concluded that they have discontinued the drug due to a high CK measurement in 12 out of 971 patients solely due to a laboratory measurement not called for in the prescribing information and therefore not available to patients receiving Baycol in clinical practice. Females over age 65 were particularly at risk, with 5 of 90 patients in that group (5.6%) showing CK elevations over 10x the upper limit of normal. The investigators point out that all but one CK elevation seen in this study were under 10,000 U/l, the level for severe myopathy/rhabdomyolysis according to Pierce et al., 1990 and that all were substantially lower than 40,000 U/l, the level associated with acute renal failure, but apparently give no thought to what would have happened to the study patients who discontinued Baycol because of high CK if they had been prescribed the drug by their physician and would not have had that CK level checked. It is my opinion within a reasonable degree of certainty that most experienced clinical research physicians in the pharmaceutical industry would have insisted that precautionary periodic CK measurements be included in the prescribing information in conjunction with the dosage increase, at the very least for the highest risk group, females over 65 years of age. Instead, the authors of this article, including the four co-authors who were members of Bayer's staff, conclude that "since the total number of patients in this in this sub-group was small, the association of increased risk of elevated CK in females over 65 years of age treated by cerivastatin 0.8 mg is not established, and warrants further studies". I am not aware that such further studies were ever conducted.

From the FDA review of this same study (Center for Drug Evaluation and Research, Application Number: 20-740/S008/S013, Medical Review, pages 2-7), there identified as Study D97-008 we learn further crucial facts, hidden in a small paragraph of the published paper cited above: After the randomized study, patients continued on Baycol at their respective doses for up to 52 weeks, while the placebo patients were switched to 40 mg pravastatin. The most important information below about the extension of the study not covered

in the published paper is extracted from FDA's table on page 7:

Study D97-008: The percentage of patients with any treatment-emergent elevations of serum CK through Week 52 (Week 8 in parenthesis) regardless of Baseline status is examined below:

| | CER 0.4 mg | CER 0.8 mg | PLA/PRAVA 40 mg |
|---|---|---|---|
| Any elevation | 38% (28%) | 49% (35%) | 35% (22%) |
| Over 10x upper limit of normal | 1.5% (1.0%) | 2.1% (1.5%) | 0.5% (0.0% |
| Over 10x ULN with symptoms | 1.5% (1.0%) | 1.0% (0.9%) | 0.0% (0.0%) |

Of the 20 patients with CK's over 10x ULN, 15 were withdrawn, three of them although they had no symptoms, again illustrating how important it would have been to include periodic CK measurements in the prescribing information.

I conclude that from the extended study three additional facts emerge:

1. The muscle toxicity is lowest for pravastatin and highest for Baycol 0.8 mg

2. Muscle toxicity increases with longer treatment periods for all groups

3. Severe muscle toxicity at a level often associated with rhabdomyolysis was all but absent with pravastatin, but present and dose dependent with Baycol

The FDA concluded in its review that there was a safety concern in the subgroup of females over 62 years of age with body weights under 65 kg and stated on page 38 that "additional pharmacokinetic studies specifically designed to evaluate the effects of gender, age and body weight (body surface area) on the plasma concentration of cerivastatin should be performed to evaluate the apparent increased incidence of CK over 10x ULN..... in the subgroup of females over 62 years of age, body weight under 70 kg. Nevertheless, they deemed this sNDA approvable, presumably on the basis that it ultimately is the manufacturer's responsibility to assure the drug's safety. There is no indication that the suggested studies were ever performed or that anyone either at Bayer or at the FDA ever considered the obvious safety measures discussed above, which would have mitigated if not prevented the unfortunate outcome described in paragraph 2 of this report.

**6. The Launch of the 0.8 mg Dose:**

The FDA approved the new dosage level on July 21, 2000. The new prescribing information states: "The recommended starting dose is 0.4 mg daily in the evening. The dosage range is 0.2 to 0.8 mg." This wording allowed the distribution of 0.8 mg samples and Bayer made extensive use of this possibility. This heavy sampling and the promotion of the new dosage based on the Insall study analyzed above caused many physicians unfamiliar with the drug to start it at that new maximal dose even in patients who may well have responded adequately to lower dosage levels.

**7. Late Post Marketing Surveillance:**

It is my opinion within a reasonable degree of medical and scientific certainty that, at this point, the fate of the drug was sealed. The disastrous decisions had already been made and is difficult to see how anyone could have stopped the events which unfolded in the year after the launch of the high dose. However, I have reviewed the deposition of Prof. Kuno Sprenger, the individual who carried the primary responsibility for Baycol as the Global Drug Safety Manager for this product at the Bayer headquarters in Germany (U.S. District Court, District of Minnesota, MDL No.1431, 3/27-4/1/2003). I have served as the U.S. Safety Officer for Pharmacia for much of the 1990's and worked closely with the Global Safety Officer of my company then headquartered in Uppsala, Sweden, until my retirement. Based on this experience, it is my professional opinion that Dr. Sprenger was not equipped to shoulder this responsibility.

