**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : | MDL No. 1431 (MJD) |
| This Document Relates to: | : | |
| *All Actions* | : | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXCLUDE EXPERT TESTIMONY OF MARTYN SMITH**

Dr. Martyn Smith is a toxicologist who opines that Baycol was the most toxic statin on the market. Report of Martyn Smith (Ex. A) ¶ 6(a). His opinion, however, is based upon untested hypotheses, rank speculation, and studies that he himself admits are flawed. This opinion is inadmissible under the *Daubert* standard for two independent reasons:

*First*, Dr. Smith's opinion is inadmissible because it is based upon extrapolation of results from high dosage animal studies to human beings. "[E]xtrapolating to humans from animal studies is problematic" in part "[b]ecause of the dose-response differential between animals and humans." *See, e.g., Sorensen v. Shaklee Corp.*, 31 F.3d 638, 646 n.12 (8th Cir. 1994).

*Second*, his opinion is inadmissible because it is based upon comparative adverse event reporting data. Smith Rep. (Ex. A) ¶¶ 8-10. AER data cannot form the basis of an expert's opinion on causation. *See* Defendants' AER Motion.

In addition to his main opinion, Dr. Smith also opines that Baycol was more susceptible than other statins to drug-drug interactions because it was metobolized

by two enzymes. Smith Rep. (Ex. A) ¶¶ 29-32. This opinion is merely Dr. Smith's untested hypothesis, and is therefore inadmissible. *Sorensen*, 31 F.3d at 649 (excluding expert opinion under *Daubert* because "neither of [the expert's] potential causal mechanisms . . . ha[s] been studied"). Dr. Smith conceded that he did not do any literature searches to determine if any other scientist shared his view and was aware of no studies that supported his opinion. He also conceded that the mechanism of statin-induced injury and metabolism is largely unknown. Because his opinion is only based upon speculation, it is inadmissible. *Id*.

Similarly, Dr. Smith's other opinions about the mechanism of statin-induced myopathy should be excluded. *See* Smith Rep. (Ex. A) ¶¶ 19-23. As Dr. Smith conceded, there are at least two theories explaining the mechanism of statin-induced myopathy, neither of which has gained general acceptance in the scientific community. Because no theory has been scientifically proven or even generally accepted in the scientific community, Dr. Smith's opinion about the mechanism of statin-induced myopathy is inadmissible. *See, e.g.*, *Sorensen*, 31 F.3d at 649.

Finally, Dr. Smith expresses a number of opinions regarding whether Bayer and its scientists acted ethically. These opinions are not based upon "scientific, technical or other specialized knowledge" and therefore are not properly the subject of expert testimony. *See* Fed. R. Evid. 702; *see also In re Rezulin Products Liability Litigation*, 309 F. Supp. 2d 531, 544 (S.D.N.Y. 2004).

# ARGUMENT

## I. DR. SMITH'S OPINIONS SHOULD BE EXCLUDED BECAUSE THEY ARE NOT BASED ON PROPER METHODOLOGY AND ARE OTHERWISE UNRELIABLE.

### A. Dr. Smith's Opinion That Baycol Is the Most Toxic Statin Is Inadmissible.

Dr. Smith asserts that "Baycol is at least 10 times more toxic than other commercially available statins." Smith Rep. (Ex. A) ¶ 6(a). As support for his opinion, Dr. Smith only relies upon two data sets: (1) data from *in vitro* and animal studies that compare Baycol to other statins; and (2) articles mentioning adverse event reports. Neither of these can properly form the basis of expert opinion.

#### 1. Dr. Smith impermissibly extrapolates data from flawed animal and *in vitro* studies to humans.

Dr. Smith's conclusions regarding the myotoxicity of Baycol in humans is primarily based upon a study by Matsuyama *et al.*, in which a group of scientists "used an assay of rats to evaluate the myopathy risk" produced by Baycol and four other statins. Smith Rep. (Ex. A) ¶ 16. At his deposition, Dr. Smith admitted that the Matsuyama study results were potentially confounded by the fact that the scientists conducting the study infused the animals with urethane, an anesthetic that has the potential to cause myotoxicity, like all statins. Of this problem, Dr. Smith observed that "[i]f [all statins] react within the same way [with urethane] . . . it wouldn't make any difference, but if specific statins were affected by the urethane more than others, then it would make a difference." Deposition of Martyn Smith, Ph.D. (Ex. B) at 93:18-21. Dr. Smith admitted

that "they don't have the data to say" whether urethane interacts with all statins in the same way. *Id.* at 100:8-9.

