**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : | MDL No. 1431 (MJD) |
| This Document Relates to: | : | |
| *All Actions* | : | |

**BAYER AND GSK's MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE PLAINTIFFS' PUTATIVE EXPERT WITNESSES FROM INVOKING THE TESTIMONY OF OTHER TESTIFYING EXPERTS**

Although the specific deficiencies in the testimony of each of plaintiffs' proposed generic expert witnesses are addressed in the individual *Daubert* motions, this motion addresses a recurring problem: many of plaintiffs' putative expert witnesses seek to piggyback on the purported expertise and on the litigation-driven and unreliable conclusions of other proposed testifying experts. This attempted end-run around the standards governing expert testimony fails.

Courts nationwide have held that a testifying expert may not simply parrot the testimony of another testifying expert. *See*, *e.g.*, *J.B. Hunt Transp., Inc. v. General Motors Corp.*, 243 F.3d 441, 444 (8th Cir. 2001) (excluding proposed expert testimony "derivative" of another testifying expert's inadmissible testimony); *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612-14 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science."); *In re TMI Litig.*, 193 F.3d 613, 714-16 (3d Cir. 1999) (expert's "failure to assess the validity of the opinions of the experts he

relied upon together with his unblinking reliance on those experts' opinions, demonstrates that the methodology he used to formulate his opinion was flawed under *Daubert*"). "One very significant fact" in determining the admissibility of expert testimony is "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purposes of litigation." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (on remand from *Daubert*, 509 U.S. 579 (1993); *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 687 (8th Cir. 2001) (same).

Despite these well-established standards, plaintiffs' proposed expert witnesses attempt to smuggle in testimony that cannot independently withstand *Daubert* scrutiny by invoking the testimony of other proposed experts. Indeed, the PSC orchestrated at least one meeting and several calls among their proposed experts, apparently to foster "groupthink." *See, e.g.*, Deposition of John W. Farquhar (Ex. A) at 126:2-3; Deposition of Harland Austin (Ex. B) at 159:7-160:13; Deposition of R. Samuel Mayer (Ex. C) at 15:5-20:20, 158:9-159:20; Deposition of Bruce Carlson (Ex. D) at 43:20-44:24, 51:19-52:11, 57:4-20, 60:18-22; Deposition of Stephen Raskin (Ex. E) at 228:14-229:21; Deposition of David Richman (Ex. F) at 205:7-23.

For example, numerous proposed witnesses attempt to rely on the report of proposed witness Dr. John Farquhar and the comparison of adverse event reports ("AERs") he prepared for this litigation to make conclusions about the toxicity of Baycol. *See* Report of John W. Farquhar (Ex. G) ¶ 43 ("Baycol is substantially more toxic than

other drugs in the same class, causing far greater numbers of rhabdomyolysis, myopathies, and deaths"); *e.g.*, Report of R. Samuel Mayer (Ex. H) ¶ 19 (addressing comparative toxicity); Report of Stephen Raskin (Ex. I) ¶¶ 10-11 (same). None of these putative experts possesses expertise in the field to which Dr. Farquhar's testimony relates, namely epidemiology. None of these experts has independently analyzed or applied Dr. Farquhar's methods, nor could they adequately do so because they lack the requisite expertise. *E.g.*, Raskin Dep. (Ex. E) at 179:15-22. Indeed, Dr. Farquhar testified that out of all of plaintiffs' proposed experts:

> I believe I'm the only one that has pretended to do epidemiologically-based biostatistical analyses.

Deposition of Dr. John Farquhar (Ex. A) (Feb. 13, 2004) at 259:7-9; *see id.* at 125:25-126:7.

Similar defects infect a variety of other proposed testimony. For example:

- Dr. Dr. Robert Mayer candidly acknowledged at his deposition that he has relied on "expert reports and not independent scientific literature" in making some of his conclusions. Mayer Dep. (Ex. C) at 260:7-262:20 (acknowledging reliance on reports prepared for litigation by plaintiffs' other proposed testifying experts, Drs. Farquhar, Corbett, Richman and Zizic).

- Dr. Martyn Smith conceded at his deposition that, although his report claims that some of the "most serious interactions" occur when Baycol is used with the medication clopidogrel, he "forget[s]" what clopidogrel is and, in fact, bases this opinion solely on "Dr. Farquhar's report." Deposition of Martyn T. Smith (Ex. J) at 176:25-177:15.

