# Exhibit A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

--oOo—

| | | |
|---|---|---|
| In re: BAYCOL PRODUCTS LITIGATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MDL No. 1431 |
| | ) | (MJD/ JGL) |
| This Document Relates to Olander v. Bayer Corporation, et al. Civil No. 03-1086 (MJD/ JGL) | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

CERTIFIED COPY

DEPOSITION OF

**JOHN FARQUHAR, M.D.**

February 13, 2004

REPORTED BY: RENEE COMBS WOLF, RMR, CSR 11867 JOB 1-712

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

--oOo--

In re: BAYCOL PRODUCTS LITIGATION )
)
Plaintiff, )
)
vs. ) MDL No. 1431
) (MJD/JGL)
This Document Relates to Olander v. )
Bayer Corporation, et al. Civil No. )
03-1086 (MJD/JGL) )
Defendant. )
)
)

--oOo--

BE IT REMEMBERED that, pursuant to Notice and on Friday, February 13, 2004, commencing at 9:13 a.m. thereof, at 275 Battery Street, 28th Floor, San Francisco, California, before me, RENEE COMBS WOLF, a Certified Shorthand Reporter, personally appeared

JOHN FARQUHAR,

called as a witness by the Defendant, who, having been first duly sworn, was examined and testified as follows:

--oOo--

SHOOK, HARDY & BACON, 600 14th Street, NW, Suite 800, Washington, D.C., 20005, represented by JOSEPH D. PIORKOWSKI, JR. and LORI CONNORS McGRODER, Attorneys at Law, appeared as counsel on behalf of

stipulating that Dr. Farquhar will offer no opinions concerning pharmacies or whether they did anything right or wrong, or individual physicians or whether they did anything right or wrong, or standard of care issues for doctors.

THE WITNESS: Right. He said it.

MR. PIORKOWSKI: Fair enough.

(Whereupon a lunch recess was taken.)

THE VIDEOGRAPHER: Coming back on the record. The time on the monitor is 1:26. Please begin.

MR. PIORKOWSKI: Q. Good afternoon, Doctor.

A. Good afternoon.

Q. Did you participate in any meetings involving other expert witnesses in this case?

A. Other meetings involving other expert witnesses? I have not met with any other expert witnesses.

Q. You have not?

A. No.

Q. Have you ever met Dr. Carlson?

A. No, I haven't.

Q. Have you ever met Dr. Kapit?

A. No.

Q. Have you ever been on a conference call with

other expert witnesses?
A. Uh-huh. Kapit and Carlson were on a single conference call that occurred.
Q. How long ago was that?
A. About two weeks.
Q. Two weeks ago?
A. Uh-huh.
Q. Did you do at some point a survey or a search of the medical literature in conjunction with your opinions in this case?
A. Yes, I did.
Q. Is that something that you did or is that something that counsel provided to you?
A. That's something that I had our center's librarian do for me, although most of my -- I mean, it's getting to the point where most people are doing their own searches, but she's better at it than I am.
Q. But you had her do a Medline search or what?
A. Yes. I don't know what else she used, to be honest. I just asked her to do a search, but she undoubtedly had Medline as one of the things that she used.
Q. And what specifically did you ask her to look for?
A. I have that in my notes somewhere, but I think

voice and Carlson's voice.

Q. Was there any substance of discussion about the issues on that conference call?

A. Well, you know, to be honest, I was disappointed. There were too many people on it, and they sort of wandered around. And I didn't personally get much out of it. For example, I believe I'm the only one that has pretended to do epidemiologically-based biostatistical analyses. And there were those that -- I think that Carlson is a muscle expert and, you know, things that I'm not involved in, as we discussed.

Q. So you're not relying on anything any other expert is saying?

A. No.

Q. No?

A. No, I'm not.

Q. Did that call involve any guidance or direction about giving a deposition today?

A. No.

Q. No?

A. No.

Q. Do you know what the purpose of it was? Let me rephrase it.

What was your understanding of the purpose of the conference call?

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
MDL NO. 1431
(MJD/JGL)

In re BAYCOL PRODUCTS LITIGATION

This Document Relates to:

ALL CASES
____________________________________/

*****CONFIDENTIAL*****

VIDEOTAPED DEPOSITION OF HARLAND AUSTIN, D.Sc.
February 17, 2004
8:43 a.m. - 4:15 p.m.

1615 Clifton Road
Atlanta, Georgia

REPORTED BY:
Sharon A. Gabrielli, RPR, CCR
Esquire Deposition Services
Atlanta Office Job #412611
Phone - 404.872.7890

MS. MEADERS: Kim Meaders on behalf of pharmacies.

THE VIDEOGRAPHER: Is that all?

