# Exhibit H

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| In re: BAYCOL PRODUCTS LITIGATION | ) | MDL No. 1431 (MJD/JGL) |
| | ) | |
| | ) | |
| | ) | |
| This Document Relates To All Actions | ) | |

# EXPERT WITNESS REPORT OF R. SAMUEL MAYER, MD

## Baycol (Cerivastatin) Induced Toxic Myopathy: An Analysis of Causation, Diagnosis, Functional Impact, and Prognosis

## BACKGROUND AND QUALIFICATIONS

1. I am Medical Director of Inpatient Rehabilitation at the Johns Hopkins Hospital ("JHH"), and Clinical Associate in the Department of Physical Medicine and Rehabilitation, Johns Hopkins University School of Medicine. I am the Physician Advisor for the Department, which makes me responsible for quality assurance, billing compliance, and credentialing. I am certified by the American Board of Physical Medicine and Rehabilitation, the American Board of Electrodiagnostic Medicine, and the American Board of Independent Medical Examiners. I am licensed to practice medicine in the states of Maryland and Illinois. I serve on the JHH Clinical Performance Improvement and Compliance Committees, on the Pain Management Task Force, and on the Clinical Subcommittee of the Curriculum Committee for the School of Medicine. I was one of approximately 100 physicians who participated in the Annual Planning Retreat for Johns Hopkins Medicine in 2003.

2. I earned my Bachelor of Science and Doctor of Medicine degrees from the Honors Program in Medical Education of Northwestern University in 1986. This is a six year combined baccalaureate/medical degree program. I served as National



EXHIBIT
Mayer 1
1-29-04 mv

Chair of the Medical Education Committee of the American Medical Students Association during 1986. In 1990 I completed my residency in Physical Medicine and Rehabilitation ("PM&R") at Rush Medical College in Chicago. During the last year of my residency I served as Chief Resident

3. After completing my residency in 1990 I became assistant professor in the Department of PM&R at Rush Medical College. I served from 1992 to 2001 as the Medical Director of the Illinois Municipal Retirement Fund (reviewing disability claims among 125,000 employees) and as a Medical Consultant to Healthcare Compare, Inc. I was the Medical Director of the Employee Health Service at Rush-Presbyterian-St. Luke's Medical Center from 1994 to 2001. I was the Residency Program Director of the Department of PM&R at Rush Medical College in 1996 to 2001, and the Acting Chair of the Department from 1998 through 2001. I left Rush Medical College to move to Johns Hopkins in 2001.

4. In 1990 I received the Elkins Award from the American Board of Physical Medicine and Rehabilitation for achieving the highest score on the Board Exam nationally that year. I have been listed in Marquis Who's Who in American Healthcare since its inaugural edition in 2000, in America's Best Doctors since 1998, Top Doctors in America since 2000, and was one of three specialists in PM&R to be listed as a Top Doctor by Baltimore magazine in 2002. I have been an invited participant in Renaissance Weekend since 1999.

5. I have published 17 peer-reviewed papers and abstracts, and 3 book chapters, many of them related to the area of abnormal muscle tone, and also in the

area of epidemiology of disability. One abstract was a case series of 3 patients with rhabdomyolysis after taking cyclosporin and simvastatin.

6. In addition to my clinical practice and research I teach at the Johns Hopkins University School of Medicine, where I am course director for Physical Medicine and Rehabilitation and an instructor in the Introduction to Clinical Medicine course as well. I have given numerous lectures on a regional and national basis, and have served as a Course Director four times at the annual meetings of the American Academy of Physical Medicine and Rehabilitation.

7. A current copy of my curriculum vitae, which includes a list of all my publications, is attached as Exhibit A.

8. The terms of my retention by the Baycol MDL Plaintiffs Steering Committee are set forth in a November 21, 2003 letter from attorney Bert Black, a copy of which is attached as Exhibit B.

9. A list of the materials I reviewed in preparing this report is attached as Exhibit C.

10. A list of cases in which I have given deposition testimony during the past four years is attached as Exhibit D. To the best of my recollection, I have not testified at trial during that period.

## INTRODUCTION

11. Baycol (cerivastatin) was withdrawn from the U.S. market by Bayer, Inc. on August 8, 2001, after 1579 reports of toxic rhabdomyolysis (severe muscle damage) and 99 deaths worldwide. The rate of these catastrophic events was up to 43 times higher than with other medications in its class, according to the European Agency for the Evaluation of Medicinal Products, and the rate of rhabdomyolysis deaths was up to 80 times more frequent, according to Adverse Event Reports (AERs) to the U.S. Food and Drug Administration (FDA). This report will discuss the toxic effects of the drug on muscle, the methods for diagnosing toxic myopathy (muscle disease), functional limitations that result from myopathy, and the prognosis for recovery after withdrawal of the medication.

12. For the purposes of this report, cerivastatin induced myopathy will be operationally defined as muscle damage characterized by: (1) pain and/or weakness in the proximal muscles of new onset associated with the concurrent use of cerivastatin, (2) which results in significant functional limitations, and (3) which either persists at the same level or diminishes after discontinuation of cerivastatin. This definition is not meant to describe a new syndrome. It is only meant as an accurate description of the continuum of muscle damage associated with cerivastatin. There have been a number of proposed definitions, and none have reached wide acceptance in the literature.

