# Exhibit F

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| In re: BAYCOL PRODUCTS LITIGATION | ) | MDL No. 1431 (MJD/JGL) |
| | ) | |
| | ) | |
| | ) | |
| This Document Relates To All Actions | ) | |

# EXPERT WITNESS REPORT OF RICHARD M. KAPIT, MD

## BACKGROUND AND QUALIFICATIONS

1. I am a medical doctor, licensed to practice medicine in Maryland and Virginia. For nearly 30 years I worked in various capacities for the Government of the United States – at the National Institute of Mental Health, the Veterans Administration, the District of Columbia, the National Institute on Drug Abuse, and the Food and Drug Administration.

2. For 16 years, I was a clinical reviewer at the Food and Drug Administration, where I reviewed data on clinical trials and medical use of drugs and biologicals. I made recommendations about Agency actions on submissions from pharmaceutical manufacturers and academic investigators. These submissions included numerous Investigational New Drug Applications (INDs), New Drug Applications (NDAs), Biologics Licensing Applications (BLAs), and postmarketing surveillance reports.

3. During my service at the FDA, I made recommendations about the safety and efficacy of unapproved and approved pharmaceuticals, about the adequacy of INDs and NDAs supporting the approval of pharmaceuticals, and about postmarketing surveillance reports related to pharmaceuticals. My recommendations often focused on whether pharmaceuticals were safe for use in human beings.

4. In a former capacity, when I worked for the District of Columbia, I testified in court more than 100 times. In these instances I was working either for the Bureau of Forensic Psychiatry of the D.C. Government or in private forensic psychiatric practice. I made recommendations to courts in the District of Columbia and Maryland (both local and federal) about the mental state of criminal defendants, specifically about competency, criminal responsibility, dangerousness, need for mental health treatment, and related matters. I have not testified in court or been deposed for 20 years. I have not testified about the pharmaceutical product development process in court before the present time.

5. The following paragraphs summarize my qualifications and experience. For completeness, a copy of my curriculum vitae and resume are attached as Exhibit A to this report. Together they comprise my best recollection of all my scientific publications over the last 10 years.

a. 2002-Present, President, MD-Writer, Inc.: Research, preparation, and composition of medical and scientific articles for newspapers, magazines, and other publishers; consulting on matters related to pharmaceuticals and their adverse effects.

b. 1991-2002, Medical Officer, GS-15, Division of Epidemiology, Office of Biostatistics and Epidemiology, Center for Biologics Evaluation and Research, Food and Drug Administration, Rockville, MD: Evaluation and analysis of adverse drug reactions for licensed biological medicines and vaccines. Member of review teams for new Biologics Licensing Applications (BLAs and PLAs). GS-15 is the highest rank in the Civil Service below the Senior Executive Service.

c. 1990-1991, Medical Officer, GS-15, Clinical Trials Branch, Medication Development Division; National Institute on Drug Abuse; Alcohol, Drug Abuse and Mental Health Administration, Rockville, MD: Development of medications to treat substance abuse.

d. 1984-1989, Medical Officer, GS-15, Division of Neuropharmacological Drug Products, Office of Drug Evaluation I, Center for Drug Evaluation and Research, Food and Drug Administration, Rockville, MD: Medical review (including clinical safety review) of investigational new drug applications (INDs), new drug applications (NDAs), and postmarketing surveillance reports. Among the new drug applications that I reviewed was the NDA for Prozac, a drug that has had an unusually large impact on the pharmacological treatment of depression.

e. 1980-1984, Forensic Psychiatrist, private practice, Washington DC and Maryland.

f. 1979-1984, Medical Officer, GS-15, Bureau Of Forensic Psychiatry, Department of Human Services, Government of the District of Columbia, Washington DC.

g. 1972-1975, National Institute of Mental Health, Overholser Division of Training and Research, St. Elizabeths Hospital, Washington, DC: Resident in Psychiatry.

h. 1972, M.D. New York University School of Medicine, New York, NY.

i. 1967, B.A. Columbia College, Columbia University, New York, NY.

6. During my career with the FDA, I received the following awards:

a. 1994 FDA Cash Award.

b. 1994 FDA Commendable Service Award – This award was given for "superior performance and leadership in development of improved procedures for post-marketing surveillance."

c. 1995 FDA Group Recognition Award for MedWatch – This award was given for work in analyzing and communicating adverse reaction information regarding certain therapeutic products.

7. In addition to my other training and education, I have taken courses in epidemiology, public health, and statistics in the Master of Public Health program at Johns Hopkins University School of Hygiene and Public Health. I completed forty credits in this program.

8. In 1978, I received certification from the National Board of Psychiatry and Neurology.

9. I am a member of the following professional societies:

a. American Academy of Pharmaceutical Physicians.

b. American Association for the Advancement of Science.

c. American College of Clinical Pharmacology.

d. American Medical Writers Association.

e. Crohn's and Colitis Foundation of America.

f. D.C. Science Writers Association.

g. FDA Alumni Association.

h. International Society of Pharmacoepidemiology.

10. The terms of my retention by the Baycol MDL Plaintiffs Steering Committee are set forth in a letter from attorney Bert Black dated July 8, 2003 and attached hereto as Exhibit B. This letter accurately reflects my hourly rate except that I am charging $125 an hour for time spent reviewing documents.

