b. A year later, in January 1992, meeting minutes of the BAY w 6228 Project Team at Bayer noted that toxicology investigations had shown that "the toxicity curve on this compound is very steep between the first adverse events noted and death." Thus the Project Team was aware at the beginning of 1992 that there was an unusually small difference in cerivastatin doses between those that at which animals first developed adverse reactions and those at which the animals died from the drug. [BAYAG00140412]. (A year later in March 1993, the Bayer pharmacologists decided to try to convince the FDA that there was no need for toxicology studies lasting more than six months, and they agreed not to bring up issues of dosing and design with the Agency. The pharmacologists may have been concerned that longer studies would demonstrate too much toxicity.) [BAYAG00148177]

c. In June 1992, the Canadian Health Protection Board (HPB, the Canadian equivalent of the FDA) raised concerns about the steep dose response curve and narrow therapeutic window of cerivastatin. In a Bayer memo reporting on the meeting, R. Ziegler, a Bayer executive, described how Bayer officials at the meeting tried to overcome the Canadians' reluctance to let the company begin a one-year human trial of the drug. [BAYAG00148177]

d. In August 1992, while Miles Inc. continued to be involved with the development of cerivastatin, two Miles pharmacologists suggested a solution to the problem of the steep dose-response curve and the narrow therapeutic window. They proposed developing an alternative form of cerivastatin, a chemical complex of the drug called a "lactone." This would reduce plasma levels and result in less toxicity. Bayer did not pursue this course of action, but their suggestion shows that the toxicity problem was considered serious enough to require a major modification of the drug. [BAYCORP01485731]

e. Bayer toxicologist, Dr. von Keutz, who had first expressed concern about the toxicity of cerivastatin in 1991, continued to harp on this point in November 1995. He wrote another memo to Dr. MacCarthy, who had transferred to Bayer by that time, expressing strong concern that cerivastatin should not be used in humans at 0.8 mg, since that dose is just 6-fold less than the dose that reliably killed dogs. [BAYAG00124275]

**B. Human Adverse Reaction Information**

72. Human volunteers began taking cerivastatin in clinical trials in the early 1990s, and patients in treatment began taking the drug in the late 1990s. Inevitably, adverse drug reactions were reported to the company. Cerivastatin is particularly unusual in its propensity to cause severe adverse reactions in muscle tissue, and Bayer received reports, dating back to the early days of human exposure, that humans receiving cerivastatin were suffering from muscle-related adverse drug reactions much more often than those receiving other statins. The following examples, presented in chronological order, refer to documents in Bayer's possession that demonstrated the excess human toxicity of cerivastatin.

a. In one of the first human studies of cerivastatin, a phase I study that tested several doses of the drug in healthy volunteers, three subjects receiving cerivastatin but no subjects on placebo showed substantially elevated blood levels of CK, the muscle protein that leaks from muscle cells into the blood stream when the muscle cells rupture and die. One subject showed an elevation slightly above normal, but another subject developed an elevation double the upper limit, while a third subject, remarkably, suffered an elevation almost 150 times normal, along with muscle pain in the left thumb. The first two subjects were receiving the relatively low dose of 0.2 mg, but the last subject was taking the therapeutic dose of 0.4 mg.

b. Following the launch of Baycol at the end of 1997, the company soon began receiving adverse reaction reports from doctors concerning patients suffering from the most serious form of muscle toxicity, rhabdomyolysis, which results from the disintegration of large numbers of muscle cells. Two such reports were received no later than April 1998 [BAYCORP267164], and four reports were received the next month, May. [BAYCORP01435512] By March 1999, a Bayer chart showed that at least 68 reports of rhabdomyolysis had been received. Of these, 37 reports described cases of treatment with both cerivastatin and gemfibrozil, a drug that is known to interact with cerivastatin in such a way as to dramatically increase the occurrence of rhabdomyolysis. However, 31 reports occurred with cerivastatin treatment alone. Even though cerivastatin was the least frequently prescribed statin drug at this time, it was shown on this chart to be associated with many times more reports of rhabdomyolysis than any of the five other drugs tabulated in comparison. [BAYCORP00247030]

c. Reports of rhabdomyolysis continued to accumulate over the next year at such a rate that Bayer officials became concerned. An internal memo from L. Simpson to the Baycol Project Team on March 11, 1999 shows that company officials submitted a Freedom of Information (FOI) request to the FDA to obtain all of the Agency's reports of rhabdomyolysis, and at the same time they began comparing Baycol-associated myopathy and rhabdomyolysis to those events associated with other marketed statins. [BAYCORP00247032] Moreover, on receiving the FOI information, Bayer performed an internal company analysis showing the reporting of rhabdomyolysis with Baycol compared to the other statin drugs on the market. This analysis utilized the FDA's database of spontaneous adverse event reports and looked at all reports received through March 1999. For each drug, the company's charts calculated the

number of reports of rhabdomyolysis in the FDA database divided by the number of patient-years of drug exposure (the reporting rate). The calculations showed that the reporting rate of cerivastatin was 5 to 19 higher than any other drug. [BAYAG01055749]

d. On December 14, 1999, there was a meeting of Bayer's Action Committee Adverse Events (the "APZ" committee, as it was referred to in company documents). Minutes of the APZ meeting on that date show that Bayer had obtained reporting data on cases of rhabdomyolysis associated with cerivastatin and other statins from several adverse event databases, and the company had performed analyses of those data, which showed that cerivastatin was associated with reporting rates many times higher than those of the other drugs. The following excerpts of the minutes are particularly relevant:

> Rhabdomyolysis update
>
> Hulla and Sprenger presented an update on cases and reporting rates of Rhabdomyolysis with Baycol and combination with fibrates based on three data bases: the spontaneous adverse event report data base in Bayer AG, the FDA data available through Freedom of Information Act and the ADROIT data base from the Medical Control Agency in UK. For details. see enclosure.
>
> In summary, 131 cases of Rhabdomyolysis were reported world-wide until November 30, 1999: 72 cases from US and 59 cases from the rest of the world.
>
> The data confirmed the trend ... that cases with combination of Gemfibrozil are responsible for more than 50 % of the Rhabdomyolysis reports in US. Based on 100.000 patient years, Gemfibrozil combination therapy has a 20-fold reporting rate of Rhabdomyolysis compared to monotherapy, while in non –US countries this excess is only 6-fold.
>
> In summary, the following conclusions were made:
>
> a) The incidence of Rhabdomyolysis reports did not substantially increase over the recent observation period.

