# Exhibit P

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| In re: BAYCOL PRODUCTS LITIGATION | ) ) | MDL No. 1431 (MJD/JGL) |

# EXPERT WITNESS REPORT OF BRIAN L. STROM, M.D., M.P.H.

## Background and Qualifications

1. My name is Brian Strom, M.D., M.P.H. I am a medical doctor licensed to practice in the states of California and Pennsylvania. I am the George S. Pepper Professor of Public Health and Preventive Medicine at the University of Pennsylvania School of Medicine. I am also a Professor and Chair of the Department of the Biostatistics and Epidemiology at the University of Pennsylvania School of Medicine. I am also a Professor of Medicine and Professor of Pharmacology, both at the University of Pennsylvania School of Medicine. I also Director the Center for Clinical Epidemiology and Biostatistics at the University of Pennsylvania School of Medicine. A copy of my curriculum vitae, which sets forth my education, training, professional experience, and publications in greater detail is attached at Tab. A.

2. I have extensive expertise in the field of pharmacoepidemiology. I am the editor of a book entitled *Pharmacoepidemiology*, which is now entering its fourth edition, including multiple chapters on the use and interpretation of adverse drug reaction reports. At the Hospital of the University of Pennsylvania, I have run for many years the program responsible for collecting and interpreting adverse drug reaction reports, reviewing hundreds of such reports each year, as well as conducting drug use evaluations. I was President of the International Society for Pharmacoepidemiology, and I currently serve as Editor for the Americas for its official journal, *Pharmacoepidemiology and Drug Safety*.

3. I also serve on the drug Safety and Risk Management Advisory Committee to the United States Food & Drug Administration. In that capacity, I am called upon to interpret spontaneous adverse event data concerning pharmaceutical products and to make recommendations concerning further investigation of "signals" generated by the Medwatch System.

## The FDA's Medwatch System

4. The FDA's Spontaneous Adverse Event database (also referred to as the "Medwatch system") was designed to identify adverse events associated with use of pharmaceutical products, especially those that were not identified during the pre-marketing controlled clinical trials.

5. The FDA's Medwatch system was never intended to be used, and cannot be used in a scientifically valid manner, to determine the incidence rate of a particular adverse event in association with use of a particular pharmaceutical product.

6. Because the FDA's Medwatch system does not provide a reliable scientific basis for determining the incidence rate of a particular adverse event in association with use of a particular drug, the Medwatch system cannot be used to make scientifically valid comparisons of incidence rates between different pharmaceutical products. Rather, to be scientifically reliable, comparisons between products must be made on the basis of formal scientific studies with control groups.

7. The FDA's Medwatch system is intended to be a tool for manufacturers and regulators to assist in identifying a "signal" that a particular pharmaceutical product might be associated with a particular (usually previously unrecognized) adverse event. With rare exceptions, when such a "signal" is identified, the appropriate response is for a manufacturer

to investigate further by launching a formal study, which is usually epidemiological in design. Many "signals" suggesting potential associations, after further investigation with an epidemiological study, do not confirm the potential association.

8. The FDA does not allow pharmaceutical product manufacturers to make statements about incidence rates in product labeling based on adverse event report data alone. Similarly, the FDA does not allow manufacturers to make statements involving comparisons with other products based solely on adverse event report data. This is due to the fact that spontaneous adverse event reporting data are unreliable for these purposes.

## Bayer's Response to Adverse Event Reports Was Appropriate

9. Rhabdomyolysis is known to be a class effect among HMG CoA reductase inhibitors ("statins"), and this adverse event was known to be associated with each of the five other statins on the market. Further, CPK elevation was well recognized with other statins, and with Baycol prior to its marketing. A rhabdomyolysis warning based on the experience with other statins was included in the original Baycol label at the time of launch in the United States. Because this adverse event was well known to be associated with the class of drugs of which Baycol was a member, the existence of reports of cases of rhabdomyolysis post-marketing was neither unexpected nor alarming.

10. Numerous factors are recognized as influencing reporting rates of adverse events including, but not limited to, the recency of the pharmaceutical products introduction to the market, publicity and/or communications with the medical community about the product and its potential adverse events, and variability in coding and diagnostic definitions with respect to the adverse event reported.

11. When questions were raised concerning Baycol and rhabdomyolysis based on reports to the Medwatch system, undertaking the Pacificare study was a responsible and appropriate response to those questions. The Pacificare study was the appropriate type of study to conduct to investigate these questions.

12. Scientific evidence can be arrayed in a hierarchy of reliability based on study design. The ranking of such study designs is as follows: (a) clinical trials; (b) cohort studies; (c) case control studies; (d) analysis of secular trends; (e) case series; and (f) case reports.

13. The Pacificare study was a cohort study and was an ideal study design for evaluating the signal raised by the Medwatch system. By contrast, the adverse event reports to the Medwatch system are case reports, which represent the lowest level of scientific reliability in terms of study design.

14. The Pacificare studies showed that Baycol was associated with an increased risk of rhabdomyolysis when used in combination with gemfibrozil as compared with other statins used in combination with gemfibrozil. The Pacificare study did not show, however, that the rhabdomyolysis rate was greater with Baycol monotherapy than with monotherapy with other statins.

15. The risk of rhabdomyolysis associated with the use of Baycol when prescribed in the absence of gemfibrozil (i.e., Baycol monotherapy) has not been proven to be different from the risk of rhabdomyolysis seen with other statins on the market in the United States when not prescribed with gemfibrozil.

16. I reserve the right to continue to review documents and depositions related to this matter, and thus expressly reserve the right to supplement the opinions, conclusions, and/or mental impressions disclosed herein. In addition, I may offer opinions and conclusions in

response to opinions and conclusions offered by rebuttal experts designated by any other party herein.

## Dr. Farquhar's Opinions

17. I have reviewed the report of Dr. John W. Farquhar M.D. filed in this action.

18. In his report, Dr. Farquhar compiled data from five different spontaneous reporting systems (including Medwatch), and performed a meta-analysis for the purpose of comparing rates of rhabdomyolysis across statins. However, the limitations noted above for the Medwatch system (#5 and #6) apply equally to the other spontaneous adverse event reporting systems as well. Specifically, data from these databases cannot be used to determine the incidence rate of a specific adverse event, nor can they be used to draw scientifically valid comparisons between different pharmaceutical products. Combining data from these various sources in a meta-analysis in no way reduces the inherent limitations of the individual databases. To the contrary, it is a method that is controversial when applied to studies other than randomized clinical trials, even when applied to good observational data, no less spontaneous reporting data. As such, no scientifically valid conclusions can be made on the basis of Dr. Farquhar's meta-analysis of spontaneous reporting data.

19. Dr. Farquhar suggests that the proportional reporting ratio (PRR) (i.e., the proportion of the adverse event of interest compared to all other adverse events for the same drug) calculated from two of the datasets supports the view that rates of rhabdomyolysis with Baycol are higher than with other statins. The PRR approach too is controversial. However, his suggestion that the PRR, because it reports the proportion of one adverse event to all other adverse events for a particular agent, is "...free of the uncertainty of inaccurate reporting (i.e., one statin is reported as toxic more than another statin – even if their rates of

toxicity are the same)...", is incorrect. Dr. Farquhar is overinterpreting this approach, which is simply intended to guide the review of spontaneous reports as case reports. To quote the same source referenced by Dr. Farquhar, which is my textbook (Wiholm BE et al, "Spontaneous Reporting Systems Outside the U.S.", Pharmacoepidemiology (Strom BL, Ed), 3rd Ed, 2000, pp.175-192), "...[the PRR] may be expected to counteract some of the biases related to variable reporting. For example, if the overall level of reporting is high because of new drug bias, this will not necessarily affect the proportion of all reactions for the drug that are of a specified type. ... It is important to recognize that PRRs are not a substitute for detailed review of cases, but an aid to deciding which series of cases most warrant further review. Also, PRRs and chi-squared values are measures of association and not causality." Indeed, factors recognized as influencing reporting rates of adverse events (e.g., the recency of the pharmaceutical products introduction to the market, publicity and/or communications with the medical community about the product and its potential adverse events), may vary for different types of adverse events. For example, if publicity surrounds a particular adverse event, this might be expected to lead to increased reporting of this adverse event (even in the absence of a true increased rate of the adverse event) without affecting reporting of other adverse events related to the drug. This would then lead to a falsely elevated PRR. Since the calculation of the PRR is based on spontaneous reporting data, it is susceptible to the same limitations noted previously for spontaneous reporting data in general. Calculation of the PRR can thus not be used in a scientifically valid manner to compare adverse events across drugs.

