| UNITED STATES DISTRICT COURT<br>DISTRICT OF MINNESOTA | |
|---|---|
| In re: BAYCOL PRODUCTS LITIGATION | MDL No. 1431 (MJD/JGL) |
| This Document Relates to:<br><br>ALL CASES | |

**MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANT SMITHKLINE BEECHAM CORPORATION D/B/A GLAXOSMITHKLINE TO PRECLUDE ERICH F. SCHINAGL, M.D. FROM OFFERING "EXPERT" OPINION TESTIMONY ABOUT GSK**

Defendant SmithKline Beecham Corporation d/b/a GlaxoSmithKline ("GSK") requests that this Court preclude Erich F. Schinagl, M.D., from offering opinions about GSK's conduct. **(This motion addresses an issue beyond those in the motion that Bayer Corporation and Bayer AG [hereinafter collectively referred to as "Bayer"] and GSK have jointly filed to exclude other testimony by Dr. Schinagl.)** Dr. Schinagl should be precluded from offering opinions about GSK because he lacks any kind of specialized knowledge, experience, training, or education that would make his opinions about GSK helpful to a jury. Moreover, even if Dr. Schinagl had such expertise, his opinions about GSK would still not be admissible because he has based those opinions on a grossly inadequate factual foundation: a half an inch to an inch of documents hand-selected by a plaintiffs' lawyer.

# I. FACTUAL BACKGROUND

## A. Introduction

The Court is quite familiar with the Baycol litigation, of course, but until now, the Court has had little reason to focus on the aspects of the litigation that involve GSK, as distinct from Bayer. An understanding of the differences between Bayer and GSK is essential, however, in deciding this motion.

Bayer developed Baycol, and Bayer was the "NDA-holder" for Baycol, *i.e.*, the company that applied for and obtained FDA permission to sell Baycol. As the NDA-holder, Bayer was responsible for the safety of the drug, and Bayer was obligated to comply with a host of FDA drug safety regulations. GSK, by contrast, was **not** the NDA-holder for Baycol. GSK agreed to help Bayer promote Baycol in the United States, but the Bayer/GSK Co-Promotion Agreement, like the FDA regulations, placed solely upon Bayer the responsibility for compliance with FDA drug safety regulations, other than the obligation on GSK sales people to adhere to FDA regulations in their communications with doctors.

## B. Bayer

Bayer developed and patented the Baycol chemical compound (cerivastatin), tested it in animals, thereafter obtained permission to test the drug in humans, and later filed a New Drug Application ("NDA") with the FDA seeking permission to sell Baycol in the United States. (Deposition of David Raymond Ebsworth (May 20, 2003) at 563:8-565:6, relevant portions cited here and throughout the brief are attached herein as Exhibit 1.) Bayer eventually received permission from the FDA to sell Baycol in the United States, after the FDA had determined that Baycol was "safe and effective" when used as directed. (*See* June 26, 1997, Letter from FDA to Bayer Corp., Pharm. Div. (BAYAG00492271-72), attached as Exhibit 2; and September 1997

Label (BAYCORP00221120-21), attached as Exhibit 3.) Bayer manufactured Baycol and Bayer sold Baycol.

As the holder of the NDA, Bayer was responsible as a matter of law for monitoring the use of Baycol once Baycol was on the market, seeking FDA approval for any changes to the Baycol package insert (sometimes called the "label" or the "labeling text") that Bayer thought were warranted in light of post-marketing events and other new data, and ensuring that Baycol was marketed in accordance with FDA regulations. (*See* 21 C.F.R. §§ 314.70(a), (b), (c); 21 C.F.R. § 314.71(a)).[1] As the holder of the NDA, Bayer was responsible for:

