(xiv) Uses "statistics" on numbers of patients, or counts of favorable results or side effects, derived from pooling data from various insignificant or dissimilar studies in a way that suggests either that such "statistics" are valid if they are not or that they are derived from large or significant studies supporting favorable conclusions when such is not the case.

(xv) Uses erroneously a statistical finding of "no significant difference" to claim clinical equivalence or to deny or conceal the potential existence of a real clinical difference.

(xvi) Uses statements or representations that a drug differs from or does not contain a named drug or category of drugs, or that it has a greater potency per unit of weight, in a way that suggests falsely or misleadingly or without substantial evidence or substantial clinical experience that the advertised drug is safer or more effective than such other drug or drugs.

(xvii) Uses data favorable to a drug derived from patients treated with dosages different from those recommended in approved or permitted labeling if the drug advertised is subject to section 505 of the act, or, in the case of other drugs, if the dosages employed were different from those recommended in the labeling and generally recognized as safe and effective. This provision is not intended to prevent citation of reports of studies that include some patients treated with dosages different from those authorized, if the results in such patients are not used.

(xviii) Uses headline, subheadline, or pictorial or other graphic matter in a way that is misleading.

(xix) Represents or suggests that drug dosages properly recommended for use in the treatment of certain classes of patients or disease conditions are safe and effective for the treatment of other classes of patients or disease conditions when such is not the case.

(xx) Presents required information relating to side effects or contraindications by means of a general term for a group in place of disclosing each specific side effect and contraindication (for example employs the term *blood dyscrasias* instead of "leukopenia," "agranulocytosis," "neutropenia," etc.) unless the use of such general term conforms to the provisions of paragraph (e)(3)(iii) of this section.

*Provided, however*, That any provision of this paragraph shall be waived with respect to a specified advertisement as set forth in a written communication from the Food and Drug Administration on a petition for such a waiver from a person who would be adversely affected by the enforcement of such provision on the basis of a showing that the advertisement is not false, lacking in fair balance, or otherwise misleading, or otherwise violative of section 502(n) of the act. A petition for such a waiver shall set forth clearly and concisely the petitioner's interest in the advertisement, the specific provision of this paragraph from which a waiver is sought, a complete copy of the advertisement, and a showing that the advertisement is not false, lacking in fair balance, or otherwise misleading, or otherwise violative of section 502(n) of the act.

(7) *Advertisements that may be false, lacking in fair balance, or otherwise misleading.* An advertisement may be false, lacking in fair balance, or otherwise misleading or otherwise violative of section 502(n) of the act if it:

(i) Contains favorable information or conclusions from a study that is inadequate in design, scope, or conduct to furnish significant support for such information or conclusions.

(ii) Uses the concept of "statistical significance" to support a claim that has not been demonstrated to have clinical significance or validity, or fails to reveal the range of variations around the quoted average results.

(iii) Uses statistical analyses and techniques on a retrospective basis to discover and cite findings not soundly supported by the study, or to suggest scientific validity and rigor for data from studies the design or protocol of which are not amenable to formal statistical evaluations.

(iv) Uses tables or graphs to distort or misrepresent the relationships, trends, differences, or changes among the variables or products studied; for example, by failing to label abscissa and ordinate so that the graph creates a misleading impression.

(v) Uses reports or statements represented to be statistical analyses, interpretations, or evaluations that are inconsistent with or violate the established principles of statistical theory, methodology, applied practice, and inference, or that are derived from clinical studies the design, data, or conduct of which substantially invalidate the application of statistical analyses, interpretations, or evaluations.

(vi) Contains claims concerning the mechanism or site of drug action that are not generally regarded as established by scientific evidence by experts qualified by scientific training and experience without disclosing that the claims are not established and the limitations of the supporting evidence.

(vii) Fails to provide sufficient emphasis for the information relating to side effects and contraindications, when such information is contained in a distinct part of an advertisement, because of repetition or other emphasis in that part of the advertisement of claims for effectiveness or safety of the drug.

