# EXHIBIT 5

Terry Hodgson

COPROMOTION AGREEMENT

THIS COPROMOTION AGREEMENT (hereinafter "AGREEMENT"), made as of the 21st day of July, 1997, between Bayer Corporation, a company organized under the laws of the state of Indiana and having a place of business at 400 Morgan Lane, West Haven, CT 06516-4175, U.S.A. and SmithKline Beecham Corporation, a company organized under the laws of the Commonwealth of Pennsylvania and having its principal office at One Franklin Plaza, Philadelphia, PA 19101,

WITNESSETH THAT:

WHEREAS, SB (as hereinafter defined) desires to obtain the right from BAYER (as hereinafter defined) to engage in the PROMOTION (as hereinafter defined) of BAYER's proprietary HMG-CoA reductase inhibiting compound known as cerivastatin on a coexclusive basis with BAYER in the United States of America; and

WHEREAS, BAYER desires to grant SB such PROMOTION right for a certain period of time;

NOW, THEREFORE, in consideration of the covenants and obligations expressed herein, and intending to be legally bound, the parties agree as follows

DEFINITIONS

1.01 "ACTIVE PERIOD" shall mean the period beginning on the EFFECTIVE DATE and ending upon the expiration of the sixth (6th) YEAR, subject to the termination provisions of Article 12 hereof.

1.02 "ADVERSE EXPERIENCE(S)" or "AE(S)" shall mean any noxious, pathological or unintended change in anatomical, physiological or metabolic function as indicated by physical signs, symptoms and/or laboratory changes occurring in clinical trials, post-marketing surveillance, or clinical practice during use of PRODUCT, or published in the medical literature, whether or not considered causally related to the PRODUCT. This includes an exacerbation of a pre-existing condition, intercurrent illness, drug interaction, significant worsening of a disease under investigation or treatment, and significant failure of expected pharmacological or biological action. AES shall include any event required to be reported to the FDA.



GSK_BL_ 0001782
MDL PTO 99 CONFIDENTIAL SUBJECT TO PROTECTIVE ORDE

provided, however, that no more than two such presentations in any DETAIL shall be considered a Major Presentation, which shall be the two presentations on which the most time is spent during the DETAIL.

1.09 "DETAIL CHARGE" shall mean the U.S. dollar figure applied to each DETAIL for purposes of calculating charges against the distribution of NET GROSS MARGIN ADJUSTED as determined in accordance with Paragraph 6.04(H).

1.10 "DEVELOPMENT COSTS" shall mean any actual out of pocket expenses incurred by either party after the EFFECTIVE DATE which are related to clinical studies for PRODUCT which are approved by the JOINT DEVELOPMENT COMMITTEE and each party in accordance with Paragraph 3.04, and, which are related to the development of the 0.1, 0.2, 0.3 and 0.4 mg dosage forms or additional dosage forms and indications of PRODUCT in the TERRITORY in accordance with Paragraph 3.05. DEVELOPMENT COSTS shall specifically exclude:

(A) salaries and other internal overhead and/or compensation paid by BAYER to BAYER's employees or by SB to SB's employees, and

(B) any expenses accrued by BAYER or SB prior to the EFFECTIVE DATE.

1.11 "EFFECTIVE DATE" shall mean the date as of which this AGREEMENT is effective and shall be the date of this AGREEMENT first written above.

1.12 "FDA" shall mean the United States Food and Drug Administration and any successor agency thereto.

1.13 "FINISHED FORM" shall mean PRODUCT packaged and labeled and in a form ready for distribution in the TERRITORY.

1.14 "INACTIVE PERIOD" shall mean the three (3) YEAR period following the ACTIVE PERIOD, subject to the termination provisions of Article 12 hereof.

1.15 "JOINT DEVELOPMENT COMMITTEE" means the group, established and conducted in accordance with the procedures set forth in Article 3.

1.16 "JOINT MARKETING TEAM" means the group, established and conducted in accordance to the procedures set forth in Article 6.

1.17 "KNOW HOW" shall mean all present and future technical information and know-how which is not in the public domain which relates to the copromotion of the PRODUCT and the development of its 0.1, 0.2, 0.3 and

(D) allowances or credits to customers on account of rejection or return of PRODUCT or on account of retroactive price reductions affecting such PRODUCT; and

(E) PRODUCT rebates and PRODUCT charge backs including those granted to managed care entities.

