specified amounts, within thirty (30) days after the occurrence of the following:

| | | |
|---|---|---|
| (I) EFFECTIVE DATE | U.S. $15 million | (fifteen million) |
| (II) NDA Approval for 0.4 mg PRODUCT | U.S. $ 5 million | (five million) |

provided that:

(A) except as otherwise provided in Article 12, said $5 million payment shall be made only one time regardless of how many times such NDA Approval may occur, and such payment for NDA Approval for 0.4 mg PRODUCT shall not be owed if such milestone is not achieved by August 31, 1999. If approval for the 0.4 mg PRODUCT is received between September 1, 1999 and October 31, 1999, and this AGREEMENT has not been terminated at the time such approval is received the payment under Paragraph 4.01(II) shall be U.S. $3 million; if approval for the 0.4 mg PRODUCT is received between November 1, 1999 and December 31, 1999, and this AGREEMENT has not been terminated at the time such approval is received the payment under Paragraph 4.01(II) shall be $1 million; if approval for the 0.4 mg PRODUCT is received after December 31, 1999, no payment under Paragraph 4.01(II) shall occur;

(B) the term "NDA Approval for 0.4 mg PRODUCT" means FDA approval of an NDA filed by or on behalf of BAYER for marketing a 0.4 mg dosage form PRODUCT for primary hypercholesterolemia in the U.S.A.; and

(C) each such payment shall be non-refundable and non-creditable to SB, except that in the event that during any of the first five YEARS, NET SALES are equal to or greater than three hundred million U.S. dollars (U.S. $300,000,000) for any YEAR, BAYER will promptly reimburse SB for one hundred percent (100%) of the payment made by SB under Paragraph 4.01(I).

4.02 In consideration for SB's performance of its exclusive right to PROMOTE PRODUCT with BAYER in the TERRITORY under this AGREEMENT including SB's commitment to invest (A) during the first year of this AGREEMENT a minimum of eighty percent (80%) of US $20 million dollars in advertising and promotion activities (exclusive of SAMPLE TABLETS) as recommended by the JOINT MARKETING COMMITTEE and (B) thereafter for each YEAR during the ACTIVE PERIOD eighty percent (80%) of the final amount recommended by the JOINT MARKETING COMMITTEE for such activities for such YEAR, during the ACTIVE PERIOD BAYER shall pay SB the NET GROSS MARGIN ADJUSTED for each YEAR, in accordance with and as adjusted pursuant

to the other provisions of this AGREEMENT. In addition, BAYER commits to invest during the first year of this AGREEMENT a minimum of twenty percent (20%) of US $20 million in such advertising and promotional activities (exclusive of SAMPLE TABLETS) as recommended by the JOINT MARKETING COMMITTEE, and thereafter for each year during the ACTIVE PERIOD twenty percent (20%) of the final amount recommended by the JOINT MARKETING COMMITTEE for such activities for such YEAR.

4.03 In further consideration for SB's performance of its exclusive right to PROMOTE PRODUCT with BAYER in the TERRITORY under this AGREEMENT, during the INACTIVE PERIOD BAYER shall pay SB the following royalty:

(A) 20% (twenty percent) of NET SALES during the first twelve (12) months of the INACTIVE PERIOD after the expiration of SB's exclusive right to PROMOTE PRODUCT with BAYER in the TERRITORY, provided that in the event NET SALES during such YEAR exceed three hundred million U.S. dollars (>U.S. $300,000,000), BAYER shall pay SB an additional three percent (3%) of total NET SALES for such YEAR;

(B) 10% (ten percent) of NET SALES during the second twelve (12) months of the INACTIVE PERIOD after the expiration of SB's exclusive right to PROMOTE PRODUCT with BAYER in the TERRITORY, provided that in the event NET SALES during such YEAR exceed three hundred million U.S. dollars (>U.S. $300,000,000), BAYER shall pay SB an additional three percent (3%) of total NET SALES for such YEAR; or

(C) 5% (five percent) of NET SALES during the third twelve (12) months of the INACTIVE PERIOD after the expiration of SB's exclusive right to PROMOTE PRODUCT with BAYER in the TERRITORY, provided that in the event NET SALES during such YEAR exceed three hundred million U.S. dollars (>U.S. $300,000,000), BAYER shall pay SB an additional three percent (3%) of total NET SALES for such YEAR.

