Paragraph 8.07 has no application to publications in connection with clinical studies performed on behalf of BAYER in conjunction with universities or other not-for-profit institutions.

8.08 Nothing in this AGREEMENT shall be construed as preventing or in any way inhibiting either party from complying with statutory and regulatory requirements governing the development, manufacture, use and sale or other license of PRODUCT in any manner which it reasonably deems appropriate, including, for example, by disclosing to regulatory authorities confidential or other information received from the other party or THIRD PARTIES.

PATENT PROSECUTION AND LITIGATION

9.01 BAYER AG, and not BAYER, has and shall retain sole and exclusive title to all PATENTS, inventions, discoveries, and KNOW HOW concerning PRODUCT, including cerivastatin (as defined in Paragraph 1.25), formulations thereof, or methods of making or using same which have been made, conceived, reduced to practice or generated by its employees, agents, or other persons acting under its authority prior to this AGREEMENT. As of the EFFECTIVE DATE, Appendix A includes all patents and patent applications in the TERRITORY which are owned by BAYER AG or to which BAYER AG otherwise has the right to grant licenses and license rights in the TERRITORY, which generically or specifically claim the manufacture, use, sale, offer for sale, or importation of PRODUCT. Included hereunder are all continuations, continuations in part, divisions, patents of addition, reissues, renewals, or extensions thereof. The patents and patent applications under this Paragraph 9.01 which are owned by BAYER AG are the subject of a separate agreement between BAYER AG and SB.

9.02 As of the EFFECTIVE DATE, BAYER does not own any PATENTS which cover the making, use, sale, offer for sale or importation of PRODUCT in the TERRITORY. BAYER shall have and retain sole and exclusive title to and sole and exclusive right to use all inventions, discoveries and KNOW HOW relating to PRODUCT which are made, conceived, reduced to practice or generated, whether singly or jointly by SB's or BAYER's employees, agents, or other persons acting under their authority in the course of or as a result of this AGREEMENT, except as otherwise provided in Paragraph 8.04, this Paragraph or any other provision of this AGREEMENT. Each party shall have the right to make, have made, use, sell, offer for sale and import, inventions, discoveries, and any KNOW HOW made, conceived, reduced to practice or generated singly or jointly by employees, agents, or other persons acting under the authority of both parties in the course of or as a result of this AGREEMENT to the extent that such are not related to PRODUCT. Further, SB and AFFILIATES of



GSK_BL_ 00017847
MDL PTO 29 CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

SB shall be free to use any inventions, discoveries, and KNOW-HOW in conjunction with this AGREEMENT as well as with respect to any other copromotion agreement or other marketing contractual relationship related to PRODUCT if any, entered into between BAYER or a BAYER AFFILIATE and SB or an SB AFFILIATE.

9.03 BAYER shall, at its expense, be responsible for filing, prosecution and maintenance of all PATENTS owned by BAYER in the TERRITORY. BAYER warrants and represents that it has disclosed to SB the complete texts of all PATENTS filed by BAYER in the TERRITORY as of the EFFECTIVE DATE which relate to PRODUCT as well as all information received concerning the institution or possible institution of any interference, opposition, re-examination, reissue, revocation, nullification, or any official proceeding involving a PATENT owned by BAYER in the TERRITORY, and that it will continue such disclosure with respect to new events during the term of the AGREEMENT. SB shall have the right to review all such future applications filed in the TERRITORY and make recommendations to BAYER concerning them and their conduct. BAYER agrees to keep SB promptly and fully informed of the course of patent prosecution or other proceedings including by providing SB with copies of observations submitted to or received from the United States Patent and Trademark Office concerning PATENTS owned by BAYER. SB shall provide such patent consultation to BAYER at no cost to BAYER. SB shall hold all information disclosed to it under this paragraph as confidential subject to the provisions of Paragraphs 9.04 and 9.05.

9.04 SB shall have the right to assume responsibility for any PATENT or any part of a PATENT which is owned by BAYER pursuant to Paragraph 9.02 of this AGREEMENT, which BAYER intends to abandon or otherwise cause or allow to be forfeited. BAYER shall give SB reasonable written notice prior to abandonment or other forfeiture of any PATENT owned by BAYER or any part of a PATENT owned by BAYER so as to permit SB to exercise its rights under this Paragraph.

