the time such injunction or similar court order becomes final and nonappealable, and the effective date of such termination shall be the date of SB's receipt of such notice. BAYER shall repay to SB the $15 million payment made by SB pursuant to Paragraph 4.01 within thirty (30) days following such a termination by BAYER.

12.11 Either party may terminate this AGREEMENT if, at any time, the other party shall file in any court or agency pursuant to any statute or regulation of any state or country, a petition in bankruptcy or insolvency or for reorganization or for an arrangement or for the appointment of a receiver or trustee of the party or of its assets, or if the other party proposes a written agreement of composition or extension of its debts, or if the other party shall be served with an involuntary petition against it, filed in any insolvency proceeding, and such petition shall not be dismissed with sixty (60) days after the filing thereof, or if the other party shall propose or be a party to any dissolution or liquidation, or if the other party shall make an assignment for the benefit of creditors.

12.12 Notwithstanding the bankruptcy of BAYER, or the impairment of performance by BAYER of its obligations under this AGREEMENT as a result of bankruptcy or insolvency of BAYER, SB shall be entitled to retain the rights granted herein, subject to BAYER's rights to terminate this AGREEMENT for reasons other than bankruptcy or insolvency as expressly provided in this AGREEMENT.

12.13 All rights granted under or pursuant to this AGREEMENT by BAYER to SB are, and shall otherwise be deemed to be, for purposes of Section 365(n) of the U.S. Bankruptcy Code, rights to "intellectual property" as defined under Section 101(52) of the U.S. Bankruptcy Code. BAYER agrees that SB shall retain and may fully exercise all of its rights and elections under the U.S. Bankruptcy Code, subject to performance by SB of its preexisting obligations under this AGREEMENT. BAYER further agrees that, in the event of the commencement of a bankruptcy proceeding by or against BAYER under the U.S. Bankruptcy Code, SB shall be entitled to a complete duplicate of (or complete access to, as appropriate) any such intellectual property and all embodiments of such intellectual property, and same, if not already in its possession, shall be promptly delivered to SB

(A) upon any such commencement of a bankruptcy proceeding upon written request therefor by SB, unless BAYER elects to continue to perform all of its obligations under this AGREEMENT, or

(B) if not delivered under (A) above, upon the rejection of this AGREEMENT by or on behalf of BAYER upon written request therefor by SB, provided, however, that upon BAYER's (or its

successor's) written notification to SB that it is again willing and able to perform all of its obligations under this AGREEMENT, SB shall promptly return all such tangible materials to BAYER, but only to the extent that SB does not require continued access to such materials to enable SB to perform its obligations under this AGREEMENT.

## RIGHTS AND DUTIES UPON TERMINATION

13.01 Upon termination of this AGREEMENT, each party shall have the right to retain any sums already paid by the other party hereunder, except as otherwise provided by Paragraph 4.01, and SB and BAYER shall each pay all sums accrued hereunder which are then due.

13.02 Termination of this AGREEMENT shall terminate all outstanding obligations and liabilities between the parties arising from this AGREEMENT except those described in Paragraphs 4.03, relating to residual royalties, 8.02, 8.03, (for the time period provided therein) 8.04, 8.05, 8.06, 8.07, 8.08 and 8.09 (relating to confidential information) 9.01 (first sentence), 9.02, 9.03 (second sentence), 9.05, 9.06 (last three sentences for acts of infringement which occur prior to termination), 9.07, 9.08, 9.09, 10.07, 10.08 (for acts of infringement that occur prior to termination), 10.09, 10.10, 10.11, 10.12, 10.13, 11.01, 11.02(B), 11.02(D), 11.02(E), 11.02(F), 12.03 and Articles 13 to 22 and 24. In addition, any other provision required to interpret and enforce the parties' rights and obligations under this AGREEMENT shall also survive, but only to the extent required for the full observation and performance of this AGREEMENT.

13.03 Termination of this AGREEMENT in accordance with the provisions hereof shall not limit remedies which may be otherwise available in law or equity.

