# EXHIBIT 6

**SB**

**SmithKline Beecham**

*Pharmaceuticals*

**AGREEMENT**
**between**
**SmithKline Beecham Corporation**
**and**
**Bayer Corporation**

THIS AGREEMENT (hereinafter "Agreement") dated this 3rd day of November, 1998 ( the "Effective Date") by and between **SmithKline Beecham Corporation**, a Pennsylvania Corporation with its principal place of business at One Franklin Plaza, Philadelphia, PA 19101 (hereinafter "SB") and **Bayer Corporation**, acting through its Pharmaceutical Division, an Indiana Corporation having a place of business at 400 Morgan Lane, West Haven, CT 06516-4175 (hereinafter "BAYER").

WHEREAS, BAYER and SB desire to enter into a relationship in which SB will make available to BAYER sufficient qualified resources and services to provide clinical monitoring and remote data entry services of BAYER compound 278817/008 (D-97008); and

WHEREAS, the parties desire to agree upon the terms and conditions under which SB will provide BAYER with such resources and services.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises and undertakings contained herein, the parties hereto, intending to be legally bound, agree as follows:

## I. SCOPE OF WORK

A. This Agreement governs the Investigation BAYER authorizes SB to perform and which SB accepts during the term of this Agreement. SB agrees to provide sufficient staffing and resources to properly provide and manage the services described herein and as set forth in Letters of Understanding for Study Conduct and Data Management attached hereto.

B. The parties agree that any changes in the scope of work hereunder shall require a written Change-in-Scope ("CIS"), mutually agreed upon and duly executed by the parties, substantially in the format attached hereto as Exhibit B.

1250 S. Collegeville Road PO Box 5089 Collegeville [illegible] 19426-0989 Telephone [illegible] 917 7000 Fax 610 917 7707

## II. EXCHANGE OF INFORMATION

During the term of this Agreement, BAYER and SB shall each provide information related to the Investigation to the other on a timely basis, so as to allow each party to allocate resources in a reasonable and prudent business manner. Any information so shared will be held confidential under the terms and provisions of this Agreement as set forth in Section IX.

## III. TERM

The term of this Agreement shall commence with the Effective Date hereof and shall expire on April 30, 2000 or upon Bayer's acceptance of the final database, whichever is later, unless sooner terminated pursuant to the provisions of Paragraph VIII. below.

## IV. COMPENSATION; PAYMENT; EXPENSES

A. Compensation

Unless otherwise agreed upon by the parties in writing, the cost of services under this Agreement shall be contracted as a fixed fee. The fixed fee agreed upon by the parties shall represent full payment for SB's professional fees and expenses, except for Reimbursable Expenses defined in Section C below. BAYER shall pay to SB, as compensation for the services performed under this Agreement, the sum of $1,502,800.

B. Payment Schedule

SB shall submit monthly invoices for payment of services or milestones completed or as otherwise agreed upon in writing by the parties. Provided that such services are accepted by BAYER, BAYER shall remit payment within forty-five (45) days after receipt of SB's invoice.

C. Reimbursable Expenses

1. BAYER will reimburse SB for the costs of monitoring visits and expenses incurred by SB as follows:

   a. Monitoring Visits to be maintained at agreed upon number of visits, unless otherwise mutually agreed in writing in a CIS. The cost of each visit is $500.00, with a travel per visit charged at a fixed rate of $400.00 per visit.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER BAYCORP00071246

b.. Other Out-of Pocket Expenses - provided such expenses have been incurred by SB in connection with the Investigation, as described in the Agreement, for third party suppliers.

2. As used herein, "actual cost" means the Sterling/Dollar cost paid by SB, without any management fee, commission or mark-up by SB, and less any discount, rebate or other allowance paid to SB by a supplier, whether reflected on the original billing or thereafter

3. Except for Reimbursable Expenses set forth in Section C 1. above, all costs incurred by SB in performing this Agreement shall be the responsibility of SB.

