# EXHIBIT 7

UNITED STATES DISTRICT COURT DISTRICT OF MINNESOTA
MDL NO. 1431 (MJD/JGL)

IN RE: BAYCOL PRODUCTS

CONFIDENTIAL

VIDEOTAPED DEPOSITION
OF DR. JEFFREY DUBB
VOLUME II

--------------------
JULY 31, 2003
--------------------

TRANSCRIPT of the deposition notes of DR. JEFFREY DUBB, witness, called for oral examination in the above-entitled action, by and before LISA KINNEVY-FORLANO, a Certified Realtime Reporter, at the offices of DECHERT LLP, 4000 Bell Atlantic Tower, 1717 Arch Street, Philadelphia,Pennsylvania, on Wednesday, July 31, 2003, commencing at 9:16 a.m.

issues during these Baycol clinical studies that SmithKline primarily directed?

MS. FLEISHMAN: Objection.

THE WITNESS: No, not really.

BY MR. LIMBACHER:

Q Did SmithKline primarily direct that .8-milligram phase three study?

A The .8 pivotal study, phase three study was D97-008. That study was actually designed and the protocol was written by Bayer and then there was a group different from the group I was in that actually carried out that study, so through most of the period, at least for the first six months or so of working on Baycol I barely knew that study existed and I never had any direct contact with that study.

Q Let me show you what we've marked as the next exhibit, Exhibit 24, and ask you if this appears to be a copy of the agreement between SmithKline and Bayer with regard to the .8-milligram pivotal study and SmithKline's role in that study?

A Yes, it appears to be that agreement.

Q And referring you to the second paragraph of the first page does it set forth there what

SmithKline's involvement was with regard to this clinical study?

A Yes. It will provide clinical monitoring and remote data entry services.

Q And who actually designed the overall study protocol for the .8-milligram pivotal study?

A That was Bayer Clinical Department.

Q Dr. Dubb, was SmithKline able to analyze the information that was in the .8-milligram study database?

A No, not really. They didn't have information that would allow them to know which patients were receiving which drug, so-called --

Q Was that because the study was what you called double blinded?

A Yes, the study was double blinded, so patients were simply receiving a drug with a certain number on it and in order to know what drug the patients were receiving you had to have the list, the code list that explained what drug it was.

Q And who had the code list?

A That was at Bayer.

Q To your knowledge, Dr. Dubb, were there any issues with the database on the .8-milligram

# EXHIBIT 8

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

IN RE: BAYCOL : MDL NO. 1431
PRODUCTS LITIGATION : (MJD/JGL)
This Document Relates:
To All Cases :

COPY

- - -

CONFIDENTIAL

- - -

January 29, 2004

- - -

Videotape deposition of ERICH F. SCHINAGL, M.D., held in the offices of Weitz & Luxenberg, P.C., 180 Maiden Lane, New York, New York, commencing at 10:05 a.m., on the above date, before Linda L. Golkow, a Registered Diplomate Reporter and Certified Shorthand Reporter.

- -

RECEIVED
FEB 18 2004
F.T.M.

ESQUIRE DEPOSITION SERVICES
1880 John F. Kennedy Boulevard
15th Floor
Philadelphia, Pennsylvania 19103
(215) 988-9191

And you've never prescribed a statin medication?

A. No.

Q. In fact, you've never prescribed any medication since your days in Vienna?

A. Correct.

Q. Am I correct that while you were at med school in Vienna, there were no such thing as the statin drugs?

A. No.

Q. Just to make sure I understand your background, Doctor, you've never been an employee of the FDA or any other regulatory agency in the world; have you?

A. No.

Q. Have you ever acted as a paid consultant to the FDA or other regulatory agency?

A. No.

Q. You've never served on an advisory board to the FDA or other regulatory agency?

A. No.

Q. You've never been asked by the FDA or regulatory agency formally or otherwise about your opinions on the safety profile of a medicine; have you?

A. Well, of course, I prepared the safety information on several new drug applications, and you could call that my opinion on the safety of a medicine. I --

Q. Have you -- okay. I'm sorry. I didn't mean to cut you off.

Have you been called to appear before the FDA to comment on any of those new drug applications?

