# EXHIBIT 9

# ADDENDUM REGARDING SMITHKLINE BEECHAM (SKB) AND GLAXO SMITH KLINE.

1. My Education and Experience:

The above are set forth in my prior report dated July 29, 2003 and my C.V. attached thereto. My rate of compensation has not changed nor have the statements set forth in that report regarding testimony in the last four years.

2. Materials Reviewed:

I have reviewed numerous documents in addition to those specifically referenced in my prior report and this report. I have reviewed thousands of pages of documents regarding the development and marketing of Baycol (cerivastatin). I have also reviewed hundreds of pages of deposition testimony.

3. SKB Recognized Serious Concerns:

It is clear that SmithKline Beecham and its successor GlaxoSmithKline were aware of the significant safety concerns of Baycol as compared to other statins from the outset of SKB's involvement with this drug. Indeed, it is striking that even as the discussions of a co-promotion agreement were in their initial phases, SKB understood that Baycol was less efficacious than its competitors. Equally striking is that only a few months before the co-promotion agreement was signed, SKB knew that Bayer was less than forthcoming when addressing SKB's questions on toxicology and clinical studies (GSK_BL_00122196). As SKB continued its investigation into the commercial viability of the drug, SKB understood very early on that the drug was unsafe and had a very steep dose response curve in terms of safety. Despite "serious concerns" and expressed reservations about being able to market Baycol as "simple and safe" (GSK_BL_00145904), SKB went forward with the agreement and marketing of this statin.

3.1 Motivations

SKB had particular interest in entering into a statin co-promotion arrangement in 1997. In addition to inserting SKB into the established and ever increasing statin market and obtaining "short term financial gains," SKB specifically desired to "avoid being publicly labeled as a poor partner." (BAYCORP 01859714) This was due to SKB's marketing problems and disputes with Merck over the statin Zocor. As the concerns over Baycol came to fruition, it appears that this backdrop in part caused SKB's failures in terms of proper communication of the problems with Baycol as they emerged. In fact, rather than address the safety problems directly and properly, SKB's conduct reflects a pattern of attempting to manipulate the information it was receiving, to preserve Baycol's existing and potential market share.

3.2 Hopes Tied to 0.4 and Higher Dosages:

Due to SKB's very early recognition of the lack of significant commercial viability of Baycol's less efficacious lower dosages, SKB was focused from the outset on the development and approval of the 0.4 and higher dosages. This issue was specifically addressed in the co-promotion agreement that was ultimately signed. Even before the agreement, moreover, SKB proposed that doses up 1.2 mg be studied (GSK_BL_00145907) and had expectations that the higher doses would be approved by the FDA in 2001. Therefore, it is clear the higher doses were important to SKB and this is reflected in their later conduct.

4. Failure to Adequately Communicate:

4.1 Adverse Events

SKB received regular updates regarding reported adverse events. In addition to the exchange of information required by the co-promotion agreement (GSK_BL_00017825), an October 1997 meeting fully detailed the adverse event information exchange guidelines. SKB, therefore, should have played an extensive role in collecting and analyzing the reports. It should have been clear to SKB, and later GSK, that Baycol was causing rhabdomyolysis adverse events at a rate that was multiples of the rates for other statins. (See BAYCORP01436612.) Rather than face the fact that this drug was more dangerous in terms of muscle injury than the other statins (and less effective), SKB persisted in its efforts to keep Baycol profitable and increase market share. Together with Bayer, SKB on the one hand blamed co-prescription of gemfibrozil as the culprit for the adverse events but on the other hand balked at a contraindication for gemfibrozil. As reflected in SKB's earliest marketing hopes for Baycol, the less contraindications the better in terms of marketing. SKB knew that contraindicating gemfibrozil would present major marketing problems. Therefore, SKB specifically fought against the obviously warranted contraindication. (See GSK_BL_00267869.) Even after the contraindication occurred, SKB (and Bayer) improperly urged sales representatives to minimize this label change. (BAYCORP01465565.) This conduct was directly engendered by a desire to prevent a decrease in prescriptions, despite the safety risks such an approach posed. In addition to not properly and timely communicating the contraindication issue, SKB failed to communicate that as much 50% of the adverse events for rhabdomyolysis were monotherapy. This, moreover, was information SKB had regarding only the 0.4 dose, (GSK_BL_001698551) thus establishing that the safety issues related to the lower doses as well. The number of adverse events relative to patient years put SKB (and of course Bayer) on notice of Baycol's more dangerous muscle injury profile. (See BAYAG01393361; BAYCORP03209518; BAYAG01038508; BAYAG01372878; BAYAG01289472; BAYAG01057259; GSK_BL_00124607; BAYCORP02339245.)

4.2 The Insull Data

Though SKB/GSK were not in any way referenced as having involvement in the Insull 0.8 mg Pivotal Study, SKB had extensive joint control over this study (BAYCOROP 00071245). As such, when the data from this study established the unacceptably high risks of 0.8 use, SKB had early and full opportunity to properly communicate this to physicians and the FDA. Instead, SKB took the opposite approach and attempted to manipulate this information. Exemplifying this conduct was the debate over how to spin the data, when communicating to the investigators of the CHARM study that 0.8 could no longer be used. Though the reason was the very serious potential for harm to elderly women, the "rationale" suggested by SKB and adopted simply stated that "the 0.4 mg dose was shown to be more appropriate for this patient population." (BAYCORP01758840) The risks of 0.8 in general and especially for elderly women were never made a part of any timely or effective communication to physicians. The PDR, for example, had the same language in 1998, 1999 and 2000 for "Geriatric Use": "In clinical pharmacology studies, there were no clinically relevant effects of age on the pharmacokinetics of cerivastatin sodium." Not until the 2001 PDR was any statement made and even that statement was inadequate. It did not properly characterize the magnitude of the risk. Moreover, it did not contraindicate in this population. In a striking departure from appropriate conduct, the initial statements in the published study note a purported greater efficacy in women over 65. So, in addition to not communicating what the data had shown regarding risk to this population, the published study essentially suggests an attractive benefit profile.

4.3 Pricing for Adverse Events

In an effort to reduce the number of reported adverse events from the 0.8mg dose, Bayer proposed pricing the 0.8 dose sufficiently high to reduce its market share and thereby reduce the number of muscle injury adverse events. Improperly, SKB/GSK agreed. This is an astonishing disregard for public safety that underscores the conclusion that Bayer and SKB/GSK made every effort to not properly communicate the very serious issues with Baycol but instead made efforts only to preserve Baycol as a statin on the U.S. and world market (GSK_BL_00032313.)

4.4 Sampling and Marketing of 0.8

Further evidencing their disregard in terms of the dangers of 0.8 dosing, Bayer and Glaxo representatives aggressively sampled this dosing. Patients would therefore inevitably be started on the 0.8 dose and not titrated. Even if the samples themselves were not used by a particular physician or patient to start their 0.8 dosing, the extensive sampling of the 0.8 dose served to reassure physicians that starting patients on a 0.8 dose was safe. This was compounded by the published study, which was not a titration study and made no reference to titration. Also, in marketing aids the emphasis on efficacy and "power" inappropriately over shadowed the titration issue. (See GSK_BL_00152860; BAYCORP00135381.) The impropriety of the 0.8

sample program, and its effect on the acceptance of 0.8 as a starting dose generally, is reflected in the system proposed to belatedly correct what they had been doing wrong. Essentially, the sample program problems were three pronged: the program had been designed to increase the number of prescriptions written; the sampling was aggressively pursued by the representatives; and it lacked physician education in terms of safety labeling. (BAYCORP00213350.) A program of this type inevitably lead to initial prescriptions of 0.8.

5. Summary:

1. Like its co-promotion partner Bayer, SKB/GSK inadequately and in fact improperly warned physicians, patients and the FDA of the risks associated with Baycol use.

2. Both Bayer and SKB/GSK ignored clear warning signals regarding the danger of Baycol and ultimately ignored data which established that Baycol was more dangerous in terms of muscle injury than other statins.

