**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : | MDL No. 1431 (MJD) |
| This Document Relates to: | : | |
| *All Actions* | : | |

# DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXCLUDE EXPERT TESTIMONY OF JOHN W. FARQUHAR

The proposed testimony of the PSC's expert witness, John Farquhar, M.D., is a classic example of junk science that should be excluded under *Daubert*. The centerpiece of Dr. Farquhar's testimony is an analysis concocted specifically for this litigation that Dr. Farquhar presents as an epidemiological study. He relies on that analysis to assert that Baycol was more dangerous than other statins and more likely to cause myopathy/rhabdomyolysis and myalgia. *See* Report of John Farquhar (Ex. A) ¶¶ 39, 43, 55; Supplemental Report of John Farquhar (Ex. C) ¶ 9; Deposition of John Farquhar, M.D. (Ex. B) at 190:24-191:3. This testimony, and Dr. Farquhar's other opinions, are not based on good scientific methodology and therefore should be excluded.

In *Daubert*, the Supreme Court explained that expert scientific testimony admitted under Rule 702 must possess "a grounding in the methods and procedures of science" and must be based on genuine knowledge, *i.e.*, "more than subjective belief or unsupported speculation." 509 U.S. 579, 589-90 (1993). Thus, "in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific

method." *Id.* at 590. The Court then explained the basic principle underlying scientific method:

> Scientific methodology today is based on generating hypotheses and testing them to see if they can be ***falsified***; indeed, this methodology is what distinguishes science from other fields of human inquiry.

*Id.* at 593 (internal quotations omitted, emphasis added).

Dr. Farquhar's testimony turns the scientific method on its head. *See Sorensen v. Shaklee Corp.*, 31 F.3d 638, 649 (8th Cir. 1994) (rejecting proffered scientific testimony based on backward reasoning). Dr. Farquhar read a few articles discussing Baycol and adverse event reports ("AERs"), *see* Farquhar Rep. (Ex. A) ¶¶ 43-48, concluded that Baycol was more dangerous than other statins, and then set out to prove this theory to be true through analysis based on AERs.

In conducting this analysis, Dr. Farquhar used data with which he had no familiarity and which was not collected in a way that would allow safety comparisons. *See* Defendants' AER Motion, Parts I and II. Further, he employed statistical techniques in ways he had never used in his half-century as an M.D. specializing in cardiology and epidemiology. *See* Farquhar Rep. (Ex. A) (curriculum vitae); Farquhar Dep. (Ex. B) at 102:24-103:10, 105:4-17, 106:4-13, 106:22-107:3. He also worked without a study plan, altering his methodology as he went along to achieve his desired outcome. *See* Farquhar Dep. (Ex. B) at 333:13-24.

In the process, Dr. Farquhar drew conclusions that have not been peer-reviewed and would not withstand such review because they are based on untenable assumptions. Farquhar Dep. (Ex. B) at 328:17-20; *Daubert*, 509 U.S. at 593-94

(discussing peer-review). For all these reasons, Dr. Farquhar should not be allowed to give testimony comparing the safety of Baycol and other statins.

Dr. Farquhar also attempts to rewrite an epidemiological study conducted for Bayer before Baycol was withdrawn. That controlled study showed that Baycol, when used in accordance with its label, was comparable in safety to other statins. *See* Study #3: The Risk of Myopathy Subsequent to HMG Inhibitor Use in a Managed Care Organization ("PacifiCare study") (Ex. D) at 24. Dr. Farquhar claims that the study should be recalculated to show Baycol was more dangerous. Again, Dr. Farquhar is using the rubric but not the method of science, working to achieve a desired outcome rather than to nullify a hypothesis. *See* Reference Manual on Scientific Evidence 175 (Federal Judicial Center 1994) (defining "null hypothesis"). Accordingly, this opinion, too, should be excluded,

*Daubert* directs district courts to serve as gatekeepers to keep junk science from confusing juries. Dr. Farquhar's proposed testimony is such junk science. Accordingly, consistent with *Daubert* and Rule 702, this Court should slam the evidentiary gate on Dr. Farquhar's testimony.

## DR. FARQUHAR'S OPINIONS COMPARING THE SAFETY OF BAYCOL AND OTHER STATINS ARE NOT BASED ON SOUND SCIENTIFIC METHOD AND SHOULD BE EXCLUDED.

### I. DR. FARQUHAR'S ANALYSIS IS NOT RELIABLE SCIENCE.

Dr. Farquhar should not be allowed to testify that Baycol was more dangerous than other statins because the analysis upon which he bases that opinion was not derived through accepted scientific methodology. Rather, Dr. Farquhar used adverse event data to confirm his preconceived opinion that Baycol was more dangerous than other statins and more likely to cause myalgias.

