UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

In re Baycol Products Litigation | MDL No. 1431 (MJD/JGL)

This document relates to:
All cases

---

**PLAINTIFFS' STEERING COMMITTEE'S RESPONSE TO BAYER AND GSK'S MOTION TO EXCLUDE THE TESTIMONY OF R. SAMUEL MAYER, M.D.**

---

The Baycol MDL Plaintiffs' Steering Committee ("PSC"), by and through the undersigned counsel, responds as follows to Defendant Bayer and GSK (collectively, Defendants") Motion to Exclude the Testimony of R. Samuel Mayer, M.D., and the memorandum in support thereof.

I. Introduction

Dr. Samuel Mayer is a physical medicine rehabilitation specialist at Johns Hopkins, one of the premier hospitals and teaching institutions in the United States. His credentials are impeccable. Dr. Mayer devotes his practice to assisting patients to recover from physical disorders and disabilities, including myalgias, myositis and rhabdomyolysis. He has diagnosed and treated patients with statin-induced myopathies. Defendants attempt to exclude Dr. Mayer's opinions with respect to myopathy has no basis in law or fact.

II. *Daubert* standards on the admissibility of scientific evidence.

The Supreme Court recognizes the district courts have a "gatekeeping" role in regards to the admissibility of scientific and technical testimony. *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The admissibility of testimony is governed by Federal Rule of Evidence 702. While *Daubert* explained that expert testimony should be granted wide latitude, more recent cases have established that an expert must employ "intellectual rigor" in forming their opinions. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L.Ed.2d 238 (1998). In the absence of independent research or peer review, the expert must explain the process by which the conclusion was reached. *Daubert v. Merrell Dow Pharm.,* 43 F.3d 1311, 1315 (9th Cir. 1995) ("Daubert II").

In cases such as pharmaceutical litigation in an MDL setting, where the opinions are offered as to general causation, the relevancy ground of Daubert is satisfied. *In re Phenylpropanolamine (PPA) Prod. Liab. Litig.,* 289 F.Supp.2d 1230, 1237at n3 (W.D.Wa. 2003). "What Daubert does require is that the expert's opinion be based on sound methodologies of the type used by experts in the field in which the opinion is offered." *Brasher v. Sandoz Pharm. Corp.*, 160 F.Supp.2d, 1291, 1296 (N.D. Ala. 2001).

The law grants a district Court the same broad latitude when it decides how to determine reliability as it enjoyed in respect to its ultimate reliability determination. *General Electric Co. v. Joiner*, 522 U.S. 136, 143, 139 L.Ed.2d 508, 118 S.Ct. 512 (1997). All the trial judge is asked to do is to determine whether the scientific opinion or testimony is based on good grounds tied to scientific method. *Bonner v. ISP Technologies,* 259 F.3d 924, 929 (8th Cir. 2001).

III. Dr. Mayer's opinions are based on good grounds: the medical literature and his clinical experience.

Defendants are seeking to exclude two of the opinions offered by Dr. Mayer: 1) that Baycol can have long-term effects on muscles, and 2) that the comparative safety of Baycol is less than that of other statins. Defs. Mem. at 2. As discussed below, both of these opinions are based on "good grounds", including the medical literature and his clinical experience.

Defendants have not specifically raised the issue, but Dr. Mayer is well qualified to offer opinions in the area of myopathy and muscle damage caused by Baycol. While Dr. Mayer has not performed any specific studies on Baycol, such a requirement would "be at odds with the Rules' liberal thrust and their general approach of relaxing the traditional barriers to 'opinion' testimony." *Daubert*, 509 U.S. at 592. An expert witness is allowed to offer opinions not based on firsthand knowledge or experimentation. *Id.* Experts in complex litigation, historically, have based their knowledge, opinion and testimony on clinical experience and training, along with a review of documents and literature and have been held to offer admissible testimony. *See In re Ephedra*, 289 F.Supp.2d 181, 194 (S.D.N.Y. 2005); *see also In re PPA*, 393 F.Supp.2d at 1242, n.12. Further, Dr. Mayer has treated patients who suffered myopathy and rhabdomyolysis induced by stains. Deposition of R. Samuel Mayer (Ex. A) at36:5 – 37:7. Physicians who treat the injury in their clinical practice are qualified to offer opinions as to causation. *Smith v. Wyeth-Ayerst Lab. Co.*, 278 F.Supp.2d 684, 702 (W.D.N.C. 2003) (finding a physician who has diagnosed and treated pulmonary hypertension and PPH

qualified to offer an opinion on causation with regard to diet drugs). Therefore, Dr. Mayer exceeds the qualifications necessary to offer an expert opinion on the general causation of Baycol-induced myopathy.

a. Baycol causes persistent muscle damage.

