# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - -x

In re: :
:
BAYCOL PRODUCTS LITIGATION. : MDL No.
: 1431 (MJD/JGL)

- - - - - - - - - - - - - - - - - - - -x

Washington, D.C.
Thursday, January 29, 2004

Video Deposition of:

ROBERT SAMUEL MAYER, M.D.

a witness, called for examination by counsel for Baycol, pursuant to notice and agreement of counsel, beginning at approximately 9:13 a.m., at Williams & Connolly, 725 Twelfth Street, N.W., Suite 1000, before Monica A. Voorhees, RPR/CSR, Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

PAGE 26

26

articles I brought with versus.
Q. Do you have anywhere in your file or your notes that would identify what literature you obtained at the meeting in San Francisco?
A. I told you I didn't take any notes.
MR. HOPPER: Yeah, mischaracterization of the prior testimony.
BY MR. ISMAIL:
Q. Do you have anywhere in your file which would identify literature you obtained at the meeting in San Francisco --
MR. HOPPER: Objection.
BY MR. ISMAIL:
Q. -- as opposed to some other source?
MR. HOPPER: He didn't say he obtained any information at the meeting.
MR. ISMAIL: Mr. Hopper, if you would let your witness answer the question rather than trying to answer for him, this will go a lot smoother.
MR. HOPPER: And if you wouldn't try to put words in his mouth, this will go a lot smoother, as well.

PAGE 27

27

MR. ISMAIL: It is my job to put words in his mouth.
MR. HOPPER: No, it is not. It's your job to ask questions and he gets to answer.
MR. ISMAIL: No.
MR. HOPPER: And you're going to be on the record as counsel testifying if you put words in his mouth, and that I'm not going to let you do, so we are not off to a very good start at all if that's how you're going to proceed.
BY MR. ISMAIL:
Q. Dr. Mayer --
A. Yes.
Q. -- did you keep any of the literature that you got at the meeting?
A. Yes.
Q. Fine, so Mr. Hopper's objection notwithstanding, can you identify from your file what literature you got at the meeting as opposed to from another source?
A. I got numerous papers which were cited in the report and I cannot tell you at what point I

PAGE 28

28

obtained any individual paper on that list. I didn't keep notes as to what date I, you know, found the paper on the Internet or got it from a colleague or things like that.
I obtained literature as I was going along and it's a substantial amount of scientific literature that I reviewed for this case, so for me to identify an individual piece of literature and tell you what date I got it would be impossible.
Q. If you would take out your expert report, please.
A. Yes.
Q. There's an Exhibit B towards the back that's got a letter addressed to you from Mr. Black.
A. Yes.
Q. The date of that letter is November 21, 2003?
A. That's correct.
Q. Is Exhibit B your retention agreement --
A. Yes.
Q. -- with the plaintiffs?
A. Yes, it is.

PAGE 29

29

Q. I take it Mr. Black spoke to you orally before he sent you this letter?
A. Yes.
Q. Do you know how much sooner?
A. I believe it was a couple weeks sooner.
Q. How do you bill for your time, sir?
A. By the hour.
Q. Do you itemize what you've done?
MR. HOPPER: Objection, vague.
THE WITNESS: I bill on a monthly basis how many hours I spent that month.
BY MR. ISMAIL:
Q. Do you say, for example, I worked three hours on this day, two hours on this day?
A. Yes, I believe I did that.
Q. And do you say what you've done that would account for the time that you are billing?
A. No, I don't think it was that specific. It was not that specific.
Pardon me, I'm getting over a case of laryngitis, so if my voice drops off, please interrupt me and let me know.

PAGE 34

34

you show a draft of your expert report?
A. Besides counsel for plaintiffs, nobody.
And I might add I didn't even show a draft to counsel for plaintiffs, I showed a final paper that there was just very minor revisions in terms of paragraphing format. It wasn't anything where they, I submitted a draft to be edited by them, no.
Q. Dr. Mayer, do you, are you working on a supplemental expert report in this case?
A. Not at this point.
Q. Have you been asked to do so?
A. Not yet.
Q. Have you been told that's a possibility?
A. I've been told there's a possibility that I might be involved in rebuttals to defense experts, but I have not been assigned a specific report to write.
Q. Can you describe your practice for me, please?
A. Sure. I'm a specialist in physical medicine rehabilitation. I'm the director of inpatient rehabilitation at Johns Hopkins Hospital, and I'm on the clinical faculty at Johns Hopkins.

PAGE 35

35

Q. What kind of patients do you see?
A. I see a huge variety of patients. I see folks with a wide range of disabilities. Physical medicine rehabilitation isn't an organ-based specialty and what we treat is patients with, based on their impairments and assess how that impacts their lives and try to improve their quality of life.
Q. How do you get your patients?
MR. HOPPER: Objection, vague.
THE WITNESS: I mean it's a, mostly referred by other physicians, but many patients also find me because of my reputation and will come to the office and see me.
BY MR. ISMAIL:
Q. Do you ever prescribe statins?
A. Yes.
Q. Did you ever prescribe Baycol?
A. Not that I recall, no.
Q. What statin currently do you most often prescribe?
A. Most often, Lipitor, Atorvastatin, because that's in our hospital formulary.

