UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

In re Baycol Products Litigation

MDL No. 1431 (MJD/JGL)

This document relates to:
All cases

**PLAINTIFFS' STEERING COMMITTEE'S RESPONSE TO BAYER AND GSK'S MOTION TO EXCLUDE THE TESTIMONY OF CHARLES E. BOULT, M.D.**

The Baycol MDL Plaintiffs' Steering Committee ("PSC"), by and through the undersigned counsel, responds as follows to Defendant Bayer and GSK (collectively, "Defendants") Motion to Exclude the Testimony of Charles E. Boult, M.D., and the memorandum in support thereof.

I. Introduction

Dr. Charles Boult is a geriatrician practicing at Johns Hopkins Hospital. Dr. Boult is unquestionably qualified to offer an expert opinion in this litigation. The majority of claimants in the MDL are elderly individuals, as the majority of patients prescribed statins are elderly. Dr. Boult is a physician who devotes his practice to treating the geriatric population. He is familiar with the care and treatment of these individuals, including the susceptibility of the elderly to suffer from adverse effects, like those caused by Baycol. Dr. Boult is further qualified to opine as to the diagnosis of muscle pain and

myopathy in the elderly patient population and the long-term effects of muscle pain on patients, as myopathy and muscle pain are frequently seen in his daily patient care.

ARGUMENT

II. *Daubert* standards for admissibility of scientific evidence.

The Supreme Court, in *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993), set forth the standard for admission of expert testimony, holding that Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise.

F.R.E 702. Daubert explained that Rule 702 must be read in the context of the "liberal thrust" of the Federal Rules of Evidence and must be interpreted consistently with the "general approach of relaxing the traditional barriers to 'opinion' testimony." *Daubert*, 509 U.S. at 588.

Daubert established two prongs: relevancy and reliability. Thus, the Court cautioned that even under these liberal requirements, judges must ensure that scientific evidence is not only relevant, but reliable. *Id.* The assessment of reliability involves a determination of whether the methodology or reasoning is valid and whether the reasoning or methodology can be applied to the facts of the case. *Daubert,* 509 U.S. at 592-593.

Courts were given the role of a "gatekeeper" in this analysis. *Id.* The objective is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152; 119 S.Ct. 1167; 143 L.Ed.2d 238 (1999). To be admissible, the opinion must be reasonably based on good science; the analogies, inferences and extrapolations connecting the science to the testimony must be of the kind a reasonable scientist or physician would make outside the context of litigation. *In re Ephedra Prods. Liab. Litig.*, 393 F. Supp. 2d 181, 188-189 (S.D.N.Y. 2005).

"As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Larson v. Kempker,* 414 F.3d 936, 941 (8th Cir.2005) (citation omitted). While the district court has broad discretion to admit or exclude expert testimony, "doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *Clark v. Heidrick, M.D.,* 150 F.3d 912, 915 (8th Cir.1998) (citation omitted). The inquiry is a flexible one. *Bonner v. ISP Technologies, Inc.,* 259 F.3d 924, 929 (8th Cir. 2001). Thus, if the court determines that the evidence supporting the expert's opinion is reliable, the opinion should be allowed.

III. Dr. Boult's opinions on Baycol are scientifically valid.

Dr. Boult has offered an opinion that Baycol causes a persistent myopathy in a population of patients. See Boult Report (Ex. A), ¶23. Defendants are asking this Court

to exclude this opinion as unsupported by the medical literature, which, as demonstrated below, is simply not true. Dr. Boult has further offered an opinion on some simple guidelines as to the diagnosis of muscle injuries caused by Baycol. While Defendants call this approach subjective and unsupported by the medical literature, this is clearly not the case. Finally, Dr. Boult was asked about his opinions on a number of topics at his deposition, including labeling; Defendants now claim he is not qualified to opine on these topics. However, Defendants opened the door and Dr. Boult was merely answering the questions he was asked.

a. Dr. Boult is qualified to offer opinions on general causation.

