# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

-----------------x
In re: :
:
BAYCOL PRODUCTS LITIGATION. : MDL No.
: 1431 (MJD/JGL)
-----------------x

Washington, D.C.
Friday, January 30, 2004

Video Deposition of:

CHARLES E. BOULT, M.D.

a witness, called for examination by counsel for Baycol, pursuant to notice and agreement of counsel, beginning at approximately 9:20 a.m., at Williams & Connolly, 725 Twelfth Street, N.W., Suite 1000, before Monica A. Voorhees, RPR/CSR, Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:



APPEARANCES:

On behalf of Baycol:
James W. Mizgala, Esquire
Sidley Austin Brown & Wood
Bank One Plaza
10 S. Dearborn Street
Chicago, IL 60603
(312) 853-7081

On behalf of Plaintiff Steering Committee:

Robert R. Hopper, Esquire
Zimmerman Reed, PLLP
651 Nicollet Mall
Suite 501
Minneapolis, MN 55402
(612) 341-0400

On behalf of Glaxo Smith Kline:
Aline Fairweather, Esquire
Dechert, LLP
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103-2793
(215) 994-4000

On behalf of Gee Shipman Pharmacy; Graham Services, Inc.; and Satterwhite Pharmacy:
(Telephonically)

Loyd Earley, Esquire
Crouch & Ramey
1455 Ross Avenue
Suite 2300
Dallas, Texas 75202
(214) 922-7100

ALSO PRESENT: William Sale, Videographer



C O N T E N T S


| EXAMINATION BY: | PAGE |
|---|---|
| Counsel for Baycol | 4 |

BOULT DEPOSITION EXHIBITS:

| NO. | | PAGE |
|---|---|---|
| 1 | Letter from Hopper to Boult | 33 |
| 2 | Exhibit 3 Materials Reviewed | 61 |
| 3 | Place-Holder | 67 |
| 4 | Expert Report - Boult | 70 |
| 5 | Drug-Induced Myopathies by Zohar Argov | 146 |
| 6 | Pasternak Article | 151 |
| 7 | Thompson Statin-Associated Myopathy Article | 156 |
| 8 | Correspondence to New England Journal of Medicine | 170 |
| 9 | Phillips Article | 199 |
| 10 | Hildebrand Article | 204 |
| 11 | England Article | 243 |




P R O C E E D I N G S

Whereupon,

CHARLES E. BOULT, M.D.,

was called as a witness and, having been first duly sworn, was examined and testified as follows:

MR. MIZGALA: I just want to point out, there is someone on the telephone.

Go ahead and introduce yourself.

MR. EARLEY: And I should have jumped in there. Loyd Earley on behalf of some pharmacists.

EXAMINATION BY COUNSEL FOR BAYCOL

BY MR. MIZGALA:

Q. Okay. Dr. Boult, you've been deposed before, correct?

A. Yes.

Q. Okay. Just quickly then, well actually the only time, or the only record I have of you being deposed in the last 10 years was May of 2003 in a case Cardiac Surgery Associates V Mid Atlantic Cardiovascular Associates.

Is that correct?

A. That is.

expert as if it's a yes or a no is -- kind of limits the amount of information I can give you in the answer.

I wouldn't give you a yes or no answer. I'd say yes, I know a lot about drug safety and it's part of what I deal with every day in practice.

But do I spend my career, you know, focusing narrowly on that, no, I don't. So I've got much more expertise than, well probably than you do or an average lay person, an educated lay person, but do I have as much as somebody who evaluates drug safety for the FDA, probably not.

Q. Now when you said you look at drug safety on a daily basis, you're talking about using a drug in a specific patient, correct?

A. Yes.

Q. You're not talking about comparing the safety of drugs, several drugs across a class, correct?

A. But that's what I have to do in making decisions for an individual patient, because I have a full range of classes and I have a full range of drugs



within classes and if I have a patient that needs a treatment, I actually have to think about that, which class, which drug within the class, and even more than that, which dose, how to monitor it, you know, what to, how to educate the patient about it.

