**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

In re: BAYCOL PRODUCTS LITIGATION ) MDL NO. 1431
This Document Relates to: )
All Actions )

# PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION TO EXCLUDE TWO OPINIONS FROM THE EXPERT TESTIMONY OF THOMAS M. ZIZIC, M.D.

## I. INTRODUCTION

From 1998 to August 8, 2001, cerivastatin, marketed as Baycol® (hereinafter "Baycol"), was used by hundreds of thousands of patients worldwide. Defendants sought approval from the United States Food and Drug Administration (the "FDA") of Baycol as a "me too" statin. Defendants, however, marketed Baycol as the most statin at the lowest dose. Unlike other available statins, patients suffered hundreds of painful and deadly complications as a result of Baycol's use.

Baycol, like other statin drugs, can cause injury to muscle tissue, resulting in cell destruction and cell death. Statins lower cholesterol by interfering with its production by blocking cholesterol synthesis. Cholesterol, however, is essential to cellular structure and the health of muscle cells. Consequently, Statins can cause the destruction and death of muscle cell membranes, resulting in myopathy. A severe and extremely rare form of myopathy may lead to rhabdomyolysis, when necrotic muscle cells are released into the blood stream. The muscle cell contents can overwhelm the kidneys, causing acute renal

failure, and can interfere with the regulation of heart muscle contractions, which is potentially fatal.

It is indisputable that Baycol is one of the most potent statins. Many physicians who prescribed Baycol to their patients reported that their patients had significant side effects. Reports to the FDA Adverse Event Reporting System ("AERS") included 761 cases of rhabdomyolysis and 3416 cases of "other adverse reactions" before Baycol was withdrawn from the market. Thirty-one of the cases of rhabdomyolysis were fatal. And it is widely accepted that adverse event data is generally underreported for a variety of reasons.

Dr. Zizic offers a medical explanation of how muscle destruction and death and resulting myopathies adversely impact patients. Further, Dr. Zizic explains the medical research that demonstrates that Baycol-induced injuries, when not fatal, can cause permanent damage to patients. He describes that after the initial muscle destruction caused by toxic exposure to Baycol, signaled by elevated creatinine kinase ("CK") levels, among other clinical signs and symptoms, has occurred, the muscle cells in certain patients cannot regenerate or recover. Dr. Zizic also offers an opinion as to the chronic injuries that result.

Thomas M. Zizic, M.D., Associate Professor of Medicine at Johns Hopkins University School of Medicine, has been a physician, scientist, researcher, and teacher for over 20 years. He is an acknowledged world leader in the field of rheumatology. In his career, Dr. Zizic has received a host of awards and accolades for his contributions to internal medicine, especially rheumatology. He was a founding fellow of the American

College of Rheumatology. On July 1, 1971, he became an instructor of medicine and has remained on the faculty of Johns Hopkins through the present. For the first 17 years of his teaching career, he was a full-time faculty member. For the following 15 years, he served on the medical school faculty part-time and began a private practice in rheumatology. (Aff. of Thomas M. Zizic, M.D. ("Zizic Aff.") ¶¶ 1-2 (Ex. A to the Aff. of Wendy R. Fleishman (hereinafter "Ex. ___")).)

Dr. Zizic has worked as a clinical investigator in a host of clinical studies over his career. He has designed a number of studies involving both pharmaceutical agents as well as medical devices. He has conducted more than 100 clinical studies; many of which involved medications developed by American pharmaceutical entities, including Merck and Bayer. Bayer retained Dr. Zizic to serve as a clinical investigator testing a drug that was a matrix metalloproteinase inhibitor. The study was abandoned by Bayer because the drug proved too toxic. (Dep. of Thomas M. Zizic, M.D. ("Zizic Dep.") 24:10–26, 25:9–25 (Ex. B).)

In his role as clinician, professor, researcher, and investigator, Dr. Zizic has been called upon to review adverse event reports and analyze them. Although he admittedly has not had "formal training" as an epidemiologist, he has reviewed and analyzed the adverse event data of multiple pharmaceutical preparations and medical devices in his more than 25-year practice. Dr. Zizic has been called upon to analyze this data for a number of clinical studies and investigations, and has extraordinary "on-the-job" training in this area. (Zizic Dep. 127:12–130:3; 131:10-133:10 (Ex. B).)

