- - -

THE VIDEOTAPE TECHNICIAN: This is Robert Whitaker, member of the National Legal Video Association for Esquire.

Today's date is February 10, 2004. We're on the record at 9:56 a.m.

We're here in the matter of Baycol Products Liability Litigation, MDL 1431 MJD/JGL.

The witness today is Dr. Thomas M. Zizic, and we are at the location of Lieff Cabraser, 780 Third Avenue, New York City.

Will the attorneys please state their appearances for the record.

MS. FLEISHMAN: Wendy Fleishman for the MDL plaintiffs.

MR. MIZGALA: James Mizgala for Bayer.

MR. BERGHOLTZ: Norbert Bergholtz for GlaxoSmithKline.

A. Thank you.
Q. Doctor, can you describe -- you said you you had a partner in your clinical practice. Can you describe your clinical practice for us?
A. Well, I've taken a sabbatical from my practice about three months ago to become president and CEO of Bionicare Medical Technologies. I have an updated copy of my C.V. I don't know if you've received that, as well.
Q. Yes. I got that late yesterday, too. We'll attach that later.
A. Okay.
Prior to -- that of officially occurred February 1st, however, I was phasing back for about three or four months prior to that, five months perhaps.
Before that, I had a full rheumatologic practice with about probably 30 hours a week on average,

24

averaging it over the year, seeing patients probably about 10 to 15 hours a week on clinical research, and then

probably about 20 hours a week on Bionicare Medical Technologies, the device that we've developed for treating osteoarthritis of the knee. So, out of my 60 hour or 70-hour work week, it was divided that way.

Q. When you mentioned clinical research, what are you referring to specifically? What kind of research?

A. Well, I have designed a number of studies, clinical studies, phase II, phase III, and phase IV studies. I designed and have launched a 10,000 patient phase IV study with our device just recently in the last six months. I've just designed a double blind placebo-controlled study both for osteoarthritis in the knee and for post arthroscopy. I've designed a double-blind study in the last year for osteoarthritis of the hip. So, I have

25

designed and developed multiple studies over my career and conducted probably over 100 to 200 studies including my full time academic careers, some of it in the last five or six years as listed in the

end of my C.V., some of the clinical studies that I've done for other pharmaceutical companies, Pfizer, Merck.

Q. Did those clinical studies involve investigation of pharmaceutical drugs, medications?

A. Yes, including Bayer's studies.

Q. Which one was that?

A. We were involved with an MMP, matrix metalloproteinase inhibitor that Bayer had us do, or it was one of the study sites probably four or five years ago.

Q. What phase study was that? Was that a phase II or phase III?

A. That was a phase III study that got discontinued because of toxicity.



Q. The more recent studies you've done, they have been involved with medical devices, is that correct, the Bionicare?

A. No. We have continued with pharmaceutical devices, but now, my own

company, we're doing as of last September, I believe, when we started the phase IV 10,000 patient study, it's primarily with that, although I'm still a partner in our research center that does studies for other pharmaceutical companies, as well.

Q. Has your company gone public yet?

A. No, private.

Q. So, Doctor, I think you said you've been the CEO, chairman of your company for the last three months, and prior to that, you had a period of about five months where you're phasing out your practice, is that right, your clinical practice?

A. Well, actually, I was

27

chairman -- I mean president and CEO, not chairman.

Q. I'm sorry.

A. President and CEO for about the last year and a half, only it was on a limited basis until we had raised enough money to get our manufacturing approval and get the product which has

A. Correct.

Q. Doctor, is it your opinion that in a myalgia there is cell



destruction or cell death occurring?

MS. FLEISHMAN: Objection.

THE WITNESS: There may or may not be. If there is cell death without elevation of the CK, it is insignificant or insufficient to elevate the CK levels in the blood. It doesn't mean that damage and pain and even weakness can't occur without sufficient damage to cause necrosis of fibers or death of fibers which will release significantly more CK, depending upon the number of fibers being so damaged.

