# EXHIBIT E

ORIGINAL INVESTIGATION

# Outcomes in 45 Patients With Statin-Associated Myopathy

Karen E. Hansen, MD; Julie P. Hildebrand, MD; Edwin E. Ferguson, MD; James H. Stein, MD

**Background:** Published studies regarding statin-associated myopathy may describe more dramatic patient presentations, potentially leading to inaccurate characterization of the condition. Furthermore, long-term outcomes and responses to statin rechallenge in patients with statin-associated myopathy are largely unknown.

**Methods:** The University of Wisconsin Hospital and Clinics Medical Informatics Department identified 437 patients with *International Classification of Diseases, Ninth Revision* codes potentially representing cases of statin-associated myopathy from more than 13 years of inpatient and outpatient data; 45 of these individuals were diagnosed as having statin-associated myopathy. Using a standardized form, 2 researchers abstracted all the case records to define the clinical course of statin-induced myopathy.

**Results:** The mean (SD) duration of statin therapy before symptom onset was 6.3 (9.8) months. Resolution of muscle pain occurred a mean (SD) of 2.3 (3.0) months after discontinuation of statin therapy. Six patients (13%) were hospitalized for the management of rhabdomyolysis; 2 had reversible renal dysfunction, and 1 with preexisting renal insufficiency subsequently began lifelong dialysis. Hospitalized patients developed myopathy more quickly after initiating statin therapy (1.3 vs 7.1 months; $P=.048$) and were more likely to be taking concomitant medications known to increase the risk of statin-associated myopathy ($P=.03$). Thirty-seven patients received another statin after an episode of statin-associated myopathy; 21 (57%) reported recurrent muscle pain, whereas 16 (43%) tolerated other statins without recurrent symptoms.

**Conclusions:** Patients with statin-associated myopathy experienced full resolution of muscle pain on cessation of statin therapy. Although no deaths occurred, 13% of the patients required hospitalization for rhabdomyolysis. Recurrent muscle pain was common on statin rechallenge.

*Arch Intern Med. 2005;165:2671-2676*

IN A WIDE RANGE OF PATIENTS WITH and without heart disease,[1-5] 3-hydroxy-3-methylglutaryl coenzyme A reductase inhibitors (statins) reduce cardiovascular morbidity and mortality. Ongoing research[6-9] is investigating the possible role of statins in the treatment of dementia, hypertension, diabetes mellitus, and arthritis. Because of the cardiovascular benefits and improved survival among patients receiving statins, these medications are now the most prescribed class of drugs in the United States.[10] Statin use is expected to increase with the advancing age of society and as additional benefits of statins are clarified.[11]

These 3-hydroxy-3-methylglutaryl coenzyme A reductase inhibitors may cause myotoxic effects, with muscle pain occurring in 2% to 11% of patients, and clinically significant myopathy, defined as a creatine kinase (CK) level more than 10 times the reference value, with associated muscle symptoms occurring in approximately 0.5% of patients.[12-15] The Heart Protection Study[3] identified no significant difference in the incident rate of myotoxic effects between individuals receiving a statin vs placebo. However, individuals with coexisting diseases or taking medications that predispose to myotoxic effects were excluded from this study.

Known risk factors for the development of statin-associated myopathy include coexisting diseases associated with rhabdomyolysis (renal insufficiency, hepatic dysfunction, and hypothyroidism) and the use of concomitant medications that interfere with statin metabolism or independently cause myositis (gemfibrozil, cyclosporine, macrolide antibiotics, niacin, azole antifungals, protease inhibitors, and calcium channel blockers).[13] The natural course of myopathy in clinical practice is unknown, with only case reports or small case series describing short-term outcomes.[16-31] Such published reports may select patients with more dramatic or unique presentations, potentially leading to a selection or publication bias and, therefore, an inaccurate characterization of the typical presentation and outcome of statin-associated myopathy.

Author Affiliations: Rheumatology Section (Drs Hansen and Hildebrand) and Cardiovascular Medicine Section (Drs Ferguson and Stein), University of Wisconsin Medical School, Madison. Dr Hildebrand is now with Associated Physicians, Madison.


Downloaded from www.archinternmed.com at University of Minnesota, on June 10, 2006
©2005 American Medical Association. All rights reserved.




**Figure.** Case ascertainment. CK indicates the peak serum creatine kinase level; *ICD-9*, *International Classification of Diseases, Ninth Revision.*

We hypothesized that statin-associated myopathy is self-limited, with a benign clinical outcome, based on similar outcomes among patients in our own practices. We initiated a retrospective study to investigate the time course, severity, and clinical outcomes of patients experiencing statin-associated myopathy at a single medical center.

## METHODS

### CASE ASCERTAINMENT

We performed a retrospective study at the University of Wisconsin Hospital and Clinics, a tertiary care academic medical center in Madison. The human subjects committee of the University of Wisconsin Medical School approved the study. Informed consent from study participants was waived because the study was of minimal risk and could not practically occur without a waiver.

To identify potential cases of myotoxic effects, the University of Wisconsin Hospital and Clinics Medical Informatics Department provided a list of patients with *International Classification of Diseases, Ninth Revision*[32] codes for myositis (code 729.1); myopathy (code 359.9); myopathy due to drugs (code 359.4); inflammatory myopathy (code 359.8); progressive myopathy (code 359.8); toxic myopathy (359.4); other disorders of muscle, ligament, and fascia (codes 728.8 and 728.89); muscle weakness (code 728.9); unspecified myalgia and myositis (code 729.1); and adverse drug reaction to a cholesterol-lowering agent (codes E942.2, E980.4, and E972.2). All inpatients and outpatients seen at the University of Wisconsin Hospital and Clinics between January 1, 1990, and October 1, 2003, were included in this initial search (N=437). On review of 437 medical records, we excluded patients with an underlying primary or secondary myopathy or an increased CK level from other causes (n=392) (**Figure**).

Because diagnostic criteria for statin-associated myopathy have not been established, all patients diagnosed by a treating physician as having statin-associated myopathy were included in the focused medical record review. We included patients with a normal or unknown CK level because recent evidence[33] supports the entity of statin-associated myopathy with CK levels within the reference range. Subsequently, we categorized cases using a modification of the American College of Cardiology Statin Clinical Advisory document terms[34] as having (1) clinically significant myopathy with a CK level greater than 10 times the upper limit of the reference range plus muscle weakness or pain (n=8), (2) myositis with a CK level greater than 3 times the upper limit of the reference range and muscle weakness or pain (n=3), or (3) myopathy with muscle pain and weakness or an unknown, normal, or mildly elevated CK level at less than 3 times the upper limit of normal (n=34) (Figure). The term *rhabdomyolysis* was used interchangeably with *clinically significant myopathy*, as in other recent publications of statin-associated myopathy.[15,35]

For patients with a diagnosis of statin-associated myopathy, 2 investigators (K.E.H. and J.P.H.) reviewed the University of Wisconsin Hospital and Clinics computerized medical record using a standardized medical record review form to record the clinical features of the illness. We collected information on patient demographics; onset, duration, location, and severity of muscle pain; inciting drug with dose and duration of therapy before the onset of symptoms; the presence of muscle weakness; peak CK values; recent thyrotropin test results; therapeutic interventions; number of months until resolution of muscle pain; and response to other statins. Recovery from statin-associated myopathy was defined as the time from cessation of the implicated statin to the resolution of muscle pain. We recorded the use of concomitant medications known to increase the risk of statin-associated myopathy, specifically noting the use of other lipid-lowering agents (gemfibrozil, fenofibrate, niacin, and cholestyramine resin), calcineurin inhibitors, macrolide antibiotics, calcium channel blockers, protease inhibitors, serotonin uptake inhibitors, amiodarone, trimethoprim-sulfamethoxazole, and anticonvulsants.[36] Clinic notes and computerized medication lists were used to determine the dose and duration of statin therapy before myopathy and the response to other statins. We calculated creatinine clearance using the Cockcroft-Gault equation.[37]

Serum CK activity was measured in the University of Wisconsin Clinical Laboratory using an enzymatic assay in which the conversion of nicotinamide adenine dinucleotide to reduced nicotinamide adenine dinucleotide is quantified by UV measurements at 340 nm. Between 1990 and 2003, the most commonly used assay for this test was the Roche Modular Chemistry analyzer (Roche Diagnostics, North America, Indianapolis, Ind), but the Dade Dimension assay (Dade Behring Inc, Wilmington, Del) was also used, both providing equivalent test results (written communication, Don Wiebe, PhD, University of Wisconsin Clinical Laboratory, July 12, 2005). Using either of these assays, the reference range for serum CK levels is 0 to 250 U/L for men and 0 to 175 U/L for women.

### STATISTICAL ANALYSIS

All the data were entered into a spreadsheet program (MS Excel; Microsoft Corp, Redmond, Wash) for statistical analysis. Descriptive statistics were used to summarize all the data acquired by medical record review, with the results given as mean (SD). The Spearman correlation coefficient and analysis of variance were used to investigate potential relationships between peak CK levels and time to CK level normalization and between peak CK levels and the presence and severity of muscle weakness. Where appropriate, $\chi^2$, Fisher exact, Mann-Whitney rank sum, or independent-sample $t$ tests were used to explore relationships between patient characteristics and outcomes. All analyses were performed using Analyse-it software (Analyse-it Software Ltd, Leeds, England).

## RESULTS

### SYMPTOMS

We identified 45 patients with statin-associated myopathy; their demographic information and clinical characteristics are summarized in **Table 1**. Forty-four patients had muscle pain when first seen, which was described as severe in more than half of the 41 patients for whom severity of pain was recorded. One individual was asymp-


Downloaded from www.archinternmed.com at University of Minnesota, on June 10, 2006
©2005 American Medical Association. All rights reserved.

**Table 1. Demographic Information and Clinical Features of 45 Patients With Statin-Associated Myopathy**

| Patient Variable | Results |
|---|---|
| Age, mean (SD), y | 58.9 (9.6) |
| Sex, M/F, No. | 27/18 |
| Presence and severity of muscle pain, No. (%) | |
| None | 1 (2) |
| Mild | 4 (9) |
| Moderate | 14 (31) |
| Severe | 23 (51) |
| Not described | 3 (7) |
| Location of muscle pain, No. (%) | |
| Diffuse | 16 (36) |
| Legs only | 12 (27) |
| Legs and arms | 9 (20) |
| Back or chest | 3 (7) |
| Arms only | 2 (4) |
| Not described | 2 (4) |
| None | 1 (2) |
| Presence and distribution of weakness, No. (%) | |
| None | 31 (69) |
| Proximal | 7 (16) |
| Diffuse | 6 (13) |
| Present but location unknown | 1 (2) |
| Statins associated with myopathy, No. (mean [SD] dose, mg) | |
| Simvastatin | 23 (31.8 [26.1]) |
| Atorvastatin calcium | 9 (15.6 [10]) |
| Cerivastatin | 5 (0.375 [0.05]) |
| Pravastatin sodium | 4 (17.5 [5]) |
| Fluvastatin | 2 (80 in One patient and dose not recorded in the other) |
| Lovastatin | 1 (40) |
| Study statin | 1 (Name and dose unknown) |

tomatic, with a peak serum CK level of 703 U/L. The distribution of muscle pain was recorded for 42 of 44 patients and was most commonly noted to be diffuse. When present, limb pain was bilateral in all but 3 patients.

Almost 1 in 3 patients (n = 14) reported weakness. Such weakness limited functional capacity or activities of daily living in 13 patients, and pain decreased 1 individual's exercise capacity. Four individuals were referred for physical therapy. Although 6 patients required hospitalization for the management of rhabdomyolysis, no deaths occurred. The statins associated with an episode of myopathy are summarized in Table 1.

