**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| **In re: BAYCOL PRODUCTS LITIGATION** | **)** | **MDL NO. 1431** |
| | **)** | |
| **This Document Relates to: All Actions** | **)** | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF MARTYN T. SMITH, Ph.D.**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .......... 1

II. DR. SMITH'S TESTIMONY IS ADMISSIBLE BECAUSE IT MEETS THE STANDARD FOR ADMISSIBILITY .......... 2

A. The Standard for Admissibility of Expert Testimony .......... 2

B. Dr. Smith's Testimony Meets the Standard Set By Rule 702 and Daubert and Should Therefore Be Admitted. .......... 4

C. Studies Based On AERS Data Are Highly Relevant And Reliable .......... 6

III. THE COURT SHOULD ADMIT DR. SMITH'S OPINIONs BECAUSE THEY ARE RELEVANT AND RELIABLE UNDER THE DAUBERT STANDARD .......... 8

A. Dr. Smith's Opinion That Baycol Is The Most Toxic Statin Is Admissible Because It Is Relevant And Reliable. .......... 8

B. Dr. Smith's Opinions That Baycol Is More Susceptible to Drug-Drug Interactions And Regarding The Mechanism of Statin-Induced Myopathy Are Admissible Because They Are Relevant And Reliable. .......... 15

1. Drug-drug interactions .......... 15

2. Statin-induced Myopathy .......... 17

IV. DR. SMITH'S OTHER OPINIONS ARE ADMISSIBLE BECAUSE THEY ARE RELEVANT AND RELIABLE .......... 20

A. Dr. Smith's Opinion That Bayer Did Not Use Proper Toxicological Methods to Interpret Data Is Admissible Because It Is Relevant And Reliable. .......... 20

B. Dr. Smith's Opinion That Bayer Incorrectly Characterized Baycol As An "Ideal Statin" Is Admissible Because It Is Relevant And Reliable .......... 24

V. CONCLUSION .......... 25

**TABLE OF CONTENTS**

**Page**

**CASES**

*Bonner v. ISP Techs., Inc.*, 259 F.3d 924 (8th Cir. 2001) ........ 3

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) ........ 2, 3, 4, 19

*Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986 (8th Cir. 2001) ........ 12

*Hose v. Chicago N.W. Transp. Co.*, 70 F.3d 968 (8th Cir. 1995) ........ 2

*In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717 (3rd Cir. 1994) ........ 4

*Lakie v. SmithKline Beecham*, 965 F. Supp. 49 (D.D.C. 1997) ........ 4

*Larson v. Kempker*, 414 F.3d 936 (8th Cir. 2005) ........ 3

*Marder v. G.D. Searle & Co.*, 630 F. Supp 1087(D. Md. 1986), *aff'd sub nom. Wheelahan v. G.D. Searle & Co.*, 814 F.2d 655 (4th Cir. 1987) ........ 12

*McClain v. Metabolife*, 401 F.3d 1233 (11th Cir. 2005) ........ 19, 20

*Miles v. General Motors Corp.*, 262 F.3d 720 (8th Cir. 2001) ........ 2

*Moore v. Ashland Chem., Inc.*, 151 F.3d 269 (5th Cir. 1998) ........ 4

*Ruiz-Trioche v. PepsiCola of P.R. Bottling Co.*, 161 F.3d 77 (1st Cir. 1998) ........ 17, 19

*Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202 (8th Cir. 2000) ........ 3

**RULES**

Fed. R. Evid. 702 ........ 2, 3

**OTHER AUTHORITIES**

A. Nakai, et al., *Enhanced myopathy following administration of hypolipidemic agents under urethane anesthesia*, 20 Biological & Pharm. Bulletin 104-06 (1997) ........ 11

Allen Brinker et al., *Spontaneous Reports of Hypertension Leading to Hospitalisation in Association with Rofecoxib, Celecoxib, Nabumetone and Oxaprozin*, 21(7) Drugs & Aging 479 (2004) ........ 7

**TABLE OF CONTENTS**
(continued)

**Page**

*Apoptosis*, The Virtual Library of Biochemistry and Cell Biology, *available at* http://www.biochemweb.org ..... 18

B.A. Masters et al., *In vitro myotoxicity of the 3-hydroxy-3-methylglutaryl coenzyme A reductase inhibitors, pravastatin, lovastatin, and simvastatin, using neonatal rat skeletal myocytes* 131 Toxicology and Applied Pharmacology 163-174 (1995) ..... 18

Bayer Pharmaceutical Business Group, Report No. PH 31298, Toxicity of lipid-lowering drugs in primary skeletal muscle cells in vitro, dated 2001-08-28 ..... 8, 11

Bernard Goldstein et al., *Reference Guide on Toxicology* in Reference Manual on Scientific Evidence 410 (Fed. Jud. Ctr., 2d ed. 2006) ..... 13

Curtis D. Klaassen, *Casarett & Doull's Toxicology: The Basic Science of Poisons* (6th ed. 2001) ..... 9

D. Perez-Sala & F. Mollinedo, *Inhibition of isoprenoid biosynthesis induces apoptosis in human promyelocytic HL-60 cells*, 199 Biochemical and Biophysical Research Communications 1209-1215 (1994) ..... 18

D.E. Duggan and S. Vickers, *Physiological disposition of HMG CoA reductase inhibitors*, 22 Drug Metabolism Reviews 333-62 (1990) ..... 24

E. Weidmann, and K. Sprenger, *Benefit-Risk Evaluation Report, CIOMS IV, Cerivastatin Sodium* ..... 8, 11, 18

Farmer et al., *Learning from the Cerivastatin Experience*, 358 Lancet 1388-84 (2001) ..... 10

I. Hamilton-Craig, *Statin-associated Myopathy*, 175 Med. J. Aust. 486-489 (2001) ..... 8, 10

Judith Staffa et al., *Cerivastatin and Reports of Fatal Rhabdomyolysis*, 346 New England J. Med. 539-540 (2002) ..... 8, 10

K. Matsuyama, et al., *Evaluation of myopathy risk for HMG-CoA reductase inhibitors by urethane infusion method*, 25 Biological & Pharm. Bulletin 346-350 (2002) ..... 11

