# EXHIBIT B

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| IN RE: BAYCOL PRODUCTS LITIGATION | : | MDL No. 1431 (MJD/JGL) |
| This Document Relates to All Cases | : | |

VIDEOTAPED DEPOSITION OF MARTYN T. SMITH, Ph.D.

San Francisco, California

Monday, February 9, 2004

Reported by:
SUZANNE F. BOSCHETTI
CSR No. 5111

Job No. 50019

2

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

IN RE: BAYCOL PRODUCTS LITIGATION : MDL No. 1431 (MJD/JGL)

This Document Relates to All Cases

Videotaped deposition of MARTYN T. SMITH, Ph.D., taken on behalf of Defendant Bayer Corporation, at 275 Battery Street, Suite 3000, San Francisco, California, beginning at 9:13 a.m. and ending at 3:19 p.m. on Monday, February 9, 2003, before SUZANNE F. BOSCHETTI, Certified Shorthand Reporter No. 5111.

3

APPEARANCES:

Counsel for MDL Plaintiffs:

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
BY: DONALD C. ARBITBLIT
Attorney at Law

275 Battery Street, 30th Floor
San Francisco, California 94111-3339
(415) 956-1000

DIAMOND McCARTHY TAYLOR FINLEY BRYANT & LEE, LLP
BY: BERT BLACK
Attorney at Law
1201 Elm Street, 34th Floor
Dallas, Texas 75270
(214) 389-5300

Counsel for Bayer Corporation:

SHOOK, HARDY & BACON, LLP
BY: MATTHEW D. KEENAN
BY: KASSIM A. KHAN, Ph.D.
Attorneys at Law
2555 Grand Boulevard
Kansas City, Missouri 64108-2613
(816) 474-6550

Counsel for SmithKline Beecham Corporation dba GlaxoSmithKline:

DECHERT LLP
BY: DEBRA D. O'GORMAN
Attorney at Law
30 Rockefeller Plaza
New York, New York 10112-2200
(212) 698-3500

Counsel for Pfizer, Inc. and Warner Lambert, Co.:

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
BY: MEREDITH SCHAUM
Attorney at Law
4 Times Square
New York, New York 10036
(212) 735-3000



APPEARANCES (Continued):

Counsel for various pharmacies in Georgia:

CROUCH & INABNETT
BY: KIM M. MEADERS
Attorney at Law
2300 Fountain Place
1445 Ross Avenue
Dallas, Texas 75202
(214) 922-7100
(Present by telephone)

Counsel for various physicians:

UZICK & ONCKEN, P.C.
BY: ROGER A. BERGER
Attorney at Law
550 Westcott, Suite 290
Houston, Texas 77007
(713) 869-2900
(Present by telephone)

Videographer:

MARTY MADJOUB
ESQUIRE DEPOSITION SERVICES
505 Sansome Street, Suite 502
San Francisco, California 94111
(415) 288-4280



INDEX

| WITNESS: | EXAMINATION |
| --- | --- |
| MARTYN T. SMITH, Ph.D. | |
| BY MR. KEENAN | 9, 128 |
| BY MS. MEADERS | 127 |

EXHIBITS

| DEPOSITION | | PAGE |
| --- | --- | --- |
| 1 | Notice of Deposition, dated February 3, 2004; 3 pages | 12 |
| 2 | Expert Witness Report of Martyn T. Smith, Ph.D.; 21 pages | 12 |

| | | |
|---|---|---|
| 3 | Literature Cited in Smith Report; 2 pages | 12 |
| 4 | Rebuttal Expert Witness Report of Martyn T. Smith, Ph.D. and attachment; 12 pages | 13 |
| 5 | Testimony of Martyn T. Smith, Ph.D. 1999 - 2003 and Consulting Rates; 1 page | 21 |
| 6 | Complaint for Violations of Proposition 65 and the Unfair Business Practices Act; 11 pages | 29 |
| 7 | Complaint for Injunctive Relief, et al., and Demand for Trial by Jury; 20 pages | 30 |
| 8 | Newspaper article from ContraCostaTimes.com, dated 12/10/2002; 3 pages | 31 |
| 9 | Baycol MDL, Smith Documents Reviewed - Supplemental; 20 pages | 39 |
| 10 | Letter to Donald C. Arbitblit, Esq. From Martyn T. Smith, Ph.D., dated December 10, 2003; 1 page | 41 |




INDEX (Continued):

EXHIBITS

SMITH


| | | PAGE |
|---|---|---|
| 11 | Curriculum Vitae for Martyn Thomas Smith, Ph.D.; 18 pages | 41 |
| 12 | Guidance for Industry, In Vivo Drug Metabolism/Drug Interaction Studies - Study Design, Data Analysis, and Recommendations for Dosing and Labeling; 19 pages | 53 |
| 13 | Pharmacology Review of NDA, Submission date June 17, 1996, Bates Nos. GSK_BL_00608387; 63 pages | 66 |
| 14 | Exhibit 3, Preclinical Safety Testing of Cerivastatin, page 57; 1 page | 69 |
| 15 | Letter from Solomon Sobel, M.D. to the File NDA, dated June 4, 1997; 1 page | 73 |
| 16 | Exhibit 5, Comparison of Margin of Safety for Cerivastatin and Atorvastatin, page 59; 1 page | 82 |

| | | |
|---|---|---|
| 17 | Bayer Pharmaceutical Business Group, Report No. PH 31298, Toxicity of lipid lowering drugs in primary skeletal muscle cels in vitro, dated 2001-08-28; 31 pages | 85 |
| 18 | Article: Evaluation of Myopathy Risk for HMG-CoA Reductase Inhibitors by Urethane Infusion Method, pages 346 - 350; 5 pages | 91 |
| 19 | Article: Evaluation of the synergistic adverse effects of concomitant therapy with statins and fibrates on rhabdomyolysis, pages 795 - 802; 8 pages | 98 |
| 20 | Metabolic disposition, dated 17-Jan-97, file CER151DD, Bates Nos. BAYAG00608588 - 00608597; 10 pages | 108 |
| 21 | Abstract: New insights into the pharmacodynamic and pharmacokinetic properties of statins; 16 pages | 113 |


0



INDEX (Continued):

EXHIBITS

SMITH


| | | PAGE |
|---|---|---|
| 22 | Correspondence, New England Journal of Medicine, Vol. 346, No. 7, February 14, 2002, pages 539 - 540; 2 pages | 130 |
| 23 | Article: Statin-Associated Myopathy, JAMA, April 2, 2003, Vol 289, No. 13, pages 1681 - 1690; 10 pages | 131 |
| 24 | Clinical Update, Statin-associated myopathy, MJA vol 175, 5 November 2001, pages 486 - 489; 4 pages | 138 |
| 25 | BAY w 6228 - Pre-IND-Meeting, Ottawa - June 2nd, 1992, Bates Nos. BAYAG00149909 - 00149911; 3 pages | 154 |
| 26 | Article: 3-Hydroxy-3-Methylglutaryl Coenzyme A Reductase and Isoprenylation Inhibitors Induce Apoptosis of Vascular Smooth Muscle Cells in Culture, pages 490 - 500; 11 pages | 164 |
| 27 | Letter, NDA 20-740/S-006, to Frederich K. Sundermann, dated 30 March 2001, Bates Nos. MDL-NP-FOODDRU00000454 - 00000455; 2 pages | 171 |
| 28 | Expert Witness Report of Joseph V. Rodricks, Ph.D., D.A.B.T.; 12 pages | 181 |

| | | |
|---|---|---|
| 29 | E-mail to Arbitblit, Donald C. from Martyn Smith, sent Saturday, February 07, 2004; 2 pages | 191 |
| 30 | Group of correspondence beginning with letter to Martyn T. Smith Ph.D., dated December 18, 2003; 10 pages | 192 |

D



SAN FRANCISCO, CALIFORNIA; MONDAY, FEBRUARY 9, 2004

9:13 A.M. - 3:19 P.M.

