**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| **In re: BAYCOL PRODUCTS LITIGATION** | **)** | **MDL NO. 1431** |
| | **)** | |
| **This Document Relates to: All Actions** | **)** | |

**<u>PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF JOHN W. FARQUHAR, M.D.</u>**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1

II. ADMISSIBILITY OF EXPERT OPINION UNDER *DAUBERT* IS BASED UPON THE EXPERT'S APPLICATION OF SCIENTIFICALLY SOUND METHODOLOGY. ..... 3

III. DR. FARQUHAR'S TESTIMONY FOLLOWS THE SCIENTIFIC METHOD AND COMPORTS WITH THE CONSENSUS THAT BAYCOL WAS THE MOST MYOTOXIC STATIN. ..... 8

- A. Adverse Event Reporting Rates Are a Recognized Method of Determining Drug Risk. ..... 9
- B. The AERs Analysis Has Been Confirmed by a Peer-Reviewed Observational Epidemiology Study. ..... 12
- C. Defendants' Miscellaneous, Unsupported Attacks on Dr. Farquhar's AERs Analysis Are Overmatched by the Magnitude of the Excess Risk. ..... 12
- D. Defendants' Reliance upon FDA Interpretation of AERS Policy Is Misplaced, Inaccurate and Incomplete. ..... 16

IV. RECENT PEER-REVIEWED LITERATURE SUPPORTS DR. FARQUHAR'S TESTIMONY ..... 19

V. THE PACIFICARE STUDY RESULTS CAN AND SHOULD BE CORRECTED WHERE THE STUDY RESULTS WERE INFLUENCED BY IDENTIFIABLE FORMS OF BIAS ..... 22

VI. CONCLUSION ..... 29

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ambrosini v. Labarraque,*
101 F.3d 129 (D.C. Cir. 1996), *cert. denied,* 520 U.S. 1205 (1997) .............................. 5

*Bonner v. ISP Techs, Inc*.,
259 F.3d 924 (8th Cir. 2001) ........................................................................ 8, 9

*Cavallo v. Star Enterprise,*
100 F.3d 1150 (4th Cir. 1996), *cert. denied,* 522 U.S. 1044 (1998)............................. 6

*Compton v. Subaru of America, Inc.,*
82 F.3d 1513 (10th Cir. 1996), *cert. denied,* 519 U.S. 1042 (1996).............................. 6

*Daubert v. Merrell Dow Pharms, Inc*.,
509 U.S. 579, 113 S. Ct. 2786 (1993)...............................................................4, 6, 7

*Glaser v. Thompson,*
32 F.3d 969 (6th Cir. 1994)................................................................................... 4

*Heller v. Shaw Indus., Inc.,*
167 F.3d 146 (3d Cir. 1999)................................................................................. 6

*In re "Agent Orange" Product Liability Litigation,*
597 F. Supp. 740 (E.D. N.Y. 1985) ........................................................................25

*In re Diet Drugs Products Liability Litigation,*
1999 U.S. Dist. LEXIS 13228, *26-27 (E.D. Pa. 1999)................................................ 2

*In re Paoli R.R. Yard PCB Litigation,*
35 F.3d 717 (3d Cir. 1994), *cert. denied,* 513 U.S. 1190 (1995) ...............................5, 7

*In re Swine Flu Products Liability Litigation*,
508 F.Supp. 897 (D. Colo. 1981)......................................................................27, 28

*In re Vioxx Products Liability Litigation,*
401 F.Supp.2d 565 (E.D. La. 2005)....................................................................2, 29

*Jones v. Otis Elevator Co.,*
861 F.2d 655 (11th Cir. 1988) ............................................................................... 6

*Kumho Tire Co. v. Carmichael,*
526 U.S. 137, 119 S. Ct. 1167 (1999)..................................................................... 4

*Lakie v. Smithkline Beecham,*
965 F. Supp. 49 (D.D.C. 1997).............................................................................. 8

*Moore v. Ashland Chem. Inc*.,
151 F.3d 269 (5th Cir. 1998) ................................................................................ 7

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Ruiz-Trioche v. PepsiCola of P.R. Bottling Co.*,
161 F.3d 77 (1st Cir. 1998) ........ 5

*Smith v. Ford Motor Co.*,
215 F.3d 713 (7th Cir. 2000) ........ 5

*United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*,
80 F.3d 1074 (5th Cir. 1996) ........ 4

**OTHER AUTHORITIES**

Allen Brinker et al., "Spontaneous Reports of Hypertension Leading to Hospitalisation in Association with Rofecoxib, Celecoxib, Nabumetone, and Oxaprozin,"
*Drugs Aging* 21 (7) (2004) ........ 15

Bruce M. Psaty et al., "Potential for Conflict of Interest in the Evaluation of Suspected Adverse Drug Reactions—Use of Cerivastatin and Risk of Rhabdomyolysis,"
*JAMA*, Vol. 292, No. 21 (Dec. 1, 2004) ........ 12, 13, 17, 20

David J. Graham and Judy A. Staffa et al., "Incidence of Hospitalized Rhabdomyolysis in Patients Treated With Lipid-Lowering Drugs,"
*JAMA* Vol. 292, No. 21, December 1, 2004 ........ 11, 19

Jennie T. Chang and Judy A. Staffa et al., "Rhabdomyolysis With HMG-CoA Reductase Inhibitors and Gemfibrozil Combination Therapy,"
*Pharmacoepidemiology and Drug Safety*, 13 (2004) 417-426 ........ passim

Judy A. Staffa et al., "Cerivastatin and Reports of Fatal Rhabdomyolysis,"
*New Engl. J. Med.*, Vol. 346, No. 7, Feb. 14, 2002 ........ 9, 10, 13, 18

Michael J. Saks et al., *Reference Manual on Scientific Evidence* (2nd Ed. 2005-2006) ........ 21, 22

Paul D. Thompson et al. "Statin-Associated Myopathy,"
*JAMA*, Vol. 289, No. 13, April 2, 2003 ........ 14, 15

*U.S. Food and Drug Administration, Guidance for Industry: Good Pharmacovigilance Practices and Pharmacoepidemiological Assessment* (March 2005) *available at*
http://www.fda.gov/cder/guidance/6359OCC.htm ........ 16

