# EXHBIT L

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: BAYCOL PRODUCTS LITIGATION | ) MDL No. 1431 (MJD/JGL) |
| | ) |
| | ) |
| | ) |
| | ) |
| This Document Relates To All Actions | ) |

# REBUTTAL EXPERT WITNESS REPORT OF JOHN W. FARQUHAR, M.D.

This Rebuttal Report is submitted in response to the Expert Witness Report of Brian Strom, M.D., dated January 12, 2004.

## I. Substantial Sets of Adverse Event Reports and Prescription Information Provide Clear and Compelling Evidence of Baycol's Greater Toxicity, in Accordance with Generally Accepted Epidemiologic Methods

1. The primary claim of Dr. Strom's Report is that it is improper to rely upon adverse event reports (AERs) to compare the toxicity of Baycol versus other statins. However, Dr. Strom's argument misstates both the nature of the available data and the accepted epidemiologic methods for their analysis. My earlier Report did not rely on isolated case reports or case series, but instead used compilations of AERs, along with reliable data as to the extent of exposure to each drug. These provided the numerators and denominators to calculate estimated incidence rate ratios, in accordance with generally accepted principles of epidemiology.

2. The AERs analysis in my prior Report is an example of a "cohort study," as that term is commonly used in the field of epidemiology. In a cohort study, the researcher identifies a group exposed to a risk factor or to a treatment that can cause a disease, and an unexposed ("control") group. If exposure causes the disease, a greater proportion of exposed than unexposed individuals would be expected to develop the disease. In this case, the AERs provide the numbers of reported cases of disease, and the prescription data serve as a surrogate for both the period of time and the population exposed (as Bayer did in its internal analysis of AERs). Patients who took Baycol are considered those "exposed" to the putative risk factor, while those who used other statins are considered "unexposed". Alternatively, a well-established



DEPOSITION EXHIBIT
5
2-13-04
Combs Reporting-(415) 296-8795

epidemiologic study design provides for comparison of groups exposed to different risk factors, which are sometimes characterized as "treatment A versus treatment B." *E.g.*, comparison of two drugs in the same class, such as anti-hypertensive drugs, where each patient group requires treatment on grounds of clinical "need," but the comparison yields useful comparative data on safety or efficacy. In either case, the comparison of disease rates from one group to the other is a well-accepted cohort study design.[1] Here, reporting rates were compared instead of incidence rates, and the ratio of reporting rates is a reasonable approximation of the ratio of incidence rates.

3. Legitimate concerns could be raised if one were to attempt to characterize risk of various statin drugs based solely upon isolated case reports. Such reports provide no information about the duration and extent of exposure, making it impossible to calculate or estimate the ratio of incidence rates. Without such information, safety comparisons cannot fairly be made. However, as noted above, my analysis was not based on such isolated information, and did provide for both numerators and denominators, which allowed reasonable estimates of the ratio of incidence rates.

4. Dr. Strom raises another red herring by his assertion that AERs cannot be used to calculate incidence rates (Strom Report at ¶ 18). True incidence rates would require reporting of all adverse events; it is well known that the AERs capture only a fraction of such adverse events. However, my Report acknowledges that the relative risks (RRs) presented therein are based upon <u>reporting</u> rates, rather than the actual or "true" incidence rates. (*See, e.g.*, Report, 11/24/03 at ¶¶ 47, 69). The real scientific question is not whether the rates are characterized as "incidence" or "reporting" rates, but rather, whether there is sufficient basis to believe that they are reliable when compared. For the reasons set forth at length in my earlier Report, there is ample basis to rely upon the data and the analysis set forth therein. The analysis meets all of the criteria typically applied by epidemiologists to infer causation, including

---

[1] The AERs analysis can also be characterized as a "Historical control: The results of treatment with the test drug are compared with experience historically derived from the adequately documented natural history of the disease or condition, or from the results of active treatment, in comparable patients or populations." *See* 21 C.F.R. § 314.126(b)(v).

exceptionally high relative risks (strength of association between exposure and disease); consistency of the observed association among studies; higher rates of disease with larger doses (dose-response relationship); and highly statistically significant results, which indicate that the association was not due to chance alone. (*See* Report, 11/24/03, ¶¶ 31-40). Further, the scientific community's consensus that Baycol is the most toxic statin was based upon precisely this type of analysis, and my Report as to AERs constitutes an extension of the same reasoning to larger and more comprehensive data sets.

5. Dr. Strom's own textbook, Pharmacoepidemiology, (3d ed. 2000), clearly acknowledges the importance of aggregate analyses of adverse event reports, which have far greater weight than individual reports. For example, Chapter 11 of this text states:

> If information from an efficient spontaneous reporting system can be combined with drug sales and prescription statistics, it is often possible to derive a rough estimate of the frequency or incidence rate of an ADR [Adverse Drug Reaction]. Such estimates can, of course, never reach the accuracy of those derived from clinical trials or formal epidemiologic studies. However, they can serve as a first indicator of the size of a potential problem. For very rare reactions they may actually be the only conceivable measure.

