**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| **In re: BAYCOL PRODUCTS LITIGATION** | ) | **MDL NO. 1431** |
| | ) | |
| **This Document Relates to: All Actions** | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF STEPHEN RASKIN, M.D.**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .......... 1

II. DR. RASKIN'S EXPERT OPINION IS ADMISSIBLE .......... 5

A. The Standard For Admissibility Of Expert Testimony Is Liberal. .......... 5

B. Dr. Raskin's Testimony Will Be Helpful To The Jury. .......... 7

C. Dr. Raskin's Opinion Is Based Upon Relevant Facts .......... 11

III. DR. RASKIN'S OPINIONS ARE ADMISSIBLE AS TO THE INACCURACY OF THE LABEL COMPARED TO THE SCIENTIFIC EVIDENCE .......... 13

IV. CONCLUSION .......... 20

# TABLE OF AUTHORITIES

**Page**

## CASES

*Cummins v. Lyle Indus.*
93 F.3d 362 (7th Cir. 1996)....................11, 12

*Daubert v. Merrill Dow Pharm., Inc.*
509 U.S. 579, 113 S. Ct. 2786 (1993)....................6, 16

*DeWitt v. Brown*
669 F.2d 516 (8th Cir. 1982)....................12

*First Nat'l Bank v. Benham*
423 F.3d 855 (8th Cir. 2005)....................12

*Hartley v. Dillard's, Inc.*
310 F.3d 1054 (8th Cir. 2002)....................6

*In re Diet Drugs*
2000 WL 876900 (E.D. Pa., June 20, 2000)....................13, 15

*Kumho Tire Co. v. Carmichael*
526 U.S. 137, 119 S. Ct. 1167 (1999)....................6

*Lauson v. Senco Prods.*
270 F.3d 681 (8th Cir. 2001)....................5

*Mauldin v. Upjohn Co.*
697 F.2d 644 (5th Cir. 1983)....................17

*Stahl v. Novartis Pharms. Corp.*
283 F.3d 254 (5th Cir. 2002)....................16, 17

*United States v. Dico, Inc.*
266 F.3d 864 (8th Cir. 2001)....................6

## OTHER AUTHORITIES

Bruce M. Psaty, M.D., Ph.D., et al., "Potential for Conflict of Interest in the Evaluation of Suspected Adverse Drug Reactions—Use of Cerivastatin and Risk of Rhabdomyolysis,"
*JAMA*, Vol. 292, No. 21, Dec. 1, 2004....................16

Bruce M. Psaty, MD, PhD and Curt D. Furberg, MD, PhD et al., "Authors' Reply to Bayer's Response to 'Potential for Conflict of Interest in the Evaluation of Suspected Adverse Drug Reactions: Use of Cerivastatin and Risk of Rhabdomyolysis,'"
*JAMA*, Vol. 292, No. 21, December 1, 2004....................4

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Curt D. Furburg MD, PhD et al., "Withdrawal of Cerivastatin from the world market," *Curr. Control Trials Cardiovasc. Med.*, 2:205-207, Sept. 26, 2001 ................................ 3

Judy A. Staffa et al., "Cerivastatin and Reports of Fatal Rhabdomyolysis," *New Engl. J. Med.*, Vol. 346, No. 7, Feb. 14, 2002 ............................................. 5, 11, 14

Michael H. Davidson, "Controversy Surrounding the Safety of Cerivastatin," *Expert Opin. Drug Saf.* 1(3) (2002) ..................................................................... 15

Paul D. Thompson et al. "Statin-Associated Myopathy," *JAMA*, Vol. 289, No. 13, April 2, 2003 ......................................................... 4, 14

**RULES**

Fed. Rule Evid. 702, Adv. Comm. Notes (2000) ..................................................... 6

**TREATISES**

*Charles Alan Wright & Victor James Gold, 29 Federal Practice and Procedure: Evidence* (1997 & Supp. 2005) § 6263 ............................................................................................................ 12

## I. INTRODUCTION

Dr. Stephen Raskin is a practicing cardiologist and Professor of Cardiology who has spent close to thirty years developing expertise concerning issues of direct relevance to this case. Dr. Raskin's expertise was sufficient for Defendant Bayer to retain him as a member of its Advisory Panel in 1999, to educate other physicians about Baycol. With no sense of irony, defense counsel now suggests that the expert physician Bayer retained on its behalf is insufficiently expert to offer testimony in this case. It is particularly unseemly for the defense to criticize the limited number of hours Dr. Raskin needed to develop the opinions set forth in his Report, since this ignores the decades spent to acquire specific expertise in the subject matter. No doubt, if Dr. Raskin had required more time to become familiar with the literature, defense counsel would criticize the size of his bill and claim that he only became an expert developing his expert for the purpose of litigation. The simple fact is that Dr. Raskin knows the literature based on his professional work, and in particular his work concerning Baycol at Defendant Bayer's request. Far from the "hired gun" that Bayer inaccurately portrays, Dr. Raskin has a demonstrated history of working on Bayer's side of the fence which gives him particular objectivity and a unique, important role in the litigation.

