# EXHIBIT I

Q. The -- is it fair to say, sir, that you are 15:59:07
of the opinion that Baycol has a higher risk of muscle 15:59:11
toxicity than other drugs in the class? 15:59:15

A. Yes, sir. 15:59:18

Q. The only evidence you have of greater muscle 15:59:22
toxicity for Baycol is the spontaneous adverse event 15:59:25
data, correct? 15:59:29

A. Yes. And I should say I have the evidence 15:59:33
of the Bayer Corporation themselves when they made 15:59:39
changes to the package insert through the mechanism of 15:59:45
the Dear Doctor letter using the very same data with 15:59:48
combination therapy, so I'm also relying on their 15:59:55
interpretation of data they had. I'm relying on 15:59:59
Bayer's review of the aggregate data. The raw data, 16:00:0?
yes, was the adverse event rate reporting. 16:00:10

Q. When you say you were relying on Bayer's 16:00:14
review of the aggregate data, are you referring to the 16:00:17
label changes Bayer voluntarily initiated regarding 16:00:20
Gemfibrozil use? 16:00:25

MR. ARBITBLIT: Objection. 16:00:27

THE WITNESS: No, I'm relying on Bayer's 16:00:29
request through the Freedom of Information Act way back 16:00:35
in February of '99 because they internally were aware 16:00:40
of the increased reports that were accruing each month 16:00:45
starting with what I believe was a spike and, yes, it 16:00:48

is in hindsight and that is how I arrived at this in looking at the untoward number of cases Bayer was aware of. For that reason and reviewing their documents, they found it necessary to do their own internal audit and so we start with the raw data, which is the adverse event rates that were being reported to Bayer. Bayer took it upon themselves to do the aggregate evaluation of that data looking at like statins of the class. They made a change, yes, with the combination therapy, but that same data stands out to me in the monotherapy as being very significant and something I would want to know about.

MR. ISMAIL: Q. Again, I don't want to begin our discussion of Bayer's interpretation of its own data now.

A. Okay.

Q. So I'll promise to come back and let you fully explain what your views are on that matter.

Earlier you indicated that it is your opinion that Baycol has a higher risk of muscle toxicity than other statins. Is your opinion regarding that risk true for all doses of Baycol?

A. I don't believe it is broken down sufficiently to say all doses, but certainly it appeared that in the aggregate of the 0.2 and the 0.3

MR. ISMAIL: Q. Well, I'm only asking you, 19:34:11
sir. 19:34:13
A. Yes. 19:34:14
Q. Because I guess you get to speak only for 19:34:14
yourself. 19:34:17
A. Correct. 19:34:18
Q. And your conclusion that Baycol had a 19:34:19
disparate risk relative to other statins is based only 19:34:26
on your retrospective analysis of certain adverse event 19:34:29
data, correct? 19:34:34
A. Yes. 19:34:37
MR. ISMAIL: Counsel, I promised you, what 19:34:43
seems like days ago, Mr. Black's e-mail to me regarding 19:34:46
the drafting process for expert reports. I, on January 19:34
20th, wrote Mr. Black and said, "With respect to 19:35:03
drafts, we agree that drafts should not be produced, 19:35:06
but presumably this will not foreclose questions about 19:35:13
the drafting process." 19:35:17
MR. ARBITBLIT: I've seen a copy that says, 19:35:17
"Will foreclose the drafting process," so if you have a 19:35:18
copy that says, "Will not," that is not what I've seen. 19:35:21
MR. ISMAIL: Okay. I presume you are not 19:35:24
going to allow me to ask questions about the drafting 19:35:26
process? 19:35:29
MR. ARBITBLIT: Correct. 19:35:30

THE WITNESS: I do not know how they assessed the data internally. 19:32:45 19:32:47

MR. ISMAIL: Q. The men and women at Bayer who looked at the data in question can speak for themselves regarding how they interpreted the reliability of that data, correct? 19:32:49 19:32:52 19:32:58 19:33:01

MR. ARBITBLIT: Objection. 19:33:04

THE WITNESS: I'm sure you are correct. They know how they did it. I'm on the outside looking in here and see an increasing risk. 19:33:05 19:33:07 19:33:13

MR. ISMAIL: Q. Now, if -- as a clinician, you don't want a drug company to tell you its drug is more dangerous if the drug company, in fact, does not believe it to be the case, right? 19:33:18 19:33:36 19:33:40 19:33:43

MR. ARBITBLIT: Objection. 19:33:46

THE WITNESS: Correct, I want a drug company to be forthright and honest. 19:33:46 19:33:47

