**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| **In re: BAYCOL PRODUCTS LITIGATION** | **)** | **MDL NO. 1431** |
| | **)** | |
| **This Document Relates to: All Actions** | **)** | |

**<u>PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF DAVID P. RICHMAN, M.D.</u>**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ........ 1

II. DR. RICHMAN'S TESTIMONY IS ADMISSIBLE BECAUSE IT MEETS THE STANDARD FOR ADMISSIBILITY. ........ 2

- A. The Standard for Admissibility of Expert Testimony ........ 2
- B. Dr. Richman's Testimony Meets the Standard Set by Rule 702 and *Daubert* and Should Therefore Be Admitted. ........ 4
- C. Studies Based on AERS Data Are Highly Relevant and Reliable ........ 5

III. THE COURT SHOULD ADMIT DR. RICHMAN'S TESTIMONY THAT BAYCOL IS MORE TOXIC THAN OTHER STATINS ........ 6

- A. Dr. Richman's Conclusions Based on Epidemiology Are Admissible. ........ 7
- B. Dr. Richman's Testimony Is Based on Sound Methodology and Adheres to the Standards of "Intellectual Rigor" and Is Therefore Admissible. ........ 9
- C. Dr. Richman's Opinions Based on Case Reports Are Admissible. ........ 10

IV. DR. RICHMAN'S OPINION CONCERNING STATIN-INDUCED PERSISTENT INJURY IS ADMISSIBLE UNDER DAUBERT ........ 13

- A. Dr. Richman's Opinions Are Based on Sound Methodology, and Cases Defendants' Cite to the Contrary Are Distinguishable. ........ 16
- B. Defendants' Other Attacks on Dr. Richman's Testimony Do Not Impact the Admissibility of His Opinions. ........ 19

V. THE COURT SHOULD ADMIT DR. RICHMAN'S CONCLUSIONS REGARDING DIAGNOSIS OF RHABDOMYOLYSIS AND MYOPATHY ........ 21

- A. Dr. Richman's Opinions Are Admissible Despite Defendants' Efforts to Distort and Discredit Them. ........ 24

VI. DR. RICHMAN'S CONCLUSION THAT BAYCOL AFFECTS CELL MEMBRANES DIFFERENTLY FROM OTHER STATINS IS ADMISSIBLE UNDER *DAUBERT* ........ 27

VII. CONCLUSION ........ 30

## TABLE OF AUTHORITIES

**Page**

### CASES

*Bonner v. ISP Techs., Inc.*,
259 F.3d 924 (8th Cir. 2001) .......... 3

*Broders v. Heise*,
924 S.W.2d 148 (Tex. 1996) .......... 7

*Clark v. Heidrick, M.D.*,
150 F.3d 912 (8th Cir. 1998) .......... 3

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) .......... passim

*General Electric Co. v. Joiner*,
522 U.S. 136 (1997) .......... 16, 17

*Glastetter v. Novartis Pharm. Corp.*,
252 F.3d 986 (8th Cir. 2001) .......... 17

*Group Health v. Philip Morris*,
344 F.3d 753 (8th Cir. 2003) .......... 9

*Hose v. Chicago N.W. Transp. Co.*,
70 F.3d 968 (8th Cir. 1995) .......... 2

*In re Paoli R.R. Yard PCB Litigation*,
35 F.3d 717 (3rd Cir. 1994) .......... 4

*J.B. Hunt Transport, Inc. v. General Motors Corp.*,
243 F.3d 441 (8th Cir. 2001) .......... 18

*Lakie v. SmithKline Beecham*,
965 F. Supp. 49 (D.D.C. 1997) .......... 4

*Larson v. Kempker*,
414 F.3d 936 (8th Cir. 2005) .......... 2

*McClain v. Metabolife Int'l, Inc.*,
401 F.3d 1233 (11th Cir. 2005) .......... 18, 28

*Medalen v. Tiger Drylac U.S.A., Inc.*,
269 F. Supp. 2d 1118 (D. Minn. 2003) .......... 7, 18

*Miles v. General Motors Corp.*,
262 F.3d 720 (8th Cir. 2001) .......... 2

*Moore v. Ashland Chem., Inc.*,
151 F.3d 269 (5th Cir. 1998) .......... 4

*Rosen v. Ciba-Geigy Corp.*,
78 F.3d 316 (7th Cir. 1996) .......... 18

*Turner v. Iowa Fire Equip. Co.*,
229 F.3d 1202 (8th Cir. 2000) .......... 3, 12

*Wehling v. Sandoz Pharm. Corp.*,
No. 97-2212, 1998 WL 546097 (4th Cir. Aug. 20, 1998) .......... 8

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Wilson v. City of Chicago*,
6 F.3d 1233 (7th Cir. 1993) .......... 8

**RULES**

Fed. R. Evid. 702 .......... 2, 9

Fed. Rule Evid. 702, advisory committee's note (2000) .......... 2, 3

**OTHER AUTHORITIES**

A. Mogyorosi, et al., *Rhabdomyolisys and Acute Renal Failure Due to Combination Therapy with Simvastatin and Warfarin*, 246 Journal of Internal Medicine 599, 601 (1999) .......... 21

Allen Brinker et al., *Spontaneous Reports of Hypertension Leading to Hospitalisation in Association with Rofecoxib, Celecoxib, Nabumetone and Oxaprozin*, 21(7) Drugs & Aging 479 (2004) .......... 6

Desylpere et al., *Rhabdomyolysis and Simvastatin*, Annals of Internal Med. (1991) .......... 14

England J. et al., *Mitochondrial myopathy developing on treatment with HMG CoA reductase inhibitors–simvastatin and pravastatin*, 25 Austl. N.Z. J. Med. 374-75 (1995) .......... 20

England, *Mitochondrial Myopathy Developing on Treatment with the HMG-CoA Reductase Inhibitors—Simvastatin and Pravastatin*, Austl. N.Z. J. Med. (1995) .......... 14

England; Chariot et al., *Simvastatin-Induced Rhabdomyolysis Followed by a MELAS Syndrome*, 31 Am. J. Med. 859-63 (1997) .......... 21

G. Fernandez-Zatarain et al., *Rhabdomyolysis and acute renal failure associated with lovastatin* (letter), 66 Nephron 483-484 (1994) .......... 14

Gilad, *Rhabdomyolysis Induced by Simvastatin and Ketoconazole Treatment*, 22 Clinical Neuropharmacology 295-297 (1999) .......... 14

Graham, D.J. et al, *Incidence of Hospitalized Rhabdomyolysis in Patients Treated with Lipid-Lowering Drugs*, 292:21 JAMA 2585 (2004) .......... 9

Grunden et al., *Lovastatin-induced Rhabdomyolysis Possibly Associated with Clarithromycin and Azithromycin*, 31 Annals of Pharmacotherapy 859-63 (1997) .......... 14

Hansen, K.E. et al., *Outcomes in 45 patients with statin-associated myopathy*, 165 Archives of Internal Med. 2671-76 (2005) .......... 14

J.D. Warren et al., *Rhabdomyolysis: a review*, 25 Muscle Nerve 332-47 (2002) .......... 24

