# EXHIBIT C-part 3

sure what any of it relates to. 16:12:18

First of all, is this one document, or is 16:12:21
this a series of notes that you've made over time? 16:12:23
A. (Reviewing) 16:12:28
It's a series of notes that I made over 16:12:45
time. 16:12:47
Q. Okay. The first page has got a message 16:12:48
slip. And does that say "mitochondrial" at the top? 16:12:51
A. Uh-huh. 16:12:54
Q. And then what's underneath mitochondrial? 16:12:55
A. "Disorder." 16:12:58
Q. With a question mark next to it -- 16:12:58
A. Yes. In front of it. 16:13:02
Q. And then you wrote, "Rhabdomyolysis 16:13:03
long-term damage," with a question mark? 16:13:05
A. Right. 16:13:07
Q. Co Q-10; is that right? 16:13:11
A. Yes. 16:13:19
Q. And then you write, "Check -- " 16:13:19
What's that say? 16:13:22
A. Mitochondrial. And I think that's "Q-10." 16:13:25
Q. In -- 16:13:34
A. I think that word is "blood specimen." 16:13:36
Q. Do you know what that relates to, any of 16:13:41
the notes here? 16:13:43

A. I think that this is -- this is a message from Mr. Arbitblit. It may be his first -- his first phone contact with me. I don't have the year. But I think we've zeroed in on May or June of, what, 2002. 16:13:52 16:13:55 16:13:59 16:14:06 16:14:09

And so these may be notes from a conversation -- maybe my first conversation with him about what he wanted consultation on. 16:14:11 16:14:13 16:14:17

Q. Then you turn the page, and it says, "Consultation effect of Baycol in -- " 16:14:22 16:14:26

A. No. "Causation." 16:14:32

Q. Oh, causation. 16:14:33

"Effect of Baycol in -- " 16:14:35

A. "General." 16:14:37

So, I think this is -- I think I'm beginning to work on my report here. And this is how I was sort of getting myself organized to work on it. 16:14:42 16:14:45 16:14:53 16:14:59

Q. Under -- 16:14:59

A. It's kind of a meager little outline. 16:14:59

Q. Under two, you write, "Issues of diagnosis." 16:15:02 16:15:05

A. Yes. 16:15:06

Q. "One year later -- " 16:15:07

What does that say? 16:15:09

A. "Pain and weakness -- " 16:15:12
I don't know what that word is. 16:15:26
" -- with -- " something. 16:15:28
And, "Never -- " 16:15:29
Maybe, "gone away." 16:15:30
And then Gabow, the reference number 9 in Gabow I was interested in. So, these may be notes relating to my reading of the Gabow article. 16:15:36 16:15:42 16:15:45
Q. I think I can read the rest. 16:15:51
If you turn the page. 16:15:54
A. Uh-huh. 16:15:56
Q. "Capacity evaluation -- " 16:16:00
Functional capacity evaluation? 16:16:01
A. Yeah, I think that's what it says. I have no idea what I meant, but I -- I think that's what it says. 16:16:02 16:16:05 16:16:08
Q. Then towards the bottom, can you read, "Bran -- " 16:16:18 16:16:24
A. "Brain pathology." I think that's the journal. 16:16:25 16:16:29
And "Fibs, plus three -- " 16:16:32
I can't read that. 16:16:34
"Fibrillations," and the next word is "Short." And then EMG. So, I think these are notes on reference number 53, maybe in the Gabow article, 16:16:39 16:16:44 16:16:50

which I think is the -- there is a brain pathology reference in my report. 16:17:09 16:17:12

And then I think down at the bottom, it says, "Autopsy quadriceps edema and necrotized -- necrosis of fibers. No regeneration." 16:17:15 16:17:17 16:17:27

Q. Can you turn to the last page, please. 16:17:36

A. Uh-huh. 16:17:38

Q. The third one, the one that's got the word "Note" with an exclamation point at the end, what's the first word? 16:17:45 16:17:48 16:17:52

