**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : | MDL No. 1431 (MJD) |
| This Document Relates to: | : | |
| *All Actions* | : | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO EXCLUDE EXPERT TESTIMONY OF R. SAMUEL MAYER**

Bayer's motion demonstrated that Dr. Mayer's opinions should be excluded because, by his own admission, there is no scientific basis for his opinions, and because he claims no expertise as to certain matters on which he nonetheless opines. In the face of that showing, plaintiffs have abandoned any effort to defend Dr. Mayer's reliance on studies that did not support his opinions on several specific points:

- There is no scientific support for his view of persistent and permanent muscle injury or injury not signaled by elevated CK levels. Mayer Dep. (Defs' Ex. B[1]) at 104:1-4; 108:1-6; 126:8-10; 186:9-16; 215:12-17.
- There is no scientific support for Dr. Mayer's inference of permanent myopathy from studies about myopathy caused by AZT or steroids, or muscle weakness due to space flight. Mayer Dep. (Defs' Ex. B) at 200:14-22; 201:6-202:8; 206:1-4, 17-21; 207:6-10.

---

[1] Exhibit references are to exhibits for Defendants' Memorandum in Support of Their Motion to Exclude Expert Testimony of R. Samuel Mayer ("Defs' Ex.") or for the PSC's Response ("Pls' Ex.").

- Dr. Mayer lacks the specific experience and qualifications to opine about Baycol's comparative safety based on AER data, Bayer's regulatory actions, or Baycol's bio-availability and metabolic profile. Mayer Dep. (Defs' Ex. B) at 254:14-18; 255:21-256:1; 256:7-12; 257:5-258:14; 263:10-22; 270:1-272:2-6.

Plaintiffs' attempt to rehabilitate Dr. Mayer rests, instead, on two new arguments: First, he is qualified to opine because of his clinical experience as a physical medicine rehabilitation specialist; second, newly-published articles – upon which Dr. Mayer did not rely – support his opinions.

Both parts of this effort to transform Dr. Mayer into an expert on Baycol-induced myopathy are insufficient to the task. None of the newly cited articles refutes – or even addresses – the accepted medical view showing that there is no causal link between Baycol and long-term myopathy. In fact, some of the articles contradict his opinions. The reliance on Dr. Mayer's clinical experience – none of which concerned Baycol – confuses the requirement of an expert's qualifications to testify with the independent requirement of reliability under *Daubert*, *Kumho*, and Rule 702.

Dr. Mayer should not be permitted to testify.

## ARGUMENT

### I. NEITHER DR. MAYER'S CLINICAL EXPERIENCE NOR PLAINTIFFS' NEWLY-DISCOVERED MEDICAL ARTICLES SUPPORT DR. MAYER'S OPINION THAT BAYCOL CAUSES LONG-TERM MUSCLE DAMAGE.

#### A. Dr. Mayer's Clinical Experience Is Not a Reliable Basis To Opine on Permanent, Post-Baycol Muscle Injury.

In their opening brief, defendants established through extensive citation to Dr. Mayer's deposition testimony that there is no scientific support for his opinion that Baycol could cause long-term, permanent myopathy or myopathy without elevated CK levels. *See* Mayer Rep. (Defs' Ex. A) ¶ 29; Mayer Dep. (Defs' Ex. B) at 108:1-6; 126:8-10; 186:9-16; 215:12-17. Nothing in plaintiffs' opposition refutes this.

Instead, plaintiffs argue that *Daubert*'s reliability standards are satisfied simply because Dr. Mayer's opinions are based on "years of clinical practice." Pls' Response at 4. However, under *Kumho*, *Daubert*, and Rule 702, plaintiffs must show how Dr. Mayer's experience led to his conclusions, why his experience is a sufficient basis for his opinions, and how that experience is reliably applied to the facts. Plaintiffs fail to meet any of these requirements.

