**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : | MDL No. 1431 (MJD) |
| This Document Relates to: | : | |
| *All Actions* | : | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO EXCLUDE EXPERT TESTIMONY OF CHARLES E. BOULT**

The PSC has designated Charles Boult to opine on issues of general causation. In his report, Dr. Boult posits that Baycol can cause persistent muscle injury after the discontinuation of statin use, even though he acknowledges that he has no scientific support for his opinion. He further contends that physicians can deduce Baycol-induced myopathy if (1) muscle pain is severe enough to cause significant functional limitations, (2) the symptoms began after Baycol use was initiated, and (3) the symptoms diminish or remain after Baycol use was discontinued. But Dr. Boult admits that these "criteria" for deducing Baycol-related injury are "too preliminary" and not generated with any rigor. At his deposition, and outside the corners of his report, Dr. Boult opined, based entirely on unreliable adverse event reports, that Baycol was more toxic than other statins. Further, Dr. Boult posited that Baycol's label was insufficient, even though he never reviewed the label before stating this opinion. Dr. Boult's opinions do not rise to the standard set forth in Rule 702 or *Daubert v. Merrell Dow Pharms., Inc.*,

509 U.S. 579 (1993), and the PSC has not demonstrated that he should be permitted to testify to these subjects as an "expert witness."

**ARGUMENT**

**I. THE PSC HAS FAILED TO DEMONSTRATE THAT THE MEDICAL LITERATURE SUPPORTS DR. BOULT'S OPINION THAT BAYCOL CAUSES PERSISTENT MYOPATHY.**

Dr. Boult asserts that Baycol could cause persistent myopathy, but recognizes that no scientific data exists that proves his opinion. Boult Dep. (Reply Ex. A[1]) at 222:21-224:6 (admitting that "high level proof in a scientific sense . . . has not been collected yet" to support his persistent myopathy opinion). Further, Dr. Boult has not conducted any independent study in an effort to inject scientific virtue into his opinion. *Id*. at 330:9-331:1 (acknowledging he has not conducted any study on statins outside the confines of his engagement as an expert in this case). Instead, Dr. Boult has assembled a collection of disconnected studies and leapt from the existing medical literature to his conclusion without any reliable scientific grounding. That sort of speculation is insufficient under *Daubert* and Rule 702.

The same jump Dr. Boult proposes to take here already has been rejected by another federal court. In *Leathers v. Pfizer, Inc.*, 233 F.R.D. 687 (N.D. Ga. 2006), the Northern District of Georgia held this year, after an independent review of the medical literature relating to statins, that the existing medical literature did not support an opinion that statins can cause persistent or permanent muscle injury: "Research addressing the

---

[1] Exhibit references are to exhibits for Defendants' Memorandum in Support of Their Motion to Exclude Expert Testimony of Charles E. Boult ("Defs' Ex.") or for the PSC's Response ("Pls' Ex.") or for this brief ("Reply Ex.").

relationship between Lipitor (and, more generally, statins) and Plaintiff's alleged injury [persistent or permanent muscle injury] is still in an immature stage and does not possess the level of reliability required by *Daubert*." *Leathers*, 233 F.R.D. at 695; *see also id.* at 697-98 (holding that the plaintiff "cannot establish general causation" of persistent or permanent muscle injury by statins because the existing medical literature is not sufficiently reliable).

In their effort to buttress Dr. Boult's opinion that Baycol can cause persistent myopathy, plaintiffs have improperly recast studies to which Dr. Boult referred and have presented new studies that Dr. Boult never reviewed in forming his opinions.[2] But Dr. Boult's and the PSC's piecemeal use of disconnected studies as building blocks to support Dr. Boult's persistent myopathy opinion is not sufficient under Rule 702 and *Daubert*. *See, e.g.*, *Domingo v. T.K.*, 289 F.3d 600, 606 (9th Cir. 2002) (holding that, where "studies that were cited do not provide support for every necessary link in [the expert's] theory of causation," expert testimony reliant on existing literature is not sufficient basis for expert testimony under *Daubert*); *Doe v. Ortho-Clinical Diagnostics, Inc.*, ___ F. Supp. 2d ___, 2006 WL 1877150, at *4-5 (M.D.N.C. July 6, 2006) (same).

