**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : | MDL No. 1431 (MJD) |
| This Document Relates to: | : | |
| *All Actions* | : | |

# DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO EXCLUDE EXPERT TESTIMONY OF BRUCE CARLSON

Defendants have moved to exclude Dr. Carlson's opinions that (1) Baycol is the most myotoxic statin; (2) Baycol causes long-term damage even after discontinuation of the drug; (3) Baycol-induced myopathy can occur in the absence of clinical symptoms or corroborating laboratory data; and (4) Bayer should have studied and publicized myotoxicity tests of Baycol. *See* Report of Bruce Carlson (Dfs' Ex. A[1]) ¶¶ 8, 14, 15, 17, 51; Supplemental Report of Bruce Carlson (Dfs' Ex. C) ¶¶ 4, 8.

Plaintiffs' primary response is that Dr. Carlson is a "world-recognized expert on the science of muscles and aging." *See* Pls' Response at 4. However, Dr. Carlson's credentials alone are not enough to make his opinions admissible. As defendants demonstrate below, plaintiffs have failed to carry their burden of proving that any of the four opinions listed above are based upon sound scientific methodology and therefore sufficiently reliable to be presented to a jury.

---

[1] Exhibit references are to exhibits for Defendants' Memorandum in Support of Their Motion to Exclude Expert Testimony of Bruce Carlson ("Dfs' Ex.") or for the PSC's Response ("Pls' Ex.") or for this brief ("Reply Ex.").

## I. DR. CARLSON'S OPINIONS ABOUT THE COMPARATIVE SAFETY OF BAYCOL LACK A SCIENTIFIC BASIS.

In their opening brief, defendants demonstrated that Dr. Carlson, by his own admission, was not qualified to render an opinion as to the comparative safety of Baycol versus other statins, and that he essentially disavowed having such an opinion to offer. *See* Dfs' Br. at 4-7. In response, plaintiffs contend that Dr. Carlson has such an opinion and that to reach it, (1) he employed an acceptable methodology in relying on unpublished opinions of other experts offered in this litigation; (2) AERs are a scientifically reliable basis for an expert opinion; and (3) Dr. Carlson relied upon *in vitro* and animal research studies which demonstrated that Baycol was the most myotoxic of statins. *See* Pls' Response at 5-7. Each of plaintiffs' arguments is unavailing.

First, Dr. Carlson cannot testify about the comparative safety of Baycol based upon the testimony of plaintiffs' other experts. *See id*. This subject lies outside his area of expertise.[2] Dr. Carlson has no basis for this testimony, independent of the opinions of the other PSC experts he seeks to parrot. Raskin Dep. (Dfs' Ex. B) at 143:3-12. And the opinions of other testifying experts, developed specifically for purposes of

---

[2] *See Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996) ("given the increasingly specialized and technical nature of medicine, there is no validity, if there ever was, to the notion that every licensed medical doctor should be automatically qualified to testify as an expert on every medical question. Such a rule would ignore the modern realities of medical specialization") (applying *Daubert*); *Medalen v. Tiger Drylac U.S.A., Inc.*, 269 F. Supp. 2d 1118, 1127-29 (D. Minn. 2003) (refusing to permit a toxicologist to opine on the etiology of basal cell carcinoma, noting that an expert in one subject may not be qualified to testify beyond that expertise); *Alexander* v. *Smith & Nephew, P.L.C.*, 98 F. Supp. 2d 1310, 1315 (N.D. Okla. 2000) ("blanket qualification for all physicians to testify as to anything medically-related would contravene the Court's gate-keeping responsibilities").

litigation, constitute hearsay evidence that does not fall within the safe harbor of Rule 703. Therefore, as discussed in the defendants' Motion to Exclude Plaintiffs' Putative Expert Witnesses Expert Witnesses from Invoking the Testimony of Other Testifying Experts and their Reply, this Court should reject the PSC's contention that Dr. Carlson can parrot the testimony of Drs. Farquhar and Austin.

Second, Dr. Carlson cannot testify to the comparative risks of various statins based upon articles discussing AERs, as plaintiffs assert. As discussed in Defendants' Reply in Support of the Motion to Exclude Expert Testimony Based on Adverse Event Reports, the FDA rejects the use of AERs to compare the safety of drugs, the articles cited by plaintiffs do not support general conclusions comparing statins, and the case law does not authorize the admission of such testimony.

