**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| In re BAYCOL PRODUCTS LITIGATION | MDL No. 1431 (MJD) |
| This Document Relates to: | |
| *All Actions* | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO EXCLUDE EXPERT TESTIMONY OF DAVID RICHMAN**

Plaintiff's response is a voluminous repetitive obfuscation intended to distract this Court from the underlying truth that Dr. Richman is a neurologist with little or no experience in epidemiology or statin-induced muscle damage who should not be permitted to testify regarding the unsupported theories he concocted for this litigation. *See* Richman Rep. (Dfs' Ex. A[1]); Richman Dep. (Dfs' Ex. B) at 128:14-19; 199:16-24.

But it is not just his lack of expertise that mandates exclusion of Dr. Richman's theories that Baycol is the "most toxic" statin; that statins may cause persistent muscle injuries and rhabdomyolysis after statin therapy is discontinued; and that Baycol affects cell membranes differently from other statins. In attempting to support Dr. Richman's opinions by claiming it is appropriate for him to rely upon anecdotal data and to speculate based on inapposite scientific articles, plaintiffs highlight the inadequacy of his methodology. The PSC has not carried its burden of demonstrating that his proposed testimony is based upon a reliable scientific foundation. *Daubert v.*

[1] Exhibit references are to exhibits for Defendants' Memorandum in Support of Their Motion to Exclude Expert Testimony of David Richman ("Dfs' Ex.") or for the PSC's Response ("Pls' Ex.") or for this brief ("Reply Ex.").

*Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 (1993); Fed. R. Evid. 702; *see also United States v. Williams*, 95 F.3d 723, 729 (8th Cir. 1996); *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 988-89 (8th Cir. 2001).

**ARGUMENT**

## I. DR. RICHMAN'S TESTIMONY THAT BAYCOL IS MORE TOXIC THAN OTHER STATINS SHOULD BE EXCLUDED.

Plaintiffs cannot show that Dr. Richman's testimony regarding the comparative toxicity of Baycol is admissible under *Daubert* because he does not have the expertise in epidemiology necessary to express such an opinion, and because, lacking such expertise, he relies upon evidence that does not support his opinions. *See* Pls' Response at 6-13.

***Lack of expertise***. Dr. Richman does not have the required expertise in epidemiology that would permit him to opine on the comparative toxicity between Baycol and other statins. Richman Dep. (Dfs' Ex. B) at 128:14-19; *Medalen v. Tiger Drylac U.S.A., Inc.*, 269 F. Supp. 2d 1118, 1127-29 (D. Minn. 2003). Indeed, plaintiffs do not dispute that under Rule 702, an expert must have specific expertise in the particular topic of his testimony. *See* Pls' Response at 7-8 & n.3; *Medalen*, 269 F. Supp. 2d at 1127-29. Instead, plaintiffs merely assert that Dr. Richman's limited exposure to epidemiology in his neurology practice entitles him to testify regarding the complexities of comparative toxicity. Pls' Response at 7-8.

Dr. Richman already has admitted that epidemiology is "not an area of [his] research or [his] focused effort." Richman Dep. (Dfs' Ex. B) at 128:18-19. Allowing

expert testimony from such limited epidemiological exposure not only would "ignore the modern realities of medical specialization" (*Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996) (applying *Daubert*)), it would confuse the jury by cloaking inexpert opinions with the unrelated expertise that Dr. Richman does possess.

***No scientific support for analysis***. Plaintiffs argue that Dr. Richman's opinions on comparative toxicity of statins are admissible because he relied upon articles discussing adverse event reports ("AERs") in coming to those conclusions.[2] Pls' Response at 5-6, 11. Those articles are based *solely* on adverse event data, however, and therefore are insufficient to provide support for Dr. Richman's opinion that Baycol is more toxic than other statins. Dfs' Br. at 4-5 & n.3. Indeed, as discussed in Defendants' AER Motion and Reply, the FDA and the courts have rejected reliance upon AERs to make comparisons between drugs. Even the authors of the Staffa article upon which plaintiffs primarily rely acknowledge that "[r]igorous comparisons between drugs that are based on these [AER] data are not recommended, since many factors can affect reporting" and "[r]eporting rates are not incidence rates." *See* Staffa *et al*., "Cerivastatin and Reports of Fatal Rhabdomyolysis," *NEJM*. 2002: 540 (Dfs' Ex. C). Perhaps because of his total lack of experience with AER data, *see* Richman Dep. (Dfs' Ex. B) at 135:12-

