**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : | MDL No. 1431 (MJD) |
| This Document Relates to: | : | |
| *All Actions* | : | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO EXCLUDE EXPERT TESTIMONY OF JOHN W. FARQUHAR**

The premise of the PSC's opposition is that, because John Farquhar is a cardiologist and epidemiologist who has been allowed to testify on certain matters in other cases, this Court should defer to that experience and allow him to testify about different matters here. Pls' Response at 1-3. Federal law, however, does not authorize courts to give experts a "pass" based on reputation, because they can manufacture an outcome-driven report for litigation that is not based on scientifically reliable methodology. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 154-57 (1999) (holding that trial court properly excluded an undisputed expert's testimony where his methodology was unreliable). That is precisely what has happened here, and that is why defendants seek to exclude Dr. Farquhar's testimony.

I. The PSC begins by misstating the law governing admission of expert testimony. Although the PSC implies otherwise (Pls' Response at 7-8), plaintiffs cannot rest on Dr. Farquhar's credentials to prove that his testimony should be admitted. *See, e.g., Kumho Tire*, 526 U.S. at 154-57; *Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1060 (8th Cir. 2005) (holding that qualified experts' opinions were properly

excluded because they "did not apply the principles and methods . . . reliably to the facts of the case"); *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001) (even where witness "easily qualifies as an expert under Federal Rule of Evidence 702," he may not testify in areas where he "sorely lacked the education, employment, or other practical personal experiences" to opine). Rather, plaintiffs bear the burden of proving that Dr. Farquhar's testimony is based on sufficient facts and data and the product of reliable methodology. Fed. R. Evid. 702. Further, plaintiffs bear the burden of persuading this Court that Dr. Farquhar "has applied the principles and methods reliably to the facts of the case." *Id.*

This burden cannot be met simply by arguing – as plaintiffs do – that Dr. Farquhar's testimony should be admitted here because his testimony was held admissible in the *Diet Drugs* and *Vioxx* MDLs. Pls' Response at 2-3, 28. Dr. Farquhar's testimony from other cases is not at issue and, in any event, is beside the point. Plaintiffs bear the burden of proving that Dr. Farquhar's testimony in this case is reliable, and they have not met that burden.

Moreover, in neither the *Diet Drugs* nor *Vioxx* MDLs did Dr. Farquhar do what he attempts here – base conclusions about the comparative safety of medicines on a meta-analysis of AERs. *See infra*, Part II. His testimony should not reach the jury unless this Court first determines that the methods and standards Dr. Farquhar applied here, as an expert witness, comport with those he applies as a scientist. *See, e.g.*, *Kumho Tire*, 526 U.S. at 152 (expert must "emplo[y] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"). Significantly,

prior to this litigation, Dr. Farquhar had never done "research on drug toxicity and [made] comparisons among drugs using the adverse event reporting system." Farquhar Dep. (Dfs' Ex. B[1]) 106:22-107:3.

II. The PSC does not meet its burden of proof. Indeed, plaintiffs did not attempt to address several of the methodological errors in Dr. Farquhar's report identified in defendants' opening brief. Pls' Response at 12-16. The PSC asserts that, because Dr. Farquhar used the same methodology as the Staffa Letter to the Editor, *see infra*, his report should be admitted into evidence. But Dr. Farquhar did not use the same methodology. Moreover, neither the Staffa letter nor any peer-reviewed study has produced results that would support Dr. Farquhar's sweeping conclusions.

III. Finally, the PSC attempts to defend Dr. Farquhar's serial recalculations of the PacifiCare epidemiological study. As demonstrated below, Dr. Farquhar's manipulations of the PacifiCare study use data, assumptions and methodology that depart from scientific method to produce his desired conclusion.

For these and the reasons set forth in defendants' moving papers, Dr. Farquhar's testimony should be excluded.

## I. PLAINTIFFS CANNOT EVADE THEIR BURDEN OF PROOF BY INVOKING DR. FARQUHAR'S CREDENTIALS.

Although plaintiffs acknowledge the Court's fundamental "gatekeeping" role in determining the admissibility of expert evidence, they misconstrue the critical

[1] Exhibit references are to exhibits for Defendants' Memorandum in Support of Their Motion to Exclude Expert Testimony of John Farquhar ("Dfs' Ex.") or for the PSC's Response ("Pls' Ex.") or for this brief ("Reply Ex.").

components of that analysis and minimize their burdens under it. The interposition of the Court between a putative expert witness and the jury is essential to the fairness of a trial involving expert evidence. As the Supreme Court has observed, "[e]xpert evidence can be both powerful and quite misleading." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993) (internal quotation omitted). Judicial oversight is therefore vital given (i) the latitude granted to expert witnesses, as compared to percipient witnesses, to offer opinion testimony and (ii) the power of the veneer of ungrounded "expertise" to unfairly influence lay jurors. Federal law accounts for these dangers by imposing significant obligations on the party offering expert testimony.

