**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : | MDL No. 1431 (MJD) |
| This Document Relates to: | : | |
| *All Actions* | : | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO EXCLUDE EXPERT TESTIMONY ON ADVERSE EVENT REPORTS**

On February 3, 2006 – before the case-specific discovery provisions of PTO 149 took effect – approximately 10,500 active plaintiffs had claims pending in this MDL. Today, approximately 4,500 active plaintiffs remain. Virtually all assert claims based on muscle aches – not rhabdomyolysis.

However, all statins can cause muscle aches and muscle aches are one of the most common complaints among statin users and non-statin users. The PSC has therefore presented a parade of experts, who rely on articles discussing rhabdo adverse event reports (AERs), parrot PSC-retained epidemiologist John Farquhar,[1] and cite to other wildly inapposite sources (in one case, zero-gravity studies of muscles-in-space) to characterize Baycol as the most "toxic" statin or to make general assertions about

[1] *See* Defendants' Motions and Replies in Support of Motions To Exclude Testimony by Dr. Farquhar and To Exclude Experts from Invoking Other Testifying Experts.

"comparative risk" of "muscle pathology."[2] The object, apparently, is to try muscle ache cases on rhabdo evidence.

This strategy is foreclosed by *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993) and Fed. R. Evid. § 702. Rule 702 requires not only that a proposed expert be properly qualified to opine on the particular issues at hand and be offering relevant testimony, but that the proposed testimony be:

- "based upon sufficient facts or data;"
- "the product of reliable principles and methods;" and
- the result of reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. § 702; *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 591 (1993); *Hammes v. Yamaha Motor Corp. U.S.A., Inc.*, 2006 WL 1195907, at *2 (D. Minn. May 4, 2006). Plaintiffs bear the burden of proving all of these elements to the Court "to lay a foundation" for admission of the testimony. *United States v. Williams*, 95 F.3d 723, 729

[2] *See, e.g.*, Smith Rep. ¶ 6 ("Baycol is at least 10 times more toxic than other commercially available statins"); Zizic Rep. ¶ 12 (Baycol "was clearly the most toxic to muscles both in monotherapy and in combination therapy"); Farquhar Rep. ¶ 75 (AER data "point[s] to Baycol's uniquely high toxicity in comparison to all other statins"); Kapit Rep. ¶ 72 (the "excess human toxicity of cerivastatin"); Richman Rep. ¶ 20 ("The muscle injuries caused by the various statins are similar, although . . . Baycol has a higher attack rate"); Carlson Rep. ¶ 8 (Baycol "is responsible for a much higher incidence of muscle pathology . . . than that of the other statin drugs"); Mayer Rep. ¶ 19 (Baycol causes muscle damage "much more frequently than the other medications in this class, indeed up to 43 times more frequently. The degree of muscle damage is worse than other statins"); Raskin Rep. ¶ 23 ("Baycol's greater toxicity compared to other statins"); Boult Dep. at 95-96, 182, 294. Plaintiffs then use those generalizations to support their muscle ache claims. *See, e.g.*, Smith Response at 6, 8, 10-11; Farquhar Response at 10-11, 12, 16-17, 19; Raskin Response at 4-5, 11, 14; Richman Response at 5-7.

(8th Cir. 1996); *Daubert*, 43 F.3d at 1316 ("the party presenting the expert must show that the expert's findings are based on sound science").

Here, plaintiffs have failed to meet their burden of proving that AERs constitute sufficient facts or data to support their proffered opinions. *See infra*, Part I. They have not demonstrated that using AERs for comparison of the relative toxicity or safety of statins is the product of good science. *See infra*, Part II. And plaintiffs have not shown that AER data may be reliably applied here to draw the conclusions experts proffer – particularly with respect to muscle ache cases. *See infra*, Part III. Accordingly, testimony based upon AERs should be excluded.

## I. THE PSC HAS MADE NO ATTEMPT TO MEET THEIR BURDEN OF SHOWING THAT AERS ARE FACTS OR DATA SUFFICIENT TO SUPPORT OPINIONS COMPARING STATIN TOXICITY.

