# EXHIBIT A

Briefs and Other Related Documents
In re Medtronic, Inc., Implantable Defibrillators LitigationD.Minn.,2006.Only the Westlaw citation is currently available.

United States District Court,D. Minnesota.
In Re: **MEDTRONIC**, INC., IMPLANTABLE DEFIBRILLATORS LITIGATION
No. 05-MDL-1726(JMRAJB).

Nov. 28, 2006.

Background: In multidistrict products liability litigation, medical device manufacturer filed motion for summary judgment.

Holdings: The District Court, Rosenbaum, Chief Judge, held that:

(1) fact that manufacturer received premarket approval (PMA) from Food and Drug Administration (FDA) did not preempt state law causes of action;

(2) implied warranty claims were not preempted; and

(3) Medical Device Amendments (MDA) did not impliedly preempt state law products liability claims.

Motion denied.

[1] States 360 ⚿ 18.5

360 States
360I Political Status and Relations
360I(B) Federal Supremacy; Preemption
360k18.5 k. Conflicting or Conforming Laws or Regulations. Most Cited Cases
Court considering preemption challenge is not to pass judgment on reasonableness of state policy, but instead is to decide if state rule conflicts with or otherwise stands as obstacle to accomplishment and execution of federal law's full purposes and objectives. U.S.C.A. Const. Art. 6, cl. 2.

[2] States 360 ⚿ 18.11

360 States
360I Political Status and Relations
360I(B) Federal Supremacy; Preemption
360k18.11 k. Congressional Intent. Most Cited Cases
Preemption of state law is compelled whether Congress' command is explicitly stated in statute's language or implicitly contained in its structure and purpose. U.S.C.A. Const. Art. 6, cl. 2.

[3] States 360 ⚿ 18.7

360 States
360I Political Status and Relations
360I(B) Federal Supremacy; Preemption
360k18.7 k. Occupation of Field. Most Cited Cases
State law may be impliedly preempted, even in absence of express Congressional statement, when federal law completely occupies field of regulation so that by implication there is no room for state regulation and coexistence of federal and state regulation is not possible. U.S.C.A. Const. Art. 6, cl. 2.

[4] Products Liability 313A ⚿ 46.1

313A Products Liability
313AI Scope in General
313AI(B) Particular Products, Application to
313Ak46 Health Care and Medical Products
313Ak46.1 k. In General. Most Cited Cases

States 360 ⚿ 18.65

360 States
360I Political Status and Relations
360I(B) Federal Supremacy; Preemption
360k18.65 k. Product Safety; Food and Drug Laws. Most Cited Cases
In determining whether state common law claim against manufacturer of premarket approved (PMA) product is preempted by Medical Device Amendments (MDA) to Food, Drug, and Cosmetic Act (FDCA), court must consider: (1) whether there are any device-specific federal requirements imposed on medical device manufacturer; and (2) if there are such requirements, whether claim would impose requirement different from or in addition to specific federal requirement. Federal Food, Drug, and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Cosmetic Act, § 521(a), 21 U.S.C.A. § 360k(a).

In determining whether state common law claim against manufacturer of premarket approved (PMA) product is preempted by Medical Device Amendments (MDA) to Food, Drug, and Cosmetic Act (FDCA), court must consider: (1) whether there are any device-specific federal requirements imposed on medical device manufacturer; and (2) if there are such requirements, whether claim would impose requirement different from or in addition to specific federal requirement. Federal Food, Drug, and Cosmetic Act, § 521(a), 21 U.S.C.A. § 360k(a).

[5] Products Liability 313A ⚷ 46.1

313A Products Liability
313AI Scope in General
313AI(B) Particular Products, Application to
313Ak46 Health Care and Medical Products
313Ak46.1 k. In General. Most Cited Cases

States 360 ⚷ 18.65

360 States
360I Political Status and Relations
360I(B) Federal Supremacy; Preemption
360k18.65 k. Product Safety; Food and Drug Laws. Most Cited Cases

Fact that Class III medical device manufacturer received premarket approval (PMA) from Food and Drug Administration (FDA) for its implantable cardioverter-defibrillators (ICD) and cardiac resynchronization therapy defibrillators (CRT-D) did not preempt, pursuant to Medical Device Amendments (MDA) to Food, Drug, and Cosmetic Act (FDCA), state law causes of action against it for failure to warn, negligence, strict liability, misrepresentation by omission, and negligence per se, where state law claims were based on manufacturer's alleged concealment of data regarding devices' defective battery from FDA to maintain its PMA approval, in violation of FDA regulations. Federal Food, Drug, and Cosmetic Act, § 521(a), 21 U.S.C.A. § 360k(a); 21 C.F.R. §§ 803.50, 803.53, 814.3, 814.39, 814.84.

Fact that Class III medical device manufacturer received premarket approval (PMA) from Food and Drug Administration (FDA) for its implantable cardioverter-defibrillators (ICD) and cardiac resynchronization therapy defibrillators (CRT-D) did not preempt, pursuant to Medical Device Amendments (MDA) to Food, Drug, and Cosmetic Act (FDCA), state law causes of action against it for failure to warn, negligence, strict liability, misrepresentation by omission, and negligence per se, where state law claims were based on manufacturer's alleged concealment of data regarding devices' defective battery from FDA to maintain its PMA approval, in violation of FDA regulations. Federal Food, Drug, and Cosmetic Act, § 521(a), 21 U.S.C.A. § 360k(a); 21 C.F.R. §§ 803.50, 803.53, 814.3, 814.39, 814.84.

[6] Products Liability 313A ⚷ 46.1

313A Products Liability
313AI Scope in General
313AI(B) Particular Products, Application to
313Ak46 Health Care and Medical Products
313Ak46.1 k. In General. Most Cited Cases

States 360 ⚷ 18.65

360 States
360I Political Status and Relations
360I(B) Federal Supremacy; Preemption
360k18.65 k. Product Safety; Food and Drug Laws. Most Cited Cases

In situations where Food and Drug Administration (FDA) is aware that use of medical device entails certain risk, and has approved particular warning concerning that risk, any state law claim of inadequate warning that might require label differing from FDA-prescribed language is preempted, but if defendant discovers information subsequent to FDA approval that would lead reasonable manufacturer to warn medical community before device is implanted into patients, state law failure to warn claim is not preempted. Federal Food, Drug, and Cosmetic Act, § 521(a), 21 U.S.C.A. § 360k(a).

In situations where Food and Drug Administration (FDA) is aware that use of medical device entails certain risk, and has approved particular warning concerning that risk, any state law claim of inadequate warning that might require label differing from FDA-prescribed language is preempted, but if defendant discovers information subsequent to FDA

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

approval that would lead reasonable manufacturer to warn medical community before device is implanted into patients, state law failure to warn claim is not preempted. Federal Food, Drug, and Cosmetic Act, § 521(a), 21 U.S.C.A. § 360k(a).

[7] Sales 343 ⚷ 427

343 Sales
343VIII Remedies of Buyer
343VIII(D) Actions and Counterclaims for Breach of Warranty
343k427 k. Right of Action. Most Cited Cases

States 360 ⚷ 18.65

360 States
360I Political Status and Relations
360I(B) Federal Supremacy; Preemption
360k18.65 k. Product Safety; Food and Drug Laws. Most Cited Cases
Medical Device Amendments (MDA) to Food, Drug, and Cosmetic Act (FDCA) did not preempt claim that Class III medical device manufacturer breached its implied warranty to consumers by failing to comply with manufacturing requirements imposed by Food and Drug Administration (FDA) during premarket approval (PMA) process. Federal Food, Drug, and Cosmetic Act, § 521(a), 21 U.S.C.A. § 360k(a).

Medical Device Amendments (MDA) to Food, Drug, and Cosmetic Act (FDCA) did not preempt claim that Class III medical device manufacturer breached its implied warranty to consumers by failing to comply with manufacturing requirements imposed by Food and Drug Administration (FDA) during premarket approval (PMA) process. Federal Food, Drug, and Cosmetic Act, § 521(a), 21 U.S.C.A. § 360k(a).

[8] Sales 343 ⚷ 427

343 Sales
343VIII Remedies of Buyer
343VIII(D) Actions and Counterclaims for Breach of Warranty
343k427 k. Right of Action. Most Cited Cases

States 360 ⚷ 18.15

360 States
360I Political Status and Relations
360I(B) Federal Supremacy; Preemption
360k18.15 k. Particular Cases, Preemption or Supersession. Most Cited Cases
Warranty claims against Class III medical device manufacturers that arise under state laws of general applicability are not preempted by Medical Device Amendments (MDA) to Food, Drug, and Cosmetic Act (FDCA). Federal Food, Drug, and Cosmetic Act, § 521(a), 21 U.S.C.A. § 360k(a); 21 C.F.R. § 801.1(d).

Warranty claims against Class III medical device manufacturers that arise under state laws of general applicability are not preempted by Medical Device Amendments (MDA) to Food, Drug, and Cosmetic Act (FDCA). Federal Food, Drug, and Cosmetic Act, § 521(a), 21 U.S.C.A. § 360k(a); 21 C.F.R. § 801.1(d).

[9] Sales 343 ⚷ 427

343 Sales
343VIII Remedies of Buyer
343VIII(D) Actions and Counterclaims for Breach of Warranty
343k427 k. Right of Action. Most Cited Cases

States 360 ⚷ 18.15

360 States
360I Political Status and Relations
360I(B) Federal Supremacy; Preemption
360k18.15 k. Particular Cases, Preemption or Supersession. Most Cited Cases
Medical Device Amendments (MDA) to Food, Drug, and Cosmetic Act (FDCA) did not preempt claim that Class III medical device manufacturer breached express warranty to consumers by including claims in its sales and marketing campaigns that did not conform to, or were not mandated by, Food and Drug Administration's (FDA) labeling or packaging requirements. Federal Food, Drug, and Cosmetic Act, § 521(a), 21 U.S.C.A. § 360k(a).

Medical Device Amendments (MDA) to Food, Drug, and Cosmetic Act (FDCA) did not preempt claim that Class III medical device manufacturer breached express warranty to consumers by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

including claims in its sales and marketing campaigns that did not conform to, or were not mandated by, Food and Drug Administration's (FDA) labeling or packaging requirements. Federal Food, Drug, and Cosmetic Act, § 521(a), 21 U.S.C.A. § 360k(a).

[10] Antitrust and Trade Regulation 29T ⚿ 132

29T Antitrust and Trade Regulation
29TIII Statutory Unfair Trade Practices and Consumer Protection
29TIII(A) In General
29Tk132 k. Preemption. Most Cited Cases

States 360 ⚿ 18.84

360 States
360I Political Status and Relations
360I(B) Federal Supremacy; Preemption
360k18.83 Trade Regulation; Monopolies
360k18.84 k. In General. Most Cited Cases

Medical Device Amendments (MDA) to Food, Drug, and Cosmetic Act (FDCA) did not preempt claim that Class III medical device manufacturer violated state consumer protection laws or false advertising and deceptive trade practice statutes by including claims in its sales and marketing campaigns that did not conform to, or were not mandated by, Food and Drug Administration's (FDA) labeling or packaging requirements. Federal Food, Drug, and Cosmetic Act, § 521(a), 21 U.S.C.A. § 360k(a); 21 C.F.R. § 801.1(d).

Medical Device Amendments (MDA) to Food, Drug, and Cosmetic Act (FDCA) did not preempt claim that Class III medical device manufacturer violated state consumer protection laws or false advertising and deceptive trade practice statutes by including claims in its sales and marketing campaigns that did not conform to, or were not mandated by, Food and Drug Administration's (FDA) labeling or packaging requirements. Federal Food, Drug, and Cosmetic Act, § 521(a), 21 U.S.C.A. § 360k(a); 21 C.F.R. § 801.1(d).

[11] States 360 ⚿ 18.5

360 States
360I Political Status and Relations
360I(B) Federal Supremacy; Preemption
360k18.5 k. Conflicting or Conforming Laws or Regulations. Most Cited Cases

States 360 ⚿ 18.7

360 States
360I Political Status and Relations
360I(B) Federal Supremacy; Preemption
360k18.7 k. Occupation of Field. Most Cited Cases

When analyzing state statute under implied preemption doctrine, court may not find state law preempted unless it conflicts with federal law or would frustrate federal scheme, or unless court discerns from totality of circumstances that Congress sought to occupy field to exclusion of states.

[12] States 360 ⚿ 18.13

360 States
360I Political Status and Relations
360I(B) Federal Supremacy; Preemption
360k18.13 k. State Police Power. Most Cited Cases

Court should presume that states' historic police powers were not to be superseded by federal act unless that was clear and manifest purpose of Congress.