On page 55 of the deposition quoted above, he was asked " Who at Bayer decided whether to inform regulatory bodies in the world of information pertaining to signals generated by spontaneous adverse event reporting data?" He responded: "This is no decision which is taken by Bayer. This is a decision

(which?) is prescribed by the rules of the authorities in so far of (as?) providing all of the data available to all of the authorities." The questioner was strictly right when he objected to the non responsiveness of the answer, but it is clear to me that Dr.Sprenger thought that all he had to do was to send reams of data to the authorities and let them make the decision. This is also apparent from the few PSUR's (see paragraph 4 above) which I was able to review. The question was essentially repeated on page 64 of Dr. Sprenger's testimony. This time he answered: "Principally, such data is presented to the safety bodies and it is these safety bodies that decide, and with respect to the handing in or presentation of such data, this is all decided by the regulations. These regulations say -- they do not say that the data need to be handed in to the FDA because the FDA does their own data analysis. This is why our body did not have to come up with such a decision". This is more proof that Dr. Sprenger had no idea how the drug safety system is supposed to work. Yes, the FDA could do their own data analysis, but as is obvious from this case, they do so only after the fact, no doubt because of a data overload and a lack of sufficient personnel. That is why it was incumbent upon Bayer, as it is for all companies, to compare their adverse event rate with that of other drugs in the class. It is my professional opinion that Bayer did not do that until it was too late, and then did not share the information with the FDA.

On page 65, Dr. Sprenger is asked: "Please cite the regulation you are referring to, sir" and he responded: "...... I said that we give everything to the FDA with our PSUR's, and I'm not a specialist in regulatory affairs. Those specialists in regulatory affairs, they do the reporting to the FDA". So Dr. Sprenger has found somebody else to shift the blame to. The regulatory affairs people in a drug company fill an important role, they check that all the items required in a PSUR are there, but certainly they can not judge the contents of a submission. I have seen no information indicating that anyone in Bayer's regulatory affairs division was aware of Dr. Sprenger's event rate analyses, when they eventually were done, at a time when it was too late to change the way the drug was used based on Bayer's own misguided marketing effort.

On the second day of his testimony (page 148) Dr. Sprenger was asked: "When did Bayer first receive a signal relating to rhabdomyolysis in association with cerivastatin monotherapy?" He responded: " The first signal got up in the year 1999 when the first cases were received and the first cases were then evaluated, and if it is that in accordance with the nature of these cases a label change seems to be appropriate, then a proposal is being formulated and submitted to the clinical safety review committee and then a decision is taken on whether or not to change a label." Dr. Sprenger here describes a procedure which is appropriate and practiced industry-wide. However, I have a quarrel with the date given. According to the FDA Adverse Event Reporting System (AERS) I have reviewed (see paragraph 4 above), numerous cases either described as rhabdomyolysis ,or qualifying as such because of elevated PK associated with elevated creatinine, were reported to the FDA during 1998, many of them not listing Lopid or gemfibrozil as a concomitant drug. Many of them list the manufacturer as the source of the report. Nonetheless, it is my opinion within a reasonable degree of medical and scientific certainty that it was incumbent upon Bayer to request this information from the FDA under the Freedom of Information Act, since some adverse events are reported to the FDA but not to the manufacturer, and the FDA is not required to, and does not send their reports to the manufacturer. The information on the disk is very limited, but it is extremely unlikely that all of these reports could reasonably have been disqualified by Dr. Sprenger's review process.

On page 155, Dr. Sprenger is asked about the switching of patients from another statin to Baycol and states: ".... it is well known from clinical pharmacology that no switch effect .... can occur because the half life of all statins is between three and six hours with the exception of atorvastatin which has a half life of 16 hours, so no effect can be seen on the next day if such a switch has occurred, and in the sense of the existing

plasma levels that is to be expected". It is my opinion within a reasonable degree of certainty that Dr. Sprenger here displays a quite disturbing ignorance of pharmacology since muscle damage caused by a prior statin can, of course, persist even in the absence of a plasma level of that statin.

On page 156, Dr. Sprenger states " This is not in accordance with the labeling at the time which required that all patients were to start a new treatment with 0.4 mg". I have pointed out in paragraph 5 above that I wish that this were true. In fact, the U.S. prescribing information merely recommended the 0.4 mg starting dose and the actions by the company totally invalidated that recommendation by sponsoring and publishing studies under company co-authorship with the conclusion that the 0.8 starting dose was safe. In addition, the company distributed millions of 0.8 mg samples which they must have known doctors gave to patients as starter packs, while they were waiting for their prescriptions to be filled.

On page 198, Dr. Sprenger responds to the suggestion that Baycol was approved "on the coattails" of the five previously approved statins with a minimum of safety data and states " It seems to be the case that the number of patients in clinical studies concerning the substances to be marketed later are required to be much higher than before in order to give the FDA the certainty that even if there is a substance of the same class that there is the same safety profile if not a better profile than the profile in existence for the substances on the market". I think that one could wish that was true, but, clearly, Dr. Sprenger has never looked at the paucity of data in the original Baycol NDA.

8.Summary:

The following summarizes my main opinions, which are stated within a reasonable degree of medical and scientific certainty:

1. In the clinical development of Baycol, Bayer failed to appropriately heed the warning signs produced by their own preclinical experts, indicating that the new drug was substantially different from and potentially more myotoxic than earlier statins.

2. Throughout the published reports of clinical studies, Bayer minimized negative findings in order to make Baycol appear safer than it really was.

3. Given the warning signs from both the preclinical and clinical studies, Bayer did not test the drug in a sufficiently large number of patients to assure its safety.

4. In developing their initial prescribing information, Bayer claimed that Baycol was safer than other statins, although the evidence pointed in the opposite direction.

5. In their early post-marketing surveillance, Bayer failed to make timely comparisons to competitor drugs in the same class to determine the relative rate of serious adverse events.