Dr. Smith testified at his deposition that "when one is comparing different statins, I think it's very important to compare therapeutically equal doses." *Id.* at 80:18-20. However, the doses Matsuyama *et al.* gave to the rats were not comparable to the dose prescribed for a person taking a statin; the rats were tested using a dose nearly two thousand times the dose any human could have possibly received. *Id.* at 94:2-96:7.

Dr. Smith also relies upon a study done by Matzno *et al.*, in which the investigators examined myotoxicity in rats muscle cells *in vitro*. Like the Matsuyama study, the Matzno study did not adjust the dose of the drug. *Id.* at 98:13-21. Dr. Smith admitted *in vitro* study is not very reliable:

> [W]e know from general science that studies done in a test tube done in an *in vitro* situation need to be cautiously interpreted when extrapolating to actual living human beings. There are many reports or discussions of that in the peer-reviewed literature.
>
> . . . .
>
> I know the general scientific community would consider that *in vitro* test tube studies were potentially unreliable and should be interpreted with caution in extrapolation to general human beings.

Smith Dep. (Ex. B) at 123:17-22, 124:7-10.

Dr. Smith conceded, however, that his "main focus has been upon the animal data and *in vitro* test tube studies of the drugs" in forming his opinion. *Id.* at 150:7-8. Dr. Smith's reliance upon the Matsuyama and Matzno studies, and others like them, does not meet the *Daubert* standard. Determination of the toxicity of statins based

upon extremely high doses in rats, using an anesthetic that has the potential to create the same side effect that the study purports to measure, is not a generally accepted method for determining toxicity in humans. And, as Dr. Smith conceded, reliance upon *in vitro* studies is inappropriate because the extrapolations from such data are unreliable. *Id.* at 124:7-10.

Courts agree that the results of such testing are inadmissible to show that a drug causes a particular effect in humans, much less that a manufacturer knew or should have known of that effect in humans. *See, e.g., Sorensen*, 31 F.3d at 646 n.12 ("Because of the dose-response differential between animals and humans, however, extrapolating to humans from animal studies is problematic"); *Soldo v. Sandoz Pharm. Corp.*, 244 F. Supp. 2d 434, 546 (W.D. Pa. 2003) ("This Court observes that studies of laboratory animals are routinely excluded as irrelevant and unreliable when proffered as a basis for medical causation testimony"); *Brock v. Merrill Dow Pharms., Inc.*, 874 F.2d 307, 313-14 (5th Cir. 1989); *Lynch v. Merrell-National Labs., Inc.*, 830 F.2d 1190, 1194 (1st Cir. 1987).

Moreover, courts have found "extrapolations . . . from high-dosage, single species in vivo" and *in vitro* testing to human causation to be unreliable and irrelevant because of exponentially greater levels of drugs given to animals. *Bourne ex rel. Bourne v. E.I. Dupont de Nemours and Co.*, 189 F. Supp. 2d 482, 496 (S.D.W. Va. 2002) (excluding expert testimony that purported to draw conclusions about harmfulness of drug in humans from high-dose animal testing); *accord General Elec. Co. v. Joiner* , 522 U.S. 136, 144 (1997) (holding district court did not abuse its discretion in excluding

animal studies evidence where mice had "massive doses of PCBs" injected into them, while the plaintiffs' "exposure to PCBs was far less than the exposure in the animal studies"); *Sorensen*, 31 F.3d at 646 n.12.[1]

In short, Dr. Smith's reliance on admittedly unreliable data from flawed animal and *in vitro* studies makes his opinion inadmissible.

**2. Dr. Smith impermissibly relies upon studies that compare adverse event reporting data.**

In support of his opinion that Baycol was the most toxic statin, Dr. Smith asserts that Baycol causes rhabdomyolysis "16 to 80" times more often than the other statins. Smith Rep. (Ex. A) ¶ 8. These rates are derived from an FDA review of adverse events reports ("AERs") and Bayer's own internal analysis of AERs. He also relies upon an article by Thompson (Thompson, *et al.*, "Statin-Associated Myopathy," *JAMA*. 2003;289:1681-1690 (Ex. D)), which asserts the same rates, and by Staffa (Staffa, *et al.*, "Cerivastatin and Reports of Fatal Rhabdomyolysis," *NEJM*. 2002;346:539-40 (Ex. E)), again asserting the same rates. Dr. Smith acknowledged that Staffa's own writing admits that the rate calculation is a crude measure and that comparison of drugs using this