- Dr. Paul David Stolley admitted at his deposition that he has not conducted any systematic evaluation of AERs. *See* Deposition of Paul David Stolley (Ex. K) at 93:17-22. Yet he seeks to parrot the conclusions of others, premised on such reports, that "monotherapy with Baycol is more dangerous than monotherapy with alternative statins." *Id*. at 223:12-14; *see*

Defendants' Memorandum in Support of Their Motion to Exclude Expert Testimony of Paul David Stolley at 3-5, 6-8.

- Dr. Bruce Carlson acknowledged at his deposition that he is not being offered as an epidemiological expert and has never conducted any independent research on muscle pathology in Baycol users versus other statin users. *See, e.g.*, Deposition of Bruce Carlson (Ex. D) at 143:2-16, 175:7-177:22. Yet he attempts to offer opinions about the comparative safety of Baycol that go beyond his expertise by bootstrapping onto the opinions of others. *See* Defendants' Memorandum in Support of Their Motion to Exclude Expert Testimony of Bruce Carlson at 3, 5-10.

All of these opinions, and other opinions of their ilk, are irreconcilable with the standards governing expert testimony and should be excluded.

Finally, even if plaintiffs could overcome these multiple hurdles, this kind of invocation of the professional judgment of another testifying expert for the truth of the matter is inadmissible hearsay with no pertinent exception.

## ARGUMENT

Plaintiffs bear the burden of establishing that the expert testimony they propose satisfies the requirements of federal law. *See, e.g.*, *United States v. Williams*, 95 F.3d 723, 729 (8th Cir. 1996) ("It is the burden of the party offering the expert testimony to lay a foundation for its admission."); *Daubert*, 43 F.3d at 1316 ("the party presenting the expert must show that the expert's findings are based on sound science"). Under the well-known standards of Rule 702 of the Federal Rules of Evidence, expert testimony is permitted only where a properly qualified witness provides relevant testimony that is (1) "based upon sufficient facts or data," (2) "the product of reliable principles and methods," and where (3) "the witness has applied the principles and methods reliably to

the facts of the case." Fed. R. Evid. 702; *see* Fed. R. Evid. 104(a) ("Preliminary questions concerning the qualifications of a person to be a witness . . . shall be determined by the court.").

Thus, as the Supreme Court has instructed, Rule 702 "imposes a special obligation upon a trial court to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (ellipsis in original) (quoting *Daubert*, 509 U.S. at 589); *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 714-15 (8th Cir. 2001) (a "trial judge has a gatekeeping responsibility to ensur[e] that an expert's testimony rests on a reliable foundation and is relevant to the task at hand") (internal quotation omitted; alteration in original).[1] In conducting this analysis, the Supreme Court has emphasized that courts must ensure that the proposed expert is applying the same "intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. Thus, courts evaluate "whether the expertise was developed for litigation or naturally flowed from the expert's research"; testimony developed specifically for the litigation is viewed with special skepticism. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 687 (8th Cir. 2001); *see Daubert*, 43 F.3d at 1317 (same).

Discharge of this obligation — and the interposition of the trial judge between a putative expert witness and the jury — is critical to the fairness of a trial

[1] *See, e.g.*, *In re Air Crash at Little Rock Ark., on June 1, 1999*, 291 F.3d 503, 514 (8th Cir. 2002) (recognizing district court's "essential gatekeeping role under *Daubert*").

involving expert evidence because putative "[e]xpert evidence can be both powerful and quite misleading" to a lay jury. *Daubert*, 509 U.S. at 595 (internal quotation omitted).

Application of these principles makes plain that plaintiffs' putative experts may not testify (i) to matters addressed by other testifying experts that go beyond their own expertise; (ii) to conclusions made by other testifying experts that are not reliable; or (iii) to hearsay that does not fall within any safe harbor.