MR. ISMAIL: Yes.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

HARLAND AUSTIN, D.Sc.,

having been first duly sworn, was deposed and testified as follows:

EXAMINATION

BY MR. ISMAIL:

Q. Good morning, Dr. Austin. My name is Tarek Ismail. I'm going to ask you some questions today on behalf of Bayer.

Sir, have you ever been deposed before?

A. No, I have not.

Q. Sir, have you ever served as an expert witness before?

A. I've been involved in a legal -- I've been involved in lawsuits, but I don't believe I've been named as an expert witness before.

Q. What has been your involvement in lawsuits previously?

A. I have served as a consultant in biostatistical methods and epidemiological methods on

analysis of myopathy in the spontaneous reports.

Q. Have you met Dr. Farquhar?

A. No, I have not.

Q. Have you spoken to him?

A. Not directly, no.

Q. What does that mean?

A. I was involved in a conference call, he was a participant.

Q. Is this the conference call that happened two weeks ago?

A. Approximately.

Q. What was your understanding of that call?

A. It was discuss upcoming dates pertaining to the depositions and who the expert witnesses were and what the content, more or less, of their expert report was.

My understanding, what I got out of that basically was who were some of these other expert reports, what was their field of expertise.

Q. The other experts on behalf of plaintiffs?

A. Yes.

Q. On this conference call, the experts on behalf of plaintiffs talked to each other about their opinions?

A. They talked to each other about the issues,

yes.

Q. And plaintiff lawyers were involved in that call?

A. Yes.

Q. And you understood this was immediately before the depositions were to begin of plaintiff's experts?

A. I didn't know what the date of their depositions was.

Q. But this was in the last two to three weeks, correct?

A. I think it was about two weeks ago, two to three weeks, yes.

Q. Other than that conference call that you just described, have you spoken to any other expert on behalf of plaintiffs?

A. Expert from the plaintiffs? No, I have not.

Q. Other than Mr. Bridgers or Mr. Black, have you spoken to any other plaintiff lawyer about Baycol?

A. No.

Q. Do you have plans to go to the conference in Miami?

A. Yes, I do.

Q. You're leaving tonight?

# Exhibit C

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\- - - - - - - - - - - - - - - - - - -x
In re: :
:
BAYCOL PRODUCTS LITIGATION. : MDL No.
: 1431 (MJD/JGL)
\- - - - - - - - - - - - - - - - - - -x

Washington, D.C.
Thursday, January 29, 2004

Video Deposition of:

ROBERT SAMUEL MAYER, M.D.

a witness, called for examination by counsel for Baycol, pursuant to notice and agreement of counsel, beginning at approximately 9:13 a.m., at Williams & Connolly, 725 Twelfth Street, N.W., Suite 1000, before Monica A. Voorhees, RPR/CSR, Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

P R O C E E D I N G S

Whereupon,

ROBERT SAMUEL MAYER, M.D.,

was called as a witness and, having been first duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR BAYCOL

BY MR. ISMAIL:

Q. Good morning, Dr. Mayer.

A. Good morning.

Q. Sir, can you state and spell your name for the record, please?

A. Yes, it's Robert Samuel Mayer, M-A-Y-E-R.

Q. Sir, have you been deposed before?

A. Yes, I have.

Q. How many occasions?

A. I believe about 10.

Q. Do all such occasions relate to work you have done as an expert witness?

A. No.

Q. What other subject matters have you given testimony on?

A. I was the subject of a malpractice case.

Q. Let's take these one at a time.
Prior to this litigation, did you know Dr. Carlson?
A. No.
Q. When did you speak to Dr. Carlson?
A. I spoke to him in November and as recently as this week.
Q. Why did you speak to Dr. Carlson in November?
A. We met to discuss various aspects of the case and tried to make each other aware of our disciplines take on the case, very different disciplines and wanted to make sure that we understood where we were coming from and understood some of the background of the case.
Q. Where was this meeting?
A. We met over the phone, we also met in San Francisco.
Q. When you say you met over the phone, the first time you spoke to Dr. Carlson was by phone?
A. Yes, I believe so.
Q. And then you met in San Francisco?

A. Yes.
Q. Was that in November, as well?
A. Yes.
Q. Do you know whether that was before or after Thanksgiving?
A. I believe before.
Q. Who else was at the meeting?
A. Dr. Boult was, several attorneys and then there were several other experts who phoned in.
Q. Okay, let's see if we can get as complete a list as you can recall from that meeting.
We have you by, in person, correct?
A. That's correct.
Q. Dr. Carlson in person?
A. Yes.
Q. Dr. Boult in person?
A. That's correct.
Q. Dr. Farquar in person?
A. No, I believe he -- I don't know that he was involved in that meeting.
Q. Who else was in person?
A. Mr. Hopper was there, Bert Black was there,

Mr. Zimmerman was there and I believe a couple of other attorneys whose Carl name's.