13. Many have relied heavily on laboratory data, in particular creatine kinase (CK) levels, in describing this damage. However, as I demonstrate later in this report, such over-reliance on laboratory data is misguided, since creatine kinase is an inaccurate and crude "snapshot" of muscle damage at one moment in time. Drawing

"cut-offs" using a single laboratory value ignores the sensitivity and specificity of this diagnostic test. The definition proposed in the preceding paragraph attempts to encompass the wide range of severity of muscle injury due to cerivastatin.

14. Pasternak et al have defined three levels of severity of myopathy. "Myalgia – muscle ache or weakness without CK elevation; myositis – muscle symptoms with increased CK levels; rhabdomyolysis – muscle symptoms with marked CK elevation and creatine elevation." These definitions were meant for use in determining the continuation or discontinuation of statin use in the face of muscle symptoms, and to advise clinicians regarding monitoring laboratory tests during therapy. These definitions were not meant for purposes of diagnosis or prognosis, as the paper clearly recognizes that serial monitoring of CK is necessary due to the transitory nature of its elevations in myopathy.

15. All opinions contained herein are expressed with reasonable medical certainty.

**OPINIONS**

16. Cerivastatin clearly injures muscle in many individuals. To understand how this damage occurs, we will first briefly consider cerivastatin toxicity at a chemical and a cellular level. Then we will look at the impact of this toxic muscle damage on individuals. We know the drug has toxic effects from epidemiological data, pharmacological analysis, and muscle biopsy pathology. The rate of this myopathy is 1% of individuals who took cerivastatin at the 0.4 mg dose in Phase III clinical trials performed by Bayer for the FDA. Data from the FDA AERs show even higher rates of myopathy, when measured by symptoms accompanied by laboratory abnormalities. In elderly women, this rate exceeded 5%. AERs notoriously underreport side effects, as the FDA relies on data provided to it by individual physicians, who must take the time to make reports. These rates probably include primarily patients with the most severe symptoms. The myopathy occurrence rate is likely much higher, therefore.

17. Cerivastatin causes a continuum of muscle damage. In animal studies, statins induced changes in the histology (microscopic appearance) of muscle cells in virtually all animals tested. In humans, this probably represents asymptomatic subclinical pathology. When muscle cell death occurs, there is associated myalgia. The larger, proximal muscles of the trunk, hips, shoulders, and calves are typically the most involved. In many individuals, these symptoms will abate within days to weeks after discontinuation of cerivastatin. In others, a more profound amount of muscle cell death occurs, and muscle weakness develops. These individuals typically take months to recover, and may suffer permanent damage. The most severely affected individuals develop rhabdomyolysis, a condition in which there is massive muscle cell death,

resulting in severe atrophy and fibrosis of the muscles. Shortening of the muscles, known as contracture, often results, leading to joint stiffness and loss of range of motion. The breakdown products of the muscles (particularly a large protein known as myoglobin) enter the bloodstream and can clog the kidneys, resulting in renal failure requiring dialysis. Deaths have occurred in a number of patients due to complications of rhabdomyolysis.

18. Cerivastatin belongs to a class of serum cholesterol lowering medications known as HMG Co-A reductase inhibitors, referring to the enzyme upon which these medications act. These medications are commonly referred to as "statins". Other drugs in this class include Lipitor (atorvastatin), Pravachol (pravastatin), Zocor (simvastatin), Mevacor (lovastatin), and Lescol (fluvastain). Lowering cholesterol is generally considered desirable because high blood levels of this substance, particularly LDL cholesterol, have been associated with heart disease and stroke. Several drugs in the statin class of medications have been shown to be more effective in lowering cholesterol than older classes of medications, such as niacin and gemfibrozil.

19. Though all statins are in the same pharmaceutical class, they are far from equal in terms of efficacy or safety. All statins can cause muscle damage, but cerivastatin causes it much more frequently than the other medications in this class, indeed up to 43 times more frequently. The degree of muscle damage is also worse than other statins. Patients presented with rhabdomyolysis more often, and there were more deaths than with any other statins. Cerivastatin differs markedly from other statins in its potency, bio-availability, and pathways of metabolism, and these differences very plausibly explain the far higher rates of muscle damage with the drug.

20. Muscle is made up of strand-like fibers. Mature muscle fibers have multiple nuclei within each cell. The nuclei contain DNA. Muscle fibers require a great deal of energy to perform work. This energy is provided by fuel generators within the cells called mitochondria, and there are many mitochondria in each muscle fiber. The muscle fibers are surrounded by satellite cells. These are stem cells which can mature into myoblasts (precursors to muscle fiber cells) or fibroblasts, which make scar tissue. This distinction is important to understanding the repair of damaged muscle cells, and may explain why many individuals do not recover completely after toxic insult.

21. Though it is clear that cerivastatin causes muscle damage, the mechanism through which it does so is still being researched. At least three mechanisms have been suggested as likely explanations for how the drug damages muscle cells, and these may act either independently or together. The first involves adverse effects on cell membranes, which can result in killing muscle cells. The second involves interference with the cell's uptake of energy, which also can lead to cell death. The third involves inappropriate activation of apoptosis, or programmed cell death. Whatever the actual cause, the more cells that die, the weaker the muscle becomes.