11. A list of the documents I reviewed in the course of preparing this report is attached as Exhibit C.

## REPORT

### I. The FDA Review Process

12. In the United States, the process of new drug development is regulated by the Food and Drug Administration, whose mission it is to promote and protect the health of Americans. In the following sections, I shall outline the phases of the process. At the outset, however, it should be understood that despite the existence of the FDA, almost all drug development work goes on without the direct participation or supervision of this Agency. The work is generally carried out by pharmaceutical manufacturers, who perform research in their own laboratories and conduct human clinical trials in their own facilities or enter into contracts for the conduct of such trials by others. Moreover, the FDA assumes regulatory authority over the process only when a pharmaceutical company applies to the Agency for permission to develop a particular chemical entity into a new drug. This request is known as an Investigational New Drug (IND) application. Prior to filing an IND application, a pharmaceutical company engages in preparation, identification, characterization, purification, synthesis, biochemical investigation, biological activity research, and animal investigations of the compound entirely without FDA oversight. However, once the IND application is received by the Agency and the company is given approval to go forward, then FDA regulations and guidelines influence the drug development process, and Agency reviewers receive information and exercise oversight of the research. For this reason, an ethical and prudent company will conduct research according to Agency regulations and requirements even prior to FDA involvement.

13. Following IND approval, at time points specified in FDA regulations, pharmaceutical companies will report to the Agency about the research they are doing and the results, and this information forms the basis upon which Agency reviewers make judgments about efficacy, safety, and approval of new drugs. As should be evident from these circumstances, to carry out its

public health mission, the FDA is acutely dependent on the honesty, diligence, forthrightness, completeness, and accuracy of the pharmaceutical companies in the conduct of research, accrual of data, and composition of reports that they submit. This dependency on the probity of the company makes the Agency vulnerable to subversion of the spirit and intent of regulations by a company that technically complies but submits reports that are not as complete and informative as one would reasonably expect.

14. Moreover, compliance with FDA regulations does not relieve pharmaceutical companies, which make or sell medicines, from their ethical obligations as providers of critical components of our health care system. Such companies have a duty to provide safe and effective medicines, and the foremost obligations they serve are those owed to the patients, who take these medicines, and the physicians, who prescribe them. Technical compliance with FDA regulations does not relieve companies from these paramount responsibilities, even when such compliance results in Agency approval of their products and their conduct. A company that possesses information that indicates a problem with one of its product is not freed of responsibility of making such problems known and taking remedial action just because the FDA has not intervened to require such action.

15. The development of new pharmaceuticals customarily proceeds through a well-defined sequence of stages of research on safety and efficacy. The initial stage of studying pharmacology and toxicology in several species of animals is called the "preclinical" stage. After that stage, four stages of human testing ensue, usually called phases I, II, III and IV. These human phases are described in detail in the following sections. Briefly, in phase I, a new drug is tested for safety in small numbers (e.g., 10-30) of healthy human volunteers. In phase II, the drug is tried in somewhat larger numbers (e.g., 30-300) of patients, who are ill with the disease that the drug is intended to treat. In phase III, the drug is given to large numbers (e.g. 300-3000) of patients with the disease. Approval

of a new drug is based on the research done in phases I to III. Finally, in phase IV, studies are continued or initiated even after the new drug has been approved and is on the market for the intended use. Post-marketing studies in this last phase examine large numbers of patients receiving the medication in clinical practice, with the goal of further investigating the optimum doses, potential uses, activity in special populations, and adverse effects of the drug.

16. During my service as medical officer at the FDA, I reviewed information and made recommendations to higher Agency officials in regard to all four phases of pharmaceutical development in human beings. In the following paragraphs, I explain each phase in more detail and indicate the kind of work that FDA reviewers perform in each phase. In this report I concentrate on those aspects of the review process that seem most relevant to the subject at hand – the safety of Baycol.

## II. <u>An Overview of the Phases of Human Investigations</u>

17. FDA regulations specify a sequential development of study designs from simple small studies, in which a few subjects are given one or a few doses of a drug, to large complex studies, in which larger numbers of sick patients receive the drug for longer periods of time. The FDA almost never performs any of this research; rather the sponsor, usually a pharmaceutical company that intends to develop and market a new drug, does the work. The company must be diligent, therefore, in conducting scientific investigations, following generally accepted principles of investigational design, execution, and quality control; and the company must report accurately and completely to the Agency about this research.

18. Because virtually all research and investigation of the drug is conducted by the sponsor, there is an important difference in perspective between the pharmaceutical company and the FDA, in terms of the information available and the completeness of understanding of the findings in

regard to a new drug. This difference should be understood as background to the substance of this report. A pharmaceutical company that has filed a New Drug Applications has "lived" with the drug for many years during the process of research and development. It has all the data on the drug. It has performed repeated assessments and projections based on the data, year after year. In short, the company has the complete picture.

19. In contrast, the FDA receives a distillation of the information prepared by medical writers and statisticians working for the pharmaceutical company. Generally the Agency receives the largest part of this information all at one time, when the NDA is filed. There is usually a specified period – which was less than one year in the case of the Baycol NDAs – during which FDA reviewers must digest, summarize, and form conclusions about the data that the company has submitted. Even when the company submits some of the unanalyzed raw data to the Agency, due to time constraints and disconnection from the actual research, the FDA reviewers almost always must rely on analyses and summaries prepared by the company. These circumstances mean that it is vital that pharmaceutical companies provide Agency reviewers with information that is accurate, complete, and scrutable. If the company does not meet these obligations to inform completely and accurately, the FDA will not be in a position to carry out its public health mission of regulating health care products, and promoting and protecting the health of Americans.