b) No dose relationship between Rhabdomyolysis and the doses of Baycol in monotherapy or in combination therapy could be established. However, the data base is limited.

c) No particular risk factors, such as age or gender could be established, although there were hints towards higher age and female gender.

d) The incidence of Rhabdomyolysis in Baycol monotherapy treatment was 2 to 6 cases per 100,000 patient years while the other statins, based on data from the Freedom of Information Act, were in the range of 0.2 to 0.6 per 100,000 patient years. [BAYAG00302424]

i. These minutes demonstrate that by mid-December 1999, Bayer had obtained adverse event reporting data from the company's own internal database, from the FDA, and from the U.K. It had performed analyses by this time and had drawn conclusions. Among other findings discussed at the meeting, these analyses indicated that 131 cases of rhabdomyolysis had been reported world wide. A reporting trend suggested that the elderly and women were more often affected than other groups of patients. Reports of rhabdomyolysis with Baycol monotherapy were 10-times more frequent than such reports of monotherapy with other statins. And reports of rhabdomyolysis with gemfibrozil-Baycol cotherapy were 20 times more frequent than such reports with Baycol monotherapy.

ii. Thus, Bayer was sufficiently concerned about these data and analyses that a meeting of the APZ committee was devoted to the issue. Therefore, it is clear that by the end of 1999, Bayer knew of much information that showed that Baycol was much worse than other statin drugs in regard to severe muscle-related adverse reactions.

iii. Despite this knowledge, in the months to come, the company pushed forward aggressively with a marketing program intended to increase Baycol's market share several fold. As we shall see, one high Bayer official urged the employees of Bayer's U.S. subsidiary to achieve "blockbuster" sales in this country. This was many months after the APZ committee meeting had recognized the serious problems with the drug.

e. At a time around the end of 1999 or early 2000, the company performed another analysis, which was similar to that which had been done with the FDA database. This second analysis utilized the World Health Organization's adverse reaction report database. It showed that cerivastatin was associated with 14 to 32 times the reporting rate of rhabdomyolysis of any other statin. The WHO database showed comparisons for individual countries. In Canada, rhabdomyolysis was reported for cerivastatin 18 to 66 times more often than any other statin; in Germany, rhabdomyolysis was reported for cerivastatin 3 to 20 times more often. [BAYAG01060224]

f On November 16, 1999, B. Harrison in the Clinical Communications department of Bayer reported to a superior, E. Vosburgh, about seven reports of rhabdomyolysis originating with just two health care organizations that prescribed Baycol – Pacificare and the Department of Defense. [BAYCORP01436601]

g. In late November 1999, an executive at Glaxo-SmithKline (GSK) wrote an excellent summary of the Baycol adverse reaction issue. GSK was an active partner with Bayer in promoting and marketing Baycol, and the two companies worked closely together in a Joint Development Committee on the Baycol effort, according to a July 21, 1997 "Copromotion Agreement" between the companies. It is not surprising that a GSK executive

became concerned about the Baycol cases of rhabdomyolysis and myopathy, since the Copromotion Agreement explicitly provided that the safety department of each company keep the other company's safety department informed about all adverse events. [GSK_BL_00618639] The GSK memo described several aspects of the Baycol safety problem in explicit and accurate detail. This memo demonstrates these issues were well understood by both Bayer and GSK no later than a month before the end of 1999. The main points include the following:

i. A greater number of spontaneous adverse reaction reports of rhabdomyolysis were associated with combined use of Baycol and gemfibrozil than with other statins and gemfibrozil.

ii. About 50% of the cases are associated with concomitant use of gemfibrozil, which increases the occurrence of rhabdomyolysis. [Thus, the other half of the reports were associated Baycol alone. – Comment added by author.]

iii. Most of the cases were coming from the US, where there was a tendency to use high dose Baycol [at that date, the 0.4 mg dose. – Comment added by author.]

iv. The rate of spontaneous reports for rhabdomyolysis was 10-fold greater for Baycol than for Lipitor.

v. Reports had been received from the Pacificare HMO and Department of Defense facilities, which had recently added Baycol to their formularies. There were 8-10 cases describing patients who had been stable on treatment with other statins and gemfibrozil, but who quickly developed rhabdomyolysis when they were switched to Baycol.

vi. In a recent human study of the 0.8 mg dose, there was an increased incidence of CK elevations in both the 0.4 mg and the 0.8 mg treatment group. This laboratory abnormality of muscle tissue was most frequent in the elderly female subgroup of patients. [GSK_BL_00267862]

73. Thus, it is apparent that Glaxo-SmithKline was aware in 1999, as was Bayer itself, that rhabdomyolysis was significantly more common with Baycol than with another marketed statin, Lipitor.