20. One of Dr. Farquhar's criticisms of the Pacificare study was that, in comparing the incidence of adverse events, the denominator "...should be based on not only the number

of patients taking each drug, but also on the duration of exposure to each drug." Dr. Farquhar argues that the Pacificare study, by not accounting for the duration of exposure, biased the results in favor of Baycol since patients receiving Baycol had a significantly shorter duration of exposure (259 days) compared to patients taking other statins (400 days). Dr. Farquhar's contention is that this difference in duration of exposure likely led to an under-representation of the true rate of rhabdomyolysis in patients who received Baycol. First, an appropriate analysis of the risk to a patient being newly started on therapy would not make such an adjustment. Further, based on my extensive review of 924 Medwatch cases of reported rhabdomyolysis in patients receiving Baycol, the vast majority of patients who developed rhabdomyolysis while on Baycol did so within the first 1-2 months after initiating therapy (well within the average duration of exposure of 259 days reported in the Pacificare study). The median duration of time from initiation of therapy with Baycol to onset of symptoms consistent with rhabdomyolysis was 31 days (95% confidence interval 30-32 days). Indeed, 88.0% of Medwatch cases had a duration of <180 days between the initiation of Baycol and onset of rhabdomyolysis. Based on these data, it is very unlikely that an average duration of follow up of 259 days for Baycol users in the Pacificare study resulted in substantial underrepresentation of rhabdomyolysis in this group. Further, performing an adjustment for duration would incorrectly underestimate the risk for the comparator products, as one would be including in the calculation time when the patients were truly not at risk of developing rhabdomyolysis. Thus, Dr. Farquhar's analysis is incorrect and unfair, for this adverse event that occurs early after the initiation of therapy.

21. Another criticism of the Pacificare study offered by Dr. Farquhar is that the results of the study were biased due to failure to account for the "healthy person effect". This

is because the Baycol group was comprised of a relatively greater percentage of people who had been switched from another statin due to a formulary conversion to Baycol. It is argued that these patients, who had already demonstrated tolerance to a statin, were less likely to demonstrate an adverse event to Baycol. While this is one plausible theory as to the impact of including a large proportion of patients who had switched statins, alternate theories may also be proposed. For example, Baycol was cheaper, and some patients may have been switched, in order to save money. Alternatively, some patients may have been switched to Baycol because of an adverse event to another statin, especially milder adverse events. These patients might then have an increased risk of an adverse event on Baycol, increasing the likelihood of finding an association between Baycol use and rhabdomyolysis. In addition, patients who switched may have been less likely to have their Baycol dose titrated up appropriately (i.e., were started at a higher dose) and may have thus been at greater risk of rhabdomyolysis. Suffice it to say, that there are several alternative interpretations of the potential impact of a greater proportion of Baycol users having been switched from another statin. None of this, of course, would affect the patients who were new users of Baycol or the comparator drugs. As such, the net effect of this is not possible to determine, without performing the requisite analyses.

22. Dr. Farquhar also notes the potential limitation of the Pacificare study with regard to misclassification of cases. Indeed, this is a potential bias in any study based on administrative claims data. It is likely that any such misclassification would be non-differential (i.e., equally likely to occur regardless of the type of statin prescribed), and would thus bias the study toward observing the absence of an effect. Arguing against an overwhelming misclassification in the Pacificare data is the fact that a statistically significant

difference was found when comparing rates of myotoxicity for various statins when used in combination with gemfibrozil. The occurrence of substantial misclassification bias would have decreased the likelihood of finding such a difference. Dr. Farquhar goes on to use data from spontaneous adverse event reporting databases to "correct" for the potential misclassification bias in Pacificare study. He uses these databases to calculate a relative risk of rhabdomyolysis for Baycol compared to other statins, separating those cases described as "confirmed" vs. "suspected". He then uses the ratio of the relative risks for "confirmed" and "suspected" cases to "correct" the calculations of the Pacificare data. This approach is not scientifically valid for several reasons. First, as discussed previously, spontaneous reporting data do not provide a reliable scientific basis for determining the incidence rate of a particular adverse event in association with use of a particular drug and cannot be used to make scientifically valid comparisons of incidence rates between different pharmaceutical products. Thus, the relative risks derived from these databases are not scientifically valid. Furthermore, the definitions of "confirmed" vs. "suspected" cases in a spontaneous reporting database are not relevant when comparing the use of various diagnosis codes in an administrative claims database as these two systems are fundamentally different. Thus, using data from one system to "correct" calculations from the other is not meaningful nor is it scientifically valid.

23. Dr. Farquhar also questions the possible impact of distribution of free samples of Baycol on the results of the Pacificare study. He notes that "…if a patient suffered a defined condition while taking Baycol samples, the accuracy of the study results could be impaired by improperly excluding that case from those associated with Baycol…". However, if free samples of Baycol were distributed during this time, (and there is no definitive

documentation in the Pacificare study that they were), it is also likely that free samples of other statins were distributed during the same time period. The same effect of underestimating the incidence of myotoxicity related to statin use would thus also apply to these other statins. Without data clearly describing the use of free samples, any hypotheses of the potential impact of use of these samples on the study results is purely speculative. Further, while these cases would have been missed, these individuals would also not be counted in the calculation of the number of people exposed. Thus, the incidence rates in those who were dispensed the drugs via normal routes would be unchanged.

24. Finally, Dr. Farquhar raises the issue of "claims lag" as a criticism of the Pacificare study. The use of a fixed study end date rather than a study end date for which claims are complete might in fact have resulted in missing claims for the most recent myopathy cases. The proportion of claims missed for each particular statin would depend on the level of use of each statin at the end of the study. While this might have resulted in a greater total number of Baycol users having missing claims data, claims for patients on other statins would also be lost at the end of the study. Further, if both drug claims and diagnosis claims lagged equally, then the incidence rates in those remaining in the study are still valid, i.e., there would be no underestimate of incidence in those still remaining in the study. Finally, it is unclear whether the impact of such a lag, if any, would be large enough to change the results substantively, or whether the larger number of people earlier in the study would dilute it out. To that end, as noted previously in my review of the Medwatch case reports, the duration of time from initiation of Baycol to the development of rhabdomyolysis was relatively short (i.e., median of 31 days), thus potentially lessening the possible impact of any bias introduced by a "claims lag". Thus, to know whether the loss was differential,

and would have changed the results, one would need to know whether there were more Baycol users at the end of the study, whether the diagnosis claims lagged more than the drug claims, and whether the net effect was large enough relative to the overall numbers in the study to change the results. None of this was provided. Without this information, any conclusion about the impact of a "claims lag" on the results of the study is speculation.