- maintaining all regulatory approvals needed to market Baycol in the U.S. (*see* 21 U.S.C § 355; *see also* 21 C.F.R. § 314.50; 21 C.F.R. § 314.81(b)(2); 21 C.F.R. § 314.70; 21 C.F.R. § 314.71);
- complying with all laws, rules, and regulations pertaining to the promotion and advertising of prescription drugs (*see* 21 C.F.R. § 202.1; 21 C.F.R. § 314.81(b)(3)(i));
- complying with all laws, rules, and regulations pertaining to the package inserts for prescription drugs (*see* 21 C.F.R. §§ 314.70(a), (b), (c); 21 C.F.R. § 314.71(a); *see also* 21 C.F.R. § 201.1 *et seq.*);
- maintaining all required records and filing with the FDA all required reports (*see e.g.* 21 C.F.R. §§ 314.80(c)(1), (c)(2); 21 C.F.R. § 314.50(d)(5)(vi)(b); 21 C.F.R. §§ 314.70(a), (b), (c), (d); 21 C.F.R. §§ 314.81(a), (b)(1), (b)(2), (b)(3), (d)); and
- analyzing "adverse event" reports about Baycol and reporting those adverse events reports to the FDA (21 C.F.R. § 314.80(c)).

---

[1] Copies of the statutory and regulatory provisions referenced herein are attached as Exhibit 4.

## C. GSK

GSK's responsibilities were quite different from Bayer's.

GSK was not involved in the development of the Baycol chemical compound (cerivastatin), in the animal tests, in the pre-NDA clinical trials, in filing of the NDA with the FDA seeking permission to sell Baycol in the United States (Ebsworth Dep. at 563:8-565:5), in the manufacture of the drug, or in any communications with the FDA once the drug was on the market, including communications relating to safety issues or amendments to the product label. (Ebsworth Dep. at 563:8-565:5.)

GSK's responsibilities were defined by the Co-Promotion Agreement that GSK entered into with Bayer after the FDA had granted Bayer permission to sell Baycol in the United States. The Co-Promotion Agreement provided that GSK sales representatives would promote Baycol (along with GSK's own drugs) when they called on physicians, and that GSK would work with Bayer in developing the Baycol marketing program. (*See* Co-promotion Agreement, dated July 21, 1997 (GSK_BL_00017825-69), attached as Exhibit 5).[2]

The Co-Promotion Agreement reflected the FDA regulations in recognizing that, as the NDA-holder, Bayer (and not GSK) was responsible for collecting Adverse Event Reports and submitting them to the FDA, for analyzing safety information after Baycol was on the market, for drafting changes to the Baycol label if changes were warranted, and for all communications

---

2 After Baycol was on the market, Bayer conducted a comprehensive study to support the Supplemental New Drug Application ("sNDA") for the 0.8 mg dose of Baycol. Although Bayer conducted the study, GSK functioned as a "contract research organization" for Bayer. Just like any other third party contract research organization, GSK held the limited responsibility of delivering a clean database of research results to Bayer. GSK performed these data monitoring functions under a November 3, 1997 Agreement that was separate and independent from the Co-Promotion Agreement. (*See* BAYCORP00071245-74, attached as Exhibit 6.) As a data manager, GSK had no part in any substantive analysis of the data for the 0.8 mg study; in fact, it only dealt with the data on a blinded basis, and thus had no way to know its significance. (Deposition of Dr. Jeffrey Dubb, Vol. II (July 31, 2003) at 454:6-455:23) attached as Exhibit 7.)

with the FDA regarding safety issues. (*See* Exhibit 5 at GSK_BL_00017843-45.) The Co-Promotion Agreement did not contemplate that GSK would have any responsibility to analyze AER's, to suggest changes to the Baycol label, or to have any communications at all with the FDA about safety issues.

GSK's one important obligation regarding safety was that GSK sales representatives who promoted Baycol to physicians were required to adhere to all the FDA regulations on how sales representatives promote prescription medicines to doctors. Significantly, however, Dr. Schinagl does not opine that any GSK sales representative ever violated those FDA regulations. (Deposition of Erich F. Schinagl, M.D. (January 29, 2004) relevant portions cited here and throughout the brief are attached herein as Exhibit 8 at 340:5-10.)

The deposition testimony of Bayer's president, David Ebsworth provides a good overview of the very limited nature of GSK's role:

> Q. . . . First off, the Bayer scientists synthesized the molecule cerivastatin many years before Bayer entered into the copromotion agreement with SmithKline. Is that right?
>
> A. That is correct.
>
> Q. And Bayer obtained a patent on that molecule years before the copromotion agreement with SmithKline. Is that right?
>
> A. In the early '90's, yes.
>
> Q. And Bayer spent years studying and analyzing the properties of cerivastatin before Bayer entered into the copromotion agreement with SmithKline?
>
> A. That is also correct.
>
> Q. And Bayer conducted animal studies on cerivastatin before --
>
> A. They did.