(viii) Fails to present information relating to side effects and contraindications with a prominence and readability reasonably comparable with the presentation of information relating to effectiveness of the drug, taking into account all implementing factors such as typography, layout, contrast, headlines, paragraphing, white space, and any other techniques apt to achieve emphasis.

(ix) Fails to provide adequate emphasis (for example, by the use of color scheme, borders, headlines, or copy that extends across the gutter) for the fact that two facing pages are part of the same advertisement when one page contains information relating to side effects and contraindications.

(x) In an advertisement promoting use of the drug in a selected class of patients (for example, geriatric patients or depressed patients), fails to present with adequate emphasis the significant side effects and contraindications or the significant dosage considerations, when dosage recommendations are included in an advertisement, especially applicable to that selected class of patients.

(xi) Fails to present on a page facing another page (or on another full page) of an advertisement on more than one page, information relating to side effects and contraindications when such information is in a distinct part of the advertisement.

(xii) Fails to include on each page or spread of an advertisement the information relating to side effects and contraindications or a prominent reference to its presence and location when it is presented as a distinct part of an advertisement.

(xiii) Contains information from published or unpublished reports or opinions falsely or misleadingly represented or suggested to be authentic or authoritative.

(f)–(i) [Reserved]

(j)(1) No advertisement concerning a particular prescription drug may be disseminated without prior approval by the Food and Drug Administration if:

(i) The sponsor or the Food and Drug Administration has received information that has not been widely publicized in medical literature that the use of the drug may cause fatalities or serious damage;

(ii) The Commissioner (or in his absence the officer acting as Commissioner), after evaluating the reliability of such information, has notified the sponsor that the information must be a part of the advertisements for the drug; and

(iii) The sponsor has failed within a reasonable time as specified in such notification to present to the Food and Drug Administration a program, adequate in light of the nature of the information, for assuring that such information will be publicized promptly and adequately to the medical profession in subsequent advertisements.

If the Commissioner finds that the program presented is not being followed, he will notify the sponsor that prior approval of all advertisements for the particular drug will be required. Nothing in this paragraph is to be construed as limiting the Commissioner's or the Secretary's rights, as authorized by law, to issue publicity, to suspend any new-drug application, to decertify any antibiotic, or to recommend any regulatory action.

(2) Within a reasonable time after information concerning the possibility that a drug may cause fatalities or serious damage has been widely publicized in medical literature, the Food and Drug Administration shall notify the sponsor of the drug by mail that prior approval of advertisements for the drug is no longer necessary.

(3) Dissemination of an advertisement not in compliance with this paragraph shall be deemed to be an act that causes the drug to be misbranded under section 502(n) of the act.

(4) Any advertisement may be submitted to the Food and Drug Administration prior to publication for comment. If the advertiser is notified that the submitted advertisement is not in violation and, at some subsequent time, the Food and Drug Administration changes its opinion, the advertiser will be so notified and will be given a reasonable time for correction before any regulatory action is taken under this section. Notification to the advertiser that a proposed advertisement is or is not considered to be in violation shall be in written form.

(5) The sponsor shall have an opportunity for a regulatory hearing before the Food and Drug Administration pursuant to part 16 of this chapter with respect to any determination that prior approval is required for advertisements concerning a particular prescription drug, or that a particular advertisement is not approvable.

(k) An advertisement issued or caused to be issued by the manufacturer, packer, or distributor of the drug promoted by the advertisement and which is not in compliance with section 502(n) of the act and the applicable regulations thereunder shall cause stocks of such drug in possession of the person responsible for issuing or causing the issuance of the advertisement, and stocks of the drug distributed by such person and still in the channels of commerce, to be misbranded under section 502(n) of the act.

(l)(1) Advertisements subject to section 502(n) of the act include advertisements in published journals, magazines, other periodicals, and newspapers, and advertisements broadcast through media such as radio, television, and telephone communication systems.