Any sales between BAYER and its AFFILIATES in the TERRITORY intended for use or sale outside of the TERRITORY shall be excluded from the gross receipts in the computation of NET SALES and no payments will be owed on such sales.

1.23 "PACKAGE PRICE OF PRODUCT" shall mean twenty-five percent (25%) of NET SALES of PRODUCT in the TERRITORY up to the LAUNCH of 0.4 mg. PRODUCT, and thereafter twenty-seven percent (27%) of NET SALES. For purposes of this definition, PRODUCT shall mean PRODUCT in FINISHED FORM.

1.24 "PATENTS" shall mean all patents and patent applications in the TERRITORY which are or become owned by BAYER or any of its AFFILIATES, or to which BAYER or any of its AFFILIATES otherwise has, now or in the future, the right to grant the rights provided under this AGREEMENT, which patents generically or specifically claim the making, having made, use, offer for sale, sale or importation of PRODUCT. Included within the definition of PATENTS are all continuations, continuations-in-part, divisions, patents of addition, reissues, renewals or extensions thereof. Also included within the definition of PATENTS are any patents or patent applications which generically or specifically claim any improvements on PRODUCT which are developed by BAYER or any of its AFFILIATES, or to which BAYER or any of its AFFILIATES otherwise has the right to grant licenses and license rights, now or in the future, during the term of this AGREEMENT. The current list of patent applications and patents encompassed within PATENTS is set forth in Appendix A attached hereto. BAYER shall update such list with regard to PATENTS owned or to which it has the right to grant the rights under Paragraph 2.01 of this AGREEMENT on a periodic basis during the term of this AGREEMENT.

1.25 "PRODUCT" shall mean the chemical compound known as cerivastatin, whose more specific chemical name is (+)-[3R,5S,(E)]-sodium-7-[4-(4-fluorophenyl)-2,6-diisopropyl-5-methoxymethylpyrid-3-yl]-3,5-dihydroxyhept-6-enoate, its prodrugs and metabolites, and all esters, salts, hydrates, solvates, polymorphs and isomers thereof, in all dosage forms and package configurations for any indications for which the PRODUCT is or may be permitted to be sold for prescription use (but not for any over the counter ["OTC"] uses) in the TERRITORY by the FDA.

1.26 "PROMOTION" shall mean those activities normally undertaken by a pharmaceutical company (excluding DETAILING by its sales force) to implement marketing plans and strategies aimed at encouraging the appropriate use of a particular prescription pharmaceutical product. When used as a verb, "PROMOTE" shall mean to engage in such activities.

1.27 "PROMOTION EXPENSES" shall mean any actual pre or post LAUNCH out of pocket expenses incurred by either party after the EFFECTIVE DATE, calculated in accordance with Article 11, and approved by the JOINT MARKETING TEAM in accordance with Paragraph 6.04, related to the selling, marketing and PROMOTION of PRODUCT in the TERRITORY by either party under this AGREEMENT. PROMOTION EXPENSES shall include, among other things, actual costs for printing of promotional and training materials, services provided by THIRD PARTIES (e.g. advertising), symposia, as well as the cost of any Phase IV post-marketing clinical studies (excluding any registration trials), clinical challenge programs and/or indigent patient programs approved by the JOINT MARKETING COMMITTEE as incidental to the marketing and PROMOTION of PRODUCT by SB and/or BAYER under this AGREEMENT. PROMOTION EXPENSES shall specifically exclude (1) salaries and other internal overhead and/or compensation paid to SB's or BAYER's employees, including internal sales force personnel, (2) the SAMPLE TABLETS employed for PROMOTION by either party during the first four (4) YEARS, and (3) the SAMPLE TABLETS employed for PROMOTION by either party with respect to a new dosage form for a period of two (2) years post LAUNCH of such form.

1.28 "SAMPLE TABLETS" shall mean bulk tablets of PRODUCT not including packaging and labeling.

1.29 "SB" shall mean SmithKline Beecham Corporation, a corporation of the Commonwealth of Pennsylvania, having its principal place of business at One Franklin Plaza, Philadelphia, Pennsylvania 19101, U.S.A.