Such payments shall be made to SB in accordance with Paragraph 11.03.

COMPULSORY LICENSE OR MARKETING RIGHTS AND THIRD PARTY ROYALTIES

5.01 In the event that a governmental agency in the TERRITORY grants or compels BAYER to grant license or marketing rights to any THIRD PARTY for PRODUCT, SB shall have the benefit of the terms granted to such THIRD PARTY to the extent that such terms are more favorable to the THIRD PARTY than those of this AGREEMENT.

5.02 During the term of this AGREEMENT, BAYER, in good faith, shall determine if it is necessary to seek a license from, and make royalty or other fee payments to, any THIRD PARTY in order to avoid infringement during SB's exercise of its right to PROMOTE PRODUCT in the TERRITORY under this AGREEMENT, provided, that the decision to enter into such a license as well as the terms and conditions thereof, shall be made solely by BAYER. If BAYER enters into such a license, all royalties or other payments to any THIRD PARTY as a result of such license shall be paid by BAYER. If BAYER does not enter into such a license agreement because it makes a good faith determination (which Bayer shall make in its sole discretion) that such license agreement would make the PROMOTION of PRODUCT in the TERRITORY commercially unacceptable, BAYER may terminate this AGREEMENT pursuant to Paragraph 12.09.

COMMERCIALIZATION AND PROMOTION

6.01 Each party will PROMOTE PRODUCT in the TERRITORY during the ACTIVE PERIOD in accordance with the guidelines of the JOINT MARKETING TEAM as set forth in the provisions of this Article 6. Each party will exercise its reasonable efforts and diligence in PROMOTING PRODUCT in the TERRITORY during the ACTIVE PERIOD in accordance with its business, legal, medical and scientific judgment. BAYER shall use its reasonable efforts and diligence in PROMOTING PRODUCT in the TERRITORY during the INACTIVE PERIOD in accordance with its business, legal, medical and scientific judgment.

6.02 (A) Pursuant to the Letter Agreement between BAYER and SB dated March 31, 1997, SB and BAYER have assembled a team of appropriate personnel from both SB and BAYER (hereinafter "JOINT MARKETING TEAM") to plan the pre-launch, LAUNCH, post-launch and ongoing promotional activities for PRODUCT in the TERRITORY. The JOINT MARKETING TEAM shall consist of six (6) members, three (3) of whom shall be appointed by SB and three (3) of whom shall be appointed by BAYER. The presence of at least four (4) members, two (2) of whom shall have been selected by each party, shall constitute a quorum for purposes of consideration and

action by the JOINT MARKETING TEAM. Each party's members shall have collectively one vote on all matters, and whenever action is to be taken by vote of the JOINT MARKETING TEAM, it shall be authorized by a unanimous vote. Chairmanship of the JOINT MARKETING TEAM shall reside with SB until six (6) months prior to the termination of DETAILING by SB. At such time and at all times thereafter, the Chairmanship shall reside with BAYER.

(B) Meetings of the JOINT MARKETING TEAM shall be held on a quarterly basis, unless the chairman determines, no later than thirty (30) days in advance of any meeting following the initial meeting, that no new business or other activity has transpired since the previous meeting and, therefore, that a meeting is unnecessary. In such instance, the next quarterly meeting will be scheduled. The location of JOINT MARKETING TEAM meetings shall alternate between SB's offices in the Philadelphia, Pennsylvania metropolitan area and BAYER's offices in West Haven, Connecticut, unless otherwise agreed upon between the parties, with the first meeting to be held at SB's offices. JOINT MARKETING TEAM meetings may not necessarily be face-to-face meetings, but upon the agreement of both parties can be via other methods of communication such as teleconferences and/or videoconferences. Minutes of the JOINT MARKETING TEAM shall be transcribed and issued by the chairman within thirty (30) days after each meeting and shall be approved as the first order of business at the immediately succeeding JOINT MARKETING TEAM meeting.