9.05 In the event of the institution of any suit by a THIRD PARTY against BAYER or SB for patent infringement involving the manufacture, use, sale, license or marketing of PRODUCT anywhere in the TERRITORY, the party sued shall promptly notify the other party in writing. BAYER and its AFFILIATES shall have the right but not the obligation to defend such suit at its own expense. In the event that BAYER or its AFFILIATES choose in their sole discretion not to defend such suit, SB shall have the right but not the obligation to defend such suit at its own expense. BAYER and SB shall assist one another and cooperate in any such litigation at the other's request without expense to the requesting party.

9.06 In the event that BAYER, or SB becomes aware of actual or threatened infringement of a PATENT anywhere in the TERRITORY which is owned by BAYER or an AFFILIATE of BAYER, that party shall promptly notify the other party in writing. BAYER and its AFFILIATES shall have the first right but not the obligation to bring, at its own expense, an infringement action against any THIRD PARTY. If BAYER does not commence a particular infringement action within ninety (90) days of receipt of the notice of infringement, then SB, after notifying BAYER in writing, shall be entitled to bring such infringement action at its own expense, and to use the name of BAYER or its AFFILIATES in connection therewith and to name BAYER or its AFFILIATE(S), as necessary, as a party thereto. The party conducting such action shall have full control over its conduct, including settlement thereof subject to Paragraph 9.09. In any event, BAYER and SB shall assist one another and cooperate in any such litigation at the other's request without expense to the requesting party.

9.07 In any action brought pursuant to Paragraph 9.06, the party bringing the action shall indemnify the other party, its officers, directors, shareholders, employees, agents, successors and assigns from any loss, damage or liability, including for attorney's fees and costs, which may result from claims, counterclaims or crossclaims asserted by a defendant, except to the extent that such losses, damages or other liabilities result from the negligence or willful misconduct of the other party.

9.08 BAYER and SB shall recover their respective actual out-of-pocket expenses, or equitable proportions thereof, associated with any litigation or settlement thereof from any award or recovery by any party. Any remaining amount shall be divided between the parties as follows: 70% to SB and 30% to BAYER for recoveries or awards related to THIRD PARTY acts which first occur during the ACTIVE PERIOD; and for recoveries or awards related to THIRD PARTY acts which first occur during the INACTIVE PERIOD, it shall be apportioned in accordance with Paragraph 4.03.

9.09 The parties shall keep one another informed of the status of and their respective activities regarding any litigation or settlement thereof concerning PRODUCT, provided however that no settlement or consent judgment or other voluntary final disposition of any suit defended or action brought by a party pursuant to this Article 9 may be entered into without the consent of the other party if such settlement would require the other party or its AFFILIATES to be subject to an injunction or to make a monetary payment or would otherwise adversely affect any rights of the other party or its AFFILIATES.

9.10 BAYER and its AFFILIATES shall have the right but not the obligation to seek extensions of the terms of PATENTS owned by them in the TERRITORY. If BAYER and its AFFILIATES choose in their sole



[...]BJECT TO PROTECTIVE ORDER

discretion not to pursue such patent term extension, then at SB's request, BAYER or its AFFILIATE, as appropriate, shall authorize SB to act as BAYER's agent for the purpose of making any application for any extensions of the term of any such PATENTS in the TERRITORY and BAYER or its AFFILIATE shall provide reasonable assistance therefor to SB at BAYER's expense.

TRADEMARKS AND COPYRIGHTS

10.01 The JOINT MARKETING TEAM shall select a BAYER TRADEMARK to be used on packaging and labeling for PRODUCT and for PROMOTION OF PRODUCT as contemplated in this AGREEMENT.

10.02 BAYER and/or its AFFILIATE agrees to search the BAYER TRADEMARK in the TERRITORY and to advise the JOINT MARKETING TEAM of its likely availability or non-availability in the TERRITORY. If the BAYER TRADEMARK is deemed available, in the opinion of trademark counsel for BAYER and/or its AFFILIATE, BAYER, and/or its AFFILIATE shall file an application to register the BAYER TRADEMARK in the TERRITORY for use with the PRODUCT as contemplated in this AGREEMENT. BAYER and/or its AFFILIATE shall maintain a registration for the BAYER TRADEMARK in the TERRITORY, if possible. THE BAYER TRADEMARK shall be owned solely by BAYER and/or its AFFILIATE. SB will not contest the ownership of the BAYER TRADEMARK, its validity, or the validity of any registration therefor during the term of this AGREEMENT or thereafter.