## WARRANTIES, REPRESENTATIONS, INDEMNIFICATIONS, AND INSURANCE

14.01 BAYER warrants and represents that it has the right to grant the exclusive PROMOTION rights outlined in Article 2, and has the right to enter into this AGREEMENT. BAYER further warrants and represents that there is nothing in any THIRD PARTY agreement BAYER has entered into as of the EFFECTIVE DATE which, in any way, will limit BAYER's ability to perform all of the obligations undertaken by BAYER hereunder. BAYER further warrants and represents that it will not enter into any THIRD PARTY agreement after the EFFECTIVE DATE which, in any way, will limit BAYER's ability to perform all of the obligations undertaken by BAYER hereunder. BAYER further warrants and

represents that it will not encumber, with liens, mortgages, security interests or otherwise, any PATENTS owned by BAYER and KNOW HOW owned by BAYER which would be infringed by activities related to the PROMOTION of PRODUCT by SB's exercise of rights herein granted.

14.02 BAYER warrants and represents that to its knowledge and in its reasonable opinion, there are no valid and enforceable THIRD PARTY patents in the TERRITORY which generically or specifically claim cerivastatin or uses thereof.

14.03 BAYER acknowledges that, in entering into this AGREEMENT, SB has relied upon information supplied by BAYER and information which BAYER has caused to be supplied to SB by BAYER's agents and/or representatives, pursuant to that certain Confidentiality Agreement dated May 30, 1996, between the parties, (all of such information being hereinafter referred to collectively as "Product Information") and BAYER warrants and represents that the Product Information is timely and accurate in all material respects. BAYER further warrants and represents that it has not, up through and including the EFFECTIVE DATE, omitted to furnish SB with any information available to BAYER concerning PRODUCT or the transactions contemplated by this AGREEMENT, which to the knowledge of BAYER could be material to SB's decision to enter into this AGREEMENT and to undertake the commitments and obligations set forth herein. SB warrants and represents that it has not, up through and including the EFFECTIVE DATE, omitted to furnish BAYER with any information available to SB concerning PRODUCT or the transactions contemplated by this AGREEMENT, which to the knowledge of SB could be material to BAYER's decision to enter into this AGREEMENT and to undertake the commitments and obligations set forth herein.

14.04 BAYER warrants and represents that it has no present knowledge of the existence of any preclinical or clinical data or information concerning PRODUCT which has not been disclosed to SB as of the EFFECTIVE DATE which to the knowledge of BAYER could materially influence SB's decision to enter into this AGREEMENT.

14.05 BAYER warrants and represents that it:

(A) has received all necessary consents and waivers, in writing, which BAYER requires from any other THIRD PARTY by virtue of the rights granted to SB under this AGREEMENT;

(B) shall pay all royalties or other sums and other payments which BAYER may owe to any THIRD PARTY by virtue of this AGREEMENT, and shall perform and observe all of the other

obligations outlined in all present and future agreements between BAYER and any THIRD PARTY which are in any way related to BAYER's ability to grant the rights granted to SB under this AGREEMENT or to BAYER's ability to perform its obligations to SB under this AGREEMENT; and

(C) In the event that BAYER receives notice from any such THIRD PARTY that BAYER has committed a breach of its obligations under any such agreement, or if BAYER anticipates such breach, such as may give rise to a right by such THIRD PARTY to terminate or otherwise diminish BAYER's rights to PATENTS and/or KNOW-HOW and/or otherwise diminish BAYER's ability to perform its obligations to SB under this AGREEMENT, BAYER shall immediately notify SB of such situation, and BAYER shall promptly cure such breach. However, if BAYER is unable to cure such breach, BAYER shall, to the extent possible, permit SB to cure such breach and to negotiate directly with such THIRD PARTY; and

(D) it will not knowingly engage in any activity regarding development or commercialization of PRODUCT outside of the TERRITORY which is or ought to be recognized by BAYER as posing a present or potential harm to the development and/or commercialization of PRODUCT within the TERRITORY. BAYER further warrants and represents that it will require its licensees and distributors of PRODUCT outside of the TERRITORY to enter in a binding agreement with BAYER which contains the same warranty and representation as outlined in this Paragraph.