4. For the Investigation, SB shall submit monthly invoices for monitoring visit expenses incurred in the preceding month, to the person designated in Section XIII. Notices, below.

## V. INVESTIGATION MANAGEMENT AND REPORTING

SB will provide support for implementing and directing the Investigation and will assign sufficient personnel to provide the services.

BAYER and SB shall designate contact persons to be available to answer questions and resolve problems relating to the Investigation. Bayer and SB shall provide the names of these individuals and the respective subjects on which they may be consulted.

The Investigation will be reviewed by BAYER and SB on a regular basis. SB shall provide to the Bayer contact identified a written site visit report within two weeks after completion.

## VI. PERFORMANCE METRICS

**<u>Study Timings:</u>**

Study Start: Nov 3, 1997
Projected end of enrollment into screening: April 30, 1998
Last patient randomized: July 15, 1998
Last patient treated 24 weeks (Visit 13): Jan 15, 1999
Final database delivery: Feb. 1, 1999
Clean database: Feb. 15, 1999

Last patient treated 52 weeks (Visit 16): July 23, 1999

Final database delivery: Aug. 7, 1999
Clean database: Aug. 23, 1999

Last patient treated 78 weeks (Visit 18): Feb 1, 2000
Final database delivery: Feb. 15, 2000
Clean database: March 1, 2000

## VII. PROTOCOL

The Investigation shall be conducted in accordance with the protocol (hereinafter "Protocol") identified in the Agreement . SB shall not deviate from the Protocol during the course of the Investigation without the prior written approval of BAYER, except where necessary to eliminate apparent immediate hazards to human subjects, subject to immediate notification to BAYER. Protocol changes may be suggested by SB or by Investigators but they must be initiated by BAYER through a formal amendment process, as the study is being conducted under IND, and must be sent to FDA. BAYER shall have the right, at any time, to initiate such changes in the Protocol as BAYER deems necessary or appropriate, including suspending the Investigation temporarily or permanently.

## VIII. TERMINATION

A. Termination of Investigation

1. Right to Terminate

Either party reserves the right to immediately terminate this Agreement, without giving a reason, upon thirty (30) days prior written notice to the other party. In the event the Investigation is terminated prior to completion, SB shall use its best efforts to conclude or transfer the project, as directed by BAYER, as expeditiously as possible. SB shall not undertake further work, incur additional expenses, or enter into further commitments with regard to the Investigation after receiving such notice of termination from BAYER, except as mutually agreed upon by the parties.

2. Compensation to SB Upon Termination of the Investigation

In the event of a termination under this Section, SB shall be entitled to payment as follows:

a. All payments due and owing under this Agreement at the effective date of termination for work completed and in progress; and SB



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER BAYCORP00071248

shall be paid pro rata for all visits made according to schedule and visits required for close out of the Investigation.

b. Reimbursement for any non-cancellable services and commitments entered into by SB in connection with the Investigation being terminated, provided SB provides BAYER with documentation of expenses incurred.

c. In no event, however, shall such payments under a. and b., when added to payments previously paid to SB, exceed the total sum specified in the Agreement. If the amount that BAYER has previously paid to SB exceeds the amount that is actually owed to it, SB shall reimburse the balance to BAYER within thirty (30) days of the effective date of termination. This paragraph is not intended to limit BAYER's legal remedies in the event that termination results from a breach of this Agreement by SB, subject to the provisions of Section XIV.D. of this Agreement.

B. Termination of Agreement

Failure by either party to comply in any material respect with any of its obligations in this Agreement shall entitle the other party to give written notice to the party in default requiring it to cure such default. If such default is not cured within thirty (30) days after receipt of such written notice, the notifying party shall be entitled to terminate the Agreement by giving notice of such termination without penalty, to take effect immediately. The right of either party to terminate this Agreement, as herein provided, shall not be affected in any way by its waiver of, or failure to take action with respect to, any previous default.