A. Well, yes, I have made presentations to FDA as part of the NDA process as required. I mean, they ask you to come in, but only in relation to the drugs that I worked on and the NDAs that I was involved in and the pieces that I had written.

Q. Let me make sure that I have a firm understanding of what NDAs you did

A. No.

Q. I think we've already established you have no formal education in statins or publications on statins?

A. No.

Q. Am I correct that you have no formal education or publications on the marketing of pharmaceutical products?

A. Correct.

Q. No formal education or publications on the ethics of pharmaceutical companies?

A. No.

Q. No formal education or peer-reviewed publications on the regulation of pharmaceutical products?

A. Well, I don't know what you refer to as formal education. Of course, my education in all of these matters were not formal in the sense that they were offered by a university or an institution of higher learning, but, obviously, I had to be educated in all of these things in the course of my work. And so that

But I see on December 1st, 2003 that you were in an all day meeting that day with "PP," and that would be Paul Pennock?

A. Yes.

Q. And "SM." Who is SM?

A. Sarah Milks.

Q. And she works here as well?

A. Yes.

Q. From reading this and looking at the date of the addendum, am I correct that you spent that day finalizing your report?

A. Correct.

Q. Was it a collaborative effort with Mr. Pennock and SM?

A. Well, it was a collaborative effort in the sense that he had supplied the documents, and they supplied the computer, because I didn't have a computer with me, and so this was typed out. I think it was Sarah that had the computer and typed this.

Q. This all day meeting you had

with Mr. Pennock, was the focus of that meeting the development of this addendum --

A. Correct.

Q. -- as opposed to other work?

A. Correct.

Q. Going back to the original report that's dated in July of 2003, am I correct, Doctor, that the documents that you relied upon for developing these opinions were all provided to you before July 29, 2003?

A. Yes.

Q. And all of those documents would be those documents that are specifically referenced on Exhibit C to your original report?

A. Yes.

Q. Is that correct?

A. Correct.

Q. Now, since that time, have you seen any new or different documents that have been provided by Weitz & Luxenberg?

A. It was written in the conference room of the Marriott Residence Inn in Somerset, New Jersey.

Q. So, on the Monday after Thanksgiving weekend of 2003, you and two lawyers from Weitz & Luxenberg gathered in a conference room in a Marriott Residence Inn in Somerset, New Jersey, and the three of you hammered out the addendum at that time; is that correct?

MR. BROADDUS: Objection to form and foundation. You may answer.

THE WITNESS: No. That's not correct.

BY MR. MAGAZINER:

Q. What was incorrect about what I said?

A. I think I testified to that before, that I was given documents relating to GSK that I did not -- had not previously seen. I had not previously seen any documents specifically relating to the role of GSK in the marketing of

Baycol. So, it was the Wednesday before Thanksgiving that Mr. Pennock and the second person who was not a lawyer, but a legal assistant, came and brought me those documents. And I had the opportunity to review them during that period. As I also testified before, this was not what I had expected to do during that period, but I did it. And then these two people, one lawyer and one legal assistant, came to the hotel again. The first meeting was also in that same location. And it was at that time that the legal assistant had a computer that made the process of preparing this not only much quicker, but also better legible than what I had produced myself.

Q. And that was on the Monday after Thanksgiving weekend?

A. That's correct.

Q. And you had not prepared a draft of the addendum until you sat down in that conference room with the lawyer from Weitz & Luxenberg --

You said -- well, let me ask a preliminary question.

Before you prepared the addendum, did you ever speak with any plaintiff's lawyer other than Mr. Pennock about GSK's role?

A. No.

Q. So, on Wednesday before Thanksgiving, Mr. Pennock came to visit you in a conference room at the Marriott Hotel in Somerset, New Jersey; correct?

A. (Witness nods.)

Q. Is that a yes?

A. Yes.

Q. You're shaking your head, but you have to say --

A. I'm sorry, yes.

Q. So, on the Wednesday before Thanksgiving, Mr. Pennock came to visit you, and he told you something about GSK's role; correct?