3. SKB/GSK and Bayer improperly manipulated information regarding the safety profile of Baycol, particularly the 0.8 dosage, and either failed to communicate information to physicians, the FDA and patients or communicated incomplete or incorrect information.

4. SKB/GSK and Bayer should not have marketed this statin given its poor risk/benefit profile or should have marketed it in a manner as to have fully and adequately communicated the nature and extent of the risks and the limitations of its efficacy.

The opinions stated above are to a reasonable degree of medical and scientific certainty and are based on the information I have seen so far. I reserve the right to amend and/or complement them if and when I receive additional information.

Erich F. Schinagl, M.D., 12/01/03

# EXHIBIT 10

# ERICH F. SCHINAGL, M.D.,
# CONSULTANT, PHARMACEUTICAL DRUG AND MEDICAL DEVICE DEVELOPMENT AND SAFETY

9902, 289th St.E
Myakka City, FL 34251
Phone (941) 322-9181
Fax (941) 322-9341
schinagl@att.net

**1. My Education and Experience:**

I obtained my M.D. in 1961 at the University of Vienna Medical School in Vienna, Austria. Subsequent to my graduation, I did my internship and residency in Internal Medicine at the same institution. My academic work during that time was concentrated in the field of Nephrology, with special emphasis on hemodialysis, a procedure now commonplace, but then still in its infancy.

In 1965 I was recruited by Pharmacia AB in Uppsala, Sweden, as Medical Director for their International Division. In that position my main responsibility was to investigate serious adverse events to the company's drugs all over the world and to recommend and implement measures to improve the company's clinical information services to prevent or mitigate adverse experiences in the future. After two years I moved to the company's Clinical Research Division and two years later I was asked to take on the responsibility of Medical Director of Pharmacia Inc. in Piscataway, NJ. In that position I had the responsibility for all clinical trials as well as for drug safety. Until my retirement from Pharmacia in 1996 I had the opportunity to participate in and contribute to the tremendous development of clinical trial and drug safety technology in the pharmaceutical industry. I had the privilege to represent Pharmacia in the Clinical Safety Surveillance Committee of the Pharmaceutical Manufacturers Association, thus being exposed to the procedures and experiences not only of Pharmacia, but all the major U.S. companies in the industry.

From 1996 to the present I have continued to work with clinical trials and drug safety issues as an independent consultant. Although I have occasionally assisted law firms with expert testimony, this has not been the focus of my activities. My rate of compensation is $250.00/ hour. In the last four years I have not testified at any trial and only give one deposition (Bender & Bender vs. Clarus et al., Case No.:98-2115CA, 12th Judicial Circuit, Sarasota, FL, Civil Division). My full C.V. and publications are appended as Exhibits A and B. A list of the documents I relied on is attached as Exhibit C.

**2. Baycol and Rhabdomyolysis: The Scope:**

Rhabdomyolysis is the most severe form of skeletal muscle complaints which can be induced by statins, a series of drugs first introduced in the 1980's to lower serum cholesterol levels. Although such muscle complaints have been reported with all statins, Baycol (cerivastatin) first introduced in 1997 stands out as by far the most dangerous in this respect. This was best illustrated by a report in the New England Journal of Medicine entitled "Cerivastatin and Reports of fatal Rhabdomyolysis" (Staffa et al., 2002) These authors reviewed reports in the Adverse Event Reporting System of the Food and Drug Administration and examined the number of prescriptions dispensed in the U.S. since the marketing of each drug began, according to the National Prescription Audit Plus (IMS HEALTH, Fairfield, CT). Including only U.S. cases reported to the FDA before 6/26/01 (six weeks prior to the withdrawal of Baycol from the U.S. market) the reporting rate of fatal rhabdomyolysis for Baycol was 3.16 deaths per million prescriptions. The comparable reporting rate for other statins ranged from 0 for fluvastatin to 0.19 for lovastatin. The most widely prescribed member of this class, atorvastatin, had a rate of 0.04 and was thus 79 times safer. I am not aware of any previous instance in the history of pharmaceutical drug development where there was such a discrepancy in the relative safety of one member of a class of drugs which remained undetected for more than four years.

3. The causes for this unique failure to recognize the magnitude of a known risk

Many factors were involved. Given that the risk of muscle toxicity with the statin drugs had been recognized and the subject of extensive research for more than a decade prior to the introduction of Baycol many of the factors were predictable. Based on the extensive documentation I have reviewed since the withdrawal of the drug two years ago, it is my opinion within a reasonable degree of medical and scientific certainty that Bayer AG and its subsidiaries, agents and key medical personnel failed to timely or adequately warn the FDA, physicians, and the public of the magnitude of the risk regarding Baycol. The various contributing errors and omissions are best reviewed and understood by following the development of Baycol chronologically:

3.1. Preclinical Studies

Near the end of the preclinical toxicology program and the beginning of the clinical studies in the U.S., Bayer convened an International R & D Conference in Wuppertal, Bayer' world headquarters. On 2/8/91 Dr. R. Ziegler wrote to Dr. MacCarthy in West Haven, CT.: (BAYAG 00153628-9):

"- Toxicology data to back treatment in humans exceeding 3 months will be provided by toxicology for 2 species in April 1992

- The highest daily dose which can be used in our clinical development program is 0.4 mg

- A pre-IND meeting with the FDA to discuss toxicological as well as clinical questions should be established as soon as possible

- A delay in submitting the IND must be avoided.

In regard to the upper dose limit for clinical development our experts from toxicology - Prof. Schlüter/Dr. von Keutz - felt very strong (sic) not to allow to step up to higher daily doses because the slope of the dose response curve of BAY w 6228 is much steeper than that of lovastatin. The safety margin for our compound from the no-effect level to non-tolerable dose is less than 3-fold whereas for lovastatin it is at least 12-fold. Besides risks/benefit evaluations for our compound are based on 13 week studies whereas the data base of lovastatin is much stronger."

This letter is signed by Prof. Schluter and Prof. Kuhlmann as well as Dr. Ziegler.

Although a number of additional senior executives of Bayer AG received this memo, I have found no evidence that Dr. Sprenger, who apparently was primarily responsible for the safety monitoring of Baycol worldwide, was aware of it. Had he been, he might have been more cautious in his interpretation and analysis of the many spontaneous adverse event reports he reviewed.

Bayer's preclinical documents show that Bayer toxicologists clearly recognized that Baycol was more cytotoxic and more myotoxic than the other statins as a result of Baycol's unique combination of high potency, high bioavailability, high lipophilicity and high permeability. (BAYAG00153628, BAYCORP0000233, BAYAG00140412, BAYAG00034909, BAYAG00459401, BAYCORP01485731, BAYCORP 02415236-40, BAYAG00520407, BAYCORP00142638, BAYAG00144223). Inexplicably, the physicians who directed the clinical development of Baycol on behalf of Bayer were either unaware or ignored these preclinical findings.[1]

3.2. Clinical Development :

Based on the findings in the preclinical phase, indicating that Baycol was substantially different from and potentially more dangerous than earlier statins, caution was indicated when the first clinical studies were designed and their results were interpreted.

[1] I concur with the excellent analysis by Randall L. Tackett, Ph.D., Professor of Pharmacology and Toxicology at the University of Georgia College of Pharmacy. (Expert Witness Report to Olander vs Bayer Corporation, MDL No.1431, U.S. District Court, Minnesota).

This caution was appropriately exercised only in the very earliest studies I have reviewed.

### 3.2.1. Phase I:

This phase involves healthy volunteers and is therefore limited to a small number of subjects.

The first U.S. study I have found in the scientific literature (Mazzu et al., 1998) involved 32 elderly and 16 young male volunteers, who were randomized to receive either 0.1 mg of cerivastatin or a matching placebo daily for 7 days. Reported side effects were mild and equally distributed between the groups. Creatine phosphokinase (CK) levels, the most sensitive indicator of potential muscle damage, were mildly elevated in two elderly men taking placebo and one young man taking cerivastatin.