Dr. Farquhar's expert report sets forth the starting point for his analysis – his view that the scientific community already had decided that Baycol was more toxic than other statins:

> The scientific community has reached a consensus that Baycol is substantially more toxic than other drugs in the same class, causing far greater numbers of rhabdomyolysis, myopathies, and deaths. This consensus is based upon the collection and analysis of spontaneous reports of adverse events reported by physicians in countries around the world, which consistently support the same conclusion.

Farquhar Rep. (Ex. A) ¶ 43. Dr. Farquhar therefore embarked upon an AER analysis to prove this proposition for the PSC. *See* Farquhar Dep. (Ex. B) at 251:14-252:20.

However, working backwards by attempting to prove a conclusion – as Dr. Farquhar has done – is contrary to scientific method. In *Sorensen v. Shaklee Corp.*, 31 F.3d 638 (8th Cir. 1994), the Eighth Circuit excluded expert testimony in a product liability case because the plaintiff's experts "reasoned from an end result in order to

hypothesize what needed to be known but was not." *Id.* at 649. In contrast, scientific opinion "reason[s] from known facts to reach a conclusion." *Id.* By starting with their desired conclusion and working backward, the plaintiffs' experts in that case "turn[ed] scientific analysis on its head." *Id.*

Dr. Farquhar's analysis is based on such flawed reasoning. To reach his conclusion – that Baycol was more dangerous than other statins – Dr. Farquhar used adverse events as the key piece of data – indeed, the foundation of his analysis. He calculated a reporting rate for each statin by comparing the number of certain types of adverse event reports for that statin during certain calendar years (his numerator) with the number of prescriptions for that statin during those calendar years (his denominator). Farquhar Dep. (Ex. B) at 116:14-117:3. He then compared the reporting rates for each statin. These calculations produced a higher reporting rate for Baycol.

This analysis – which would not exist but-for this litigation – should be rejected for at least four reasons. First, it purports to make drug safety comparisons based on AERs; such comparisons cannot be made. Second, analyses of this type are not accepted, as evidenced by Dr. Farquhar's failure ever before to conduct such an analysis. Third, Dr. Farquhar's analysis ignored established scientific protocols to ensure the integrity and replicability of scientific research. Fourth, as a result of the above, the Farquhar analysis is replete with flaws that demonstrate its lack of reliability.

**A. Dr. Farquhar's Analysis Is Improperly Based upon AERs.**

Defendants already have demonstrated that the FDA and the courts have concluded that AERs cannot be used to compare the safety of drugs. *See* Defendants'

AER Motion. Dr. Farquhar conceded during his deposition that controlled clinical studies are the scientific gold standard in medical methodology. Farquhar Dep. (Ex. B) at 309:12-14. Nevertheless, he based his analysis for this litigation on uncontrolled data sets – AERs. Dr. Farquhar offers several rationalizations for using this inferior data, but those do not withstand examination. Indeed, Dr. Farquhar has no experience with AERs whatsoever, let alone experience that would justify his using them in a manner explicitly rejected by the FDA.

*First*, Dr. Farquhar contends that, because AERs are cited in several articles published in the flurry of publicity surrounding the withdrawal of Baycol, it must be scientifically appropriate to rely upon AERs to compare drugs. Farquhar Rep. (Ex. A) ¶ 43. But these articles do not support the view that scientifically sound conclusions about the comparative safety of drugs can be derived by manipulating AER data.

Indeed, the first article cited by Dr. Farquhar adds this major caveat to its discussion of reporting rates based on AERs:

> These data rely on voluntary physician reporting and do not use a uniform definition of rhabdomyolysis. The effect of these vagaries on the results is unknown, but these data provide some insight into the magnitude of the problem.

Thompson *et al.*, "Statin-Associated Myopathy," *JAMA*. 2003;289:1681-90 (Ex. E) at 1683. Thus, Thompson treats the AERs as providing "some insight" – *i.e.*, a signal. The appropriate response to such signal is to initiate a formal, well-designed study, not conduct a shoddy analysis based on data subject to the "unknown" effect of various "vagaries." *Id.* *See* Report of Brian Strom, M.D., M.P.H. (Ex. F) ¶ 7. *See also* Farquhar

Dep. (Ex. B) at 152-53, 196 (relying on Dr. Strom's epidemiology text and remarking on Dr. Strom's expertise with AERs).