Defendants seek to characterize Dr. Mayer's testimony and opinion of the long-term effects of Baycol as "speculation" and "conjecture". Dr. Mayer has years of experiencing first hand, the effects of myopathy in patients. As such, his opinions are far more than mere speculation. He has witnessed firsthand the devastating effects suffered by patients with statin-induced myopathy. A significant part of Dr. Mayer's practice relates to treating muscle disorders. Mayer Dep. (Ex. A) at 39: 10-13. Dr. Mayer has treated patients in his practice who have suffered from rhabdomyolysis and statin induced myopathy; his clinical experience demonstrates not all patients made a quick recovery. Mayer Dep. (Ex. A) at 38:10-39:9. Dr. Mayer further testified that some of the patients continued to have ongoing weakness. *Id.* "[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho,* 525 U.S. at 156. Moreover, Dr. Mayer's opinion that myopathy persists is supported by the scientific and medical literature – irrespective of whether the myopathy was induced by Baycol or another source entirely.

Defendants apparently object to Dr. Mayer's opinion that "[m]yopathy causes significant, and often-long lasting functional limitation." Dr. Mayer developed this opinion through years of clinical practice. This opinion is not limited to Baycol, but to all myopathies. This is his experience and a well-known fact recognized by the medical

community. This is found throughout the medical literature, not limited only to statin-induced myopathies, but myopathies in general.

Defendants rely on *Leathers v. Pfizer, Inc.*, 233 F.R.D. 687 (N.D. Ga. 2006), for their position that any testimony that Baycol causes long term muscle effects should be excluded as not accepted by the medical community. This case is different for several reasons, including: 1) *Leathers* involves Lipitor, a drug still on the market, 2) the expert at issue was not a specialist in muscle disorders, 3) the expert opinion failed to address the issues of general causation *at all*, and 4) the expert had not cited any literature to support an opinion and denied being aware of a causal link. Dr. Mayer's opinion relates to Baycol, a drug withdrawn from the market due to increased adverse events with respect to muscle damage. Dr. Mayer is a specialist who spends much of his practice treating patients with muscle problems like the injuries in this litigation. A doctor that lacks specialized knowledge cannot assist the jury in understanding the causation of injury. *Smith*, 278 F.Supp.2d at 698. Further, Dr. Mayer's report is being offered for the purposes of general causation, something missing in *Leathers*. In forming his opinions on general causation, Dr. Mayer reviewed a "substantial" amount of literature. Mayer Dep. (Ex. A) at 27:17-28:9. Accordingly, the *Leathers* case is in no way instructive as to the reliability of Dr. Mayer's opinions.

Defendants further disparage Dr. Mayer's opinions are mere hypothesis. However, there is a difference between hypothesis based upon science and pure speculation or conjecture.

> "I think one of the differences between medicine and law is lawyers view things as being proved or disproved and I can think of very few things in medicine that are proven beyond any doubt to be true, so that virtually everything that we think about in medicine is a hypothesis that requires ongoing study. So, there's different levels at which things have been shown to be true, but I don't think we have an absolute truth in medicine in that truth is always changing."

Mayer Dep. (Ex. A) 111: 10 – 112: 8.

The bulk of Defendants argument is that there are not definitive tests demonstrating persistent myopathy as a result of Baycol use. What would Defendants have Dr. Mayer do? A clinical trial on humans with a drug that has been removed from the market would be unethical, at the very least. Courts have recognized that performing a clinical trial, after a chemical has been withdrawn is not only dangerous, but unethical. *See e.g. Globetti v. Sandoz Pharm., Corp.*, 111 F.Supp.2d 1174, 1180 (N.D. Ala. 2000); *In re Ephedra*, 393 F. Supp.2d at 192-193; *Brasher,* 160 F.Supp.2d at 1297.