PAGE 36

36

Q. Do you prescribe any other statins?
A. Simvastatin, Lescol, and on occasion miscellaneous other ones. If the patient has been on it before, I may refill their prescriptions.
Q. Have you ever treated a patient whom you have diagnosed having a statin-induced myopathy?
A. Yes.
Q. How many occasions?
A. I would say probably about a dozen occasions, three of which were very severe and rhabdomyolysis cases.
Q. Were any of these dozen or so patients whom you have treated for statin-induced myopathy taking Baycol?
A. I believe one or two may have been. It's been several years, so I don't recall in the less severe cases what statin they were on.
Q. The three --
A. The --
Q. I'm sorry, were you done?
A. Well the majority of the cases that I treated during the time frame that Baycol was on the

PAGE 37

37

market I was in Chicago and Baycol was not on the formulary, thankfully, in our health care system, so very few patients were on Baycol that I saw.
Q. The three cases of rhabdomyolysis that you treated, those were all caused by a statin other than Baycol?
A. That's correct.
Q. Were you the diagnosing physician for the statin-induced myopathy?
A. Yes.
Q. Did you oversee the care and rehabilitation of those rhabdomyolysis patients?
A. Yes.
Q. For the other nine or so patients that didn't have rhabdo.
A. Yes.
Q. What form of myopathy did you diagnose?
A. They had muscle pain, weakness.
Q. In each instance, did you discontinue the statin?
A. I believe so, yes.
Q. And obviously in the rhabdomyolysis cases

you discontinued the statin?
A. Yes.
Q. Did you attempt to restart the patients on a new statin?
A. Not in the rhabdomyolysis cases. In the more mild ones I believe I discussed with a treating cardiologist and I believe in a few of those the, a different statin was started subsequently and I don't remember specifics of that.
Q. For any of these 12 cases, did you determine whether or not the patients fully recovered?
A. Yes, the mild cases several of them did fully recover.
Q. In the nine or so milder cases of statin-induced myopathy that you have treated, how many would you say have fully recovered?
A. Let's be careful about putting words in my mouth in terms of exact numbers because I don't know that it was nine or a dozen.
Q. Okay, well --
A. But in those cases I would say that the majority of them recovered completely over a period of





months. Some of them I did not follow over a longer period of time to know how they did. I saw them, you know, as a consultation and did not have ongoing follow-up with them.
Q. In the small handful of rhabdomyolysis cases that you treated, did those patients fully recover?
A. They did not entirely recover. They had some ongoing weakness.
Q. Now you're not an expert in muscle diseases, correct?
A. Oh, I think I am an expert in muscle diseases, that's a huge part of my practice.
Q. As far as I can tell, you have one abstract written on the subject of muscle diseases?
A. I'm not a researcher as an academician. My primary role in academics is a clinician educator, so I have not published a lot of articles as, you know, some of the other witnesses in this case have.
That's not a major in my practice.
Q. There's a difference between physical medicine on the one hand and experts in muscle





diseases on the other, wouldn't you say?
A. No.
Q. You --
A. Most specialists in physical medicine have a very strong background in muscle diseases, an enormous part of our practice and so I think it's part of our exams, it's part of our training, so I think, yes, we are, in fact, probably more so than just about any medical specialty, we are involved in muscle disease.
Q. You have never written about rhabdomyolysis?
A. I have written about it. I -- well, a poster in a conference.
Q. By the way, did you bring that?
A. I did not bring the poster, no.
Q. Were you asked to bring it?
A. I was asked to pull the abstract on it yesterday and unfortunately I did not have time to do that, but I will be happy to get you the data at some later point.
Q. We would appreciate it. It's cited in your





list, but there's no way for us to get a hold of your abstract since it was never published.
A. Yeah, the title was published but the actual abstract was not. I'm aware of that.
Q. Other than your one unpublished abstract, have you ever written about rhabdomyolysis?
A. No.
Q. You've not done any primary research in rhabdomyolysis?
A. That's correct.
Q. Rhabdomyolysis can be caused by other factors other than statins, correct?
A. Certainly.
Q. Other than the three statin-induced cases that you've testified about --
A. Uh-huh.
Q. -- have you treated any other patients for rhabdomylysis?
A. A number of patients.
Q. Have any of those other rhabdomyolysis patients that you have treated in your opinion fully recovered?

A. Yes.
Q. What type of injury is that?
A. You could have damage to the mitochondria, the energy factories of the cell that could make the cell less effective in working and the cell might still be living, but it's not working as effectively.
Q. You indicated previously that -- do you want to take a break?
MR. HOPPER: Whenever it's, I'm not in any rush. Off the record.
MR. ISMAIL: Understood, let me just do a couple quick questions here.
MR. HOPPER: Not a problem.
BY MR. ISMAIL:
Q. Dr. Mayer, you indicated previously that a patient may have CK testing within the normal range, but if higher than a baseline, you may think that's an indication of a muscle problem?
A. I think it likely, yes.
Q. Would you agree with me that a patient's CK varies from day to day?
A. Yes.