Defendants begin their attack on Dr. Boult by claiming he has not conducted studies on Baycol and therefore his review of the scientific and medical literature for his report is somehow inadequate. While Dr. Boult has not performed any clinical studies on Baycol, there is no requirement that an expert perform studies in order to offer an opinion about a particular drug or chemical. Such a rigid standard would "be at odds with the Rules' liberal thrust and their general approach of relaxing the traditional barriers to 'opinion' testimony." *Daubert*, 509 U.S. at 592. An expert witness is allowed to offer opinions not based on firsthand knowledge or experimentation. *Id.* It is common in the MDL setting to allow testimony of experts who base their knowledge, opinion and testimony on clinical experience and training, along with a review of documents and literature. *See In re Ephedra*, 289 F.Supp.2d at 194; *see also In re Phenylpropanolamine (PPA) Prod. Liab. Litig.*, 393 F.Supp.2d 1230, 1242, n.12 (W.D. Wa. 2003). In addition, while Dr. Boult may not have performed specific tests or clinical trials, he has treated

patients who suffered muscle pain on statins. Deposition of Charles E. Boult (Ex. B) at 93: 1-6. This too is a valid qualification for an expert. *Smith v. Wyeth-Ayerst Lab. Co.*, 278 F.Supp.2d 684, 702 (W.D.N.C. 2003) (finding a physician who has diagnosed and treated pulmonary hypertension and PPH qualified to offer an opinion on causation with regard to diet drugs).

The Federal Judicial Centers' *Reference Guide on Scientific Evidence* notes that a review of medical literature is the well-accepted practice of an expert on generic causation. Henefin, M.S., et al., *Reference Guide on Medical Testimony* in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE. 439, 444 (Fed.Jud.Ctr., 2d ed. 2000). "General causation is established by demonstrating, often through a review of scientific and medical literature, that exposure to a substance can cause a particular disease.". *Id.* "To determine general causation, the expert must review the pertinent literature, as familiarity with the literature is key to expert opinion." *Id.* at 452.

Finally, Dr. Boult extrapolated from peer-reviewed, published literature and his clinical experience to form his opinions. Extrapolation from the literature and a clinician's experience is also extremely well-founded. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 , 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). "Trained experts commonly extrapolate from existing data. *Id.* Inference and extrapolation can be sufficiently reliable steps to warrant admissibility so long as the gaps between steps are not too great. *Joiner*, 522 U.S. at 146. Dr. Boult has based his opinions for general causation on medical and scientific literature, epidemiological data, toxicological data, case reports and series and clinical experience; the same factors enumerated in the *Reference Guide*

*on Medical Testimony*. REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, at 469; *see also In re Ephedra*, 289 F.Supp.2d at 194; *In re PPA*, 393 F.Supp.2d at 1242, n.12. As such, Dr. Boult's opinions are sound, based on valid scientific methodology.

b. Baycol can cause a persistent myopathy.

Defendants further seek to exclude Dr. Boult's testimony that Baycol can induce a persistent myopathy in some patients.

> "The prognosis for moderate-to-severe statin-induced myopathy is variable. Articles by scientists in four countries have described patients with statin-induced myopathy in whom symptoms (myalgia and/or weakness) or muscle biopsy abnormalities have persisted for months after the discontinuation of statins, including cerivastatin. Three lines of evidence suggest that the prognosis for recovery from the pain and weakness of this myopathy ranges from good to poor among people who have taken these drugs....I believe with a reasonable degree of medical certainty that people in whom muscle pain or weakness began on cerivastatin and persisted after stopping it suffer from a moderate-to-severe cerivastatin-induced myopathy."