It's all, it's all part of what a practicing clinician should do.

Q. And you rely on adverse event data when you make this decision?

A. Yes, I do.

Q. In what way?

A. Well, for instance, I mean in the case we were just talking about when the reports began to come out about the early reports of rhabdomyolysis occurring on people who were taking Cerivastatin, I considered that very strongly and felt that I would not want to prescribe that drug because of those adverse reports.

Q. And what were those adverse event reports related to?

A. Rhabdomyolysis in people who were taking Cerivastatin.



Q. And to what are you specifically referring to, what information did you take into account?

A. There were reports in the -- this is not something I have a specific, I didn't specifically review this for this case, but you're asking me as a clinician, I remember that there were reports that came out in both the lay press and the scientific literature saying that there have been a number of cases of rhabdomyolysis in people taking Cerivastatin and there's concern early on. You know, we didn't know, hadn't been thoroughly studied, but it looked like it was emerging as a problem and that's the kind of thing that a practicing clinician, especially one who is taking care of frail people who can't tolerate the same degree of risk, say, as a robust younger person.

We have to be very tuned in to these things and minimize the risk that we subject our patients to.

Q. Why do you use the term frail, Doctor, is that age-ism?

A. Not at all. Frailty is a condition in which some old people, not all, this is a very



important distinction, some old people have lost a lot of their capacity of different parts of their body, their lungs, their kidneys, livers, muscles and so on as a result of a combination of, as I said earlier, the aging process does some things, the accumulation of diseases do others, the side effects of drugs do others and the result of all those forces renders some, say, 80 year olds are essentially bedridden and have to be taken care of by others and they have, they are frail, meaning that they are not resilient, they, if they are injured or get an illness, it can kill them. Say this is what happens in influenza, a flu goes through a nursing home, it will kill a lot of people, whereas if flu went through an elementary school, you have a lot of absences, but they are not frail and they wouldn't die.

So frailty is a condition of lack of resilience, of fragility, of being particularly vulnerable to new additional injuries or illnesses.

Q. Okay.

A. But just to make that point a little clearer, there are also 90 year olds who are not

Q. And have you ever taken care of a patient, or have you ever diagnosed one of your patients as having a statin-induced myopathy?

A. I believe I've seen a few who had the mild form, where we stopped the drug and the symptoms went away.

Q. How about the intermediate form where you believe the symptoms persist, have you ever diagnosed that in one of your patients?

A. No, I don't believe so.

Q. Doctor, what percentage of your patient population do you think takes statins?

A. 25.

Q. And how many patients are you covering, roughly?

A. 500.

Q. So about 100 people?

A. Something like that.

Q. And what statins are you currently prescribing, Doctor?

A. Simvastatin.

Q. Just Simvastatin?



A. Simvastatin is the one with the, that I use mostly.

Q. How does Simvastatin compare in terms of adverse events of rhabdomyolysis to the other statins that are available on the market today?

A. It's similar to all but Cerivastatin -- well you said on the market today, so it's similar to all of them that are on the market today, as far as I know.

Q. And what do you base that on?

A. My reading of the literature.

Q. Anything in specific?

A. The most recent would be that Thompson article I mentioned, it's a review of statin-induced injuries.

Q. And this Thompson article provided enough data for you to make that determination, Simvastatin versus the other statins?

A. Yeah.

Q. Doctor, is it your testimony that for these across your continuum that Baycol had a higher rate of mild muscle injury than the other statins?



MR. HOPPER: I'm sorry, did you ask him if that was his testimony?

MR. MIZGALA: Yeah.

THE WITNESS: No, I didn't --

BY MR. MIZGALA:

Q. Okay.

A. -- testify to that.

Q. Is that your opinion, do you think that Baycol had a higher rate of the mild form of what you defined as your, in your spectrum, the mild myopathy, do you feel that it had a higher rate of myopathy associated with it than the other statins?

A. I don't have information about that.

Q. Okay. How about the intermediate form, do you feel Baycol had a higher rate of the intermediate form of myopathy than the other statins?