Dr. Zizic's pioneering research showed that certain rheumatologic diseases are associated with drug ingestion and toxic exposures, and opened up the field of rheumatologic medicine to critical new causative research, medical developments, and new treatment strategies for patients worldwide. He has devoted most of his adult life to treating patients with rheumatologic diseases directly or indirectly related to muscles and connective tissue.[1] Indeed, he readily categorizes himself as a "muscleologist," or one who studies muscles. Dr. Zizic's scientific articles, abstracts, chapters, lectures, and scholarly research projects, numbering over 100, continue to be widely cited in medical literature.

Defendants seek to exclude two opinions Dr. Zizic intends to offer: (1) that Baycol toxicity can cause permanent muscle injury, even in the absence of elevated CK levels and (2) that Baycol was the most toxic statin available on the market during the time from its release and to its withdrawal. (Defs.' Mem. 1-2.) Notably, Defendants do *not* challenge Dr. Zizic's expertise as a medical doctor and a rheumatologist, who has treated patients with statin-induced diseases for more than 15 years. Nor do Defendants contest any of the other opinions to be offered by Dr. Zizic, set forth at length in his affidavit. (See Zizic Aff. (Ex. A).) For example, Defendants do not contest that Dr. Zizic may offer opinions that: (1) "muscle toxicity of Baycol resulted in a continuum of myopathies–ranging from myalgia to severe rhabdomyolysis with acute renal failure and death; and (2) an explanation for Baycol's "extreme propensity for causing myopathy,

[1] Not "bone" as Defendants suggest in their brief. (Defs.' Mem.1.)

including a biologically plausible explanation for cause and effect." (Zizic Aff. ¶ 13 (Ex. A).)

## II. DR. ZIZIC'S ANALYSIS OF BAYCOL IS RELIABLE SCIENCE.

### A. *Daubert* Admissibility Factors Are Not a Definitive Checklist or Test.

The admissibility of expert opinion testimony is governed by Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods to the facts of the case.

Expert testimony is to be liberally construed under the Federal Rules of Evidence[2].

According to the Supreme Court, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. at 152. Not surprisingly then,

> [a] review of the case law after *Daubert* shows that the *rejection of expert testimony is the exception rather than the rule*. *Daubert* did not work a "sea change over federal evidence law," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996).

[2] The United States Supreme Court explained in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993), that "Rule 702 must be read in the context of the liberal thrust of the Federal Rules of Evidence and must be interpreted consistently with the 'general approach of relaxing the traditional barriers to opinion' testimony." *Glaser v. Thompson*, 32 F.3d 969, 971-972 (6th Cir. 1994) (citing and quoting *Daubert*). Rule 702 was amended in 2000 in response to *Daubert* and its progeny, including *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). Fed. R. Evid. 702, Adv. Comm. Notes (2000).

Fed. R. Evid. 702, Adv. Comm. Notes (2000) (emphasis added).

While the trial court as "gatekeeper" must ensure that admissible expert testimony is reliable, *Daubert* does not support one competing methodology over another. *Miles v. Gen. Motors Corp.,* 262 F.3d 720, 724-725 (8th Cir. 2001). The threshold for admissibility is not how *persuasive* the evidence may be to the fact-finder, but the reliability of the evidence. *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 152 (3d Cir. 1999) ("[E]xpert opinion . . . need not be so persuasive as to meet a party's burden of proof or even necessarily its burden of production."); *Cavallo v. Star Enter.,* 100 F.3d 1150, 1157-1158 (4th Cir. 1996), *cert. denied,* 522 U.S. 1044 (1998). According to *Daubert*, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; Fed. Rule Evid. 702, Adv. Comm. Notes (2000) (citations omitted).

*Daubert* sets forth several factors to be considered for admissibility. Those factors are not intended to be exhaustive nor to constitute "a definitive checklist or test." *Daubert,* 509 U.S. at 593. *Daubert* specifies only two requirements for admissibility: reliability and relevance. *Id.* at 589. Under Federal Rule of Evidence 401, relevance is satisfied if the evidence tends to make some fact in issue more probably true than it would be in the absence of the evidence. *Id.* at 587. Indeed, relevance is not at issue here.

For reliability–the Court is instructed to look to other factors such as scientific methodology. To constitute scientific knowledge under Rule 702, the evidence must be

"grounded in the methods and procedures of science." *Id.* at 590. *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1207-08 (8th Cir. 2000) (citing *Daubert*, 509 U.S. at 593-94). *Daubert* makes plain that testimony requires methods or techniques that fairly count as scientific, and such factors such as peer review are *indicia* potentially supporting the conclusion that the requirements are met, but are not definitive. *Daubert*, 509 U.S. at 593. Peer review and publication are of diminished importance for propositions that are "too particular, too new, or of too limited interest to be published." *Id.* That is especially enlightening and helpful here, where the evidence is a backward-looking forensic account of what happened when Baycol was used by the general public, an evaluation now only necessary because Baycol caused injuries and deaths and where there will be no randomized, double-blind, peer-reviewed controlled studies, Defendants' purported "gold standard." It is common sense that no person would want, or permit themselves, to be experimented on with a drug now withdrawn from the market. Therefore, any forward-looking clinical study is not available, and therefore, cannot be dispositive of the questions facing this Court.