BY MR. MIZGALA:

Q. But is it your opinion you could have myalgia in the absence of cell death, muscle cell death?

A. Certainly.

Q. Therefore, you wouldn't be able to record, if you had the absence of

I'll look at yours. I'll look at
the one he gave me as an exhibit.
MS. FLEISHMAN: There are
different ones.
THE WITNESS: There are.
MR. MIZGALA: Oh, yes, it
depends on -- it was published in
a couple of different journals.
MS. FLEISHMAN: Right.
THE WITNESS: All right
BY MR. MIZGALA:
Q. "Mechanism of myopathy" the
first sentence?
A. Yes.
Q. "Because it occurs so
rarely, little is known about the
fundamental mechanisms of
statin-associated myopathy." Do you



agree with that sentence?
A. I agree that we don't know
the fundamental mechanism. I don't know
that I would go so far to say that little
is known. There's a number of things
that are known, and over on the same page
in the left-hand side where they talk
about the FDA review of cerevastatin and

the increased death rate with
cerivastatin as compared to the other
statins and with monotherapy as well as
with the combination with gemfibrozil, I
think that gives you -- and the FDA
report also noted that more than 60
percent of the fatal cases with
cerivastatin were associated with the
highest dose of .8 milligrams daily.
Well, I think when you start seeing the
fact that you have a dose effect, and the
data that would indicate that this is not
a pharmacodynamic, but a pharmacokinetic
effect in terms of the combination with
gemfibrozil, gives us some real clues.
It is not the fact that

88

pharmacodynamically, these two agents
which individually can cause myopathy,
are making -- that the gemfibrozil is
making pharmacodynamically the muscle
more amenable to injury. That tissue,
which is what pharmacodynamics is, is
more vulnerable, it is a pharmacokinetic
action that you're getting interference
with the metabolism of the liver and

increase in blood levels, which goes
along with the fact that the highest
dose, 8/10th milligrams, is where you're
getting 60 percent of the fatal cases.
Despite the fact that .4 was prescribed
more frequently than the .8, it means
that there's a pharmacokinetic effect,
and it is one of several possible
mechanisms in interference with
cholesterol, metabolism and its effect on
membranes, or more likely as they go on
here, go on to say here, "the
interference with cholesterol formation
going from -- to mevolate and ubiquinones
and the energy production of the cell or

89

perhaps the isoprenoid, but in that
pathway is being interfered with
pharmacokinetically. Is it correct to
say little is known? We don't know what
it is absolutely, but I think a lot is
known.

MR. MIZGALA: Move to strike
as nonresponsive

BY MR. MIZGALA:

Q. Doctor, the cellular
mechanism of statin-induced myopathy is

not known; correct?

A. The absolute mechanism is not known, that is correct.

Q. As you've noted in your report, there are theories out there, but no one agrees absolutely what theory governs the mechanism for statin-induced myopathy; correct?

A. I think there's more of a consensus than your statement. We don't know for sure, but I think most of the people would -- I believe most people, the consensus is that it's likely to be



involved with the ubiquinone or the geranyl geranyl side of the pathway leading to isoprenylation of proteins. So, it's either isoprenylation of proteins or ubiquinone synthesis co-enzyme Q10 so that you interfere with the energy metabolism of the cell, and I think there's a lot of data that that's where the money lies, it's not just the membrane itself. The membrane may be part of it, but if you don't have the energy and the ATP to be able to keep the

sodium out of the cell and, therefore, exchange it with the calcium, and the calcium getting in the cell, and when the calcium gets in the cell, it activates phospholipase A2, it activates calcium sensitive proteases which break down the muscle and cause damage, if not necrosis, and death of the cell.

Q. Down further in the paragraph, Doctor.

A. I'm sorry. Are we still on Page 570?

91

Q. Yes. We're still on mechanism myopathy. The authors state: "No clinical study has yet provided support for the hypothesis of diminished isoprenoid synthesis or energy generation in muscle cells during statin therapy." Do you agree with that statement?

A. I would agree.

Q. Do you also agree with the statement just preceding that, "Despite an in vitro support for this concept," and they are talking about ubiquinone as the mechanism for statin-induced myopathy; correct?

MS. FLEISHMAN: It's actually ubiquinone deficiency.