## SIGNS

Serum CK levels were measured in 37 patients (82%), with a mean value of 10 160 (28 879) U/L and a median value of 328 U/L (range, 36-140 190 U/L). The serum CK levels were within the reference range for 13 patients (35%). We found no statistical relationship between peak serum CK level and the presence of weakness and the duration or severity of muscle pain. Sixteen patients (36%) underwent thyrotropin testing within 2 months of the episode of myopathy; no individual had overt hypothyroidism.

**Table 2. Clinical Features and Hospitalization for Rhabdomyolysis**

| Patient Variable | Hospitalization (n = 6) | No Hospitalization (n = 39) |
|---|---|---|
| Age, mean (SD), y | 64.2 (8.6) | 58.1 (9.6) |
| Female sex, No. (%) | 5 (83) | 13 (33) |
| Duration of statin therapy before myopathy, mean (SD), mo | 1.3 (0.8)* | 7.1 (10.0)*† |
| Duration of myalgia after stopping statin therapy, mean (SD), mo | 4.0 (5.1) | 2.1 (2.5)† |
| Peak serum creatine kinase, mean (SD), U/L | 55 813 (52 677)* | 1029 (3271)*‡ |
| Combination therapy, No. (%)§ | 6 (100)* | 17 (45)*† |
| Creatinine clearance, mean (SD), mL/min | 56 (16)‖ | 63 (20)¶ |

*Statistically significant difference between groups ($P<.05$).
†Data were unavailable for 1 patient (n = 38).
‡Data were unavailable for 8 patients (n = 31).
§Combination therapy refers to use of a concomitant medication known to increase the risk of statin-associated myopathy.
‖Data were unavailable for 2 patients (n = 4).
¶Data were unavailable for 7 patients (n = 32).

Six of 8 patients with clinically significant myopathy were admitted to the hospital for the management of rhabdomyolysis. The serum CK levels of these patients were significantly higher than those of individuals treated as outpatients (**Table 2**). Three hospitalized patients experienced renal dysfunction. This first patient (peak CK level, 35 140 U/L) developed acute tubular necrosis (peak serum creatinine concentration, 6.2 mg/dL [548 μmol/L]) and during the following 3 months experienced recovery of normal renal function. The second patient (peak serum CK level, 11 928 U/L) developed mild renal insufficiency (peak serum creatinine concentration, 1.6 mg/dL [141 μmol/L]) but had normalization of renal function by the time of hospital discharge. The third patient (peak serum CK concentration, 7000 U/L) had preexisting renal artery stenosis and required dialysis during her hospitalization; her admission creatinine concentration of 2.1 mg/dL (186 μmol/L) increased to 4.6 mg/dL (407 μmol/L) by discharge. Subsequent outpatient renal stenting did not delay progression to end-stage renal disease, and she now receives lifelong dialysis.

Patients with clinically significant myopathy were older than those without this degree of myositis (66.1 [9.2] vs 57.4 [9.1] years; $P=.02$) but were similar in other patient characteristics (data not shown). In hospitalized patients, the duration of statin therapy before the onset of muscle pain was significantly shorter than that in individuals treated as outpatients (1.3 [0.8] vs 7.1 [10.0] months; $P=.048$) (Table 2).

Like other investigators,[35] we found that the use of combination therapy was more common in patients hospitalized for rhabdomyolysis ($P=.03$) (Table 2). Specifically, 3 patients developed rhabdomyolysis within 1 month of simultaneously beginning therapy with 2 lipid-lowering drugs (simvastatin and niacin added to long-term verapamil hydrochloride, simvastatin and gemfibrozil added to


Downloaded from www.archinternmed.com at University of Minnesota, on June 10, 2006
©2005 American Medical Association. All rights reserved.

**Table 3. Clinical Features and Muscle Biopsy**

| Patient Variable | Muscle Biopsy (n = 4) | No Muscle Biopsy (n = 41) |
|---|---|---|
| Age, mean (SD), y | 57.5 (11.3) | 59.0 (9.6) |
| Female sex, No. (%) | 1 (25) | 17 (41) |
| Duration of statin therapy before myopathy, mean (SD), mo | 1.1 (1)* | 6.7 (10) |
| Duration of myalgia after stopping statin use, mean (SD), mo | 1.3 (1) | 2.3 (3)† |
| Peak serum creatine kinase, mean (SD), U/L | 2277 (3186) | 11 145 (30 522)‡ |
| Combination therapy, No. (%)§ | 3 (75) | 20 (50)† |
| Creatinine clearance, mean (SD), mL/min | 79 (17)* | 61 (19)‡ |
| Hospitalization, No. (%) | 1 (25) | 5 (12) |
| Intolerance to >1 statin, No. (%) | 3 (75) | 18 (44) |

SI conversion factor: To convert creatinine clearance to milliliters per second, multiply by 0.0167.

*Data were unavailable for 1 patient (n = 3).

†Data were unavailable for 1 patient (n = 40).

‡Data were unavailable for 8 patients (n = 33).

§Combination therapy refers to use of a concomitant medication known to increase the risk of statin-associated myopathy.

long-term verapamil, and cerivastatin sodium plus gemfibrozil). The fourth individual tolerated gemfibrozil monotherapy for 2 months but experienced rhabdomyolysis within 1 month of adding cerivastatin. A fifth individual, who was already taking diltiazem hydrochloride, experienced rhabdomyolysis within 2½ weeks of beginning treatment with a study statin. The sixth person was taking felodipine and within 2 months of starting cerivastatin therapy sustained rhabdomyolysis.

To exclude other causes of myopathy, 5 patients underwent muscle biopsy or electromyography with assessment of nerve conduction velocity. Findings from the latter were normal in all the patients (n=4). Muscle biopsy histologic findings were normal in 2 patients, demonstrated muscle necrosis without inflammation in a third, and revealed nonspecific myopathy in a fourth. We did not detect differing clinical characteristics between patients undergoing muscle biopsy and those managed without such additional testing (**Table 3**). No patient developed permanent liver dysfunction, defined by elevated total bilirubin or alkaline phosphatase levels in addition to elevated transaminase levels.

## LONGITUDINAL DATA

Of 44 patients for whom data were available, the mean duration of statin therapy before symptom onset was 6.3 (9.8) months (range, 0.25-48.0 months) (**Table 4**). More specifically, approximately one third of the patients (n=17) noted muscle pain within 1 month and another one third (n=16) within 6 months of beginning statin therapy.

Thirty medications known to increase the risk of statin-associated myopathy were prescribed to 23 patients (52%). Concomitant medications associated with an episode of

**Table 4. Long-term Outcomes in 45 Patients With Statin-Associated Myopathy**

| Patient Variable | Results |
|---|---|
| Duration of statin therapy before myopathy, mean (SD) (range), mo | 6.3 (9.8) (0.25-48.0) |
| Duration of myalgia after stopping statin therapy, mean (SD) (range), mo | 2.3 (3.0) (0.25-14.0) |
| Rhabdomyolysis, No. (%) | 8 (18) |
| Hospitalization, No. (%) | 6 (13) |
| Renal dysfunction, No. (%) | |
| Temporary | 2 (4) |
| Permanent | 1 (2) |
| Deaths, No. | 0 |
| Intolerance to >1 statin, No. (%) | |
| Received another statin | 37 (82) |
| Recurrent muscle pain | 21 (57) |
| No recurrent muscle pain | 16 (43) |

statin-associated myopathy included calcium channel blockers (n=9), niacin (n=5), gemfibrozil (n=4), macrolide antibiotics (n=2), nefazodone hydrochloride (n=2), cyclosporine (n=2), and miscellaneous medications (n=1 each for amiodarone, cholestyramine, fenofibrate, fluoxetine hydrochloride, sertraline hydrochloride, and trimethoprim-sulfamethoxazole). Among patients taking cyclosporine, one received simvastatin, 20 mg daily, with subsequent myopathy and the other reported muscle pain while taking pravastatin sodium, 10 mg daily, and later tolerated this statin without recurrent symptoms.

In 44 patients, medical records indicated recovery from statin-associated myopathy a mean of 2.3 (3.0) months after the cessation of statin therapy (range, 0.25-14.0 months) (Table 4). Specifically, 57% of the patients (n=25) reported resolution of muscle symptoms by 1 month, another 34% (n=15) by 6 months, and 7% (n=3) by 14 months after stopping statin use. The single patient with ongoing muscle pain chose to continue statin therapy because of the high risk of cardiovascular disease. One individual reported "several months" of pain before full recovery.

Thirty-seven patients received other statins after an episode of statin-associated myopathy, with medical records providing adequate documentation of a response to that statin. Of these patients, 57% (n=21) reported recurrent muscle pain with the use of other statins. Conversely, 43% (n=16) tolerated a different statin (n=12) or the same statin (n=4) after an episode of statin-associated myopathy. Of 4 patients tolerating the same statin, 1 noted muscle pain with the statin amiodarone and a macrolide antibiotic that resolved with discontinuation of the treatment with macrolide despite continued use of amiodarone. Another patient tolerated a lower dose of simvastatin without pain, whereas 2 patients tolerated the statin at the same dose (n=1) or an unknown dose (n=1), in the latter case despite continuation of cyclosporine and trimethoprim-sulfamethoxazole treatment.

Of 6 patients hospitalized for rhabdomyolysis, 4 received other statins after recovery from myositis. The first


Downloaded from www.archinternmed.com at University of Minnesota, on June 10, 2006
©2005 American Medical Association. All rights reserved.

patient developed rhabdomyolysis with use of simvastatin and niacin and later reported flank pain with atorvastatin calcium; verapamil was prescribed throughout this period. The second patient experienced rhabdomyolysis while taking cerivastatin and gemfibrozil but later did well while taking atorvastatin. The third patient with rhabdomyolysis while receiving cerivastatin and gemfibrozil also reported muscle pain while taking simvastatin. The final patient recovered from rhabdomyolysis while taking simvastatin, gemfibrozil, and verapamil and then tolerated pravastatin despite concurrent use of verapamil and fenofibrate. Thus, although the data are limited, these findings suggest that some patients with rhabdomyolysis from one statin can tolerate other statins without recurrent symptoms.

We sought but did not find predictors of intolerance to more than 1 statin. Specifically, patient age, sex, duration of statin therapy before the onset of myopathy, duration of muscle pain, and peak serum CK level were no different between individuals with and without tolerance to other statins (**Table 5**). Likewise, disparate use of concomitant medications known to increase the risk of statin-associated myopathy was not observed between the tolerant and intolerant groups. Patients with intolerance to other statins had a higher creatinine clearance ($P = .006$), but this variable was available only for 32 individuals.

**Table 5. Clinical Variables and Intolerance to More Than 1 Statin***

| Patient Variable | Tolerant (n = 16) | Intolerant (n = 21) |
|---|---|---|
| Age, mean (SD), y | 59.8 (12) | 55.8 (7) |
| Female sex, No. (%) | 5 (31) | 9 (43) |
| Duration of statin therapy before myopathy, mean (SD), mo | 9.4 (11) | 5.4 (10)* |
| Duration of myalgia after stopping statin therapy, mean (SD), mo | 2.3 (3.4) | 1.6 (1.4)* |
| Peak serum creatine kinase, mean (SD), U/L | 11 271 (28 081)† | 11 039 (34779)‡ |
| Combination therapy, No. (%)§ | 10 (63) | 8 (40)* |
| Creatinine clearance, mean (SD), mL/min | 48 (23)‖¶ | 70 (12)¶ |

SI conversion factor: To convert creatinine clearance to milliliters per second, multiply by 0.0167.

*Data were unavailable for 1 patient (n = 20).

†Data were unavailable for 4 patients (n = 12).

‡Data were unavailable for 4 patients (n = 17).

§Combination therapy refers to use of a concomitant medication known to increase the risk of statin-associated myopathy.