Michael D. Green et al., *Reference Guide on Epidemiology* in *Reference Manual on Scientific Evidence* 346 (Fed. Jud. Ctr., 2d ed. 2006) ..... 15

Michael J. Saks et al., *Annotated Reference Manual on Scientific Evidence* 569 (2d ed. 2006) ..... 13

O.P. Flint et al., *Inhibition of cholesterol synthesis by squalene synthase inhibitors does not induce myotoxicity in vitro*, 145 Toxicology and Applied Pharmacology 91-98 (1997) ..... 18

Pharmacology Review of NDA, Submission date June 17, 1996, Bates no. GSK_BL_00608387 ..... 8

S. Matzno et al., *Inhibition of cholesterol biosynthesis by squalene epoxidase inhibitor avoids apoptotic cell death in L6 myoblasts*, 38 J. Lipid Research 1639-48 (1997) ..... 18

**TABLE OF CONTENTS**
(continued)

**Page**

S. Matzno, et al., *Evaluation of the synergistic adverse effects of concomitant therapy with statins and fibrates on rhabdomyolysis*, 55 J. Pharm. Pharmacology 795-802 (2003)........ 8

Thompson et al., *Statin-Associated Myopathy*, 289 JAMA 1681-1690 (2003)........ 8, 10

W. Muck, *Clinical pharmacokinetics of cerivastatin*, 39 Clinical Pharmacokinetics 99-116 (2000)........ 11, 15

## I. INTRODUCTION

Martyn T. Smith, Ph.D., is a Professor of Toxicology in the Division of Environmental Health Sciences, School of Public Health, University of California at Berkeley. For the past 13 years, he has served in the rotating position of either Head or Deputy Head of the Division of Environmental Health Sciences. Dr. Smith has had a long and distinguished career in the field of toxicology. He was elected in 1994 as a Fellow of the American Association for the Advancement of Science, for outstanding contributions to the field of environmental toxicology. He has served on advisory councils to the National Institutes of Health (NIH) and has authored over 150 articles in peer reviewed journals.

Dr. Smith formed his opinion by looking at the totality of the available animal and human toxicology data, which provides a consistent picture of the toxicity of Baycol. Given the strength of Dr. Smith's qualifications and the reliability of his methodology, Defendants have been forced to fill their motion to exclude Dr. Smith's testimony with nit-picking about peripheral issues, while leaving unchallenged Dr. Smith's qualification as an expert and most of the methodology by which he reached his opinions. Those arguments Defendants do make are unpersuasive; Dr. Smith is well qualified and his opinions are relevant and reliable and should be admitted.

## II. DR. SMITH'S TESTIMONY IS ADMISSIBLE BECAUSE IT MEETS THE STANDARD FOR ADMISSIBILITY

### A. The Standard for Admissibility of Expert Testimony

Federal Rule of Evidence 702 requires the district courts to perform a gatekeeping function to ensure the reliability and relevance of scientific evidence. *See generally* Fed. R. Evid. 702;[1] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Fed. R. Evid. 702 and subsequently *Daubert* specify only two threshold requirements for admissibility: relevance and reliability. *Daubert*, 509 U.S. at 589. Relevance is satisfied if the evidence assists the jury by making some fact in issue more probably true than it would be in the absence of the evidence. *Id*. at 587. Reliability is satisfied if scientific evidence is "grounded in the methods and procedures of science." *Id*. at 590. Attacks on the soundness of the opinion, the adequacy of methodology used, or the unorthodox nature of a witness' views go only to the weight of an expert's opinion, not to its admissibility. *Miles v. General Motors Corp.*, 262 F.3d 720, 724-25 (8th Cir. 2001); *Hose v. Chicago N.W. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995). "It is

---

[1] "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if

(1) the testimony is based upon sufficient facts or data,
(2) the testimony is the product of reliable principles and methods, and
(3) the witness has applied the principles and methods to the facts of the case."

Fed. R. Evid. 702.

up to the opposing party to examine the factual basis for the opinion in cross-examination." *Larson v. Kempker*, 414 F.3d 936, 941 (8th Cir. 2005).

The "rejection of expert testimony is the exception rather than the rule." Fed. Rule Evid. 702, advisory committee's note (2000). The admissibility standard set out by Fed. R. Evid. 702 and *Daubert* was not intended to usurp the role of "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," which are "the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; Fed. Rule Evid. 702, advisory committee's note (2000). "Doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *Clark v. Heidrick, M.D.*, 150 F.3d 912, 915 (8th Cir. 1998) (citation omitted).

The *Daubert* court provides four general indicia of admissibility of scientific testimony, namely, "(1) whether the expert's methodology has been tested; (2) whether the technique has been subjected to peer review and publication; (3) whether the technique has a known or knowable rate of error; and (4) whether the technique has been generally accepted in the proper scientific community." *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1207-08 (8th Cir. 2000) (citing *Daubert*, 509 U.S. at 593-94). The inquiry, however, is a flexible one. *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (citing *Daubert*, 509 U.S. at 594-95). The *Daubert* decision sets forth that the indicia of admissibility are not exhaustive and do not constitute "a definitive checklist or

test." *Daubert,* 509 U.S. at 593. Moreover, these criteria are intended to help evaluate the expert's *methodology*, and not the expert's conclusions. *Bonner*, 259 F.3d at 929.

The standard of proof at this stage of the proceedings is modest. Proponents of scientific evidence "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable. . . . The evidentiary requirement of reliability is lower than the merits standard of correctness." *In re Paoli R.R. Yard PCB Litigation* 35 F.3d 717, 744 (3rd Cir. 1994); *Moore v. Ashland Chem., Inc*., 151 F.3d 269, 276 (5th Cir. 1998) (*en banc*) ("The proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable."). "The court's only function is to ensure that the expert employed scientifically valid methodologies. Once this is clear, the opinions which follow are admissible." *Lakie v. SmithKline Beecham*, 965 F. Supp. 49, 54 (D.D.C. 1997).