09:13 VIDEO OPERATOR: Good morning. Here begins
09:13 videotape No. 1, Volume 1, in the deposition of
09:13 Dr. Martyn Smith in the matter of -- of Baycol Products
09:13 litigation in the United States District Court of
09:13 Minnesota, MDL number which is 1431.
09:13 Today's date is February 9th, 2004. The time
09:13 is 9:13 a.m. This deposition is being taken at
09:13 275 Battery Street, San Francisco, California. The
09:13 videographer is Marty Majdoub, here on behalf of Esquire
09:13 Deposition Services, 505 Sansome, San Francisco,
09:13 California.
09:13 Would all counsel present please identify
09:13 yourselves and state whom you represent.
09:13 MR. KEENAN: Matthew D. Keenan and Dr. Kassam
09:14 Khan, here on behalf of Bayer and related Bayer entities
09:14 with Shook, Hardy & Bacon in Kansas City.
09:14 MS. O'GORMAN: Debra O'Gorman from Dechert,

09:14 LLP, here on behalf of SmithKline Beecham Corporation,
09:14 doing business as GlaxoSmithKline.
09:14 MS. SCHAUM: Meredith Schaum from Skadden,
09:14 Arps, representing Pfizer and Warner Lambert.
09:14 MR. ARBITBLIT: Donald Arbitblit, Lieff,



09:14 Cabraser, Heimann & Bernstein, for plaintiffs.
09:14 VIDEO OPERATOR: And the people on the phone,
09:14 if you could please identify yourselves.
09:14 MR. BERGER: This is Roger Berger from Uzick &
09:14 Oncken in Houston for various Texas physicians.
09:14 VIDEO OPERATOR: And would the court reporter
09:14 please swear -- please swear in the witness.

MARTYN T. SMITH, Ph.D.,
having been first duly sworn, was
examined and testified as follows:

09:14 MR. KEENAN: Before we begin, this fan just
09:14 kicked in. It's not going to bother me, but is that
09:15 just the -- is that just the heating and cooling?
09:15 MR. ARBITBLIT: Yes.
09:15 MR. KEENAN: So without that, it's -- it's
09:15 going to be very hard to keep the room cool?
09:15 MR. ARBITBLIT: Right.
09:15 MR. KEENAN: Okay. Fair enough.
09:15 I'm ready to begin.
09:15 VIDEO OPERATOR: Sure.
09:15

09:15 EXAMINATION

09:15 BY MR. KEENAN:



09:15 Q Doctor, please state your name, please.
09:15 A My name is Martyn, M-a-r-t-y-n, Thomas Smith.
09:15 Q And may I address you as Dr. Smith? Is that okay?
09:15 A That's fine.
09:15 Q My name is Matthew D. Keenan. I've introduced myself to you shortly before we went on the record. I'm an attorney on behalf of Bayer and related Bayer entities in an MDL case that's been filed in the Federal Court of Minnesota.
09:15 Do you understand we're here today to take your deposition?
09:15 A I do.
09:15 Q Okay. I have reviewed your report and related materials and know that you have given a deposition before. Is that correct?
09:15 A That is correct.
09:15 Q And you are familiar with the ground rules under which we're operating today?
09:15 A I am.
09:15 Q Okay. You're sworn to tell the truth under oath, yes?
09:16 A Correct.
09:16 Q Okay. If at any time you don't understand my questions, please let me know, and I'll be happy to

09:16 clarify them. Okay?
09:16 A All right.
09:16 Q Okay. Fine. And if at any time you'd like to
09:16 take a break, just let me know, and I'll be happy to
09:16 accommodate that request. All right?
09:16 A Thank you.
09:16 Q All right. We're here today because you've
09:16 been identified as an expert witness on behalf of the
09:16 plaintiffs in the MDL proceedings that are pending on
09:16 behalf of various claimants involving the prescription
09:16 drug Baycol.
09:16 You understand that, right?
09:16 A I do.
09:16 Q And -- and you're -- you've prepared a report
09:16 in connection with your opinions in this case; correct?
09:16 A I've prepared a report a rebuttal report.
09:16 Q Okay. Your report was filed a couple of weeks
09:16 ago and circulated. And there's a rebuttal report that
09:16 counsel provided to me this morning. Is that right?
09:16 A That is correct. I believe it was more than a
09:16 couple of weeks ago. It was in December.
09:16 Q Okay. But the rebuttal report was provided to
09:16 me this morning.
09:16 A Absolutely. Correct, uh-huh.
09:16 Q And when -- when did you finish working on that

09:17 rebuttal report?
09:17 A Last night.
09:17 Q You understand that we're here today to identify all the opinions that you have in your role as a toxicologist on behalf of the plaintiffs in this litigation?
09:17 A I do.
09:17 MR. KEENAN: Okay. I have marked for the record Exhibit No. 1, which is the notice of deposition. I have marked as Exhibit No. 2 a copy of your expert witness report.
09:17 (Deposition Exhibits 1 and 2 were marked by the court reporter.)
09:17 BY MR. KEENAN:
09:17 Q Does that appear to be your expert witness report?
09:17 A Unsigned version.
09:17 Q An unsigned version, that's right.
09:17 A Yes.
09:17 MR. KEENAN: And I have marked as Deposition Exhibit No. 3 a document that was filed with your original report, and it is captioned "Literature Cited in Smith Report."
09:18 (Deposition Exhibit 3 was marked by the court reporter.)

13

09:18 BY MR. KEENAN:
09:18 Q Can you identify that for me?
09:18 A Yes.

09:18 Q What is that?
09:18 A It's a list of the literature cited in my
09:18 actual expert -- first expert witness report.
09:18 MR. KEENAN: Okay. And I've marked as
09:18 Deposition Exhibit No. 4 the "Rebuttal Expert Witness
09:18 Report of Martyn T. Smith."
09:18 (Deposition Exhibit 4 was marked by
09:18 the court reporter.)
09:18 BY MR. KEENAN:
09:18 Q And this is the document that you prepared and
09:18 finished last night, correct?
09:18 A That's correct.
09:18 Q All right. And describe for me what this --
09:18 what this represents, Exhibit No. 4?
09:18 A This represents a response to the toxicological
09:18 components of Dr. Rodricks' report that was filed on
09:18 October the 14th, 2003.
09:18 Q Okay. Now, directing your attention to
09:19 Exhibit No. 2, which is your original report that was
09:19 filed in December.
09:19 Are there any changes or additions that you
09:19 need to make to that document separate and apart from

0



09:19 the rebuttal expert witness report that we've marked as
09:19 Exhibit 4?
09:19 A Not that I'm aware of, no.
09:19 Q Is there any work that you need to do today to
09:19 support the opinions that you express in the report
09:19 that's marked as Exhibit No. 2?