**RULES**

Fed. Rule Evid. 702 ........ 3

Fed. Rule Evid. 702, Adv. Comm. Notes (2000) ........ 4, 5

## I. INTRODUCTION

John W. Farquhar, M.D., Professor Emeritus (active) at Stanford University, has been a physician, scientist, researcher and teacher for over 50 years. He is an acknowledged world leader in the fields of cardiology and epidemiology. In his career, Dr. Farquhar has received many significant awards and is a member of numerous medical organizations. He was the Director of the Preventive Cardiology Clinic in the Stanford Medical Center from 1978 to 1996 and has been Co-Director since that time. From 1973 to 1984 he served as the Director of the Stanford Heart Disease Prevention Program. He also maintained an active clinical cardiology practice from 1962 to 2001. Dr. Farquhar's pioneering research showed that lower cholesterol reduces heart disease, helping to create the field of preventive cardiology. His scientific articles, predominantly in the fields of epidemiology and cardiovascular risk factors (which number over 200) continue to be widely cited in medical literature. *See* Curriculum Vitae of Dr. John W. Farquhar. (Ex. A.)

In this litigation, Dr. Farquhar has submitted a scholarly expert report that adheres to the highest level of scientific methodology. Dr. Farquhar's report comprehensively sets forth the evidence that Baycol was the most toxic drug in the statin class, which caused far more rhabdomyolysis, myopathy and muscle injury than other statins, justifying its withdrawal from the market. These opinions meet all applicable precedents and rules of evidence governing the admissibility of expert testimony, and Bayer's motion should be denied. Also, as

noted in Dr. Farquhar's Declaration filed herewith, recent peer-reviewed literature has confirmed the validity of his opinions and the consensus that Baycol is the most toxic statin.

The Court may take judicial notice of the decisions of other Federal MDL judges finding that Dr. Farquhar is a renowned scientist who has employed reliable methodology to support his opinions, and that his opinions were admissible under *Daubert*. Thus, in the Vioxx litigation, Judge Fallon of the United States District Court for Eastern District of Louisiana permitted Dr. Farquhar's testimony following a *Daubert* motion. *In re Vioxx Products Liability Litigation*, 401 F.Supp.2d 565, 596 (E.D. La. 2005). After devoting considerable attention to Dr. Farquhar's credentials, the Court stated:

> Merck asserts that Dr. Farquhar's opinion is based on scientifically unreliable information. This assertion is unpersuasive. Dr. Farquhar has reviewed all the relevant literature on Vioxx. The materials he reviews are the same materials reviews by Merck's experts. Dr. Farquhar, however, has reached a different conclusion than Merck's experts. Differing conclusions are permissible under Rule 702; improper methodology is not. If Dr. Farquhar's reliance on these studies is improper, then the same reliance by Merck's experts is improper. As evidenced by his thorough and explanatory ninety-five page report, Dr. Farquhar is qualified and relied on proper methodology.

*Id.*

Also, in the United States District Court for the Eastern District of Pennsylvania, Judge Bechtle favorably cited Dr. Farquhar's expert testimony

when he affirmed class certification in the *Diet Drug* litigation. *In re Diet Drugs Products Liability Litigation*, 1999 U.S. Dist. LEXIS 13228, *26-27 (E.D. Pa. 1999).

As in the *Diet Drug* and *Vioxx* cases, Dr. Farquhar has applied the scientific method to the data to formulate admissible opinions that meet the *Daubert* standard in all respects. Dr. Farquhar has reviewed the same materials, including peer-reviewed literature, adverse event reports, the PacifiCare study and internal company documents to reach supportable conclusions that differ from those of Bayer's experts. Dr. Farquhar thus used a reliable methodology, and his opinions are admissible.

## II. ADMISSIBILITY OF EXPERT OPINION UNDER *DAUBERT* IS BASED UPON THE EXPERT'S APPLICATION OF SCIENTIFICALLY SOUND METHODOLOGY.

Expert opinion testimony admissibility is governed by Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods to the facts of the case.

Fed. Rule Evid. 702.

Expert testimony is liberally construed under the Federal Rules. The United States Supreme Court in "*Daubert* explained that Rule 702 must be read in the context of the liberal thrust of the Federal Rules of Evidence and must be interpreted consistently with the 'general approach of relaxing the traditional barriers to opinion' testimony.'" *Glaser v. Thompson*, 32 F.3d 969, 971-972 (6th Cir. 1994) (citing and quoting *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 588, 113 S. Ct. 2786, 2794 (1993) ("*Daubert*")).

Rule 702 was amended in 2000 in response to *Daubert*, and to the many cases applying *Daubert*, including the Supreme Court's subsequent decision in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167 (1999). Fed. Rule Evid. 702, Adv. Comm. Notes (2000). According to the Supreme Court, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, *supra*, 526 U.S. at 152, 119 S. Ct. at 1176.

Consequently,

> [a] review of the case law after *Daubert* shows that the *rejection of expert testimony is the exception rather than the rule*. *Daubert* did not work a "sea change over federal evidence law," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996).

Fed. Rule Evid. 702, Adv. Comm. Notes (2000) (emphasis added).

While the trial court as "gatekeeper" must ensure that admissible expert testimony is reliable, *Daubert* does not support one competing methodology over another. As a result, the threshold question is whether the methodology employed by the expert is reliable. *See, e.g., Ruiz-Trioche v. PepsiCola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) ("*Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance. It demands only that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion."); *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) (trial courts must limit *Daubert* inquiry to whether expert's testimony is based on "valid principles"); *Ambrosini v. Labarraque*, 101 F.3d 129, 138 (D.C. Cir. 1996), *cert. denied*, 520 U.S. 1205 (1997) (courts must avoid becoming "evaluators of the persuasiveness of an expert's conclusion"); *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 744-45 (3d Cir. 1994), *cert. denied*, 513 U.S. 1190 (1995) (same). Attacks on the soundness of the opinion, the adequacy of methodology used, or the unorthodox nature of a witness' views go only to the weight of an expert's opinion, not to its admissibility. *Jones v. Otis Elevator Co.*, 861 F.2d 655, 663 (11th Cir. 1988); *Compton v. Subaru of America, Inc.*, 82 F.3d 1513, 1518 (10th Cir. 1996), *cert. denied*, 519 U.S. 1042 (1996); *Miles v. General Motors Corp.*, 262 F.3d 720, 724-725 (8th Cir. 2001).