(Wiholm, et al., "Spontaneous Reporting Systems Outside the U.S.," published in Pharmacoepidemiology (3d ed. 2000) at 187; emphasis added).

6. In an earlier text, Dr. Strom had included an article by the same lead author (Dr. Wiholm), which stated that "adequately correct estimates" of risk can be obtained using spontaneous reports of adverse events (the numerator) and prescription data (the denominator), where a drug is taken in standardized doses for long-term treatment or defined short-term periods; eliciting a reaction which is serious and has a low background rate and few confounding conditions; especially if "the Relative Risk (RR) is high and the reaction is well-known." Wiholm, et al., "Postmarketing Surveillance of ADRs by Spontaneous Reporting and Register Data," published in Drug Epidemiology and Post-Marketing Surveillance, Strom, et al. (1992), at 18-19.

7. These are precisely the conditions that apply here. Baycol and other statins are taken in standardized doses, commonly for long-term treatment. Baycol causes

rhabdomyolysis, a serious condition with a low-background rate and few relevant confounding conditions; and, as demonstrated in my earlier Report, the Relative Risk (RR) is exceptionally high when comparing the rate of rhabdomyolysis with Baycol to the rate with other statins. See also ¶¶ 45-51 of my earlier Report, citing scientific literature approving the use of adverse event data to assess causality.[2]

8. Dr. Strom's textbook also includes an article entitled "Spontaneous Reporting in the United States," authored by three officials of the United States FDA.[3] Strom, Pharmacoepidemiology (3d ed 2000) pp. 151-174. The article explicitly endorses the use of AERs to determine whether a cause and effect relationship exists between drug exposure and adverse events, and further approves of the methodology used in my earlier Report to estimate incidence. In particular, the authors state that,

> The stronger the drug-event relationship in each case and the lower the incidence of the AE occurring spontaneously, the fewer case reports are needed to perceive causality....Biological plausibility and reasonable strength of association aid in deeming any association as causal....[E]ven if the exposed patient population is not precisely known, estimation of the exposure can be attempted through the use of drug utilization data....This approach, whose basic methodologies are applicable to medical products in general, can be of great utility. Major sources of data on the use of drugs by a defined population include market surveys based on sales or prescription data,...

(Id.) at 166-68. Thus, while the authors correctly note that it is "unusual" to determine causality or estimated incidence based on adverse event reports, such unusual circumstances are in fact present with regard to Baycol. There is a very low background rate of rhabdomyolysis occurring spontaneously, so fewer case reports are needed to perceive causality. The occurrence of rhabdomyolysis is biologically plausible with statin use, and the strength of association or "relative risk" (RR) is strikingly high, whether comparing Baycol to the background or the rate reported for other statins. Estimated occurrence rates are reasonably based upon large numbers

---

[2] *See, e.g.*, Brinker, "Spontaneous ADE [adverse drug event] reports may be sufficient to assign causality for an association between a drug and an event," cited at ¶ 50 of my prior report."

[3] Since the article does not state that the views expressed are solely those of the authors, it is assumed that they are stating the FDA's official position.

of AERs, in conjunctions with reliable sales and prescription data for the various statin drugs. The facts support the reliability of the methodology employed to determine that Baycol is the most toxic statin, and the same methodology was applied by FDA officials in both their internal and published analyses.

9. Dr. Strom's argument against the use of AERs to compare toxicity is based upon rote incantations of theoretical objections that are contradicted by the circumstances of the particular case at hand. Thus, as described below, the facts negate Dr. Strom's criticisms and support the use of AER data to demonstrate Baycol's toxicity.

a. The "New Drug" Reporting Effect

The higher rate of adverse events with Baycol is not explained by recency of its introduction to the market. This possibility has been ruled out in two ways. First, Baycol was associated with a 79-fold greater rate of fatal rhabdomyolysis than Lipitor, despite the fact that the two drugs were approved for marketing within 6 months of each other. See Staffa, et al., New England Journal of Medicine (NEJM), February 14, 2002 at 539-540, discussed in detail in my earlier Report at ¶¶ 44-47. Second, the same FDA officials analyzed reporting rates of serious cases of rhabdomyolysis during the first two years of marketing of each statin; their results showed that Baycol had a higher reporting rate than every other statin, with Relative Risks (RRs) ranging from 3.2 to 40. (U.S. serious cases of rhabdomyolysis: first two years of marketing, MDL-MP-FOODIMS00000779). The FDA safety evaluators stated, in a memorandum dated June 8, 2000, that the higher reporting rate for Baycol "cannot be wholly attributed to the newness of cerivastatin to the marketplace." (Id. at 14; p. BAY1820). Thus, recency of marketing does not explain the far higher rate of rhabdomyolysis reported for Baycol.

b. The "Publicity" Effect

The high RR for Baycol cannot be explained by publicity or communications to the medical community about the product and its potential adverse events, because Baycol's statistically significantly higher rates of rhabdomyolysis were reported well before any publicity about such adverse events took place:

(i) Using 1998 adverse event data from the National Technical Information Service (NTIS) as numerators, and denominators from the same prescription data referenced in Staffa's NEJM Report, rhabdomyolysis was reported over 17 times more often for Baycol monotherapy than for all other statins, and almost 33 times higher than the rate for Lipitor, which was marketed at almost the same time. (See Report, 11/24/03, ¶¶ 89-90 and Table 8). Yet, the first publication of any adverse event report of rhabdomyolysis in association with Baycol did not occur until April 1, 1999. (Pogson, et al., "Rhabdomyolysis and Renal Failure Associated with Cerivastatin-Gemfibrozil Combination Therapy," American Journal of Cardiology, 1999; 82:1146).[4] It goes without saying that a case report in April 1999 could not possibly have affected the reporting rates in 1998, and could not have caused Baycol's significantly higher reporting rate.