It is also significant that Dr. Raskin is a percipient witness as well as an expert witness, and his Report includes both elements. In particular, Dr. Raskin offers not only expert testimony as to the role of statins in cardiovascular health

and their risks, but also provides factual evidence that the information he was given by Bayer to provide to physicians in an educational/marketing setting was materially different from the information known to the Defendant at the same time. Dr. Raskin's dual role as both expert and percipient witness makes it particularly important that juries be permitted to hear his testimony.

Dr. Raskin clearly has the right credentials to assist the jury in understanding relevant issues. He has been a practicing cardiologist, teacher, and researcher for over 28 years. He was Board Certified in Internal Medicine in June of 1976 with a Certification in Cardiovascular Diseases in October of 1977. He is an Associate Clinical Professor of Medicine at the University of California, San Francisco, Medical Center; the Director of the Coronary Care Unit at Alameda Hospital, in Alameda, California and an Attending Physician at the Highland Hospital in Oakland, California, and the Veterans Administration Medical Center in San Francisco. Dr. Raskin is a staff member of Summit Medical Center in Oakland, California, Alta Bates Hospital in Berkeley, California, and the San Leandro Hospital in San Leandro, California. He is a fellow of both the American College of Cardiology and the American College of Physicians, and served on the American Heart Association Council on Arteriosclerosis and Thrombosis and its Council on Clinical Cardiology. (*See* Curriculum Vitae of Dr. Stephen Raskin.) (Ex. A.)

In addition to his cardiology practice, Dr Raskin has a research and continuing education interest in preventive cardiology, including the identification

of novel coronary risk factors and in particular, high cholesterol treatment. In 2003 he co-authored "Genetic analysis of a polymorphism in the human apolipoprotein A-V gene: effect on plasma lipids" for the *Journal of Plasma Lipid Research*. Dr. Raskin's research has also been published in the *American Journal of Cardiology* and the *New England Journal of Medicine*. He has been a frequent lecturer on lipid management and pre-clinical coronary artery disease detection. He was invited by Bayer to participate in its September, 1999 program, "Emerging Trends in the Management of Dyslipidemia: An Update for Speakers of the Baycol Clinical Advisory Panel" as a panel member to promote Baycol, an experience he now regrets. (Expert Report of Stephen Raskin, M.D. ¶¶ 16, 26.) (Ex. B.)

Dr. Raskin not only participated in the promotion of Baycol, he also prescribed this potentially lethal drug to his patients because Bayer withheld information from him about its risks. Dr. Raskin's experience is an example of what happened to many prescribing physicians who unwittingly chose Baycol for their patients. None of Dr. Raskin's patients died, but other doctors were not so fortunate.

From 1998 until withdrawal from the market in 2001, there were 700,000 prescriptions for Baycol in the United States, and subsequent painful and deadly complications were reported to the FDA as adverse events. Curt D. Furburg MD, PhD et al., "Withdrawal of Cerivastatin from the world market," *Curr. Control Trials Cardiovasc. Med.*, 2:205-207, Sept. 26, 2001 *available at*

http://cvm.controlled-trials.com/content/2/5/205. (Ex. C.) The reporting rates for Baycol were much higher than for any other statin. Bruce M. Psaty, MD, PhD and Curt D. Furberg, MD, PhD et al., "Authors' Reply to Bayer's Response to 'Potential for Conflict of Interest in the Evaluation of Suspected Adverse Drug Reactions: Use of Cerivastatin and Risk of Rhabdomyolysis,'" *JAMA,* Vol. 292, No. 21, December 1, 2004 at 2658. (Ex. D.) For monotherapy, the reporting rate ratio was 59-fold higher for Baycol than for Lipitor. *Id.* For combination therapy with gemfibrozil, the reporting rate ratio was 2532 times higher for Bayer than for Lipitor. *Id.* Bayer did not report this information to physicians who prescribed the drug. It is generally accepted that Baycol was the most toxic statin, which caused substantially more muscle injury than other statin drugs.