MR. ISMAIL: Q. So what we get down to, sir, is assuming Bayer interpreted its adverse event data as not reliable indications of a disparate risk with Baycol, in essence, you disagree with that conclusion, right? 19:33:55 19:33:55 19:33:58 19:34:03 19:34:06

MR. ARBITBLIT: Objection. 19:34:08

THE WITNESS: I believe I do and other people do as well. 19:34:09 19:34:10

background material, research, reviewing records not necessarily specific to these proceedings. 13:20:31 13:20:36

Q. Let me rephrase my question. When you prepare bills for Counsel, do you do your best to be complete and accurate in a listing of time that you spend on any engagement? 13:20:39 13:20:42 13:20:45 13:20:48

A. Of course. 13:20:51

Q. You had indicated that counsel for Plaintiffs asked whether you would be willing to look at some documents. Are all the documents that you reviewed in preparation for your expert opinions in this case provided by Counsel? 13:20:56 13:20:59 13:21:01 13:21:06 13:21:11

A. Yes, sir. 13:21:13

Q. Did you do any investigation on your own to -- either literature review or any other source of documents other than those selected by Counsel? 13:21:14 13:21:17 13:21:21

A. I can answer that best in that in my day-to-day proceedings as a cardiologist with a particular interest in lipid management, use of statins, and the fact that I give frequent lectures on the subject, it passes that during the day and this is not billed to Lieff, Cabraser if I'm preparing for such grand rounds or presentation to groups of doctors or health professionals, that I will review a panoply of literature that I've accumulated over decades, really, 13:21:26 13:21:31 13:21:33 13:21:36 13:21:41 13:21:46 13:21:52 13:21:54 13:22:00

and so that common knowledge that I would say, my background knowledge not specific to this proceeding, is voluminous. That is what I bring to the table. 13:22:05 13:22:11 13:22:15

MR. ISMAIL: If you could mark this next document as Exhibit 2, please. 13:22:22 13:22:23

(Whereupon, Defendants' Exhibit 2 was marked for identification.)

MR. ISMAIL: Q. Dr. Raskin, you've been handed Exhibit 2. Sir, is that a copy of your expert report for the Baycol litigation? 13:22:51 13:22:51 13:22:55

A. Yes, it is. 13:22:58

Q. Does Exhibit 2 contain all the opinions you intend to offer at trial for the Baycol litigation, sir? 13:23:00 13:23: 13:23:06

A. Yes. 13:23:08

Q. Do you still stand by everything you say in Exhibit 2? 13:23:09 13:23:11

A. I do. 13:23:13

Q. Did you -- withdrawn. 13:23:14

Who was the principal draftsperson for your report, sir? 13:23:17 13:23:21

MR. ARBITBLIT: Objection. Counselor, I was copied on your e-mail saying that questions concerning the mechanics were not going to be asked in agreement 13:23:22 13:23:25 13:23:28

read on the limitations of adverse event reporting 16:44:[illegible]
rates is the Brewer abstract and JAMA, correct? 16:44:38

A. Correct. 16:44:44

Q. When is the first time you reviewed the 16:44:44
Brewer abstract? 16:44:46

A. This is subsequent to my expert report. 16:44:48

Q. Was this in the last 30 days? 16:44:51

A. Yes. 16:44:53

Q. Would you mind giving a copy of the abstract 16:44:57
to counsel for plaintiffs? 16:44:59

A. Sure. 16:45:01

Q. It is the first we've heard of the Brewer 16:45:03
abstract in connection with your opinions. 16:45:07

A. Yeah. Well, that was just me getting a 16:45:[illegible]
little more information out of the material that I 16:45:10
believe you have from Farquhar. 16:45:13

Q. Prior to being retained as an expert in the 16:45:19
Baycol litigation, you never read an article regarding 16:45:23
the limitations of spontaneous data, correct? 16:45:26

A. I wouldn't say that is correct. In the 16:45:29
past, I have been aware of reports. I believe I had 16:45:32
read an article by Sydney Wolf in JAMA years ago. I've 16:45:39
had a basic understanding of the system and some of its 16:45:48
limitations. I've been to lectures where Dr. Woolsley, 16:45:53
who I now believe is in Arizona -- this is years ago -- 16:45:58

talking about the problems of the current process of 16:46:02
FDA approval of drugs, the issues of side effects, and 16:46:06
how limited preclinical studies are not sufficient to 16:46:13
pick up potentially, and very happily, rare 16:46:19
life-threatening events that occur postmarketing, so 16:46:23
I've had a knowledge of the issue. I haven't made an 16:46:28
in-depth study of it. I've been studying this much 16:46:32
more recently. 16:46:36