K.A. Antons et al., *Clinical perspectives of statin-induced rhabdomyolysisI*, 119 Am. J. Med. 400-409 (2006) .......... 16

Loma Linda University Medical Center, Surgical Pathology Final Reports at 6 (November 27, 2001) .......... 14

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

M.H. Davidson, *Controversy surrounding the safety of cerivastatin*, 1 Expert Opin. Drug Saf. 207-12 (2002) .... 27

Mary Sue Henifin, *Reference Guide on Medical Testimony* in Reference Manual on Scientific Evidence 475 (Fed. Jud. Ctr., 2d ed. 2006) .... 11

P.S. Phillips et al., *Statin myotoxicity is associated with changes in the cardiopulmonary function*, 177 Artherosclerosis 183:88 (2004) .... 16

Phillips et al., *Statin-Associated Myopathy with Normal Creatine Kinase Levels*, 137 Annals of Internal Med. 581-85 (2002) .... 21

S.F. London et al., *Cholesterol-Lowering Agent Myopathy*, Neurology (1991) .... 14

Woodrow, et al., *The Clinical and Biochemical Features of Acute Renal Failure Due to Rhabdomyolysis*, Renal Failure (1995) .... 14

## I. INTRODUCTION

David B. Richman, M.D. is a Professor in the Department of Neurology at University of California at Davis, School of Medicine, in Davis, California. Dr. Richman served as Chair of the Department from 1991 to 1997. He has been Board-certified in Neurology since 1976 and has served as a member of the Special Review Committee of the National Institute of Arthritis, Muscular, Skeletal and Skin Diseases, as well as several National Institutes of Health (NIH) advisory committees. Expertise in muscle function and disease is integral to his field of research, and he has published close to one hundred (100) peer-reviewed articles relating to neurology and muscle disease. Dr. Richman is well qualified to express opinions concerning Baycol as a cause of muscle disease, based upon the reasonable methodology described in his report, which included review of peer-reviewed literature and medical records demonstrating the range of injuries attributable to Baycol. Dr. Richman is entitled to rely upon the consensus in the medical community that Baycol is the most toxic statin, and defendants have cited no literature to the contrary.

The evidence in peer-reviewed literature supports the consensus that Baycol is the most toxic statin. That literature has only grown over time. *(See* Opposition to Motion to Exclude Testimony of John W. Farquhar, M.D., incorporated by reference.) Suffice it to say that Bayer took the drug off the market, and has kept it off the market, based on that evidence.

## II. **DR. RICHMAN'S TESTIMONY IS ADMISSIBLE BECAUSE IT MEETS THE STANDARD FOR ADMISSIBILITY.**

### A. **The Standard for Admissibility of Expert Testimony**

Federal Rule of Evidence 702 requires the district courts to perform a gatekeeping function to ensure the reliability and relevance of scientific evidence. *See generally* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Fed. R. Evid. 702 and subsequently *Daubert* specify only two threshold requirements for admissibility: relevance and reliability. *Daubert*, 509 U.S. at 589. Relevance is satisfied if the evidence assists the jury by making some fact in issue more probably true than it would be in the absence of the evidence. *Id*. at 587. Reliability is satisfied if scientific evidence is "grounded in the methods and procedures of science." *Id*. at 590. Attacks on the soundness of the opinion, the adequacy of methodology used, or the unorthodox nature of a witness' views go only to the weight of an expert's opinion, not to its admissibility. *Miles v. General Motors Corp.*, 262 F.3d 720, 724-25 (8th Cir. 2001); *Hose v. Chicago N.W. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995). "It is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Larson v. Kempker*, 414 F.3d 936, 941 (8th Cir. 2005).

The "rejection of expert testimony is the exception rather than the rule." Fed. Rule Evid. 702, advisory committee's note (2000). The admissibility standard set out by Fed. R. Evid. 702 and *Daubert* was not intended to usurp the role of "vigorous cross-examination, presentation of contrary evidence, and

careful instruction on the burden of proof," which are "the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; Fed. Rule Evid. 702, advisory committee's note (2000). "Doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *Clark v. Heidrick, M.D.*, 150 F.3d 912, 915 (8th Cir. 1998) (citation omitted).

The *Daubert* court provides four general indicia of admissibility of scientific testimony, namely, "(1) whether the expert's methodology has been tested; (2) whether the technique has been subjected to peer review and publication; (3) whether the technique has a known or knowable rate of error; and (4) whether the technique has been generally accepted in the proper scientific community." *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1207-08 (8th Cir. 2000) (citing *Daubert*, 509 U.S. at 593-94). The inquiry, however, is a flexible one. *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (citing *Daubert*, 509 U.S. at 594-95). The *Daubert* decision sets forth that the indicia of admissibility are not exhaustive and do not constitute "a definitive checklist or test." *Daubert*, 509 U.S. at 593. Moreover, these criteria are intended to help evaluate the expert's *methodology*, and not the expert's conclusions. *Bonner*, 259 F.3d at 929.

The standard of proof at this stage of the proceedings is modest. Proponents of scientific evidence "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct,

they only have to demonstrate by a preponderance of evidence that their opinions are reliable. . . . The evidentiary requirement of reliability is lower than the merits standard of correctness." *In re Paoli R.R. Yard PCB Litigation* 35 F.3d 717, 744 (3rd Cir. 1994); *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (*en banc*) ("The proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable."). "The court's only function is to ensure that the expert employed scientifically valid methodologies. Once this is clear, the opinions which follow are admissible." *Lakie v. SmithKline Beecham*, 965 F. Supp. 49, 54 (D.D.C. 1997).

### B. <u>Dr. Richman's Testimony Meets the Standard Set by Rule 702 and *Daubert* and Should Therefore Be Admitted.</u>

As a whole, Dr. Richman's testimony is admissible under the standard set forth by FRE 702 and *Daubert* and its progeny. Dr. Richman's expert opinion will assist the trier of fact to understand the evidence about the toxicity of Baycol, how Baycol and other statins affect the muscles and how myopathy and rhabdomyolysis are diagnosed. Dr. Richman's opinion will ultimately help the trier of fact in determining a fact at issue, namely that Baycol is capable of causing a continuum of muscle damage, from mild to severe.

Dr. Richman is an expert in muscle function and disease, which necessarily includes muscle damage and muscle cell death. (Expert Witness Report of David Richman, M.D. ¶¶ 4, 5 ("Richman Rep.") (attached as Exhibit

"A").) Baycol, and statins in general, are well known to affect muscle function and cause muscle damage and muscle cell death. Moreover, Dr. Richman has treated patients with muscle complaints caused by statin drugs. (Richman Rep. ¶ 5.) In reading the peer-reviewed literature and forming his opinions, Dr. Richman also relied on his 30+ years of education and expertise as a board-certified neurologist and muscle expert. (Richman Rep. ¶¶ 2, 6.)