A. "Editors." 16:17:53

Q. Put that aside. I think I can read the rest. 16:18:03 16:18:06

Dr. Richman, have you ever spoken to anyone else besides Dr. Kason that you understood was a plaintiff expert in this litigation? 16:18:08 16:18:12 16:18:16

A. There was a conference call about 10 days ago amongst experts. And I don't remember -- I think it -- it was related to some of the earliest depositions, people telling what their deposition was like. 16:18:22 16:18:26 16:18:44 16:18:49 16:18:52

Q. Who participated in this conference call? 16:18:54

A. I don't remember exactly. I didn't keep a record of it. I ... 16:19:00 16:19:09

Q. Was it -- 16:19:12

A. I can remember -- oh -- yeah, I just -- I mean -- I'm sorry to say. I really only remember the rheumatologist from Johns Hopkins, Dr. Zizic, and Dr. Meyers -- or Mayer. 16:19:13 16:19:23 16:19:27 16:19:34

And there were a number of epidemiologists. I think that's ... 16:19:39 16:19:41

Q. This conference call that was about 10 days ago, there were plaintiff experts on the call, correct? 16:19:47 16:19:49 16:19:52

A. Yes. 16:19:52

Q. And there were plaintiff lawyers on the call? 16:19:53 16:19:55

A. Yes. 16:19:55

Q. And the subject was to discuss what was said at the early expert depositions? 16:19:55 16:19:57

A. Yes. 16:20:01

Q. Did you participate or contribute to the call? 16:20:02 16:20:04

A. I think I said something about myositis, that that was a loosely used term and that people should pay attention to the definition of it. 16:20:07 16:20:16 16:20:21

And that was -- I think that was my contribution. 16:20:28 16:20:30

Q. Other than that conference call 10 days ago, did you ever speak to any other plaintiff 16:20:30 16:20:32

expert? 16:20:34

A. No. 16:20:35

Q. Did you participate in a meeting at Lieff, 16:20:35 Cabraser in San Francisco in which other plaintiff 16:20:39 lawyers besides -- 16:20:46

A. No. 16:20:48

Q. Okay. Have you reviewed the expert 16:20:51 reports of your fellow plaintiff experts? 16:20:56

A. I'd say about 50 percent of them. 16:21:00

Q. Did you have any of those reports prior to 16:21:07 the time you prepared your own report? 16:21:09

A. No. 16:21:13

Q. Now, have you reviewed the experts report 16:21:22 of defendants' experts? 16:21:25

A. Two of them. I don't know if there are 16:21:29 any more. I'm blocking on their names. The one 16:21:38 from the University of Miami and one from Stanford. 16:21:38

Q. Dr. Bradley? 16:21:38

A. Bradley, yeah. 16:21:39

Q. And Dr. Dorfman? 16:21:41

A. Yes. 16:21:42

Q. Did you form any opinions regarding any 16:21:44 criticisms you have of Dr. Dorfman's report? 16:21:47

MR. ARBITBLIT: If you're going to ask him 16:21:51 about the reports, he should look at them, Counsel. 16:21:52

BY MR. ISMAIL: 16:21:56
Q. Well, I'm not going to go paragraph by 16:21:56
paragraph. You either recall criticism, or you 16:21:58
don't. 16:22:05
A. I don't think I went through them that 16:22:05
carefully. I pretty much got a Gestalt. 16:22:09
Q. A Gestalt? 16:22:13
A. Yes. 16:22:17
Q. What's your Gestalt? 16:22:17
A. I didn't think they had gone through the 16:22:19
literature as carefully as I had. 16:22:22
Q. That relates both to Dr. Dorfman and to 16:22:26
Dr. Bradley? 16:22:29
A. (Nods head.) 16:22:30
Q. "Yes"? 16:22:30
MR. ARBITBLIT: You have to answer out 16:22:33
loud. 16:22:34
THE WITNESS: Yes. 16:22:34
BY MR. ISMAIL: 16:22:35
Q. Other than that Gestalt, did you perform 16:22:35
any specific criticisms in regards to doctors 16:22:41
Dorfman and Bradley? 16:22:46
A. No. 16:22:48
Q. Have you ever heard an individual by the 16:22:51
name of Randy Pierce? 16:22:52