In *Kumho Tire Co. v. Carmichael*, the Supreme Court held that *Daubert*'s reliability requirement applies to all experts. 526 U.S. 137, 151-52 (1999). The purpose of this holding "is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

The proper standards governing the reliability of expert testimony based on experience are clear:

> [I]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it."

Fed. R. Evid. 702, Advisory Committee's Note (2000).

The fact "that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable *any* conceivable opinion the expert may express." *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (emphasis in original). Plaintiffs pair Dr. Mayer's anecdotal assertion that "I've seen it [*i.e.*, long-term muscle damage after taking a statin] myself clinically" with the approving reference in *Kumho* to drawing expert conclusions from "extensive and

specialized experience." The flaw in this is that Dr. Mayer's relevant experience with Baycol, or any statin, is neither extensive nor specialized.[2]

First, plaintiffs fail to demonstrate how Dr. Mayer's clinical experience supports his opinion that Baycol can cause long-term myopathy even when a patient has normal CK levels and has stopped using Baycol. As Dr. Mayer readily admitted in his deposition, no medical or scientific literature supports his hypothesis; he has conducted no study, not even one based on his own clinical experience, to test his hypothesis; and the accepted view by the medical community is that statin-induced side effects are temporary. *See Leathers v. Pfizer, Inc*., 233 F.R.D. 687, 691 (N.D. Ga. 2006).

Plaintiffs' attempts to distinguish *Leathers* (Pls' Response at 5) are inaccurate or inconsequential because: (1) the fact that *Leathers* involved Lipitor, a drug still on the market, is irrelevant to the scientific question of whether one can infer long-

---

[2] Plaintiffs cite cases which show how unreliable Dr. Mayer's opinions really are. In both *Ephedra* and *PPA*, plaintiffs' experts based their opinions on independent research personally conducted by these experts on the particular drug involved. *See In re Ephedra Prods. Liab. Litig.*, 393 F. Supp. 2d 181, 195 (S.D.N.Y. 2005) (plaintiffs' experts "expressed virtually the same opinion professionally before they were retained as litigation experts, at a time when ephedra lawsuits were rare or unknown"); *In re PPA Prods. Liab. Litig.*, 289 F. Supp. 2d 1230, 1242 (W.D. Wa. 2003) (several plaintiffs' experts conducted independent, clinical PPA-based research). By contrast, Dr. Mayer did not conduct any independent research into Baycol-induced myopathy, either before or after the start of the Baycol litigation.

*Smith v. Wyeth-Ayerst Labs. Co.*, on which plaintiffs also rely, actually supports the exclusion of Dr. Mayer's testimony. There, the court limited the treating physicians' testimony to factual observations and excluded opinion testimony on the causes of primary pulmonary hypertension ("PPH"), the injury at issue in the case. 278 F. Supp. 2d 684, 697-98 (W.D.N.C. 2003). Just as Dr. Mayer lacks specialized knowledge of Baycol-induced myopathy, the physicians in *Smith* lacked the "specialized knowledge or experience in PPH, PH, or the relationship between diet drugs and PPH necessary to assist the jury in understanding the etiology of Plaintiff's PPH." *Id.* at 698.

term injury from short-term myopathy; (2) like the expert in *Leathers* who lacked relevant expertise, Dr. Mayer's clinical experience with Baycol is neither extensive nor specialized – he treated only one or two Baycol patients with myopathy, and doesn't know of any long-term injury; (3) the *Leathers* court specifically found that the "statements regarding both general and specific causation" by plaintiffs' expert failed to meet *Daubert*'s standards (*see* 233 F.R.D. at 691); and (4) as described below and similar to the expert in *Leathers*, the scientific literature does not support Dr. Mayer's opinions. Though plaintiffs seek to distinguish *Leathers*, they do not and cannot dispute that Dr. Mayer's hypothesis and the accepted scientific view about statin-induced myopathy are diametrically opposed. *See, e.g.*, *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996) ("When a scientist claims to rely on a method practiced by most scientists, yet presents conclusions that are shared by no other scientist, the district court should be wary that the method has not been faithfully applied").