Indeed, in some cases, the PSC has resorted to characterizing the studies upon which Dr. Boult relied as not contradictory to his opinions. But *not contradicting*

[2] Defendants have discussed in detail each of the studies upon which Dr. Boult relied in opining that Baycol can cause persistent myopathy, and will confine their discussion here to the PSC's characterization of those studies. For defendants' previous discussion, *see* Defs' Br. at 4-6.

Dr. Boult's opinions is not the same as *supporting* them, which Rule 702 and *Daubert* require.

**A. Studies Upon which Dr. Boult Relied**

***1. The England study.*** The PSC contends that J. England, et al., *Mitochondrial Myopathy Developing on Treatment with HMG CoA Reductase Inhibitors – Simvastatin and Pravastatin*, 25 Aust. J. Med. 374-75 (1995) (Defs' Ex. C), supports Dr. Boult's opinion because it states, without any cited support, "Most patients recover clinically after stopping the drug." *Id.* at 374; Pls' Response at 7. England offers no evidence that some patients do not recover clinically, and, in fact, found exactly the opposite. Specifically, England reported that among the subjects of the study, "all symptoms and signs [of muscle stiffness and tenderness] resolved on cessation of the drugs." England at 374. Furthermore, England did not even include Baycol patients as the study was published in 1995, before Baycol was marketed. Thus, notwithstanding an unsupported cursory comment by the author, the England study does not support Dr. Boult's conclusion that Baycol causes persistent muscle injury.

***2. The Phillips report.*** The PSC acknowledges that P.S. Phillips, et al., *Statin-Associated Myopathy With Normal Creatine Kinase Levels*, 137 Annals Internal Med. 581-86 (2002) (Defs' Ex. D), does not support Dr. Boult's opinion, but the PSC asserts that the study "in no way contradicts Dr. Boult's opinion that muscle injuries from Baycol persist." Pls' Response at 7-8. However, the Phillips study does, in fact, contradict Dr. Boult, because each of the subjects of the study, "symptoms and histologic

changes occurred only during statin use . . . . [T]he pathologic abnormality reversed upon discontinuation of statin therapy." Phillips at 582, 583.

***3. The Hildebrand abstract.*** The PSC does not attempt to explain how J. Hildebrand, et al., *The Natural Course of Statin Induced Myopathy [abstract]*, 48 Arthritis & Rheumatism 730 (2003) (Defs' Ex. E), upon which Dr. Boult relied in forming his opinion that Baycol caused persistent muscle injury, supports Dr. Boult's opinion. Pls' Response at 9. Instead, the PSC refers to a subsequent published study by the same group of authors. As discussed in Part I.B.3., Dr. Boult did not review or rely on the subsequent study in forming his opinions, and, therefore, it cannot now be used to justify his methodology. Moreover, and contrary to the PSC's assertion (Pls' Response at 9), the subsequent publication does not support, but contradicts Dr. Boult's opinion. Indeed, the study reports, "Every patient who discontinued statin therapy experienced rapid resolution of muscle pain, typically within a month after cessation of therapy." K.E. Hansen, et al., *Outcomes in 45 Patients with Statin-Associated Myopathy*, 165 Archives Internal Med. 2671-76 (2005) (Pls' Ex. C).