Indeed, at his deposition, Dr. Carlson deflected questions about Baycol's comparative safety to the other experts retained by plaintiffs (Carlson Dep. (Dfs' Ex. B) at 15:7-14; 97:18-20; 143:2-12; 175:7-13), conceding that he had conducted only a cursory review of the AER literature:

Q: Are you aware of any study that shows that Baycol has a greater propensity to cause myalgia than other statins?

A: No. But I need to qualify the answer. The answer is, no, I am not aware. But I did not specifically look at that literature because that was not my area of concentration.

Q: What was not in your area of concentration?

A: The epidemiological aspects of incidence or adverse event reporting.

Carlson Dep. (Reply Ex. A) at 175:7-16. Dr. Carlson then conceded that he would not offer comparative safety opinions based on the medical literature (*id*. at 176:1-6), and later stated that he was only opining that he agreed with the opinions of other experts. *Id.* at 177:19-22. Plainly, Dr. Carlson did not approach this issue with the scientific rigor that would support admission of this opinion under *Daubert*. *See Group Health Plan, Inc. v. Phillip Morris U.S.A.*, 344 F.3d 753, 760 (8th Cir. 2003) ("What is required [under the *Daubert* inquiry] is that when experts testify in court they adhere to the same standards of intellectual rigor that are demanded in their professional work").

Third, plaintiffs state that Dr. Carlson relied upon a study performed by Bayer scientists for his conclusion that Baycol was the most myotoxic statin. Pls' Response at 6. However, plaintiffs' assertion that "the 2001 study clearly demonstrated that Baycol was the most myotoxic of statins" (*id*.) is not true because it ignores relative pharmacologic activity of these medicines. Thus, the study found that "cerivastatin, fluvastatin, simvastatin and lovastatin behave quite similar[ly], whereas atorvastatin and pravastatin seemed to have a markedly lower myotoxic potential in this *in vitro* model." *See* BAYAG000611516-47 (Reply Ex. B)[3]; *see also id*. at BAYAG000611526 ("it became obvious that the myotoxic potential of cerivastatin, simvastatin, fluvastatin, and lovastatin was in a comparable relation to pharmacologic activity"). Even assuming Dr. Carlson claimed to have a comparative opinion of the myotoxicity of various statins, this

[3] The PSC claimed to have attached this document to its Response as Exhibit G, but Exhibit G was deposition testimony of Dr. Thomas Zizic.

study would not support such an opinion. To the degree the study indicates anything, it concludes that Baycol behaves like most other statins.

The simple truth is that Dr. Carlson, by his own admission, lacks the expertise to opine on the comparative safety of Baycol. He has not conducted any independent studies on statins, nor can he reasonably support such an opinion with a single controlled study or research on the topic. *See* Carlson Dep. (Dfs' Ex. B) at 175:7-13; 143:2-6. Accordingly, Dr. Carlson's proffered testimony must be excluded under Rule 702 and *Daubert*.

## II. THE COURT SHOULD EXCLUDE DR. CARLSON'S OPINIONS ABOUT LONG-TERM MUSCLE DAMAGE FROM BAYCOL AS IMPROPER CONJECTURE.

Dr. Carlson admitted in his expert report and deposition testimony that there is no support within the scientific community for his opinion that Baycol can cause long-term or permanent damage after discontinuation of the drug. *See* Dfs' Br. at 10-12; Carlson Dep. (Dfs' Ex. B) at 230:22-231:1. Dr. Carlson also admitted to relying on unrelated animal studies and muscle transplant cases to support his novel conclusion. *See* Dfs' Br. at 12; Carlson Dep. (Dfs' Ex. B) at 155:5-8; 125:22-126:5.

Plaintiffs do not dispute that there is no direct support for Dr. Carlson's opinion, nor do they dispute that Dr. Carlson's opinions rely solely on various unrelated studies. *See* Pls' Response at 8-10. Rather, they argue that, because there are no relevant studies on this subject, Dr. Carlson should be allowed to extrapolate from other scientific areas in which he has more than 30 years of experience. *Id*. at 9-10. In essence, plaintiffs

argue that, given the absence of reliable support in medical literature, the sheer volume of unrelated studies justifies Dr. Carlson's speculation.