---

[2] Staffa, *et al*., "Cerivastatin and Reports of Fatal Rhabdomyolysis," *NEJM*. 2002; 346:539-40 (Dfs' Ex. C); Farmer, "Learning from the Cerivastatin Experience," *Lancet*. 2001; 358:1383-84 (Dfs' Ex. D); Davidson, "Controversy surrounding the safety of cerivastatin," *Expert Opin. Drug Saf.* 2002;1:207-12 (Dfs' Ex. E); Thompson, *et al.*, "Statin-Associated Myopathy," *JAMA*. 2003;289:1681-90 (Dfs' Ex. G); Hamilton-Craig, "Statin-associated myopathy," *MJA*. 2001;175:486-89 (Dfs' Ex. F).

14, Dr. Richman thus impermissibly extrapolates from articles about AERs – evidence of his inadequate methodology.

Plaintiffs attempt to bolster Dr. Richman's opinion by citing ten case reports and one series of 11 case reports upon which he also relies to claim that Baycol is the most toxic statin. Pls' Response at 10-13. However, "[c]ase reports are generally not considered reliable evidence of causation." *Turner v. Iowa Fire Equip. Co.*, 229 F. 3d 1202, 1209 n.5 (8th Cir. 2000). Plaintiffs imply that *Turner* holds that scientific studies are not necessary to show comparative toxicity. Pls' Response at 11-12. However, *Turner* actually holds that a *differential diagnosis* (to establish specific causation) will not be excluded when a lack of medical evidence exists to establish general causation. 229 F.3d at 1208-09. Dr. Richman does not offer specific causation testimony, *see* Richman Rep. (Dfs' Ex. A), and there is no doubt that "[t]hough case reports demonstrate a temporal association . . . that association is not scientifically valid proof of causation." *Glastetter*, 252 F.3d at 990 (relying upon *Turner*, court excluded expert testimony where much of opinion was culled from case reports).

Plaintiffs assert that Dr. Richman's opinion on comparative toxicity of statins passes *Daubert* scrutiny because he relied upon a sufficient number of case reports – as if some critical mass is necessary to satisfy *Daubert*. Pls' Response at 12. It is not the volume of case reports, however, that determines whether they are sufficient; it is the fact that case reports are insufficient to establish causation or to support a comparative toxicity opinion that dooms his reliance upon them as "good grounds." *Turner*, 229 F.3d

at 1209 n.5; *Glastetter*, 252 F.3d at 990. Combining multiple flawed reports does not add up to a valid source of data.[3]

Plaintiffs also assert that Dr. Richman's testimony is based upon the absence of scientific data supporting the comparative *safety* of Baycol and that Dr. Richman reviewed the same materials as defendants' experts and just came to different conclusions. Pls' Response at 6-7, 10. But plaintiffs cannot use such devices to evade their burden of proof on the admissibility of their expert's testimony or obviate the requirement for scientific support for his conclusions. Where a witness has nothing to support his opinion – and that is the case with Dr. Richman – his proposed testimony is "junk" science that should never be presented to a jury.

## II. PLAINTIFFS CANNOT SHOW THAT DR. RICHMAN'S OPINIONS ON STATIN-INDUCED PERSISTENT INJURY ARE ADMISSIBLE.

Nothing in plaintiffs' Response refutes the fact that there is no support in either medical science or the articles Dr. Richman read for his theory that statins may cause debilitating myopathies and muscle symptoms long after a statin has been discontinued. Pls' Response at 13-21. Such an untested theory based upon nothing but the *ipse dixit* of the expert is inadmissible under *Daubert*. *See General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered").

---

[3] Indeed, many of the case reports cited by Dr. Richman are – at most – of marginal relevance to any alleged Baycol-induced injury. *See* Richman Rep. (Dfs' Ex. A) ¶ 20. For example, three of Dr. Richman's case studies involved statin-induced injuries associated with lovastatin, three studies involved simvastatin, one study involved heroin, and two studies involved a co-prescription with gemfibrozil. *Id.*

Indeed, plaintiffs do not dispute that *no scientific study ever* has supported Dr. Richman's novel hypothesis that statin-induced injuries may persist after statin (or more particularly, Baycol) treatment has ended. Pls' Response at 13-21. Dr. Richman clearly testified that no study has validated such a theory:

> Q. Are you aware of a single article describing the possibility that a patient with normal CK can have muscle pain or weakness persist following discontinuation of the statin?
>
> * * *
>
> A. No, I'm not aware of any article that does that – that states that…

Richman Dep. (Dfs' Ex. B) at 87:15-21.