Plaintiffs try to minimize the burden they bear of establishing that Dr. Farquhar's testimony satisfies the requirements of federal law, asserting that it is "modest." Pls' Response at 6. At an irreducible minimum, however, "[i]t is the burden of the party offering the expert testimony" – plaintiffs here – "to lay a foundation for its admission." *United States v. Williams*, 95 F.3d 723, 729 (8th Cir. 1996); *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d at 1311, 1316 (9th Cir. 1995) ("the party presenting the expert must shown that the expert's findings are based on sound science"). Thus, plaintiffs must demonstrate not only that their proposed expert witness (1) is properly qualified to opine about the matters at hand and (2) will provide relevant testimony, but that the proposed testimony is (3) "based upon sufficient facts or data," (4) "the product of reliable principles and methods," and that (5) "the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702; *see id.* 104(a)

("Preliminary questions concerning the qualifications of a person to be a witness . . . shall be determined by the court").[2]

Rather than offering proof as to each of these elements, plaintiffs focus upon Dr. Farquhar's expert qualifications, *see* Pls' Response at 1-3, which defendants did not even contest in their moving papers. Plaintiffs suggest that, because Dr. Farquhar's expert reports were not excluded in the *Diet Drugs* and *Vioxx* MDLs, his testimony should be admitted here. *Id.* at 2-3, 28.

This argument, however, proves nothing because the methodology underlying Dr. Farquhar's proffered testimony in those other MDLs was entirely different from the opinions he has proffered here. In neither *Diet Drugs* nor *Vioxx* did Dr. Farquhar attempt to conduct a meta-analysis based upon AERs – the procedure at the heart of his Baycol expert report.

In *Diet Drugs*, Dr. Farquhar performed "a meta-analyses . . . of 7 studies with a *treatment/control design*." *In re Diet Drugs Prods. Liab. Litig.*, Expert Witness

---

[2] Plaintiffs assert that "[a]ttacks on the soundness of the opinion, the adequacy of the methodology used, or the unorthodox nature of a witness's views go only to the weight of an expert's opinion, not to its admissibility." Pls' Response at 5. This comment, however, presupposes that the threshold 702 and *Daubert* requirements have been met. In this regard, plaintiffs' extensive reliance on *Bonner v. ISP Technologies, Inc.*, 259 F.3d 924 (8th Cir. 2001), *see* Pls' Response at 7-8, is misplaced. As the Eighth Circuit recently clarified, *Bonner* involved the admissibility of expert causation testimony in a very narrow context. *See Marmo v. Tyson Fresh Meats, Inc.*, No. 05-1906, 2006 WL 2165734, at *5 (8th Cir. Aug. 3, 2006). In *Marmo*, the Eighth Circuit ruled that a toxicologist should be excluded from presenting causation testimony because of various "analytical flaws" in the expert's proposed testimony, including that the expert "did not inquire about other toxic exposures," "did not exclude confounding factors," and employed a causation standard that was "not subject to expression in terms of a potential rate of error." *Id.* at *6. Thus, *Bonner* offers no support to the deeply analytically flawed testimony proposed here.

Report of John W. Farquhar, M.D. (Sept. 30, 2004) (Reply Ex. A) ¶ 8 (emphasis added). There, Dr. Farquhar's report focused upon this meta-analysis of controlled data as the basis for his opinions. *Id.* ¶¶ 21-32. Dr. Farquhar also briefly discussed two additional meta-analyses – one based primarily on controlled data and the other on observational studies. *Id.* ¶¶ 33-34. He referred to these analyses as providing *additional* support for his view. *Id.* Moreover, Dr. Farquhar emphasized the superiority of the study based on controlled data over observational studies because it "has the virtue of being based on incidence data, a distinction from either case studies or a case series, which gives [the incidence study] additional credibility." *Id.* ¶ 37.