In their moving papers, defendants showed the Court that the Food and Drug Administration – the agency that requires pharmaceutical companies to collect AERs, *see* 21 C.F.R. § 314.80, – has published caveats expressly discussing the limitations upon us of AERs. FDA Office of Postmarketing Drug Risk Assessment, "Adverse Event Reporting System (AERS): Brief Description with Caveats of System" (Oct. 18, 1999) ("FDA Caveats") (Dfs' Ex. A[3]) at 2. Those caveats are set forth below.[4]

---

[3] Exhibit references are to exhibits for Defendants' Memorandum in Support of Their Motion to Exclude Expert Testimony Based on Adverse Event Reports ("Dfs' Ex.") or for the PSC's Response ("Pls' Ex.") or for this brief ("Reply Ex.").

[4] The FDA "caveats" state that "[t]here are some important things to remember when reviewing or analyzing data from AERs."

The first two caveats make clear that AERs are submitted voluntarily and are not subject to scientific or other verification, *id*., making AERs scientifically unreliable. Accordingly, courts reviewing AERs have stated that they are "data upon which no epidemiologist would rely" to render an opinion. *DeLuca v. Merrell Dow Pharm., Inc.*, 791 F. Supp. 1042, 1059 (D.N.J. 1992), *aff'd*, 510 U.S. 1044 (1994). *See infra*, Part II (discussing AER cases).

Defendants' opening brief discussed, in some detail, the reasons why AERs are not reliable. The PSC has made no attempt to refute these arguments, much less meet its burden of proving that AERs are reliable "data or facts" that would support an expert scientific opinion. Specifically:

---

1. Reports contain only those reactions voluntarily submitted either directly to the FDA or to the drug manufacturer by consumers and/or members of the health profession . . . .

2. The information contained in the reports ***has not been scientifically or otherwise verified.***

3. For any given report, ***there is no certainty that the suspected drug caused the reaction.*** This is because physicians are encouraged to report suspected reactions. The event may have been related to the underlying disease for which the drug was given to concurrent drugs being taken or may have occurred by chance at the same time the suspected drug was taken.

4. Accumulated case reports ***cannot be used to calculate incidence or estimates of drug risk.***

5. Numbers from these data must be carefully interpreted as reporting rates and not occurrence rates. ***True incidence rates cannot be determined from this database. Comparisons of drugs cannot be made from these data.***

*Id*. (emphasis added).

- As the FDA has repeatedly stated, the information contained in AERs has not been scientifically verified and therefore cannot be used to calculate incidence rates or estimates of drug use. FDA Caveats (Dfs' Ex. A) at 2. ***Plaintiffs make no response.***

- The medicine identified in the AER may have nothing to do with the reported reaction. As the FDA has explained, "The adverse event may . . . have occurred by chance at the same time the suspect drug was administered." Annual Adverse Drug Experience Report: 1996, Surveillance and Data Processing Branch, Division of Pharmacovigilance and Epidemiology, Office of Epidemiology and Biostatistics, Center for Drug Evaluation and Research, Food and Drug Administration (Oct. 30, 1997) (Dfs' Ex. O) at 1. ***Plaintiffs make no response.***

- Because AER data is passively collected based upon voluntary reporting, data are "generated in an uncontrolled and incomplete manner" and contain numerous "difficulties with AE [adverse event] recognition, underreporting, biases, estimation of population exposure, and report quality." *See, e.g., Pharmcoepidemiology* 167, 169 (Strom ed.) (4th ed. 2005). ***Plaintiffs make no response.***

- One well-recognized bias in AER data is that a healthcare provider or patient is more likely to make a voluntary report about an adverse event associated with a medicine about which there has been a lot of publicity (including relating to litigation)." Austin Dep. (Dfs' Ex. R) at 37-38. This can significantly skew reporting rates. ***Plaintiffs make no response.***

- Another well-recognized bias is that a medication that has recently been introduced generally has an increased rate of reporting over medicines in the class that have been on the market longer. Austin Dep. (Dfs' Ex. R) at 37, 42. ***Plaintiffs make no response.***

- The FDA and the scientific community recognize numerous additional factors as introducing bias into the reporting rates of adverse events including, but not limited to, communications with the medical community about the product and its potential adverse events, and variability in coding and diagnostic definitions with respect to the adverse event reported. Strom Rep. (Dfs' Ex. P) ¶ 10. ***Plaintiffs make no response.***

Because AERs, individually and collectively are inherently flawed data, they do not constitute "good grounds," appropriately validated, that can support expert testimony. *See Daubert*, 509 U.S. at 590; *see also, e.g., McClain v. Metabolife Int'l.*, 401