[13] Products Liability 313A ⚿ 46.1

313A Products Liability
313AI Scope in General
313AI(B) Particular Products, Application to
313Ak46 Health Care and Medical Products
313Ak46.1 k. In General. Most Cited Cases

States 360 ⚿ 18.65

360 States
360I Political Status and Relations
360I(B) Federal Supremacy; Preemption
360k18.65 k. Product Safety; Food and Drug Laws. Most Cited Cases

Medical Device Amendments (MDA) to Food, Drug, and Cosmetic Act (FDCA) did not impliedly preempt state law products liability claims against Class III medical device manufacturer, where

plaintiffs did not complain of fraud on Food and Drug Administration (FDA), but rather claimed that they, themselves, were deceived and injured by manufacturer's actions in continuing to sell devices with possibly-defective battery for implantation into plaintiffs, its failure to advise patients and physicians about defect, and its failure to inform them that safer model of battery was available. Federal Food, Drug, and Cosmetic Act, § 521, 21 U.S.C.A. § 360k.

Medical Device Amendments (MDA) to Food, Drug, and Cosmetic Act (FDCA) did not impliedly preempt state law products liability claims against Class III medical device manufacturer, where plaintiffs did not complain of fraud on Food and Drug Administration (FDA), but rather claimed that they, themselves, were deceived and injured by manufacturer's actions in continuing to sell devices with possibly-defective battery for implantation into plaintiffs, its failure to advise patients and physicians about defect, and its failure to inform them that safer model of battery was available. Federal Food, Drug, and Cosmetic Act, § 521, 21 U.S.C.A. § 360k.

ORDER

ROSENBAUM, Chief District J.

***1** The Medtronic, Inc., Implantable Defibrillator Multidistrict Litigation ("MDL") cases have been transferred to this Court by Order of the Judicial Panel on Multidistrict Litigation. The cases were transferred for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. Prior to instituting a full discovery/pretrial schedule, defendant, Medtronic, Inc. ("Medtronic"), has asked the Court to consider its motion for summary judgment based on its claim that federal preemption bars plaintiffs' claims. The Court has done so. Medtronic's motion is denied.

I. *Background* FN1

Medtronic manufactures implantable cardioverter-defibrillators ("ICDs") and cardiac resynchronization therapy defibrillators ("CRT-Ds"). Each device contains a small computer, battery, and capacitor which stores electrical energy to be used to regulate cardiac function. These three-ounce devices are surgically implanted into a subcutaneous pocket. A properly functioning ICD or CRT-D offers potentially lifesaving treatment for patients susceptible to cardiac arrhythmia.

Medtronic's defibrillators are Class III medical devices. These devices are subject to the most intensive review by the Food and Drug Administration ("FDA"). Under the Medical Device Amendments ("MDA") to the Food, Drug, and Cosmetic Act ("FDCA"), Class III medical devices are used for "supporting or sustaining human life" or are of "substantial importance in preventing impairment of human health." 21 U.S.C. § 360c(a)(1)(C)(ii)(I) (2002). Class III devices are subject to a rigorous premarket approval ("PMA") process before they may be put on the market. An applicant for PMA must demonstrate a "reasonable assurance" that the device is both "safe ... [and] effective under the conditions of the use prescribed, recommended, or suggested in the proposed labeling thereof." 21 U.S.C. § 360e(d)(2)(A), (B)(2004).

Even after approval, medical device manufacturers must self-report adverse events through the FDA's medical device reporting ("MDR") system. 21 C.F.R. § 803, et. seq. (2005). These MDR regulations assist the FDA in protecting "the public health by helping to ensure that devices are ... safe and effective for their intended use." *Id.* at § 803.1(a). The manufacturer must make an FDA report "no later than 30 calendar days" after it "become[s] aware of information, from any source, that reasonably suggests that a device [it] market[s] ... has malfunctioned and this device or a similar device that [it] market[s] would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur." *Id.* at § 803.50(a).

The FDA first reviewed the devices before the Court when it considered Medtronic's Model 7271 defibrillator, which received its approval on October 9, 1998. Following the initial approval, Medtronic has systematically modified, updated, or improved its defibrillators. On these occasions, Medtronic filed PMA Supplement applications. As modifications of previously issued PMAs, these later applications were somewhat less rigorous.

***2** In November, 2000, Medtronic sought FDA approval for its updated Marquis 7274. A new battery, the Chi 4420L, constituted a major difference between the proposed Marquis 7274 and its predecessors. Medtronic's PMA Supplement application included detailed information and a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

description of the new battery. The PMA Supplement application described modifications of the previous battery design, a summary of the testing performed on the battery, battery modeling methodology, and projected the expected life of the new battery. On March 1, 2000, the Marquis Model 7274 received FDA approval.

Sometime in early 2003, during routine laboratory testing, Medtronic discovered a defect in the Chi 4420L battery which caused it to discharge prematurely. Medtronic's engineers continued to test the Chi 4420L battery between February and September of 2003. Through these tests, Medtronic engineers identified and came to understand the shorting mechanism which led to its observed battery depletion anomaly. Medtronic did not notify the FDA or the medical community of this discovery, even though it had identified, and known for more than six months, a defect which could cause its defibrillators to lose their electrical charge in days instead of years.

Medtronic claims it opted against notifying the FDA, physicians, or patients during this period because it had not received any field reports of early battery depletion. Medtronic avers that, absent field reports of failure, it assumed the potential for depletion was limited to laboratory conditions. During this six-month period, Medtronic sold and shipped thousands of Marquis devices with potentially defective batteries to patients throughout the country.

Even in the absence of field reports of battery failure or premature discharge, Medtronic began to redesign its Chi 4420L battery to address the defect in the Spring of 2003. While this redesign was underway, Medtronic sought and obtained approval for three additional device models-the Maximo DR and VR ICDs and Insync II Protect-each containing the Chi 4420L battery. Each device's PMA Supplement application failed to advise the FDA of the Chi 4420L's documented shorting problem, or that this anomaly could lead to premature depletion. Thus, these new devices received FDA approval, and went into production and distribution with a battery Medtronic knew could short and discharge prematurely.

On October 6, 2003, Medtronic filed another PMA Supplement application with the FDA seeking approval to implement three design changes to the Chi 4420L battery. The application stated that the prior design had experienced internal shorts, which it asserted was a "known failure mode" in the devices. (Ex. O, p. 9.) Medtronic included the "known failure mode" language in its October, 2003, PMA Supplement application, despite earlier drafts of the submissions which described the defect as "a previously undetected failure mode," and described and diagramed details of the known problem. (Ex. F.) Medtronic claims it deleted references to the "previously undetected failure mode" from its FDA submissions, because if supplied, the information might "not [have made] sense to the [FDA] reviewer." (Ex. E, Keller Depo. 172:22.)

***3** Based on the information Medtronic supplied, the FDA approved the new battery's PMA Supplement application on October 23, 2003. Even with this new approval in hand, Medtronic did not notify physicians or patients that its Marquis devices which contained the Chi 4420L battery posed a greater risk of battery depletion than its newly-designed and approved battery. It also continued to ship and sell ICDs and CRT-Ds containing the Chi 4420L batteries.

Somewhere between February and April, 2004, Medtronic began to receive field reports of premature battery depletion. Upon receiving this information, Medtronic, for the first time, reported battery problems through the FDA's MDR system.

By December, 2004, more than one year and nine months after its own discovery of the problem, Medtronic received nine field returns of devices with premature battery depletion. Even with this field evidence in hand, it was not until February, 2005-two full years after its own discovery of the battery discharge anomaly-that Medtronic first warned the public of the defective battery. At that time, it initiated a voluntary field action, and sent a "Dear Doctor" letter advising physicians that certain Marquis devices posed a risk of failure, and cautioned that "[o]nce a short occurs, [battery] depletion can take place within a few hours to a few days, after which there is a complete loss of device function." (Ex. H.) On March 16, 2005, the FDA initiated a regulatory enforcement action against Medtronic, ordering a total Class II recall of the 87,000 Marquis devices containing the Chi 4420L

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

battery.

Plaintiffs seek damages for personal injuries resulting from their receipt of Marquis devices with a defective battery. Their Master Complaint asserts state law product liability claims sounding in negligence and strict liability. Other claims include negligence per se premised on the FDCA, breaches of express and implied warranties, misrepresentation by omission, violations of state Consumer Protection Statutes, and violations of Minnesota false advertising and deceptive trade practices statutes. In addition, plaintiffs seek disgorgement of "unjust enrichment" related to payment for the devices, and the spouses of patients seek recovery for derivative loss of consortium claims.

In support of their opposition to Medtronic's motion, plaintiffs have offered the affidavit of Dr. Suzanne Parisian, a former FDA employee.FN2 Dr. Parisian avers that Medtronic failed to inform the FDA of certain information essential to its continued approval of the Chi 4420L battery. She states that the information Medtronic supplied was not complete, and failed to advise the FDA of known defects and failures in its PMA and PMA supplement applications. In her view, Medtronic failed to take appropriate action to warn patients and the medical community about the dangers associated with the devices as part of the PMA Supplement process. She points to specific post-marketing requirements, which she claims imposed upon Medtronic certain obligations which were not fulfilled, particularly concerning timely performance of post-marketing studies, timely submission of reports, and altering devices without prior FDA approval. Assuming these facts to be true, as the Court must at this time, these allegations have legal consequences.

*4 Medtronic now moves for summary judgment, claiming all of plaintiffs' state law claims are preempted by the MDA and FDA regulations promulgated pursuant to it. Medtronic argues that plaintiffs' claims challenge and conflict with the FDA's regulatory judgment, as well as the FDA's requirements for the devices' design, labeling, and manufacturing processes, thus triggering both the doctrines of express and implied preemption.

II. *Analysis*

A. *Summary Judgment*

Summary judgment may only be granted when there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When material facts or questions of law remain in dispute, summary judgment must be denied.

B. *Preemption*

Federal preemption derives from the Supremacy Clause of the United States Constitution. The Constitution establishes the laws of the United States as "the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. IV, cl. 2. In practice, this means state laws conflicting with federal laws or regulations are preempted. *Malone v. White Motor Corp.,* 435 U.S. 497, 504, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978).

[1] A court considering a preemption challenge "is not to pass judgment on the reasonableness of state policy," but instead "to decide if a state rule conflicts with or otherwise 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives' of the federal law." *Livadas v. Bradshaw,* 512 U.S. 107, 120, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994) (citation omitted). Thus, the Court must "ascertain Congress' intent in enacting the federal statute at issue." *Metro. Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 738, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985).

[2][3] Preemption "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Id.* at 738 (citations omitted). Express preemption is found when Congress declares a clear intent to preempt state law. *Hillsborough County v. Automated Med. Labs., Inc.,* 471 U.S. 707, 712-713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). But state law may be impliedly preempted, even in the absence of an express Congressional statement, "when a federal law completely occupies the field of regulation so that by implication there is no room for state regulation and the coexistence of federal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

and state regulation is not possible." *Missouri Bd. of Exam'rs for Hearing Instrument Specialists v. Hearing Help Express, Inc.*, 447 F.3d 1033, 1035 (8th Cir.2006). Medtronic asks the Court to find both express and implied preemption here.

1. *Express Preemption*

The Medical Device Amendments to the FDCA provide that:

no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement-(1) which is different from, or in addition to, any requirement applicable under this Act to the device, and (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this Act.

*5 21 U.S.C. § 360k(a). In interpreting § 360k, the Court is guided by the Supreme Court's decision in *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (plurality opinion), and the Eighth Circuit Court of Appeals' decision in *Brooks v. Howmedica Inc.*, 273 F.3d 785 (2001) (en banc).FN3

*Lohr* provides the framework by which the MDA's express preemption clause is applied to state law tort claims. *Lohr,* of course, is wondrously complex, comprising two separate majorities. Five justices found state law actions, including state law duties of general applicability, preempted when they impose conditions on a device manufacturer which differ from or add to federal requirements. *Lohr,* 518 U.S. at 509-11 (O'Connor, J., Rehnquist, C.J., Scalia, J., and Thomas, J., concurring and dissenting), 503-05 (Breyer, J., concurring in part). As Justice Breyer said in his concurring opinion, "if a jury were to find negligence in the use of a wire longer than one inch in the manufacture of a hearing aid when the FDA had required a two inch wire, there would be federal preemption as surely as if a state regulation were to impose such a limitation." *Brooks,* 273 F.3d at 796 (quoting *Lohr,* 518 U.S. at 504 (Breyer, J., concurring)).