6. The 0.8 mg dosage of Baycol was tested, launched and promoted in a reckless manner in an attempt to match the efficacy of competitor statins, without regard to the proper precautions.

7. The later post-marketing surveillance was conducted without a proper understanding of the respective roles of the company and the regulatory authorities.

My opinions stated in this report are based on the information I have seen so far. I reserve the right to amend and/or complement them if and when I receive additional information.

M.D

Erich F. Schinagl, M.D., 7/29/2003

**ERICH F. SCHINAGL, M.D.**
**Consultant, Clinical Drug Development and Safety**
**9902, 289th St.E, Myakka City, FL 34541**
**Telephone (941) 322-9181 Fax (941) 322-9341**
**e-mail: schinagl @ worldnet.att.net**

# RESUME

## SUMMARY PROFILE

Doctor of Medicine trained as a specialist in Internal Medicine with over 20 years of service in various positions in Pharmacia, a major pharmaceutical company.

Experienced in all aspects of the clinical development process for new drugs, devices and biologicals, from the assessment of pre-clinical information to the design of study protocols and case report forms, investigator recruitment, study monitoring, safety audits, report writing etc.

Broad experience in all aspects of the regulatory process from IND to NDA or PLA, including periodic reporting, safety assessments, prescribing information and all summaries required by the FDA.

Extensive exposure to all aspects of the medico-legal process as it relates to the safety of drugs, devices and biologicals, particularly legal actions alleging medical malpractice, negligence and "failure to warn".

**Medico-Legal Experience**

Carried the overall responsibility for all medical decisions in connection with Pharmacia's products. This responsibility started with the design, review and evaluation of the preclinical animal studies to assure that it was safe to start testing the product in healthy volunteers and ultimately in patients.

Responsible for all the major documents resulting from this work, including Physician's Brochures, Patient Consent Forms, Clinical Trial Protocols etc. This

responsibility included defending all decisions made if and when challenged in court.

Responsible for the conduct, monitoring and reporting of clinical studies,, evaluation and reporting of adverse events during these trials, design of the resulting prescribing information and presentation of all the data to the FDA to gain approval to market the product.

Responsible for post-marketing surveillance, including the handling of adverse events reported by patients, physicians or other care givers. Most importantly, this included deciding if and when action had to be taken as a result of these reports. Such action could range from recommending a change in the prescribing information all the way to withdrawing the product from the market. Again, this responsibility included defending each of these decisions in court, if and when challenged. During my tenure this happened on average about 10 to 15 times annually when actions were brought against Pharmacia, e.g. for "failure to warn".

Responsible, in such cases, for conducting a medical review of the complaint and assessing its merits, followed by answering interrogatories, giving depositions and, if a settlement was not reached earlier, testifying in court on behalf f the company, in one case being questioned for more than two hours by Melvin Belli on behalf of the patient. None of the actions against Pharmacia resulted in an award against the company by a jury during my watch although numerous actions were settled at various stages of the process.

Represented Pharmacia in the Clinical Safety Surveillance Committee of the PMA (now the Pharmaceutical Research and Manufacturers Association) in Washington, DC for several years. I am therefore familiar with the practices of other large pharmaceutical companies in respect of drug safety and labelling issues.

**Clinical Development Experience**

Documented success in completing large clinical programs leading to approval of new drugs, devices and biologicals.

**Achievements:**

Completion of a large multicenter study of Dipentum (olsalazine) in mild to moderate active ulcerative colitis.

Completion of a large multicenter study of Azulfidine (sulfasalazine) in seronegative spondylarthropathies, jointly

sponsored by Pharmacia and the U.S. Department of Veterans Affairs

Maintenance of a large international multicenter study of Azulfidine in multiple sclerosis, jointly sponsored by Pharmacia and the Mayo Foundation

Investigator sponsored studies of combination therapy of R.A. with Azulfidine, methotrexate and hydroxychloroquine and of polymyalgia rheumatica with Azulfidine initiated

Designed and implemented a large clinical program to document the safety and efficacy of Estring, a vaginal preparation of estradiol for the prevention and treatment of vaginal symptoms in menopause

Developed and implemented a large clinical trial program to update the clinical information on Emcyt (estramustine) for the treatment of prostatic cancer

Developed and implemented a clinical trial plan for Linomide, an immune modulator, in AML after ABMT

Initiated, contracted and completed a large clinical trial of rhSOD in renal transplantation

Initiated, contracted and completed a large external pre-clinical program for several other indications for rhSOD, including cardiac ischemia in connection with CABG

Completion of a major clinical development program resulting in the approval of Rheomacrodex (dextran 40) for the prevention of postoperative thromboembolic complications

Completion of the National Cooperative Crohn's Disease Study, jointly sponsored by Pharmacia and the NIH

Development and implementation of a large clinical trial program resulting in the approval for Healon (hyaluronic acid) as a viscoelastic aid in cataract surgery

**Regulatory Affairs Experience**

Documented success in preparing documents for submission to the FDA in support of new product approvals, extension of indications, other label changes, annual reports, safety reports etc.