---

1 *See also Soldo*, 244 F. Supp. 2d at 547-48 (holding animal studies inadmissible because, *inter alia*, "plaintiff's experts did not attempt to correlate the doses used in [animal] studies to the dose ... arising from the use [of the drug by a human under the prevailing circumstances]"); *Wade-Greaux v. Whitehall Labs., Inc.*, 874 F. Supp. 1441, 1454 (D.V.I. 1994) ("In addition to species specificity, the results of animal studies cannot be extrapolated to humans because such studies often employ quantities of the agent far in excess of the equivalent human therapeutic dose"); *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 729 (Tex. 1997) ("courts have rejected animal studies that relied on high dosage levels as evidence of causation in humans" and the "reliability [of animal studies] as predictors of the effect of [the drug] in humans is questionable because of the dosage levels").

measure is not recommended. Smith Dep. (Ex. B) at 130:15-23. He also noted at his deposition that Thompson article only relied upon the Staffa article as the source of information for the rates. *Id*. at 132:21-24.

As defendants have explained more fully in their concurrently filed AER Motion, it is impermissible under *Daubert* for an expert to rely on comparative AER data to make conclusions with respect to the risk presented by any given drug. *See* FDA Office of Postmarketing Drug Risk Assessment, "Adverse Event Reporting System (AERS): Brief Description with Caveats of System" (Oct. 18, 1999) (Ex. F) at 2. Thus, because Dr. Smith relies upon AER data to form his opinion that Baycol is the most myotoxic statin, his opinion in this regard is inadmissible.

**B. Dr. Smith's Opinion That Baycol Is More Susceptible to Drug-Drug Interactions Because of its Dual Metabolic Profile and His Opinion Regarding the Mechanism of Statin-Induced Myopathy Are Inadmissible as Untested Hypotheses.**

In Sections VI and VIII of his report, Dr. Smith purports to offer two expert opinions: (1) that Baycol's dual metabolic profile (via which the drug can be metabolized in the liver by two different proteins, instead of one) makes drug-drug interactions more likely; and (2) that "an increase in apoptosis [cell death] more likely than not plays a critical role" in the mechanism of statin-induced myopathy. *See* Smith Rep. (Ex. A) ¶¶ 19-23, 29-32. Both opinions are inadmissible because both are merely Dr. Smith's unfounded hypotheses.

***Opinion regarding drug-drug interactions.*** Dr. Smith testified in his deposition that his "opinion" that Baycol's dual metabolic profile makes drug-drug

interactions more likely is merely his untested and unsupported hypothesis. Indeed, Dr. Smith admitted that he "ha[d]n't looked for the peer reviewed literature to support that opinion," Smith Dep. (Ex. B) at 141:15-16, and that he "ha[d]n't seen any writings on it at all, really." *Id.* at 176:21-22.

Dr. Smith's main reason for concluding that a dual metabolic profile is a negative feature of Baycol is that both of the proteins that metabolize Baycol "are equally open to inhibition by other drugs. . . ." Smith Rep. (Ex. A) ¶ 31. At deposition, Dr. Smith testified: "I just think it's weak thinking, it's just poor thinking that two pathways are better than one." Smith Dep. (Ex. B) at 140:4-18, 176:7-9.

Dr. Smith admitted that his opinion is merely a hypothesis for which there is no support in the scientific community. *See id.* at 141:15-16, 176:21-22. Not even plaintiffs' rebuttal expert, Dr. Sandy Pang, agrees with Dr. Smith's untested hypothesis:

> Q: Okay, Dr. Pang, have you had a chance to review the report, this rebuttal report, of Dr. Martyn Smith?
>
> A: Very briefly.
>
> Q: Okay. Is there anything in there, in your brief review, that you find that you disagree with?
>
> A: . . . Dr. Smith . . . [H]e said that the potential for drug-drug interaction is increased when you have more than one pathway. . . . I think it is better to have more than one pathway. Then you . . . if you inhibit one enzyme, the other enzyme compensates for the inhibition. And the rate goes up for the second enzyme. So [there] is a difference in opinion there.

Deposition of Sandy Pang (Ex. G) at 152:24-154:2 (referring to Rebuttal Report of Martyn Smith (Ex. C)).

The lack of scientific support and data renders Dr. Smith's untested hypothesis inadmissible. *See* Fed. R. Evid. 702 (expert testimony is admissible only if "the testimony in based upon sufficient facts or data"); *see also J.B. Hunt Transp., Inc. v. General Motors Corp.,* 243 F.3d 441, 444 (8th Cir. 2001) ("[N]othing in either *Daubert* or the Federal Rules of Evidence require a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered") (quoting *Joiner*).