## I. ONE PUTATIVE TESTIFYING EXPERT CANNOT BORROW ANOTHER'S EXPERTISE.

It is axiomatic that each expert witness must be "qualified as an expert by knowledge, skill, experience, training, or education" in the subject of his proposed testimony. Fed. R. Evid. 702. Moreover, there must be a close match between the witness's expertise and the subject of the testimony. *See*, *e.g.*, *Wheeling Pittsburgh*, 254 F.3d at 715 (expert must have "sufficient specialized" expertise in the area of his testimony); *Garnac Grain Co., Inc. v. Blackley*, 932 F.2d 1563, 1566 (8th Cir. 1991) (same); *Dura Auto. Sys.*, 285 F.3d at 614 ("The *Daubert* test must be applied with due regard for the specialization of modern science."); *In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, 2001 WL 454586, at *7 (E.D. Pa. Feb. 1, 2001) (it is not enough to show that the proposed expert "has specialized knowledge or training which would qualify him or her to opine on some *other* issue") (emphasis added).

As the Eighth Circuit has put it, a witness may be "eminently qualified" to testify about one topic and yet "sorely lac[k]" the relevant experience to opine about a different topic. *Wheeling*, 254 F.3d at 715. Thus, "[t]he real question is, what is he an

expert about?" *Id.* For example, a "hydrologist specializing in flood risk management" who "easily qualifies" as an expert in those areas is not transformed into an expert in "safe warehousing practices" where he did not study warehousing practices in his formal education, had not written about those matters, had never been employed at a warehouse, and had never prepared an emergency response plan for a warehouse. *Id.* Nor may the witness "compensate for his lack of education or experience about warehousing by, for example, determining or studying the actions of other warehousemen" for the current litigation. *Id.*

Likewise, an expert witness may not simply borrow another expert's purported expertise; rather, each expert must be independently qualified to offer each of his own proposed opinions. As Judge Posner has described it, "[a] scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. This would not be responsible science." *Dura*, 285 F.3d at 614; *see also TK-7 Corp. v. Estae of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993) (excluding testimony of expert who relied on another expert's testimony but "professed no expertise" in the area). Absent the requisite independent expertise, a witness is simply parroting another's conclusions and is not even qualified to evaluate whether the other expert's techniques "were appropriately chosen and applied." *Dura*, 285 F.3d at 615. This is the antithesis of reliable expert testimony.

Nonetheless, plaintiffs' experts seek to do just that. For example, Dr. R. Samuel Mayer, although willing to opine about the comparative toxicity of Baycol (by invoking Dr. Farquhar's report), *see* Mayer Rep. (Ex. H) ¶ 19, candidly admitted at

his deposition that he is *not* qualified to do so, *see* Mayer Dep. (Ex. C) at 263:10-22 (conceding he is "not qualified to give statement about comparative safety"); *see id.* at 240:1-6 (acknowledging that he is "not an expert in pharmacology" or "toxicology"). Likewise, Dr. Raskin is a cardiologist who has no experience utilizing AER data or comparing the toxicity of pharmaceuticals. *See* Raskin Dep. (Ex. E) at 113:6-18 (conceding he has never published or done research using AER data); *id.* at 113:15-19 (testifying that prior to being retained as an expert he had never compared the safety of two drugs using only spontaneous adverse event data). Yet Dr. Raskin has been designated to offer AER-based testimony (again, grounded in the testimony of Dr. Farquhar) that Baycol had a higher risk of muscle toxicity than other similar medications. *See* Raskin Report (Ex. I) ¶¶ 6, 10-17, 21, 26. This conclusion is not grounded in Dr. Raskin's own training or experience, but an impermissible attempt to piggyback on Dr. Farquhar's purported expertise.

Thus, each witness must be independently qualified to offer the specific opinions he proposes and may not adopt the opinions of another putative expert witness as his own if he personally lacks the requisite expertise.

## II. AN UNRELIABLE, LITIGATION-DRIVEN CONCLUSION BY ONE TESTIFYING EXPERT WITNESS DOES NOT BECOME RELIABLE BY BEING PARROTED BY ANOTHER TESTIFYING EXPERT.

In addition to the requirement that each expert witness testify within the confines of his own expertise, the substance of the testimony must be "based upon sufficient facts or data" and be "the product of reliable principles and methods" and the witness must have "applied the principles and methods reliably to the facts of the case."