Q. Was this meeting at the firm of Lieff Cabraser in San Francisco?

A. That's correct.

Q. Prior to this litigation, did you know any of the attorneys that are representing the plaintiffs in this case?

A. No.

Q. What individuals appeared by phone at this meeting?

A. I believe Dr. Richman and Dr. Zizic, I think. I can't recall exactly.

Q. Anyone else?

A. Not that I recall, but, again, it was some months ago.

Q. You were just recently retained prior to this November meeting, correct?

A. Correct.

Q. Had you done any real substantive work on the case prior to the meeting?

A. Yes.

Q. How many hours would you say you worked?
A. About 10 hours prior to that.
Q. Were there any written materials handed out at the meeting?
A. No.
Q. Did you take notes at the meeting?
A. No.
Q. Do you know whether anyone else took notes at the meeting?
A. I don't believe so.
Q. Did you see any summaries of the meeting in writing?
A. There were none.
Q. Do you know if the meeting was videotaped?
A. It was not.
Q. Recorded in any way?
A. No.
Q. What was the purpose of the meeting?
A. The purpose of the --
MR. HOPPER: If you know.
BY MR. ISMAIL:
Q. What was your understanding of the purpose

of the meeting?

A. Well, I think the main purpose of the meeting was so that the experts would have a chance to meet each other, discuss their takes on the case and exchange scientific literature and thoughts on the case and then exchange those ideas with the attorneys so that the attorneys were aware of what our opinions would be.

Q. Was this an opportunity for everyone to get on the same page?

MR. HOPPER: Objection as to form, vague.

THE WITNESS: I --

MR. HOPPER: If you can understand the question.

THE WITNESS: I'm not sure I understand the question.

BY MR. ISMAIL:

Q. Have you ever heard the phrase get on the same page before?

A. Yeah.

Q. So can you answer it?

A. I don't think that was the intent at all,

in fact, we were very much encouraged to have our own independent opinions and I don't think that the purpose was that everybody's report looked the same or everybody had the same ideas. The idea was to exchange as many different ideas as possible, not to have a party line.

Q. Had you formed any opinions in the Baycol litigation prior to attending that meeting?

A. Yeah.

Q. Were there any opinions that are expressed in Exhibit 1 that were formed after your meeting in November?

A. It's hard for me to put a time frame on specifics of the report and when they were formed. I mean a majority of my opinions were formed probably prior to the meeting in San Francisco.

I think the meeting in San Francisco just served to have an opportunity to obtain more evidence to read through and to exchange ideas. It wasn't that it substantively changed my opinion.

MR. ISMAIL: Let's go off the record.

(Recessed 9:31 a.m.)

A. We had a phone conference.
Q. What was the purpose of discussing your report?
A. The purpose was to review the report in terms of what items we might be questioned on.
Q. Did Mr. Black have any questions about statements you've made in your report?
A. Not that I recall.
Q. When was the last time you spoke to Mr. Zimmerman?
A. I believe that was in San Francisco in November.
Q. At that meeting in San Francisco, did anyone make a presentation?
A. I wouldn't call them presentations. We, we, each of the experts discussed their area of expertise and what areas they would be focusing in on in their report.
Q. Did anyone have a Power Point?
A. No.
Q. Was there any projection screen of any sort?

A. Absolutely not. It was very informal.
Q. Was there an agenda?
A. No.
Q. Was there a literature list?
A. No.
Q. Was there a sign-in sheet?
A. No.
Q. Did you have any correspondence from counsel for plaintiffs ahead of that meeting giving you the time, place?
A. I either had phone conversations, I don't even think we did E-mail on that.
Q. Okay. Did you have any correspondence from the plaintiff lawyers about the meeting in San Francisco?
A. No, no formal correspondence.
Q. Any informal correspondence?
A. The, the only thing I can think of is there may have been one or two E-mails back and forth just about time and place.
Q. Returning to Exhibit 3, sir, the E-mail from Ms. Hauer, now that's dated January 27th,

Q. You're not an expert in pharmacology, are you, sir?
A. Not directly, no.
Q. You're not an expert in toxicology, are you?
A. No.
Q. In paragraph 11 of your report you write the rate of these catastrophic events was up to 43 times higher than with other medications in the class according to the European agency for the evaluation of medicinal products?
A. Yes, I see that.
Q. The events you're talking about here are rhabdomyolysis events?
A. Correct.
Q. Now when you say the rate --
A. That's the number of events per million prescriptions.
MR. ISMAIL: I think we should probably go off the record.
(Recessed 3:08 p.m.)
(Reconvened 3:10 p.m.)