22. A number of co-morbidities can increase the risk of developing cerivastatin-induced myopathy, and can exacerbate and prolong symptoms once they occur. Women and the elderly appear to be far more sensitive to the medication, with higher rates of myopathy. Impaired liver and kidney function make it more difficult for the body to break down the medication. Hypothyroidism, diabetes, and rheumatoid arthritis are relatively common diseases that are associated with myopathy. A subclinical myopathy in these patients could be greatly exacerbated by cerivastatin. Peripheral

vascular disease would likely lead to decreased ability of muscle to clear toxins, potentiating myopathy. Frailty, which afflicts many elderly individuals, is characterized by a loss of muscle mass. Further damage from cerivastatin-induced myopathy can have disastrous results in these individuals.

23. Concomitant use of some medications with cerivastatin can potentiate even more severe myopathy. Examples include gemfibrozil, niacin, cyclosporin, clopidogrel, diltiazem, fluconazole, erythromycin, AZT, and St. John's wort. This may be partly due to the additive myotoxic effects of these medications, and partly due to metabolism increasing serum levels of both the cerivastatin and the concomitant medication. Over 50% of the cases of severe rhabdomyolysis in the FDA AERs involved drug interactions, especially with gemfibrozil and cyclosporin.

24. When diagnosing myopathy there is no single "gold standard" test. Objective evidence may include elevated creatine kinase (CK) levels, myoglobinuria, EMG, muscle biopsy, and quantitative strength testing. Each of these tests, however, has significant limitations in their sensitivity and specificity for the diagnosis. They are also of limited value in the prediction of prognosis. In the following paragraphs I discuss each in more detail.

25. **CK and myoglobinuria.** When muscle cells die, their contents are released into the bloodstream. One of the chemicals released early in myocyte death is creatine kinase (CK). It is a good marker of early cell death, but it should be noted that once a cell has died, it will no longer release this protein, and the CK levels measured in blood will decrease with time. This bears no relationship to recovery of muscle function. Another protein released during acute muscle damage can be more deleterious.

Myoglobin builds up rapidly in the blood stream. Myoglobin is a very large protein molecule, and it will essentially plug up the kidneys, which try to clean it out of the bloodstream. It is excreted in the urine where it can easily be measured. This is termed myoglobinuria. Measurements of these two chemicals can be useful when damage initially occurs. CK can be measured in the blood, and myoglobin can be measured in the urine. However, the levels of both these proteins will dissipate once damage is has been completed. They tell us little about prognosis.

26. **Muscle biopsy**. A muscle biopsy can tell us what the cells look like. We can see dead cells, or cells with damaged mitochondria. Biopsies, however, depend on getting a specimen right from the area of muscle that is damaged. Often a muscle biopsy will appear normal even if there is severe muscle disease because the injured portion of tissue was missed. The injury occurs at a microscopic level, so the exact location of damage may be missed by the biopsy.

27. **Electromyography (EMG).** EMG measures muscle function through the electrical activity the muscle generates while contracting. This is done by measuring the size of the motor unit potential (MUP), which reflects the activity of one nerve ending on a group of muscle fibers. In myopathy the number of muscle fibers with which each nerve ending communicates (innervates) is reduced. Therefore, the MUP is smaller. This test can also measure when a muscle is irritable, signaling acute damage. It involves sticking a needle into the muscle, and it can be a painful test. Moreover, it can miss muscle injury if the proper muscles are not tested. It is also quite tricky to diagnose myopathy in older individuals with EMG. This is because with aging, the nerve endings die off, leaving each nerve ending with more muscle fibers to innervate. This means that

with normal aging, the MUPs get larger. Thus what may be a normal sized MUP in a younger patient may actually be myopathic in an older individual.

28. Muscle cells can regenerate (grow back), but this is a slow process, taking months, and often it is incomplete if damage is severe. The regeneration occurs in several steps. The dead muscle cells release byproducts into the bloodstream. These include creatine kinase (an enzyme that can be easily measured by a routine laboratory test), and myoglobin, a large protein that can clog the kidneys. Next, macrophages (cells that clean up waste products) consume the dead cells, and release a chemical called prostaglandin, which signals pain to the brain. Over the course of weeks and months, special stem cells develop into myoblasts, which then form myotubes. Myotubes are weak and immature muscle fibers. It takes additional weeks and months for these myotubes to mature into muscle fibers. In many cases, the stem cells form fibroblasts instead of myoblasts. These fibroblasts make scar tissue. In older individuals, the regeneration process is even slower and more incomplete, and fbroblasts are more likely to form. We know this from experiments in mice. This very likely applies to humans as well; however, obvious ethical concerns limit this type of experimentation in human subjects.

29. Clinical recovery from muscle cell death can take months. To date, there are no specific longitudinal studies of recovery from cerivastatin-induced myopathy. However, we can infer much information regarding prognosis based on empirical support from other kinds of scientific data. There have been a number of case series with a consistent range of outcomes. We can also infer information based on the time course of cellular regeneration in the laboratory. We know that mitochondrial

damage without cell death is usually reversible in days to weeks in mammalian models. Furthermore, we know much about recovery from other forms of myopathy. For example, we know in one case series of AZT induced myopathy, 20% of patients had long-term muscle weakness. Similar results are seen in studies of steroid induced myopathy. In the initial weeks of recovery from significant muscle damage, the individual may actually become even weaker before regaining strength. We know this from experiments performed on astronauts after returning from space flight. Muscles are weakened in space by prolonged periods of lack of use due to zero gravity. When an astronaut returns to earth, this muscle damage ends, but he/she actually becomes weaker over the first week back on earth because the high energy demands on the weakened muscle overloads the mitochondria, re-injuring the muscle. Muscle strength, in the absence of fibrosis and scarring, will generally recover approximately 3% per week in healthy young adults. In older and frailer individuals with multiple medical problems, this recovery takes much longer and is less complete.