20. It is improper for a pharmaceutical company to submit data and leave it entirely up to the FDA to determine whether a new drug is safe and effective. If a company has information that a drug is unsafe or less safe than other drugs, it should not continue marketing the product without informing the FDA. Pharmaceutical companies have obligations – ethical, medical, and regulatory – to give the Agency the complete picture.

### A. Pre-IND

21. In the earliest stage, new drug development occurs entirely without FDA participation, supervision, or even knowledge. Drugs are synthesized, characterized and tested in animals. Much of this research is never reported to the FDA, since for one reason or another a company decides not to pursue development of the compound. Though unsupervised by the FDA, the conduct of research performed during this initial stage of drug development must be done with an eye to compliance with FDA regulations and requirements. Otherwise, when the company decides to apply to the Agency for permission to test the drug in humans, the FDA may not accept the results of the investigations.

22. When a pharmaceutical manufacturer determines that it has found a chemical worth developing into a drug, then the results of all of this unsupervised research are compiled and submitted to the Agency and become the basis for an Investigational New Drug application (IND). As part of its new commercial IND, the pharmaceutical company sponsoring the application is required to accurately and completely disclose the results of prior research.

23. For this reason, even before an IND is filed and the new drug is tested in human beings, FDA regulations guide the drug development process, and the company must follow these regulations, even in the absence of FDA oversight. During the conduct of pre-phase I testing, a sponsor must perform a rigorous chemical characterization. The characterization involves more than identifying the chemical compound. Since preparation of the compound involves an extraction from a source or a chemical synthesis, an assessment of purity is also required, as well as an indication of the reproducibility and reliability of the preparation process.

24. The company then tests the compound in several species of animals, e.g., mice, rats, guinea pigs, cats, dogs, or monkeys, etc., to determine its pharmacological properties and

toxicological effects. The animal testing, which is done in mammalian species, is of great importance. It is vital to know what sort of activity the drug may have in human beings, and especially what sort of toxicities to anticipate and look out for.

25. With almost all drugs intended for human use, animal investigations should establish a no-effect dose, that is, a dose at which no discernable toxicities or adverse effects are observed. Once the no-effect dose is established, it is also very important to discover the doses at which pharmacological activity and toxic effects emerge. Often those actions of the drug that are responsible for beneficial pharmacological activity at a low dose level are the same actions that are responsible for toxic effects at a high dose. Drugs that are safe and effective for treatment of human disease are generally those that exhibit a large difference between the pharmacological-effect dose level and the toxic-effect dose level.

26. When this favorable situation prevails, a drug is said to have a wide therapeutic window. However, if a drug has a small difference between the pharmacological and toxicological doses, it is said to have a narrow therapeutic window. In the latter case, such drugs are usually unsafe for human use because too often toxic effects occur at the same doses as beneficial effects. The steepness of the toxicity dose-response curve for a drug may in some instances be related to the width of the therapeutic window, especially if over a given dosing range adverse effects increase rapidly.

27. As Bayer was well aware even before starting clinical trials with Baycol, Baycol's therapeutic window was narrower than that of other statins. Also the toxicity dose-response of Baycol was steeper than that of other statins.

28. It is incumbent upon sponsoring companies to be forthright in making high-risk toxicities known to the FDA and to the principal investigators, who will conduct the human clinical

trials. The sponsor should also write clinical investigational protocols geared to assess the degree to which such toxicities are observed and cause potential or actual harm in human subjects.

29. Chemical characterization and "pre-clinical" animal testing are the minimum requirements for research prior to beginning clinical testing in humans. If sponsor companies believe that their chemical and pre-clinical testing is sufficient, they then put the information before the FDA in an Investigational New Drug (IND) application, and apply for permission to begin phase I.

**B. The IND**

30. A new commercial IND, as submitted by a pharmaceutical manufacturer, is a lengthy document, often containing many hundreds of pages of information and explanation. The IND contents are specified in detail in regulations, and sponsoring companies are obligated by ethical considerations and FDA regulations to be accurate and complete in the information submitted. The documents should cover the chemical identity, preparation and purity of the compound; and all known pre-clinical pharmacological and toxicological data, including information developed outside the company. If the drug has previously been administered to humans in another country, the human safety and efficacy information from those other countries must be included, as well. The application should also identify the company, the company officials responsible for drug development, and the investigators who will perform the first studies in the United States.

31. A protocol for the initial study is included in the IND. The protocol indicates the types of patients that will be included in the study, those that will be excluded, the doses and durations of treatment with the new drug and the control treatments, the efficacy and safety assessments that will be performed during the study, and the outcome measures that will be used to decide if the new drug demonstrates safety and efficacy.

32. Also contained in the IND is a general plan for the entire investigation in human beings. This overall investigational plan is an outline of all human studies to be performed during phases I, II, and III. The outline addresses the number and kind of studies that will be performed and the issues the studies are intended to investigate. The outline specifies the different patient populations to be studied, the control treatments to be used as comparators, and the potential drug interactions to be investigated. Among the studies listed in the outline, two are designated "pivotal." The pivotal studies are those that the company declares – in advance – to be absolutely necessary for the demonstration of the safety and efficacy of the new drug for the disease which it is intended to treat. Pivotal studies usually include a larger number of patients than other studies. These studies are described in precisely detailed protocols, with inclusion and exclusion criteria for the patients, and assessments of efficacy and safety.