74. In the summer of 2000, Bayer hoped to receive FDA approval to launch the highest dose of Baycol, 0.8 mg. That approval was received, and Bayer began marketing the new dose in August. Yet throughout the spring of 2000, the company collected more and more information and analyses showing that the safety problem with Baycol was extremely serious. Despite these serious signals, Bayer proceeded full speed ahead in August. The next sub-paragraphs give some of the information the company had in its possession prior to the August launch.

a. On March 10, 2000, Dr. S.J. Niemcryk, a Bayer epidemiologist, analyzed adverse reaction reporting data that had been tabulated by Dr. Kuno Sprenger, the chairman of Bayer's Pharmacoepidemiology Working Group. Niemcryk noted that although only seven cases of rhabdomyolysis had been reported to Bayer by June 1999, an additional 162 had been received by March 2000, less than a year later. The problem clearly had been growing much more acute. Niemcryk wrote,

> The findings indicate that in patients receiving mono-therapy, cerivastatin substantially elevates risk for rhabdomyolysis compared with other statins. In combination with gemfibrozil, cerivastatin patients were also found to be at a remarkable disadvantage compared with patients receiving gemfibrozil and another statin. [BAYCORP00135576]

b. On May 12, 2000, concerned about potential problems with the new 0.8 mg dose, which would launch that summer, Pat Stenger wrote to Dr. Richard Goodstein. Stenger was a Bayer executive involved with the Scientific Affairs Liaison staff that communicated to physicians in practice; Goodstein was her superior. In her memo, Stenger noted that 86 cases of rhabdomyolysis and 109 cases of myositis (a term meaning muscle inflammation) had been reported in four months from January to April 2000. A staff person named Bob Tota had compared Baycol to other statins and told her that "we clearly have a higher incidence," and he raised a question about how this might impact the 0.8 mg situation.

c. A few days later on March 17, the epidemiologist, Dr. Niemcryk, wrote a memo about Bayer Drug Safety officials' examination of reporting tables and conclusion that the number of reports of Baycol-gemfibrozil cotherapy (the highest risk form of treatment with Baycol) was decreasing, following the addition of a warning to labeling in December 1999. Niemcryk said that the number of reports of cotherapy was going up rather than down, indicating that the problem and the risk to patients appeared to be getting worse. Clearly concerned that these Drug Safety officials were ignoring the problem, he wrote:

> Safety interpreted the following tables to mean that the label warning was "working." This conclusion does not appear to be accurate. In the first table, specific to rhabdo, April had only 2 cases fewer than January. Notably the decline was in cases of monotherapy with an *increase* of 3 cases of combination therapy. In the second table which has a broader definition of rhabdo, the reduction is 9…, but this is entirely caused by a decline in monotherapy cases. Too, no attention was paid by Safety to the high proportion of cases on monotherapy. Although Bob Tota pointed this out, Rajeshwar Sharma [Associate Director of Drug Safety] ignored it. [BAYCORP01438968]

d. In June 2000, Bayer officials became aware of an article in the medical journal *Pharmacotherapy*, a report of six cases of rhabdomyolysis that had been observed

within three months at just one hospital. Two of the patients had developed kidney failure and one of these died. Five had developed rhabdomyolysis within several weeks of starting cerivastatin. [BAYCORP00247544]

e. In August 2000, clinical investigators researching cerivastatin in Japan refused to continue the study after three patients out of 26 developed CK elevations, and one of these had rhabdomyolysis. This information was communicated to Bayer U.S. from Bayer Japan. [BAYCORP00045058]

f. In November 2000, an analysis by Bayer, utilizing the FDA's database available through Freedom of Information (FOI), showed rhabdomyolysis risk for Baycol was 5-10 times greater than any other statin in monotherapy and 100 times riskier when used in cotherapy with gemfibrozil. [BAYCORP02016889]

g. Evidence had accumulated since the cerivastatin drug development program started that the drug was much more toxic to muscles than other statins, and the accumulation of such evidence snowballed through the year 2000. Nevertheless, in the spring of 2000, Bayer was claiming that Baycol was like other statin drugs in this regard. In May 2001, the FDA instructed the company to remove all references to other statins in a Bayer-drafted warning letter to physicians and health care providers about muscle injury and rhabdomyolysis. According to the Agency, the warning letter should state that the problem occurred with Baycol, and should not imply that it also occurred with other drugs. [BAYCORP00220955]

h. In June 2001, an analysis done by or for the Australian TGA, the equivalent of the FDA in that country, showed that the Baycol rhabdomyolysis adverse reaction reporting rate was 56 to 200 times greater than any other statin.

i. In June 2001, the Medicines Control Agency of the UK suspended marketing of the 0.8 mg dose of cerivastatin in that country. [BAYCORP02016878]

j. On August 3, 2001, the FDA expressed "grave concerns regarding the overall safety of this drug." [BAYCORP00262796] And about a week later, Bayer voluntarily suspended marketing of Baycol in the U.S.

75. It is clear that Bayer had much evidence and many opportunities to recognize that cerivastatin was a dangerous drug, many times more dangerous to muscle tissue than any other statin. On any one of those numerous occasions, the company could have taken the opportunity to discuss the dangers of the drug with the FDA and with other regulatory authorities in other countries. The company did not do so. In a subsequent section of this report, I will show that Bayer did the opposite by trying to assure regulatory officials that the drug was safe and not significantly different from other statins.

76. Even in June 2001, just before suspensions of marketing in the U.S. and the U.K. later that summer, the company was still asserting that its drug was safe and not different. In a meeting of Bayer personnel on June 29, 2001, Frank Armstrong of Bayer UK presented slides showing "Key Messages" for the company to present to physicians and others. One of these reads,

> Bayer strongly believes that there is overwhelming evidence supporting the safety of the 0.8 mg dose. Data clearly demonstrate the safety of cerivastatin 0.1-0.8 mg is similar to other statins when used as directed in product labeling.

## VII. <u>Reckless Disregard for Public Health by Bayer</u>

77. Throughout the Baycol development program, Bayer was extremely hopeful for the marketing prospects for the drug. Even as evidence about its toxicity continued to mount rapidly in the last two years of marketing, high company officials imagined that the drug could achieve "blockbuster" sales. In many instances, such ambitions for the product apparently motivated Bayer

executives and employees to ignore the adverse consequences on patients' health that the drug caused. At times this willful heedlessness of consequences reached a level that must be described as a reckless disregard for health. In the following paragraphs, I give examples of such recklessness.