## Myalgia

25. Myalgia is a symptom that may be described by a patient as muscle aches, muscle pains, muscle soreness, and/or muscle cramps. Myalgia is a common complaint in the general population that can be caused by a wide variety of conditions and exposures encountered in everyday life ranging from exercise, fatigue, dehydration, and muscle strain, to viral infections, electrolyte abnormalities, and trauma, among many others. Additionally, based on information set forth in the PDR, there are over one hundred prescription medications that are associated with a "high incidence" of myalgia (defined by the PDR as greater than or equal to 3% based on clinical trial data) and over 400 prescription medications with a "low incidence" of myalgia (defined by the PDR as less than 3% based on clinical trial data).

26. The available data from the Phase 3 clinical trials demonstrate that myalgia was an adverse event associated with the use of Baycol. From the time Baycol was first marketed in the United States, the Baycol product labelling informed physicians that myalgia was an adverse event that could potentially be associated with the use of Baycol. The information contained in the Baycol product labelling accurately reflected the experience with Baycol during the Phase 3 clinical trials.

27. Using the clinical trial data set forth in the PDR for the different products, the relative risk of myalgia compared to placebo associated with the use of Baycol is comparable to

the relative risk of myalgia compared to placebo for other statin drugs that were available at the time Baycol was on the market.

## Materials Reviewed

28. I have reviewed the adverse event reports in the FDA's Spontaneous Adverse Event database (also referred to as "the Medwatch system") concerning Baycol. I have also reviewed the FDA's summary of the Baycol New Drug Application, including the FDA's review of the controlled clinical trials on Baycol. Further, I have reviewed various internal company documents concerning Bayer's analysis of the Baycol adverse event reports, among other things. Additionally, I have reviewed the reports of the cohort studies conducted by Pacificare. I have also reviewed the report of Dr. John W. Farquhar M.D. I have reviewed data set forth in the *Physicians' Desk Reference* concerning rates of myalgia for different statin drugs. Finally, I have reviewed various articles in the published medical literature to formulate my opinions in this matter. I base my opinions and conclusions on the documents I have as well as my education, training, background, and experience.

## Compensation

29. I charge $600 per hour for time spent in review, preparation, etc. I charge $800 per hour for deposition or $6400 per day of trial testimony.

January 12, 2004

Dr. Brian L. Strom, M.D., M.P.H.

# Exhibit Q

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| In re: BAYCOL PRODUCTS LITIGATION | ) | MDL No. 1431 (MJD/JGL) |
| | ) | |
| | ) | |
| | ) | |
| This Document Relates To All Actions | ) | |

# EXPERT WITNESS REPORT OF PAUL DAVID STOLLEY, MD

## BACKGROUND AND QUALIFICATIONS

1. I am Adjunct Professor of Medicine at the University of Maryland School of Medicine. I am also a practicing internist working at the Faculty Practice of the University of Maryland, and at the Howard County Health Alliance for the Uninsured.

2. Formerly I have held posts as Professor and Chairman of the Department of Epidemiology and Public Health at the University of Maryland, Professor of Medicine and Co-Director of the Clinical Epidemiology Unit of the Department of Medicine at the University of Pennsylvania School of Medicine, and Assistant and Associate Professor of Epidemiology at the Johns Hopkins School of Hygiene and Public Health.

3. In addition to my academic positions, I have served as an Epidemic Intelligence Service Officer at the Centers for Disease Control, Acting State Epidemiologist for the State of Maryland, and in the Office of the U.S. Surgeon General.

4. I have been president of the Society for Epidemiologic Research, the American Epidemiological Society, and the American College of Epidemiology. I also have served as treasurer of the International Epidemiological Association.



Stolley Dep
EXHIBIT NO. 1
9/15/04
L. GOLKOW

5. I am a member of the National Academy of Sciences, Institute of Medicine. I also am a member of the Johns Hopkins Society of Scholars.

6. I have published over 200 articles and three books.

7. A copy of my curriculum vita, which includes a complete list of my publications, is attached as Exhibit A.

8. I am being compensated for the work I do on the Baycol matter at the rate of $250 per hour.

9. A list of the documents I have been provided for review is attached as Exhibit B.

10. A list of cases in which I have provided testimony over the past four years, either at deposition or at trial, is attached as Exhibit C.

**OPINIONS**

I have formed the following opinions based on my general knowledge of epidemiology, adverse drug reactions and the operating rules of the US FDA, and on the materials listed in Exhibit B.

11. Spontaneous reports of adverse reactions can identify a strong signal that a problem with particular adverse reactions exists with a particular drug. Incidence rates based on these reports can be approximated if denominator data of drug use are available through sales data, pharmacy volumes, marketing research data, shipping information, surveys or combinations of these data.

12. Even though incidence rates calculated as described above are approximations, the ratio of such incidence rates for two drugs in the same class may provide useful information.

13. While spontaneous reports of adverse reactions usually generate hypotheses that can later be tested by formal epidemiological studies, this is not always the case and the reports along with other supportive data can sometimes suffice to answer a question of importance. A dramatic example of this was the cases of pulmonary hypertension reported after use of Aminorex in Europe and the cases of the new disease, eosinophilia-myalgia syndrome following the use of contaminated L-tryptophane in the USA. Spontaneous reports led to regulatory action prior to further formal epidemiological studies. There are many more examples that could be cited.

14. The response of the Bayer Corporation to the strong signal concerning rhabdomyolysis associated with the use of Baycol, both as monotherapy and in combination with the use of fibrates, was to launch a formal epidemiological study (the Pacificare Study) that could have been predicted at the planning stage to be inadequate due to the paucity of clinical data, lack of access to patient charts, imprecise disease coding leading to great difficulty defining cases, and reliance on billing data rather than clinical data (surely no advantage over adverse reports). There also were several other critical design deficiencies, some identified by the company's own consultants.

15. This response (i.e. the Pacificare Study) to the signal was neither adequate, precise nor timely and several superior and even less costly alternatives were available to the Company.

16. A poorly designed and inadequate formal epidemiological study offers no advantages over detailed and well-analyzed spontaneous adverse drug reaction reports.

17. The response of Bayer to the adverse drug reaction reports was inadequate, not timely and calculated not to produce a definitive conclusion by virtue of its design deficiencies and lack of informativeness. This need not have been the case had a better study been designed and executed.

**POSSIBLE ADDITIONAL ANALYSES AND AMENDMENT OF REPORT**

If I learn of additional information relevant to my opinions, I will submit an amended and/or supplemental report as appropriate.

Paul D. Stolley

Paul D. Stolley

# Exhibit R

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
MDL NO. 1431
(MJD/JGL)

In re BAYCOL PRODUCTS LITIGATION

This Document Relates to:

ALL CASES
_______________________________/

*****CONFIDENTIAL*****

VIDEOTAPED DEPOSITION OF HARLAND AUSTIN, D.Sc.
February 17, 2004
8:43 a.m. - 4:15 p.m.

1615 Clifton Road
Atlanta, Georgia

REPORTED BY:
Sharon A. Gabrielli, RPR, CCR
Esquire Deposition Services
Atlanta Office Job #412611
Phone - 404.872.7890

MS. MEADERS: Kim Meaders on behalf of pharmacies.

THE VIDEOGRAPHER: Is that all?

MR. ISMAIL: Yes.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

HARLAND AUSTIN, D.Sc.,

having been first duly sworn, was deposed and testified as follows:

EXAMINATION

BY MR. ISMAIL:

Q. Good morning, Dr. Austin. My name is Tarek Ismail. I'm going to ask you some questions today on behalf of Bayer.

Sir, have you ever been deposed before?

A. No, I have not.

Q. Sir, have you ever served as an expert witness before?

A. I've been involved in a legal -- I've been involved in lawsuits, but I don't believe I've been named as an expert witness before.