Q. And also before the copromotion agreement was entered, Bayer conducted clinical trials on human beings?

A. That is correct.

Q. And Bayer applied for licenses in various countries to sell Baycol or Lipobay before Bayer entered into the copromotion agreement with SmithKline. Correct?

A. That's correct, for the .2 and .3 milligram doses.

Q. And as a matter of fact, Bayer filed the new drug application with the FDA some time before Bayer entered into the copromotion agreement with SmithKline. Is that correct?

A. That is correct.

Q. And Bayer actually received permission from the FDA, or received a license from the FDA to sell .2 and .3 milligram Baycol in the United States before Bayer entered into the copromotion agreement with SmithKline. Correct?

A. That is also correct.

Q. And before Bayer entered into the copromotion agreement with SmithKline, the FDA had already determined, based on its review of all the data and information that Bayer submitted, that Baycol .2 and .3 milligram was a safe and effective drug when used as directed. Is that correct?

A. That is correct.

Ebsworth Dep. at 563:12-565:6.

**D. The GSK "Addendum"**

Dr. Schinagl's "Addendum Regarding SmithKlineBeecham (SKB) and Glaxo SmithKline" ("the GSK Addendum", attached as Exhibit 9) consists of opinions about GSK's conduct that are contrary both to the FDA regulations and to the Co-Promotion Agreement. Although the responsibility for the contents of the Baycol label and for communications with the FDA rested entirely on Bayer as the NDA-holder, Dr. Schinagl opines in the GSK Addendum

(1) that GSK inadequately and improperly warned physicians, patients and the FDA of the alleged risks associated with Baycol use, (2) that GSK manipulated safety information and failed to communicate or adequately communicate that information to physicians, the FDA and patients, (3) and that GSK should not have marketed Baycol at all or "should have marketed it in a manner as to have fully and adequately communicated the nature and extent of the risks and the limitations of [Baycol's] efficacy." *See* the GSK Addendum at p.4. Although Dr. Schinagl himself acknowledged that Bayer had sole responsibility for evaluating the clinical data, he opines in the GSK Addendum that GSK ignored warning signs from clinical data.

Dr. Schinagl expressed these opinions about GSK even though he was aware that GSK's responsibilities were very different from, and much more limited than, Bayer's:

> Q. First of all, you agree with me, do you not, sir, that Baycol was developed or invented or synthesized by Bayer, not GSK?
>
> A. I know that.
>
> Q. You know it was Bayer, not GSK, that conducted the preclinical trials?
>
> A. Yes.
>
> Q. And it was Bayer, not GSK, that conducted the clinical trials except for the .8 that you've mentioned earlier [*see* footnote 2, *supra*], correct?
>
> A. I'm aware of that.
>
> Q. And it was Bayer, not GSK, that filed an IND with the FDA; correct?
>
> A. (Witness nods.)
>
> Q. That's an investigational new drug application; correct?
>
> A. Yes, I'm aware of that.
>
> Q. And it was Bayer, not GSK, that filed the new drug application or the NDA with the FDA; correct?

A. I'm aware of that.

Q. And it was to Bayer, not the GSK, that the FDA issued a license to sell Baycol; correct?

A. Correct. I was aware of that.

Q. And it was to Bayer, not GSK that manufactured Baycol; correct?

A. I was aware.

* * *

Q. . . . You understand based on your many years in the pharmaceutical industry that it was Bayer as the license holder for Baycol that had the responsibility of collecting adverse event reports and transmitting them to the FDA; correct?

A. Correct.

Q. That was not a GSK responsibility?

A. Correct, I'm aware of that.

Q. You understand that GSK's role was limited to helping Bayer market Baycol in the United States; correct?

A. Correct.

Schinagl Dep. at 326:3-327:10; 328:10-24. Having acknowledged the very different responsibilities of the two companies, Dr. Schinagl nonetheless applied to GSK the same standards that he had applied to Bayer, the NDA-holder for Baycol:

Q. Now, in your addendum you express opinions about what GSK should have done or should not have done or should have done differently; correct?

A. Correct.

Q. What standards are you applying in reaching those conclusions? When you say GSK should have done something differently, to what standards are you comparing GSK's conduct?