(2) Brochures, booklets, mailing pieces, detailing pieces, file cards, bulletins, calendars, price lists, catalogs, house organs, letters, motion picture films, film strips, lantern slides, sound recordings, exhibits, literature, and reprints and similar pieces of printed, audio, or visual matter descriptive of a drug and references published (for example, the "Physicians Desk Reference") for use by medical practitioners, pharmacists, or nurses, containing drug information supplied by the manufacturer, packer, or distributor of the drug and which are disseminated by or on behalf of its manufacturer, packer, or distributor are hereby determined to be labeling as defined in section 201(m) of the act.

[40 FR 14016, Mar. 27, 1975, as amended at 40 FR 58799, Dec. 18, 1975; 41 FR 48266, Nov. 2, 1976; 42 FR 15674, Mar. 22, 1977; 60 FR 38480, July 27, 1995; 64 FR 400, Jan. 5, 1999]

EFFECTIVE DATE NOTE: At 44 FR 37467, June 26, 1979, § 202.1(e)(6) (ii) and (vii) were revised. At 44 FR 74817, Dec. 18, 1979, paragraphs (e)(6) (ii) and (vii) were stayed indefinitely. At 64 FR 400, Jan. 5, 1999, these paragraphs were amended. For the convenience of the user, paragraphs (e)(6) (ii) and (vii), published at 44 FR 37467, are set forth below:

**§ 202.1 Prescription-drug advertisements.**

* * * * *

(e) * * *

(6) * * *

(ii) Represents or suggests that a prescription drug is safer or more effective than another drug in some particular when the difference has not been demonstrated by substantial evidence. An advertisement for a prescription drug may not, either directly or by implication, e.g., by use of comparative test data or reference to published reports, represent that the drug is safer or more effective than another drug, nor may an advertisement contain a quantitative statement of safety or effectiveness (*a*) unless the representation has been approved as part of the labeling in a new drug application or biologic license, or (*b*) if the drug is not a new drug or biologic, unless the representation of safety or effectiveness is supported by substantial evidence derived from adequate and well-controlled studies as defined in § 314.111(a)(5)(ii) of this chapter, or unless the

requirement for adequate and well-controlled studies is waived as provided in § 314.111(a)(5)(ii) of this chapter.

* * * * *

(vii) Suggests, on the basis of favorable data or conclusions from nonclinical studies of a prescription drug, such as studies in laboratory animals or in vitro, that the studies have clinical significance, if clinical significance has not been demonstrated. Data that demonstrate activity or effectiveness for a prescription drug in animal or in vitro tests and have not been shown by adequate and well-controlled clinical studies to pertain to clinical use may be used in advertising except that (*a*), in the case of anti-infective drugs, in vitro data may be included in the advertisement, if data are immediately preceded by the statement "The following in vitro data are available but their clinical significance is unknown" and (b), in the case of other drug classes, in vitro and animal data that have not been shown to pertain to clinical use by adequate and well-controlled clinical studies as defined in § 314.111(a)(5)(ii) of this chapter may not be used unless the requirement for adequate and well-controlled studies is waived as provided in § 314.111(a)(5)(ii) of this chapter.

* * * * *

## PART 203—PRESCRIPTION DRUG MARKETING

### Subpart A—General Provisions

Sec.
203.1 Scope.
203.2 Purpose.
203.3 Definitions.

### Subpart B—Reimportation

203.10 Restrictions on reimportation.
203.11 Applications for reimportation to provide emergency medical care.
203.12 An appeal from an adverse decision by the district office.

### Subpart C—Sales Restrictions

203.20 Sales restrictions.
203.22 Exclusions.
203.23 Returns.

### Subpart D—Samples

203.30 Sample distribution by mail or common carrier.
203.31 Sample distribution by means other than mail or common carrier (direct delivery by a representative or detailer).
203.32 Drug sample storage and handling requirements.
203.33 Drug sample forms.
203.34 Policies and procedures; administrative systems.
203.35 Standing requests.
203.36 Fulfillment houses, shipping and mailing services, comarketing agreements, and third-party recordkeeping.
203.37 Investigation and notification requirements.
203.38 Sample lot or control numbers; labeling of sample units.
203.39 Donation of drug samples to charitable institutions.