1.30 "STEERING COMMITTEE" shall consist of six (6) members of Senior Management, three (3) of whom shall be appointed by SB and three (3) of whom shall be appointed by BAYER. For BAYER, the initial representatives, which may be changed from time to time by BAYER, shall be Senior Vice President, and General Manager Pharmaceuticals US, Senior Vice President Pharmaceutical Development and Vice President of Business Planning and Administration. From SB, the representatives, which may be changed from time to time by SB, shall be Senior Vice President and Director Sales and Marketing, SB Pharmaceuticals North America, Vice President and Director, New Product Development, SB Pharmaceuticals North America, and Vice President and Director, Cardiopulmonary Therapeutic Area Team, SB Pharmaceuticals North America. The presence

of at least four (4) members, two (2) of whom shall have been selected by each party, shall constitute a quorum for purposes of consideration and action by the STEERING COMMITTEE. Each party's members shall have collectively one vote on all matters, and whenever action is to be taken by vote of the STEERING COMMITTEE, it shall be authorized by a unanimous vote. Chairmanship of the STEERING COMMITTEE shall reside with BAYER for the first twelve (12) months and shall alternate between SB and BAYER for each additional twelve (12) month period of the active period of this AGREEMENT.

Meetings of the STEERING COMMITTEE shall be held on a semiannual basis, unless either SB or BAYER determine, no later than thirty (30) days in advance of any meeting following the initial meeting, that no new business or other activity has transpired since the previous meeting and, therefore, that a meeting is unnecessary. In such instance, the next meeting will be scheduled. The location of STEERING COMMITTEE meetings shall alternate between SB's offices in the Philadelphia, Pennsylvania metropolitan area and BAYER's offices in West Haven, Connecticut, unless otherwise agreed upon between the parties. STEERING COMMITTEE meetings may not necessarily be face-to-face meetings, but upon the agreement of both parties can be via other methods of communication such as teleconferences and/or videoconferences. Minutes of the STEERING COMMITTEE shall be transcribed and issued by the chairman within thirty (30) days after each meeting and shall be approved as the first order of business at the immediately succeeding STEERING COMMITTEE meeting.

1.31 "TARGET AUDIENCE" shall mean each specialty identified by the JOINT MARKETING TEAM, in accordance with Paragraph 6.04, as being a suitable 'target' for the PROMOTION of PRODUCT for a particular indication of PRODUCT in the TERRITORY, provided that such physician specialties are selected off a list to be provided by SB to the JOINT MARKETING TEAM on an annual basis. TARGET AUDIENCE shall include health care professionals with actual prescribing authority such as nurse practitioners and physicians' assistants and other individuals or entities that have a significant impact/influence on prescribing decision including but not limited to Managed Health Care Organizations.

1.32 "TERRITORY" shall mean the U.S.A.

1.33 "THIRD PARTY(IES)" shall mean any party other than SB and BAYER.

1.34 "U.S.A." shall mean the United States of America, its territories and possessions, such as, but not limited to, Puerto Rico.

1.35 "YEAR" shall mean each twelve month period following the day of the LAUNCH.

GRANT OF COPROMOTION RIGHT

2.01 BAYER hereby grants to SB the exclusive right to PROMOTE PRODUCT with BAYER in the TERRITORY, subject to the terms and conditions of this AGREEMENT. The exclusive right to PROMOTE PRODUCT with BAYER in the TERRITORY granted to SB under this provision shall include all activities related to the PROMOTION of PRODUCT. Neither party shall be permitted to grant any THIRD PARTY any rights under its right to PROMOTE PRODUCT in the TERRITORY under this AGREEMENT without the prior written consent of the other party.

DEVELOPMENT

3.01 Pursuant to the Letter Agreement between BAYER and SB dated March 31, 1997, the parties formed a JOINT DEVELOPMENT COMMITTEE whose mandate is to

(A) direct the regulatory and scientific development of PRODUCT necessary to receive regulatory approval for the commercialization of PRODUCT in the TERRITORY for the indication of primary hypercholesterolemia for the 0.1, 0.2, 0.3 and 0.4 mg dosage forms of PRODUCT,

(B) evaluate the scientific feasibility and direct any subsequent development of PRODUCT for additional indications and/or additional dosage forms in the TERRITORY, and

(C) recommend the budget for the DEVELOPMENT COSTS, said budget to be subject to the approval of both SB and BAYER management.