6.03 Except as otherwise provided in this Paragraph 6.03, a unanimous vote of the JOINT MARKETING TEAM on an issue properly before it shall be final and binding upon both parties thirty (30) days after the date of such vote unless a party notifies the other party within such thirty (30) day period that the result of such vote has been disapproved by an internal management committee within the notifying party's organization, provided that any issue which cannot be resolved by a unanimous vote of the JOINT MARKETING TEAM after good faith attempts shall be referred to the STEERING COMMITTEE. Any issue that cannot be resolved by a unanimous vote of the STEERING COMMITTEE after good faith effort shall be referred to the President of SmithKline Beecham Pharmaceuticals North America and the President of the Pharmaceutical Division of BAYER for resolution. Notwithstanding the first sentence of this Paragraph 6.03 and any other provision of this AGREEMENT, and subject to any termination of this AGREEMENT permitted under Article 12, all decisions concerning the following aspects of any PRODUCT PROMOTION in the TERRITORY shall be subject to final approval by BAYER management:

(A) pricing, provided that such approval shall be only with respect to BAYER's determination of whether or not such pricing meets all requisite legal requirements; and

(B) content of promotional methods (e.g., detailing, seminars, conferences, etc.) and messages (e.g., advertising text), provided that such approval shall be only with respect to BAYER's determination of whether or not such methods or messages meet all requisite medical, legal, and regulatory requirements, including those requirements related to issues concerning product liability.

6.04 Subject to Paragraphs 6.01 and 6.03, the following principles shall apply to any PROMOTION of PRODUCT by the parties under this AGREEMENT:

(A) the JOINT MARKETING TEAM shall determine the TARGET AUDIENCE(S) for each indication for PRODUCT in the TERRITORY, including the annual number of DETAILS to be provided to the TARGET AUDIENCES in the TERRITORY.

(B) the JOINT MARKETING TEAM shall reasonably determine six (6) months in advance of each calendar year (or partial year for the year of PRODUCT commercial launch) the AGGREGATE PROJECTED DETAILS to each TARGET AUDIENCE during such year in the TERRITORY. Such determination shall be made considering factors including the number of physicians or health care professionals with actual prescribing authority such as nurse practitioners and physicians' assistants in each TARGET AUDIENCE, their geographic license, the elapsed time since the last DETAIL, and the frequency of detailing visits to the TARGET AUDIENCE customary in pharmaceutical sales practice in TERRITORY for products of similar nature to PRODUCT. In addition, the JOINT MARKETING TEAM shall determine the number of face-to-face meetings at approved medical conventions which can qualify as a DETAIL.

(C) the JOINT MARKETING TEAM shall reasonably determine six (6) months in advance of each calendar year (or partial year for the year of PRODUCT commercial launch) the minimum number of SB and the minimum number of BAYER sales representatives available during the entirety of such year which will need to be trained to perform DETAILS in the TERRITORY.

(D) the JOINT MARKETING TEAM shall be responsible for preparation of a marketing plan to include plans related to the prelaunch, launch, PROMOTION and sale of PRODUCT to each TARGET AUDIENCE for each indication (hereinafter "Product Marketing Plan").

(E) the JOINT MARKETING TEAM shall determine the PROMOTION EXPENSES for PRODUCT in the TERRITORY.

(F) the JOINT MARKETING TEAM shall determine the types of promotional materials and literature (including quantities), the content of such materials and literature, the quantity and timing of distribution of promotional samples of PRODUCT to be used by the parties to PROMOTE PRODUCT in the TERRITORY, and the guidelines for the use of promotional materials and literature by the parties' professional sales force in their PROMOTION of PRODUCT in the TERRITORY.

(G) the JOINT MARKETING TEAM shall make recommendations to the STEERING COMMITTEE to adjust the number of DETAILS to correspond to the prevailing market conditions relating to the PRODUCT.