10.03 All labeling, promotional materials, packaging and advertising for the PRODUCT will clearly indicate that PRODUCT is manufactured by or for BAYER and that the BAYER TRADEMARK is owned by BAYER or its AFFILIATE.

10.04 BAYER consents to the use by SB of the BAYER TRADEMARK in promotional materials, advertisements, presentation brochures and such other materials as may be used by SB to PROMOTE the PRODUCT as contemplated in this AGREEMENT. SB agrees that all use of the BAYER TRADEMARK by SB as provided in this AGREEMENT shall inure to BAYER and/or its AFFILIATE.

10.05 All uses and displays of the BAYER TRADEMARK on promotional materials, packaging, advertisements, brochures and PRODUCT labeling shall be determined by the JOINT MARKETING TEAM but shall be subject to BAYER's written approval.

10.06 SB's right to use the BAYER TRADEMARK shall terminate at such time as SB's rights to PROMOTE PRODUCT are terminated in accordance with this AGREEMENT.

10.07 BAYER shall defend, indemnify and hold harmless SB, its officers, directors, shareholders, employees, successors and assigns from any loss, damage, or liability, including reasonable attorney's fees resulting from any claim, complaint, suit, proceeding or cause of action by a THIRD PARTY against any of them alleging trademark infringement resulting from the use and/or registration of the BAYER TRADEMARK. BAYER shall have no obligation under this Paragraph unless:

(A) SB gives BAYER prompt notice of any claim or lawsuit or other action for which it seeks to be indemnified under this AGREEMENT,

(B) BAYER is granted full authority and control over the defense, including settlement, against such claim or law suit or other action, and

(C) SB cooperates fully with BAYER and its agents in defense of the claims or law suit or other action.

SB shall have the right to participate in the defense of any such claim, complaint, suit, proceeding or cause of action referred to in this Paragraph utilizing attorneys of its choice, at its own expense, provided however, that BAYER shall have full authority and control to handle any such claim, complaint, suit proceeding, or cause of action, including any settlement or other disposition thereof, for which SB seeks indemnification under this Paragraph.

10.08 In the event that BAYER or SB becomes aware of actual or threatened infringement of the BAYER TRADEMARK anywhere in the TERRITORY, that party shall promptly notify the other party in writing. BAYER shall have the first right, but not the obligation, to bring, at its own expense, an infringement and/or opposition or cancellation action against any THIRD PARTY and to use SB's name in connection therewith and to name SB as a party thereto. If BAYER does not commence a particular infringement and/or opposition or cancellation action within ninety (90) days of receipt of the notice of infringement, then SB, after notifying BAYER in writing, shall be entitled to bring such infringement and/or opposition or cancellation action at its own expense. The party conducting such action shall have full control over its conduct, including settlement thereof. In any event, SB and BAYER

shall assist one another and cooperate in any such litigation or action at the other's request without expense to the requesting party.

10.09 In any action brought pursuant to Paragraph 10.08, the party bringing the action shall indemnify the other party, its officers, directors, shareholders, employees, agents, successors and assigns from any loss, damage or liability, including for attorney's fees and costs, which may result from claims, counterclaims or crossclaims asserted by a defendant, except to the extent that such losses, damages or liabilities result from negligence or willful misconduct of the other party.

10.10 BAYER and SB shall recover their respective actual out-of-pocket expenses, or equitable proportions thereof, associated with any litigation or settlement thereof from any award or recovery made by any party. Any remaining amount shall be divided between the parties as follows: 70% to SB and 30% to BAYER for recoveries or awards related to THIRD PARTY acts which first occur during the ACTIVE PERIOD; and for recoveries or awards related to THIRD PARTY acts which first occur during the INACTIVE PERIOD, it shall be apportioned in accordance with Paragraph 4.03.