14.06 SB shall defend, indemnify and hold harmless BAYER and its AFFILIATES and their officers, directors, shareholders, employees, successors and assigns from and against all claims, complaints, or lawsuits for damages (hereinafter collectively referred to as 'claim') that arise as a result of personal injury or death that is alleged to have been caused by or attributed to SB's promotional efforts for any PRODUCT which is dispensed, utilized, ingested, and/or administered in the TERRITORY, provided:

(A) SB shall not be obligated under this Paragraph to the extent it is shown by evidence acceptable in a court of law having jurisdiction over the subject matter and meeting the appropriate degree of proof for such action, that

(i) the injury was the direct result of the performance by any employee or agent of BAYER or anyone acting on behalf of BAYER, such as any of its employees, agents or representatives, including, but not limited to, negligence,

malfeasance or willful misconduct, or where the injury was the direct result of a failure to warn attributable to BAYER or a product design or manufacturing defect.

(ii) the injury was the direct result of the material failure to adhere to the terms of the Product Marketing Plan (as defined in Paragraph 6.04(D)), or the terms of the AGREEMENT by any employee or agent of BAYER or anyone acting on behalf of BAYER, such as any of its employees, agents or representatives, including, but not limited to, negligence, malfeasance or willful misconduct,

(iii) the injury was the direct result of a material breach of any warranty or representation, whether express or implied, made by BAYER under this AGREEMENT;

(iv) the injury was the direct result of a patent infringement action brought by a THIRD PARTY related to SB's exercise of its rights under this AGREEMENT, or

(v) the injury was the direct result of an alleged material release or threat of release of a hazardous substance at either: (a) the place of manufacture of PRODUCT, or (b) the place at which any waste, including but not limited to any hazardous waste, generated at the time of manufacture of PRODUCT has been treated, stored or disposed.

(B) SB shall have no obligation under this Paragraph unless BAYER

(i) gives SB prompt written notice of any claim or lawsuit or other action for which it seeks to be indemnified under this AGREEMENT,

(ii) SB is granted full authority and control over the defense, including settlement, against such claim or lawsuit or other action, and

(iii) BAYER cooperates fully with SB and its agents in defense of the claims or lawsuit or other action; and

(C) BAYER shall have the right to participate in the defense of any such claim, complaint, suit, proceeding or cause of action referred to in this Paragraph utilizing attorneys of its choice, at its own expense, provided, however, that SB shall have full authority and control to handle any such claim, complaint, suit, proceeding or cause of action, including

any settlement or other disposition thereof, for which BAYER seeks indemnification under this Paragraph.

14.07 BAYER shall defend, indemnify and hold harmless SB, its officers, directors, shareholders, employees, successors and assigns from and against all claims, complaints, or lawsuits for damages that arise as a result of personal injury or death that is alleged to have been caused by or attributed to any PRODUCT which is dispensed, utilized, ingested, and/or administered in the TERRITORY, provided that

(A) the injury was the direct result of a failure to warn attributable to BAYER or a product design or manufacturing defect, or the injury was the direct result of the performance by any employee or agent of BAYER or anyone acting on behalf of BAYER, such as any of its employees, agents or representatives, including, but not limited to, negligence, malfeasance or willful misconduct, or

(B) the injury was the direct result of the material failure to adhere to the terms of the Product Marketing Plan, or the terms of the AGREEMENT by any employee or agent of BAYER or anyone acting on behalf of BAYER, such as any of its employees, agents or representatives, including, but not limited to, negligence, malfeasance or willful misconduct, or

(C) the injury was the direct result of a material breach of any warranty or representation, whether express or implied, made by BAYER under this AGREEMENT

BAYER shall not be obligated under this Paragraph if it is shown by evidence acceptable in a court of law having jurisdiction over the subject matter and meeting the appropriate degree of proof for such action, that the injury was the result of the negligence or willful misconduct of any employee or agent of SB or anyone acting on behalf of SB; BAYER shall have no obligation under this Paragraph unless SB

(i) gives BAYER prompt written notice of any claim or lawsuit or other action for which it seeks to be indemnified under this AGREEMENT,

(ii) BAYER is granted full authority and control over the defense, including settlement, against such claim or lawsuit or other action, and

(iii) SB cooperates fully with BAYER and its agents in defense of the claims or lawsuit or other action; and

SB shall have the right to participate in the defense of any such claim, complaint, suit, proceeding or cause of action referred to in this Paragraph utilizing attorneys of its choice, at its own expense, provided, however, that BAYER shall have full authority and control to handle any such claim, complaint, suit, proceeding or cause of action, including any settlement or other disposition thereof, for which SB seeks indemnification under this Paragraph.