C. Either party may terminate this Agreement by immediate written notice if the other party becomes insolvent, or if proceedings are instituted against the party for reorganization or other relief under any bankruptcy law, or if any substantial part of the party's assets come under the jurisdiction of a receiver or trustee in an insolvency proceeding authorized by law.

D. Upon termination of the Agreement or the Investigation, no later than thirty (30) days after such termination, SB shall return to BAYER all of BAYER's property and confidential information regarding this Agreement or applicable Investigation in SB's possession, power or control.

## IX. CONFIDENTIAL INFORMATION

A. Definition



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER BAYCORP00071249

For purposes of this Agreement, "Confidential Information" means any knowledge or information in any form or media that is (1) acquired by either party from the other party prior to or during the course of the Investigation, or (2) prepared, developed or generated by either party during the course of the Investigation; provided, however, that "Confidential Information" does not include knowledge or information that the receiving party can demonstrate by reasonable proof was known by it prior to the receipt of such knowledge or information from the other party, or that is publicly disclosed by the other party either prior to or subsequent to receipt of the knowledge or information by the receiving party or is acquired by the receiving party from third parties who have a right to disclose such information or which the receiving party is required by law to disclose. In the event either party is required by law to disclose such information, it shall provide the other party with prompt notice thereof and to allow it to intervene to seek appropriate protective relief with respect to such disclosure.

B. Non-Disclosure

Both parties (1) shall not publish, disseminate, or otherwise disclose to any third party (except as may be required to perform its services under this Agreement or by law) any Confidential Information without the prior written consent of the other party; (2) shall use the same care and discretion in maintaining the confidentiality of the Confidential Information that it uses with similar information that it considers confidential; provided that such care and discretion shall not be less than the standard of care and discretion that would be employed by a prudent person under similar circumstances; (3) shall restrict the dissemination of the Confidential Information within its own organization to persons who have a need to know; and (4) shall not, without the prior written consent of the other party, make any use whatever of the Confidential Information except for the purpose of conducting the Investigation. SB shall require all of its employees and agents or sub-contractors or third parties involved in carrying out this Agreement to sign non-disclosure agreements containing terms of confidentiality substantially similar to those set forth in this Section XI. For purposes of this Section, Investigators are not agents of SB.

C. Return of Confidential Information

Upon conclusion or termination of the Investigation or earlier termination of this Agreement or upon demand by BAYER, both parties shall return to the other party all Confidential Information, and all written material that incorporates any Confidential Information, i.e. belonging to the other or received from the other or someone acting on their behalf.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER BAYCORP00071250

## X. PROPERTY OWNERSHIP

A. Rights in Property

All materials, documents, data, and information of every kind and description including any BAYER proprietary computer programmes supplied to SB by BAYER or prepared, developed, or generated by SB pursuant to this Agreement, (except for SB procedural manuals, personnel data, methods, processes, templates, SB's proprietary software (including SB's RDE system), computer equipment supplied by SB, procedures, and policies ) shall be the sole and exclusive property of BAYER and BAYER shall have the right to make whatever use it deems desirable of any such property. SB shall not, without the prior written consent of BAYER, publish, disseminate, or otherwise disclose to any third party any such property (except such disclosure as may be required by law), or use any such property for any purpose other than the performance of this Agreement.

B. Retention of Property

Unless otherwise required by law or the terms of this Agreement, any property specified in Subsection A, above, that SB shall have in its possession shall be maintained by SB for a period of not less than five (5) years from the date of receipt thereof at the cost and expense of BAYER and shall be organized in such manner that it will be ready for reference upon reasonable notice. BAYER shall have the right at any time during such five (5) year period, upon reasonable prior written notice to SB to examine or obtain from SB copies of any or all such property. Subject to any legal requirement for retention, after five (5) years, SB may dispose of such property in accordance with instructions provided by BAYER. If BAYER fails to provide such instructions, SB shall so notify BAYER, and if instructions are still not forthcoming within thirty (30) days of such notification, SB may destroy such property.