A. And --

Q. And he gave you some documents?

A. Gave me the documents, so, I think --

Q. I'm just concentrating on what he told you. You said he told you that GSK had done 80 percent of the detailing to doctors; correct?

A. Well, I cannot testify to that he told me that. He may have shown me a document to that effect.

Q. You said, I thought, that he told you that GSK had played a substantial role in the .8 study. Did I understand that correctly?

A. And showed me documents. And, again, the visit -- my meeting with Mr. Pennock and the legal assistant was not for that purpose. It was to prepare me for the deposition on my original report.

Q. Right. Now --

A. That was supposed to occur on the Monday after Thanksgiving.

Q. Let's concentrate on the Wednesday meeting. Did Mr. Pennock

either tell you something else about GSK's role or point out to you based on -- in documents other aspects of GSK's role besides the two things you mentioned, which were the 80 percent of the detailing to physicians and the substantial involvement in the .8 milligram study? Is there anything else he pointed out to you or explained to you about GSK's role?

A. Well, he gave me these documents to read.

Q. Now, you're holding your fingers about an inch apart. Is that about how many documents there were?

A. It was a substantial amount.

Q. About an inch thick, would you say?

A. Half an inch, an inch.

Q. Half an inch to an inch of documents.

At what point did you agree that you would write an addendum focused on GSK? Was it at the time that you were

meeting with Mr. Pennock that Wednesday?
A. No.
Q. When did you agree to write the report about GSK?
A. On Monday.
Q. So, on Monday Mr. Pennock came back, and at that point you had reviewed the half an inch to an inch of documents?
A. Correct.
Q. And you agreed you would write an addendum?
A. Correct.
Q. Then the addendum was written that day?
A. Correct.
Q. So, at the time you wrote the addendum, the only documents you had seen concerning GSK's role were the half an inch to an inch of documents that Mr. Pennock brought you the previous Monday; correct?
A. And the documents that were scattered throughout this so-called hot

Q. The documents that you relied upon in preparing the addendum that you prepared with Mr. Pennock on the Monday after Thanksgiving were all documents found in that pile of documents that Mr. Pennock gave you on the Wednesday before Thanksgiving; correct?
A. Correct.
Q. Did Mr. Pennock tell you how he had selected the documents that he showed to you in that half inch to one-inch pile of documents?
A. No.
Q. Did Mr. Pennock tell you that GSK had made available to plaintiffs' counsel several hundred thousand documents?
A. No.
Q. Did you ask Mr. Pennock how he selected the half an inch to an inch of documents that he gave you from out of the several hundred thousand documents that GSK had made available to plaintiffs' counsel?

A. No.

MR. BROADDUS: Objection to form. You may answer.

THE WITNESS: No. Sorry.

BY MR. MAGAZINER:

Q. What efforts did you make between Wednesday, when you got this half an inch to an inch of documents, and Monday, when Mr. Pennock and you wrote the report --

MR. BROADDUS: Objection, form.

BY MR. MAGAZINER:

Q. -- to obtain more documents from GSK's file?

MR. BROADDUS: Sorry. Objection to form. You may answer.

THE WITNESS: I did not make any such efforts.

BY MR. MAGAZINER:

Q. What steps did you take to be sure that the half an inch to an inch of documents that Mr. Pennock gave you

fairly told the story about GSK's role and were not slanted in one way or another?

A. I didn't make any such efforts.

Q. Isn't it a fact, sir, that between Wednesday, when Mr. Pennock gave you the documents, and Monday, when you met with Mr. Pennock to write the report, you only spent about two hours looking at the GSK documents?

A. I cannot tell you how many hours I spent.

Q. Does two hours sound about right?

A. I would imagine it was more than that.

Q. Three hours?

A. I could refer to my notes, which does not mean that the times are exactly correct. Yes, you can see it here. It's here.