### 3.2.2. Phase IIa:

This phase is aimed at investigating appropriate dosage levels and dosage schedules for the new drug.

Two pilot dose ranging and one dose scheduling study were reported in one publication. (Hunninghake, 1998) In the dose ranging studies, Baycol in doses from 0.025 to 0.2 mg were compared to placebo and 40 mg lovastatin (U.S. study) or 20 mg simvastatin (European study) given nightly for 4 weeks. Baycol reduced total cholesterol and LDL ("Bad" cholesterol) and increased HDL ("Good" cholesterol) in a dose dependent fashion. Both control drugs were more effective than the highest dose of Baycol. No abnormalities in CK levels were seen in any group in these short-term low-dose studies. The dose scheduling study was conducted in the U.S. and randomized 319 patients with primary hypercholesterolemia to 4 weeks of treatment with either 0.1 mg Baycol twice daily, 0.2 mg with the evening meal, 0.2 mg at bedtime, or placebo. LDL reduction was 25% in the first treatment group and 30% in the others, compared to placebo. The author states that "a greater (but small) percentage of patients treated with cerivastatin compared with placebo experienced elevations in creatine phosphokinase, aspartate transaminase, and alanine transaminase that were normal at baseline". No further details are given in this report, but since the study involved only short term treatment with a low and clearly suboptimal dose of Baycol, these findings are the first indication in the clinic that the concerns and warnings from the preclinical scientists should have been heeded in the subsequent clinical development of Baycol.

### 3.2.3. Phase IIb/III:

One of the earliest studies which would fit into this category was performed in Japan. Mabuchi et al. (1998) treated 20 patients with heterozygous familial hypercholesterolemia with 0.2mg of cerivastatin per day alone for 4 weeks and were able to lower total serum cholesterol by 18-22 %. After adding 8 grams of cholestyramine or 1gram of probucol per day for a further 12 weeks, cholesterol levels were decreased by a further 16% and 17% respectively, giving a total reduction of 34 - 39%, which was comparable to results commonly achieved with other statins. Cerivastatin at this dosage level was well tolerated as were the two combinations, with no increases in CK levels. It is not clear to me why these Japanese scientists, at this early stage, opted to deal with the inadequate efficacy of Baycol at the 0.2 mg dosage in this unconventional manner. Instead of increasing the dose they combined it with two old bile acid sequestering agents which, although of proven efficacy, are no longer used widely in this country today. With the benefit of hindsight, however, their approach may have had merit. This study appears to have been done outside the Bayer clinical development plan, because it was never confirmed with a larger study or followed up in any other way.

Instead, Bayer opted for stepping up the dosage. While this was the logical approach, it was a risky one, given the warnings and red flags issued by the preclinical scientists. It could have succeeded with tight control over overenthusiastic clinicians and marketing personnel, but as events evolved, this control, if it ever was present, soon began to slip and both company personnel and outside investigators began to look for excuses rather than realistically assessing the facts.

Davignon et al., (1998), summarized the pivotal Phase IIb/III studies which were the basis for the regulatory approvals in the U.S. and elsewhere.

In the U.S. study, 939 male and female patients with primary hypercholesterolemia were randomized to 0.05, 0.1, 0.2 and 0.3 mg of Baycol, 40 mg lovastatin or placebo for 24 weeks. After that time, patients continued to receive active treatment for a period of up to 24 months, with those previously on placebo switched to 0.2 mg Baycol. Patients were permitted to take concomitant lipid lowering resin treatment during the extension phases if lipid control was unsatisfactory (LDL 130 mg/dl or higher). There was a dosage dependent decrease in LDL in the Baycol groups, but even the highest dose was inferior to lovastatin, both after the 24 week and 24 month treatment periods, in spite of the concomitant resin use, which, predictably, was highest (47%) in the lowest dosage group and lowest in the patients receiving 0.3 mg Baycol (17%) and lovastatin (15%). While this study design was obviously necessary in order to protect the patients, it reduced the reliability of the study for the assessment of the safety of Baycol. The published report states that "for patients with a normal creatine phosphokinase at baseline, the in incidence of treatment emergent increase to over 10 times the upper limit of normal was 0.4% for cerivastatin and 0.3% for placebo". I can think of no reason why the readers of this article would be interested in these figures rather than the comparative increase in CK in all patients treated.. Furthermore, looking at the analysis of this study by the FDA (Medical Review, pages 25-30, study identification D 91-031) one finds that patients with a CK of 3 times the upper limit of normal or over were a priori excluded from the study and that one of the 159 patients receiving 0.2 mg Baycol discontinued the drug because of arthralgia and myasthenia which resolved on discontinuation. Finally, the effect of the concomitant resins on this and other safety parameters is unknown. In summary, based on all the information on this study available to me, I am not convinced that the safety of even the relatively modest top dose in this study of 0.3 mg of Baycol, was demonstrated in this pivotal study, certainly not for the actual situation in the clinical practice, where the physician does not know the patient's preexisting CK level.

The same article also reports on a second pivotal study performed in Europe. This second study had a similar design, but the study was larger with 1158 patients randomized, Baycol dosages were lower at 0.025, 0.05, 0.1 and 0.2 mg, and the control drug was 20 mg of simvastatin. Also, the treatment periods were shorter at 12 weeks for the randomized and 88 weeks for the extension period.. The reporting of the key safety parameter for the purposes of this review, CK levels, was much better for this study, suggesting, once more, that the authors, or more likely the sponsor of the study, wanted to hide less than favorable information in the first study. For the European study, a table shows that CK increases (presumably of any magnitude) were 4.3% in the 955 patients receiving Baycol vs. 5.4% in the 186 patients receiving simvastatin. It is also stated in the text that " Slight increases in levels of hepatic transaminases and creatine phosphokinase occurred after treatment with both cerivastatin and simvastatin, but clinically significant increases above 3 times the upper limit of normal were rare (under 2%)". So we suddenly learn that these authors are well aware of the generally accepted limit for clinical significance of CK increases, but we are not offered an explanation why they chose the higher limit for reporting the safety results of the first pivotal study. In spite of my initial praise for the better reporting of the second study, I have to point out that even the comparison given in the second study is designed to create the impression the Baycol is safer for the musculature than simvastatin, when almost certainly the opposite is true. The 955 patients in the four Baycol dosage groups received an average dose of 0.09375 mg and obtained reductions in LDL cholesterol ranging from 11.5 to 29.1% (average reduction 19.9%), compared to a reduction of 38.3% observed in the simvastatin patients, all of whom received an effective, if not necessarily optimal dose. Thus the comparison, as presented in the paper is misleading, since the readers would only be interested in a comparison of dosages that provide equal benefit to the patient. There is no breakdown of the effect of the different dosages of Baycol on CK levels in the published report or in the FDA Medical Review quoted above, where this second study is identified as study 0120 and is analyzed on pages 31-33. The FDA review does, however, contain a table of withdrawals due to adverse events broken down by dosage group on pages 32 and 33. According to this table, one of 195 patients was withdrawn from the 0.1 mg Baycol group because of myasthenia and one patient each was withdrawn from the 0.025 and 0.1 mg groups because of CK increase. The narrative following the table includes one additional patient withdrawn for the same reason in the 0.025 mg group. This last patient presumably is not in the table because the investigators classified the relationship of the CK increase to the medication as remote. There were no discontinuations due to myasthenia or CK increase recorded in the 116 patients receiving simvastatin. The importance of these findings rests in the fact that the patients in the trial underwent periodic tests for CK and thus could be withdrawn before suffering serious damage, while the same benefit was not accorded to

the patients prescribed Baycol by their physicians after the drug was approved and marketed. Based on the limited information I have been able to find about this second pivotal study, it is my opinion within a reasonable degree of medical and scientific certainty that, even at this very early stage in the clinical development, that the investigators and Bayer as the sponsors, could and should have suspected that the adverse effect of Baycol on the musculature is greater than comparator drugs, even at these low dosages that were not even close to the latter's efficacy.