Significantly, the Thompson article sets forth rates of myalgia from *clinical trials* for Baycol and other statins. Those tables show Baycol as having the second lowest myalgia rate of all statins in absolute percentage and the second lowest when compared to a placebo. *See* Thompson (Ex. E) at 1683. Dr. Farquhar brushed aside this controlled data, saying: "I undoubtedly saw that in association with reading, although I didn't necessarily pause and digest every number that's there." Farquhar Dep. (Ex. B) at 369:1-3. ***However, Dr. Farquhar had to concede that he knows of no study in a peer-reviewed journal that shows Baycol has a higher rate of myalgia than other statins.*** *Id.* at 360:15-361:1.

Similarly, the other articles cited by Dr. Farquhar fail to support his reliance on AERs:

- The Farmer article is a *commentary* that discusses only rhabdo data – it does not address general dangerousness or myalgia – and calls for increased post-marketing surveillance. Farmer "Learning from the cerivastatin experience," *Lancet*. 2001;358:1383-84 (Ex. G).

- The Hamilton-Craig article does not support the use of adverse event data to compare the safety of statins. The table in that article listing adverse reactions shows the percentage of reports for *each* statin attributable to myalgia, myopathy, and rhabdo. *See* Hamilton-Craig, "Statin-Associated Myopathy," *MJA* 2001;175:486 (Ex. H) at 487 Table 3. But the statistical analysis does not compare statins.

- The Furberg article is a commentary that makes no pretense of conducting AER analysis. The commentary merely opens with a reference to "press reports" linking Baycol to rhabdo. Furberg, *et al.* "Withdrawal of Cerivastatin from the World Market," *Current Controls in Cardiovascular Medicine*. 2001;2:205-07 (Ex. I).

- The Staffa letter to the editor does state, on the basis of AERs, that the reporting rate for fatal rhabdo was higher with Baycol than other statins, but includes the following caveat:

> The reporting rate . . . is a crude measure of the number of reports received by the FDA . . . Rigorous comparisons between drugs that are based on these data are not recommended, since many factors can affect reporting and an unknown number of cases may not be attributed to the drug or reported to the FDA. Reporting rates are not incidence rates.

Staffa, *et al.* "Cerivastatin and reports of Fatal Rhabdomyolysis," *NEJM*. 2002;346:539-40 (Ex. J).[1]

Thus, none of these articles supports Dr. Farquhar's claim that the medical community has reached a consensus that scientifically-sound conclusions about the comparative safety of medicines can be based on voluntary reporting by physicians, plaintiffs' lawyers, pharmaceutical sales representatives, and others. More importantly, none of these articles justifies abandoning the long-established precedent that AERs cannot serve as the foundation for an expert to show general or specific causation in court. *See* AER Motion, Part III.

*Second*, Dr. Farquhar asserts that various sources of AERs consistently showed a higher reporting rate for Baycol. Farquhar Rep. (Ex. A) ¶ 49. At most, this suggests that the AER databases signaled that further investigation was appropriate; that is what they were designed to do. *See* FDA Office of Postmarketing Drug Risk

---

[1] Dr. Farquhar claims that the Staffa letter reflects the position of the FDA because another publication misstates the authorship as that of the FDA. Farquhar Rep. (Ex. A) ¶ 46. However, a reading of the Staffa letter makes clear that the letter did not express the official views of the FDA. *See* Staffa (Ex. J) at 540.

Assessment, "Adverse Event Reporting System (AERs): Brief Description with Caveats of System" (Oct. 18, 1999) (Ex. K) at 2. But that does not support Dr. Farquhar's conclusion that AER signal data can be used in a way they were not designed to be used.

*Third*, Dr. Farquhar asserts that post-marketing data, like AERs, are more likely to identify rare side effects, like rhabdo, than clinical trials. Farquhar Rep. (Ex. A) ¶ 50, 54(a). But even if Dr. Farquhar's hypothesis were true, it would not help him here because Dr. Farquhar is opining, not about rhabdo, but more generally about Baycol's toxicity and "dangerousness" and about myalgias. *Id.* ¶ 55; Farquhar Suppl. Rep. (Ex. C) ¶¶ 9-10. Myalgia is a common condition, with many causes, as another PSC expert testified:

> Q: Would you agree that muscle pain is one of the most common complaints encountered in the practice of medicine, especially in the elderly?
>
> A: Yes.
>
> Q: And that muscle pain has a myriad of possible causes?
>
> A: Yes.

Deposition of Thomas M. Zizic, M.D. (Ex. L) at 184:23-185:6.