> "Scientists, too, form professional opinions that are reasonably based on 'good science' but where data is insufficient for definitive scientific proof. To hold the opinions of scientists inadmissible unless backed by statistically significant results from tightly controlled (and very expensive) trials would set a separate, higher standard for scientists than for other witnesses with specialized knowledge."

*In re Ephedra*, 393 F.Supp.2d at 188. Given that data is not available, and studies cannot be performed, Dr. Mayer relies on the data available - his clinical experience treating muscle disorders and the peer-reviewed medical literature.

i. Dr. Mayer's clinical experience has shown that statin-induced myopathy can persist.

Dr. Mayer has years of experience treating patients who have experienced muscle damage and muscle injuries' including patients who have suffered from rhabdomyolysis

and statin-induced myopathies. Dr. Mayer has testified that his professional opinion is that muscle damage induced by Baycol can be long-term. One of the sources for this opinion is his clinical experience; "I can tell you from experience it certainly can be. ...I've seen it myself clinically." Mayer Dep. (Ex. A) 214:17-215:1. This is surely "good grounds" for his opinion. See *Kumho,* 525 U.S. at 156 (stating that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); *see also Glaser v. Thompson*, 32 F.3d 969, 972 (6th Cir. 1994).

ii. Dr. Mayer's opinion about long-term myopathy has support in the medical literature.

Defendants claim Dr. Mayer cannot cite to literature that supports the notion that statins cause muscle damage other than cell death. However, Dr. Mayer testified that he could recall several articles and that other experts would also be able to testify on this issue. Mayer Dep. (Ex. A) at 89: 2-8. Further, there is support in the medical literature that has been published recently demonstrating long term myopathy following statin use.

1. Dr. Phillips has published several articles that demonstrate statins cause long-term myopathy.

Defendants question Dr. Mayer's reliance on the Phillips report published in 2002 that reports 4 patients with statin-induced myopathy who demonstrated normal CK levels. Phillips, P.S., *et al.*, "Statin-associated myopathy with normal creatine kinase levels." *Annals of Internal Med.* 2002; 137:581-586. (Ex. C to Defs Mem.) The specific requirement of this study was to focus on patients with muscle pain that resolved upon discontinuation of statin therapy in order to correlate muscle tissue from biopsies with symptoms. "Patients who had muscle symptoms during statin therapy that resolved when

they were not statins for two weeks were recruited…" *Id.* at 581. This study would have been impossible using patients who continued to have muscle pain and weakness of cessation of statin therapy. The fact that this study focused on patients without persistent problems in no way contradicts Dr. Mayer's opinion that muscle injuries from Baycol persist. Dr. Mayer testified to this fact as well. "The point of the article is not to talk about prognosis in these patients, he didn't follow them over a long period of time to tell you whether there was ongoing problems." Mayer Dep. (Ex. A) at 114: 12-15. Furthermore, Dr. Phillips has published subsequent articles which report precisely the opposite; that myopathy persists in some patients.

In 2004, Dr. Phillips published an article comparing patients post rhabdomyolysis or myositis with controls for certain cardiac indicators. Phillips, P.S., *et al.*, "Statin myotoxicity is associated with changes in the cardiopulmonary function." *Atherosclerosis*. 2004; 177:183-188 (Ex. B). Significantly, Dr. Phillips reports that 7 of the 11 post-myositis patients remained symptomatic 3-62 months after the acute event. *Id.* Specifically, Patient 2 had taken cerivastatin and was still experiencing severe weakness more than 5 years after stopping the Baycol. *Id.* Dr. Phillips also notes: "[a]bnormal aerobic function correlating with disability in these subjects after statin induced muscle toxicity is consistent with previous work suggesting that two thirds of these subjects remain chronically symptomatic subsequent to their index event." *Id.* at 187.

More recently, Dr. Phillips has another article published in the *American Journal of Medicine*. Antons, K.A., *et al.*, "Clinical perspectives of statin-induced

rhabdomyolysis." *Am. J. Med.* 2006; 119: 400-409 (Ex. C). While this article focuses on statin-induced rhabdomyolysis, it does recognize that there are persistent symptoms in some patients following stain therapy. Accordingly, there is significant work in the literature by Dr. Phillips that supports Dr. Mayer's opinion that Baycol can cause long-term myopathy.