Q. Exercise can affect your level of CK?
A. Yes.
Q. There are other processes in the body that can affect your level of CK?
A. Yes.
Q. Do physicians know all the reasons that why a patient's CK can vary from day to day?
A. Physicians don't know all the reasons for anything.
Q. Okay.
MR. ISMAIL: Why don't we take the afore-mentioned break.
THE WITNESS: Thank you.
(Recessed 10:41 a.m.)
(Reconvened 10:51 a.m.)
BY MR. ISMAIL:
Q. Dr. Mayer, prior to the break we were talking about a muscle injury from statins that does not cause death of the muscle cell.
A. Yes.
Q. What support do you have for the assertion that statins can cause a muscle injury that does not





result in death of the muscle cell?
MR. HOPPER: Objection, lack of foundation. Where does he opine that? I'm not saying he doesn't, but where and when?
MR. ISMAIL: 15 seconds ago.
MR. HOPPER: Okay, is it in the record?
MR. ISMAIL: Yes.
MR. HOPPER: Okay.
BY MR. ISMAIL:
Q. I believe that --
MR. HOPPER: Thank you.
THE WITNESS: Similar muscle damage found by Phillips was mitochondrial damage in living cells.
BY MR. ISMAIL:
Q. Other than Dr. Phillips' article, which we will get to, I promise, do you have any support for the assertion that statins can cause a muscle damage other than destruction of the muscle cell?
A. I think you might better ask that of some of our other, some of the other experts involved in this case who are cellular biologists, like Dr. Carlson could certainly give you better data than





I can on exactly which papers have shown that.
Q. Okay. You're not aware of any other support other than Dr. Phillips' article, correct?
A. I think that's the only one I could cite to you off the top of my head. I'm sure I could find you some articles about mitochondrial damage, but I can't tell you which articles specifically right at this moment.
Q. When you discuss Baycol-induced myopathy in your report, are you talking only about myopathy that results in muscle cell death?
A. That wasn't part of my operational definition so that --
Q. I'm sorry, was not?
A. That wasn't part of the operational definition. I mean if you look at the paper, we are defining things on an individual's level rather than on a cellular level that, you know, the operational definition I'm using for this is a set of symptoms and a set of objective findings. It's not necessarily what's going on at a cellular level.
Q. Would your definition of myopathy include

A. Yes, I did.
Q. -- editorial?
A. Yes.
Q. Did you disagree with the criticisms made in the editorial?
A. I think the basic gist of the criticisms in the editorial were that this was a small sample size, which I certainly agree with, and that further studies are needed.
Q. Well would you agree that Dr. Phillips' article presents a hypothesis of statin-associated myopathy with normal CK?
A. That's the title of the article.
Q. But it's a hypothesis that has not been proven, correct?
MR. HOPPER: Objection. Calls for a conclusion. He's already stated on testimony his opinion.
MR. ISMAIL: Mr. Hopper, you've stated your objection, such as it is.
BY MR. ISMAIL:
Q. Can you answer my question?





A. I think that --
MR. HOPPER: If you can.
THE WITNESS: -- that Dr. Phillips himself would say that further research is needed and that this was a, the, a preliminary finding that he wanted to report that needed further research.
So certainly that's true.
BY MR. ISMAIL:
Q. Well this is the way hypotheses are generated and then proved, you would report on a small sample size?
A. Uh-huh.
Q. Report on some findings you've found in a small number of patients and present a hypothesis for a disease or syndrome, whatever you want to call it, correct?
A. Yeah.
Q. And then you would prove that hypothesis using a larger study and better controls, et cetera?
A. I think one of the differences between medicine and law is lawyers view things as being proved or disproved and I can think of very few things





in medicine that are proven beyond any doubt to be true, so that virtually everything that we think about in medicine is a hypothesis that requires ongoing study.
So, there's different levels at which things have been shown to be true, but I don't think we have an absolute truth in medicine in that truth is always changing.
Q. Let's see if we can agree on this in our two fields.
A. Yes.
Q. Dr. Phillips in Exhibit 2 reports a hypothesis of statin-associated myopathy with normal CK based on a review of four patients?
A. Correct.
Q. And a four-patient study generally is considered not large enough to make conclusions about whether or not there's an injury present in a general population?
MR. HOPPER: Objection. That's vague. From an epidemiological standpoint or what?
BY MR. ISMAIL:





Q. Dr. Mayer?
A. Well I think that four patients is too small to make a statement about a broad epidemiologic population; however, this was a carefully controlled study that looked at these four patients and I think in these four patients he showed very convincing evidence that you could get muscle damage from a statin without elevated CK levels. I mean that clearly happened in these four cases.
How frequently that happens we can't say based on this article, so whether these are four patients out of the millions of patients that took statins or whether this represents 40 percent of the patients that took statins, I can't tell you based on this article. But clearly it happens.
Q. And the convincing evidence that you just referred to in Dr. Phillips' work is the, includes abnormal biopsies during statin use?
A. Yes.
Q. And discontinuation, sorry, it includes the absence of symptoms following the discontinuation of the statin, correct?

PAGE 114

114

A. The intent of the article was to challenge the patient with a statin, then discontinue the statin and substitute in a placebo, see if the patient felt any difference.

The patients were able to identify that yes, indeed, the statin was causing their muscle pain because they didn't have the muscle pain when they were taking the placebo.

He then went back and biopsied them after re-starting the statin and showed there was muscle damage. That's the whole point of the article.