See ¶25-6, Boult Report (Ex. A). Indeed, Dr. Boult recognizes that in many patients Baycol-induced myopathy resolves within a few weeks of stopping the offending agent. However, this is certainly not *always* the case; just as Dr. Boult further testified that not every person who takes Baycol suffers from myopathy. Boult Dep. (Ex. B) at 353:20-354:2. Unfortunately, just as some people do recover quickly, there are others who are not so fortunate. In some patients, the effects of Baycol-induced myopathy can last months. This testimony supported by published, peer-reviewed medical literature.

i. The England Report recognizes that not all patients recover from statin-induced myopathy.

Defendants claim that the England report relied upon by Dr. Boult does not support his opinion. England J, *et al.,* "Mitochondrial myopathy developing on treatment with HMG CoA reductase inhibitors-simvastatin and pravastatin [letter]," *Aust. NZ J. Med.* 1995; 25: 374-375 (Ex. C to Defs. Mem.). Dr. England's work was published in 1995, long before Baycol was on the market. This work was a study limited to only 15 patients. *Id.* Indeed, of these 15 patients, symptoms resolved upon discontinuation of the drug. *Id.* However, Dr. England in no way indicates that all patients recover upon discontinuation of a drug. In fact, he specifically states "[m]ost patients recover clinically after stopping the drug." *Id.* So, as early as 1995 it was reported that clinicians believed that not all patients recovered completely from statin-induced myopathy.

ii. The Phillips report and subsequent papers demonstrate persistence up to five years after Baycol.

Defendants next wage their attack on the Phillips report which reported 4 patients with statin-induced myopathy who demonstrated no elevation in CK levels. Phillips PS, *et al.,* "Statin-associated myopathy with normal creatine kinase levels," *Annals Internal Med.* 2002; 137(7):581-586 at 583, (Ex. D to Defs. Mem.). This Brief Communication was published in the *Annals of Internal Medicine*, one of the nation's premier medical journals. The aim of this study was to identify patients with muscle pain that resolved upon discontinuation of statin therapy. "Patients who had muscle symptoms during statin therapy that resolved when they were not on statins for two weeks were recruited…" *Id.* at 581. This study would not have been possible using patients who continued to have muscle pain and weakness after cessation of statin therapy. Defendants and Dr. Boult

agreed that this was a primary feature of this particular study. Boult Dep. (Ex. B) at 201:3-12. The fact that this study focused on patients without persistent problems in no way contradicts Dr. Boult's opinion that muscle injuries from Baycol persist. Moreover, Dr. Phillips has recently published more work on this subject which demonstrates his opinion and research are, in fact, to the contrary and that statin induced myopathy can persist.

In 2004, Dr. Phillips published an article in the journal *Atherosclerosis* comparing patients post rhabdomyolysis or myositis with controls for some physiologic parameters. Phillips, P.S., *et al.*, "Statin myotoxicity is associated with changes in the cardiopulmonary function." *Atherosclerosis.* 2004; 177:183-188 (Ex. E). Notable for us, Dr. Phillips reports that 7 of the 11 post-myositis patients remained symptomatic 3-62 months after the acute event. *Id.* at 185 Specifically, Patient 2 had taken cerivastatin and was still experiencing severe weakness *62 months* (more than 5 years) after the event. *Id.* All of the subjects in this report were tested while not taking statins. "Abnormal aerobic function correlating with disability in these subjects after statin induced muscle toxicity is consistent with previous work suggesting that two thirds of these subjects remain chronically symptomatic subsequent to their index event." *Id.* at 187.

Finally, Dr. Phillips recently published in the *American Journal of Medicine*. Antons, K.A., *et al.*, "Clinical perspectives of statin-induced rhabdomyolysis. Am. J. Med. 2006; 119: 400-409 (Ex. F). This article focuses on statin-induced rhabdomyolysis, but references several times as to persistent symptoms in some patients following stain therapy. *Id.* Dr. Phillips has published subsequent papers to reaffirm his research

demonstrating persistent myopathy. These, along with others, support Dr. Boult's testimony that there is a population of people who suffer from persistent myopathy after discontinuation of Baycol.

iii. Hildebrand abstract and article show persistent myopathy of over a year.