A. As far as I know, there's no studies that even tell us that.

Q. Okay.

A. We just know that it had a higher rate of severe and sort of biological inference, if it tends to cause more higher rate or more frequent severe



damage, then it probably has a higher rate of the moderate to severe damage, as well, since it's all on a continuum.

Q. So you're relying on the rhabdo data; is that correct, when you talk about these other rates?

A. More likely to be the moderate to severe, yes. Yes, it's --

Q. There's no direct data on that, correct, comparing the statins?

A. Just the rhabdo data.

Q. Okay. So there is no direct data on the mild or the intermediate; is that correct?

A. There may, there probably is on the mild and I'm just not able to cite it for you right now.

Q. What would the nature of that data be?

A. Well it would be the combination of the data from clinical trials and then the post marketing data.

Q. And when you refer in your continuum, when you're talking about mild, the mild, are we calling this myopathy or muscle injury, what do you want to call it?

the, up in the abstract on the first page says -- no, that's not what I wanted to read.

Okay, in this article, none of these, none of these patients' symptoms persisted upon discontinuation of the drug, correct?

A. I believe that's correct. These people resolved.

Q. Okay. And, in fact, that was instrumental for Dr. Phillips to determine that these people had a statin-related event, correct?

A. I think they considered that, yeah, in deciding that it was statin related.

Q. Okay, if we look on page, the second page, 582, the last -- the discussion, the carry-over sentence, "More important, these features are convincingly related to statin therapy and fulfill the accepted criteria for an adverse drug reaction."

One, muscle symptoms occurred when the patients were receiving the statin in a double-blinded fashion; two, those symptoms normalized when the patients received placebo, three, muscle toxicity recurred upon re-exposure to the statin, as it had



occurred on previous exposures; four, the adverse reaction was confirmed by pathologic and biochemical findings; and, five, the pathologic abnormality reversed upon discontinuation of statin therapy.

So, here, Doctor, Dr. Phillips is defining the accepted criteria for an adverse reaction as challenge, de-challenge, rechallenge and de-challenge, correct?

A. Well, he's, he's not defining it, he's referring to that as if it were defined by someone else. He calls it the accepted criteria.

Q. Do you disagree that challenge, successful de-challenge and successful rechallenge are not the accepted criteria for an adverse drug reaction?

A. I think that that's a useful set of criteria that can be applied uniformly across a lot to determine whether certain reactions are related to drugs, but I don't think they are intended, nor are they appropriately used, as exclusive. In other words, to -- I don't think anyone would argue that you must do all these things in order to have an adverse drug event.



For instance, it would rule out any kind of a permanent damage, if a person had a permanent effect, permanent damage, like a scarring from a drug, it wouldn't revert to normal, and so these aren't intended for that. These are intended for a set of adverse drug reactions that are reversible when you stop the drug.

Q. And those are adverse drug reactions in which there is no CK elevation, correct?

A. No, I wouldn't say that.

Q. Well that's what this reports on, right? Statin-associated myopathy with normal creatine kinase levels?

A. Right, but these criteria were, this, these authors didn't invent these criteria, they are just citing them from this other article that was published in 1995. They are adopting someone else's criteria and applying it to their four cases. Their four cases, in fact, did not have CK elevations.

Q. Right. So their, where there's no elevation of CK, what Phillips and his colleagues showed in this article was that the pathology and



symptomology completely resolved upon cessation of drug use, correct?

A. In these three cases, they did.

Q. Are you aware of any other cases where they didn't?

A. Back in --

Q. Were normal CKs?

A. Back into the Hildebrand article.

Q. Show me where in the Hildebrand article --

MR. MIZGALA: Let's mark it right now, Exhibit Number 10.

(Boult Deposition Exhibit No. 10 was marked for identification.)

BY MR. MIZGALA:

Q. Show me in Exhibit Number 10, Doctor, where it says that a patient with a normal CK had a persistent, had persistent symptomology --

MR. HOPPER: I gave him my copy.