The *Daubert* inquiry is a flexible one. *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (citing *Daubert*, 509 U.S. at 594-95). The court must determine the appropriate test in each instance to assess the testimony of the expert witness given the circumstances of the case. Federal Judicial Center, *Reference Manual on Scientific Evidence* 38 (2d ed. 2000). The chosen criteria evaluate the expert's methodology, and not the expert's conclusions. *Bonner,* 259 F.3d at 929. "[E]ven if the judge believes there are better grounds for some alternative conclusion, and that there are some flaws in

the scientist's methods, if there are good grounds for the expert's conclusion, it should be admitted." *Id.* (quoting *Heller v. Shaw Indus.*, 167 F.3d 146, 152-53 (3d Cir. 1999)).

Accordingly, federal courts should admit expert testimony if it is generally derived from sound scientific principles. "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Bonner*, 259 F.3d at 929-30; *accord, Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001) (*per curiam*) ("In sum, the district court's gate keeping role separates expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge."). Here, the expert opinions to be offered by Dr. Zizic are supported by research, peer-reviewed medical literature, and generally accepted medical principles, as well as Dr. Zizic's experience as a clinician, professor, and researcher.

The standard of proof at this stage of the proceedings is modest. Proponents of scientific evidence, "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct*, they only have to demonstrate by a preponderance of evidence that their opinions are reliable. . . . The evidentiary requirement of reliability is lower than the merits standard of correctness." *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 744 (3d Cir. 1994) (emphasis original); *accord Moore v. Ashland Chem. Inc.* 151 F.3d 269, 276 (5th Cir. 1998) (*en banc*) ("The proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable."). "The court's only function is to ensure that the expert employed scientifically valid methodologies. Once

this is clear, the opinions which follow are admissible." *Lakie v. Smithkline Beecham*, 965 F. Supp. 49, 54 (D.D.C. 1997).

**B. Dr. Zizic Used Reliable Methodology to Base His Opinion That, in Certain Patients, Baycol Can Cause Permanent Injury.**

From Dr. Zizic's affidavit and three days of deposition testimony, it is clear that he bases his opinions on an analysis of the medical literature, the ongoing medical research being conducted at learning centers and teaching hospitals around the U.S., together with his own experience as a clinician, researcher, and professor of medicine. Dr. Zizic relies on a peer-reviewed article by Paul S. Phillips et al., 137 Annals Internal Med. 581-85 (2002). This is a four case presentation, which represents a preliminary communication. (Zizic Dep. 109:20–116:1 (Ex. B).) Dr. Zizic explains why the Phillips' study provides reliable medical data upon which to conclude that statin-induced myopathy need not be accompanied by an elevation in creatine kinase ("CK"). The study presents four patients who, after ingesting a statin, experienced muscle pains and weakness. Pathological and biochemical findings confirmed the adverse reaction. When the statin was withdrawn, the patients recovered. When the statin was reintroduced, the muscle toxicity returned, again confirmed by pathological and biochemical findings. (Zizic Dep. 109:20–116:1 (Ex. B).) This positive rechallenge with statins confirmed that statins do, indeed, induce muscle damage, which can be indicated by means other than elevated CKs. Dr. Zizic explains that the findings are very specific and clear and that the biological and pathological confirmation outweighs the concern that the study was not double-blinded. (Zizic Dep. 113:23–114:13 (Ex. B).) It is extremely instructive that the study results

were confirmed by biopsy. (Zizic Dep. 115:6-22 (Ex. B).) And, further, Dr. Zizic relies on Bayer's scientist, Dr. Grundy, who is in agreement with Dr. Phillips, in part, that, "[d]espite the study's small size, we cannot dismiss these observations as random variations in muscle structure." (Zizic Dep. 121:13-16 (Ex. B).)

Defendants attack the reliability of the source of the study, and argue that Dr. Phillips' study should be ignored because at some point in time, Dr. Phillips was retained by counsel to serve as a consultant. Dr. Zizic explains that the medical journal that published the study, the Annals of Internal Medicine, is a well-regarded, peer-reviewed medical journal, and as such, is a reliable source. Further, Dr. Zizic spoke with Dr. Phillips to find out more about his research.[3] This contact served to further educate Dr. Zizic, and further convince him of the reliability of the study results.