BY MR. MIZGALA:

Q. Right. That's what they are talking about when they say "concept" there?

A. You see, I heard you say the clinical support. Although there's a lot of laboratory support, the clinical study has not yet shown is that, I agree with



that. Now, what was the next one?

Q. Above that. They say, "Despite in vitro concept, in vitro support for this concept," and they are talking about ubiquinone deficiency, correct, when they refer to a concept?

A. Yes.

Q. They say, "A human study of six months on simvastatin treatment on skeletal muscle concentrations of high energy phosphates of ubiquinone demonstrated that muscle energy phosphate and ubiquinone concentrations assayed after simvastatin treatment were similar to those observed at baseline and did not

differ from values in control subjects."
Is that correct?
A. That is correct. Although other studies have shown differently.
Q. Other studies have shown differently what?
A. That the ubiquinone concentration or ubiquinone has an effect in terms of being beneficial in some

93

patients even in a clinical setting, not studies, but the physician, the 48-year-old physician who was taking 10 milligrams and had muscle symptoms, and then he took -- stopped the statin, took co-enzyme Q10 and then started the statin again in a lower dosage and was able to continue with exercise. So, there are some studies showing that both ways.
Q. Sir, what you were just referring to, the 48-year-old physician, that was a case report; correct?
A. That's correct.
Q. And it involved one patient; correct?
A. That's correct, a physician.
Q. There have been other

studies where they have given ubiquinone to greater numbers of statin users, and they haven't shown an across-the-board effect in all patients; is that correct?

A. That's correct.

Q. In this study, sir, that they are referring to about simvastatin



therapy, they actually measured skeletal muscle concentration of ubiquinone and high energy phosphates, and they showed no difference in the muscle levels between the patients taking simvastatin and the control group; is that correct?

A. Again, I don't know -- I recall the article, but I don't recall if it was a patient, a case study or whether a series of patients they looked at. But it is correct.

Q. But right here you can tell they had a control group for this study, correct? They had patients and controls, the simvastatin study?

A. Correct.

Q. So, Dr. Zizic, would you agree that there's no generally accepted

scientific view regarding how statins affect muscle on a cellular level?

A. Yes.

Q. And that's true for Baycol, too; correct?

A. Correct.



Q. And, in fact, your report suggested two different hypotheses as to how statins could affect muscle; correct?

A. That is correct.

Q. And no one really knows which of those is correct at this point in time?

A. That is correct.

Q. The mechanisms that you related in your report, are they mechanisms that lead to cell death, cell destruction?

A. Not necessarily.

Q. Why not?

A. Well, it's a part of the magnitude of the damage that occurs. If the damage is sufficient enough and prolonged enough, it will eventually lead to cell death. On the other hand, there can be a low grade subclinical smoldering

damage that may produce pathologic
changes, may produce clinical changes and
laboratory changes without necessarily
cell death.

96

Q. Now, when a muscle cell
dies, when there's muscle cell necrosis,
it necessarily releases its cellular
contents into the bloodstream; right?

A. That's correct.

Q. And if enough muscle cells
die, you can measure an increase in CK in
the blood; right?

A. At the right time, along
with a lot of other things, myoglobin,
potassium, calcium, uric acid,
creatinine.

Q. Once a cell is dead, it
doesn't release anything, it doesn't
release any more stuff from inside?

A. That particular cell will
not, correct.

Q. Would you agree, Doctor, if
a CK is normal, then necessarily no
active muscle cell destruction is taking
place?

A. I would agree with that.
Q. That's still the general consensus; correct?
A. I don't know if you can say "the general consensus," but the majority of patients who have muscle symptoms and normal CKs probably don't have statin myopathy.
Q. Doctor, Paragraph 52 is all about measuring urine 3-methylglutonic acid; right?
A. Correct.
Q. And using that test -- and you have to do mass spectroscopy in order to measure that; correct?

□

109

A. That is correct.
Q. That's a fairly complex technique; right?
A. That is correct.
Q. It's not as simple as a CK test; right?
A. For certain.
Q. So, this is not in common practice right now, right, the use of this test?
A. Not that I'm aware of. It

may be clinically available at some places, but probably very few.