‖Data were unavailable for 5 patients (n = 11).

¶Statistically significant difference between groups ($P<.05$).

## COMMENT

Because statin use is widespread, most primary care providers will encounter patients who experience an episode of statin-induced myopathy. Understanding the natural course of statin-associated myopathy will facilitate better informed consent of patients initiating such therapy and will allow caregivers to provide more complete information to their patients regarding the prognosis of the condition.

This study of statin-associated myopathy provides a spectrum of observations ranging from mild muscle pain to acute rhabdomyolysis. We describe important clinical details of statin-associated myopathy, including location of muscle pain, frequency of muscle weakness, time course of the illness, and ability to tolerate other statins after an episode of statin-associated myopathy. Like other researchers, we found that rhabdomyolysis is often associated with the use of coexisting medications known to increase its risk. In addition, patients with clinically significant myopathy were older than those without this degree of myositis.

Every patient who discontinued statin therapy experienced rapid resolution of muscle pain, typically within a month after cessation of therapy. Renal dysfunction was usually temporary but occurred in half of the patients who required hospitalization for rhabdomyolysis. Finally, although data are limited, our findings suggest that some patients with statin-associated rhabdomyolysis may tolerate other statins without recurrent symptoms.

The most important limitation of this study is its retrospective, observational nature. We relied on health care providers to record clinical details and to order objective tests of muscle function, such as the serum CK measurement. This study may involve selection or referral bias because patients receiving care in a tertiary center may be different from those treated in private practice. In addition, we used clinical outcomes, and most patients did not undergo objective muscle tests, such as electromyography or muscle biopsy, during or after an episode of statin-associated myopathy. The small sample size of this study is an important limitation; our study had limited power to detect individual patient characteristics that may predict adverse outcomes from statin-associated myopathy. Finally, the data from this study cannot be used to assess the incidence of myopathy with each statin.

In this study, patients with statin-associated myopathy experienced full resolution of muscle pain on the cessation of statin therapy. Although no deaths occurred, 13% of the patients required hospitalization for rhabdomyolysis, and half of these individuals experienced transient or permanent renal dysfunction. Recurrent muscle pain was common on statin rechallenge, but predictors of intolerance to multiple statins were not identified in this small study.

Accepted for Publication: July 12, 2005.
Correspondence: Karen E. Hansen, MD, Rheumatology Section, University of Wisconsin Medical School, Mailbox 3244, H6/363 Clinical Science Center, 600 Highland Ave, Madison, WI 53792 (keh@medicine.wisc.edu).
Financial Disclosure: Dr Ferguson is on the speaker's bureaus and has received grant support from Pfizer and Kos Pharmaceuticals. Dr Stein is on the speaker's bureaus of Kos Pharmaceutical, Merck, Pfizer, and Schering-Plough and has received grant support from AstraZeneca and Bristol-Myers Squibb.
Funding/Support: This study was supported by grants 1K23 AR050995 and 1K12RRO17614 (Dr Hansen) and


Downloaded from www.archinternmed.com at University of Minnesota, on June 10, 2006
©2005 American Medical Association. All rights reserved.

grant K23 RR16176-01 (Dr Stein) from the National Institutes of Health, Bethesda, Md.
Acknowledgment: We thank Don Wiebe, PhD, for information regarding CK assays.

## REFERENCES


1. Sacks FM, Pfeffer MA, Moye LA, et al; Cholesterol and Recurrent Events Trial Investigators. The effect of pravastatin on coronary events after myocardial infarction in patients with average cholesterol levels. *N Engl J Med*. 1996;335:1001-1009.
2. Shepherd J, Cobbe SM, Ford I, et al; West of Scotland Coronary Prevention Study Group. Prevention of coronary heart disease with pravastatin in men with hypercholesterolemia. *N Engl J Med*. 1995;333:1301-1307.
3. Heart Protection Study Collaborative Group. MRC/BHF Heart Protection Study of cholesterol lowering with simvastatin in 20,536 high-risk individuals: a randomised placebo-controlled trial. *Lancet*. 2002;360:7-22.
4. Bucher HC, Griffith LE, Guyatt GH. Effect of HMGcoA reductase inhibitors on stroke: a meta-analysis of randomized, controlled trials. *Ann Intern Med*. 1998;128:89-95.
5. Hebert PR, Gaziano JM, Chan KS, Hennekens CH. Cholesterol lowering with statin drugs, risk of stroke, and total mortality: an overview of randomized trials. *JAMA*. 1997;278:313-321.
6. Jick H, Zornberg GL, Jick SS, Seshadri S, Drachman DA. Statins and the risk of dementia. *Lancet*. 2000;356:1627-1631.
7. Freeman DJ, Norrie J, Sattar N, et al. Pravastatin and the development of diabetes mellitus: evidence for a protective treatment effect in the West of Scotland Coronary Prevention Study. *Circulation*. 2001;103:357-362.
8. Sposito AC, Mansur AP, Coelho OR, Nicolau JC, Ramires JA. Additional reduction in blood pressure after cholesterol-lowering treatment by statins (lovastatin or pravastatin) in hypercholesterolemic patients using angiotensin-converting enzyme inhibitors (enalapril or lisinopril). *Am J Cardiol*. 1999;83:1497-1499.
9. Leung BP, Sattar N, Crilly A, et al. A novel anti-inflammatory role for simvastatin in inflammatory arthritis. *J Immunol*. 2003;170:1524-1530.
10. Golomb BA, Criqui MH, White H, Dimsdale JE. Conceptual foundations of the UCSD Statin Study: a randomized controlled trial assessing the impact of statins on cognition, behavior, and biochemistry. *Arch Intern Med*. 2004;164:153-162.
11. Baxter C, Jones R, Corr L. Time trend analysis and variations in prescribing lipid lowering drugs in general practice. *BMJ*. 1998;317:1134-1135.
12. Ucar M, Mjorndal T, Dahlqvist R. HMG-CoA reductase inhibitors and myotoxicity. *Drug Saf*. 2000;22:441-457.
13. Evans M, Rees A. The myotoxicity of statins. *Curr Opin Lipidol*. 2002;13:415-420.
14. Evans M, Rees A. Effects of HMG-CoA reductase inhibitors on skeletal muscle: are all statins the same? *Drug Saf*. 2002;25:649-663.
15. Thompson PD, Clarkson P, Karas RH. Statin-associated myopathy. *JAMA*. 2003;289:1681-1690.
16. Deslypere JP, Vermeulen A. Rhabdomyolysis and simvastatin [letter]. *Ann Intern Med*. 1991;114:342.
17. Scalvini T, Marocolo D, Cerudelli B, Sleiman I, Balestrieri GP, Giustina G. Pravastatin-associated myopathy: report of a case. *Recenti Prog Med*. 1995;86:198-200.
18. Iliadis EA, Rosenson RS. Long-term safety of pravastatin-gemfibrozil therapy in mixed hyperlipidemia. *Clin Cardiol*. 1999;22:25-28.
19. Murdock DK, Murdock AK, Murdock RW, et al. Long-term safety and efficacy of combination gemfibrozil and HMG-CoA reductase inhibitors for the treatment of mixed lipid disorders. *Am Heart J*. 1999;138:151-155.
20. Bizzaro N, Bagolin E, Milani L, Cereser C, Finco B. Massive rhabdomyolysis and simvastatin [letter]. *Clin Chem*. 1992;38:1504.
21. McDonagh J, Winocour P, Walker DJ. Musculoskeletal manifestations during simvastatin therapy. *Br J Rheumatol*. 1993;32:647-648.
22. Giordano N, Senesi M, Mattii G, Battisti E, Villanova M, Gennari C. Polymyositis associated with simvastatin. *Lancet*. 1997;349:1600-1601.
23. Oldemeyer JB, Lund RJ, Koch M, Meares AJ, Dunlay R. Rhabdomyolysis and acute renal failure after changing statin-fibrate combinations. *Cardiology*. 2000;94:127-128.
24. Gutierrez CA. Sildenafil-simvastatin interaction: possible cause of rhabdomyolysis? *Am Fam Physician*. 2001;63:636-637.
25. Caldwell SH, Hespenheide EE, von Borstel RW. Myositis, microvesicular hepatitis, and progression to cirrhosis from troglitazone added to simvastatin. *Dig Dis Sci*. 2001;46:376-378.
26. Tomlinson B, Lan IW. Combination therapy with cerivastatin and gemfibrozil causing rhabdomyolysis: is the interaction predictable? *Am J Med*. 2001;110:669-670.
27. Rodriguez ML, Mora C, Navarro JF. Cerivastatin-induced rhabdomyolysis [letter]. *Ann Intern Med*. 2000;132:598.
28. Garcia-Valdecasas-Campelo E, Gonzalez-Reimers E, Lopez-Lirola A, Rodriguez-Rodriguez E, Santolaria-Fernandez F. Acute rhabdomyolysis associated with cerivastatin therapy [case report]. *Arch Intern Med*. 2001;161:893.
29. Wenisch C, Krause R, Fladerer P, El Menjawi I, Pohanka E. Acute rhabdomyolysis after atorvastatin and fusidic acid therapy [letter]. *Am J Med*. 2000;109:78.
30. Gemici G, Toprak A, Oktay A. Rhabdomyolysis due to cerivastatin monotherapy [letter]. *Am J Med*. 2001;110:742.
31. Alexandridis G, Pappas GA, Elisaf MS. Rhabdomyolysis due to combination therapy with cerivastatin and gemfibrozil. *Am J Med*. 2000;109:261-262.
32. World Health Organization. *International Classification of Diseases, Ninth Revision (ICD-9)*. Geneva, Switzerland: World Health Organization; 1977.
33. Phillips PS, Haas RH, Bannykh S, et al. Statin-associated myopathy with normal creatine kinase levels. *Ann Intern Med*. 2002;137:581-585.
34. Pasternak RC, Smith SC Jr, Bairey-Merz CN, Grundy SM, Cleeman JI, Lenfant C. ACC/AHA/NHLBI clinical advisory on the use and safety of statins. *J Am Coll Cardiol*. 2002;40:567-572.
35. Graham DJ, Staffa JA, Shatin D, et al. Incidence of hospitalized rhabdomyolysis in patients treated with lipid-lowering drugs. *JAMA*. 2004;292:2585-2590.
36. Omar MA, Wilson JP, Cox TS. Rhabdomyolysis and HMG-CoA reductase inhibitors. *Ann Pharmacother*. 2001;35:1096-1107.
37. Verhave JC, Balje-Volkers CP, Hillege HL, de Zeeuw D, de Jong PE. The reliability of different formulae to predict creatinine clearance. *J Intern Med*. 2003;253:563-573.



Downloaded from www.archinternmed.com at University of Minnesota, on June 10, 2006
©2005 American Medical Association. All rights reserved.

# EXHIBIT F

1. Reijonen H, Daniels TL, Lernmark A, Nepom GT. GAD65-specific autoantibodies enhance the presentation of an immunodominant T-cell epitope from GAD65. Diabetes 2000;49:1621-6.
2. McDevitt H. Closing in on type 1 diabetes. N Engl J Med 2001;345:1060-1.
3. Chiu PP, Serreze DV, Danska JS. Development and function of diabetogenic T-cells in B-cell deficient nonobese diabetic mice. Diabetes 2001;50:763-70.
4. Bonifacio E, Atkinson M, Eisenbarth G, et al. International Workshop on Lessons from Animal Models for Human Type 1 Diabetes: identification of insulin but not glutamic acid decarboxylase or IA-2 as specific autoantigens of humoral autoimmunity in nonobese diabetic mice. Diabetes 2001;50:2451-8.