**B. Dr. Smith's Testimony Meets the Standard Set By Rule 702 and Daubert and Should Therefore Be Admitted.**

As a whole, Dr. Smith's testimony is admissible under the standard set forth by Fed. R. Evid. 702, *Daubert* and its progeny. Dr. Smith's expert opinion will assist the trier of fact to understand the evidence about the toxicity of Baycol and, how Baycol, and other statins affect the muscles on a molecular level.

Dr. Smith's opinion will ultimately help the trier of fact in determining a fact in issue, namely that Baycol is capable of causing muscle damage.

Dr. Smith is currently a Professor of Toxicology at the University of California at Berkeley, where he has been employed since 1982. (Expert Witness Report of Martyn T. Smith, Ph.D. ¶ 1 ("Smith Rep.") (attached as Exhibit "A").) For the past fifteen years he has been a full member of the Society of Toxicology, and he has had the honor of being elected as a Fellow of the American Association for the Advancement of Science for his outstanding contributions to the field. (Smith Rep. ¶ 3.) Additionally, Dr. Smith has been a reviewer or a member of the editorial boards of several peer-reviewed journals, and has authored or co-authored hundreds of articles, book chapters and abstracts about toxicological matters. (*Id*. ¶ 5.) Dr. Smith has devoted his professional career "to the study of toxic effects of chemicals and drugs on the human body, with particular emphasis on the mechanisms by which chemicals and their metabolites cause damage at the cellular level and to the human organism as a whole." (*Id*.)

Dr. Smith's testimony is also reliable because it is based on sound methodology, as required by Fed. R. Evid. 702 and *Daubert*. Dr. Smith formed his opinions after reviewing peer-reviewed literature and analyzing data using classical toxicological methods. (*See* Smith Rep.; Videotaped Dep. of Martyn T. Smith, February 9, 2004 ("Smith Dep. I") (attached as Exhibit "B"); Videotaped Dep. of Martyn T. Smith, July 26, 2004 ("Smith Dep. II").) In reviewing the peer-reviewed literature and forming his opinions, Dr. Smith also relied on his 30+

years of education and expertise as a highly respected toxicologist. (Smith Rep. ¶ 2.)

### C. Studies Based On AERS Data Are Highly Relevant And Reliable.

Some of the peer-reviewed literature upon which Dr. Smith based his opinion used data gathered from the FDA's Adverse Event Reporting System, a program by which the reports of adverse events detected and reported after the marketing of a drug are compiled. These data, and literature discussing them, are acceptable and reliable as support for an expert opinion.[2] This is especially true where the AERS evidence consists of an epidemiologic study of Relative Reporting Rates of the same types of events, as between drugs in the same class, first marketed at essentially the same time, and used among similar patient populations, thereby meeting all the criteria established by the FDA to allow safety comparisons of the type conducted by Judith Staffa of the FDA, and by John Farquhar using identical methodology. FDA officials like Staffa commonly write articles in peer-reviewed journals based on these methods. *See, e.g.,* Allen Brinker et al., *Spontaneous Reports of Hypertension Leading to Hospitalisation in Association with Rofecoxib, Celecoxib, Nabumetone and Oxaprozin*, 21(7) Drugs

[2] Plaintiffs are filing contemporaneously with this memorandum of law a reply to Defendants' Motion to Exclude Expert Testimony Based on Adverse Event Reports. (*See* Pl.'s Mem. in Opp'n to Bayer and GSK's Mot. to Exclude Expert Test. Based on Adverse Event Reports.) Plaintiffs incorporate the arguments raised in that brief by reference here. Plaintiffs also incorporate by reference their Opposition to Motion to Exclude Testimony of John W. Farquhar, M.D., which further describes the grounds for admissibility of epidemiologic analyses of Adverse Event Report data.

& Aging 479 (2004) (attached as Exhibit "C"). Defendant has cited not a single case excluding evidence of a relative reporting rate epidemiologic study such as those relied upon by Dr. Smith, and the cases cited by defendant involving individual case reports are simply inapposite.

In the case of Baycol, the AERS evidence was overwhelming and was entirely consistent across multiple adverse event reporting systems. Moreover, in reaching his conclusions Dr. Smith relied on many sources in addition to AERS evidence, including internal company documents and external data obtained from Bayer, to demonstrate the toxicological dangers of Baycol. The documents at Dr. Smith's disposal included animal studies, clinical trials, AERs from multiple databases, and studies of AERs showing relative reporting rates among drugs in the classification. No federal courts have excluded expert testimony based on the kind of evidence presented here, namely, database and cross-database analysis of AERs compared to like pharmaceuticals and corroborated by other evidence, including animal studies and other independent trials. Therefore, the present case falls squarely within the precedents admitting expert testimony based on AERs. The scientific methodology of the studies reviewed by Dr. Smith easily satisfies the *Daubert* standard for reliability. Therefore, the fact that Dr. Smith's opinion is based in part on the same AERS data that has demonstrated Baycol's toxicity to the medical community supports, rather than distracts from, the admissibility of his testimony.

## III. THE COURT SHOULD ADMIT DR. SMITH'S OPINIONS BECAUSE THEY ARE RELEVANT AND RELIABLE UNDER THE DAUBERT STANDARD

### A. Dr. Smith's Opinion That Baycol Is The Most Toxic Statin Is Admissible Because It Is Relevant And Reliable.

Dr. Smith's testimony that Baycol is the most toxic statin is admissible under the standard set by Fed. R. Evid. 702 and *Daubert*. The methodology used by Dr. Smith to reach his conclusions was reliable because he formed his opinions after reviewing peer-reviewed literature and other relevant materials, in light of his experience and expertise. Specifically, Dr. Smith's testimony that Baycol is more toxic than other statins is based on his overall understanding after reading the medical literature, including peer-reviewed articles by Staffa, Thompson, Hamilton-Craig, Matzno, studies by Bayer's own toxicologists, and a report by the FDA.[3] (Smith Rep. ¶¶ 8-10, 15, 17; Smith Dep. I 69:8-12, 86:8-87:6, 90:22-91:2.) Dr. Smith reviewed these studies and literature and, using his 30+ years of education and expertise as a toxicologist, and applying classic toxicology methods to analyze the data, drew his conclusions. "Trained