09:19 A No.
09:19 Q Okay. Are there any documents that, in the
09:19 course of preparing that report, that you requested or
09:19 were looking for, wanted to see but were unable to
09:19 obtain for one reason or another?
09:19 A No.
09:19 Q Okay. And I understand that there's an
09:19 additional document that is being copied that identifies
09:19 additional literature and materials that you reviewed in
09:19 connection with preparing your opinions in this case; is
09:19 that right?
09:19 A That is correct.
09:20 MR. KEENAN: Okay. And Don, that is being
09:20 copied?
09:20 MR. ARBITBLIT: Yes, it is.
09:20 BY MR. KEENAN:
09:20 Q Okay. All right. When it is copied, we'll
09:20 mark that, and I'll have you identify that.
09:20 Dr. Smith, how much time have you estimated --

0



09:20 do you estimate you've spent in the Baycol litigation to
09:20 this point?
09:20 MR. ARBITBLIT: I believe there's a bill with
09:20 time records up to a certain point in the materials
09:20 being copied. If you want him to estimate without that
09:20 in front of him, that's -- you're entitled to ask that.
09:20 I just want to make you are aware that --
09:20 MR. KEENAN: Okay.
09:20 MR. ARBITBLIT: -- there is a bill.

50019.txt

09:20 MR. KEENAN: Good deal.
09:20 Q You feel capable of estimating how much time you spent?
09:20 A There is a bill that's outstanding --
09:20 Q Okay.
09:20 A -- submitted at the end of December. And since that time, I've probably performed an additional 30 to 40 hours.
09:20 Q Okay. Fair enough.
09:20 And your hourly rate today is $400 an hour?
09:20 A That's correct.
09:21 Q And what is the rate that you're charging counsel for this deposition?
09:21 A The same.
09:21 Q $400?
09:21 A Yes.

0

16

09:21 Q Okay. Describe for me how you first became involved as a witness on behalf of Plaintiffs in this litigation?
09:21 A I was involved in the Rezulin MDL litigation, and during that action, I was asked if I would like to also participate in this litigation. And I said that I would review the matter and agree to be a -- agreed to be a participant in this litigation.
09:21 Q And your involvement in the Rezulin litigation included having an arrangement with this law firm we're here today, correct?
09:21 A That's correct.

09:21 Q Lieff, Cabraser?
09:21 A Lieff, Cabraser, yes.
09:22 Q Okay. And Don --
09:22 Help me with the pronouncing your last name.
09:22 MR. ARBITBLIT: Arbitblit.
09:22 BY MR. KEENAN:
09:22 Q -- Arbitblit was also your primary contact person here in the firm in connection with the Rezulin litigation?
09:22 A That's correct.
09:22 Q Okay. And were there any occasions where you had a meeting or interaction with other experts who are also identified on behalf of the plaintiffs in the

0



09:22 Baycol litigation?
09:22 A Could you repeat that question again?
09:22 Q Did you at one time get together with other experts on behalf of Plaintiffs in the Baycol litigation?
09:22 A No.
09:22 Q Have you spoken to any other experts who have been identified in the MDL litigation?
09:22 A I have only heard their voices on a conference call.
09:22 Q Okay. And tell me when that conference call was and just describe all the circumstances surrounding that conference call, if you would, for me.
09:23 A I was asked to participate in a conference call by Don a few weeks ago, and I agreed to participate in

09:23 the evening. There were a large number of people on the
09:23 call. That's about all I remember.
09:23 Q And the people that were on the call consisted
09:23 of who? Attorneys? Experts?
09:23 A There were a number of experts and a number of
09:23 attorneys. And there wasn't a full roll call of who was
09:23 present. The call was led by an attorney with a
09:23 southern accent whose name I don't recall.
09:23 Q An accent like yours?
09:23 A No, not an accent like mine. From the southern



09:23 U.S.
09:23 Q Okay.
09:23 A And he talked a lot on the call, and various
09:23 other experts spoke.
09:23 Q Okay. Did you participate or did listen?
09:23 A I mainly listened. I don't -- I said hardly
09:24 anything.
09:24 Q Okay. And how long ago -- you said a couple of
09:24 weeks ago. Was that before Christmas or after?
09:24 A It was after Christmas. It was approximately a
09:24 fortnight ago, I believe.
09:24 Q A fortnight?
09:24 A Two -- two weeks ago.
09:24 Q Okay.
09:24 A It was a Tuesday evening.
09:24 Q Okay. And was there an agenda or any written
09:24 materials associated with this conference call?
09:24 A I received a call in the middle of the

afternoon asking me to participate that evening in a conference call. I said I would and joined the conference call, and as far as I knew, I didn't know why the conference call happened. I didn't see an agenda beforehand.

Q What was the nature of the discussions?

A There was discussion about recent depositions

D



by some of the experts, the medical experts, I believe, in the case. That was the main topic of discussion.

Q Okay. And what was the nature of that discussion?

A The kinds of questions that were asked by defense attorneys, areas that were being explored in -- in that testimony.

Q Okay. Did they discuss things that were done wrong, mistakes made by experts and how to do a better job? Is that the substance of any discussion in the call?

A Not that I can recall.

Q Okay. Was that the only conference call then that you've had concerning this litigation?

A Yes, that's my only contact with any attorneys or experts on this case apart from Mr. Black and Mr. Arbitblit.

Q Okay. Now, Mr. Arbitblit, I know, was involved in your testimony in the Rezulin litigation. What -- what role has Mr. Black had in your role as an expert witness in this litigation?

09:26 A Mr. Black has -- I've had two meetings with
09:26 Mr. Black and Mr. Arbitblit. And there was one
09:26 conference call with Mr. Arbitblit and Mr. -- that
09:26 Mr. Black was on.



09:26 Q Okay.
09:26 A Or one three-way call, rather than a conference
09:26 call.
09:26 Q Okay. Fair enough.
09:26 How many -- have you had meetings with other
09:26 counsel other than Mr. Black and Mr. Ar- -- Arplitit?
09:26 A Arbitblit.
09:26 MR. ARBITBLIT: Arbitblit.
09:26 MR. KEENAN: Arbitblit.
09:26 MR. ARBITBLIT: My four year old can say it.
09:26 Just kidding, Matt.
09:26 MR. KEENAN: That's fine.
09:26 MR. ARBITBLIT: I -- I've had a lot of people
09:26 who have trouble with it, and you're far from the first.
09:26 THE WITNESS: So I've forgotten the question
09:26 now.
09:26 BY MR. KEENAN:
09:26 Q Did you have meetings with any other attorneys
09:26 other than Mr. Black and Mr. Arbitblit?
09:27 A No.
09:27 Q Thank you.
09:27 All right. I want to mark as Deposition
09:27 Exhibit No. --
09:27 A 5.

09:27 Q -- 5 a list of the cases that you identified in



09:27 your disclosure between a period of time of 1999 and
09:27 2003?
09:27 (Deposition Exhibit 5 was marked by
09:27 the court reporter.)
09:27 BY MR. KEENAN:
09:27 Q And that's a document that you prepared?
09:27 A Yes.
09:27 Q All right. If you could, using my pen, just
09:27 identify in the margins which -- which of those cases
09:27 you identify -- you testified or were retained on behalf
09:27 of plaintiff and which ones you were retained on behalf
09:27 of defendant.
09:27 A You want to put P or D or whatever?
09:27 Q That's fine.
09:28 Okay. Thank you.
09:28 Based on Exhibit No. 5, the -- in the list of
09:28 cases that represent deposition testimony there are one,
09:29 two, three, four, five, six, seven, eight, nine, ten,
09:29 eleven, twelve, thirteen, fourteen cases for plaintiff
09:29 and two for defendant.
09:29 Does that sound about right?
09:29 A Something like that.
09:29 Q Okay. And all of your court testimony in the
09:29 last four years have all been on behalf of plaintiffs;
09:29 correct?