The "gatekeeping" role of threshold admissibility is not how persuasive the evidence may be to the fact-finder. *Cavallo v. Star Enterprise*,

100 F.3d 1150, 1157-1158 (4th Cir. 1996), *cert. denied,* 522 U.S. 1044 (1998); *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 152 (3d Cir. 1999) ("[E]xpert opinion . . . need not be so persuasive as to meet a party's burden of proof or even necessarily its burden of production.") According to *Daubert*, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert, supra*, 509 U.S. at 596, 113 S. Ct. at 2798; Fed. Rule Evid. 702, Adv. Comm. Notes (2000) (citations omitted).

*Daubert* sets forth that factors for admissibility are not exhaustive and do not constitute "a definitive checklist or test." *Daubert*, 509 U.S. at 593. *Daubert* specifies only two requirements for admissibility: reliability and relevance. *Id.* at 589. Under Fed. R. Evid. 401, relevance is satisfied if the evidence tends to make some fact in issue more probably true than it would be in the absence of the evidence. *Id.* at 587. To constitute scientific knowledge under Rule 702, the evidence must "grounded in the methods and procedures of science." *Id.* at 590. Daubert makes plain that testimony requires methods or techniques that fairly count as scientific, and such factors such as peer review are subsidiary indicia potentially supporting that the requirement is met, but are not definitive. *Id.* at 593.

The standard of proof at this stage of the proceedings is modest. Proponents of scientific evidence "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct,

they only have to demonstrate by a preponderance of evidence that their opinions are reliable. . . . The evidentiary requirement of reliability is lower than the merits standard of correctness." *In re Paoli R.R. Yard PCB Litigation, supra*, 35 F.3d at 744. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (*en banc*) ("The proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable."). "The court's only function is to ensure that the expert employed scientifically valid methodologies. Once this is clear, the opinions which follow are admissible." *Lakie v. Smithkline Beecham*, 965 F. Supp. 49, 54 (D.D.C. 1997).

In *Bonner v. ISP Techs, Inc.*, 259 F.3d 924 (8th Cir. 2001), the court found that victims of a toxic tort should not be barred from suit simply because medical literature, which will eventually support causal connection, had not yet been completed. *Id.* at 928. Plaintiff needed to merely offer evidence from which jurors could reasonably conclude that exposure probably caused her injuries. *Id.* There is no requirement that plaintiff's expert must always cite published studies on general causation, nor that pertinent epidemiological studies supporting plaintiff's position exist. *Id.* at 929. Even if trial judge believes there are better grounds for some alternative conclusion, and that there are some flaws in expert's methods, the expert's opinion should be admitted if there exist good grounds to support it. *Id.* The only question is whether testimony is sufficiently reliable and relevant to assist the jury. *Id.* The factual basis of expert opinion generally goes to credibility, not admissibility. *Id.* Only if the expert's opinion is so

fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded. *Id.* at 929-930.

Defendants in *Bonner* argued that plaintiff's expert's theory was developed for litigation, not subjected to peer review, had not been published in scientific literature, and was unsupported by epidemiology but the expert testimony was admitted. *Id.* at 929. In *Bonner*, as with Baycol, the defendant offered no studies indicating its product was incapable of causing permanent damage. *Id.* at 932. In fact, Defendants' studies here show the opposite. The Baycol clinical trials showed extra toxicity despite the fact that healthier people were used in the studies and the signals for muscle damage actually did appear. (Farquhar Dep. at 90:20-25.) (Ex. B.)

Dr. Farquhar does not have to produce a double-blind, peer-reviewed published controlled study of his own for his testimony to be useful to the jury. Dr. Farquhar applied reliable methodologies comparable to those set forth in the peer-reviewed literature to reach conclusions that are supported by the data. His opinions meet and exceed the test of admissibility in *Bonner*. The jury can decide if Defendant's contentions render his testimony more or less convincing than Defendants' experts' testimony.

## III. DR. FARQUHAR'S TESTIMONY FOLLOWS THE SCIENTIFIC METHOD AND COMPORTS WITH THE CONSENSUS THAT BAYCOL WAS THE MOST MYOTOXIC STATIN.

Dr. Farquhar conducted a thorough, scientific analysis of all the available epidemiologic data to form the opinions expressed in his Report. Those

opinions were in accord with the scientific consensus that Baycol was the most toxic statin and caused more muscle disease than any other drug in its class. Dr. Farquhar cited numerous peer-reviewed articles contributing to this consensus, yet Defendants cannot cite a single independent author who disagrees. Instead, Defendants attempt to find flaws in Dr. Farquhar's analysis, and make unwarranted attacks on his alleged bias in performing the analysis. As detailed below, none of these claims have merit. In fact, as noted in Dr. Farquhar's Declaration in opposition to the defense motion to exclude his testimony, recent literature has only reinforced the consensus view that Baycol was by far the most toxic statin.

### A. <u>Adverse Event Reporting Rates Are a Recognized Method of Determining Drug Risk.</u>

The primary focus of Defendants' argument against the admissibility of Dr. Farquhar's testimony is the assertion that adverse event reports (AERs) may not be used to support opinions concerning causation or comparative toxicity of pharmaceuticals. In this regard, Defendants misrepresent the nature of Dr. Farquhar's analysis, the state of the scientific literature, and the applicable case law.

Defendants rely upon judicial decisions involving individual case reports or case series, which were found insufficient to support causation. *See* Bayer and GSK's Motion to Exclude Expert Testimony Based on Adverse Event Reports and Plaintiffs' Memorandum in Opposition To Defendants' Motion to

Exclude Expert Testimony Based on Adverse Event Reports (incorporated by reference). However, Dr. Farquhar has not relied upon individual case reports or case series, and such decisions are inapposite. Instead, Dr. Farquhar has followed the same methodology applied in peer-reviewed literature to analyze entire databases of adverse event reports, in conjunction with the best available, commonly used prescription sales data, to present Relative Reporting Rates (RRRs) showing such large differences between Baycol and other statins that the acknowledged uncertainties of the AERs methodology pale by comparison.