(ii) Furthermore, sporadic reports of rhabdomyolysis had been published in association with other statins since 1990, and the single Baycol-associated report in April 1999 did not constitute a particularly significant degree of publicity differentiating it from other statins. Indeed, a major, official journal of the American Heart Association published an article on January 18, 2000, stating that "there are no known differences in safety" among statins as a class. Maron, et al., "Current Perspectives on Statins," Circulation 2000; 101:207-213, at 207.[5] Thus, the published

[4] The authors of that article explicitly stated that no prior reports of Baycol/gemfibrozil-associated rhabdomyolysis had been published.

[5] It is noteworthy that Circulation, an authoritative source relied upon by physicians for accurate information, stated that there are "no known differences in safety" between the statins, because the dramatically higher rates of rhabdomyolysis caused by Baycol had not been published, even though evidence of such toxicity had appeared in the data for both 1998 and 1999. It is equally significant that Bayer had apparently conducted its own analysis of the FDA's Adverse Event databases through June 1999, and had stated: "The findings indicate that in patients receiving mono-therapy, cerivastatin substantially elevates risk for rhabdomyolysis compared with other statins. In combination with gemfibrozil, cerivastatin patients were also found to be at a remarkable disadvantage compared with patients receiving gemfibrozil and another statin." (BAYCORP 00135576; emphasis added). This Bayer document goes on to assert the usual disclaimers about adverse event data, but the evidence was nevertheless clear enough for the Bayer authors to state the conclusion quoted above. It is clear that Bayer did not share this information with the medical community; if it had done so, the AHA's official journal certainly

literature through at least January 2000 did not call attention to Baycol's higher toxicity, negating any effect of "publicity" as a supposed cause of Baycol's significantly higher reporting rate.

c. "Dear Doctor" Letters

Communications from Bayer to the medical community about the risk of rhabdomyolysis came long after the higher reporting rate, and could not have caused what had already occurred. In December 1999, Bayer issued a "Dear Healthcare Professional Letter," stating a contra-indication against use of Baycol and gemfibrozil together. (BAYCORP 01645141, 01645197). The issuance of such a letter in December 1999 has no bearing upon the higher rates of reporting of rhabdomyolysis for Baycol in 1998 and 1999, since the letter was not even sent until the very end of 1999. (It is of interest that Bayer's public submissions state that spontaneous reports had identified a signal of toxicity as to concomitant use with gemfibrozil as of December 1999, while the internal document states that Baycol "substantially elevates risk for rhabdomyolysis compared with other statins" in monotherapy as well as combination therapy. (BAYCORP 00135576). If AERs were sufficiently reliable to conclude that there was a true risk of Baycol with Lopid, there is no principled reason why such reports could not support the same conclusion as to Baycol alone.)

d. Inter-Country Reporting Differences

Baycol's higher reporting rate is not explained by variation in reporting practices from one country to another, since higher rates were reported in multiple countries around the world.

10. Finally, with regard to Dr. Strom's assertions concerning the supposed unreliability of case reports, the Reference Manual on Scientific Evidence of the Federal Judicial Center acknowledges that physicians can and do rely upon case reports or case series in the medical literature, even where only one or a few individuals are involved, and that "such studies

---

would not have published the erroneous information that there were no known differences in safety among the statins as of January 2000. Such differences apparently were known, but only by Bayer itself.

may be carefully considered in light of other information available, including toxicological data." (Id. at 474-75). Here, even if the adverse event datasets are considered as case reports, they are available in large numbers, and most importantly, they are supported by prescription data that allow for rough estimates of incidence, and consistently demonstrate far higher toxicity of Baycol across multiple datasets throughout the world. Such data constitute powerful evidence that Baycol is far more toxic than other statins, both in mono-therapy and in combination with gemfibrozil.

## II. Dr. Strom Ignores the Clinical Trial Evidence Demonstrating Baycol's Greater Toxicity

11. Dr. Strom asserts that clinical trials are at the top of the "hierarchy of reliability" of scientific evidence. (Strom Report, ¶ 12). Accordingly, it is surprising that Dr. Strom's report makes no mention whatsoever of the clinical trial data compiled by Bayer itself, as described and analyzed in my Report of November 24, 2003, at ¶¶ 122-124. These data show that Baycol monotherapy was significantly more toxic in producing rhabdomyolysis at both the 0.4 mg and 0.8 mg doses, with highly statistically significant results. These clinical trial data are consistent with and supportive of the analysis based upon compilations of adverse event reports and prescription data. Dr. Strom offers no explanation for his failure to even address the type of evidence he claims to find most persuasive, and that evidence refutes his assertion that Baycol monotherapy is no more toxic than other statin drugs.