Eighteen hundred ninety-nine cases of rhabdomyolysis, and 3416 "other adverse reactions" (classified as death, life-threatening, hospitalization—initial or prolonged, disability, congenital anomaly, required intervention to prevent permanent impairment/damage, or other) were reported to the FDA Adverse Event Reporting System (AERS) involving patients taking Baycol. Paul D. Thompson et al. "Statin-Associated Myopathy," *JAMA*, Vol. 289, No. 13, April 2, 2003 at 1684 (Ex. E); Expert Witness Report of John W. Farquhar, M.D. (Ex. F); and *Adverse Event Reporting System (AERS) Office of Postmarketing Drug Risk Assessment, Brief Description with Caveats of System* (October 18, 1999), Defs. Ex. C (Ex. G). Thirty-one rhabdomyolysis cases were fatal. Judy A. Staffa et al., "Cerivastatin and Reports of Fatal Rhabdomyolysis," *New Engl. J.*

*Med.*, Vol. 346, No. 7, Feb. 14, 2002 at 539-540. (Ex. H.) During the time that these adverse events took place, Bayer aggressively marketed the drug to physicians, including Dr. Raskin, and never told them that patients taking Baycol were being seriously injured and dying. Dr. Raskin is a cardiologist who advocates statin drug therapy—and prescribed Baycol—and he offers his expert opinion as to what information from Bayer would have been helpful and decisive in his prescribing practices, namely, that patients taking it were seriously injured or died. Because Bayer withheld this crucial information from him, Dr. Raskin was unable to make an informed decision about which of the statin drugs on the market would be a benefit at the lowest risk to his patients.

For the reasons set forth herein, Dr. Raskin's opinions meet the *Daubert* standard and should be admitted.

## II. DR. RASKIN'S EXPERT OPINION IS ADMISSIBLE

### A. The Standard For Admissibility Of Expert Testimony Is Liberal.

As set forth in *Lauson v. Senco Prods.*, 270 F.3d 681, 686 (8th Cir. 2001):

> the Federal Rules of Evidence 702 governs admissibility of expert testimony. See Fed. Rule 702. "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony." *Weisgram v. Marley Co.*, 169 F.3d 514, 523 (8th Cir. 1999) *aff'd*, 528 U.S. 440, 145 L. Ed. 2d 958, 120 S. Ct. 1011 (2000); *see also Daubert*, 509 U.S. at 588 (citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169, 102 L. Ed. 2d 445, 109 S. Ct. 439 (1988)) (highlighting the "'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to 'opinion testimony'"). The rule clearly "is one of admissibility rather

than exclusion." *Arcoren v. United States*, 929 F.2d 1235, 1239 (8th Cir. 1991).

According to the Supreme Court, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 at 152, (1999) 119 S. Ct. 1167 at 1176.

Consequently,

> [a] review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule. *Daubert* did not work a "sea change over federal evidence law," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996).

Fed. Rule Evid. 702, Adv. Comm. Notes (2000).

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579, 596, 113 S. Ct. 2786, 2798 (1993); Fed. Rule Evid. 702, Adv. Comm. Notes (2000) (citations omitted). According to *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002), the factual basis of expert testimony goes to the weight of the opinion evidence, not its admissibility, and exclusion is required only if the expert testimony is so fundamentally unsupported as to offer no assistance to the jury. *See also United States v. Dico, Inc.*, 266 F.3d 864 (8th Cir. 2001) (holding that factual basis for expert opinion goes to credibility, not

admissibility).

**B. Dr. Raskin's Testimony Will Be Helpful To The Jury.**

Dr. Raskin's opinion is based on many factors, including his expertise as a practitioner; as a statin drug researcher; as a member of the Baycol Advisory Panel for Bayer; his review of internal Bayer documents showing Bayer had knowledge of harmful side effects that were not disclosed to him; and his review of the AERS database information showing the excessive reporting rate of injuries and death of patients taking Baycol. Dr. Raskin, like other physicians, relies upon drug manufacturers to provide accurate and complete information regarding the efficacy and safety of their pharmaceuticals. (*See* Raskin Rep. ¶ 12.) As the intermediary between his patients and pharmaceutical companies, Dr. Raskin is qualified to render his opinion as to what information is relevant and necessary when prescribing statins to patients and he is fully qualified to opine as to what information should have been made available to him as a prescribing physician, and as a cardiologist to whom Bayer marketed Baycol. His report is based upon actual events and extensive personal knowledge, including his experience on the "Baycol Advisory Panel" in which he helped Bayer market its drugs to other physicians. (*Id*. at ¶ 16.)