Q. And your recent study relates solely to your 16:46:37
work as an expert in the Baycol litigation? 16:46:42

MR. ARBITBLIT: Objection. 16:46:45

MR. ISMAIL: Q. Correct? 16:46:45

A. The recent work, of course, is in the last 16:46:46
month and a half or so, yes. 16:46:48

Q. And your recent study consists of reading 16:46:51
Dr. Farquhar's report, Dr. Straum's report, and the 16:46:54
Brewer abstract, correct? 16:46:57

A. Correct. 16:46:59

Q. You have never written an article regarding 16:47:01
the limitations of spontaneous adverse event data in a 16:47:09
peer-reviewed journal, correct? 16:47:12

A. That is correct. I would consider myself a 16:47:14
practicing cardiologist who has to be aware of the 16:47:17
current limitations when we start drugs and I have to 16:47:22
make use of experts in the field who have certainly 16:47:32

Q. And you have relied on comparisons of reporting rates of rhabdomyolysis between Baycol and the other statins, correct? 16:50:?? 16:50:41 16:50:44

A. Correct. 16:50:47

Q. And you have perceived reporting rate differences between Baycol and the other statins, correct? 16:50:47 16:50:50 16:50:55

A. Correct. 16:50:55

Q. The only bias you considered as a potential explanation for that difference is the new drug effect; isn't that right? 16:50:59 16:51:03 16:51:09

A. I would consider that was a potential bias, yes. 16:51:10 16:51:12

Q. You did not consider any other potential biases that would explain the difference in reporting rates between Baycol and the other statins, correct? 16:51.?? 16:51:15 16:51:19

A. Again, I think that was a major effect and I specifically looked at the leader in the field, Lipitor at that time, which had just come out within the previous six months and I thought that obviated that bias. 16:51:27 16:51:33 16:51:39 16:51:41 16:51:45

Q. I had a different question, Doctor. Whether or not a comparison to Lipitor obviates the new drug bias or not is a separate question. 16:51:46 16:51:51 16:51:55

A. Okay. 16:51:58

Q. Would you agree that if drug companies -- if the statin manufacturers used different coding definitions for adverse events, that would be a potential bias in the reporting rate data?

MR. ARBITBLIT: Objection.

THE WITNESS: Yes.

MR. ISMAIL: Q. You have not controlled for that bias in the data you are relying upon in this case, correct?

A. I am not using that variable, correct.

Q. Have you seen any publications by the FDA containing any caveats for the use of spontaneous adverse event data?

A. I had seen something -- I've only heard and read statements from the FDA, I think chief drug and safety officer, about the limitations of adverse event reporting. Specifically I have not in-depth reviewed regulations and I believe there are people involved in this litigation who have who are expert in the FDA rules and regs.

Q. You are not an expert in FDA rules and regs, are you?

A. No, I'm not.

Q. Whether you have read them in-depth or superficially, have you read any publication of the FDA

containing caveats for the proper use of adverse event data? 16:58:07 16:58:10

A. No, I have not. 16:58:11

Q. All drug companies are required to collect adverse events voluntarily reported with their drugs, correct? 16:58:33 16:58:35 16:58:39

A. They are all required to report it to the FDA, yes. 16:58:41 16:58:43

Q. And you have prescribed a number of drugs over the years, haven't you, Doctor? 16:58:46 16:58:49

A. Yes, I have. 16:58:51

Q. Can you identify a single drug that has listed the number of spontaneous adverse events in its label? 16:58:52 16:58:59 16:59:01

A. Yes, I can. 16:59:09

Q. Which drug is that? 16:59:09

A. Well, with one little caveat, I'm aware of a drug where that occurs, but not a drug that I've prescribed. 16:59:12 16:59:14 16:59:17

Q. Which drug is that? 16:59:17

A. Fenfluramine. 16:59:19

Q. Fenfluramine. It is one of the diet drugs? 16:59:23

A. Yes. Because of a spike, meaning I think only four cases of fatal primary pulmonary artery hypertension, it became evident in the label and it was 16:59:26 16:59:31 16:59:36

-- you know, not a randomized control study. It was because of the concern. 16:59:?? 16:59:48