### C. Studies Based on AERS Data Are Highly Relevant and Reliable.

Some of the peer-reviewed literature upon which Dr. Richman based his opinion used data gathered from the FDA's Adverse Event Reporting System, a program by which the reports of adverse events detected and reported after the marketing of a drug are compiled. These data, and literature discussing them, are acceptable and reliable as support for an expert opinion.[1] This is especially true where the AERS evidence consists of an epidemiological study of Relative Reporting Rates of the same types of events, as between drugs in the same class, first marketed at essentially the same time, and used among similar patient populations, thereby meeting all the criteria established by the FDA to allow safety comparisons of the type conducted by Judith Staffa of the FDA, and by

[1] Plaintiffs are filing contemporaneously with this memorandum of law a reply to Defendants' Motion to Exclude Expert Testimony Based on Adverse Event Reports. (*See* Pl.'s Mem. in Opp'n to Bayer and GSK's Mot. to Exclude Expert Test. Based on Adverse Event Reports.) Plaintiffs incorporate the arguments raised in that brief by reference here. Plaintiffs also incorporate by reference their Opposition to Motion to Exclude Expert Testimony of John W. Farquhar, M.D., which describes in detail the peer-reviewed literature and other sources supporting admissibility of epidemiological analysis of Adverse Event Reports.

John Farquhar using identical methodology. FDA officials like Staffa commonly write articles in peer-reviewed journals based on these methods. *See, e.g.,* Allen Brinker et al., *Spontaneous Reports of Hypertension Leading to Hospitalisation in Association with Rofecoxib, Celecoxib, Nabumetone and Oxaprozin,* 21(7) Drugs & Aging 479 (2004) (attached as Exhibit "B"). Defendant has not cited a single case excluding evidence of a relative reporting rate epidemiological study such as those relied upon by Dr. Richman, and the cases cited by defendant involving individual case reports are simply inapposite. The scientific methodology of the studies reviewed by Dr. Richman satisfies the *Daubert* standard for reliability. Therefore, the fact that Dr. Richman's opinion is based in part on the same AERS data cited in the peer reviewed literature supports, rather than detracts from, the admissibility of his testimony.

## III. <u>THE COURT SHOULD ADMIT DR. RICHMAN'S TESTIMONY THAT BAYCOL IS MORE TOXIC THAN OTHER STATINS</u>

Dr. Richman's testimony that Baycol is more toxic than other statins is relevant and reliable and therefore should be admitted by the Court.

Dr. Richman's testimony that Baycol is more toxic than other statins is based on his overall understanding after reading the medical literature describing the outcome of rhabdomyolysis among statin users, as well as more specifically the articles by Staffa and Farmer. (Richman Rep. ¶¶ 8, 9, 20; Deposition of David P. Richman, M.D., February 11, 2004 134:7-11 ("Richman Dep.") (attached as Exhibit "C").) In addition, Dr. Richman's testimony is based on the absence of

data in the literature to suggest that Baycol was equally as safe as other statins. (Richman Rep. ¶ 10.) The literature reviewed by Dr. Richman was peer-reviewed, including the Staffa letter to the Editor of the New England Journal of Medicine.[2] Dr. Richman reviewed this literature and, using his 30+ years of education and expertise as a doctor and muscle expert, drew his conclusions. Therefore Dr. Richman's testimony that Baycol is more toxic than other statins is admissible under Daubert and should not be excluded.

**A. Dr. Richman's Conclusions Based on Epidemiology Are Admissible.**

Defendants argue that the comparison of Baycol's toxicity to that of other statins is something that requires expertise in epidemiology, and because Dr. Richman is not an epidemiologist, his testimony that Baycol is more toxic than other statins should be excluded. These arguments are without merit. Dr. Richman is entitled to rely on the report of Dr. Farquhar and his own review of the literature in determining that Baycol is the most toxic statin. Although this is a conclusion based on epidemiology, Defendants have cited no evidence that conclusions based on epidemiology must be offered by an epidemiologist.[3]

[2] *See* Declaration of the Massachusetts Medical Society, June 16, 2006 (attached as Exhibit "D").

[3] In support of their argument, Defendants cite authority in which courts excluded the opinions of experts unqualified to testify as to certain subjects, for example, a toxicologist's testimony on the etiology of basal cell carcinoma (*Medalen v. Tiger Drylac U.S.A., Inc*., 269 F. Supp. 2d 1118 (D. Minn. 2003); an emergency room doctor's testimony on the causation of an ultimately fatal head injury, where some degree of education/experience with neurology would be necessary to qualify the doctor as an expert (*Broders v. Heise*, 924 S.W.2d 148 (Tex. 1996)); a (continued)

Dr. Richman is an expert in muscle function and disease, which necessarily includes muscle damage and muscle cell death. (Richman Rep. ¶¶ 4, 5.) Baycol, and statins in general, are well known to affect muscle function and cause muscle damage and muscle cell death. Moreover, Dr. Richman has treated patients with muscle complaints caused by statin drugs. (Richman Rep. ¶ 5.) A comparison of the toxicity of statins with respect to the extent and type of muscle damage and muscle cell death caused by different statins would therefore certainly be a topic well within the scope of Dr. Richman's expertise.

Indeed, practicing physicians use epidemiology in their daily clinical practice, by considering the evidence of risks and benefits of competing therapeutic options, on the basis of drug labels reporting clinical trial data, as well as evolving scientific literature relating to their practice. Dr. Richman is particularly qualified to perform this function as to literature on muscle disease, an area of his specialization.

---

pathologist's testimony on neurology, psychiatry and physiology (*Wilson v. City of Chicago*, 6 F.3d 1233 (7th Cir. 1993)); a pharmacist's testimony on causation (*Wehling v. Sandoz Pharm. Corp.*, No. 97-2212, 1998 WL 546097 (4th Cir. Aug. 20, 1998)). All of these cases are distinguishable from the instant case, in which Dr. Richman, a board-certified neurologist with a specialty in muscle function and disease who has treated patients with statin-induced myopathies in his clinical practice, is well-qualified to testify as an expert on the toxicity of Baycol and its effect on the muscles, including its causation of myopathy and rhabdomyolysis.

**B. Dr. Richman's Testimony Is Based on Sound Methodology and Adheres to the Standards of "Intellectual Rigor" and Is Therefore Admissible.**

As explained above, Dr. Richman's conclusions were reached through reliable methodology as required by Fed. R. Evid. 702 and *Daubert*. Defendants cite to *Group Health v. Philip Morris*, 344 F.3d 753 (8th Cir. 2003), in which the Eighth Circuit stated that the testimony of an expert such as Dr. Richman must adhere to the same standards of intellectual rigor demanded in the expert's professional work. *Group Health*, 344 F.3d at 760. In reaching medical opinions, the reliance on decades of medical education and experience and the careful study of and reliance on peer-reviewed literature is well within the standards of intellectual rigor expected of doctors. The fact that Dr. Richman himself has no direct prior experience with adverse event reports is irrelevant; those of Dr. Richman's conclusions that involved AERS data were drawn from his reading of peer-reviewed articles written by authors who have extensive experience with adverse events and the AERS. Unlike the expert economist in *Group Health*, who made complex expenditure projections intended to show what might have occurred in a counterfactual world, Dr. Richman's testimony does not involve "inferences that approach leaps of faith." *Id.* at 760. On the contrary, Dr. Richman's opinions are consistent with the consensus of medical opinion and peer-reviewed literature. *See, e.g.*, Graham, D.J. et al, *Incidence of Hospitalized Rhabdomyolysis in Patients Treated with Lipid-Lowering Drugs*, 292:21 JAMA 2585 (2004) (a peer-reviewed article in one of the world's most prestigious

medical journals that strongly supports the greater toxicity of Baycol compared to all other statins evaluated) (attached as Exhibit "E").