A. No. 16:22:55
Q. I take it you won't have any opinions regarding the diagnosis of any injuries in Mr. Pierce? Or you have not been asked to form any opinions regarding anyone by the name of Randy Pierce? 16:22:55 16:22:59 16:23:04 16:23:06 16:23:08
A. Randy Pierce is a patient, is a -- 16:23:13
Q. He's our plaintiff. 16:23:19
A. Oh. I see. 16:23:20
I think I received his deposition but haven't read it. And along with it came a deposition from his doctor, which I did read and didn't have enough information to really make a lot of sense out of it. 16:23:22 16:23:26 16:23:34 16:23:43 16:23:45
Q. Okay. So, at this point, you've not formed any opinions regarding Mr. Pierce, correct? 16:23:47 16:23:48
A. Correct. 16:23:50
Q. And you have not been asked to, correct? 16:23:51
A. Correct. 16:23:53
MR. ISMAIL: Why don't we stop the tape; I'll go through my notes; and we'll finish up. 16:23:53 16:23:55
THE VIDEOGRAPHER: The time the 4:24. Off the record. 16:23:57 16:23:59
(Recess taken.) 16:24:00
THE VIDEOGRAPHER: The time is 4:34. On 16:33:50

the record. 16:33:53
BY MR. ISMAIL: 16:33:54
Q. Dr. Richman, when we began this morning, I 16:33:54
asked you if there were any other opinions that you 16:33:58
intend to offer in this litigation in addition to 16:34:03
those reflected in your expert report, and you made 16:34:08
reference to an exercise myopathy opinion that we 16:34:13
started to discuss, but I asked you to table, 16:34:17
pending going through your report, as written. 16:34:21
A. (Nods head.) 16:34:24
Q. Can you state again what your newly formed 16:34:26
opinion is regarding the Sinzinger article that you 16:34:30
started to discuss this morning. 16:34:38
A. Let me get a hold of it. 16:34:41
Q. I may have -- 16:34:45
A. You may have my copies, yes. 16:34:47
MR. ISMAIL: Let's mark the article as 16:34:49
Exhibit 18. 16:34:51
(WHEREUPON, Richman Exhibit 18 was marked 16:35:06
for identification.) 16:35:08
BY MR. ISMAIL: 16:35:09
Q. Can you state again, sir, what your newly 16:35:09
formed opinion is regarding exercise and myopathy 16:35:12
and statins. 16:35:21
A. (Reviewing) 16:35:26

It's known that CK can go up with vigorous exercise in normal people, especially normal people who are not in very good shape and then have vigorous exercise. It's usually a very transient elevation. 16:35:32 16:35:38 16:35:43 16:35:47 16:35:58

This article on page 168 talks about two things, patients taking statin who have more problems with exercise. One example they give is playing tennis and developing aching muscles. And this author has observed that and, to a greater degree, in patients taking statins. 16:36:08 16:36:18 16:36:26 16:36:36 16:36:40 16:36:45

And then he talks about what I think is a very useful observation. And that is top athletes very rarely tolerate treatment with statins. And what that suggests to me is that the statins -- well, in conjunction with the second article that I'll talk about, which was an article referenced in this Sinzinger article. 16:36:49 16:36:57 16:37:04 16:37:12 16:37:17 16:37:21 16:37:25

The combination of the article from both of these articles suggests to me that statins have an effect on muscle function in everyone who takes it, all the time. And -- but it's a very mild effect and probably has no clinical significance in the vast majority of people who take it. 16:37:29 16:37:31 16:37:36 16:37:42 16:37:49 16:37:53

But if you are a top athlete, where you 16:37:57

really depend on your muscle function, then it has an effect that's noticeable. And the second Thompson article is a scientific study of that issue. If I could have it -- 16:38:03 16:38:08 16:38:15 16:38:23