Second, plaintiffs fail to demonstrate that Dr. Mayer's limited clinical experience with Baycol is a sufficient basis for his opinions. Any effort at such a showing faces an immovable obstacle: Dr. Mayer has no clinical experience in treating long-term or permanent, Baycol-induced myopathy. *See* Mayer Dep. (Pls' Ex. A) at

36:12-17, 37:4-7.[3] Dr. Mayer candidly admitted that he cannot remember if he treated any patients with Baycol-induced muscle injuries. *See id.*

The reason for Dr. Mayer's lack of clinical experience in treating Baycol-induced myopathy is that Baycol was "not on the formulary" at his health care system. *See* Mayer Dep. (Pls' Ex. A.) at 36:20-37:3. Thus, he saw "very few patients" who were on Baycol. *See id.* As for his limited experience treating patients with myopathy induced by statins other than Baycol, Dr. Mayer admitted that the "majority of them recovered completely over a period of months," and he did not know whether the remaining patients fully recovered because he "did not have ongoing follow-up with them." *See id.* at 38:21-39:4.

Finally, it is undisputed that Dr. Mayer's experience cannot reliably be applied to the facts of the Baycol cases because plaintiffs make an astonishing admission that Dr. Mayer's "opinion is not limited to Baycol, but [applies] to all myopathies." *See* Pls' Response at 4. Plaintiffs emphasize that any and all scientific literature supports Dr.

---

[3] Q. Were any of these dozen or so patients whom you have treated for statin-induced myopathy taking Baycol?

A. I believe one or two may have been. It's been several years, so I don't recall in the less severe cases what statin they were on.

* * *

Q. The three cases of rhabdomyolysis that you treated, those were all caused by a statin other than Baycol?

A. That's correct.

Mayer Dep. (Pls' Ex. A.) 36:12-17; 37:4-7.

Mayer's opinion of persistent myopathy – "irrespective of whether the myopathy was induced by Baycol or another source entirely." *See id.* at 4.

Because there are "lots of different myopathies" each with "different prognoses" (*see* Mayer Dep. (Defs' Ex. B) at 201:6-202:8), plaintiffs cannot establish how myopathies of all stripes and colors are informative of Baycol-induced myopathy. Dr. Mayer's myopathy opinion is so general that it cannot be tied to the facts of this case or assist the trier of fact to understand the evidence. *See* Rule 702; *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 591 (1993) (the court's gatekeeping inquiry must be "tied to the facts" of a particular case). Thus, Dr. Mayer's permanent myopathy opinion should be excluded.

**B. Plaintiffs' Newly-Found Medical Articles Do Not Support Dr. Mayer's Opinion of Baycol-Induced Myopathy.**

Plaintiffs abandon their reliance on the literature Dr. Mayer read when he formed his opinions – because it provided no support and sometimes contradicted his opinions – and instead point to recent articles by Dr. Phillips (an expert previously retained but then dropped by plaintiffs' counsel in this litigation) and Dr. Hildebrand that Dr. Mayer either had no knowledge of or did not review when he wrote his report.[4]

**1. The Phillips' Articles Do Not Support Dr. Mayer's Opinions.**

None of the three articles by Dr. Phillips (a 2002 article, a 2004 article, and a 2006 article) supports Dr. Mayer's opinion of persistent, Baycol-induced myopathy.

[4] The reference to, interpretation of, and reliance upon these new articles come solely from plaintiffs' counsel, not from Dr. Mayer.

The 2002 Phillips article (Defs' Ex. C) concluded – in direct rebuttal of Dr. Mayer's hypothesis of persistent myopathy – that muscle symptoms "reversed upon discontinuation of statin therapy." Defs' Br. at 6. Although Dr. Mayer relied on this study to support his hypothesis, plaintiffs' tepid rejoinder is that the 2002 study in "no way contradicts" Dr. Mayer's opinions. *See* Pls' Response at 8. Plaintiffs now concede that the study was not designed to determine whether Baycol could cause persistent myopathy. But that, of course, is precisely why the study does not support Dr. Mayer's opinions.