***4. The Argov article.*** The PSC claims that Z. Argov, *Drug-induced Myopathies*, 13 Current Opinions in Neurology 541-45 (2000) (Defs' Ex. F), supports Dr. Boult's persistent myopathy opinion. The PSC suggests that, because Argov reports having personally witnessed patients with persistent muscle aches after discontinuation of statin therapy, Dr. Boult's opinion that Baycol causes persistent muscle injury must have some legitimacy in science. Pls' Response at 9-10. This is not the case. First, Argov does not mention Baycol, and there is no indication that Argov considered any data

related to Baycol. Second, Argov makes no claim to identifying a *cause* of the persistent muscle aches reported. In fact, Argov only postulates that the muscle aches "*may represent* a sustained, subclinical, drug-induced muscle injury." Argov (Defs' Ex. F) at 542 (emphasis added) "Such a conditional statement cannot meet the preponderance of the evidence standard that Plaintiffs need to meet to show that [a substance] could cause [a condition]." *Doe*, 2006 WL 1877150 at *5. Third, Argov's personal observation is nothing more than an adverse event report without any confirmation that the event was caused by the drug, whatever drug that may be. As defendants have noted elsewhere, and as the FDA cautions, adverse event reports are not reliable evidence upon which to base an opinion on general causation. Thus, Argov does not support Dr. Boult's opinion that Baycol causes persistent muscle injury.

**B. Newly Offered Studies**

The PSC also cites four new studies. However, studies that Dr. Boult did not review or rely upon in forming his opinions cannot now be used to defend those opinions. Moreover, none of the new studies supports Dr. Boult's opinions that Baycol can cause persistent myopathy:

***1. The Phillips study.*** The PSC cites Paul S. Phillips, et al., *Statin Myotoxicity Is Associated With Changes In The Cardiopulmonary Function*, 177 Atherosclerosis 183-88 (2004) (Pls' Ex. E), for the proposition that "post-myositis patients remained symptomatic 3-62 months after the acute event." Pls' Response at 8; *see also id.* at 11 (citing Phillips as support for Dr. Boult's opinions). However, Phillips states that the researchers could not draw any conclusion regarding the effect of past

statin use on persistent muscle toxicity, instead suggesting only the "possibility" and the need for further research. Phillips (Pls' Ex. E) at 187. Conclusions conditioned on further research are not reliable evidence to support Dr. Boult's opinions. *Doe*, 2006 WL 1877150 at *5.

***2. The Antons survey.*** The PSC refers to K.A. Antons, et al., *Clinical Perspectives Of Statin Induced Rhabdomyolysis*, 119 Am. J. Med. 400-09 (2006) (Pls' Ex. F), a treatment survey limited to post-rhabdomyolysis patients, because the article makes note of "persistent symptoms in some patients following statin therapy." Pls' Response at 8. But the existence of post-rhabdomyolysis muscle symptoms does not support the proposition Dr. Boult has advanced – that statins *cause* persistent muscle injury. Indeed, the Antons survey makes no attempt to uncover the cause of the post-rhabdomyolysis muscle symptoms. Moreover, the survey does not address patients who claim to have experienced muscle aches while taking statins.

***3. The Hansen report.*** The PSC cites K.E. Hansen, et al., *Outcomes in 45 Patients with Statin-Associated Myopathy*, 165 Archives Internal Med. 2671-76 (2005) (Pls' Ex. C), because it does not contradict Dr. Boult's opinion. Pls' Response at 9. But it does, in concluding that "Every patient who discontinued statin therapy experienced rapid resolution of muscle pain, typically within a month after cessation of therapy." Hansen (Pls' Ex. C) at 2675.

***4. The Dobkin article.*** The PSC contends B.H. Dobkin, *Underappreciated Statin-Induced Myopathic Weakness Causes Disability*, 19 Neurorehabilitation and Neural Repair 259-63 (2005) (Pls' Ex. G), supports the

conclusion that "patients suffer a persistent statin-induced myopathy." Pls' Response at 11. But this is not the case. Dobkin studied post-stroke victims, and concluded that physicians should test muscle weakness routinely while a patient is taking a statin to ensure the consideration of any "possibility of statin-induced weakness." Dobkin (Pls' Ex. G) at 262. Dobkin expressly states that further research needs to be conducted to determine the *cause* of patient disability. *Id.* Though Dobkin notes that myopathy can occur while the patient is treated with a statin, he also states that all subjects he studied recovered fully after the statin had been discontinued. *Id.* at 261. Dr. Boult, on the other hand, has opined that muscle pain or weakness can persist following the discontinuation of Baycol. Boult Rep. (Defs' Ex. A) ¶ 26. Dobkin in no manner supports Dr. Boult's opinion that Baycol could cause persistent myopathy.