Unfortunately for the plaintiffs, *Daubert* and Rule 702 foreclose testimony like that of Dr. Carlson, which leaps from an accepted scientific premise to an unsupported one. *See Glastetter* v. *Novartis Pharm. Corp.*, 252 F.3d 986, 989-90 (8th Cir. 2001) (excluding testimony that was inappropriate extrapolation from case studies, medical tests, and other sources, where the studies did not explicitly state that such a causal relationship existed); *see also Sorensen v. Shaklee Corp.*, 31 F.3d 638, 646, n.12 (8th Cir. 1994) (extrapolating to humans from animal studies is problematic in part because of the dose-response differential between animals and humans).

Dr. Carlson cannot cite a single study that provides the methodological justification for using animal research to extrapolate the long-term effects of statins on humans. Moreover, the animal studies upon which he relies do not involve statin-associated myopathy, but rather, muscle regeneration in animals generally. Carlson Dep. (Dfs' Ex. B) at 19:7-23; 155:5-22. As to muscle transplant cases – the other supporting "data" upon which Dr. Carlson relies – there is no explanation of why or how these cases might also relate to statin-associated myopathy. Other than the "say so" of Dr. Carlson, there is no connection between the "supporting" data and the proffered opinion. Consequently, his opinion as to the long-term muscle effects of Baycol should be excluded as unfounded speculation that has no place in a discussion of scientific methods and principles. *See J.B. Hunt Transp., Inc. v. General Motors Corp.*, 243 F.3d 441, 444

(8th Cir. 2001) ("mere speculation and pure conjecture . . . is not competent proof and contributes nothing to a legally sufficient evidentiary basis").[4]

Finally, plaintiffs' attempt to distinguish the recent decision in *Leathers v. Pfizer, Inc.*, 233 F.R.D. 687 (N.D. Ga. 2006), is futile and misleading. The *Leathers* court, recognizing that the purported expert opinion regarding permanent statin-induced myopathy was unsupported by the medical community, held that an expert could not extrapolate such long-term damage from existing data about temporary side effects. *See id*. at 691, 694-695.[5]

Plaintiffs err in asserting that the expert in *Leathers* did not opine on general causation and had failed to cite any literature. *See* Pls' Response at 11. In fact, in *Leathers*, the court considered the exact same opinion offered by Dr. Carlson here – that statin-induced myopathy can be prolonged or permanent after discontinuation of the drug. *Leathers*, 233 F.R.D. at 694-95. And the expert in *Leathers* relied upon the same

---

[4] Nor is Dr. Carlson's speculation the kind of extrapolation recognized as sometimes permissible in either the Manual on Complex Litigation or *In re Ephedra Products Liability Litig.*, 393 F. Supp. 2d 181, 189 (S.D.N.Y. 2005), cited by plaintiffs. In *Ephedra*, the court required that the testifying expert employ the same level of intellectual rigor that would characterize the work of an expert in the field, and allowed qualified testimony regarding general causation where the FDA, using "sound science," had reached the same conclusion regarding ephedra. 393 F. Supp. 2d at 194-96. Here, plaintiffs can cite to no one in the scientific community holding such an opinion other than their own retained experts.

[5] Plaintiffs also claim that *Leathers* is distinguishable because the expert in that case was not a specialist in muscle disorders. *See* Pls' Response at 11. The *Leathers* court did not, however, exclude the expert based on qualifications. Rather, the court found the witness qualified, but ultimately excluded the opinion because his methodology did not comply with *Daubert*. *Leathers*, 233 F.R.D. at 694.

types of "data" relied upon by Dr. Carlson in the present matter – anecdotal reports and studies unrelated to statins. *Id*. In *Leathers*, the court concluded that the studies identified by the expert could not support his opinion on the long-term effects of statins. *Id*. Likewise, Dr. Carlson's reliance on animal studies and muscle transplant cases that have nothing to do with statins is misplaced and cannot reasonably support his opinions about Baycol. Thus, Dr. Carlson's testimony about the long-term effects of Baycol should be excluded.

## III. PLAINTIFFS HAVE NOT ADDRESSED DEFENDANTS' ARGUMENTS TO EXCLUDE DR. CARLSON'S OPINION REGARDING MYOPATHY IN THE ABSENCE OF CLINICAL SYMPTOMS AND LAB RESULTS.