> Q. Are you aware of a single article or case report of a patient having persistent elevations of CK following discontinuation of the statin?
>
> A. No, I'm not.

*Id*. at 105:17-20. Instead of addressing the lack of scientific evidence for Dr. Richman's theory, plaintiffs assert that Dr. Richman's untested hypothesis is admissible opinion testimony because he relies upon articles that he claims support his conclusions. Pls' Response at 17.

Plaintiffs' argument is unavailing, however, because the scientific literature does not support him.[4] First, Dr. Richman relies upon a letter to a medical journal by Dr.

---

[4] To the extent Dr. Richman's sources rely upon AER data or case studies to prove that statins *cause* persistent injury, those are, for the same reasons argued in Part I, inadmissible to provide support for that opinion. Further, any scientific literature published *after* Dr. Richman's Report and deposition testimony is irrelevant to the question of whether his methodology was sound, as he did not rely upon it in formulating his opinions.

England, *et al.*, which found that patients fully recovered from their clinical symptoms following their initial statin therapy, which plaintiffs claim supports Richman's theory because the letter shows "mitochondrial changes in muscle of patients treated with two statin drugs" rather than "clinical symptoms like muscle pain." Pls' Response at 20.[5] But this is not the gist of Dr. Richman's untested hypothesis: that debilitating injuries persist well after statin therapy has been discontinued. *See* Richman Rep. (Dfs' Ex. A) ¶ 11 ("muscle damage 'may result in prolonged rehabilitation and *permanent disability* in a minority of patients'"); ¶ 17 ("the patient developed fibrosis of muscle tissue which is so extensive that it continues to prevent his joints from moving . . . the severity of the injury and its persistence to date support the conclusion that the patient's injury is probably permanent"); ¶ 18 ("It is likely that patients experience a range of mild to severe initial injuries attributable to statin drugs, with some individuals suffering from *persistent aches, pains or weakness* as a result of toxic myopathy"). Dr. Richman's untested theory focuses on the persistence of clinical symptoms, not the undetectable and symptom-less microscopic muscle changes on which plaintiffs now have focused. Moreover, the England letter contradicts Dr. Richman's theory because it states that *all* clinical symptoms, including those he asserts are persistent, resolved after statin therapy was completed. Richman Dep. (Dfs' Ex. B) at 169:13-16.

Plaintiffs also point to the Hildebrand article as support for Dr. Richman's opinion that a proportion of patients suffering statin-induced rhabdomyolysis do not fully

---

[5] England J., *et al.*, "Mitochondrial myopathy developing on treatment with HMG CoA reductase inhibitors-simvastatin and pravastatin," *Aust. NZ J. Med.* 1995; 25:374-75 (Dfs' Ex. J).

recover following statin discontinuation.[6] Pls' Response at 14-15. But Dr. Richman's reliance upon this article – which he could not remember well enough to summarize, *see* Richman Dep. (Reply Ex. A) at 156:06-158:01 (describing it as involving 30 patients, 24 percent of whom had not returned fully recovered from rhabdomyolysis following the cessation of statin therapy) – is misplaced: it involved a study with 45 patients with the stated "Conclusion" that "[p]atients with statin-associated myopathy experienced *full resolution of muscle pain* on cessation of statin therapy." Hildebrand (Pls' Ex. F), Conclusions, at 2671 (emphasis added). Indeed, the article notes that all patients experienced a total recovery from all "muscle symptoms" after their statin therapy ended. *Id.* at 2674.

Dr. Richman's reliance upon medical literature that directly contradicts his theory of persistent muscle symptoms and rhabdomyolysis following the cessation of statin therapy is exactly the kind of "egregious speculation and weak authority" that fails to meet the *Daubert* standard and is appropriately excluded here. *See* Pls' Response at 17; *General Electric Co. v. Joiner*, 522 U.S. at 146.