In *Vioxx*, Dr. Farquhar's analysis was based primarily upon scientifically-controlled, randomized clinical trials, in which he evaluated the controlled data available to Merck, critiques Merck's analysis of that data, and draws his own conclusions. *See In re Vioxx Prods. Liab. Litig,* Supplemental Expert Report of John W. Farquhar, M.D. (Sept. 26, 2005) (Reply Ex. B) 43-48; *see, e.g., McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1250 (11th Cir. 2005) (AERs and other "[u]ncontrolled anecdotal information offers one of the least reliable sources to justify opinions about both general and individual causation."[3] Dr. Farquhar's *Vioxx* report also discussed AERs, but in so doing, Dr. Farquhar stated that "these reports amplify, complement and verify the conclusions

[3] As explained in defendants' AER Motion and Reply, AERs are uncontrolled because they are voluntarily submitted and not investigated. That is why the FDA says that AERs "cannot be used to calculate incidence or estimates of drug risk" and that "[t]rue incidence rates cannot be determined from this database." FDA Office of Postmarketing Drug Risk Assessment, "Adverse Event Reporting System (AERS): Brief Description with Caveats of System" (Oct. 18, 1999) ("FDA Caveats") (Dfs' Ex. A) at 2.

reached from the experimental epidemiology studies described above . . . .," *id.* at ¶ 158, and provide "ancillary support for the findings of increased risk report[ed in] randomized clinical trials . . . ." *Id.* ¶ 175. Thus, while Dr. Farquhar discussed AERs in his *Vioxx* opinion, these uncontrolled data were not the primary basis for his opinion.

Dr. Farquhar based his Baycol report and opinions solely upon *uncontrolled data*: articles discussing AERs, case studies, and his own meta-analysis of AERs. *See* Farquhar Rep. (Dfs' Ex. A). He formed his sweeping opinion that Baycol is the most toxic statin based upon these uncontrolled data and *then* purported to confirm his conclusions by recalculating the PacifiCare study, to reverse its findings. Further, as defendants explained in their opening brief, Dr. Farquhar drew these conclusions even though: before this litigation, he had never done research on drug toxicity and comparisons of drugs using AERs; he did not understand how data are coded in AER databases; and he delegated to an assistant the task of searching the databases for the information used in his "expert" report. *See* Dfs' Br. at 10-11.

In sum, far from supporting admission of Dr. Farquhar's testimony, *Diet Drugs* and *Vioxx* demonstrate why Courts cannot simply rely on the qualifications of an expert witness and must instead examine the data, scientific methodology, and application of that methodology to the facts of each case to determine that the proffered testimony is reliable as to that case. Fed. R. Evid. 702.[4] *See Daubert*, 509 U.S. at 593-94; *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686-87 (8th Cir. 2001). "[T]he

---

[4] Defendants do not suggest that Dr. Farquhar's methods were reliable or appropriate in either *PPA* or *Vioxx*. It is clear, moreover, that his analysis here falls below even the practices he followed in those MDLs.

courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996).

## II. THE PSC FAILS TO MEET ITS BURDEN OF PROVING DR. FARQUHAR'S AER-BASED REPORT IS ADMISSIBLE UNDER *DAUBERT.*

The first portion of Dr. Farquhar's report consists of his conclusions, based upon his manipulations of overlapping AER databases and articles discussing AERs and case studies – that Baycol is more dangerous than other statins and more likely to cause myopathy/rhabdomyolysis and myalgia. Farquhar Rep. (Dfs' Ex. A) ¶¶ 39, 43, 55, Farquhar Supp. Rep. (Dfs' Ex. C) ¶ 9. Defendants have addressed at length in their AER Motion and Reply the reasons why AERs do not and cannot support such conclusions. Those arguments, in and of themselves, require exclusion of Dr. Farquhar's opinion. Moreover, defendants' moving papers seeking exclusion of Dr. Farquhar's testimony demonstrated that he has little experience with or understanding of AERs – a factor that further renders his analysis scientifically unsound. Dfs' Br. at 10-14 (showing that Dr. Farquhar acknowledged at his deposition that he has never "done a meta-analysis of this type" or "a proportional reporting rate analysis" before this litigation). Those arguments will not be repeated here.

This section instead focuses on the PSC's failure to respond – either meaningfully or at all – to defendants' illustrative criticisms of Dr. Farquhar's methodology in conducting his meta-analysis. This section also demonstrates that the articles upon which Dr. Farquhar relies do not support his opinion.

### A. The PSC Does Not Respond Adequately to Defendants' Criticisms of Dr. Farquhar's Meta-Analysis of AERs.

Defendants' moving papers listed six examples to illustrate the myriad ways in which Dr. Farquhar's methodology departed from reliable scientific method. The PSC challenges only three of those examples, and even those challenges are not persuasive. Because plaintiffs have the burden of demonstrating that Dr. Farquhar's opinions are the product of reliable scientific methodology, they have failed to prove that Dr. Farquhar's opinions are admissible.