F.3d 1233, 1250 (11th Cir. 2005) (AERs "reflect complaints called in by product consumers without any medical controls or scientific assessment" and constitute "one of the least reliable sources to justify opinions about both general and individual causation"); *Doe v. Ortho-Clinical Diagnostics, Inc.*, 2006 WL 1877150 (M.D.N.C. July 6, 2006) (Reply Ex. A) (noting that it would be inappropriate to calculate incidence rates based upon AERs because neither the diagnosis nor causation has been verified); *Brumbaugh v. Sandoz Pharm. Corp.*, 77 F. Supp. 2d 1153, 1156 (D. Mont. 1999) (AERs "are temporal associations between a drug's administration and an unexpected physical reaction" which have "been rejected as reliable scientific evidence").

Plaintiffs here not only have failed to meet their burden of proof showing that AERs are sound "facts or data" that would support an expert opinion, they have made no effort to refute defendants' showing to the contrary. Accordingly, because plaintiffs have failed to establish the foundation necessary to admit expert testimony based upon AERs, that testimony must be excluded under Rule 702, *Daubert*, and their progeny.

## II. THE PSC HAS NOT MET ITS BURDEN OF PROVING THAT COMPARING DRUGS BASED ON AERS IS A RELIABLE SCIENTIFIC METHOD, NOR THAT IT HAS BEEN SO RECOGNIZED BY THE COURTS.

### A. The Cases Cited By Plaintiffs Do Not Support Use Of AER Data As The Basis For Expert Testimony on Comparative Risk.

The PSC asserts that adverse event data "falls squarely within the precedents" because courts have considered AER data to support general causation expert testimony, and because no court has "excluded expert testimony based upon the kind of

evidence collected here." Neither argument supports a conclusion that comparative risks of drugs can be established through use of AER data.

Two courts have excluded as unreliable expert testimony based upon a comparative analysis of adverse event data as the product of unreliable principles and methods (*see* Fed. R. Evid. 702) in analogous contexts. In *Doe v. Ortho-Clinical Diagnostics, Inc.*, 2006 WL 1877150 ((M.D.N.C.) July 6, 2006) (Reply Ex. A), plaintiffs claimed that their child suffered from autism as a result of exposure to toxic levels of mercury through vaccine injections containing thimerosal. Plaintiffs' expert testified to general causation based upon a literature review and his own analysis of the Vaccine Adverse Event Reporting System, specifically comparing reported incidents of adverse events after the administration of the Diphtheria, Tetanus & Pertussis ("DTP") vaccine that contained thimerosal against reported incidents of adverse events after thimerosal was removed from the DTP vaccine. His studies – some of which had been published – were criticized by the Institute of Medicine because, among other reasons, "as a passive reporting system, it would be inappropriate to calculate incidence rates based upon [the Vaccine AER System] because it 'does not have complete reporting of all adverse events and because many report events lack a confirmed diagnosis or confirmed attribution to the vaccine.'" *Id.* at *6 (quoting IOM Report). The Court excluded the expert's testimony, holding that plaintiffs had failed to carry their burden of proving its admissibility. *Id.*

Similarly, the *In re Meridia Prods. Liab. Litig.*, 328 F. Supp. 2d 791 (N.D. Ohio 2004), *aff'd*, 447 F.3d 861 (6th Cir. 2006), plaintiffs submitted an affidavit from

one of their experts who compared the number of AERs filed as to Meridia (a medicine used for weight loss) to the number of AERs filed as to other weight loss medications (*i.e.*, Xenical, Effexor and Ultran). That expert compiled a "proportional reporting rate analysis" similar to what the PSC's experts have done in this case. The *Meridia* court rejected proportional reporting rate analysis as "incomplete and often misleading," and held that it was insufficient to create a genuine issue of material fact on causation. *Id*. at 807-08 (citing to *Rider v. Sandoz Pharm. Corp.*, 295 F.2d 1194, 1199 (11th Cir. 2002); *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989-90 (8th Cir. 2001); *Dunn v. Sandoz Pharm. Corp.*, 275 F. Supp. 2d 672, 682 (M.D.N.C. 2003)).