But all nine of *Lohr* 's Justices ultimately found defective design claims concerning § 510(k)-cleared devices survived § 360k(a) preemption because there were no specific federal requirements with which such claims could conflict.FN4 *Lohr,* 518 U.S. at 493-94 (majority opinion), 513 (O'Connor, J., concurring in part and dissenting in part). Five justices also held the plaintiff's manufacturing and labeling claims survived a preemption challenge, because the FDA's manufacturing and labeling requirements were general in nature rather than device specific, and because the device had not gone through the PMA process. *Id.* at 497-500 (majority opinion); *Id.* at 505-07 (Breyer, J., concurring in part and concurring in the judgment).

[4] Two main common law preemption principles arise from *Lohr:* first, a Court must consider whether there are any device-specific federal requirements imposed on the medical device manufacturer; second, if there are such requirements, the Court must determine whether the state common-law claim would "impose a requirement different from or in addition to" the specific federal requirement. *Id.* at 511; *Brooks,* 273 F.3d at 794. The federal and state requirements must be "carefully compared" to ascertain whether a conflict exists. *Lohr,* 518 U.S. at 500; *Brooks,* 273 F.3d at 794.

The *Brooks* court considered these principles in the case of a PMA approved product, as opposed to the *Lohr* court's § 510(k) approval. The *Brooks* court found the two processes "by no means comparable," *Brooks,* 273 F.3d at 795 (quoting *Lohr,* 518 U.S. at 478). The Eighth Circuit recognized that, while the § 510(k) process usually takes 20 hours, "PMA review typically requires 1,200 hours of rigorous testing for device safety." *Brooks,* F.3d 273 at 795. As the FDA, through its PMA process, had issued specific directives concerning the product labeling in *Brooks,* the court found plaintiff's failure to warn claim would interfere with federal requirements. *Brooks,* 273 at 796. Drawing on Justice Breyer's inch-long wire example, the court held a jury finding of negligent failure to warn would effectively impose a different labeling requirement from that established by the FDA; thus, the claim was preempted. *Id.*

*6 With these principles in mind, this Court considers whether the MDL plaintiffs' state law claims would impose upon Medtronic any requirement different from those imposed upon it by the FDA/PMA device-specific approvals.

a. *Device-specific Federal Requirements*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

As a threshold matter, the Court considers whether the FDA has established specific federal requirements upon Medtronic's Marquis devices. Medtronic, of course, claims its PMA submissions and the FDA-issued approvals constitute preemptive device-specific federal requirements, particularly as they relate to every facet of the Marquis devices design, including the batteries. (*See* Samsel Aff. Exs. B-D.) Plaintiffs reply that the PMA process imposes no device-specific preempting requirements.

The majority of circuits hold that the FDA's PMA approval constitutes a specific federal requirement. *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 118 (2d Cir.2005); *Gomez v. St. Jude Med. Daig Div., Inc.*, 442 F.3d 919, 929 (5th Cir.2006); *McMullen v. Medtronic, Inc.*, 421 F.3d 482, 487-88 (7th Cir.2005); *Horn v. Thoratec Corp.*, 376 F.3d 163, 169-70 (3d Cir.2004); *Brooks*, 273 F.3d at 795-96; FN5 *Kemp v. Medtronic, Inc.*, 231 F.3d 216, 226-28 (6th Cir.2000).FN6 In *Brooks*, the Eighth Circuit, speaking through the Honorable Diana E. Murphy, said, "[t]hrough its approval of the PMA application ... and continuing series of directives, the [FDA] imposed specific federal requirements on [the manufacturer]." *Brooks*, 273 F.3d at 798.

Once a Class III device manufacturer receives PMA approval, the manufacturer is barred from making any changes affecting the device's safety and effectiveness without obtaining further FDA approval. This obligation to adhere to the standards set forth in its individual FDA-approved PMA constitutes a set of federal, device-specific requirements. *Riegel*, 451 F.3d at 118. "It is the totality of the design, manufacturing processes, and labeling-when coupled with the prohibition against modifying them-that represents the specific federal requirement." *Kemp*, 231 F.3d at 228.FN7

The Code of Federal Regulations states, "[a] device may not be manufactured, packaged, stored, labeled, distributed, or advertised in a manner that is inconsistent with any conditions to approval specified in the PMA approval order for the device." 21 C.F.R. § 814.80 (2005). Thus, the Court finds that through the PMA process, the FDA has established specific federal requirements for the Marquis devices' design, testing, intended use, manufacturing methods, performance standards, and labeling. *See Horn*, 376 F.3d at 169-70.

This finding does not, however, end the inquiry, for "common law claims are only preempted to the extent that they threaten to interfere with specific federal requirements." *Brooks*, 273 F.3d at 795 (citing *Lohr*, 518 U.S. at 500-01).

b. *Conflicting State Requirements*

The Court now considers whether plaintiffs' common law and state law-based claims impose state requirements "different from" or "in addition to" those required by the FDA. *Lohr*, 518 U.S. at 514 (O'Connor, J., concurring in part and dissenting in part). Drawing upon Justice Breyer's exemplar, the Court asks whether plaintiffs' claims present "one-inch wire" requirements in conflict with "two-inch wire" requirements the PMA approval may have imposed upon Medtronic's product. *See Lohr*, 518 U.S. at 504 (Breyer, J., concurring). Ultimately, Medtronic must show plaintiffs' state claims would require it to design, manufacture, or label its devices in a manner inconsistent with its PMA specifications.

*7 Medtronic, first, claims the simple fact that it has obtained PMA approval shields it from any state law claims at all-Medtronic effectively argues the PMA renders each of plaintiffs' state law claims a "one-inch wire." It says, once there is PMA approval, almost no state law claim can be maintained. Plaintiffs reply that a common law claim does not impose any additional requirements, because a jury would not compel Medtronic to modify its approved device; it would merely impose "general obligations" which do not implicate medical device preemption. In plaintiffs' view, almost no state law claim would ever be preempted.

The Court considers each such argument to be overly simplistic. Jury verdicts can, and do, impose their own requirements on device manufacturers. Plaintiffs' cite *Lohr* for their argument to the contrary,FN8 without noting this was not its majority holding. Five of *Lohr* 's justices agreed that state law duties of general application can impose conditions which differ from or are in addition to those imposed by federal requirements. *Lohr*, 518 U.S. at 509-11 (O'Connor, J., Rehnquist, C.J., Scalia, J., and Thomas, J ., concurring and dissenting), 503-05 (Breyer, J., concurring in part). Such common-law requirements may fall within the MDA's preemption clause. *Geier v. Am. Honda*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

*Motor Co.*, 529 U.S. 861, 867, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) (citing *Lohr* ). Medtronic's argument also fails, however, because it has entirely failed to demonstrate how plaintiffs' state law claims would actually impose conflicting requirements upon it.

Medtronic also asks the Court to look past evidence, which if believed, tends to show it withheld critical information from the FDA while seeking the PMA Supplement approval for its newly-designed battery. Plaintiffs have produced credible evidence indicating that-after Medtronic discovered the design defect, and confirmed the discovery through patients' device failures, and after obtaining FDA approval for the modified battery-Medtronic continued to ship and sell devices containing the defective battery. In doing so, it failed to notify the FDA, physicians, or patients that the battery was defective. There is evidence showing Medtronic sought PMA approval for three new devices, but continued to use the known-to-be defective battery in them. Medtronic did not advise the FDA that it knew-for longer than a year-that the Chi 4420L had exhibited a "previously undetected failure mode." Lacking such knowledge, the FDA approved Medtronic's PMA Supplement applications. Only after Medtronic issued its February, 2005, "Dear Doctor" letter did the FDA order the recall.

It defies logic, and flies in the face of Congress's decision to impose a regime strictly regulating medical device manufacturers, to think Congress intended the result Medtronic advocates. *See Lohr*, 518 U.S. at 587. If the Court adopted Medtronic's view, once a medical device manufacturer obtains PMA approval, it would be insulated from liability even if it chose to conceal data from the FDA to maintain its PMA approval. Neither *Lohr* nor the FDA regulatory scheme can be stretched so far.

i. *Parallel Requirements*

***8** [5] Plaintiffs claim Medtronic violated FDA regulations, including 21 C.F.R. §§ 803.50, 803.53 , 814.3, 814.39, and 814.84. Their common law claims of failure to warn, negligence, strict liability, misrepresentation by omission, and negligence per se are premised on those violations. The Court finds plaintiffs' state law causes of action alleging failure to comply with FDA regulations are not subject to preemption; these claims merely impose parallel requirements, but impose no requirements different from, or in addition to, the federal requirements. *Lohr*, 518 U.S. at 495-97; *Brooks*, 273 F.3d at 798-99; *Horn*, 376 F.3d at 179; *Martin v. Telectronics Pacing Sys., Inc.*, 105 F.3d 1090, 1101 (6th Cir.1997). "Section 360k does not preclude States from imposing different or additional *remedies*, but only different or additional *requirements*." *Lohr*, 518 U.S. at 513 (O'Connor, J., concurring in part and dissenting in part) (emphasis in original). Thus, state law claims which make a party liable for damages for failure to comply with federal law are not preempted.

Defendant's claim that *Brooks* bars these claims is unavailing. In *Brooks*, plaintiff's claims of liability for violations of FDA regulations were dismissed for failure to provide evidence showing that failure; they were not dismissed on preemption grounds. 273 F.3d at 799. Here, plaintiffs have offered as yet unrebutted evidence from which a factfinder could find Medtronic violated several PMA and post-approval FDA regulations. These include allegations that Medtronic: improperly manufactured the devices (Parisian Aff. ¶ 18); FN9 failed to comply with PMA approval requirements (*Id.* ¶ 16, 30); failed to comply with FDA reporting obligations ( *Id.*); misrepresented and concealed information during the FDA approval process (*Id.* ¶ 19); and failed to timely warn patients and physicians of known risks concerning the Marquis devices (*Id.* ¶ 30).

Medtronic vigorously denies these claims-and the Court expresses no opinion as to which side's version is correct-but there is no question that there are unresolved fact issues here. For these reasons, and to the extent plaintiffs' claims are premised on violations of FDA requirements, their claims of failure to warn, negligence, strict liability, misrepresentation by omission, and negligence per se, are not preempted.

ii. *Failure to Warn*

[6] Plaintiffs claim Medtronic failed to warn patients and physicians of the known battery flaw which caused premature battery depletion in its Marquis devices. Federal regulations allow a manufacturer to voluntarily recall products and change labels without prior FDA approval, when needed to enhance the safety of medical devices. *Lohr*, 518 U.S. at 497 n.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

16 (citing 21 C.F.R. §§ 814.39(d)(1) and (2) (1995) ). In situations where the FDA is aware of a certain risk, and has approved a particular warning concerning that risk, any claim of inadequate warning which might require a label differing from the FDA-prescribed language is preempted. *Brooks,* 273 F.3d at 796-98. But in the instance where a defendant discovers information subsequent to FDA approval which would lead a reasonable manufacturer to warn the medical community before the device is implanted into patients, a failure to warn claim is not preempted. *Kemp,* 231 F.3d at 236-37.

***9** In *Brooks,* the Eighth Circuit carefully examined whether the FDA was aware of the risk at issue when it approved the language on the label, and whether the claim that the risk might occur was scientifically valid. *Brooks,* 273 F.3d at 797. Because, in that case, the FDA was aware of and considered the claimed risk when it prescribed the label warning, plaintiff's failure to warn claim was preempted. *Id.* at 798. This reasoning "implies that if the FDA had not been aware of the risk, plaintiff Brooks' failure to warn claim would not have been preempted." *In re St. Jude,* 2004 WL 45503 at *11.

Here, Medtronic discovered the battery defect in early 2003, but made no report to the FDA. In the face of this perceived defect, it thereafter submitted PMA Supplement applications for three new devices containing the battery without disclosing the possibility of this defect to the FDA. Medtronic redesigned the Chi 4420L battery in October, 2003, and when it sought FDA approval for the modification, it opted to describe the reason for its redesign as battery shorting, a "known failure mode." Plaintiffs argue this language was a knowing effort to disguise the fact that Medtronic had not only discovered this failure, but had, itself, called it a "previously undetected failure mode." They claim Medtronic's documentation in support of the newly-designed battery insinuated that the modification was a mere improvement on the old battery, rather than alerting the FDA to the fact that it knew the Chi 4420L battery had failed by reason of a previously unknown defect. Medtronic had received field-report notices of Chi 4420L battery failures between February and April, 2004. By this time, it had received reports from physicians who had dealt with the problem in their patients. In the face of C.F.R. § 803.50(a)(2)'s requirement that a manufacturer must make an FDA report "no later than 30 calendar days" after it "become[s] aware of information, from any source, that reasonably suggests that a device [it] market[s] ... has malfunctioned ...," Medtronic still made no report.