**Achievements:**

Preparation of the Overall Summary, Summaries of Safety and Effectiveness, Prescribing Information and related documents in preparation for filing a supplemental NDA to extend the indications for Dipentum (olsalazine sodium) in ulcerative colitis

Overall medical responsibility for an NDA resulting in the approval of Azulfidine EN-tabs (sulfasalazine) for rheumatoid arthritis

Overall medical responsibility for an NDA resulting in the approval of Estring , a vaginal delivery system for estradiol specifically designed for the treatmernt of vaginal estrogen deficiency in menopause

Principal writer for the medical portions of successful NDA's, PLA's or BLA's for the following products:

Rheomacrodex (dextran 40) in the prevention of postoperative thromboembolic complications

Healon (sodium hyaluronate) as a viscoelastic aid in cataract surgery

A series of hymenoptera venom extracts for the treatment of severe and life threatening allergies to these stinging insects

## PROFESSIONAL APPOINTMENTS

### INDEPENDENT CONSULTANT FOR DRUG AND DEVICE DEVELOPMENT AND SAFETY 1996- PRESENT

Neoprobe, Inc., Columbus, OH: Medical audits of clinical studies either already submitted or about to be submitted to the FDA to obtain clearance for marketing and the negotiations with the institutions and investigators involved in these studies to prepare them for the impending FDA audit.

Prologue Research International, Columbus, OH:

Audit of Adverse Event Files for a major study by a leading pharmaceutical manufacturer to ensure compliance with applicable FDA regulations.

Principal recruiter for a major Phase III b study for a global pharmaceutical company based in France.

**PHARMACIA & UPJOHN, INC., MEDICAL RESEARCH CENTER, DUBLIN, OH**

**DIRECTOR, AUTOIMMUNITY** **1995-1996**

**RESPONSIBILITIES:**

All U.S.clinical activities in the fields of gastroenterology and rheumatology including clinical trials in Phases II, III and IV, review of adverse events, prescribing information, liability actions, etc.

**DIRECTOR, UROLOGY, GYNECOLOGY AND AUTOIMMUNITY**
**1993-1994**

**RESPONSIBILITIES:**

All U.S. clinical activities in the above fields as related to Estring (estradiol), tolterodine, Azulfidine and Dipentum, including clinical trials in Phases II, III and IV, review of adverse events, prescribing information etc.

**KABI -PHARMACIA INC., PISCATAWAY, NJ**

**MEDICAL DIRECTOR** **1990-1993**

**RESPONSIBILITIES:**

All U.S.clinical activities involving Kabi Pharmacia products, including, in addition to the products/projects listed above, all products/projects emanating from the former Leo facilities in Helsingborg, Sweden, including Linomide (roquinimex) and Emcyt (estramustine)

**PHARMACIA CHIRON PARTNERSHIP, PISCATAWAY, NJ AND EMERYVILLE, CA**

**PROJECT DIRECTOR** **1985-1990**

**RESPONSIBILITIES:**

Development of recombinant human superoxide dismutase (rhSOD), a free radical scavenger produced by the Chiron Corporation and licensed to the Partnership.

**PHARMACIA INC., PISCATAWAY, NJ**

**MEDICAL DIRECTOR** **1969-1984**

**RESPONSIBILITIES:**

All U.S. clinical activities, including clinical trials, adverse events, prescribing information, medical liability etc.

**PHARMACIA AB, UPPSALA, SWEDEN**

**DIRECTOR OF CLINICAL RESEARCH** **1967-1969**

**RESPONSIBILITIES:**

All clinical trials and handling of adverse events worldwide for the product group Infusion Soultions

**PHARMACIA INTERNATIONAL, UPPSALA, SWEDEN**

**MEDICAL DIRECTOR** **1965-1969**

**RESPONSIBILITIES:**

All clinical trials and hamdlmg of adverse events for all products marketed outside the Scandinavian countries

**EDUCATION**

| | |
|---|---|
| Public High School, Vienna, Austria | Valedictorian |
| Hamilton College, Clinton, NY | Fulbright Scholar |
| University of Vienna Medical School (UVMS) | M.D. |
| Dept. of Internal Medicine, UVMS | Internship and Residency in I.M. |

**STATUS**

U.S. Citizen by Naturalization

# Exhibit B

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

IN RE: BAYCOL : MDL NO. 1431
PRODUCTS LITIGATION : (MJD/JGL)
This Document Relates:
To All Cases :

ORIGINAL

- - -

CONFIDENTIAL

- - -

January 29, 2004

- - -

Videotape deposition of ERICH R. SCHINAGL, M.D., held in the offices of Weitz & Luxenberg, P.C., 180 Maiden Lane, New York, New York, commencing at 10:05 a.m., on the above date, before Linda L. Golkow, a Registered Diplomate Reporter and Certified Shorthand Reporter.

- - -

ESQUIRE DEPOSITION SERVICES
1880 John F. Kennedy Boulevard
15th Floor
Philadelphia, Pennsylvania 19103
(215) 988-9191

record.

MR. BROADDUS: John Broaddus for the plaintiffs.

MS. FLEISHMAN: Wendy Fleishman for the plaintiffs.

MR. HASTON: Tripp Haston for Bayer.

MR. PIORKOWSKI: Joe Piorkowski for Bayer.

MR. MAGAZINER: Fred Magaziner for GlaxoSmithKline.

MS. DeLAINE: Halimah DeLaine for GlaxoSmithKline.

THE VIDEOTAPE TECHNICIAN: Will the court reporter please administer the oath to the witness.

\- - -

ERICH F. SCHINAGL, M.D., after having been duly sworn, was examined and testified as follows:

\- - -

EXAMINATION

\- - -

A. (Witness nods.)

Q. Am I correct that this would reflect all the dates and time in which you've put in in serving as an expert witness in this matter?