***Opinion regarding mechanism of statin-induced myopathy.*** In Section VI of his expert report, Dr. Smith opines that "an increase in apoptosis [cell death] more likely than not plays a critical role" in the mechanism of statin-induced myopathy. This opinion is inadmissible because it is merely Dr. Smith's unfounded hypothesis. *See* Smith Rep. (Ex. A) ¶¶ 19-23.

Dr. Smith concedes that the mechanism of statin injury is "not fully known," Smith Dep. (Ex. B) at 58:2-5, and that there are at least two competing theories that purportedly explain it. He further admits that "additional work is required to demonstrate definitively" whether either theory is correct. *See* Smith Rep. (Ex. A) ¶¶ 20-23. Although Dr. Smith opines that apoptosis "plays a critical role" in statin-induced myopathy, he admits that "the apoptosis theory is still just a theory because there's no direct proof of it in human beings." Smith Dep. (Ex. B) at 162:9-12.

Because no theory regarding it has been scientifically proven or even generally accepted in the scientific community, Dr. Smith's opinion about the mechanism

of statin-induced myopathy is mere speculation and therefore is inadmissible. *Sorensen*, 31 F.3d at 649 (excluding expert opinion under *Daubert* because "neither of [the expert's] potential causal mechanisms . . . ha[s] been studied."); *see also Daubert*, 509 U.S. at 593-94; *Turner* v. *Iowa Fire Equip. Co.*, 229 F.3d 1202, 1207-08 (8th Cir. 2000).

## III. DR. SMITH'S OTHER OPINIONS ARE INADMISSIBLE.

### A. Dr. Smith's Assertion that Bayer Did Not Heed the Concerns of Its Own Toxicologists Is Inadmissible because It Is Merely a Speculative Argument, Not Expert Testimony.

Dr. Smith criticizes Bayer for inadequately evaluating the potential toxicity of Baycol, despite admitting that "Bayer carried out very extensive preclinical toxicology studies which [he] do[es]n't dispute were very comprehensive and substantial." Smith Dep. (Ex. B) at 144:3-5. In particular, Dr. Smith claims that "it would have been best to critically evaluate [Baycol's] potential toxicity more thoroughly." Smith Rep. (Ex. A) ¶ 12. He also claims that Bayer's scientists "were concerned about [Baycol's] narrow safety margin very early on in the development process," but that "[i]t appears that [their] warnings were not appropriately heeded." *Id*. ¶ 14. As he explained during his deposition, Dr. Smith was trying to "put forward the argument that it was clear that Bayer toxicologists were concerned" and that they or the company did not follow through on those concerns. Smith Dep. (Ex. B) at 156:7-9.

This "expert opinion" is inadmissible for two independent reasons. *First*, Dr. Smith is admittedly "put[ting] forward [an] argument" rather than offering an expert opinion. This argument is inadmissible, however, because it is based on "simple inferences drawn from uncomplicated facts that serve only to buttress plaintiffs' theory of

the case[,]" inferences that the jury is equally capable of drawing without his assistance, and that counsel may argue at trial. *Rezulin*, 309 F. Supp. 2d at 544.

*Second*, Dr. Smith's opinion is inadmissible because he is merely speculating about what Bayer's toxicologists did or did not know, and whether any of their warnings were heeded. Moreover, opinions about Bayer's purported motives, knowledge, intent, or state or mind fall outside Dr. Smith's knowledge or stated expertise, and do not rest upon "scientific, technical or other specialized knowledge . . . " Fed. R. Evid. 702; *Rezulin*, 309 F. Supp. 2d at 553. Each of these topics is a "classic jury question and not one for the experts." *In re Diet Drugs*, 2000 WL 876900 *9 (E.D. Pa. June 20, 2000). These opinions merely reflect Dr. Smith's personal beliefs, which are based on his layman's speculation, not his scientific expertise:

Judge Bernstein of the Pennsylvania Court of Common Pleas rejected similar testimony by a different expert in the *Galdi* Baycol trial. As Judge Bernstein noted, this type of testimony "sounds like his personal opinion, not a scientific conclusion," and thus must be excluded. *Galdi v. Bayer Corp.,* Pa. Ct. Cmn. Pls., July Term 2002, Case No. 4892, Trial Tr. 3/12/04 at 37:2-4 (Ex. H). This Court should likewise exclude Dr. Smith's testimony on Bayer's motives, knowledge, intent, and/or state of mind under Fed. R. Evid. 702.