Fed. R. Evid. 702; *see*, *e.g.*, *Kumho Tire*, 526 U.S. at 149; *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996) ("Under the regime of *Daubert*, a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist"). One testifying expert's reliance on another's does "not relieve the plaintiffs from their burden of proving the underlying assumptions contained" in the expert's report. *TK-7 Corp.*, 993 F.2d at 732. Instead, each time an expert seeks to offer expert testimony, the reliability of the opinion must be evaluated. Consequently, if the underlying methods of the first expert are flawed, or the second expert has done nothing to ascertain the reliability of the methods, the testimony is not reliable and cannot be admitted. *E.g.*, *J.B. Hunt Transp., Inc.*, 243 F.3d at 444 (excluding proposed expert testimony "derivative" of another testifying expert's inadmissible testimony).

As noted above, like the Eighth Circuit, courts across the country have excluded expert testimony premised on an underlying expert's methodology that itself fails *Daubert* review. For instance, the Third Circuit excluded an expert whose "unblinking reliance" on other "experts' opinions, demonstrate[d] that the methodology he used to formulate his opinion was flawed under *Daubert* as it was not calculated to produce reliable results." *In re TMI Litigation*, 193 F.3d at 716. In that case, plaintiffs claimed they sustained injury from the Three Mile Island disaster and offered an expert to testify generally about the alleged dosages of radiation to which they were exposed. *Id.* at 714. This expert did not do his own independent testing or analysis, but merely "reviewed the reports of the Trial Plaintiffs' other dose exposure experts and, on the basis

of that review, offered an opinion." *Id.* The district court excluded his testimony "because it did not meet Rule 702's reliability requirement." *Id.* The court of appeals agreed and explained "his opinion is somewhat analogous to the last domino in the line that begins to fall when the first domino is toppled." *Id.* at 715. This is because "by not assessing the validity of the other experts' assumptions" plaintiffs failed to demonstrate the methods used were reliable. *Id.* at 716.

Blind reliance on another testifying expert's conclusions is particularly suspect when the underlying conclusions were developed for litigation, rather than in the field. *See Kumho Tire*, 526 U.S. at 152 (courts must ensure that the proposed expert is applying the same "intellectual rigor that characterizes the practice of an expert in the relevant field"); *accord Lauzon*, 270 F.3d at 687; *Daubert*, 43 F.3d at 1317. Thus, plaintiffs' experts cannot manufacture the illusion of general acceptance and scientific reliability within the context of litigation by having their testifying experts cross-reference each others' litigation-driven conclusions.

But that is exactly what plaintiffs' experts try to do here. For example, none of the experts who rely on Dr. Farquhar's testimony ascertained its reliability. Dr. Raskin's statements on this issue are illustrative of this dynamic. Dr. Raskin's proposed testimony about the alleged higher rate of muscle toxicity, myopathy and rhabdomyolysis from Baycol than other statins is grounded in Dr. Farquhar's report and litigation-driven analysis. *See* Raskin Rep. (Ex. I) ¶¶ 6, 10 -17, 21, 26. Dr. Raskin has acknowledged that he had not done any independent evaluation of Dr. Farquhar's opinion: he had not "replicated Dr. Farquhar's analysis," nor had he "tested Dr. Farquhar's assumptions" "by

doing an independent analysis." Raskin Dep. (Ex. E) at 180:15-22. Instead, Dr. Raskin blindly relied on Dr. Farquhar's litigation-driven conclusions. Similarly, even after he submitted his report, and having learned of adverse event biases, Dr. Raskin's sole attempt to control for those biases has been his blind (and belated) reliance on the reports of other putative testifying experts. *See id.* at 127:21-25 ("Q. So the only investigation you made into how potential biases affect the reporting rate of adverse events for statins is to review the reports of Dr. Farquhar and Dr. Str[o]m, correct? A. That is correct.").

This amounts to nothing more than the following tautology: "Although I have not independently analyzed or assessed the correctness or the reliability of Dr. Farquhar's opinion, because Dr. Farquhar said it, it must be so. Thus, it is my opinion as well." At bottom, Dr. Raskin employed *no* methodology, let alone a reliable one under *Daubert* and his opinion in this regard amounts to rank, inadmissible speculation. *See Weisgram* v. *Marley Co.*, 169 F.3d 514, 520 (8th Cir. 1999) (overruling district court and disqualifying expert under Rule 702, whose testimony had "no reasonable factual basis" and thus was "pure conjecture").