questions about it.
MR. HOPPER: You can --
MR. ISMAIL: All right.
MR. HOPPER: -- but you're getting an answer that you already know what the answer is.
BY MR. ISMAIL:
Q. By the way, did you see any other expert report, draft or final, before you submitted your expert report in this case?
A. Yes.
Q. Whose?
A. I saw Dr. Farquar's, Dr. Corbett's, Dr. Richman's. I believe those were the ones, there may have been others.
Q. Did you rely upon any of the statements made in Dr. Farquar's report when completing your expert report in this case?
A. In part, yes.
Q. Did you rely on any statements made in Dr. Corbett's expert report when doing your expert report in this case?
A. Yes.

Q. Did you rely upon any statements made in Dr. Richman's expert report when you did the report in this case?

A. Yes.

Q. Why did you not identify those reports in your list of materials reviewed?

MR. HOPPER: I believe he did.

THE WITNESS: I don't know that I did, but I frankly wasn't aware that I needed to because they were expert reports and not independent scientific literature.

If I made a mistake in doing that, that's somehow against the Court's rules, I apologize and certainly I can disclose that right now. I've got nothing to hide by that fact, I mean.

BY MR. ISMAIL:

Q. Sorry, were you done?

A. Go ahead.

Q. Can you recall what statements made by Dr. Richman you relied upon in making your opinions in this case?

A. I can't recall specifically. I mean I read

through his report, read through some of the references he cited, read those references, myself, and came to my own opinions.

Q. Same question for Dr. Farquar's report.

A. Same answer.

Q. Same question for Dr. Corbett's report?

A. And the same answer there.

Q. Other than Corbett, Farquar and Richman, did you review any other report prior to doing your report in this case?

A. I'm trying to remember because I reviewed so much material.

I, I think I also saw Dr. Zizic's report.

Q. Do you recall anything in Dr. Zizic's report that you relied on?

A. I can't give you specifics. I read through the reports, read through their references, re-read the references that I felt were applicable to my area of, you know, of expertise and, you know, the other experts will talk more about their areas of expertise.

Q. When did you get these other expert reports?

A. In November and December.
Q. Was it early on after you got retained?
A. Within a few weeks of being retained.
Q. Well the dates of your report, is your report dated?
A. December 1st, I believe.
Q. I believe that's true, okay.
A. So I, I got those reports probably sometime in November.
Q. Is it fair to say, Dr. Mayer, that you are not qualified to give statements about comparative safety based upon a drug's bio-availability?
A. That's fair to say.
Q. Is it fair to say, sir, that you are not qualified to give opinions about a drug's comparative safety based upon the drug's metabolic profile?
A. That's fair to say as well.
Q. Is it fair to say that you are not qualified to give opinions about a drug's comparative safety based upon regulatory action taken by the FDA or voluntary action taken by a drug company?
A. That's correct.

# Exhibit D

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
MDL No. 1431
(MJD/JGL)

COPY

------------------------------------------------

In Re: BAYCOL PRODUCTS LITIGATION
This Document Relates to:
ALL CASES

------------------------------------------------

* * * * * * * * * * * * * * * * * * * * * * * * * * *

VIDEOTAPED DEPOSITION OF
DR. BRUCE M. CARLSON

* * * * * * * * * * * * * * * * * * * * * * * * * * *

DATE TAKEN: 02/03/04 BY: CINDY M. TRATTLES

Piorkowski, Jr. I'm with Shook, Hardy & Bacon. I represent Bayer Corporation. Also with me is Matt Morton from Shook, Hardy & Bacon.

MS. FLEISHMAN: Wendy Fleishman for the plaintiffs.

MR. HOPPER: Randy Hopper for the plaintiffs.

THE WITNESS: Bruce Carlson.

MR. MUNNO: Thomas F. Munno, Dechert, LLP, for defendant SmithKlineBeecham.

MR. PIORKOWSKI: Would counsel on the phone please identify themselves.

MR. EARLY: Loyd Early, counsel for several pharmacists.

MR. HOPPER: Hi, Loyd.

MR. EARLY: Hello.

THE VIDEO TECHNICIAN: You may remain seated and the court reporter will swear you in.