30. Myopathy can result in serious and significant functional limitations. It disproportionately affects the large proximal muscle of the trunk, hips, and shoulders; the neck and calves are also commonly involved. Pain and weakness are the two main symptoms. There is poor endurance and exercise tolerance. This leads to marked fatigue. The muscles become very tender. Because these muscles are critical to all gross movements of the body, simple activities like getting out of bed or up from a chair may become excruciating, and if weakness is severe, impossible to do without assistance. Patients may have difficulty with such simple everyday activities as getting dressed or getting on and off the toilet. Climbing stairs is difficult for most patients.

Heavy labor and sports can become next to impossible to perform. Thus it is incorrect to label cerivastatin-induced myopathy (short of rhabdomyolysis and death) as trivial. Myopathy causes significant, and often long-lasting, functional limitations.

**POSSIBLE ADDITIONAL ANALYSES AND AMENDMENT OF REPORT**

If I learn of additional information relevant to my opinions, I will submit an amended and/or supplemental report as appropriate.

R. Samuel Mayer

# Exhibit I

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| In re: BAYCOL PRODUCTS LITIGATION | ) | MDL No. 1431 (MJD/JGL) |
| | ) | |
| | ) | |
| | ) | |
| This Document Relates To All Actions | ) | |

**EXPERT WITNESS REPORT OF STEPHEN RASKIN, M.D.**

I, Stephen Raskin, M.D. hereby state as follows:

1. I am a practicing cardiologist in Alameda, California. I have been Board Certified in Internal Medicine since June, 1976, with a subspecialty Certification in Cardiovascular Diseases since October, 1977. I am currently serving as an Associate Clinical Professor of Medicine at the University of California, San Francisco Medical Center, San Francisco, California. Since 1977, I have served as the Director of the Coronary Care Unit at Alameda Hospital in Alameda, California. I am an Attending Physician at the Highland Hospital, Oakland, California, and the Veterans Administration Medical Center, San Francisco, California. I am a member of the active medical staff of Summit Medical Center, Oakland, California, Alta Bates Hospital, Berkeley, California, and the San Leandro Hospital, San Leandro, California. I am a fellow of both the America College of Cardiology and the American College of Chest Physicians. I have served on the American Heart Association's Council on Arteriosclerosis and Thrombosis and its Council on Clinical Cardiology. I am also a member of the American College of Physicians, the American Society of Echocardiography, and the Society of Atherosclerosis Imaging. A true and correct copy of my curriculum vitae, further outlining my training, publications and experience, is attached as Exhibit 1.

EXHIBIT
Raskin
2
2-2-04

2. I have a cardiology practice, research and continuing education interest in preventive cardiology, including the identification of novel coronary risk factors and, in particular, the treatment of hyperlipidemia (high cholesterol). I recently co-authored, "Genetic analysis of a polymorphism in the human apolipoprotein A-V gene: effect on plasma lipids," Journal of Lipid Research in 2003. I have been a frequent invited lecturer on lipid management and pre-clinical coronary artery disease detection. Venues have included: the Advanced Cardiovascular Risk Management Training Course (Berkely HeartLab and Cholesterol, Genetics, and Heart Disease Institute), on October 18, 1997; the 4th Annual Stanford University School of Medicine's Program for the Atherosclerosis and Cardiovascular Therapies (PACT), on February 21, 1999; and the Electron Beam International Symposium, New Orleans, September 20-22, 2002.

3. I was invited by Bayer to participate in its September, 1999 program, "Emerging Trends in the Management of Dyslipidemia: An Update for Speakers of the Baycol Clinical Advisory Panel." The meeting was sponsored by Bayer, for the purpose of providing physicians with information about Baycol and to provide these physicians, the "Baycol Clinical Advisory Panel," with communication skills for anticipated future presentations to medical professionals about Baycol and statin therapy.

4. In forming my opinions in this case, I have reviewed the information Bayer shared with health care professionals regarding Baycol, in the form of package inserts and letters to health care professionals. I have also reviewed a number of Bayer's internal documents and communications, some of which are discussed specifically below and all of which are listed on Exhibit 2 to this Report. I have also reviewed the materials provided to me by Bayer in connection with the "Baycol Clinical

Advisory Panel." A list of previous testimony and my fee schedule are attached as Exhibit 3.

5. As a treating cardiologist who regularly prescribes medications to patients, I reasonably and necessarily rely upon drug manufacturers to provide accurate and complete information regarding the efficacy and safety of their pharmaceuticals.

6. Based upon my review of the information known to Bayer internally, and of the information the company provided to the medical community, I and other physicians were not informed about key and very material concerns relating to Baycol's efficacy and safety. In particular, Bayer failed to disclose to the medical community important information about the risk of muscle injuries associated with the use of Baycol. This information, which is described more fully below, is and was precisely the type of information I and other practitioners reasonably expect and rely upon drug manufacturers to provide to us.