33. It is important to understand that despite the size, detailed structure, and sophistication of the pivotal clinical trials, the results of these studies provide no certainty about either safety or efficacy of the new drug. At most, they provide what might be termed reasonably valid scientific evidence supporting a claim of safety and efficacy for the disease that the new drug is intended to treat. Particularly in regard to safety issues, the lack of certainty is significant. Strom[a] has noted that it is necessary to study 3000 patients to be 95% certain of detecting an adverse event that occurs in one patient in 1000. Most pivotal studies range in size from 200-400 patients. Hence, there remains considerable uncertainty about the safety of a new drug, even if the pivotal studies find no serious adverse reactions.

34. The FDA evaluates and approves both the initial protocol and the overall investigational plan. The latter is considered preliminary, however, and modifications may be

---

[a] Strom BL (2000). Sample Size Considerations for Pharmacoepidemiology Studies. In: Brian L. Strom (ed). *Pharmacoepidemiology, Third Edition.* Chichester, John Wiley & Sons, Ltd., 2000.

necessary as studies continue and new information qualifies previous conclusions. As the sponsor possesses the most complete and accurate information on the drug, such adjustments by the FDA depend on complete and accurate disclosure of the information by the company.

35. The FDA personnel reviewing a new IND include chemists, pharmacologists, medical officers, statisticians, and others. My role, as medical officer and clinical reviewer of an IND, was to assess the information in the IND, focusing particularly on prior human testing results from non-U.S. human research, the proposed study protocols, and the overall investigational plan. I made recommendations about whether it was safe for the company to proceed, sometimes requesting changes to protocols and plans. On occasion, I recommended that the FDA place the IND on "hold" and explained why I considered it unsafe to proceed.

## C. Phase I

36. Phase I investigations, the first human trials, are primarily safety studies to determine whether humans can take the new drug without significant adverse reactions. These studies usually enroll small numbers of paid healthy volunteers, and the subjects are given one or a few doses of the new drug. Usually the first group of volunteers would receive a very low dose. If safe passage is achieved (no significant adverse reactions or laboratory abnormalities were observed), then the next group receives a somewhat higher dose. The dose level would be increased group-by-group of volunteers, until a dose level was reached at which the investigators observed significant pharmacological activity or toxicological effects.

37. In phase I, it is important to establish that significant pharmacological activity is observed at doses that do not cause significant adverse effects. As previously explained, the difference between pharmacological and adverse effects has often been called the "therapeutic window." A wide therapeutic window is indicative of a safe drug, and it is considered a green light when the therapeutic

window seen in phase I is sizable. On the other hand, a narrow or non-existent therapeutic window is seen when significant toxicity is observed in phase I at the same doses that are needed for pharmacological effects. That is considered a red light and reason to terminate a drug-development program. In the case of cerivastatin, as we shall see below, substantial toxicity was observed in phase I at doses in the therapeutic range. One subject developed substantial muscle-related laboratory abnormalities and muscle injury while receiving a therapeutic dose of 0.4 mg of cerivastatin. The company faced a choice at this point. It should have consulted with FDA about the advisability of continuing the drug development program. Instead, it chose to ignore and play down the finding, relating the muscle abnormalities and injury to the fact that the volunteer subject was a weight lifter. On notifying the FDA, the company promised not to exceed 0.2 mg in phase II trials. It appears that the Agency accepted this stipulation. But it is also clear that the company was disingenuous. First, cerivastatin does cause muscle adverse effects and laboratory abnormalities at an unusually high rate, and therefore the company had the obligation to consider that the adverse reaction was due to its drug and discuss the adverse phase I findings with the FDA. Second, the company did not keep the promise to limit doses in phase II doses to 0.2 mg, rather it increased phase II doses to 0.3 and 0.4 mg, going back on its promise to the Agency.

38. As a general rule, if any subject actually develops significant adverse reactions or laboratory abnormalities during a phase I study, as happened with cerivastatin, the investigation would usually be terminated. The company and the FDA would then have to confer on whether the drug development program should continue or be aborted. Often a company, on its own initiative, would choose to halt drug testing and development, if significant adverse effects on human safety were observed during phase I testing, particularly if pre-clinical animal testing had already identified those adverse effects as a potential problem. As a clinical reviewer, I would occasionally play a role in

communications with the company on such go or no-go decisions, if the situation arose. In the case of Baycol, as discussed below, a few subjects – one subject in particular – developed significant myopathy. Yet the company did not see the occurrence of these adverse effects as an occasion to reconsider the Baycol development program. Also, based on the documents I reviewed, it appears that Bayer did not confer at that time with the FDA reviewers about the risks and benefits of the drug and the best course of action.

39. In the case of Baycol, the main goal of phase I – to demonstrate a wide therapeutic window and safety in human use – was not achieved. In my opinion, most drug companies would have chosen not to proceed to phase II. Yet Bayer chose to ignore the negative findings and push forward.

## D. Phase II

40. If phase I investigations show that the new drug has a sufficient therapeutic window and lacks significant adverse effects at therapeutic dose levels (which did not happen in the case of Baycol), then the company proceeds to phase II. On the other hand, if no therapeutic window is established, such that significant adverse effects are observed at the same doses as pharmacological activity, then the sponsoring company would probably decide to terminate the development without entering phase II.