78. Before citing specific instances, however, it is useful to consider what ultimately happened against a background of cautions voiced by one of Bayer's own executives in 1990. B. C. Johnson, a high-ranking executive who was then project manager for cerivastatin, wrote that, "BAY w 6228 [cerivastatin] is a 'me-too' drug in a potential $2.3 billion market. The opportunity exists for it to be competitive provided it proves to be at least as well tolerated and efficacious as the seven other drugs expected to be on the market by the year 2000." She went on to specify a couple of particularly important prerequisites for success:

> Safety and efficacy must be at least equivalent to other HMG-CoA reductase inhibitors. No increase in toxicity as compared to other HMG-CoA reductase inhibitors can be observed. [BAYCORP00080559]

These words would be prophetic, because neither equivalent efficacy nor equivalent safety would prove true, and the project ultimately failed. Yet throughout the years between project initiation and product withdrawal, company officials drove forward aggressively as if nothing was wrong and no one was harmed. These words of Johnson should be kept in mind when reading the following paragraphs, because they are instances when company officials explicitly recognized that Johnson's conditions were not met but pushed forward anyway.

### A. Examples of Recklessness in Regard to Elderly Women

79. In August 1999, the Baycol project team became aware that elderly women comprised a group of patients who were a particularly vulnerable to rhabdomyolysis and other adverse reactions due to cerivastatin. Elderly women tended to be small and frail. Their small body size would result in them having higher blood concentrations of the drug, and consequently put them at greater

risk of serious muscle adverse reactions and even death. Moreover, being frail, small muscled and often less mobile, they would be likely to suffer especially from any muscle injury that the drug caused.

80. On August 12, 1999, a member of the U.S. Baycol Project Team wrote to a counterpart at the headquarters in Germany:

> A sub-team of the US project team (Medical, Marketing, Regulatory, Safety, Statistics, Project Management) met yesterday to discuss the current CHARM design relative to the CK elevations noted in the pivotal 0.8 mg study. The team recommends removing Baycol 0.8 mg from the CHARM study due to the likelihood of CK elevations in the study population (post-menopausal women) and the potential for an unfavorable safety comparison between Baycol 0.8 mg and Lipitor 10mg. [BAYAG01471858]

The U.S. Project Team was sufficiently concerned with the safety issue in regard to post-menopausal women to change the design of an upcoming study of Baycol in treating osteoporosis. They recommended removing the highest dose of Baycol, 0.8 mg, from the protocol.

81. In the U.K. also, there was concern among Bayer officials about the vulnerability of elderly women. An October 1999 memo from Steven Steare to David Sommerville, a high-ranking executive in the British subsidiary, reads:

> I am mindful that the 01 82 study suggested that there was an increased risk of myopathy (CPK >10xULN) in both 800mcg and 400mcg treatment groups in elderly females (>65 years).... I would like reassurance that any elderly female patients in the study are not being unwittingly exposed to a previously unrecognized excessive risk.

82. In these cases, the company officials were behaving responsibly, out of concern, at least, for the adverse event comparison between Baycol and Lipitor. But these concerns did not translate in to caution about marketing the product. Recognizing that elderly women were at particular risk, the company should have warned doctors of the problem and targeted other kinds of patients. We shall see that it did the opposite. The company made efforts to conceal the information from doctors, at the same time as it was aggressively targeting elderly women as a potentially profitable market.

a. On October 11, 1999, shortly after the U.S. Project Team memo about elderly women, there was a meeting of the Scientific Communications Committee. K. Pomerantz, a member of that committee, wrote that they were aware of data from a pivotal study showing a disproportionally high risk for CK elevations greater than 10 X ULN. For that reason the Project Team decided not to present this study data in a poster at scientific meeting. They removed the subgroup analysis showing adverse reaction data for elderly females, and decided to eliminate a discussion of gender and age effects from a manuscript being prepared for a medical journal. [BAYAG01408320] Clearly, this is an example of the company holding back negative information without regard for the health consequences. The company had an ethical medical obligation not only to present the data in scientific forums, but also to inform the FDA. They did neither.

In contrast to Bayer's decision to hold back negative information from clinical trials, a number of authors writing in prominent medical journals have emphasized the need and obligation of pharmaceutical companies to publish all clinical results, favorable and unfavorable. As then chairman of GlaxoWellcome, Sykes, wrote in the BMJ, "We have committed to publishing all clinical trials…."[b] More recently, Antes and Chalmers declared, "Under-reporting of clinical trials is unethical.[c]

b. Previously in this report, I have referred to a meeting of the Action Committee Adverse Events (APZ committee), which took place in mid-December 1999 and which focused on the rhabdomyolysis reporting rates of Baycol and other statin drugs. A portion of the discussion at the meeting concerned elderly women, and the precautions that the

[b] Sykes R (1998). Being a modern pharmaceutical company involves making information available on clinical trial programs. *BMJ* 317:1172, October 31.

[c] Antes G, Chalmers I (2003). Under-reporting of clinical trials is unethical. *The Lancet* 361:978-9, March 22.

APZ committee decided should be observed when treating elderly women. Here is a quotation from the minutes of that meeting.

> Schubert stated that 0.8 should only be used after 0.4, showed no adequate efficacy. The usual dosage in women should be 0.2 to 0.4 and 0.8 should probably not be used. In men, the dose should be 0.4 and in case of inadequate efficacy 0.8. [BAYAG00302424]

In these minutes, the committee recognized that the 0.8 mg dose is more toxic than lower doses. For that reason, it recommended that 0.8 mg be used only if 0.4 mg is less than adequately effective. However, in regard to elderly women, the committee recommended that 0.8 mg *not be used at all.* Despite this recommendation of its own APZ committee, in the coming months, Bayer aggressively targeted Baycol toward the treatment of elderly women. After the approval of the 0.8 mg dose in the summer of 2000, Bayer took no steps to prevent elderly women from being treated with that dose. To my knowledge, based on review of hundreds of company documents, the company never informed physicians of this precaution, and they never informed the FDA or discussed the precaution with the Agency.