Q. What has been your involvement in lawsuits previously?

A. I have served as a consultant in biostatistical methods and epidemiological methods on

Q. Are there -- are there certain factors that may cause the voluntary reports of one drug to be more frequent than other drugs in the class?
MR. BRIDGERS: Object to the form.
THE WITNESS: In some circumstances, one could imagine, yes.
Q. (By Mr. Ismail) The secular reporting trend would be one such factor, correct?
A. Yes.
Q. The newer the drug, the more likely it is that a healthcare provider will make a voluntary report, correct?
A. I believe that is correct.
Q. Two drugs could have the exact same safety profile, but if one was introduced ten years ago and one was introduced five years ago, you may observe a difference in the rate of voluntary reports, correct?
A. You may, and for a number of reasons.
Q. Have you ever heard of the term publicity bias before?
A. Yes.
Q. What is that, sir?
A. My understanding of the term is that more spontaneous reports would occur, if, in fact, there was publicity pertaining to that drug and its adverse

events and -- and adverse events thought to be associated with it.

Q. When did you first hear the term "publicity bias"?

A. As it pertains to this or -- in general, in epidemiology, that would be a concern that one would have. If you were to conduct a case control study, another form of epidemiology, publicity bias could, in fact, affect the recall of cases with respect to controls.

And publicity bias is -- is not unique to, as you use the term, pharmacoepidemiology. It's a problem in general.

Q. Do you believe publicity bias to be a limitation of the FDA database?

A. It could be.

Q. Do you believe the secular trend reporting bias to be a limitation of the FDA database?

A. That's a limitation that could be dealt with in various ways, but that -- it's a difficult question. It doesn't have to be a limitation because there are ways to analytically deal with it.

Q. So the publicity bias, theoretically, you could have two drugs in a class and have more publicity about -- an adverse event in association

with one of the drugs can stimulate a higher rate of voluntary reports; correct?

A. Theoretically, yes. It's not clear that it wouldn't stimulate the adverse reports to the other drug as well, if it's in the same class.

Q. Well, the publicity -- the term "bias" is part of the concept, correct?

A. I don't know. You use the word "publicity bias," and I said I had heard of it.

Q. Well, let me make sure we're in agreement. The theory behind publicity bias is that it can be a confounder when you analyze the FDA database, correct?

A. No.

MR. BRIDGERS: Object to the form.

THE WITNESS: No, it's not. It's not -- the word "confounder" would not be applied in this case. You used the word "bias." That's a better use of -- that's a better term to describe it.

Q. (By Mr. Ismail) To educate me, sir, what's the difference between a bias and a confounder?

A. The confounder is a specific type of bias arising because you did not control or did not consider a factor which is associated both with the disease and is a determinate of the outcome. We're

not talking about things that cause the outcome now. We're talking about publicity bias.

Q. Okay. The theory behind publicity bias is that it can -- withdrawn.

You could have two drugs with the same safety profile and yet observe a difference in their rate of voluntary reports because of the publicity bias, correct?

MR. BRIDGERS: Object to the form.

THE WITNESS: Well, you -- your use of the word "safety profile," I'm not exactly sure. And then -- then you follow the use of the word "safety profile" and imply that we're talking about a specific disease.

You could have two drugs whose association is the same with a particular disease at issue, and publicity bias could be an issue. It could, in fact, cause a problem in a study, yes. The answer to that question is yes.

Q. (By Mr. Ismail) Have you ever heard of the Webber effect?

A. Not specifically, no.

Q. Have you ever heard of the new drug effect?

A. I assume --

I've forgotten the question now.
Q. (By Mr. Ismail) There is really two issues, is there not, Doctor: One is that, over time, healthcare providers in this country are more frequently reporting adverse events in association with pharmaceuticals, correct?
A. That's correct.
Q. So the same drug can show disparate reporting over time, based on the secular reporting trend?
A. That's one issue, yes.
Q. The other issue is that it has been observed or written about that when new drugs come on the market, there is a stimulated rate of adverse event reporting associated with the newness of the drug, correct?
MR. BRIDGERS: Object to the form.
THE WITNESS: Yes. And you phrase that they're two separate issues and I would agree with that, yes.
Q. (By Mr. Ismail) Can the FDA database miss important variables in association with the adverse events reported?
MR. BRIDGERS: Object to the form.
THE WITNESS: I -- I don't know what you

concurrently or simply occurred by chance at that time."

A. Yes.

Q. Then the FDA writes, "Accumulative reports cannot be used to calculate incidence (occurrence rates) or to estimate drug risk."

A. Yes.

Q. Do you see that?

A. Yes.

Q. Did you know about this caveat when you began your work in the Baycol litigation?

A. Yeah, that you can't estimate incident rates with reporting date -- data, yes, I know that.

Q. Did you know you can't estimate drug risk.

MR. BRIDGERS: Object to the form.

THE WITNESS: I would say that was a corollary of incident rates, yes.

Q. (By Mr. Ismail) So you agree you cannot estimate drug risk using the FDA spontaneous event database?

A. Yes, I do.

Q. And then the FDA writes, "Comparisons between drugs cannot be made from these data." Do you see that?

A. Yes.

apparent with regards to monotherapy and Baycol from the adverse event data, would you agree that it was a good idea for Bayer to want to do a study such as the Pacificare study?

A. I think it was an appropriate -- yes. Yes.

Q. I think you started to -- to say this, but let's make sure we can agree. The Pacificare study, at least the conception of the study, was an appropriate response to the signal generated by the spontaneous data?

MR. BRIDGERS: Object to the form.

THE WITNESS: Let me back up a little bit. Appropriate -- the study itself was a -- I considered had the -- the potential to add meaningful scientific information pertaining to myopathy and statins.

Now, the use of the word "appropriate" would sort of imply that I'm saying that the timing of when the study was conducted and under what circumstances it was conducted was also appropriate. I don't mean to imply that in my answer.

The fact that a study was done, I think, was the appropriate response.

Q. (By Mr. Ismail) I take it you're not implying the opposite, that the study was -- was -- the timing was defective or -- or the manner in which

the study was initiated was defective?

A. I'm not making any infer -- I'm not making any suggestion that, yes, that the timing was inappropriate one way or the other.

Q. Okay. Are you aware of any other study using follow-up cohort analysis comparing the risk of myopathy in the statin class other than the Pacificare study?

A. I have seen some information gleaned from the clinical studies that were conducted by -- by Baycol, which I believe did include the myopathy as an outcome. I did not review those studies -- I did not carefully review those studies.

Q. And your report does not contain any opinions about the clinical trials regarding the statins, correct?

A. That's correct.

Q. So the only data comparing the risk of Baycol to the other statins that you are aware of is the Pacificare study, the clinical trial data, and the spontaneous adverse events, correct?

A. Yes, that I reviewed carefully, yes.

Q. Are you aware of any other data that exists that you didn't review?

A. To the extent that I've seen citations and

# Exhibit S

# EXPERT REPORT OF JANET ARROWSMITH-LOWE, M.D.

## I. QUALIFICATIONS AND EXPERTISE

I am a practicing physician licensed in the state of New Mexico. I am board certified in Internal Medicine, an elected member of the American College of Epidemiology, and an elected Fellow of the American College of Physicians. I received my undergraduate degree at Duke University in 1972 and obtained my medical degree from Tulane University School of Medicine in 1979.