A. I think I did not apply any different standards to GSK's conduct that I would have applied or did apply to Bayer's conduct.

Q. Doctor, I think we've just established that the only rules or regulations that you know of that apply to GSK were rules or regulations that governed what a GSK salesperson could say to a doctor or was required to say to a doctor in promoting Baycol to the doctor; correct?

A. Correct.

Schinagl Dep. at 339:6-340:4.

**E. Dr. Schinagl's Background**

Nothing in Dr. Schinagl's background qualifies him to offer the opinions in the GSK Addendum. Dr. Schinagl held various medical and scientific positions at Pharmacia Corp., including Medical Director and Director of Clinical Research, (*see* Report of Erich F. Schinagl, M.D. at Ex. A p. 5-6, attached as Exhibit 10), but he has no background at all in how responsibilities are divided in a co-promotion context between an NDA-holder (Bayer) and the company that has agreed to help with the promotion (GSK):

Q. Let me ask you this, talking about experience and different things. In your years at Pharmacia, did you ever negotiate a co-promotion agreement with another pharmaceutical company?

A. No.

Q. Did you ever participate in writing a co-promotion agreement?

A. No.

* * *

Q. Okay. Let me ask you a more pointed question. In your years at Pharmacia, did you ever have any experience or involvement in a situation in which another company was promoting a Pharmacia product, using its salespeople to promote a Pharmacia product, or in which Pharmacia

salespeople were promoting some other company's product, either way?

A. No.

Q. So, the situation that existed on Baycol between GSK and Bayer, that is, the situation in which GSK salespeople were helping to market and promote a Bayer product, that was not a situation that you had any experience in when you were with Pharmacia; correct?

A. No.

Q. When you say "no," I am correct?

A. You are correct.

Schinagl Dep. at 331:12-20; 333:6-334:3.

### F. How Dr. Schinagl Prepared the GSK Addendum

Dr. Schinagl's initial report did not mention GSK, but he later agreed to a PSC request that he write an addendum about GSK. After a four hour review of a "half an inch to an inch" of documents that the PSC had hand-selected for his him, Dr. Schinagl then spent a day in a hotel room with plaintiffs' counsel and a paralegal drafting the GSK Addendum. (Schinagl Dep. at 148:1-149:6; 304:19-305:20, 310:8-313:16.)

Dr. Schinagl based the GSK Addendum entirely on the "half an inch to an inch" of documents that the PSC had hand-selected for his review. (*Id.* at 315:1-8, 318:10-17.) Even though he "would assume" that it was the Co-Promotion Agreement that defined the respective responsibilities of the two companies (*id.* at 334:4-11), Dr. Schinagl did not actually review the Bayer/GSK Co-Promotion Agreement (*id.* at 329:10-21), but read instead only some "summaries" of the Agreement that were "mentioned" in other documents that the PSC selected for his review. (*Id.*) He did not ask for or obtain any of the other hundreds of thousands of documents that GSK has produced in the litigation (*id.* at 315:9-316:20), he did not review even

a single one of the many depositions that the PSC had taken of GSK officers and managers (*id.* at 320:4-14), and he did not review the testimony of Dr. Ebsworth (the Bayer president) about the division of responsibility between Bayer and GSK (*id.* at 320:15-321:8).

Dr. Schinagl candidly conceded that when he drafted the GSK Addendum, he was unaware of any laws, FDA regulations, written guidelines or other publications that address the duties and responsibilities of co-promoters of pharmaceutical products:

> Q. Do you know of any laws that define what obligations or responsibilities a drug company has when it is marketing another drug company's product?
>
> A. I would assume that that is something that would have to be covered in the co-promotion agreement.
>
> Q. No. I said do you know of any laws?
>
> A. No.
>
> Q. Do you know of any FDA regulations that govern what a company should do or must not do or is obligated to do or has a responsibility to do when it is helping another company market that other company's product?
>
> A. No.
>
> Q. Do you know of any written guidelines of any kind that define what a company should do when it is marketing another company's pharmaceutical product?
>
> A. No.
>
> Q. Do you know of any books or articles or anything else in writing, no matter what label you might put on it, that addresses the question of what a company should do when it is marketing or helping to market another company's pharmaceutical product?
>
> A. No.