### Subpart E—Wholesale Distribution

203.50 Requirements for wholesale distribution of prescription drugs.

### Subpart F—Request and Receipt Forms, Reports, and Records

203.60 Request and receipt forms, reports, and records.

### Subpart G—Rewards

203.70 Application for a reward.

AUTHORITY: 21 U.S.C. 331, 333, 351, 352, 353, 360, 371, 374, 381.

SOURCE: 64 FR 67756, Dec. 3, 1999, unless otherwise noted.

## Subpart A—General Provisions

**§ 203.1 Scope.**

This part sets forth procedures and requirements pertaining to the reimportation and wholesale distribution of prescription drugs, including both bulk drug substances and finished dosage forms; the sale, purchase, or trade of (or the offer to sell, purchase, or trade) prescription drugs, including bulk drug substances, that were purchased by hospitals or health care entities, or donated to charitable organizations; and the distribution of prescription drug samples. Blood and blood components intended for transfusion are excluded from the restrictions in and the requirements of the Prescription Drug Marketing Act of 1987 and the Prescription Drug Amendments of 1992.

**§ 203.2 Purpose.**

The purpose of this part is to implement the Prescription Drug Marketing Act of 1987 and the Prescription Drug

## Subpart B—Applications

**§ 314.50 Content and format of an application.**

Applications and supplements to approved applications are required to be submitted in the form and contain the information, as appropriate for the particular submission, required under this section. Three copies of the application are required: An archival copy, a review copy, and a field copy. An application for a new chemical entity will generally contain an application form, an index, a summary, five or six technical sections, case report tabulations of patient data, case report forms, drug samples, and labeling, including, if applicable, any Medication Guide required under part 208 of this chapter. Other applications will generally contain only some of those items, and information will be limited to that needed to support the particular submission. These include an application of the type described in section 505(b)(2) of the act, an amendment, and a supplement. The application is required to contain reports of all investigations of the drug product sponsored by the applicant, and all other information about the drug pertinent to an evaluation of the application that is received or otherwise obtained by the applicant from any source. FDA will maintain guidance documents on the format and content of applications to assist applicants in their preparation.

(a) *Application form.* The applicant shall submit a completed and signed application form that contains the following:

(1) The name and address of the applicant; the date of the application; the application number if previously issued (for example, if the application is a resubmission, an amendment, or a supplement); the name of the drug product, including its established, proprietary, code, and chemical names; the dosage form and strength; the route of administration; the identification numbers of all investigational new drug applications that are referenced in the application; the identification numbers of all drug master files and other applications under this part that are referenced in the application; and the drug product's proposed indications for use.

(2) A statement whether the submission is an original submission, a 505(b)(2) application, a resubmission, or a supplement to an application under § 314.70.

(3) A statement whether the applicant proposes to market the drug product as a prescription or an over-the-counter product.

(4) A check-list identifying what enclosures required under this section the applicant is submitting.

(5) The applicant, or the applicant's attorney, agent, or other authorized official shall sign the application. If the person signing the application does not reside or have a place of business within the United States, the application is required to contain the name and address of, and be countersigned by, an attorney, agent, or other authorized official who resides or maintains a place of business within the United States.

(b) *Index.* The archival copy of the application is required to contain a comprehensive index by volume number and page number to the summary under paragraph (c) of this section, the technical sections under paragraph (d) of this section, and the supporting information under paragraph (f) of this section.