3.02 The parties have appointed up to four (4) voting representatives for membership on the JOINT DEVELOPMENT COMMITTEE. Membership shall include representation from each party's scientific, clinical development, regulatory affairs, and marketing departments and/or representation from such other departments as the JOINT DEVELOPMENT COMMITTEE may deem appropriate. The presence of at least six (6) members, three (3) of whom shall have been selected by each PARTY, shall constitute a quorum for purposes of consideration and action by the JOINT DEVELOPMENT COMMITTEE. Regardless of the number of representatives appointed by either party, each party's voting representatives shall have collectively one (1) vote on each matter brought

before the JOINT DEVELOPMENT COMMITTEE. In addition, the JOINT DEVELOPMENT COMMITTEE may from time to time include additional non-voting ad-hoc representatives from either party on specific issues as the need arises.

3.03 The chairman of the JOINT DEVELOPMENT COMMITTEE shall be one of the members of the JOINT DEVELOPMENT COMMITTEE. Chairmanship of the JOINT DEVELOPMENT COMMITTEE shall alternate between an SB member and a BAYER member on an annual basis, with a BAYER member serving as JOINT DEVELOPMENT COMMITTEE chairman for the first year following the EFFECTIVE DATE. A meeting of the JOINT DEVELOPMENT COMMITTEE shall occur within thirty (30) days after the EFFECTIVE DATE. The purpose of this meeting shall be to review the current status of the development of PRODUCT in the TERRITORY. Thereafter, meetings shall be held once a quarter unless no later than thirty (30) days in advance of any meeting there is a determination by the Chairman of the JOINT DEVELOPMENT COMMITTEE that no new business or other activity has transpired since the previous meeting, and that there is no need for a meeting. In such instance, the next quarterly meeting will be scheduled. The location of such meetings shall alternate between BAYER's offices in West Haven, Connecticut and SB's offices in the Philadelphia, Pennsylvania metropolitan area unless otherwise agreed upon between the parties, with the first meeting to be held at BAYER's offices. JOINT DEVELOPMENT COMMITTEE meetings may not necessarily be face-to-face meetings but, upon the agreement of both parties, can be via other methods of communication such as teleconferences and/or videoconference. Minutes of each JOINT DEVELOPMENT COMMITTEE meeting will be transcribed and issued to the members of the JOINT DEVELOPMENT COMMITTEE by the Chairman within thirty (30) days after each meeting and shall be approved as the first order of business at the immediately succeeding JOINT DEVELOPMENT COMMITTEE meeting.

3.04 The unanimous vote of the JOINT DEVELOPMENT COMMITTEE with respect to any matter within its mandate as set forth in Paragraph 3.01 shall be final and binding upon both parties thirty (30) days following the review and written approval of the result of such vote by the JOINT MARKETING COMMITTEE, unless a party notifies the other party within such thirty (30) day period that the result of such vote has been disapproved by an internal management committee within the notifying party's organization, and further provided that any disputes which cannot be settled by the JOINT DEVELOPMENT COMMITTEE within thirty (30) days after good faith attempts to achieve such settlement shall be referred to the STEERING COMMITTEE, and further provided that any disputes which cannot be settled by the STEERING COMMITTEE within thirty (30) days after good faith attempts to achieve such settlement shall be referred to the President

of SmithKline Beecham Pharmaceuticals, North America and the President of the Pharmaceutical Division of BAYER for resolution.

3.05 During the term of this AGREEMENT, BAYER shall use its reasonable efforts to carry out the remaining preclinical and clinical development of PRODUCT in the TERRITORY with indications requiring a prescription for the 0.1 mg, 0.2 mg, 0.3 mg and the 0.4 mg dosage forms of PRODUCT, including the remaining work required for filing of regulatory applications for PRODUCT regulatory approvals for such indications for all such dosage forms, to the extent necessary to achieve product registration in the TERRITORY for such indications for all such dosage forms, and BAYER shall be named on each such filing. All activity carried out by BAYER under this Paragraph shall be done in accordance with the recommendations of the JOINT DEVELOPMENT COMMITTEE.