(H) During each YEAR, SB shall be expected to perform a guaranteed number of the AGGREGATE PROJECTED DETAILS in the TERRITORY (hereinafter "SB's Guaranteed Details"), such number to be equal to eighty percent (80%) of AGGREGATE PROJECTED DETAILS. During each YEAR, BAYER shall be expected to perform a guaranteed number of the AGGREGATE PROJECTED DETAILS in the TERRITORY, such number to be equal to AGGREGATE PROJECTED DETAILS minus SB's Guaranteed Details (hereinafter "BAYER's Guaranteed Details"), such number to be equal to twenty percent (20%) of AGGREGATE PROJECTED DETAILS. In addition, during each YEAR, SB shall perform at least ninety five percent (95%) of SB's Guaranteed Details, and at least ninety percent (90%) of this number shall be DETAILS to the TARGET AUDIENCES. In addition, during each YEAR, BAYER shall perform at least ninety five percent (95%) of BAYER's Guaranteed Details, and at least ninety percent (90%) of this number shall be DETAILS to the TARGET AUDIENCES. In the event that either party does not achieve the performance requirements set forth in this Paragraph, such party shall have three (3) months after the end of the YEAR in question to carry out the DETAILS required to achieve such requirements. For any DETAILS not achieved, by the end of such three (3) month period, the party that does not achieve the performance requirements shall be liable for a fee of forty dollars U.S. ($40.00 U.S.) per DETAIL, charged against the distribution of NET GROSS MARGIN ADJUSTED to the non-performing party under this AGREEMENT. As of the EFFECTIVE DATE, the AGGREGATE PROJECTED DETAILS are estimated to be eight hundred thousand (800,000) during the first YEAR. In the event that the JOINT MARKETING COMMITTEE determines that

AGGREGATE PROJECTED DETAILS for the first YEAR will exceed eight hundred thousand (800,000), the parties shall meet to discuss the DETAIL CHARGE of such additional details exceeding eight hundred thousand (800,000) and determine how to pay for such DETAIL CHARGE. The performance of the DETAILS shall be measured pursuant to standards selected by the JOINT MARKETING TEAM.

6.05 Each party shall use only promotional materials, advertising and literature provided by SB, and promotional samples provided by BAYER, and approved by the JOINT MARKETING TEAM, subject to Paragraph 6.03. During the term of the AGREEMENT, all promotional material, literature, and advertising related to PRODUCT in the TERRITORY as well as packaging for SAMPLE TABLETS shall bear the logos of both parties, which logos shall, subject to compliance with applicable legal requirements, be prominently displayed in accordance with each party's specifications and be of a similar size to each other on all such materials.

6.06 The professional sales representatives of a party who are utilized by a party to PROMOTE PRODUCT in the TERRITORY in accordance with this AGREEMENT shall remain exclusively under the authority of such party's field sales management.

6.07 Each party warrants and represents that any professional sales representatives (or equivalents thereof) used by such party to PROMOTE PRODUCT in furtherance of this AGREEMENT, shall do so solely in accordance with the Product Marketing Plan and the provisions of this AGREEMENT

6.08 In each YEAR, BAYER will book all NET SALES for PRODUCT in the TERRITORY.

6.09 BAYER shall be solely responsible for the distribution of PRODUCT in the TERRITORY during the term of the AGREEMENT.

**PRODUCT SUPPLY**

7.01 BAYER shall supply, or cause to be supplied, all of the requirements for PRODUCT in the TERRITORY, in FINISHED FORM, during the term of the AGREEMENT. All PRODUCT labels and commercial packs shall contain the BAYER name and logo and no other company name or logo. Notwithstanding the foregoing, PRODUCT for clinical trials and for samples shall be provided as bulk tablets.



GSK_BL_ 0001784
MDL PTO 99 CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

EXCHANGE OF INFORMATION AND CONFIDENTIALITY

8.01 Promptly after the EFFECTIVE DATE and continuously thereafter, each party shall promptly disclose and supply to the other all KNOW HOW necessary for the performance of the parties under this AGREEMENT.