10.11 The parties shall keep one another informed of the status of and of their respective activities regarding any litigation or settlement thereof concerning BAYER TRADEMARK, provided however that no settlement or consent judgment or other voluntary final disposition of any suit or proceeding defended or action brought by a party pursuant to Article 10 may be entered into without the consent of the other party if such settlement would require the other party to be subject to an injunction or to make a monetary payment or would otherwise adversely affect the other party's rights under this AGREEMENT.

10.12 In the event that a trademark other than BAYCOL is selected by the JOINT MARKETING TEAM, BAYER shall be the owner of such alternative trademark, and such trademark will become the BAYER TRADEMARK.

10.13 All copyrighted works created for use on promotional materials, advertisements, packaging and labeling for the PRODUCT which are created, whether singly or jointly by SB's or BAYER's employees, agents, or other persons acting under their authority in the course of or as a result of this AGREEMENT shall be owned by BAYER. Each party shall have the right to use all such works to the extent that such are not related to PRODUCT. Further, SB and AFFILIATES of SB shall be free to use such works in conjunction with this AGREEMENT as well as with respect to any other copromotion agreement or other marketing contractual relationship related to PRODUCT, if any, entered into between BAYER

or a BAYER AFFILIATE and SB or an SB AFFILIATE. Nevertheless, Bayer claims no rights in the SB trade name or logo.

STATEMENTS AND REMITTANCES

11.01 SB shall keep and require its AFFILIATES to keep complete and accurate records of all PROMOTION EXPENSES and DEVELOPMENT COSTS. In addition, SB shall submit to BAYER, within thirty (30) days of the end of each quarter during each YEAR, a report containing an accounting of all DETAILS by SB's sales force in the TERRITORY, as well as any other information BAYER reasonably deems necessary regarding such DETAILS held during the preceding quarter. BAYER shall have the right, at BAYER's expense, through a certified public accountant or like person reasonably acceptable to SB, to examine such records during regular business hours during the life of this AGREEMENT and for twelve (12) months after its termination of the ACTIVE PERIOD; provided, however, that such examination shall not take place more often than once a year and shall not cover such records for more than the preceding three (3) years and provided further that such accountant shall report to BAYER only as to the accuracy of the calculation of DETAILS, PROMOTION EXPENSES, DEVELOPMENT COSTS, and the payments made to BAYER by SB under this AGREEMENT.

11.02 (A) BAYER shall have exclusive financial responsibility for the funding of all development and product registration work and PROMOTION EXPENSES for PRODUCT in the TERRITORY, subject to reimbursement from SB as provided herein.

(B) BAYER shall keep complete and accurate records of PACKAGE PRICE OF PRODUCT, NET GROSS MARGIN, DEVELOPMENT COSTS, NET SALES, and PROMOTION EXPENSES, and shall submit to SB, within sixty (60) days after the end of each quarter during each YEAR, a report containing an accounting of all of the above, as well as any other information SB reasonably deems necessary regarding such DEVELOPMENT COSTS, NET SALES, PACKAGE PRICE OF PRODUCT, NET GROSS MARGIN and PROMOTION EXPENSES during such quarter. In addition, BAYER shall submit to SB, within thirty (30) days of the end of each quarter during each YEAR, a report containing an accounting of all DETAILS by BAYER's sales force in the TERRITORY, as well as any other information SB reasonably deems necessary regarding such DETAILS held during the preceding quarter.

(C) Simultaneously with the delivery by BAYER of the reports described in the first sentence of Paragraph 11.02(B), BAYER shall deliver to SB

a calculation of the NET GROSS MARGIN ADJUSTED. In the event the SB MARGIN SHARE (as defined in Paragraph 1.21) exceeds the SB COST SHARE (as defined in Paragraph 1.21), BAYER shall pay such difference to SB within ninety (90) days of the end of the quarter on which the calculation was based. In the event the SB COST SHARE exceeds the SB MARGIN SHARE, SB shall pay such difference to BAYER within ninety (90) days of the end of the quarter on which the calculation was based.

(D) SB shall have the right, at SB's expense, through a certified public accountant or like person reasonably acceptable to BAYER, to examine such records during regular business hours during the life of this AGREEMENT and for twelve (12) months after termination of the ACTIVE PERIOD; provided, however, that such examination shall not take place more often than once a year and shall not cover such records for more than the preceding three (3) years and provided further that such accountant shall report to SB only as to the accuracy of the calculation of DEVELOPMENT COSTS, NET SALES, DETAILS, PROMOTION EXPENSES and the payments made to BAYER by SB under this AGREEMENT.