14.08 Notwithstanding the provisions of Paragraphs 14.06 and 14.07, above, SB and BAYER agree and understand that, in the event of a claim, complaint, suit, proceeding or cause of action brought against one party containing allegations of liability based on activities for which such party was responsible, such party shall control and bear financial responsibility for its own defense; unless the other party agrees to control and bear financial responsibility of such defense.

14.09 BAYER shall defend, indemnify and hold harmless SB and its officers, directors, shareholders, employees, successors and assigns from and against any and all damages, claims, costs, losses, liabilities or expenses (including reasonable attorneys' fees) allegedly arising out of, or resulting from or in connection with infringement of THIRD PARTY intellectual property rights by the manufacture, use and/or sale of PRODUCT under this AGREEMENT, provided:

(a) BAYER shall have no obligation under this Paragraph unless SB (i) gives BAYER prompt notice of any claim or lawsuit or other action for which it seeks to be indemnified under this Paragraph, and (ii) cooperates fully with BAYER and its agents in defense of the claims or lawsuit or other action: and

(b) SB shall have the right to participate in the defense of any such claim, complaint, suit, proceeding or cause of action referred to in this Paragraph utilizing attorneys of its choice, at the expense of SB.

14.10 Immediately upon LAUNCH, and for a period of five (5) years after the expiration of this AGREEMENT or the earlier termination thereof, each party shall obtain and/or maintain, respectively, at its sole cost and expense, product liability insurance in amounts, respectively, which are reasonable and customary in the U.S. pharmaceutical industry for companies of comparable size and activities at the respective place of business of each party. Such product liability insurance shall insure against all liability, including personal injury, physical injury, or property damage arising out of the manufacture, sale, distribution, or marketing of PRODUCT in the TERRITORY. Each party shall provide written proof of the existence of such insurance to the other party upon request.

## FORCE MAJEURE

15.01 If the performance of any part of this AGREEMENT by either party, or of any obligation under this AGREEMENT, is prevented, restricted, interfered with or delayed by reason of any cause beyond the reasonable control of the party liable to perform, unless conclusive evidence to the contrary is provided, the party so affected shall, upon giving written notice to the other party, be excused from such performance to the extent of such prevention, restriction, interference or delay, provided that the affected party shall use its reasonable efforts to avoid or remove such causes of non-performance and shall continue performance with the utmost dispatch whenever such causes are removed. When such circumstances arise, the parties shall discuss what, if any, modification of the terms of this AGREEMENT may be required in order to arrive at an equitable solution.

## GOVERNING LAW AND DISPUTE RESOLUTION

16.01 This AGREEMENT shall be deemed to have been made in the State of New York and its form, execution, validity, construction and effect shall be determined in accordance with the laws of the State of New York, U.S.A., and, to the extent permitted by law, without reference to that state's choice of law or conflicts of law rules.

16.02 BAYER and SB recognize that disputes, claims or controversies (collectively, "Disputes") arising out of or relating to this AGREEMENT may arise from time to time. BAYER and SB will follow the procedures set forth herein to facilitate the resolutions of disputes arising under this AGREEMENT in an expedient manner to attempt to avoid litigation. Any disputes between BAYER and SB, which cannot be resolved by good faith negotiation, shall be referred, by written notice from either party to the other, to the respective senior managers designated below (or their successors):

For BAYER: President, Pharmaceutical Division

For SB: President, SmithKline Beecham Pharmaceuticals North America

Such senior managers shall negotiate in good faith to achieve a resolution to the Dispute referred to them, within thirty (30) days after such notice is received. In the event the designated senior managers are not able to resolve such Dispute within such thirty (30) day period, either PARTY may then invoke any remedies available to it under law or equity.

## WAIVER OF BREACH

17.01 The failure of either party at any time or times to require performance of any provision hereof shall in no manner affect its rights at a later time to enforce the same. No waiver by either party of any condition or term in any one or more instances shall be construed as a further or continuing waiver of such condition or term or of another condition or term.