## XI. RIGHTS IN INTELLECTUAL PROPERTY AND PATENTS

A. Inventions, Discoveries, and Know-How

With respect to any and all inventions, discoveries, and know-how (including, without limitation, all ideas, improvements, and creations) that are conceived, gained, or reduced to practice by SB in the course of performing its obligations under this Agreement including the performance of Investigations, other than any inventions, discoveries and know-how (including, without limitation, all ideas, improvements, and creations) which relate directly to SB

and its business of providing clinical trials management, regulatory affairs consulting services, database management and statistical analysis and which do not relate to the present or future products of BAYER or contain information of BAYER required to be kept confidential hereunder, SB agrees:

1. To disclose promptly to BAYER or its nominee any such inventions, discoveries and know-how

2. To assign and transfer to BAYER all rights, title, and interest in and to any and all such inventions, discoveries, and know-how upon the request of BAYER

3. To perform any and all lawful acts that in the judgment of BAYER are necessary or desirable to secure or maintain for the benefit of BAYER adequate patent and other property rights in the United States and all foreign countries with respect to any such inventions, discoveries and know-how, including, without limitation, making or delivering to BAYER United States and foreign patent applications, powers of attorney, assignments, oaths and affirmations, and applications for securing, protecting or registering any property rights relating to such inventions, discoveries and know-how, and cooperating with BAYER in the defense of patents related to such inventions, discoveries and know-how in infringement actions. BAYER shall compensate SB at standard hourly rates for the time devoted to said activities and reimburse it for all reasonable expenses incurred.

B. Copyrights

SB agrees to assign all right, title, and interest in and to any Work, as defined below, including without limitation all right, title, and interest in and to copyright of the Work, in the U.S.A. or anywhere throughout the world, in the name of BAYER (or otherwise, as directed by BAYER) for the sole benefit of BAYER, and to give BAYER all assistance reasonably requested by BAYER to secure renewals or extensions of such copyrights in BAYER's name (or otherwise, as directed by BAYER). Upon the written request of BAYER, SB shall execute any assignments or other documents that BAYER reasonably deems necessary to effectuate the purposes of this Subsection B. BAYER shall compensate SB at standard hourly rates for the time devoted to said activities and reimburse it for all reasonable expenses incurred. For purposes of this Section, "Work" means all reports, documents, research, drafts, materials, and data that are recorded in any form (including, without limitation, written, electronic, or photographic form) and that are prepared, developed, or generated by SB in the course of performing its obligations under this Agreement. Notwithstanding the foregoing, BAYER acknowledges and agrees that SB is the sole owner of, and shall retain the entire copyright

and all other rights in and to, all materials developed and/or modified by SB prior to, apart from or in the course of performing its obligations under this Agreement, regardless of whether such materials are used in connection with SB's performance of this Agreement, including, without limitation, all templates, computer software programs (including, but not limited to SB's RDE system), reports and other materials provided by SB to create deliverables hereunder, it being understood and agreed that only materials specifically produced for BAYER under this Agreement shall be deemed works made for hire.

Bayer is not granted license, by implication or otherwise, to SB's RDE software.

C. Survival of Obligations

The obligations imposed by this Section shall survive the expiration or earlier termination, for any reason, of this Agreement with respect to inventions, discoveries and know-how conceived, gained, or reduced to practice by SB, and Work prepared, developed, or generated by SB, in the course of performing this Agreement. Such obligations shall be binding upon permitted assignees, administrators and other legal representatives of SB.

## XII. INDEMNIFICATION

A. Indemnification of BAYER

SB shall hold harmless and indemnify BAYER, its employees, agents and assigns, from and against all claims, complaints, or lawsuits for damages that arise or are alleged to arise as a result of the negligence or malfeasance of the SB, or any of its employees, agents, or representatives, in conducting the Investigation, or from the SB's failure to adhere to the terms of the Protocol or this Agreement, or to applicable State and Federal Laws, regulations, including FDA regulations and guidelines. For purposes of this Section, Investigators are not agents or representatives of SB.