Q. As I read it, it said two hours. Am I reading it wrong?

A. Well, two hours that I wrote down, yes, that's correct.
Q. So, based on your --
A. Sorry, wait a minute. 6:30 to 7:30, read SKB file and 10 to 1 I did, as well.
Q. So, that would be four hours?
A. Yes.
Q. So, based on your records, before you sat down with Mr. Pennock and the two of you wrote the report, the addendum, you spent four hours reviewing half an inch to an inch of documents from GSK's files, and that was the basis on which you wrote the report; correct?
A. Correct.
MR. MAGAZINER: Let's stop for a moment. Do you need to change?
THE VIDEOTAPE TECHNICIAN: Yes.
MR. MAGAZINER: We're going to change the tape.

THE VIDEOTAPE TECHNICIAN: We're off the video record at 5:11 p.m.

- - -

(Whereupon, there was a recess.)

- - -

THE VIDEOTAPE TECHNICIAN: We're back on the video record at 5:13.

BY MR. MAGAZINER:

Q. Dr. Schinagl, as I or, actually, as Halimah, my colleague, counted it, there were nine GSK documents cited in your original report and addendum total. Is that about right?

A. I'm sure it is.

Q. Those are nine documents that you selected out of the half an inch to an inch of documents that Mr. Pennock gave you the Wednesday before Thanksgiving; correct?

A. Correct.

Q. Do you know whether any GSK

people have been deposed in the Baycol litigation?

A. No, I don't.

Q. So, I guess it's safe to say you have not read the transcripts of any depositions of any GSK people?

A. No.

Q. Did you ask Mr. Pennock whether he could make available to you transcripts of depositions of GSK people?

A. No.

Q. Did he offer to make such transcripts available to you?

A. No.

Q. Do you know whether any of the Bayer people who were deposed in the Baycol litigation answered questions about GSK's role?

A. No, because I haven't read any depositions of Bayer people either.

Q. Did you ask Mr. Pennock or any of the other plaintiffs' lawyers that you've worked with whether there was any deposition testimony from any Bayer

personnel about GSK's role?

A. No.

Q. Did Mr. Pennock or any of the other plaintiffs' lawyers offer to make available to you transcripts of depositions of Bayer personnel where they answered questions about GSK's role?

A. No.

Q. So, you would agree with me, would you not, Dr. Schinagl, that if you actually were to read the depositions of Bayer personnel and the depositions of GSK personnel, you might find in those depositions information that would change your opinions?

A. That's possible.

Q. Does it make you uncomfortable that you have offered an opinion in this litigation about GSK without making any effort to read the testimony of the GSK personnel who were asked to explain what they had done?

MR. BROADDUS: Objection to form. You may answer.

background about your understanding of GSK's role.

First of all, you agree with me, do you not, sir, that Baycol was developed or invented or synthesized by Bayer, not by GSK?

A. I know that.

Q. You know it was Bayer, not GSK, that conducted the preclinical trials?

A. Yes.

Q. And it was Bayer, not GSK, that conducted the clinical trials except for the .8 that you've mentioned earlier; correct?

A. I'm aware of that.

Q. And it was Bayer, not GSK, that filed an IND with the FDA; correct?

A. (Witness nods.)

Q. That's an investigational new drug application; correct?

A. Yes, I'm aware of that.

Q. And it was Bayer, not GSK, that filed the new drug application or

the NDA with the FDA; correct?

A. I'm aware of that.

Q. And it was to Bayer, not the GSK, that the FDA issued a license to sell Baycol; correct?

A. Correct. I was aware of that.

Q. And it was Bayer, not GSK that manufactured Baycol; correct?

A. I was aware.

Q. And it was Bayer, not GSK, that sold Baycol; correct?

A. Yes. Well, sold -- well, I don't know anything about sold.

Q. Well, Bayer is a manufacturer that sold the drug to wholesalers. I guess what's confusing you is you know that there were GSK salespeople who were promoting the drug to physicians.

A. When you say "sold," I would tend to associate that with the activity of the salesmen, but that's not what you mean.

Q. I mean "sold" in the sense of if you own something --

A. As a commercial transaction.

Q. The commercial transaction is Bayer selling the drug to wholesalers.

A. As opposed to "sold" as promoted.

Q. All right. I think we understand one another.

You understand based on your many years of experience in the pharmaceutical industry that it was Bayer as the license holder for Baycol that had the responsibility of collecting adverse event reports and transmitting them to the FDA; correct?