The third study reported in the Davignon et al. paper was a Canadian dose titration study comparing Baycol and simvastatin. In this study 387 patients with primary hypercholesterolemia were randomized to 32 weeks of treatment with either 0.05 mg of Baycol or 5 mg simvastatin in a ratio of 2:1 respectively. After 8, 16 and 24 weeks the dosage was titrated upwards to 0.1, 0.2 and 0.3 mg of Baycol and 10, 20 and 40 mg of simvastatin respectively if patient's LDL cholesterol remained above 130 ml/dl. Patients completing 32 weeks of therapy were eligible to receive an additional 72 weeks of the same drug provided LDL levels remained at 130 mg/dl or under. At the end of the 32 week dose titration phase, 60% of patients were on the highest Baycol dosage of 0.3 mg/day, while only 35% of the simvastatin patients required 40 mg of Simvastatin for adequate control of their LDL. The LDL reductions in the two groups were 25 and 34% respectively. The reporting of the safety parameters in this study is, again, inadequate, stating only that 8.5% of the patients in the Baycol group and 10% in the simvastatin group reported myalgia and that clinically significant increases in creatine phosphokinase were seen in under 2.5% of the patients. I have not found an analysis of this study in the FDA medical review. So, again, a less effective dose of Baycol seems to have caused nearly equal muscle damage compared to a more effective dose of simvastatin.

The fourth and final study reported in this publication was labeled the European Phase IIb Higher dose study and reports on 349 patients with primary hypercholesterolemia randomized to 0.3 or 0.4 mg Baycol or placebo for a short course of 8 weeks. The reduction in LDL cholesterol was 33 and 36% respectively in the two treatment groups. Surprisingly, given the findings in the three previous studies, the authors report no muscle related adverse events, no elevations of CK above 10x the upper limit of normal (ULN), and asymptomatic increases of CK below 3x the ULN of 2.8% in the placebo group, none in the 0.3 mg Baycol group and only 1.4% in the 0.4 mg group. This study, again, is not covered in the FDA Medical Review of the original NDA, the only one available to me at this writing, presumably because of the inclusion of the higher Baycol dose, which was not included in the original NDA. It is my professional opinion within a reasonable degree of certainty that the apparently more favorable safety profile of Baycol in this study was due to the shorter treatment period.

In their overall conclusions, the authors claim an adverse affect profile for Baycol similar to that of lovastatin or simvastatin. It is my opinion within a reasonable degree of medical and scientific certainty that this similarity was achieved, in part, by biased presentation of the data and, more importantly, was clinically misleading, since the comparator drugs proved to be much more effective than the Baycol doses used in these studies.

Evan Stein (1998), performed a global, pooled analysis of the efficacy, safety and tolerability of Baycol on data obtained from all randomized, double blind studies in which Baycol up to doses of 0.4 mg/day was compared with placebo or active comparator. In the tables and figures reporting efficacy, he lists the results for each dose level of Baycol, but leaves the comparator drugs out. In the tables dealing with the safety parameters, active comparators are pooled, but at least present. In table VII giving incidence rates of biochemical adverse effects, the CK increases from 5x to 10x of the upper limit of normal for the placebo group are given as 0.39%, for Baycol 0.025 mg as 0.47, for Baycol 0.3 mg as 0.55% and for Baycol 0.4 mg as 0.88%. Nevertheless, the author states that "there was also no evidence to indicate that clinically significant increases in levels of creatine phospholinase were related to increasing doses of cerivastatin. In summary, again we see highly biased, if not misleading reporting.

All three papers cited above were published on consecutive pages of a supplement to the American Journal of Cardiology shortly after the approval of Baycol by the FDA. Pharmaceutical companies typically try to hold back publication of key papers prior to approval of a new drug and arrange with a reputable journal for combining them in a supplement to be available at launch to give salesmen a "launch package". Large numbers of reprints are typically ordered and distributed to potential prescribers. It is reasonable to assume that Bayer reviewed the manuscripts prior to publication and leaned on the authors present their data in the

most favorable light. While this is also common practice in the pharmaceutical industry, it is my opinion within a reasonable degree of medical and scientific certainty that what happened in this case went way beyond the bounds of propriety and contributed materially to the complacency among their own staff that was so evident when reports of serious adverse events began rolling in shortly after the drug came on the market.

A fourth paper in the series in the same supplement, Farnier et al.,1998, compared three doses of Baycol with gemfibrozil in the treatment of primary mixed hyperlipidemia, in which high levels of both cholesterol and triglycerides are present. 751 patients were randomized to 0.1, 0.2 or 0.3 mg of Baycol daily or twice daily doses of 600 mg gemfibrozil. Much as would be expected given the mechanism of action of the two drugs, all doses of Baycol were more effective than gemfibrozil in lowering total cholesterol and LDL, while gemfibrozil was much more effective in lowering triglycerides. Myalgia was reported for both drugs, but less frequently than in the placebo group. Elevated CK levels were also reported for both drugs, with the highest incidence in the 0.2 mg Baycol group. The authors concluded that these findings were well within the range previously reported for this class of lipid lowering agents, without acknowledging the fact that Baycol in the dosages tested in this study was not as effective as the other agents.

To wrap up the early studies, Sasaki et al., 1998, performed a small study in Japan. 73 patients with severe primary hypercholesterolemia were randomly assigned to receive either 0.15 or 0.3 mg of Baycol once daily after the evening meal for 12 weeks. In 58 patients the same drug was continued at a flexible dosage for an additional 36 weeks or longer to assess its long term efficacy and safety. Contrary to the above American and European studies, these patients were apparently not pre-screened for abnormal levels of CK and therefore reflected what could be expected in normal clinical practice. Reductions in total cholesterol after 12 weeks averaged 20% in the lower dose group and 25% in the 0.3 mg group. While there were no serious adverse events reported, 3 of the 33 patients (9%) in the lower and 7 of the 40 patients (17.5%) in the higher dose group had increased CK values. This study indicates that the deleterious effect of Baycol on the musculature is much more common, even at low dosages, when the precautions employed in the other trials are removed.

### 3.3. The Original New Drug Application (NDA):

Bayer submitted their NDA for 0.05, 0.1, 0.2 and 0.3 mg Baycol on 6/26/96, largely based on the pivotal studies described above. Four other statins, chemically closely related to Baycol, were on the market at that time. The first of them, lovastatin, had been introduced by Merck in 1987, after extensive investigation of the drug's potential for inducing muscle damage. As a result Merck had included extensive warnings and precautions to minimize that potential in its prescribing information. All of this literature was available to Bayer's scientists and physicians throughout the development of Baycol. Nevertheless, Bayer conducted only a few studies comparing Baycol with other statins. All of these studies showed Baycol to be less effective than the comparator statin and/or showed a higher incidence of muscle problems. All of this indicated that Baycol should have been tested on a larger number of patients than usual before the NDA was filed. In the introduction of his textbook of pharmacoepidemiology, Strom, 2000, states that "generally, between 500 and 3000 patients are exposed to a drug during Phase III". Instead, the original NDA for Baycol was submitted with only a minimal number of patients treated at the important dosage levels. At 0.3mg, only 342 patients had been treated for 12 months or more in clinical studies all over the world. This is only a fraction of what most companies I am familiar with would consider adequate for the introduction of a new chemical entity to the market.

In addition:

- Almost without exception, patients with elevated CK (a measure of damage to muscle tissue) were excluded from pivotal studies.

- Patients taking other lipid lowering substances which could damage muscle were also excluded from these studies

- Long term studies included periodic measurement of CK and patients who developed elevated CK discontinued treatment with Baycol.

All of these measures were, of course, entirely appropriate to protect the early study subjects from harm. They had, however, the effect that the number and severity of muscle problems seen in the pivotal studies must have been lower than they would have been without these precautions.