*Fourth*, Dr. Farquhar cites the Pierfitte study discussed in Defendants' AER motion. Farquhar Rep. (Ex. A) ¶ 51. That study demonstrated that it is possible to take identical drugs, *including statins,* market them under identical circumstances, and get widely disparate adverse event reporting rates. *See* AER Motion, Part II. Thus, the Pierfitte study confirms the FDA position that AERs are not a scientifically reliable method for comparing the safety of drugs. *See* Pierfitte *et al.*, "Is reporting rate a good

predictor of risks associated with drugs?" *Br. J. Clin. Pharmacol.* 1999;47:329-31 (Ex. M). In short, Dr. Farquhar's explanations do not justify his disregard for explicit FDA statements rejecting the use of AERs for safety comparisons.

Dr. Farquhar's insistence that he knows better than the FDA about the appropriate use of AER data is particularly presumptuous, given that he had virtually no AER experience before he was retained by the PSC. Dr. Farquhar testified that, prior to this litigation, he had no experience collecting, coding, analyzing, or interpreting AER data. Farquhar Dep. (Ex. B) at 99:21-102:3. Moreover, Dr. Farquhar testified that he had no prior experience working with the FDA's AER database:

> Q: Had you ever, before your involvement in this litigation, used the FDA's adverse event reporting database to obtain numbers of adverse events for different drugs?
>
> A: No. I have not prior to this done research on drug toxicity and comparisons among drugs using the adverse event reporting system.

*Id.* at 106:22-107:3.

Nor did Dr. Farquhar seek to educate himself on the workings of AER databases in preparing his opinion for this litigation. He left all such details to a colleague who actually ran the searches that gathered the data for Dr. Farquhar's analysis. Dr. Farquhar testified that he did not know how these searches had been conducted:

> Q: Do you know that – do you understand the way data are coded in the FDA's adverse event database?
>
> A: Well, I really don't. You know, this was under Dr. Ahn's – he was directed to do the search.
>
> Q: Okay.

A: And I didn't look to see what the ingredients were within the database in the sense you're asking [*i.e.*, what medical search terms were used for the analysis of myalgia].

Farquhar Dep. (Ex. B) at 338:18-25.

In sum, Dr. Farquhar's claim that drug safety comparisons can be based on AERs is simply a product of his goal-oriented approach to this project, which flies in the face of sound scientific methodology.[2]

**B. Dr. Farquhar Has No Experience Conducting an Analysis Like This One.**

Dr. Farquhar also was working in new territory in designing his analysis. Before this litigation, he had never compared drugs on the basis of AERs. Farquhar Dep. (Ex. B) at 103; 5-10. *See Lauzon* v. *Senco Prods., Inc.*, 270 F.3d 681, 687 (8th Cir. 2001) (impetus for opinion weighs in admissibility evaluation); *Wagner v. Hesston Corp.*, 2005 WL 1540135 (D. Minn. June 30, 2005), at *6 (expert testing conducted in context of litigation increased unreliability of expert opinions).

Dr. Farquhar used a technique called meta-analysis, totaling AERs from several AER databases. Farquhar Rep. (Ex. A) ¶ 57. As Dr. Farquhar explained in his report, a meta-analysis is sometimes used to compile data collected in several controlled studies to develop a larger database. *Id.* ¶ 41. But, as Dr. Farquhar conceded in his deposition, such meta-analyses are typically done on independent *studies*. Farquhar Dep. (Ex. B) at 271:6-10. The data used here were not from controlled studies, they were

[2] Dr. Farquhar also testified to unfamiliarity with another key source of data for his analysis. *See infra*, at Part I.A.4. (discussing "the denominator problem").

tabulations of raw data by Dr. Farquhar and his colleague from AER databases that accumulate reports without regard to whether adverse events are causally-linked to the medicines in question. *See* Farquhar Dep. (Ex. B) at 271:25-272:22; 21 C.F.R. § 314.80(a).

Before this, Dr. Farquhar had never done a meta-analysis involving drugs outside of litigation:

> Q: Okay. Outside of the context of litigation, have you ever done a meta-analysis of this type?
>
> A: On drugs?
>
> Q: Yes?
>
> A: No.

Farquhar Dep. (Ex. B) at 270:17-21. And he had never performed a meta-analysis using AERs. *Id.* at 102:24-103:10, 105:4-17, 106:4-13, 106:22-107:3. Therefore, Dr. Farquhar's analysis here was a new venture for him:

> Q: Have you ever conducted any study of two or more drugs in the same class based on spontaneous post-marketing adverse event reports prior to your involvement in this case, whether the results were published or not.
>
> A: No.

*Id.* at 103:5-10.

But the novelty did not end there. Indeed, one of the calculations performed by Dr. Farquhar, a proportional reporting rate analysis (which compares the reporting rates of different statins), was proposed by a PSC attorney:

> Q: Okay. Did Mr. Arbitblit suggest to you to do a proportional reporting rate analysis?

A: The idea of proportional reporting rates was given to me in a telephone call by Mr. Black, and I don't remember when.