2. Dr. Hildebrand's work also shows long-term effects of statins.

Defendants next turn to an abstract relied upon by Dr. Mayer prepared by Dr. Hildebrand. During Dr. Mayer's deposition, an abstract by Hildebrand was marked as an Exhibit; however, this work has since been published. Hansen, K.E., *et al.*, "Outcomes in 45 patients with statin-associated myopathy." *Archives Internal Med.* 2005; 165: 2671-2676. (Ex. D). A retrospective study was reported involving patients who suffered from statin-induced myopathy. Of the 45 patients described in the article, "57% of the patients reported resolution of the symptoms by one month, 34% by 6 months, and 7% by 14 months." *Id.* at 2674. There is nothing in this report that contradicts Dr. Mayer's opinion that myopathy induced by Baycol can be long-term. In fact, as to the Hildebrand abstract marked at his deposition, Dr. Mayer testified:

> "It's very clear from this article substantiating what I had clinically stated in my opinion that it takes months to recover from this and it exactly mirrored what I had said back in November before I had ever read the article from my clinical impressions of these patients. So I found that reassuring that the scientific evidence supported my clinical suspicions."

Mayer Dep. (Ex. A) 165: 22 - 166: 7. Therefore, Defendants argument is completely without merit.

3. It is reasonable to infer symptoms and healing and long term effects from other drug-induced myopathies.

As is often the case when doctors are facing a dearth of information on a specific topic, they reach out into the literature and extrapolate to the particular issues they seek to examine. In particular, the Court in *Kumho* notes that there may be cases such as here where no study has been conducted. *Kumho,* 526 U.S. at 151. Further, given the practical unavailability of other forms of scientific evidence when a drug has been withdrawn, reliance on the data available is all the more reasonable. *Brasher*, 160 F.Supp.2d at 1297. Dr. Mayer testified as to his reliance on the AZT data:

> Q. Are you aware of any medical literature suggesting a similarity between AZT myopathy and statin myopathy?
> A. They are similar only in the sense that they are both drug induced. In terms of the exact mechanism of injury to muscles, I don't know that we know that they are similar, but they are similar in the sense that a patient was taking a pill every day and got muscle damage. So in that sense, it's a model that's useful to look at. I don't mean this to substitute for a more comprehensive study of Cerivastatin-induced myopathy, but I think it's worthwhile looking at what other drug myopathies do.

Mayer Dep. (Ex. A) at 200:14 - 201:5. Trained experts commonly extrapolate from existing data. *Joiner*, 522 U.S. at 146. "[I]t would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science." *Daubert*, 509 U.S. at 590.

Accordingly, Dr. Mayer has taken data from the scientific literature with respect to drug induced myopathies and other causes of muscle damages (i.e. astronauts) to infer further support for his conclusions that are supported by other literature. "Science, like

many other human endeavors, draws conclusions from circumstantial evidence when other, better forms of evidence is[sic] not available." *Globetti,* 111 F.Supp.2d at 1180.

4. Dr. Mayer's opinions about scarring and the rate at muscle recovery are also based in science.

Dr. Mayer also offered opinions as to the return of muscle strength. Defendants claim that the medical literature does not support his assertion that most people have a return of muscle strength of approximately 3% per week, which could be extrapolated to mean recovery in approximately 6 months, depending on the injury. Mayer Dep. (Ex. A) at 207:11-209:12. Defendants have obviously not read, or perhaps, more accurately, have ignored, the medical literature. As discussed above, the Phillips article from 2004 shows a number of individuals who suffer permanent muscle damage after statin use – including a subject who is still in severe weakness more than five years after stopping Baycol. *Phillips*, 2004. Further, the Hildebrand article shows that approximately 7% of people took up to 14 months to recover from myopathy. *Hansen*, 2005. These articles by no means contradict Dr. Mayer's opinions that by six months most patients have recovered – but not all.