The point of the article is not to talk about prognosis in these patients, he didn't follow them over a long period of time to tell you whether there was ongoing problems.

Q. But the diagnosis occurred because of the new onset of the pain and weakness, the absence of pain and weakness following discontinuation and the abnormal biopsy?

A. Yes.

Q. If you could turn to paragraph 13 of your report, sir. Are you there, sir?

PAGE 115

115

A. Yes.

Q. You write, many have relied heavily on laboratory data, in particular creatine kinase levels, in describing this damage; do you see that?

A. Yes.

Q. The damage referred to in that sentence is the statin-induced myopathy?

A. Yes.

Q. And you say many have relied heavily on CK testing.

A. Yes.

Q. Is the many that you're referring to there researchers, clinicians?

A. All of the above.

Q. All of the above. And you are critical of the many who rely heavily on CK testing?

A. I'm critical of using that as a sole value for defining myopathy, yes.

Q. Prior to Dr. Phillips' work, had anyone suggested doing something different besides CK testing to diagnose a myopathy?

A. Yes, I believe we've been through this

PAGE 116

116

several times in this deposition, about the ways we diagnose myopathies and myopathies are diagnosed by the four methods that I described in the report in detail.

Q. Prior to Dr. Phillips' work, do you know anyone who has suggested using biopsies to diagnose statin-induced myopathies?

A. Biopsies aren't routinely used in clinical practice to diagnose statin-induced myopathies because it's an extremely expensive and time-consuming way of evaluating the patients and requires some specialized laboratories, et cetera.

So the average practitioner in North Dakota is not going to order a muscle biopsy on a patient who has muscle pain from a statin.

Q. Prior to Dr. Phillips' work, you're not critical of any physician who drew a CK in lieu of a biopsy, right?

A. No, in fact, I've done that myself. I think creatine kinase certainly has a role in diagnosing the disease, but what I'm saying here is that if all you're looking at is one CK value and

PAGE 117

117

saying yeah, they have the disease or no, they don't, I think that's a misuse of the test.

Q. Okay.

A. And that's what this paragraph is referring to.

Q. Is it your testimony that a physician who relied only on a CK test prior to Dr. Phillips' work was misguided?

MR. HOPPER: Objection, mischaracterization of his prior testimony.

THE WITNESS: I think I'm not criticizing people to use a CK level to diagnose the syndrome.

I'm saying that drawing a CK level and using that as the only criteria by which you determine whether a patient has a disease or not is wrong.

So if a physician were to say to me that this patient had a lot of symptoms and at some point in time they drew a CK level that was normal and therefore they didn't have myopathy, I would say that physician was misled in terms of the sensitivity and specificity of that test.

BY MR. ISMAIL:

Q. Dr. Austin?
A. Might have been, but I'm not sure.
Q. Dr. Raskin?
A. Again, I'm not sure.
Q. Who told you about the conference call?
A. I believe Stacy Hauer did.
Q. Was there any correspondence setting up the call?
A. Just an E-mail.
Q. Did you retain that E-mail?
A. No.
Q. You deleted it?
A. Yeah.
Q. Was there an agenda for the call?
A. No.
Q. What was the purpose as you understood it?
A. The purpose was that the -- well, just overall we were getting prepared for upcoming depositions and making sure that we had the latest evidence and we exchanged ideas kind of before.
Q. So the list of plaintiff experts that you just testified to had a conference call on





January 26th to discuss the upcoming depositions; is that fair to say?
A. That's fair to say.
Q. That would include the opinions expressed in the Baycol litigation?
A. Yes.
Q. And you in the context of this phone conference learned of this rheumatology abstract?
A. Yes, Dr. Zizic said by the way there's this new abstract that came out in the last month or two and I think you all should read it.
Q. Prior to the conference on Monday, you weren't aware of the rheumatology abstract?
A. That's correct.
Q. And Dr. Zizic suggested it may be useful in regards to your opinions in this case?
A. Yes.
Q. Did he suggest any other literature that you review?
A. No, he did not.
Q. Did any of the other experts on the phone call suggest other literature that you should review?





A. I believe this was the only article that came out of that conference that we decided would be worthwhile looking at that we hadn't looked at before.
Q. Did any of the plaintiff lawyers suggest that the plaintiff experts look at any other materials?
A. No.
Q. How long did the conference last?
A. I don't remember exactly, an hour.
Q. Did you take any notes?
A. No.
Q. Did you write anything in the margin of your own report?
A. No. Frankly it was a boring conference and it was hard to hear people because there were 10 people on at once.
Q. The abstract then is on the third page of Exhibit 3; is that correct?
A. That's correct.
Q. And the abstract in question, is that from, is that on the top of the left column?
A. Yes.