Defendants next turn to an abstract relied upon by Dr. Boult prepared by Dr. Julie Hildebrand. During Dr. Boult's deposition, an abstract by Hildebrand was marked as an Exhibit; this work has since been published. Hansen, K.E., *et al.*, "Outcomes in 45 patients with statin-associated myopathy." *Archives Internal Med.* 2005; 165: 2671-2676. (Ex. C). A retrospective study was performed on patients who suffered from statin induced myopathy. Two important findings arise from this article to support Dr. Boult's testimony. First, patients with clinically significant myopathy were older than those without the degree of myositis demonstrating that elderly patients are more susceptible to muscle damage. *Id.* at 2673. More importantly, of the 44 patients described in the article, "57% of the patients reported resolution of the symptoms by one month, 34% by 6 months, and 7% by 14 months." *Id.* at 2674. There is nothing in this report to contradict Dr. Boult's opinion that myopathy induced by Baycol can persist after cessation of the drug; it clearly reports that myopathy persists for more than six months in at least 7% of the patients.

iv. The Argov article reports persistent myopathies.

Finally, the Argov article, entitled Drug-induced Myopathies was published in 2000. Argov Z., "Drug-induced myopathies," *Current Opinion in Neurology.*

2000;13:541-545 (Ex. F to Defs. Mem.) "Withdrawal of the drug usually leads to full recovery. However, I have seen several patients in whom recovery was very slow and incomplete, and who continued to complain of muscle aches long after the drug was stopped. This clinical experience has been reported to me by other neuromuscular experts also, but has not been formally reported." *Id.* at 542. Argov also states "The fact that patients who had rhabdomyolysis sustain high serum CK after the episode is not proof that it was a risk factor to begin with, because it may represent a sustained, subclinical, drug-induced muscle injury." *Id.* As Defendants state, Dr. Argov notes that there has not been a formal study of this problem conducted. This is not fatal to his article. Courts have recognized that there is not always a study or research directly on point to support an opinion. The MANUAL FOR COMPLEX LITIGATION – FOURTH states: "in other cases there may be a dearth of scientific evidence as to the existence of a causal relationship between exposure to a chemical, product or contaminant and adverse health effects, because the relationship has not been sufficiently tested or because the substance is new." MANUAL FOR COMPLEX LITIGATION – FOURTH, §23.3 (Thomson 2004). In particular, the Court in *Kumho* notes that there may be cases such as here where no study has been conducted. *Kumho*, 526 U.S. at 151. This statement by the author in no way indicates that his article is unreliable; particularly here, where literature has been published in the last six years that repeatedly confirms the causal link between statins and persistent myopathy.

v. Recent literature also supports Dr. Boult's opinion as to persistent Baycol-induced myopathy.

As medicine is always evolving, and clinical research and publication takes significant time, there are recent published, peer-reviewed articles that have appeared in the scientific literature to support Dr. Boult's opinions. For instance, the two Phillips articles, discussed *supra*, support Dr. Boult's opinions. These are not the only articles that support Dr. Boult's opinions.

Another recent publication confirms patients suffer a persistent statin-induced myopathy. Dobkin, B.H. "Underappreciated statin-induced myopathic weakness causes disability." *Neurorehabilitation and Neural Repair* 2005; 19: 259-263 (Ex. G). The author reports patients referred to an outpatient neurorehabilitation clinic over the course of one year. Eighteen patients presented with new difficulty walking by 3 to 12 months after starting one of three statins. *Id.* They reported no myalgias, exercise-induced aches, or weakness. *Id.* Examination revealed weakness of 4/5. *Id.* Laboratory tests did not reveal myositis or other causes for the weakness. *Id.* No improvement was found six weeks after beginning treatment. *Id.* Statins were stopped. By three months after statin was stopped, all 18 recovered to 5/5 proximal strength. *Id.* The author concludes that a statin induced myopathy may go unrecognized by clinicians who do not test muscle strength. *Id.* at 261.