BY MR. MIZGALA:

Q. -- upon cessation of drug use.

A. Well as I said before, the, this doesn't say that.

rhabdomyolysis and we know that there's people that are in between. It's a spectrum.

Q. Well, Doctor, I want you to show me the evidence that people who don't have CK elevations have persistent problems from their use of statins?

MR. HOPPER: What, objection, vague, what do you mean persistent problems, did they have pain, did they have weakness, what do you mean persistent problems?

BY MR. MIZGALA:

Q. Persistent muscle problems, show me your evidence?

MR. HOPPER: What's that?

MR. MIZGALA: That's what we've been talking about for hours.

MR. HOPPER: No, that's what you're talking about, what is that? It's a vague question.

MR. MIZGALA: I got a vague definition that I'm dealing with.

MR. HOPPER: No, you don't. He's been very specific for how long, four and a half hours explaining to you what he's saying.



BY MR. MIZGALA:

Q. Okay, Doctor. Doctor, show me a case or show me your evidence that I can have severe to moderate statin-induced myopathy symptoms with normal CK that persists upon discontinuation of the statin?

MR. HOPPER: That what persists?

MR. MIZGALA: The symptoms.

MR. HOPPER: What symptoms? It's they, James.

MR. MIZGALA: Randy.

MR. HOPPER: I object. That what persists, pain?

MR. MIZGALA: I'm using his definition, Randy.

MR. HOPPER: Okay, then go to his report and ask him the question using his report instead of you asking him some vague non-medically based question to get the answer you want. He's been testifying and he's said three or four times already.

BY MR. MIZGALA:

Q. Doctor, show me your evidence that you can have in the absence of CK elevations persistent pain



or weakness of proximal muscles severe enough to cause functional, significant functional limitations after the use of a statin is discontinued?

A. So what you're calling for is high level proof in a scientific sense that has not been collected yet in the way that you're calling for it. What we have to deal with in reality in taking care of our patients is about three or four different lines of evidence that are not what you're describing.

I can design a study that would give you the answers you're looking for, but no one has done that study yet. So what we are left with is, as we often are in the emergence of a relatively newly-recognized condition, is we have incomplete data. We have data that show on the one hand that people can clearly have cell damage, muscle cell damage from statins with normal CKs. We know that.

We also know that people who have the clear temporal relationship between starting statins and getting the symptoms that you just described, we know that those people, 25 percent of them don't have elevated CKs and we know that 25 percent of them don't



recover within nine months. These are, these are very suggestive evidence and then we also know from our experience with other enzymes and even other CK enzymes that they are very transient and it's not uncommon at all to miss a temporary rise in the level of CK.

Q. Doctor, do you have the Hildebrand article in front of you?

A. Yeah.

Q. The last two sentences of that, or of that abstract, in the conclusion it says, "Most patients with elevated CK even when greater than 10,000 had complete and rapid recovery with supportive care and statin discontinuation."

Do you have any basis to disagree with that statement?

A. Just to realize that most doesn't mean all and that that means that those who didn't had some persistent, severe myopathy, but go ahead.

Q. And when you say persistent, what do you mean?

A. Well it's the, it's what's -- this

have as much as somebody who value" -- "but I do not have as much as somebody who evaluates drug safety for the FDA." Because he never worked at the FDA.

And he states -- he's drawing that comparison there. So therefore, he never worked in the Department of Drug Vigilance. You asked him all these questions.

MR. MIZGALA: Okay. Where did -- where did he ever say that he -- where did I ever ask him whether he's been primarily -- primarily responsible to evaluate adverse event reports in order to make a regulatory decision about a marketing medicine such as a labeling change?

MR. HOPPER: He's telling you right here what his level of expertise is.

MR. MIZGALA: Randy, will you stipulate that he's not going to offer any testimony on the comparative toxicity of Baycol versus the other statins based upon adverse event reporting rates?

MR. HOPPER: We have other experts who are -- who are rendering opinions on that: Two




toxicologists, for one thing, an FDA expert, Dr. Farquar, and an FDA expert, Dr. Kapit, who have already been questioned on these matters. Their depo -- their depositions have already been taken.