Dr. Zizic relied upon the research of Dr. Phillips to develop a biologically plausible explanation why certain patients who suffered Baycol-induced myopathy did not recover months after the acute event, even though their CKs abated. Dr. Zizic explained that in certain myopathies, "there is cell death without elevation of the CK. It doesn't mean that damage and pain and even weakness can't occur without sufficient damage to cause necrosis of fibers or death of fibers which will release significantly more CK, depending upon the number of fibers being damaged." (Zizic Dep. 57:4–16 (Ex.

[3] Defendants contend that Dr. Phillips is not reliable because he was retained as a consulting expert for Plaintiffs. Dr. Phillips acknowledged that he had been contacted by the lawyers in the litigation, but at the time of the research and the submission of his work for publication, Dr. Zizic did not believe he had been a retained expert. (Zizic Dep. 126:11–18 (Ex. B).) The fact that he was at some point retained as an expert does not militate against the reliability of his work.

B).) He explained further that elevated CKs are a time-specific event that is prompted when the muscle's cells die, causing the contents to escape into the blood stream. The CKs will remain elevated for a short-time, until they are eliminated through the kidneys as waste. The fact that CK elevations are no longer detectable does not mean that the muscle cells, which were destroyed, somehow regenerate. (Zizic Dep. 96:1–99:13 (Ex. B).) Dr. Zizic relied on Dr. Phillips' research to reach his conclusions. Indeed, Dr. Phillips has published subsequent articles which report precisely that myopathy in certain patients does indeed persist. In 2004, Dr. Phillips published an article comparing patients' post-rhabdomyolysis and/or post-myositis with controls for certain cardiac indicators. Paul S. Phillips et al., *Statin Myotoxicity Is Associated With Changes In The Cardiopulmonary Function*, 177 Atherosclerosis 183-88 (2004) (Ex. C). Significantly, Dr. Phillips reports that 7 of the 11 post-myositis patients remained sympathetic for 3 to 62 months after the acute event. *Id.* Specifically, Dr. Phillips describes patients who had taken Baycol, suffered myopathic reaction to Baycol, and continued to suffer severe weakness more than five years after stopping Baycol. *Id.* Dr. Phillips also reports: "Abnormal aerobic function correlating with disability in these subjects after statin induced muscle toxicity is consistent with previous work suggesting that two-thirds of these subjects remain chronically symptomatic subsequent to their index event." *Id.* at 187.

Indeed, more recently, Dr. Phillips has and others have published another article in The American Journal of Medicine. K.A. Antons et al., *Clinical Perspectives Of Statin Induced Rhabdomyolysis*, 119 Am. J. Med. 400-09 (2006) (Ex. D). While this article

focuses on statin-induced rhabdomyolysis (which adverse reaction itself is not contested generally in this litigation), the article does recognize that there are persistent symptoms in certain patients following statin therapy. Accordingly, there is significant work in the literature by Dr. Phillips that supports Dr. Zizic's opinion that Baycol can cause long-term myopathy.

### 1. <u>The University of Wisconsin Study Demonstrates Long Term Adverse Impact Of Statins.</u>

Defendants next turn to an abstract relied upon by Dr. Zizic that was prepared by Dr. Hanson and Dr. Hildebrand of the University of Wisconsin. During Dr. Zizic's deposition, this abstract of a study was marked as an exhibit. At the time of the deposition, the work had not been fully published and, as a result, only the abstract had been published. Since that time, the study has indeed been published in a peer-reviewed publication. K.E. Hanson et al., *Outcomes in 45 Patients with Statin-Associated Myopathy*, 165 Archives Internal Med. 2671-76 (2005) (Ex. E). A retrospective study was reported involving patients who suffered from statin-induced myopathy. Of the 45 patients described in the article, "57% of the patients reported resolution of the symptoms by one month, 34% by six months, and 7% by 14 months." *Id.* at 2674. There is nothing in this study that contradicts Dr. Zizic's opinion that myopathy-induced Baycol can, indeed, be long-term.