Q. Have you ever ordered a urine 3 MGA test done on somebody?

A. No.

Q. You have never used it to diagnose a statin-induced myopathy then?

A. I have not.

Q. Let's look at the three articles that you referred to, Phillips, Argov and Sinzinger.

MR. MIZGALA: Let's mark this as 6.

110

\- - -

(Whereupon, Deposition Exhibit Zizic-6, "Statin-Associated Myopathy with Normal Creatine Kinase Levels," (Phillips et al. 10-02) was marked for identification.)

\- - -

MS. FLEISHMAN: Phillips will be 6?

MR. MIZGALA: Phillips is 6.

BY MR. MIZGALA:

Q. Doctor, can you identify Exhibit 6?

A. This is a Brief Communication in the Annals of Internal Medicine, 137, page 581 to 585, 2002, Paul S. Phillips, et al., "Statin-Associated Myopathy with Normal Creatinine Kinase Levels."

Q. And you noted that it's a Brief Communication. What significance is that to you?

A. It's a preliminary



communication. It's not a full-length presentation. Dr. Phillips or others who use it will try to get something out quickly in order for colleagues to be aware of it.

Q. This is a report on four cases from one of their studies; correct?

A. That is correct.

Q. In the background up in the abstract they state: "Muscle symptoms in patients who are treated with statins and have normal creatine kinase levels are not well understood." Do you agree with that statement?

A. I do.
Q. Now, if you'd turn to
page -- the "Discussion," the second
page, the first or the second full
paragraph under the "Discussion." Are
you there?
A. Yes.
Q. The authors state: "The
similar clinical, pathologic, and
biochemical features of our four patients

112

suggest that the patients have the same
type of myopathy." Do you agree with
that statement?
A. Yes.
Q. Then they say, "More
important, these features are
convincingly related to statin therapy
and fulfill the accepted criteria for an
adverse drug reaction." And they list:
"1) Muscle symptoms occurred when the
patients were receiving statins in a
double-blinded fashion." And that's what
you would call a challenge; correct?
A. Correct.
Q. "2) these symptoms

normalized when the patients were
received placebo," and that's a
successful dechallenge; correct?
A. Correct.
Q. Okay.
"3) muscle toxicity recurred
upon re-exposure to the statin, as it had
occurred upon previous exposures," and
that's a successful rechallenge; correct?



A. Correct.
Q. Okay.
And "4) the adverse reaction
was confirmed by pathologic and
biochemical findings." So, they actually
had objective evidence of pathologic and
biochemical findings in these four cases;
correct?
A. Correct.
Q. Okay.
And "5) the pathologic
abnormality reversed upon discontinuation
of statin therapy," again, a successful
dechallenge; right?
A. Correct.
Q. And do you agree that these
are accepted criteria for an adverse drug

reaction?

A. Not the only, but certainly they would fulfill what many people would accept as criteria for an adverse drug reaction.

Q. And just below that, were you aware that pathologists who reviewed



this material were not blinded?

A. I was.

Q. What significance is that of to you?

A. Well, that adds a potential bias into the process. On the other hand, these are fairly specific findings under the microscope that are depicted here in the figure, so that it's a little less concern, but it is a concern. There's always a potential bias when the pathologist knows what he should be looking for.

Q. Do you have any other concerns with this article, the Phillips article?

A. Yes.

Q. What are those?

A. Well, it's a -- obviously, you would like to a larger number of patients in order for this to be totally accepted. I mean, it is very suggestive, and as the editorial by Scott Grundy, one of Bayer's consultants that was in this



same journal says, it's very provocative and very important.

MR. MIZGALA: Move to strike as nonresponsive.

BY MR. MIZGALA:

Q. Doctor, does the fact that there's no control group play any -- does that have any consideration to you?

A. Surely.

Q. Why?

A. Well, you'd like to see patients of the same age particularly that have gotten biopsies to be certain that this wasn't a situation where you had the ragged red fibers that can occur with the aging process. You're less concerned about it because they rebiopsied, and showed that the changes went away. So, it's unlikely that it would be due -- the changes that were

initially there, if they were due to age,
shouldn't have gone away. So, it's less
likely that there's a compounding problem
there. But any time you don't have



controls, there's always that potential.
Q. Doctor, just a minute ago
you mentioned Scott Grundy is a
consultant for Bayer. Why did you
mention that?
A. Well, you were mentioning
the criticisms of the article and Dr.
Grundy wrote an editorial about this
article in this journal at the time it
was written.
Q. Did you read Dr. Grundy's
editorial?
A. Yes. I have it right here.
Q. Did you generally agree with
the substance of it?