## The Acts of Terrorism

*To the Editor:* People all over the world were shocked by the disaster of September 11, 2001. I want to emphasize what the editors wrote about medical insurance in the *Journal*'s editorial on the subject (Oct. 11 issue)[1]: "Victims and their families must receive medical and mental health attention regardless of their ability to pay and whether or not they have medical insurance."

I believe that the international community of physicians should fight for justice in medical treatment. It is noteworthy that 40 million Americans have no medical insurance and billions of people in the Third World do not receive basic medical treatment. Physicians may not be able to save the world, but our united voice must be heard loud and clear. Everybody on this planet deserves medical and mental health care, regardless of his or her ability to pay. Justice in medical care might help to prevent hatred and frustration. Justice in medical care will not solve the problem of terrorism, but it might play a part in preventing it.

Ariel Rokach, M.D.
Hadassah University Hospital
Jerusalem 91240, Israel
arielr@hadassah.org.il

1. The Editors. September 11, 2001. N Engl J Med 2001;345:1126.

*To the Editor:* The editorials on bioterrorism (July 26 issue[1] and Oct. 11 issue) called for an improved national program of preparedness, including a strengthened public-service infrastructure, improvements in diagnosis, better integration of information, and timely reporting of laboratory results. An important omission in these proposals is the role of the nation's 17,000 nursing homes as a necessary addition to the evolving system of response. There are 1,600,000 nursing home beds, of which approximately 200,000 are unoccupied on any given day.[2] The nursing homes have about twice the total number of beds that hospitals have, are located in every community in the United States, employ skilled nursing staffs and medical directors, and are linked with other medical staffs in the community. They also have established mechanisms for rehabilitation, laboratory testing, radiology, and the transportation of patients. Moreover, family and social-service support are part of the work of nursing homes.

With a small amount of additional effort and planning, the nursing homes can enhance the developing response to natural or man-made emergencies. A beneficial byproduct will be a strengthening of the nursing homes in each community and improvement in their performance of their traditional role. Fear of terrorism is understandable, but fear of the nursing home is not an acceptable reason to overlook this opportunity to enhance our response to these threats to the public.

Leslie S. Libow, M.D.
Jewish Home and Hospital
New York, NY 10025
llibow@jhha.org

1. Khan AS, Ashford DA. Ready or not — preparedness for bioterrorism. N Engl J Med 2001;345:287-9.
2. Gabrel CS. An overview of nursing home facilities: data from the 1997 National Nursing Home Survey. Advance data from vital and health statistics. No. 311. Hyattsville, Md.: Public Health Service, 2000:1-12.

*To the Editor:* The same species that eradicated smallpox and has very nearly eradicated poliomyelitis has also committed innumerable acts of violence against itself. Will we ever learn that every war is a civil war?

John R. Dykers, Jr., M.D.
P.O. Box 565
Siler City, NC 27344

The editors reply:

The new threats of massive terrorism have developed amid the anger and resentment that have been building in oppressive, failing countries that do not provide for the basic needs of their people. Dr. Rokach's statement is a reminder that any plan to counter the underlying causes of terrorism should include plans to improve the health of those trapped in severe poverty. The health care resources of the economically developed countries are enormous. Some small fraction of those resources could produce substantial improvements for those living in the poorest countries.

In the aftermath of September 11 and the subsequent acts of biologic terrorism, we know that preparedness is now required for responses to acts that once seemed unimaginable. Those responses should draw on all our health care resources, including nursing homes and their personnel, as Dr. Libow points out. As Dr. Libow also suggests, being forced to create such contingency plans could result in the development of a better perspective on some of the problems in the fragmented health care system of the United States.

Edward W. Campion, M.D.
Jeffrey M. Drazen, M.D.

## Cerivastatin and Reports of Fatal Rhabdomyolysis

*To the Editor:* Bayer's voluntary withdrawal of cerivastatin from the U.S. market led to questions regarding the safety of all hydroxymethylglutaryl–coenzyme A reductase inhibitors,



Downloaded from www.nejm.org by RENEE E. MUKHERJI on June 21, 2006.
Copyright © 2002 Massachusetts Medical Society. All rights reserved.

**TABLE 1. REPORTED CASES OF FATAL RHABDOMYOLYSIS AND NUMBERS OF PRESCRIPTIONS FOR ALL STATINS DISPENSED IN THE UNITED STATES SINCE THESE PRODUCTS WERE LAUNCHED.**

| VARIABLE | LOVASTATIN | PRAVASTATIN | SIMVASTATIN | FLUVASTATIN | ATORVASTATIN | CERIVASTATIN | TOTAL |
|---|---|---|---|---|---|---|---|
| Date approved | 8/31/87 | 10/31/91 | 12/23/91 | 12/31/93 | 12/17/96 | 6/26/97 | — |
| Fatal cases of rhabdomyolysis* | 19 | 3 | 14 | 0 | 6 | 31 | 73 |
| No. of prescriptions dispensed since marketing began† | 99,197,000 | 81,364,000 | 116,145,000 | 37,392,000 | 140,360,000 | 9,815,000 | 484,273,000 |
| Reporting rate (per 1 million prescriptions)‡ | 0.19 | 0.04 | 0.12 | 0 | 0.04 | 3.16 | 0.15 |

*U.S. cases reported to the FDA before June 26, 2001, that met the following criteria were included: the report included a clinical diagnosis of rhabdomyolysis, a temporal association between rhabdomyolysis and the use of a statin could be identified from the report, and death resulted either directly or indirectly from rhabdomyolysis.

†Data are through May 2001 and are from the National Prescription Audit Plus, excluding the Long Term Care Channel.

‡The reporting rate is the number of fatal cases divided by the number of prescriptions dispensed and is a crude measure of the number of reports received by the FDA relative to the extent of the use of an agent in the U.S. population. Rigorous comparisons between drugs that are based on these data are not recommended, since many factors can affect reporting and an unknown number of cases may not be attributed to the drug or reported to the FDA. Reporting rates are not incidence rates.

or statins. Myopathy and the rarer severe rhabdomyolysis are considered adverse events of therapy with this class of drugs.[1] Concomitant use of drugs that can increase blood levels of statins can increase the risk of myopathy, as can concomitant use of gemfibrozil.[2] We summarize the U.S. reports of fatal rhabdomyolysis associated with all six drugs in this class: lovastatin, pravastatin, simvastatin, fluvastatin, atorvastatin, and cerivastatin.

We reviewed reports in the Adverse Event Reporting System of the Food and Drug Administration (FDA). We also examined the number of prescriptions dispensed in the United States since the marketing of each drug began, according to the National Prescription Audit Plus (IMS HEALTH, Fairfield, Conn.). This is a nationally projected audit of retail pharmacies and mail-order houses.

Our results show that fatal rhabdomyolysis is a rare event among statin users, with reporting rates much lower than 1 death per million prescriptions in the case of most statins (Table 1). The rate of fatal rhabdomyolysis associated with cerivastatin therapy, however, is 16 to 80 times as high as the rates for any other statin. Some of this difference appears to be related to the known, marked interaction (relative to that of other statins) between cerivastatin and gemfibrozil, which in late 1999 led to the listing on the labels of contraindications against the combined use of these agents. The use of this combination was reported in 12 of the 31 deaths. After the exclusion of the 12 cases in which gemfibrozil was used with cerivastatin and the 7 cases in which it was used with lovastatin, the reporting rate of fatal rhabdomyolysis in association with cerivastatin monotherapy is 1.9 per million prescriptions, 10 to 50 times as high as the rates associated with the other statins. Among the 19 deaths associated with cerivastatin in the absence of gemfibrozil therapy, 12 occurred after use of the 0.8-mg dose (which was approved in the United States in July 2000), 6 occurred after use of the 0.4-mg dose, and the dose was not reported in 1 case. This pattern suggests that there is a relation to the dose.

Because of the underreporting of adverse reactions, the use of reporting rates as proxy measures of risk has limitations. Only about 1 percent of all serious events are directly reported by physicians.[3] There is a secular trend of increased reporting to the FDA over the past decade.[4] However, the rate of reports of fatal rhabdomyolysis associated with the use of atorvastatin (approved for use within six months after the approval of cerivastatin) was far less than for cerivastatin. Thus, the increased reporting associated with the use of cerivastatin appears to be more than an artifact related to an increased awareness of statin-associated rhabdomyolysis or to secular trends in reporting.

On the basis of the finding of a markedly increased reporting rate of fatal rhabdomyolysis in association with cerivastatin, Bayer, with the concurrence of the FDA, moved to withdraw cerivastatin from the U.S. market. Clinicians should be aware of this labeled but rare event associated with the use of all statins and should warn patients to watch for symptoms of myopathy, such as muscle pain or weakness, which should prompt an immediate consultation with their physician.

(The views expressed are those of the authors and do not necessarily represent those of, nor imply endorsement by, the FDA or the U.S. government.)

JUDY A. STAFFA, PH.D., R.PH.
JENNIE CHANG, PHARM.D.
LANH GREEN, R.PH., M.P.H.
Food and Drug Administration
Rockville, MD 20857
staffaj@cder.fda.gov

1. Physicians' desk reference. 55th ed. Oradell, N.J.: Medical Economics, 2001.
2. Pierce LR, Wysowski DK, Gross TP. Myopathy and rhabdomyolysis associated with lovastatin-gemfibrozil combination therapy. JAMA 1990; 264:71-5.
3. Scott HD, Rosenbaum SE, Waters WJ, et al. Rhode Island physicians' recognition and reporting of adverse drug reactions. R I Med J 1987;70:311-6.
4. Kennedy DL, Goldman SA, Lillie RB. Spontaneous reporting in the United States. In: Strom BL, ed. Pharmacoepidemiology. 3rd ed. New York: John Wiley, 2000:151-74.

Correspondence Copyright © 2002 Massachusetts Medical Society.



Downloaded from www.nejm.org by RENEE E. MUKHERJI on June 21, 2006 .
Copyright © 2002 Massachusetts Medical Society. All rights reserved.

# EXHIBIT G

**C**

**Motions, Pleadings and Filings**

United States District Court,
N.D. Georgia,
Atlanta Division.
Fred B. LEATHERS, Jr., Plaintiff,
v.
PFIZER, INC. & Warner-Lambert Company LLC,
Defendant.
**No. CIV.A.1:04CV00615.**

March 10, 2006.

**Background:** Patient who had been prescribed and had taken statin drug to combat high cholesterol brought products liability/toxic tort action against drug's manufacturer, asserting claims including defective design, failure to warn, and negligence. Manufacturer moved to exclude testimony of expert witness/treating physician, moved to strike declarations by other proffered experts, and moved for summary judgment.

**Holdings:** The District Court, Orinda D. Evans, J., held that:
(1) patient had to establish both general and specific causation;
(2) fact that proffered expert was also treating physician did not obviate
need for *Daubert* analysis;
(3) reliability criterion was unmet as to expert's opinion on general causation;
(4) reliability criterion also was unmet as to specific causation; and
(5) second treating physician's opinion was opinion from "retained or specially employed" expert, and thus was subject to requirement for pretrial written report.
Motions granted.

West Headnotes

**[1] Products Liability 🔑46.2**
313Ak46.2 Most Cited Cases
Patient who brought toxic tort action against manufacturer of statin drug that patient had taken to combat high cholesterol, alleging that drug had caused permanent and diffuse muscle ailment regardless of his having discontinued use, was obligated to establish both general and specific causation, i.e. had to show that drug was capable of causing his condition; medical community generally accepted only that statins were capable of temporary, not permanent, muscular side effects.