[3] Judith Staffa et al., *Cerivastatin and Reports of Fatal Rhabdomyolysis*, 346 New England J. Med. 539-540 (2002); Thompson et al., *Statin-Associated Myopathy*, 289 JAMA 1681-1690 (2003); I. Hamilton-Craig, *Statin-associated Myopathy*, 175 Med. J. Aust. 486-489 (2001); S. Matzno, et al., *Evaluation of the synergistic adverse effects of concomitant therapy with statins and fibrates on rhabdomyolysis*, 55 J. Pharm. Pharmacology 795-802 (2003); E. Weidmann, and K. Sprenger, *Benefit-Risk Evaluation Report, CIOMS IV, Cerivastatin Sodium*; Bayer Pharmaceutical Business Group, Report No. PH 31298, Toxicity of lipid-lowering drugs in primary skeletal muscle cells in vitro, dated 2001-08-28; Pharmacology Review of NDA, Submission date June 17, 1996, Bates no. GSK_BL_00608387.

experts commonly extrapolate from existing data." *General Elec. v. Joiner*, 522 U.S. 136, 146 (1997).

Defendants' arguments against admission of Dr. Smith's testimony that Baycol is the most toxic statin are unpersuasive. *In vivo* and *in vitro* toxicological evidence is often the best available scientific information about the effects of chemical agents like pharmaceutical drugs, since it is unethical to experiment on humans by exposing them to known doses of potentially harmful agents. Bernard Goldstein et al., *Reference Guide on Toxicology* in Reference Manual on Scientific Evidence 405 (Fed. Jud. Ctr., 2d ed. 2006). Moreover, *in vivo* and *in vitro* studies are often the most able to keep other variables constant, thereby avoiding confounding factors in the results. *Id.* at 407.

Dr. Smith is well-versed in the widely accepted, classical toxicological methods of interpreting animal studies appropriately for therapeutic agents, and he is well aware of the benefits and limitations of animal studies in the totality of evidence considered by toxicologists:

> Q: … Doctor, can you point [me to] authority that stands for the proposition that extrapolating NOEL [no-observed-effect level] from animal studies is appropriate methodology in therapeutic agents?
>
> A: Most toxicology textbooks cover that and have the therapeutic index of the drug based on the TD99 and the E effective dose 1, [see, for example,] Casarett & Doull[4] [a toxicological textbook].

---

[4] Curtis D. Klaassen, *Casarett & Doull's Toxicology: The Basic Science of Poisons* (6th ed. 2001).

Q: …And you're confident that in those textbooks it discusses using that methodology for agents that are ultimately going to be used in clinical trials?

A: You use that methodology with any chemical in which you're evaluating the potential toxicity of. … It's just standard toxicological practices.

Q: …[I]f you have actual human data in a double-blinded placebo-controlled clinical trial, … isn't that more relevant information on human experience rather than extrapolating from no-observable-effect level?

***

A: Well, … I think as a toxicologist, obviously human data is very valuable … as is all data, and you have to essentially assess the total data picture. There may be issues with regard to the clinical trial, whether it was done in just healthy young own [sic] of 25 when you're actually giving it to elderly patients and things like this that you have to consider. So human data also has flaws or potential bias, and so you have to consider the total data picture.

(Smith Dep. I 149:17–150:21.) Accordingly, Dr. Smith has based his opinion on the "total data picture" provided by animal, *in vitro* and human studies, and has found in those data and reports a consistent picture of Baycol's toxicity.

Dr. Smith makes two points about Baycol being the most toxic statin, but Defendants erroneously conflate them into one point. In his expert report, Dr. Smith notes that "the scientific community accepts that Baycol is the most toxic statin" and cites support from several peer-reviewed articles, including Farmer, Staffa, Thompson and Hamilton-Craig.[5] (Smith Rep. ¶¶ 7-10.) The fact

[5] Farmer et al., *Learning from the Cerivastatin Experience*, 358 Lancet 1388-84 (2001); Staffa; Thompson; Hamilton-Craig.

that some of these articles rely in whole or in part on adverse event report data does not make them, nor Dr. Smith's opinion, less reliable. As discussed *supra*, studies based on AERS data are highly relevant and reliable. Moreover, the authors of these articles are experienced in interpreting AERS data—in fact, Dr. Staffa is an FDA scientist—and the articles themselves have survived a rigorous peer-review process on their way to publication in these highly respected journals. As Dr. Smith said of the Thompson article, for example, "[i]t is a JAMA review article which typically are well peer-reviewed and thoroughly prepared. … It would be considered reliable [and is in] one of the leading journals in the field." (Smith Dep. I 134:11-13, 134:17-18.)

Dr. Smith's second point about Baycol being the most toxic statin is expressed in his opinion that "Baycol is the most toxic statin *in vivo* and *in vitro*." (Smith Rep. ¶¶ 15-18.) This opinion is based on the animal and *in vitro* studies by Weidmann & Sprenger and other Bayer scientists, Muck, Matsuyama, Nakai and Matzno.[6] (Smith Rep. ¶¶ 15-18; Smith Dep. I 86:8-91:2.) Dr. Smith does not extrapolate from these animal studies that Baycol is the most toxic statin in humans—instead his opinions are that Baycol is the most toxic statin *in vivo* and

[6] E. Weidmann, and K. Sprenger, *Benefit-Risk Evaluation Report, CIOMS IV, Cerivastatin Sodium*; Bayer Pharmaceutical Business Group, Report No. PH 31298, Toxicity of lipid-lowering drugs in primary skeletal muscle cells in vitro, dated 2001-08-28; W. Muck, *Clinical pharmacokinetics of cerivastatin*, 39 Clinical Pharmacokinetics 99-116 (2000); K. Matsuyama, et al., *Evaluation of myopathy risk for HMG-CoA reductase inhibitors by urethane infusion method*, 25 Biological & Pharm. Bulletin 346-350 (2002); A. Nakai, et al., *Enhanced myopathy following administration of hypolipidemic agents under urethane anesthesia*, 20 Biological & Pharm. Bulletin 104-06 (1997); Matzno.

*in vitro*; and that the scientific community considers Baycol to be the most toxic statin in humans. These two opinions are separate and distinct, although they are certainly related and logically supportive of each other.