09:29 A Correct.
09:29 Q Yeah. And I've read your Rezulin testimony.
09:29 You've gaven -- you've given several
09:29 depositions in the Rezulin litigation, and you've also
09:29 testified in an MDL Daubert hearing; is that right?
09:29 A That's right.
09:29 Q Would it be a fair estimate of the income you
09:29 made in the Rezulin litigation to be a figure in excess
09:29 of $100,000?
09:29 MR. ARBITBLIT: Objection.
09:29 THE WITNESS: I'm not clear of the total
09:29 amount, but it would be -- it would be approaching that
09:29 I would think.
09:29 BY MR. KEENAN:
09:29 Q Okay. There was a time you were spending quite
09:29 a bit of your free time involved in that in your role as
09:29 an expert?
09:29 A That was taking a major portion of my
09:29 consulting time.
09:29 Q Now, as we sit here today in February of 2004,
09:30 are there any depositions that you have scheduled in any
09:30 other cases that wouldn't be reflected on Exhibit No. 5?
09:30 A I don't think on Exhibit No. 5 the Daubert
09:30 hearing is listed or the hearing in Southern California.
09:30 I'm not sure which.

D

23

09:30 Q Okay. Help me with that. Would that have been
09:30 in the --

09:30 A In the Rezulin case.
09:30 Q Okay. Okay.
09:30 A There are no other depositions that I know of
09:30 that are scheduled at this time.
09:30 Q Okay. And I took that away from you. You
09:30 can --
09:30 A I'm sorry. It is listed --
09:30 Q Okay.
09:30 A -- on the court testimony --
09:30 Q All right.
09:30 A -- at the top.
09:30 Q And are you involved in any other Baycol cases
09:30 other than the MDL case that we're here about today?
09:30 A No, I'm not.
09:30 Q I note that your hourly rate in Exhibit 5 is
09:30 identified as $400 an hour.
09:31 A Correct.
09:31 Q But when I was reading in the Rezulin
09:31 litigation, I believe you identified your hourly rate
09:31 for reviewing materials to be $350 an hour and $500 for
09:31 deposition and court testimony.
09:31 Is that -- is that accurate --
09:31 A Correct.



09:31 Q Okay. So you've changed your hourly rate now.
09:31 You're $400 an hour for both deposition, court
09:31 testimony, and reviewing background materials and
09:31 preparing reports?
09:31 A Yes, just to make life simpler.

09:31 Q Okay. Fair enough. I'm in favor of that.
09:31 Okay. In your report, your first report, you
09:31 represented to the court that at that time there were no
09:31 courts that have excluded your testimony?
09:31 A That is my understanding, yes.
09:31 Q Okay. Do you still believe that to be the
09:31 case?
09:31 A Yes.
09:31 Q Okay. Have you read -- you were involved in a
09:31 case called Cotter; is that correct?
09:32 A That's correct.
09:32 Q All right. And that was a case in which you
09:32 gave trial testimony, right?
09:32 A Yes.
09:32 Q Okay. And you were testifying on behalf of the
09:32 plaintiff; is that right?
09:32 A That's correct.
09:32 Q Okay. You have not then read any recent court
09:32 rulings from the appellate court involving that case
09:32 caption, have you?



09:32 A I have been informed by Plaintiff's counsel
09:32 that the decision in that case was overturned by the
09:32 appellate court --
09:32 Q Right.
09:32 A -- with criticism of the judge in her handling
09:32 of that particular matter.
09:32 Q Okay. Did they tell you that one of the
09:32 criticisms was the admission of testimony by a number of

09:32 experts including you?
09:32 A The criticism was of the judge's procedures
09:32 rather than of the testimony itself, as I understand it.
09:32 Q Okay. And the procedures concerned how to
09:32 handle your testimony as well as the testimony of a
09:32 couple of other experts for Plaintiff; is that your
09:32 understanding?
09:32 A I haven't seen the written --
09:32 Q Okay. Have you sought to find it on the
09:32 Internet?
09:33 A No.
09:33 Q Okay. Now, in Exhibit No. 5, you identified,
09:33 as I asked you to, those cases that you were involved as
09:33 a plaintiff or a defendant.
09:33 Could you also identify if any of these cases
09:33 were involving the Lieff -- Lieff, Cabraser law firm?
09:33 I think we've already established that the

0



09:33 Rezulin litigation was involved with this firm. Any of
09:33 those other cases?
09:33 A No.
09:33 Q Okay. Do you presently have other cases that
09:33 aren't identified on Exhibit No. 5 that you're
09:33 consulting with the Lieff, Cabraser firm?
09:33 A Yes, I have one other.
09:33 Q Okay. And what -- what is the nature -- just
09:33 generally speaking, what's the nature of that case?
09:33 MR. ARBITBLIT: Objection.
09:33 THE WITNESS: It's -- it's related to a release

09:33 at a refinery.
09:33 BY MR. KEENAN:
09:33 Q Okay. And it involves claims of -- is that a
09:34 case -- have you been disclosed as an expert in that
09:34 case, or are you just looking at materials in a
09:34 consulting role?
09:34 A I have been disclosed, as I understand it. I
09:34 am looking at materials in a consulting role.
09:34 MR. KEENAN: Okay. All right. I want to be
09:34 sure it's not a -- he's not a consulting expert.
09:34 Q What -- so that is a case that has been filed,
09:34 and you -- you have -- you've begun some work on that
09:34 case?
09:34 A Yes.

27

09:34 Q Okay. And what -- just briefly, tell me what
09:34 that case is about.
09:34 A It's about the release of a -- a catalyst
09:34 material at a refinery to which workers working at the
09:34 refinery were exposed and had subsequent health
09:34 conditions.
09:34 Q Okay. And that is a refinery in what part of
09:34 the country?
09:34 A Here in the Bay Area.
09:34 Q Okay. And what is the name of the company that
09:34 owned the refinery? What's the defendant? Do you know?
09:35 A Chevron.
09:35 Q Okay. And have you prepared a report in that
09:35 case?

09:35 A Yes.
09:35 Q Okay. All right. And is that case pending in
09:35 the state or federal court here in the California -- in
09:35 California?
09:35 A Yes.
09:35 Q All right. Now, are you involved in any other
09:35 MDL proceedings other than the Rezulin proceeding, which
09:35 we talked about, and the MDL proceeding we're here about
09:35 today in Baycol?
09:35 A No.
09:35 Q Okay. Now, Doctor, when I was doing some --



09:35 some background work on you, I found your name
09:35 associated with an entity called CERT, C-E-R-T.
09:35 A Yes.
09:35 Q Tell me what CERT is.
09:35 A CERT is a nonprofit organization set up to
09:36 potentially receive funds from litigation settlements
09:36 which would promote the education and training of
09:36 students in the field of toxicology.
09:36 Q What is your specific role? What's your legal
09:36 status in CERT?
09:36 A I'm, if I remember this correctly, chair of the
09:36 scientific advisory board.
09:36 Q At one time you were a board member of CHERT --
09:36 of CERT, correct?
09:36 A That's correct.
09:36 Q Are you still a board member?
09:36 A No.