At the time of Dr. Farquhar's Expert Report, Dr. Farquhar cited Judy A. Staffa et al., "Cerivastatin and Reports of Fatal Rhabdomyolysis," *New Engl. J. Med.*, Vol. 346, No. 7, Feb. 14, 2002 (Ex. C) (Expert Witness Report of John W. Farquhar, M.D., "Farquhar Rep." at ¶¶ 47-48, 89) (Ex. D), as the source of his methodology. Dr. Staffa and her colleagues, officials of the United States Food and Drug Administration (FDA), used the AERs from the MedWatch system and prescription data from IMS to calculate RRRs for cases of fatal rhabdomyolysis. The authors reported that the rate was 16 to 80 times greater for Baycol than for any other statin. Staffa et al. at 540. Dr. Farquhar applied the same methodology to the same database, as well as several other comparable sources of adverse event data.

After the Staffa publication first appeared, Defendants criticized it as a mere "Letter to the Editor" that did not undergo peer review and was entitled to no credence. However, the Defendants' view was based on lack of investigation.

In fact, the Staffa publication was peer reviewed before it appeared in the most prestigious medical journal in the world. *See* Decl. of Stephen Morrissey, Ph.D., filed herewith. (Ex. E.) Thus, Staffa's publication is entitled to the full weight and consideration afforded to peer reviewed literature. Plaintiffs respectfully submit that Dr. Farquhar's analysis is deserving of substantial credence, since it used the same methodology and data sources as those that passed this rigorous peer-review process, and reached similar conclusions.

Significantly, two additional peer-reviewed publications have been published since Dr. Farquhar's original report, which relied upon similar AERs analyses to demonstrate the excess toxicity of Baycol to the satisfaction of the peer reviewers, including those at the *Journal of the American Medical Association* (*JAMA*). *See* Jennie T. Chang and Judy A. Staffa et al., "Rhabdomyolysis With HMG-CoA Reductase Inhibitors and Gemfibrozil Combination Therapy," *Pharmacoepidemiology and Drug Safety*, 13 (2004) 417-426 (Ex. F) and David J. Graham and Judy A. Staffa et al., "Incidence of Hospitalized Rhabdomyolysis in Patients Treated With Lipid-Lowering Drugs," *JAMA* Vol. 292, No. 21, December 1, 2004, 2585-2590 (Ex. G), also discussed *infra*. Both of these articles commented upon the limitations of the AERs data; yet both found the margin of excess events reported with Baycol use to be so substantial that (1) the risk of Baycol was "evident" and that (2) an inference of cause and effect was warranted. (*See* Decl. of John W. Farquhar in Opp'n to Mot. to Exclude Expert Test., "Farquhar Decl." at ¶ ¶ 4, 7.) (Ex. H.) These authorities represent the consensus

view that Baycol is more toxic than other statins, fully supporting the opinions expressed by Dr. Farquhar, and fully supporting their admissibility.

### B. <u>The AERs Analysis Has Been Confirmed by a Peer-Reviewed Observational Epidemiology Study.</u>

Following submission of expert reports in this litigation, a peer-reviewed publication by a distinguished group of academics and FDA officials, including Professor Richard Platt, M.D., of the Harvard School of Public Health (who recently served on the FDA Advisory Committee for Cox-2 Inhibitors) concluded that Baycol caused significantly more cases of rhabdomyolysis than any other statin. *See* Graham et al., *supra*. This article was based upon the pharmacoepidemiologic methods espoused in a textbook edited by defense expert Brian Strom, using information from a medical claims database of over 250,000 patients. *Id.* at 2585. Its findings remain uncontradicted, and it further supports the consensus view of Baycol's excess toxicity. (*See* Farquhar Decl. at ¶ 7.) Yet the defense makes no mention of this article, which is directly on point.

### C. <u>Defendants' Miscellaneous, Unsupported Attacks on Dr. Farquhar's AERs Analysis Are Overmatched by the Magnitude of the Excess Risk.</u>

Defendants' Memorandum raises a host of insignificant attacks on Dr. Farquhar's AERs analysis. Similar claims have been considered and rejected in the peer-reviewed literature. Thus, for example, Psaty et al. acknowledge the well-known limitations on AERs reporting rate analyses, yet they state that such limitations do not explain the unusually high magnitude of excess risk in the

reporting rate ratios (RRRs) for Baycol compared to other statins. *See* Bruce M. Psaty et al., "Potential for Conflict of Interest in the Evaluation of Suspected Adverse Drug Reactions—Use of Cerivastatin and Risk of Rhabdomyolysis," *JAMA*, Vol. 292, No. 21 (Dec. 1, 2004) at 2625. (Ex. I.) Instead, the authors state that a cause and effect inference is warranted by the data. *Id.* Similarly, Chang, et al. find that the excess risk for Baycol is "evident" despite the typical caveats concerning AERs analyses. Chang et al., *supra*, at 425. Plaintiffs submit that the defense arguments are entitled to no more weight before this Court than they received from the authors of the peer-reviewed publications. Specific defense claims are briefly addressed below.

First, Defendants argue that Dr. Farquhar's opinions should be discounted because he presented a meta-analysis of the AERs data. (Def. Mem. at 11.) This argument is meritless. First, Dr. Farquhar's Report explicitly stated that each of the AERs databases was <u>independently</u> sufficient to demonstrate large and statistically significant increased risk of Baycol; the meta-analysis was not necessary to establish excess risk, but was performed to provide a more accurate overall estimate of the magnitude of risk, a well-established function of meta-analytic technique. (*See* Farquhar Rep. ¶ 41.) The defense "critique" of Dr. Farquhar's opinions fails to mention these important facts which undermine its argument.

Second, while the defense highlights that there was some overlap in two FDA databases used in the meta-analysis, they omit to state that all of the data

sets showed consistent, statistically significant excess risk of Baycol. These include AERs data from Australia and Spain as to which there is evidence of consistent excess risk of Baycol, but no evidence of overlapping data with other sources. (Farquhar Rep. ¶ 59.)

Third, while the defense argues that variations in the definitions of myopathy in AERs might make the data unreliable, they fail to show any evidence whatsoever to support the speculative and unlikely conclusion that variable definitions resulted in a substantial increase or decrease in the reporting rate of events for any particular statin.