## III. The Proportional Reporting Ratio (PRR) Method is a Noncontroversial Method of Validating Other Approaches to Adverse Event Analysis

12. The PRR method is described in some detail in my earlier Report. Briefly, this method compares the number of adverse event reports of a particular type to the total number of adverse events reported for the same drug. Here, the proportion of rhabdomyolysis cases in comparison to all other adverse events was significantly higher for Baycol than for any other statin, yielding a PRR of 12.8 for monotherapy and 66.9 for combination therapy with gemfibrozil. These data are remarkably consistent with the magnitude of elevated RRs for Baycol based upon the ratios of rhabdomyolysis adverse events in proportion to the number of

prescriptions or patient years of exposure to each statin, which resulted in RRs of 7.8 and 66.3 for monotherapy and combination therapy, respectively. Such consistency is an important element of epidemiologic analysis confirming and assisting in validation of the greater toxicity of Baycol.

13. In his report, Dr. Strom makes several unpersuasive criticisms of the PRR method. First, Dr. Strom claims that the method is "controversial". However, this claim is undermined by Dr. Strom's own textbook, Pharmacoepidemiology (3d ed. 2000), which includes an article describing use of the PRR method, without criticism. Wiholm, et al., "Spontaneous Reporting Systems Outside the U.S.", id. at 175-192. The four authors of that article represent a spectrum of reputable authority, including members of both the World Health Organization Collaborating Center for International Drug Monitoring and the Medicines Control Agency (the British equivalent of the United States FDA). Furthermore, Bayer itself knew of the use of the PRR method by Australian regulators in assessing Baycol's toxicity relative to other statins, and Bayer's internal document shows no criticism of that methodology.[6]

14. Next, Dr. Strom quotes a portion of the article from his textbook suggesting that PRRs "are measures of association and not causality" (Strom Report at ¶ 19), but Strom omits comments from the same authors stating that a causal connection between an adverse event and a drug may be made on the basis of adverse event reports where "there is a cluster of exposed cases reported, the background incidence of the adverse event is close to zero, and there is no confounding" (id. at 186), conditions which apply to the Baycol analysis. Strom

[6] See BAYCORP01510052, Bayer Internal Memo, to Elizabeth Stoeckert:

> "While the current safety issue with cerivastatin relates to the gemfibrozil/cerivastatin combination, we have little doubts that the same safety concern will also have an impact on our registration application for cerivastatin 0.8mg tablets. This is because nearly half of the rhabdomyolysis cases reported to ADRAC [Australian regulatory authority] are related to cerivastatin monotherapy. Both the absolute number and proportion (with all ADRs reported as the denominator) are relatively higher than the other statins currently available on the Australian market."

The latter reference to "proportion" is the same PRR method used in my Report.

also omits the same authors' statements supporting the use of adverse event and prescription data to estimate incidence rates (see ¶ 3, above).

15. Third, Dr. Strom concedes that the PRR method "may be expected to counteract some of the biases related to variable reporting." In particular, the potential for new drug bias is counteracted because all of the reporting pertains to the same drug, rather than to different drugs that have been on the market for shorter or longer periods of time. Dr. Strom suggested that publicity surrounding a particular type of adverse event could lead to increased reporting of that adverse event, even in the absence of a true increased rate for that event, which would then lead to a falsely elevated PRR. However, this speculation is contradicted by the facts that Dr. Strom has failed to mention: as noted previously, both methods of adverse event analysis showed remarkably similar elevations in rates of rhabdomyolysis due to Baycol in 1998, before publication of any case reports of rhabdomyolysis associated with Baycol, and also for 1999, despite minimal publicity concerning a single such case report. Therefore, the elevated PRR for rhabdomyolysis due to Baycol cannot be attributed to publicity about that type of adverse event.

16. Instead, the PRR method is consistent with other information and supports the conclusion that Baycol causes far more rhabdomyolysis than other statins.

## IV. <u>The PacifiCare Study was a Belated Response to Signals of Baycol's Greater Toxicity</u>

17. My earlier Report discussed the PacifiCare study at length. In that study, a private HMO reviewed claims data to compare the number of myopathy related claims in the database for each statin. Dr. Strom states that,

> When questions were raised concerning Baycol and rhabdomyolysis based on reports to the Medwatch system, undertaking the Pacificare study was a responsible and appropriate response to those questions.

(Strom Report at ¶ 11.) However, Dr. Strom's characterization of the PacifiCare study does not take into account the time when questions were raised, nor the date when the PacifiCare study was ultimately begun. As discussed above, evidence of Baycol's greater toxicity had appeared

by no later than the end of 1998, according to both the higher RR using adverse events divided by patient years of exposure, and the PRR method. Bayer's own internal documents indicate that analysis of reports through June 1999 showed more rhabdomyolysis with Baycol than with other statins, both in monotherapy and combination therapy with gemfibrozil. The PacifiCare study was not approved until October 2000, almost two years after the signal of greater toxicity was available through adverse event review. Setting aside for the moment the methodological issues affecting proper interpretation of the PacifiCare study, it would have been "responsible and appropriate" for Bayer to conduct an epidemiologic investigation much closer in time to the availability of the signal.