In the role of both a percipient witness and an expert witness, Dr. Raskin offers real-world testimony about his experience prescribing Baycol and other statin therapies. His testimony is relevant to inform the jury as to the facts that he and other physicians seek when making a decision about risks and

benefits of prescribing a drug to any particular patient. Dr. Raskin also reviewed internal Bayer documents showing that in addition to not warning physicians about adverse events, Bayer excluded a patient from the Baycol clinical trials that showed rhabdomyolysis indications, and that Bayer knew Baycol did not provide greater benefits in cholesterol lowering properties than other statins. (Raskin Rep. ¶¶ 8, 25.) Dr. Raskin did need less time to prepare his report, concluding that he had been essentially duped by Bayer into prescribing a dangerous drug to his patients, because of his extensive prior experience and familiarity with the relevant medical literature, the risks and benefits of statins generally, and information about Baycol gained from his work on Bayer's Advisory Panel.

Defendants excerpt out-of-context "sound bytes" from Dr. Raskin's deposition to a misleading and incomplete picture. For example, when Dr. Raskin was asked if the "only evidence you have of greater muscle toxicity for Baycol is the spontaneous adverse event data" he replied, "Yes." But Defendants omit his elucidation in the next sentences:

> A: "And I should say I have the evidence of the Bayer Corporation themselves when they made changes to the package insert through the mechanism of the Dear Doctor letter using the very same data with combination therapy, so I'm also relying on their interpretation of the data they had. I'm relying on Bayer's review of the aggregate data. The raw data, yes, was the adverse event rate reporting. . . . I'm relying on Bayer's request through the Freedom of Information Act way back in February of '99 because they internally were aware of the increased reports that were accruing each month starting with what I believe was a spike and yes, it is in hindsight that is now I

> arrive a this in looking at the untoward number of cases Bayer was aware of. For that reason and reviewing their documents, they found it necessary to do their own internal audit and so we start with the raw data, which is the adverse event rates that were being reported to Bayer. Bayer took it upon themselves to do the aggregate evaluation of that data looking at like statins of the class. They made a change, yes, with the combination therapy, but that same data stands out to me in the monotherapy as being very significant and something I would want to know about."

(Deposition of Stephen Raskin, M.D. at 110:5-25, 111:1-12.) (Ex. I.)

Defendants cut Dr. Raskin off at this point in his deposition and promised to allow him to further explain himself later, but never did allow him that opportunity, and now quote his answers incompletely and out of context. Defendants skip 108 pages ahead in the deposition transcript for a quote and insert it in their motion to exclude his testimony as if it were the next thing Dr. Raskin said:

> Q: And your conclusion that Baycol had a disparate risk relative to other stating is based only on your retrospective analysis of certain adverse event data, correct?
>
> A: Yes.

(*Id.* at 218:7-11.) The context of this question was actually whether Dr. Raskin wanted Bayer to disclose AERS event data to him and other physicians, not what information he evaluated, and it can be expected that 108 pages later, the subject had changed. (*See id.* at 217:1-25.) Such selection of quotes is deceptive. Indeed, Dr. Raskin's Report refers to peer-reviewed literature he reviewed that supported

his opinion, but Defendants make no mention of that testimony. *See* Raskin Dep. at 15:14-16:3 discussing the "voluminous" literature Dr. Raskin has reviewed that was "not billed" to plaintiffs' counsel.

Defendants use selected excerpts to suggest that Dr. Raskin is unfamiliar with AERS data and has not considered potential biases, when in fact his testimony showed substantial familiarity with, and consideration of, such issues. For example, Dr. Raskin testified that he has a "basic understanding of the [spontaneous reporting] system" and some of its limitations, on the basis of peer reviewed literature and attending lectures in the course of his career with respect to postmarketing surveillance. (*Id*. at 130:17-131:8.) Dr. Raskin also testified that he considered the potential "new drug effect" as a source of bias that could explain differences in reporting rates, stating "I specifically looked at the leader in the field, Lipitor at that time, which had just come out within the previous six months and I thought that obviated that bias." (*Id*. at 134:17-21.) Further, Dr. Raskin testified generally to the fact that spikes in the adverse event reports were commonly used by manufacturers of pharmaceutical products that he had prescribed during his career, to inform clinicians of potential safety risks. (*Id*. at 138-146.)