Q. How many drugs -- different kinds of drugs have you prescribed in the past 27 years? 16:59:49 16:59:52

A. Different kinds of drugs? 16:59:57

Q. Different brands of drugs. 17:00:00

A. Oh, too many to enumerate. Many, many. 17:00:00

Q. More than 50? 17:00:05

A. Probably more than 50. 17:00:06

Q. More than 100? 17:00:08

A. Over my -- yeah; yes. 17:00:09

Q. Over the past 27 years for more than 100 drugs that you have personally prescribed, in no occasion did the drug company list the number of spontaneous reports in association with the medicine, correct? 17:00:14 17:00:19 17:00:?? 17:00:29 17:00:33

A. Not totally correct. When I -- I -- in my experience, I've seen drugs having label changes through the mechanism of the Dear Doctor letter, caveats made based on the raw data we're talking about. The raw data being the adverse event rate reporting. It is because, given its limitations, it becomes the only mechanism for a drug company to let me know that there is an issue. That is before the PI has changed, so if we're talking about specific numbers, no, but I'm 17:00:36 17:00:40 17:00:45 17:00:50 17:00:57 17:01:03 17:01:06 17:01:11 17:01:15

talking about what I really care about. Do you see a blip up there that is important for my patients and their safety, so I'm talking about before the PI comes out. I don't necessarily need to have the number, but I need to know there is a concern.

Q. If I understood your last comment correctly, you are not saying that drug companies need to publish the number of spontaneous reports received with their drugs, correct?

MR. ARBITBLIT: Objection.

THE WITNESS: That is correct in the general statement. No, I do not believe they need to. I believe it is critical that a drug company lets a clinician know if there is a spike in the adverse event reports. If they have credible evidence, given the limitations we've already talked about, that they have a right to let me know so I can make an informed decision for my patients.

MR. ISMAIL: Let's change the tape, please.

THE VIDEOGRAPHER: Sure. This concludes videotape No. 2 in the video deposition of Stephen Raskin. Going off the record. The time on the monitor is 5:01.

(Recess taken.)

THE VIDEOGRAPHER: Here begins videotape No.

3 in the deposition of Stephen Raskin. Coming back on 17:04:4
the record. The time on the monitor is 5:03. Please 17:04:50
begin. 17:05:00

MR. ISMAIL: Q. Dr. Raskin, it is true that 17:05:00
over 27 years, in no time for the greater than 100 17:05:00
drugs that you have prescribed has the drug company 17:05:03
listed the number of spontaneous adverse events in its 17:05:07
label, correct? 17:05:11

A. No, but they've certainly issued black boxes 17:05:12
and other amendments to the PI. 17:05:16

Q. Doctor, I had a specific question and I 17:05:23
believe I'm entitled to a specific answer. And my 17:05:25
question was simply this: Over 27 years, for greater 17:05:27
than 100 drugs, you can't recall a single instance in 17:05.
which a drug company has listed the number of 17:05:39
spontaneous events in its label, correct? 17:05:45

MR. ARBITBLIT: Objection. Asked and 17:05:47
answered. 17:05:47

THE WITNESS: Except I think we mentioned in 17:05:48
the case of Fenfluramine. 17:05:50

MR. ISMAIL: Q. You've not prescribed 17:05:52
Fenfluramine? 17:05:54

A. Correct. 17:05:55

Q. So for drugs that you have prescribing 17:05:55
experience with over 27 years, for greater than 100 17:05:58

drugs, you can't recall a single instance in which the drug company has listed the number of spontaneous events in its label? 17:06:06 17:06:07 17:06:09

MR. ARBITBLIT: Objection. Asked and answered. 17:06:11 17:06:12

MR. ISMAIL: Q. Correct? 17:06:14

A. That is right. 17:06:15

Q. Now, the only drug that you are aware of that lists the number of adverse events in its label, whether you prescribed it or not, is Fenfluramine? 17:06:19 17:06:24 17:06:30

A. Correct. 17:06:31

Q. And you became familiar with that drug and its label through expert work you've done for the Plaintiffs, correct? 17:06:31 17:06:36 17:06:39

A. Incorrect. I was aware of that -- I became aware of that prior to that work in the course -- in routine practice of my specialty. 17:06:43 17:06:49 17:06:55

Q. You became familiar with the Fenfluramine label? 17:06:59 17:07:03

A. Yes. 17:07:04

Q. Okay. Did -- can you identify a single drug that has compared its rate of spontaneous adverse events to another drug in its label? 17:07:04 17:07:14 17:07:21