Dr. Richman has employed the requisite "intellectual rigor" in forming his opinions. Nowhere in Fed. R. Evid. 702 or *Daubert* is it required that an expert base his opinions on "controlled data."[4] The fact that Dr. Richman testified that he has no prior experience with raw adverse event report data and had not heard of the expression "spontaneous adverse event" do not affect the admissibility of his testimony. (Bayer and GSK's Mem. In Supp. of Their Mot. to Exclude Test. of David Richman at 5 ("Def. Mem."); Richman Dep. 134:25-135:14.) Dr. Richman reviewed the same materials that defense experts reviewed, and reached different conclusions. Dr. Richman's opinions were formed in a reliable manner and are therefore admissible.

## C. Dr. Richman's Opinions Based on Case Reports Are Admissible.

In his expert report, Dr. Richman writes that "the literature suggests that Baycol has a higher attack rate" in the causation of muscle injuries than do other statins. (Richman Rep. ¶ 20.)

Dr. Richman does not suggest, in his report or in his deposition testimony, that his testimony about Baycol's higher attack rate is based solely on

[4] Nevertheless, in forming his testimony, Dr. Richman relied on peer-reviewed literature that controlled for biases and errors in the subject data. (Richman Dep. 137:15-138:14.) Dr. Richman also relied on peer-reviewed literature that examined clinical trial data. (Richman Dep. 152:12-16.) Neither Fed. R. Evid. 702 nor Daubert requires or even prefers expert testimony to be based on raw data rather than peer-reviewed literature discussing and analyzing raw data.

the ten case reports and one case series cited in his report. On the contrary, Dr. Richman has testified that he relied on several peer reviewed articles to support his conclusion that Baycol has a higher attack rate than other statins:

> Q: What other articles besides Dr. Staffa's letter do you believe supports [sic] your opinion that Baycol had a higher risk of myotoxicity?
>
> ***
>
> A: Well, there was the Davidson article we talked about; there's a Farmer article in Lancet that I've referenced in paragraph seven; there's the Thompson article that I've referenced in paragraph 15. There's the Ravnan article in paragraph 20(a). There's the Hamilton-Craig article that we talked about. …I could come up with more. But it's quite a number.

(Richman Dep. 143:5-20.)

The ten case reports and one case series that Dr. Richman summarizes in his report are offered to show "the range of disease reported in association with Baycol or other statins." (Richman Rep. ¶ 20.) The Reference Manual on Scientific Evidence states that case reports and case series may be considered by experts in forming their opinions, especially since case reports may often be the only information available on a particular subject. Mary Sue Henifin, *Reference Guide on Medical Testimony* in Reference Manual on Scientific Evidence 475 (Fed. Jud. Ctr., 2d ed. 2006). The authority cited by the Defendants to the contrary is unpersuasive.[5] Indeed, in the Eighth Circuit decision cited by the

[5] Defendants cite to *Turner v. Iowa Fire Equip. Co*., 229 F.3d 1202 (2000), which mentions *in a footnote* that case reports are not *generally* considered reliable (continued)

Defendants, the Court expressed the opinion that "the first several victims of a new toxic tort should not be barred from having their day in court simply because the medical literature, which will eventually show the connection between the victims' condition and the toxic substance, has not yet been completed." *Turner,* 229 F.3d at 1209. Moreover, Dr. Richman did not rely on each case report individually, but arrived at his conclusion after reviewing and relying on them taken together. Therefore, Defendants' arguments that no individual one of the case reports provides a comparative analysis of statins and that seven of the twenty-one case reports do not involve Baycol are unavailing.[6]

Also, Defendants' claim that the case reports relied upon by Dr. Richman do not suggest a continuum of muscle injury but rather involve only rhabdomyolysis. (Def. Mem. at 6.) This is incorrect. In addition to rhabdomyolysis, the patients in the case reports suffered from muscle aches,

---

evidence. The *Turner* court did not reach its holding of exclusion on the grounds that the expert in that case had relied on case reports, and this small piece of footnote dicta by no means precludes case reports from ever being considered reliable evidence. 229 F.3d at 1209 n.5. Defendants also cite to deposition testimony of Plaintiffs' expert Dr. Thomas Zizic, which they misleadingly quote to give the impression that Dr. Zizic's testimony supports their position. Dr. Zizic did not testify that case reports are inherently unreliable—he merely stated that in the hierarchy of reliability of epidemiological data, isolated case reports were not as reliable as, for example, clinical trials. Nothing in the *Turner* opinion or in Dr. Zizic's testimony supports the Defendants' contention that Dr. Richman's testimony should be excluded because it relies in part on peer-reviewed literature about case series or individual cases.

[6] Note that Defendants miscount Dr. Richman's sources: in his report he relied on ten individual case reports and one case series, a discussion of eleven individual patients, bringing the total individual patients up to twenty-one. (Richman Rep. ¶ 20(a)-(k).)

severe leg pain, bilateral lower extremity myalgia and weakness and muscle weakness resulting in inability to walk, lending support to Dr. Richman's conclusion that there is a spectrum of severity of muscle injury resulting from Baycol and statin usage that leads up to and includes rhabdomyolysis. (Richman Rep. ¶ 20(a)-(k).)

In general, all of Defendants' attacks on Dr. Richman's testimony that Baycol is more toxic than other statins go towards the weight of his testimony, but not its admissibility; Dr. Richman's testimony that Baycol is more toxic than other statins should be admitted.

## IV. DR. RICHMAN'S OPINION CONCERNING STATIN-INDUCED PERSISTENT INJURY IS ADMISSIBLE UNDER DAUBERT

Dr. Richman's testimony that statin use can induce myopathy and rhabdomyolysis that persists even after discontinuation of statin is relevant and reliable; therefore it is admissible under Fed. R. Evid. 702 and *Daubert*.

Specifically, Dr. Richman's testimony that statin use may induce myopathy and rhabdomyolysis that persists even after discontinuation of statin use is based on his overall understanding after reading the medical records of individual patients and the medical literature regarding statin-induced myopathy and rhabdomyolysis, especially peer-reviewed articles by Woodrow, England,

Desylpere, Fernandez-Zatarain, Grunden and Gilad.[7] (Richman Rep. ¶¶ 11, 17, 18, 20(f)-(h), 20(j), 26, 29.)