MR. ISMAIL: Let's mark it as Exhibit 20 -- 19. I'm sorry. 16:38:26 16:38:29

(WHEREUPON, Richman Exhibit 19 was marked for identification.) 16:38:54 16:38:57

THE WITNESS: So, this is an article in which ---- it was sort of an adjunct to a randomized double-blind, placebo-controlled trial of lovastatin. 16:38:58 16:39:01 16:39:08 16:39:19

In a subgroup of those patients -- and let me come back to how many patients were in this subgroup. 16:39:22 16:39:35 16:39:38

(Reviewing) 16:39:39

So, 59 -- and these were all men -- were randomized to receive either lovastatin, 40 milligrams a day, or placebo. And after being on the drug or placebo for four weeks, they had very specific exercise, two types of exercise. One was a treadmill, and the second -- it was treadmill walking for 30 minutes, primarily on a downhill slope. 16:39:41 16:39:45 16:39:51 16:39:57 16:40:00 16:40:09 16:40:13 16:40:21

And then the second exercise was repeated 16:40:21

bicep curls. And in those patients -- and with the treadmill test, they measured -- in both situations, they measured the CK at various times after the exercise, 24 hours, 48 hours, 72 hours and 96 hours. 16:40:37 16:40:41 16:40:46 16:40:51

And there was a rise of the CK in both the placebo and the lovastatin-treated patients, peaking at 24 hours. But the rise was significantly greater in the lovastatin-treated patients. 16:40:59 16:41:03 16:41:14 16:41:21

The -- and so the mean value for -- at 24 hours after exercise for the lovastatin patients was on the order of 325 units per liter, and -- which is in the abnormal range. But it didn't reach the abnormal range in the placebo-treated patients. 16:41:26 16:41:31 16:41:35 16:41:53 16:41:56

So, I think that's evidence supporting the fact that there is a problem with muscle function when treated in this case with lovastatin, and that if you stress the system enough, you can bring out that difference. And I would view that as the far-low end of the continuum that I've been talking about. 16:42:02 16:42:06 16:42:15 16:42:20 16:42:23 16:42:30 16:42:36

MR. ISMAIL: Let's change the tape. 16:42:36

THE VIDEOGRAPHER: This marks the end of tape number three in the deposition of David Richman, M.D. Going off the record, the time is 4:43. 16:42:36 16:42:40 16:42:42 16:42:46

(Recess taken.) 16:42:49
THE VIDEOGRAPHER: Back on the record. 16:46:31
Here marks the beginning of tape number four in the 16:46:42
deposition of David Richman, M.D. The time is 4:47. 16:46:46
BY MR. ISMAIL: 16:46:51
Q. Doctor, you made reference to a new 16:46:51
opinion you have formed since the submission of your 16:46:57
expert report regarding implications of research in 16:47:00
exercise and statins, correct? 16:47:07
A. Correct. 16:47:09
Q. One of the implications of the research 16:47:11
you have discussed is that exercise can be a 16:47:13
variable that affects the propensity to develop 16:47:19
myopathy from a statin? 16:47:23
A. Well, I didn't -- I didn't really conclude 16:47:25
that. I think what I've -- I've looked at it in the 16:47:31
other direction. We know exercise has some effect 16:47:34
on the muscle fibers, leading to some -- in 16:47:39
everyone, but especially in people who are not 16:47:46
conditioned -- leading to some small and not 16:47:49
clinically significant leakage of CK. 16:47:56
But in patients who are taking statins and 16:48:04
have no muscle symptoms, when they exercise, there's 16:48:07
two things, greater leakage of CK and, in people who 16:48:13
really vigorously use their muscles, actual symptoms 16:48:22