The 2004 Phillips article also provides no support for the notion that Baycol causes permanent myopathy. That article studied the hypothesis that statin-associated muscle toxicity may be caused by a metabolic defect found in patients with lipid disorders. *See* Phillips PS, *et al.*, "Statin myotoxicity is associated with changes in cardiopulmonary function." *Atherosclerosis* 177:183-188 (2004) (Pls' Ex. B). Plaintiffs lift a couple of statements out of context to claim support for the view that Baycol causes persistent myopathy but ignore the study's purpose and the authors' conclusions.

The authors tested whether "the tendency to myotoxicity on lipid-lowering therapy might be due to the patient's lipid disorder itself." *See* Pls' Ex. B. After comparing 11 patients diagnosed with statin-induced myositis to a control group, the authors found that the two groups had "striking" differences in a certain metabolic test. This test indicated that a patient's lipid disorder itself may cause greater susceptibility to toxic muscle reactions. The authors concluded that "these findings suggest the possibility that it is not the lipid-lowering therapy alone but an underlying disorder of muscle fat

metabolism in some vulnerable hyperlipidemic patients that predisposes to myotoxicity on such therapies. Further evaluation of this hypothesis is warranted." *See id.* at 187. That conclusion does not approach what Dr. Mayer opined about permanent or long-lasting, Baycol-induced myopathy.

The 2006 Phillips article is similarly unhelpful to Dr. Mayer's myopathy hypothesis. This article reviewed recent scientific findings to provide clinical advice to treat patients with post-statin muscle symptoms. *See* Antons et al., *Amer. J. of Med.*, Clinical Perspectives of Statin-Induced Rhabdomyolysis, 119: 400-409 (2006) (Pls' Ex. C). The authors did not conduct any research into whether statins cause long-term myopathy. Like Dr. Phillips' previous article, the 2006 authors noted that "[s]everal lines of evidence suggest that patients who have statin-induced rhabdomyolysis may have an underlying metabolic predisposition to this reaction." *See id.* at 402.[5] The authors concluded that "our understanding of the cause and treatment of [statin-induced rhabdomyolysis] remains limited" and that "further work is needed to clarify this disorder." *See id.*

Because the 2004 and 2006 Phillips articles do not even investigate, much less conclude, that Baycol causes permanent myopathy, neither provides scientific support for Dr. Mayer's long-term myopathy opinion.

[5] The authors also pointed out that: "Although pharmacokinetic causes of elevated statin activity clearly contribute to the risk of statin-induced rhabdomyolysis, there seem to be factors involved other than statin level and bioactivity. It seems that latent metabolic defects may render some previously asymptomatic patients vulnerable to the metabolic effects of statins." *See id.* at 406.

**2. The Hildebrand Article Does Not Support Dr. Mayer's Hypothesis Of Persistent Post-Baycol Pain.**

Dr. Hildebrand's recent article contradicts Dr. Mayer's opinion that Baycol causes long-term myopathy. Plaintiffs conveniently ignore the authors' conclusion: "Every patient who discontinued statin therapy experienced *rapid resolution of muscle pain, typically within a month after cessation of therapy*." Hansen, *et al.* "Outcomes in 45 Patients With Statin-Associated Myopathy," *Archives Internal Med.* 165 at 2675 (2005) (Pls' Ex. D) (emphasis added). The article concluded that "patients with statin-associated myopathy experienced full resolution of muscle pain on the cessation of statin therapy." In short, consistent with the accepted view by the medical community, the Hildebrand article confirms that statin-induced myopathy is temporary.

**3. Plaintiffs Fail To Show That Studies About Non-Statin Drugs Or Zero-Gravity Space Flight Support Dr. Mayer's Myopathy Hypothesis**.