* * *

Even if the studies supported Dr. Boult's conclusion that Baycol can cause persistent myopathy – and they do not – support for Dr. Boult's *conclusion* would not go to the *reliability* of Dr. Boult's *methodology*. Evaluation of Dr. Boult's methodology is the relevant issue in determining the reliability of his opinions. *Daubert*, 509 U.S. at 589-90. Using disconnected studies as piecemeal building blocks, and then leaping to a conclusion that appears nowhere in the existing medical literature, is not sufficient to meet the standard for reliability of expert testimony under Rule 702 and *Daubert*.

## II. DR. BOULT'S EXPERIENCE TREATING PATIENTS CANNOT BE SUBSTITUTED FOR PHARMACOKINETIC AND TOXICOLOGICAL EXPERTISE.

Dr. Boult has no particularized knowledge regarding pharmacokinetic and toxicological properties of Baycol or statins as a class. He has not conducted any study of statins outside the context of this litigation. Boult Dep. (Defs' Ex. B) at 253:9-10, 12-20. His limited knowledge stems from a limited review of the medical literature. Id., at 330:9-331:1. Rule 702 requires more for Dr. Boult to be qualified to opine that Baycol can cause persistent muscle injury – ostensibly opinions on the pharmacokinetic and toxicological properties of Baycol.

Contrary to the PSC's suggestion, the fact that Dr. Boult has a medical degree and that he has practiced medicine does not qualify him as an expert in pharmacokinetics and toxicology. The PSC contends that, because Dr. Boult "has treated patients who suffered from muscle pain on statins," he has "valid qualification for an expert" to opine on general causation. Pls' Response at 4-5. The PSC cites to *Smith v. Wyeth-Ayerst Lab. Co.*, 278 F. Supp. 2d 684, 702 (W.D.N.C. 2003) for this claim. But the court in *Smith* found that, though practitioners may be permitted to opine on whether proven risks of a pharmaceutical are disclosed sufficiently in a label, they are not qualified by a medical degree alone to opine on whether a pharmaceutical causes alleged side effects. *Id.* at 702.

Indeed, courts have recognized that, "given the increasingly specialized and technical nature of medicine, there is no validity, if there ever was, to the notion that every licensed medical doctor should be automatically qualified to testify as an expert on

every medical question. Such a rule would ignore the modern realities of medical specialization." *Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996) (applying *Daubert*); *see also Medalen v. Tiger Drylac U.S.A., Inc.*, 269 F. Supp. 2d 1118, 1127-29 (D. Minn. 2003) (refusing to permit a toxicologist to opine on the etiology of basal cell carcinoma, noting that an expert in one subject may not be qualified to testify beyond that expertise); *Wilson v. City of Chicago*, 6 F.3d 1233, 1238-39 (7th Cir. 1993) (excluding pathologist's testimony on issues of neurology, psychiatry, and physiology). By his own admission, Dr. Boult's experience with statins is limited, and he does not possess the specialized knowledge required by Rule 702 and *Daubert* to opine that Baycol can cause persistent muscle injury. A medical degree alone is not enough.

## III. DR. BOULT'S "CLINICAL CRITERIA" DO NOT QUALIFY AS EXPERT OPINION BY HIS OWN ADMISSION.

Dr. Boult claims that physicians can deduce that Baycol caused myopathy, even in the absence of objective clinical evidence, if (1) muscle pain is severe enough to cause significant functional limitations, (2) the symptoms began after Baycol use was initiated, and (3) the symptoms diminish or remain after Baycol use was discontinued. Boult Report (Defs' Ex. A) ¶ 23. Dr. Boult's "clinical criteria" for determining whether a myopathy is caused by Baycol are neither remotely scientific nor will they assist the jury, and Dr. Boult admits as much.