In their opening brief, defendants argued that the Court should exclude Dr. Carlson's opinion regarding Baycol-induced myopathy in the absence of CK elevations, because he lacked the expertise to render such an opinion (having never practiced medicine or conducted any studies on Baycol) and because he relied upon a single unreliable study. Dfs' Br. at 14-15. In response, plaintiffs argue that defendants have overstated Dr. Carlson's testimony, and that "Dr. Carlson is not being offered as an expert on generic causation to provide opinion that Plaintiffs with no symptoms and no laboratory evidence of injury have a claim." Pls' Response at 12. Also, plaintiffs now state that Dr. Carlson's opinion is only the recognition of one point on a continuum, and that he is not offered as a generic causation expert to opine that plaintiffs with no symptoms and no laboratory evidence have valid claims. The fact plaintiffs make these concessions in a section of their response headed "Myopathy induced by Baycol can

occur in the absence of clinical symptoms" (*id.*), however, makes it unclear precisely what plaintiffs now are arguing on this issue.

To the extent they intend to offer Dr. Carlson's opinion on this point, plaintiffs fail to address the problems with Dr. Carlson's methodology raised in defendants' brief. Consequently, the Court should exclude his testimony because of this flawed methodology.

## IV. PLAINTIFFS CONTRADICT DR. CARLSON'S TESTIMONY REGARDING THE BASIS OF HIS OPINION THAT BAYER SHOULD HAVE STUDIED OR PUBLISHED MYOTOXICITY TESTS OF BAYCOL.

Defendants moved to exclude Dr. Carlson's opinion that Bayer should have studied and/or published myotoxicity tests of Baycol in preclinical and clinical studies, because Dr. Carlson admitted in his deposition that he did not know what studies Bayer conducted, and, further, did not know what studies were required by the FDA. *See* Carlson Dep. (Dfs' Ex. B) at 29:14-25; 51:13-18; 108:2-109:16; 107:20-108:1. In their opposition, plaintiffs contradict their own expert's deposition testimony, and claim that Dr. Carlson came to the conclusion that Bayer did not perform sufficient studies on Baycol "after reviewing thousands of pages of research," and that "[a]fter a thorough review of the research, Dr. Carlson's opinion is that further studies were warranted and Defendants did not conduct the required studies." *See* Pls' Response at 13.

To opine reasonably that Bayer should have conducted more studies, it would have been necessary for Dr. Carlson to know what studies Bayer had done. Whatever plaintiffs now contend, they cannot change the fact that Dr. Carlson admitted at his deposition that he did not know what studies already had been conducted or

published. Thus, any opinion from Dr. Carlson that Bayer should have done more studies would be nothing but his baseless personal opinion, and entirely excludable as lacking foundation.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court exclude Dr. Carlson's above-referenced testimony under *Daubert* and Rule 702.

Dated: August 11, 2006

Respectfully submitted,

Peter W. Sipkins (No.101540)
DORSEY & WHITNEY LLP
Suite 1500
50 South Sixth Street
Minneapolis, MN 55402
(612) 340-2600

Philip S. Beck
Adam Hoeflich
BARTLIT BECK HERMAN
PALENCHAR & SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60610
(312) 494-4400

/signature on file/
Susan A. Weber
James W. Mizgala
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000

Scott A. Smith
Tracy J. Van Steenburgh
HALLELAND LEWIS NILAN
SIPKINS & JOHNSON, P.A.
220 South Sixth Street, Suite 600
Minneapolis, Minnesota 55402-4501
(612) 338-1838

/signature on file/
Fred T. Magaziner
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000

*Counsel for SmithKline Beecham Corporation d/b/a GlaxoSmithKline*

Paul J. Zidlicky
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

Catherine Valerio Barrad
Linda S. Peterson
Christine K. Son
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
(213) 896-6000

Richard K. Dandrea
ECKERT SEAMENS CHERIN
& MELLOTT, LLC
USX Tower, 600 Grant St., 44th Floor
Pittsburgh, PA. 15219
(412) 566-6000

Douglas R. Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000

Joseph D. Piorkowski, Jr.
THE PIORKOWSKI LAW FIRM, PC
910 17th Street, NW Suite 800
Washington, D.C. 20006
(202) 223-5535

*Counsel for Bayer Corporation and Bayer AG*