## III. DR. RICHMAN'S UNTESTED THEORIES REGARDING DIAGNOSIS OF RHABDOMYOLYSIS AND MYOPATHY SHOULD BE EXCLUDED UNDER *DAUBERT.*

Plaintiffs attempt to salvage Dr. Richman's opinions regarding novel methods for diagnosing rhabdomyolysis from exclusion under *Daubert* by contending that Dr. Richman testified – not that rhabdomyolysis may exist when CK levels are

---

[6] Hansen, K.E., Hildebrand, J.P., *et al.*, "Outcomes in 45 patients with statin-associated myopathy," *Archives of Internal Med.* 2005;165:2671-76 (Pls' Ex. F).

normal – but that "CK levels of a patient suffering from rhabdomyolysis can be within the normal range if the CK level is not tested in a timely manner." Pls' Response at 25. This argument is non-responsive. Defendants have requested exclusion of Dr. Richman's unsupported testimony that diagnosis of rhabdomyolysis can be made retrospectively without evidence that CK levels were *contemporaneously* elevated. Dfs' Brief at 10-14; *see* Richman Rep. (Dfs' Ex. A) ¶ 23; Richman Dep. (Dfs' Ex. B) at 25:2-5. Such a distinction does not alter the fact that Dr. Richman relies on speculation alone to support his theory that rhabdomyolysis may be diagnosed absent evidence of such an elevation.

First, plaintiffs attempt to downplay Dr. Richman's testimony that no scientific literature he had reviewed contained the words "retrospective diagnosis." Pls' Response at 25; Richman Dep. (Dfs' Ex. B) at 111:7-10. Yet, the import of this testimony is not that the *exact* phrase is not found in a specific scientific article, but that the entire *concept* of retrospectively diagnosing rhabdomyolysis is not present or supported in the medical literature. *Id.* Indeed, when Dr. Richman specifically identified the Warren article as a source for the criteria for retrospective diagnosis of rhabdomyolysis absent elevated CK levels, he admitted that "[t]hey list the criteria for diagnosis, and there's no mention made of whether it's concurrent or retrospective."[7] Richman Dep. (Reply Ex. A) at 110:24-111:5.

---

[7] Warren, *et al.*, "Rhabdomyolysis: A Review," *Muscle & Nerve*. 2002; 332-347 (Pls' Ex. J).

That Dr. Richman is unable to support his theory that the diagnostic criteria in Warren specifically are appropriate for a retrospective diagnosis of rhabdomyolysis is not surprising – the Warren article mentions no such use:

> Q. Is there any statement in the Warren article that says, "A patient with Normal CK can be diagnosed as having rhabdo if the following factors are present."
>
> * * *
>
> A. I don't see that they've given a statement like that.

Richman Dep. (Dfs' Ex. B) at 115:12-18. Indeed, quite the opposite – the Warren article specifically notes that "[m]any cases of rhabdomyolysis are subclinical and detected *only* by an elevated serum CK." Warren (Pls' Ex. J) at 334. Thus, contrary to Dr. Richman's testimony, the Warren article recognizes that CK levels must be tested under certain circumstances to diagnose rhabdomyolysis correctly. *Id.*

The only other authority Dr. Richman cites in support of his theory similarly provides no support for a retrospective diagnosis of rhabdomyolysis without a concurrent elevated CK level. *See* Mogyorosi, *et al.*, "Rhabdomyolysis and Acute Renal Failure Due to Combination Therapy with Simvastatin and Warfarin," *Journal of Internal Medicine*. 1999; 246:599-602 (Reply Ex. B). Indeed, as defendants noted in their opening brief, Dr. Richman specifically disregards the actual conclusions of Mogyorosi in favor of his own speculation:

> Q. Where in this article do the authors suggest that when the patient had normal CK, the patient still had rhabdomyolysis?
>
> * * *
>
> A. I don't know whether that's relevant or not. We could look through. But

> you know, I feel capable of reviewing these scientific data and making that conclusion.
>
> * * *
>
> Q. Can we agree that nowhere in here do the authors suggest that a patient with normal CK has rhabdomyolysis?
>
> A. *I don't know whether that's relevant or not*. I would have to go through it again to see whether they state that or not. But that's—this article is communicating that. *Whether they state it in English words doesn't really, to me, seem relevant to my opinion.*"

Richman Dep. (Dfs' Ex. B) at 30:17-31:17 (emphasis added); Brief at 12-13.