Plaintiffs did not offer *any* response to half of defendants' criticisms of Dr. Farquhar's meta-analysis:

- ***No written protocol for his analysis.*** To avoid introducing error, whether conscious or unconscious, the scientific method requires that the investigator identify a hypothesis, create a protocol before starting the study to try to falsify that hypothesis, and then follow the protocol. Dr. Farquhar did not work to falsify a hypothesis, as scientific method requires, but instead started with a conclusion ("Baycol is more myotoxic than all other statins") and worked backwards in an attempt to prove himself right. This approach, which is illustrated by his failure to create a written protocol before beginning his study and his admitted repeated modification of his "mental" protocol during the study, is wholly inconsistent with reliable scientific methodology. *See Sorensen v. Shaklee Corp.*, 31 F.3d 638, 649 (8th Cir. 1994); *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 783 (10th Cir. 1999); *Claar v. Burlington N. R.R.*, 29 F.3d 499, 502-03 (9th Cir. 1994).

- ***Made-for-litigation bias.*** When an expert undertakes an analysis solely for the purposes of litigation, particularly when that expert has not previously done research in that area, the court should be extra wary of potential bias in the methodology and ultimate conclusion. *Daubert*, 509 U.S. at 593-94; *see, e.g., Doe v. Ortho-Clinical Diagnostics, Inc.*, No. 1:03 CV 669, 2006 WL 1877150, at *6 (M.D.N.C. July 6, 2006) (noting bias in methodology and conclusion where expert began research only during pendency of lawsuit). Defendants pointed out this bias, noting that Dr. Farquhar's work has not been subject to review and critique by other scientists.

- ***The denominator problem.*** Dr. Farquhar used a number from the National Prescription Audit Plus ("IMS Health") database as the denominator in his calculation of relative risk. That database provides the number of prescriptions for different statins in a given year, but does not include the count of statins distributed as samples. Thus, it would overstate a relative risk calculated for a medication, such as Baycol, that was heavily sampled during the relevant time frame. Plaintiffs make no meaningful attempt to rebut the showing in defendants' opening brief that the data upon which Dr. Farquhar's opinion is based are unreliable.

Plaintiffs' response to defendants' three remaining criticisms fails to demonstrate the reliability of Dr. Farquhar's analysis under *Daubert*, 509 U.S. at 593-95. Nor do plaintiffs demonstrate, as they must, that Dr. Farquhar's use of AERs to make comparative risk assessments is anything other than an unjustifiable extrapolation from an accepted use of AERs (as a signal) to an unfounded quantitative conclusion. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). In particular:

***Duplicative counts of AERs.*** Dr. Farquhar's analysis was based on the sum of adverse events in studies and databases he reviewed. Dr. Farquhar disregarded, and made no attempt to correct for, duplication in adverse events reported in these sources. This methodological error exaggerates the "excess risk" effect that Dr. Farquhar purports to see in the data. Plaintiffs respond to this failure by attempting to shift the burden to defendants to prove their expert wrong, accusing defendants of failing to acknowledge that "all of the data sets showed consistent, statistically significant excess risk of Baycol." Pls' Response at 13-14.

It is plaintiffs' burden, however, to demonstrate that the methodology is sound. Even so, plaintiffs' statement is false: neither the PacifiCare study nor the cited studies show a statistically significant excess risk of muscle aches associated with Baycol

monotherapy. Moreover, plaintiffs' focus on defending Dr. Farquhar's conclusions, rather than his methodology, fails to meet their burden under *Daubert*.

***Failure to adjust for variability in AER definitions.*** Dr. Farquhar admitted that the AER data upon which he relied was inconsistently reported and that he did nothing to correct for the inherent errors in the data. Defendants pointed out that the error rate of the data made the conclusions suspect, as the error rate was too large to be acceptable. Plaintiffs again attempt to shift the burden under *Daubert* to defendants and pretend that the shortcomings in Dr. Farquhar's methodology do not matter. *See* Pls' Response at 14. Plaintiffs are incorrect. Defendants are not responsible for showing that a substantial increase or decrease in reporting rate would occur if proper methodology were used. Rather, plaintiffs have the burden of demonstrating that Dr. Farquhar used a scientifically reliable method to arrive at his opinions in the first place. Their failure to do so makes Dr. Farquhar's opinions inadmissible.

***Ignoring the new drug effect.*** Adverse event reports are made more frequently during the first few years a medicine is on the market. As defendants explained in their opening brief, FDA conducted an evaluation in the summer of 2000 to determine whether Baycol AERs suggested a "signal," and found Baycol adverse events to be in the middle of the pack of statins, based on adjustments for data in the first two years after Baycol was marketed. *See* Dfs' Br. at 18.