None of the cases cited by the PSC supports what plaintiffs are trying to do here: use AERs as a basis for comparing the safety of different medicines. The cases they rely upon, which involve use of AER data to support a claim of general causation, cannot be stretched to support reliance on those data to answer a much more precise question of comparative risk. For instance, the PSC relies upon *In re Ephedra Prods. Liability Litig.*, 393 F. Supp. 2d 181 (S.D.N.Y. 2005), as support for the proposition that expert testimony may be based upon AERs. However, *Ephedra* did not involve comparisons of different medicines; the issue there was whether ephedra was capable of causing the injuries alleged by plaintiffs. *Id.* at 186. Accordingly, the court did not hold that a methodology based on AERs could be used for comparing different medicines.[5]

[5] Significantly, while discussing adverse events, the FDA Final Rule Summary explicitly stated that "adverse event reports are not dispositive of a determination of unreasonable risk and our determination did not depend on them." Dietary Supplements Containing Ephedrine Alkaloids Final Rule Summary *available at*

Similarly, *In re Phenylpropanolamine (PPA) Prods. Liability Litig.*, 289 F. Supp. 2d 1230 (W.D. Wash. 2003), does not support using AERs for comparing the risk of different medications. Rather, the court held that expert testimony on general causation was admissible to supplement an epidemiologic study[6] which the experts relied upon in rendering their opinions. The experts supplemented the results of this study with non-epidemiological lines of evidence, including case reports, textbooks and treatises, adverse drug reports, and the clinical experience of several experts and other scientists. *Id*. at 1242-43. However, the *PPA* court did not address the use of AERs to compare the relative risks of different medicines, as the PSC seeks to do here.

Plaintiffs' argument that no court has excluded expert testimony based on comparative AER data is both factually incorrect and misleading. Indeed, none of the cases cited by the PSC supports use of AERs for purposes of comparing the purported risks of different medicines. In fact, even when courts have allowed expert testimony based on AER data or on general causation (which is not at issue here), none has allowed

---

http://www.fda.gov/oc/initiatives/ephedra/february2004/finalsummary.htm (Reply Ex. B); 21 C.F.R. § 119.1. Further, the *Ephedra* court limited plaintiffs experts to testifying that ephedra may be a contributing cause of stroke and cardiac injury in some people and required them to qualify their testimony by saying there was not enough scientific data to prove a causal relationship definitively and that controlled studies might disprove it. *Ephedra*, 393 F. Supp. 2d at 187.

[6] The results of the study, known as Hemorrhagic Stroke Project or HSP, were published in a lead article in the New England Journal of Medicine. *See* Walter N. Kernan et al., Phenylpropanolamine and the Risk of Hemorrhagic Stroke, 343 New Eng. J. Med. 1826 (2000). The HSP also was considered by an advisory committee (Non-prescription Drug Advisory Committee or NDAC) convened by the FDA which recommended to the FDA that PPA-containing products no longer be available for OTC use. Following this recommendation, the FDA requested voluntary removal of PPA-containing products from the market and issued a public health advisory. *See PPA*, 298 F. Supp. 2d at 1235-36.

such testimony to be based on AERs alone. Rather, the cases cited by plaintiffs list, without further analysis, a variety of sources of evidence relied upon by the testifying experts:

- *Smith v. Wyeth-Ayerst Laboratories Co.*, 278 F. Supp. 2d 684, 695 (W.D.N.C. 2003): The court held that, "standing alone, case reports may or may not be a sufficient basis for expert opinion regarding causation" but that they may be considered *in conjunction with the epidemiological data* to support causation because such reports "can provide supportive or corroborating data."

- *Crawford v. Muscletech Research & Development, Inc.*, 2002 WL 31852828, at *1 (W.D. Okla. Oct. 10, 2002): The court denied a motion *in limine* to prevent plaintiffs from relying upon AERs and case studies to establish a causal link between ephedra and plaintiff's injuries where prior ruling permitted expert opinions on general causation based "in part on AERs and case studies."

- *Globetti v. Sandoz Pharm., Corp.*, 111 F. Supp. 2d 1174, 1178 (N.D. Ala. 2000): In ruling upon defendant's motion for summary judgment, the court concluded that plaintiff's experts' testimony on causation – based upon a combination of animal studies, medical literature reviews, AERs, the "general acceptance" of the association between Parlodel and acute myocardial infarction reflected in medical texts, a specific experiment, and personal observations – was admissible.

- *Brasher v. Sandoz Pharm. Corp.*, 160 F. Supp. 2d 1291, 1297-99 (N.D. Ala. 2001): In ruling on defendant's motion for summary judgment, the court concluded that the evidence presented by plaintiffs (which included AER data among others) was sufficient to create a genuine issue of material fact.