This was close to a year after Medtronic had observed this failure in its own bench testing. Even so, Medtronic did not report the premature battery depletion problem to the FDA until approximately one year later, and it did not publicly warn physicians and their patients of the defect until February, 2005. In light of these presently unrebutted facts, the Court finds plaintiffs have adduced facts which show a triable issue as to whether Medtronic had actual knowledge of this defect-evidence it either disguised or hid from the FDA. From this evidence, a reasonable trier of fact could find Medtronic knew of this defect for a substantial period prior to advising the FDA of the defect. For these reasons, plaintiffs' failure to warn claim survives the preemption challenge.

iii. *Implied Warranty*

Plaintiffs claim Medtronic breached its implied warranty to consumers because its devices were unsafe and unfit for their intended use. Implied warranty claims are "based on the accepted standards of design and manufacture of the product." *Mitchell,* 126 F.3d 915. Because Medtronic's Marquis devices underwent the PMA process, their design and manufacturing criteria were FDA approved. Therefore, it could be possible that "[a] state judgment for breach of implied warranty that rested on allegations about standards other than those permitted by the FDA would necessarily interfere with the PMA process and, indeed, supplant it." *Id.* Such is not the case here.

***10** [7] First, plaintiffs allege Medtronic deviated from its PMA manufacturing standards, and thus manufactured and sold a defective device. If these facts are proven at trial, a jury could conclude Medtronic breached its implied warranty to patients. By holding Medtronic to the manufacturing requirements imposed by the FDA, such a jury verdict would not impose any different or additional requirements on Medtronic. *See Brooks,* 273 F.3d at 798-99. Therefore, to the extent plaintiffs allege Medtronic breached its implied warranty due to the fact that the devices were manufactured in a manner

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

inconsistent with its PMA-approved standards, the claim survives summary judgment.

[8] More importantly, even if Medtronic did not violate its PMA requirements, the FDA's own implementing regulations demonstrate that warranty claims which arise under state laws of general applicability are not preempted. The applicable regulation states: "[t]he following are examples of State or local requirements that are not regarded as preempted ... requirements of general applicability where the purpose of the requirement relates either to other products in addition to devices (e.g., requirements such as ... the Uniform Commercial Code ["UCC"] (warranty of fitness))." 21 C.F.R. § 801.1(d). Because Minnesota, along with most other states, has adopted the UCC implied warranty provision, plaintiffs' implied warranty claim is not preempted. *In re St. Jude,* 2004 WL 45503 at *11.

iv. *Express Warranty*

According to plaintiffs, Medtronic expressly warranted to the public, through promotional statements and product literature, that its ICDs were safe and highly reliable. As a result of continuing sales and marketing campaigns which touted the safety of its products while knowing of the possible defect and risk of product failure, plaintiffs argue Medtronic breached these express warranties.

[9] Medtronic responds that, because it sold its devices with FDA-mandated labeling, any claim depending on the incompleteness of that information would impose a requirement different from, or in addition to, those of the FDA. Despite Medtronic's argument, plaintiffs express warranty claims survive preemption for two reasons. First, to the extent plaintiffs' breach of express warranty claim is predicated on Medtronic's failure to adhere to FDA labeling or packaging requirements, the claim is not preempted. *See Brooks,* 273 F.3d at 798-99.

Second, while the FDA may approve the devices' product label, Medtronic is silent on the issue of whether the FDA imposes requirements for its promotional statements. There is no showing that a jury verdict based on voluntary express representations by Medtronic would interfere with its PMA obligations. *See Mitchell,* 126 F.3d at 915. Moreover, express warranties "arise from the representations of the parties." *Id.* "[A]ny requirements imposed by the warranty are created by the warrantor and [are] not imposed by state law." *Davenport v. Medtronic, Inc.,* 302 F.Supp.2d 419, 433 (E.D.Pa.2004); *see also Cipollone,* 505 U.S. at 526. Because Medtronic has voluntarily undertaken these requirements and they are not state-imposed- "the *sine qua non* of preemption under § 360k"- plaintiffs' express warranty claims are not preempted by the MDA. *Steele v. Depuy Orthopaedics, Inc.,* 295 F.Supp.2d 439, 455 (D.N.J.2003) (quotation omitted).

v. *Consumer Protection Statutes*

***11** [10] Plaintiffs also seek to recover under various Minnesota false advertising and deceptive trade practice statutes, as well as several other states' consumer protection statutes. These claims are premised on Medtronic's purportedly misleading statements regarding the safety of its devices. Again, Medtronic does not claim the FDA regulates its advertising and promotional materials concerning the devices. Thus, to the extent the PMA does not address these materials, a jury verdict based on these statutes would not conflict with the PMA, and plaintiffs' claims are not preempted. *Mitchell,* 126 F.3d at 915. Alternatively, to the extent these materials departed from the PMA specifications, they also survive preemption. *Id.* Finally, like state requirements under the UCC, the FDA implementing regulations specifically exclude state unfair trade practices claims from preemption. 21 C.F.R. § 801.1(d); *In re St. Jude,* 2004 WL 45503 at *11. For all these reasons, plaintiffs' claims based on the various states' consumer protection statutes are not subject to MDA preemption

In summary, other than brandishing its PMA approval, Medtronic has failed to point to any preempted "one-inch wires" in any of plaintiffs' claims. Plaintiffs' claims either contain parallel requirements, or involve areas not covered by the PMA. Their claims do not impose any requirements different from or in addition to those contained in their PMA. Thus, none of plaintiffs' claims are expressly preempted.

2. *Implied Preemption*

[11][12] Medtronic further claims that, even if plaintiffs' claims are not expressly preempted, they are nonetheless impliedly preempted. When

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

analyzing a state statute under the implied preemption doctrine, a court may not find a state law preempted "unless it conflicts with federal law or would frustrate the federal scheme," or unless a court discerns "from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States." *Bldg. and Constr. Trades Council v. Associated Builders and Contractors,* 507 U.S. 218, 224, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993). The Court should presume "that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995) (internal quotation omitted).

Here, Medtronic points to the Supreme Court's decision in *Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341, 350, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001). Medtronic claims *Buckman* forecloses any inquiry into the FDA regulatory process. It claims any review of MDA compliance is exclusively lodged in the FDA. Medtronic says it received PMA approval for the Marquis devices employing the Chi 4420L battery, and the FDA has never found or cited it for a regulatory violation. From this, Medtronic argues implied preemption applies precluding plaintiffs' claims. The Court declines to read *Buckman* so broadly.

***12** As an initial matter, the claim at issue in *Buckman* was actual "fraud-on-the-FDA," and not state tort claims involving the plaintiffs' personal injuries. The case rested on a separate footing, because *Buckman* 's defendant manufacturer had already settled with the plaintiffs-the remaining defendant was an FDA consultant who presented the application to the FDA. *See* Daniel W. Sigelman, *Is Fraud on the FDA a Dead Letter After Buckman v. Plaintiffs' Legal Committee?,* 2 ATLA-CLE 2483 (2001). *Buckman* 's holding cannot be considered without recognizing its facts. The MDA has a comprehensive scheme for dealing with fraud on the FDA. Its scheme permits consumers to petition the FDA to take action against wrongdoing. *Buckman,* 531 U.S. at 348. Of course, states have no traditional interest in policing fraud against federal agencies. *Id.* at 347 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). The present case is an entirely different situation.

[13] Plaintiffs do not complain of fraud on the FDA. Rather, they claim they, themselves, were deceived and injured by: (a) Medtronic's actions in continuing to sell devices with the possibly-defective Chi 4420L battery for implantation into plaintiffs; (b) Medtronic's failure to advise patients and physicians about the defect; and (c) Medtronic's failure to inform them that a safer model ICD was available. (Compl.¶¶ 13-15.) States may not be concerned about protecting federal agencies, but states have a strong interest in protecting their citizens from fraud and personal injuries. The Supreme Court in *Lohr* recognized "the historic primacy of state regulation of matters of health and safety." *Lohr,* 518 U.S. at 485. This state interest counsels against finding implied preemption of plaintiffs' state law causes of action. *See Buckman,* 531 U.S. at 347.

*Buckman* is further distinguished because it dealt with medical devices being used "off-label." There is no suggestion that the Chi 4420L-bearing devices were being used outside their label restrictions. This obviates *Buckman* 's expressed concerns regarding off-label usage of medical devices as "an accepted and necessary corollary of the FDA's mission to regulate in this area without directly interfering with the practice of medicine." *Buckman,* 531 U.S. at 350.

Finally, were the Court to accept Medtronic's expansive reading of *Buckman,* it would place itself outside the legion of cases upholding parallel requirements to federal violations as actionable under state law. *See e.g. Lohr,* 518 U.S. at 495-97; *Brooks,* 273 F.3d at 798-99; *Horn,* 376 F.3d at 179; *Martin,* 105 F.3d at 1101. *Buckman* makes clear that, under *Lohr,* state law causes of action which parallel federal safety requirements are not preempted, whereas a mere violation of the FDCA does not provide the basis for a claim in and of itself. 531 U.S. at 353. Thus, plaintiffs may use evidence-if they are able to produce it-of Medtronic's efforts to manipulate the regulatory process in order to prove their negligence and strict liability claims, but they may not bring an independent claim for relief based on fraud-on-the-FDA. *See In re St. Jude,* 2004 WL 45503 at *13; *Dawson ex rel. Thompson v. Ciba-Geigy Corp., USA,* 145 F.Supp.2d 565, 573 (D.N.J.2001). All

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

plaintiffs' claims are based on state statutes or traditional tort causes of action; they seek no recovery for a fraud-on-the-FDA claim. For these reasons, the Court finds no basis in *Buckman* to find an implied preemption of plaintiffs' claims.

c. *Another Possibility: No Preemption at All*

*13 Finally, but importantly, it is possible that Medtronic's own actions and inactions placed it entirely beyond the scope of FDA PMA approval protection. Congress has chosen, and FDA regulations impose, a scheme under which the manufacturer-not the government-determines a medical device to be safe and efficacious. *See* 21 C .F.R. §§ 803, et. seq., 814.39. Under this model, the manufacturer bears the highest duty to develop, produce, and offer in the marketplace products it knows to be safe. The FDA has only the most limited role in independently obtaining the information it needs; the duty to develop and fully disclose information concerning a medical device's safety falls upon the manufacturer. *Id.*

Here, the Court makes no finding, but plaintiffs argue that, once Medtronic's bench-testing suggested, and field reports confirmed, an early-charge-depletion flaw in Chi 4420L battery-bearing devices, the company bore a Congressionally-imposed affirmative duty to disclose this information to the FDA posthaste. When it opted against doing so-and worse, elected to seek approval for more devices bearing a medical Trojan horse and continued to sell Chi 4420L-bearing devices it knew could be flawed for implantation into patients-pl aintiffs' claim Medtronic placed itself beyond the ambit of federal preemption protection. *See* 21 C.F.R. § 814.82(c) ("Failure to comply with any post approval requirement constitutes a ground for withdrawal of approval of a PMA."); March 1, 2002 FDA Approval letter for S23, Ex.-V ("Failure to comply with the conditions of approval invalidates the approval order.") At this early point in the litigation, the Court cannot entirely reject such an argument.

This is a condition Justice Breyer never contemplated in *Lohr.* He never considered the possibility of a manufacturer which knows, but fails to disclose, that the FDA's "required two inch wire" is not only no longer safe and efficacious, it is defective, corrosive, and barbed. At this point, the manufacturer's knowing failure to disclose its own positive knowledge of danger hidden in an approved medical device has its own effect: the company's failure to exhibit absolute probity could be found to have knowingly deprived the FDA of information needed to confer its approval for the device to be implanted in humans. If proven, such a failure to fully comply with Congress's self-disclosure scheme may have deprived Medtronic of federal preemption protection altogether.

III. *Conclusion*

For the foregoing reasons, the Court finds defendant has failed to show plaintiffs' claims are preempted by federal law. As a result, the Court concludes plaintiffs' state-law claims remain viable.

Accordingly, defendant's motion for summary judgment [Docket No. 74] is denied.

IT IS SO ORDERED.

FN1. When considering a motion for summary judgment, the Court views the facts most favorably to the plaintiffs, the nonmoving parties. *See Ludwig v. Anderson,* 54 F.3d 465, 470 (8th Cir.1995).

FN2. Medtronic objects to consideration of this affidavit. Its objections are presently overruled. Dr. Parisian's education, training, and experience are sufficient. Her testimony is relevant and, for purposes of this motion, the Court accepts her affidavit. Fed.R.Evid. 702. The Court, of course, disregards her legal conclusions, but does credit her opinions concerning the factual matters upon which she opines.

FN3. "When analyzing questions of federal law, the [MDL] transferee court should apply the law of the circuit in which it is located." *In re Temporomandibular Joint Implants Prod. Liab. Litig.,* 97 F.3d 1050, 1055 (8th Cir.1996). Thus, Eighth Circuit law controls.