A. Correct.

Q. And the first date I have on here is August 21st, 2002. Does that square with your recollection about the first time you were contacted?

A. Yes.

Q. What were you told by Mr. Pennock when he called you? Why was he calling you?

A. Well, he was responding, I believe, to some letters I had sent out not to him, but I had sent out letters to a number of law firms that were advertising about the Baycol at that time. They were advertising not for medical experts, of course, but to see if there were patients who had been injured. And so I read the New York Times and the Wall Street Journal, and I just wrote

A. No.

Q. Is there some reason why you didn't send letters to the other side?

A. Well, because from the press reports -- I mean, before all of these things happened, of course, there were numerous press reports. And from the press reports, it appeared that that was pretty much an open and shut case, but that's all I knew at that time.

Q. You don't believe everything you read in the papers, though, do you, Doctor?

A. No, but I rely on some papers more than on others, and those two that I mentioned are pretty good ones.

Q. What did Mr. Pennock ask you to do when he called you?

MR. BROADDUS: Just so we don't stray into this later, anything with respect to work product-type discussions, obviously, I would object to and instruct him not to answer. But

disks constantly.

Q. Right.

A. And his name appeared, I believe, at one of the -- this was attachments to depositions that I did not have.

Q. This hot disk you were talking about again?

A. Yes. And the name that appeared in some of these relevant documents was constantly Dr. Kuno Sprenger. So, obviously, I was interested in that deposition because, obviously, it appeared from these documents that he was a very key person in this whole thing. So, this was --

Q. Did anyone select that specific deposition and recommend you read it?

A. No.

Q. You have not read the deposition, I take it, of any of the toxicologists from Bayer AG?

A. No. No. In fact, as far as

I know, these were all depositions that I've seen that were plaintiff's depositions. Have I -- I can't recall seeing -- well, of course, this was a Bayer expert or, let's say, a Bayer employee, Sprenger was.

Q. Have you asked for any additional depositions to review?

A. No.

Q. Like with the documents, you've agreed to be open-minded, and if additional deposition testimony was presented to you from Bayer employees or Bayer AG employees, am I right that you still agree to keep an open mind about that?

A. Well, yes. That's part of the deal that was understood by all --

Q. Good.

A. -- actually.

MR. BROADDUS: Do you want to break at this point?

MR. HASTON: That's fine if lunch is here.

A. Correct.

Q. So, you're not alleging or saying that Bayer -- and I'm not really sure what information you're talking about, we'll get into it, but for these particular things, let's talk about lovastatin, whether it's a medical article or something, some kind of filing, you were able to reach that conclusion because the information was there, you just quibble with the way it was presented?

A. Exactly.

Q. You're not accusing Bayer or any clinical trial physicians of hiding or keeping information about efficacy or safety?

A. No. No, but that includes, you know, the reports to the FDA. Everything was reported as far as I could see.

Q. Okay.

A. But it was not -- the interpretation given to it by the company

Do you now understand, Doctor, that there were six reports that were filed?

A. Yes.

Q. Have you been provided copies with those six reports?

A. Correct, yes.

Q. So, to the extent you have any criticism in this original opinion or implicating or suggesting in any way that Bayer failed to file timely any periodic safety updates, you now understand that those all were filed; correct?

A. I don't think I said failed to serve -- failed to -- did I say that?

Q. Well, you talk about in the second paragraph --

A. I agree, this is difficult to read. I think I have a better copy in there.

Q. That would be great, if you've got a better copy.

A. It's probably not much better, but -- yes, it's better.

Q. Good. Second paragraph in that last sentence you talk about there's an "Unexplained 6-month gap." Do you see that?

A. Second paragraph?

Q. Yes, sir, under Paragraph 4.

A. Yes.

Q. You do now understand, don't you, that there were no gaps in Bayer's reporting periodic safety updates; don't you? Or maybe you don't have that understanding. That's what I'm trying to determine.

A. Yes. This was just a gap in the information I had at that time.

Q. So, you now, am I correct, have seen the 236-page PSUR that covers March '98 through August of '98?

A. I've seen all of them, yes, I think.

Q. You now understand that Bayer did file all of its PSURs --

A. Yeah.

Q. -- while the product was

A. No, I do not express a medical opinion. My expertise, because of my history, is solely in the area of drug development and the pharmaceutical -- how the pharmaceutical industry approaches it.

Q. Okay.

A. Certainly mostly how Pharmacia approached it, and from my knowledge during that time, how I learned that other pharmaceutical companies approached.

Q. So that I'm clear, you've never in your professional career while at Pharmacia or any of its related companies conducted a comparison of drug risk based solely on spontaneous adverse event reports?

A. No.

Q. For the folks who don't understand about the FDA that may have the benefit of watching your testimony, let's see if we can agree on a couple of things about the FDA.

trials at extremely low doses. And when you look at that table, you can see that the bulk of these patients were at very, very low doses. And since the smallest dose that they sought approval for was .3, that was the relevant number. And since this was a treatment that was intended for essentially lifelong use, anything less than -- I mean, 12 months wasn't long, but anything less than 12 months was not relevant. So, I believe that before this speeding up of the drug approval process as part of the fees that were paid by the industry, this contributed to, number one, I assume, Bayer saying 342 patients are enough and the FDA agreeing with it.

Q. So, you would disagree with, for example, Dr. David Orloff's medical review of the initial NDA where he characterized the exposure as substantial?