**B. Dr. Smith's Opinion that Bayer Incorrectly Characterized Baycol as An "Ideal Statin" Is Inadmissible because It Is Only Relevant to a Fraud-on-the-FDA Theory.**

In his expert report, Dr. Smith points out that Bayer characterized Baycol as an ideal statin in its New Drug Application to the FDA.[2] He then spends the next five paragraphs of his expert report explaining that Baycol did not meet the characteristics of an ideal statin. Smith Report ¶¶ 24-28. However, Dr. Smith admitted at his deposition that none of the other statins are ideal:

> Q: [N]one of the other statins . . . would be ideal statins, using this definition, correct?
>
> A: None of them are ideal.

Smith Dep. (Ex. B) at 168.

Dr. Smith apparently asserts that Baycol is not an ideal statin because he wants to argue that Bayer somehow misled the FDA in its New Drug Application. However, Dr. Smith conceded that Bayer did not hide any of its data from the FDA. *Id.* at 144-45.

Dr. Smith's belief that Bayer somehow misled the FDA by referring to Baycol as an ideal statin is inadmissible because plaintiffs cannot pursue a fraud-on-the-FDA theory. In *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 353 (2001), the Supreme Court held that federal law preempts any state-law claims predicated on allegations that a manufacturer provided false or inadequate disclosures to the FDA.

---

2 The characteristics of an "ideal statin" were laid out in a 1990 article by Duggan and Vickers, "Physiological disposition of HMG-CoA reductase inhibitors." *Drug. Metab.* 1990;22:333 (Ex. I).

After *Buckman*, many courts have precluded plaintiffs from presenting evidence designed to impugn a company's submissions to the FDA.

For example, the court in a recent Baycol-related case excluded proposed testimony "that Bayer (a) misled or deceived the FDA, or (b) failed to provide to the FDA any data, studies or other information required by the FDA." *Pauley* v. *Bayer Corp.*, Pa. Ct. Com. Pl. No. 002729, Order on Defendants' Motion *in Limine* No. 6 (Nov. 16, 2004) (Ex. J).

Similarly, in *Bouchard v. American Home Prods. Corp.*, 213 F. Supp. 2d 802 (N.D. Ohio 2002), the court relied upon *Buckman* in excluding "any evidence or argument that [the defendant] 'misled' the [FDA] . . . or 'violated' the Food, Drug and Cosmetic Act." *Id.* at 811. The court held that "[e]vidence will be excluded outright when it is offered only to show that the FDA was misled, or that information was intentionally concealed from the FDA." *Id*. at 812. *See also Webster v. Pacesetter, Inc.*, 259 F. Supp. 2d 27, 36-37 (D.D.C. 2003) (holding that, under *Buckman*, "what was told to the FDA cannot support a tort claim"; such evidence "would be nothing more than an invitation for the jury to speculate about what . . . the FDA . . . might do if the facts were different").

This Court should follow the above line of cases and exclude Dr. Smith's musings on whether Bayer misled the FDA in referring to Baycol as an "ideal statin."

## CONCLUSION

For these reasons, defendants respectfully request that this Court exclude the testimony by Martyn Smith addressed herein.

Dated: April 17, 2006

Respectfully submitted,

Philip S. Beck
Adam Hoeflich
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60610
(312) 494-4400

/signature on file/

Susan A. Weber
James W. Mizgala
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000

Paul J. Zidlicky
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000

Catherine Valerio Barrad
Nitin Reddy
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
(213) 896-6000

Scott A. Smith
Tracy J. Van Steenburgh
HALLELAND LEWIS NILAN SIPKINS & JOHNSON, P.A.
220 South Sixth Street, Suite 600
Minneapolis, MN 55402
(612) 338-1838

/signature on file/

Fred T. Magaziner
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000

*Counsel for SmithKline Beecham Corp. d/b/a GlaxoSmithKline*

Richard K. Dandrea
ECKERT SEAMENS CHERIN
& MELLOTT, LLC
USX Tower, 600 Grant St., 44th Floor
Pittsburgh, PA 15219
(412) 566-6000

Peter W. Sipkins (No.101540)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
(612) 340-2600

Douglas R. Marvin
WILLIAMS & CONNOLLY
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

Joseph D. Piorkowski, Jr.
THE PIORKOWSKI LAW FIRM, PC
910 17th Street, N.W. Suite 800
Washington, D.C. 20006
(202) 223-5535

*Counsel for Bayer Corporation and Bayer AG*