Thus, the Court should exclude any testimony by plaintiffs' proposed experts that simply regurgitates the unreliable and litigation-driven conclusions of other expert witnesses.

## III. ONE TESTIFYING EXPERT'S INVOCATION OF ANOTHER TESTIFYING EXPERT'S TESTIMONY AS TRUTH IS INADMISSIBLE HEARSAY.

Finally, plaintiffs' witnesses' invocation of other proposed experts' litigation-created conclusions as truth also should be excluded as hearsay. *See* Fed. R.

Evid. 803 ("Hearsay is not admissible except as provided by these rules . . . ."). To be sure, Rule 703 allows an expert witness to rely on certain otherwise inadmissible evidence in reaching an opinion, but this rule "was not intended to abolish the hearsay rule and to allow a witness under the guise of giving expert testimony to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion." *Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005) (citing *Dura*, 285 F.3d at 613; *TK-7 Corp.*, 993 F.2d at 731-34; *In re James Wilson Assocs.*, 965 F.2d 160, 173 (7th Cir. 1992)).

Rule 703 allows an expert to rely on otherwise inadmissible "facts or data" if it is of a type "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed. R. Evid. 703. Thus, by its terms, Rule 703 provides a limited exception for matters that constitute "facts or data," not matters that amount to the "exercise [of] professional judgment" or an "expert judgment." *Dura*, 285 F.3d at 612-13; *Loeffel*, 387 F. Supp. 2d at 808. Put another way, Rule 703 does not abolish the hearsay rule and allow a witness, under the guise of giving expert testimony, to become the mouthpiece of the views of another testifying expert.

A key part of this inquiry is the determination whether the underlying statements are merely like those of an assistant who is just a "data gathere[r]" or something more complex such as those opinions of a person "exercis[ing] professional judgment." *Dura*, 285 F.3d at 613. In *Dura*, for example, plaintiffs designated an expert hydrogeologist to assess whether defendant had contaminated an underground water supply. *Id.* at 611-12. But the expert did not himself construct the underlying modeling

which his report relied upon. *Id.* The Seventh Circuit upheld the exclusion of the expert testimony, explaining that such modeling did not constitute mere facts, but amounted to professional opinion, and was therefore not contained within the ambit of Rule 703. *Id.* at 615.

Here as well, for example, the efforts by plaintiffs' putative experts to piggyback on Dr. Farquhar's opinions and offer them for the truth of the matter asserted is not mere reliance on "facts and data" which are "of a type reasonably relied upon by experts in the particular field." Fed. R. Evid. 703. These witnesses aim to adopt Dr. Farquhar's method and professional opinion and testify to their truth. These efforts should be rejected.

## CONCLUSION

Accordingly, Defendants Bayer and GSK respectfully request that the Court exclude testimony by plaintiffs' putative expert witnesses that improperly relies on the testimony of another proposed testifying expert witness.

Dated: April 17, 2006

Respectfully submitted,

Philip S. Beck
Adam Hoeflich
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60610
(312) 494-4400

Scott A. Smith
Tracy J. Van Steenburgh
HALLELAND LEWIS NILAN SIPKINS & JOHNSON, P.A.
220 South Sixth Street, Suite 600
Minneapolis, MN 55402
(612) 338-1838

/signature on file/
Susan A. Weber
James W. Mizgala
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000

Paul J. Zidlicky
Rebecca K. Wood
Dan Rabinowitz
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000

Catherine Valerio Barrad
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
(213) 896-6000

Richard K. Dandrea
ECKERT SEAMENS CHERIN
& MELLOTT, LLC
USX Tower, 600 Grant St., 44th Floor
Pittsburgh, PA 15219
(412) 566-6000

Peter W. Sipkins (No.101540)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
(612) 340-2600

Douglas R. Marvin
WILLIAMS & CONNOLLY
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

/signature on file/
Fred T. Magaziner
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000

*Counsel for SmithKline Beecham Corp. d/b/a GlaxoSmithKline*

Joseph D. Piorkowski, Jr.
THE PIORKOWSKI LAW FIRM, PC
910 17th Street, N.W. Suite 800
Washington, D.C. 20006
(202) 223-5535

*Counsel for Bayer Corporation and Bayer AG*