* * *

DR. BRUCE M. CARLSON,
called as a witness, being first duly sworn,
was examined and testified as follows:

* * *

EXAMINATION

BY MR. PIORKOWSKI:

your knowledge?
A Let's see. Okay. Shortly after the San Francisco meeting I received a thick notebook, about maybe four inches thick with a number of company documents or assessment reports. And this came from Lieff Cabraser.
Q Okay. And do you have that document with you today?
A No, I did not bring that notebook.
MR. HOPPER: I believe, for the record, we disclosed to Tarek Ismail the Bate stamp numbers of all these documents.
MR. PIORKOWSKI: Yeah, I'm sure you did. Except if he needs to refer to them today, he doesn't have an option.
A I made xerox copies of a couple of the major sections to which I referred.
Q (By Mr. Piorkowski) Did you bring those with you today?
A Yes, I did.
Q Okay. All right. The San Francisco meeting, let's talk about that for a minute. This is a meeting that was held between a number of different experts all serving on behalf of the plaintiff?
A There were three experts.
Q Who were they?

A Dr. Mayer, Dr. Boult and myself.
Q Okay. Was Dr. Farquhar part of that meeting?
A No, he was not.
Q And who was there as far as counsel goes?
A Mr. Arbitblit, Mr. Hopper Mr. Black and Mr. Zimmerman.
Q Okay. Did anyone explain to you what the purpose of the meeting was?
A The basic purpose was for the experts to get together to understand each other's respective backgrounds.
Q Okay. And do you now understand Dr. Boult's background?
A Yes, I do.
Q What is his background?
A He's a combination of a geriatrician and an epidemiologist.
Q And what is Dr. Mayer's background?
A He's in rehabilitation medicine with special expertise in electromyography.
Q And did you make a presentation at the meeting?
A No, we just discussed things.
Q Okay. Was there an agenda?
A No.
Q Just kind of all got together. Who started?

Q Okay. You don't have an understanding of what the standards are; is that right?
A Not specifically, no.
Q I mean if I sat here and said: Tell me what a company has to do to go through preclinical trials, you couldn't tell me; is that right?
A I could tell you quite a few things that have to be done. And I've been involved with this more in the past in relation to teratologic effects of drugs because in my career over 40 years I deal with birth defects quite a bit. But it's not been in regard to a specific study or a specific case.
Q Okay. Apart from the knowledge you gained in dealing with teratologic drugs, do you have any other knowledge of what the standards are for conducting preclinical trials on pharmaceutical products?
A Not official standards.
Q Okay. After the meeting in San Francisco did you ask that specific documents be sent to you or did plaintiffs' counsel select the documents that were sent to you?
A The first packet of documents was sent me unsolicited. After having read that, I did ask for one specific document concerning the in vitro

testing that was done by Bayer.
Q Okay. Let me just back up. When you say the first package that was sent to you --
A -- Yes.
Q -- are you referring to after the San Francisco meeting?
A Yes, yeah, the large notebook.
Q Okay. And did that notebook contain preclinical studies that were done on Baycol?
A It contained extracts and summaries, but not the specific data.
Q Do you know whether the studies that were sent to you represent a comprehensive review of the preclinical studies that were done on Baycol?
A I really don't know that for sure, no.
Q Do you know as you sit here today whether you have in fact reviewed all of the preclinical studies that were done with respect to Baycol?
A I can't say because I don't know all the studies that have been done.
Q Now, if you're not sure if you've seen all of the studies that have been done, there could be two explanations for your opinion that Bayer did not conduct or publicize the result of thorough myotoxicity tests of cerivastatin in preclinical or

A I had been doing continual library research and I was revising just as new information came into my possession.
Q Okay. Was there new information that came into your possession as a result of the San Francisco meeting that led you to revise your report on the 16th of November?
A No. Nothing that was in my report was based purely on the San Francisco meeting, but literature that I heard about from that meeting or subsequently went into my revisions in late November.
Q Okay. What literature did you learn about for the first time at the November 15th meeting?
A I couldn't quote specific articles. It would be mainly areas. And I would have done the actual research and using Medline and so forth myself.
Q Is there an area you can tell me that first came to your attention after the San Francisco meeting?
A Not really. I think I just did more general research on all aspects of my report.
Q Okay. Now, on the 11-20 it says analyzing Baycol notebooks sent to me.
A Yes.
Q Is that what you're referring to when you're talking about the first time you saw Bayer Corp documents?

encountered.
Q Did somebody draw your attention to areas that needed to be enhanced in your report?
A No, absolutely not.
Q Did any other expert witness on behalf of the plaintiffs have input into your report?
A No.
Q Did anybody -- other experts see it prior to the time it was finished?
A No.
Q Where it says printing out and organizing expert reports from CD, what does that refer to on the 19th of December?
A I was sent a CD which contained about I think a dozen or maybe ten expert reports.
Q Expert reports written by plaintiffs' experts?
A By plaintiffs' experts, yes.
Q Okay. Were the opinions that you read for Dr. Mayer and Dr. Boult consistent with what you heard from them at the San Francisco meeting?
A At the San Francisco meeting we weren't really expressing opinions.
Q Okay. And all the other entries in December all refer to your review of the reports of other plaintiffs' experts; is that correct?