7. Bayer's public communications repeatedly stated that there were no cases of rhabdomyolysis during "extensive clinical studies" of Baycol. For example, packaging information dated November, 1998, disclosed that rhabdomyolysis has been reported only "since market introduction." As another example, Bayer's "Dear Health Care Professional" letter of December, 1999 regarding the contraindication with gemfibrozil stated that, "While no cases of rhabdomyolysis were reported during the extensive clinical trials of Baycol (cerivastatin sodium tablets) there have been a number of cases reported during the post-marketing period, ..." (BAYCORP01973816). Likewise, in its original packaging materials and PDR information for Baycol, dated September, 1997, Bayer stressed that, "Rare cases of rhabdomyolysis with acute renal

failure secondary to myoglobinuria have been reported with other HMG-CoA reductase inhibitors." (emphasis supplied).

8. Contrary to Bayer's repeated representations about having no cases of rhabdomyolysis during the clinical trials, at least one patient, Patient 1301, did develop rhabdomyolysis during a pre-marketing clinical study. This patient suffered an extreme elevation in CPK, which reached a peak of 36,650. The patient also suffered myoglobinuria. Because of this condition, the patient was discontinued from Baycol. (See BAYCOPR00000892, BAYCORP00141991 and BAYCORP02695739).

9. Bayer began receiving post-marketing reports of rhabdomyolysis and myopathy in association with Baycol use almost as soon as the drug went on the market, in early 1998. Bayer had received at least seven reports of "rhabdomyolysis and similar reports," with elevated CPKs ranging from 3,180 to 71,500 by May 28, 1998. (BAYCORP01435512). By March 31, 1999, reports of rhabdomyolysis with Baycol had jumped to thirty-five, including some with renal failure. (BAYAG00025695). By that point, Bayer had also pulled four female patients from its clinical study of a 1.6 mg dose due to CPK elevations. (BAYAG00025698). By May, 1999, Bayer was aware of at least fifty-eight cases of rhabdomyolysis in patients taking Baycol, only about half of which involved combination therapy with gemfibrozil. (GSK_BL_00448252).

10. Perhaps in response to the growing reports of rhabdomyolysis in patients taking Baycol, in February, 1999, Bayer requested information from the FDA on rhabdomyolysis adverse event reports for other statins. (BAYCOPR00247032). With this data, Bayer compared the rhabdomyolysis and increased CPK reports from Baycol patients versus patients taking other statins. The results were significant. Comparison of

the adverse event reports received by the FDA through March, 1999, demonstrated a markedly higher reporting rate of rhabdomyolysis with Baycol as compared to the other statins. (BAYAG01055749, BAYAG01055750).

11. The increased adverse event reporting rates for Baycol did not disappear, but grew over time. Bayer's chart comparing adverse event reporting data through June, 1999, vividly demonstrated that compared to other statins, Baycol was associated with between 5 and 67 times as many reports of rhabdomyolysis. (BAYCORP02878488). An email from May 6, 1999 referenced Baycol's "recently acknowledged greater incidence of rhabdomyolysis" based upon the report of the Bayer safety department's rhabdomyolysis surveillance information. (GSK_BL_00448252). Bayer's comparison of spontaneous reporting data from the World Health Organization through September, 1999 showed that Baycol use was associated with between 14 and 59 times as many reported cases of rhabdomyolysis in the United States. (BAYAG01060224).

12. During the entire time that Baycol was on the market, Bayer never informed me, nor the medical community as a whole, about the very important data showing that Baycol was more dangerous than other statins. Doctors and patients had a right to know these facts in order to make informed decisions about which of the six available statin medications would provide the greatest benefit and the lowest risk of adverse events. Bayer's failure to disclose is not justified by the fact that the data is based on adverse event reports; any doubts about the precision of such data pale by comparison to the overwhelming evidence of greater risk demonstrated by reporting rates orders of magnitude higher for Baycol than for other statins. This is particularly true

where the reporting rate for Baycol was many times higher than the rate for Lipitor, a statin that went on the market at about the same time as Baycol. Comparing the adverse event reporting rate for Baycol with the rate for Lipitor refutes any argument that Baycol's higher rate was due to a "new drug" reporting bias.

13. Indeed, Bayer's own scientists found the adverse event data strong enough to state,

> The findings indicate that in patients receiving mono-therapy, cerivastatin substantially elevates the risk for rhabdomyolysis compared with other statins. In combination with gemfibrozil, cerivastatin patients were also found to be at a remarkable disadvantage compared with patients receiving gemfibrozil and another statin.

(BAYCORP 00135576). I am confident that I would have reached the same conclusion if Bayer had disclosed their data to me, and I would have prescribed one of the other available statins to my patients.

14. Information about adverse event reporting rates is important to practicing physicians. Indeed, continuing medical education materials on statins prepared by the Vascular Biology Working Group ("VBWG"), after Baycol was withdrawn from the market, contain exactly the kind of comparisons that Bayer did not disclose to the medical community. I am a member of the VBWG, an organization that serves as a forum for the periodic review, exchange, and assimilation of findings from vascular biology research for dissemination to the clinical medicine community for the purpose of facilitating a consensus on what implications recent research findings have for present and future practices in patient care. Bayer could have and should have provided this information to practitioners years earlier.