41. In unusual situations, even when significant adverse reactions are observed at therapeutic levels during phase I, the company might choose anyway to proceed to phase II. In such situations, the company would have to make the determination that the benefits of the new drug outweigh the potential risks. Such might be the case if the disease treated were extremely incapacitating or terminal. For instance, a company developing a new chemotherapy for cancer might observe significant human toxicity in phase I, but because cancer is most often a fatal illness, the

company might still choose to move on to phase II, if the new drug had showed strong anti-tumor activity in the laboratory. In the usual case, however, when the drug is intended to treat a non-lethal condition, or is primarily a preventive treatment, or when there are other safe treatments already approved and marketed, then the company would choose not to proceed to phase II if significant adverse effects had been noted in phase I.

42. If significant adverse effects occurred in phase I at therapeutic doses, then an ethical sponsor company would likely bring the matter to the attention of the FDA and consult with the Agency about whether to proceed to with phase II development. This would have been particularly important for Bayer to do in the case of Baycol. Since Baycol was a statin, and five statin drugs had already demonstrated acceptable risk-benefit profiles and been approved by the FDA, it would have been quite possible that the Agency might assume that the Bayer product was like all the others. If the FDA reviewers did make such an assumption (and there is evidence that they did), then it would have been especially important for Bayer to take the initiative and bring to the Agency's attention the evidence that its drug diverged from the others toward greater risk. Since the company was intimately familiar with the study results, Bayer was in much better position to be aware of the rhabdomyolysis and myopathy observed in early trials.

43. During phase II, the drug is first tested in patients suffering from the disease that the drug is intended to treat. The usual investigational plan of this phase describes a sequence of human investigations of increasing size and complexity. During the first half of phase II, often called "phase IIa", the new drug is tested in a small number of patients who are given the medicine for a short time. If the drug seems safe and shows preliminary evidence of efficacy, then successively larger groups of patients are exposed to the medicine and the safety and therapeutic efficacy are assessed. In the second half of the phase, phase IIb, the drug is tested in larger groups of patients.

44. During phase II, statistical analyses of efficacy become important. It is usually necessary for the sponsor to demonstrate, according to well-established statistical principles, that the new drug is statistically significantly better than placebo at achieving the intended therapeutic effect. The demonstration that the new drug is more efficacious than a placebo is the most important efficacy finding during the early phase II studies, and it is critical for proceeding into the later stages of phase II and moving on to phase III. Occasionally, in addition to showing superiority to placebo, the sponsor may succeed in preliminary demonstrations that the new drug is no worse than other drugs on the market that achieve the same therapeutic action. A finding "no difference" between the new drug and a competitor, at this stage of drug development, is almost always a less reliable and less important result. Most phase II investigations are not sufficiently powered (e.g., not large enough) to adequately compare a new treatment with another active-control drug.

45. It is important to note that, as a general rule, the company does not apply to FDA for permission to proceed from phase I to phase II to phase III; rather, the company pilots its own development program, deciding to move forward or change direction on its own initiative. Approval of an IND by the FDA constitutes approval of the whole development plan. The Agency has the right to intervene for cause, but it must take a specific action to change, pause, or halt a development program. If the FDA receives progress reports from the company containing new information about potential or actual harmful effects in human beings, the FDA may choose to intervene in this way.

46. FDA regulations require that companies submit timely progress reports (information amendments), adverse drug experience reports (safety amendments), and annual reports in regard to active INDs. Although the regulations list many items of information that should be included in these reports, in practice, companies exercise great latitude and discretion in deciding how much to reveal to the Agency. For example, it is possible to limit study reports to little more than how

many subjects enrolled, dropped out, and completed, plus a list of adverse reactions. Adverse experience reports are required at the time of occurrence, only if an investigator decides that there is a significant possibility that the event was drug-related. This leaves open the possibility of failing to immediately report a significant but unexpected new adverse reaction. Unless the FDA reviewer intervenes to request more information, a company may choose to be rather selective in what it includes in progress reports to the Agency, and the reviewer may easily overlook significant information. If progress reports are not particularly revealing, or the sponsor continually reassures the FDA reviewer that no unusual or significant risks have emerged during clinical trials, then the Agency may not take the opportunity to reassess a situation and a potential decision to reconsider or halt a development program may slip through the cracks. In the case of Baycol, the company did make repeated, often misleading, reassurances to the FDA that Baycol's risk-benefit profile was similar to other statins, and these reassurances likely played a role in the Agency's allowing the clinical investigation program to go forward.

47. Another factor in this regard is that FDA clinical reviewers generally have less to do with oversight of the drug development process in phase II than at the beginning and end of the clinical testing program. In this stage of development, it is generally assumed the drug does not cause any serious adverse reactions at a high rate. Moreover, the decisions about the development program are usually left up to the sponsoring company, which submits protocols, investigator assignments, and progress reports. These submissions may be reviewed cursorily in phase II. Between the approval of an IND and the submission of an NDA, FDA reviewers expect and assume that pharmaceutical companies proceed according to good ethical and scientific principles.

48. There are two exceptions to the "benign neglect" of phase II. One is that the company may choose to declare a phase IIb protocol to be pivotal, in which case the protocol of that

study will be examined and approved by the reviewer. Bayer did indeed do this in phase IIb, and this may have reduced the assessment of possible adverse effects. Phase II studies are generally smaller in size and performed sooner than phase III investigations. If allowed to designate a phase II trial as pivotal, a company may be able to demonstrate efficacy and safety sooner and at less expense. The second exception occurs when a sponsor requests meetings with the FDA during the phase II development process, in order to get the Agency's input on such questions as efficacy, safety, and design of studies. In such a case, the FDA reviewer will check over the company's submissions to prepare for the discussions; however, based on the documents I reviewed, it does not appear that Bayer asked on its own initiative for any phase II meetings.