c. Three months later, in March 2000, company officials demonstrated their ambitions for Baycol, ambitions in which elderly women played a major role. A slide presentation prepared by J. Ippen, at Bayer's headquarters, appears to have been shown at meetings of the company's sales forces. The presentation is titled, "The Creation of a Blockbuster" and describes Bayer's goal of pushing Baycol market share to 10% and 20% from about 2%. On several slides, elderly women are designated as a main focus of sales operations. This presentation also shows the 0.8 mg dose as the most frequently prescribed dose. If Bayer's plans had come to fruition and had achieved the sales goals, there is very little doubt that a great number of elderly women would have suffered severe muscle injury and

some would have died. The company had every reason to know this. Some company officials had previously expressed concern about this vulnerable group of patients, especially in regard to the high dose of Baycol. But there is no caution about the problem in this slide presentation. Instead the impetus is to market aggressively, even if many patients would be seriously hurt. [BAYAG01413876]

d. In April 2000, N. Smith of U.S. Bayer sent a message to M. Bornemann at Bayer headquarters. In the note, Smith affirms that the U.S. affiliate's strategy is consistent with Bornemann's and describes it as an effort to "own the elderly". [BAYAG01418924] A slide created about this time for use at marketing meetings also announced the goal of "owning" the elderly, women, and diabetics. [BAYCORP02351676]

e. On June 15, 2000, meeting minutes of the Joint Development Committee for Baycol showed that the company was actively recruiting for the osteoporosis study, and that 97 post-menopausal women had begun screening, with a goal of 150. It was this study that had previously been the focus of concerns about the vulnerability of older women in late 1999. Thus, besides targeting older women as a marketing strategy, the company continued to target this vulnerable population for further research and development of the drug.

**B. Examples of Irresponsibility Generally**

83. The following are still further examples of Bayer's irresponsibility in regard to Baycol.

a. On August 27, 1995, Bayer employee Steven Jungerwirth wrote to Lawrence Posner, a Bayer official, about the 0.3 mg dose, which was the highest dose of cerivastatin included in the first New Drug Application. He noted that this dose was

statistically significantly less effective than the comparator, lovastatin 40 mg, which was already marketed. Thus, Bayer proceeded with the NDA knowing that its drug would be less helpful to patients than another that was already available. [BAYCORP00143864]

b. On October 2, 1995, Evan Stein a Bayer U.S. official wrote to R. Ziegler, a high official of the parent company in Germany. He discussed the phase I study volunteer #1301, who had suffered extremely high CK elevations, pain, and loss of thumb strength, while receiving 0.4 mg. Stein wrote that if this patient were the only major reason not to develop the 0.4 mg dose, then that decision should be reconsidered. [BAYAG00487518]

c. On June 27, 1997, A.N. Karabelas, a high official of SmithKline Beecham, a company that was partnering with Bayer on cerivastatin, wrote to D. Ebsworth, President of the Pharmaceutical Division of Bayer. The following quotations from the letter are significant:

> I am writing to share with you our serious concerns regarding the emerging profile of cerivastatin. After your team has had sufficient time to review our concerns, I suggest a meeting .... Now, ... we have learned more about cerivastatin...: cerebral hemorrhage ... is a recognized "class effect" of statins, but occurs at lower multiples of our desired 0.4 mg and 0.8 mg cerivastatin doses, as compared to competitor products.... drug interactions have been observed with erythromycin ..., cyclosporine ...expected with itraconazole. From a safety standpoint, there exists a substantial risk that a patient concomitantly taking any of the above-mentioned drugs along with cerivastatin is rapidly approaching a toxic dose. These findings, we expect, will limit our ability to develop the higher, more potent doses of cerivastatin which the market would value greatly. [BAYCORP00142638]

One high official was writing to another high official voicing a concern about the risk of serious toxicity with cerivastatin and an expectation that the risk would prevent development of sufficiently efficacious doses. Despite these admonitions, Bayer pushed forward.

d. Because of the lesser efficacy of cerivastatin, some Bayer officials pushed for development of higher and higher doses, 0.4 mg initially, then 0.8 mg, and on August 25, 1999, internal Bayer AG (Germany) documents recommended development of 1.6 mg, despite the general knowledge that the higher doses would produce much more toxicity. In order to test the drug at the highest dose, special precautions were necessary.

> On condition that the study is performed in a well-controlled clinical setting and by an experienced investigator (i.e. lipidologist), the proposed four-week studying hyperchlesterol-aemic patients (including a 9 to 10 day in-house period during the first doses) is judged to be the better option for addressing the question of safety of high BAY w 6228 than studies in healthy subjects, as patients will be included who benefit from BAY w 6228treatmentand who already been on statin treatment before enrollment (i.e. shown to tolerate a statin).

Usually, the first studies are done in healthy volunteers, but in this memo, it is recommended the dose is too dangerous to test in healthy people, who will experience no compensatory benefit from the drug. Moreover, volunteers have not previously taken statins and have not shown the ability to tolerate the adverse effects. The report notes that patients should be monitored for elevations of liver enzymes, since those abnormalities precede CK abnormalities and muscle injury, allowing for patients to be discontinued before serious problems develop. And monitoring of blood platelet (thrombocyte) function will also be needed to prevent the possibility of patients developing hemorrhages.

> Thus, careful monitoring of LFT, CK, and thrombocyte function ... is supportive of a cautious increase of the clinical doses of BAY w 6228.

Not addressed in these memos is the fact that if 1.6 mg were developed and marketed, then patients receiving the dose in ordinary clinical practice would not have received the careful

monitoring that the company officials felt was necessary. [BAYAG00144223 and BAYCORP02039063]

e. In January 2000, in a handwritten note (probably to herself), Pat Stenger, a Bayer official in the Scientific Affairs department, wrote about the frequency of myositis seen in patients taking the 0.8 mg dose. She worried that the company was being set up for increased adverse event reporting sufficient to "kill the drug ultimately." That, of course, was exactly what happened, but Stenger and other company officials did not change course to avoid the coming crash. [BAYCORP00138782]

**C. Bayer's Failure to Fully Inform the Medical Community**

84. There was an important way that Bayer could have protected public health and prevented many injuries – and probably some deaths – from muscle injury due to cerivastatin. That way would have been to make sure the doctors who were prescribing cerivastatin knew that the drug was especially risky in regard to myotoxicity. First, the company could have made sure that the doctors knew that cotherapy with gemfibrozil raised the risk of rhabdomyolysis to a level perhaps 100-fold higher than that of cotherapy with any other statin. Second, the company could have made sure that the doctors were aware that even in monotherapy the drug was as much as 5-10 times more likely to cause this severe adverse event. If the doctors had known these things, they could have avoided cotherapy. And if they had reason to prescribe cerivastatin, they could have monitored the patient carefully for muscle symptoms and laboratory abnormalities.