I have over 11 years of experience with the United States Food and Drug Administration (FDA). I was a Medical Review Officer in the Division of Blood and Blood Products in the FDA Center for Biologics Evaluation and Research at FDA and in the Division of Antiviral Drug Products in the Center for Drug Evaluation and Research at the FDA. In both of these positions, I was responsible for reviewing premarket NDAs. I served as a Staff Epidemiologist in the Office of Epidemiology and Biostatistics at the FDA. In this position, I monitored the postmarket safety and effectiveness of marketed drugs, and I served as Consultant to the Centers for Drug and Biologics Evaluation and Research on epidemiologic issues and problems. Further, I was Acting Director of the Office of Surveillance and Biometrics in the Center for Devices and Radiological Health at the FDA. I was also an Epidemic Intelligence Service Officer at National Centers for Disease Control (CDC) and Prevention in Atlanta, Georgia. In this position, I participated in CDC and the FDA epidemiologic investigations of problems of national and regional interest.

A copy of my Curriculum Vitae is attached as Exhibit "A."

## II. MATERIALS REVIEWED

I have reviewed a substantial number of documents relating to Baycol®, including, but not limited to, documents from the Baycol® IND, NDA and sNDAs, the medical officer's review of the NDA, documents relating to contacts between FDA and the sponsor, internal FDA documents, as well as regulations in 21 CFR part 300, which governed the sponsor and FDA during the time that Baycol® was marketed. Attached, as Exhibit "B", is a list of materials I have reviewed. I have also reviewed various medical articles and textbooks and rely on my professional training and experience in assessing the materials I have reviewed. I anticipate reviewing additional materials pertinent to my opinions, as they become available.

## III. FDA PRACTICE AND PROCEDURES

### A. FDA's Regulation of Prescription Drugs

The FDA is a federal regulatory agency of the US Public Health Service under the Department of Health and Human Services. The mission of FDA is to protect the public health and safety in the areas of prescription drugs, medical devices, radiological devices, biologics, veterinary products, foods and cosmetics. The FDA has over 9,000 employees located in more

than 150 U.S. cities. Among its staff, the FDA has several thousand scientists, including physicians, chemists, pharmacologists, epidemiologists, statisticians, microbiologists and other professionals. Many of these scientists work for CDER (Center for Drug Evaluation and Research), the drug section of the FDA. CDER is the largest drug regulatory agency in the world.

The FDA regulates virtually every aspect of the manufacture, distribution, evaluation, approval, labeling and postmarketing safety surveillance of prescription drugs approved for marketing in the United States. The FDA is at the forefront in setting standards for health product regulation worldwide. The FDA's standards for drug approval and postmarketing surveillance have been, and are being adopted, by regulatory agencies in Europe and throughout the world.

## B. FDA's Drug Approval Process

### 1. Investigational New Drugs

Under the provisions of Section 505 of the Federal Food Drug and Cosmetic Act, the FDA requires that an Investigational New Drug ("IND") be submitted to the agency prior to administration of any new pharmaceutical compound to any human being in the United States. The IND application contains extensive information on the manufacture of the drug, animal studies demonstrating safety for humans, pharmacologic studies, and protocols for the first studies in humans. Based on initial safety information from the first clinical studies in healthy volunteers, the drug product may be studied in more extensive clinical trials to establish effectiveness as well as safety for the intended population. The FDA can and sometimes does place a hold on further development at the IND stage when the safety of the product for use in humans is in question. The foremost consideration for the FDA in clinical investigations is drug safety.

### 2. New Drug Application Review

When a sponsor determines that sufficient data to demonstrate that a drug is safe and effective has been compiled, it submits to the FDA an NDA containing this data with proposed labeling. In general, the FDA regulations require that an NDA contains: 1) reports of all investigations (preclinical and clinical); 2) a summary of the efficacy and safety data; 3) the composition of the drug; 4) methods and facilities used in the manufacture of the drug; 5) drug samples; 6) integrated assessment of benefit/risk; 7) proposed labeling and postmarket and other information concerning the drug's use in foreign markets. After approval of the initial NDA , a company may submit supplemental NDAs (SNDAs), which are applications for approval of new doses or new indications for the original drug product. These SNDAs are considered part of the new drug application and are numbered as such.

Once the NDA has been submitted, the FDA scientists determine whether the data are sufficient to establish that the drug meets the FDA's safety and efficacy requirements then rigorously review it. The FDA is very familiar with a drug when the NDA is submitted because it has followed the drug in the prior IND process. In addition, cerivastatin is one of a number of

drugs in the same mechanistic class, and so the reviewers for cerivistatin were familiar with the mechanisms of action, risks, and benefits associated with the other drugs in this class. A team of scientists and physicians conducts a careful review of the NDA and prepares detailed reports on their findings. The FDA review teams are all experts in their fields. After intensive review by the FDA team and their supervisors, the FDA then issues a letter to the sponsor indicating whether the NDA has been approved. If it has not, the FDA identifies the deficiencies that must be corrected and the additional information required before approval can be reconsidered.

The development of a new drug is costly and time consuming, with the average development time approximately 8.5 years and requiring approximately $359 million in development funds. For every 5,000 molecules that enter preclinical testing, only 5 will advance to the IND stage. Of the five compounds that reach the IND stage, only one will reach NDA approval.

The final product label is a carefully drafted document developed and reviewed by the sponsor and the FDA. However, the FDA makes final determinations on the appearance, content, placement and language of information in the label based on best judgment and in accordance with the regulations. Both FDA and the product sponsor review the labeling throughout marketing for possible revisions based on postmarketing safety data or other information.

### 3. Benefit-Risk Assessment

All drugs have adverse events associated with their use. It is impossible to identify and quantitate all risks associated with prescription drugs prior to marketing. When the FDA approves an NDA, it has reached a determination that the drug has been shown to be safe and effective as labeled. This means that the FDA has found that the known benefits of the drug outweigh its known risks when used in accordance with the approved labeling. The benefit-risk assessment is a central and ongoing part of the drug approval process involving judgment by the FDA reviewers and the sponsor.

## C. FDA's Approval of Baycol®

Bayer Corporation submitted the Baycol® IND on March 19, 1991. The initial Baycol® NDA for the 0.2 and the 0.3-mg doses was submitted on June 26, 1996. The NDA was approved on June 26, 1997. I agree with the FDA's decision. My opinions on the adequacy of the underlying data and labeling are based on my reviews of the NDA data, the FDA's reviews of the data, and my experience with the FDA review process.

The Baycol® NDA contained extensive information on preclinical pharmacology and toxicology as well as extensive information on safety and effectiveness for the drug's proposed indication, including information from over 60 completed clinical studies, including phase 1, 2 and the pivotal phase 3 trials. The review of preclinical toxicologic and pharmacologic data indicated that Baycol's toxicologic profile showed "a similar spectrum of toxicities to those seen with the class of 'statins' as a whole." In terms of the clinical database, over three thousand people were exposed to cerivistatin prior to initial marketing. The duration of exposure ranged from one day to over two years. The trials were appropriately designed and powered and were reviewed and agreed upon by the FDA prior to initiation. These trials established the safety

and effectiveness of cerivistatin for use in treating hyperlipidemia in men and women. Approval of the drug indicated that the FDA found the drug safe and effective when used in accordance with the label as it was approved initially and following labeling modifications throughout the marketing history of the drug.

While no cases of rhabdomyolysis were see in the premarket clinical trials, the initial Baycol® label warned of the risk of "rare cases of rhabdomyolysis with acute renal failure secondary to myoglobinuria" which had been reported with other HMG-CoA reductase inhibitors. In addition, the Warnings section specifically referred to the need to avoid combined use of HMG-CoA inhibitors and fibrates, such as gemfibrozil. The "Precautions" section also mentioned fibric acid derivatives and drug interactions, referring back to the skeletal muscle "Warnings" section. In addition, in July 1998, Bayer submitted a "Changes Being Effected" for a labeling change to indicate that "rare cases of rhabdomyolysis…" had been reported with cerivastatin.