Schinagl Dep. at 334:4-335:10.

## II. ARGUMENT

There are two distinct reasons why this Court should preclude Dr. Schinagl from offering any opinions about GSK. First, Dr. Schinagl lacks any kind of specialized knowledge, experience, training, or education that would make his opinions about GSK helpful to a jury. Second, even if Dr. Schinagl had such expertise, his opinions about GSK would still not be admissible because he based those opinions on a grossly inadequate factual foundation – a half an inch to an inch of documents hand-selected by a plaintiffs' lawyer.

### A. Expert Testimony Standard

Rule 702 of the Federal Rules of Evidence permits expert opinion testimony only if the witness (1) is offering "scientific, technical or other specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue," and (2) is qualified by "knowledge, skill, experience, training, or education" to offer the opinion. Fed. R. Evid. 702. Moreover, a witness can proffer expert opinion only if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id.*

The party seeking to introduce the expert testimony bears the burden of proving its admissibility that the testimony is both relevant and reliable. *Daubert v. Merrell Dow Pharm. Inc.,* 509 U.S. 579, 592 n. 10, 113 S.Ct. 2786 (1993). In analyzing an expert's proposed testimony under Rule 702, the judge performs a gatekeeping function by considering both the relevance and reliability of the expert testimony. *Id.*, 509 U.S. at 589.

### B. Dr. Schinagl Lacks Expertise To Opine on GSK's Conduct

The touchstone for determining the admissibility of expert opinion is whether the expert possesses "sufficient specialized knowledge to assist the jurors in 'deciding the particular issues in the case.'" *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 156-57, 119 S.Ct. 1167 (1999)

(quoting 4 J. McLaughlin, *Weinstein's Federal Evidence* ¶ 702.05[1], p. 702-33 (2nd ed. 1998)); *see also Wheeling Pittsburgh Steel Corp., v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001); *Teska v. Potlatch Corp.*, 184 F.Supp.2d 913, 920 (D. Minn. 2002). In *Wheeling*, the Eighth Circuit held that the district court abused its discretion in allowing a hydrologist to testify as an expert about safe warehousing practices in flood-prone areas. 254 F.3d at 715. The Court found that testimony about the specific efforts and levels of flood protection associated with good warehousing practices was outside of the scope of the hydrologist's expertise in matters of flood risk management. *See id.*; *see also*, *Teska* 184 F.Supp.2d at 920-21 (excluding the expert testimony of a former crane operator on the basis that since 1967 the former operator lacked "appreciable, relevant, experience in working with cranes, or with crane operators."); *Ancho v. Pentek Corp.*, 157 F.3d 512, 519 (7th Cir. 1998) ("Just as a qualified and board certified heart surgeon does not possess sufficient knowledge of orthopaedic medicine to render an expert opinion on spine surgery, likewise we agree . . . that a mechanical engineer . . . lacks qualifications to give expert testimony about plant configuration.").

Dr. Schinagl lacks any specialized knowledge that could qualify him to opine on whether GSK acted appropriately as the co-promoter of Baycol. Although he was a Medical Director for Pharmacia Corporation, that hardly makes him an "expert" on what constitutes proper conduct for a company, such as GSK, that is co-promoting a drug that another pharmaceutical company has developed, manufactured, and obtained FDA approval to sell. *See Garnac Grain Co., Inc. v. Blackley,* 932 F.2d 1563, 1566 (8th Cir. 1991) (precluding expert testimony where the experts, while knowledgeable of basic accounting principles, did not have specific accounting expertise in the areas in which they were opining).

Dr. Schinagl also has no education on the marketing of pharmaceutical products, or on the ethics of pharmaceutical companies. (Schinagl Dep. Tr. at 48:6-13.) He has never been consulted by or served on an advisory board for the FDA or any other regulatory agency. (*Id.* at 44:12-45:1.) Moreover, Dr. Schinagl did nothing – no reading, no investigation, no web searches, etc. – to try to compensate for his utter lack of relevant experience. *See Wheeling,* 254 F.3d at 715 (noting expert's failure to compensate for lack of specific experience with warehouse flood at issue with general research into activities regarding the flood at issue or other floods).

Dr. Schinagl simply has no basis at all -- no education, no experience, and no knowledge -- for offering "expert" opinions about GSK's conduct.