(c) *Summary.* (1) An application is required to contain a summary of the application in enough detail that the reader may gain a good general understanding of the data and information in the application, including an understanding of the quantitative aspects of the data. The summary is not required for supplements under § 314.70. Resubmissions of an application should contain an updated summary, as appropriate. The summary should discuss all aspects of the application, and synthesize the information into a well-structured and unified document. The summary should be written at approximately the level of detail required for publication in, and meet the editorial standards generally applied by, refereed scientific and medical journals. In addition to the agency personnel reviewing the summary in the context of their review of the application, FDA may furnish the summary to FDA advisory committee members and agency

officials whose duties require an understanding of the application. To the extent possible, data in the summary should be presented in tabular and graphic forms. FDA has prepared a guideline under § 10.90(b) that provides information about how to prepare a summary. The summary required under this paragraph may be used by FDA or the applicant to prepare the Summary Basis of Approval document for public disclosure (under § 314.430(e)(2)(ii)) when the application is approved.

(2) The summary is required to contain the following information:

(i) The proposed text of the labeling, including, if applicable, any Medication Guide required under part 208 of this chapter, for the drug, with annotations to the information in the summary and technical sections of the application that support the inclusion of each statement in the labeling, and, if the application is for a prescription drug, statements describing the reasons for omitting a section or subsection of the labeling format in § 201.57 of this chapter.

(ii) A statement identifying the pharmacologic class of the drug and a discussion of the scientific rationale for the drug, its intended use, and the potential clinical benefits of the drug product.

(iii) A brief description of the marketing history, if any, of the drug outside the United States, including a list of the countries in which the drug has been marketed, a list of any countries in which the drug has been withdrawn from marketing for any reason related to safety or effectiveness, and a list of countries in which applications for marketing are pending. The description is required to describe both marketing by the applicant and, if known, the marketing history of other persons.

(iv) A summary of the chemistry, manufacturing, and controls section of the application.

(v) A summary of the nonclinical pharmacology and toxicology section of the application.

(vi) A summary of the human pharmacokinetics and bioavailability section of the application.

(vii) A summary of the microbiology section of the application (for anti-infective drugs only).

(viii) A summary of the clinical data section of the application, including the results of statistical analyses of the clinical trials.

(ix) A concluding discussion that presents the benefit and risk considerations related to the drug, including a discussion of any proposed additional studies or surveillance the applicant intends to conduct postmarketing.

(d) *Technical sections.* The application is required to contain the technical sections described below. Each technical section is required to contain data and information in sufficient detail to permit the agency to make a knowledgeable judgment about whether to approve the application or whether grounds exist under section 505(d) of the act to refuse to approve the application. The required technical sections are as follows:

(1) *Chemistry, manufacturing, and controls section.* A section describing the composition, manufacture, and specification of the drug substance and the drug product, including the following:

(i) *Drug substance.* A full description of the drug substance including its physical and chemical characteristics and stability; the name and address of its manufacturer; the method of synthesis (or isolation) and purification of the drug substance; the process controls used during manufacture and packaging; and the specifications necessary to ensure the identity, strength, quality, and purity of the drug substance and the bioavailability of the drug products made from the substance, including, for example, tests, analytical procedures, and acceptance criteria relating to stability, sterility, particle size, and crystalline form. The application may provide additionally for the use of alternatives to meet any of these requirements, including alternative sources, process controls, and analytical procedures. Reference to the current edition of the U.S. Pharmacopeia and the National Formulary may satisfy relevant requirements in this paragraph.

(ii)(a) *Drug product.* A list of all components used in the manufacture of the drug product (regardless of whether

they appear in the drug product) and a statement of the composition of the drug product; the specifications for each component; the name and address of each manufacturer of the drug product; a description of the manufacturing and packaging procedures and in-process controls for the drug product; the specifications necessary to ensure the identity, strength, quality, purity, potency, and bioavailability of the drug product, including, for example, tests, analytical procedures, and acceptance criteria relating to sterility, dissolution rate, container closure systems; and stability data with proposed expiration dating. The application may provide additionally for the use of alternatives to meet any of these requirements, including alternative components, manufacturing and packaging procedures, in-process controls, and analytical procedures. Reference to the current edition of the U.S. Pharmacopeia and the National Formulary may satisfy relevant requirements in this paragraph.