3.06 The parties may at any time submit to the JOINT DEVELOPMENT COMMITTEE a proposal to develop PRODUCT for any other indication or dosage form in addition to the indication for the 0.1 mg, 0.2 mg, 0.3 mg and the 0.4 mg dosage forms of PRODUCT for prescription use. Such proposal shall contain, at a minimum, information supporting the rationale for developing each additional indication or dosage form of PRODUCT from a scientific, regulatory and commercial standpoint, as well as an estimated developmental critical path and an estimate of the cost of such development. In keeping with the collaborative spirit of this AGREEMENT, all proposals shall be considered by the JOINT DEVELOPMENT COMMITTEE as joint proposals without regard for which entity initiates or "champions" the proposals. The JOINT DEVELOPMENT COMMITTEE shall approve such proposal if

(A) it determines that the program has scientific and technical merit and is likely to result in the approval of a new indication(s) or dosage form, and

(B) the commercial return from sales of PRODUCT in the TERRITORY for such new indication or dosage form can reasonably be expected to offset the cost of development within a reasonable period of time following launch for such new indication of PRODUCT and produce an acceptable return on investment to both parties. If the JOINT DEVELOPMENT COMMITTEE approves a proposal, it shall give prompt written notice thereof to SB and BAYER, and the parties shall promptly meet to determine whether the parties can reach mutually acceptable terms for developing such new indication or dosage form for the TERRITORY. Notwithstanding any provision of this AGREEMENT, BAYER and SB each shall have unilateral discretion to determine if it wants to participate in the development and/or commercialization of PRODUCT in the TERRITORY for such new

indication or dosage form, and BAYER (but not SB) may so develop and/or commercialize the PRODUCT for such indication or dosage form if the parties cannot reach mutually acceptable terms to do so together.

If under Paragraph 3.06(B) SB should determine not to participate in the development of PRODUCT, for a new dosage form or indication excluding 0.4mg and 0.8mg dosage forms, and the dosage form or indication is approved in the TERRITORY after the fifth anniversary of LAUNCH, the sales of such new dosage form or indication shall be included in the gross receipts used in the computation of NET SALES for the purposes of Paragraphs 4.02 and 4.03 and the PROMOTIONAL EXPENSES incurred by BAYER related to such new dosage or indication shall be included for the purposes of calculating the payments to SB under Paragraph 4.02. However, if the approval is prior to the fifth anniversary of LAUNCH, and the sales of such new dosage form or indication are able to be differentiated from the sales of all other dosage forms and indications of PRODUCT in the TERRITORY under this AGREEMENT, the sales of such new dosage form or indication shall be excluded from the gross receipts used in the computation of NET SALES for the purposes of Paragraphs 4.02 and 4.03, and the PROMOTIONAL EXPENSES incurred by BAYER related to such new dosage form or indication shall be excluded for the purposes of calculating such payments to SB if such expenses can be differentiated from those incurred in connection with the promotion of all other dosage forms and indications of PRODUCT in the TERRITORY under this AGREEMENT. Further, if the approval is prior to the fifth anniversary of LAUNCH and the sales of such new dosage form or indication cannot be differentiated from the sales of all other dosage forms and indications of PRODUCT in the TERRITORY under this AGREEMENT, then the sales of such new dosage form or indication shall be included in the gross receipts used in the computation of NET SALES for the purposes of Paragraphs 4.02 and 4.03 and the PROMOTIONAL EXPENSES incurred by BAYER related to such new dosage form or indication shall be included for the purposes of calculating payments to SB under Paragraph 4.02. In all three circumstances set forth above whereby SB determines not to participate in the development of PRODUCT, DEVELOPMENT COSTS incurred by BAYER and related to such a new dosage form or indication shall be excluded for the purposes of calculating the payments to SB under Paragraph 4.02.

**PAYMENTS**

4.01 In consideration for the exclusive right to PROMOTE PRODUCT with BAYER in the TERRITORY granted to SB under this AGREEMENT, SB shall make the following payments (in U.S. dollars) to BAYER, in the