8.02 BAYER, in its sole discretion, shall fulfill and discharge all obligations under any U.S. governmental law, rule or regulation or otherwise, as well as procedures ensuring timely compliance with all laws, rules and regulations as are necessary or customary in accordance with accepted business practices and legal requirements to maintain the authorization and/or ability to market PRODUCT in the TERRITORY, including without limitation, the following:

(A) The maintenance of all regulatory approvals necessary for the manufacture of PRODUCT in or the importation of PRODUCT into the U.S. and the marketing of PRODUCT for all approved indications in the U.S. including maintaining such records and filing such reports as may be required under the provisions of the U.S. Federal Food, Drug and Cosmetic Act, the Steroids Control Act and Controlled Substances Act, as well as applicable state and federal law including, without limitation, all advertising and promotional literature and labeling relating to PRODUCT.

(B) Timely filing with FDA of all AE reports; provided that the parties shall report to one another within 24 hours any information concerning any PRODUCT or package complaint or any serious or unexpected side effect, injury, toxicity or sensitivity reaction or any unexpected incidence or severity thereof associated with the clinical uses, studies, investigations, tests and marketing of PRODUCT, whether or not determined to be attributable to PRODUCT; provided, further that BAYER will obligate any THIRD PARTY licensees and/or commercial partners (including BAYER's licensors for PRODUCT or other THIRD PARTY contractual partners to whom AES for PRODUCT may be reported) to provide AES to BAYER, within the aforementioned time periods. An AE will be considered 'serious' if it is any one or more of the following, i.e., fatal, life threatening, disabling or incapacitating, results in hospitalization or prolongation of hospitalization, a congenital abnormality, a carcinoma, or an overdose. In addition, any AE which suggests a significant hazard, contraindication, side effect or precaution that may be associated with the use of PRODUCT will be considered a serious AE.

(i) All AE reports and queries for BAYER shall be addressed to Vice-President, Global Safety Assurance, Bayer Corporation, 400 Morgan Lane, West Haven, CT 06516-4175 (facsimile

number 203-812-2986; telephone number 203-812-2461), and for SB should be addressed to Associate Director, Worldwide Clinical Safety Quality Management, SmithKline Beecham Pharmaceuticals, 1250 S. Collegeville Road, Collegeville, Pennsylvania 19426 (facsimile number 610-917-4826; telephone number 610-917-5747) or such other safety representative as may be designated by SB for SB or by BAYER for BAYER.

(ii) In the event BAYER shall desire to appoint a clinical trial contractor to report AES to SB, in lieu of BAYER, for the contracted clinical trial, BAYER shall notify such contractor to SB, in writing and in accordance with this Paragraph, at least four (4) weeks prior to the initiation of the contracted clinical trial, and such contractor shall not be permitted to undertake such reporting unless SB has given its written consent to the appointment of such contractor for such purpose, such consent not to be unreasonably withheld.

(iii) The central safety department of each party will report to the central safety department of the other party all AES reported to it in respect of the PRODUCT as follows:

(a) fatal unexpected and life-threatening unexpected AES by telephone or facsimile within one (1) working day of receipt by the central safety department;

(b) all other serious AES in writing within five (5) working days of receipt by the central safety department;

(c) a summary of all AES, serious and non-serious, in writing on a monthly basis, indicating those cases which have previously been reported to the other party.

Further information received on any serious AE (or any information which changes an AE from non-serious to serious) will also be reported to the other party within one (1) or five (5) working days of receipt by the central safety department, according to the above criteria.

(C) Creation of a master safety data base which shall cross-reference any AE relating to PRODUCT occurring anywhere in the world.

(D) Responding to all medical inquiries. BAYER shall be the party responsible for responding to medical inquiries resulting from the marketing activities of each respective sales forces. SB shall refer all such medical inquiries to BAYER; provided that BAYER shall provide copies of the responses to SB. All information regarding PRODUCT

which is known to SB or to BAYER, either through actual communication or through information appearing in the literature, shall be provided to the other party upon request. Each party shall provide to the others one copy of all medical documents including, but not limited to, medical responses, written, phone and personal contact inquiries, and published literature which such party believes is useful or necessary to the other parties in connection with the transactions contemplated by this AGREEMENT.