(E) SB shall have the right, at SB's expense, through a certified public accountant or like person reasonably acceptable to BAYER, to examine such records during regular business hours during the life of this AGREEMENT and for twelve (12) months after termination of the INACTIVE PERIOD; provided, however, that such examination shall not take place more often than once a year and shall not cover such records for more than the preceding three (3) years and provided further that such accountant shall report to SB only as to the accuracy of the calculation of NET SALES under this AGREEMENT.

(F) Except as set forth in Article 12 hereof, any payments to be made under this Paragraph 11.02 or 4.02 shall cease upon the termination of this AGREEMENT except for those which have accrued prior to termination.

11.03 The payments owed to SB by BAYER under Paragraph 4.03 for each 12 month period during the INACTIVE PERIOD shall be made quarterly during each such 12 month period, with each such quarterly payment due to SB no later than thirty (30) days after the end of the relevant quarter.

11.04 (a) Any taxes, levies or other duties paid or required to be withheld by SB on account of monies payable to BAYER under this AGREEMENT shall be deducted from the amount of monies otherwise due BAYER under this AGREEMENT. SB shall secure and send to BAYER proof of any such

taxes, levies or other duties withheld and paid by SB for the benefit of BAYER.

(b) Any taxes, levies or other duties paid or required to be withheld by BAYER on account of monies payable to SB under this AGREEMENT shall be deducted from the amount of monies otherwise due SB under this AGREEMENT. BAYER shall secure and send to SB proof of any such taxes, levies or other duties withheld and paid by BAYER or its sublicensees for the benefit of SB.

11.05 All calculations by either party under this AGREEMENT shall be calculated in accordance with U.S. Generally Accepted Accounting Procedures (GAAP). All payments due to by one party to the other party under this AGREEMENT shall be payable in United States dollars.

## TERM AND TERMINATION

12.01 Payment obligations under Paragraph 4.02 shall expire upon the earlier of (A) the expiration of the sixth (6th) YEAR, or (B) termination of such obligations pursuant to the terms of this Article 12.

12.02 Payments obligations under Paragraph 4.03 shall commence upon the expiration or termination of BAYER's payment obligations under Paragraph 4.02 and shall expire three (3) years thereafter, except as terminated pursuant to the terms of this Article 12.

12.03 Expiration of BAYER's payment obligations to SB under Paragraph 4.02 shall terminate SB's right to

(A) exclusively PROMOTE PRODUCT with BAYER in the TERRITORY under Article 2, and

(B) use BAYER TRADEMARK in the TERRITORY.

12.04 Unless otherwise terminated, this AGREEMENT shall expire upon the expiration of BAYER's payment obligation to SB under Paragraph 4.03.

12.05 If either party fails or neglects to perform covenants or provisions of this AGREEMENT and if such default is not corrected within sixty (60) days after receiving written notice from the other party with respect to such default, such other party shall have the right to terminate this AGREEMENT by giving written notice to the party in default provided the notice of termination is given within six (6) months of the default and prior to correction of the default.

12.06 (a) In the event NDA Approval for 0.4 mg PRODUCT (as defined by Paragraph 4.01(B)) is not achieved by August 31, 1999, SB may terminate this AGREEMENT, but such termination shall be effective only if SB delivers written notice of such termination to BAYER within ten (10) days after August 31, 1999, and the effective date of termination shall be six (6) months after the date of BAYER's receipt of such notice. If SB does not deliver notice of termination to BAYER within such ten (10) day period, SB shall have waived any and all rights to terminate this AGREEMENT pursuant to this Paragraph 12.06(a).

(b) In the event that NDA Approval for 0.4 mg PRODUCT (as defined by Paragraph 4.01(B)) is not achieved by December 31, 1999, SB may terminate this AGREEMENT, but such termination shall be effective only if SB delivers written notice of such termination to BAYER within ten (10) days after December 31, 1999, and the effective date of termination shall be six (6) months after the date of BAYER's receipt of such notice. If SB does not deliver notice of termination to BAYER within such ten (10) day period, SB shall have waived any and all rights to terminate this AGREEMENT pursuant to this Paragraph 12.06(b).