## SEPARABILITY

18.01 In the event any portion of this AGREEMENT shall be held illegal, void or ineffective, the remaining portions hereof shall remain in full force and effect.

18.02 If any of the terms or provisions of this AGREEMENT are in conflict with any applicable statute or rule of law, then such terms or provisions shall be deemed inoperative to the extent that they may conflict therewith and shall be deemed to be modified to conform with such statute or rule of law.

18.03 In the event that the terms and conditions of this AGREEMENT are materially altered as a result of Paragraphs 18.01 or 18.02, the parties will renegotiate the terms and conditions of this AGREEMENT to resolve any inequities.

## ENTIRE AGREEMENT

19.01 This AGREEMENT, entered into as of the date written above, constitutes the entire agreement between the parties relating to the subject matter hereof and supersedes all previous writings and understandings. No terms or provisions of this AGREEMENT shall be varied or modified by any prior or subsequent statement, conduct or act of either of the parties, except that the parties may amend this AGREEMENT by written instruments specifically referring to and executed in the same manner as this AGREEMENT.

## NOTICES

20.01 Any notice, request, approval or other document required or permitted to be given under this AGREEMENT shall be in writing and shall be deemed to have been given when delivered in person, or sent by overnight courier service, postage prepaid, or sent by certified or registered mail, return receipt requested, to the following addresses of the parties (or to such

other address or addresses as may be specified from time to time in a written notice)

**BAYER**

Bayer Corporation
400 Morgan Lane
West Haven, CT 06516-4175
Attention: Business, Planning and Administration

Copy to:

Bayer Corporation
400 Morgan Lane
West Haven, CT 06516-4175
Attention: Vice President and Assistant General Counsel

**SB**

SmithKline Beecham Corporation
One Franklin Plaza (Mail Code FP1935)
P.O. Box 7929
Philadelphia, Pennsylvania 19101
(or: 200 North 16th Street
Philadelphia, PA 19102)
Attention: Senior Vice President and Director Business Development

copy to:

SmithKline Beecham Corporation
One Franklin Plaza (Mail Code FP2225)
P.O. Box 7929
Philadelphia, Pennsylvania 19101
(or: 200 North 16th Street
Philadelphia, PA 19102)
Attention: Corporate Law-U.S.

20.02 Any notice required or permitted to be given concerning this AGREEMENT shall be effective upon receipt by the party to whom it is

addressed or within two (2) days after dispatch (if proof of delivery is available) whichever is earlier.

ASSIGNMENT

21.01 This AGREEMENT and the rights herein granted shall be binding upon and inure to the benefit of the successors in interest of the respective parties, provided that it is understood that no successor in interest to BAYER shall acquire the benefit of any marketing right or comarketing right to PRODUCT granted to BAYER under this AGREEMENT without the prior written consent of SB. Neither this AGREEMENT nor any interest hereunder shall be assignable by either party without the written consent of the other provided, however, that SB may assign this AGREEMENT or any part of its rights and obligations hereunder to any AFFILIATE of SB or to any corporation with which SB may merge or consolidate, or to which it may transfer all or substantially all of its assets to which this AGREEMENT relates, without obtaining the consent of the BAYER.

NO PARTNERSHIP OR JOINT VENTURE

22.01 This AGREEMENT shall not be deemed to establish a joint venture or partnership between SB and BAYER.

EXECUTION IN COUNTERPARTS

23.01 This AGREEMENT may be executed in any number of counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

NO OTHER RIGHTS

24.01 Except as expressly set forth herein, nothing in this AGREEMENT shall be deemed to grant or have granted either party any rights except as expressly set forth. No provision of this AGREEMENT shall be construed to prevent BAYER or any BAYER AFFILIATE from using any or all

preclinical or clinical development data for any purpose outside the TERRITORY, subject to Paragraphs 8.04, 9.02 and 14.05(D).

IN WITNESS WHEREOF, the parties, through their authorized officers, have executed this AGREEMENT as of the date first written above.

BAYER CORPORATION

By: [signature]

Name: R. C. SEATON

Title: VICE PRESIDENT

SMITHKLINE BEECHAM CORPORATION

By: [signature]

Name: J P Garnier

Title: President, COO SB