B. Indemnification of SB

BAYER shall indemnify and hold harmless SB, its representatives and employees, from and against all claims, complaints, or lawsuits for damages that arise as a result of personal injury or death that is alleged to have been caused by or attributed to any substance provided by BAYER and dispensed or administered in accordance with the provisions of the Protocol; provided that

1. BAYER shall be promptly notified of any such claim, complaint, or lawsuit;

2. BAYER shall have the right, in its sole discretion, to undertake the defense, compromise, or settlement, at its own expense and by its own counsel, of any such claim, complaint, or lawsuit; and

3. BAYER shall co-operate fully in the investigation and defense of any such claim, complaint, or lawsuit.

The indemnification provided for in this Subsection B shall not apply to any loss, damage, cost or expense that is caused by or attributable to the negligence or malfeasance of SB, its employees, agents, or representatives.

## XIII. NOTICES

Except as otherwise provided herein, any notice or other communications or any payment required under this Agreement shall be delivered by hand, first class mail, a nationally recognized overnight courier service, or facsimile transmission, to the respective designated representatives at the addresses set forth below. Any such notice shall be effective (1) in the case of a hand delivery, when received; (2) in the case of an overnight delivery service, on the next business day after being placed in the possession of such delivery service, with delivery charges prepaid; (3) in the case of the mail, three days after deposit in the postal system, first class postage prepaid; and (4) in the case of facsimile transmission, when electronic indication of receipt is received.

If to SB: Elsie Harte
SmithKline Beecham Pharmaceuticals
1250 S. Collegeville Road
Collegeville, PA 19426

If to Bayer: Susan Kronick
Bayer Corporation
400 Morgan Lane
West Haven, CT 06516-4175

## XIV. MISCELLANEOUS

### A. MODIFICATIONS



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER BAYCORP00071254

No changes shall be made in this Agreement except by written agreement of the parties, signed by authorized representatives.

## B. ENTIRE AGREEMENT

This Agreement, together with its Exhibits, shall be the entire and complete understanding between the parties in regard to the covered subject matter. This Agreement merges all prior discussions between the parties and neither party shall be bound by conditions, definitions, warranties, understandings, or representations concerning such subject matter except as provided in this Agreement or as specified on or subsequent to the effective date of this Agreement in a writing signed by properly authorized representatives of both the parties.

## C. ASSIGNMENT

Neither party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the other party. Notwithstanding the previous sentence, BAYER may assign its obligations under this Agreement to any affiliate of BAYER, provided that the rights of SB under this Agreement are not materially prejudiced.

## D. INDEPENDENT CONTRACTOR

SB shall function as an independent contractor and shall not hold itself out as an agent of BAYER in any way. This Agreement shall not constitute, create, or be interpreted as a joint venture or business organization of any kind.

## E. WAIVER

The failure of a party in any instance to insist on the strict performance of the terms of this Agreement shall not be construed to be a waiver or relinquishment of any of the terms of this Agreement, either at the time of the party's failure to insist upon strict performance or at any subsequent time.

## F. SEVERANCE

Each clause of this Agreement is a distinct and severable clause and if any clause is deemed illegal, void, or unenforceable, the validity, legality, or enforceability of any other clause or portion of this Agreement shall not be affected thereby.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER BAYCORP00071255

## G. HEADINGS

All headings contained in this Agreement appear only for convenience and reference. They do not define, limit, extend, or describe the scope of this Agreement or the intent of any of its provisions.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by its authorized representatives in the manner appropriate to each as of the day and year set forth below.

SMITHKLINE BEECHAM CORPORATION

Jerome A. Boscia, M.D.
Vice President/Director, Clinical Research & Development
SmithKline Beecham Pharmaceuticals, N.A.