A. Correct.

Q. That was not a GSK responsibility?

A. Correct. I'm aware of that.

Q. You understand that GSK's role was limited to helping Bayer market Baycol in the United States; correct?

A. Correct.

Q. And that role was defined by a co-promotion agreement between Bayer and GSK that you've reviewed; correct?

A. Well, I am not sure that this package that I had in my hand contained the whole co-promotion agreement. In fact, I'm pretty sure that it did not contain the complete co-promotion agreement.

Q. So, Mr. Pennock gave you a less than complete version of the Bayer GSK co-promotion agreement; is that correct?

A. I believe what these documents contained were summaries of that co-promotion agreement mentioned in various documents relating to -- various documents from the joint bodies that were created between the two companies. So, I did indeed not see the whole co-promotion agreement, which means, very importantly -- and that, I think, bears on my earlier statement, that I had no reason to believe that Mr. Pennock had

have gathered in this whole proceeding, I am a relative novice in this. Although I have done it on behalf of the company --

BY MR. MAGAZINER:

Q. Let me --

A. -- but my plaintiff -- work on the plaintiff side was very limited and nothing like that. So, I'm inexperienced and didn't do any of the things you suggest I should have done.

Q. Let me ask you this, talking about experience and different things. In your years at Pharmacia, did you ever negotiate a co-promotion agreement with another pharmaceutical company?

A. No.

Q. Did you ever participate in writing a co-promotion agreement?

A. No.

Q. Did you ever -- did your duties at Pharmacia ever require you to interact with a company that was co-promoting a Pharmacia drug?

A. Yes.

Q. What was that drug, and tell me about that experience.

A. That drug was Rheomacrodex that I mentioned earlier.

Q. Who was the other company?

A. The other company was Abbott. They made -- Pharmacia made Rheomacrodex. Abbott made a generic dextran 40 product, D-E-X-T-R-A-N, which is the generic name for Rheomacrodex. This had all occurred before I came to the US. Abbott had already been licensed to make their own version of Rheomacrodex under their own label. And several years after I came to the US, it became apparent that it was not possible for Pharmacia to continue funding the research for new indications alone. So, Pharmacia at that point approached Abbott, and an agreement -- it wasn't actually a co-promotion agreement, but it was a collaboration on the research side.

Q. I see.

A. So, they promoted their product, Pharmacia promoted independently their product, but the research effort that was funded by both companies separately was combined.

Q. Okay. Let me ask you a more pointed question.

In your years at Pharmacia, did you ever have any experience or involvement in a situation in which another company was promoting a Pharmacia product, using its salespeople to promote a Pharmacia product, or in which Pharmacia salespeople were promoting some other company's product, either way?

A. No.

Q. So, the situation that existed on Baycol between GSK and Bayer, that is, the situation in which GSK salespeople were helping to market and promote a Bayer product, that was not a situation that you had any experience in when you were with Pharmacia; correct?

A. No.

Q. When you say "no," I am correct?

A. You are correct.

Q. Do you know of any laws that define what obligations or responsibilities a drug company has when it is marketing another drug company's product?

A. I would assume that that is something that would have to be covered in the co-promotion agreement.

Q. No. I said do you know of any laws?

A. No.

Q. Do you know of any FDA regulations that govern what a company should do or must not do or is obligated to do or has a responsibility to do when it is helping another company market that other company's product?

A. No.

Q. Do you know of any written guidelines of any kind that define what a company should do when it is marketing

another company's pharmaceutical product?

A. No.

Q. Do you know of any books or articles or anything else in writing, no matter what label you might put on it, that addresses the question of what a company should do when it is marketing or helping to market another company's pharmaceutical product?