Given this situation it is my opinion within a reasonable degree of medical and scientific certainty that Bayer should have conducted additional, open studies without those precautions to ascertain that Baycol was safe for use in general practice. Alternatively, Bayer should have included the precautions incorporated in the pivotal studies in their prescribing information. Bayer did neither of these and, surprisingly, received marketing approval on 6/26/97, in spite of the scant patient numbers in the NDA. Even more surprisingly, the FDA approved prescribing information which, if anything, made Baycol appear safer than other statins. Notwithstanding their NDA, Bayer opted to market only 0.2 and 0.3 mg tablets of Baycol with a recommended starting dose of 0.3 and the 0.2 dose recommended only for patients with significant renal impairment. However, the "Overdosage" section of the prescribing information states that the maximum single oral dose of Baycol received by healthy volunteers and patients is 0.4 mg. An ambitious salesman would thus have had little difficulty persuading an aggressive therapist that he could prescribe two 0.2 mg tablets if the response to the 0.3 mg starting dose proved inadequate: The market launch of Baycol 0.2 and 0.3 mg tablets took place on 1/26/98, but because of the actions of Bayer described above, now the full onus of establishing the conditions for the safe use of Baycol rested on the quality of Bayer's post marketing surveillance.

## 4. Early Post Marketing Surveillance:

Even with all the errors and omissions during the many years Baycol was in clinical development, corrections were still possible, had there been an effective postmarketing surveillance system in place from the day the drug was launched.

At the time of this writing, certain crucial Bayer documents are apparently not available. The critical documents are the Periodic Safety Update Reports (PSUR's), which regulations require the company to file at six monthly intervals during the first two years after approval then annually for two years and at five year intervals thereafter. I have so far only seen two PSUR's, #5, covering the period 3/1/99 - 8/31/99 and #6, covering 3/1/00 - 8/31/00. I have found both of these seriously flawed, apart from the fact that there is an unexplained 6-month gap between them, but will return to these flaws later in order not to break the chronology in this presentation.

Regarding the early adverse event reports, the only information I have at this writing is from the FDA Adverse Event Reporting System, which listed 40 Baycol related adverse events involving the musculature reported to them between 12/17/97 and 9/17/98. Many of them were of a serious nature involving rhabdomyolysis and renal failure but outcomes were not listed. I lack information on the number of patients exposed during this time period, which was required to be included in the PSUR's due to be filed during that period. Given that most of these events were triggered by the 0.3mg dose of Baycol, which was the highest dose then approved, but which could not achieve anywhere near the lipid lowering benefit available from the highest approved dosages of competitive products, this number of serious problems reported to the FDA in the first nine months of marketing should have triggered aggressive action by the Bayer physicians charged with post-marketing surveillance. At this time, I have seen no evidence that this did indeed happen. There was no change in the prescribing information until 1/4/99. The new section under "Post Marketing Adverse Event Reports" did not appear in the PDR until the 2000 edition and read: "While these events were temporally associated with the use of Baycol, a causal relationship...cannot be readily determined due to the spontaneous reporting of medical events, and the lack of controls..." This change, rather than drawing prescribers' attention to a serious problem, was obviously trying to minimize it.

## 5. The development of the 0.8 mg dose:

In spite of all the warnings from their own toxicologists Bayer apparently felt that they could make Baycol competitive in the market place only by a substantial increase in the dosage. It is my opinion within a reasonable degree of medical and scientific certainty that it was reasonable to explore if a higher dosage level could bring the efficacy of Baycol closer to the competitive statins, but it is my also opinion that it was a serious mistake to design the studies with 0.8 mg as the starting dose. It would have been much more

sensible to titrate the dosage up stepwise depending on the response of the patient, so that only the patients who really require higher dosages are exposed to their higher likelihood of adverse events.

In a memorandum from Bayer AG Toxicology dated 11/22/95 Drs. Schlüter and Krotz wrote:

" With this memorandum we express our strong concerns about the intention to test doses of BAY 6228 as high as outlined in in Dr. Ziegler's memo dated November 21, 1995. The now planned human doses are approaching the dose level which has reproducibly killed dogs in toxicological studies. A human dose of 800 mcg - corresponding to 16 mcg/kg b.w. for a 50 kg patient - is only 6 fold lower than the dose of 100 mcg/kg b.w. which has repeatedly induced severe and fatal bleedings including CNS-haemorrhages in dogs. Moreover, no indicators exist that would allow adequate monitoring of this toxicity. Due to this known toxicity of the drug we feel obliged to indicate our reservation towards the new clinical development plan which cannot be supported by toxicology." (BAYAG 00124275).

In spite of this warning, which went to Drs. Ziegler and McCarthy as well as the most senior Bayer executives the company went ahead with a major pivotal trial with the 0.8mg dosage, eventually obtained FDA approval for it and marketed it aggressively, a fact that in my opinion within a reasonable degree of certainty to be primarily responsible for the disastrous outcome described in paragraph 2 above.

The pivotal study supporting Bayer's proposal to extend the dosage range to 0.8 mg was published by Insull et al., 2000. In this trial, 1170 patients with primary hypercholesterolemia were randomized in a ratio of 1:1:4 to placebo, 0.4 and 0.8 mg Baycol once daily for 8 weeks. A long list of exclusion criteria relating to cardiovascular disease, endocrine and renal disorders included patients with significant abnormalities in CK. Again, while these precautions were justified in the interests of the participating patients, they rendered the study population completely non-representative of the patient population which was subsequently exposed to the high dose of Baycol in clinical practice. During the double blind treatment period patients were seen by the investigator and CK levels were measured every two weeks. LDL cholesterol decreased 35.6 and 41.8% in the 0.4 and 0.8 mg Baycol groups respectively, finally bringing the efficacy of the drug into the range achieved by other statins. As for adverse events, two patients in the 0.4 mg group discontinued due to myalgia and four in the 0.8 mg group due to either myalgia or myasthenia. In addition, two of the 195 patients (1.0%) randomized to 0.4 mg Baycol were withdrawn due to CK elevation, as were 10 of the 776 (1.29%) randomized to 0.8 mg Baycol. The statisticians will tell us that this difference is most likely due to chance. However, in the light of all the information which was available or should have been available to the Bayer drug safety experts and through them to their investigators, they should have concluded that this difference may well have been due to a real difference between the two dosages. Even more importantly, they should have concluded that they have discontinued the drug due to a high CK measurement in 12 out of 971 patients solely due to a laboratory measurement not called for in the prescribing information and therefore not available to patients receiving Baycol in clinical practice. Females over age 65 were particularly at risk, with 5 of 90 patients in that group (5.6%) showing CK elevations over 10x the upper limit of normal. The investigators point out that all but one CK elevation seen in this study were under 10,000 U/l, the level for severe myopathy/rhabdomyolysis according to Pierce et al., 1990 and that all were substantially lower than 40,000 U/l, the level associated with acute renal failure, but apparently give no thought to what would have happened to the study patients who discontinued Baycol because of high CK if they had been prescribed the drug by their physician and would not have had that CK level checked. It is my opinion within a reasonable degree of certainty that most experienced clinical research physicians in the pharmaceutical industry would have insisted that precautionary periodic CK measurements be included in the prescribing information in conjunction with the dosage increase, at the very least for the highest risk group, females over 65 years of age. Instead, the authors of this article, including the four co-authors who were members of Bayer's staff, conclude that "since the total number of patients in this in this sub-group was small, the association of increased risk of elevated CK in females over 65 years of age treated by cerivastatin 0.8 mg is not established, and warrants further studies". I am not aware that such further studies were ever conducted.