Q: Okay. Had you ever personally done a proportional reporting rate analysis prior to this date?

A: I don't know if I had done it at this date, but no. I certainly had not.

Farquhar Dep. (Ex. B) at 251:21-252:4.

Q: Is the first – is it fair to say that the first time you learned about proportional reporting rates was in connection with your services as an expert in this case?

A: That is correct.

*Id.* at 251:16-20. *See also id.* at 251:21-25. Dr. Farquhar – the PSC's epidemiological expert – had never heard of a proportional reporting rate. He was directed to the calculation by a PSC lawyer, and learned about the calculation – not from an epidemiology text – but a science guide for lawyers. *Id.* at 318:5-18. *See generally* Strom Rep. (Ex. F) ¶ 19 (criticizing Dr. Farquhar for "overinterpreting" proportional analysis "which is simply intended to guide the review of spontaneous events as case reports" and "can thus not be used in a scientifically valid manner to compare adverse event reports across drugs.")

Courts applying *Daubert* and Rule 702 generally view with suspicion putative scientific research prepared specifically for litigation. *Daubert*, 43 F.3d at 1317; *Lauzon*, 270 F.3d at 687; *Wagner*, 2005 WL 1540135 at *6. Here, Dr. Farquhar not only conducted an analysis just for the PSC, he has done so using data with which he is unfamiliar, selecting his statistical tools with the guidance of the PSC. This methodology is suspect, especially given that it is based on AER databases, which have been excluded

by federal courts as the basis for expert testimony. Far from having the hallmarks of reliable science, Dr. Farquhar's analysis has the indicia of a skewed exercise in advocacy.

### C. Dr. Farquhar's Work Departed from Basic Scientific Methodology in Important Ways.

Dr. Farquhar abandoned appropriate scientific methodology in other ways in his meta-analysis. Most significantly, he did not develop and write out a plan for this project, making it impossible for another scientist to test or even attempt to reproduce his work – a key part of scientific methodology. *See* Daubert, 509 U.S. at 593 (admissibility of expert testimony depends, *inter alia*, on whether the expert's method "can be (and has been) tested"):

> A: No, I didn't have a written protocol. I had a mental protocol. I knew what search terms I was going to ask to be used.

Farquhar Dep. (Ex. B) at 333:17-19. In fact, that "mental protocol" was a moving target:

> Q: Often when you undertake to do a study, prior to undertaking the study, you draft up something in writing that says – has a section that says – you know, has an abstract that kind of is an overview of the problem you're looking at, perhaps a methodology section that lays out these are the search terms we're going to use, these are the data lock points we're going to use, this is the type of software we're going to use, that sort of thing.
>
> A: Yes.
>
> Q: You're familiar with that term "protocol" as I'm using it, right?
>
> A: I do understand now what you mean by protocol, and I can comment on that when you want me to.
>
> Q: Okay. My question is . . . was there ever a written protocol that you used to do the adverse event reporting analysis that we talked about last time, the meta-analysis?
>
> A: Let me explain that. You recall receiving – I don't know, 50 pages of my notes?

Q: Yes.

A: All right. ***As one goes from the beginning to the end, there's an evolution of thinking and rethinking and discarding and starting a new chain of plans.*** . . .

*Id.* at 335:22-336:22 (emphasis added). Thus, Dr. Farquhar modified the study as he went along, working tenaciously to get the result he wanted – not to falsify a hypothesis, as is consistent with the scientific method. *See Sorensen*, 31 F.3d at 649; *Mitchell* v. *Gencorp., Inc.*, 165 F.3d 778, 783 (10th Cir. 1999); *Claar* v. *Burlington N. R.R. Co.*, 29 F.3d 499, 502-03 (9th Cir. 1994) (all rejecting admissibility of result-oriented expert analysis).

Dr. Farquhar's notes of his evolving plan show him reviewing statistics indicating monotherapy Baycol to have a lower risk of adverse events than other statins, with Lescol the highest. *See* Excerpt from Farquhar notes (Ex. N). The notes then refer to the Lescol "anomaly." Within a few pages, Dr. Farquhar has devised some calculations followed by a note, "Now, try for the logic," and within a few more pages the Lescol "anomaly" has disappeared and "[a]ll statins are lower than Baycol." *Id.*

Thus, Dr. Farquhar's notes appear to show him adjusting his methodology to meet the needs of the PSC. This may constitute good client service, but most emphatically is not consistent with the scientific method.

Not surprisingly, Dr. Farquhar's work has not been subject to review and critique by other scientists. Farquhar Dep. (Ex. B) at 328:17-20. The absence of peer review is yet another reason to question the integrity of this made-for-litigation analysis

and to exclude Dr. Farquhar's testimony based upon it. *See Daubert*, 509 U.S. at 593-94 (discussing peer-review).