Dr. Mayer also opined that there may be some fibroblasts that form as a result of statin induced myopathy. Dr. Mayer has clinical experience treating muscle disorders and as such, has specialized knowledge about muscle tissue and muscle physiology. In addition, Dr. Mayer is relying on Dr. Carlson.[1] The medical literature is full of articles that recognize the formation of scar tissue of damage to muscle tissue. As discussed

[1] See the PSC Response to Bayer and GSK's Motion to Exclude the Plaintiffs' Putative Expert Witness From Invoking the Testimony of Other Testifying Witnesses

previously, there is no basis to exclude testimony based on clinical experience and the medical literature.

iii. Baycol is not as safe as other statins.

The safety of Baycol, as compared to the other statins, is something Defendants seek to exclude entirely from all expert testimony. However, as Baycol was withdrawn from the market due to the increased reporting rate for adverse events, this is more than mere speculation on the part of Dr. Mayer and other experts as to the risks associated with it. "In science, as in life, where there is smoke, fire can be inferred, subject to debate and further testing." *Brasher,* 160 F.Supp.2d at 1296. Dr. Mayer testified similarly.

> "But we are talking about something that was a whole magnitude of order different and I think that's overwhelming evidence to anybody, including members of the jury I'm sure will agree with that. So, no, I'm not an expert on FDA policy, but I don't think you have to be to look at that data and say there's something desperately wrong with this drug."

Mayer Dep. (Ex. A) at 273: 3-10. Dr. Mayer is certainly able to testify as to the comparative safety of Baycol based on peer reviewed medical literature reporting analysis of adverse events associated with Baycol and the unique properties of Baycol.

1. Dr. Mayer is competent to rely on adverse event data.

Defendants seek to preclude the PSC experts from relying on adverse event data for their opinions which states that Baycol caused a greater degree of muscle problems.[2]

---

[2] Defendants make the same arguments they have made repeatedly throughout this Motion (and others). Please see the PSC response to Bayer and GSK's Motion to

In addition, Defendants themselves acknowledge there is an increased incidence rate of muscle injuries with Baycol. Defendants themselves warned doctors of the increased reporting rate when Baycol was withdrawn in their withdrawal letter. BAYAG00263761 (Ex. E). Bayer performed their internal analysis of the rates of adverse events they were receiving them and used them for their own internal analysis. Defendants even admitted at Dr. Mayer's deposition that "the reporting rates of adverse events for rhabdomyolysis was greater for Baycol" Mayer Dep. (Ex. A) 251: 13-17. Accordingly, there is no reason why the PSC experts can not rely on this data that Baycol was not as safe as other statins.

2. Dr. Mayer's opinion on other factors affecting the safety of Baycol are also valid and should be admitted.

During Dr. Mayer's deposition, Dr. Mayer testified that he believed the difference between Baycol and other statins were related to its chemical properties and metabolic profile. Defendants seek to characterize this opinion as "his safety opinions is not junk science. It is not science at all." Defs. Mem. at 19. Dr. Mayer relies on other experts for the basis of some of these opinions. Dr. Mayer testified:

> "So, you know, we've got a, there are a panel of experts here that cover a wide range of expertise and I think you will see a mosaic of evidence, overall. It's not all going to come from me or any one of our experts about how unsafe this drug is, but I think the overwhelming evidence is that it's a very unsafe drug."

Depo at 258: 4-10 (Ex. A). This is an apt picture. There are no concrete borders in science. The different subject areas overlap; some experts will know more than others on specific topic areas. At the end of the day, it is the cumulative effect of all experts'

---

Exclude Expert Testimony Based on Adverse Event Reports, incorporated by reference herein.

knowledge that completes the picture. A scientific expert may testify as to the biological plausibility of a particular hypothesis that a substance contributed to a particular injury. *See In re Ephedra*, 393 F.Supp.2d at 190. That is precisely what Dr. Mayer has done. "Although the gaps between such data and definite evidence of causality are real and subject to challenge before the jury, they are not so great as to require the opinion to be excluded from evidence. Inconclusive science is not the same as junk science." *Id.* at 194.