Q. The natural course of statin-induced myopathy?
A. That's correct.
Q. How would you describe the nature of this study?
A. Well I think it was a very good retrospective study. They reviewed 217 patients who had taken statins, found that 30 of them had muscle complaints. Found that out of those, 7 had weakness, or actually 10 had weakness and they found that 15 of 20 had elevated CPK levels, one patient had a severe rhabdo.
They looked at the patients, one of the nice parts is they followed the patients for nine months and looked at how many had symptoms at each point in time, which is the first time I'm aware of anybody doing this with statins.
They found that at two months 36 percent had their symptoms completely resolved, so two-thirds of them did not. And then at nine months, about 25 percent of the patients had ongoing symptoms, so.
It's very clear from this article

substantiating what I had clinically stated in my opinion that it takes months to recover from this and it exactly mirrored what I had said back in November before I had ever read the article from my clinical impressions of these patients.
So I found that reassuring that the scientific evidence supported my clinical suspicions.
Q. You understand that this study in Exhibit 3 was done using ICD 9 codes from a claims database?
A. Yes.
Q. Do you find that to be a reliable method of epidemiological study?
A. What they did was they identified the 217 patients who were taking the statins that way. They then looked at their charts in much more detail so that I think that's a very acceptable way of determining things.
Q. The subset of patients who are identified by using ICD 9 codes for myositis and myopathy due to an adverse reaction to a cholesterol lowering agent, correct?
A. There's no ICD 9 code that I'm aware of





that's that specific. What they did is they took ICD 9 codes of patients who had muscle disease and then they looked at those 217 patients and found that of those, 30 of them had been taking statins.
Q. Do you find the use of ICD 9 codes to identify the cohort of patients to look at a reliable method of epidemiological research?
A. That's a very standard way of measuring it.
Q. So you find it reliable?
A. Yes.
Q. So you understand that there were 217 patients identified from this database, right?
A. Correct.
Q. And 30 of the patients presenting with these muscle type symptoms were taking a statin?
A. Correct.
Q. And 20 patients had CK tests of the 30 -- I'm sorry, yes, 20 had CK tests?
A. 20 had CK tests and 15 of those 20 had elevated CKs, yes.
Q. And then they also talk about how 26 of the 30 patients discontinued their statin use?





A. That's correct.
Q. And then there were the statistics on recovery here.
A. Correct.
Q. Do you know how the author of this abstract determined recovery in the patients in the cohort?
A. I think it was predominantly by symptoms, judging from what the study says, but I have not personally spoken to the authors to know that.
Q. Did they speak to the patients?
A. Like I said, I do not know the details of that. I would probably refer you to Dr. Zizic who I did, I do know spoke directly to the authors of the paper and knows a lot more about the details of this study.
Q. Then you say that at two months, 11 out of 30 patients had completely resolved their muscle complaints?
A. Yes.
Q. And then at nine months, 16 of 21 returned to baseline?
A. Correct.





Q. Do you know of the patients in this group, there were only 5 that were on a statin and had normal CK?
A. 5 of 30, yes.
Q. Okay. And this article doesn't tell you anything about the rate of recovery of patients who had normal CK?
MR. HOPPER: Objection. There's no question pending. It's counsel testifying.
BY MR. ISMAIL:
Q. Isn't that correct, sir?
A. Is what correct?
Q. Isn't it true that the abstract in Exhibit 3 doesn't tell you anything about the rate of recovery for patients with normal CK?
A. It doesn't specifically break down those 5, but I'm sure there's way of getting that data.
Q. It's not published, is it?
A. It's not published.
(Recessed 1:38 p.m.)
(Reconvened 1:39 p.m.)
BY MR. ISMAIL:

Q. But at a minimum Dr. Phillips does hypothesize some mitochondrial injury short of cell death?
A. Let me see exactly what he said about that in the article.
(Witness examining document)
Q. Well let me ask it --
A. I don't think he specifically said that.
Q. Well let me ask it this way, earlier when I asked you whether you thought statins can cause a muscle injury that is not characterized by muscle cell death, you mentioned that you thought statins can cause a mitochondrial damage that doesn't involve cell death; is that fair?
A. That's true.
Q. Okay. In paragraph 29 you direct us to other forms of myopathies?
A. Yes.
Q. And wanting to, and I believe as your, is it your opinion that these other forms of myopathy are informative of the prognosis for statin-induced myopathy?





A. I think these are models that help us understand things better, yes.
Q. Okay. You talk about a case series of AZT-induced myopathy?
A. Yes.
Q. And that in that research, 20 percent of patients had long-term muscle weakness?
A. Yes.
Q. Do you recall or what did you mean by long-term muscle weakness?
A. Was at least months, I don't have the article in front of me to recall the exact time frame they looked at patients.
Q. Now AZT is a drug that is given to patients with HIV?
A. That's correct.
Q. If 20 percent of the patients had long-term muscle weakness from this AZT study, that would mean that 80 percent did not have long-term muscle weakness following AZT-induced myopathy?
A. That is correct.
Q. And it's your opinion that this AZT data is





informative of statin myopathy, right?
A. I think it's a model to look at in terms of what the range of outcomes may be.
(Mayer Deposition Exhibit No. 4 was marked for identification.)
BY MR. ISMAIL:
Q. Dr. Mayer, is Exhibit 4 the AZT myopathy study to which you refer in your report?
A. I believe so. Let me check. Indeed it is, yes.
Q. Well, did you read this article before you submitted your report?
A. Of course.
Q. Are you aware of any medical literature suggesting a similarity between AZT myopathy and statin myopathy?
A. They are similar only in the sense that they are both drug induced. In terms of the exact mechanism of injury to muscles, I don't know that we know that they are similar, but they are similar in the sense that a patient was taking a pill every day and got muscle damage.