Dr. Boult's opinion is thoroughly supported by the scientific and medical literature; it will continue to be as more publications are accepted in this field. Further, this opinion can be inferred from the medical literature as well. As Dr. Boult testified at his deposition, in some instances he has taken the existing medical literature and extrapolated to reach his conclusion.

> Q. Doctor, show me your evidence that you can have in the absence of CK elevations persistent pain or weakness of proximal muscles severe enough to cause functional, significant functional limitations after the use of a statin is discontinued?
>
> A. So what you're calling for is high level proof in a scientific sense that has not been collected yet in the way that you're calling for it. What we have to deal with in reality in taking care of our patients is about three or four different lines of evidence that are not what you're describing. I can design a study that would give you the answers you're looking for, but no one has done that study yet. So what we are left with is, as we often are in the emergence of a relatively newly-recognized condition, is we have incomplete data. We have data that show on the one hand that people can clearly have cell damage, muscle cell damage from statins with normal CKs. We know that. We also know that people who have the clear temporal relationship between starting statins and getting the symptoms that you just described, we know that those people, 25 percent of them don't have elevated CKs and we know that 25 percent of them don't recover within nine months. These are, these are very suggestive evidence and then we also know from our experience with other enzymes and even other CK enzymes that they are very transient and it's not uncommon at all to miss a temporary rise in the level of CK.

Boult Dep. (Ex. B) at 222: 21 - 224: 6. As described above, there is significant support in case law that experts can extrapolate from existing data. See *Joiner*, 522 U.S. at 146. Therefore, Dr. Boult has taken the existing data and formed his own opinions as to the injuries caused by Baycol and the consequences of these injuries.

c. Dr. Boult's operation definition of myopathy is sound science.

Defendants next object to Dr. Boult's opinion that moderate-to-severe cerivastatin-induced myopathy cases be characterized by three clinical criteria: 1) pain or weakness of proximal muscles severe enough to cause significant functional limitation; 2) symptoms that began after the statin was ingested; and 3) symptoms that either diminished or persisted (i.e. did not increase) after use of the statin was discontinued. Boult Report (Ex.

A), ¶23. The practice of establishing guidelines for practitioners is common place in all fields of medicine. For example, relevant to this litigation, the National Cholesterol Education Program ("NCEP") has established guidelines for the treatment of high cholesterol. "Executive Summary of the Third Report of the National Cholesterol Education Program (NCEP) Expert Panel on Detection, Evaluation, and Treatment of High Blood Cholesterol in Adults (Adult Treatment Panel III)." *J Am. Med. Assn.* 2001; 285: 2486-97 (Ex. H). Further, the Phillips article published in 2006 suggests treatment and evaluation guidelines following statin-induced rhabdomyolysis. *Phillips*, 2006. Therefore, testifying as to an operational definition of myopathy is within the standards and common practice of the field.

Moreover, there is support in the medical literature for each of the criteria Dr. Boult sets forth. For example, it is recognized that statin-induced myopathies cause significant functional limitations. *See Dobkin* at 260. A temporal relation with Baycol is also a well-recognized requirement. "A strong temporal connection is powerful evidence of causation." *Bonner*, 259 F.3d at 931. Finally, that the symptoms either got better or persisted, but did not increase. As discussed previously in section III(b) above, this is well documented in the medical literature.