Go ahead. Ask him what you want to ask him. I'll try to make him available to answer, but that's not his area of expertise, and he's stated that on the record.

MR. MIZGALA: If you stipulate that he's not going to offer testimony on the comparative toxicity of Baycol versus other statins based upon AER reporting basis -- or rates, then I don't have to ask him these questions.

MR. HOPPER: Okay. Let me -- let me consult with Dr. Boult, and -- and we'll come back to give you an answer.

MR. MIZGALA: Okay.

THE VIDEOGRAPHER: We were on record at 11:09. We were going off at 11:11 a.m.

(Discussion off the record.)

(Off the video record.)

MR. HOPPER: Why don't you read back




James' last question regarding will I stipulate?

(The reporter read the record as requested.)

MR. HOPPER: I have consulted with Dr. Boult. Plaintiffs are not willing to stipulate to that fact, and you may question Dr. Boult on this. But I am going to continue my objection as to asked and answered, and Dr. Boult has already provided prior testimony on these questions. But you can go ahead and you can answer.

(On the video record.)

THE VIDEOGRAPHER: Back on the record at 11:14 a.m.

BY MR. MIZGALA:

Q Dr. Boult, do you have any formal education in interpreting spontaneous adverse event data?

A Well, I have a Master's degree in epidemiology, and I have a medical doctorate degree. And the combination of that formal training allows me to interpret the values that are reported.




Q And have you ever been primarily -- primarily responsible to evaluate adverse event reports in order to make a regulatory decision about a marketing -- a marketed medicine such as a labeling change?

A No. My responsibility is -- is interpreting the -- the values that are reported by others, not in -- in making those regulatory decisions.

MR. MIZGALA: I move to strike everything as nonresponsive after "no."

BY MR. MIZGALA:

Q Doctor, have you ever been responsible for analyzing postmarketing adverse event reports for prescription medications?

A Responsible for what?

Q Analyzing postmarketing adverse event reports for prescription medications.

A Well, yes, I -- I analyze it -- those reports whenever I see them so that I can provide the -- the best and safest prescription medications for my patients.

PAGE 90

350

MR. HOPPER: Is that question specific to Plaintiffs or Defense, or both?
MR. MIZGALA: The only Defense expert who's been deposed is Janet Arrowsmith-Lowe.
BY MR. MIZGALA:
Q Did you refer -- review her deposition?
MR. HOPPER: Actually, that's not true. There are other experts you've offered that have been deposed relative to the Olander case that you submitted as gener -- as generic experts in this case.
MR. MIZGALA: Who else has been deposed?
MR. HOPPER: Well, I'd have to look at my list, but I know that's the case. I just don't remember all the names.
BY MR. MIZGALA:
Q Well, let's -- either one. Have you reviewed any depositions for any of the other experts in the litigation -- in this litigation?
A I reviewed Dr. Richman's.
Q Dr. Richman?

PAGE 91

351

A Yeah.
Q Anyone else?
A As I mentioned earlier, I -- I was sent a CD that -- that had files that were supposedly containing the depositions of -- no, those weren't depositions; those were the reports --
Q Those were the reports, right, okay?
A -- and they just basically just had signature pages. But in terms of depositions, I did -- I did see the -- the depositions of -- I believe there were three of the Defense experts. I can tell you where they're from, but I can't remember their names. There was one from Stanford, one from Harvard --
Q Dr. Dorfman, Dr. Freeman.
A -- and one from Miami, I believe.
Q Dr. Bradley. You saw the reports. None of them have been deposed yet.
A Oh, okay. Okay. I guess I saw their reports, then.
Q Okay. Dr. Richman's deposition; anything in his deposition that you recall

PAGE 92

352

disagreeing with?
A You know, I read that last fall sometime, and I have not reviewed it since, so I -- I really -- I really couldn't say.
Q Did you read Dr. Zizic's deposition?
A No.
Q Dr. Mare's?
A No, I don't think I've read anyone else's.
Q Okay. Doctor, not everyone who takes a statin suffers an adverse effect from taking that statin, correct?
A Correct.
Q And not everyone who took Baycol suffered an adverse effect from taking Baycol?
A I wouldn't presume so.
Q You wouldn't presume what?
A That -- that everyone did, that everyone had a side effect.
MR. MIZGALA: Okay. Okay. Give me a few minutes, and I think I'm done.
MR. HOPPER: Sure, sure.