In fact, after the Hildebrand abstract was marked at Dr. Zizic's deposition, Dr. Zizic testified that the study demonstrated, without question, that these patients have prolonged symptoms of muscle damage due to statin therapy. (Zizic Dep. 118:16-119:5

(Ex. B).) Dr. Zizic relies on ongoing research to opine that, in certain patients, permanent muscle damage occurs as a result of acute statin-induced muscle toxicity. Dr. Zizic relies upon medical research at the University of Wisconsin, where patients with statin-induced myopathy were studied. He describes that 24 percent of the patients who had discontinued statin therapy had symptoms that had not resolved by nine months. (Zizic Dep. 118:16–119:5 (Ex. B).) The question of whether the CK levels returned to normal was not addressed. But, the study did demonstrate that, without question, these patients had prolonged symptoms of muscle damage due to statin therapy. *Id.* Dr. Zizic further provides a biologically plausible mechanism for permanent damage to muscles, which is based on generally accepted medical literature and his experience as a clinician and an investigator, as well as these studies.

### 2. **<u>It Is Reasonable to Infer Symptoms And the Long-Term Adverse Effects of Baycol from Other Drug Induced Myopathies.</u>**

It was reasonable, indeed, responsible, for Dr. Zizic to reach out into the medical literature and extrapolate to the particular issue that he observed in Baycol patients. In particular, the Supreme Court in *Kumho* describes that there may be cases, such as here, where no study has been conducted. *Kumho*, 526 U.S. at 151. Further, given the practical unavailability of other forms of scientific evidence when the drug has been withdrawn, reliance on the data available is all the more reasonable. *See Brasher v. Sandoz Pharm. Corp.*, 160 F. Supp. 2d 1291, 1297 (N.D. Ala. 2001). In cases such as pharmaceutical litigation in an MDL setting, where the opinions are offered as to general causation, the relevancy ground of *Daubert* is satisfied. "What *Daubert* does require is

that the expert's opinion be based on sound methodology of the type used by experts in the field in which the opinion is offered." *Brasher*, 160 F. Supp. 2d at 1296. It is clear that Dr. Zizic indeed, relied on the same sound methodologies of the type used by other experts in his field.

The law grants a district court the same broad latitude when it decides how to determine reliability as is enjoyed in respect to its ultimate reliability determination. *Gen. Elec. Co. v. Joiner*, 523 U.S. 136, 143 (1997). All the trial judge is asked to do here is to determine whether the proffered testimony is based on good grounds tied to the scientific method. *Bonner*, 259 F.3d at 929. Indeed, Dr. Zizic's reliance on these studies and his review of sound, peer-reviewed literature demonstrates that it is based on good grounds.

Defendants object to Dr. Zizic's opinion that myopathy can cause long-lasting functional limitations in certain patients. This conclusion is not limited to Baycol but extends to all myopathies, and other muscle ailments that he has seen and treated in his practice of more than 25 years. Dr. Zizic offers a well-reasoned and sound medical explanation for this opinion. This effect is well-recognized by the medical community and is found throughout the medical literature, not limited to statin-induced myopathy but in myopathies in general. Dr. Zizic explains that in certain patients with decreased muscle function, such as small, elderly women with decreased muscle mass, destruction of such muscle mass can cause long-term, devastating effects, because muscle cells can no longer be generated in these patients in the way they can in young healthy patients. Dr. Zizic noted that M. Ucar et al., 12 Drug Safety 441 (2002), have determined that from the

spectrum of myotoxic reactions related to statins, certain patients continue to have symptoms after the initial event has resolved. (Zizic Dep. 198:9-199:10 (Ex. B).) Dr. Zizic said the medical community is aware that patients can have long-term adverse effects with myopathies and rhabdomyolysis. Dr. Zizic pointed again to the University of Wisconsin longitudinal study to support the finding that certain patients do not recover fully after an acute myopathic event caused by statins. (Zizic Dep. 201:8–202:3 (Ex. B).)

### 3. **Defendants Offer No Studies to Show That Baycol Was Incapable of Causing Permanent Injuries.**

Dr. Zizic bases his opinion that it "is clear that some patients with statin-induced muscle disease will continue to have chronic problems despite the discontinuation of the offending agent [Baycol]", on well-developed, peer-reviewed medical literature, case reports, and his experience and knowledge as a treating rheumatologist. (Zizic Aff. ¶¶ 68-70 (Ex. A).) Defendants mistakenly rely upon *Leathers v. Pfizer, Inc.*, 233 F.R.D. 687 (N.D. Ga. 2006) (Ex. G), as the basis to argue that Dr. Zizic's opinion that Baycol causes chronic and permanent muscle myopathies in certain patients should be rejected by this Court. Defendants' reliance on *Leathers* is misplaced.