\- - -

(Whereupon, Deposition
Exhibit Zizic-7, "Can Statins
Cause Chronic Low-Grade Myopathy?"
(Grundy, 10-02), was marked for
identification.)

\- - -

THE WITNESS:

(Witness reviewing



document.)

Well, some of the things I would not agree with, but in general --

BY MR. MIZGALA:

Q. What would you not agree with?

A. In the right-hand column, the fourth paragraph: "Is a carefully controlled, sizable study this type worth the investment of time and effort? To date, no evidence indicates that prolonged statin therapy leads to permanent muscle damage or progressive myopathy in patients with normal creatine kinase levels." I think he's right at the time he wrote this. I'm not sure that he's right today, and he may be, he may not be.

Q. So, let's just hold on there a second. So, you're referring to the statement: "To date, no evidence indicates that prolonged statin therapy

leads to permanent muscle damage or



progressive myopathy in patients with normal creatine kinase levels." Correct?

A. Correct.

Q. I think you said that he may have been right at the time he wrote this; right?

A. Correct. To date, no evidence exists.

Q. At the date -- and he had the Phillips article at this time; correct?

A. Correct.

Q. And he also would have been aware of Argov and Sinzinger; correct?

A. Right.

Q. What's happened since then that could change that?

A. Well, the University of Wisconsin study indicates that 25 percent of patients had normal creatine kinase levels, and 26 -- or 24 percent of the patients had not resolved by nine months. Now, talking to the senior author of that study, it is not -- she is not -- she

does not know whether the patients who had normal creatine kinase, any of the patients who had normal CKs were also patients whose symptoms did not resolve in nine months.

And Dr. Karen Hansen is whom I spoke to. She is the senior rheumatologist. The first author, Dr. Hildebrand is a postdoctoral fellow in rheumatology. And the IRB would not let anybody but one person look at these charts for HIPPA reasons. And so I've got a call in to Dr. Hildebrand, but I have not yet heard back from her to know whether any of these patients in the Wisconsin study had normal CKs did not resolve. So, we don't know one way or the other yet.

Q. And so because you don't have the data right now, there's still today no evidence indicating that prolonged statin therapy leads to permanent muscle damage or progressive myopathy in patients with normal creatine

THE WITNESS: Correct.

BY MR. MIZGALA:

Q. Now, Doctor, I think you agree with Dr. Grundy here that when he says -- when he's talking about Phillips, "However, these highly suggestive results are clearly preliminary. The number of patients was small, and all appropriate controls were not used." Do you agree with that about the Phillips article?

A. Well, particularly if you add the first sentence you omitted: "Despite the study's small size, we cannot dismiss these observations as random variation in muscle structure."

Q. Right.

A. "However, these highly suggestive results are clearly preliminary."

Q. Now, you knew Dr. Grundy was involved -- if you flip to the second page, you saw "Potential Financial Conflicts of Interest," and you can see "Honoraria." And Dr. Grundy says that

□

Q. Brief communications are submitted and published rather quickly, aren't they? You don't need an eight or nine month lead time; do you?

A. I think the Annals of Internal Medicine, your lead time is often a year or year and a half. It may be six months to nine months or longer --

Q. If Dr. --

A. -- for a Brief Communication.

Q. If Dr. Phillips were a retained expert, would you want to have seen that disclosed?

MS. FLEISHMAN: Objection.

BY MR. MIZGALA:

Q. Whether it be for plaintiffs or defendants.

A. Yes. You know, I'm trying



to recall if that's one of the stipulations of the journal, yes. I can't remember seeing -- in my career, I haven't seen disclosures retained by attorneys or cases.

Q. I will represent to you that

the Annals specifically requires expert witness participation.