**[2] Evidence 🔑545**
157k545 Most Cited Cases
Party to federal action seeking to present expert testimony must establish its admissibility by preponderance of evidence. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[3] Evidence 🔑536**
157k536 Most Cited Cases
Gaps in federal expert witness's qualifications or knowledge generally go to weight of witness's testimony, not its admissibility. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[4] Evidence 🔑555.2**
157k555.2 Most Cited Cases
Factors in determining whether proposed expert testimony is based on reliable scientific knowledge include whether: (1) theory can and has been tested; (2) theory has been subjected to peer review and publication; (3) there is known or potential rate of error associated with theory; and (4) theory or methodology employed is generally accepted in the field. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[5] Evidence 🔑505**
157k505 Most Cited Cases
Fact that patient's proffered expert witness in toxic tort action against drug manufacturer was also patient's treating physician did not obviate need to conduct *Daubert* analysis of proffered expert testimony; physician would be testifying regarding causation, not merely his experiences in treating patient. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[6] Evidence 🔑536**
157k536 Most Cited Cases
Under liberal *Daubert* approach for deciding proffered expert's
qualifications, treating physician, an internist, qualified as expert in patient's toxic tort action against drug manufacturer, even though physician was strictly clinical practitioner rather than epidemiologist or toxicologist. Fed.Rules Evid.Rule

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

702, 28 U.S.C.A.

[7] **Evidence 555.10**
157k555.10 Most Cited Cases

[7] **Evidence 556**
157k556 Most Cited Cases
In patient's toxic tort action against drug manufacturer, reliability criterion was unmet as to patient's proffered expert witness's opinion on general causation, i.e. whether drug in question, a statin, could cause diffuse muscle ailment of which patient complained; expert relied on adverse incident reports, which did not by themselves establish general causation, and journal articles, which either did not address relationship between statins and muscular side effects or did not support general causative link. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

[8] **Evidence 555.10**
157k555.10 Most Cited Cases
In patient's toxic tort action against drug manufacturer, reliability criterion was unmet as to patient's proffered expert witness's opinion on specific causation, i.e. whether drug in question, a statin, had caused diffuse muscle ailment of which patient complained; expert, who was also patient's treating physician, had not made definitive diagnosis, did not discount possibility that patient had underlying muscle disease, had not observed patient for more than one year before writing his report, and relied critically on temporal proximity of ingestion of drug and reporting of symptoms. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

[9] **Federal Civil Procedure 1278**
170Ak1278 Most Cited Cases
Burden of establishing that failure to disclose expert testimony was substantially justified or harmless, thus permitting introduction of such testimony, rests on nondisclosing party. Fed.Rules Civ.Proc.Rules 26(a)(2), 37(c)(1), 28 U.S.C.A.

[10] **Federal Civil Procedure 1274**
170Ak1274 Most Cited Cases
Treating physician's pretrial declaration in toxic tort action against drug manufacturer, attached to plaintiff patient's response to summary judgment motion, and opining that "[i]t is generally recognized in the medical community that [drug in question] ha[s] side effects which include muscle problems such as myalgias and myopathy," constituted opinion of "retained or specially employed" expert, and thus was subject to requirement for pretrial written report; statement did not relate to care or treatment of patient, but was opinion on general causation. Fed.Rules Evid.Rule 702, 28 U.S.C.A.; Fed.Rules Civ.Proc.Rules 26(a)(2), 37(c)(1), 28 U.S.C.A.

[11] **Federal Civil Procedure 1278**
170Ak1278 Most Cited Cases
In patient's toxic tort action against drug manufacturer, deposition of physician taken by manufacturer, in earlier action against same manufacturer and concerning same drug, and offered by patient in response to summary judgment motion in order to show general causation, was subject to requirement for pretrial disclosure of expert testimony, regardless of whether or not substance of deposition qualified for hearsay exception for former testimony. Fed.Rules Evid.Rules 702, 804(b)(1), 28 U.S.C.A.; Fed.Rules Civ.Proc.Rules 26(a)(2), 37(c)(1), 28 U.S.C.A.

***689** James Randolph Schulz, Ragsdale Beals Hooper & Seigler, Atlanta, GA, for Plaintiff.

Leeann Jones, Melissa Davis Strickland, Vernon Robert Denham, Jr., Powell Goldstein LLP, Atlanta, GA, Mark S. Cheffo, Skadden Arps Slate Meagher & Flom, New York, NY, for Defendant.

*ORDER*

ORINDA D. EVANS, District Judge.

****1** This toxic tort diversity action is currently before the Court on Defendants' Motion to Exclude the Opinions of Mark R. Firth, M.D. [# 72], Defendants' Motion for Leave to File Excess Pages [# 70], Defendants' Motion for Summary Judgment [# 71], Defendants' Motion to File Under Seal Certain Portions of Exhibits to Their Motion for Summary Judgment [# 75], Defendants' Motion for Scheduling Order [# 78], Defendants' Motion for Leave to File Excess Pages [# 95], Defendants' Motion to Strike [# 98], Defendants' Motion for Leave to File Response to Plaintiff's Notice of Subsequent Authority [# 113]; Defendants' Motion for Ruling on the Record [# 124]; and Defendants' Motion for Leave to File a Response to Plaintiff's Supplemental Brief Document [# 129].

On February 1, 2006, United States District Judge William S. Duffey, Jr. conducted a *Daubert* hearing on Defendants' Motion to Exclude the Opinions of Dr. Mark R. Firth, M.D. [# 72]. The hearing also addressed issues related to Defendants' Motion to Strike. Counsel for both parties delivered oral arguments on the matter. Neither Dr. Firth nor the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

subjects of Defendants' Motion to Strike were in attendance. After the hearing but prior to ruling on Defendants' motions, Judge Duffey recused himself and the case was transferred to the undersigned judge.

For the following reasons, Defendants' Motion to Exclude the Opinions of Dr. Mark R. Firth, M.D. [# 72] and Defendants' Motion for Summary Judgment [# 71] are GRANTED. Defendants' Motion to Strike [# 98] is GRANTED IN PART and DISMISSED AS MOOT IN PART. Defendants' Motions for Leave to File Excess Pages [# 70 & # 95], Defendants' Motion to File Under Seal [# 75], and Defendants' Motion for Leave to File a Response to Plaintiff's Supplemental Authority [# 113] are GRANTED NUNC PRO TUNC. Defendants' Motion ***690** for Scheduling Order [# 78] and Defendants' Request for Ruling on the Record [# 124] are DISMISSED AS MOOT.

I. *Background*

The following facts are undisputed unless otherwise noted. Defendant Pfizer, Inc. ("Pfizer") is a foreign corporation in the business of pharmaceutical manufacturing, marketing, and sales. Pfizer makes Lipitor, the prescription medication at issue in this lawsuit. Defendant Warner-Lambert Company ("Warner-Lambert") is a subsidiary of Pfizer. Through an unincorporated division called Parke-Davis, Warner-Lambert manufactures and sells Lipitor in the United States and, more specifically, in Georgia. According to the Complaint, Defendants began selling Lipitor in the United States in 1997 after garnering approval from the Food and Drug Administration ("FDA").

Lipitor is in a class of drugs called statins, which inhibit a certain enzyme in the liver from producing the kind of cholesterol responsible for clogging blood vessels. Lipitor is commonly prescribed to reduce cholesterol levels, thereby reducing the risk of heart attack, stroke, and other related maladies. By virtue of being a statin, Lipitor has certain widely recognized side effects. Defendants freely admit that physicians have long been aware of "certain muscle-related adverse events [that] have been associated with statin drugs." Defs.' Mot. 3. Defendants also acknowledge that "in some class or some subset of people they can basically have [rhabdomyolysis], renal failure and death ... with respect to statins." Firth Trans. 35:8-12. Plaintiff and Defendants, however, dispute whether Lipitor can cause the permanent, milder form of diffuse muscle ailment that Plaintiff claims to have. Plaintiff and Plaintiff's doctors refer to Plaintiff's alleged injury as "statin-induced myopathy."

****2** Plaintiff's first exposure to Lipitor was in August of 2001. He was 69 years old at the time. Dr. Mark R. Firth, Plaintiff's general internist, prescribed 10 milligrams of Lipitor per day to Plaintiff. A few months later (on or about February 20, 2002 according to Plaintiff's Complaint), Plaintiff's dosage increased to 20 milligrams of Lipitor per day. According to Dr. Firth's expert report, [FN1] "within a few weeks [of the increase in dosage, Plaintiff] developed signs and symptoms consistent with myopathy including extreme fatigue, weakness and diffuse muscle pain."

FN1. While Dr. Firth is Plaintiff's treating physician, he has also been designated as an expert witness.

Plaintiff discontinued Lipitor and underwent tests. Dr. Firth did a blood test which showed that Plaintiff's creatine phosphokinase levels were normal, indicating that Plaintiff did not have rhabdomyolysis. Dr. Firth referred Plaintiff to Dr. Linker, a rheumatologist, and Dr. Novey, a neurologist. After brief consultations, both doctors concluded that Plaintiff's ailments were linked to Lipitor.

Plaintiff claims that his muscle pain did not abate when he discontinued Lipitor. He claims that as a result of taking Lipitor, he has suffered from "grievous injuries, including, but ... not limited to, muscular weakness, severe muscle pain, multiple myalgias, myositis, a myopathic syndrome, and permanent disability." Compl. ¶ 3. Plaintiff alleges that Defendants knew that Lipitor had the potential to cause these permanent side effects, but that Defendants inadequately warned the FDA, doctors, and consumers of these risks. Plaintiff's claims include defective design, failure to warn, negligence, breach of express warranties, breach of implied warranties, and unjust enrichment. He seeks compensatory, punitive, and exemplary damages.

II. *Toxic Tort Litigation & Causation*

Toxic tort litigation is a subset of products liability in which "cases ... are won or lost on the strength of the scientific evidence presented to prove causation." Rider v. Sandoz Pharm. Corp., 295 F.3d 1194, 1197 (11th Cir.2002). Recently, the United States Court of Appeals for the Eleventh Circuit noted that "toxic tort cases usually come in two broad categories: first, those cases in which the medical community

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

generally recognizes the toxicity of the drug or chemical at issue, and second, those cases in which the medical community does not generally recognize the agent as both toxic and causing the *691 injury plaintiff alleges." McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1239 (11th Cir.2005). In the first type of toxic tort case, the Court "need not undertake an extensive *Daubert* analysis on the general toxicity question when the medical community recognizes that the agent causes the type of harm a plaintiff alleges." *Id.* In other words, general causation [FN2] is already established, leaving only specific causation at issue for trial. In the second type of case, the plaintiff bears the burden of establishing both general and specific causation.

FN2. " 'General causation is concerned with whether an agent increases the incidence of disease in a group and not whether the agent caused any given individual's disease.' " *McClain,* 401 F.3d at 1239 (quoting Michael D. Green et al., Reference Guide on Epidemiology, in *Reference Manual on Scientific Evidence* 392 (Federal Judicial Center, 2d ed.2000)).

**3 [1] The parties dispute which category the instant case falls into. Plaintiff argues that because the medical community recognizes that Lipitor (and statins in general) cause muscle-related ailments, general causation is already established. Defendants, on the other hand, insist that while the medical community recognizes that statins can cause certain maladies, the medical community also believes that discontinuing the medication will correct the problems. They argue that the type of general causation Plaintiff asserts-- one where statins cause prolonged and even permanent damage--is not recognized in the medical community; thus, Plaintiff must establish both general and specific causation.

After carefully reviewing the articles and adverse incident reports of record in this case, the Court agrees with Defendants. The statin side effect recognized in the medical community is a temporary one that ends when the patient stops taking the drug. Plaintiff attempts to extrapolate this temporary side effect to establish general causation of a much more serious, permanent illness. However, *Daubert* decisions "warn against leaping from an accepted scientific premise to an unsupported one." *Allison v. McGhan Med. Corp.,* 184 F.3d 1300, 1314 (11th Cir.1999). Thus, Dr. Firth's statements regarding both general and specific causation must undergo a *Daubert* analysis.