Contrary to what Defendants state in their motion, neither the Eighth Circuit nor Dr. Smith have stated that extrapolations from *in vivo* and *in vitro* studies are unreliable bases for opinions.[7] "There is a range of scientific methods for investigating questions of causation—for example, toxicology and animal studies, clinical research, and epidemiology—which all have distinct advantages and disadvantages." *Marder v. G.D. Searle & Co*., 630 F. Supp 1087, 1094 (D. Md. 1986), *aff'd sub nom. Wheelahan v. G.D. Searle & Co*., 814 F.2d 655 (4th Cir. 1987); *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 991 n.5 (8th Cir. 2001) (refusing to discount the value of animal studies *per se*); *Bonner* 259 F. 3d 924 (affirming admissibility of plaintiff's expert, whose opinion was partially based on *in vivo* studies).

It is a basic principle of pharmacology and toxicology that "one can usually rely on the fact that a compound causing an effect in one mammalian species will cause it in another species." Bernard Goldstein et al., *Reference*

---

[7] In their motion, Defendants cite *Sorenson v. Shaklee Corp*., 31 F.3d 638, 646 n.12 (8th Cir. 1994) in support of their contention that courts find animal studies inadmissible. (Def. Mem. in Supp. of their Mot. to Exclude Expert Test. of Martyn Smith at 5 ("Def. Mem.").) However, the quote Defendants misleadingly attribute to the *Sorenson* court was not penned by the *Sorenson* court but is instead a passage from a law review article that the *Sorenson* court quoted in a footnote. In actuality, the *Sorenson* court does not hold that animal studies are inadmissible or even unreliable.

*Guide on Toxicology* in Reference Manual on Scientific Evidence 410 (Fed. Jud. Ctr., 2d ed. 2006). "Humans are animals. There is an overwhelming biological similarity between humans and other animals, especially mammals," such as the dogs and rats that were the subjects of the *in vivo* studies relied upon by Dr. Smith. Michael J. Saks et al., *Annotated Reference Manual on Scientific Evidence* 569 (2d ed. 2006).

Defendants' arguments about the differences in dosage between the subjects in the animal studies[8] and the patients who took Baycol are irrelevant and unpersuasive. In this instance, Dr. Smith does not base his opinion on the extrapolation of the results of high-dose animal studies to humans. In actuality, Dr. Smith bases his opinion on the comparison of high-dose animals studies *between* statins. The results of similar animal studies using several different statins were compared with each other—studies of the same species taking therapeutically equal doses of different statins showed Baycol to be the most toxic statin. No complex extrapolation is required to reach that conclusion from those data.

*In vitro* studies can also form the basis for a reliable expert opinion, if they are interpreted with the proper care and precision. As an expert

[8] Animal subjects of *in vivo* studies are often exposed to extremely high dose rates, because this provides information that might not be available at therapeutic dose rates. Michael J. Saks et al., *Annotated Reference Manual on Scientific Evidence* 575 (2d ed. 2006). Also, in the case where the incidence of injury at lower dose rates is quite low, exposing subjects to higher dose rates can make it easier and more economical to detect adverse effects without using a large number of subject animals. *Id.* at 576.

toxicologist, Dr. Smith understands full well that while results from *in vitro* studies may be extrapolated to humans, it must be done carefully. (Smith Dep. I 124:17-22.) For example, he explains that studying a drug *in vitro* is very different from *in vivo* because in cell culture 100% of the drug acts on whatever is in the Petri dish, be it muscle cells or liver cells, whereas "*in vivo* what matters is the amount of drug that gets to the liver, inhibits the enzyme [HMG-CoA reductase] within the liver and not elsewhere." (*Id.* at 89:24-90:1.)

The *in vivo* and *in vitro* studies upon which Dr. Smith bases a portion of his opinion are reliable because the authors of the studies controlled for any confounding variables, such as the myotoxicity of the urethane anesthetic used in the Matsuyama study[9]—if they had not so controlled, their studies would not have survived the rigorous peer-review process undergone prior to publication in these well-respected medical journals. (*Id.* at 94:7-10.)

Each type of research—epidemiological studies and toxicological models such as *in vivo* and *in vitro* studies—have their strengths and weaknesses; toxicologic studies are often the only or best available evidence of toxicity. Michael D. Green et al., *Reference Guide on Epidemiology* in *Reference Manual*

[9] In his deposition testimony, Dr. Smith notes that the authors of the study mention that the interaction between urethane and statins is a class effect, meaning that all statins interact with urethane in the same way and therefore the usage of urethane in the study will potentiate the myotoxicity of all statins equally, making comparison among all statins possible and allowing for the effect of urethane to be controlled for in the study results. (Smith Dep. I 93:13-94:21, 100:17-102:11.) Moreover, multiple studies, including those done by Bayer scientists, found results similar to Matsuyama's that support the opinion that Baycol is the most toxic statin *in vivo* and *in vitro*. (*Id.* at 101:18-22.)

*on Scientific Evidence* 346 (Fed. Jud. Ctr., 2d ed. 2006). Moreover, Dr. Smith's opinion is not based solely on *in vivo* or *in vitro* or AERS data, but on all three, in addition to other types of peer-reviewe d and reliable data; Dr. Smith took all of these data types together and, considering them with the education and experience of 30+ years as an expert toxicologist, drew his conclusions in a reliable manner that is admissible under Fed. R. Evid. 702 and *Daubert*.

**B. <u>Dr. Smith's Opinions That Baycol Is More Susceptible to Drug-Drug Interactions And Regarding The Mechanism of Statin-Induced Myopathy Are Admissible Because They Are Relevant And Reliable.</u>**

**1. Drug-drug interactions**

Dr. Smith's testimony that Baycol is more susceptible to drug-drug interactions is relevant and reliable and therefore should be admitted by the Court. Dr. Smith reviewed the data and reports of Bayer scientists such as Dr. Muck and analyzed them using his own expert knowledge of molecular toxicology to reach his conclusion that Baycol's has a higher propensity for drug-drug interaction because of its dual metabolic pathway.[10] (Smith Rep. ¶¶ 29-31; Smith Dep. I 140:10-142:10, 172:22-177:23.)