09:36 Q When did you cease to become a board member?
09:36 A A year ago or so.
09:36 Q And is CERT -- is it still active?
09:36 A It's dormant, I would say. It's not active.
09:36 Q Is it still a legally recognized entity,
09:37 nonprofit entity?
09:37 A Yes.
09:37 Q Is Ralph Metzger -- is Raphael Metzger still



09:37 involved in CERT?
09:37 A Yes.
09:37 Q Okay. Now, CERT, at the time you were a board
09:37 member, has filed several lawsuits in the California
09:37 state courts, did it not?
09:37 A Filed two, one against McDonald's and one
09:37 against Starbucks.
09:37 Q Okay. And has CERT filed any other lawsuits
09:37 other than those two?
09:37 A Not that I'm aware of.
09:37 Q Okay. The -- both of those lawsuits generated
09:37 a fair amount of publicity, did it not -- did they not?
09:37 A Yes. Well, the McDonald's one. I'm not so
09:37 sure about the Starbucks one.
09:38 MR. KEENAN: Marking as Deposition Exhibit
09:38 No. 6 a copy of the complaint that was filed on behalf
09:38 of CERT against McDonald's and Burger King.
09:38 (Deposition Exhibit 6 was marked by
09:38 the court reporter.)
09:38 BY MR. KEENAN:

09:38 Q Are you familiar with that document?
09:38 A Yes.
09:38 Q This would have been a lawsuit which would have been filed with your permission and consent --
09:38 A Yes.

0



09:38 Q -- as a board member of CERT? Okay.
09:38 Hand you Deposition Exhibit No. 7, which is also a lawsuit filed on behalf of CERT against Starbucks.
09:38 (Deposition Exhibit 7 was marked by the court reporter.)
09:38 BY MR. KEENAN:
09:38 Q That reflects the actual claims made in the Starbucks lawsuit, correct?
09:38 A Yes.
09:38 Q Okay. Now, is my understanding correct that both of these lawsuits were filed after the California Attorney General declined to take the action that CERT wanted it to do on behalf of CERT?
09:39 A I don't know that.
09:39 Q Okay. Do you understand what the term "private attorney general lawsuit" means?
09:39 A No.
09:39 Q Okay. Both of these lawsuits were seeking monetary damages; is that right?
09:39 A That's correct.
09:39 Q And your testimony is that was going -- that was money that CERT was seeking on a nonprofit basis?

09:39 A Yes.
09:39 Q Now, one of the things I found was a discussion



09:39 by the attorney Ralph Metzger.
09:39 You know him obviously?
09:39 A Raphael Metzger.
09:39 Q Thank you. Raphael Metzger.
09:39 Where he stated he was intentionally not
09:39 disclosing the name of a college professor to spare him
09:39 publicity.
09:40 Was that -- was that you?
09:40 MR. ARBITBLIT: Objection.
09:40 THE WITNESS: I don't -- I don't know. I
09:40 haven't seen the document.
09:40 BY MR. KEENAN:
09:40 Q Okay. Well, was there a period of time in
09:40 which there was some -- that Mr. Raphael Metzger was
09:40 declining to disclose the other principals involved in
09:40 CERT, including you?
09:40 MR. ARBITBLIT: Objection.
09:40 THE WITNESS: I didn't know that.
09:40 (Deposition Exhibit 8 was marked by
09:40 the court reporter.)
09:40 MR. KEENAN: Okay. Let me mark as Deposition
09:40 Exhibit No. 8 a newspaper article from the "Contra Costa
09:40 Times," dated December 10th, 2002, in which it states
09:40 that Burger King said the leader of a environmental
09:41 group, suing the restaurant chain over claims its french

32

09:41 fries contain a chemical suspected of causing cancer must identify himself or risk having the lawsuit dismissed, the Council for Education and Research on Toxics' lawyers."

09:41 Q That's CERT, right?

09:41 A Toxic substances, not toxic lawyers.

09:41 Q I'm reading what it says. "The Council for Education and Research on Toxics' lawyer, Raphael Metzger, said he intentionally omitted the name of the college professor to spare him publicity."

09:41 Now, I've just read what I'm handing you.

09:41 MR. ARBITBLIT: Can I have a far afield objection.

09:41 THE WITNESS: I've read that, but I was not aware of it.

09:41 BY MR. KEENAN:

09:41 Q Okay. Your testimony is that you know nothing about an effort on behalf of Burger King and McDonald's to have the scientist involved in CERT identified publicly and that there was some resistance on the part of Raphael Metzger to do that. You don't know anything about that.

09:42 A No.

09:42 MR. ARBITBLIT: Objection.

09:42 THE WITNESS: I don't know anything about that.

33

09:42 BY MR. KEENAN:
09:42 Q Okay. How do you know Raphael Metzger?
09:42 A I've worked with Raphael on a number of cases
09:42 related to exposures to benzene.
09:42 Q Is he still practicing law?
09:42 A He was the last time I spoke with him in the
09:42 end of last year.
09:42 Q Okay. And was there a third board member of
09:42 CERT, Carl Craner.
09:42 A Yes, a professor at the University of
09:42 California at Riverside.
09:42 Q Okay. And is he still involved in CERT?
09:42 A I believe so.
09:42 Q Okay. Are there any other scientists -- strike
09:42 that.
09:43 Any other principals involved in CERT other
09:43 than Mr. Craner, you, and Raphael Metzger?
09:43 MR. ARBITBLIT: Objection.
09:43 THE WITNESS: There are two or three other
09:43 board members whose name I can't recall at the present
09:43 time.
09:43 BY MR. KEENAN:
09:43 Q Okay. So just so we're clear, CERT is a -- is
09:43 a licensed -- a not-for-profit corporation in the state
09:43 of California?



09:43 A I believe so, yes.
09:43 Q Okay. And has CERT generated any funds from
09:43 any litigation?

09:43 A No.
09:43 Q Okay. Did you serve on the board at no
09:43 compensation?
09:43 A I serve on the board at compen- -- compensation
09:43 related to the acrylamide matter from Mr. Metzger's
09:43 office.
09:43 Q Okay. Explain that, if you would.
09:43 A In my actions on the scientific components of
09:44 the acrylamide case I'm compensated for.
09:44 Q Okay.
09:44 A My participation in board meetings is not
09:44 compensated.
09:44 Q I understand.
09:44 So you are a retained expert witness, hired on
09:44 behalf of Raphael Metzger, not unlike you're doing here
09:44 today?
09:44 A Exactly.
09:44 Q Okay. And how much time did you spend on the
09:44 acrylamide litigation? More or less than --
09:44 A Three --
09:44 Q -- twenty hours?
09:44 A Three or four hours.



09:44 Q Okay. All right. Now, what was the
09:44 disposition -- let's start with the McDonald's lawsuit.
09:44 What was the disposition of that lawsuit?
09:44 A Sorry. I don't understand "disposition" --
09:44 Q What -- what happened?
09:44 A -- in the context.