Fourth, Defendants claim that Dr. Farquhar failed to consider the "new drug effect" which results in greater reporting of events for recently marketed drugs, but this is incorrect. (Defs. Mem. at 18.) Like the authors of the peer-reviewed literature, Dr. Farquhar explicitly considered and rejected the new drug effect as an explanation, since the RRR for Baycol was grossly excessive compared to atorvastatin (Lipitor), despite the fact that both were marketed at about the same point in time. (*See* Farquhar Rep. ¶ 47); Psaty et al. at 2625; Chang, et al., at 417. Based on the atorvastatin comparison, Staffa called the Baycol results "more than artifact," by which "Staffa can only mean that the difference between the fatal effects of Baycol and other statins is real." Staffa et al. at 540; (Farquhar Rep. ¶ 48).

Finally, Defendants claim that Dr. Farquhar had never done this type of analysis before, and that he worked backwards to achieve a pre-conceived

result. (Defs. Mem. at 4-5, 11-14.) These unwarranted aspersions on Dr. Farquhar's acumen and integrity as a scientist fail to take into account that the skills he acquired as an epidemiologist over the course of five decades are transferable to this analysis; further, Dr. Farquhar reached the same conclusion as the scientists and FDA officials who wrote the peer-reviewed articles establishing the consensus that Baycol is the most toxic statin, relying on both RRR analyses of AERs and pharmacoepidemiologic data, and the consistency of his opinions with the published literature belies any claim that Dr. Farquhar's opinions resulted from bias or preconception.[1]

Defendants cite selectively from Paul D. Thompson et al. "Statin-Associated Myopathy," *JAMA*, Vol. 289, No. 13, April 2, 2003 (Ex. J) to challenge the use of AERs data, but they misinterpret his article. In particular, Defendants quote Thompson to the effect that AERs data "provide some insight" as if this only meant that a "signal" existed which required investigation. Thompson et al. at 1683. However, Defendants omit the key phrase, that AERs data gave "some insight <u>into the magnitude of the problem</u>" (emphasis added), *i.e.*,

[1] In a particularly egregious example of unwarranted character attack, Defendants excerpt a single page from Dr. Farquhar's extensive notes to suggest that he suppressed AERs data allegedly showing that Lescol had a higher reporting rate than Baycol. In fact, careful reading would have informed defense counsel that Dr. Farquhar's notes referred to the <u>PacifiCare</u> study and had nothing to do with the AERs analysis. Further, the logic that Dr. Farquhar applied to PacifiCare, which Defendants improperly criticize, was <u>identical</u> to that followed by Bayer's own head of Regulatory Affairs, Lawrence Posner, who recommended precisely the same corrections for duration of exposure and statin-tolerance that Dr. Farquhar performed. (See *infra*, pp. 20-26.) The anomalous result for Lescol was no longer present in the PacifiCare study after application of the corrections recommended by Dr. Posner.

the AERs data showed that there was already a "problem." *Id.* Furthermore, Thompson, like other commentators, accepts the Staffa *New England Journal of Medicine* publication, *supra*, for the consensus conclusion that the rate of fatal rhabdomyolysis on Baycol is 16 to 80 times worse than for other statins, and Thompson's statement further demonstrates the clear consensus that the AERs analyses were sufficient to demonstrate excess toxicity of Baycol. *Id.* at 1684.

### D. **Defendants' Reliance upon FDA Interpretation of AERS Policy Is Misplaced, Inaccurate and Incomplete.**

Defendants rely heavily upon two FDA memoranda which purportedly preclude reliance upon AERS data to compare the relative toxicity of pharmaceutical products. This reliance is misplaced and inaccurate, for several reasons. First and foremost, this Court is the gatekeeper of the admissibility of expert evidence under *Daubert*. The FDA is not the gatekeeper, nor are its memoranda controlling. The role of the Court is to apply the rules of evidence and the judicial precedents, which dictate that expert testimony which follows a reliable methodology is admissible. Here, Dr. Farquhar has followed the same methodology that has passed peer review on numerous occasions to compare drug toxicity, not only in the three articles by lead authors Staffa, Chang, and Psaty as to Baycol, but also with respect to other pharmaceuticals. *See, e.g.*, Allen Brinker et al., "Spontaneous Reports of Hypertension Leading to Hospitalisation in Association with Rofecoxib, Celecoxib, Nabumetone, and Oxaprozin," *Drugs Aging* 21 (7) (2004) 479-484. (Ex. K.) While peer review is not necessary to

validate an expert's methodology, such validation strongly supports the reliability of the methodology applied by an expert. Despite Defendants' laundry list of hypothetical uncertainties in Dr. Farquhar's analysis, the fact remains that they cannot meaningfully distinguish his analysis from those referenced in the Staffa, Chang, and Psaty articles referenced above. Those articles took note of the FDA's AERs data, but nevertheless found the evidenced excess risk of Baycol so compelling that such relatively minor uncertainties did not affect their conclusions.

Second, the literature shows that FDA officials are the principal authors of articles and chapters in textbooks that apply the AERS data to make drug safety comparisons, including a chapter in the textbook of Defendants' own expert, Brian Strom, which states, "Spontaneous ADE [Adverse Drug Event] reports may be sufficient to assign causality for an association between a drug and an event." (Rebuttal Expert Witness Rep. of John W. Farquhar, M.D., "Farquhar Rebuttal Rep." ¶ 8.) (Ex. L.) The authors are three officials of the United States FDA who do not state that they are expressing only their own opinions, and it is inferred that they are stating the FDA's official position. (*See* Farquhar Rebuttal Rep. ¶¶ 1-8, summarizing several sources supporting use of AERs' data to evaluate drug safety.) (Ex. M.)