## V. PacifiCare Data Demonstrate Increased Toxicity of Baycol in Monotherapy as Well as Combination Therapy

### A. PacifiCare Data Show Greater Toxicity of Baycol Monotherapy Among Patients Who Never Switched Statins

18. The PacifiCare authors state that Baycol in combination with gemfibrozil caused more myopathy than other statins in combination use, but they erroneously report that there was no increase in myopathy for Baycol versus other statins in monotherapy. Dr. Strom adopts the PacifiCare authors' conclusion that Baycol monotherapy is no more toxic than other statins, without mentioning that the data contradict that conclusion.[7]

19. In particular, as pointed out in my Report of November 24, 2003 (¶¶ 103-104), Table 13 of the February 14, 2003 PacifiCare study shows a statistically significant increase in myopathy among Baycol patients as opposed to users of all other statins, among the category of individuals who had never switched statins (RR = 1.54, $p < 0.0001$). The "never switched" patient population was the most appropriate group to analyze, for the reasons stated in my earlier Report, and this methodology was also recommended by Bayer's consultant, Dr. Faich.[8]

[7] Dr. Strom (¶ 14) mistakenly asserts that PacifiCare's conclusions relate to "rhabdomyolysis", when in fact PacifiCare explicitly studied the broader category of "myopathy", including, among other diagnoses, "myalgia."

[8] Monotherapy: RR = 1.54 based on "never switched" category without correction; RR = 2.33 with correction for duration of exposure; RR = 4.75 with additional correction for nondifferential

20. The PacifiCare authors mistakenly failed to use the "never switched" category as the basis for their analysis, despite Dr. Faich's recommendations. Instead, as noted in my earlier Report, the PacifiCare authors reported their conclusions based upon all statin users. Because this included a much larger population of Baycol users who had survived other statins without adverse events, the PacifiCare Baycol population was inherently less susceptible to statin injury than the populations exposed to the other statins. This biased the results in favor of Baycol, pursuant to the "healthy person effect," a well-known source of selection bias. Dr. Strom concedes that this is a "plausible theory" (Strom Report at ¶ 21). However, he goes on to describe several alternative theories that have little relevance to the issue. For example, Dr. Strom asserts that patients may have been switched to Baycol in order to save money. Such economic motivations, even if true, have no bearing upon the interpretation of the data. Instead, the fact that the patients had taken other statins without any events requiring them to discontinue such medications necessarily means that the Baycol population was generally more tolerant of statins than a "naive" population (i.e., one that had no prior statin exposure). Dr. Strom states that the net effect cannot be determined without performing the requisite analysis, but this is incorrect. The net effect is readily determined by performing the statistical calculations on the population of persons who never switched statins, and the PacifiCare authors themselves report that data (Table 13, Study No. 3, February 14, 2002 version). The PacifiCare data show that Baycol is more toxic, in monotherapy as well as combination therapy, consistent with other sources.

21. It is noteworthy that Bayer's scientists were well-aware of the "healthy person" effect and in fact sought to use it to their perceived advantage. In designing a clinical trial for a proposed 1.6mg Baycol dose (never marketed), Bayer proposed that trial participants "should have be [sic] pretreated with a statin to assure they are tolerating." BAYAG00144210. In other words, Bayer wanted subjects who tolerated other statins prior to the Baycol trial,

---

misclassification. RRs for combination therapy are 6.24 with correction for duration of exposure and 7.18 with additional correction for non-differential misclassification.

because their statin tolerance would provide a lower risk of reportable adverse muscle effects in the trial. This is precisely the same principle that biased the PacifiCare study in Baycol's favor, because a higher percentage of Baycol users had demonstrated statin tolerance by their prior use of other statin drugs without adverse effects.

### B. Failure to Correct for Baycol's Shorter Duration of Exposure Was a Methodologic Error That Necessarily Biased the Results in Baycol's Favor

22. Dr. Strom contends that the correction for duration of exposure described in my earlier Report would not significantly affect the results of PacifiCare, because a large percentage of patients who developed rhabdomyolysis while on Baycol did so within the first one to two months after initiating therapy, according to his review of spontaneous Medwatch reports. However, Dr. Strom's position once again ignores the facts, as explained below:

a. First, the PacifiCare data themselves directly refute Dr. Strom's contention, by showing that substantial numbers of myopathies were diagnosed throughout the period of the study, both very soon after exposure to Baycol and after prolonged therapy. In particular, Table 10 of the PacifiCare study #3, 2/14/02, shows the mean duration of 188.5 days' exposure to Baycol before myopathy was diagnosed, as well as a standard deviation of 162.9 days. The latter figure of one standard deviation means that two-thirds of the myopathy diagnoses occurred during 188.5 ± 162.9 days of Baycol therapy, that is, during a range from 26 days to 351 days of Baycol use. The remaining one-third of cases would have fallen outside of these parameters, thereby including cases of even longer duration of exposure before myopathy diagnoses. Thus, a large percentage of Baycol patients' myopathies were not diagnosed until well beyond the 259-day mean duration of exposure. Accordingly, the shorter duration of exposure to Baycol than to other statins indisputably had a significant effect in reducing the number of patients who would otherwise have had myopathy diagnoses, thereby resulting in a bias favoring Baycol.