In short, a fair reading of Dr. Raskin's report and deposition demonstrate that he is an experienced, thoughtful academic and clinician, who is familiar with the literature, as well as the strengths and limitations of the data he relied to form his opinions. Defendants exclude Dr. Raskin's explanations and

therefore leave out important information regarding the reliability and validity of his conclusions.

### C. <u>Dr. Raskin's Opinion Is Based Upon Relevant Facts.</u>

Defendants criticize Dr. Raskin for relying on the opinions of Dr. Farquhar. However, it is acceptable and appropriate for experts to cite other experts' work, as long as it adheres to the same standards of intellectual rigor of their professional work. *See Cummins v. Lyle Indus.*, 93 F.3d 362, 369 (7th Cir. 1996). Dr. Farquhar's work meets this standard, because it is based on the same methodology followed by FDA officials in their peer-reviewed publication as to the toxicity of Baycol. *See* Staffa et al., *supra*. Furthermore, Dr. Raskin's review of this information only supplements his experience as a cardiologist and statin prescriber, which also formed the basis of his testimony. Also incorporated here by reference is Plaintiffs' Memorandum in Opposition to Defendants' Motion to Preclude Expert Witnesses From Invoking the Testimony of Other Testifying Experts.

Defendants posit that Dr. Raskin did not cite all relevant facts. But Defendants do not cite which relevant facts are lacking in Dr. Raskin's report. Regardless, Dr. Raskin's testimony is helpful to the jury because it is based upon his experience as a statin therapy expert and prescriber, and because it sets forth the safety information he would have used in his treatment decisions, if Bayer had disclosed it to him and other prescribing physicians. These are relevant facts. In short, Dr. Raskin's opinions are independently sufficient to support admissibility

of expert opinions, and he is entitled to rely in part upon the report of another expert, under applicable precedent. *See Cummins*, *supra*.

Dr. Raskin's testimony regarding the standard of care as to what information physicians want to know when prescribing statin therapy relies on his specialized knowledge and provides necessary insight beyond lay experience. Federal courts allow expert opinion regarding the standard of care in highly specialized topics such as the duties of a reasonable physician in, for example, medical malpractice actions. In a diversity action, state law determines the admissibility of expert testimony regarding the standard of care. *Charles Alan Wright & Victor James Gold, 29 Federal Practice and Procedure: Evidence* § 6263 (1997 & Supp. 2005). Expert testimony is admissible to demonstrate the standard of care under most states' laws. *See DeWitt v. Brown*, 669 F.2d 516, 522 (8th Cir. 1982) (upholding admission of expert testimony to establish the appropriate standard of care in a cause of action for medical malpractice under Arkansas law) *see also First Nat'l Bank v. Benham*, 423 F.3d 855 (8th Cir. 2005) (expert opinion regarding standard of care admissible).

Accordingly, Dr. Raskin can help the jurors understand the standard of care of prescribing physicians and what information physicians require from drug companies in order to accurately inform their patients of the benefits and risks of potential therapies.

## III. **<u>DR. RASKIN'S OPINIONS ARE ADMISSIBLE AS TO THE INACCURACY OF THE LABEL COMPARED TO THE SCIENTIFIC EVIDENCE</u>**

Dr. Raskin opines that Bayer should have used AERS or other post-marketing data to change the warnings on the Baycol label. Defendants take the position that because Dr. Raskin is not an FDA regulator, he cannot offer his testimony. However, it is well established that a physician can permissibly testify to the state of scientific and medical evidence of risk of a pharmaceutical product, and to the question of whether information provided on a label accurately or inaccurately describes the risk. *See, e.g., In re Diet Drugs*, 2000 WL 876900 (E.D. Pa., June 20, 2000), which found that physicians working in the field were:

> fully qualified to opine on the medical facts and science regarding the risks and benefits of the diet drugs in question and to compare that knowledge with what was provided in the text of labeling and warnings on the diet drugs in question. In other words, [plaintiff's experts] are qualified to render an opinion as to the labels' completeness, accuracy, and – it follows from that – the extent to which any inaccuracies or omissions could either deprive a reader or mislead a reader of what the risks and benefits of the diet drugs in issue are or were at the time the labeling was published.

*Id*. at *11. Similarly, Dr. Raskin is an expert on statin therapy, a past member of Bayer's Advisory Panel on Baycol, and well qualified to render an opinion as to the labels' accuracy or inaccuracy in representing the risks and benefits of Baycol.