A. The effect of what you are asking me has -- am I aware of a drug where the package insert comments 17:07:28 17:07:33

on comparative rates of adverse events and that is certainly why some members of the class of thiazole ladindeones developed a black box because the manufacturer was aware of adverse event reporting rates in excess of similar in class. 17:07:40 17:07:47 17:07:51 17:07:55 17:08:00

Q. I had a different question. My question is, can you point me to a single drug in the history of pharmaceuticals that has listed the adverse event reporting rate for its drug compared to another in the class? 17:08:06 17:08:07 17:08:12 17:08:15 17:08:18

A. No, but they made use of that very information. 17:08:21 17:08:23

Q. So the answer to my question is, no, you are not aware of a single drug that has ever listed its reporting rate for adverse events compared to another drug in the class? 17:08:25 17:08. 17:08:31 17:08:34

MR. ARBITBLIT: I think he has answered your question, Counsel. You don't have to ask it four times. 17:08:35 17:08:37 17:08:39

MR. ISMAIL: I'm entitled to an answer to my question and only my question. 17:08:39 17:08:42

MR. ARBITBLIT: I don't think that your question is necessarily yes or no and he is entitled to answer it as he sees fit. 17:08:43 17:08:44 17:08:48

MR. ISMAIL: Q. Doctor, do your best to 17:08:50

answer this question yes or no. Let me ask it again: Can you identify a single drug that has compared its rate of spontaneous adverse events to another drug in the class in its label? 17:08:52 17:08:55 17:09:02 17:09:08

A. In the label -- I don't believe it is a yes or no answer, so I -- 17:09:15 17:09:23

Q. Go ahead. 17:09:23

A. I believe any reasonable -- this is where my expertise is as a clinician and I make use of these adverse event reports and so do the drug companies and I can think of Resulin. I can think of Regulon. I can think of Tegison. These are drugs that make use of specific comparators with -- of the adverse event reporting to put certain caveats out there for me to make the right decision. They don't, in so many numbers, say numbers or ten percent greater or less, but doing the right thing, they, in fact, do the comparison. 17:09:23 17:09:27 17:09:33 17:09:35 17:09:42 17:09:46 17:09:52 17:09:58 17:10:03 17:10:10 17:10:13

Q. Let me ask it this way: I want to make a distinction between making use of reporting rates and publishing reporting rates in the label. Do you understand the distinction I'm drawing? 17:10:15 17:10:19 17:10:24 17:10:29

A. Yes. 17:10:31

Q. We'll talk about permissible uses in a minute. I promise you. 17:10:31 17:10:34

Can you identify a single drug that lists its rates of spontaneous adverse event compared to other drugs in the class? 17:10:27 17:10:43 17:10:46

A. I cannot think of any that have specified numbers. I can think of some that have said more or greater. 17:10:50 17:10:53 17:10:58

Q. So your criticism of Bayer -- withdrawn. 17:11:03

You are not critical of Bayer for not listing its rate of adverse events in its label, are you, sir? 17:11:08 17:11:10

MR. ARBITBLIT: Objection. Misstates testimony. 17:11:15 17:11:16

THE WITNESS: I am critical of Bayer for not bringing to my attention the data on the 0.4 dose, for instance, when they had the same data to make an important change in labeling with use with Gemfibrozil, for Cerivastatin use with Gemfibrozil. That is one of my criticisms. I was not aware of the increased risk of rhabdo with Ceriva based on the very information they had to change the label with combination therapy. 17:11:16 17:11:[illegible] 17:11:27 17:11:29 17:11:35 17:11:41 17:11:51 17:11:54

MR. ISMAIL: Q. You have indicated several times, sir, that you give a -- you attach some significance to the adverse event data because Bayer made label changes you believe on the basis of that data; is that correct? 17:11:56 17:12:04 17:12:10 17:12:15 17:12:19

A. I do not. I believe these closely parallel 19:27:[illegible]
the FDA reporting rates the way they were evaluated by 19:27:13
Merck -- excuse me, by Bayer. 19:27:27
Q. But the answer to my question is you do not 19:27:36
know what methods, how they controlled for biases, if 19:27:38
at all, how they segregated the data, et cetera? 19:27:41
A. Correct. 19:27:44
Q. Okay. You can put that aside. Have you 19:27:44
ever seen a patient, sir, or been aware of a patient 19:28:05
who was stable on Baycol, but developed a myopathy on 19:28:09
another statin? 19:28:14
A. No. 19:28:16
Q. Do you agree, sir, that the Baycol clinical 19:28:36
trials showed Baycol to be safe and well tolerated? 19:28:[illegible]
MR. ARBITBLIT: Objection. 19:28:44
THE WITNESS: In their -- in the clinical 19:28:47
trials I saw, yes. 19:28:50
MR. ISMAIL: Q. Paragraph 21, sir, I'm 19:28:51
trying to get at why you listed this particular 19:29:13
document. You write, "Perhaps indicative of Bayer's 19:29:15
attitude," and you make reference to this e-mail 19:29:18
string, correct? 19:29:22
A. Correct. 19:29:24
Q. You are not here to be an expert on Bayer's 19:29:27
attitude, are you, sir? 19:29:30