In his deposition testimony, Dr. Richman discussed in detail his opinion regarding the persistence of rhabdomyolysis after discontinuation of statin use and the basis for that opinion:

> Q: Have you seen data in regards to what percentage of patients fully recover from rhabdo [sic] versus what patients do not fully recover?
>
> A: Yes. There's an article actually in the abstract by Hildebrand[8] that I have here that gives information … to that question.
>
> ***
>
> Q: What does the Hildebrand [article] tell you about the rate of recovery versus nonrecovery from an episode of rhabdomyolysis?

---

[7] Woodrow, et al., *The Clinical and Biochemical Features of Acute Renal Failure Due to Rhabdomyolysis*, Renal Failure (1995); England, *Mitochondrial Myopathy Developing on Treatment with the HMG-CoA Reductase Inhibitors—Simvastatin and Pravastatin*, Austl. N.Z. J. Med. (1995); Desylpere et al., *Rhabdomyolysis and Simvastatin*, Annals of Internal Med. (1991); G. Fernandez-Zatarain et al., *Rhabdomyolysis and acute renal failure associated with lovastatin* (letter), 66 Nephron 483-484 (1994); Grunden et al., *Lovastatin-induced Rhabdomyolysis Possibly Associated with Clarithromycin and Azithromycin*, 31 Annals of Pharmacotherapy 859-63 (1997); Gilad, *Rhabdomyolysis Induced by Simvastatin and Ketoconazole Treatment*, 22 Clinical Neuropharmacology 295-297 (1999); S.F. London et al., *Cholesterol-Lowering Agent Myopathy*, Neurology (1991); Loma Linda University Medical Center, Surgical Pathology Final Reports at 6 (November 27, 2001).

[8] An abstract by Hildebrand was marked as an exhibit and referred to during a portion of Dr. Richman's testimony; this work has since been published and is cited as: Hansen, K.E. et al., *Outcomes in 45 patients with statin-associated myopathy*, 165 Archives of Internal Med. 2671-76 (2005). A copy of the article is attached hereto as Exhibit "F".

> A: [T]hese authors identified the 30 patients from their institution who had muscle symptoms consistent with the diagnosis of statin myopathy, including rhabdomyolysis. And they had information on the eventual recovery of these patients, and they found that at nine months after the episode and after withdrawal of the medication, that 24 percent had not returned to their baseline motor function.

(Richman Dep. 156:6-12; 157:4-15.) In addition, Dr. Richman described in deposition that a patient could have an acute phase of rhabdomyolysis in which a patient could be very severely affected, followed by a phase of recovery and then another worsening of the symptoms, and that in fact this situation had occurred with a patient described in the documents reviewed by Dr. Richman. (Richman Dep. 159:20–160:3.)

In his report and deposition testimony, Dr. Richman also described and discussed the neurological reasoning behind why some patients do not fully recover from rhabdomyolysis despite discontinuation of the statin drug that initially induced the rhabdomyolysis: healthy muscle tissue has been replaced by fibrotic tissue, (Richman Rep. ¶¶ 17, 29; Richman Dep. 163:10 – 164:7), because damaged or destroyed muscle fibers have failed to regenerate or re-innervate (Richman Rep. ¶ 32; Richman Dep. 161:9–17, 162:6–24), or because permanent mitochondrial abnormalities in the muscle cells arose as a result of the toxic injury (Richman Rep. ¶ 18; Richman Dep. 166:1–169:11).

Since Dr. Richman's deposition, several peer-reviewed studies have demonstrated that statins cause persistent injury, consistent with Dr. Richman's

testimony.[9] Dr. Richman's opinion will continue to be supported by the scientific literature as more studies are published on the long-term, persistent injury caused by statins. Dr. Richman's testimony that statin use can induce myopathy and rhabdomyolysis that persists even after discontinuation of statin use is admissible under *Daubert* and should not be excluded.

### A. **Dr. Richman's Opinions Are Based on Sound Methodology, and Cases Defendants' Cite to the Contrary Are Distinguishable.**

In their motion to exclude Dr. Richman's testimony, Defendants claim that Dr. Richman's opinion that statin-induced injury can persist beyond discontinuation of statin use is based on speculation rather than sound scientific methodology. Although Defendants cite several cases to support this contention, all of them can be distinguished from the instant case and Defendants' argument remains unpersuasive.

In support of their position, Defendants cite to *General Electric Co. v. Joiner*, 522 U.S. 136 (1997), in which the Supreme Court upheld the District Court's exclusion of expert evidence on the alleged link between PCB's and cancer where the expert relied in part on four epidemiological studies, one of which did not involve exposure to PCBs and another of which studied a

---

[9] *See*, *e.g.*, P.S. Phillips et al., *Statin myotoxicity is associated with changes in the cardiopulmonary function*, 177 Artherosclerosis 183:88 (2004) (finding that seven of eleven patients remained symptomatic three months to five years after the acute event) (attached as Exhibit "G"); K.A. Antons et al., *Clinical perspectives of statin-induced rhabdomyolysisI*, 119 Am. J. Med. 400-409 (2006) (recognizing persistent symptoms in some patients following statin therapy) (attached as Exhibit "H").

population exposed to multiple potential carcinogens in addition to PCBs. The *Joiner* court held that "a court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. In the instant case, however, the analytical gap between the data – all the data upon which Dr. Richman relied, taken as a whole – and Dr. Richman's opinion is not great at all. Unlike the *Joiner* experts, Dr. Richman relied on conclusions and data in peer-reviewed studies of the toxicity of Baycol and other statins in human patients to form his opinions. (Richman Rep. ¶ 6.) There is no mandate that the sources upon which an expert relies must explicitly state the conclusion that the expert ultimately draws from the source. *Daubert* requires only that experts' sources *support* the conclusions reached by the expert. The expert's testimony is required only to "pertain to 'scientific knowledge'" not be explicitly stated in scientific literature. *Daubert*, 509 U.S. at 590.

Defendants cite several other cases to support their argument that Dr. Richman's opinion should be excluded. Only three of the cases carry any precedential weight in this Circuit; all the cited authority can be distinguished by the fact that the excluded experts in those cases based their reports on egregious speculation and weak authority, clearly failing to meet the standards set by Rule 702 and Daubert and its progeny.[10] The experts in the cases cited by Defendants