of decreased power and more pain in their muscles. 16:48:27
Q. First off, the research that you've described, that's the Sinzinger article and the Thompson article, correct? 16:48:34 16:48:36 16:48:38
A. Correct. 16:48:39
Q. Those articles are not specific to Baycol, correct? 16:48:40 16:48:43
A. Correct. 16:48:43
Q. Those articles do not talk about a prognosis from the myopathy, correct? 16:48:44 16:48:50
A. Correct. 16:48:52
Q. Those articles do not talk about the -- those articles do not change the diagnostic criteria for a myopathy, correct? 16:48:52 16:48:56 16:48:59
A. Well, I think they support the fact that you can have the low end of the scale, that is, muscle symptoms, such as mild weakness and aching with these medications. 16:49:02 16:49:08 16:49:16 16:49:22
Q. Were you done? 16:49:25
A. Yes. 16:49:28
Q. If I understood you correctly, you have suggested, based on the Sinzinger article and the Thompson article, that every patient who takes a statin suffers some injury to the muscle? 16:49:32 16:49:36 16:49:45 16:49:47
A. I wouldn't put it as strongly as "injury." 16:49:53

I would say -- I think the term I used was dysfunction substitute. 16:49:57 16:50:00

Q. Okay. Did either of those authors suggest that an implication of their research is that every patient who takes a statin suffers some form of muscle dysfunction? 16:50:04 16:50:06 16:50:09 16:50:14

A. (Reviewing) 16:50:27

Let me just look at the Thompson article first. 16:50:28 16:50:31

(Reviewing) 16:50:31

What Thompson concludes is suggesting that HMG CoA reductase inhibitors exacerbate exercise-related muscle injury. They actually use the term "injury." 16:50:49 16:50:56 16:51:04 16:51:10

And -- I mean, they -- my opinion is that Sinzinger concludes the same thing I do. He makes the statement, "The fact that many of the mildest symptoms are exercise dependent probably results in misinterpretation by the patient and the doctor and is not -- " 16:51:13 16:51:42 16:51:46 16:51:49 16:51:54 16:52:01

"-- and is not related to the statin treatment." 16:52:04 16:52:06

I think what he means, that misinterpreted by the patient and the doctor, that it is not related to the statin treatment. So, he would -- 16:52:07 16:52:11 16:52:15

saying it's not related to the statin treatment, 16:52:24
that is, these symptoms with exercise, he would view 16:52:26
as a misinterpretation. 16:52:29

Q. In the patients who are expressing 16:52:32
symptoms, correct? 16:52:34

A. Yes. 16:52:35

Q. That's a far cry from saying everyone who 16:52:36
takes a statin suffers some form of muscle 16:52:38
dysfunction, correct? 16:52:41

MR. ARBITBLIT: Objection. 16:52:49

THE WITNESS: Well, Sinzinger is talking 16:52:49
about athletes and people who exercise a lot. 16:52:52

But if you look at the Thompson article, 16:52:55
they -- the mean value, the average value for all 16:52:59
the patients taking the medication, that is, the 16:53:11
value of the increase in CK, is increased. And so 16:53:13
that's -- that's how I draw that conclusion. 16:53:22

BY MR. ISMAIL: 16:53:25

Q. The point of the Thompson article was that 16:53:25
statins can affect the injury caused by exercise, 16:53:29
correct? I mean, that's what the conclusion you 16:53:34
just read. 16:53:37

A. Yes. 16:53:38

Q. Not that everybody who has a statin is 16:53:38
suffering a muscle dysfunction, correct? 16:53:41

A. Well, these were just -- these patients were -- who were tested were not selected in any way in terms of whether they had symptoms or CK changes. In fact, they all had normal CK levels. 16:53:46 16:53:47 16:53:52 16:53:55

So, just grabbing a bunch of patients who they had available to them who were taking statins showed this effect. 16:53:57 16:54:02 16:54:06

Q. Right. 16:54:08

But Thompson does not write in his article that every patient who takes a statin suffers a muscle dysfunction, correct? 16:54:09 16:54:12 16:54:15

A. I mean, he writes what I read to you. 16:54:16

Q. Can you agree with my statement? 16:54:20

A. (Reviewing) 16:54:35

I mean, his conclusion is that the drug has this effect. But I agree that he doesn't say, "This effect in every single patient." 16:54:36 16:54:38 16:54:44

Q. But you are prepared to say that based on Thompson and Sinzinger, that every patient who takes a statin suffers some form of muscle dysfunction. 16:54:47 16:54:50 16:54:53