Plaintiffs concede that there is no support in the scientific literature showing a similarity between statin-induced myopathy and myopathy caused by using AZT drugs or steroids or returning from zero-gravity space. *See* Mayer Dep. (Defs' Ex. B) at 200:14-22; 201:6-202:8; 206:1-4; 206:17-21; 207:6-10. In addition, Dr. Mayer cannot rely on these studies to support his opinion because he fails to show how one might reliably extrapolate from such data to his conclusion that Baycol causes permanent muscle injury in the absence of abnormal CK elevations.

### 4. Dr. Mayer's Opinions About Muscle Recovery Rate And Scar Tissue Lack Scientific Support

Plaintiffs do not dispute that Dr. Mayer could not have reliably extrapolated a three percent recovery rate for statin-induced muscle injury from data concerning "surgically-induced slicing of the muscle in surgery." Mayer Dep. (Defs' Ex. B) at 209:1. Neither the 2004 Phillips article nor the Hildebrand article devote any attention, much less provide support for, Dr. Mayer's view that muscle strength returns at the rate of about three percent per week.

Lastly, plaintiffs state that "the medical literature is full of articles that recognize the formation of scar tissue of [sic] damage to muscle tissue." *See* Pls' Response at 11. But like Dr. Mayer's undisputed inability to recall any study showing formation of new scar tissue following statin-induced myopathy (Mayer Dep. (Defs' Ex. B) at 213:4-10), plaintiffs fail to cite a single supportive science article. Dr. Mayer's clinical experience also is unavailing since he has virtually no experience with Baycol-induced myopathy. Thus, Dr. Mayer's opinions on the recovery rate of muscle strength and formation of fibroblasts in response to statin-induced myopathy should be excluded.

## II. DR. MAYER'S OPINIONS ABOUT THE COMPARATIVE SAFETY OF BAYCOL SHOULD BE EXCLUDED.

Undeterred by their own concession that Dr. Mayer is "not a drug safety expert" and "[h]e's not an FDA expert," Mayer Dep. (Defs' Ex. B) at 249:8-9, and oblivious to Dr. Mayer's admission that he lacks the experience to interpret AER data (*id.* at 270:1-272:2-6), plaintiffs insist that Dr. Mayer should be allowed to opine that Baycol was more dangerous than other statins.

Plaintiffs contend that Dr. Mayer may rely on AERs because Bayer acknowledged there was an increased reporting rate of “muscle injuries” when it voluntarily withdrew Baycol. Pls’ Response at 13. In so arguing, plaintiffs are putting words in Bayer’s mouth. Bayer actually stated, “[o]ur ongoing scrutiny of post-marketing reports of rhabdomyolysis, including fatalities, has revealed an increased reporting rate of rhabdomyolysis with Baycol relative to other statins, especially when gemfibrozil is coprescribed. These data also suggest an increased reporting rate of rhabdomyolysis at the 0.8 mg. dose of Baycol alone.” *See* Pls’ Ex. E. Once again, plaintiffs are freely and improperly substituting references to “muscle injuries” for rhabdo.

Moreover, plaintiffs ignore the threshold issue of whether AERs are the sort of evidence upon which scientists can properly rely to draw conclusions about comparative drug risk. As shown in Defendants’ AER Motion and Reply, the overwhelming weight of scientific and legal authority establishes that AERs cannot be properly relied upon to compare the safety of medicines. As both the courts and FDA have explained, anecdotal reports of adverse events, regardless of the *reporting* rate, do not support conclusions about the *incidence* rate, let alone whether there is a meaningful association between the drug and the events.