Dr. Boult concedes that his "criteria" are so preliminary, and generated with less than adequate rigor, that he would be wary of submitting them for peer review. Boult Dep. (Defs' Ex. B) at 253:17-254:13. Dr. Boult further admits that his "criteria"

were generated expressly for this litigation. *Id*. This Court should not be the testing ground for such "criteria." "The objective . . . is to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). Dr. Boult's "clinical criteria" do not meet this standard.

The PSC attempts to resurrect Dr. Boult's "criteria" by redefining them as diagnostic "guidelines," and by claiming that such guidelines are commonplace in medical practice. Pls' Response at 13. In support of this proposition, the PSC offers two *peer-reviewed* sets of guidelines published, respectively, by the National Cholesterol Education Group and the American Journal of Medicine. *Id.* These guidelines stand in stark contrast to Dr. Boult's "criteria" in that: (1) they were both peer-reviewed, and (2) they are treatment guidelines and not "criteria" aimed at deducing causation.

Apparently in recognition of these shortcomings, the PSC argues that Dr. Boult's causation opinion is legitimate because one court has noted that temporal proximity is suggestive of causation. Pls' Response at 13 (citing *Bonner v. ISP Tech., Inc.*, 259 F.3d 924 (8th Cir. 2001)). *Bonner*, however, concerned the specific cause of a particular plaintiff's condition, as opposed to *general causation* for which Dr. Boult's opinions are offered. *See id.*, 259 F.3d at 931. Indeed, Dr. Boult admits that proof of specific causation requires a detailed examination of a patient's history and a differential diagnosis – much more than the one-step application of his "clinical criteria." Boult Dep. (Defs' Ex. B) at 134-42. Accordingly, Dr. Boult's unscientific, unreviewed "criteria"

will not assist the jury to determine causation, and should not be endorsed with the imprimatur of "expert testimony."

## IV. ADVERSE EVENT REPORTS ARE NOT SUFFICIENTLY RELIABLE TO SUPPORT DR. BOULT'S OPINION THAT BAYCOL WAS MORE TOXIC THAN OTHER STATINS.

Though without mention anywhere in his report,[3] Dr. Boult offered the opinion at his deposition that Baycol was comparatively more toxic than other statins. Boult Dep. (Defs' Ex. B) at 86:3-8; 95:20-96:3; 182:3-12. Dr. Boult's opinion rests squarely on literature reporting adverse event data. Boult Dep. (Reply Ex. A) at 46:14-17; (Defs' Ex. B) 162:18-22; 294:16-20 (admitting that his opinion on comparative toxicity is premised entirely on adverse event data). Specifically, Dr. Boult relied on data drawn from J.A. Staffa, et al., *Cerivastatin and Reports of Fatal Rhabdomyolysis*, 346 N. Engl. J. Med. 539-40 (2002). *Id.* As defendants have explained in their AER Motion and Reply, adverse event reports are not reliable data upon which to draw opinions regarding the relative or comparative toxicity of a particular drug. Indeed, the very source of the data upon which Dr. Boult relied to form his opinion states plainly: "Rigorous comparisons between drugs that are based on these data are not recommended, since many factors can affect reporting and an unknown number of cases may not be attributed

[3] The PSC contends that defendants "opened the door" to Dr. Boult's testimony on comparative toxicity by asking him questions during his deposition. The PSC misstates the facts. In response to questions from defense counsel regarding known risks of statin use, Dr. Boult expressed an opinion regarding the comparative risk of the various statins. Boult Dep. (Reply Ex. A) at 43:18-45:1. Dr. Boult acknowledged that risk and relative risk were two separate concepts, and that the questions put to him related only to risk. *Id*. at 46:1-20. Further, Dr. Boult acknowledged that his report made no mention of relative risk, but he proceeded to assert his opinions on the subject anyway. *Id*. at 47:12-48:11.

to the drug or reported to the FDA. Reporting rates are not incidence rates." Staffa (Ex. E to Defs' Smith Motion) at 540.