Dr. Richman's waffling regarding his reliance upon Mogyorosi is unsurprising as the three-page article is littered with statements that rhabdomyolysis resolved after a discontinuation of a statin: "Rhabdomyolysis and renal failure occurred 7 days after warfarin . . . was added to a chronic stable dose of simvastatin . . . and *resolved abruptly after discontinuation of simvastatin*," Mogyorosi (Reply Ex. B) at 599; "Laboratory abnormalities and symptoms quickly improved and within 5 days the patient was *asymptomatic with a normal CPK value and normal renal function* . . . ," *id*. at 600. Dr. Richman irrationally extrapolates from this article that rhabdomyolysis may exist absent a concurrent elevation of CPK even though the article explicitly states that rhabdomyolysis "resolved abruptly" after CPK values returned to normal. *See* Mogyorosi (Reply Ex. B) at 599-600; Richman Dep. (Dfs' Ex. B) at 30:17-31:17.

Dr. Richman's reliance upon studies that do not even remotely support the propositions included in his report is not sound methodology. *Pugliano v. United States*, 315 F. Supp. 2d 197, 200 (D. Conn. 2004) ("The mere recitation of a list of studies is not

a magical incantation paving the way to the witness stand unless it is accompanied by reasoned and scientifically accepted analysis.") (quoting *O'Connor v. Commonwealth Edison Co.*, 807 F. Supp. 1376, 1392 (C.D. Ill. 1992).

Given the dearth of scientific evidence, plaintiffs fall back upon Dr. Richman's "30+ years of education and expertise as a doctor and muscle expert . . ." Pls' Response at 21. Experience and education do not trump his inappropriate use of scientific studies. Richman Dep. (Dfs' Ex. B) at 115:12-18, 30:17-31:17. Moreover, he has virtually no experience with actual or purported muscle injuries related to statins, Richman Rep. (Dfs' Ex. A) ¶¶ 4-5; Richman Dep. (Dfs' Ex. B) at 199:16-24; never has prescribed a statin, Richman Dep. (Dfs' Ex. B) at 199:8-9; never has retrospectively diagnosed a patient with rhabdomyolysis, *id.* at 112:2-5; has no clinical experience with patients suffering from statin-induced rhabdomyolysis, *id.* at 129:20-25; and has never researched or published on the subject of statin-induced rhabdomyolysis, *id.* at 200:1-15. Indeed, without scientific support *or* adequate experience, Dr. Richman's opinions are mere speculation. Under *Daubert*, the Court should exclude this testimony based only upon the *ipse dixit* of Dr. Richman. *Joiner*, 522 U.S. at 145-146.

Finally, Finally, plaintiffs make no effort to support Dr. Richman's claims "that statin-induced *myopathy* can be diagnosed solely based upon strength testing." Dfs' Br. at 10, 13; Pls' Response at 21-27; *see* Richman Rep. (Dfs' Ex. A) ¶ 25; Richman Dep. (Dfs' Ex. B) at 117:6-118:17. Dr. Richman acknowledged that there is no known literature or clinical practice to support the use of strength testing in diagnosis of statin-induced myopathy. Richman Dep. (Dfs' Ex. B) at 117:6-118:17. Such opinion, not

based on personal knowledge, experience, medical literature, nor other science, cannot withstand a *Daubert* challenge.

## IV. DR. RICHMAN'S THEORY THAT BAYCOL AFFECTS CELL MEMBRANES DIFFERENTLY FROM OTHER STATINS IS SPECULATIVE AND SHOULD BE EXCLUDED UNDER *DAUBERT*.

Plaintiff's sole argument for admission of Dr. Richman's hypothesis that Baycol affects cell membranes differently from other statins is that Dr. Richman may testify about an untested and speculative theory because of the alleged "generally recognized" toxicity of Baycol. Pls' Response at 27-29. This is a desperate attempt to circumvent *Daubert's* requirement of sound scientific methodology.

First, plaintiffs fail to provide a single published study, or any other supporting evidence, to demonstrate that the medical community has recognized plaintiffs' novel allegation that Baycol affects cell membranes in a unique and more severe manner than other statins. *See id.* at 28. *See* Richman Dep. (Dfs' Ex. B) at 50:12-25 ("Q. Would you agree that there is no accepted mechanism of action regarding how statins cause muscle cell death? A. We know a number of effects, pathologic effects, that statins have on muscle . . . But how these come together to produce the death isn't yet known").