Dr. Farquhar ignored the "new drug" effect and compared Baycol both to new medications and those that had been on the market for years. Plaintiffs claim that Dr. Farquhar considered and rejected the "new drug" effect, because the relative risk of

Baycol was considerably greater than that of Lipitor, and because these drugs were marketed at around the same time. *See* Pls' Response at 14. Even if this were enough to make Dr. Farquhar's methodology reliable enough to compare Baycol and Lipitor – which it is not, given the other inherent errors in the underlying data – it does nothing to address the rest of his opinion, which is that Baycol was more myotoxic than all other statins. Plaintiffs have not responded to this crucial point.

**B. The Literature Does Not Support the Methodology Employed by Dr. Farquhar.**

Plaintiffs assert that Dr. Farquhar did nothing more than slavishly follow the methodology employed by Staffa *et al.* in the 2002 Letter to the Editor and that, because that letter was published in a peer-reviewed journal, the scientific community has generally accepted the methodology in the letter and (plaintiffs argue) in Dr. Farquhar's work. This argument is based upon at least two fallacies: (1) that the letter lays out the methodology that was used to come to its conclusions; and (2) that Dr. Farquhar did not deviate from that methodology.

The Staffa letter does not contain a full discussion of the experimental method used by the authors, and thus it is difficult to ascertain the "methodology" Dr. Farquhar purports to follow. But unlike Dr. Farquhar's report, which seeks to show that Baycol was more toxic than the other statins, the Staffa letter only seeks to "summarize the U.S. reports of fatal rhabdomyolysis associated with all six" statins and to identify a "crude" reporting rate by comparing the AER data to known error-prone prescription numbers. Staffa *et al.*, Cerivastatin and Reports of Fatal Rhabdomyolysis, 346 New

Eng. J. Med. 539, 540 n.≠ (2002) (Dfs' Ex. J). But the Staffa letter does not recommend the sort of "comparisons between drugs" that Dr. Farquhar makes. *Id*. The authors of the letter refuse to take the additional step that Dr. Farquhar does – they do not state that Baycol caused fatal rhabdomyolysis (let alone non-fatal rhabdomyolysis or other "muscle injury") at a higher rate than other statins. Indeed the authors note that the infirmities inherent in AER data preclude such claims. *Id*. (noting that "[r]eporting rates are not incidence rates," and that "[r]igorous comparisons between drugs" using these data are not recommended because "many factors can affect reporting and an unknown number of cases may not be attributed to the drug or reported to the FDA"). *Id*.

The PSC also states that two "peer-reviewed publications" "relied upon similar AERs analyses to demonstrate the excess toxicity of Baycol." Pls' Response at 11. The PSC's reliance upon these publications is unavailing. One of the articles, Graham *et al*., Incidence of Hospitalized Rhabdomyolysis in Patients Treated With Lipid-Lowering Drugs, 292 *JAMA* 2585 (2004), does not even mention AERs, let alone perform the same kind of analysis that Dr. Farquhar did.

The other article, Chang *et al*., Rhabdomyolysis With HMG-CoA Reductase Inhibitors and Gemfibrozil Combination Therapy, 13 *Pharmacoepidemology & Drug Safety* 417 (2004), conducts an analysis similar to the Staffa letter, but includes an even more extensive discussion of the caveats associated with analyzing AER data. In the "method" section of the article, the authors note that "reporting rates cannot be interpreted as incidence rates and cannot be used to estimate the actual number of cases of rhabdomyolysis occurring among all users of statins and gemfibrozil." *Id*. at 420.

Significantly, the Chang article devotes an entire section to a discussion of the "limitations" of AER-based analyses, noting that the AER system is a voluntary reporting system and the number of "reported cases included here present an unknown proportion of all cases of rhabdomyolysis that occur in relation to statin and gemfibrozil use, that "the estimates for drug use for this analysis are crude," and that "it is important to bear in mind that the reporting rates presented are NOT incidence rates and are in no way reflective of the actual occurrence of rhabdomyolysis among users of statins and/or gemfibrozil in clinical practice." *Id*. at 425-26. Thus, the article concludes that "comparisons of reporting rates across drugs" like the one done by Dr. Farquhar "should not be viewed as conclusive findings, but as crude indicators of known post-marketing experience." *Id*. at 426.