- *Glaser v. Thompson Medical Co., Inc.*, 32 F.3d 969, 972-75 (6th Cir. 1994): The court held that plaintiff's expert's opinion on causation was admissible, without mention of the case reports upon which the expert relied. Instead, the court based its reliability determination upon the expert's reliance on five studies and two research papers, combined with his extensive experience and work in the area.

Thus, as the court in *Nelson v. American Home Prods. Corp.*, 92 F. Supp. 2d 954, 969 (W.D. Mo. 2000) explained: "Evidence of an association [provided by AER spontaneous reporting] may be sufficient for formulation of a hypothesis that can later be tested and

confirmed, but it is not proof of causation in the courtroom or the scientific community." Since it is methodologically unsound for an expert to rely on AER data alone to establish general causation, it would be even more unsound for an expert to rely on such data to establish the more precise measurement of how likely one drug is to cause myopathy as compared to another. *See DeLuca v. Merrell Dow Pharm., Inc.*, 791 F. Supp. 1042, 1059 (D.N.J. 1992); *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1250 (11th Cir. 2005); *Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1164-65 (S.D. Fla. 1996); *Hagaman v. Merrell Dow Pharm., Inc.*, 1987 WL 342949, at *7-9 (D. Kan. June 26, 1987).

In sum, contrary to the PSC's representations, case law does not support admissibility of expert testimony based on AERs for purposes of comparing the safety of different medicines. As defendants explained in their opening brief, there is simply too much error inherent in AER data to make such data reliable for use in comparative analyses.

**B. The PSC Errs in Arguing that Sound Science Allows the Use of AERs To Compare Drug Risks.**

The PSC also claims that their experts may do what the FDA warns against doing because reliance on AERs to establish comparative risk is consistent with sound scientific practice. But the sources plaintiffs cite do not support this proposition.

**1. The Suprofen article does not support plaintiffs.**

The PSC asserts that an article involving Suprofen by Rossi *et al*. demonstrates that AERs can be used to infer causation. *See* Pls' Response at 2 (citing Rossi *et al.*, *The Importance of Adverse Reaction Reporting by Physicians: Suprofen and*

*the Flank Pain Syndrome*, 259 JAMA 1203 (1988) (Pls' Ex. A)). But that article does not support the proposition that AERs can be used to compare the risk of one drug to another, as plaintiffs seek to do here. The difference is between using AERs to generate a signal of a hazard which merits rigorous study and using AERs to measure the magnitude of the risk when multiple variables make such comparisons unreliable.

The thrust of the Suprofen article is to encourage AER reporting by physicians. As the JAMA head note states, the experience with Suprofen provided "a noteworthy example of the ability of spontaneous reporting to produce a timely and unequivocal sign of drug-related risk." *Id*. at 1203. In other words, adverse event reporting generated a ***signal***. This was FDA's purpose for requiring adverse event reporting. The authors then note a correlation of patient exposure with AERs, which "tended to support the belief of a causal connection." *Id.* at 1203-04. Moreover, as the "Comment" section of the article makes clear, the authors' use of AERs to suggest causation was based on more than tallying numbers:

> The event was unusual in the population not treated with Suprofen and occurred abruptly after one or two doses, both features that would point to a causal relationship to Suprofen; it involved healthy young individuals with little complicating disease or confounding exposures to consider; and finally, it occurred with uncommon frequency in health professions, *i.e*., in the people best prepared to recognize, attribute, and report a drug reaction, presumably because of their ready access to drug samples. Indeed, health professionals, their employees, and their spouses accounted for about 40% of the cases of FPS occurring from February to July 1986 and about 25% of all cases of FPS reported during the 17 months of marketing.

*Id.* at 1204.

Thus, the Suprofen article does not support the proposition urged by plaintiffs here – that they may compare the relative risks of statins based on AERs. Moreover, the contrast between the patient populations in Suprofen and here could not be more clear. The typical statin user is not young, healthy, or free of complicating disease or confounding exposure, unlike the Suprofen users. Unlike Suprofen, muscle aches are scarcely a signature disease and rarely correlate to one or two doses, factors that made the reliance on AERs in Suprofen plausible bases of proof of causation. Furthermore, unlike Suprofen where the AERs were reviewed, the PSC's epidemiologist did not even look at the reports or participate in the decision on which ones to include in his calculations. *See* Dfs' Farquhar Br. at 10-11.