FN4. The *Lohr* device was not PMA reviewed. Its approval was obtained under the less rigorous § 510(k) premarket notification process. The justices all agreed the § 510(k) process established no federal requirements for the design of medical devices, because the § 510(k) process simply reflected the FDA's conclusion that a new device

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

was substantially equivalent to a pre-existing device. *Lohr,* 518 U.S. at 493-94 (majority opinion), 513 (O'Connor, J., concurring in part and dissenting in part).

FN5. This Court considers *Brooks* to be among the cases holding the PMA process imposes specific federal requirements. In doing so, it recognizes that another Judge in this District, in *In re St. Jude,* 2004 WL 45503 (D.Minn.), found to the contrary. This Court respectfully departs from its brother's analysis. When *Brooks* carefully compared its plaintiff's state law claims with the federal requirements, it did not separate itself from the cases holding the PMA process imposes federal requirements on a manufacturer. *Brooks,* instead, cited and relied on those cases. Finally, it carefully distinguished the single case which found a PMA does not impose federal requirements. *See Brooks,* 273 F.3d at 795-96 (citing *Martin v. Medtronic,* 254 F.3d 573, 582 (5th Cir.2001); *Kemp,* 231 F.3d at 230; *Mitchell v. Collagen Corp.,* 126 F.3d 902, 913-14 (7th Cir.1997); *Papike v. Tambrands, Inc.,* 107 F.3d 737, 742 (9th Cir.1997); distinguishing *Goodlin v. Medtronic,* 167 F.3d 1367 (11th Cir.1999)).

FN6. Only the Eleventh Circuit has held FDA approval of a PMA Supplement does not establish device-specific federal requirements. *Goodlin,* 167 F.3d at 1367.

FN7. At this point, the MDL plaintiffs make an interesting point: they claim that in the case of devices like the Marquis products, the FDA process makes it impossible to describe or delineate the federally-mandated design. They base their argument on the fact that only Medtronic's original 1988 Model 7271 defibrillator went through the full PMA approval process. Every succeeding Medtronic defibrillator device has been approved through the less-rigorous PMA Supplement process, with significant modifications at each step. The defendant argued in response that each device need no longer have defined statements of all of its specific elements; it is the approved device-as a whole-which constitutes the preemptive "requirements." This raises the interesting question of how, exactly, a Court is to find Justice Breyer's "two-inch wire," and then discern whether the state claim calls for another of one-inch.

FN8. Plaintiffs also rely on *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005). But *Bates* considered the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"). FIFRA imposes a different regulatory scheme, one which does not mandate specific federal-agency approval or requirements. Accordingly, this Court does not find *Bates*'s preemption analysis to be apposite in a § 360k case. *Reigel,* 451 F.3d at 14; *McMullen,* 421 F.3d at 487.

FN9. Medtronic claims plaintiffs' negligent manufacturing claims are actually design defect claims in disguise. At this early point in the litigation, the Court cannot agree. Plaintiffs' evidence, if believed, tends to show failures of quality assurance and possible failures to manufacture its devices in accord PMA approved standards, (Parisian Aff. ¶ 18). These factual allegations establish issues of fact for trial. The claim survives summary judgment. *See Reigel,* 451 F.3d at 123.

D.Minn.,2006.

In re Medtronic, Inc., Implantable Defibrillators Litigation

--- F.Supp.2d ----, 2006 WL 3478987 (D.Minn.)

Briefs and Other Related Documents (Back to top)

. 2006 WL 3267448 (Trial Motion, Memorandum and Affidavit) Medtronic, Inc.'s Reply Memorandum of Law in Support of Its Motion to Strike, for Partial Dismissal and for Severance of Certain Claims (Nov. 6, 2006) Original Image of this Document (PDF)

. 2006 WL 3325659 (Trial Motion, Memorandum and Affidavit) Medtronic, Inc.'s Reply Memorandum of Law in Support of its Motion to Strike, for Partial Dismissal and for Severance of Certain Claims (Nov. 6, 2006) Original Image of this Document (PDF)

. 2006 WL 3625622 (Trial Pleading) Complaint by Adoption for Individuals (Oct. 30, 2006)

. 2006 WL 3625537 (Trial Pleading) Complaint by Adoption for Individuals (Oct. 18, 2006)

. 2006 WL 3625538 (Trial Pleading) Complaint by Adoption for Individuals (Oct. 18, 2006)

. 2006 WL 3625447 (Trial Pleading) Order re: Complaint by Adoption Form (Oct. 16, 2006)

. 2006 WL 3625616 (Trial Pleading) Complaint by Adoption for Individuals (Oct. 13, 2006)

. 2006 WL 3625618 (Trial Pleading) Complaint by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Adoption for Individuals (Oct. 13, 2006)
. 2006 WL 3625620 (Trial Pleading) Complaint by Adoption for Individuals (Oct. 13, 2006)
. 2006 WL 3625388 (Trial Pleading) Complaint by Adoption for Individuals (Oct. 11, 2006)
. 2006 WL 3625415 (Trial Pleading) Complaint by Adoption for Individuals (Oct. 11, 2006)
. 2006 WL 3625602 (Trial Pleading) Complaint by Adoption for Individuals (Oct. 10, 2006)
. 2006 WL 3625318 (Trial Pleading) Complaint Demand for Jury Trial (Oct. 9, 2006)
. 2006 WL 3625319 (Trial Pleading) Complaint Demand for Jury Trial (Oct. 9, 2006)
. 2006 WL 3625320 (Trial Pleading) Complaint Demand for Jury Trial (Oct. 9, 2006)
. 2006 WL 3625321 (Trial Pleading) Complaint Demand for Jury Trial (Oct. 9, 2006)
. 2006 WL 3625322 (Trial Pleading) Complaint Demand for Jury Trial (Oct. 9, 2006)
. 2006 WL 3625302 (Trial Pleading) Complaint by Adoption for Individuals (Oct. 6, 2006)
. 2006 WL 3625303 (Trial Pleading) Complaint by Adoption by Individuals (Oct. 6, 2006)
. 2006 WL 3625304 (Trial Pleading) Complaint by Adoption for Individuals (Oct. 6, 2006)
. 2006 WL 3625305 (Trial Pleading) Complaint by Adoption for Individuals (Oct. 6, 2006)
. 2006 WL 3625306 (Trial Pleading) Complaint by Adoption for Individuals (Oct. 6, 2006)
. 2006 WL 3625316 (Trial Pleading) Complaint by Adoption for Individuals (Oct. 6, 2006)
. 2006 WL 3625290 (Trial Pleading) Complaint by Adoption for Individuals (Oct. 3, 2006)
. 2006 WL 3625291 (Trial Pleading) Complaint by Adoption for Individuals (Oct. 3, 2006)
. 2006 WL 3625293 (Trial Pleading) Complaint by Adoption for Individuals (Oct. 3, 2006)
. 2006 WL 3625294 (Trial Pleading) Complaint by Adoption for Individuals (Oct. 3, 2006)
. 2006 WL 3625295 (Trial Pleading) Complaint by Adoption for Individuals (Oct. 3, 2006)
. 2006 WL 3625296 (Trial Pleading) Complaint by Adoption for Individuals (Oct. 3, 2006)
. 2006 WL 3625396 (Trial Pleading) Complaint by Adoption for Individuals (Oct. 3, 2006)
. 2006 WL 3625289 (Trial Pleading) Complaint by Adoption for Individuals (Oct. 2, 2006)
. 2006 WL 2469542 (Trial Motion, Memorandum and Affidavit) Star Tribune's Memorandum of Law in Support of its Motion for Permissive Intervention, Modification of Protective Order, and Unsealing of Documents (Aug. 21, 2006) Original Image of this Document (PDF)
. 2006 WL 2378196 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Supplemental Response to Defendant's Motion to Dismiss the Medicare Secondary Payer Act Claims (Aug. 7, 2006) Original Image of this Document (PDF)
. 2006 WL 2376183 (Trial Motion, Memorandum and Affidavit) Medtronic's Response to Bloomberg's Motion to Intervene and Unseal Summary Judgment Materials (Jul. 27, 2006) Original Image of this Document (PDF)
. 2006 WL 2376182 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Bloomberg L.P.'s Motion to Intervene and Unseal the Summary Judgment Motion Papers and Associated Materials (Jul. 11, 2006) Original Image of this Document (PDF)
. 2006 WL 1734346 (Trial Motion, Memorandum and Affidavit) Medtronic, Inc.'s Reply Memorandum of Law in Support of its Motion for Summary Judgment Regarding Federal Preemption (Jun. 8, 2006)
. 2006 WL 2378194 (Trial Motion, Memorandum and Affidavit) Medtronic, Inc.'s Reply Memorandum of Law in Support of Its Motion for Summary Judgment Regarding Federal Preemption (Jun. 8, 2006) Original Image of this Document (PDF)
. 2006 WL 2378193 (Trial Motion, Memorandum and Affidavit) Third Party Payor Plaintiffs' Memorandum in Opposition to Medtronic, Inc's Motion to Dismiss the Master Consolidated Complaint for Third Party Payor Cases (May 15, 2006) Original Image of this Document (PDF)
. 2006 WL 2926072 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to Medtronic, Inc.'s Motion to Dismiss the Master Consolidated Complaint for Individuals (May 15, 2006) Original Image of this Document (PDF)
. 2006 WL 2926073 (Trial Motion, Memorandum and Affidavit) Plaintiff's Opposition to Defendant's Motion to Dismiss (May 15, 2006) Original Image of this Document (PDF)
. 2006 WL 3625285 (Trial Pleading) Order re: Complaint by Adoption Form (Mar. 19, 2006)
. 2006 WL 2378209 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Motion to Include Plaintiffs in Alternative Dispute Resolution (Mar. 16, 2006) Original Image of this Document (PDF)
. 2006 WL 1734345 (Trial Motion, Memorandum and Affidavit) Medtronic, Inc.'s Memorandum of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Law in Support of Motion for Summary Judgment Regarding Federal Preemption (Mar. 15, 2006)
. 2006 WL 2378207 (Trial Motion, Memorandum and Affidavit) Medtronic, Inc.'s Memorandum of Law in Support of Motion for Summary Judgment Regarding Federal Preemption (Mar. 15, 2006) Original Image of this Document (PDF)
. 2006 WL 2378208 (Trial Motion, Memorandum and Affidavit) Medtronic, Inc.'s Memorandum in Support of Motion to Dismiss the Master Consolidated Complaint for Third Party Payor Cases (Mar. 15, 2006) Original Image of this Document (PDF)
. 2006 WL 3485105 (Trial Motion, Memorandum and Affidavit) Medtronic, Inc.'s Memorandum of Law in Support of Motion for Summary Judgment Regarding Federal Preemption (Mar. 15, 2006) Original Image of this Document (PDF)
. 2006 WL 2378191 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to Medtronic's Motion for Protective Order (Mar. 8, 2006) Original Image of this Document (PDF)
. 2006 WL 2378205 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to Medtronic's Motion for Protective Order (Mar. 8, 2006) Original Image of this Document (PDF)
. 2006 WL 2378190 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Medtronic's Motion for Protective Order (Mar. 7, 2006) Original Image of this Document (PDF)
. 2006 WL 2378204 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Medtronic's Motion for Protective Order (Mar. 7, 2006) Original Image of this Document (PDF)
. 2006 WL 2378189 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to Plaintiffs' Motion to Compel Responses to Plaintiffs' First Set of Unlimited Discovery Requests (Mar. 1, 2006) Original Image of this Document (PDF)
. 2006 WL 2378195 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to Plaintiffs' Motion to Compel Responses to Plaintiffs' First Set of Unlimited Discovery Requests (Mar. 1, 2006) Original Image of this Document (PDF)
. 2006 WL 2378202 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to Plaintiffs' Motion to Compel Responses to Plaintiffs' first set of Unlimited Discovery Requests (Mar. 1, 2006) Original Image of this Document (PDF)
. 2006 WL 2378188 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Motion to Compel Responses to Plaintiffs' First Set of Discovery Requests Focused on Matters Critical to Federal Preemption (Feb. 22, 2006) Original Image of this Document (PDF)
. 2006 WL 2378201 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Motion to Compel Responses to Plaintiffs' First Set of Discovery Requests Focused on Matters Critical to Federal Preemption (Feb. 22, 2006) Original Image of this Document (PDF)
. 2006 WL 2378199 (Trial Pleading) Master Consolidated Complaint for Medicare as Secondary Payer Act Claims (Feb. 21, 2006) Original Image of this Document (PDF)
. 2006 WL 2378200 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Medtronic, Inc.'s Motion to Strike, for Partial Dismissal and for Severance of Certain Claims (Feb. 20, 2006) Original Image of this Document (PDF)
. 2006 WL 2378197 (Trial Pleading) Master Consolidated Complaint for Third Party Payor Cases (Feb. 15, 2006) Original Image of this Document (PDF)
. 2006 WL 2378198 (Trial Pleading) Master Consolidated Complaint for Individuals (Feb. 15, 2006) Original Image of this Document (PDF)
. 2006 WL 470060 (Trial Pleading) Complaint and Demand for Jury Trial (Feb. 10, 2006)
. 2006 WL 2378181 (Verdict, Agreement and Settlement) Stipulation of Amendments to Existing Orders (Feb. 8, 2006) Original Image of this Document (PDF)
. 2006 WL 2378206 (Trial Filing) Rule 26(f) Report (Dudek and Ruiz Plaintiffs) (Jan. 5, 2006) Original Image of this Document (PDF)
. 2006 WL 2378187 (Trial Filing) Plaintiffs' Report of Rule 26(F) Conference (Jan. 4, 2006) Original Image of this Document (PDF)
. 2006 WL 3625624 (Trial Pleading) Complaint by Adoption for Individuals (2006)
. 0:05md01726 (Docket) (Dec. 8, 2005)
. 2005 WL 4668513 (Trial Pleading) Complaint (Sep. 19, 2005) Original Image of this Document (PDF)
. 2005 WL 4668512 (Trial Pleading) Trial Pleading (Aug. 25, 2005) Original Image of this Document (PDF)
. 2005 WL 4668514 (Trial Pleading) Class Action Complaint Jury Trial Demanded (Jul. 17, 2005) Original Image of this Document (PDF)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