A. Absolutely. Absolutely.

Q. And I think you've told me

far as I know hasn't changed, that what you are looking for is at least a ten-fold safety margin between the animals and the humans. So, in drug development, you do not usually expect animals to die or have any serious side effects at less than ten times the human dose. I mean, that is a standard that you look for.

Q. Do you know how the Baycol safety margin with regard to these brain hemorrhagings in dogs compare to the muscle effects that it had with atorvastatin or Lipitor?

MR. BROADDUS: Objection to form. You may answer.

THE WITNESS: No. I don't know that.

BY MR. HASTON:

Q. You don't know how the relative safety margins compare?

A. No.

Q. And if it turned out that the safety margin for Lipitor was less

when it came to muscle effects in dogs than it was with Baycol, would that change your opinion at all about --

A. Well, that alone --

Q. Can I finish my question first?

A. Sorry.

Q. Would that change your opinion with regard to the significance of these preclinical recommendations that were being made in February of '91?

A. In that regard, it would, yeah. But only in regard to these preclinical recommendations.

Q. Again, you've not had the benefit of reviewing the INDs or NDAs of the other statins in this class?

A. No.

Q. And all these INDs and NDAs were on file with the FDA at the time Bayer's IND and NDA was filed; is that correct?

A. Yes.

Q. So, the professionals inside

the FDA had the benefit of the other statins' experience in their drug development when they reviewed the Baycol NDA?

MR. BROADDUS: Objection to form. You may answer.

BY MR. HASTON:

Q. Is that correct?

A. Yes.

Q. And that, again, the four or five other statins' information is something that you have not been provided with or looked at?

MR. BROADDUS: Objection to form. You may answer.

THE WITNESS: That's correct.

BY MR. HASTON:

Q. You understand when you file an IND that you file all the results from your preclinical trials?

A. Yes. That's what you are supposed to do.

Q. That's what you are supposed

to do.

And you have no reason to doubt that Bayer did that in this case; do you?

A. No.

Q. And the FDA has toxicologists?

A. Yes.

Q. And they do a specific toxicology review of an IND; don't they?

MR. BROADDUS: Objection to form.

THE WITNESS: Yes.

BY MR. HASTON:

Q. Have you looked at that review of the IND from the FDA toxicologists?

A. I have looked at the summary basis of approval, so, I know what was in there, but not -- I don't know everything, because the summary basis of approval is exactly what it says. It's a summary and does not allow you to dig too deeply into anything.

Q. So that folks who are watching your tape, to the extent they do, understand what you're saying and that don't have the same experience, the FDA has different departments that review different aspects of an IND; correct?

A. Yes.

Q. And they will either approve or not approve different parts of the IND?

A. That's correct.

Q. And sometimes departments can say, I recommend against approval, but the summary of the overall approval would say we approve it?

A. Yes.

Q. And you don't know, for example, what the toxicologists, when reviewing the atorvastatin or Lipitor IND or NDA, had to say about the toxicity of atorvastatin; do you?

A. No.

Q. So, would you agree that because the FDA had that experience, that

gave them a perspective that you don't have in evaluating this information?

MR. BROADDUS: Objection to form. You may answer.

THE WITNESS: Correct.

BY MR. HASTON:

Q. Doctor, let me go now to your second opinion, and we're going to flip back and forth. I apologize, but it's the way the report has been put together.

Number 2, you conclude "Throughout the published reports of clinical studies, Bayer minimized negative findings in order to make Baycol appear safer than it really was."

My first question is, and then if we turn back to Page 2 of your report, the body of the original report from July of 2003 under 3.2, Clinical Development, is that the part of your body of the report that you believe supports that final conclusion?

A. Correct.

Q. Throughout here, you are discussing in some detail various pieces of medical literature?
A. Correct.
Q. And those are various pieces of medical literature concerning the clinical trials of Baycol?
A. Correct.
Q. So, in reaching this conclusion about Bayer minimizing the negative findings in order to make Baycol appear safer than it was, you're talking about this medical literature?
A. Correct.
Q. So that I'm clear, are you saying that either -- that Bayer employees wrote all this literature?
A. No, no, I' m not saying that. In fact, the only thing I know is that at least one of these, and one of the pivotal studies, the .8, which in that respect was the worst of the lot, had three people that are identified as Bayer people as co-authors. So, that would

suggest that they had at least something to do with the way this was written.

Q. Well, other than that one particular document you're talking about for 0.8, these other pieces of medical literature have been written by physicians who were conducting the clinical trials. Is that your understanding?

A. I did not -- I can't say that I critically examined the author list of each of these papers to see what relationship, if any, these authors had to Bayer. It was -- I mean, that particular one 0.8 study, that sort of attracted my attention. It did not attract my attention in any of the others, so, I don't know for sure.

Q. Well, the reason I ask is because the summary opinion is that Bayer minimized negative findings, and what I'm trying to determine is, are you saying that all these physicians who wrote these various pieces of medical literature were

acting on behalf of Bayer when they did that?

A. Well, I am very familiar with what the -- how the industry deals with publications of clinical trials because I've done it dozens, if not hundreds of times. And what you usually, as part of the industry, attempt to get is as much influence over the publication as you can get because a published paper is an important and critical marketing tool. So, most of the time the company has some influence.

Q. But of the 16 documents that were specifically cited in your opinion to discuss what you saw, as you said, that was going on inside the company, none of those 16 documents suggest that Bayer had any input into the medical literature that was published for those physicians who were not employed by Bayer?