A Sure. (Witness reviews said paragraph.) All right.
Q Now, am I correct that the conclusions --. Well, let me back up. You haven't done any independent research about the incidence of muscle pathology in Baycol users versus other statins; have you?
A No, no independent original research; no.
Q And basically the statements that are in Paragraph 8 are statements that are contained in the references that you've cited?
A That is absolutely correct.
Q And you're merely citing those references?
A Yes.
Q Okay. And let me ask you to turn to Page 46.
MR. HOPPER: That he relied upon for his opinion.
A Yes, I relied to them for my opinion.
MR. MUNNO: Objection to the sidebar.
Q (By Mr. Piorkowski) Paragraph 46, you have not done an analysis of the adverse event reports for Baycol compared to any other statins; have you?
A Now, when you say adverse event reports, the ones that would have been submitted to the FDA?
Q Yes.
A No, I have not.
Q Other than the medical articles that you cite in

or muscle pain. The Pasternak tacked on the CK. I did not.
Q Okay. But, in any event, using Pasternak's definition, okay, muscle aches in the absence of CK elevation; right?
A Uh-hum.
Q Are you aware of any study that shows that Baycol has a greater propensity to cause myalgia than other statins?
A No. But I need to qualify the answer. The answer is, no, I am not aware. But I did not specifically look at that literature because that was not my area of concentration.
Q What was not in your area of concentration?
A The epidemiological aspects of incidence or adverse event reporting.
Q So you're testifying that you did not look at the epidemiological literature?
A I looked at it but not enough --. I didn't look at it in depth. Let's put it that way.
MR. HOPPER: He's not being offered as an epidemiological expert. We have those experts and you'll have your chance to question them.
A I would defer to the experts on that.
Q (By Mr. Piorkowski) But so I'm clear as we sit here

today, you're not going to be offering any opinions at trial that Baycol has a greater propensity to cause myalgia than other statins based on any of the literature you've reviewed?
A On the basis of literature I've reviewed, no, I would not. And, again, I would stress up to this point.
Q Now, one of the articles you did review was an article --
A -- Excuse me, could I get that one back so we don't lose it. It's on the bottom.
Q Yes.
A Okay. Thank you.
Q Do you have with you a copy of the Thompson articles?
A Oh, the review? Yes, I do.
MS. FLEISHMAN: JAMA 2003?
MR. PIORKOWSKI: JAMA 2003.
A Let's see if I can find that. Yes, I do.
Q (By Mr. Piorkowski) Actually, let me just back up and ask one other question. Now, is it your testimony that the opinion offered in Paragraph 8 of your report is not an epidemiological opinion?
MR. HOPPER: Does he have time to go back and look at the report before he answers since he

didn't know you were going to it?

MR. PIORKOWSKI: Absolutely.

MR. HOPPER: What's the question again, please?

MR. PIORKOWSKI: Would you read it back, please.

(WHEREUPON, the question appearing on Page 176, Lines 19 through 22 was read back by the court reporter.)

A This is my opinion based on reading the epidemiological literature.

Q (By Mr. Piorkowski) Is that different than having an epidemiological opinion?

A It is because I'm not offering this opinion as a professional epidemiologist who has looked at the primary data. That would be the difference. I've been looking at reported data, not the primary reports.

Q So you're essentially stating the conclusions of the authors of the studies that you cite?

A And stating that upon my reading of the literature, I agree with those conclusions.

Q All right.

MR. PIORKOWSKI: Have we marked the Thompson study?

# Exhibit E

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

--oOo—

| | | |
|---|---|---|
| In re: BAYCOL PRODUCTS LITIGATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MDL No. 1431 |
| | ) | (MJD/ JGL) |
| This Document Relates to Olander v. Bayer | ) | |
| Corporation, et al. Civil No. 03-1086 (MJD/ JGL) | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**CERTIFIED COPY**

DEPOSITION OF

**STEPHEN RASKIN, M.D., F.A.C.C.**

(Pages 1 through 233)

February 2, 2004

REPORTED BY: JOHNNA PIPER, CSR 11268

JOB 1-635

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

--o0o--

In re BAYCOL PRODUCTS LITIGATION. )
)Case No. 1431
_____________________________________) (MJD/JGL)

--o0o--

BE IT REMEMBERED that, pursuant to notice and on Monday, February 2, 2004, commencing at 1:08 p.m. at Lieff, Cabraser, Heimann & Bernstein, LLP, Embarcadero Center West, 275 Battery Street, 30th Floor, San Francisco, California, before me, JOHNNA PIPER, a Certified Shorthand Reporter, personally appeared

STEPHEN RASKIN, M.D., F.A.C.C.