15. Rather than providing its material and important knowledge about comparative adverse event rates for the various statins to the medical community, Bayer's packaging information in 1998 and early 1999 stated only that, "Rare cases of

rhabdomyolysis (some with renal failure secondary to myoglobinuria) have been reported with cerivastatin and other drugs in this class." The only change Bayer eventually made in response to this compelling data of which it was well aware was to omit the word "rare" beginning in December 1999 – so that the warning read, "Cases of rhabdomyolysis, some with acute renal failure secondary to myoglobinuria, have been reported with cerivastatin and other drugs in this class." Nothing in this packaging information suggested that adverse event reporting data revealed a significantly higher reporting rate of rhabdomyolysis with Baycol versus other statins.

16. In September, 1999, I attended a conference of the "Speakers of the Baycol Clinical Advisory Panels," hosted by Bayer, at Dana Point, California. The documents I have reviewed indicate that by the time of this conference, Bayer had performed the data analysis of adverse event reports described above, showing that Baycol was more dangerous than other statins. Despite this knowledge, Bayer's presentation to the approximately 65 cardiologists who attended made no mention of their analysis, nor the higher reporting rates of rhabdomyolysis with Baycol. Instead, the presentation continued to portray Baycol as a safe drug, with no more risk of rhabdomyolysis than other statins. An article distributed during the meeting, "Efficacy and Safety of Cerivistatin, 0.2 mg and 0.4 mg, in Patients with Primary Hypercholesterolaemia: a Multinational, Randomized, Double-Blind Study," stated that the adverse events reported during the study, including CK elevations, were "consistent with the adverse events reported during previous studies involving other HMG-CoA reductase inhibitors." While this may have been true with respect to the limited population of relatively younger and healthier subjects of the clinical trial, it was misleading for Bayer to present only this type of data, while concealing their data analysis showing much higher reporting rates of muscle toxicity for Baycol than for other statins among the more typical population of higher risk, older patients with multiple co-morbidities who were prescribed the drug. In practice, drug therapy is

targeted for the higher risk patients. Also included in the conference were presentations by communication experts to train the attendees for anticipated future presentations about Baycol. It is simply wrong for Bayer to have misled the cardiology community by concealing the adverse event analysis, and equally wrong to recruit cardiologists to further mislead other doctors who Bayer hoped and intended would portray Baycol as safe and effective medication, contrary to the information Bayer had at the time.

17. On December 15, 1999, Bayer distributed a letter to health care professionals recommending against concomitant use of Baycol with gemfibrozil (Lopid). This letter was false and misleading, both in its content and its omissions. First, the letter stated that there were no cases of rhabdomyolysis in Baycol clinical trials. As noted above, patient 1301 was a Baycol clinical trial rhabdomyolysis case. Second, the letter stated that all statins are associated with increased risk of myopathy in combination with gemfibrozil, while failing to disclose that the risk of combination use was greater with Baycol than with other statins. (See, for example, J.Dubb, memo dated 11/24/99, "Earlier this year, Bayer safety noted that there seemed to be a greater number of spontaneous adverse event reports of rhabdomyolysis associated with combined use of Baycol and Gemfibrozil than with other statins;" also indicating that the rate of adverse event reports was ten times greater for Baycol than for Lipitor, and that about half of the adverse event reports were associated with combination use. (GSK_BL_00267862)). Third, the December 15, 1999 letter misleadingly gave the impression that the problem was only with combination use, when in fact the same data showed a much higher risk with Baycol monotherapy than for other statins in monotherapy. Since Bayer apparently found the adverse event data to be a sufficiently reliable indicator of greater risk to issue the recommendation against combination use, there is no justification for failing to disclose the higher risk shown by the data in regard to monotherapy. Finally, it is highly significant that, by no later than November, 1999, Bayer knew of at least eight to ten cases of patients who were stable on other statins but

developed rhabdomyolysis shortly after switching to Baycol. (GSK_BL_00267862). This is highly suggestive of a greater risk with Baycol, yet the company's December 15, 1999 letter made no mention of it.

18. In conjunction with the issuance of the December 15, 1999 letter, Bayer warned the sales force not to, "unduly alarm physicians" by starting their Baycol presentation with the contraindication issue. (GSK_BL_00040275-76, BAYCORP01973799-800). Rather than encouraging an open and honest discourse about Baycol's risks, Bayer urged its sales force to emphasize that, "Baycol has been shown to be safe and well tolerated."

19. Moreover, by at least November 24, 1999, internal documents show that Bayer was aware of evidence that CPK elevations in its clinical trials for .8 mg dose appeared to impact elderly women in particular. (GSK_BL_00267862). Bayer never informed practitioners of this significant information. Again, this information is the type that doctors reasonably rely upon manufacturers to provide.

20. By February, 2000, Bayer was aware of at least 125 cases of rhabdomyolysis according to internal emails, including a number of deaths. (BAYCORP01437831).

21. Bayer did not communicate the increasing evidence of Baycol's toxicity to the medical community, even though this is the kind of information medical providers expect from drug manufacturers. Perhaps indicative of Bayer's attitude, in a string of emails from February, 2000 regarding rumors in the field of Baycol-related deaths, Patricia Stenger wrote, "So much for keeping this quiet." (BAYCORP01437832).