**E. Phase III**

49. In phase III, the main goal is to accrue increasingly valid data about efficacy and safety – data that provide a higher level of confidence in the accuracy of the results of the clinical investigations. This is mainly achieved by studying significantly larger numbers patients than in phase II and by applying more rigorous (more highly powered) statistical tests of the data. Whereas phase II might be thought as preliminary investigation of the efficacy and safety of the new drug, phase III is research directed at achieving reasonably reliable conclusions regarding those issues. To that end, large numbers of patients are enrolled in multiple studies in phase III, and well-defined efficacy and safety measurements are assessed carefully and continually during the course of the clinical trials. The sponsoring company will usually declare at least two phase III investigations to be pivotal, meaning the company affirms in advance that these studies will produce statistically significant data demonstrating the claims to be made in drug labeling for treatment and safety in use. Even in phase III, however, it is possible that a sponsor may fail to discover important findings. There may be one chance in 20 (5%), that an investigation that shows efficacy is incorrect because of random fluctuations

in outcome measurements. And as noted above, even very large studies may fail to observe serious but uncommon adverse reactions.

50. As in phase II, the decisions about the drug development program in phase III are generally left up to the sponsoring company, and the FDA reviewer generally does not intervene without cause. As phase III investigations come toward conclusion, the company will generally begin discussions with the Agency and the reviewers who will have responsibility for reviewing the NDA. The goal of the discussions will be to achieve clarity and agreement about what information should be included in the NDA and how it should be presented.

51. At the end of phase III, if the company believes the results of the clinical research justify approval, it will submit a New Drug Application. Once the application has been filed and accepted by the FDA, the clinical reviewer has much to review. He or she must identify and prioritize the main data sets and most important findings in documents numbering thousands of pages and containing hundreds of large tables. The reviewers must find ways to crosscheck and corroborate the voluminous information that is included in the submission. It is easy to miss information or become confused. The thousands of pages of documentation in the NDA must be perused, and substantial portions must be examined in detail. Frequently, in the midst of the ongoing review process, the company may file an amendment, as new information is developed or old information is adjusted. This further complicates and increases the extent of the review. Commonly the reviewer must ask the company to resubmit the data in a new format or arrangement. Moreover, all of this review work must be accomplished within increasingly limited time deadlines established by FDA for promptness of the review procedure. For example, in the year 1998, the standard time for reviewing an efficacy supplement was one year. In the years following, the Agency moved to decrease that review

time to 10 months. (See below the discussion of the HHS Inspector General report on the increasingly challenging deadlines that reviewers work under.)

52. Reviewers are greatly helped by companies that display the NDA information transparently and make it easy to crosscheck the data shown in the many different sections of the NDA. Helpful companies are diligent in highlighting the main safety and efficacy issues and directing reviewers to data that corroborates their analyses. Conversely, it is also possible for companies to use the extreme complexity of the NDA to their advantage, to slant or conceal information, or even to mislead reviewers. The success of an NDA review depends greatly on the time available and the extent to which the company's submission allows the reviewer to use the available time efficiently.

53. During the year that the clinical reviewer is examining the NDA, a number of the phase II and phase III investigations may be continuing. New patients may sometimes be enrolled in the studies even after the NDA is filed, and many patients who enrolled before filing continue to receive long-term treatment in study extensions. At time points specified in regulations, the company is required to file amendments to the NDA, updating the safety and efficacy information. In addition to data on patients enrolled and treated since the submission of the NDA, sponsors are required by regulations to include in these updates any new safety information, such as new data or analyses of data, which may affect labeling. These updates become additional material subject to the NDA review process, and the information in these updates usually plays an important role in the Agency's decision on the application. There is evidence that Bayer had significant data and analyses in regard to Baycol and rhabdomyolysis and myopathy, which were never submitted to FDA as part of the required updates.

54. Throughout the pre-approval phases of a drug development program, a sponsor company has the right to seek meetings with the FDA and request FDA input on questions regarding

safety and efficacy of the new drug, design of investigations, moving from phase to phase, requirements for approval, or any other matter of significance to the application. The Agency encourages companies to come forward with questions for discussions, and most companies actively seek out meetings with the Agency to bring up such issues. Companies usually choose to request meetings with Agency officials and reviewers at several decision points in the drug development process, often before proceeding from one phase to the next. It does not appear that Bayer ever sought a meeting with the Agency to discuss the safety of Baycol, and instead repeatedly reassured the Agency that there were no significant problems.

**F. Phase IV**

55. In most cases, the approval of an NDA by the FDA does not mean that the company ceases all clinical trials. After approval, clinical investigations continue in a stage of development often called "phase IV." Some phase IV clinical trials are those that began during phases II and III and continue into phase IV as ongoing extensions of treatment. These extension studies may be considered part of phase IV after NDA approval. Other phase IV investigations are first begun after approval. Such investigations may include new clinical trials or methodologically well-defined postmarketing surveillance studies. These studies may be conducted at the sponsor's own initiative, or at the request of the FDA. In many cases, conduct of phase IV clinical trials is mandated in approval letters issued by the Agency at the end of the NDA review process. These investigations are usually geared toward determining optimum doses, effects in special populations, or characteristics of adverse reactions. The company has the obligation to periodically update the Agency about serious drug-related adverse reactions occurring in these post-approval studies, as well as any other significant clinical findings that might affect labeling.