85. Bayer did make changes in its drug labeling warning physicians about the gemfibrozil issue, and the company issued a Dear Health Care Provider letter after consultations with the FDA. But the best way for Bayer to have informed physicians would have been to use its scientific liaison personnel and sales forces to do so. These employees speak face-to-face with physicians, and

would have been in the best position to make sure the doctors got the message. But there is evidence that Bayer avoided doing this. Company documents show that the scientific affairs and sales people were continually asking the company – sometimes almost pleading with it – to provide them with more information so that they could discuss the problems with the physicians fully and accurately. For some reason, the company did not do so. Its communications and liaison people were unable to answer questions from physicians who suspected there was a problem. The following paragraphs give some examples of this evidence.

a. Already cited previously, but germane here as well, is the company's decision in October 1999 not to present adverse reaction information from a cerivastatin clinical trial by age and gender in a poster at a scientific meeting that would have been attended by physicians. This information would have shown the special vulnerability of elderly women to muscle injury. [BAYCORP00185016]

b. On November 16, 1999, as noted earlier, B. Harrison in the Clinical Communications department of Bayer inquired of a superior, E. Vosburgh, about the seven reports of rhabdomyolysis coming from two "accounts," Pacificare and the Department of Defense. Harrison wrote:

> ...I have shared the limited information that we have with representatives of these accounts to assist with the appropriate management of these patients. Clinical Communications has shared that no cases of rhabdomyolysis were seen in clinical trials in over 4,000 patients, that the majority of postmarketing reports included concurrent therapy with a fibric acid derivative, and that the onset seems to occur within the first 3 -4 weeks of therapy. We have shared that our labeling has changed to include some of this information and have reviewed the recommendations within labeling concerning concurrent therapy with gemfibrozil.
>
> **However, both the Department of Defense and PacifiCare have requested that a more detailed analysis of the data be provided as soon as possible**

> **including a summary of demographics and the clinical course of patients. They have also requested an analysis of the relative incidence of the occurrence of rhabdomyolysis associated with Baycol as compared with other statins.** In the case of PacifiCare, continuing availability of Baycol on the PacifiCare formulary seems to be at stake. In addition, **some physicians who have reported patients experiencing rhabdomyolysis with Baycol have requested similar information.** These customers are all expecting some additional information from Bayer. [Bold added]
>
> Please advise with respect to any additional information which Bayer may be able to provide to these customers. In addition, it would be helpful to discuss these issues at a meeting as requested by Juan Nadal. [BAYCORP01436601]

By November 1999, analyses done by Bayer had shown that its drug was associated with many more reports of rhabdomyolysis than any other marketed statin. Both DOD and Pacificare were asking for information about adverse event reports and reporting rates. Such information, however, was not forthcoming. Harrison in the Clinical Communications department was either not privy to such information or was not sharing it, or both. Thus the company was withholding important information about the safety of Baycol from large health care organizations, organizations, which could have used that information to protect patients from harm caused by the drug.

c. Juan Nadal, who was mentioned in the previous memo by Harrison, was a Bayer physician, who was Deputy Director of the Clinical Communications department. This doctor had charge of the so-called Goldmine database, which recorded inquiries from consumers, physicians, and other health care providers, as well as responses by Bayer. Thus Nadal was in a position to provide important adverse reaction information about Baycol to patients and the health care community. However, according to testimony he gave on June 23-24, 2003, Nadal did not provide such information.

For example on March 3, 1999, Clinical Communications received an inquiry from a physician asking whether Baycol had "any interaction with Lopid [gemfibrozil]." At that time, the company knew that such an interaction did occur, had reported cases of such interactions to the FDA, and indeed at about the same time, had become quite concerned about the frequency with which the interaction was occurring. Rather than acknowledge the interaction to the physician, Clinical Communications responded with a letter that stated "The safety and efficacy of concurrent use of Baycol with gemfibrozil ... have not been determined in clinical trials," but the letter said nothing about the post-marketing reports to the FDA that adverse reactions due to this interaction had occurred. [Nadal exhibit 7]

Another instance of withholding information occurred on November 10, 1999. By that time, internal analyses done by Bayer were showing highly elevated reporting rates of rhabdomyolysis with Baycol. An inquiry was received on that date from a health care provider in the Department of Defense, who asked questions about rhabdomyolysis and the safety of Baycol. The Clinical Communications employee told the provider that

> in clinical trials [there had been] no reports of rhabdo in over 4000 patients. Bayer had [received] some post marketing reports of rhabdo with Baycol" ... [but] the "patients were elderly, diabetic, and renally impaired. No evidence [exists] to suggest that Baycol causes more rhabdo than other [statins] – it is a class effect....

This response denied known problems with Baycol, and it contradicted information in the company's possession at that time. First, there had been at least one report of a subject (#1301) participating in a phase I clinical trial, who developed an abnormal CK elevation hundreds of times above normal, accompanied by muscle pain, muscle cell rupture, and muscle protein leaking into his blood stream and urine. This case would have qualified as rhabdomyolysis.

Second, by the fall of 1999, it was known to the company that reports of rhabdomyolysis with Baycol were many times more frequent than such reports with other statins. Moreover, the provider was working for the Defense Department, which has responsibility for treating thousands of soldiers. Surely, it would have been especially important for the DOD to have the truth about Baycol and muscle injury.