The supplemental NDA (sNDA) for the 0.4-mg dose of cerivistatin was submitted on August 16, 1998 and approved on May 24, 1999. In approving this new dose of cerivastatin, the FDA states that it has found "the drug product is safe and effective for use as recommended in the agreed upon labeling text." The label approved with the 0.4 mg dose also strengthened the precaution against combination use by specifically identifying gemfibrozil in this language. In addition, the warnings section addressing combination use of cerivastatin and fibrates was expanded to advise physicians that the combination of fibrates and HMG-COa inhibitors should be avoided. The supplemental NDA for the 0.8-mg dose, submitted on September 22, 1999, was approved on July 21, 2000. The pivotal study for this sNDA included over 1000 patients. Again the FDA found the "drug product safe and effective for use as recommended in the agreed upon labeling text." The label for the 0.8-mg dose included the statement that "the starting dose of Baycol® is 0.4 mg once daily in the evening." This label also included the statement that "cases of rhabdomyolysis…" had been reported with cerivastatin." The sNDAs contained all appropriate safety and efficacy data, as required by FDA regulations.

In addition, the label approved at the time of approval of the 0.8 mg dose, contained a statement in the "Warnings" section that "women over 65 years of age, especially those with low body weight, were observed to be at an increased risk of myopathy".

**Postmarketing Safety Surveillance for Approved Drug Products**

After the FDA approves a drug for marketing, the agency continues to monitor the product's safety profile in accordance with the regulatory requirements. The FDA's safety surveillance, like that of the manufacturer, encompasses the review and analysis of adverse event reports submitted by drug manufacturers, by health professionals such as physicians, pharmacists and nurses, and by individuals as well as reports published in the scientific literature. In addition, FDA receives information from foreign drug regulatory authorities, from other federal agencies, and from other sources. The FDA uses outside databases to conduct epidemiological studies testing hypotheses concerning drug exposure and adverse events. In general, individual

reports submitted to FDA as part of postmarket safety surveillance cannot be used to determine incidence rates and are unreliable for use in comparing reporting rates among drugs or classes of drugs. Similarly, the comparison of reporting rates calculated from spontaneously reported adverse drug events is not generally accepted by the scientific and medical community as a valid methodology for estimating the relative risks of those events associated with individual drug products.

Virtually all serious, unexpected adverse event reports and adverse event reports from health care providers are individually reviewed by FDA scientists for new safety information. Any significant safety issues are discussed with the review division responsible for approval of the drug. The FDA monitors adverse events closely and determines whether labeling changes are indicated. Each time the FDA approves a labeling change, the agency reaffirms that the drug is safe and effective when used in accordance with the labeling. The FDA makes the final determination of the appearance, location and language of any labeling changes.

### D. FDA Postmarket Reporting Requirements

Under 21 C.F.R. § 314.80, the FDA has established a systematic approach to the reporting of adverse drug events associated with the use of approved drugs. These regulations, enacted in 1985, are based on federal law. Two groups within the agency generally evaluate adverse event reports submitted to the FDA. One group responsible for the review, coding and processing of such reports, formerly known as the Office of Epidemiology and Biostatistics, includes physicians, epidemiologists, pharmacists and other scientists. The other group monitoring postmarket safety reports is the review team responsible for approval and labeling of the drug. Adverse drug event (ADE) reports are evaluated and independently coded by the FDA and entered into a computerized, automated database. Detailed reports of the review of ADEs reported with certain products or product classes can be prepared using ADE data alone or in combination with other information. While it is understood that most adverse events occurring in association with marketed drugs are under-reported to the manufacturer and to FDA, FDA statisticians have recently stated that one of the additional problems in interpretation of adverse event reports is the possibility of over-reporting of certain events, emphasizing the difficulty in assessing the accuracy of ADE numerator data.

FDA monitored reporting rates of rhabdomyolysis in association with the use of cerivastatin, as well as other members of the same drug class, alone and in combination with fibrates. Submission of a report of an adverse event, which occurs in association with the use of a drug, does not mean that the drug caused the event. Many events may occur while a person is taking a drug, but the event may have nothing to do with the drug exposure. There are other important limitations in the use of spontaneously reported adverse event data, including the lack of comparative data, the incompleteness of reports, the absence of denominator data, differences in coding, and the presence of factors which influence reporting rates, such as newness of marketing, severity of the event and publicity concerning a drug or an event, for which no reliable means of assessing the effects on reporting are available.

Under 21 C.F.R. § 314.80, the FDA has established a reporting system for adverse event reports that occur in association with the use of marketed drug products. Serious, unlabeled events from any source are submitted to the FDA by the manufacturer within 15 days after the manufacturer determines that the event is a serious and unlabeled event. Serious in this context means that the event meets certain FDA criteria, as defined in the regulations. Serious labeled reactions from foreign or domestic sources do not fall under the 15-day requirement. Other reporting requirements include submission of serious, labeled events and domestic non-serious events as part of periodic reports (either annually or quarterly) listing those reports identified in 21 C.F.R. § 314.80(c)(iv)(2) and submission of annual reports covering information specified in 21 C.F.R. § 314.81(b)(2). It is my opinion that the FDA's reporting requirements and regulations are based on good science and sound judgment. Based on my review of documents, I believe that Bayer complied with the all postmarket reporting requirements in effect during the marketing of Baycol®, an opinion that is supported by the FDA's establishment inspection report.

## E. <u>Labeling Requirements</u>

The FDA's labeling requirements for prescription drugs are set out in 21 C.F.R. § 201.57. Significant safety information is included under the Contraindications, Warnings and Precautions sections of the labeling under 21 C.F.R. § 201.57(d)-(f). Additional safety information also may found under the Adverse Reactions section of the label. These regulations identify what must be included in each section of the labeling.

Under the labeling requirements, a pharmaceutical manufacturer can submit a labeling change, called a "Changes being Effected" or CBE, to initiate a labeling change for safety reasons prior to FDA approval of the change. In many cases, the CBE is approved without changes in wording or appearance. In some cases, the CBE is not approved as submitted. In the case of Baycol®, several CBEs and other labeling changes were submitted to FDA at Bayer's initiative. The first was submitted in July 1998, as a "Changes Being Effected" to indicate that "rare cases of rhabdomyolysis..." had been reported with cerivastatin. A second CBE, submitted December 3, 1999, was to contraindicate the co-administration of cerivastatin and gemfibrozil due to an increased risk of myopathy associated with the combination. This second CBE was accompanied by a "Dear Healthcare Provider" letter dated December 15, 1999. Another CBE was submitted April 30, 2001 and contained labeling revisions intended to further emphasize the starting dose of cerivastatin as 0.4 mg. The FDA approved this CBE and confirmed that Baycol was safe and effective for use as recommended in the agreed upon labeling. This labeling change was based on information received through the spontaneous reports of cases of rhabdomyolysis occurring in persons in whom the starting dose was greater than the recommended 0.4 mg. While US physicians may prescribe medications to their patients as they feel appropriate, the approved product label is intended to provide information, which allows them to do so in the safest manner possible.

Through the Division of Drug Marketing, Advertising and Commercialization (DDMAC), the FDA reviews launch, advertising, and promotional materials produced by sponsors. As with other statin sponsors, DDMAC expressed concerns about various promotional materials

produced by Bayer in association with Baycol. Bayer responded appropriately to these concerns.