### C. Dr. Schinagl's Opinions Lack Sufficient Foundation in Relevant Facts and Standards, Thus His Resulting <u>Conclusions Are Merely Speculative and Should Be Excluded</u>

Even if Dr. Schinagl were qualified to offer an expert opinion on industry standards of pharmaceutical co-promotion, which he concedes he is not, Dr. Schinagl's opinions do not satisfy evidentiary standards of reliability. The Federal Rules of Evidence require that an expert opinion (1) be based on sufficient facts or data, (2) is the product of reliable principles and methods, and (3) consists of reliable application of principles and methods to the facts of the case. Fed. R. Evid. 702; *see also Lauzon v. Senco Prods. Inc.,* 270 F.3d 681, 686 (8th Cir. 2001). If an expert fails to review relevant facts and data in constructing his opinion, that opinion constitutes inadmissible conjecture and speculation. *See Concord Boat Corp. v. Brunswick Corp.,* 207 F.3d 1039, 1056-57 (8th Cir. 2000).

First and fundamentally, the GSK Addendum is not the result of an objective and adequate investigation into the relevant facts of this case. Dr. Schinagl reviewed only a tiny and insignificant fraction (a "half an inch to an inch") of the hundreds of thousands of documents

produced by GSK in this litigation, and only those that the PSC hand-selected for his review. Dr. Schinagl did not request or independently obtain any additional documents, nor did he even ask plaintiffs' counsel how they had selected the "half an inch to an inch" of documents from out of hundreds of thousands produced by GSK. (*See* Schinagl Dep. at 315:9-316:4.) Dr. Schinagl did not review any statutes, regulations, industry standards, guidelines or other materials relating to the duties and responsibilities of a company that is co-promoting another company's prescription drug. (*Id.* at 334:4-335:10.) He did not review any documents establishing the duties and responsibilities of Bayer and GSK, and he did not even read the Co-Promotion Agreement. (*Id.* at 339:6-340:10; 319:12-23; 329:4-9.)

Dr. Schinagl's failure to review even a single deposition of a GSK officer or manager is also remarkable. He conceded that he drafted his opinions about GSK without making any effort to inquire about and/or read the testimony of GSK personnel, and indeed Dr. Schinagl was unaware that anyone from GSK had even been deposed in this litigation until he was questioned about it at his deposition. (*Id.* at 319:24-320:3.)

Additionally, Dr. Schinagl spent merely four hours reviewing the "half an inch to an inch" of documents, **which did not even include a copy of the Co-Promotion Agreement,** and he cited only nine GSK documents in his Addendum. (*Id.* at 319:12-23; 329:4-9.) Dr. Schinagl relied upon a letter presented to him by the PSC without even asking to read the author's extensive deposition testimony about the letter, (*id.* at 354:2-355:4), and he relied upon a Bayer document as a basis for characterizing GSK's motivations for co-promoting Baycol, without even noticing that the document on which he relied was an internal Bayer document, not a document written by someone at GSK. (*Id.* at 355:5-356:14.) When questioned about the

propriety of this methodology, Dr. Schinagl testified that "[w]ell, if I did that, then that was wrong." *Id.* at 356:24-357:1.

Dr. Schinagl's admitted lack of any objective investigation into the relevant facts of the case (*id.* at 316:22-317:5), raises obvious questions of bias and reliability. *See Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317-18 (9th Cir. 1995).

The law in this circuit is clear that expert opinion requires objective verification of facts. *See In re Air Crash at Little Rock, Ark.*, 291 F.3d 503, 514-15 (8th Cir. 2002) (excluding expert opinion when based on plaintiff's statements and not objectively confirmed with other evidence). Dr. Schinagl's narrow and abbreviated examination of documents "fails to establish a reliable basis for [his] conclusions or that [his] conclusions are the product of reliable principles or methods." *Carlson v. C.H. Robinson Worldwide, Inc.*, No. Civ. 02-3780/ Civ. 02-4261, 2005 WL 758601 at *4 (D. Minn. Mar. 30, 2005). "An expert opinion that fails to consider the relevant facts of the case is fundamentally unsupported." *Nebraska Plastics, Inc. v. Holland Colors Americas, Inc.*, 408 F.3d 410, 416 (8th Cir. 2005); *see also*, *Concord Boat Corp.*, 207 F.3d at 1056.