(*b*) Unless provided by paragraph (d)(1)(ii)(*a*) of this section, for each batch of the drug product used to conduct a bioavailability or bioequivalence study described in § 320.38 or § 320.63 of this chapter or used to conduct a primary stability study: The batch production record; the specification for each component and for the drug product; the names and addresses of the sources of the active and noncompendial inactive components and of the container and closure system for the drug product; the name and address of each contract facility involved in the manufacture, processing, packaging, or testing of the drug product and identification of the operation performed by each contract facility; and the results of any test performed on the components used in the manufacture of the drug product as required by § 211.84(d) of this chapter and on the drug product as required by § 211.165 of this chapter.

(*c*) The proposed or actual master production record, including a description of the equipment, to be used for the manufacture of a commercial lot of the drug product or a comparably detailed description of the production process for a representative batch of the drug product.

(iii) *Environmental impact.* The application is required to contain either a claim for categorical exclusion under § 25.30 or 25.31 of this chapter or an environmental assessment under § 25.40 of this chapter.

(iv) The applicant may, at its option, submit a complete chemistry, manufacturing, and controls section 90 to 120 days before the anticipated submission of the remainder of the application. FDA will review such early submissions as resources permit.

(v) The applicant shall include a statement certifying that the field copy of the application has been provided to the applicant's home FDA district office.

(2) *Nonclinical pharmacology and toxicology section.* A section describing, with the aid of graphs and tables, animal and in vitro studies with drug, including the following:

(i) Studies of the pharmacological actions of the drug in relation to its proposed therapeutic indication and studies that otherwise define the pharmacologic properties of the drug or are pertinent to possible adverse effects.

(ii) Studies of the toxicological effects of the drug as they relate to the drug's intended clinical uses, including, as appropriate, studies assessing the drug's acute, subacute, and chronic toxicity; carcinogenicity; and studies of toxicities related to the drug's particular mode of administration or conditions of use.

(iii) Studies, as appropriate, of the effects of the drug on reproduction and on the developing fetus.

(iv) Any studies of the absorption, distribution, metabolism, and excretion of the drug in animals.

(v) For each nonclinical laboratory study subject to the good laboratory practice regulations under part 58 a statement that it was conducted in compliance with the good laboratory practice regulations in part 58, or, if the study was not conducted in compliance with those regulations, a brief statement of the reason for the noncompliance.

(3) *Human pharmacokinetics and bioavailability section.* A section describing the human pharmacokinetic data and

human bioavailability data, or information supporting a waiver of the submission of in vivo bioavailability data under subpart B of part 320, including the following:

(i) A description of each of the bioavailability and pharmacokinetic studies of the drug in humans performed by or on behalf of the applicant that includes a description of the analytical procedures and statistical methods used in each study and a statement with respect to each study that it either was conducted in compliance with the institutional review board regulations in part 56, or was not subject to the regulations under §56.104 or §56.105, and that it was conducted in compliance with the informed consent regulations in part 50.

(ii) If the application describes in the chemistry, manufacturing, and controls section tests, analytical procedures, and acceptance criteria needed to assure the bioavailability of the drug product or drug substance, or both, a statement in this section of the rationale for establishing the tests, analytical procedures, and acceptance criteria, including data and information supporting the rationale.

(iii) A summarizing discussion and analysis of the pharmacokinetics and metabolism of the active ingredients and the bioavailability or bioequivalence, or both, of the drug product.

(4) *Microbiology section*. If the drug is an anti-infective drug, a section describing the microbiology data, including the following:

(i) A description of the biochemical basis of the drug's action on microbial physiology.

(ii) A description of the antimicrobial spectra of the drug, including results of in vitro preclinical studies to demonstrate concentrations of the drug required for effective use.

(iii) A description of any known mechanisms of resistance to the drug, including results of any known epidemiologic studies to demonstrate prevalence of resistance factors.