(E) Handling of all recalls of PRODUCT vis-à-vis any regulatory agency in the TERRITORY

8.03 During the term of this AGREEMENT and for five (5) years thereafter, irrespective of any termination earlier than the expiration of the term of this AGREEMENT, BAYER and SB shall not use or reveal or disclose to THIRD PARTIES any confidential information received from the other party or otherwise developed by either party in the performance of activities in furtherance of this AGREEMENT without first obtaining the prior written consent of the disclosing party, except as may be otherwise provided herein, or as may be required for purposes of investigating, developing, manufacturing or marketing PRODUCT or for securing essential or desirable authorizations, privileges or rights from governmental agencies, or is required to be disclosed to a governmental agency or is necessary to file or prosecute patent applications concerning PRODUCT or to carry out any litigation concerning PRODUCT. This confidentiality obligation shall not apply to such information which is or becomes a matter of public knowledge, or is already in the possession of the receiving party, or is disclosed to the receiving party by a THIRD PARTY having the right to do so, or is subsequently and independently developed by employees of the receiving party or AFFILIATES thereof who had no knowledge of the confidential information disclosed, or is required by law to be disclosed. The parties shall take reasonable measures to assure that no unauthorized use or disclosure is made by others to whom access to such information is granted.

8.04 Nothing herein shall be construed as preventing one party hereto from disclosing any information including KNOW-HOW, received from the other party hereto to an AFFILIATE of such first party. In addition, BAYER AG and other AFFILIATES of BAYER shall be free to use any information, including KNOW-HOW, received by them hereunder for any and all purposes relating to PRODUCT, including, without limitation, product registration, but not for any purposes not related to PRODUCT. Further, SB and AFFILIATES of SB shall be free to use any information, including KNOW-HOW, received by SB hereunder in conjunction with this AGREEMENT as well as with respect to any other copromotion agreement or other marketing contractual relationship related to PRODUCT, if any, entered into between a BAYER AFFILIATE and SB or an SB AFFILIATE.

All information, including KNOW-HOW, disclosed by one party to the other shall remain the property and confidential property of the disclosing party, except as may otherwise be provided by this AGREEMENT.

8.05 All confidential information disclosed by one party to the other shall remain the intellectual property of the disclosing party. In the event that a court or other legal or administrative tribunal, directly or through an appointed master, trustee or receiver, assumes partial or complete control over the assets of a party to this AGREEMENT based on the insolvency or bankruptcy of such party, the bankrupt or insolvent party shall promptly notify the court or other tribunal

(A) that confidential information received from the other party under this AGREEMENT remains the property of the other party and

(B) of the confidentiality obligations under this AGREEMENT. In addition, the bankrupt or insolvent party shall, to the extent permitted by law, take all steps necessary or desirable to maintain the confidentiality of the other party's confidential information and to insure that the court, other tribunal or appointee maintains such information in confidence in accordance with the terms of this AGREEMENT.

8.06 No public announcement or other disclosure to THIRD PARTIES concerning the existence of or terms of this AGREEMENT shall be made, either directly or indirectly, by any party to this AGREEMENT, except as may be legally required or as may be required for recording purposes, without first obtaining the written approval of the other party and agreement upon the nature and text of such announcement or disclosure. The party desiring to make any such public announcement or other disclosure shall inform the other party of the proposed announcement or disclosure in reasonably sufficient time prior to public release, and shall provide the other party with a written copy thereof, in order to allow such other party to comment upon such announcement or disclosure. Each party agrees that it shall cooperate fully with the other with respect to all disclosures regarding this AGREEMENT to the Securities and Exchange Commission and any other governmental or regulatory agencies, including requests for confidential treatment of proprietary information of either party included in any such disclosure.

8.07 BAYER shall not submit for written or oral publication any manuscript, abstract or the like which includes data or other information relating to PRODUCT without obtaining the prior written consent of SB, which consent shall not be unreasonably withheld. The contribution of each party shall be noted in all publications or presentations by acknowledgment or coauthorship, whichever is appropriate. SB acknowledges that this