(c) In the event the parties are prevented from launching the PRODUCT in the TERRITORY or prevented from selling PRODUCT in the TERRITORY during the ACTIVE PERIOD as a result of an injunction or similar court order due to patent infringement, SB shall have the right to terminate this AGREEMENT from the date such injunction or similar court order is entered until ninety (90) days from the date such order can no longer be appealed and the effective date of such termination shall be the date of BAYER's receipt of such notice. If SB terminates under this Paragraph 12.06(c) within three years of the EFFECTIVE DATE, BAYER shall repay SB the $15 Million payment made by SB pursuant to Section 4.01 within thirty (30) days following such termination.

12.07 If SB elects to terminate this AGREEMENT pursuant to Paragraph 12.06(a) or (b), then during the six (6) month period following notice of termination to BAYER (the "Termination Period"), SB shall not be obligated to make any payments under Paragraph 4.01 for milestones which are achieved during the Termination Period. In addition, during the Termination Period the calculation of NET GROSS MARGIN ADJUSTED as used to determine BAYER's obligation under Paragraphs 4.02 and 11.02 will be adjusted as follows: (i) for the third and fourth month of the Termination Period, the eighty percent (80%) of NET GROSS MARGIN used to calculate NET GROSS MARGIN ADJUSTED shall be reduced to fifty percent (50%) of NET GROSS MARGIN and (ii) for the fifth and sixth month of such Termination Period, the eighty percent (80%) of NET GROSS MARGIN used to calculate NET GROSS MARGIN ADJUSTED shall be reduced to twenty percent (20%) of NET

GROSS MARGIN. During the Termination Period following notice of termination to BAYER, SB shall continue to be obligated for DEVELOPMENT COSTS and or PROMOTIONAL EXPENSES which are incurred during such period, and such costs and expenses shall be reduced proportionally (i.e., 50% of PROMOTIONAL EXPENSES in months three and four, and 20% of PROMOTIONAL EXPENSES in months five and six; 5/12 of DEVELOPMENT COSTS in months three and four, and 1/6 DEVELOPMENT COSTS in months five and six) with respect to the NET GROSS MARGIN ADJUSTED calculations set forth above in this Paragraph. Further, SB shall continue to be responsible for DETAILS during such Termination Period, reduced to 50% in months three and four and 20% in months five and six. SB shall have no financial obligation for DEVELOPMENT COSTS or PROMOTIONAL EXPENSES incurred after the Termination Period.

12.08 In the event SB elects to terminate this AGREEMENT, BAYER's payment obligations under Paragraphs 4.02 and 4.03 shall terminate on the effective date of such termination unless otherwise provided for in this AGREEMENT. In the event BAYER elects to terminate this AGREEMENT, BAYER's payment obligations under Paragraph 4.02 will terminate on the effective date of such termination and those under Paragraph 4.03 will commence, unless otherwise provided for in this AGREEMENT. In the event SB elects to terminate this AGREEMENT under Paragraph 12.05, BAYER's payment obligations under Paragraph 4.02 will terminate on the effective date of such termination, and those under Paragraph 4.03 commence ~~terminate~~, unless otherwise provided for in the AGREEMENT.

12.09 BAYER may terminate this AGREEMENT upon making a determination (which BAYER shall make in its sole discretion) under Paragraph 5.02 that it will not enter into a license agreement as referenced in such Paragraph 5.02 because such license agreement would make the PROMOTION of PRODUCT in the TERRITORY commercially unacceptable. The effective date of termination shall be six (6) months after the date of SB's receipt of such notice from BAYER. In the event BAYER terminates this AGREEMENT pursuant to this Paragraph 12.09 on or prior to the third anniversary of the LAUNCH, BAYER shall repay to SB the $15 million payment made by SB pursuant to Paragraph 4.01 within thirty (30) days of such notice of termination, and SB shall not be obligated to pay any $5 million milestone payment that would otherwise be due during such six (6) month period.

12.10 In the event the parties are prevented from launching the PRODUCT in the TERRITORY prior to the third anniversary of the AGREEMENT as a result of an injunction or similar court order due to patent infringement, BAYER may terminate this AGREEMENT within ninety (90) days from