Date: 6 OCT '98

BAYER CORPORATION
Accepted and Agreed To:

By: Paul MacCarthy
Paul MacCarthy, M.D.

APPROVED AS TO LEGAL FORM 10/19/98 LAW DEPT.

Title: Vice President, Medical Affairs Development

Date: November 18, 1998

By: Lawrence Posner
Lawrence Posner, M.D.

Title: Sr VP Pharmaceutical Div.
Sr. Vice President, Research & Product

Date: November 18, 1998

# EXHIBIT A

Clinical CRO Check List (Responsibilities)
Study # 97/008

Number of Sites:60 Number of Patients: 1200

Number of Pages/CRF: ___________ Total Number of CRF Pages:__________

S = Task to be completed by SB
B = Task to be completed by BAYER
N = Task not applicable

Protocol Development

S B N
☐☒☐ **Design Study**
☐☒☐ **Protocol Development (includes draft, QA, approval)**
☐☒☐ **CRF Development (Case Report Form - Includes approval)**
☐☒☐ **Print CRF**
☐☒☐ **RAP Development (Report and Analysis Plan - Includes draft and approval)**
☐☐☒ **Local Language Translations (Non-English Speaking Countries)**
**Includes Protocol and Informed Consent, Case Report Form(according to local, regulatory, legal and ethics committee)**
☐☒☐ **Update Investigator Brochure/print**
☐☐☒ **European Studies - Obtain and maintain authorization to conduct trial in each country** ***(Study will be conducted at 10 Canadian sites: Bayer responsible for authorizations, etc, SB for monitoring)***

Investigator Selection
S B N
☐☒☐ **Identify Investigators**
☐☒☐ **Investigator Screening**
☐☒☐ **Investigator Selection**
☐☒☐ **Investigator Qualification**
☒☒☐ **Investigator Newsletter** ***(Joint effort)***

Regulatory Document Collection
S B N
☐☒☐ **Signed first page of Protocol**
☐☒☐ **IRB/ERC Approval Forms**
☐☒☐ **IRB/ERC member list or composition details**
☐☒☐ **1572 (IND Studies)**
☐☒☐ **Current Cvs for Investigators and sub-investigators**
☐☒☐ **Informed Consent Forms**
☐☒☐ **Lab Normal Ranges**

☐☒☐ IRB/ERC Approvals of Amendments/Advertising Copy
☐☒☐ Copy of Current Medical License
☐☒☐ Outside of U.S. - Additional Documents

Grant Administration
S B N
☐☒☐ Negotiate Investigator Payments
☐☒☐ Sample Itemized Budgets
☐☒☐ Template for Investigator Agreement

USA Filing Regulatory Documents
S B N
☐☒☐ First Investigator Documents to USRA for Submission to FDA
☐☒☐ Subsequent Investigator Documents filed direct to FDA (copies to SB)

Europe Filing Regulatory Documents
S B N
☐☐☒ Compile and Finalize documents

Investigator Meetings - (U.S. Meetings held in Philadelphia)
*Already held*
S B N
☐☐☒ Physical Set up of Meeting
☐☐☒ Travel Arrangements (Rosenbluth - US/Travel Company - UK)
☐☐☒ Meeting Agenda
☐☐☒ Plan for adequate enrollment prepared and rollout
☐☐☒ Prep/Printing/Collation of Investigator Meeting Notebooks

Investigator Site Initiation
S B N
☒☐☐ Conduct Visit
☒☐☐ Review study procedures, protocol, CRF, etc.

Drug Supplies
S B N
☐☒☐ Arrange packaging of trial drugs
☐☒☐ Label clinical trial supplies
☐☒☐ Ship drug to sites
☒☐☐ Open at Site Initiation
☐☒☐ Virtual Randomization - Contact SB for drug assignments
☐☒☐ Shipping Orders - Submit to FDA, ~~Copy to SB USRA~~
☐☐☒ Sub-Contract storage of drug supplies



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER BAYCORP00071258