A. No.

Q. Are there any standard operating procedures that you're familiar with that govern such situations?

A. Well, I would assume that all the provisions of the Food, Drug & Cosmetics Act with all of its provisions apply in such a situation, as well, in other words, all the things that are forbidden for the originator company to do in the marketing, marketplace would also apply to the co-promotion. And if the co-promotion agreement is such that one company has assumed or continues to have the sole responsibility for safety

salespeople said when they visited doctors, you don't know of any regulations that apply to GSK in its role as a co-promoter of Baycol; correct?

A. Correct.

Q. Now, in your addendum you express opinions about what GSK should have done or should not have done or should have done differently; correct?

A. Correct.

Q. What standards are you applying in reaching those conclusions? When you say GSK should have done something differently, to what standards are you comparing GSK's conduct?

A. I think I did not apply any different standards to GSK's conduct that I would have applied or did apply to Bayer's conduct.

Q. Doctor, I think we've just established that the only rules or regulations that you know of that apply to GSK were rules or regulations that governed what a GSK salesperson could say

to a doctor or was required to say to a doctor in promoting Baycol to the doctor; correct?

A. Correct.

Q. None of your opinions, as I read them, in the addendum has anything to do with whether a GSK salesperson said the right thing or the wrong thing to a doctor; am I correct?

A. That's correct. But --

Q. Let me ask another question, please.

A. I'm sorry.

Q. I don't mean to interrupt you, but I know you want to get out by 6:00. I was standing next to you when I heard you say, I hope to be out by 6:00, and we'd all like to get out, so, I'll try to move quickly.

I should tell you if at any time you feel I'm interrupting you unfairly because there's really more you need to say on the question I've asked you, let me know. But if there's just

A. Yes.

Q. Sentence number 10 cites a letter which is signed by someone named Gerry. Do you remember that letter?

A. Yes.

Q. Do you know who Gerry is?

A. I do not remember Gerry's surname, but I know he was one of the top executives --

Q. Of GSK?

A. -- of GSK.

Q. Did you ask Mr. Pennock whether Gerry had ever been deposed and had been asked questions about the meaning of the various things that he said in the letter?

A. No.

Q. Did Mr. Pennock volunteer to you that Gerry had, in fact, been deposed and had testified at great length about the letter?

A. No.

Q. So, when you characterized the letter and attribute significance to

the letter, you do that without having any idea whatsoever what Gerry said about the letter; correct?

A. Correct.

Q. Let me ask you to look at sentence Number 12. Do you have that in front of you?

A. Yes, I have it.

Q. It reads: "In addition to inserting SKB into the established and ever increasing statin market and obtaining 'short term financial gains,' SKB specifically desired to 'avoid being publicly labeled as a poor partner.'" And you cite a document from Bayer's files, a Baycorp document; correct?

A. Yes.

Q. Do you remember what that document was?

A. I think it was a memo.

Q. Was it created by GSK or by Bayer, do you know?

A. Well, judging from the label the document has, it suggests that it

would have been created by Bayer.

Q. Was it -- the quotes about "short-term financial gains," was that Bayer's guess as to GSK's motivations or something that GSK had said in some memo that GSK created? Do you remember?

A. I would -- again, I do not recall the specific document, but I would guess that that statement probably did not come from SKB because that's -- although short term financial gains may be foremost in the minds of top executives all the time, they don't like to talk about them.

Q. So, when you fault SKB for having short -- for wishing to obtain "short term financial gains" and you put that in quotes, what you're saying is that someone else, not SKB or GSK, someone else characterized that as GSK's motivation, and based on someone else's characterization, you fault GSK for having that motivation; correct?

A. Well, if I did that, then

that was wrong.

Q. Turn to sentence 16, please.

A. 16, yes.

Q. It reads: "Due to SKB's very early recognition of significant commercial viability of Baycol's less efficacious lower dosages, SKB was focused from the outset on the development and approval of the 0.4 and higher dosages."

First of all, is there anything wrong with a company wanting to bring to market drugs that have significant commercial viability?

A. No. In fact --

Q. Isn't that, in fact, what Pharmacia always strived --

A. That is their function. They wouldn't exist unless they did that.

Q. And you would expect that a pharmaceutical company like GSK would be interested in the commercial viability of any project that it undertook; correct?

A. Absolutely.