From the FDA review of this same study (Center for Drug Evaluation and Research, Application Number: 20-740/S008/S013, Medical Review, pages 2-7), there identified as Study D97-008 we learn further crucial facts, hidden in a small paragraph of the published paper cited above: After the randomized study, patients continued on Baycol at their respective doses for up to 52 weeks, while the placebo patients were switched to 40 mg pravastatin. The most important information below about the extension of the study not covered

in the published paper is extracted from FDA's table on page 7:

Study D97-008: The percentage of patients with any treatment-emergent elevations of serum CK through Week 52 (Week 8 in parenthesis) regardless of Baseline status is examined below:

| | CER 0.4 mg | CER 0.8 mg | PLA/PRAVA 40 mg |
|---|---|---|---|
| Any elevation | 38% (28%) | 49% (35%) | 35% (22%) |
| Over 10x upper limit of normal | 1.5% (1.0%) | 2.1% (1.5%) | 0.5% (0.0% |
| Over 10x ULN with symptoms | 1.5% (1.0%) | 1.0% (0.9%) | 0.0% (0.0%) |

Of the 20 patients with CK's over 10x ULN, 15 were withdrawn, three of them although they had no symptoms, again illustrating how important it would have been to include periodic CK measurements in the prescribing information.

I conclude that from the extended study three additional facts emerge:

1. The muscle toxicity is lowest for pravastatin and highest for Baycol 0.8 mg

2. Muscle toxicity increases with longer treatment periods for all groups

3. Severe muscle toxicity at a level often associated with rhabdomyolysis was all but absent with pravastatin, but present and dose dependent with Baycol

The FDA concluded in its review that there was a safety concern in the subgroup of females over 62 years of age with body weights under 65 kg and stated on page 38 that "additional pharmacokinetic studies specifically designed to evaluate the effects of gender, age and body weight (body surface area) on the plasma concentration of cerivastatin should be performed to evaluate the apparent increased incidence of CK over 10x ULN..... in the subgroup of females over 62 years of age, body weight under 70 kg. Nevertheless, they deemed this sNDA approvable, presumably on the basis that it ultimately is the manufacturer's responsibility to assure the drug's safety. There is no indication that the suggested studies were ever performed or that anyone either at Bayer or at the FDA ever considered the obvious safety measures discussed above, which would have mitigated if not prevented the unfortunate outcome described in paragraph 2 of this report.

**6. The Launch of the 0.8 mg Dose:**

The FDA approved the new dosage level on July 21, 2000. The new prescribing information states: "The recommended starting dose is 0.4 mg daily in the evening. The dosage range is 0.2 to 0.8 mg." This wording allowed the distribution of 0.8 mg samples and Bayer made extensive use of this possibility. This heavy sampling and the promotion of the new dosage based on the Insall study analyzed above caused many physicians unfamiliar with the drug to start it at that new maximal dose even in patients who may well have responded adequately to lower dosage levels.

**7. Late Post Marketing Surveillance:**

It is my opinion within a reasonable degree of medical and scientific certainty that, at this point, the fate of the drug was sealed. The disastrous decisions had already been made and is difficult to see how anyone could have stopped the events which unfolded in the year after the launch of the high dose. However, I have reviewed the deposition of Prof. Kuno Sprenger, the individual who carried the primary responsibility for Baycol as the Global Drug Safety Manager for this product at the Bayer headquarters in Germany (U.S. District Court, District of Minnesota, MDL No.1431, 3/27-4/1/2003). I have served as the U.S. Safety Officer for Pharmacia for much of the 1990's and worked closely with the Global Safety Officer of my company then headquartered in Uppsala, Sweden, until my retirement. Based on this experience, it is my professional opinion that Dr. Sprenger was not equipped to shoulder this responsibility.

On page 55 of the deposition quoted above, he was asked " Who at Bayer decided whether to inform regulatory bodies in the world of information pertaining to signals generated by spontaneous adverse event reporting data?" He responded: "This is no decision which is taken by Bayer. This is a decision

(which?) is prescribed by the rules of the authorities in so far of (as?) providing all of the data available to all of the authorities." The questioner was strictly right when he objected to the non responsiveness of the answer, but it is clear to me that Dr. Sprenger thought that all he had to do was to send reams of data to the authorities and let them make the decision. This is also apparent from the few PSUR's (see paragraph 4 above) which I was able to review. The question was essentially repeated on page 64 of Dr. Sprenger's testimony. This time he answered: "Principally, such data is presented to the safety bodies and it is these safety bodies that decide, and with respect to the handing in or presentation of such data, this is all decided by the regulations. These regulations say -- they do not say that the data need to be handed in to the FDA because the FDA does their own data analysis. This is why our body did not have to come up with such a decision". This is more proof that Dr. Sprenger had no idea how the drug safety system is supposed to work. Yes, the FDA could do their own data analysis, but as is obvious from this case, they do so only after the fact, no doubt because of a data overload and a lack of sufficient personnel. That is why it was incumbent upon Bayer, as it is for all companies, to compare their adverse event rate with that of other drugs in the class. It is my professional opinion that Bayer did not do that until it was too late, and then did not share the information with the FDA.

On page 65, Dr. Sprenger is asked: "Please cite the regulation you are referring to, sir" and he responded: "..... I said that we give everything to the FDA with our PSUR's, and I'm not a specialist in regulatory affairs. Those specialists in regulatory affairs, they do the reporting to the FDA". So Dr. Sprenger has found somebody else to shift the blame to. The regulatory affairs people in a drug company fill an important role, they check that all the items required in a PSUR are there, but certainly they can not judge the contents of a submission. I have seen no information indicating that anyone in Bayer's regulatory affairs division was aware of Dr. Sprenger's event rate analyses, when they eventually were done, at a time when it was too late to change the way the drug was used based on Bayer's own misguided marketing effort.

On the second day of his testimony (page 148) Dr. Sprenger was asked: "When did Bayer first receive a signal relating to rhabdomyolysis in association with cerivastatin monotherapy?" He responded: " The first signal got up in the year 1999 when the first cases were received and the first cases were then evaluated, and if it is that in accordance with the nature of these cases a label change seems to be appropriate, then a proposal is being formulated and submitted to the clinical safety review committee and then a decision is taken on whether or not to change a label." Dr. Sprenger here describes a procedure which is appropriate and practiced industry-wide. However, I have a quarrel with the date given. According to the FDA Adverse Event Reporting Sytem (AERS) I have reviewed (see paragraph 4 above), numerous cases either described as rhabdomyolysis ,or qualifying as such because of elevated PK associated with elevated creatinine, were reported to the FDA during 1998, many of them not listing Lopid or gemfibrozil as a concomitant drug. Many of them list the manufacturer as the source of the report. Nonetheless, it is my opinion within a reasonable degree of medical and scientific certainty that it was incumbent upon Bayer to request this information from the FDA under the Freedom of Information Act, since some adverse events are reported to the FDA but not to the manufacturer, and the FDA is not required to, and does not send their reports to the manufacturer. The information on the disk is very limited, but it is extremely unlikely that all of these reports could reasonably have been disqualified by Dr. Sprenger's review process.

On page 155, Dr. Sprenger is asked about the switching of patients from another statin to Baycol and states: "..... it is well known from clinical pharmacology that no switch effect .... can occur because the half life of all statins is between three and six hours with the exception of atorvastatin which has a half life of 16 hours, so no effect can be seen on the next day if such a switch has occurred, and in the sense of the existing

plasma levels that is to be expected". It is my opinion within a reasonable degree of certainty that Dr. Sprenger here displays a quite disturbing ignorance of pharmacology since muscle damage caused by a prior statin can, of course, persist even in the absence of a plasma level of that statin.

On page 156, Dr. Sprenger states " This is not in accordance with the labeling at the time which required that all patients were to start a new treatment with 0.4 mg". I have pointed out in paragraph 5 above that I wish that this were true. In fact, the U.S. prescribing information merely recommended the 0.4 mg starting dose and the actions by the company totally invalidated that recommendation by sponsoring and publishing studies under company co-authorship with the conclusion that the 0.8 starting dose was safe. In addition, the company distributed millions of 0.8 mg samples which they must have known doctors gave to patients as starter packs, while they were waiting for their prescriptions to be filled.