**4. Examples of a few specific problems in Dr. Farquhar's analysis confirm that it is not reliable.**

Given the inappropriate use of AER data and Dr. Farquhar's outcome-determinative approach to his analysis, there are myriad problems with each component of Dr. Farquhar's calculations. This part of the brief addresses just a few, by way of illustration.

***Duplication of AERs in Meta-Analysis.*** Dr. Farquhar used two FDA adverse event databases, among other sources, in adding up adverse events. He conceded that use of those databases allowed double-counting of AERs and that he made no attempt to correct for such duplication:

Q: Okay. Now, did you – one of the databases on which you did a meta-analysis was the FDA's U.S. adverse reporting database, right?

A: Right.

Q: Another of the databases in which you did the analysis was the FDA's worldwide reporting analysis?

A: Right.

Q: Did you determine that there was – did you attempt to learn whether there was any overlap of cases between those databases?

A: ***There is overlap.***

* * *

Q: Did you take steps to avoid duplication of individual cases in your meta-analysis?

> A: There was – ***no, I did not.*** There was no way to do that with the information that we had available. We were taking the data given to us . . . .

*Id.* at 271:25-272:10, 272:23-273:2 (emphasis added). One does not need a background in science or statistics to realize that an analysis based on adverse event reports that double counts some reports is fundamentally flawed.

***AER reports do not use standard definitions and Dr. Farquhar made no attempt to adjust for such variations.*** Dr. Farquhar agreed that use of standard definitions is essential to an epidemiological study:

> Q: … [I]f you're doing an epidemiological study, you got to make sure you're using a consistent definition throughout the study; is that fair?
>
> * * *
>
> A: It is fair to say that you want to have consistency in definitions.

Farquhar Dep. (Ex. B) at 178:10-16.

But Dr. Farquhar made no attempt to determine whether or how AERs were reported or to adjust for inconsistencies in the reporting process.

> Q: . . . I'm trying to get an understanding of what it is you're referring to and what your understanding of those conditions is clinically . . .
>
> A: Well, what I would like to say at this point is that when I have used rhabdomyolysis or myopathy or myositis or toxic myopathy or myalgias from the AERS data, I have to take those terms at face value as they were used . . . But I can't not – I cannot be certain that the AERs followed those completely.

*Id.* at 183:13-20.

> Q: I just want to be sure I wasn't missing something. So it would be fair to say you took the adverse event reporting data at its face value, and to the extent that there were problems with the data, there were

problems with the data, but that wasn't something that you as a part of your analysis looked at?

A: That's correct. I take the data as it comes.

*Id.* at 346:9-15. This failure to corroborate the data on which he relied makes Dr. Farquhar's analysis scientifically unreliable.

***The "new drug" effect***. Dr. Farquhar also failed to take into consideration a recognized phenomenon: adverse event reports are made more frequently during the first years a medicine is on the market. *Id.* at 202:8-17. To take this into account, when AERs are being evaluated as a possible signal that scientifically controlled study may be required, comparisons between drugs are based not only on calendar years, but on frequency of reports during the first two years the drugs are on the market. *Id.* at 207:16-208:5. If reporting rates are widely disparate using the calendar years analysis, they are examined using the "first two years analysis," to consider the potential new drug effect. That is what the FDA did when it conducted an internal evaluation to determine whether Baycol AERs produced such a signal in the summer of 2000. *See* Rebuttal Report of John Farquhar (Ex. O) ¶ 9(a). In fact, the FDA found Baycol to be in the middle of the statin AER pack, when adjusted for the first two years of use. *See* FDA Reporting Rates Tables (Ex. P).

Dr. Farquhar, however, based his analysis on calendar years, comparing Baycol to both new drugs and those that had long been on the market. Farquhar Dep. (Ex. B) at 216:22-25. He acknowledged that certain biases might be built into his methodology, such that the true risk can be "distorted by the new drug effect," Farquhar

Dep. (Ex. B) at 209:17, but discounted that effect for Baycol. *Id*. at 217:18-219:14, 220:13-221:3, 221:22-222:21. The disparity between Dr. Farquhar's litigation-driven findings and those of the FDA demonstrate that such assumptions cannot be made.

***The denominator problem.*** This brief has focused on AERs – the numerator in Dr. Farquhar's reporting rate calculus. But the number that Dr. Farquhar used for the denominator in his calculations also is methodologically unsound. He extracted that number from the National Prescription Audit Plus ("IMS Health") database. Farquhar Dep. (Ex. B) at 117:4-8, 118:5-8, 118:11-20. That database provides the number of prescriptions for different statins in a given year. *Id.* at 116:14-24.