The nature of medicine and science is to consult between specialists in different areas or specialties. This is why medicine is organized into specialties and subspecialties, as no one doctor can be an expert in all areas. *Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996). *See also Medalen v. Tiger Drylac U.S.A., Inc.*, 269 F. Supp. 2d 1118, 1127-29 (D. Minn. 2003) (refusing to permit a toxicologist to opine on the etiology of basal cell carcinoma, noting that an expert in one subject may not be qualified to testify beyond that expertise). *See also Alexander* v. *Smith & Nephew, P.L.C.*, 98 F. Supp. 2d 1310, 1315 (N.D. Okla. 2000) ("blanket qualification for all physicians to testify as to anything medically-related would contravene the Court's gate-keeping responsibilities"). Physicians do "consults" all the time in the practice of medicine; it is a part of the professional rigor to do so. Accordingly, Dr. Mayer is doing what is customary for doctors to do – to look at other doctors and scientists of different specialties in order to gather information to make an informed opinion, diagnosis, or other treatment decision.

## IV. Conclusions

For the foregoing reasons, Bayer and GSK's motion to exclude Dr. Mayer's opinions and conclusions should be rejected, and his testimony admitted in its entirely.

Respectfully submitted,

Dated: June 23, 2006

ZIMMERMAN REED, P.L.L.P.

s/Stacy K. Hauer
Charles S. Zimmerman, #120054
Ronald S. Goldser, #35932
Robert R. Hopper, #208760
Stacy K. Hauer, #317093
651 Nicollet Mall, Suite 500
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844

LOCKRIDGE GRINDAL NAUEN, P.L.L.P.
Richard A. Lockridge, #64117
Robert K. Shelquist, #21310X
Yvonne M. Flaherty, #267600
100 Washington Avenue South, Ste. 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981

***Co-Lead Counsel for Plaintiffs***

***Plaintiffs' Steering Committee***

Don Barrett
Barrett Law Office, PA
404 Court Square North
P.O. Box 987
Lexington, MS 39095

Daniel E. Becnel
Law Offices of Daniel E. Becnel, Jr.
106 West Seventh St., P.O. Drawer H
Reserve, LA 70084

Turner W. Branch
Branch Law Firm
2025 Rio Grande Blvd. N.W.
Albuquerque, NM 87104

Elizabeth J. Cabraser
Lieff, Cabraser, Heimann & Bernstein, LLP
Embarcadero Center West
30th Floor, 275 Battery St.
San Francisco, CA 94111-3339

Stanley M. Chesley
Waite, Schneider, Bayless & Chesley Co., LPA
1513 Fourth and Vine Tower
One West Fourth Street
Cincinnati, OH 45202

John R. Climaco
Climaco, Lefkowitz, Peca, Wilcox & Garofoli Co., L.P.A.
1220 Huron Road, Suite 1000
Cleveland, Ohio 44115

James R. Dugan
Gauthier, Downing, LaBarre, Beiser & Dean
3500 North Hullen Street
Metairie, LA 70002

Frederic S. Fox
Kaplan Fox & Kilsheimer LLP
805 3rd Avenue, 22nd Floor
New York, NY 10022

Paul J. Geller
Cauley Geller Bowman & Coates, LLP
2255 Glades Road, Suite 421 Atrium
Boca Raton, FL 33431

Don Hildre
Dougherty, Hildre, Dudek & Haklar
2550 Fifth Ave., Suite 600
San Diego, CA 92103-5624

Will Kemp
Harrison, Kemp & Jones
3800 Howard Hughes Pkwy, 17th Floor
Las Vegas, NV 89109

Dianne M. Nast
Roda & Nast, P.C.
801 Estelle Drive
Lancaster, PA 17601

W. James Singleton
Singleton Law Firm
4050 Linwood Ave.
Shreveport, LA 71108

William M. Audet
Alexander, Hawes & Audet, LLP
300 Montgomery St.
Suite 400
San Francisco, CA 94104

Ted B. Lyon, Jr.
Teb B. Lyon & Associates, P.C.
Town East Tower, Suite 525
18061 LBJ Freeway
Mesquite, TX 75150

Dale I. Larson
Larson King
2800 World Trade Center
30 East Seventh Street
St. Paul, MN 55101

Mark Robinson
Robinson, Calcagnie & Robinson
620 Newport Center Dr., Seventh
Floor
Newport Beach, CA 92660

Ron Meshbesher
Meshbesher & Spence Ltd.
1616 Park Avenue South
Minneapolis, MN 55404