So in that sense, it's a model that's useful to look at. I don't mean this to substitute for a more comprehensive study of Cerivastatin-induced myopathy, but I think it's worthwhile looking at what other drug myopathies do.
Q. Different, there are lots of different myopathies, right?
A. Correct.
Q. And different myopathies may have different prognoses?
A. Absolutely.
Q. So you're not saying that AZT myopathy is the same thing as statin myopathy?
A. No, I'm not.
Q. And you're not saying that the prognosis from AZT myopathy will tell us what the prognosis is for statin myopathy?
A. No. What I am saying is that we know that drug-induced myopathies, in general, can produce long-term muscle weakness in some patients and that's merely the point I was making with this.
Q. Have you written anywhere before you did

Q. Now again, you're not suggesting that steroid-induced myopathy is the same thing as statin-induced myopathy, are you?
A. No.
Q. In fact, steroid myopathy affects a much, is a much different mechanism than the hypothesized mechanism for statin myopathy?
A. Actually I don't know that it was much different, but I don't mean to say that steroid myopathy is the same as statin myopathy.
I think that it's certainly a different model. What I'm pointing out here is that drug-induced myopathies causes long-lasting weakness.
Q. But not all drug-induced myopathies are the same thing, are they, Doctor?
A. That's correct.
Q. And prior to your expert report in this case, you've never seen anyone suggest in writing a similarity between steroid-induced myopathy and statin-induced myopathy, correct?
A. Not that I'm aware of.
Q. You then talk about astronauts returning



from space flight?
A. Yes.
Q. And the effect that zero gravity may have on astronauts' muscles, correct?
A. Correct.
Q. Prior to writing your expert report in this litigation, have you ever seen anyone suggest in writing a similarity between zero gravity muscle problems and statin-induced myopathy?
A. No.
Q. You write in, towards the end of the paragraph, muscle strength in the absence of fibrosis and scarring will generally recover approximately 3 percent per week in healthy young adults.
Do you see that, sir?
A. Yes.
Q. Can you tell me what support you're relying upon for the 3 percent recovery rate?
A. That's frequently cited in chapters regarding muscle damage in general that it recovers at about a 3 percent per week rate.
Q. Does this rate of recovery depend upon the



type of muscle injury that has occurred?
A. Sure.
Q. Does it depend upon the severity of the injury that it occurred?
A. Sure.
Q. Have you seen any scientific support for the notion that statin-induced myopathy recover, muscle strength recovers 3 percent per week?
A. Nothing specific to that, but I think that's consistent with the findings of the abstract we just discussed, is that those patients took months to recover.
Q. I don't understand this 3 percent, how it works.
Does that mean in 33 weeks you are fully recovered or is there some --
A. Well it's going to be a slope so that in 33 weeks, if you took a normal, healthy adult and you had a one-time muscle damage, which is another issue here, because we are not talking about one-time muscle damage, we are talking about drug myopathy. But you take a one-time drug muscle damage, let's say a



surgically-induced slicing of a muscle in surgery, that that muscle will recover at a rate about 3 percent per week, so that each week they will get 3 percent stronger and it's a cumulative affect. It's kind of like an interest rate that you get from the bank that compounds itself.
Q. I'm just trying to understand sort of the end game here of this 3 percent recovery rate.
Is it 33 weeks, is the math wrong, I mean is that --
A. At 33 weeks you would be mostly, most patients would be mostly recovered, yes.
Q. Okay. Now how is it if that's the rate of recovery that Dr. Phillips' patients had their muscle symptoms resolve upon discontinuation of the statin in the short time frame that he was studying his patients?
MR. HOPPER: Objection, vague and compound.
THE WITNESS: I don't think that he was, first of all, he didn't show resolution of the muscle damage, he showed resolution of the symptoms, but that was resolution of the symptoms while they were on the

A. Right. That's fair.
Q. And so you are not aware of any study demonstrating scarring resulting from a statin-associated myopathy?
A. I can't cite you that literature off the top of my head, I don't know. It doesn't mean the literature doesn't exist, it just means it's not at my fingertips.
Q. And you don't cite it in your report, do you?
A. I don't know that any of my citations directly get at that issue, but there might be citations from other citations.
Q. Are you aware of a single scientific study demonstrating that muscle injury from a statin can be permanent?
A. I can tell you from experience it certainly can be. You know, a patient that has severe rhabdo winds up a quadriplegic and has a partial recovery has permanent damage. They have contractures, which means their tendons are short, loss of range of motion, they have ongoing weakness and I've seen it myself





clinically.
Q. Are you aware of, other than your clinical experience, are you aware of any study demonstrating that muscle injury from a statin can be permanent?
A. I think the evidence from the studies, for example, from the American College of Rheumatology paper shows 25 percent of patients had ongoing problems at nine months, that's pretty close to permanent. I would doubt that many of those patients recovered full function, ultimately. That's nine months, that's a long time.
Q. Are you aware of any scientific study demonstrating that muscle injury in a patient with normal CK can persist, say, greater than six months after stopping a statin?
A. I'm not aware of any specific study that shows that. That doesn't mean it might not be in individual cases.
Q. I think you agreed earlier that the extent of the muscle damage influences the rate of recovery?
A. Yes.
Q. And that patients may recover slower from a