Dr. Boult's opinions and testimony are being offered as to general causation for Baycol-induced injuries. These criteria are not being used to diagnose individual plaintiffs or perform a differential diagnosis. Defendants overstate Dr. Boult's opinion and seek to draw attention to a non-issue. Dr. Boult is by no means advocating exclusion of a differential diagnosis from a case-specific opinion; certainly individual patient

information will need to be evaluated. "Many federal cases state that a plaintiff, in order to recover in a "toxic tort" case, must prove both general and specific causation." *In re Ephedra*, 393 F.Supp.2d at 186. (citations omitted). Every plaintiff in this litigation will need a case specific expert report, as required by existing Pre-Trial Orders; this presumably includes a differential diagnosis.[1]

d. Dr. Boult's remaining opinions are scientifically valid.

Defendants' final position is that Dr. Boult has testified outside the scope of his expertise. During Dr. Boult's deposition, attorneys for Bayer and GSK had the opportunity to ask Dr. Boult a variety of questions on a variety of subject matters – to which Dr. Boult testified to the best of his ability. Defendants now claim that Dr. Boult has attempted to testify on matters not contained in his report and areas that he is not qualified to testify.

i. The comparative risk of Baycol, as compared to other statins, is high.

To begin, Defendants have brought two other Motions with regard to this topic and seek a second bite at the apple with this Motion.[2] Furthermore, Dr. Boult is well-

---

[1] The PSC recognizes that individual plaintiffs may have differing opinion as to the necessity of a case specific expert report and different jurisdictions have different standards of required evidence. This too was recognized in *In re Ephedra*: "[i]n the cases here consolidated what plaintiffs must prove is determined by state law. Neither side here, however, has suggested that general causation is not a requirement under the law of the relevant states, and the Court will so assume for the purposes of this motion.". *In re Ephedra*, 393 F.Supp.2d at 186.

[2] The PSC refers the Court to the PSC Response to Bayer and GSK's Motion to Exclude Expert Testimony Based on Adverse Event Reports and the PSC Response to Bayer and GSK's Motion to Exclude the Plaintiffs' Putative Expert Witness From Invoking the Testimony of Other Testifying Witnesses

qualified to testify as the comparative risk of drugs. Dr. Boult has a Masters degree in epidemiology, a credential that certainly supports his ability to rely on epidemiological evidence. Boult Dep. (Ex. B) at 304: 15-22. Dr. Boult testified that he feels confident to rely on adverse event data and that it is a valuable tool for a physician. Boult Dep. (Ex. B) at 49: 4 - 51: 18. Given Dr. Boult's credentials of both a doctorate in medicine and a master's degree in epidemiology, he is more than qualified to opine on the comparative safety of Baycol.

ii. The labeling for Baycol was inadequate.

Defendants seek to categorize Dr. Boult's testimony on the adequacy of the Baycol label as neither relevant nor competent. First and foremost, his opinion on this matter is certainly relevant. The labeling of Baycol is a key matter in this case. For a drug that Bayer and GSK specifically marketed to the elderly, an opinion as to the adequacy of the warning for this particular population is certainly relevant.

As for Dr. Boult's competency to opine on the adequacy of the label, it is well established. Dr. Boult has opined that Bayer did not go far enough in providing warnings to the elderly population. Dr. Boult knows precisely what an elderly population needs and he has the standing, as a gerontologist, to make this statement. Additionally, physicians have been accepted as qualified to offer opinions as to the adequacy of warning labels. For example, in the Fen-Phen MDL, Judge Bechtle found that testimony from physicians, who were admittedly not regulatory experts, could opine on the medicine and science regarding the risks and benefits and compare that knowledge with

---

and incorporates them by reference herein.

what was disclosed in the label. *See In Re: Diet Drugs*, PTO 1332 at 27 (E.D. Pa. 2000) (Ex. D). The physicians were therefore qualified to opine as to a labels completeness and accuracy. This Order was followed by district courts when cases were remanded. *Smith*, 278 F.Supp.2d at 702. Accordingly, Dr. Boult, as physician and a gerontologist, is qualified to render an opinion as to the completeness and accuracy of the Baycol label.