PAGE 93

353

MR. MIZGALA: I need to go --
MR. HOPPER: Sure.
THE VIDEOGRAPHER: Going off the record at 12:26 p.m.
(Discussion off the record.)
THE VIDEOGRAPHER: Back on the record at 12:34 p.m.
BY MR. MIZGALA:
Q Doctor, you just testified that not everyone who took Baycol suffered an adverse effect from taking Baycol.
So, Doctor, would it be true that not everyone who took Baycol suffered a myopathy from taking Baycol?
MR. HOPPER: Excuse me. Objection as to form. And all I'm asking is if you would mind repeating it? It doesn't make sense because you commingled adverse event and --
BY MR. MIZGALA:
Q Okay. Doctor, not everyone who took Baycol suffered -- please put on -- not everyone who took Baycol suffered a myopathy from taking

Baycol, correct?
A Not that we know of.
Q Okay. And in order to make that determination, again, you'd have to do an individual examination of the specific patient, including a differential diagnosis, correct?
A Correct.
Q Okay. Doctor, one of the -- well, let me ask you this --
MR. MIZGALA: I'm going to cover the pharmacies. Kim's a friend.
MR. HOPPER: Should we put on the record that you don't represent them?
MR. MIZGALA: I don't represent them, but, you know, I'm just -- I feel bad, because they're --
MR. HOPPER: I understand.
BY MR. MIZGALA:
Q Doctor, do you have any knowledge regarding what any specific pharmacy knew or should have known about Baycol at any particular time?
A What a specific pharmacy should have





known?
Q Um-hum.
A Do I -- do I have knowledge about what they should have known?
Q Yeah, right.
MR. HOPPER: Actually, you answered this previously when they asked you earlier, but --
THE WITNESS: I don't remember that, but --
MR. HOPPER: I can show you. Wasn't it Mr. Earley?
MR. MIZGALA: Earley was on, but I don't think -- Kim Meaders wasn't on the last time.
MR. HOPPER: Okay.
BY MR. MIZGALA:
Q So, Doctor, do you have any knowledge regarding what any specific pharmacy knew or should have known about Baycol at any particular time?
A It just seems that the pharmacy -- the pharmacist -- I assume you're talking about the pharmacist as opposed to the pharmacy which is the store front company?





Q Um-hum.
A The pharmacist should -- should have the knowledge of the potential side effects and dosing and so on that -- that -- much the same that physicians should have in order to fill prescriptions safely.
Q But with respect to any specific pharmacist, you don't have any personal knowledge about what they knew or should have known?
A No --
Q Okay.
A -- not what they should have known, but all pharmacists should -- should have known those things.
Q What was in the label; is that what you're saying?
A Well, and anything that -- that was available that wasn't in the label.
Q Doctor, are you intending to provide any opinions regarding the pharmacies in this litigation or the pharmacists?
A No, I don't think so.





Q Okay. Doctor, last time we put a place holder in as Exhibit Number 3. Did you have a chance to go back and look for that?
A What was that supposed to be? I didn't --
Q That would be an article from your list of materials reviewed that would support the proposition that the clinical trials of cerivastatin were somehow inadequate and not testing a certain section of the geriatric population.
MR. HOPPER: I have to enter on the record that I should have taken some responsibility for that as well, and I did not -- we'll try to get that to you.
THE WITNESS: Yeah, I don't have that available today.
BY MR. MIZGALA:
Q Okay. You didn't -- you didn't endeavor to do that in the interim here?
A No.
Q Okay.