First, in *Leathers*, the court frankly stated that it had reservations that the plaintiffs' expert, Dr. Mark Firth, was qualified to offer an opinion regarding general causation that Lipitor, like other statins, can cause myopathy, rhabdomyolysis, renal failure, and death. Dr. Zizic, unlike Firth, is a rheumatologist–not merely an internist. *Leathers*, 233 F.R.D. at 694-695. Dr. Zizic's special expertise is in the area of muscle and connective tissue diseases and in the area of statin-induced muscle diseases. (Zizic

Aff. ¶ 1-4 (Ex. A).) Contrast Dr. Firth's expertise, he is neither an expert in statins nor in muscle disease. *Leathers*, 233 F.R.D. at 694-695. Indeed, Defendants here do not challenge Dr. Zizic's qualifications to testify about the muscle toxicity of Baycol, or to offer general causation opinions, with discrete exceptions. Without doubt, Dr. Zizic is qualified to offer the opinions enunciated in his expert affidavit.

Second, unlike the defendant in *Leathers*, Defendants here do not challenge the essential predicate to general causation–that in certain patients, Baycol does cause myopathies and rhabdomyolysis. Defendants rely on *Leathers* for their argument that any testimony that Baycol causes long-term muscle effects should be excluded as not accepted by the medical community. This case is different for several reasons, including: (1) *Leathers* involved Lipitor, a drug still marketed; (2) the expert at issue was not a specialist in muscle disorders, unlike Dr. Zizic; (3) Dr. Firth's expert opinion failed to address the issues of general causation at all; (4) unlike Dr. Zizic, Dr. Firth could not point to any support in the medical literature for his opinion; and, (5) Dr. Firth denied being aware of any causal link. The Contrary is true here on all five grounds.

Dr. Zizic is a specialist who spends most of his practice treating patients with muscle problems like the injuries in this litigation. He is a doctor who has specialized knowledge which can indeed assist the jury in understanding the causation of the injury. *See Smith v. Wyeth-Ayerst Labs. Co.*, 278 F. Supp. 2d 684, 698 (W.D.N.C. 2003). Further, Dr. Zizic's report is being offered for general causation, clearly, something missing in *Leathers*. In forming opinions on general causation, Dr. Zizic reviewed a substantial amount of literature, and can point to specific support in the medical literature

for every statement he makes. (*See generally* Zizic Aff.(Ex. A); Zizic Dep. (Ex. B).) And, Dr. Zizic explains the causal link between the myotoxicity from Baycol and the permanent harm suffered in certain patients. Accordingly, *Leathers* is no way instructive as to the reliability of Dr. Zizic's opinions.

In *Bonner*, the Eighth Circuit considered a case in which the plaintiff alleged workplace exposures to the defendants' organic solvent caused her injuries. 259 F.3d at 924. The court found that victims of a toxic tort should not be barred from suit simply because medical literature, which will eventually support a causal connection, had not yet been published. *Id.* at 928. The plaintiff needed to merely offer evidence from which jurors could reasonably conclude that exposure probably caused her injuries. *Id.* Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded. *Id.* at 929-930. The defendants in *Bonner*, as they do here, offered no studies indicating its product was incapable of causing permanent damage. *Id.* at 932. In fact, just the opposite. The clinical trials on Baycol demonstrated myotoxicity in their findings (despite the fact that healthier people were used in the trials) and the toxicity signals for muscle damage actually did appear.

Dr. Zizic does not have to produce a double-blind, peer-reviewed, published, controlled study of his own for his testimony to be useful to the jury. Dr. Zizic worked with the data that are available, reviewed all the available medical literature, spoke with several researchers in the field, and reached conclusions that are supported by his sources. The jury can decide if Defendants' contentions render his testimony more or less convincing than Defendants' experts' testimony to be offered on the same issue.

### C. **Dr. Zizic Used Reliable Methodology to Evaluate the Toxicity of Baycol.**

Dr. Zizic's analyses regarding the toxicity of Baycol are based upon the peer-reviewed methodology articulated by Staffa et al. article in the New England Journal of Medicine: "the reporting rate is the number of fatal cases divided by the number of prescriptions dispensed." Staffa et al., *Cerivastatin and Reports of Fatal Rhabdomyolysis*, 346 New Eng. J. Med. 539-40 (2002). (Ex. F).) Dr. Zizic agrees with Dr. Staffa and her colleagues that adverse event reporting rates are not incidence rates, because adverse event reports are under-reported, and the true incidence is likely much higher, and, further, that the reporting rate for rhabdomyolysis deaths from Baycol was 1.9 deaths per million prescriptions--which was ten to fifty times higher than that reported for other statins. (Zizic Aff. ¶¶ 46, 63 (Ex. A); Zizic Dep. 87:8-89 (Ex. B).) There is no reasonable basis to conclude that fatal cases of rhabdomyolysis were reported at a higher rate for Baycol than for other statins. (Zizic Aff. ¶¶ 46, 63 (Ex. A); Zizic Dep. 87:8-89 (Ex. B).)