A. I don't disagree. I just can't recall seeing that.

Q. Did you talk to Dr. Phillips about his involvement in this litigation at all when you spoke to him in January?

A. He said he had done very little, if any, work on this litigation. And I asked him why, and he said he didn't know.

Q. You got a copy of his report; right?

A. I did.

Q. Did you read it?

A. A while back, not very recently.

Q. You got a copy of all the

127

other expert reports plaintiffs designated in this litigation; right?

A. I believe I did. There may be some experts that I don't know about, but I hope I got them all because I don't want to read any more.

Q. Are you relying on anything any of those experts said in their

reports for your opinions here today?

A. Certainly.

Q. Such as?

A. Well, I mean, I understand adverse drug reporting, spontaneous adverse drug reporting. I've been involved in that process, was involved in several capacities. I understand it certainly. I understand the pros and cons. On the other hand, I think Dr. Farquhar's affidavit and subsequent affidavit are superb documentation of the thoughts that I would agree with. And he's by far and away a much more renowned epidemiologist than certainly I am and most people I know. He's got -- he's



trained in that and obviously has done a lot of work in that. I've just done some work in it.

Q. Are you a trained epidemiologist, sir?

A. No.

Q. So, you're deferring to Dr. Farquhar on the adverse event analysis in this litigation?

A. I don't know -- I certainly have opinions, and they have been expressed in my report. We'll express them at trial, and certainly have some expertise in spontaneous adverse drug reporting, but would I defer to Dr. Farquhar, yes, I would.

Q. What is the basis for your expertise in spontaneous drug adverse reporting?

A. Some years ago I was involved in the spontaneous adverse drug reporting and was called before the FDA with regards to Piroxicam which I had done a significant a significant amount

□

129

of research with, and also with regards to phenylbutazone, which similar to Baycol, was taken off the market not after five years, 25 years. Phenylbutazone was taken off the market because of spontaneous adverse reporting of a very rare event. Aplastic anemia occurred in 1 in 1,000 patients with phenylbutazone, but it was often death. It was often not reversible, whereas aplastic anemia and death occurred in a

about 1 in 50,000 patients with Naproxen, Ibuprofen and Piroxicam. And that five-fold increase in death rate in spontaneous adverse reporting was enough to cause it to be taken off the market.

Q. What was the nature of your involvement with the FDA with respect to these adverse event reports? What were you actually doing?

A. I was discussing the significance of that for clinicians, and how, when such rare events occur, that that one has no better information than



spontaneous adverse drug reporting mechanisms. And although there is underreporting, which we all know in that system, if one can use the denominator of either the duration of exposure or the number of prescriptions, one can indeed get some relative idea of toxicity of several agents in a given class. And that data is used, and, in fact, was used, was relied on by the FDA and is quoted in the Pasternak article and Staffa and her colleagues at the FDA in

the New England Journal and also Dr. Jenkins from the FDA was quoted by -- in the British Medical Journal right after cerivastatin was taken off the market, that it was the basis of the spontaneous adverse drug reporting that was substantially higher, and that's the whole point. You can say that they may not be good incidence figures, and granted you'd like to have things as accurate as you can. On the other hand, when you have a log fold difference in a



major event that's a rare event, you're not going to have anything better than spontaneous adverse drug reporting.

MR. MIZGALA: I'm going to move to strike all of that as nonresponsive.

BY MR. MIZGALA:

Q. Doctor, you sort of shifted gearsm and I think you shifted gears there in midresponse there. I was asking you about your experiences with the FDA, and then you switched and talked about the Baycol situation.

When you were involved with

FDA looking at adverse event reports,
were you doing any comparative safety
analyses across a class of drugs?
A. I was not doing the analyses
myself. I was commenting on the analyses
specifically as a clinician and having
done studies.
Q. With respect to Baycol, you
haven't done any analyses yourself.
You're relying on analyses that others



have done; is that correct?
A. I'm relying on my
interpretation of those analyses.
Q. When you say your
"interpretation," that's often just the
presentation of some data; is that
correct?
A. No. Looking at the data to
look at whether there is, number one,
consistency across various adverse drug
reporting systems, such as the US, such
as the Australian, such as the World
Health Organization. Does one see the
same magnitude of changes in those
various data sets? Is the data

consistent from the standpoint of the comparable time that the drugs were on the market? For example, in this specific case, atorvastatin coming on the market within six months of cerivastatin, so that the most recent drug phenomenon does not come into play here. So, an analysis, I think, with some expertise of knowing what to look for in the various



data sets, as well as within the drugs that are being compared. Was there adverse publicity that would have affected one drug differentially at the time of the reports? That is not the case here.