III. *Defendants' Motion to Exclude Dr. Firth's Opinions*

A. *Legal Standard*

Federal Rule of Evidence ("FRE") 702 lays the foundation for this Court's *Daubert* analysis, providing as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.

[2] In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court observed that "unlike an ordinary witness, see Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on first-hand knowledge or observation." Because of this latitude, the "trial judge must determine at the outset, pursuant to [Federal Rule of Evidence] 104(a), whether ... the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology can properly be applied to the facts in issue." *Id.* at 592-93, 113 S.Ct. 2786. "*Daubert* requires the trial court to act as a gatekeeper to insure that speculative and unreliable opinions do not reach the jury." *McClain,* 401 F.3d at 1237. The burden rests upon the party seeking to present the expert testimony to establish admissibility by a preponderance of the evidence. *Id.*

**4 Under *Daubert,* expert testimony is admissible if: (1) the expert is competent and qualified to testify regarding the subject matter of his testimony; (2) the methodology *692 by which the expert reached his conclusions is sufficiently reliable; and (3) the expert, through scientific, technical or specialized expertise, provides testimony that assists the trier of fact to understand the evidence or determine a fact in issue.

[3] Regarding the first element, the expert must be "competent and qualified by knowledge, skill, experience, training, or education to render the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

opinion." Siharath v. Sandoz Pharm. Corp., 131 F.Supp.2d 1347, 1351 (N.D.Ga.2001), *aff'd sub nom. Rider*, 295 F.3d 1194 (11th Cir.2002). "[I]t is not necessary that the witness be recognized as a leading authority in the field in question .... Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony not its admissibility. Thus, Rule 702 takes a liberal approach to expert witness qualification." 29 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure; Evidence* § 6265 (West 1997).

[4] Regarding the second element, in order to be reliable, expert testimony must be supported by scientific knowledge. The *Daubert* Court explained that "[t]he adjective 'scientific' implies a grounding in the methods and procedure of science. Similarly the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786. It set forth four nonexhaustive criteria for determining whether expert testimony is based on reliable scientific knowledge: (1) whether the theory can and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether there is a known or potential rate of error associated with the theory; and (4) whether the theory or methodology employed is generally accepted in the field. *Daubert*, 509 U.S. at 593-95, 113 S.Ct. 2786; *Rider*, 295 F.3d at 1197. In toxic tort cases, a "lack of epidemiological studies supporting [a plaintiff's] claims creates a high bar for [a plaintiff] to surmount with respect to the reliability requirement." *Siharath*, 131 F.Supp.2d at 1358.

Finally, the last factor requires that the expert opinion be relevant to the facts of the case. In other words, there must be a valid scientific connection to a material issue in the case. *See Daubert*, 509 U.S. at 591, 113 S.Ct. 2786 (explaining that this final element requires a "fit" between the expert opinion and the facts of the case).

B. *Dr. Firth's Expert Report*

On October 15, 2004, Plaintiff filed an amendment to the initial disclosures required under Federal Rule of Civil Procedure ("FRCP") 26, designating his general internist, Dr. Mark R. Firth as an expert for trial. Pursuant to FRCP 26(a)(2)(B), Plaintiff submitted Dr. Firth's expert report, which provides as follows:

> Coronary Heart disease and stroke are leading causes of morbidity and mortality in the United States. As a general internist for the past 21 years I have spent a significant amount of my professional time and effort dealing with the prevention and treatment of theses [sic] cardiovascular diseases. I have also attended numerous lectures on these topics and have read countless related articles. One of the major areas of concern in this population of patients has been the role of cholesterol levels in modifying the disease process. Although diet and exercise remain the foundation of therapy, the use of cholesterol lowering medications, especially statins, has become increasingly important. A large body of medical literature now promotes the prescribing of these drugs in an attempt to achieve "goal" levels of LDL-cholesterol. Recent recommendations call for even lower levels in increasingly large portion of patients.
>
> ****5** The safety of these drugs has generally been described by both the pharmaceutical industry and most researches [sic] as "excellent", "superb", and "enviable". The occasional effect on the liver causing elevated liver enzymes has been well publicized and has led to periodic [sic] monitoring of blood tests. Much less discussed and poorly understood is the statin associated myopathy which I have found occurs more often in clinical practice than the medical literature and drug companies admit to. Physicians have been warned for a number of years about the rare extreme form of myopathy, ***693** rhabdomyolyis [sic], associated with muscle damage and elevated muscle enzymes that can lead to renal failure and death. Much less information has been shared regarding the more common forms of myopathy causing weakness and pain which can be severe, debilitating, and persist even after the drug has been withdrawn. I have seen these forms of myopathy more and more as the use of statins has increased, especially with atrovastatin [sic] (Lipitor).
>
> One of my patients, Mr. Fred Leathers, was started on a low dose of Lipitor in August [sic] 2001. At that time the only warnings about statin related myopathy in the Physicians Desk Reference and from pharmaceutical representatives related to rhabdomyolysis with virtually no mention of other musculoskeletal problems. A few months later Mr. Leathers' Lipitor dose was increased to 20 mg to lower LDL cholesterol to goal levels recommended by guidelines. Within a few weeks he developed signs and symptoms consistent with myopathy including extreme fatigue, weakness and diffuse muscle pain. Lipitor was discontinued and blood work was obtained which failed to show evidence of rhabdomyolysis. At the time physicians were led to believe that this would essentially "rule out" statin associated myopathy. An extensive search for other possible explanations for Mr. Leathers'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

symptoms failed to find any abnormalities. The consensus among his physicians was Lipitor was indeed the cause of his illness.

Unfortunately [sic], despite the withdrawal of Lipitor, Mr. Leathers has continued to suffer significant problems, contrary to the information from the literature and drug companies. Since then I have had several other patients with a very similar clinical course from taking statins in general and Lipitor in particular. I had the opportunity recently to review a large number of "suspected adverse drug reports" and I am shocked to realize how frequently such problems are occurring with Lipitor. There have been more concerns expressed by other patients and physicians leading to several special reports on the network news. Despite this revelation the pharmaceutical industry has continued to downplay the frequency and significance of the problem. Only recently has information in the medical literature surfaced regarding statin induced myopathy.

I am very concerned that the new recommendation for more aggressive and broader use of these drugs, especially Lipitor, will lead to increased numbers of patients who developed symptoms similar to Mr. Leathers and so many others. In my own practice I have become more reluctant to use statins despite the urging of "experts". I now discuss at length the possibility for side effects and in great detail describe the potential for musculoskeletal problems. Not infrequently patients decide to avoid statin therapy. If I had been given more information 3 years ago to share with my patients, Mr. Leathers [sic] situation could have been avoided.

**6 Pl.'s Amend. to Initial Disclosures Ex. 1.

C. *Daubert Analysis*

[5] At the outset, Plaintiff raises the issue of whether *Daubert* should apply to Dr. Firth's testimony. In his response brief, Plaintiff seems to imply that because Dr. Firth has personal knowledge of Plaintiff's ailments as his treating physician, *Daubert* does not apply. Plaintiff states:

Here, Dr. Firth, [Plaintiff]'s family physician for over ten years, is testifying about what he did after [Plaintiff] came to him for treatment complaining about muscle pain and weakness. The Fourth Circuit has held that a treating physician's diagnosis of his patient's ailments does not have to meet *Daubert* standards because he is a fact witness observing the condition of a patient.

Pl.'s Resp. 22-23 (internal citations omitted).

Dr. Firth's status as Plaintiff's treating physician does not immunize his testimony from *Daubert.* The subject of this motion to exclude is Dr. Firth's opinions regarding causation. These opinions clearly fall within FRE 702's scope of "scientific knowledge." Therefore, Dr. Firth's opinion is an expert opinion and must satisfy *Daubert* and Rule 702.

*694 1. *Dr. Firth's Qualifications*

[6] Dr. Firth is a general internist. He earned his medical degree from the Medical College of Georgia (1976-1980), and he completed his residency in Internal Medicine at the Memorial Medical Center in Savannah, Georgia in 1983. Dr. Firth spent four years as Chief of the Specialty Clinic at Hawley Army Community Hospital. From 1987 to present, he has practiced as a general internist at Athens Internal Medicine Associates. He is certified by the National Board of Medical Examiners and the American Board of Internal Medicine. He has been a member of the American College of Physicians since 1984.

The Court is skeptical about Dr. Firth's qualifications to opine on an issue such as general causation. In *Siharath,* 131 F.Supp.2d at 1363, the Court stated that "[w]ith respect to general causation, the relevant scientific field is epidemiology or toxicology and not clinical medicine." Dr. Firth is strictly a clinical practitioner, not an epidemiologist, toxicologist, or a pharmacologist. He has not written or published articles or case studies nor has he conducted any other research on statins. Dr. Firth does have substantial experience with treating patients for high cholesterol and prescribing Lipitor. However, he has very little experience with permanent musculoskeletal disorders. Dr. Firth and counsel for Defendants had the following exchange at Dr. Firth's deposition:

**Q.** Doctor, do you consider yourself an expert in statins?

**A.** I consider myself knowledgeable for a general internist in statins. An expert in statins, no, I would not say I'm an expert in statins.

**Q.** Do you consider yourself an expert in drug-induced adverse reactions?

**A.** No.

**Q.** Do you--Are you a muscle expert?

**A.** No.

Firth Trans. 54:5-15.

**7 While the Court has reservations about Dr. Firth's qualifications, it also is mindful of the liberal approach taken in qualifying a witness as an expert.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Therefore, the Court finds that Dr. Firth does qualify as an expert.

2. *Reliability: Dr. Firth's General Causation Opinion*

[7] Dr. Firth's FRCP 26(a)(2)(B) expert report does not directly address the issue of general causation (presumably because Plaintiff is of the opinion that he need not prove general causation). Dr. Firth indicates that he relied upon adverse incident reports and medical articles attached to his report in arriving at the opinion that Lipitor was the specific cause of Plaintiff's alleged injuries. The Court, therefore, will assume that the adverse incident reports and articles were the basis for Dr. Firth's implicit opinion that Lipitor generally can cause Plaintiff's alleged injuries.

As an initial matter, adverse incident reports generally do not, standing alone, render an expert's opinion reliable under *Daubert.* In *Rider,* 295 F.3d 1194, the Eleventh Circuit stated that "courts must consider that case reports are merely accounts of medical events. They reflect only reported data, not scientific methodology. Some case reports are a very basic form report of symptoms with little or no patient history, description or course of treatment, or reasoning to exclude other possible causes." *Id.* at 1199. The *Rider* court concluded that "the contents of [the] case reports were inadequate ... to demonstrate a relationship between a drug and a potential side effect." *Id.* Even Dr. Firth agreed that the adverse incident reports attached to his report do not establish causation. Firth Trans. 213:7-9. [FN3]

FN3.
**Q.** And you also know just from reading those few adverse events that they don't determine causation, right?
**A.** Say that--the reports themselves do not--
**Q.** Yeah. You can't make a causal determination--
**A.** Right. Right.

Having carefully read Dr. Firth's deposition transcript and the reports and articles attached to his expert report, the Court finds *695 that *Daubert* mandates excluding Dr. Firth's opinion. Many of the articles attached to the report do not address the relationship between statins and muscle-related side effects. Among the scant passages actually discussing muscle-related side effects, the Court found the following quotations: "symptoms resolve completely with statin discontinuation;" "despite the clinical importance of statin-induced myopathy, we understand very little about its causes, which makes it hard to develop good treatments or preventive strategies;" "little is known about the mechanism by which statin therapy leads to muscle toxicity;" "the patient's symptoms ... improved 3 months after she had discontinued statin therapy ... [and] muscle biopsy showed complete resolution of the pathologic abnormalities;" "repeated muscle biopsy performed 3 months after discontinuation of statin therapy revealed complete resolution;" and "repeated biopsy done after the patient had not received statin therapy for 5.5 months showed resolution." These articles fail to support Dr. Firth's opinion and do not create a scientifically valid causal link between Lipitor and statin-induced myopathy.