Contrary to what Defendants' would have the Court believe, Dr. Smith's opinion regarding Baycol's increased propensity for drug-drug interaction is a well-reasoned opinion based on classical toxicological principles. In his expert report he gives a detailed analysis of cerivastatin's two main oxidative

[10] W. Muck, *Clinical pharmacokinetics of cerivastatin*, 39 Clinical Pharmacokinetics 99-116 (2000).

biotransformation reactions: its "dual metabolic pathway." (Smith Rep. ¶¶ 30, 31.) He then goes on to explain that the two "pathways" useable by Baycol—CYP2C8 and CYP3A4—are "equally open to inhibition by other drugs and different ones at that. At least 50 different drugs inhibit either or both of these enzymes," including commonly prescribed drugs like Avandia (for diabetes), Actos (for diabetes), tamoxifen (to prevent breast cancer), ethinylestradiol (oral contraceptive). (*Id*. ¶ 31.) Inhibition of these enzymes essential for the metabolism of Baycol means that detoxification and clearing of Baycol from the blood is slowed, raising circulating plasma concentration to potentially toxic levels. (*Id*. ¶ 31.)

In his deposition testimony, Dr. Smith explains why the dual metabolism pathway, which was initially claimed to be a benefit, actually was a negative feature of Baycol:

> [People] knew about CYP3A4 inhibitors and they knew that there was quite a large number of those, and therefore they realized that having a second pathway would actually lower the risk of interaction with those specific drugs. But for some reason, what they seem to completely have missed is the fact that there is a number of CYP2C8 inhibitors, including things like Rezulin and the glitazones we were talking about earlier today. And that would open it up actually to more drug-drug interactions with a larger list of drugs than just the individual groups. So this initially looks like a good idea and … an advantage, but actually, when you think about it, it's not.

(Smith Dep. I 141:5-18.) Dr. Smith goes on to say that the idea that two pathways are necessarily better than one is "too simplistic," especially in light of the fact

that Baycol turned out to have a much more complicated metabolic profile than initially thought. (*Id.* at 141:22-142:3, 177:9.) This opinion is not radical, nor does it require an "analytical leap" of any great measure—it is a logical toxicological conclusion based on the molecular behavior of cerivastatin and the drugs with which it interacts.

The fact that Dr. Smith did not look for peer-reviewed literature that expressed opinions similar to his own on this point does not mean, as Defendants' erroneously conclude, that his opinion is unreliable. Not every possible subject appears in the peer-reviewed literature, and the more relevant question is whether Dr. Smith came to hold his opinion by a reasonable methodology. Dr. Smith applied the classical principles of toxicology and metabolism to the drug-drug interaction issue, and this is a reasonable scientific method.

Defendants also note that Dr. Smith's opinion regarding the drug-drug interactions of Baycol is at odds with the opinion of Plaintiffs' rebuttal expert, Dr. Sandy Pang. That two experts disagree on something is neither unusual nor fatal to the admissibility of either expert's opinion under *Daubert*. Indeed, the court in *Ruiz-Trioche v. PepsiCola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) held that *Daubert* does not require nor empower trial courts to decide between competing scientific theories.

**2. Statin-induced Myopathy**

Dr. Smith's testimony regarding the mechanism of statin-induced myopathy is relevant and reliable and therefore should be admitted by the Court.

Dr. Smith reviewed the data and reports of Bayer scientists such as Weidmann & Sprenger, and the peer-reviewed articles by Matzno, Perez-Sala & Mollinedo, Masters and Flint and analyzed them using his own expert knowledge of molecular toxicology to reach his conclusion that apoptosis[11] induction is one potential mechanism of statin-induced myopathy.[12] (Smith Rep. ¶¶ 19-23; Smith Dep. I 105:1-107:11, 160:15-160:25, 162:16-167:24.)

There is a consensus in the medical community that statins cause rhabdomyolysis and muscle injury, and that Baycol was the most toxic statin in causing these diseases. This consensus has existed for a number of years, but it has been strengthened by recent literature published since the time of Plaintiffs' expert

[11] In biology, apoptosis is one of the main types of programmed cell death. As such, it is a process of deliberate life relinquishment by an unwanted cell in a multicellular organism. In contrast to necrosis, which is a form of cell death that results from acute cellular injury, apoptosis is carried out in an ordered process. Since the beginning of the 1990s, research on apoptosis has grown spectacularly. In addition to its importance as a biological phenomenon, defective apoptotic processes have been implicated in an extensive variety of diseases. Too much apoptosis causes cell-loss disorders, whereas too little results in uncontrolled cell proliferation, namely cancerous tumors. *Apoptosis*, The Virtual Library of Biochemistry and Cell Biology, *available at* http://www.biochemweb.org (last visited June 16, 2006).

[12] E. Weidmann and K. Sprenger, *Benefit-Risk Evaluation Report, CIOMS IV, Cerivastatin Sodium*; S. Matzno et al., *Inhibition of cholesterol biosynthesis by squalene epoxidase inhibitor avoids apoptotic cell death in L6 myoblasts*, 38 J. Lipid Research 1639-48 (1997); D. Perez-Sala & F. Mollinedo, *Inhibition of isoprenoid biosynthesis induces apoptosis in human promyelocytic HL-60 cells*, 199 Biochemical and Biophysical Research Communications 1209-1215 (1994); B.A. Masters et al., *In vitro myotoxicity of the 3-hydroxy-3-methylglutaryl coenzyme A reductase inhibitors, pravastatin, lovastatin, and simvastatin, using neonatal rat skeletal myocytes* 131 Toxicology and Applied Pharmacology 163-174 (1995); O.P. Flint et al., *Inhibition of cholesterol synthesis by squalene synthase inhibitors does not induce myotoxicity in vitro*, 145 Toxicology and Applied Pharmacology 91-98 (1997).

reports, as summarized in the Declaration of Dr. Farquhar filed herewith. While the defense focuses its attacks on Dr. Smith and others with regard to the proof of mechanism of injury, such a focus is misplaced. It is well-established that "the Court need not undertake an extensive *Daubert* analysis on the general toxicity question when the medical community recognizes that the agent causes the type of harm a plaintiff alleges." *McClain v. Metabolife*, 401 F.3d 1233, 1239 (11th Cir. 2005). Plaintiffs have submitted sufficient evidence of plausible mechanisms of action, in light of the consensus that Baycol causes the type of harm alleged.