09:44 Q What happened in the lawsuit?
09:44 A The lawsuit, as I understand it, was still
09:44 waiting for a decision from the judge in the matter as
09:44 to whether it should -- could go forward or not.
09:44 Q Was -- did you prepare an expert witness report
09:44 in connection with your role in that case?
09:45 A No.
09:45 Q And the complaint in the lawsuit seeks $2,500
09:45 for each violation of California law.
09:45 Do you know how they were measuring those
09:45 damages for each violation?
09:45 MR. ARBITBLIT: Objection.
09:45 BY MR. KEENAN:
09:45 Q Was that per french fry?
09:45 A It's out of my area, I'm afraid.
09:45 Q Now, what about the Starbucks lawsuit? What
09:45 was the outcome of that?
09:45 A I know it didn't go forward. That's all I
09:45 know.

36

09:45 Q Was it dismissed?
09:45 A It may have been. I don't know.
09:45 Q As a board member, that's not something you'd
09:45 be privy too?
09:45 A It actually has been discussed, but it was more
09:46 than several months ago, and I don't recall the exact
09:46 discussion.
09:46 Q I don't want to spend any more time on this
09:46 than we have already, but just in general terms, Doctor,

09:46 describe for me what the nature of -- what the theory of
09:46 the claims were in the McDonald's lawsuit?
09:46 A It has been identified that acrylamide is in a
09:46 number of fried foods. It's been identified that
09:46 acrylamide is a likely human carcinogen and is a toxin
09:46 to the nervous system and reproductive system. Some of
09:46 the highest levels in processed food have been found in
09:46 French fries.
09:46 The nature by which McDonald's and Burger King
09:46 process french fries in that they flash heat them and
09:46 they freeze them and then deliver them and process them
09:46 in certain ways, very specific ways, elevates the levels
09:46 of acrylamides in those french fries such that they are
09:47 very high levels. These levels exceed what would pose a
09:47 significant risk in the state of California under
09:47 Proposition 65, and that is really the basis of the

D



09:47 lawsuit.
09:47 Q Okay. And then if you can give me a similar
09:47 description of the Starbucks lawsuit.
09:47 A The Starbucks lawsuit arose out of a -- an
09:47 athlete, as I understand it, identifying that his
09:47 reasons why he failed a drug test, the appearance of
09:47 ephedrine metabolites in his blood, was related to his
09:47 drinking of a tea manufactured by Starbucks.
09:47 There were measurements of the levels of
09:47 ephedrine in the tea made by a consultant to
09:47 Dr. Metzger -- to Mr. Metzger. This -- these levels
09:47 showed that they were part per billion concentrations of

09:47 ephedrine in the tea. This potentially posed a risk as
09:48 ephed- -- ephedrine is known to cause a number of
09:48 effects including fatal heart attacks.
09:48 As I understand it, Starbucks attempted also to
09:48 measure the levels of ephedrine in the tea, which was a
09:48 Tazo chai tea, which probably had Ma Huang in it --
09:48 M-a-r -- sorry, M-a, space, H-u-a-n-g -- which contains
09:48 ephedrine naturally, and they claimed that they could
09:48 not measure ephedrine in the tea.
09:48 Q Well, did you -- were you functioning in that
09:48 case as an expert witness on behalf of Mr. Metzger like
09:48 you were in the McDonald's case?
09:48 A I would have testified as to the toxic effects

□



09:48 of ephedrine if asked.
09:48 Q And how much time did you spend on that case?
09:49 A A few hours.
09:49 Q Okay. And so they -- was testing, in fact,
09:49 done on this particular brand of tea to determine the
09:49 presence or absence of ephedra by Mr. Metzger?
09:49 A Yes.
09:49 Q And was that test disclosed to the court?
09:49 A I believe so.
09:49 Q Okay. And you don't know where that case
09:49 currently sits, the status of that case?
09:49 A No.
09:49 Q No deposition, no report?
09:49 A Nothing. Didn't go forward.
09:49 Q All right. Does CERT plan any other lawsuits

09:49 at the present time? You said it was dormant. I take
09:49 that to mean no?
09:49 A There hasn't been a board meeting for some time
09:49 that I've been aware of, and there are no further
09:49 actions that I know of.
09:49 Q Have you been a plaintiff in any litigation of
09:49 a -- I don't mean a personal injury, but I mean as a
09:50 public interest plaintiff or --
09:50 A Not that I'm aware of.
09:50 Q Is Tazo tea still sold in Starbucks?

□



09:50 A I don't know. I don't go in Starbucks.
09:50 Q Okay.
09:50 Do we have those copies? Are those copies
09:50 done?
09:50 MR. ARBITBLIT: Let me take a one-minute break.
09:50 We don't have to take a full break. I'll find out
09:50 what's going on. It should have been here a long time
09:50 ago.
09:50 THE WITNESS: You can take a break for a
09:50 minute. I'll get some water.
09:50 MR. KEENAN: Please.
09:50 VIDEO OPERATOR: We're now going off the video
09:50 record. The time is 9:50 a.m.
09:50 (Recess.)
09:53 (Deposition Exhibit 9 was marked by
09:53 the court reporter.)
09:53 VIDEO OPERATOR: We are now back on the video
09:53 record. The time is 9:53 a.m.

09:53 BY MR. KEENAN:
09:53 Q Dr. Smith, Counsel now has provided me with a
09:53 document that I have marked as Exhibit No. 9, which
09:53 is -- it appears to be a supplemental disclosure of
09:53 documents and articles and things that you've reviewed
09:53 in connection with your opinions in this case.
09:53 Is that an accurate description of Exhibit



09:53 No. 9?
09:53 A This -- this is the peer-reviewed literature
09:53 that I've reviewed with regard to this case.
09:53 Q Okay. Now, how does that list differ from the
09:53 list that I've marked as Exhibit No. 3?
09:53 A So, let me just take a -- reiterate on that.
09:54 The first part is articles in the peer-reviewed
09:54 literature that I've reviewed.
09:54 Q Okay.
09:54 A The second part are depositions that I've
09:54 reviewed, those of Muck and Dr. von Keutz, and --
09:54 THE REPORTER: I'm sorry. Those -- say that
09:54 again.
09:54 THE WITNESS: Dr. Muck, M-u-c-k, and Dr. von
09:54 Keutz, v-o-n, space, K-e-u-t-z, and a variety of Bayer
09:54 documents and expert reports. So this is the material
09:54 that I've reviewed. This Exhibit 3 -- excuse me -- is
09:54 literature cited specifically in my expert witness
09:54 report.
09:54 BY MR. KEENAN:
09:54 Q Fair enough.

09:54 MR. ARBITBLIT: The last page of the set should
09:54 have been a bill.
09:55 MR. KEENAN: Okay. And I've marked now --
09:55 Exhibit No. 10 is a document that we previously



09:55 referenced, but it was being copied at the time.
09:55 (Deposition Exhibit 10 was marked by
09:55 the court reporter.)
09:55 BY MR. KEENAN:
09:55 Q And does that reflect your invoice as of a date
09:55 certain last year?
09:55 A Yes.
09:55 Q And what does that -- is that -- does that
09:55 refresh your recollection about how much time you spent
09:55 as of the date that bill was sent?
09:55 A 45 hours up to December 10th.
09:55 Q Okay. And then the time that you have spent
09:55 since then obviously wouldn't be reflected in that
09:55 invoice, right?
09:55 A That's right.
09:55 Q And maybe you've already answered this.
09:55 How much time would you estimate you've spent
09:55 since that bill -- that invoice was -- was prepared and
09:55 sent?
09:55 A I believe I said -- and this is to the best of
09:55 my recollection -- 30 to 40 hours.
09:55 Q Okay. All right.
09:55 Doctor, I'm going to mark as Exhibit No. 11 the
09:56 curriculum vitae that was part of your report.