Third, Defendants fail to cite the FDA's more recent Guidance For Industry on the subject of post-marketing surveillance and adverse event reporting data. *U.S. Food and Drug Administration, Guidance for Industry: Good*

*Pharmacovigilance Practices and Pharmacoepidemiologic Assessment* (March 2005) *available at* http://www.fda.gov/cder/guidance/6359OCC.htm. (Exhibit M.) The Guidance reiterates the FDA's caveats, but nevertheless endorses their use as a "valuable" method of comparing toxicity of drugs in the proper circumstances, that is, for drugs in the same class, prescribed for the same indications, to similar populations, and marketed at approximately the same time. *Id.* All of these conditions apply to the comparison between Baycol and Lipitor (atorvastatin), a cholesterol lowering statin drug first marketed within several months of Baycol. All of the peer reviewed literature specifically comments upon the grossly excessive RRR of rhabdomyolysis for Baycol in direct, head-to-head comparisons to Lipitor, which support the conclusion that Baycol is more toxic. Thus, the scientific literature on Baycol and the analysis prepared by Dr. Farquhar take into account the specific factors cited by the Guidance document, obviating the limitations on use of the data. (*See* Farquhar Rebuttal Rep., ¶¶ 5-8.)

Fourth, there is a practical reason for the courts to follow the standard *Daubert* approach to admissibility of expert testimony, rather than adhering to the FDA memoranda promoted by Defendants. In particular, as noted in the peer reviewed literature and popular press, the FDA post-marketing surveillance system has been criticized for failing to adequately protect the American public from adverse drug effects, including those of Baycol. *See, e.g.* Psaty, et al., *supra*. Thus, it is particularly important for the courts to afford the parties the right to have their positions heard and determined under the prevailing

rules of evidence and judicial precedents as they apply to the particular facts of the case, rather than non-binding agency memoranda that inherently cannot account for the circumstances of particular cases.

## IV. RECENT PEER-REVIEWED LITERATURE SUPPORTS DR. FARQUHAR'S TESTIMONY

There is a consensus in the medical community that statins cause rhabdomyolysis and muscle injury, and that Baycol was the most toxic statin in causing these diseases. This consensus has existed for a number of years, but it has been strengthened by recent literature published since the time of Dr. Farquhar's expert report, as summarized in the Declaration of Dr. Farquhar filed herewith.

Since Dr. Farquhar's initial reports, relevant peer-reviewed literature has appeared confirming the opinions that he provided at the time. The Letter To The Editor by Staffa et al., in the 2002 *New England Journal of Medicine* is confirmed to have been peer-reviewed prior to publication. (*See* Decl. of Stephen Morrissey, *supra*.). The peer-review process confirms the validity of Dr. Farquhar's reliance on that publication as a basis for the methodology that he applied to similar data concerning excess toxicity of Baycol.

Dr. Staffa and her co-authors from the 2002 Letter To The Editor subsequently published "Rhabdomyolysis With HMG-CoA Reductase Inhibitors and Gemfibrozil Combination Therapy," in *Pharmacoepidemiology and Drug Safety*, *supra*. The authors reviewed data for rhabdomyolysis in general, whereas

the prior Letter To The Editor had concerned fatal rhabdomyolysis only. The authors appropriately described the strengths and limitations of Adverse Event Reporting System ("AERS") documents. Nevertheless, they stated,

> In our analyses of all statin-associated cases, the risk for reported rhabdomyolysis associated with cerivastatin is evident. Though only marketed for 3 years, the number of reported fatal cases surpassed that lovastatin, which was in the market for about 10 years more. Compared to all statins, cerivastatin had higher reporting rates for rhabdomyolysis than any of the other five agents, whether as monotherapy or in combination with gemfibrozil.

*Id.* at 425 (emphasis added).

The authors further reported that the cerivastatin (Baycol) reporting rate was "much higher" than for any other statin. *Id.* at 417. Because Lipitor was the statin marketed closest in time to Baycol, it is the most relevant comparison, and the reporting rate of rhabdomyolysis with Lipitor was only 0.03 case per hundred thousand prescriptions, compared to 4.29 per hundred thousand prescriptions for cerivastatin. *Id*. at 424. Thus, the reporting rate for Baycol was 143 times greater than for Lipitor, which was marketed for similar indications, similar patient populations and data, and similar point in time. *See id.* Any uncertainties relating to the AERS reporting system are dwarfed by the magnitude of this excess toxicity as demonstrated by the reporting rate comparison. Thus, the recent publication by the same authors confirms the excess toxicity of Baycol.

In 2004, Graham and Staffa and their co-authors collaborated on the article "Incidence of Hospitalized Rhabdomyolysis in Patients Treated With Lipid-

Lowering Drugs," in *JAMA, supra*. This article reviewed rhabdomyolysis in a medical claims database of 252,460 patients. Graham et al. at 2585. The authors state:

> The risk of rhabdomyolysis with cerivastatin monotherapy was 10-fold greater than with other statins, and in combination with a fibrate, was increased more than 1400-fold. With an estimated incidence of approximately 1,000 per 10,000 person years of use, rhabdomyolysis might have occurred in approximately one of every ten patients treated with cerivastatin and fibrate for a year.

*Id*. at 2589 (emphasis added). Once again, the significant excess risk of Baycol is clearly demonstrated, and this is the consensus scientific view.

The Psaty et al. article, *supra*, "Potential for Conflict of Interest in the Evaluation of Suspected Adverse Drug Reactions," in JAMA addressed the use of cerivastatin and risk of rhabdomyolysis. This peer-reviewed article is based upon adverse event reports analysis comparable to the analysis presented in Dr. Farquhar's Report and reaches similar conclusions. In particular, the authors noted that cases of confirmed rhabdomyolysis occurred at a rate approximately 50 times higher than that of the other statins. *Id.* at 2625. Reported mortality rates from rhabdomyolysis for Baycol users were sixteen to eighty-six times higher than those of the other statins. *Id*. The data also suggested a direct relationship between cerivastatin dose and the risk of fatal rhabdomyolysis. *Id*. Of importance, the authors state, "Although a number of potential biases make RRRs [Relative Reporting Rates] up to 2 or 3 [times more] difficult to interpret, the

mortality RRRs for cerivastatin were so high that few alternative explanations are credible, and an inference of cause and effect seems warranted." *Id*.

These articles are consistent with the views expressed Dr. Farquhar's report, have passed peer review, and represent the scientific consensus that Baycol is the most toxic statin.