b. Second, the Medwatch reports cited by Dr. Strom, showing relatively rapid onset of rhabdomyolysis, have little to do with the pattern of reports in the PacifiCare study, which did not analyze rhabdomyolysis alone, but instead evaluated a collection

of various muscle complaints, under the broad heading of "Myopathies." As noted in my previous Report, this aspect of the PacifiCare study design inherently resulted in misclassification of cases, a phenomenon noted by FDA analysts as well as Bayer's consultant Dr. Faich, and even Dr. Strom admits that misclassification is "a potential bias in any study based on administrative claims data." (Strom Report at ¶ 22). Dr. Strom's argument fails to take into account that various muscle ailments would have occurred among a large, elderly HMO population throughout the period of the PacifiCare study, since the misclassified cases by definition had nothing to do with exposure to Baycol nor any of the other statins. Indeed, defendants' other experts rely on the high background rate of miscellaneous muscle complaints, especially among elderly persons, to urge caution in attributing such complaints to Baycol or other statins. (*See, e.g.*, Report of Dr. Dorfman, 1/12/04, ¶ 21.) Because the period of exposure to Baycol was shorter than for any other statin, and because the PacifiCare data shows that misclassified muscle complaints continued throughout the period of the study, the failure to correct for Baycol's shorter duration and exposure necessarily biased the results in Baycol's favor. The rapid onset of true rhabdomyolysis cases reported to Medwatch is of limited, if any, relevance to this issue.

c. Finally, published scientific literature indicates that myopathy associated with statins can and does occur both early and late in the course of therapy. For example, it has been reported in the case of Lovastatin that "[t]he duration of therapy before the onset of myopathy varied from a few weeks to over two years." Tobert, "Efficacy and Long-Term Adverse Effect Pattern of Lovastatin," American Journal of Cardiology 1988; 62:28 J-34J, at 29J. Since Baycol is the most toxic of statins, it is not surprising that there is an early spike of myopathies and rhabdomyolysis events within the first few months of treatment. However, this does not mean that the risk ends after a few months; instead, the risk continues throughout the course of therapy for Baycol, just as it does for Lovastatin.

23. Thus, it is highly likely that the shorter duration of Baycol use biased the results in favor of Baycol, and that if Baycol had been used for the same duration as other statins,

there would have been proportionately more cases of myopathy. The failure to adjust for duration is inconsistent with other reporting sources, and with proper epidemiologic methods.

C. Misclassification of Cases Significantly Biased the PacifiCare Results

24. As mentioned above, Dr. Strom concedes that misclassification of cases was likely, and that such an effect would "bias the study toward observing the absence of an effect." (Strom Report at ¶ 22). However, Dr. Strom incorrectly asserts that "overwhelming misclassification" was unlikely, since PacifiCare did find Baycol to be more toxic than other statins when used in combination with gemfibrozil. The flaw in this reasoning is its failure to take into account the dramatic difference in the magnitude of the risk of combination therapy between PacifiCare's results and those of other sources.

25. Specifically, PacifiCare data show a Relative Risk of only 6.24 for Baycol with gemfibrozil in comparison to other statins combined with gemfibrozil.[9] In contrast, analysis of AERs and the PRR both showed that Baycol in combination with gemfibrozil was 55 to 67 times more likely to cause rhabdomyolysis than the average of all other statins,[10] or about 10 times greater than the RR reported by PacifiCare for combination use. The likely and logical factor contributing to this large difference is that misclassification of cases artificially moved the PacifiCare relative risk of combination therapy downward and closer to 1.0, (i.e., toward the absence of an effect), for the reasons explained in my earlier Report. Thus, although the RR for Baycol plus gemfibrozil was statistically significant in PacifiCare, it would likely have been far higher if not for the misclassification effect.

26. Dr. Strom objects to correction of the PacifiCare misclassification effect

[9] Using the "never switched" group and correcting for duration; see November 24, 2003 Report, ¶¶ 106-107, Fig. 16.

[10] November 24, 2003 Report, ¶¶ 60, 74, 96, and Figs. 2, 5, 13.

by reference to "confirmed" versus "unconfirmed" adverse event reports. However, such objections are neither principled nor persuasive. As a preliminary point, it is noteworthy that the PacifiCare data for the "never switched" group show statistically significant increased incidence of myopathy with Baycol monotherapy and combination therapy, regardless of whether any correction factor is applied. (See ¶ 19, above). Nevertheless, the use of reliable data to apply such a correction is appropriate, to enhance the accuracy of the PacifiCare results by addressing widely noted sources of uncertainty in the study data.