Defendants state that the AERS data are isolated case reports. (Defs. Mem. at 9.) However, Plaintiffs do not rely upon isolated case reports. Instead,

the evidence shows that Bayer itself compiled complete AERS data and conducted epidemiologic analyses of reporting rates based on such compilations. Furthermore, as the Staffa publication makes clear, it was "[o]n the basis of the finding of a markedly increased reporting rate of fatal rhabdomyolysis in association with cerivastatin," that Bayer moved to withdraw the drug from the U.S. market "with the concurrence with the FDA." Staffa et al., *supra*, at 540. Thus, the AERS data are far from isolated, but instead constituted a substantial body of evidence of excess toxicity that required the drug to be withdrawn.

The sheer numbers of reported serious events associated with Baycol supports the conclusion that the reports were not "isolated." Eighteen hundred ninety-nine cases of rhabdomyolysis, and 3416 "other adverse reactions" (classified as death, life-threatening, hospitalization—initial or prolonged, disability, congenital anomaly, required intervention to prevent permanent impairment/damage, or other) were reported to the FDA Adverse Event Reporting System (AERS) involving patients taking Baycol. Paul D. Thompson et al. "Statin-Associated Myopathy," *JAMA*, Vol. 289, No. 13, April 2, 2003 at 1684; Farquhar Decl. Ex. 9; and *Adverse Event Reporting System (AERS) Office of Postmarketing Drug Risk Assessment, Brief Description with Caveats of System* (October 18, 1999), Defs. Ex. C. Thirty-one rhabdomyolysis cases were fatal, as noted by the Staffa article. Staffa et al. at 540. After the withdrawal of Baycol, more than 100 total fatalities from rhabdomyolysis were identified as associated with Baycol. Thompson et al. at 1681; Michael H. Davidson, "Controversy

Surrounding the Safety of Cerivastatin," *Expert Opin. Drug Saf.* 1(3) (2002) at 207. (Ex. K.) Dr. Raskin is qualified as an academic, researcher and experienced clinician, to provide the opinions stated in his Report concerning the risks of Baycol that were not accurately described in the label; admissibility is supported by medical expertise, with no requirement that Dr. Raskin have expertise in the federal regulations.

Dr. Raskin's is a dual capacity witness who provided both percipient witness factual evidence in his Report. Both Dr. Raskin's scientific/medical expertise and his personal experience as a cardiologist prescribing statin drugs are relevant to support admissibility of his opinions. First, as noted previously, an expert in the relevant field of medicine can testify to the accuracy or inaccuracy of a pharmaceutical label in relation to the scientific evidence. *See In re Diet Drugs, supra*, at *11. Dr. Raskin provided precisely this type of expert opinion in his Report:

> Bayer did not tell practicing cardiologists or the medical community what it knew about the risks of muscle toxicity associated with Baycol. In fact, Bayer misrepresented the risks as comparable to, or probably, safer than other statins on the market . . . when in fact the data Bayer had collected showed a substantially higher risk of muscle toxicity and death. Had I known the information Bayer possessed I would not have prescribed Baycol to my patients and I would not have agreed to participate on Baycol's Clinical Advisory Panel.

(Raskin Rep. ¶ 26.)

Dr. Raskin's opinions concerning the gap between corporate

knowledge and disclosure to doctors is supported by the peer-reviewed literature. As stated in the *Journal of the American Medical Association*, "despite the limitations of the data available, the asymmetry between the information available to the company and the information available to patients and physicians seems striking." Bruce M. Psaty, M.D., Ph.D., et al., "Potential for Conflict of Interest in the Evaluation of Suspected Adverse Drug Reactions—Use of Cerivastatin and Risk of Rhabdomyolysis," *JAMA*, Vol. 292, No. 21 (Dec. 1, 2004) at 2629. (Ex. L.) Dr. Raskin may permissibly testify to the striking imbalance between what was known and what was on the label.