MR. ARBITBLIT: Objection. 19:29:32

THE WITNESS: No. 19:29:35

MR. ISMAIL: Okay. 19:29:35

THE WITNESS: I'm here just to comment on what appear to be continued omission to the medical community about their own perceived concerns with the increasing reporting rates and their own data by February 2000. 19:29:43 19:29:43 19:29:49 19:29:56 19:30:02

MR. ISMAIL: Q. Part of my job at the deposition is to understand what you are going to be opining about at trial and what you are not and perhaps save us all a motion down the line. You are not going to go up on the stand and purport to offer opinions about what Bayer's attitude was, are you, sir? 19:30:07 19:30:12 19:30:14 19:30:20 19:30:22 19:30:26

A. I'm using the term "Attitude" loosely. No, I'm not going to say, "And the attitude." I'm going to say -- this is what I'm telling you is that I believe there was a conscious effort to withhold information that I, as a clinician, would deem very important, given the fact that I had a choice in statins, given the point that certainly by February 2000, there was ample evidence, I believe, of an increasing pattern of risk. These reports were continuing to come in and there were obviously comments made about the concern or perception of doctors in different parts of the country 19:30:30 19:30:34 19:30:36 19:30:40 19:30:46 19:30:51 19:30:56 19:31:05 19:31:13 19:31:21 19:31:25

being concerned from their own observations. 19:31:31

Q. You don't purport to be an expert on what Bayer believed about the risk of Baycol at particular points in time, correct? 19:31:37 19:31:42 19:31:46

MR. ARBITBLIT: Objection. 19:31:47

THE WITNESS: I would say exactly, I do not know their perception. I know they did not let me know about their concerns. 19:31:53 19:31:53 19:31:58

MR. ISMAIL: Q. Let's see if we can summarize it this way: You are prepared to opine that your personal perspective is you would have liked to have seen particular types of data, correct? 19:31:59 19:32:02 19:32:07 19:32:11

A. Correct. 19:32:15

Q. And you have pointed to data you believe Bayer had at particular points in time, correct? 19:32: 19:32:17

A. Correct. 19:32:20

Q. You are not an expert in how Bayer assessed that data internally, correct? 19:32:20 19:32:24

MR. ARBITBLIT: Objection. 19:32:27

THE WITNESS: I'm an observer of some key documents noting that Bayer had a concern. 19:32:28 19:32:32

MR. ISMAIL: I had a different question. 19:32:39

Q. You are not an expert in how Bayer assessed that data internally, correct? 19:32:40 19:32:43

MR. ARBITBLIT: Objection. 19:32:45

THE WITNESS: I do not know how they 19:32:45
assessed the data internally. 19:32:47
MR. ISMAIL: Q. The men and women at Bayer 19:32:49
who looked at the data in question can speak for 19:32:52
themselves regarding how they interpreted the 19:32:58
reliability of that data, correct? 19:33:01
MR. ARBITBLIT: Objection. 19:33:04
THE WITNESS: I'm sure you are correct. 19:33:05
They know how they did it. I'm on the outside looking 19:33:07
in here and see an increasing risk. 19:33:13
MR. ISMAIL: Q. Now, if -- as a clinician, 19:33:18
you don't want a drug company to tell you its drug is 19:33:36
more dangerous if the drug company, in fact, does not 19:33:40
believe it to be the case, right? 19:33:43
MR. ARBITBLIT: Objection. 19:33:46
THE WITNESS: Correct, I want a drug company 19:33:46
to be forthright and honest. 19:33:47
MR. ISMAIL: Q. So what we get down to, 19:33:55
sir, is assuming Bayer interpreted its adverse event 19:33:55
data as not reliable indications of a disparate risk 19:33:58
with Baycol, in essence, you disagree with that 19:34:03
conclusion, right? 19:34:06
MR. ARBITBLIT: Objection. 19:34:08
THE WITNESS: I believe I do and other 19:34:09
people do as well. 19:34:10