[10] *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986 (8th Cir. 2001) (upholding exclusion of expert opinions where differential diagnoses lacked a proper basis for "ruling in" Parlodel as a potential cause of intracerebral hemorrhage (ICH) because experts did not produce evidence to support their testimony that Parlodel (continued)

are wholly distinguishable from Dr. Richman in this case, who has based his opinions—which are not radical, but rather are widely accepted in the medical

causes vasoconstriction, which in turn causes ICH; only one text hesitantly ventured a conclusion of causation, and rechallenge/dechallenge data and animal studies were not conclusive evidence to support experts' opinions in this instance); *J.B. Hunt Transport, Inc. v. General Motors Corp*., 243 F.3d 441 (8th Cir. 2001) (upholding exclusion of accident reconstructionist's expert opinion where reconstructionist conceded that he had been unable to scientifically reconstruct the accident and proffered instead an analysis based on photographs of scratches in the paint on the vehicle which the court found to be pure conjecture and in contradiction with eyewitness testimony; and exclusion of "foamology" expert's opinion on the seat foam because there is no science or speciality of foam study and therefore no scientific basis for the expert's opinions); *Medalen v. Tiger Drylac U.S.A., Inc*., 269 F. Supp. 2d 1118 (D. Minn. 2003) (excluding testimony of a toxicologist who was offered to show proof of causation, where toxicologist was not a medical doctor and could not opine on the etiology of basal cell carcinoma; where toxicologist did not offer opinions specific to the defendants' products but rather opined on the carcinogenicity of nickel and chromium, which were not even ingredients in defendants' products; where toxicologist had no competent opinion as to the carcinogenicity of TGIC, an ingredient in one of the defendants' products; and toxicologist had spent a total of four hours researching for his opinions and had read no articles, but only the abstracts of articles, in drawing his conclusions that defendants products caused plaintiff's cancer); *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316 (7th Cir. 1996) (upholding exclusion of well-respected cardiologist's expert opinion where doctor expressed an "inspired hunch" about the cause of plaintiff's heart attack, but did not supply a theoretical reason or "any experimental, statistical or other scientific data from which such a causal relation might be inferred or which might be used to test the hypothesis," nor an explanation of how nicotine overdose could precipitate a heart attack, nor evidence concerning the level of nicotine in the plaintiff's blood at the time of the heart attack); *McClain v. Metabolife Int'l, Inc*., 401 F.3d 1233 (11th Cir. 2005) (upholding exclusion of pharmacologist's expert opinion where pharmacologist drew key conclusions from the family classification of the drug, gave equivocal and sometimes contradictory statements about the effect of the drug on the body, did not account for individual variation in reactions to the drug, ignored the dose-response relationship that is a hallmark tenet of toxicology, drew unsubstantiated analogies between ephedrine and PPA, did not take into account high background risk of heart attack and stroke, could not show any support for his theories that Metabolife causes vasospasm/vasculitis and ischemic events nor that Metabolife's effects linger in the body after discontinuation of the drug).

community—on 30+ years of education and experience with muscle disease and damage and reasonable extrapolation from oft-cited, peer-reviewed articles by respected researchers.

### B. Defendants' Other Attacks on Dr. Richman's Testimony Do Not Impact the Admissibility of His Opinions.

The fact that Dr. Richman himself has never treated a patient whose muscle symptoms persisted after the discontinuation of statin drugs, (Def. Mem. at 8), does not affect the admissibility of Dr. Richman's testimony. Nothing in *Daubert* or Rule 702 suggests that this would be required of an expert when considering the admissibility of his opinion.

Defendants also claim that Dr. Richman's testimony should be excluded because he has allegedly improperly extrapolated his opinion from his reading of the article by England, et al. (Def. Mem. at 9.) On the contrary, Defendants erroneously and misleadingly cite Dr. Richman's deposition testimony to support their claim that the England study's "only definitive finding" was that patients fully recovered following their initial statin therapy. (Def. Mem. at 9.) In his deposition testimony, Dr. Richman agreed that the finding that patients fully recovered following initial statin therapy was "one takeaway" from the England article, but Dr. Richman did not testify that it was the article's "only definitive" finding. (Richman Dep. 167:22–168:1.)

More importantly, Defendant misunderstands the entire thrust of the England article and the opinion Dr. Richman draws from it. The focus of the

England article—as evinced by its title as well as its text—is on mitochondrial changes in the muscle of patients treated with two statin drugs, not on clinical symptoms like muscle pain. *See* England J. et al., *Mitochondrial myopathy developing on treatment with HMG CoA reductase inhibitors–simvastatin and pravastatin*, 25 Austl. N.Z. J. Med. 374-75 (1995) (attached as Exhibit "I"). Dr. Richman properly understood and discussed the England article as showing that "the mitochondrial abnormality was there a year after stopping the [statin] drug," lending support to his opinion that mitochondrial injuries to the muscle cells resulting from statin use could be permanent. (Richman Dep. 166:4–12.) Contrary to the Defendants' erroneous characterization of his testimony, Dr. Richman did not draw, much less "fabricate," any conclusions regarding clinical symptoms from the England article and only discussed clinical symptoms in the context of the England article when pressed by Defendants' counsel:

> Q: And in those three patients, was there any clinical manifestation of the microscopic changes?
>
> ***
>
> A: They don't comment on that.
>
> ***
>
> Q: Would you consider a patient to have completely recovered if they had no signs or symptoms of muscle problems if the biopsy revealed mitochondrial changes in the muscle cell?
>
> A: No. I think the biopsy is the gold standard of what things are. I mean, you can have a disease going on without any symptoms [i.e. clinical manifestations].

(Richman Dep. 169:13–16, 170:10–16.) Therefore, Dr. Richman did not improperly extrapolate from the England article but rather properly understood, discussed and drew his logical conclusion from it, and his testimony based on the England article meets the *Daubert* standard and should be admitted.

## V. THE COURT SHOULD ADMIT DR. RICHMAN'S CONCLUSIONS REGARDING DIAGNOSIS OF RHABDOMYOLYSIS AND MYOPATHY

Dr. Richman's testimony regarding the diagnosis of rhabdomyolysis and myopathy will assist the trier of fact and is properly grounded in scientific methodology and principles; therefore it is admissible under *Daubert*.

The methodology used by Dr. Richman to reach his conclusions regarding the diagnosis of rhabdomyolysis and myopathy is reliable in part because he formed his opinions after reviewing peer-reviewed literature, specifically articles by Phillips, England, Chariot, Mogyorosi, and London.[11] (Richman Rep. ¶¶ 16, 18, 20(i), 22, 26, 28.) Dr. Richman's testimony is also based on his 30+ years of education and expertise as a doctor and muscle expert, combined with his overall understanding after reading the peer-reviewed articles taken together. (Richman Rep. ¶ 2, 6.)

---

[11] Phillips et al., *Statin-Associated Myopathy with Normal Creatine Kinase Levels*, 137 Annals of Internal Med. 581-85 (2002); England; Chariot et al., *Simvastatin-Induced Rhabdomyolysis Followed by a MELAS Syndrome*, 31 Am. J. Med. 859-63 (1997); A. Mogyorosi, et al., *Rhabdomyolisys and Acute Renal Failure Due to Combination Therapy with Simvastatin and Warfarin*, 246 Journal of Internal Medicine 599, 601 (1999); London.

In his deposition testimony, Dr. Richman discussed in detail his opinion regarding the diagnosis of rhabdomyolysis and myopathy and the basis for that opinion. To diagnose rhabdomyolysis, "you need the whole syndrome of muscle pain, weakness and other evidence of this type of severe damage to muscle, which might mean fever [and] changes in blood counts." (Richman Dep. 22:13–16.) In addition, "at some point in time, the CK would be elevated," although "because CK is cleared from the blood relatively quickly … you could miss the elevation in an individual case if you only had a couple of time points," as opposed to measuring the CK level continuously throughout the illness. (Richman Dep. 22:24–25.) Dr. Richman further explains that a patient suffering from rhabdomyolysis could have CK levels within the normal range if the CK was measured at a point in the course of a patient's rhabdomyolysis where the CK had been largely cleared from the bloodstream. (Richman Dep. 23:17–25:12.)