A. Well, I might modify that to a -- the majority of patients. A lot of patients. 16:55:05 16:55:13

Q. We're moving a lot. You went from "all" to "majority" to "a lot." 16:55:23 16:55:27

A. Well, my -- really, what I was getting at 16:55:39

was that these -- that patients who are asymptomatic, who are just taking the drug, you can find this effect, and there may be variability within that group of asymptomatic patients. I don't think we can say completely from that information. 16:55:41 16:55:45 16:55:46 16:55:51 16:55:56

Q. What is this muscle dysfunction that is caused in all majority or a lot of statin patients? 16:55:59 16:56:03

A. It's susceptibility to leaking CK at the simplest level. I mean: What are the mechanisms that lead to that? 16:56:20 16:56:25 16:56:28

I don't think that that's -- we can get that information from these articles. 16:56:35 16:56:38

Q. Let's try to cut this short. 16:56:49

Would you agree that your opinion inferring from the Thompson and Sinzinger article that a majority of statin patients suffer some form of muscle dysfunction to be an unproven hypothesis? 16:56:52 16:56:56 16:57:01 16:57:04

A. I wouldn't characterize it by that. I would -- I think your original statement, a conclusion inferred from those data, would be a reasonable description of it. 16:57:11 16:57:16 16:57:20 16:57:23

Q. All right. Have you seen anyone else besides yourself -- or let me restate that. 16:57:24 16:57:26

Are you aware of anyone else besides you who is prepared to say that all or a majority of 16:57:32 16:57:35

patients who take a statin suffer a muscle 16:57:40
dysfunction? 16:57:43
A. Well, in my opinion, Sinzinger would be 16:57:49
willing to say that, and probably Thompson. 16:57:55
Q. Well, they may be willing to say it. But 16:57:58
they haven't yet, correct? 16:57:59
A. Correct. 16:58:01
Q. Are you aware of anyone else besides you 16:58:02
who has expressed the opinion that all or a majority 16:58:05
of patients who take a statin suffer a muscle 16:58:09
dysfunction? 16:58:11
A. No, I'm not. 16:58:13
MR. ISMAIL: With that, I have no more 16:58:17
questions. 16:58:18
Anyone else have questions today? 16:58:19
MS. O'GORMAN: No questions. 16:58:21
MR. ISMAIL: Stephen? 16:58:22
MR. FILIPOVITCH: Yeah. I've got two. 16:58:24
EXAMINATION
BY MR. FILIPOVITCH:
Q. Doctor, it's your understanding that 16:58:25
you're being presented as a general expert, correct? 16:58:30
A. I'm not sure how I'm being presented. 16:58:36
Q. Okay. You're not here to tell us what the 16:58:38
standard of care is for a doctor prescribing Baycol? 16:58:40

MR. ARBITBLIT: It's stipulated that the doctor is not here to provide opinions about the standard of care of doctors prescribing Baycol. 16:59:04 16:59:04 16:59:08

MR. FILIPOVITCH: Thank you. Appreciate it. Sorry. 16:59:10 16:59:12

MR. ISMAIL: Is that it, Stephen? 16:59:14

MR. FILIPOVITCH: That's it. 16:59:15

MR. ISMAIL: Okay, Dr. Richman. Thank you for your time. 16:59:17 16:59:19

Good night, Stephen. 16:59:20

THE VIDEOGRAPHER: Here marks the end of videotape number four in the deposition of David Richman, M.D. The videotapes will be retained at Combs Reporting, 300 Montgomery Street, San Francisco, California. The time is the 5:00. Off the record. 16:59:23 16:59:25 16:59:28 16:59:31 16:59:33 16:59:37

(Whereupon the deposition was adjourned at 5:00 p.m.)

____________________________

DAVID P. RICHMAN, M.D.

STATE OF CALIFORNIA, )
) ss.
COUNTY OF Sacramento )

## CERTIFICATE OF REPORTER

I, **Kathy A. Kollehner**, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth in the within-entitled cause;

That said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED: 2/17/04

Kathy A. Kollehner

Kathy A. Kollehner, CSR 4102, CRR