Plaintiffs do not debate that Dr. Mayer is not qualified to opine about the comparative safety of Baycol based on the drug’s bio-availability, metabolic profile or voluntary actions by Bayer. *See* Mayer Dep. (Defs’ Ex. B) at 254:14-18; 255:21-256:1; 256:7-12; 257:5-258:14; 263:10-22. In an attempt to gloss over Dr. Mayer’s self-

admitted lack of qualifications, plaintiffs argue that Dr. Mayer may rely on other experts and that "[a]t the end of the day, it is the cumulative effect of all experts' knowledge that completes the picture." Pls' Response at 13-14. This "sum of the parts" theory has multiple flaws.

First, *Daubert* and its progeny do not permit the admission of an opinion that cannot stand on its own, but must be somehow propped up by other opinions of other people on other subjects. Dr. Mayer's borrowing of another expert's purported expertise is the antithesis of reliable expert testimony. *See* Defs' Motion to Exclude Expert Witnesses from Invoking the Testimony of Other Testifying Witnesses and Reply.[6] Further, Dr. Mayer's parroting of another expert without any independent thought or evaluation does not create a "cumulative" effect. *See, e.g., Siharath v. Sandoz Pharm. Corp.*, 131 F. Supp. 2d 1347, 1371 (N.D. Ga. 2001) ("one cannot lump together lots of hollow evidence in an attempt to determine what caused a medical harm").

---

[6] The case law cited by plaintiffs undercuts their argument that an expert may opine on subjects beyond his expertise. *See Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996) ("given the increasingly specialized and technical nature of medicine, there is no validity, if there ever was, to the notion that every licensed medical doctor should be automatically qualified to testify as an expert on every medical question. Such a rule would ignore the modern realities of medical specialization"); *Medalen v. Tiger Drylac U.S.A., Inc.*, 269 F. Supp. 2d 1118, 1127-29 (D. Minn. 2003) (refusing to permit a toxicologist to opine on the etiology of basal cell carcinoma, noting that an expert in one subject may not be qualified to testify beyond that expertise); *Alexander v. Smith & Nephew, P.L.C.*, 98 F. Supp. 2d 1310, 1315 (N.D. Okla. 2000) ("blanket qualification for all physicians to testify as to anything medically-related would contravene the Court's gate-keeping responsibilities").

Second, this new notion that the "cumulative" effect of all the expert opinions supports a finding that Baycol was unsafe is not expert opinion at all. It is argument, and the rhetorical assertions from the mouth of an advocate, not a scientist.

Dr. Mayer's opinion about Baycol's comparative safety should be excluded.

**CONCLUSION**

For the foregoing reasons, defendants respectfully request that the Court exclude Dr. Mayer's testimony under *Daubert*, *Kumho*, and Rule 702.

Dated: August 11, 2006

Respectfully submitted,

Peter W. Sipkins (No.101540)
DORSEY & WHITNEY LLP
Suite 1500
50 South Sixth Street
Minneapolis, MN 55402
(612) 340-2600

Philip S. Beck
Adam Hoeflich
BARTLIT BECK HERMAN
PALENCHAR & SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60610
(312) 494-4400

/signature on file/
Susan A. Weber
James W. Mizgala
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000

Scott A. Smith
Tracy J. Van Steenburgh
HALLELAND LEWIS NILAN
SIPKINS & JOHNSON, P.A.
220 South Sixth Street, Suite 600
Minneapolis, Minnesota 55402-4501
(612) 338-1838

/signature on file/
Fred T. Magaziner
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000

*Counsel for SmithKline Beecham Corporation d/b/a GlaxoSmithKline*

Paul J. Zidlicky
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

Catherine Valerio Barrad
Thomas P. Hanrahan
Justin Ma
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
(213) 896-6000

Richard K. Dandrea
ECKERT SEAMENS CHERIN
& MELLOTT, LLC
USX Tower, 600 Grant St., 44th Floor
Pittsburgh, PA. 15219
(412) 566-6000

Douglas R. Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000

Joseph D. Piorkowski, Jr.
THE PIORKOWSKI LAW FIRM, PC
910 17th Street, NW Suite 800
Washington, D.C. 20006
(202) 223-5535

*Counsel for Bayer Corporation and Bayer AG*