Nonetheless, the PSC contends that Dr. Boult's reliance on adverse event reports was proper because, "Dr. Boult testified that he feels confident to rely on adverse event data and that it is a valuable tool for a physician." Pls' Response at 15. Dr. Boult's "confidence" in drawing conclusions regarding comparative toxicity from unreliable data, however, is not sufficient under Rule 702 and *Daubert*. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Corp. v. Joiner*, 522 U.S. 136, 146 (1997).

## V. DR. BOULT'S OPINIONS REGARDING THE BAYCOL LABEL ARE NOT COMPETENT.

Dr. Boult contends that Baycol's labeling was inadequate because it should have warned physicians that clinical trials did not sufficiently test the effects of the drug on the elderly. Boult Dep. (Defs' Ex. B) at 121:14-122:5; (Reply Ex. A) at 79:17-80:4; (Defs' Ex. B) at 111:22-112:7.[4] Dr. Boult concedes, however, that he never reviewed Baycol's clinical trials data, and that he did not review the Baycol label at any point prior to forming his opinion. *Id*. at 62:20-63:3; 123:4-125:4.

---

[4] Like Dr. Boult's opinion on comparative toxicity, Dr. Boult's opinion on the sufficiency of the Baycol label appears nowhere in his report. At his deposition, however, Dr. Boult insisted that his opinion on Baycol labeling could be inferred from his report. Boult Dep. (Reply Ex. A) at 78:8-79:16. Defendants did not "open the door" by exploring Dr. Boult's unsupported opinion on labeling.

The PSC does not contest the lack of foundation for Dr. Boult's opinions regarding Baycol's label, but instead points to his experience as a gerontologist as supporting his capability to legitimately make such uninformed statements. Pls' Response at 15-16. Whatever Dr. Boult's qualifications may be for forming an opinion regarding the sufficiency of Baycol's label, he should not be permitted to ruminate on something he has not reviewed and call it expert opinion. *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001) (the Court must "separat[e] expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge"). Because neither Rule 702 nor *Daubert* permit Dr. Boult to opine on the sufficiency of a label that he admits he never reviewed, the Court should exclude his opinions.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court exclude the testimony of Charles E. Boult, M.D. pursuant to *Daubert* and Rule 702.

Dated: August 11, 2006

Respectfully submitted,

Peter W. Sipkins (No.101540)
DORSEY & WHITNEY LLP
Suite 1500
50 South Sixth Street
Minneapolis, MN 55402
(612) 340-2600

Philip S. Beck
Adam Hoeflich
BARTLIT BECK HERMAN
PALENCHAR & SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60610
(312) 494-4400

/signature on file/
Susan A. Weber
James W. Mizgala
James H.R. Hemmings
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000

Paul J. Zidlicky
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

Catherine Valerio Barrad
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
(213) 896-6000

Scott A. Smith
Tracy J. Van Steenburgh
HALLELAND LEWIS NILAN
SIPKINS & JOHNSON, P.A.
220 South Sixth Street, Suite 600
Minneapolis, Minnesota 55402-4501
(612) 338-1838

/signature on file/
Fred T. Magaziner
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000

*Counsel for SmithKline Beecham Corporation d/b/a GlaxoSmithKline*

Richard K. Dandrea
ECKERT SEAMENS CHERIN
& MELLOTT, LLC
USX Tower, 600 Grant St., 44th Floor
Pittsburgh, PA. 15219
(412) 566-6000

Douglas R. Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000

Joseph D. Piorkowski, Jr.
THE PIORKOWSKI LAW FIRM, PC
910 17th Street, NW Suite 800
Washington, D.C. 20006
(202) 223-5535

*Counsel for Bayer Corporation and Bayer AG*