Second, plaintiffs' only legal authority for the proposition that the market withdrawal of Baycol is enough to support Dr. Richman's hunches is inapposite, as well as non-controlling. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1239 (11th Cir. 2005). The one-sentence dictum plaintiffs cite from *McClain* merely suggests that a less extensive *Daubert* analysis may be appropriate when there is absolutely no question that

the drug at issue generally causes the type of harm at issue. *Id.* It does *not* suggest that *Daubert* ceased to apply the moment a medicine has been withdrawn from the market.

Indeed, plaintiffs do not dispute that "Dr. Richman and the medical community do not know the exact mechanism by which statins affect muscle cells . . . ". Pls' Response at 29; Richman Dep. (Dfs' Ex. B) at 50:12-25. They further concede that Dr. Richman's sole scientific source for his theory (beyond his own speculative hunches) is something he saw a week before his deposition, a single sentence within the *Davidson* article, which failed to address even remotely *any* mechanism for muscle cell injury in statins.[8] Pls' Response at 27; Richman Dep. (Dfs' Ex. B) at 56:1-10. That single sentence merely states that "[t]he noted myotoxicity and subsequent withdrawal of cerivastatin from the worldwide market in August 2001 has demonstrated that the safety of statins is not a class effect." Richman Dep. (Dfs' Ex. B) at 56:1-10. Plaintiffs fail to address Dr. Richman's admission that the *Davidson* article "does not describe a muscle injury unique to Baycol." *Id.* at 57:24-58:3.

Thus, plaintiffs offer no rationale that would permit Dr. Richman to speculate that the mechanism for muscle cell injury is different in Baycol when neither he nor the medical community knows what that mechanism is and despite his admission that

[8] Any attempt by plaintiffs to suggest that Dr. Richman's opinion is based upon any other scientific source than *Davidson* is disingenuous. Pls' Response at 27. Although Dr. Richman states that he used his prior experience as a doctor and his understanding of certain medical articles to form some of the opinions contained in his *expert report*, Richman Rep. (Dfs' Ex. A) ¶ 2, 6, his opinion that Baycol affects cell membranes differently was formed *after* that Report was drafted and is not contained in it. Indeed, during Dr. Richman's deposition, the only time he has discussed his theory, he relied solely upon *Davidson* for support. Richman Dep. (Dfs' Ex B) at 56:1-10.

Baycol does not cause a unique muscle injury compared to other statins. *See* Richman Dep. (Reply Ex. A), at 58:19-60:13. As such, his testimony, created seemingly out of thin air, without even a single scientific source, cannot pass muster under *Daubert.*

**CONCLUSION**

For the foregoing reasons, defendants respectfully request that the Court exclude Dr. Richman's report and proposed testimony as inadmissible under FRE 702 and *Daubert*.

Dated: August 11, 2006

Respectfully submitted,

Peter W. Sipkins (No.101540)
DORSEY & WHITNEY LLP
Suite 1500
50 South Sixth Street
Minneapolis, MN 55402
(612) 340-2600

Philip S. Beck
Adam Hoeflich
BARTLIT BECK HERMAN
PALENCHAR & SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60610
(312) 494-4400

/signature on file/
Susan A. Weber
James W. Mizgala
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000

Scott A. Smith
Tracy J. Van Steenburgh
HALLELAND LEWIS NILAN
SIPKINS & JOHNSON, P.A.
220 South Sixth Street, Suite 600
Minneapolis, Minnesota 55402-4501
(612) 338-1838

/signature on file/
Fred T. Magaziner
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000

*Counsel for SmithKline Beecham Corporation d/b/a GlaxoSmithKline*

Paul J. Zidlicky
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

Catherine Valerio Barrad
Linda S. Peterson
J.P. Pecht
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
(213) 896-6000

Richard K. Dandrea
ECKERT SEAMENS CHERIN
& MELLOTT, LLC
USX Tower, 600 Grant St., 44th Floor
Pittsburgh, PA. 15219
(412) 566-6000

Douglas R. Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000

Joseph D. Piorkowski, Jr.
THE PIORKOWSKI LAW FIRM, PC
910 17th Street, NW Suite 800
Washington, D.C. 20006
(202) 223-5535

*Counsel for Bayer Corporation and Bayer AG*