Plaintiffs also assert that peer-reviewed articles published since Dr. Farquhar prepared his expert report agree with Dr. Farquhar's conclusion that Baycol "was the most toxic statin in causing" "rhabdomyolysis and muscle injury."[5] Pls' Response at 19. In particular, plaintiffs assert that because Dr. Farquhar's conclusions regarding the comparative risks of Baycol and other statins are the same as the conclusions the plaintiffs allege are suggested by later-published, peer-reviewed studies, then Dr. Farquhar's methodology must *ipso facto* be reliable.

Plaintiffs are wrong for three reasons. First, each of these articles addresses only reporting rates of *rhabdomyolysis* associated with Baycol use and thus cannot

[5] *See* Psaty *et al.*, *Potential for Conflict of Interest in the Evaluation of Suspected Adverse Drug Reactions – Use of Cerivastatin and Risk of Rhabdomyolysis*, 292 JAMA 2622 (2004), and Graham *et al*, *supra*.

support Dr. Farquhar's conclusion that Baycol was the most toxic statin in causing "*rhabdomyolysis and muscle injury*." *See* Pls' Response at 19 (emphasis added). Second, plaintiffs' use of the Psaty article exaggerates support for Dr. Farquhar, because they Psaty articles discusses *Haltom* trial exhibits and parrots the Staffa letter without doing any independent research or analysis. Finally, plaintiffs confuse their burden of proving the soundness of methodology with the coincidence that later published articles agree with his conclusions. *Daubert* is concerned with methodology, not conclusions. Articles published after Dr. Farquhar wrote his report do not render his methodology reliable, whether or not they conform to his conclusion.

## III. PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN OF DEMONSTRATING THAT DR. FARQUHAR'S REWRITING OF THE PACIFICARE STUDY IS SCIENTIFICALLY SOUND.

Dr. Farquhar's serial recalculations of the data in the PacifiCare epidemiological study that Bayer sponsored in 2001-2002 further illustrate his unscientific methodology.[6] In fact, his efforts to reform selected portions of the completed epidemiological study bear striking resemblance to the recalculated epidemiological studies that led to the *Daubert* decision in the first place. *See* 509 U.S. at 583. With this analogy in mind, defendants pointed to three specific examples of how Dr. Farquhar's approach to the study failed to meet the *Daubert* standard. Plaintiffs' attempt to answer these fatal defects fail for the reasons discussed below. Fundamentally, the problem with Dr. Farquhar's critique of the PacifiCare study is that,

[6] The only PacifiCare study Dr. Farquhar addresses is PacifiCare 3, the study completed in February 2002, attached as Exhibit D to defendants' opening brief.

instead of stopping with opinions about the study's limitations, he tries to turn the study into something it was not, without following the methods of science which include exposing his methodology.

### A. Dr. Farquhar's "Correction" for the "Healthy Person" Effect on the PacifiCare Study Is Not Scientifically Sound.

Dr. Farquhar's first "correction" of the PacifiCare study takes one slice of data from Table 13 of the PacifiCare study and applies it to the entire study. This maneuver is based on his observation that the Baycol cohort had a significantly higher number of patients who had been switched from another statin to Baycol. Dr. Farquhar's report assumes that these patients must have been more tolerant to statins in general, and therefore more tolerant of Baycol, and so would not be representative of the general population. He then takes that slice of the data, recalculates the ratios and pronounces that the results prove his point with scientific certainty and statistical significance. Farquhar Rep. (Dfs' Ex. A) ¶ 103(b). Besides not providing any support for the underlying assumption other than conjecture, no clue is given as to how Dr. Farquhar performed this feat.

The numbers do not add up to a 54% increased risk. Specifically, Table 13, on which he relies, shows that 0.555% of Baycol patients who never took another statin were diagnosed with myopathy. The percentage of patients who developed myopathy while on other statins were approximately the same, ranging from 0.259% for Pravachol to 0.454% for Lipitor. No indication is given as to how Dr. Farquhar concluded from this

data that the rate of myopathy was 54% higher among Baycol users or how he determined its statistical significance.

More importantly, Dr. Farquhar does not even mention the comparable percentages among patients who *did* switch from one statin to another during the study period. This population, after all, would also be in the real world of Baycol use. Under his theory of statin tolerance, the percentages of patients who developed myopathy should be significantly lower across the board, but they are not. The percentage of patients developing myopathy who switched from one statin to another range from 1.818% among Mevacor patients to 0.288% among Zocor patients, with Baycol users at 0.357%, *slightly below the average* of 0.359%. In other words, not only do Dr. Farquhar's numbers not add up, he only tells half the story. Yet he opines (inexplicably) that there is only a one in 10,000 chance that his conclusion is wrong. Farquhar Rep. (Dfs' Ex. A) ¶ 103.