**2. The Pierfitte study does not support plaintiffs.**

Although the PSC tries mightily to spin the Pierfitte study to support the methodology of their experts, the argument fails. Pierfitte *et al.*, *Is Reporting Rate a Good Predictor of Risks Associated With Drugs*?, 47 Brit. J. Clinical Pharmacology 329 (1999) (Pls' Ex. B). In fact, Pierfitte illustrates the problems of reliance on AER reporting rate data to calculate relative risk.

In the Pierfitte study, the authors sought to test the hypothesis that the reporting rate "should be reasonably similar for similar drugs sharing the same indication, country and period of marketing." *Id.* at 329. Thus, the study examined the adverse event reporting rate for "six pairs of identical drug[s] marketed at the same time by different companies under different brand names." *Id.*

According to the authors, the study "support[ed] the . . . assumption of similar reporting for similar drugs." *Id*. at 329. But that was true with respect to only four of the six pairs of drugs. The authors *disproved* their hypothesis with respect to the statins because they found a "statistically significant" difference in reporting rates with respect to the two pairs of statins. *Id*. at 330.

The PSC wishes away this fact by asserting that the reporting rate difference for statins was "no larger than a third," and positing that if statin reporting rates were adjusted by a third, Baycol's reporting rate for fatal rhabdomyolysis would still be higher than the reporting rate for other statins. Pls' Response at 3. But this calculation is based on flawed science – *i.e.*, findings that have not been proven by a scientific method. Making corrections to data by a non-proven error rate associated with unrelated data merely introduces *more* error (not less) into the analysis. Reliance on such data does not meet the Rule 702 tests of sufficient data or reliable methodology.

## III. THE OTHER ARTICLES CITED BY THE PSC DO NOT SUPPORT USE OF AERS TO DRAW GENERAL CONCLUSIONS ABOUT THE COMPARATIVE TOXICITY OF BAYCOL.

Finally, as its response makes clear, the PSC is intent on projecting conclusions based on rhabdo AERs to support conclusions about generic "muscle injury" and nebulous assertions about relative toxicity. Presumably, plaintiffs intend to rely on the logic that if Baycol had a higher reporting rate of rhabdo than other statins, it must have caused more muscle aches that were not rhabdo than other statins too. *See, e.g.*, Pls' Response at 1, 6 (arguing that the risk of "muscle disorders" was higher for patients taking Baycol). *Daubert* does not, however, allow experts to make such logical leaps.

*See, e.g.*, *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001) (the Court must "separat[e] expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge"); *Savage v. Union Pacific R.R. Co.*, 67 F. Supp. 2d 1021, 1035 (E.D. Ark. 1999) (where expert's conclusion is "nothing more than an 'educated guess' with no scientific data to support it . . . [t]he opinion fails to meet the requirements of *Daubert* and Fed. R. Evid. § 702").

Plaintiffs contend that their experts' reliance on rhabdo AERs to support general conclusions about the relative risk of other muscle-related adverse events is supported by medical literature and "non-AER data." Neither argument withstands examination.

**A. The Other Articles Cited by Plaintiffs Do Not Support General Opinions on Comparative Toxicity, Absent Rank Speculation.**

Plaintiffs rely on a letter, Staffa et al., *Cerivastatin and Reports of Fatal Rhabdomyolysis*, 346 New Engl. J. Med. 539, 540 (2002) (Pls' Ex. D), that "summarize[s] the U.S. reports of fatal rhabdomyolysis associated with all six" statins. *Id.* But the authors explicitly note the infirmities inherent in use of AER data, stating that that "[r]eporting rates are not incidence rates." *Id.* Thus, they do not recommend "[r]igorous comparisons between drugs" using these data because "many factors can affect reporting and an unknown number of cases may not be attributed to the drug or reported to the FDA." *Id.* *See also* Pasternak *et al.*, *ACC/AHA/NHLBI Clinical Advisory on the Use and Safety of Statins*, 40 J. Am. College of Cardiology 567 (2002) (Pls' Ex. I)

(which parrots both the rhabdo data and the caveats regarding use of AERs that appear in the Staffa Letter).