. 2005 WL 4668503 () (Report or Affidavit) (2005)
. 2005 WL 4668506 (Trial Motion, Memorandum and Affidavit) Medtronic, Inc.'s Memorandum in Support of Motion to Dismiss the Master Consolidated Complaint for Medicare as Secondary Payer Act Claims (2005) Original Image of this Document (PDF)
. 2005 WL 4668507 (Trial Motion, Memorandum and Affidavit) Medtronic's Opposition to Motion to Include Plaintiffs in Alternative Dispute Resolution (2005) Original Image of this Document (PDF)
. 2005 WL 4668509 (Trial Motion, Memorandum and Affidavit) Medtronic, Inc.'s Reply in Support of Motion to Dismiss the Master Consolidated Complaint for Third Party Payor Cases (2005) Original Image of this Document (PDF)
. 2005 WL 4668510 (Trial Motion, Memorandum and Affidavit) Medtronic, Inc.'s Reply in Support of Motion to Dismiss the Master Consolidated Complaint for Medicare as Secondary Payer Act Claims (2005) Original Image of this Document (PDF)
. 2005 WL 4668518 (Trial Deposition and Discovery) Affidavit of Tim Samsel in Support of Medtronic, Inc.'s Motion for Summary Judgment Re Federal Preemption (2005) Original Image of this Document (PDF)
. 2005 WL 4705058 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Medtronic, Inc.'s Motion to Strike Plaintiffs' Supplemental Response to Defendant's Motion to Dismiss the Medicare Secondary Payer Act Claims (2005) Original Image of this Document (PDF)
. 2005 WL 4891608 (Trial Deposition and Discovery) Affidavit of Timothy Brown (2005) Original Image of this Document (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

# EXHIBIT B

H
Briefs and Other Related Documents
Nutraceutical Corp. v. Von EschenbachC.A.10 (Utah),2006.
United States Court of Appeals,Tenth Circuit.
NUTRACEUTICAL CORPORATION; Solaray, Inc., Plaintiffs-Appellees,
v.
Andrew VON ESCHENBACH, Acting Commissioner, U.S. Food and Drug Administration; United States Food and Drug Administration; Michael O. Leavitt, Secretary of the Department of Health and Human Services; Department of Health And Human Services; United States of America, Defendants-Appellants.
**No. 05-4151.**

Aug. 17, 2006.

**Background:** Dietary supplement producers brought action against Food and Drug Administration (FDA), challenging validity of regulation banning ephedrine-alkaloid dietary supplements (EDS). The United States District Court for the District of Utah, Tena Campbell, J., 364 F.Supp.2d 1310, granted summary judgment in favor of producers. FDA appealed.

**Holdings:** The Court of Appeals, Eagan, Circuit Judge, held that:

(1) FDA properly conducted risk-benefit analysis, and

(2) FDA's determination that no dosage level of EDS was acceptable for market was not arbitrary and capricious.

Reversed and remanded.
West Headnotes
**[1] Food 178 5**

178 Food
178k5 k. Purity and Quality. Most Cited Cases

**Health 198H 307**

198H Health
198HI Regulation in General
198HI(E) Drugs; Medical Devices and Instruments
198Hk307 k. Adulteration and Defects; Unsanitary Conditions. Most Cited Cases
Food and Drug Administration (FDA), in assessing whether any dosage level of ephedrine-alkaloid dietary supplements (EDS) was acceptable for market, properly conducted risk-benefit analysis under Dietary Supplement Health and Education Act (DSHEA); Congress enacted DSHEA to clarify that dietary supplements, absent declarations promoting them as drugs, would be regulated in manner similar to food products, and imposed burden on FDA to keep adulterated supplements off market. Federal Food, Drug, and Cosmetic Act, § 402(f)(1)(A), 21 U.S.C.A. § 342(f)(1)(A).

**[2] Health 198H 316**

198H Health
198HI Regulation in General
198HI(E) Drugs; Medical Devices and Instruments
198Hk315 Applications and Approvals
198Hk316 k. In General. Most Cited Cases
Determination by Food and Drug Administration (FDA) that no dosage level of ephedrine-alkaloid dietary supplements (EDS) was acceptable for market, pursuant to Dietary Supplement Health and Education Act (DSHEA), was not arbitrary and capricious; in determining that EDS posed unreasonable risk of illness or injury, FDA properly found that weight loss and other health benefits possible from use of EDS were dwarfed by potential long-term harm to user's cardiovascular system. Federal Food, Drug, and Cosmetic Act, § 402(f)(1)(A), 21 U.S.C.A. § 342(f)(1)(A).

***1034** Christine N. Kohl, Attorney (Peter D. Keisler, Assistant Attorney General, Paul M. Warner, United States Attorney, Jeffrey Bucholtz, Deputy Assistant Attorney General, and Douglas N. Letter, Attorney, Department of Justice, Washington, D.C., and Paula M. Stannard, Acting General Counsel, Sheldon T. Bradshaw, Associate General Counsel, Eric M. Blumberg, Deputy Chief Counsel, and Claudia J. Zuckerman, Associate Chief Counsel, Office of General Counsel, U.S. Department of Health & Human Services, Food and Drug Division, Rockville,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

MD, with her on the briefs), for Defendants-Appellants.
Jonathan W. Emord (Andrea G. Ferrenz with him on the brief), Emord & Associates, P.C., Reston, VA, for Plaintiffs-Appellees.

Before KELLY, TYMKOVICH, Circuit Judges and EAGAN,[FN*] District Judge.

FN* The Honorable Claire V. Eagan, District Judge, United States District Court for the Northern District of Oklahoma, sitting by designation.

EAGAN, District Judge.
Defendants-appellants, Andrew von Eschenbach, M.D., Acting Commissioner of the U.S. Food and Drug Administration, the United States Food and Drug Administration ("FDA" or "the agency"), Michael O. Leavitt, Secretary of the Department of Health and Human Services, the Department of Health and Human Services, and the United States, appeal from a judgment of the district court denying their motion ***1035** for summary judgment and granting the cross-motion of plaintiffs-appellees for summary judgment. *Nutraceutical Corp. v. Crawford,* 364 F.Supp.2d 1310 (D.Utah 2005). Plaintiffs-appellees, Nutraceutical Corporation and its wholly-owned subsidiary, Solaray Corporation (collectively, "Nutraceutical"), manufacture and sell Ephedra, a product containing ephedrine-alkaloid dietary supplements ("EDS"). In 2004, the FDA issued a regulation which banned all EDS sales in the United States market. Nutraceutical brought this action challenging the regulation as unlawful. The district court agreed with Nutraceutical. *Id.* at 1321. Our jurisdiction arises under 28 U.S.C. § 1291, and we reverse.

### Background

In its published decision, the district court determined that the risk-benefit analysis employed by the FDA to support an EDS ban was contrary to the intent of Congress and that the FDA had failed to prove by a preponderance of the evidence that EDS pose an unreasonable risk of illness or injury at 10 milligrams ("mg") or less a day. *Nutraceutical,* 364 F.Supp.2d 1310. It accordingly entered summary judgment in favor of Nutraceutical, enjoined the FDA from enforcing its proscription against Nutraceutical for the sale of products with a recommended daily dosage of 10 mg or less of EDS,[FN1] and remanded to the FDA for new rule-making.

FN1. To the extent that we recognize Nutraceutical's product as recommending less than 10 mg of ephedrine alkaloids per day, Nutraceutical's Motion to Correct Oral Argument Record, filed on May 11, 2006, is granted.

The issues raised by this appeal are: (1) whether the FDA correctly interpreted the relevant statute to require a risk-benefit analysis in determining if a dietary supplement presents an "unreasonable risk of illness or injury"; and (2) whether the FDA satisfied its burden of proving that dietary supplements containing EDS present an unreasonable risk of illness or injury when doses of 10 mg or less per day are suggested or recommended in labeling.

Nutraceutical alleges that the FDA lacked statutory authority to promulgate and enforce a ban of all EDS. The FDA argues that it acted pursuant to the broad authority delegated to it by the Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § § 301, *et seq.*, to regulate dietary supplements for safety. The FDCA provides the FDA with broad authority to regulate food, drug, and dietary supplement products in order to ensure public health and safety. *Id.* In 1994, Congress amended the FDCA with the Dietary Supplement Health and Education Act ("DSHEA"), Pub.L. No. 103-417, 108 Stat. 4325 (1994). Under DSHEA, the FDA regulates vitamins, minerals, herbs, amino acids, and other dietary substances. Dietary supplements are generally regulated in a manner similar to food and the FDA is authorized to prevent adulterated products from entering the market. *See* 21 U.S.C. § 331(a), (b), (c), (k) (adulteration and distribution of adulterated food are prohibited acts). Congress declared that a dietary supplement is "adulterated":

If it is a dietary supplement or contains a dietary ingredient that-

(A) presents a significant or unreasonable risk of illness or injury under-

(i) conditions of use recommended or suggested in labeling, or

(ii) if no conditions of use are suggested or recommended in the labeling, under ordinary conditions of use; ...

21 U.S.C. § 342(f)(1). The FDA argues that EDS are adulterated and points to the "unreasonable risk of illness or injury" provision of DSHEA as the primary ***1036** source of statutory authority for its EDS ban. 21 U.S.C. § 342(f)(1)(A).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Ephedrine alkaloids are a class of structurally-related chemical stimulants that occur naturally in some botanicals. In the 1980s and 1990s, manufacturers promoted the sale of EDS for weight loss and athletic performance enhancement. In the 1990s, the FDA received numerous **Adverse Event Reports** ("**AERs**") which documented harmful side effects, including heart attacks, strokes, seizures, and death, associated with EDS intake.[FN2] Based on the circumstantial evidence of the **AERs**, the FDA began to investigate the effects of EDS. The investigation included a literature review of scientific studies and a Food Advisory Committee on Dietary Supplements Containing Ephedrine Alkaloids Meeting held on August 26-27, 1996 ("1996 Food Advisory Committee"). In 1997, the agency proposed a regulation which would have required specific warnings and established a dosage regimen. 62 Fed.Reg. 30,678 (June 4, 1997).

FN2. The FDA established the MedWatch program to monitor AERs associated with nutritional products, including dietary supplements. This program relies on voluntary reporting from public health agencies, health professionals, and consumers. *See* FDA MedWatch Home Page, *http:// www.fda.gov/medwatch/.*

The FDA's 1997 proposed regulation of EDS faced substantial opposition, including from the General Accounting Office ("GAO"). The GAO determined that the FDA had not been thorough in its investigation and requested further research. *See* GAO, *Dietary Supplements: Uncertainties in Analyses Underlying FDA's Proposed Rule on Ephedrine Alkaloids* 11 (1999). Responding to the GAO's concerns, the FDA withdrew the 1997 proposed regulation. 65 Fed.Reg. 17,474 (Apr. 3, 2000).