MR. BROADDUS: Objection to form and foundation. You can

answer.

THE WITNESS: Could you repeat that.

BY MR. HASTON:

Q. What I'm trying to determine is, you don't have any specific information, do you, other than your experience with what you did at Pharmacia, to conclude that Bayer, in fact, was reviewing all of the manuscripts that you'd written about here in your opinion?

A. I don't have any specific information, but it would be extremely surprising to me if they didn't.

Q. You would concede that the 16 documents cited in your Exhibit C as documents that you've relied upon do not address this or shed any light one way or the other on it?

A. No.

Q. So, your only evidence would be based on what your experience was with Pharmacia, not what Bayer's experience

was?

A. Yes. All right.

Q. And you said on Page 5 of this report that "It is reasonable to assume that Bayer reviewed manuscripts prior to publication and leaned on authors to present their data in a most favorable light." So that I understand, again, you don't have any specific information that shows that Bayer leaned on anyone when writing these papers?

MR. BROADDUS: What paragraph, Counsel? Sorry.

MR. HASTON: It's page.

MR. BROADDUS: 5?

MR. HASTON: Last paragraph.

THE WITNESS: Yes.

BY MR. HASTON:

Q. You don't have any specific --

A. As I said, it is reasonable to assume.

Q. It is an assumption?

A. Yes.

Q. It's an assumption based on what you did when you were at Pharmacia?

A. What I did, yes, and what, to the best of my knowledge, what every pharmaceutical company does.

Q. So, you would lean on authors in terms of the way they presented their data on Pharmacia products?

A. Well, I mean, yes, that's business.

Q. And you said that in this case, again, based on an assumption only, not any particular information, this went way beyond the bounds of propriety?

MR. BROADDUS: Objection to form. You may answer.

THE WITNESS: Yes. That's what I thought.

BY MR. HASTON:

Q. Where is the line of propriety on leaning on authors in terms of how they present their information from clinical trials?

me that again.

BY MR. HASTON:

Q. The FDA approved the NDA and the supplemental new drug applications that Bayer filed in support of Baycol?

A. It did, yes.

Q. And so they, therefore, necessarily concluded that an adequate number of patients had been tested to prove the safety and efficacy of the drug?

MR. BROADDUS: Objection to form. You may answer.

THE WITNESS: That was their opinion, and I've given you mine.

BY MR. HASTON:

Q. You disagree with their opinion?

A. I do.

Q. You've never worked with the FDA -- at the FDA?

A. No.

Q. You've never worked with any other regulatory agencies --

way beyond where it should have been pushed.

Q. In your opinion?

A. In my opinion based on the documents and information that I've seen.

Q. We can agree that that conclusion that you've reached is a different conclusion than the FDA reached when they approved these new drug applications and in the subsequent NDAs?

A. That's correct.

Q. So, you don't know these -- either the clinicians, and you don't know positions and the marketing personnel you are referring to here?

A. No.

Q. You haven't spoken with them?

A. I know them only from their -- from what they were quoted as saying or doing in the documents I've seen.

Q. And you say, now turning to Page 4 in the second paragraph, that

Defendant's Exhibit 5, which is, I'll represent, the first --

A. Okay. I believe --

Q. -- set of prescribing information for Baycol.

\- - -

(Whereupon, Deposition Exhibit Schinagl-5, Baycol Package Information, 9/97, was marked for identification.)

\- - -

THE WITNESS: Okay. I believe I should have said that Bayer "implied" or "suggested," rather than "claimed." Some words as that.

BY MR. HASTON:

Q. So, you would modify your opinions now instead of saying "claimed" to "implied" or suggested?

A. Yes, because claimed does imply that there was an actual statement to the effect when, indeed, this was just a question of Bayer stating that

spend time if he wants to.

MR. BROADDUS: Just make sure he's had enough time. That's all I'm saying.

BY MR. HASTON:

Q. There's nothing in the label that says Baycol is safer than any other statins?

A. Not verbatim, no.

Q. This one sentence that you've referred to in this prescribing information about skeletal muscle is: "Rare cases of rhabdomyolysis with acute renal failure secondary to myoglobinuria have been reported with other HMG-CoA" --

A. Correct.

Q. -- that's the sentence you don't like?

A. Well, it's not a question of me not liking it. It's what led me to say what I said, and as I said, I corrected that it shouldn't have said "claimed" but "suggested."

Q. Can we agree, though,

Doctor, that at the time this was approved, it was an accurate statement?

A. No.

Q. How was it not accurate?

A. Because there was a patient in the Phase I study that had rhabdomyolysis.

Q. Now, did the -- and your basis for that is something you've seen in some other expert's report?

A. I have seen that in not just that expert report, but in other documents.

Q. The reason I ask is I did not see that reference in the body of this original report in July of 2003, any reference to any particular patient?

A. No, but I have seen that since, yes.

Q. Now, with regard to that one patient, do you know how the clinician who was in charge of that trial characterized that patient's condition?

A. Yes. Well, I don't know if

Q. My question was simply you don't know --

A. -- and that person was not part of the package insert review, and that's how this slipped in.

MR. HASTON: I'll object to the nonresponsive portions of your answer.

BY MR. HASTON:

We can agree that -- or do you know, because maybe you haven't looked, that when Baycol was first marketed, every other statin on the market had several cases of rhabdo that had been reported? Do you know.

A. I don't know about every other statin, and I don't know about several cases, but obviously cases of rhabdo had been reported, yes.