________________________________

called as a witness by the Defendant Bayer, who, having been first duly sworn, was examined and testified as follows:

--o0o--

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP, Embarcadero Center West, 275 Battery Street, 30th Floor, San Francisco, California 94111-3339, represented by DONALD C. ARBITBLIT, Attorney at Law,

which shows an unacceptable risk of muscle toxicity? 16:05:01
A. I have not seen any specific clinical 16:05:09
studies. The reporting rates on the statins aggregate 16:05:11
the doses and I can't give a specific answer about just 16:05:17
0.3 in isolation. 16:05:21
Q. Have you ever published an article, Dr. 16:05:33
Raskin, in which you make comparative statements 16:05:35
between two drugs using spontaneous adverse event data? 16:05:38
A. No, sir. 16:05:43
Q. Have you done any research in which you make 16:05:44
comparative statements between two drugs using 16:05:47
spontaneous adverse event data? 16:05:51
A. No, I haven't. 16:05:53
Q. Has anyone ever asked you to undertake an 16:05:54
investigation into the comparative safety of two drugs 16:05:57
using spontaneous adverse event data? 16:06:02
A. Only for the purposes here to review this 16:06:08
data. No, I haven't done a study. 16:06:10
Q. Prior to being retained as an expert in the 16:06:13
Baycol litigation, isn't it true that no one had asked 16:06:16
you to make an investigation comparing the safety of 16:06:19
two drugs using spontaneous adverse event data? 16:06:24
A. Nobody has asked me to do that kind of 16:06:29
analysis. I make my own analyses when I'm looking at 16:06:35
drugs and side effects. I like to have as much data as 16:06:38

for example, six months, then it becomes a reasonable way to say new drug overreporting can be reduced. New drug bias can be reduced by comparing within your variable comparables a certain time period. 16:39:08 16:39:15 16:39:26 16:39:33

Q. You would agree that there are many potential biases that affect the reporting rate of adverse events, correct? 16:39:45 16:39:46 16:39:49

A. Correct. 16:39:51

Q. What investigation have you made into how these biases affect the reporting rate of adverse events in the statin class? 16:39:57 16:40:03 16:40:07

A. I have reviewed Dr. Brian Straum's expert report. I've reviewed Dr. Farquhar's responses in this specific -- in a more specific question of the issue of adverse event reporting rates. 16:40:12 16:40:18 16:40:29 16:40:33

Q. You -- 16:40:38

A. Go ahead. I'm sorry. 16:40:40

Q. I want you to complete your answer, if you had more to say. 16:40:41 16:40:43

A. That is all. 16:40:47

Q. So the only investigation you made into how potential biases affect the reporting rate of adverse events for statins is to review the reports of Dr. Farquhar and Dr. Straum, correct? 16:40:47 16:40:51 16:40:56 16:41:00

A. That is correct. 16:41:02

MR. ARBITBLIT: Objection. 18:27:25

THE WITNESS: I believe, to the best of my 18:27:27
knowledge, that Dr. Farquhar came up with different 18:27:29
conclusions, as did the FDA reviews. 18:27:32

MR. ISMAIL: Q. Sir, you don't know what 18:27:36
version of the Pacific Care study the FDA reviewed, do 18:27:38
you? 18:27:42

A. No, sir. 18:27:43

Q. Now, the answer to my question, Dr. Farquhar 18:27:49
undertook some analyses by which he made different 18:27:52
assumptions than the study authors of the Pacific Care 18:27:56
report and came to different conclusions, right? 18:28:03

MR. ARBITBLIT: Objection. 18:28:06

THE WITNESS: To my knowledge, yes, he did. 18:28:06

MR. ISMAIL: Q. And you have not replicated 18:28:08
Dr. Farquhar's analysis, have you? 18:28:11

A. No, I did not. 18:28:13

Q. You have not tested Dr. Farquhar's 18:28:18
assumptions, have you? 18:28:20

A. By doing an independent analysis? 18:28:26

Q. Correct. 18:28:28

A. Correct. 18:28:28

Q. Other than your interpretation of Dr. 18:28:35
Farquhar's re-analysis of the Pacific Care data, are 18:28:37
you aware of any comparison between Baycol and other 18:28:44