22. A Bayer chart comparing the confirmed U.S. rhabdomyolysis cases according to FDA data from October 1, 1999 through May 15, 2000 graphically demonstrated that Baycol resulted in markedly increased reporting rates of myoglobinuria, renal failure, CPK increases, serious muscle symptoms and

rhabdomyolysis. (BAYAG01306787). When only monotherapy cases resulting in rhabdomyolysis were compared, the risks of Baycol versus other statins was even more prominent. (BAYAG01306789, BAYAG01306790). This analysis confirmed the higher risk of toxicity that had been apparent in the data analyzed by Bayer in 1999 (see paragraphs 10 -15, above).

23. In July, 2000 and May, 2001, however, Baycol's packaging information still only stated that, "Cases of rhabdomyolysis, some with acute renal failure secondary to myoglobinuria, have been reported with cerivastatin and other drugs in this class." Bayer's "Dear Health Care Professional" letters dated May, 2001 and June 2001, which discussed labeling changes regarding the .8 mg dose and the dangers associated with combined therapy with gemfibrozil, stated that, "Rhabdomyolysis has been reported with all statins and is reflected in the corresponding prescribing information for all statins." (BAYCORP02012860; BAYCORP03192431). Again, nothing suggested the strong evidence of Baycol's greater toxicity compared to other statins.

24. Not only did Bayer fail to provide relevant, material information to doctors regarding the relative risks of Baycol, it pushed forward with plans to market even greater doses. Greater doses meant greater toxicity. Yet, in Bayer's .8 mg "Training Guide" for its sales force, the selling strategy for the .8 mg dose included the goal of establishing, "Baycol 0.8 mg efficacy as the new 'go-to' dose with significantly enhanced efficacy to compete with market leaders," and "that Baycol 0.8 mg is as well tolerated as 0.4 mg." (GSK BL 00142332). Bayer provided its field representatives with plenty of .8 mg free samples for doctors. In all, more than 26 million 0.8 mg tablets were distributed as free samples. (See, also, BAYCORP01995069, a case of such samples per field representative distributed starting in November, 2000). Between its launch in the late summer of 2000 and April 18, 2001, Baycol at 0.8 mg had received

169 adverse event reports for rhabdomyolysis worldwide, 13 of which resulted in death. (BAYCORP02392537).

25. Compounding the harm of Bayer's lack of accurate and complete reporting to physicians about the risks of Baycol compared with other statins is the fact that studies demonstrate that Baycol did not provide any greater benefits in cholesterol lowering properties. See, e.g. Weidmann, Ernst and Sprenger, Kuno, "Benefit-Risk Evaluation Report, CIOMS IV, Cerivistatin Sodium" at 22-29, 157 (BAYAG00915869 – 16089).

26. In summary, Bayer did not tell practicing cardiologists or the medical community what it knew about the risks of muscle toxicity associated with Baycol. In fact, Bayer misrepresented the risks as comparable to, or probably, safer than other statins on the market, in light of its supposedly advantageous dual pathways of metabolism, when in fact the data Bayer had collected showed a substantially higher risk of muscle toxicity and death. Had I known the information that Bayer possessed I would not have prescribed Baycol to my patients and I would not have agreed to participate on Baycol's Clinical Advisory Panel.

Dated:___________ ____________________________________

STEPHEN RASKIN, M.D.

169 adverse event reports for rhabdomyolysis worldwide, 13 of which resulted in death. (BAYCORP02392537).

25. Compounding the harm of Bayer's lack of accurate and complete reporting to physicians about the risks of Baycol compared with other statins is the fact that studies demonstrate that Baycol did not provide any greater benefits in cholesterol lowering properties. See, e.g. Weidmann, Ernst and Sprenger, Kuno, "Benefit-Risk Evaluation Report, CIOMS IV, Cerivistatin Sodium" at 22-29, 157 (BAYAG00915869 – 16089).

26. In summary, Bayer did not tell practicing cardiologists or the medical community what it knew about the risks of muscle toxicity associated with Baycol. In fact, Bayer misrepresented the risks as comparable to, or probably, safer than other statins on the market, in light of its supposedly advantageous dual pathways of metabolism, when in fact the data Bayer had collected showed a substantially higher risk of muscle toxicity and death. Had I known the information that Bayer possessed I would not have prescribed Baycol to my patients and I would not have agreed to participate on Baycol's Clinical Advisory Panel.

Dated: 12-2-03

STEPHEN RASKIN, M.D.

# Exhibit J

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| IN RE: BAYCOL PRODUCTS LITIGATION | : | MDL No. 1431 (MJD/JGL) |
| | : | |
| This Document Relates to All Cases | : | |

ORIGINAL

VIDEOTAPED DEPOSITION OF MARTYN T. SMITH, Ph.D.

San Francisco, California

Monday, February 9, 2004

Reported by:
SUZANNE F. BOSCHETTI
CSR No. 5111

Job No. 50019

09:14 Cabraser, Heimann & Bernstein, for plaintiffs.

09:14 VIDEO OPERATOR: And the people on the phone,
09:14 if you could please identify yourselves.

09:14 MR. BERGER: This is Roger Berger from Uzick &
09:14 Oncken in Houston for various Texas physicians.

09:14 VIDEO OPERATOR: And would the court reporter
09:14 please swear -- please swear in the witness.