## III. Postmarketing

56. Once an NDA has received FDA approval, the sponsoring company is authorized to introduce the drug to the medical market, if it chooses to do so. And once a drug is on the market, inevitably, some patients experience adverse effects that occur in association with treatment. Occasionally, the patients experiencing such reactions or their health care providers may choose to report these reactions. It is well-recognized that most adverse events that get reported are not related to drugs that the patients have taken; rather they are medical events that have occurred coincidentally in close temporal relation to drug ingestion. However, even when the adverse reactions are indeed related to the drugs taken, in most cases patients and health care providers choose not to report these adverse effects. At the FDA, it is generally assumed that no more than 10% of adverse drug experiences get reported, even if drug-related.

57. In the United States, when adverse effects are reported, the reports usually are sent to the pharmaceutical manufacturers. The companies are required by regulations to relay the reports to the FDA's MedWatch program for monitoring adverse events associated with licensed medicinal products. In some cases, the patients or the health care providers will report directly to MedWatch.

58. When the pharmaceutical company receives an adverse event report, it has well-defined time-specified reporting requirements. Serious adverse events that are unexpected (i.e., not mentioned in the drug labeling) must be reported to the FDA within 15 days of receipt of the information by the company (i.e., as so-called "15-day alert reports"). In addition, a company must exert due diligence in obtaining follow up information about the course, treatment, and outcome of the adverse events. Other adverse events must be compiled and submitted periodically to the Agency, at quarterly intervals for the first three years after approval and annually thereafter. These periodic

adverse drug experience reports also must contain a narrative summary and analysis of the 15-day reports.

59. FDA clinical reviewers examine the individual adverse event reports, as they come in either directly to the FDA or as relayed by the companies. Most attention is devoted to the 15-day alert reports of unexpected events. However, in the months and years following approval, as hundreds and thousands of adverse event reports are received over time, these reports – even the 15-day reports – may receive less attention from reviewers. Often the reviewers come to rely more and more upon summaries, analyses, and case narratives prepared by the companies and included in Periodic Safety Reports, which must be submitted to the Agency on a regular basis. Therefore, as time goes on, FDA reviewers come to depend for adverse reaction information on full and accurate disclosure and analysis performed by the sponsors. This is especially true when – as was the case with Baycol – the drug in question is a member of a well-known class of drug that had been used safely in clinical practice for years, at least up till the time that problems arose with Baycol.

## IV. Reporting Requirements of INDs and NDAs

60. Federal regulations require a variety of special and regular reports from companies holding active INDs and NDAs. In many cases, these reports are intended to be vehicles for the companies to update the Agency with any new information that may materially affect the review of the drugs for which such applications have been filed.

61. Some of these reports have been mentioned or described elsewhere in this report. They are listed here, in one section, for ease of reference.

a. *IND Safety Reports, Sec. 312.32* – Adverse experiences reports pertaining to subjects participating in clinical trials performed under the IND.

b. *IND Annual Reports, Sec. 312.33* – Status reports on investigations ongoing under the IND; reports of adverse events, including death, experienced by subjects of these studies; summaries of significant changes in manufacture, the Investigators Brochure, protocols and investigational plan; foreign marketing developments; and any information "pertinent to understanding of the drug's actions." This last requirement of IND Annual Reports is explained in more detail at 21 CFR 312.56:

> The sponsor shall review and evaluate the evidence relating to the safety and effectiveness of the drug as it is obtained from the investigator. The sponsors shall make such reports to FDA regarding information relevant to the safety of the drug as are required under Sec. 312.32. The sponsor shall make annual reports on the progress of the investigation in accordance with Sec. 312.33.

Also at this regulation:

> A sponsor who determines that its investigational drug presents an unreasonable and significant risk to subjects shall discontinue those investigations that present the risk, notify FDA, all institutional review boards, and all investigators.

c. *NDA Safety Update Reports, Sec. 314.50(5)(vi)(b)* – Reports about any new safety information. These reports are described in more detail elsewhere in this report. Updates are required at 4 months after filing, upon receipt of an approvable letter, and upon request from the Agency.

d. *Postmarketing 15-day alert reports* – Reports describing individual adverse drug experiences occurring in association with drug use.

e. *Periodic Adverse Drug Experience Reports* – A compilation of adverse drug experience reports not qualifying for 15-day alert processing. This report should also include a summary and analysis of the information in all 15-day alert reports submitted during the reporting period.

62. Each of these categories of reports provided an opportunity for Bayer – should the company have chosen to make use of it – to have reported to the Agency about any concerns it was considering in relation to Baycol, particularly regarding evidence of myotoxicity in excess of that associated with other statin drugs.

## V. FDA's Reliance on Full and Honest Disclosure

63. The FDA's new-drug review process, described in Section II of this report, requires submission of extensive and detailed data by the sponsor of an NDA, which is most often the pharmaceutical manufacturing company. In the Code of Federal Regulations, section 21 CFR 314.50 lists the numerous documents that must be submitted in an NDA, including reports of chemical investigations of the drug, non-clinical (animal) pharmacology studies, and human clinical trials. The clinical trial reports must cover bioavailability, pharmacokinetics, human pharmacology, and efficacy and safety in patients suffering from the diseases the drug is intended to treat. It is crucial to understand that these extensive requirements are necessary because the FDA almost never performs new drug research itself; it relies *entirely* on the investigations performed and the resultant data submitted by the sponsor.