The same Goldmine report that describes this contact with DOD also records a pleading request for information from Bayer's drug safety department. "It would tremendously assist us in Clinical Communications if Bob and I can have a copy of the full safety analysis that the Drug Safety Assurance Dept is conducting regarding specific demographics of all spontaneous post marketing case reports of rhabdomyolysis with Baycol and concomitant fibric acid derivatives vs baycol alone. With this report we can then develop a response to our customer's concerns...." Thus, Clinical Communications appears to have known that such information and analysis existed, but the drug safety people were keeping them in the dark about it. [Nadal exhibit 18.]

d. In December 1999, a series of internal company memos among high-ranking Bayer officials concerned the difficulties of the Clinical Communications department, one of the groups responsible for getting the word out. Here is some of what was said:

i. R. Goodstein to G. Rosenberg about frustration expressed by R. Kull: "Here is a very private but frank report from Rich Kull (edited by me) born out of the frustration in Clinical Communications with lack of key info from Drug Safety on AE cases of Baycol we are passing through to them."

ii. Here is what Kull said:

> ...many of our callers have specific questions for which the data to answer is uncomfortably unavailable. These questions have to do with the incidence of rhabdo on Baycol alone, on Baycol /gemfib combination, the incidence of rhabdo with other statins, Baycol prescribing techniques when another stain on-board, and if there is a typical vulnerable population that we can recommend avoiding with the drug. This info is important to our customers and Marketing/Sales. We have tried to get definitive / written answers to these questions from Drug Safety based on cases they are following, but have unfortunately been unable to do so.... The net impact of this is that Clinical Communications is NOT in a position to provide in-depth credible information to those who want details beyond basic information, at the very time when the Dear HC Professional letter will provoke more of these questions we cannot answer. The incidence data is clearly the question that will be the most significant, yet is apparently the most elusive. [BAYCORP02039633]

Kull's questions about the incidence of rhabdomyolysis with monotherapy and cotherapy, and about prescribing techniques and vulnerable populations, were exactly the questions to which physicians needed answers in order to prevent injuries to their patients. Yet the company did not supply their communications people with this data. In December 1999, Bayer did in fact possess this information. The comparative reporting data and the data about the vulnerability of elderly women had been available for at least two or three months and probably longer. An ethical pharmaceutical company, one concerned about the welfare of patients treated with its products, would have moved to get this information out as quickly as possible. The evidence from its own personnel, writing to high-ranking officials, indicates that Bayer was holding back.

e. One dramatic example of Bayer's failure to inform the medical community comes from a letter written to Bayer on August 28, 2001 and recorded a Goldmine entry. A physician at the Mount Sinai School of Medicine, a leading medical school, accused the company of disingenuously increasing the risk to which his patients may have been exposed. He wrote:

> I am writing this note to lodge a complaint regarding the correspondence that you sent me regarding Baycol on May 31, 2001. I asked Ted Joe, your professional sales representative in May questions on the overall safety of Baycol particularly in older patients and possible development of rhabdomyolysis. The report that you sent to me said … when used as directed doses of Baycol [are] safe and effective. Based upon that information, I began prescribing Baycol to patients who otherwise I would have given Zocor or Lipitor. As you well know, only two months later there was significant manufacturer initiated recall of the medication. I feel that the note that you sent regarding safety of the medication was disingenuous based upon information that you must have had in-house regarding Baycol related complications which may have led to exposing my patients to unnecessary risk.

This physician's intuition was indeed correct. In late May, only a few weeks would pass before Bayer prepared tabulations of comparative reporting information on rhabdomyolysis for the FDA, and a short time later the company would suspend marketing of Baycol. At that time Bayer had a large amount of internal data showing Baycol to be more dangerous than other statins in respect to rhabdomyolysis. Yet the sales representative told the physician that the drug was safe and effective at all doses given according to directions, which included the especially risky dose of 0.8 mg.

f. In late February 2000, Pat Stenger, an official in the Scientific Affairs Liaison group, wrote to R. Goodstein about physicians in New Hampshire and other physicians in the Pacificare HMO who were asking for more information. "In NH as well as Pacificare there is an impassioned request for information from Bayer regarding these cases [muscle injury and rhabdomyolysis]…but we are unable to answer many questions still." In the same memo, she also noted that the sales representatives were increasingly uncomfortable "detailing Baycol" and that "it might be worthwhile to develop a very clear, supportive communication to both Bayer and SB sales forces around AEs." Stenger's note implies that the sales people were

hurting, worried about the safety of Baycol, but that the company was still withholding information from its own people about this issue.

g. In March 2000, another memo from R. Goodstein to G. Rosenberg indicated that Bayer was actively compiling information and preparing answers.

> Both the database and Q's are in the hands of our epidemiologist (Steve Niemcryk) and our database analyst (Paul Cislo), plus duplicates submitted to Felix in DS. We are collaboratively working on potential answers. A Bayer/SB Safety Committee will start convening next week to put these answers in priority order, make decisions on action or not, and apply acceptable semantics for actions to represent Bayer-wide interests. [BAYCORP00142301]

While this work was going on, Goodstein wrote in the same memo about the worries of either a Scientific Affair Liaison (SAL) employee or a doctor "from the Field." "For example, Tony Gotto [position and affiliation not clear from context] seems very concerned for Baycol and Bayer credibility at this point (more to follow) because no information is available to him beyond the label change. He feels it is easy to resolve and potentially in our favor with prompt and accurate info." Thus, while Bayer officials were considering the data carefully and deciding on the semantics of how to present information in the best light to represent the company's interests, the employees communicating to physicians still had no information beyond the change in labeling. Yet, this was a year after the company had obtained and then analyzed the FDA's FOI database of adverse reaction reports of myopathy and rhabdomyolysis.

h. SAL employee Pat Stenger wrote to Goodstein about the same concern – i.e., the fact that almost no information about rhabdomyolysis and myopathy had been made available to the SAL department. In a memo on May 12, 2000 to Goodstein, she expressed concern about two issues: First, physicians were continuing to prescribe gemfibrozil

along with Baycol, despite the insertion of a contraindication into labeling, and second, there was a continuing lack of information from the company's Drug Safety. She wrote:

> If nothing else, we in [Scientific Relations] believe that combo reports should be much lower if not at 0. Secondly, there is NO movement that I can see on USEFUL information or communication to respond to customers. [Caps in original.]