### F. Epidemiology

Epidemiology is a discipline that uses scientific and medical evidence to make medical and public health decisions. In making epidemiological judgments, practitioners in my field assign different weights to different types of evidence. In the hierarchy of scientific evidence, randomized controlled trials are ranked highest and in general are the most convincing in establishing causation, followed in diminishing strength of evidence by cohort studies, case-control studies, analyses of secular trends, case series and case reports. Case series and case reports are generally used to generate hypotheses that can then be evaluated by larger scale epidemiologic studies. Generally, case series and case reports cannot establish medical causation. Epidemiology deals generally with populations, and does not address causation in any individual.

In the case of myopathy/rhabdomyolysis and the use of Baycol®, epidemiologic studies were conducted using a large, records-linked database, PacifiCare, to further evaluate the risks of myopathy/rhabdomyolysis associated with the use of HMG-CoA reductase inhibitors, including Baycol®, alone and in conjunction with the use of gemfibrozil.

I have reviewed these studies and the methodologies employed. It is my opinion that these studies have led to a better understanding of the risk of myopathy/rhabdomyolysis with Baycol when used in association with gemfibrozil, as well the risks of myopathy/rhabdomyolysis in persons exposed to other drugs in this class. The data from these studies show that myopathy/rhabdomyolysis occurs more frequently in persons exposed to the Baycol®-gemfibrozil combination than in persons exposed to some other HMG-CoA reductase inhibitor plus gemfibrozil. These studies further served to confirm the contraindication, noted in the label, against the use of gemfibrozil with cerivastatin. The studies also indicate that there is no increased risk of myopathy/rhabdomyolysis with Baycol® monotherapy. In essence, the safety and effectiveness profile of cerivistatin was found to be similar to that of other drugs in its class when cerivastatin was used in accordance with it approved product label. This finding has been confirmed in an additional database from the United Kingdom, the results of which have been reported by the General Practice Database Division of the Medicines Control Agency.

I have reviewed internal Bayer documents comparing reporting rates of rhabdomyolysis associated with the use of Baycol and with other statins, as well as a letter to the editor of the New England Journal of Medicine comparing reporting rates of fatal rhabdomyolysis associated with the use of Baycol and other statins. These comparisons of reporting rates are not useful for assessing risk, including risks associated with events which occurred prior to those comparisons being made.

## IV. Opinions Regarding Baycol®

It is my opinion that Baycol® was appropriately labeled during its marketing history in the United States. It is my opinion that Bayer was fully in compliance with the FDA's

labeling and postmarket safety-reporting requirements throughout the time the drug on the US market. It is also my opinion that the label presented an appropriate analysis of the benefits and risks of Baycol®.

I have reviewed the data supporting the NDA and sNDAs for Baycol®. The NDA and the sNDAs contain the necessary safety and efficacy data for the use of Baycol® in persons with hyperlipidemia. I believe that Baycol® provided benefits, which outweighed potential risks, when used in accordance with its approved labels. It is my understanding that the withdrawal of Baycol® was due to the continued receipt of postmarket safety reports indicating rhabdomyolysis occurring with the continued co-prescribing of Baycol® with gemfibrozil. It is my opinion that withdrawal was a reasonable public health response to these continuing problems with co-prescribing and dosing. It is my opinion that Baycol®, when used in accordance with its label, was safe and effective for use in treating hyperlipidemia in appropriately selected patients.

I am reimbursed for my services at the rate of $400/hour.

Baycol Expert Report

Janet Arrowsmith-Lowe, M.D.

1/8/04
Date

# Exhibit T

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

--oOo—

| | | |
|---|---|---|
| In re: BAYCOL PRODUCTS LITIGATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MDL No. 1431 |
| | ) | (MJD/ JGL) |
| This Document Relates to Olander v. Bayer | ) | |
| Corporation, et al. Civil No. 03-1086 (MJD/ JGL) | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

CERTIFIED COPY

DEPOSITION OF

**JOHN FARQUHAR, M.D.**

February 13, 2004

REPORTED BY: RENEE COMBS WOLF, RMR, CSR 11867 JOB 1-712

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

--oOo--

In re: BAYCOL PRODUCTS LITIGATION )
)
Plaintiff, )
)
vs. ) MDL No. 1431
) (MJD/JGL)
This Document Relates to Olander v. )
Bayer Corporation, et al. Civil No. )
03-1086 (MJD/JGL) )
Defendant. )
)
)

--oOo--

BE IT REMEMBERED that, pursuant to Notice and on Friday, February 13, 2004, commencing at 9:13 a.m. thereof, at 275 Battery Street, 28th Floor, San Francisco, California, before me, RENEE COMBS WOLF, a Certified Shorthand Reporter, personally appeared

JOHN FARQUHAR,

called as a witness by the Defendant, who, having been first duly sworn, was examined and testified as follows:

--oOo--

SHOOK, HARDY & BACON, 600 14th Street, NW, Suite 800, Washington, D.C., 20005, represented by JOSEPH D. PIORKOWSKI, JR. and LORI CONNORS McGRODER, Attorneys at Law, appeared as counsel on behalf of

attempt to validate the reporting rates that one gets out of -- that one gets out of the AERS system.

And in making comparisons among drugs by using the ratios of reporting rates, the question is do those give a satisfactory estimate of relative risk as compared to what might be obtained were the data obtained from true incidence rates.

And the qualifications that are necessary to stay away from a complete categorical no, that you cannot use them, requires one to go into that other territory, including the proportional reporting rate question which has, in the case of Baycol, been able to come up with a partial validation of the information obtained from adverse event reporting rate ratios, the relative risks that I spoke of.

So it's -- the other thing that is in the literature in more than one place is that if you're dealing with a relatively uncommon event, it is incumbent upon you to look carefully at the adverse event reporting rate data because it may be -- it may be difficult to get confirmation from other sources. And there are instances where a drug has been removed from the market on the basis of adverse event reporting ratios themselves.

And those people like Wiholm who has his

article in Strom's book, make that point very clearly that you cannot be -- you cannot arbitrarily dismiss everything that's been obtained from adverse event reporting; otherwise, you're going to be making scientific errors that are very important.

Q. Objection. Move to strike the nonresponsive portion.

Doctor, has somebody represented to you or have you seen in some defense expert report that the suggestion that adverse event data are meaningless or that a company should not look at adverse event data? Has anybody suggested that Bayer has taken that position to you?

MR. ARBITBLIT: Objection.

THE WITNESS: Well, let me answer that in two ways. One is that the item number -- caveat number 4 --

MR. PIORKOWSKI: Q. Yes.

A. That implies that one has limited utility of such data. Secondly, if I recall, some of the words and comments used by Dr. Sprenger, it was very clear that he was dismissing them and said you can't use them to estimate risk. And on and on in a variety of ways indicated, and representing Bayer, that they are virtually useless.

Q. Well --

# Exhibit U

Short report

# Is reporting rate a good predictor of risks associated with drugs?

**Corinne Pierfitte, Bernard Bégaud, Rajaa Lagnaoui & Nicholas D. Moore**

*Département de Pharmacologie, Université Victor Segalen, Hôpital Pellegrin, 33076 Bordeaux cedex, France*

***Aims*** Uncertainty as to relative under-reporting plagues the comparisons of spontaneous reporting rates as a tool for decision-making in pharmacovigilance. However, it is generally accepted that under-reporting should be reasonably similar for similar drugs sharing the same indication, country and period of marketing. To test this, we compared the adverse drug reaction reporting rates to the French regional pharmacovigilance centres for six pairs of identical drug marketed at the same time by different companies under different brand names (co-marketing).

***Methods*** All reaction reports were related to sales, to compute reporting rate; within each pair, the reporting rate ratio and its confidence interval were calculated.

***Results*** The rate ratios were all between 0.76 and 1.33. Two of them were significantly different from 1 (1.28; 95% C.I. [1.01; 1.60] and 1.33; 95% C.I. [1.06; 1.74]).