In *Nebraska Plastics*, the Eighth Circuit upheld the district court's exclusion of an expert's future damages testimony on the ground that the expert's calculation of future damages resulting from customer warranty claims did not take into account a "plethora of specific facts tending to show limits on the amount of defective fencing that would be the subject of future warranty claims." *Nebraska Plastics*, 408 F.3d at 417. In *Carlson*, the district court precluded an expert report and testimony in which the expert based her report on a limited selection of deposition testimony and documentary evidence. *Carlson*, 2005 WL 758601 at *4; *see also,*

*Concord Boat Corp.*, 207 F.3d at 1056 (excluding expert opinion where expert did not consider all relevant facts of the case).

Absent objective verification of the facts, opinions developed expressly for litigation do not satisfy Rule 702's requirement of reliability. *See Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d at 1317; *Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 597-98 (9th Cir. 1996); *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 423 n.2 (5th Cir. 1987). Thus, an expert's sole reliance on evidence selected by plaintiff's counsel is a sufficient ground on which to exclude expert testimony. Material pre-selected by counsel is "so unreliable that no reasonable expert could base an opinion on it." *See Montgomery County v. Microvote Corp.*, 320 F.3d 440, 449 (3d Cir. 2003) (excluding expert testimony where expert relied on a sample of documents selected by counsel). Experts "cannot rely" on summaries prepared by persons "aligned with counsel for one of the litigants." *See In re TMI Litigation*, 193 F.3d 613, 698 (3d Cir. 1999); *see also, Braun v. Lorillard, Inc.*, 84 F.3d 230, 234-35 (7th Cir. 1996) (excluding expert who departed from standard method of testing and instead employed testing method initially suggested the attorneys who hired the expert); *Burton v. Danek Medical Inc.*, No. Civ. A. 95-5565, 1999 WL 118020, at *4 (E.D. Pa. Mar. 1, 1999) (excluding expert who "performed no research beyond reading articles that were provided to him by Plaintiffs' counsel"); *O'Brien v. Sofamor, S.N.C.*, No. Civ. A. 96-8015, 1999 WL 239414, at *5 (E.D. Pa. Mar. 30, 1999) (excluding expert who "only reviewed various doctor's reports that [plaintiff's] attorneys supplied to him"). In short, experts should not be permitted to "pick and choose from the scientific landscape." *Blum v. Merrell Dow Pharmaceuticals, Inc.*, 564 Pa. 3, 7 n.5, 764 A.2d 1, 4 n.5 (2000).

If the expert acts as a lawyer's mouthpiece, reiterating opinions generated solely for litigation, the expert opinion fails to assist the trier of fact and should be excluded. *See*

*Primavera Familienstifung v. Askin*, 130 F.Supp.2d 450, 530 (S.D.N.Y. 2001); *see also Lauzon*, 270 F.3d at 687 (viewing testimony developed specially for litigation with skepticism).

## III. CONCLUSION

The Court should preclude Dr. Schinagl from offering any opinions about GSK's conduct. His "expert" opinions about GSK are worthless, and do not come close to meeting the legal standards for admissibility.

Respectfully submitted,

Dated: April 17, 2006

/s/ Tracy Van Steenburgh
Tracy J. Van Steenburgh
**HALLELAND LEWIS NILAN SIPKINS & JOHNSON, P.A.**
220 South Sixth Street
Suite 600
Minneapolis, MN 55402-4501
(612) 338-1838 (phone)

Fred T. Magaziner
Halimah D. DeLaine
**DECHERT LLP**
Cira Centre
2929 Arch Street
Philadelphia, PA 191034-2828
(215) 994-4000 (phone)
(215) 994-2222 (fax)
**Attorneys for SmithKline Beecham Corporation d/b/a GlaxoSmithKline**

**CERTIFICATE OF SERVICE**

I, Halimah D. DeLaine, Esquire, hereby certify that a true and correct copy of the Motion of Defendant SmithKline Beecham Corporation d/b/a GlaxoSmithKline to Preclude Erich F. Schinagl, M.D. From Offering "Expert" Testimony About GSK was served and filed on April 17, 2006.

Halimah D. DeLaine