(iv) A description of clinical microbiology laboratory procedures (for example, in vitro sensitivity discs) needed for effective use of the drug.

(5) *Clinical data section*. A section describing the clinical investigations of the drug, including the following:

(i) A description and analysis of each clinical pharmacology study of the drug, including a brief comparison of the results of the human studies with the animal pharmacology and toxicology data.

(ii) A description and analysis of each controlled clinical study pertinent to a proposed use of the drug, including the protocol and a description of the statistical analyses used to evaluate the study. If the study report is an interim analysis, this is to be noted and a projected completion date provided. Controlled clinical studies that have not been analyzed in detail for any reason (e.g., because they have been discontinued or are incomplete) are to be included in this section, including a copy of the protocol and a brief description of the results and status of the study.

(iii) A description of each uncontrolled clinical study, a summary of the results, and a brief statement explaining why the study is classified as uncontrolled.

(iv) A description and analysis of any other data or information relevant to an evaluation of the safety and effectiveness of the drug product obtained or otherwise received by the applicant from any source, foreign or domestic, including information derived from clinical investigations, including controlled and uncontrolled studies of uses of the drug other than those proposed in the application, commercial marketing experience, reports in the scientific literature, and unpublished scientific papers.

(v) An integrated summary of the data demonstrating substantial evidence of effectiveness for the claimed indications. Evidence is also required to support the dosage and administration section of the labeling, including support for the dosage and dose interval recommended. The effectiveness data shall be presented by gender, age, and racial subgroups and shall identify any modifications of dose or dose interval needed for specific subgroups. Effectiveness data from other subgroups of the population of patients treated, when appropriate, such as patients

with renal failure or patients with different levels of severity of the disease, also shall be presented.

(vi) A summary and updates of safety information, as follows:

(*a*) The applicant shall submit an integrated summary of all available information about the safety of the drug product, including pertinent animal data, demonstrated or potential adverse effects of the drug, clinically significant drug/drug interactions, and other safety considerations, such as data from epidemiological studies of related drugs. The safety data shall be presented by gender, age, and racial subgroups. When appropriate, safety data from other subgroups of the population of patients treated also shall be presented, such as for patients with renal failure or patients with different levels of severity of the disease. A description of any statistical analyses performed in analyzing safety data should also be included, unless already included under paragraph (d)(5)(ii) of this section.

(*b*) The applicant shall, under section 505(i) of the act, update periodically its pending application with new safety information learned about the drug that may reasonably affect the statement of contraindications, warnings, precautions, and adverse reactions in the draft labeling and, if applicable, any Medication Guide required under part 208 of this chapter. These "safety update reports" are required to include the same kinds of information (from clinical studies, animal studies, and other sources) and are required to be submitted in the same format as the integrated summary in paragraph (d)(5)(vi)(*a*) of this section. In addition, the reports are required to include the case report forms for each patient who died during a clinical study or who did not complete the study because of an adverse event (unless this requirement is waived). The applicant shall submit these reports (*1*) 4 months after the initial submission; (*2*) following receipt of an approvable letter; and (*3*) at other times as requested by FDA. Prior to the submission of the first such report, applicants are encouraged to consult with FDA regarding further details on its form and content.

(vii) If the drug has a potential for abuse, a description and analysis of studies or information related to abuse of the drug, including a proposal for scheduling under the Controlled Substances Act. A description of any studies related to overdosage is also required, including information on dialysis, antidotes, or other treatments, if known.

(viii) An integrated summary of the benefits and risks of the drug, including a discussion of why the benefits exceed the risks under the conditions stated in the labeling.

(ix) A statement with respect to each clinical study involving human subjects that it either was conducted in compliance with the institutional review board regulations in part 56, or was not subject to the regulations under § 56.104 or § 56.105, and that it was conducted in compliance with the informed consent regulations in part 50.