On page 198, Dr. Sprenger responds to the suggestion that Baycol was approved "on the coattails" of the five previously approved statins with a minimum of safety data and states " It seems to be the case that the number of patients in clinical studies concerning the substances to be marketed later are required to be much higher than before in order to give the FDA the certainty that even if there is a substance of the same class that there is the same safety profile if not a better profile than the profile in existence for the substances on the market". I think that one could wish that was true, but, clearly, Dr. Sprenger has never looked at the paucity of data in the original Baycol NDA.

**8.Summary:**

The following summarizes my main opinions, which are stated within a reasonable degree of medical and scientific certainty:

1. In the clinical development of Baycol, Bayer failed to appropriately heed the warning signs produced by their own preclinical experts, indicating that the new drug was substantially different from and potentially more myotoxic than earlier statins.

2. Throughout the published reports of clinical studies, Bayer minimized negative findings in order to make Baycol appear safer than it really was.

3. Given the warning signs from both the preclinical and clinical studies, Bayer did not test the drug in a sufficiently large number of patients to assure its safety.

4. In developing their initial prescribing information, Bayer claimed that Baycol was safer than other statins, although the evidence pointed in the opposite direction.

5. In their early post-marketing surveillance, Bayer failed to make timely comparisons to competitor drugs in the same class to determine the relative rate of serious adverse events.

6. The 0.8 mg dosage of Baycol was tested, launched and promoted in a reckless manner in an attempt to match the efficacy of competitor statins, without regard to the proper precautions.

7. The later post-marketing surveillance was conducted without a proper understanding of the respective roles of the company and the regulatory authorities.

My opinions stated in this report are based on the information I have seen so far. I reserve the right to amend and/or complement them if and when I receive additional information.

M.D

Erich P. Schinagl, M.D., 7/29/2003

# EXHIBIT A

**ERICH F. SCHINAGL, M.D.**
**Consultant, Clinical Drug Development and Safety**
**9902, 289th St.E, Myakka City, FL 34541**
**Telephone (941) 322-9181 Fax (941) 322-9341**
**e-mail: schinagl @ worldnet.att.net**

# RESUME

## SUMMARY PROFILE

Doctor of Medicine trained as a specialist in Internal Medicine with over 20 years of service in various positions in Pharmacia, a major pharmaceutical company.

Experienced in all aspects of the clinical development process for new drugs, devices and biologicals, from the assessment of pre-clinical information to the design of study protocols and case report forms, investigator recruitment, study monitoring, safety audits, report writing etc.

Broad experience in all aspects of the regulatory process from IND to NDA or PLA, including periodic reporting, safety assessments, prescribing information and all summaries required by the FDA.

Extensive exposure to all aspects of the medico-legal process as it relates to the safety of drugs, devices and biologicals, particularly legal actions alleging medical malpractice, negligence and "failure to warn".

**Medico-Legal Experience**

Carried the overall responsibility for all medical decisions in connection with Pharmacia's
products. This responsibility started with the design, review and evaluation of the preclinical
animal studies to assure that it was safe to start testing the product in healthy volunteers and
ultimately in patients.

Responsible for all the major documents resulting from this work, including Physician's Brochures, Patient Consent Forms, Clinical Trial Protocols etc. This

responsibility included defending all decisions made if and when challenged in court.

Responsible for the conduct, monitoring and reporting of clinical studies,, evaluation and reporting of adverse events during these trials, design of the resulting prescribing information and presentation of all the data to the FDA to gain approval to market the product.

Responsible for post-marketing surveillance, including the handling of adverse events reported by patients, physicians or other care givers. Most importantly, this included deciding if and when action had to be taken as a result of these reports. Such action could range from recommending a change in the prescribing information all the way to withdrawing the product from the market. Again, this responsibility included defending each of these decisions in court, if and when challenged. During my tenure this happened on average about 10 to 15 times annually when actions were brought against Pharmacia, e.g. for "failure to warn".

Responsible, in such cases, for conducting a medical review of the complaint and assessing its merits, followed by answering interrogatories, giving depositions and, if a settlement was not reached earlier, testifying in court on behalf f the company, in one case being questioned for more than two hours by Melvin Belli on behalf of the patient. None of the actions against Pharmacia resulted in an award against the company by a jury during my watch although numerous actions were settled at various stages of the process.

Represented Pharmacia in the Clinical Safety Surveillance Committee of the PMA (now the Pharmaceutical Research and Manufacturers Association) in Washington, DC for several years. I am therefore familiar with the practices of other large pharmaceutical companies in respect of drug safety and labelling issues.

## Clinical Development Experience

Documented success in completing large clinical programs leading to approval of new drugs, devices and biologicals.

**Achievements:**

Completion of a large multicenter study of Dipentum (olsalazine) in mild to moderate active ulcerative colitis.

Completion of a large multicenter study of Azulfidine (sulfasalazine) in seronegative spondylarthropathies, jointly

sponsored by Pharmacia and the U.S. Department of Veterans Affairs

Maintenance of a large international multicenter study of Azulfidine in multiple sclerosis, jointly sponsored by Pharmacia and the Mayo Foundation

Investigator sponsored studies of combination therapy of R.A. with Azulfidine, methotrexate and hydroxychloroquine and of polymyalgia rheumatica with Azulfidine initiated

Designed and implemented a large clinical program to document the safety and efficacy of Estring, a vaginal preparation of estradiol for the prevention and treatment of vaginal symptoms in menopause

Developed and implemented a large clinical trial program to update the clinical information on Emcyt (estramustine) for the treatment of prostatic cancer

Developed and implemented a clinical trial plan for Linomide, an immune modulator, in AML after ABMT

Initiated, contracted and completed a large clinical trial of rhSOD in renal transplantation

Initiated, contracted and completed a large external pre-clinical program for several other indications for rhSOD, including cardiac ischemia in connection with CABG

Completion of a major clinical development program resulting in the approval of Rheomacrodex (dextran 40) for the prevention of postoperative thromboembolic complications

Completion of the National Cooperative Crohn's Disease Study, jointly sponsored by Pharmacia and the NIH

Development and implementation of a large clinical trial program resulting in the approval for Healon (hyaluronic acid) as a viscoelastic aid in cataract surgery

**Regulatory Affairs Experience**

Documented success in preparing documents for submission to the FDA in support of new product approvals, extension of indications, other label changes, annual reports, safety reports etc.

**Achievements:**

Preparation of the Overall Summary, Summaries of Safety and Effectiveness, Prescribing Information and related documents in preparation for filing a supplemental NDA to extend the indications for Dipentum (olsalazine sodium) in ulcerative colitis

Overall medical responsibility for an NDA resulting in the approval of Azulfidine EN-tabs (sulfasalazine) for rheumatoid arthritis

Overall medical responsibility for an NDA resulting in the approval of Estring , a vaginal delivery system for estradiol specifically designed for the treatmernt of vaginal estrogen deficiency in menopause

Principal writer for the medical portions of successful NDA's, PLA's or BLA's for the following products:

Rheomacrodex (dextran 40) in the prevention of postoperative thromboembolic complications

Healon (sodium hyaluronate) as a viscoelastic aid in cataract surgery

A series of hymenoptera venom extracts for the treatment of severe and life threatening allergies to these stinging insects

## PROFESSIONAL APPOINTMENTS

<u>INDEPENDENT CONSULTANT FOR DRUG AND DEVICE DEVELOPMENT AND SAFETY</u> 1996- PRESENT

<u>Neoprobe, Inc., Columbus, OH:</u> Medical audits of clinical studies either already submitted or about to be submitted to the FDA to obtain clearance for marketing and the negotiations with the institutions and investigators involved in these studies to prepare them for the impending FDA audit.

<u>Prologue Research International, Columbus, OH:</u>

Audit of Adverse Event Files for a major study by a leading pharmaceutical manufacturer to ensure compliance with applicable FDA regulations.

Principal recruiter for a major Phase III b study for a global pharmaceutical company based in France.