Dr. Farquhar did not know how this data was calculated or what its error rate was, but took the numbers at face value:

> Q: Am I correct that when you prepared [your report], you were not familiar with the methods by which IMS derives its prescription data; is that correct?
>
> A: . . . [T]o answer specifically, I cannot say what the method is that they use.
>
> * * *
>
> Q: You don't know, as you sit here today, what the error rate is in IMS data, do you?
>
> A: No.

Farquhar Dep. (Ex. B) at 349:11-23; *see also id.* at 350:2-6.

Total reliance on the IMS numbers as the denominator was a fundamental mistake, because this prescription database omits drugs distributed as samples. Farquhar Dep. (Ex. B) at 233:14-20. Since Baycol was a new drug during the period in question, it

was extensively sampled. *Id.* at 231:11-17. Dr. Farquhar conceded that use of this database as a denominator could inflate the adverse event reporting rate for Baycol:

> Q: And if the denominator – well, if there were a lot of people who should have been in the denominator for analysis purposes who weren't in the denominator because they received samples rather than prescriptions, that would cause the reporting – the adverse event reporting rate for rhabdo for Baycol users overall to be artificially higher; is that correct?
>
> PSC: Objection.
>
> A: It would be higher assuming that the reporting rate is unaffected by samples versus prescriptions.

*Id.* at 236:13-23.

* * *

In sum, this Court's function under *Daubert* and Rule 702 is to keep out testimony based on junk science because such unreliable testimony will not assist juries. Dr. Farquhar's proposed testimony does not meet *Daubert*'s requirements; therefore, he should not be allowed to opine about the comparative safety of statins.

## II. DR. FARQUHAR'S RECALCULATION OF THE PACIFICARE STUDY SHOULD BE EXCLUDED.

Dr. Farquhar also asserts that his opinion on the comparative toxicity of Baycol is supported by the PacifiCare study. The PacifiCare study was an epidemiological study performed by outside experts on Bayer's behalf. This study was based on actual prescription data for patients and medical records for those same patients, all of which were available from PacifiCare, one of the largest health care plans in the United States.

Dr. Farquhar's conclusions about PacifiCare require an exercise in historical revisionism, because the finding of the PacifiCare study was that Baycol was comparable in safety and effectiveness to other statins, when used in accordance with its label. Study #3 (Ex. D) at 24; *see also* Farquhar Dep. (Ex. B) at 328:2-10. To invert the finding of PacifiCare, Dr. Farquhar performs a series of "adjustments" to the data, which collectively have the effect of taking a study demonstrating no increased risk with Baycol monotherapy and transforming it into a study demonstrating a marked increased risk with Baycol monotherapy. Once again, this outcome-driven approach is the antithesis of the scientific method. *Sorensen*, 31 F.3d at 649.

**A. Background on PacifiCare Study.**

PacifiCare is a cohort epidemiological study conducted at Bayer's request while Baycol was on the market, to evaluate the risk of myopathy associated with the use of statins, including Baycol, both alone (monotherapy) and in conjunction with the use of gemfibrozil (combination therapy). Report of Janet Arrowsmith-Lowe (Ex. Q) § III.F., pp. 5-7. Bayer launched this study to evaluate a signal raised by AERs involving rhabdo in Baycol users. Report of Brian Strom (Ex. F) ¶¶ 11, 13. PacifiCare showed an association between adverse events and combination therapy with Baycol and gemfibrozil, but showed no increase in the rate of myopathy associated with Baycol monotherapy compared to monotherapy with other statins. *Id.* at ¶ 14; Arrowsmith-Lowe Rep. (Ex. Q) § III.F., p. 7. In other words, "the safety and effectiveness profile of cerivastatin [Baycol] was found to be similar to that of other drugs in its class when

cerivastatin was used in accordance with its approved product label" – *i.e.*, not in combination with gemfibrozil. Arrowsmith-Lowe Rep. (Ex. Q) § III.F., p. 7.

**B. Dr. Farquhar's Purported Re-Analysis of PacifiCare Is Outcome-Driven and Methodologically Unsound.**

Dr. Farquhar's spin on the PacifiCare study is an example of advocacy, rather than of appropriate scientific methodology. *See, e.g.*, Farquhar Rep. (Ex. A) ¶ 102 (asserting that "[i]t is apparent from the documents that Bayer sought to use the PacifiCare study to justify keeping Baycol on the market . . . .") Ironically, although Dr. Farquhar injects argumentative characterizations of "the documents" into his report, he failed to review the PSC depositions of the PacifiCare researchers:

> Q: Have you been provided, by the way, with copies of the depositions that [plaintiffs' counsel] took of the authors of the PacifiCare study? . . .
>
> * * *
>
> A: . . . You know, it's possible I looked at them and – but I've just – I just don't remember reading that.