bout of rhabdo than they might from a bout of mild CK elevation?
A. I wouldn't draw the distinction based on lab value, but certainly patients with mild muscle damage would probably have a quicker or more complete recovery than those with severe.
Q. Would you agree that a patient with normal CK has mild muscle damage?
A. You know, we've been down this route I don't know how many times today.
It, you can't take the lab value and, out of context of the rest of the picture.
Q. You used the phrase mild muscle damage.
How do you discern what is mild muscle damage as opposed to another form of muscle damage?
A. By examining the patient and looking at a complete picture of the patient and their lab values and their examination and not one particular lab test.
So certainly there are patients who have mild symptoms and mild damage on any one of these four tests that we talked about who have complete recovery within days or weeks of stopping their statin. I, I





have no doubt there's a lot of patients like that, that may have some muscle aches, they stop their statin, their muscle aches go away. There's no question there's patients like that, but I also think there's patients that doesn't happen to.
Q. Would you agree that a patient with normal CK has a milder form of muscle damage than a patient with very high CK?
A. No, I would not. I mean I gave you the example with muscular dystrophy, I think that's a useful example, because if a patient has lost a lot of muscle mass by the point that CK is drawn, it may well be within normal range because there's not active damage going on at that point; but that doesn't mean a month ago they didn't lose half their muscle mass.
Q. In a case of muscular dystrophy in which the patient has normal CK, there would be a clinical course of severe functional limitations in that patient, right?
A. Correct.
Q. And there would be a clinical course of dramatically elevated CK in the patient, correct?

Q. Dr. Mayer, are you going to be offering any opinions at trial suggesting that Baycol caused muscle problems at a greater rate than other statins?
A. Yes, I will, but I will base that on data and cite it specifically --
Q. That's fine.
A. -- that was gathered by other people. I'm not saying here that I'm an expert in gathering that data.
Q. That's fine.
But I understand what you intend to testify to at trial. I'm entitled to explore the support and qualifications --
A. I mean we can go that route, why don't we go ahead and talk about it and I'll tell you what I know and what I don't know. Fair enough.
(Recessed 3:19 p.m.)
(Reconvened 3:21 p.m.)
BY MR. ISMAIL:
Q. Doctor, you have indicated that you intend to testify at trial that Baycol caused muscle problems at a greater rate than other statins; is that correct?





A. I'll testify at trial that the adverse event reports occurred at a much greater frequency than with other statins, yes.
Q. I apologize, but I have to be specific here because your answer was a little different than my question.
My question was whether you intend to testify that Baycol caused muscle problems at a greater rate than other statins.
A. And I was specifying what I meant by rate and that will be the rate of adverse event reports to the FDA and to the European agency.
Q. Okay. We can agree that the reporting rates of adverse events for rhabdomyolysis was greater for Baycol in some cases than other statins, right?
A. Right, it goes much greater than some cases, we are talking 60 times greater, so, I mean.
Q. You have seen different, have you seen different analyses that look at dose or monotherapy versus concomitant use?
A. Yes.
Q. Are you going to be offering opinions at





trial that the greater reporting rate for Baycol suggests that Baycol was a more dangerous drug than other statins?
A. Yes.
Q. Okay. Are you aware, please tell me the full support for your opinion that Baycol is a more dangerous drug than other statins?
A. I go over a number of issues in my report. The adverse event reports are one big issue that shows that clearly a whole magnitude of order greater reports occurred than other statins. I think that's very dramatic evidence.
I think other dramatic evidence is the fact that the whole way the drug is metabolized is different than other statins, the bio-availability is different and, hence, the interactions with other medications may be substantially different.
And clearly I think the big thing that speaks for itself is it's the only drug that was pulled off the market, so clearly somebody thought it was unsafe to be on the market. It was pulled off the market not only in the U.S. but in Europe, as well.





So I think that speaks for itself.
Q. Okay. To support your opinion that Baycol is, was more dangerous than other statins, you have cited the adverse event reporting rate, the metabolic profile of the various statins and the fact that Baycol alone was withdrawn from the market; is that correct?
A. Yes.
Q. Is there any other support you have for the opinion that Baycol was a more dangerous drug than others in the class?
MR. HOPPER: Excuse me, counsel, you missed one. You didn't state it completely. You missed bio-availability. I can't let the record be incomplete.
MR. ISMAIL: That's what I meant by metabolic profile.
MR. HOPPER: Well he separated the two, those are two different things.
BY MR. ISMAIL:
Q. Well let's make sure we have it complete, sir.