In addition, previous MDL courts have allowed experts to offer testimony on topics not included in their expert reports, provided Defendants are given the opportunity to examine the expert. *See In re Ephedra,* 393 F.Supp.2d at 198. As such, the fact that the word's label do not appear in Dr. Boult's report is in and of itself not a bar to this testimony. Defendants were given the opportunity to examine Dr. Boult on this issue previously and will not be prejudiced by this testimony.

IV. Conclusion

For the foregoing reasons, Bayer and GSK's motion to exclude Dr. Boult's opinions and conclusions should be rejected, and his testimony admitted in its entirety.

Respectfully submitted,

Dated: June 23, 2006

ZIMMERMAN REED, P.L.L.P.

s/Stacy K. Hauer

Charles S. Zimmerman, #120054
Ronald S. Goldser, #35932
Robert R. Hopper, #208760
Stacy K. Hauer, #317093
651 Nicollet Mall, Suite 500
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844

LOCKRIDGE GRINDAL NAUEN, P.L.L.P.
Richard A. Lockridge, #64117
Robert K. Shelquist, #21310X
Yvonne M. Flaherty, #267600
100 Washington Avenue South
Ste. 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981

***Co-Lead Counsel for Plaintiffs***

***Plaintiffs' Steering Committee***

Don Barrett
Barrett Law Office, PA
404 Court Square North
P.O. Box 987
Lexington, MS 39095

Daniel E. Becnel
Law Offices of Daniel E. Becnel, Jr.
106 West Seventh St., P.O. Drawer H
Reserve, LA 70084

Turner W. Branch
Branch Law Firm
2025 Rio Grande Blvd. N.W.
Albuquerque, NM 87104

Elizabeth J. Cabraser
Lieff, Cabraser, Heimann &
Bernstein, LLP
Embarcadero Center West
30th Floor, 275 Battery St.
San Francisco, CA 94111-3339

Stanley M. Chesley
Waite, Schneider, Bayless & Chesley
Co., LPA
1513 Fourth and Vine Tower
One West Fourth Street
Cincinnati, OH 45202

John R. Climaco
Climaco, Lefkowitz, Peca, Wilcox &
Garofoli Co., L.P.A.
1220 Huron Road, Suite 1000
Cleveland, Ohio 44115

James R. Dugan
Gauthier, Downing, LaBarre, Beiser
& Dean
3500 North Hullen Street
Metairie, LA 70002

Frederic S. Fox
Kaplan Fox & Kilsheimer LLP
805 3rd Avenue, 22nd Floor
New York, NY 10022

Paul J. Geller
Cauley Geller Bowman & Coates, LLP
2255 Glades Road, Suite 421 Atrium
Boca Raton, FL 33431

Don Hildre
Dougherty, Hildre, Dudek & Haklar
2550 Fifth Ave., Suite 600
San Diego, CA 92103-5624

Will Kemp
Harrison, Kemp & Jones
3800 Howard Hughes Pkwy, 17th Floor
Las Vegas, NV 89109

Dianne M. Nast
Roda & Nast, P.C.
801 Estelle Drive
Lancaster, PA 17601

W. James Singleton
Singleton Law Firm
4050 Linwood Ave.
Shreveport, LA 71108

William M. Audet
Alexander, Hawes & Audet, LLP
300 Montgomery St.
Suite 400
San Francisco, CA 94104

Ted B. Lyon, Jr.
Teb B. Lyon & Associates, P.C.
Town East Tower, Suite 525
18061 LBJ Freeway
Mesquite, TX 75150

Dale I. Larson
Larson King
2800 World Trade Center
30 East Seventh Street
St. Paul, MN 55101

Mark Robinson
Robinson, Calcagnie & Robinson
620 Newport Center Dr., Seventh Floor
Newport Beach, CA 92660

Ron Meshbesher
Meshbesher & Spence Ltd.
1616 Park Avenue South
Minneapolis, MN 55404