The FDA methodology for determining reporting rates is to use the total number of the reported cases in the United States as the numerator and estimates of national patient exposure to the product in the denominator. Food and Drug Administration, Guidance for Industry: Good Pharmacovigilance Practices and Pharmacoepidemiological Assessment (March 2005), *available at* http://www.fda.gov/cder/guidance/6359OCC.htm The AERS data was sufficient to cause the drug to be withdrawn from the market. The World Health Organization's International Drug Information System database reflected

early reports of increased muscle toxicity of Baycol as well. (Zizic Aff., ¶ 64 (Ex. A).) It was reasonable for Dr. Zizic to rely upon both the FDA and the World Health Organization for data regarding reporting rates. Federal Rule of Evidence 703 sets forth the standard regarding what an expert may and may not rely on in formulating her opinions. "[T]he facts or data [on which the expert relied] need not be admissible in evidence in order for the opinion or inference to be admitted." Fed. R. Evid. 703. Rule 703 outlines the circumstances under which an expert may rely on "facts or data."[4] The Advisory Committee Notes to the 1972 Proposed Rules provide that "facts or data" may consist of (1) the expert's firsthand observations of facts or data; (2) evidence presented at trial; and (3) presentation of information or data to the expert outside of the courtroom and other than by the expert's own perception. The third category includes the opinions of other experts. *Barris v. Bob's Drag Chutes & Safety Equip., Inc.*, 685 F.2d 94, 102 n. 10 (3d Cir. 1982). Therefore, as stated under Rule 703, Dr. Zizic opinions may be formulated by the use of facts and data from public documents and records, as are utilized here, as well as being based upon the opinions of other experts–as was done here.

---

[4] Rule 703 states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

### D. **<u>Defendants' Own Studies and Internal Documents Show That Baycol is More Toxic Than Other Statins.</u>**

Defendants' own data show that Baycol is more toxic than other statins. As set forth by the PacifiCare study: "Cerivastatin has a potency 60 to 200 times greater than that of simvastatin, lovastatin, or pravastatin." Kristina Yu-Isenberg (Prescription Solutions and Bayer Pharmaceuticals), Study #3: The Risk of Myopathy Subsequent to MHG Inhibitor Use in a Managed Care Organization 6 (February 2002) (the "PacifiCare Study"). "The risk of myopathy for hospitalized patients was highest for Baycol." *Id.* at 20. "Baycol had the highest proportion of patients with liver abnormalities compared to other HMG inhibitors." *Id.* at 23.

Contrary to Defendants' characterization of Baycol and myalgia (basically the premise that the two are unrelated because elderly people have muscle pain generally), Dr. Farquhar's position is that there is a dose-related increase in myalgia and other evidence of muscle injury as the dose of Baycol increases. (Farquhar Dep. 36:15-17). Dr. Zizic testified that he reviewed the report, spoke with the other experts, and was familiar with their deposition testimony. Therefore, it was responsible for Dr. Zizic to rely on Dr. Farquhar's analysis of the PacifiCare Study. That study confirmed, for example, that a higher incidence of adverse events in women using Baycol may have to do with their lower body weight, further supporting that the drug is toxic and dose is important: "In a clinical trial study, women over the age of 65 years, especially those with low body weight and on Baycol 0.8 mg, were found to be at increased risk of

myopathy. Thus there may be factors such as body weight and other physiological difference that may account for the higher risk in women." PacifiCare Study at 21.

Bayer internal documents state that Baycol clinical trials demonstrated "dose related" elevations in CK (creatine kinase), indicating muscle cell necrosis, and further, that Baycol-associated rhabdomyolysis rates increase with dose.

### E. <u>The Medical Literature Supports Dr. Zizic's Position</u>

Articles cited by Dr. Zizic support his reliance on AERs and strengthen his position. The Farmer article is a commentary that discusses rhabdomyolysis data and states that the "tragic rate of rhabdomyolysis with cerivastatin . . . seems to be at least tenfold higher than with first generation statins . . ." Farmer, *Learning From the Cerivastatin Experience*, 358 Lancet 1383-1384 (2001). The Hamilton-Craig article states that the adverse effect of myopathy "is shared by all statins, but is more common with cerivastatin." Hamilton-Craig, *Statin-Associated Myopathy*, 175 MJA 486-489 (2001). The Furberg article states, "the withdrawal of cerivastatin demonstrates that all stains are not interchangeable. Cerivastatin is at least ten times more likely than the other statins to cause fatal rhabdomyolysis." Furberg et al., *Withdrawal of Cerivastatin from the World Market*, 2 Current Controls Trials in Cardiovascular Medicine, 205-207, 206 2001.