So, I think I have a bit of expertise -- a lot of expertise in this area, having been through it a number of times in a rigorous fashion.

Q. Well, Doctor, what you've been through -- well, what have you been through? You said you didn't do any sort of comparative analyses yourself. What have you been through a number of times in rigorous fashion?

A. Well, this is the kind of

information one should be using at any time one has a group of medications that have comparable benefits to determine, based on the risk/benefit ratio, what agents one is going to use. And because one doesn't do the tabulation or a statistical analysis doesn't make one any



less expert than if you have somebody else, a graduate student, a Ph.D., an epidemiologist tabulate the findings. One still has to then have the responsibility of interpreting those findings, and we do that, quite frankly, frequently in medicine, certainly in the slow active anti-rheumatic drugs in terms of their risk/benefit analysis, in terms of the COX-2 selective inhibitors. These are all things we do all the time.

Q. Have you done any sort of independent calculations -- have you done any calculations of your own involved in your review of the adverse event data regarding the statins?

A. I have done no independent calculations.

referring to secondary renal failure?



A. Yes. I think that's what they are referring to. Besides, as I say, we have lots of other evidence now that there necessarily isn't prompt resolution and complete recovery of muscle.

Q. What's the other evidence to which you're referring?

A. We know from the Ucar article that some patients continue to have symptoms. We know from the Wisconsin data that some people at nine months still have symptoms and signs. They don't have complete recovery, certainly, which is what this statement would apply to or imply if you applied it to muscle. But I think they are talking about in that same sentence, "secondary renal failure, complete recovery is the rule if proper treatment is commenced promptly." And that proper treatment is adequate hydration primarily.

Occasionally, one has to use Kayexalate to treat the potassium so you

don't get a fatal arrhythmia. Occasionally, one has to alkalinize the urine so that you don't get hypocalcemia of substantial degree which the calcium can get deposited into the tissue, in the muscle, and you can get it out of the blood, get tetani and those kind of things. But they all apply to the acute renal failure that occurs with substantial rhabdomyolysis.

Q. Doctor, do you agree that skeletal muscle has a large capacity for regeneration?

A. I do.

Q. Do you agree that injured muscle fibers can repair themselves?

A. I do.

Q. And that necrotic skeletal muscle fibers can be replaced by satellite cells?

MS. FLEISHMAN: Objection. Doesn't this depend on the circumstances?

THE WITNESS: I think it --

generally excellent?

MS. FLEISHMAN: Objection.

THE WITNESS: Could you please repeat the first part of the question? I don't know what the adjective was.

BY MR. MIZGALA:

Q. Except in a small proportion of the most severe cases, the prognosis after an episode of statin-induced myopathy is generally excellent?

MS. FLEISHMAN: I would object.

THE WITNESS: I don't know that there was enough long-term follow-up data on these people at all. The Wisconsin data is some of the first longitudinal data I've seen. In terms of -- as imperfect as it is, it is the first attempt to look at the natural history. I don't think we have that information. I would think the patients in this case

would belie that, that there's a substantial percentage of patients with some long-term effects.

BY MR. MIZGALA:

Q. So, there's just basically not good data on the rate of recovery versus rate of nonrecovery from statin-induced myopathy. Is that what you're saying?

A. The studies have not been done, that's correct.

Q. Doctor, if a patient reports pain or weakness that gets worse after discontinuing a statin, does that mean the pain and weakness is caused by something else?

MS. FLEISHMAN: Objection.

THE WITNESS: I think that for the most part, that that would be true, but not necessarily. The fact that it got worse would not necessarily ..... In other words, you could have some weakness that is caused and,

203

therefore -- by the damage, and, therefore, with continued use, you