**8 Research addressing the relationship between Lipitor (and, more generally, statins) and Plaintiff's alleged injury is still in an immature stage and does not possess the level of reliability required by *Daubert.* At his deposition, Dr. Firth stated that he was unaware of any report or article that established a causal link between statins and Plaintiff's injury.

**Q.** Are you aware of any ... peer-review study which basically says from a causal factor that they've seen any evidence of people with no [creatine phosphokinase] elevations who have some kind of muscle pain and weakness--but--
**A.** Has it been done? No, I've not seen it. I'd love to.
...
**Q.** Are you aware of any peer-review studies or reports which would show with any kind of statistical reliance that people who take Lipitor who have no--who have no [creatine phosphokinase] elevations and who have muscle pain and weakness have a continuing disability--
**A.** No.
**Q.** for myopathy after, you know, months or years?
**A.** I've seen no studies that address that.

Firth Trans. 152:13-153:10. As Judge Posner has stated, "the courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir.1996).

In sum, Dr. Firth's opinion and the articles and reports on which he relies fall short of *Daubert's* requirements. Therefore, the Court concludes that Dr. Firth's opinions should be excluded.

3. *Reliability: Dr. Firth's Specific Causation Opinion*

[8] Having concluded that Plaintiff's expert failed to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

establish general causation, the Court need not discuss specific causation. However, it notes that Dr. Firth's specific causation opinion is problematic as well. First, Dr. Firth testified that Plaintiff does not have some of the diseases he alleges to have in his Complaint. Dr. Firth testified that "[Plaintiff] has a normal [creatine phosphokinase] level. He does not have mild myalgia. He does not have [rhabdomyolisis]. He does not have myositis." Firth Trans. 199:16-19. This directly contradicts Plaintiff's Complaint, which claims that Plaintiff's injuries include "multiple myalgias [and] myositis."

Second, Dr. Firth's specific causation opinion falls more in the category of an intuitive, clinical hunch than a reliable, scientific, expert opinion. Dr. Firth's opinion is that Plaintiff has "statin-induced myopathy," which he describes as a diffuse, nebulous muscle ailment that is incapable of definitive diagnosis. "Did we make a definitive diagnosis? I don't think so. I don't think you can in those people .... I think it's one of those entities that you're stuck with, you know, based on clinical presentation and sequence of events and the whole slew of things that you make your best decision on." Firth Trans. 221:6-18.

Dr. Firth testified that he referred Plaintiff to a rheumatologist, Dr. Linker, and neurologist, *696 Dr. Novey, who examined Plaintiff once and concluded that Plaintiff's problems were caused by Lipitor. However, Dr. Firth admits that, to his knowledge, Plaintiff never had a muscle biopsy, which is reputed to be the "gold standard" for determining whether a person's pains are statin-induced; or an EMG, which measures whether muscles have lost strength; [FN4] or a nerve conduction study, which provides an objective measure of muscle pain. In fact, Dr. Firth testified that he was not aware of any test that "rules in statin-induced myopath," Firth Trans. 100:15-17, and that he could not rule out the possibility that Plaintiff has an underlying muscle disease. The Court also notes that when Dr. Firth wrote his expert report on October 13, 2004, he had not seen Plaintiff since August 2003. Dr. Firth admitted that he could not testify as to whether Plaintiff's problems resolved, worsened, or remained the same since August 2003. These statements prove that Dr. Firth's opinion is not based on reliable, scientific methodology.

> FN4. According to Dr. Firth, an EMG would shed light on the cause of the loss of muscle strength.

**9 Finally, Dr. Firth's deposition indicated that one of the most critical factors on which he relied in formulating the opinion expressed in his expert report was the temporal proximity of Plaintiff's ailments to the ingestion of Lipitor. Firth Trans. 100:8-10. In *McClain*, 401 F.3d at 1243, the Eleventh Circuit cautioned that to assume causality from temporal sequence is to subscribe to the *post hoc, ergo propter hoc* [FN5] fallacy. While the temporal relationship between a drug and symptoms may have some utility to a clinical practitioner such as Dr. Firth, heavy reliance on such a relationship does not withstand scrutiny under *Daubert*.

> FN5. According to Black's Dictionary, the literal translation of *post hoc, ergo propter hoc* is "after this, therefore because of this." *Black's Law Dictionary* 1205 (8th ed.2004).

For the foregoing reasons, even if Dr. Firth's opinion was sufficiently reliable on the issue of general causation, his testimony regarding specific causation does not satisfy *Daubert*.

4. *Relevance*

The Court need not analyze the relevance of Dr. Firth's expert report because Plaintiff has not satisfied *Daubert's* other requirements.

In sum, the Court finds that Dr. Firth's opinion does not pass muster under Rule 702 and *Daubert*. Defendants' Motion to Exclude the Opinions of Dr. Mark R. Firth, M.D. is GRANTED.

IV. *Defendants' Motion to Strike*

Defendants' Motion to Strike concerns the following documents: (1) the declaration of Dr. Firth; (2) the declarations of Drs. Novey and Linker; and (3) the deposition transcript of Dr. Paul Phillips, which was taken by counsel for Defendants in a different case involving Lipitor brought in California.

FRCP 26(a) and 37(c)(1) provide the legal basis for Defendants' Motion to Strike. FRCP 26(a)(2)(A) applies generally to any witness who will deliver an expert opinion under FRE 702. It requires that "a party shall disclose to other parties the identity of any person who may be used at trial to present [expert testimony]." FRCP 26(a)(2)(B) requires additional disclosures with respect to a "witness who is *retained* or *specially employed* to provide expert testimony in the case." Fed.R.Civ.P. 26(a)(2)(B) (emphasis added). When FRCP 26(a)(2)(B) applies, the expert must file an expert report containing "a complete

statement of all opinions to be expressed and the basis and reasons therefor [along with] the data or other information considered by the witness."

Treating physicians generally are not subject to the FRCP 26(a)(2)(B) requirements. They are not considered "retained" or "specially employed" to the extent their testimony concerns their personal care, diagnosis, and treatment of a patient. "The approach taken by a majority of courts when determining whether to require treating physicians to provide Rule 26(a)(2)(B) reports is that the plaintiff[ ] can not avoid the requirements of Rule 26 by simply indicating that [her] experts are plaintiffs' treating physician.... Rule 26 focuses not on the status of the ***697** witness, but rather the substance of the testimony." *Brown v. Best Foods,* 169 F.R.D. 385, 388 (N.D.Ala.1996) (internal quotations and citations omitted). *See also Green v. Office of the Sheriff's Office,* 2002 U.S. Dist. LEXIS 26485, at * 16-17 (M.D.Fla.2002) ("[T]he key to the treating physician's being excused from the report requirement is that she testify only as to observations made during the care and treatment of the party."); *Indem. Ins. Co. of N. Am. v. Am. Eurocopter LLC,* 227 F.R.D. 421, 423-24 (M.D.N.C.2005) ("A treating physician is a participant or fact witness when it comes to describing the diagnosis and treatment of a party's condition. However, because of the physician's specialized training and knowledge, when the physician testifies, he or she testifies as an expert witness. Therefore, the physician must be disclosed as an expert because he or she is relying on scientific, technical, or other specialized knowledge. When the treating physician goes beyond the observations and opinions obtained by treating the individual and expresses opinions acquired or developed in anticipation of trial, then the treating physician steps into the shoes of an expert who may need to provide a Rule 26(a)(2)(B) report."); *Wreath v. United States,* 161 F.R.D. 448, 449 (D.Kan.1995) ("To the extent that the treating physician testifies only as to the care and treatment of his/her patient, the physician is not to be considered a specially retained expert notwithstanding that the witness may offer opinion testimony under Fed.R.Evid. 702, 703 and 705.").

****10** [9] The consequences for failure to comply with FRCP 26(a) are contained in FRCP 37(c)(1), which states as follows: "[a] party that without substantial justification fails to disclose information required by Rule 26(a) ... is not, unless such failure is harmless, permitted to use as evidence ... on a motion any witness or information not so disclosed." The burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party. *See Go Med. Indus. Pty. v. Inmed Corp.,* 300 F.Supp.2d 1297, 1308 (N.D.Ga.2003); *see also Burney v. Rheem Mfg.,* 196 F.R.D. 659, 691 n. 29 (M.D.Ala.2000); *Rabello v. Bell Helicopter Textron,* 200 F.R.D. 484, 489 (S.D.Fla.2001).

With this in mind, the Court addresses Defendants' Motion to Strike.

A. *Declaration of Dr. Firth*

Dr. Firth's declaration was attached to Plaintiff's response to Defendants' Motion for Summary Judgment. Defendants challenge paragraphs 3-6 of the declaration, which provide as follows:

> 3. It is generally recognized within the medical community that statins can cause myalgias and myopathies, which in some patients persist after the drug is discontinued. Not only can I state this from personal experience, but also from the medical literature.
> 4. Many articles in the medical literature have described patients, like [Plaintiff], who had normal [creatine phosphokinase levels] and statin-induced muscle disorders.
> 5. Exercise has been reported to increase the muscle pain associated with statin induced muscular problems.
> 6. Based upon my first-hand observation of [Plaintiff], my professional experience, and my consultations with Dr. Joe B. Linker, III and Dr. Edward S. Novey, I believe with reasonable medical certainty that [Plaintiff's] myalgia and myopathy were caused by his ingestion of Lipitor.

Dr. Firth Decl. ¶ 3-6 (internal citations omitted).

Defendants claim that the opinions in the declaration are different from the opinions contained in Dr. Firth's original expert report. Defendants argue that this is a violation of FRCP 26(a)(2)(B), which requires the expert report to provide complete disclosure of "all opinions to be expressed and the basis and reasons therefor." Fed.R.Civ.P. 26(a)(2)(B). Defendants urge the Court to strike the paragraphs as authorized by FRCP 37(c)(1). Plaintiff, on the other hand, claims "the opinions [Dr. Firth] expressed in his declaration are the same as those he provided in his report." Plaintiff claims that he has not violated FRCP 26(a)(2)(B) because the declaration does not contain new opinions.

***698** The issues raised with respect to Dr. Firth's declaration are of no consequence. If the Court were

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to accept Plaintiff's argument that the declaration contains the same opinions as the expert report, then the declaration would not change the Court's ruling that Dr. Firth's expert opinions do not satisfy *Daubert* and FRE 702. Additionally, it would not disturb the Court's granting of Defendants' Motion for Summary Judgment because Plaintiff still cannot establish general causation. Therefore, the Court dismisses this portion of Defendants' Motion to Strike as moot.

B. *Declarations of Doctors Novey & Linker*

****11** A brief background of some relevant deadlines and chronology is appropriate before discussing the parties' contentions. In an Order [# 25] entered on August 13, 2004, the Court set October 15, 2004 as the due date for "[r]eports from retained experts." On October 15, 2004, Plaintiff designated only Dr. Firth as a retained expert and submitted his expert report pursuant to FRCP 26(a)(2)(B). Plaintiff did not designate any witnesses as experts under FRCP 26(a)(2)(A) at that time.

On February 4, 2005, the Court entered a Consent Order, postponing further discovery until after the Court ruled on motions that Defendants anticipated filing by March 1, 2005. On March 1, Defendants filed a Motion to Exclude the Opinions of Dr. Mark R. Firth and a Motion for Summary Judgment. On March 18, 2005, Plaintiff responded to Defendants' Motion to Exclude and attached Dr. Novey's and Dr. Linker's declarations. At the time the declarations were submitted, Drs. Novey and Linker had been designated only as fact witnesses. It was not until April 6, 2005 that Plaintiff filed an amendment to initial disclosures, adding Drs. Novey and Linker as experts "out of an overabundance of caution."