The fact that the exact mechanism of statin-based myopathy is not yet known by scientists does not affect the admissibility of Dr. Smith's opinion on the topic; on the contrary, courts have long recognized that science is constantly evolving, and the fact that a theory is new or in the process of becoming generally accepted does not prevent it from being admissible in court. *See, e.g.*, *Ruiz-Trioche*, 161 F.3d at 85 ( "*Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance. It demands only that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.") Nor does the limited number of published studies supporting apoptosis induction of muscle injury require exclusion of Dr. Smith's testimony about it. The *Daubert* court itself notes that peer review and publication are of diminished importance for expert testimonial propositions that are "too particular, too new, or of too limited interest to be published." *Daubert*, 590 U.S. at 593. It is therefore not required that Dr. Smith

be able to show the exact mechanism by which Baycol affects muscle cells, especially where the there is a consensus in the medical community that Baycol causes muscle damage and rhabdomyolysis.

Dr. Smith acknowledges that apoptosis induction is one possible mechanism of statin-induced myopathy, supported by some peer-reviewed articles but not yet fully tested and developed:

> …There are really two main theories [to explain the myotoxicity of statins] now. Ubiquinone depletion and apoptosis induction because of small molecule alterations to proteins, and both of those could … actually be working. But they're the two main theories now.

(Smith Dep. I 160:21-25.) Dr. Smith cites the available, reliable research on both mechanism theories and acknowledges that more studies must be done to confirm the mechanism. (*Id.* at 102-103.) However, *Daubert* does not require that a scientific theory be proven to be admitted into evidence. Dr. Smith presents both plausible mechanism of muscle damage, and this is sufficient where there is a scientific consensus that the agent (Baycol) causes the type of harm alleged (muscle damage). *McClain*, 401 F.3d at 1239.

## IV. DR. SMITH'S OTHER OPINIONS ARE ADMISSIBLE BECAUSE THEY ARE RELEVANT AND RELIABLE

### A. Dr. Smith's Opinion That Bayer Did Not Use Proper Toxicological Methods to Interpret Data Is Admissible Because It Is Relevant And Reliable.

Dr. Smith's testimony that Bayer's scientists did not use the appropriate, classical toxicology techniques to interpret the data is relevant and

reliable under Fed. R. Evid. 702 and *Daubert* and therefore should be admitted by the Court.

Dr. Smith used his own expert knowledge of molecular toxicology and the classical, widely accepted methods of interpreting toxicological data to reach his conclusion that the Bayer scientists did not properly interpret the Baycol data. (Smith Rep. ¶¶ 12; Smith Dep. I 145:3-147:19.) Dr. Smith's conclusions were based on his scientific expertise, not "layman's speculation." (Def. Mem. at 11.) He states that because Baycol was an entirely new formulation with a different chemical structure than that of other statins, a thorough critical evaluation of its toxicity was in order. (Smith Rep. ¶ 12.) Dr. Smith noted that "[i]f you look at the data [on Baycol] more thoroughly and use classical toxicological methods as well as other methods based upon pharmacokinetic parameters, you get very different results" with a large amount of discrepancy between the two sets of results. (Smith Dep. I 146:17-21.) "[I]t's really … [the] critical evaluation of that discrepancy [that] is not presented in the CIOMS reports or in other things I have read by the Bayer scientists." (*Id.* at 146:21-24.) Dr. Smith reached these conclusions by relying on his expertise as a toxicologist.

When asked by counsel what specific problems Dr. Smith could pinpoint in the Bayer scientists' interpretation of the Baycol data, Dr. Smith pointed out that the Bayer scientists didn't use therapeutically equivalent doses, selectively chose data, ignored principles of classical toxicology, and then failed to explain the discrepancy between the results they had gotten and the results gleaned

from the application of classical toxicological methods. (*Id.* at 147:5-19.) "[T]o any toxicologist, that should be a red flag: … you have to explain this discrepancy between just classical methodology and the data that you've taken from pharmacological or pharmacokinetic interpretation." (*Id.* at 151:21-25.) Again, these conclusions are far from the speculation of a layman—they are scientific opinions by an expert toxicologist evaluating the work of other toxicologists, and should be admitted as such.

Moreover, Dr. Smith's testimony that Bayer toxicologists were concerned about the steep dose-response curve and narrow safety margin of Baycol is not an inference the jury is "equally capable of drawing without his assistance." (Def. Mem. at 11.) Dr. Smith is an expert toxicologist assisting the jury by interpreting the report of Bayer's toxicologists and translating for them what would otherwise be too technical to understand. Without Dr. Smith's expert assistance, it is not at all clear to the layman juror what is being communicated by Bayer scientists in sentences like "the safety margin for our compound from the no-effect level to *non-tolerable* dose is less than three whereas for lovastatin it is at least 12-fold" and "the toxicity curve 'is very steep between the first adverse events noted and death.'" (Smith Rep. ¶ 14.) By explaining the technical terms, noting the emphasis in the sentences and putting them into a toxicological context, Dr. Smith's testimony assists the jury in understanding that this portion of the

Bayer scientists' report communicates their concern over the narrow safety margin and steep dose-response curve of their compound, Baycol.[13] (*Id.* ¶ 14.)

Neither is Dr. Smith "speculating about what Bayer's toxicologists did or did not know." (Def. Mem. at 11.) The Bayer scientists state directly in their report what they knew—that Baycol has a narrow safety margin and a steep dose-response curve. (Smith Rep. ¶ 14.) Dr. Smith did not extrapolate or hypothesize those concepts—he quoted them directly from the Bayer scientists' report! (*Id.* ¶ 14.) Dr. Smith's testimony on this point is limited to the scientific data and the report of the Bayer scientists and the reasonable inferences thereon. In the course of such testimony, it is appropriate to comment that, from a scientific standpoint, unreasonable interpretations of the data were made. Defendants' arguments to the contrary are the basis of cross-examination, not exclusion of Dr. Smith's opinions.