09:56 (Deposition Exhibit 11 was marked by



09:56 the court reporter.)

09:56 BY MR. KEENAN:

09:56 Q You're no doubt familiar with that?

09:56 A Yes.

09:56 Q Okay. To the best of your knowledge, that's a current curriculum vitae?

09:56 A There are a few more articles in press that I could add, but this is reasonably current.

09:56 Q Could you provide Counsel with a more current curriculum vitae that he can circulate to us at a later time?

09:56 A Yes. It has just three or four additional articles. That's all.

09:56 Q All right. Do any of those pertain to Baycol --

09:56 A No.

09:56 Q -- cerivastatin? Okay. All right.

09:56 And by the way, Doctor, as we get more into your report, just as you use "cerivastatin" and "Baycol" interchangeably, I'm going to do the same, okay? Just so we're on the same page.

09:56 A That's all -- I understand that.

09:56 Q Okay. I want to talk a little bit about your curriculum vitae, but I want to ask you a couple of questions that are going to be fairly self-evident.

09:57 You are not, obviously, a medical doctor; is
09:57 that right?
09:57 A That is correct.
09:57 Q And you've testified about that in other cases.
09:57 But you don't have a license to treat and care
09:57 for patients, correct?
09:57 A I do not.
09:57 Q You are not trained to know the diagnostic
09:57 criteria of certain muscle diseases.
09:57 Fair to say?
09:57 A That's correct.
09:57 Q You have not been consulted in any case of any
09:57 patient who's had a muscle disease or muscle condition
09:57 like rhabdomyolysis.
09:57 Fair to say?
09:57 A That is correct.
09:57 Q You have never cared for a patient who had
09:57 myopathy or statin-induced myopathy.
09:57 Fair to say?
09:57 A Yes.
09:57 Q And the same answer would be true if I changed
09:57 my questions to include myalgias or aches and pains.
09:57 Fair to say?
09:57 A Yes.
09:57 Q Okay. You are here as a general liability

□



09:58 expert and are not a case specific expert on the case of
09:58 Randy Pierce.

09:58 Is that fair to say?
09:58 A I have not heard the name.
09:58 Q Okay. I believe Randy Pierce is a ca- -- the
09:58 name of the case that's coming up for trial in the MDL,
09:58 and you're not here to talk about his medical
09:58 conditions, the care and treatment of his conditions,
09:58 the nature of his complaints or anything relating to his
09:58 general state of medical health.
09:58 Fair to say?
09:58 A That's correct.
09:58 Q All right. You are not a pharmacologist, are
09:58 you?
09:58 A Well, I mean, I have knowledge of pharmacology.
09:58 Some people define toxicology as simply high dose
09:58 pharmacology. So I have knowledge of it, but I don't
09:58 call myself a pharmacologist.
09:58 Q Okay. And neither are you an epidemiologist?
09:58 A Well, I've actually been called an
09:58 epidemiologist by Science -- General Science and some
09:58 other journals, but -- although I'm a molecular
09:58 epidemiologist, I wouldn't consider myself either a
09:59 card-carrying epidemiologist.
09:59 Q Okay. I'm not going to check your wallet for

□



09:59 your cards, but I've seen speeches you've given where
09:59 you've said you are not an epidemiologist, and you're
09:59 not going to fight that?
09:59 A I'm not going to fight that.
09:59 Q Okay. Fair enough.

09:59 Your curriculum vitae shows a great deal of
09:59 interest in the area of what I believe -- well, I
09:59 believe you describe it -- it's described in the
09:59 curriculum vitae as having -- the current research areas
09:59 include causes of leukemia and lymphoma in adults and
09:59 children, metabolism and toxicity of benzene, biomarkers
09:59 and genetic damage and susceptibility in humans, and
09:59 studies of genotoxic effects of chemicals in humans.
09:59 Is that a fair summary of what your current
10:00 interests are?
10:00 A Research interests, yes.
10:00 Q You've published quite a bit in the area of
10:00 benzene and toxic effects of benzenes.
10:00 Is that fair to say?
10:00 A Yes.
10:00 Q Okay. I think I've counted over a hundred
10:00 cha- -- a hundred -- over a hundred articles and over 25
10:00 book chapters roughly. Whatever the -- whatever the
10:00 number is, it is.
10:00 Fair to say?

D

46

10:00 A About 160 and 31 book chapters or something.
10:00 MR. KEENAN: I figured he'd have the exact
10:00 number.
10:00 Q But none of those articles or book chapters
10:00 address the mechanism of action for HMG-Coenzyme
10:00 reductase inhibitors.
10:00 Fair to say?
10:00 A True.

10:00 Q None address statin-induced myopathies?
10:00 A True.
10:00 Q None address rhabdomyolysis in animal models?
10:00 A True.
10:00 Q None address the role of mevalonic acid in
10:00 cellular function?
10:00 A True.
10:00 Q None address specifically toxic-induced
10:00 myopathies?
10:00 A Correct.
10:00 Q Okay. And obviously none address cerivastatin
10:01 or Baycol, and none address statins generally.
10:01 Fair to say?
10:01 A That's correct.
10:01 Q Okay. In your previous depositions you
10:01 described that you are no longer doing bench research,
10:01 animal research.



10:01 Is that still true?
10:01 A Doing bench research, but we're not doing --
10:01 we're doing mainly research on humans rather than
10:01 animals.
10:01 Q Okay. Is that in the nature of a clinical
10:01 trial for a ther- -- a therapeutic drug?
10:01 A No.
10:01 Q Okay. But you don't do -- you presently don't
10:01 do any animal tox- -- toxicity testing presently; is
10:01 that right?
10:01 A That's correct.

10:01 Q Okay. When was the last time that you did
10:01 any -- you had hands-on involvement in animal tox
10:01 testing?
10:01 A In the 1990s.
10:01 Q Okay. And just -- and would -- Doctor, if you
10:02 could use Exhibit No. 11 and identify for me when the
10:02 last paper was published that would have involved animal
10:02 research that you were doing directly as opposed to
10:02 someone in your group doing. Do you understand my
10:02 question?
10:02 A Yes.
10:02 Q Okay.
10:03 A It was around 1990.
10:03 Q Okay. And is there -- looking at your

0



10:03 curriculum vitae, is there a number on the CV with a --
10:03 with a published report that would -- I could better
10:03 delineate that?
10:03 A 62 and 64.
10:03 Q Okay.
10:03 A I think they're the last times we did.
10:03 Q And what were those generally -- just generally
10:03 speaking, what -- what did those studies concern?
10:03 A They concerned one of the metabolism of
10:03 benzene, metabolites in mouse bone marrow in 19- --
10:03 in -- in reference 62. And reference 64 was regarding
10:03 toxicity in liver cells of various compounds.
10:03 Q Okay. And was that work -- was that -- was
10:03 that work done at the -- Cal Berkeley?