## V. THE PACIFICARE STUDY RESULTS CAN AND SHOULD BE CORRECTED WHERE THE STUDY RESULTS WERE INFLUENCED BY IDENTIFIABLE FORMS OF BIAS

Defendants argue that the Bayer-funded PacifiCare study is sacrosanct, and that its findings and conclusions are somehow immunized against criticism and correction by Plaintiffs' experts. However, there is no legitimate basis for such an argument, and in fact the *Reference Manual on Scientific Evidence* and relevant cases support the opposite conclusion. Michael J. Saks et al., *Reference Manual on Scientific Evidence* (2nd Ed. 2005-2006). (Ex. N.) It is generally accepted that bias in the conduct of a study can materially affect the results, and that detection and accounting for bias are standard tools of epidemiology. *See id*. Here, Dr. Farquhar relied upon sources describing well-known types of bias that are within his expertise as an epidemiologist, and that were apparent in the documents concerning the PacifiCare study.

There are several types of bias that can produce error in a study outcome. *Id*. at 504. Selection bias refers to the errors from case selection, for example. *Id.* at 514. Information bias refers to the bias resulting form inaccurate information about the study participants regarding either their disease or exposure

status. *Id.* at 515. The PacifiCare Study results were affected by both types of bias.

First, the PacifiCare authors committed a fundamental error by failing to analyze their own data in a manner that would negate selection bias due to the "healthy person effect." (Farquhar Rep. at ¶ 103.) This can occur where the disease rate observed in one group is lower than would be otherwise expected, because of the group members' greater tolerance to withstand toxic exposure. *Id.* Here, the HMO that provided the study population was undergoing a rapid conversion of its formulary to Baycol; therefore, the study group is disproportionately a large percentage of patients who had switched from another statin just prior to beginning Baycol. *Id.* As a result, the patients are those who had demonstrated a tolerance to statins, shown by the fact that they had not discontinued statin therapy as a result of an adverse event. *Id.* Accordingly, the study results are properly recalculated to control for this particular bias. Since the effect of the bias was to present an artificially low incidence of muscle complaints with Baycol, the effect of correcting the bias is to increase the risk of myopathy associated with Baycol in comparison to all other statins. *Id.*

It is significant that Bayer itself was well aware of the healthy person effect and sought to use it when it seemed to suit its purposes. Thus, in preparation for a study of a 1.6 mg dose, Bayer internal documents show a plan to recruit study patients who had tolerated other statins, in order to reduce the number of adverse events on Baycol (Farquhar Rebuttal Rep. at ¶ 21.) This

acknowledgement undermines Defendant's credibility in attacking Dr. Farquhar for taking the same effect into account in the PacifiCare study.

In the *In re "Agent Orange" Product Liability Litigation*, 597 F. Supp. 740, 783 (E.D. N.Y. 1985), the court expressed similar concerns about selection bias: The exposed cohort were young, healthy men who served in Vietnam. *Id*. Comparing the mortality rate from Agent Orange exposure to a control group of civilians might have resulted in error from selection bias. *See id.* Failing to account for health status as an independent variable tends to understate any association between exposure and diseases in studies in which the exposed cohort is healthier. *Reference Manual on Scientific Evidence*, *supra*, at 514 n. 85.

The PacifiCare study is also flawed due to information bias. It is generally accepted that when comparing different drugs the denominator should be based on number of patients taking each drug and exposure duration. (Farquhar Rep. at ¶ 105.) The PacifiCare authors did not account for this. (*Id*.) The flaw biased the result in favor of Baycol, which had a significantly shorter average exposure than other statins to which it was compared. (*Id*.) Dr. Farquhar corrected the study results through a straightforward mathematical formula to account for the fact that Baycol's events had occurred with shorter duration. (*See id*.) The results showed that Baycol had increased toxicity as monotherapy and combination therapy. (*Id*. at ¶ 106.) The difference increased toxicity 133% for monotherapy and 524% for combination therapy. (*Id*.)

Defendants rely on the Report of Dr. Strom for the claim that no duration correction is needed. Ironically, Strom in turn cites as support the brief time to onset of rhabdomyolysis in the very same AERs reports which Defendants argue cannot be relied upon. This argument is off the mark for two reasons. First, PacifiCare did not refer to rhabdomyolysis, a rare and identifiably drug-related condition, but instead assessed a broad endpoint of muscle-related ailments, including myalgias, which occur commonly in the study population over time, both with and without drug toxicity. Second, the actual data of PacifiCare show an extended period of time to first diagnosis of myopathy, averaging over six months, with two-thirds of the cases arising over a range from 26 to 351 days of use. (Farquhar Rebuttal Rep. at ¶ 22.) Accordingly, the failure to correct for the shorter duration of Baycol exposure was a fundamental methodological error that reduced the number of Baycol patients who would otherwise have had myopathy diagnoses. (*Id*.)

As noted in the Supplemental Rebuttal Report of Dr. Farquhar (Defense Ex. C), Lawrence Posner, Bayer's own Head of Regulatory Affairs, recommended exactly the same adjustments of the PacifiCare study that Dr. Farquhar has performed. Dr. Posner stated, "(2) Has there been any adjustment for 'time' in these data? It would make a difference if patients were on other statins longer than Baycol. (3) Have we looked at 'switch' vs. 'non-switch' patients (non-switch adjusted for time would be the best analysis). Switch patients

<u>will have a lower incidence of AEs because they previously tolerated another statin</u>." (*Id*., at ¶ 11; emphasis added).

Thus, Bayer's lawyers, in their overzealous attack on Dr. Farquhar, ignore the advice of their own corporate official who endorsed the corrections Dr. Farquhar ultimately made. These corrections resulted in a statistically significant increased risk of myopathy with Baycol monotherapy, compared to all other statins (Relative Risk = 2.33, p<0.0001). (*Id*.) Further, even without any correction, there was a statistically significant increased risk of myopathy in the PacifiCare study among Baycol patients who had never used another statin. (Farquhar Rep. ¶ 103.)

Additional informational bias in the PacifiCare study probably occurred due to the misclassification of cases. This bias is inherent in the study design, because it relied on administrative claim codes for various muscle ailments instead of review of medical records for symptoms. (*Id.* ¶ 111.) It is a general principle of epidemiology that nondifferential misclassification of either exposure or disease will bias estimates to show an absence of an effect, just as in the PacifiCare study. (*Id*.) The codes compiled by the Bayer researchers included nonspecific muscle complaints that may occur in the absence of statin use, therefore reducing the relative risk. (*Id*.) The PacifiCare authors were aware of this deficiency in the evaluation of the data and stated that there was a need to perform chart reviews of inpatient cases to validate medication exposures,

diagnoses, and clinical outcomes. Furthermore, the FDA review of the PacifiCare study also noted this limitation. (Farquhar Rep. at ¶ 114.)