27. Dr. Strom asserts two challenges to the correction for the misclassification effect. First, he contends that the adverse event reports themselves are not a reliable source of information about comparative risk of Baycol versus other statins. However, as noted above and in my earlier Report, this contention is refuted by several respected sources, including the authors of chapters published in Dr. Strom's own textbooks. In fact, the reliability of the adverse event data is actually supported by the findings of statistically significant increased relative risk when the "confirmed" cases are compared to those that are merely "suspected." This is precisely the type and direction of effect one would expect where there is a true causal association between the drug in question and the increased incidence of disease. That is, since non-differential misclassification tends to <u>lower</u> the relative risk toward 1.0 (<u>i.e.</u>, the absence of an effect), reduction or elimination of such misclassification has the opposite effect of <u>increasing</u> the relative risk and tending to show the true strength of association. This was the result of the process of establishing criteria and reviewing patient-specific data to confirm the cases, as was done with the adverse event reports described in my earlier Report.[11]

28. Dr. Strom further objects that it is improper to apply a correction factor from adverse event data set to a cohort study, simply because the two analyses have different study designs. However, Dr. Strom cites no authority for such a limitation, which is in fact antithetical to the scientific process. Scientists make use of available, reliable information to analyze data, discover and elucidate true relationships, while rejecting those that are not

[11] *See* Report November 24, 2003, ¶¶ 115-117.

supported by the evidence. In this case, the misclassification effect is a generally accepted phenomenon, and Dr. Strom himself so admits. To my knowledge, all reviewers of the PacifiCare study, including Dr. Faich, the FDA, and Bayer itself, have lamented PacifiCare's lack of record review to confirm cases. The adverse event data sets were subjected to this type of review and confirmation process, resulting in more reliable, statistically significant increased relative risk of Baycol versus other statins, when confirmed cases were compared to suspected cases. There is a sound basis to conclude that a similar review of the PacifiCare data would give rise to a similar result; misclassified cases would be removed from the analysis, and the relative risk would be increased, more closely representing the true state of affairs. Therefore, it is appropriate and scientifically sound to use the adverse event data analysis to estimate a correction factor for the admitted misclassification effect in the PacifiCare study, thereby enhancing the accuracy of the PacifiCare results and their consistency with other data.

D. **<u>Distribution of Free Samples Biased the Results in Favor of Baycol</u>**

29. Dr. Strom questions the impact of distribution of free samples of Baycol on the results of the PacifiCare study, going so far as to claim that there is no definitive documentation that free samples were even distributed during the time of the PacifiCare study. Instead, Bayer internal documents show that approximately 55% of all Baycol 0.8mg doses were samples, compared to only 45% in the form of written prescriptions, from the approval of that dosage in the Summer of 2000 until March 27, 2001 (BAYCORP 00147357), contemporaneous with the time period for which the PacifiCare study collected its data. Furthermore, the limitations stated by the PacifiCare authors to the FDA included "couldn't capture use of free samples." (BAYCORP 01454772). The same FDA review documented that the PacifiCare study was conducted during a period of dramatically increasing use of Baycol at that HMO. (<u>Id.</u>) It is common knowledge among medical professionals that the use of samples typically accompanies marketing and promotion of a newer drug being introduced to the formulary. Dr. Strom's contention that free samples of other statins were also likely to have been distributed is simply not credible, since it is known that the HMO was in the process of <u>switching to Baycol</u>,

not to other statins. Finally, Dr. Strom misses the main concern over misattribution of cases due to free samples. Because the PacifiCare study identified users based on their prescriptions, a patient who suffered from myopathy while taking Baycol free samples would have been mistakenly attributed to the prescribed statin, where the onset of myopathy occurred within 30 days of the prescription having been written. The PacifiCare data show that muscle complaints occurred both early and late in the study period, and the study design dictated that the early cases would have been misattributed to the prescribed medication rather than the Baycol free sample.

E. **"Claims Lag" Biased the PacifiCare Results in Baycol's Favor**

30. Dr. Strom also misses the point concerning the phenomenon of a "claims lag," which refers to the delay of approximately 6 months between the provision of services and the entry of the data upon which the authors based their counts of cases. The evidence clearly documents this phenomenon, and the FDA noted that "medical data lag time (180 days) caused at least 4 patients with myopathy to be excluded." (BAYCORP 01454772). PacifiCare's authors specifically admit the "medical claims data lag of 180 days" which may have resulted in failure to capture all myopathy claims. (MDL-NP-FAISCHGE 00001061.) Because Baycol use was increasing rapidly, the claims lag would have differentially caused a loss of myopathy claims due to Baycol, in comparison to other statins. Dr. Strom asserts that this would not be a problem if there were a similar lag time in the entry of prescription data, but there is no evidence of such delays, and if such a lag had existed it likely would have been described in the PacifiCare authors' statement of the limitations of the study. Instead, the evidence shows delays in the entry of the medical claims, rather than the prescription data, as well as documented losses of myopathy claims due to this phenomenon.