Alternatively, it has been held that a prescribing physician can testify based upon personal knowledge as to whether a warning label adequately warned of risks of the product. Dr. Raskin, as a treating cardiologist who prescribed statins including Baycol, may also be permitted to testify in this regard. Thus, in *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254 (5th Cir. 2002), the district court awarded summary judgment for defendant in partial reliance on an affidavit from a patient's treating physician stating that the manufacturer's warning on a medication was clear and reasonably apprised him of risks. *Id.* at 268. The plaintiff argued that the treating physician was not an expert in the adequacy of pharmaceutical warnings, and that district court should not have considered physician's affidavit without first conducting a *Daubert* hearing. *Id.* at 265. However, in testifying that warnings reasonably notified him of risks, the physician was testifying to personal knowledge, not as an expert, and as such his

testimony was admissible. *Id.* When the doctor testified as to the adequacy of the warning contained in package insert, he was not providing an expert opinion. *Id.* The court then cited *Mauldin v. Upjohn Co.*, 697 F.2d 644, 648 (5th Cir. 1983):

> This court has previously recognized that a treating physician does not necessarily testify in an expert capacity when he or she testifies as to the adequacy of the warning contained in a drug label. Indeed, no expertise outside the treating physician's field is required for such an assessment. As we reasoned in *Mauldin*: Upjohn insists that only an expert in the preparation or construction of medical product warning statements can testify properly as to the issue of adequacy. We cannot accept this argument, for it belies the essential purpose of the warning. Package inserts and PDR references are not written for medical experts schooled and skilled in the writing of warnings. They are written to inform fully and adequately the medical practitioner who is called upon . . . to prescribe the medication. The understanding and perception of [the prescribing physicians] is entirely relevant, for the sufficiency of the warning is dependent upon their reasonably anticipated comprehension.

*Id.* at 265, n5. Thus, Dr. Raskin can opine that Baycol's warnings were not adequate based upon his personal experience.

Contrary to Bayer's assertions, Dr. Raskin does not present himself as a normative expert, however, and does not offer his opinion regarding Bayer's motive, knowledge, intent or state of mind.

> Q: You are not here to be an expert on Bayer's attitude, are you, sir? . . .
>
> A: No.

. . . .

> Q: You don't purport to be an expert on what Bayer believed about the risk of Baycol at particular points in time, correct? . . .
>
> A: I would say exactly, I do not know their perception.
>
> . . . .
>
> Q: You are not an expert in how Bayer assessed that data internally.
>
> A: I do not know how they assessed the data internally.

(Raskin Dep. at 214:24-215:02; 216:2-7; 216:23-217:2; Defs. Mem. at 14.)

Instead, Dr. Raskin's opinion is based upon (1) the gap between the scientific evidence of risk and the information on the label; and (2) his personal experience in determining that the label did not apprise him of the risks. "As a treating cardiologist who regularly prescribes medication to patients I reasonably and necessarily rely upon drug manufacturers to provide accurate and complete information regarding the efficacy and safety of their pharmaceuticals." (Raskin Rep. ¶ 5.) Bayer knew far more about Baycol's risk than was disclosed to the medical community, and Dr. Raskin experienced this firsthand:

> In September, 1999, I attended a conference of the "Speakers of the Baycol Clinical Advisory Panels," hosted by Bayer. The documents I have reviewed indicate that by the time of this conference Bayer had performed the data analysis of adverse event reports . . . showing that Baycol was more dangerous than other statins. Despite this knowledge, Bayer's presentation to the approximately 65 cardiologists who attended made no mention of their analysis, nor the

> higher reporting rates of rhabdomyolysis with Baycol. Instead, the presentation continued to portray Baycol as a safe drug, with no more risk of rhabdomyolysis than other statins.

(Raskin Rep. ¶ 16.)

Dr. Raskin also examined internal Bayer documents that reveal information that he would have wanted to know in his medical practice, including reports as early as March 31, 1999 that 35 Baycol patients had rhabdomyolysis, including some with renal failure. (Raskin Rep. ¶ 9.) By May of 1999, Bayer was aware of at least fifty-eight rhabdomyolysis cases in patients taking Baycol. (*Id*.) This information was not disclosed to the medical community at that time. (*Id*.) Accordingly, Dr. Raskin's testimony explains what he or any other reasonable prescribing physician would have wanted to know. His testimony is important to the jury's understanding of what information doctors require in the practice of medicine generally and particularly in the decision to prescribe Baycol.

Dr. Raskin's personal experience as a prescribing physician also contributed to a significant exchange with defense counsel that is omitted from Defendants' brief. In particular, at his deposition, defense counsel sought to elicit testimony that reporting rate comparisons between drugs were not disclosed in product labels. To the contrary, Dr. Raskin testified that "this is where my expertise is as a clinician and I make use of these adverse reports and so do the drug companies," and he went on to name three specific examples of pharmaceutical product labels that made use of "adverse event reporting to put

certain caveats out there for me to make the right decision. They don't, in so may numbers, say numbers or 10% greater or less, but doing the right thing, they, in fact, do the comparison." (Raskin Dep. at 144:6-145:18.) Further, in response to a question as to whether he could identify a single drug that lists its rates of spontaneous adverse events compared to other drugs in the class, Dr. Raskin testified, "I cannot think of any that have specified numbers. I can think of some that have said more or greater." (*Id*. at 146:1-6.)