> Q: If I understand your testimony, you're saying once you remove the insult to the skeletal muscle, the CK within the blood will clear and return [to normal levels] within a few days, is that correct?
>
> ***
>
> A: Within a number of days. [It] depends on how high it was to begin with…
>
> Q: And if someone tests for normal CK, if I understand you correctly, that doesn't mean they didn't have rhabdomyolysis at some point in the past.
>
> A: No, that's not what I'm saying. I'm saying the rhabdomyolysis … there's still injury to the muscle. But all of the CK has been cleared out of the blood, but they still have rhabdomyolysis.

> Q: How?
>
> A: The muscle is severely injured and that's what the rhabdomyolysis is. The CK is just some indicator of that. For example, if you did a biopsy, if you happened to do a biopsy of that muscle, it would be severely abnormal.

(Richman Dep. 24:11–25:12.) Contrary to what the Defendants seem to think, "rhabdomyolysis" is not a synonym for "elevated CK levels." Elevated CK levels are an easy-to-measure indicator of rhabdomyolysis, but they are not the only way to diagnose the disease and the absence of elevated CK levels does not mean the patient does not have rhabdomyolysis.

In support of his opinion, Dr. Richman cited the data table in the peer-reviewed Mogyorosi article, which shows the daily CK values for a patient with rhabdomyolysis. (Richman Dep. 30:6–16.) The table shows four consecutive elevated CK values and then a normal value on the fifth day, "so if you were to measure the CK only on that day, on day five, that would be a normal CK in a patient with rhabdomyolysis. I think that's a good example of what I'm trying to get across." (Richman Dep. 30:9–30:16.) On day five, the patient had a normal CK level, but nevertheless still had rhabdomyolysis—the patient could not conceivably have recovered from rhabdomyolysis between days four and five because "a patient could not recover from rhabdomyolysis in one day. A patient could not recover from rhabdomyolysis in five days. It is a severe injury to the muscle cells that takes considerable time to recover from." (Richman Dep. 32:17–19, 33:17–21.)

Dr. Richman also testifies that even if the CK level is drawn after the CK has cleared out from the bloodstream, and therefore the CK level is not above the normal range, a patient can still be diagnosed with rhabdomyolysis based on a retrospective analysis of other clinical information about the patient, such as exposure to a statin drug and symptoms such as muscle pain and/or weakness, brownish discolored urine and renal injury of the type associated with rhabdomyolysis. (Richman Dep. 105:21–106:18.) A combination of any of these factors could allow a doctor to diagnose a patient with rhabdomyolysis despite CK levels drawn after the CK peak and therefore measuring in the normal range. (Richman Dep. 105:21–106:18.) Dr. Richman bases this opinion on a number of articles that describe the syndrome of rhabdomyolysis, for example the peer-reviewed Warren article.[12] (Richman Dep. 110:14–115:18.) Therefore, Dr. Richman's testimony about the diagnosis of rhabdomyolysis and myopathy is admissible under Daubert and should not be excluded.

### A. Dr. Richman's Opinions Are Admissible Despite Defendants' Efforts to Distort and Discredit Them.

Defendants, in their motion to exclude Dr. Richman's testimony on these points misconstrue and distort Dr. Richman's testimony. For example, Defendants claim that Dr. Richman testified "that rhabdomyolysis may exist even when CK levels are normal." (Def. Mem. at 10.) Defendants' oversimplification distorts Dr. Richman's testimony. In fact, Dr. Richman testified that the CK levels

[12] J.D. Warren et al., *Rhabdomyolysis: a review*, 25 Muscle Nerve 332-47 (2002) (attached as Exhibit "J").

of a patient who is suffering from rhabdomyolysis can be within the normal range *if the CK level is not tested in a timely manner*, i.e. when the CK level is at a high level, before it has been cleared from the bloodstream. (Richman Dep. 23:1–4.) If the CK in that patient had been tested at an earlier point in time, the CK would have been elevated above normal levels. (Richman Dep. 22:21–25.) However, even a patient whose CK levels are within the normal range because the CK level was drawn after the high amounts of CK had been cleared from the bloodstream can still be suffering from rhabdomyolysis because the patient's muscles are still severely damaged. (Richman Dep. 23:17–23.)

Defendants also attempt to discredit Dr. Richman's testimony that rhabdomyolysis can be diagnosed retrospectively using clinical information, in the event that the CK levels are not timely drawn and so have returned to within normal range. Defendants claim that Dr. Richman's theory is purely speculative because no article uses the exact phrase "retrospective rhabdomyolysis" and because Dr. Richman himself has not written an article on the criteria for retrospective diagnosis of rhabdomyolysis. (Def. Mem. at 10.) These are weak supports for a weak claim.

In fact, Dr. Richman's testimony is logical and grounded in the peer-reviewed literature. Dr. Richman's testimony is that in the event that CK levels are not drawn in a timely manner, and therefore a patient's CK levels have returned to normal levels, a doctor can still diagnose that patient with rhabdomyolysis by looking at the symptoms the patient has recently suffered and

the other diagnostic evidence. For example, dark urine is not a typical condition, but instead results from muscle cell death and presence of excess cell contents passing through the kidneys. When a CK level is not timely taken, observation of dark urine accompanied by severe muscle pain would support any reasonable clinician's diagnosis of rhabdomyolysis/myopathy. (Richman Dep. 105:21–106:18.) It is not a radical concept that a doctor can consider symptoms from a patient's recent past in diagnosing the patient's condition.[13] Moreover, Dr. Richman cited the Warren article in his discussion of the types of symptoms that could be used to diagnose rhabdomyolysis in such a manner. (Richman Dep. 110:14–111:5.)

Defendants further misapprehend Dr. Richman's testimony when they claim that he has no experience with muscle injuries related to statins. Dr. Richman has personally treated patients with statin-induced myopathies. (Richman Rep. ¶ 5; Richman Dep. 129:20–22.) Even so, personal clinical experience is not required of a medical expert under the *Daubert* standard. *See*

[13] Nowhere in his report or deposition testimony did Dr. Richman suggest that he intended to state that rhabdomyolysis could or should be diagnosed retrospectively on the basis of exposure to statin drugs and one other piece of clinical information, such as strength-test results or muscle pain. While it is true that during deposition questioning by Defendants' counsel, Dr. Richman answered affirmatively that one could diagnose rhabdomyolysis on the basis of exposure to statin drugs and strength testing alone (since strength testing is a good measure of muscle damage, including rhabdomyolysis), he did so in reaction to Defense counsel's questioning only. (Richman Dep. 107–108, 116–117.) In his report, Dr. Richman intended his testimony to be interpreted that in the absence of timely CK level measurement, a retrospective diagnosis could be made on the basis of *some combination* of the factors in the constellation of symptoms he described. (Richman Rep. ¶ 23.)