Dr. Farquhar's methods are not disclosed and were not decided upon *a priori*, in contrast to the PacifiCare studies. Moreover, although Bayer's expert, Dr. Brian Strom, acknowledges that statin tolerance among previously exposed patients is a "plausible" theory (Strom Rep. (Dfs' Ex. F) ¶ 21), Dr. Farquhar does not have any scientific evidence to back it up. As Dr. Strom noted, there are reasons why Dr. Farquhar's assumption may be false. People who switch from one statin to another may be *more likely* to be susceptible to adverse reactions. *Id*. For example, one common reason patients are switched from one to another statin is an inability to tolerate their

current statin. Such patients would be more prone to statin adverse reactions, not less, as Dr. Farquhar assumes. *Id*. Dr. Farquhar does not account for this potential explanation.

Indeed, the data in Table 13 on which Dr. Farquhar relies show that the risk of myopathy actually *increased* among patients who were switched from another statin to Mevacor and Pravachol, the opposite effect Dr. Farquhar assumes. That same table shows that the overall rate of myopathy among switchers and non-switchers for all statins was approximately the same, 0.359% and 0.385% respectively. These numbers do not bear out Dr. Farquhar's assumptions about a healthy person effect and thus his "correction" of the data is unreliable.[7]

[7] As further indication of his biased reasoning, Dr. Farquhar even argues that Bayer recognized the "healthy person" effect in a memo recommending use of previously statin treated patients for a high dose (1.6 mg, two times the highest approved dose) experimental study. Farquhar Rebuttal Rep. (Dfs' Ex. O) ¶ 21. What Dr. Farquhar fails to mention in citing to this memo is that the study being discussed was not an epidemiological study. It was a proposed special high dosing study that was never done and a selection criterion that was never used. An unproven assumption made by a Bayer official in connection with a different study that was never done does not make Dr. Farquhar's assumption a scientific fact. Plaintiffs' attempt to compare this situation to *In re Agent Orange Product Liability Litigation,* 597 F. Supp. 740, 783 (E.D.N.Y. 1985), is inapt. Pls' Response at 24. In contrast to the PacifiCare studies where the patients were all participants in the PacifiCare health system with comparable demographic characteristics (*see, e.g.*, Dfs' Ex. D at 14-18), in *Agent Orange* the court noted numerous problems in finding a group to compare to Vietnam combat veterans. Soldiers tend to be young and healthy, but they are also subjected to environmental exposures to carcinogens in training and on the battlefield, not to mention the stresses of combat, among other things. Thus, finding a group with comparable characteristics is nearly impossible. 597 F. Supp. at 783-85. *Agent Orange* had nothing to do with an attempt, such as Dr. Farquhar's here, to recalculate selected parts of a study.

### B. Dr. Farquhar's "Adjustment" of Exposure Periods Is Not Scientifically Sound.

Dr. Farquhar's second recalculation of the PacifiCare study data, which he adds to the first, depends on an unproven assumption that the risk of rhabdomyolysis remains essentially constant over the entire time that a patient is taking Baycol. Based on that assumption, Dr. Farquhar concludes that the PacifiCare study needs "adjustment" because the group who used Baycol had used the drug, on average, for a shorter period of time than the group that used the other statins. He then recalculates the numbers to "equalize" the exposure periods.

Dr. Farquhar crosses the *Daubert* line when he applies what plaintiffs call "a straightforward mathematical formula," Pls' Response at 24, to recalculate the risk for the patients taking all the other statins. This is because he has offered no scientific support for his formula and in fact does not even disclose the formula, whether straightforward or not. Compounding the error, he adds his "correction" for duration to his recalculation based on the erroneous "healthy person" effect discussed above and again pronounces that his answer is right to the tune of 99.99% certainty (p value <0.0001). Farquhar Rep. (Dfs' Ex. A) ¶ 110.

In contrast to Dr. Farquhar's opacity, defendants' expert, Dr. Strom, explained in detail why Dr. Farquhar's assumption was erroneous. As Dr. Strom noted, the greatest risk of rhabdomyolysis is when the patient starts taking the drug (median 31 days *after* start). Virtually all rhabdomyolysis cases occur well within the mean exposure period for Baycol in the PacifiCare study. Strom Rep. (Dfs' Ex. F) ¶ 20. Thus the

shorter period of Baycol use resulted in neither under-counting incidents related to Baycol nor over-counting incidents related to the other statins. *Id*. at ¶ 21. Any "equalization" attempted by Dr. Farquhar cannot be supported.

The *Daubert* issue here is not Dr. Farquhar's critique of the PacifiCare study based on the different periods of exposure, as plaintiffs suggest. It is the unscientific attempt by Dr. Farquhar to manipulate the data, disguised as simple "adjustments," and to present his recalculations to the jury as scientific fact.