Such articles or testimony based upon them would not be admissible under *Ortho* or *Meridia* with respect to their conclusions about rhabdo. But plaintiffs and their experts want to use the Staffa letter and Pasternak article for even more than comparisons among the statins as to the risk of rhabdo. Although these sources address only rhabdo, the PSC and their experts point to them time-and-again in support of sweeping conclusions about the dangerousness or toxicity of Baycol to the other statins or their comparative risk of Baycol causing myopathy or myalgia.[7] Thus, the underlying problem of using AER data to compare the risk of rhabdo is compounded by leaps of logic – from rhabdo to muscle aches – based on impermissible speculation. *Cf. Glastetter*, 252 F.3d at 989. Indeed, the PSC itself concedes that blurring of analysis of rhabdo and myalgia is wrong. *See* PSC Response to Motion to Exclude Dr. Farquhar at 25 (contrasting rhabdo, “a rare and identifiably drug-related condition,” with “a broad endpoint of muscle-related ailments, including myalgias, which occur commonly” among statin users over time “both with and without drug toxicity”).

The PSC also relies upon an article written by a group of paid plaintiff experts who have submitted reports in state Baycol cases, Psaty *et al.*, *Potential for Conflict of Interest in the Evaluation of Suspected Adverse Drug Reactions: Use of Cerivastatin and Risk of Rhabdomyolysis*, 292 JAMA 2622 (2004) (Pls’ Ex. G). This

[7] *E.g.*, Pls’ Response to Smith Mot. at 6, 8, 10-11; Pls’ Response to Farquhar Mot. at 10-11, 12, 16-17, 19; Pls’ Response to Raskin Mot. at 4-5, 11, 14; Pls’ Response to Richman Mot. at 5-7.

review article discusses the Baycol litigation and exhibits offered during the *Haltom* trial, which (like every other jury to consider the issue) resulted in a defense verdict. The Psaty article parrots the data presented in the Staffa letter, while ignoring the caveats that Staffa (and the FDA) identified regarding "comparisons between drugs." Even if these articles could be relied upon to measure differences between Baycol and other statins as to rhabdo, none supports the use of rhabdo data to generalize about comparative toxicity and muscle aches.

The remaining articles cited by the PSC are either irrelevant or support defendants' position. Two of the articles do not even mention AERs and therefore have no bearing on whether AER data can form the basis of comparative drug safety claims. *See* Graham *et al*., *Incidence of Hospitalized Rhabdomyolysis in Patients Treated With Lipid-Lowering Drugs*, 292 JAMA 2585 (2004) (Pls' Ex. F); Furberg & Pitt, *Withdrawal of Cerivastatin From the World Market, 2 Current Controls Trials in Cardiovascular Medicine* 205 (2001) (Pls' Ex. H).

In short, none of the studies cited by the PSC supports plaintiffs' assertion that adverse event data can be used to compare the risk or toxicity of Baycol and other statins.

### B. The PSC Cannot Carry Its Burden of Proof through Self-Referential Argument.

The PSC next argues that AERs can be used for comparative risk analysis of statins because the expert witnesses the PSC hired to perform a comparative risk analysis say so. *See* Pls' Response at 6-7. An expert cannot establish that his data is

sufficient or his methods are reliable by saying that they are, at least not under Rule 702. The PSC first argues that Baycol AERs were elevated across multiple AER databases. *Id.* at 6. However, the fact that AER databases may have produced a consistent *signal* that further study of Baycol was warranted does not support the conclusion that AER data can be used to jump to the general conclusion "that Baycol resulted in a far higher risk of muscle disorders than other statins." *Id*. at 6. Data that is insufficient to support a methodologically sound conclusion does not become sufficient by comparing it to another set of data with the same defects. Plaintiffs quote the reports of their own experts, Drs. Farquhar and Austin, as authority for this proposition. Defendants' motions to exclude the testimony of these witnesses identifies fatal flaws in their scientific methodology. *See* Dfs' Farquhar and Austin Motions and Replies. Plaintiffs cannot argue that AERs can be used for risk comparison because Farquhar and Austin say so, and then assert – as plaintiffs do – that Farquhar and Austin's statistical machinations are correct because they are supported by AER databases not designed to support risk comparisons. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (nothing in the "Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").

Similarly, the PSC argues that "[n]on-AER [d]ata [c]orroborate" use of AERs for comparisons of statin risks. But the "non-AER data" upon which plaintiffs rely is the re-analysis of the PacifiCare study conducted by Drs. Farquhar and Austin. As defendants have demonstrated, those re-analyses were designed to change the results of

the PacifiCare study by 180 degrees, to bring it into conformity with plaintiffs' experts AER analysis. *See* Dfs' Farquhar and Austin Motions and Replies.