The FDA continued to receive AERs and compile scientific literature regarding EDS. Given the fact that dietary supplement manufacturers are not required to submit scientific data on their products, the body of scientific literature on EDS was limited. Among the studies on which the FDA relied was a report commissioned by the National Institutes of Health. To further supplement the record, the agency hired Mario A. Inchiosa, Jr., Ph.D.,[FN3] to conduct further research on the health effects of EDS in 1999. During the public notice and comment period, Nutraceutical submitted to the FDA several requests for an exemption of low-dosage EDS, to no avail. The administrative record grew to over 130,000 pages, approximately 19,000 AERs were collected,[FN4] and extensive public notice and comment resulted in over 48,000 comments.

FN3. Professor of Pharmacology, New York Medical College.

FN4. The AERs which were voluntarily submitted to the FDA were supplemented with 16,000 complaints received by Metabolife, one of the largest distributors of EDS. 364 F.Supp.2d at 1315; *see* GAO, *Dietary Supplements: Review of Health-Related Call Records for Users of Metabolife 356* (GAO-03-494) (2003).

After seven years of investigating EDS, the FDA adopted a regulation which banned EDS at all dosage levels from the national market. Final Rule Declaring Dietary Supplements Containing Ephedrine Alkaloids Adulterated Because They Present an Unreasonable Risk, 69 Fed.Reg. 6788 (Feb. 11, 2004) ("Final Rule"). In the Final Rule, the FDA concluded that "[t]he best clinical evidence for a benefit ... supports only a modest short-term weight loss, insufficient to positively affect cardiovascular risk factors or health conditions associated with being overweight or ***1037** obese." *Id.* at 6789. Based on this risk-benefit analysis, the FDA determined that all EDS present an "unreasonable risk of illness or injury" under all ordinary or recommended conditions of use. *Id.* at 6788. As such, the Final Rule classified EDS adulterated within the meaning of DSHEA.

The district court held that "the FDA's requirement that EDS demonstrate a benefit is contrary to the clear intent of Congress" and found the agency's definition of "unreasonable" as entailing a risk-benefit analysis to be improper. 364 F.Supp.2d 1310, 1319. The district court also found that the FDA failed "to prove by a preponderance of the evidence that a dosage of 10 mg or less of ephedrine alkaloids presents a significant or unreasonable risk of illness or injury." *Id.* at 1321. Based on these findings, the district court granted summary judgment for plaintiffs and denied summary judgment for defendants.

**Discussion**

*Standard of Review*

The district court's conclusions as to whether the FDA had acted pursuant to congressionally delegated authority in promulgating a rule is reviewed *de novo*. However, the parties dispute the appropriate standard of review of the administrative decision. DSHEA provides that: "The court shall decide any issue under this paragraph on a de novo basis." 21 U.S.C. § 342(f). The district court did "not reach the question of whether the FDA's statutory construction should be reviewed *de novo*." 364 F.Supp.2d at 1317. In the interest of clarity and consistency, we now reach this question.

Courts are to review agency actions under DSHEA using the "traditional tools of statutory construction." *Pharmanex v. Shalala*, 221 F.3d 1151, 1154 (10th Cir.2000). The *de novo* standard, under section 342(f), applies to enforcement actions by the United States against manufacturers of dietary supplements. Such enforcement actions may result in imprisonment or monetary fines. 21 U.S.C. § 333; *see United States v. Park*, 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975). Reading the statute as a whole, it is clear that the *de novo* standard applies when courts "decide" matters rather than when they "review" administrative decisions. As such, it is appropriate to limit the *de novo* standard of review, which affords the FDA no deference, to enforcement proceedings. Challenges by private parties to FDA rules promulgated under DSHEA are reviewed pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and "the normal rules for judicial deference regarding agency action apply." *NVE, Inc. v. HHS*, 436 F.3d 182, 196 (3rd Cir.2006). "Had Congress intended to supplant the well-established procedures for APA challenges, it would have been clearer about its objective." *Id.* at 194.

*Chevron Analysis*

A court reviewing the FDA's construction of the FDCA must determine: whether Congress has directly spoken to precise question at issue; and if not, then whether agency's construction of statute is permissible one. *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In reviewing the FDA's interpretation of DSHEA under *Chevron*, we ask two questions:

First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress [*Chevron* step 1]. But if the statute is silent or ambiguous with respect to the ***1038** specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. If Congress has explicitly or implicitly delegated authority to an agency, legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute [*Chevron* step 2].

*Seneca-Cayuga Tribe of Oklahoma v. National Indian Gaming Com'n*, 327 F.3d 1019, 1037 (10th Cir.2003) (citations omitted).

The APA reflects the principles of *Chevron* and "provides that agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements." *Valley Cmty. Pres. Comm'n v. Mineta*, 373 F.3d 1078, 1084 (10th Cir.2004) (internal quotation omitted) (citing 5 U.S.C. § 706). "When we review an agency's decision under the arbitrary, capricious or abuse of discretion standard [of the APA], our review is narrow and deferential; we must uphold the agency's action if it has articulated a rational basis for the decision and has considered relevant factors." *Slingluff v. Occupational Safety & Health Review Comm'n*, 425 F.3d 861, 866 (10th Cir.2005) (citing *Mountain Side Mobile Estates P'ship v. Sec'y of HUD*, 56 F.3d 1243, 1250 (10th Cir.1995)). Under the APA, regulations are presumed to be valid, and review is deferential to the government agency.

*"Unreasonable Risk"*

[1] In this case, we must determine whether Congress unambiguously manifested its intent to restrict the FDA from weighing benefits when determining the risk posed by a dietary supplement. The district court was correct to proceed under *Chevron* step one in deciding the question of whether the FDA properly used a risk-benefit analysis in determining whether EDS pose an "unreasonable risk." *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. We nevertheless reverse the district court after finding that Congress unambiguously required the FDA to conduct a risk-benefit analysis under DSHEA.

In 1994, Congress enacted DSHEA to clarify that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

dietary supplements, absent declarations promoting the supplements as drugs, would be regulated in a manner similar to food products. Accordingly, in the interest of public health, Congress imposed a duty on the FDA to keep adulterated dietary supplements off the market. 108 Stat. at 4326 (instructing the FDA to "take swift action against [dietary supplements] that are unsafe or adulterated."). DSHEA classifies a dietary supplement as adulterated if it "presents a significant or unreasonable risk of illness or injury." 21 U.S.C. § 342(f)(1). The FDA understood "[t]he plain meaning of 'unreasonable' ... [to] connote [ ] comparison of the risks and benefits of the product." 69 Fed.Reg. 6788, 6823 (2004). We agree. The plain language of the statute directs the FDA to restrict distribution of dietary supplements which pose any risk that is unreasonable in light of its potential benefits. *See Merck KGaA v. Integra Lifesciences I, Ltd.*, 545 U.S. 193, 125 S.Ct. 2372, 162 L.Ed.2d 160 (2005) (unanimously finding that "unreasonable risk," as used in another FDCA provision, 21 U.S.C. § 355(i)(3)(B)(I), "involves a comparison of the risks and the benefits....").

Congress enacted DSHEA in an effort to improve public access to dietary supplements based on the belief that there may be a positive relationship between dietary supplement use, reduced health-care expenses, and disease prevention. *See Pharmanex*, 221 F.3d at 1158-59 ("It is true that DSHEA was enacted to alleviate the ***1039** regulatory burdens on the dietary supplement industry, allowing consumers greater access to safe dietary supplements in order to promote greater wellness among the American population.") (citation omitted). The FDCA should not be read too restrictively but in manner consistent with the statute's overriding purpose to protect public health. *See* 21 U.S.C.A. § 301 *et seq.*; *United States v. Rx Depot, Inc.*, 438 F.3d 1052, 1061 (10th Cir.2006) ("The FDCA's primary purpose is to protect the public health.") (citing *United States v. An Article of Drug ... Bacto-Unidisk*, 394 U.S. 784, 798, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1969)). Accordingly, DSHEA should receive a liberal construction where the FDA has taken remedial steps in response to a perceived public health problem.

According to the district court, by injecting a risk-benefit analysis, the FDA required Nutraceutical to make a showing of the benefits of its product. However, at no time has the FDA required manufacturers of EDS to provide data on the benefits of their products. Rather, the FDA has assumed its responsibility of gathering data, soliciting comments, and conducting the risk-benefit analysis.[FN5] Congress expressly placed the burden of proof on the government to determine whether a dietary supplement is adulterated. Accordingly, EDS were allowed to enter the market without findings of safety or effectiveness. The FDA did not impose a pre-market requirement for the sale of EDS. For example, Nutraceutical has been selling EDS since 1988. As dictated by the statutory scheme, the FDA assumed the duty of post-market surveillance and imposed the EDS ban following numerous AERs, public notice and comment, and significant scientific review. *See* 69 Fed.Reg. 6788. Based on the record, we disagree with the district court and find that the FDA did not shift the burden of proof to manufacturers. The risk-benefit analysis is conducted by, and at the expense of, the agency. *Id.* at 6798 ("the agency performs a risk/benefit analysis to ascertain whether the risks of the product outweigh its benefits."). Despite Nutraceutical's characterization of the process, the agency did not "require[ ] proof of a substantial benefit to counterbalance risk as a condition precedent to lawful sale of EDS." Appellee's Brief, at 5. The burden remains on the agency to show that risks associated with a dietary supplement outweigh benefits and are, therefore, unreasonable. Thus, a risk-benefit analysis does not undermine congressional intent by improperly shifting the burden of proof onto manufacturers of dietary supplements.

FN5. The district court compared the language of DSHEA to the statutory language governing medical devices and drugs and concluded that, unlike manufacturers of medical devices and drugs, manufacturers of dietary supplements do not need to prove effectiveness prior to taking their product to market. 364 F.Supp.2d at 1318 ("A brief look at the legislative history of the DSHEA indicates that Congress generally intended to harmonize the treatment of dietary supplements with that of foods when it added the dietary supplement subsection to the food adulteration provision."). The district court is correct. However, the district court confused effectiveness with safety. The FDA did not ban EDS for failing to deliver promised health gains or for ineffectiveness; the FDA banned EDS because they were determined to be unsafe.

Under the rules of statutory construction, courts consider the whole act and evaluate terms in context.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Pharmanex,* 221 F.3d at 1154 ("we examine the statutory provision in context."). The rule against surplusage encourages courts to give meaning to every word used in a statute to realize congressional intent. In effect, this rule embodies the belief that Congress would not have included superfluous language. Thus, in DSHEA, an ***1040** "unreasonable risk" has a meaning independent from a "significant risk." The plain meaning of a "significant risk" is a great danger. "Unreasonable risk" is a distinct term and requires more than evaluation of the significance of risk. "A risk could be significant but reasonable if the benefits were great enough to outweigh the risks." 69 Fed.Reg. at 6823. In other words, an "unreasonable risk" is relative to the circumstances; the potential risk is more "unreasonable" if the potential benefit is smaller. *See Castrignano v. E.R. Squibb & Sons, Inc.,* 900 F.2d 455, 459 (1st Cir.1990) (upholding jury instructions which define "unreasonable" as the "balance between the expected beneficial effects of the [product] as opposed to its harmful effects, if any."). The district court erred by conflating the terms "significant" and "unreasonable," thereby rendering "unreasonable" superfluous. In contrast to "significant risk," "unreasonable risk" accounts for whether the benefits justify the risks. The use of "unreasonable" to qualify risk in addition to "significant" makes it clear that Congress intended to integrate a risk-benefit analysis in the former. Thus, because we find the statute is clear, we now review the FDA's absolute prohibition of EDS under the APA.

*"Conditions of Use"*

[2] Under DSHEA, the government bears the burden of proof to show that, "under conditions of use recommended or suggested in labeling," a dietary supplement is adulterated. 21 U.S.C. § 342(f)(1)(A)(i). It is undisputed that the FDA must consider the dosage recommended in a dietary supplement's labeling when making an adulteration determination under section 342(f)(1)(A). The district court held that the FDA failed "to prove by a preponderance of the evidence that a dosage of 10 mg or less of ephedrine alkaloids presents a significant or unreasonable risk of illness or injury, [and] has failed to give effect to the dose-specific language of [ ] § 342(f)(1)(A)(I)." 364 F.Supp.2d at 1321.

In determining that EDS pose an "unreasonable risk of illness or injury," the FDA found that the weight loss and other health benefits possible from the use of EDS were dwarfed by the potential long-term harm to the user's cardiovascular system. The agency went on to enact a complete ban on the product after making a finding that any amount of EDS had negative ramifications on the cardiovascular system and, based on the FDA's analysis, EDS provided no benefits so great as to justify such risk.