Q. Otherwise, this was a type of class warning, as we talked about earlier; correct?

A. Yes.

Q. And Bayer told the doctors

the FDA.

Q. That's your assumption again?

A. Correct.

Q. You don't know one way or the other?

A. Correct.

Q. Have you ever diagnosed a patient with rhabdomyolysis?

A. No.

Q. Have you ever seen a patient with rhabdomyolysis?

A. No.

Q. Have you ever done a clinical study on a pharmaceutical product that had rhabdomyolysis as a potential side effect?

A. No.

Q. Have you ever had any professional experience with respect to labeling issues concerning rhabdomyolysis?

A. Would you repeat that, please?

Q. Have you ever had any experience with labeling issues concerning rhabdomyolysis as a potential side effect?

A. Not with the products I worked with.

Q. In fact, Doctor, are you familiar with the term "COSTART"?

A. Yes.

Q. What is that, for the benefit of people who aren't savvy with the language?

A. That's a dictionary that the FDA used to classify adverse events.

Q. You're not familiar when a COSTART definition of rhabdo was developed, are you?

A. No.

Q. You're not familiar with what that definition might be?

A. No.

Q. Doctor, on to Paragraph 5 of your summary opinions. In that you say: "In their early post-marketing

THE WITNESS: Well, the drugs I worked with were not of that nature that that became an issue.

BY MR. HASTON:

Q. That wasn't my question, Doctor. I know you're doing your best, and I am, too. I just want to try to get it clear so we both understand each other.

You've not done that analysis that you say Bayer should have; correct?

A. No.

Q. And so you don't know what significance, if any, such an analysis would show?

A. I know from the information that I have gathered on Baycol that that would have been a very desirable thing not only to do earlier, because it was done earlier than it was communicated to anybody, so, this was done and kept secret inside the company. The FDA was

Q. In fact, I think you told me earlier that you never did such a comparative reporting rate analysis?
A. That's correct.
Q. For any of the products?
A. There was no reason to do it --
Q. Well --
A. -- because there were no comparative products of this type and no issue of an overwhelming side effect, which this was, in the sense that it was the predominant side effect for this drug that outnumbered any other.
Q. Let me ask the question in a little bit different way.
You can't say to a reasonable medical probability what such analysis that you've talked about here in Opinion Number 5 would have shown?
MR. BROADDUS: Objection to form. You may answer.
BY MR. HASTON:
Q. Because you haven't done it?

A. It almost certainly would have shown the same thing.

Q. You don't know, though, do you, Doctor?

A. No.

Q. You haven't looked at the PSURs for the other statins at all; have you?

A. No.

Q. So, you don't know how many cases of rhabdomyolysis or other muscle effects were experienced in the other statins during their period of marketing before Bayer did its analysis; do you?

A. Well, I know that from the Staffa analysis, which --

Q. That wasn't my question, though.

MR. BROADDUS: I'm sorry, let him finish his answer.

MR. HASTON: He's not being responsive. It is a simple question.

BY MR. HASTON:

(Whereupon, there was a recess.)

- - -

THE VIDEOTAPE TECHNICIAN: We're back on the video record at 4:36 p.m.

BY MR. HASTON:

Q. Doctor, let me move down to Opinion Number 6 on your summary opinions about the marketing of .8 that you concluded was "promoted in a reckless manner." And then moving to the body of your report, Page 8, under the development of .8, you cite a document from the tox group written by Drs. Schluter and von Keutz. Do you recall that cite?

A. Page 8 to -- whereabouts is it?

Q. At the very top, Doctor. It's a quote from the memo from Bayer AG Toxicology in '95?

A. Oh, yes. Yes.

Q. Again, Doctor, do you know

what particular adverse event Drs. Schluter and von Keutz were concerned about in dogs when they wrote this memo in 1995?

A. Well, I think we went through that before. They were dying of hemorrhages.

Q. Brain hemorrhages; right?

A. Yes.

Q. CNS?

A. Yes.

Q. That's not a side effect that was ever seen with any kind of frequency in human development; was it?

A. No.

Q. And you're not familiar with that being seen in terms of any post-marketing experience with any of the statins?

A. No.

Q. And, again, you don't know, because you haven't reviewed how this incidence of brain hemorrhages, what rate it occurred at in the INDs of the other

statins?

A. No.

Q. Doctor, you also make some comments about the .8 pivotal trial here in the body. Just so we're clear, you're not suggesting that the FDA didn't receive the same information that you had concerning the .8 pivotal trial; are you?

A. No.

Q. You believe, in fact, the FDA had the same information?

A. Well, I don't know. All the information I had about that trial was the publication --

Q. Right.

A. -- and whatever was included in the summary basis of approval. So, what they would have had to submit to the FDA in order to get that dosage approved is the full study report.

Q. More information than just what you were looking at?

A. Much, much more.

Q. And more people looked at it

pivotal study, do you, Doctor?
A. Well, it was -- yes, I do know that.
Q. It was more than just a few hundred.
A. It was 800 or something like that. I may even have written it. It was a large study, yes.
Q. Again, would I be correct in saying that you again just disagreed with the conclusions of the FDA personnel who approved this application?
A. Emphatically so, yes.
Q. Even though they had more information and spent more time on this application than yourself?
MR. BROADDUS: Objection to form. You may answer.
THE WITNESS: Yes.
BY MR. HASTON:
Q. Doctor, have you seen any -- in addition to the documents that you've cited in Exhibit C that you relied on, you do know from your experience, don't