about increasing rhabdomyolysis. 19:51:22
Q. Your last answer would fall in the category 19:51:22
of omissions, you believe? 19:51:24
A. Yes. 19:51:26
Q. Not affirmative misstatements? 19:51:27
A. Well, the statement was made affirmatively 19:51:29
that the drug was as safe as others, so I find that to 19:51:32
be a specific misstating of the facts. 19:51:39
Q. You didn't go out and speak on behalf of 19:51:44
Baycol following the conference reflected in Exhibit 19:51:46
13, right? 19:51:50
A. I don't believe I did. I can't say for 19:51:50
sure. 19:51:54
Q. Have you -- did you attend a meeting in the 19:51:57
offices of Lieff, Cabraser that was attended by other 19:52:02
Plaintiffs' experts? 19:52:06
A. No, sir. 19:52:08
Q. Did you participate in a conference call 19:52:11
last Monday with other Plaintiff experts? 19:52:12
A. Yes, I did. 19:52:16
Q. What was your understanding of the purpose 19:52:18
of that call? 19:52:22
A. I think the purpose at that point was -- if 19:52:26
I can remember. It was a late night -- I think the 19:52:33
ultimate purpose was that if any of us had any 19:52:50

questions really to consider the opportunity to either talk to other experts -- I'm not exactly sure what the purpose -- the suspected -- I do not know. I was just asked to take part in the conference call. 19:52:59 19:53:14 19:53:26 19:53:32

Q. Did the assembled group on the conference call discuss the upcoming depositions of Plaintiffs' experts? 19:53:40 19:53:45 19:53:48

A. There was some discussion about that, yes. 19:53:48

Q. Did you participate by offering views or comments during the call? 19:53:54 19:53:58

A. I believe I did. 19:54:03

Q. Do you recall on what subjects you offered views? 19:54:04 19:54:07

A. Oh, I think related to my experience with statins in general. 19:54:10 19:54:16

Q. Anything else? 19:54:19

A. That was it. I had very little to say. 19:54:20

Q. Was there anything said in the conference call last Monday that forms any of your opinions in this case? 19:54:24 19:54:27 19:54:33

A. No. 19:54:34

Q. Doctor, you made reference several times to something called a Dear Doctor letter? 19:54:38 19:54:41

A. Yes, Dear healthcare provider letter, something to that effect, yes, sir. 19:54:45 19:54:48

# Exhibit F

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

--oOo—

| | | |
|---|---|---|
| In re: BAYCOL PRODUCTS LITIGATION,<br><br>Plaintiff,<br><br>vs.<br><br>This Document Relates to Olander v. Bayer Corporation, et al. Civil No. 03-1086 (MJD/ JGL)<br><br>Defendant. | ) | MDL No. 1431<br>(MJD/ JGL) |

**CERTIFIED COPY**

DEPOSITION OF

**DAVID P. RICHMAN, M.D.**

February 11, 2004

REPORTED BY: KATHY KOLLEHNER, RPR, CRR, CSR 4102 JOB 1-684

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
---o0o---

In re: BAYCOL PRODUCTS LITIGATION )
)
Plaintiff, )
)
vs. ) MDL No. 1431
) (MJD/JGL)
This Document Relates to Olander v. )
Bayer Corporation, et al. Civil No. )
03-1086 (MJD/JGL) )
)
Defendants. )
)
_______________________________________)

---o0o---

BE IT REMEMBERED that, pursuant to Notice, and on Wednesday, February 11, 2004, commencing at 9:10 a.m., thereof, at 1333 Research Park Drive, Davis, California, before me, KATHY KOLLEHNER, a Certified Shorthand Reporter, personally appeared

DAVID P. RICHMAN, M.D.,

called as a witness by the Defendant, who, having been first duly sworn, was examined and testified as follows:

---o0o---

DIAMOND McCARTHY, 1201 Elm Street, 34th Floor, Dallas, Texas 75270, represented by BERT

A. I can remember -- oh -- yeah, I just -- I mean -- I'm sorry to say. I really only remember the rheumatologist from Johns Hopkins, Dr. Zizic, and Dr. Meyers -- or Mayer. 16:19:13 16:19:23 16:19:27 16:19:34

And there were a number of epidemiologists. I think that's ... 16:19:39 16:19:41

Q. This conference call that was about 10 days ago, there were plaintiff experts on the call, correct? 16:19:47 16:19:49 16:19:52

A. Yes. 16:19:52

Q. And there were plaintiff lawyers on the call? 16:19:53 16:19:55

A. Yes. 16:19:55

Q. And the subject was to discuss what was said at the early expert depositions? 16:19:55 16:19:57

A. Yes. 16:20:01

Q. Did you participate or contribute to the call? 16:20:02 16:20:04

A. I think I said something about myositis, that that was a loosely used term and that people should pay attention to the definition of it. 16:20:07 16:20:16 16:20:21

And that was -- I think that was my contribution. 16:20:28 16:20:30

Q. Other than that conference call 10 days ago, did you ever speak to any other plaintiff 16:20:30 16:20:32