MARTYN T. SMITH, Ph.D.,

having been first duly sworn, was

examined and testified as follows:

09:14 MR. KEENAN: Before we begin, this fan just
09:14 kicked in. It's not going to bother me, but is that
09:15 just the -- is that just the heating and cooling?

09:15 MR. ARBITBLIT: Yes.

09:15 MR. KEENAN: So without that, it's -- it's
09:15 going to be very hard to keep the room cool?

09:15 MR. ARBITBLIT: Right.

09:15 MR. KEENAN: Okay. Fair enough.
09:15 I'm ready to begin.

09:15 VIDEO OPERATOR: Sure.

09:15

09:15 EXAMINATION

09:15 BY MR. KEENAN:

14:23 you decide to take the alternate pathway, but on the alternate pathway, you come across a -- a crash which has blocked you going that way, and so it's not forced to make it better, especially when very common drugs such as Tamoxifen, the glitazones, and all contraceptives are metabolized by the alternate pathway.

14:23 So I just -- I just think it's weak thinking, it's just poor thinking that two pathways are better than one. It's just too simplistic.

14:23 BY MR. KEENAN:

14:23 Q But does anybody in the world agree with your view on this?

14:23 A I don't know. I haven't asked them.

14:23 Q But you've taken time to look at the literature.

14:23 Have you seen any literature that -- that -- that supported your view that two pathways is not necessarily better than one?

14:24 MR. BLACK: Objection.

14:24 MR. ARBITBLIT: Objection.

14:24 THE WITNESS: I haven't seen any writings on it at all, really. But I'd be willing to bate -- debate anybody in the world about it.

14:24 BY MR. KEENAN:

14:24 Q Paragraph 32. The most serious interactions

14:24 between Baycol and other drugs appear to be with gemfibrozil and clopidogrel.

14:24 What's clopidogrel?

14:24 A Well, I forget as I sit here today. It's a source or a commonly prescribed drug, but I forget for what condition.

14:24 Q What's your basis for this statement?

14:24 A That -- that -- the report by Dr. Farquhar.

14:25 Q Okay. Did -- did you do a literature search, or do you find any other support for that statement other than Dr. Farquhar's report?

14:25 A There are many reports, of course, with gemfibrozil.

14:25 Q Right.

14:25 A The clopidogrel is from Dr. Farquhar's report.

14:25 Q All right. The -- okay. Now, gemfibrozil is a fibrate, is it not?

14:25 A Yes.

14:25 Q Gemfibrozil is known to interact with other statins as well, correct?

14:25 A Yes.

14:25 Q Okay. Let me ask you -- I've got questions about paragraph 33, and then I think we can take a break.

14:25 Paragraph 33 cites Dr. Wang's work; is that

# Exhibit K

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

IN RE: BAYCOL PRODUCTS LITIGATION : MDL NO. 1431 (MJD/JGL)
:
This Document Relates To: All Cases :

COPY

- - -

C O N F I D E N T I A L

- - -

September 15, 2004

- - -

Videotape deposition of PAUL D. STOLLEY, M.D., held at the Sheraton Columbia, 10207 Wincopin Circle, bia, Maryland, 21044, commencing at 9:30 a.m., on the above date, before Linda L. Golkow, a Registered Diplomate Reporter and Certified Shorthand Reporter.

- - -

ESQUIRE DEPOSITION SERVICES
1880 John F. Kennedy Boulevard
15th Floor
Philadelphia, Pennsylvania 19103
(215) 988-9191

hear some people.

\- - -

PAUL D. STOLLEY, M.D., after having been duly sworn, was examined and testified as follows:

\- - -

EXAMINATION

\- - -

BY MR. PIORKOWSKI:

Q. Good morning, Dr. Stolley.
A. Good morning.
Q. Would you state your full name for the record, please.
A. Paul David Stolley.
Q. What's your address?
A. 6424 Brass Knob, Columbia, Maryland 21044-4019.
Q. Is that a home address or business address?
A. That's my home address.
Q. Do you have a current business address?
A. I do.
Q. What is that?

Q. Am I correct that what you're referring to, although we don't have it here today, is something that would have been an exhibit to Dr. Strom's deposition?

A. Probably.

Q. Have you reviewed -- you're familiar with MedWatch forms, obviously; right?

A. Yes.

Q. Have you looked at any of the completed MedWatch forms on Baycol?

A. I think when I was at Public Citizen, I had a chance to look at some, if I recall correctly, but I'm not 100 percent sure of that.

Q. You haven't done any kind of systematic evaluation of the MedWatch forms on Baycol; is that right?

MR. BLACK: Objection.

THE WITNESS: No, not personally.

BY MR. PIORKOWSKI:

Q. Have you reviewed any

A. Yes.
Q. Do you agree with that?
A. No, I don't agree with that. I imagine the difference between Dr. Strom and myself would have to do with what constitutes proof, and I believe that the weight of the evidence from the spontaneous reporting systems and clinical trial data as summarized, I think, best by the European review of when they withdrew it from the market persuades me that monotherapy with Baycol is more dangerous than monotherapy with alternative statins. My guess is that Dr. Strom would find that to be inadequate as proof.
Q. Are you aware of any controlled epidemiologic study that shows an increased risk of rhabdomyolysis for Baycol monotherapy compared to monotherapy with any other statin?
A. No.
Q. Are you aware of any controlled epidemiologic study that shows