64. In order to make a medically appropriate decision about the approval of new drug, the FDA expects and relies upon the completeness and accuracy of the data provided by the sponsor. This important point cannot be overstated. Since the FDA does not develop data on its own, the Agency is exquisitely dependent on the forthrightness, completeness, and honesty of the sponsor. Without such ethical behavior by the pharmaceutical company, the FDA has no sound basis upon which to perform its vital mission of promoting and protecting the public health of the country.

65. The language of the applicable federal regulations assumes that the pharmaceutical company submits accurate and complete information in all sections of an NDA. But

particularly in regard to data on safety, which is the special concern of this report on Baycol, the regulations at 21 CFR 314.50 explicitly state that the Agency requires all information available to the sponsor:

> The applicant [i.e., the sponsor] shall submit an integrated summary of *all available information about the safety of the drug product*, including pertinent animal data, demonstrated or potential adverse effects of the drug, clinically significant drug/drug interactions, and other safety considerations, such as data from epidemiological studies of related drugs. [Italics added.]

66. Moreover as also required under section 314.50, as new information becomes available, the sponsor is required to update the data originally submitted.

> The applicant shall, under section 505(i) of the act, update periodically its pending application with new safety information learned about the drug that may reasonably affect the statement of contraindications, warnings, precautions, and adverse reactions in the draft labeling and, if applicable, any Medication Guide required under part 208 of this chapter. These "safety update reports" are required to include the same kinds of information as clinical studies, animal studies, and other sources) and are required to be submitted in the same format as the integrated summary in paragraph (d)(5)(vi)(a) of this section.

67. The inclusive language of the CFR is intended to alert sponsors that submission of safety information is not merely a passive requirement to pass along the investigators' data to the Agency. Companies are expected to accurately analyze the data and inform the Agency of the significance and relevance of the information. For instance, in order to report epidemiologic studies of related drugs, the company must actively survey the medical and scientific literature for potentially related information, pick out relevant articles, analyze such information, and report the results of such efforts.

68. During my many years of work at the FDA, I encountered numerous instances of companies bringing safety matters to Agency's attention, when they came upon such information in the course of monitoring data related to their drugs. It was clear that <u>pro-active efforts to bring safety matters forward for Agency consideration constitutes the standard of practice of ethical pharmaceutical</u>

companies. It should not be assumed that FDA reviewers will necessarily discern safety problems from raw data submitted by sponsors as part of required NDA documents. Like any human enterprise, the FDA review process may be affected by competing demands for reviewers' attention, the acumen and perspicacity of individual reviewers, prior expectations about actions and effects of a particular class of drugs, and a host of factors that might impede the review process. It is quite possible that the FDA review process may occasionally miss a problem entirely. Consequently, if a sponsor knows about a problem, the company has the affirmative obligation to bring the matter before the FDA. Without such initiatives taken by ethical pharmaceutical companies, the FDA cannot properly perform its mission.

69. After reviewing many documents that Bayer submitted to the FDA as part of its Baycol development project and many other commentaries on Bayer's submissions, I have concluded that the company fell short of the requirements in substantial ways. In regard to the risks of myopathy and rhabdomyolysis associated with Baycol, Bayer repeatedly made interpretations to the FDA, which may have given the FDA the impression that Baycol is safer than it is. In some instances, the company misled the FDA about these issues. In the sections that follow in this report, I consider some examples of this behavior.

## VI. Bayer's Knowledge of the Excessive Toxicity of Baycol

70. In the course of preparing this report, I reviewed hundreds of pages of IND and NDA documents prepared by Bayer about Baycol, internal company documents not part of regulatory submissions, and documents originating outside the company. Time and again, within this data on animal pharmacology, human pharmacology, clinical efficacy, and clinical safety, I found information demonstrating that Baycol was substantially more toxic to muscles than other statins to which Bayer compared its drug. This information was obtained from the company, and the company itself produced

much of this information, through its sponsored research or through analysis of data from external sources. It is clear that Bayer was aware, from the earliest moments of the process of developing Baycol, that there was data demonstrating the excessive toxicity of its drug. In this section, I will give examples showing that a large amount information in the company's possession indicated that Baycol was an excessively toxic drug.

### A. Preclinical Toxicology Information

71. The first group of examples concern data derived from animal investigations of cerivastatin. Documents dating from the earliest preclinical studies showed cerivastatin to be excessively toxic, in that the drug was associated with a narrow therapeutic window. This concept has been discussed above in Section II.A, but to recapitulate briefly here, this means that there is too small a difference between doses at which pharmacological activity is first observed and doses at which toxic effects occur. The following examples of documents showing excess toxicity of cerivastatin in animals are presented in chronological order.

a. As far back as February 1991, when the cerivastatin development program was first getting off the ground, two pharmacologists at Bayer, Drs. Schulter and von Keutz, sent a memo to Dr. Paul MacCarthy, an executive at Miles, Inc., which owned the compound at that time. The pharmacologists expressed "strong" concern that the higher doses of the drug were too toxic and should not be used in the clinical development program. They explained that the slope of the dose response curve of BAY w 6228 (as it was then known) is much steeper than that of lovastatin. "The safety margin for our compound from the no-effect level to non-tolerable dose is less than 3-fold whereas for lovastatin it is at least 12-fold." [BAYAG00153628]