As has been shown, Bayer was compiling and analyzing information about rhabdomyolysis and myopathy reporting rates at this time, and the company had been doing so for several months. Yet no information about these data and analyses had been transmitted from the Drug Safety department to the SAL group. SAL employees were asking for this information so that they could inform doctors about the problem and respond to their questions. Bayer was failing to utilize its scientific relations staff to fully and accurately inform the medical community about the myotoxicity of Baycol, a significant breech of Bayer's obligations as a health care company.

## VIII. Misplaced Trust: Reliance by the FDA on the Baycol Submissions

86. We have seen how many times, during the research and development of Baycol, the data demonstrated that the drug was substantially more toxic to muscles than other drugs of the statin class. Numerous documents cited in this report show that Bayer possessed clinical and preclinical information that Baycol was excessively toxic to muscle tissue. Yet in instance after instance, when the company had the opportunity to inform the FDA of this increased toxicity, Bayer refrained from explicitly making note of the increased myotoxicity of its product, and in fact did the opposite. The company repeatedly reassured the FDA that its drug did not differ substantially in myotoxicity from the other drugs of the class. In this section, I will give examples of the company's inappropriate reassurances to the Agency.

**A. Investigators Brochure, Version 1, April 1991**

87. One of the first instances of Bayer avoiding evidence of myotoxicity appears at the time the company submitted its IND, indicating that its inappropriately reassuring attitude regarding Baycol began almost at the beginning of the drug development process. This particular instance appears in the first version of the Investigator's Brochure (IB), a document required under IND regulations, which serves as an information manual about the new drug. Intended for clinical investigators who plan to test a drug in human beings, as well as for the FDA reviewers who will also review the document, an IB summarizes the available chemical, pharmacological, toxicological, and clinical safety and efficacy information available at the time the brochure is written. In the case of cerivastatin, chemical data, animal investigations, and early small human studies were reported in version 1, which is dated April 8, 1991.

88. On page 17, there is a report of an animal toxicity investigation, in which groups of rats were exposed to several different dose levels of cerivastatin for 13 weeks. At the highest dose, Bayer reported degeneration of skeletal muscle and heart muscle in the high-dose group.

> Degenerations of skeletal muscle and heart muscle were also observed only in the 5.0 mg/kg/d dose which may be related to altered nutritional status and general wasting in this dose group [page 17].

In other contexts, this statement suggesting a relationship to nutritional status and wasting would appear reasonable, since it was reported that 8 of 10 female rats and 3 of 10 male rats in this dose group showed general wasting and died. In the context of a report on a statin drug, however, the significance of this explanation is different. When Bayer wrote this version of the IB, it was known that statin drugs were toxic to muscle tissue. Moreover, in other sections of the IB, the company noted muscle degeneration occurring in toxicity studies of two other species, dogs and minipigs. General wasting did not occur in either of those species, and the findings of muscle toxicity were reported

without comment. Observing muscle degeneration in the high dose rats, it was therefore incumbent upon company authors to explain that the degeneration might have been related to the toxicology of cerivastatin. But they chose not to say that.

89. A more appropriate comment would have stated that muscle degeneration might have been due to nutrition and wasting, but that it could also have been due to cerivastatin-related myotoxicity. Additionally, Bayer might have discussed myotoxicity in relation to the other species where it was observed. It was possibly true that the muscle degeneration could have been related to wasting, and it was not untruthful for the company to make this assertion. For that reason, the statement in the Investigator's Brochure would not have drawn an objection from the FDA. Nevertheless the company's consideration of this issue was incomplete, since it also could have been related to cerivastatin-induced myotoxicity, and that should have been discussed. The company put a favorable spin on the finding, and in that way the assertion was part of a pattern of denying the myotoxicity of the drug.

90. At the conclusion of this version of the IB in the Safety, Tolerability section, the company writes:

> As a class HMG CoA inhibitors share many animal toxicities at high doses. These include elevation of hepatic enzymes, degeneration of skeletal and cardiac muscle, formation of cataracts in dogs, and intracranial hemorrhage in dogs [insert page cite from IB 1].

Note that in mentioning the myotoxic effects, Bayer does not state that they are associated with cerivastatin. Rather the company states that ALL the drugs of this class cause such effects. Thus this statement does not inform the investigators and FDA reviewers about excessive risk associated with Baycol. Rather, it implies that Baycol is like other drugs in its class. Instead of alerting investigators and FDA reviewers, this statement of the finding seems intended make it seem routine.

**B. Phase I Multiple Dose Study, Investigators Brochure Version 9, June 1997**

91. In the ninth version of the IB, which is dated about half a year before the launch of Baycol at the end of 1997, Bayer tried to minimize the significance of a serious adverse reaction occurring in one of the first human studies of the its drug. The adverse event occurred in one of the very first human studies, a phase I trial. It has been cited previously in this report in Section VI.B. Three subjects receiving cerivastatin showed substantial elevations of blood CK levels, and one of them suffered an elevation almost 150 times normal, along with muscle pain in the left thumb. Here we note the attitude of the company in regard to the occurrence of this serious reaction.

92. One should first note that in this early study, 3 of 48 subjects (6%) on active drug, but 0 subjects on placebo had elevated CK, an infrequent abnormality. The most seriously affected subject (i.e., 2% of those tested) had clinically significant muscle disease. Any pharmaceutical manufacturer doing a simple calculation would have realized that if a million patients took the drug at the therapeutic dose level, the results of the phase I trial suggested that perhaps 60,000 would show laboratory evidence of muscle toxicity, while 20,000 people would develop clinically significant muscle disease. Many pharmaceutical manufacturers, I believe, would have simply terminated the drug development program at this point, concluding that a healthy subject developing CK of 150 times normal at this early testing stage represented too great a risk associated with the drug. Discovering such problems is the main purpose of doing phase I trials, which are essentially safety and tolerability studies. In my experience as a clinical reviewer, I encountered a number of instances where companies did in fact discontinue drug development programs when a significant abnormalities were encountered in phase I. This is particularly true for drug classes that already include approved safe and effective medicines.