***Conclusions*** These small differences in reporting rates would not warrant regulatory action and support the usual assumption of similar reporting for similar drugs.

*Keywords:* pharmacovigilance, spontaneous reporting, decision-making, pharmacoepidemiology, drugs

## Introduction

Most estimations and decisions made in pharmacovigilance are based on spontaneously reported data [1, 2]. Due to the size of the surveyed population and to the prompt reporting of serious and unexpected effects, this first-line surveillance method is particularly efficient in identifying new adverse drug reactions (ADRs) [3]. However, it suffers from many limitations when one intends to quantify the risk associated with a given drug, mostly because of an inescapable under-reporting, the magnitude of which remains unknown [4]. When comparing the risk associated with drugs, under-reporting whatever its magnitude does not affect the validity of conclusions if it is assumed that it is more or less identical for the compared drugs. It is generally admitted that this could be the case for two drugs belonging to the same therapeutic class, with the same indications, marketed in the same country, during the same period of time [5]. Under these conditions, observing a significant difference in reporting rates would mean that the risks associated with these drugs could differ.

*Correspondence:* Professor B. Bégaud, Département de Pharmacologie, Université Victor Segalen-Hôpital Pellegrin, 33076 Bordeaux cedex, France.
*Received 4 December 1997, accepted 17 October 1998.*

To test this hypothesis, we compared the reporting rates for twelve co-marketed drugs (six pairs) in France. In order to share development costs or for other reasons, two companies may decide to market simultaneously the same compound, under different brand-names. This situation represents a kind of gold standard for similitude: same active ingredient(s), same recommended dose, same presentation, same approved indications and same launching date in the same country.

## Methods

For this study, we selected all co-marketed drug pairs meeting the following criteria:

(i) new chemical entities or new associations of known active principles, (ii) launched in France between 1988 and 1993, with (iii) a market life of at least 3 years, for which (iv) a minimal number of thirty ADR cases were reported to the French pharmacovigilance centres over the period considered. We only considered ADR cases, whatever the type, assessed as 'reasonably associated' by the reporter. Moreover, in order to eliminate the influence of possible differences in the efficiency in the surveillance system of companies, we only considered ADRs directly reported to the pharmacovigilance centres

(around 50% of the whole number of cases collected per year in France).

For each drug of each pair, we estimated a reporting rate considering:

(i) as numerator, the number of reports of ADR (as defined above) found in the French pharmacovigilance database,

(ii) as denominator, the corresponding number of patient-months calculated by dividing the number of units (e.g. tablets, capsules …) sold during the same period of time by the average daily dose and by 30.4 (the average number of days in a month).

These data were obtained from the French Medicines Agency.

For each pair, we calculated a reporting rate ratio (RRR), by dividing the reporting rate estimated for the drug marketed by the company which originally developed the compound by the reporting rate estimated for the drug marketed by the associated company. The two-sided ninety-five percent confidence interval (95% C.I.) for this ratio was calculated according to the normal approximation of the binomial distribution as suggested by Tubert *et al.* [6].

## Results

Six pairs of co-marketed drugs met the criteria considered for this study:

Pair 1: an angiotensin-converting enzyme inhibitor launched in 1988

Pair 2: another angiotensin-converting enzyme inhibitor associated with a thiazide diuretic (1988)

Pair 3: an HMG-CoA reductase inhibitor (1989)

Pair 4: a third angiotensin-converting enzyme inhibitor (1990)

Pair 5: another HMG-CoA reductase inhibitor (1991)

Pair 6: a proton-pump inhibitor (1991)

The results are given in Table 1.

**Table 1** Numbers of reported cases and reporting rates for 12 drugs marketed in France between 1988 and 1993. RRR is the ratio of the reporting rates for the two drugs of the same pair. The bold figures correspond to the drug marketed by the company which originally developed the compound.

| *Pairs* | *Number of case reports* | *Reporting rate per $10^6$ patient-months* | *RRR* | *RRR 95% CI* |
|---|---|---|---|---|
| 1 | **134** | **3.37** | 1.28 | [1.01; 1.60] |
| | 164 | 2.64 | | |
| 2 | **151** | **1.69** | 0.84 | [0.68; 1.02] |
| | 260 | 2.02 | | |
| 3 | **409** | **2.75** | 1.33 | [1.06; 1.74] |
| | 74 | 2.06 | | |
| 4 | **47** | **1.45** | 0.76 | [0.49; 1.19] |
| | 36 | 1.90 | | |
| 5 | **91** | **2.37** | 1.33 | [0.97; 1.85] |
| | 63 | 1.78 | | |
| 6 | **24** | **2.45** | 1.32 | [0.71; 2.66] |
| | 16 | 1.85 | | |

## Discussion

Due to the selection criteria used in this study (i.e. new chemical entities launched between 1988 and 1993), three pairs corresponded to ACE inhibitors and two to lipid-lowering drugs. However, this over-representation does not *per se* constitute a limitation for the purpose of the present analysis.

It can be seen in Table 1 that for all studied pairs, the RRR value differed slightly from 1. However, the difference was statistically significant only in two cases (pairs 1 and 3), for which the corresponding 95% C.I. for RRR did not include 1. In both cases, significance is borderline (lower bounds being 1.01 and 1.06, respectively).

It is very improbable that a regulatory decision would be undertaken on the basis of such low difference, even if statistically significant.

The most relevant point is that the observed differences remained low: the RRR value never exceeded 1.33 (the reverse of the RRR observed in pair 4, i.e. 0.76, is 1.32). Although the upper 95% confidence interval did exceed this in four cases, this is reassuring for the validity of comparisons made in the framework of spontaneous reporting because confirming that the magnitude of under-reporting is the same for two drugs of the same therapeutic class marketed concurrently. In the conditions of this study, it is reasonable to state that the actual risks of ADRs associated with each drug of the same pair are more or less the same. Thus, under the hypothesis of an under-reporting of equal magnitude, the RRR are expected to be close to 1 which was effectively the case in our study: the ratio of reporting rates never exceeded the low value of 1.33.

These results tend to validate the basic assumption currently accepted in spontaneous reporting: the ratio of reporting rates approximates the ratio of actual risks (which would have been calculated on the basis of the actual number of cases) given that the two compared drugs belong to the same therapeutic class and are used in similar conditions. This reinforces the credibility of calculations and comparisons made in this context, even if decision-making based on the results of an *ad hoc* pharmacoepidemiologic study remains always preferable.

The authors wish to acknowledge the assistance of Mr Patrick de Roef (French Medicines Agency).

## References


1 Rawlins MD. Spontaneous reporting of adverse drug reactions. I: the data. *Br J Clin Pharmacol* 1988; **26**: 1–5.

2 Smith CC, Bennet PM, Pearce HM, *et al.* Adverse drug reactions in a hospital general medical unit meriting notification to the Committee on Safety of Medicines. *Br J Clin Pharmacol* 1996; **42**: 423–429.

3 Praus M, Schindel F, Fescharek R, *et al.* Alert system for post-marketing surveillance of adverse drug reactions. *Stat Med* 1993; **12**: 2383–2393.

4 Lumley CE, Walker SR, Hall GC, *et al.* The under-reporting of adverse drug reactions seen in general practice. *Pharm Med* 1986; **1**: 205–212.

5 Bégaud B, Tubert P, Haramburu F, *et al.* Comparing toxicity of drugs: use and misuse of spontaneous reporting. *Post-Marketing Surveillance* 1991; **5**: 69–76.

6 Tubert-Bitter P, Bégaud B, Moride Y, *et al.* Comparing the toxicity of two drugs in the framework of spontaneous reporting: a confidence interval approach. *J Clin Epidemiol* 1996; **49**: 121–123.