(x) If a sponsor has transferred any obligations for the conduct of any clinical study to a contract research organization, a statement containing the name and address of the contract research organization, identification of the clinical study, and a listing of the obligations transferred. If all obligations governing the conduct of the study have been transferred, a general statement of this transfer—in lieu of a listing of the specific obligations transferred—may be submitted.

(xi) If original subject records were audited or reviewed by the sponsor in the course of monitoring any clinical study to verify the accuracy of the case reports submitted to the sponsor, a list identifying each clinical study so audited or reviewed.

(6) *Statistical section.* A section describing the statistical evaluation of clinical data, including the following:

(i) A copy of the information submitted under paragraph (d)(5)(ii) of this section concerning the description and analysis of each controlled clinical study, and the documentation and supporting statistical analyses used in evaluating the controlled clinical studies.

(ii) A copy of the information submitted under paragraph (d)(5)(vi)(*a*) of this section concerning a summary of information about the safety of the

drug product, and the documentation and supporting statistical analyses used in evaluating the safety information.

(7) *Pediatric use section.* A section describing the investigation of the drug for use in pediatric populations, including an integrated summary of the information (the clinical pharmacology studies, controlled clinical studies, or uncontrolled clinical studies, or other data or information) that is relevant to the safety and effectiveness and benefits and risks of the drug in pediatric populations for the claimed indications, a reference to the full descriptions of such studies provided under paragraphs (d)(3) and (d)(5) of this section, and information required to be submitted under § 314.55.

(e) *Samples and labeling.* (1) Upon request from FDA, the applicant shall submit the samples described below to the places identified in the agency's request. FDA will generally ask applicants to submit samples directly to two or more agency laboratories that will perform all necessary tests on the samples and validate the applicant's analytical procedures.

(i) Four representative samples of the following, each sample in sufficient quantity to permit FDA to perform three times each test described in the application to determine whether the drug substance and the drug product meet the specifications given in the application:

(*a*) The drug product proposed for marketing;

(*b*) The drug substance used in the drug product from which the samples of the drug product were taken; and

(*c*) Reference standards and blanks (except that reference standards recognized in an official compendium need not be submitted).

(ii) Samples of the finished market package, if requested by FDA.

(2) The applicant shall submit the following in the archival copy of the application:

(i) Three copies of the analytical procedures and related descriptive information contained in the chemistry, manufacturing, and controls section under paragraph (d)(1) of this section for the drug substance and the drug product that are necessary for FDA's laboratories to perform all necessary tests on the samples and to validate the applicant's analytical procedures. The related descriptive information includes a description of each sample; the proposed regulatory specifications for the drug; a detailed description of the methods of analysis; supporting data for accuracy, specificity, precision and ruggedness; and complete results of the applicant's tests on each sample.

(ii) Copies of the label and all labeling for the drug product (including, if applicable, any Medication Guide required under part 208 of this chapter) for the drug product (4 copies of draft labeling or 12 copies of final printed labeling).

(f) *Case report forms and tabulations.* The archival copy of the application is required to contain the following case report tabulations and case report forms:

(1) *Case report tabulations.* The application is required to contain tabulations of the data from each adequate and well-controlled study under § 314.126 (Phase 2 and Phase 3 studies as described in §§ 312.21 (b) and (c) of this chapter), tabulations of the data from the earliest clinical pharmacology studies (Phase 1 studies as described in § 312.21(a) of this chapter), and tabulations of the safety data from other clinical studies. Routine submission of other patient data from uncontrolled studies is not required. The tabulations are required to include the data on each patient in each study, except that the applicant may delete those tabulations which the agency agrees, in advance, are not pertinent to a review of the drug's safety or effectiveness. Upon request, FDA will discuss with the applicant in a "pre-NDA" conference those tabulations that may be appropriate for such deletion. Barring unforeseen circumstances, tabulations agreed to be deleted at such a conference will not be requested during the conduct of FDA's review of the application. If such unforeseen circumstances do occur, any request for deleted tabulations will be made by the director of the FDA division responsible for reviewing the application, in accordance with paragraph (f)(3) of this section.