**PHARMACIA & UPJOHN, INC., MEDICAL RESEARCH CENTER, DUBLIN, OH**

**DIRECTOR, AUTOIMMUNITY** **1995-1996**

**RESPONSIBILITIES:**

All U.S.clinical activities in the fields of gastroenterology and rheumatology including clinical trials in Phases II, III and IV, review of adverse events, prescribing information, liability actions, etc.

--

**DIRECTOR, UROLOGY, GYNECOLOGY AND AUTOIMMUNITY**
**1993-1994**

**RESPONSIBILITIES:**

All U.S. clinical activities in the above fields as related to Estring (estradiol), tolterodine, Azulfidine and Dipentum, including clinical trials in Phases II, III and IV, review of adverse events, prescribing information etc.

**KABI -PHARMACIA INC., PISCATAWAY, NJ**

**MEDICAL DIRECTOR** **1990-1993**

--

**RESPONSIBILITIES:**

All U.S.clinical activities involving Kabi Pharmacia products, including, in addition to the products/projects listed above, all products/projects emanating from the former Leo facilities in Helsingborg, Sweden, including Linomide (roquinimex) and Emcyt (estramustine)

**PHARMACIA CHIRON PARTNERSHIP, PISCATAWAY, NJ AND EMERYVILLE, CA**

**PROJECT DIRECTOR** **1985-1990**

**RESPONSIBILITIES:**

--

Development of recombinant human superoxide dismutase (rhSOD), a free radical scavenger produced by the Chiron Corporation and licensed to the Partnership.

--

**PHARMACIA INC., PISCATAWAY, NJ**

**MEDICAL DIRECTOR** **1969-1984**

**RESPONSIBILITIES:**

All U.S. clinical activities, including clinical trials, adverse events, prescribing information, medical liability etc.

**PHARMACIA AB, UPPSALA, SWEDEN**

**DIRECTOR OF CLINICAL RESEARCH** **1967-1969**

**RESPONSIBILITIES:** - - - - -

All clinical trials and handling of adverse events worldwide for the product group Infusion Soultions

**PHARMACIA INTERNATIONAL, UPPSALA, SWEDEN**

**MEDICAL DIRECTOR** **1965-1969**

**RESPONSIBILITIES:** - - - - -

All clinical trials and hamdling of adverse events for all products marketed outside the Scandinavian countries

**EDUCATION**

| | |
|---|---|
| Public High School, Vienna, Austria | Valedictorian |
| Hamilton College, Clinton, NY | Fulbright Scholar |
| University of Vienna Medical School (UVMS) | M.D. |
| Dept. of Internal Medicine, UVMS | Internship and Residency in I.M. |

**STATUS**

U.S. Citizen by Naturalization

# EXHIBIT B

Schinagl EF, Strauss PC., Treatment of rheumatoid arthritis. N Engl J Med. 1996 Sep 12;335(11):822; author reply 822-3.

Hessemer CA, Schinagl EF. Desensitization to sulfasalazine. Am J Gastroenterol. 1993 Mar;88(3):460-1, 462.

Schinagl EF. Hyskon (R) (32% dextran 70), hysteroscopic surgery and pulmonary edema. Anesth Analg. 1990 Feb;70(2):223-4.

Schinagl EF, Ali R. Letter: dextran 40. Ann Intern Med. 1975 May;82(5):722-3.

Schinagl EF, Romasz, R.S, and Barnhart, B.S. Application of Dextranomer Beads (Debrisan) in the Treatment of Exudating Skin Lesions: Results of a Cooperative Study. Angiology. 1978; 29: 675-82

Schinagl EF, Filippi Eda, Pavuk, Jack. Fast and Prist in the Practice of Allergy. (name illegible) 1978:182-187.

The Brain Resuscitation Clinical Trial II Study Group. A Randomized Clinical Trial of Calcium Entry Blocker Administration to Comatose Survivors of Cardiac Arrest. New England Journal of Medicine. 1991;324(18):525-52

Schinagl EF, Ratzenbock W, and Fritzer Von W. Behandlungsergebnisse und Ergahrungen mit der Hamodialyse. Aus der II Medizinischen Universitaltklinik in Wien. Jahrgang. 1964; September 45(9):359-68.

# EXHIBIT C

Documents and materials reviewed

1. Package inserts
   a. Baycol (1998, 1999, 2000, 2001)
   b. Other (lovastatin)
2. FDA documents
   - INDs
   - NDAs
   - NDA App 20-740/S008/S013, Medical Review
   - sNDAs
3. Bayer PSURs
4. Bayer Dear Health Care Professional letters
5. Bayer Annual reports
   - IND Annual reports
   - NDA Annual reports
6. FDA FOIA AERs information
7. Bayer documents
   - BAYAG00124275
   - BAYAG00153628
   - BAYAG00140412
   - BAYAG00459401
   - BAYAG00144223
   - BAYAG00144328
   - BAYAG0014909
   - BAYAG00520407
   - BAYAG01306782-92
   - BAYCORP01485731
   - BAYCORP02415236-40
   - BAYCORP00153628
   - BAYCORP0000233
   - BAYCORP00142638
   - BAYCORP00135576-83
   - BAYCORP02878487-90
8. Depositions
   a. Kuno Sprenger
9. Expert reports
   a. Randall Tackett, Ph.D.
   b. Brian Strom, MD
   c. John Farquhar, MD
   d. Wayne Ray, Ph.D.
10. Medical literature
    - Staffa, J
      a. Staffa JA, Chang J, Green L. Cerivastatin and reports of fatal rhabdomyolysis. N Engl J Med. 2002 Feb 14;346(7):539-40.
    - Mazza, A,(1998)
      a. Mazzu AL, Lasseter KC, Shamblen EC, Agarwal V, Lettieri J, Sundaresen P. Itraconazole alters the pharmacokinetics of atorvastatin to a greater extent than either cerivastatin or pravastatin. Clin Pharmacol Ther. 2000 Oct;68(4):391-400.
    - Hunninghake (1998)

a. Hunninghake DB, Ballantyne CM, Maccubbin DL, Shah AK, Gumbiner B, Mitchel YB. Comparative effects of simvastatin and atorvastatin in hypercholesterolemic patients with characteristics of metabolic syndrome.

- Mabuchi (1998)
  a. Mabuchi H, Koizumi J, Kajinami K. Clinical efficacy and safety of cerivastatin in the treatment of heterozygous familial hypercholesterolemia. Am J Cardiol. 1998 Aug 27;82(4B):52J-55J.

- Davignon (1998)
  a. Farnier, Michael and Davignon, Jean. Current and Future Treatment of Hyperlipidemia; The Role of Statins. The American Journal of Cardiology. 1998 Aug, 27;(4B):82.

- Stein, E (1998)
  a. Stein, Evan. Cerivastatin in primary hyperlipidemia – a multicenter analysis of efficacy and safety. Atherosclerosis. 1998 (139): S15-S22.

- Farnier (1999)
  a. Farnier M. [The hyperlipidemias. Role of various statins] Presse Med. 1999 Nov 20;28(36):2002-10. Review. French.

- Sasaki (1998)
  a. Sasaki J, Arakawa K, Yamamoto K, Kobori S, Ageta M, Kono S. A long-term comparative trial of cerivastatin sodium, a new HMG-CoA reductase inhibitor, in patients with primary hypercholesterolemia. Clin Ther. 1998 May-Jun;20(3):539-48.

- Insull (2000)
  a. Efficacy and safety of cerivastatin 0.8 mg in patients with hypercholesterolaemia: the pivotal placebo-controlled clinical trial. Cerivastatin Study Group.
  J Int Med Res. 2000 Mar-Apr;28(2):47-68.

- Thompson (2003)
  a. Statin-associated myopathy.
  JAMA. 2003 Apr 2;289(13):1681-90. Review.

11. Treatises

Strom, B., *Pharmacoepidemiology*, 3rd ed. 2002