Farquhar Dep. (Ex. B) at 222:22-223:12. Based on his limited inquiry, Dr. Farquhar identifies several putative errors in the PacifiCare study, and then purports to correct three of them.

Dr. Farquhar first claims that the PacifiCare study has bias due to the "healthy person effect," which he characterizes as occurring "when the rate of disease observed in one group is lower than would otherwise be expected, because of the group members' relatively greater tolerance to withstand the toxic effects of the exposure in question." Farquhar Rep. (Ex. A) ¶ 103(a) (citing a book on occupational work exposure

to toxins). This "adjustment" was based on Dr. Farquhar's assumption that the patients taking Baycol were more likely to be "statin tolerant" because they were more likely to be patients switched from another statin to Baycol. As noted by defendants' expert, Dr. Strom, however, there are many reasons why patients were started on or switched to Baycol that do not have anything to do with statin tolerance. *See* Strom Report (Ex. F) at ¶ 21. To counter this supposed effect, Dr. Farquhar made statistical adjustments to ratchet up the relative risk of Baycol. This outcome-driven approach is specifically contrary to the scientific method. *See Sorensen*, 31 F.3d at 649.

Second, Dr. Farquhar argues that persons taking Baycol in the study were on the medicine for less time than those taking other statins and that the risk of their experiencing toxic effects of the medicine was therefore understated. Farquhar Rep. (Ex. A) ¶ 105. Dr. Farquhar therefore increases the relative risk, purportedly to compensate for this. But Dr. Farquhar's adjustment is based on the assumption – for which he offers no scientific justification – that people who have an adverse reaction to Baycol will do so at a consistent rate over the time they are on the medicine. As defendants' epidemiologist Brian Strom, testified, adverse reactions to Baycol were more likely to occur shortly after starting the medicine. *See* Strom Rep. (Ex. F) ¶ 20. Dr. Farquhar's failure to address this issue in his purportedly corrective calculations is another illustration of Dr. Farquhar's working toward a predetermined end.

Third, Dr. Farquhar complains that the PacifiCare researchers "likely" misclassified cases. *Id.* ¶ 111. Such speculation does not provide an adequate basis for expert testimony. *Daubert*, 509 U.S. at 590 ("the word 'knowledge' connotes more than

subjective belief or unsupported speculation”). Dr. Farquhar then proceeds to make another “correction” based on his supposition about how the researchers who actually did the study may have “misclassified” certain cases.

The bottom line is that Dr. Farquhar’s attempt to use suppositions and baseless assumptions to rewrite the results of the PacifiCare study is contrary to sound scientific method and Rule 702.

* * *

In sum, Dr. Farquhar is unable to cite any research that provides reliable grounding for his opinion that Baycol was the most toxic statin. Dr. Farquhar’s opinions are not founded on scientific knowledge or research, but instead rest on improper assumptions and suppositions. *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) (quoting *Weisgram v. Marley Co.*, 528 U.S. 440, 454 (2000)) (“Expert testimony that is speculative is not competent proof and contributes ‘nothing to a legally sufficient evidentiary basis.’”).

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court exclude the above-referenced testimony of Dr. Farquhar under *Daubert* and Rule 702.

Dated: April 17, 2006

Respectfully submitted,

Philip S. Beck
Adam Hoeflich
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60610
(312) 494-4400

/signature on file/
Susan A. Weber
James W. Mizgala
Elizabeth Curtin
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000

Paul J. Zidlicky
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000

Catherine Valerio Barrad
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
(213) 896-6000

Richard K. Dandrea
ECKERT SEAMENS CHERIN & MELLOTT, LLC
USX Tower, 600 Grant St., 44th Floor
Pittsburgh, PA 15219
(412) 566-6000

Peter W. Sipkins (No.101540)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
(612) 340-2600

Scott A. Smith
Tracy J. Van Steenburgh
HALLELAND LEWIS NILAN SIPKINS & JOHNSON, P.A.
220 South Sixth Street, Suite 600
Minneapolis, MN 55402
(612) 338-1838

/signature on file/
Fred T. Magaziner
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000

*Counsel for SmithKline Beecham Corp. d/b/a GlaxoSmithKline*

Douglas R. Marvin
WILLIAMS & CONNOLLY
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

Joseph D. Piorkowski, Jr.
THE PIORKOWSKI LAW FIRM, PC
910 17th Street, N.W. Suite 800
Washington, D.C. 20006
(202) 223-5535

*Counsel for Bayer Corporation and Bayer AG*