increases the likelihood of any drug interaction?
A. I, I will not be testifying as to the specifics of that. I will let our pharmacologists testify to the specifics of that. So, you know, we've got a, there are a panel of experts here that cover a wide range of expertise and I think you will see a mosaic of evidence, overall. It's not all going to come from me or any one of our experts about how unsafe this drug is, but I think the overwhelming evidence is that it's a very unsafe drug.
Q. Can you answer the question I asked?
A. The answer to the question that you asked is, no, I cannot specifically cite the study because it's not my area of expertise.
Q. Okay. Now you pointed me to, for example, bio-availability as support for the testimony that Baycol was more dangerous, correct?
A. Yes.
Q. Yet you're not aware of any study making that connection, correct?
A. I said I couldn't cite a specific study making that connection because that's not my area of



expertise and not the area that I focused my review on in this report.
Q. How did you come to the conclusion, sir, that Baycol's bio-availability impacts its safety?
A. From talking to other experts of ours, specifically Dr. Corbett and Dr. Farquar, and reading their reports.
Q. So would --
A. And I think they have much more specific information on that and they are better people to ask about that.
MR. HOPPER: Which is why I suggested that you do and then skip this.
MR. ISMAIL: Well then just tell me that he's not going to get up and say because of what Farquar says, I think it's more dangerous. Let Farquar speak for himself.
You're telling me he's going to come to trial and say because of what the other experts are opining about, I think it's a more dangerous drug.
MR. HOPPER: He gets to do that.
MR. ISMAIL: Okay, then I get to ask him



questions about it.
MR. HOPPER: You can --
MR. ISMAIL: All right.
MR. HOPPER: -- but you're getting an answer that you already know what the answer is.
BY MR. ISMAIL:
Q. By the way, did you see any other expert report, draft or final, before you submitted your expert report in this case?
A. Yes.
Q. Whose?
A. I saw Dr. Farquar's, Dr. Corbett's, Dr. Richman's. I believe those were the ones, there may have been others.
Q. Did you rely upon any of the statements made in Dr. Farquar's report when completing your expert report in this case?
A. In part, yes.
Q. Did you rely on any statements made in Dr. Corbett's expert report when doing your expert report in this case?
A. Yes.



Q. Did you rely upon any statements made in Dr. Richman's expert report when you did the report in this case?
A. Yes.
Q. Why did you not identify those reports in your list of materials reviewed?
MR. HOPPER: I believe he did.
THE WITNESS: I don't know that I did, but I frankly wasn't aware that I needed to because they were expert reports and not independent scientific literature.
If I made a mistake in doing that, that's somehow against the Court's rules, I apologize and certainly I can disclose that right now. I've got nothing to hide by that fact, I mean.
BY MR. ISMAIL:
Q. Sorry, were you done?
A. Go ahead.
Q. Can you recall what statements made by Dr. Richman you relied upon in making your opinions in this case?
A. I can't recall specifically. I mean I read

SHEET 35 PAGE 270

270

that is, as part of your work in this case, have you investigated the potential biases that may impact statin adverse event reporting?

A. I'm not sure how you would define investigate. I, I am aware of what those biases may be or some of those biases may be, but I haven't done any formal investigating into them. That's not my role in this case.

Q. Have you made any effort to assess the relative reporting rate of spontaneous adverse events with statins by controlling for biases that are part of the data?

A. No.

Q. Have you in any context for any drug made any investigation into biases that affect adverse event reporting?

A. No.

Q. Have you done a literature review either in this case or for any other exercise to determine what others have said about biases in spontaneous adverse event reporting?

A. I have read commentaries and editorials,

PAGE 271

271

et cetera, about Cerivastatin, but in terms of doing a formal review, no.

Q. Do you know what the FDA has said about the reliability of using spontaneous adverse event data to compare the safety of drugs in a class?

A. I am aware the FDA actually forbids it to be used for competitive advantage from a legal standpoint.

Q. Do you know of, when you say you're aware of that, in what context have you become aware of that FDA prohibition?

A. I've been aware of that for a while in the context of, for example, pharmaceutical representatives when they see you can't tell you, you know, their reporting rates versus other peoples' reporting rates in order to use that for a competitive advantage. That's an illegal activity.

Q. What is your understanding as to the reason why companies cannot use spontaneous adverse event data to compare themselves to other drugs in the class?

A. I think the FDA does not want to be used as

PAGE 272

272

an advertising agency.

Q. Are you aware of any guidelines the FDA has put out regarding whether spontaneous adverse event data can be used to show the relative safety profile of drugs?

A. I'm not aware of that.

Q. Prior to your expert report in this case, have you ever written a safety assessment of a drug based on its spontaneous adverse event record?

MR. HOPPER: Objection, irrelevant.

THE WITNESS: No.

BY MR. ISMAIL:

Q. Is it fair to say, sir, that your interpretation that the relative reporting rate for Baycol says something about its safety profile is based in part upon what you've learned from Dr. Farquar, for example?

A. Yes, it is based in part on that. In part it's based on plain common sense.

I mean we are not talking small differences here. I mean if we were talking a reporting rate that was .1 percent different between the different

PAGE 273

273

statins, I would say all these factors may be important.

But we are talking about something that was a whole magnitude of order different and I think that's overwhelming evidence to anybody, including members of the jury I'm sure will agree with that.

So, no, I'm not an expert on FDA policy, but I don't think you have to be to look at that data and say there's something desperately wrong with this drug.

Q. Have you ever seen any epidemiological data comparing the safety profile of Baycol versus other drugs?

A. I've seen the FDA reports. I'm aware, I haven't actually read the study of the PacifiCare HMO study that was done.

Q. Now the FDA reports are not epidemiological data, correct?

A. They are a form of epidemiologic data. I think to characterize them otherwise is not -- I mean epidemiology is a broad study of populations and this is a population. Is it a perfect way of studying