Dr. Zizic's opinion that Baycol is more toxic than other statins is corroborated by the articles above. His conclusions are the general consensus of the medical community and the FDA, which withdrew Baycol for safety reasons. Any defense challenges to Dr.

Zizic's testimony go to weight, not admissibility. *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001).

### F. Dr. Zizic's Expertise Will Assist the Jury.

Prior experience "working with" the FDA AERS database is hardly a precursor to the ability to testify about what the data indicates about Baycol, or to compare it to Bayer's studies and the medical literature. Dr. Zizic is a highly qualified doctor and researcher. Dr. Zizic analyzed all available data and used his medical background, medical research, and his experience to render an opinion. It is also acceptable and appropriate for experts to cite the work of other experts. Hands-on testing is not an absolute prerequisite to the admission of expert testimony as long as experts adhere to the same standards of intellectual rigor that are demanded in their professional work. *Cummins v. Lyle Indus.*, 93 F.3d 362, 369 (7th Cir. 1996). This objective can be accomplished in a number of different ways, including through the review of experimental, statistical, or other scientific data generated by others in the field. *Id.* Accordingly, Dr. Zizic's reliance on the analysis of Dr. Farquar is normal and acceptable.

As Defendants point out, there are no independent "studies" of Baycol. Baycol was essentially tested on the American public, and now that Baycol is known to be unreasonably dangerous, Defendants argue that the adverse side effects inflicted along the way should not be counted because they were not "independent studies." But Bayer never performed such studies. Plaintiffs are faced with a difficult task left in the aftermath of a massive drug experiment on the public. Plaintiffs have the AERS

reporting rate epidemiologic study data to show that they are part of a large group of people who were also taking Baycol and were similarly injured. This information is important for jurors to understand and weigh appropriately.

## III. CONCLUSION

Dr. Zizic's testimony is admissible, and Defendants' motion should be denied.

Dated: June 23, 2006

LOCKRIDGE GRINDAL NAUEN, P.L.L.P.

/s/ Yvonne M. Flaherty
Richard A. Lockridge
Bert Black
Robert K. Shelquist
Yvonne M. Flaherty
100 Washington Avenue South, Ste. 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900

ZIMMERMAN REED, P.L.L.P
Charles Zimmerman
Robert R. Hopper
651 Nicollet Mall
Suite 501
Minneapolis, MN 55401
Telephone: (612) 341-0400

*Plaintiffs' Co-Lead Counsel*

RODA & NAST, P.C.
Dianne M. Nast
801 Estelle Drive
Lancaster, PA 17601
Telephone: (717) 892-3000

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
Elizabeth J. Cabraser
Wendy R. Fleishman
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000

ALEXANDER HAWES & AUDET
William Audet
152 N. 3rd Street
Suite 600
San Jose, CA 95112
Telephone: (408) 289-1776

WAITE, SCHNEIDER, BAYLESS & CHESLEY CO., LPA
Stanley M. Chesley
Central Trust Tower, Suite 1513
One West Fourth Street
Cincinnati, OH 45202
Telephone: (513) 621-0267

BRANCH LAW FIRM
Turner W. Branch
2025 Rio Grande Blvd. N.W.
Albuquerque, NM 87104
Telephone: (505) 243-3500

LAW OFFICES OF DANIEL E. BECNEL, JR.
Daniel E. Becnel
106 West Seventh St., P.O. Drawer H
Reserve, LA 70084
Telephone: (985) 536-1186

CLIMACO, LEFKOWITZ, PECA, WILCOX & GAROFOLI CO., L.P.A.
John R. Climaco
1226 Euclid Avenue, Suite 900
Cleveland, OH 44115-1891
Telephone: (216) 621-8484

SINGLETON LAW FIRM
W. James Singleton
4050 Linwood Ave.
Shreveport, LA 71108
Telephone: (318) 631-5200

LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS, LLP
Paul J. Geller
197 South Federal Highway, Suite 200
Boca Raton, FL 33432
Telephone: (561) 750-3000

KAPLAN, FOX & KILSHEIMER, LLP
Joel B. Strauss
Laurence D. King
805 3rd Avenue, 22nd Floor
New York, NY 10022
Telephone: (212) 687-1980

*Plaintiffs' Steering Committee*