Defendant moved to strike certain portions of both doctors' declarations which Defendants claim constitute expert opinions. Defendants challenge the purported expert opinions on the grounds that Plaintiff never properly or timely identified the doctors as experts.

[10] The Court first addresses the statements in Dr. Novey's declaration. Defendants object to the second and third sentences in paragraph 6 of Dr. Novey's declaration, in which Dr. Novey states as follows: "My opinion is based on reasonable medical certainty. It is generally recognized in the medical community that Lipitor and other drugs in its class have side effects which include muscle problems such as myalgias and myopathy." Defendants claim that these statements rise to the level of an expert opinion and should be stricken. The Court agrees with Defendants.

Plaintiff conceded at the *Daubert* hearing that these statements constitute expert opinions under FRE 702. However, Plaintiff argues that the October 15 deadline set by the Court expressly applied only to expert reports submitted by retained experts under FRCP 26(a)(2)(B). Plaintiff contends that the deadline did not apply to Drs. Linker and Novey because they qualify as treating physicians (rather than retained or specially employed experts) and are governed by FRCP 26(a)(2)(A).

Plaintiff's argument is incorrect. Dr. Novey's statements are the statements of a retained expert. In *Brown v. Best Foods*, 169 F.R.D. 385, 388 (N.D.Ala.1996), the court stated that treating physicians are not "retained" or "specially employed" to the extent that they deliver expert opinions relating to their care or treatment of a party to the lawsuit. *Brown* also emphasized that the appropriate analysis "focuses not on the status of the witness, but rather the substance of the testimony." *Brown*, 169 F.R.D. at 388 (internal quotations and citations omitted).

****12** The challenged portion of Dr. Novey's declaration has nothing to do with the care or treatment of Plaintiff. Dr. Novey's statement is an opinion relating to general causation; that is, the statement pertains to whether the medical community generally recognizes that Lipitor can cause the type of harm suffered by Plaintiff. Although Dr. Novey was, in fact, one of Plaintiff's treating physicians, in substance Dr. Novey's statement is not one of a treating physician--it is ***699** the statement of a retained or specially employed expert under FRCP 26(a)(2)(B). Therefore, the Court's October 15 deadline applied to Dr. Novey's declaration.

Under FRCP 37(c)(1), Plaintiff may still avoid having Dr. Novey's declaration stricken if he shows that the failure to disclose was substantially justified and harmless. Plaintiff has not met this burden. First, Plaintiff's nondisclosure is not substantially justified because the conduct of Plaintiff indicates that he understood the October 15 expert deadline to apply to all experts. Defendants correctly point out that "Plaintiff clearly knew and understood his obligations under the rules, and that is precisely why he formally designated Dr. Firth as an expert, within the prescribed time period, even though Dr. Firth was, like Drs. Novey and Linker, one of Plaintiff's treating physicians who had previously been identified as a fact witness." Defs.' Reply 7. The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Court finds this to be a reasonable and persuasive argument. Second, Plaintiff knew as early as February 3, 2005 that Defendants intended to file a Motion to Exclude the Opinions of Dr. Mark Firth and a Motion for Summary Judgment. *See Joint Motion to Amend Scheduling Order* ("Pfizer will soon file a motion to exclude the testimony of Plaintiff's expert witness, Mark D. Firth, M.D., and for summary judgment."). Despite this knowledge, Plaintiff casually attached the declarations in response to one of these motions and attempted to amend his initial disclosures in April 2005. Plaintiff's actions indicate a lack of substantial justification. Additionally, Plaintiff cannot show that the delay in identifying Dr. Novey as an expert was harmless. Defendants did not have a chance to take Dr. Novey's declaration prior to the Court's stay of discovery pending the outcome of these motions. Thus, Defendants' Motion to Strike Dr. Novey's declaration is granted. The same conclusion applies to Dr. Linker's declaration. Dr. Linker was not timely identified as an expert, and Plaintiff has failed to show substantial justification and harmlessness. The Court also notes that Dr. Linker's declaration pertains only to specific causation. Regardless of whether the Court granted Defendants' Motion to Strike with respect to Dr. Linker's declaration, Plaintiff still has not established general causation.

C. *Dr. Phillips's Deposition Transcript*

[11] Plaintiff attached the deposition transcript of Dr. Paul Phillips in Plaintiff's response to Defendants' Motion for Summary Judgment. Dr. Phillips's deposition was taken by Mark Cheffo, counsel for Defendant, in a Lipitor case brought in California. [FN6] Defendants correctly note that Plaintiff has been equivocal about how he intends to use Dr. Phillips's deposition. In his response to Defendants' Motion for Summary Judgment, Plaintiff lists Dr. Phillips's deposition as one of the items of expert testimony that establishes general causation. Then, in his response to Defendants' Motion to Strike, Plaintiff contradicts himself. He states that "Dr. Phillips' testimony is primarily as a fact witness to show why there was not more medical literature on Lipitor's side effects. He cannot provide expert opinions on Mr. Leathers. They have never met." Pl.'s Resp. to Mot. to Strike 13.

FN6. *Noeder v. Pfizer et al.*, No. GIC815342 (Calif. Super. Ct. San Diego Co.).

****13** As Plaintiff still has not established general causation, the motion to strike Dr. Phillips's deposition is moot to the extent that Plaintiff intends to use Dr. Phillips only as a fact witness. To the extent that Plaintiff intends to use the deposition to establish general causation and avoid summary judgment, the Court agrees with Defendants that the deposition should be stricken. Plaintiff never disclosed Dr. Phillips as an expert (or even a fact witness for that matter) in this case pursuant to FRCP 26(a); therefore, Plaintiff cannot use the deposition to establish general causation.

Plaintiff's only counterargument is that Dr. Phillips's deposition is admissible under FRE 804(b)(1). FRE 804(b)(1) provides an exception to the rule against hearsay for former testimony if the declarant is unavailable and the testimony was given "in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered ... had an opportunity and similar motive to ***700** develop the testimony by direct, cross, or redirect examination." Regardless of whether the testimony is excepted from the rule against hearsay, it still contains expert opinions under FRE 702 and is subject to FRCP 26(a)'s disclosure requirement. Thus, Defendants' Motion to Strike Dr. Phillips's deposition is granted.

V. *Defendants' Motion for Summary Judgment*

The Court now turns to Defendants' Motion for Summary Judgment. The Court finds that Plaintiff cannot establish a genuine issue of material fact with respect to causation; thus, Defendants are entitled to summary judgment.

A. *Standard of Review*

This Court will grant summary judgment when "there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]his standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal citations omitted). In *Celotex Corporation v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *cert. denied*, 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988), the Supreme Court held that "the plain language of Rule 56(c) mandates the entry of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

The movant's burden is "discharged by showing--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." Id. However, it is not enough in most situations for the movant merely to point out to the court this absence of evidence. Id. at 323, 106 S.Ct. 2548; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). Rather, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(c)).

****14** Only after the movant meets its initial burden does any obligation on the part of the nonmovant arise. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Clark*, 929 F.2d at 608. Nevertheless, once the movant has met this initial burden, the opposing party must present evidence establishing a material issue of fact. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. The nonmoving party must go "beyond the pleadings" and present evidence designating "specific facts showing that there is a genuine issue for trial." Id. at 324, 106 S.Ct. 2548.

All evidence and factual inferences should be viewed in the light most favorable to the nonmoving party. *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir.1987); *Everett v. Napper*, 833 F.2d 1507, 1510 (11th Cir.1987). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505 (emphasis in original). An issue is not genuine if it is unsupported by evidence or is created by evidence that is "merely colorable" or "not significantly probative." Id. at 250, 106 S.Ct. 2505. Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the nonmoving party's case. Id. at 248, 106 S.Ct. 2505. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of every element essential to his or her case so as to create a *genuine* issue for trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Rollins*, 833 F.2d at 1528.

***701** B. *Analysis*

General causation is an essential element of Plaintiff's prima facie case for each claim asserted in this litigation. That Lipitor can cause Plaintiff's injury "is not a natural inference that a juror could make through human experience." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1320 (11th Cir.1999). Therefore, "medical expert testimony [is] essential to prove causation in this case." Id. Defendants' Motion for Summary Judgment is premised upon the argument that Plaintiff has not presented admissible expert testimony establishing causation. The Court agrees.

Accordingly, the Court GRANTS Defendants' Motion for Summary Judgment [# 71].

VI. *Conclusion*

For the foregoing reasons, Defendants' Motion to Exclude the Opinions of Dr. Mark R. Firth, M.D. [# 72] and Defendants' Motion for Summary Judgment [# 71] are GRANTED. Defendants' Motion to Strike [# 98] is GRANTED IN PART and DISMISSED AS MOOT IN PART. Defendants' Motions for Leave to File Excess Pages [# 70 & # 95], Defendants' Motion to File Under Seal [# 75], and Defendants' Motion for Leave to File a Response to Plaintiff's Supplemental Authority [# 113] are GRANTED NUNC PRO TUNC. The remaining motions [# 78,# 92, # 124, & # 129] are DISMISSED AS MOOT.

233 F.R.D. 687, 2006 WL 708571 (N.D.Ga.)

**Motions, Pleadings and Filings** (Back to top)

• 2006 WL 735900 (Trial Motion, Memorandum and Affidavit) Plaintiff's Supplemental Brief (Feb. 6, 2006)

• 2005 WL 2362293 (Trial Motion, Memorandum and Affidavit) Defendants' Response to Plaintiff's Notice of Subsequent Authority (Aug. 26, 2005)

• 2005 WL 987174 (Trial Motion, Memorandum and Affidavit) Defendants' Reply In Further Support of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Their Motion to Exclude the Opinions of Mark R. Firth, M.D. (Apr. 2005)

- 2005 WL 3415921 (Expert Report and Affidavit) Declaration of Mark R. Firth, M.D. (Mar. 23, 2005)Original Image of this Document (PDF)

- 2005 WL 3833615 (Expert Report and Affidavit) Declaration of Edward S. Novey, M.D. (Mar. 18, 2005)Original Image of this Document (PDF)

- 2005 WL 987171 (Trial Motion, Memorandum and Affidavit) Defendants' Response to Plaintiff's Motion to compel Production of Documents and for Sanctions (Mar. 14, 2005)

- 2004 WL 3723478 (Partial Expert Testimony) Videotaped Deposition of Mark Firth, M.D. (Dec. 1, 2004)Original Image of this Document (PDF)

- 2004 WL 3723484 (Expert Report and Affidavit) Agreed Order Extending Discovery Period (May 18, 2004)Original Image of this Document (PDF)

- 2004 WL 2561029 (Trial Pleading) Answer and Affirmative Defenses of Defendant Warner-Lambert Company LLC to Plaintiff's Complaint and Demand for Jury Trial (Mar. 12, 2004)

- 2004 WL 2561050 (Trial Pleading) Answer and Affirmative Defenses of Defendant Pfizer Inc to Plaintiff's Complaint and Demand for Jury Trial (Mar. 12, 2004)

- 1:04cv00615 (Docket) (Mar. 05, 2004)

- 2004 WL 3723479 (Partial Expert Testimony) (Partial Testimony) (2004)Original Image of this Document (PDF)

- 2004 WL 3723480 (Partial Expert Testimony) (Partial Testimony) (2004)Original Image of this Document (PDF)

- 2004 WL 3723481 (Partial Expert Testimony) (Partial Testimony) (2004)Original Image of this Document (PDF)

- 2004 WL 3723482 (Partial Expert Testimony) (Partial Testimony) (2004)Original Image of this Document (PDF)

- 2004 WL 3723483 (Partial Expert Testimony) (Partial Testimony) (2004)Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.