Therefore, Dr. Smith's testimony that Bayer scientists inappropriately interpreted the toxicological data on Baycol is admissible under *Daubert* and should not be excluded.

[13] Dr. Smith's testimony in the instant case is wholly distinct from the opinion of the expert in *Galdi v. Bayer Corp*., Pa. Ct. Cmn. Pls., July Term 2002, Case No. 4892, Trial Tr. 3/12/04 (Def. Ex. H), cited by the Defendants in their Motion. (Def. Mem. at 11.) Unlike the expert in *Galdi*, who testified that Bayer was aware of the ineffectiveness of its safety communication campaign but did little to remedy it, Dr. Smith is testifying to a scientific opinion about the toxicological interpretation of the report of Bayer's own toxicologists. This opinion is well within Dr. Smith's scientific expertise, and is not a mere expression of Dr. Smith's personal beliefs.

### B. **<u>Dr. Smith's Opinion That Bayer Incorrectly Characterized Baycol As An "Ideal Statin" Is Admissible Because It Is Relevant And Reliable</u>**

Dr. Smith's testimony that Baycol was not an "ideal statin," as it was styled by Bayer, is relevant and reliable and therefore should be admitted by the Court. In his expert report, Dr. Smith notes that Bayer scientists stated in Baycol's New Drug Application ("NDA") that Baycol fit the Duggan and Vickers definition[14] of an "ideal statin," when in fact the data shows that Baycol is nowhere near an "ideal statin". (Smith Rep. ¶¶ 24-28.) Nowhere in his expert report or his deposition testimony does Dr. Smith opine that Bayer misled the FDA by making that statement in the Baycol NDA. Dr. Smith simply cited the inaccuracy of the Bayer scientists' statement that Baycol was an "ideal" statin to underscore his expert opinion regarding the toxicological shortcomings of Baycol.[15] Defendants' lengthy argument against Dr. Smith's testimony claiming that it is only relevant to a fraud-on-the-FDA claim is therefore inapposite.

---

[14] The characteristics of an ideal statin are "one which (1) is well absorbed; (2) reaches the liver unchanged; and (3) is completely extracted by it, precluding unnecessary systemic exposure. Finally, (4) its elimination, if in the form of active inhibitor(s), would be direct elimination in the bile." D.E. Duggan and S. Vickers, *Physiological disposition of HMG CoA reductase inhibitors*, 22 Drug Metabolism Reviews 333-62 (1990).

[15] Moreover, Defendants misleadingly use selective quotations of Dr. Smith's deposition testimony to make it sound as though Dr. Smith said that no statin could reach the ideal laid out by Duggan and Vickers. In actuality, Dr. Smith testified that atorvastatin (Lipitor) fits the definition and that none of the other statins (other than atorvastatin) are ideal. (Smith Dep. I 167:25-169:16.)

Therefore, and especially in light of the liberal construction of Fed. R. Evid. 702 and the court's role as gatekeeper rather than evaluator of an opinion's persuasiveness, Dr. Smith's testimony that Baycol is far from an "ideal statin" is admissible under *Daubert* and should not be excluded.

## V. CONCLUSION

Dr. Smith's expert opinion is relevant and reliable under the standard set forth by Fed. R. Evid. 702 and *Daubert* and its Eighth Circuit progeny, and should be admitted.

Date: June 23, 2006

Respectfully submitted,

LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP

By: /signature on file/
Donald C. Arbitblit

Embarcadero Center West
30th Floor, 275 Battery Street
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

ZIMMERMAN REED, PLLP
Charles S. Zimmerman, #120054
Ronald S. Goldser, #35932
Robert R. Hopper, #208760
Stacy K. Hauer, #317093
651 Nicollet Mall, Suite 500
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844

LOCKRIDGE GRINDAL NAUEN, P.L.L.P.
Richard A. Lockridge, #64117
Robert K. Shelquist, #21310X
Yvonne M. Flaherty, #267600
100 Washington Avenue South, Ste. 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981

***Plaintiffs' Steering Committee***

Don Barrett
Barrett Law Office, PA
404 Court Square North
P.O. Box 987
Lexington, MS 39095

Daniel E. Becnel
Law Offices of Daniel E. Becnel, Jr.
106 West Seventh St., P.O. Drawer H
Reserve, LA 70084

Turner W. Branch
Branch Law Firm
2025 Rio Grande Blvd. N.W.
Albuquerque, NM 87104

Stanley M. Chesley
Waite, Schneider, Bayless & Chesley Co., LPA
1513 Fourth and Vine Tower
One West Fourth Street
Cincinnati, OH 45202

John R. Climaco
Climaco, Lefkowitz, Peca, Wilcox & Garofoli Co., L.P.A.
1220 Huron Road, Suite 1000
Cleveland, Ohio 44115

James R. Dugan
Gauthier, Downing, LaBarre, Beiser & Dean
3500 North Hullen Street
Metairie, LA 70002

Frederic S. Fox
Kaplan Fox & Kilsheimer LLP
805 3rd Avenue, 22nd Floor
New York, NY 10022

Don Hildre
Dougherty, Hildre, Dudek & Haklar
2550 Fifth Ave., Suite 600
San Diego, CA 92103-5624

Will Kemp
Harrison, Kemp & Jones
3800 Howard Hughes Pkwy, 17th Floor
Las Vegas, NV 89109

Dianne M. Nast
Roda & Nast, P.C.
801 Estelle Drive
Lancaster, PA 17601

W. James Singleton
Singleton Law Firm
4050 Linwood Ave.
Shreveport, LA 71108

William M. Audet
Alexander, Hawes & Audet, LLP
300 Montgomery St.
Suite 400
San Francisco, CA 94104

Ted B. Lyon, Jr.
Teb B. Lyon & Associates, P.C.
Town East Tower, Suite 525
18061 LBJ Freeway
Mesquite, TX 75150

Dale I. Larson
Larson King
2800 World Trade Center
30 East Seventh Street
St. Paul, MN 55101

Mark Robinson
Robinson, Calcagnie & Robinson
620 Newport Center Dr., Seventh Floor
Newport Beach, CA 92660

Ron Meshbesher
Meshbesher & Spence Ltd.
1616 Park Avenue South
Minneapolis, MN 55404