10:03 A Yes.
10:03 Q Okay. Now -- thank you.
10:03 Now, in -- in the -- the published articles
10:04 after that date in which you were an author or listed as
10:04 an author, describe for me what your role, generally
10:04 speaking, would have been with respect to those animal
10:04 tests.
10:04 A I -- I don't think -- we -- we haven't used
10:04 animals in the lab since 1990.
10:04 Q Okay. But as I read your previous depositions,
10:04 you say that -- I believe you described how there are

□

49

10:04 graduate assistants that work with you in your primary
10:04 role as advisor and consulting with others and helping
10:04 prepare requests for proposals for -- for funding of one
10:04 kind or another.
10:04 Is that --
10:04 A Well --
10:04 Q Maybe I -- maybe I should let -- let you
10:04 describe what you do presently at the university.
10:04 MR. ARBITBLIT: Object to form.
10:04 THE WITNESS: Well, my office is right in the
10:04 middle of my lab.
10:04 BY MR. KEENAN:
10:04 Q Okay.
10:04 A And so every day I go in my office and go in
10:04 all my labs, see all the people who are working in the
10:04 labs; give them advice; discuss with them about what
10:04 they're doing today; talk with the senior scientists in

my lab. There's about 20 people working in the lab. So I don't do hands-on bench work where I actually plate out materials or do that kind of thing, but I advise and consult, review lab books. I'm there all the time, looking at that kind of thing.

Q Okay. And is the -- in your lab, if you're not working with animals, then are you doing the in vitro studies?



A We made a conscious decision in the early 1990s to -- since there was no animal models of leukemia or lymphoma induction by chemicals, that we really needed to study this topic in human beings. And so we deliberately set about developing methods to study people. And we have systematically developed those methods and applied them in human populations in molecular epidemiology studies. And we have performed cell culture and in vivo studies using human material and cell lines since that time with the specific aim of trying to find the causes of leukemia and lymphoma in people.

Q Okay. So what -- what physiologic material, then, are -- are used -- employed in your lab?

A Human bone marrow, human blood, human urine, various cell lines, cell cultures of human marrow cord blood and blood.

Q Okay. So in your lab -- you describe my lab -- you haven't done any animal models, animal tox testing in a conventional sense since the '90s?

10:06 A Correct.
10:06 Q Okay. You're using human tissue of one kind or
10:06 another to further test hypotheses about the cause and
10:06 etiologies of human diseases including leukemia and --
10:07 A Lymphoma.



10:07 Q Okay. And is your lab presently receiving
10:07 funds from any of the federal agencies that grant funds
10:07 for medical research?
10:07 A Yes. We have four major NIH grants --
10:07 Q Okay.
10:07 A -- National Institution of Health grants. I've
10:07 undergone peer review and scored in the very top of
10:07 their categories.
10:07 Q Okay. What about the National Cancer
10:07 Institute? Do you have any funds from them?
10:07 A Well, the NCI, the National Cancer Institute,
10:07 is part of the NIH. We have two grants from the
10:07 National Cancer Institute. We have three grants from
10:07 the National Institute of Environmental Health Sciences.
10:07 Q Does the tissue that you guys use include
10:08 people that are currently suffering from those diseases?
10:08 A Yes.
10:08 Q Does your lab have any funding from any
10:08 pharmaceutical companies that are doing research in this
10:08 area?
10:08 A No.
10:08 Q Have you sought funding from any pharmaceutical
10:08 companies that are seeking cures for any of those

10:08 diseases?
10:08 A No.



10:08 Q You have never sought grants for any work
10:08 relating to HMG-Coenzyme reductase inhibitors.
10:08 Fair to say?
10:08 A Correct.
10:08 Q I believe you've covered this in your previous
10:08 depositions, but for my record, I need to just make
10:08 certain that your -- in terms of your training and
10:08 experience, you have never been employed by the FDA?
10:08 A I have not.
10:08 Q You've not served on any FDA advisory
10:08 committees?
10:08 A No.
10:08 Q Ever been employed by a drug company?
10:09 A No.
10:09 Q Never been hired as a consultant to a
10:09 pharmaceutical company to prepare an IND or an NDA?
10:09 A No.
10:09 Q Ever been retained by the FDA in any capacity?
10:09 A Not that I can recall.
10:09 Q You're not here to profess any expertise in the
10:09 FDA regulations governing preclinical testing?
10:09 A I am not here today to do that, no.
10:09 Q Okay. You're not conversant with the FDA
10:09 guidelines on what companies must do to prepare
10:09 investigational new drug applications?

10:09 A I'm generally aware of those guidelines, but I'm not an expert on them.
10:09 Q You're not here to profess any expertise in the FDA on drug labeling, for example?
10:09 A I'm not.
10:10 Q There's a document that I -- that I brought that's entitled "Guidance for Industry, Drug Metabolism, Drug Interaction Studies and the Drug Development Process, Studies In Vitro."
10:10 Is that a document that you reviewed in connection with the formation of your opinions in this case?
10:10 A No.
10:10 Q Okay.
10:10 MR. ARBITBLIT: Are you going to mark that?
10:10 MR. KEENAN: Yeah. Exhibit 12. I've got an extra copy.
10:10 (Deposition Exhibit 12 was marked by the court reporter.)
10:10 BY MR. KEENAN:
10:10 Q So Exhibit No. 12 is not a document that you reviewed in connection with your opinions in this case?
10:10 A No.
10:10 Q Okay. Is that a document that you've seen prior to today?

10:10 A I may have looked at it a long time ago if it's
10:11 on the Web in the FDA's site, but I have not reviewed it
10:11 recently.
10:11 Q Okay. Okay. Doctor, we were talking about how
10:11 you came to be involved in this -- this litigation.
10:11 And is it fair to say that prior to counsel
10:11 raising this issue about you possibly being involved in
10:11 this litigation, that -- that the mechanisms of action
10:11 for statins has not been the focus of any of your prior
10:11 work?
10:11 A That's correct.
10:11 Q And since the time that you have been retained
10:11 and been looking at this, you haven't undertaken any
10:11 independent research other than simply reviewing some of
10:11 the materials that we've identified as exhibits in this
10:11 case?
10:11 A I've not performed any lab-based research.
10:11 Q Thank you.
10:11 You're also not here and your report doesn't
10:12 comment on adverse event reporting and reliability of
10:12 adverse event reports.
10:12 Is that fair to say?
10:12 MR. ARBITBLIT: Objection.
10:12 THE WITNESS: There's no mention of that in my
10:12 report.

□

55

10:12 BY MR. KEENAN:
10:12 Q Now, you have dedicated much of your -- much of
10:12 your professional career to the area of environmental

50019.txt

10:12 toxicology.

10:12 Is that fair to say?

10:12 A Well, I began my career mainly looking at drug
10:12 toxicity in my Ph.D. and in Sten Orrenius's lab in the
10:12 early 1980s. With our work on benzene, our findings on
10:12 benzene in 1986, '87, that became a large focus of my
10:12 research.

10:12 Q And when you were doing drug toxicity work
10:12 early on, what was the nature -- just describe that for
10:12 me in a bit of greater detail, if you would.

10:12 A Mechanism of the toxicity to liver cells by
10:12 drugs and other chemicals.

10:12 Q Okay. And were those in animal models?

10:13 A They were in -- mainly in liver cells from
10:13 rats.

10:13 Q And that work would be identified in your
10:13 curriculum vitae that's already been marked for the
10:13 record?

10:13 A Yes.

10:13 Q Okay. Doctor, are you -- you here offering
10:13 opinions about medical causation in a general sense?
10:13 We've talked about Mr. Pierce. I call that

0

56

10:13 case specific, but are you offering general medical
10:13 causation opinions here? Do you feel qualified to do
10:13 that?

10:13 A Well, I have offered causation opinions in the
10:13 past, but I can't think of -- I'm acting in a specific
10:13 sense here in giving causation opinions.