In the *In re Swine Flu Products Liability Litigation*, 508 F.Supp. 897, 903 (D. Colo. 1981), the court critically evaluated a study relied on by an expert whose testimony was stricken. *Id.* In that study, determination of whether a patient had Guillian-Barre syndrome was made by medical clerks, not physicians who were familiar with diagnostic criteria. *Id.*

> Much of plaintiff's exhibit . . . was obtained from computer retrieval of cases [listed under a code]. The medical clerks, who are not doctors, decided which cases . . . were Guillian-Barre syndrome. On this point we note that diagnosis of Guillian Barre syndrome is a very difficult and complex and is the subject of constantly evolving medical knowledge.

*Id.* Defense expert Strom has similarly criticized the reliability of claims databases, where the diagnosis is not "objective" or "laboratory driven." (Farquhar Rebuttal Rep. at ¶ 32.) That problem is present in the PacifiCare definition of "myopathy" which is subjective, not "laboratory driven", and which obscures treatment effects. (*See id.* at ¶¶ 32-33.)

Finally, two further problems, "differential misclassification" and "claims lag" further skew the PacifiCare study result. (Farquhar Rep. at ¶ 118.) Bayer's marketing of Baycol included a large number of free samples. (*Id.*) The PacifiCare study assigned patients to their statin groups based on their last prescription. (*Id.*) Free sample use was unaccounted for. (*Id.*) Accordingly, a patient could have been taking a Baycol sample and the study results would

attribute any adverse reaction to whatever statin the patient was prescribed prior to using Baycol. (*Id*.) "Claims lag" caused the study not to account for the typical 6 to 9 month delay between the date when services are provided and the ultimate entry in a database for payment claims. (*Id*. ¶ 119.) As a result there is a high likelihood that many missing claims for the most recent myopathy cases were not included in the study. (*Id*.) Since this was the same time frame during which Baycol use was dramatically increasing, this probably lead to an underascertainment of adverse events. (*Id*.) These, and other defects, were noted by Bayer's own consultant, Dr. Faich. (Farquhar Rebuttal Rep. at ¶ 31.)

Dr. Farquhar reviewed the PacifiCare study and reached a different conclusion about its interpretation. As Judge Fallon stated in the Vioxx opinion favorably regarding Dr. Farquhar's testimony, Dr. Farquhar reviewed "the same materials review[ed] by [defendant's] experts. Dr. Farquhar, however, has reached a different conclusion than [defendant's] experts. Differing conclusions are permissible under Rule 702; improper methodology is not. If Dr. Farquhar's reliance on these studies is improper, then the same reliance by [defendant's] experts is improper." *In re Vioxx Products Liability Litigation*, *supra*, 401 F.Supp.2d 565, 596.

Accordingly, since Defendants also seek to rely on the PacifiCare study, Dr. Farquhar is entitled to present his interpretation of the same study, and the testimony should be admitted.

## VI. CONCLUSION

Dr. Farquhar applied generally accepted methodologies that adhere to those followed in the peer-reviewed literature. Dr. Farquhar's testimony is admissible, and Bayer's motion should be denied.

Date: June 23, 2006

Respectfully submitted,

LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP

By: /signature on file/
Donald C. Arbitblit

Embarcadero Center West
30th Floor, 275 Battery Street
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

ZIMMERMAN REED, PLLP
Charles S. Zimmerman, #120054
Ronald S. Goldser, #35932
Robert R. Hopper, #208760
Stacy K. Hauer, #317093
651 Nicollet Mall, Suite 500
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844

LOCKRIDGE GRINDAL NAUEN, P.L.L.P.
Richard A. Lockridge, #64117
Robert K. Shelquist, #21310X
Yvonne M. Flaherty, #267600
100 Washington Avenue South, Ste. 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981

***Plaintiffs' Steering Committee***

Don Barrett
Barrett Law Office, PA
404 Court Square North
P.O. Box 987
Lexington, MS 39095

Daniel E. Becnel
Law Offices of Daniel E. Becnel, Jr.
106 West Seventh St., P.O. Drawer H
Reserve, LA 70084

Turner W. Branch
Branch Law Firm
2025 Rio Grande Blvd. N.W.
Albuquerque, NM 87104

Stanley M. Chesley
Waite, Schneider, Bayless & Chesley Co., LPA
1513 Fourth and Vine Tower
One West Fourth Street
Cincinnati, OH 45202

John R. Climaco
Climaco, Lefkowitz, Peca, Wilcox & Garofoli Co., L.P.A.
1220 Huron Road, Suite 1000
Cleveland, Ohio 44115

James R. Dugan
Gauthier, Downing, LaBarre, Beiser & Dean
3500 North Hullen Street
Metairie, LA 70002

Frederic S. Fox
Kaplan Fox & Kilsheimer LLP
805 3rd Avenue, 22nd Floor
New York, NY 10022

Don Hildre
Dougherty, Hildre, Dudek & Haklar
2550 Fifth Ave., Suite 600
San Diego, CA 92103-5624

Will Kemp
Harrison, Kemp & Jones
3800 Howard Hughes Pkwy, 17th Floor
Las Vegas, NV 89109

Dianne M. Nast
Roda & Nast, P.C.
801 Estelle Drive
Lancaster, PA 17601

W. James Singleton
Singleton Law Firm
4050 Linwood Ave.
Shreveport, LA 71108

William M. Audet
Alexander, Hawes & Audet, LLP
300 Montgomery St.
Suite 400
San Francisco, CA 94104

Ted B. Lyon, Jr.
Teb B. Lyon & Associates, P.C.
Town East Tower, Suite 525
18061 LBJ Freeway
Mesquite, TX 75150

Dale I. Larson
Larson King
2800 World Trade Center
30 East Seventh Street
St. Paul, MN 55101

Mark Robinson
Robinson, Calcagnie & Robinson
620 Newport Center Dr., Seventh Floor
Newport Beach, CA 92660

Ron Meshbesher
Meshbesher & Spence Ltd.
1616 Park Avenue South
Minneapolis, MN 55404