F. **PacifiCare May Have Been a "Cohort Study," But It Was Not an "Ideal Study Design"**

31. Dr. Strom asserts that the PacifiCare cohort study was "an ideal study design for evaluating the signal raised by the Medwatch system." (Strom Report at ¶ 13). I am not aware of any unbiased professional who shares that view. Certainly, the FDA analysts found significant flaws in the PacifiCare study design, as noted in my Report of November 24, 2003.

Similarly, Bayer's consultant Dr. Faich also noted substantial problems, including the issues of misclassification and lack of record review to confirm diagnoses related to statin exposure.

32. Equally important, Dr. Strom's own previously published articles provide an additional source of concern about the PacifiCare study design. In particular, Dr. Strom has previously written about the circumstances in which pharmacoepidemiologic analysis of adverse events can or cannot be reliably conducted on the basis of a database of administrative claims. Dr. Strom concluded that one factor which makes such a study design useful is that the adverse event in question is readily susceptible to "objective, laboratory-driven diagnoses." In contrast, Dr. Strom found administrative claim data to be "problematic" where the outcomes in question are "poorly defined by the ICD-9-CM coding system." Strom, "Data Validity Issues in Using Claims Data," Pharmacoepidemiology and Drug Safety 2001; 10:389-392 at 392.

33. The PacifiCare study has been criticized for its overbroad definition of the muscle conditions studied, which are not "objective, laboratory-driven diagnoses," but instead encompass the type of nonspecific, poorly defined complaints leading to inaccuracies in data analysis, as described in Dr. Strom's prior publications. In fact, the PacifiCare "myopathy" definition actually includes "myalgia," the very same condition that Dr. Strom's report describes as "a common complaint in the general population," even in the absence of statin exposure. (Strom Report at ¶ 25.) This design problem could have been avoided if PacifiCare had included record review and had been limited to rhabdomyolysis claims, since objective tests of elevated CPK would have provided the type of laboratory evidence that Dr. Strom found to be a reliable basis for an administrative claims-based study. However, since the PacifiCare authors ignored the recommendations of Bayer's consultant to conduct the study based on adequate record review, Dr. Strom's criterion for reliability of administrative claims data could not be met. In light of this shortcoming, it is all the more remarkable that the PacifiCare study found any statistically significant effects, and it is likely that the effects would have been far greater if not

for the methodological defects that muddied the waters.[12]

G. Summary

34. In summary, the evidence relating PacifiCare to the other types of analysis shows consistency in two different ways. Most importantly, different methods of study all show highly statistically significant differences with the same direction of the effect, that is, Baycol is shown to be more toxic than other statins, by every data source. A secondary type of consistency refers to similarity of the magnitude of the effect, or strength of association. Here, the adverse event analysis, the PRR, and the Staffa NEJM article all show very similar, highly elevated relative risks. PacificCare, while providing consistency in the direction of effect, yields lower relative risks, likely due to the design of the study. When appropriate corrections are applied, the relative risks of Baycol's toxicity based on PacificCare are more consistent with the other sources, and more likely to reflect the magnitude of the increased risk of Baycol.

## CONCLUSION

35. For the reasons stated above, and in my earlier Report, the far higher toxicity of Baycol in monotherapy and in combination with gemfibrozil is demonstrated by multiple methods and data sources. Several sets of adverse event reports independently provide consistent evidence of statistically significant increased risk of Baycol; meta-analysis was not necessary to demonstrate this effect, but instead provides a unified and comprehensive estimate of the overall increased risk. Contrary to Dr. Strom's assertions, these are neither case reports nor case series, but instead constitute appropriate population data for epidemiologic analysis, especially where reliable prescription information serves as a surrogate for duration of exposure and allows for the type of incidence estimates endorsed in Dr. Strom's own textbooks. The PRR

[12] Dr. Strom incorrectly relies on PDR entries, summarizing clinical data, to assert that the risk of "myalgia" is no greater for Baycol than for other statins. As noted in detail in my earlier Report, clinical trials provide incomplete information about adverse events, because of their small, relatively healthy subject population, in comparison to actual patients who use the products. Among actual users, Baycol was statistically significantly more toxic, not only with respect to rhabdomyolysis, but also with respect to the broader category of "myopathies," including "myalgias." This was demonstrated both by Australian ADRAC AER data (BAYCORP 01645109), and the PacifiCare data for those who never switched statins. *See* Report, November 24, 2003, ¶¶ 37, ¶¶ 100-104.

method provides very consistent estimates of increased risk of Baycol assisting in validation of Baycol's greater toxicity. The PacifiCare data also independently show statistically significant increased risk of Baycol, in monotherapy or combination therapy, with or without correction. The application of a correction factor based upon sound scientific methods results in a more accurate and consistent estimate of the true relative risk. Finally, evidence compiled by Bayer from randomized clinical trials, the study design ranked most highly by Dr. Strom, also shows that Baycol was more toxic, to a statistically significant degree. All of these sources show that Baycol is by far the most toxic statin, both in monotherapy and combination therapy.

Dated: January 21, 2004

John W. Farquhar, M.D.
John W. Farquhar, M.D.