Thus, Dr. Raskin's personal knowledge as a clinician, in combination with his medical and scientific expertise, goes to the very heart of this case. Dr. Raskin knows and has testified that drug companies have made labeling disclosures of excess adverse event reports that permitted him to "make the right decision" in prescribing medications for his patients. That is precisely what Bayer did not do here. It is highly relevant that Bayer knew of substantial excess of rhabdomyolysis reported for Baycol than for Lipitor and other statins, yet failed to disclose this information, thereby depriving physicians of the ability to "make the right decision," with the result that unnecessary deaths and severe injuries occurred.

## IV. CONCLUSION

Dr. Raskin was sufficiently expert for Bayer to hire him when it wanted to promote Baycol. This employment was based upon Dr. Raskin's stature in the community of cardiologists, his research in the field of statin therapy, and his general reputation as a physician and scientist. Dr. Raskin's unique role as

both expert and percipient witness makes his testimony particularly relevant and valuable to the juries who will decide these cases.

Dr. Raskin's testimony is admissible, and Bayer's motion should be denied.

Date: June 23, 2006

Respectfully submitted,

LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP

By: /signature on file/
Donald C. Arbitblit

Embarcadero Center West
30th Floor, 275 Battery Street
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

ZIMMERMAN REED, PLLP
Charles S. Zimmerman, #120054
Ronald S. Goldser, #35932
Robert R. Hopper, #208760
Stacy K. Hauer, #317093
651 Nicollet Mall, Suite 500
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844

LOCKRIDGE GRINDAL NAUEN, P.L.L.P.
Richard A. Lockridge, #64117
Robert K. Shelquist, #21310X
Yvonne M. Flaherty, #267600
100 Washington Avenue South, Ste. 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981

***Plaintiffs' Steering Committee***

Don Barrett
Barrett Law Office, PA
404 Court Square North
P.O. Box 987
Lexington, MS 39095

Daniel E. Becnel
Law Offices of Daniel E. Becnel, Jr.
106 West Seventh St., P.O. Drawer H
Reserve, LA 70084

Turner W. Branch
Branch Law Firm
2025 Rio Grande Blvd. N.W.
Albuquerque, NM 87104

Stanley M. Chesley
Waite, Schneider, Bayless & Chesley Co., LPA
1513 Fourth and Vine Tower
One West Fourth Street
Cincinnati, OH 45202

John R. Climaco
Climaco, Lefkowitz, Peca, Wilcox & Garofoli Co., L.P.A.
1220 Huron Road, Suite 1000
Cleveland, Ohio 44115

James R. Dugan
Gauthier, Downing, LaBarre, Beiser & Dean
3500 North Hullen Street
Metairie, LA 70002

Frederic S. Fox
Kaplan Fox & Kilsheimer LLP
805 3rd Avenue, 22nd Floor
New York, NY 10022

Don Hildre
Dougherty, Hildre, Dudek & Haklar
2550 Fifth Ave., Suite 600
San Diego, CA 92103-5624

Will Kemp
Harrison, Kemp & Jones
3800 Howard Hughes Pkwy, 17th Floor
Las Vegas, NV 89109

Dianne M. Nast
Roda & Nast, P.C.
801 Estelle Drive
Lancaster, PA 17601

W. James Singleton
Singleton Law Firm
4050 Linwood Ave.
Shreveport, LA 71108

William M. Audet
Alexander, Hawes & Audet, LLP
300 Montgomery St.
Suite 400
San Francisco, CA 94104

Ted B. Lyon, Jr.
Teb B. Lyon & Associates, P.C.
Town East Tower, Suite 525
18061 LBJ Freeway
Mesquite, TX 75150

Dale I. Larson
Larson King
2800 World Trade Center
30 East Seventh Street
St. Paul, MN 55101

Mark Robinson
Robinson, Calcagnie & Robinson
620 Newport Center Dr., Seventh Floor
Newport Beach, CA 92660

Ron Meshbesher
Meshbesher & Spence Ltd.
1616 Park Avenue South
Minneapolis, MN 55404