*generally, Daubert*, 509 U.S. 579. Nor does *Daubert* identify the development of theories for the purposes of litigation as a stand-alone test to exclude otherwise reliable expert testimony, such as that presented by Dr. Richman, an experienced former Department Chair at a major medical school. *Id.* Similarly, Daubert does not suggest that the length of time an expert has held a certain opinion affects the reliability of that opinion. *Id.*

## VI. DR. RICHMAN'S CONCLUSION THAT BAYCOL AFFECTS CELL MEMBRANES DIFFERENTLY FROM OTHER STATINS IS ADMISSIBLE UNDER *DAUBERT*

Dr. Richman's testimony that Baycol affects cell membranes differently from other statins will assist the trier of fact and is properly grounded in scientific methodology and principles; therefore it is admissible under *Daubert*. The methodology used by Dr. Richman to reach his conclusion that Baycol affects cell membranes differently from other statins was reliable in part because he formed his opinions after reviewing peer-reviewed literature, specifically an article by Davidson.[14] (Richman Dep. 54:18.) Dr. Richman's testimony is also based on his 30+ years of education and expertise as a doctor and muscle expert, combined with his overall understanding after reading the peer-reviewed articles taken together.[15] (Richman Rep. ¶ 2, 6.)

---

[14] M.H. Davidson, *Controversy surrounding the safety of cerivastatin*, 1 Expert Opin. Drug Saf. 207-12 (2002) (Attached as Exhibit "K").

[15] The fact that Dr. Richman's opinion on this matter is based, in part, upon an article which he only recently came across is by no means grounds for exclusion of his testimony, and neither Fed. Rule Evid. 702 nor *Daubert* nor any Eighth Circuit authority make any suggestion of the sort.

There is a consensus in the medical community that statins cause rhabdomyolysis and muscle injury, and that Baycol was the most toxic statin in causing these diseases. This consensus has existed for a number of years, but it has been strengthened by recent literature published since the time of Plaintiffs' expert reports, as summarized in the Declaration of Dr. Farquhar filed herewith. While the defense focuses its attacks on Dr. Richman and others with regard to the proof of mechanism of injury, such a focus is misplaced. It is well-established that the courts do not require extensive proof of mechanism where "the medical community generally recognizes the toxicity of the drug or chemical at issue. . . ." *McClain v. Metabolife*, 401 F.3d 1233, 1239 (11th Cir. 2005):

> The court need not undertake an extensive Daubert analysis on the general toxicity question when the medical community recognizes that the agent causes the type of harm a plaintiff alleges.

*McClain*, 401 F.3d at 1239. Plaintiffs have submitted sufficient evidence of plausible mechanisms of action, in light of the consensus that Baycol causes the type of harm alleged.

In his deposition testimony, Dr. Richman discussed in detail his opinion that Baycol affects cell membranes differently from other statins and the basis for that opinion.

> Q: By whatever mechanism statins injure muscle is true for all the statins, correct?

***

> A: I can’t agree with that statement. …[A]t the very simplest level, for example, the ability of the statins to get into the muscle cell differs, and Baycol being the most effective in getting into the muscle cell.

(Richman Dep. 52:14–21.)

Dr. Richman testifies that although the exact mechanism by which statins affect the muscle cells is not fully known, authority such as the Davidson article suggest that the statins do not all affect the muscle cells in exactly the same way. (Richman Dep. 50, 56–57.) In other word, it is not a “class effect” but one which differs from statin to statin. Rhabdomyolysis is an endpoint of many toxic myopathic processes, and while all statins can cause rhabdomyolysis, the mechanisms by which and rate at which they do so differs for all statins. Therefore, Dr. Richman’s opinion is logically supported by Davidson’s article, and has an appropriate methodology to be admitted under *Daubert*.

That Dr. Richman and the medical community do not know the exact mechanism by which statins affect muscle cells does not mean that they cannot know that the statins have differing mechanisms. Even in the case of smoking and lung cancer, the causal link is clear but the mechanism is not. Similarly, Dr. Richman and the medical community do not need to know the exact mechanisms by which Baycol causes greater muscle damage, where the medical consensus supports that conclusion.

## VII. CONCLUSION

Dr. Richman's expert opinion is relevant and reliable under the standard set forth by Fed. R. Evid. 702 and *Daubert* and its Eighth Circuit progeny, and should be admitted.

Date: June 23, 2006

Respectfully submitted,

LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP

By: /signature on file/
Donald C. Arbitblit

Embarcadero Center West
30th Floor, 275 Battery Street
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

ZIMMERMAN REED, PLLP
Charles S. Zimmerman, #120054
Ronald S. Goldser, #35932
Robert R. Hopper, #208760
Stacy K. Hauer, #317093
651 Nicollet Mall, Suite 500
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844

LOCKRIDGE GRINDAL NAUEN, P.L.L.P.
Richard A. Lockridge, #64117
Robert K. Shelquist, #21310X
Yvonne M. Flaherty, #267600
100 Washington Avenue South, Ste. 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981

***Plaintiffs' Steering Committee***

Don Barrett
Barrett Law Office, PA
404 Court Square North
P.O. Box 987
Lexington, MS 39095

Daniel E. Becnel
Law Offices of Daniel E. Becnel, Jr.
106 West Seventh St., P.O. Drawer H
Reserve, LA 70084

Turner W. Branch
Branch Law Firm
2025 Rio Grande Blvd. N.W.
Albuquerque, NM 87104

Stanley M. Chesley
Waite, Schneider, Bayless & Chesley Co., LPA
1513 Fourth and Vine Tower
One West Fourth Street
Cincinnati, OH 45202

John R. Climaco
Climaco, Lefkowitz, Peca, Wilcox & Garofoli Co., L.P.A.
1220 Huron Road, Suite 1000
Cleveland, Ohio 44115

James R. Dugan
Gauthier, Downing, LaBarre, Beiser & Dean
3500 North Hullen Street
Metairie, LA 70002

Frederic S. Fox
Kaplan Fox & Kilsheimer LLP
805 3rd Avenue, 22nd Floor
New York, NY 10022

Don Hildre
Dougherty, Hildre, Dudek & Haklar
2550 Fifth Ave., Suite 600
San Diego, CA 92103-5624

Will Kemp
Harrison, Kemp & Jones
3800 Howard Hughes Pkwy, 17th Floor
Las Vegas, NV 89109

Dianne M. Nast
Roda & Nast, P.C.
801 Estelle Drive
Lancaster, PA 17601

W. James Singleton
Singleton Law Firm
4050 Linwood Ave.
Shreveport, LA 71108

William M. Audet
Alexander, Hawes & Audet, LLP
300 Montgomery St.
Suite 400
San Francisco, CA 94104

Ted B. Lyon, Jr.
Teb B. Lyon & Associates, P.C.
Town East Tower, Suite 525
18061 LBJ Freeway
Mesquite, TX 75150

Dale I. Larson
Larson King
2800 World Trade Center
30 East Seventh Street
St. Paul, MN 55101

Mark Robinson
Robinson, Calcagnie & Robinson
620 Newport Center Dr., Seventh Floor
Newport Beach, CA 92660

Ron Meshbesher
Meshbesher & Spence Ltd.
1616 Park Avenue South
Minneapolis, MN 55404