### C. Dr. Farquhar's AER-Based "Capture" of PacifiCare Misclassification of Cases Is Not Scientifically Sound.

In order to make Baycol look even worse, Dr. Farquhar adds to his prior two recalculations of data a third one: recapture of myopathy cases that he assumed escaped the PacifiCare study net due to "misclassification." Dr. Farquhar assumes that the PacifiCare study missed cases in need of capture because International Classification of Disease (ICD-9) diagnostic codes recorded in the PacifiCare records were used to identify possible "cases" and the study authors did not confirm actual diagnosis of the patients by a chart review. As Dr. Strom, Bayer's expert, acknowledged, large epidemiological studies that are based on computerized claims data carry the potential for any individual case to be misclassified. Medical records may have mistakes. But the effect of this limitation is neutral since it would affect Baycol patients and other statin patients equally. Dr. Strom demonstrated why this was not a fatal flaw in the study. Strom Rep. (Dfs' Ex. F) at ¶ 22.

To recapture his assumed escaped cases, Dr. Farquhar falls back on a formula he concocted from AER data to "correct" for misclassification. The foundation for this third correction to the PacifiCare study thus rests on unsound and improper use of AER data: using AER data to compare all the statins against Baycol, this time calculating a ratio of the relative risks for "confirmed" vs. "suspected" cases and applying the result of that calculation to the PacifiCare data.

Apparently even plaintiffs have difficulty with Dr. Farquhar's misclassification calculation. Instead of challenging Dr. Strom's explanation of why this use of AER data does "not provide a reliable scientific basis for determining the incidence rate of a particular adverse event in association with a particular drug" or why these data cannot be used "to make scientifically valid comparisons of incidence rates between different pharmaceutical products," Strom Rep. (Dfs' Ex. F) ¶ 22, plaintiffs deflect the question away from Dr. Farquhar's methods (and recalculations). Instead, they attack PacifiCare's reliance on diagnostic codes as a screening method to identify cases.[8] The merit of the PacifiCare study is not the issue in defendants' motion; the issue is Dr. Farquhar's methodology in slicing the data to reach new conclusions presented as scientific fact.

---

[8] Plaintiffs claim support from *In re Swine Flu Products Liability Litigation*, 508 F. Supp. 897, 903 (D. Colo. 1981). There, the district court excluded an exhibit that was derived from a computer review of diagnostic codes from which clerical staff made a diagnosis of Guillian-Barre syndrome. In contrast, the PacifiCare study does not involve medical clerks making complex diagnostic decisions based on computer codes, or other decisions requiring medical judgment.

* * *

The overarching problem with Dr. Farquhar's approach to the PacifiCare study is that his report does not have the hallmarks of science or the indicia of reliability that would permit him to go beyond critique to offering new conclusions based on the data. He provides no description of his hypothesis, his methods, his formulae, scientific support for his assumptions or reasoning. He relies on patently flawed use of comparative AER data and ignores contrary data to force his conclusions. This is not science. His opinions are advocacy and should be excluded.

## CONCLUSION

For these reasons, the Court should grant Defendants' Motion to Exclude Dr. Farquhar's Testimony.

Dated: August 11, 2006

Respectfully submitted,

Philip S. Beck
Adam Hoeflich
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60610
(312) 494-4400

/signature on file/
Susan A. Weber
Eugene A. Schoon
Elizabeth Curtin
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000

Paul J. Zidlicky
Rebecca K. Wood
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000

Catherine Valerio Barrad
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
(213) 896-6000

Richard K. Dandrea
ECKERT SEAMENS CHERIN & MELLOTT, LLC
USX Tower, 600 Grant St., 44th Floor
Pittsburgh, PA 15219
(412) 566-6000

Scott A. Smith
Tracy J. Van Steenburgh
HALLELAND LEWIS NILAN SIPKINS & JOHNSON, P.A.
220 South Sixth Street, Suite 600
Minneapolis, MN 55402
(612) 338-1838

/signature on file/
Fred T. Magaziner
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000

*Counsel for SmithKline Beecham Corp. d/b/a GlaxoSmithKline*

Peter W. Sipkins (No.101540)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
(612) 340-2600

Douglas R. Marvin
WILLIAMS & CONNOLLY
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

Joseph D. Piorkowski, Jr.
THE PIORKOWSKI LAW FIRM, PC
910 17th Street, N.W. Suite 800
Washington, D.C. 20006
(202) 223-5535

*Counsel for Bayer Corporation and Bayer AG*