Plaintiffs also invoke Dr. Farquhar's analysis of clinical trial data on statins to support the assertion that "non-AER data" corroborates conclusions based on comparing AERs. These clinical trial data were the data presented to the FDA in support of Bayer's new drug application. Dr. Farquhar's assertion that the clinical trial data add "another nail in the coffin" of evidence of Baycol's "*unusual* toxicity" is belied by the fact that the FDA approved Baycol based on this clinical data. After reviewing the same data, the FDA found Baycol's toxicity to be comparable to the other statins and approved it as safe and effective. Thus, to accept Dr. Farquhar's reinterpretation of the clinical trial data and the AER data would be two conclusions the FDA has already rejected.

The PSC does include a citation to persons not on their payroll – a letter to the editor from three Houston physicians who reported six cases of severe rhabdo in plaintiffs taking Baycol. *See* Hyman et al., *Severe Rhabdomyolysis Related to Cerivastatin without Gemfibrozil*, 137 Annals of Int. Med. E-74 (2002) (Pls' Ex. L). Like the previously mentioned articles, this case report does not address myopathy or myalgia. For whatever this anecdotal information is worth – and the authors do not present it as anything other than anecdotal data – the letter does not support comparisons of the general toxicity of statins or their propensity to cause myopathy based upon AERs. In fact, anecdotal case reports suffer from the same limitations as AERs. *See Nelson*, 92 F. Supp. 2d at 969; *Haggerty*, 950 F. Supp. at 1165.

**C. The PSC's Attempt To Invoke The FDA Fails.**

Finally, the PSC urges that the FDA has recognized the value of comparing reporting rates. Defendants do not dispute that fact. Comparisons may be useful in identifying a potential signal. But the fact that such internal, signal-testing analyses are done does not mean that the results establish scientifically valid comparisons. This is exactly what FDA's Guidance document, cited by the PSC, states:

> Comparisons of reporting rates and their temporal trends can be valuable, particularly across similar products or across different product classes prescribed for the same indication. However, such comparisons are subject to substantial limitations in interpretation because of the inherent uncertainties in the numerator and denominator used. As a result, FDA suggests that a comparison of two or more reporting rates be viewed with extreme caution and generally considered exploratory or hypothesis-generation. Reporting rates can by no means be considered incidence rates, for either absolute or comparative purposes.

FDA Guidance for Industry: Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment at 11 (Mar. 2005) (Pls' Ex. M).

**CONCLUSION**

The PSC has failed to prove that comparative AER analysis constitutes "good grounds" upon which safety comparisons of different medications can be made. Accordingly, expert testimony that Baycol caused a higher rate of muscle toxicity, based upon comparative AER analysis, is inadmissible under *Daubert* and Rule 702 because the PSC has not shown that such testimony is based upon a reliable scientific methodology. For these reasons, defendants respectfully submit that proposed expert testimony regarding comparative risk based upon adverse event reports be excluded.

Dated: August 11, 2006

Respectfully submitted,

Peter W. Sipkins (No.101540)
DORSEY & WHITNEY LLP
Suite 1500
50 South Sixth Street
Minneapolis, MN 55402
(612) 340-2600

Philip S. Beck
Adam Hoeflich
BARTLIT BECK HERMAN
PALENCHAR & SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60610
(312) 494-4400

/signature on file/
Susan A. Weber
James W. Mizgala
Sherry A. Knutson
Nathan A. Huey
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000

Paul J. Zidlicky
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

Catherine Valerio Barrad
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
(213) 896-6000

Scott A. Smith
Tracy J. Van Steenburgh
HALLELAND LEWIS NILAN
SIPKINS & JOHNSON, P.A.
220 South Sixth Street, Suite 600
Minneapolis, Minnesota 55402-4501
(612) 338-1838

/signature on file/
Fred T. Magaziner
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000

*Counsel for SmithKline Beecham Corporation d/b/a GlaxoSmithKline*

Richard K. Dandrea
ECKERT SEAMENS CHERIN
& MELLOTT, LLC
USX Tower, 600 Grant St., 44th Floor
Pittsburgh, PA. 15219
(412) 566-6000

Douglas R. Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000

Joseph D. Piorkowski, Jr.
THE PIORKOWSKI LAW FIRM, PC
910 17th Street, NW Suite 800
Washington, D.C. 20006
(202) 223-5535

*Counsel for Bayer Corporation and Bayer AG*