The preponderance of the evidence standard [FN6] requires the party with the burden of proof to support its position with the greater weight of the evidence. *See Metropolitan Stevedore Co. v. Rambo,* 521 U.S. 121, 137-38 n. 9, 117 S.Ct. 1953, 138 L.Ed.2d 327 (1997) (explaining that the preponderance of the evidence standard "simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence ....") (citation omitted); *Vesper Const. Co., Inc. v. Rain for Rent, Inc.,* 602 F.2d 238, 242 (10th Cir.1979) ("by the greater weight of the evidence or, as it is sometimes called, the preponderance of the evidence."). The evidence relied on by the FDA to enact its ban of EDS covers over seven years of agency review, public notice and comment, peer-reviewed literature, and scientific ***1041** data. It is the purview of the FDA to weigh the evidence, including the evidence submitted by Nutraceutical and other manufacturers during public notice and comment.

> FN6. Congress did not prescribe the quantum of proof required under DSHEA. Accordingly, the standard traditionally applied in administrative cases, the preponderance of the evidence standard, governs. *See Steadman v. SEC,* 450 U.S. 91, 95, 102, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981).

It is noteworthy that Nutraceutical relies on the 1999 GAO report to support its contention that the Final Rule lacks support. However, the GAO has since updated its findings and arrived at conclusions in support of the Final Rule. *See* GAO, *Dietary Supplements: Review of Health-Related Call Records for Users of Metabolife 356* (GAO-03-494) (2003). Based on scientific data and AERs, the GAO concluded that EDS pose a significant risk of cardiovascular and nervous system effects among consumers who are young to middle-aged. *See* GAO, *Dietary Supplements Containing Ephedra,* Testimony before the Subcommittee on Oversight and Investigations, Committee on Energy and Commerce, House of Representatives (July 23, 2003); 69 Fed.Reg. at 6818 (GAO found that AERs

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"were consistent with ... the scientifically documented pharmacological and physiological effects of ephedrine alkoids.").

The FDA hired Dr. Inchiosa to study the effects of EDS on human health in 1999. Dr. Inchiosa used principles of pharmacokinetics [FN7] to examine the effects of ingestion of EDS on the human cardiovascular system. Dr. Inchiosa found that ephedrine would be expected to produce the same adverse cardiovascular effects (increased heart rate and blood pressure) as a comparable dose of the pharmacologically-related drug, epinephrine,[FN8] and that, consequently, no dose of ephedrine can be considered safe. Nutraceutical raises objections to Dr. Inchiosa's study and methodology which it did not raise during the rulemaking.[FN9] Nutraceutical argues that ***1042** Dr. Inchiosa's work is irrelevant to the effect of its low-level dosage EDS product because his study examined the impact of continuous injection of epinephrine into the bloodstream rather than ingestion of pills containing 10 mg or less of EDS.[FN10] The district court rejected the "mathematical model used [by Dr. Inchiosa] to compare doses of epinephrine to ephedrine." 364 F.Supp.2d at 1315. To account for the different potency levels of ephinephrine and ephedrine, Dr. Inchiosa factored the greater potency of ephinephrine into his calculations. Dr. Inchiosa's work indicates that he exaggerated margins of error in order to come to a conservative conclusion that the cardiovascular effects produced by a dose of 9 mg of EDS daily may be dangerous.

FN7. A pharmacokinetic analysis is one which examines the bodily absorption, distribution, metabolism, and excretion of drugs. *Merriam Webster's Collegiate Dictionary* 871 (10th ed.1994).

FN8. To reach his conclusions, Dr. Inchiosa relied on a peer-reviewed study of the effect of epinephrine in humans. William E. Clutter, et al., *Epinephrine Plasma Metabolic Clearance Rates and Physiologic Thresholds for Metabolic and Hemodynamic Actions in Man,* 66 J. Clin. Invest. 94 (July 1980). The Clutter study revealed significant increases in heart rate and blood pressure from epinephrine infusion at the rate of 0.5 <<mu>>g/minute.

FN9. Although Nutraceutical did not specifically object to Dr. Inchiosa's study and methodology during rulemaking, it did not thereby waive its objection. In a review of the decision of an administrative agency, a party waives its right to appeal an issue if it fails to object through comments or documents in the record. *New Mexico Environmental Imp. Div. v. Thomas,* 789 F.2d 825, 835 (10th Cir.1986) (when agency solicited comments on the very issue being challenged, party "was obligated to make its record before the agency."); *American Frozen Food Institute v. Train,* 539 F.2d 107, 134 (D.C.Cir.1976) ("What the industry failed to present to the Administrator during rulemaking procedures when specifically asked to comment cannot now be urged [as] a basis for invalidation [of the rule]."); *see also Fuel Safe Washington v. F.E.R.C.,* 389 F.3d 1313 (10th Cir.2004); *Kennecott Copper Corp. V. E.P.A.,* 612 F.2d 1232, 1245 (10th Cir.1979) ("it is well settled that industry must first utilize the opportunity for comment [on an agency regulation] before it may raise issues on appeal."). While Nutraceutical did not object to Dr. Inchiosa's study on the record, it did advance dissatisfaction with the scientific evidence relied on by the FDA during the rulemaking. Appellee's App., at 159-60 ("Nutraceutical submits these comments to show that there is absolutely no basis for concluding that [ ] whole-herb ephedra supplement products present a significant or unreasonable risk...."). The FDA solicited comments on "new scientific evidence ... concerning health risks associated with the use of dietary supplements containing ephedrine alkaloids." 68 Fed.Reg. 10417 (March 5, 2003). Dr. Inchiosa's study was not among the evidence referenced in the FDA's March notice. *Id.* Given that the FDA did not specifically ask for comments on Dr. Inchiosa's study and Nutraceutical did object to the new scientific evidence generally, it is appropriate for us to consider Nutraceutical's objections to Dr. Inchiosa's study in particular.

FN10. Nutraceutical's conclusory allegation that there is insufficient science to support the FDA's conclusion that increased heart rate and blood pressure correlate to increased risk of cardiovascular disease is contrary to the vast scientific evidence in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

administrative record.

Further, the FDA did not rely on Dr. Inchiosa's work alone.[FN11] The FDA's investigation*1043 also considered the findings of the National Institutes of Health, the GAO, and the 1996 Food Advisory Committee, among others. *See also* 364 F.Supp.2d at 1320-21 ("Dr. Inchiosa ... states that he cannot determine a safe level of EDS intake. This sentiment is echoed throughout the transcript of the [1996 Food Advisory Committee]. Several of the meeting's attendees made comments that a safe level could not be determined. There was, apparently, not enough evidence to support the conclusion that there is a safe level of intake for EDS."). The review of scientific literature is properly in the province of the FDA, to which this Court grants deference based on its expertise. *See* Weinberger v. Bentex Pharms., Inc., 412 U.S. 645, 653-54, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973) (The FDA is "peculiarly suited" to evaluate conflicting scientific reports, a matter "not ... well left to a court without chemical or medical background," because it "necessarily implicates complex chemical and pharmacological considerations.").

FN11. The FDA relied on multiple studies which demonstrated that EDS raise blood pressure and increase heart rate. The agency considered evidence from the well-known, scientifically established pharmacology of ephedrine alkaloids; peer-reviewed scientific literature on the effects of ephedrine alkaloids; and AERs of occurrences following consumption of EDS. 69 Fed.Reg. 6788. In its call for comments, the FDA specifically cited to the following peer-reviewed studies: Stephen Bent, et al., *The Relative Safety of Ephedra Compared with Other Herbal Products,* 138 Ann. Intern. Med. 468-72 (March 2003) (finding that EDS accounted for 64% of all adverse reactions to herbs in the United States, despite representing only 0.82% of herbal product sales); Paul G. Shekelle, et al., U.S. Dep't of Health & Human Servs., Agency for Healthcare Research & Quality, Assessment No. 76, *Ephedra and Ephedrine for Weight Loss and Athletic Performance Enhancement: Clinical Efficacy and Side Effects* (Feb.2003) (concluding that the use of ephedrine and/or the use of ephedra or ephedrine plus caffeine is associated with two to three times the risk of nausea, vomiting, psychiatric symptoms such as anxiety and change in mood, autonomic hyperactivity, and palpitations); Lewis B. Morgenstern, et al., *Use of Ephedra-Containing Products and Risk for Hemorrhagic Stroke,* 60 J. Neurology 132-35 (2003) (concluding that ephedra is not associated with increased risk for hemorrhagic stroke, expect possibly at higher doses); David Samenuk, et al., *Adverse Cardiovascular Events Temporally Associated With ma huang, an Herbal Source of Ephedrine,* 77 Mayo Clinic Proceedings 12 (2002) (concluding that ephedra use is temporally related to stroke, myocardial infarction, and sudden death; underlying heart or vascular disease is not a prerequisite for ephedra-related adverse events; and the cardiovascular toxic effects associated with ephedra were not limited to massive doses); Christine Haller, et al., *Pharmacology of Ephedra Alkaloids and Caffeine After Single-dose Dietary Supplement Use,* 71 Clinical Pharmacology and Therapeutics 421-32 (June 2002) (after assessing the pharmokinetic effects of a single dose of EDS plus caffeine in eight healthy adults and finding that the mean heart rate response reached a maximum change of 15 beats/minute above the baseline, the authors concluded that dietary supplements that contain ephedra and caffeine can produce significant cardiovascular responses after a single dose); C. Boozer, et. al. *Herbal Ephedra/Caffeine for Weight Loss: a 6-month Randomized Safety and Efficacy Trial,* 26 Int'l J. Obesity Related and Metabolic Disorders 593-604 (2002) (concluding that dietary supplements that contain ephedra and caffeine promote weight and fat loss without the expected decrease in blood pressure); C. Boozer, et al., *An Herbal Supplement Containing Ma Huang-Guarana for Weight Loss: A Randomized, Double-blind Trial,* 25 Int'l J. Obesity and Related Metabolic Disorders, 316-24 (2001) (concluding that dietary supplements that contain ephedra and caffeine promote short-term weight and fat loss, but that safety with long-term use requires further investigation). The FDA also relied on an investigation by the GAO which withdrew its earlier criticism of the FDA's 1997 proposed regulation of EDS after linking EDS use with heart attacks,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> strokes, seizures, death, and cardiac arrest. In addition, Dr. Inchiosa's study discussed the relationship between EDS and epinephrine in a transparent manner. Ephedrine alkaloids are members of a family of pharmacological compounds called sympathomimetics, which mimic the effects of epinephrine in the human body. 69 Fed.Reg. at 6789. Dr. Inchiosa extrapolated data on epinephrine to draw conclusions about EDS, but he did so using peer-reviewed data and generally accepted principles of pharmacology.

The majority of data in the administrative record suggests that EDS pose an unreasonable threat to the public's health. The FDA:

looked at the seriousness of the risks and the quality and persuasiveness of the totality of the evidence to support the presence of those risks. [It] then weighed the risks against the importance of the benefits and the quality and persuasiveness of the totality of the evidence to support the existence of those benefits ... giv[ing] more weight to benefits that improve health outcomes, especially in the long term, than to benefits that are temporary or rely on subjective measures such as feeling or looking better.

69 Fed.Reg. at 6799. The agency expressed that it would not deem EDS adulterated based on "risks that are insignificant and reasonable in light of the benefits from the supplement...." *Id.* at 6825. The evidence in the administrative record was sufficiently probative to demonstrate by a preponderance of the evidence that EDS at any dose level pose an unreasonable risk. The greater weight of the evidence supports the FDA's ban on EDS, thus satisfying the agency's burden.

The FDA's extensive research identified the dose level at which ephedrine alkaloids present unreasonable risk of illness or injury to be so minuscule that no amount of EDS is reasonably safe. The FDA reasonably concluded that there is no recommended dose of EDS that does not present an unreasonable risk. *Id.* at 6829 ("dose limitations cannot change the unfavorable risk-benefit ratio of [EDS]"). The FDA was not arbitrary or capricious in its Final Rule; the FDA met its statutory burden of justifying a total ban of EDS by a preponderance of the evidence.

We find that the FDA correctly followed the congressional directive to analyze the risks and benefits of EDS in determining that there is no dosage level of EDS acceptable for the market. Summary judgment for plaintiffs was therefore improper, and summary judgment for defendants should have been entered. Accordingly, ***1044** the district court's decision is reversed, and we remand for entry of judgment in favor of defendants. As noted above, Nutraceutical's Motion to Correct Oral Argument Record is granted.

REVERSED AND REMANDED.

C.A.10 (Utah),2006.
Nutraceutical Corp. v. Von Eschenbach
459 F.3d 1033

Briefs and Other Related Documents (Back to top)

• 2005 WL 3657877 (Appellate Brief) Reply Brief for the Appellants (Nov. 2, 2005) Original Image of this Document with Appendix (PDF)
• 05-4151 (Docket) (Jun. 22, 2005)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.