# EXHIBIT C

C
Briefs and Other Related Documents
Jackson v. Pfizer, Inc.D.Neb.,2006.
United States District Court,D. Nebraska.
David G. **JACKSON**, and Debra F. **Jackson**, Plaintiffs,
v.
**PFIZER**, INC., Wyeth, and Wyeth Pharmaceuticals, Defendants.
**No. 8:05CV18.**

May 31, 2006.

**Background:** Parents sued drug manufacturers for strict liability and negligence, alleging that antidepressant drugs manufactured and sold by defendants caused their son to commit suicide. Defendants filed motions for summary judgment.

**Holdings:** The District Court, Bataillon, J., held that:

(1) Food and Drug Administration (FDA) requirement that drug manufacturers use verbatim the label specified by the FDA did not preempt parents' state-law failure to warn claim, and

(2) state-law failure to warn claim was not preempted by federal statute that prohibited false and misleading labels.

Motions denied.
West Headnotes
**[1] States 360 ⚷18.5**

360 States
360I Political Status and Relations
360I(B) Federal Supremacy; Preemption
360k18.5 k. Conflicting or Conforming Laws or Regulations. Most Cited Cases
State law which conflicts with federal law is preempted under the Supremacy Clause of the United States Constitution. U.S.C.A. Const. Art. 6, cl. 2.

**[2] States 360 ⚷18.3**

360 States
360I Political Status and Relations
360I(B) Federal Supremacy; Preemption
360k18.3 k. Preemption in General. Most Cited Cases
Preemption of state law may occur when (1) Congress expressly preempts state regulation; (2) Congress intends federal law to "occupy the field"; or (3) state law conflicts with federal law.

**[3] Products Liability 313A ⚷46.2**

313A Products Liability
313AI Scope in General
313AI(B) Particular Products, Application to
313Ak46 Health Care and Medical Products
313Ak46.2 k. Drugs in General. Most Cited Cases

**States 360 ⚷18.65**

360 States
360I Political Status and Relations
360I(B) Federal Supremacy; Preemption
360k18.65 k. Product Safety; Food and Drug Laws. Most Cited Cases
Food and Drug Administration (FDA) requirement that drug manufacturers use verbatim the label specified by the FDA did not preempt state-law failure to warn claim brought by parents whose son committed suicide while taking antidepressant drugs, alleging that drug manufacturers failed to warn of alleged suicide risk associated with antidepressants, where FDA regulations explicitly permitted manufacturers to unilaterally strengthen their warning labels at any time without regulatory pre-approval, and state law regarding failure to warn did not conflict in any way with the FDA label requirement. 21 C.F.R. § 314.70(b).

**[4] Products Liability 313A ⚷14**

313A Products Liability
313AI Scope in General
313AI(A) Products in General
313Ak14 k. Warning or Instructions. Most Cited Cases
Under Nebraska law, a product is defective if the instructions or warnings are inadequate.

**[5] Products Liability 313A ⚷46.2**

313A Products Liability
313AI Scope in General

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

313AI(B) Particular Products, Application to
313Ak46 Health Care and Medical Products
313Ak46.2 k. Drugs in General. Most Cited Cases

Under Nebraska law, a prescription drug is not safe if the warnings are not provided to health care providers or in some cases the patient. Restatement (Third) of Torts (Products Liability) § 6(d).

**[6] Products Liability 313A 46.2**

313A Products Liability
313AI Scope in General
313AI(B) Particular Products, Application to
313Ak46 Health Care and Medical Products
313Ak46.2 k. Drugs in General. Most Cited Cases

**States 360 18.65**

360 States
360I Political Status and Relations
360I(B) Federal Supremacy; Preemption
360k18.65 k. Product Safety; Food and Drug Laws. Most Cited Cases

State-law failure to warn claim brought by parents whose son committed suicide while taking antidepressant drugs, alleging that drug manufacturers failed to warn of alleged suicide risk associated with antidepressants, was not preempted by federal statute that prohibited false and misleading labels, although there was no evidence of an association between antidepressants and suicide at time of son's suicide, and manufacturers had attempted to include pediatric, suicide-related warnings but the Food and Drug Administration (FDA) did not insert those warnings, where FDA regulations permitted manufacturers to strengthen warnings any time without the approval of the FDA. Federal Food, Drug, and Cosmetic Act, § 505(e), 21 U.S.C.A. § 355(e); 21 C.F.R. § § 201.57(e), 314.70(c)(6)(iii)(A).

*965 Andrew J. Hilger, Greul, Hilger Law Firm, Omaha, NE, for Plaintiffs.
Andrew T. Schlosser, Gerald L. Friedrichsen, Matthew F. Heffron, Fitzgerald, Schorr Law Firm, Omaha, NE, Craig R. May, James E. Hooper, Wheeler, Trigg Law Firm, Denver, CO, Amber Shushan, Jones, Day Law Firm, Atlanta, GA, Brien M. Welch, Charles F. Gotch, Michael K. Huffer, Michael D. Reisbig, Cassem, Tierney Law Firm, Omaha, NE, David B. Alden, Jones, Day Law Firm, Cleveland, OH, David S. Rutkowski, Junius C. McElveen, Jr., Jones, Day Law Firm, Washington, DC, for Defendants.

MEMORANDUM AND ORDER

BATAILLON, District Judge.

This matter is before the court on defendants' motions for summary judgment, Filing Nos. 39 and 46, and request for hearing, Filing No. 71. Defendants contend that plaintiffs' claims rely on Nebraska common law which has been preempted by the Food and Drug Administration (FDA). Plaintiffs have sued the defendants for strict liability and negligence causes of action. They alleged that the drug Zoloft, manufactured and sold by Pfizer, and the drug Effexor, manufactured and sold by Wyeth and Wyeth Pharmaceuticals, caused their son Jacob Jackson to commit suicide. Plaintiffs contend that the duties under Nebraska common law require additional warnings relating to the risk of suicide. The court has carefully reviewed the record and the relevant case law and concludes the motions should be denied.

**Background**

The plaintiffs' eleven year old son Jacob suffered from severe depression. In the fall of 2002, Jacob's doctors prescribed Zoloft initially, and when that did not help, they described Effexor. Jacob worsened and on October 10, 2002, he committed suicide in his parents' home. At that time, the FDA required the following precaution: "Suicide-The possibility of a suicide attempt is inherent in depressive disorder and may persist until significant remission occurs. Close supervision of high risk patients should accompany initial drug therapy. Prescriptions ... should be written for the smallest quantity of tablets consistent with good patient management, in order to reduce the risk of overdose." (Filing No. 49, Appendix at 275-76.) FN1 Plaintiffs contend that Nebraska common law requires a finding that the warnings given by the defendants about the risk of suicide were inadequate.

FN1. The FDA has now changed its position and requires the black-box label to include a warning of the possibility of suicide in pediatric patients. The FDA made this change in 2004.

**Discussion**

[1] The only issue before the court is whether the federal law preempts the Nebraska state law in this

regard. State law which conflicts with federal law is preempted under the Supremacy Clause of the United States Constitution. U.S. Const., Art. VI, cl. 2. The FDA monitors the safety of drugs for consumers, and the FDA requires certain warnings on drugs. The FDA regulates advertising, warnings, labeling, misbranding, approval, and withdrawal of approval. Such warnings can be changed after approval by the FDA if research so dictates. A manufacturer can make changes and later ask for FDA approval. 21 C.F.R. § 314.70(c)(6)(iii)(A).

[2] Preemption may occur when (1) Congress expressly preempts state regulation;*966 (2) Congress intends federal law to "occupy the field"; or (3) state law conflicts with federal law. *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). The Eighth Circuit has recently stated:

A state law may be either expressly or impliedly preempted by federal law. Express preemption exists when a federal law explicitly prohibits state regulation in a particular field. Implied preemption arises when a federal law completely occupies the field of regulation so that by implication there is no room for state regulation and the coexistence of federal and state regulation is not possible. *See Chapman v. Lab One*, 390 F.3d 620, 624 (8th Cir.2004). Preemptive language in a statute is to be read narrowly, *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 518-19, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), and without clear congressional intent there is a general presumption against finding implied preemption. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996); *Cliff v. Payco General American Credits, Inc.*, 363 F.3d 1113, 1125 (11th Cir.2004); *Springston v. Consolidated Rail Corp.*, 130 F.3d 241, 244 (6th Cir.1997). Implied preemption is therefore rarely found and only when the state law is in direct conflict with or frustrates the purposes of the federal law. *See, e.g., CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 78-79, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987).

*Missouri Board of Examiners v. Hearing Help Express, Inc.*, 447 F.3d 1033, 1035 (8th Cir.2006). The Eighth Circuit has also held that "FDA regulations are generally minimal standards." *Hill v. Searle Labs.*, 884 F.2d 1064, 1068 (8th Cir.1989); *see also*, *Wells v. Ortho Pharm. Corp.*, 788 F.2d 741, 746 (11th Cir.1986) ("An FDA determination that a warning is not necessary may be sufficient for federal regulatory purposes but still not be sufficient for state tort law purposes.")

*A. Conflict With State Law*

There is no issue with regard to the first or second area of preemption outlined in *Crosby*. This court, then, is presented with an issue of whether there is a conflict between state and federal law. Defendants argue that Nebraska common law requires stronger warnings than the federal regulatory scheme. Defendants argue that the FDA has repeatedly reviewed research to determine if these types of drugs increase the risk of suicide and has determined that the language required on labels adequately addressed the potential risk. Ex. 5; Ex. 8 at 1. Defendants believe anything more would not have been supported by the evidence. *Id.* In addition, the FDA received evidence that if additional warnings were placed on the labels, patients might not take the antidepressant which might actually increase the risk of suicide. Ex. 3, 9/20/91 PDAC Tr. at 27-28, 50-51, 89-92, 99-100, 103-06; Depo. of Dr. Paul Leber at 129.

In enacting amendments to the FDCA in 1962, Congress made it clear that state laws would still be valid, although conflicts between state and federal law would be preempted. Congress stated: "Nothing in the amendments made by this Act to the Federal Food, Drug and Cosmetic Act shall be construed as invalidating any provision of State law which would be valid in the absence of such amendments **unless there is a direct and positive conflict between such amendments** and such provisions of State law." Pub.L. No 87-781, 76 Stat. 780, 793 (1962) (emphasis added).

[3] To date the Eighth Circuit Court of Appeals has not ruled on this exact issue. However, a number of district courts have very recently ruled that state court tort claims for failure to warn in drug cases are *967 not pre-empted. *See Laisure-Radke v. Par Pharmaceutical, Inc.*, 426 F.Supp.2d 1163, 1169 (W.D.Wash.2006) and 2006 WL 901657 * 2-6 (March 29, 2006) *(* plaintiff could bring state law claim for failure to warn of increased risk of suicidality of antidepressant drug fluoxetine as state law not preempted, statement would not be false and misleading, and no frustration of Congressional purpose existed*);* *Peters v. Astrazeneca, LP*, 417 F.Supp.2d 1051, 1055 (W.D.Wis.2006) (no preemption over state law where FDA did not require a warning on the product); *McNellis v. Pfizer*, 2005 WL 3752269 *10 (D.N.J. December 29, 2005) (common law failure to warn claim not preempted by

federal law in Zoloft suicide case, and product not considered mislabeled because the label is strengthened, but burden on plaintiff to prove defendant's knowledge of suicide); *Zikis v. Pfizer, Inc.*, No. 04C8104, 2005 WL 1126909 (N.D.Ill. May 9, 2005) (Ex. 5) (finding state court claims not preempted, and manufacturer can add additional warnings and that manufacturer can comply with both FDA and state requirements); *Witczak v. Pfizer, Inc.*, 377 F.Supp.2d 726, 728-30 (D.Minn.2005) (manufacturer can unilaterally strengthen a warning; requirement by FDA to use label verbatim did not preempt state law failure to warn claim; and prohibition against false and misleading labels did not preempt failure to warn claims); *Cartwright v. Pfizer, Inc.*, 369 F.Supp.2d 876, 881-(E.D.Tex.2005) (FDA warning label requirement is a minimum standard of conduct); *but see, Dusek v. Pfizer Inc.*, No. H-02-3559, 2004 WL 2191804 (S.D.Tex. Feb. 20, 2004) (finding preemption by FDA of state law warning requirements), and *Needleman v. Pfizer Inc.*, No. 3:03CV3074N, 2004 WL 1773697 (N.D.Tex. Aug. 6, 2004) (Ex. 4) (same). As stated by Chief Judge James Rosenbaum in *Witczak*:

Defendant's preemption argument has a surface appeal: Should it face state law liability for a failure to warn even though its label fully complied with federal law? But the argument fails upon scrutiny. Federal labeling laws are minimum standards; they do not necessarily shield manufacturers from state law liability. The primary purpose of both the FDCA and the FDA's regulatory scheme is to protect the public. State-law protections reinforce and enhance this objective. Defendant's preemption argument ultimately fails because Congress has not expressed a specific intent to preempt state consumer-protection laws in the area of prescription-drug labeling. In the absence of Congress's express statement, defendant must overcome the presumption against implying Congressional preemptive intent. It has not done so. As a result, plaintiff's state law claims remain viable.

*Witczak*, 377 F.Supp.2d at 732.

[4][5] The court must now determine if there exists a conflict between Nebraska state law and federal law. A product is defective under Nebraska law if the instructions or warnings are inadequate. *Freeman v. Hoffman-LaRoche, Inc.*, 260 Neb. 552, 618 N.W.2d 827, 841 (2000). Nebraska law contemplates that some drugs will be dangerous, but contemplates that the seller will give proper warning. *Id.* at 835, *citing*, *Restatement (Second) of Torts § 402*, Comment k. In addition, a prescription drug is not safe if the warnings are not provided to health care providers or in some cases the patient. *Freeman*, 260 Neb. at 571, 618 N.W.2d 827; Restatement (Third) of Torts (Products Liability) § 6(d).

Defendants contend that to apply a state standard in this case would substantially interfere with the specific federal requirements. Defendants argue that if plaintiffs' argument is adopted, defendants would ***968** have been required to violate FDA policy. The FDA required that the antidepressants use the exact language specified by it with regard to suicide. Defendants argue that the FDA looked at the suicide issue in the 1990's, 2002, and 2003 and determined the industry lacked sufficient evidence to require a warning of suicide. According to defendants, after conducting and reviewing years of test results, the FDA did not believe that sufficient evidence existed to note an increased risk of suicide.[FN2]

FN2. Defendants rely on *Brooks v. Howmedica, Inc.*, 273 F.3d 785, 795 (8th Cir.2001) (plaintiff in a Medical Devices Act case filed failure to warn claim which court found to be preempted). The court notes that *Brooks* dealt with a medical device bone cement and did not deal with prescription drugs.

The court finds the analysis of the *Laisure-Radke, Peters, Hill* and *Witczak* to be persuasive. There has been no Congressional directive that the field is preempted. The recent notice issued by the FDA claiming preemption is not persuasive.[FN3] Further, the Eighth Circuit has adopted the minimum standards analysis when reviewing FDA regulations and has recently stated in *Missouri Bd. of Examiners* that implied preemption is rarely found, absent a direct conflict or a frustration of federal purpose. In addition, there has been no showing that the Nebraska failure to warn law in any way directly conflicts with the FDA label requirement nor is there a showing of frustration of purpose as set forth in *Missouri Bd. of Examiners*. Further, the regulations clearly permit unilateral strengthening of the labeling. 21 C.F.R. § 314.70(b). Finally, the Fourth Circuit has stated that compliance with federal regulations will not absolve a manufacturer from liability. *Salmon v. Parke, Davis & Co.*, 520 F.2d 1359, 1362 (4th Cir.1975). Based on the foregoing, the court finds that federal law does not preempt state law on the issue of failure to warn.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN3. *See* 21 C.F.R. parts 201, 314, 601; 71 Fed.Reg. 3,922, 3,934, 3,969, and 3,935-36 (January 24, 2006) (January 24, 2006, statement by FDA that it intends to preempt the field with regard to labeling). The FDA failed to comply with its requirements to communicate with the states and to allow the states an opportunity to participate in the proceedings prior to a preemption decision. Executive Order 13132, Section 4(c) (regulatory preemption must be kept to a minimum level), 4(d) (agency shall consult to extent practicable with the state and local officials to avoid the conflict), 4(e) (if agency acts through adjudication or rulemaking to preempt the law of the state, it shall provide state and local officials with notice and an opportunity to participate).

*B. Misbranding*

[6] Defendants also contend that such a requirement about suicide could easily violate the statutory prohibition against misbranding. "The labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved." 21 C.F.R. § 201.57(e). Absent such evidence of association, and none existed in 2002 argues defendants, requiring a suicidal label would have violated the misbranding provision. FN4 Defendant Wyeth argues that twice-once in September 2002 and again in August 2003-it attempted to include***969** pediatric, suicide-related warnings. On both occasions, Wyeth contends, the FDA did not insert those warnings. The *Needleman* and *Dusek* opinions, argue defendants, are directly on point. *See also* *Ehlis v. Shire Richwood, Inc.*, 233 F.Supp.2d 1189, 1198 (D.N.D.2002), *aff'd on other grounds*, 367 F.3d 1013 (8th Cir.2004) (granting summary judgment at trial court level on ground that FDA approval of warning regarding specific alleged side effect preempted any different warning).

FN4. The court notes that the defendants contend that the government filed amicus briefs in the cases of *KALLAS v. PFIZER, INC.*, Case No. 2:04CV0998, 2005 WL 4030146 (D. Utah Sept. 29, 2005) and in *Colacicco v. Apotex, Inc.*, 05CV05500 (E.D.Pa. May 10, 2006) wherein the government argued that the additional state law warning label would have been "false and misleading" under federal law and that the FDA has preempted state tort law failure to warn claims. This court will not treat amicus briefs as the force of law. *See* *McNellis v. Pfizer*, 2005 WL 3752269 at *10 (D.N.J. Dec. 29, 2005).

Plaintiffs argue that strengthening the label would not have made the label false and misleading. The court in *Witczak* noted that the FDA regulations permit a manufacturer to strengthen its warnings any time without the approval of the FDA, relying on 21 C.F.R. § 314.70(c)(6)(iii)(A) (permits the company to add or strengthen a warning). *Witczak* at 729. The court further found that it was not "impossible for [Pfizer] to comply with both state and federal requirements." *Id.* With regard to the defense that a label different from the one dictated by the FDA would be "false and misleading," the *Witczak* court found that the misbranding statute set forth in 21 U.S.C. § 355(e) did not make it impossible for the manufacturer to comply with a state failure to warn law. *Id.* at 730. Further, the court held that state consumer protection laws complemented rather than frustrated the FDA's job. *Id.* at 732. This court agrees and finds defendants' claims in this regard to be without merit.

THEREFORE, IT IS ORDERED that defendants' motions for summary judgment, Filing Nos. 39, 46, and request for hearing, Filing No. 71, are denied.

D.Neb.,2006.
Jackson v. Pfizer, Inc.
432 F.Supp.2d 964, Prod.Liab.Rep. (CCH) P 17,482

Briefs and Other Related Documents (Back to top)

• 2006 WL 1887006 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Supplementary Brief in Opposition to Defendants' Motions for Certifcation of Interlocutory Appeal (Jul. 9, 2006)
• 2006 WL 1887004 (Trial Motion, Memorandum and Affidavit) Defendant Pfizer Inc's Notice of Supplemental Authority in Support of Motion for Certification of Interlocutory Appeal (Jul. 6, 2006)
• 2006 WL 1887005 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Brief in Opposition to Defendants' Motions for Certification of Interlocutory Appeal (Jun. 23, 2006)
• 2006 WL 1887002 (Trial Motion, Memorandum and Affidavit) Defendant Pfizer Inc.'s Brief in Support of Motion for Certification of Interlocutory Appeal (Jun. 13, 2006)
• 2006 WL 1887007 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Wyeth

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Defendants' Motion for Certification for Interlocutory Appeal Pursuant to 28 U.S.C. | 1292(b) of the Court's May 31, 2006 Order Denying Defendants' Motions for Summary Judgments Based on Preemption (Jun. 9, 2006)
• 2006 WL 1887009 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Defendants Wyeth's and Wyeth Pharmaceuticals' Motion for Summary Judgment Based on Federal Preemption (Feb. 2, 2006)
• 2006 WL 652870 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Defendants Wyeth's and Wyeth Pharmaceuticals' Motion for Summary Judgment Based on Federal Preemption (Feb. 2, 2006) Original Image of this Document (PDF)
• 2006 WL 652871 (Trial Motion, Memorandum and Affidavit) Defendant Pfizer Inc's Reply Brief in Support of Motion for Summary Judgment (Federal Preemption (Feb. 2, 2006) Original Image of this Document (PDF)
• 2006 WL 1887003 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Brief in Opposition to Defendant Pfizer's Motion for Summary Judgment (Jan. 23, 2006)
• 2006 WL 1887008 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Brief in Opposition to Defendant Wyeth's Motion for Summary Judgment (Jan. 23, 2006)
• 2006 WL 351506 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Brief in Opposition to Defendant Pfizer's Motion for Summary Judgment (Jan. 23, 2006) Original Image of this Document (PDF)
• 2005 WL 4157943 (Trial Motion, Memorandum and Affidavit) Defendant Pfizer Inc's Brief in Support of its Motion for Summary Judgment (Federal Preemption) (Dec. 22, 2005)
• 2005 WL 4157944 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Defendants Wyeth's and Wyeth Pharmaceuticals' Motion for Summary Judgment Based on Federal Preemption (Dec. 21, 2005)
• 8:05cv00018 (Docket) (Jan. 18, 2005)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

**H**

Briefs and Other Related Documents

Perry v. Novartis Pharma. Corp.E.D.Pa.,2006.

United States District Court,E.D. Pennsylvania.

Andrea **PERRY**, et al.

v.

**NOVARTIS** PHARMA. CORP., et al.

**No. CIVA 05-5350.**

Oct. 16, 2006.

**Background:** Parents of patient who developed lymphoblastic lymphoma following use of Elidel, a prescription drug for the treatment of atopic dermatitis, brought suit against the makers of the drug alleging, inter alia, negligent failure to warn.

**Holding:** On drug maker's motion to dismiss, the District Court, Dalzell, J., held that federal law did not preempt failure to warn claims.

Motion denied.

West Headnotes

**[1] Food 178 1.7**

178 Food
178k1 Power to Make Regulations
178k1.7 k. Administrative Power in General. Most Cited Cases

**Health 198H 323**

198H Health
198HI Regulation in General
198HI(E) Drugs; Medical Devices and Instruments
198Hk323 k. Judicial Review or Intervention. Most Cited Cases

**Statutes 361 219(6.1)**

361 Statutes
361VI Construction and Operation
361VI(A) General Rules of Construction
361k213 Extrinsic Aids to Construction
361k219 Executive Construction
361k219(6) Particular Federal Statutes
361k219(6.1) k. In General. Most Cited Cases

To the degree that the Food and Drug Administration (FDA) seeks to address ambiguities in the Food, Drug and Cosmetic Act (FDCA) or in its own regulations, a district court will give that opinion great weight. Federal Food, Drug, and Cosmetic Act, § 1, 21 U.S.C.A. § 301.

**[2] Statutes 361 219(5)**

361 Statutes
361VI Construction and Operation
361VI(A) General Rules of Construction
361k213 Extrinsic Aids to Construction
361k219 Executive Construction
361k219(5) k. Particular Officers, Construction By. Most Cited Cases

Where the Food and Drug Administration (FDA) attempts to supply, on Congress's behalf, the clear legislative statement of intent required to overcome the presumption against preemption, no deference is warranted.

**[3] States 360 18.3**

360 States
360I Political Status and Relations
360I(B) Federal Supremacy; Preemption
360k18.3 k. Preemption in General. Most Cited Cases

Federal pre-emption of state law can occur in three types of situations: where Congress explicitly pre-empts state law, where pre-emption is implied because Congress has occupied the entire field, and where pre-emption is implied because there is an actual conflict between federal and state law.

**[4] States 360 18.5**

360 States
360I Political Status and Relations
360I(B) Federal Supremacy; Preemption
360k18.5 k. Conflicting or Conforming Laws or Regulations. Most Cited Cases

For preemption purposes, a court will find an "actual conflict" when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[5] Products Liability 313A 46.2**

313A Products Liability
313AI Scope in General
313AI(B) Particular Products, Application to
313Ak46 Health Care and Medical Products
313Ak46.2 k. Drugs in General. Most Cited Cases

**States 360 18.65**

360 States
360I Political Status and Relations
360I(B) Federal Supremacy; Preemption
360k18.65 k. Product Safety; Food and Drug Laws. Most Cited Cases
Federal law did not preempt failure to warn claims brought by parents of patient who developed lymphoblastic lymphoma following use of Elidel, a prescription drug for the treatment of atopic dermatitis; a state law requirement to provide an additional warning would not force the drug company to choose between violating state and federal law, as at the time Elidel was prescribed, the Food and Drug Administration (FDA) had made no finding regarding a link between use of topical calcineurin inhibitors and increased cancer risk in children and no statute or regulation prevented the drug maker from adding the warning, and, requiring company to add a warning to the Elidel label would not disturb the balance of the regulatory scheme since FDA regulations made specific accommodation for adding a warning in the situation the parents alleged. Federal Food, Drug, and Cosmetic Act, § 1, 21 U.S.C.A. § 301; 21 C.F.R. § 201.57(e).

**[6] Products Liability 313A 46.2**

313A Products Liability
313AI Scope in General
313AI(B) Particular Products, Application to
313Ak46 Health Care and Medical Products
313Ak46.2 k. Drugs in General. Most Cited Cases

**States 360 18.65**

360 States
360I Political Status and Relations
360I(B) Federal Supremacy; Preemption
360k18.65 k. Product Safety; Food and Drug Laws. Most Cited Cases
Preemption of state law claims with respect to injuries caused by drugs is unwarranted in the absence of clear evidence that state law requiring an additional warning would either compel the manufacturer to violate the terms of the FDCA or the Food and Drug Administration (FDA) regulations, or would somehow be disruptive of the statutory and regulatory scheme. Federal Food, Drug, and Cosmetic Act, § 505(a), 21 U.S.C.A. § 355(a).

**[7] Products Liability 313A 46.2**

313A Products Liability
313AI Scope in General
313AI(B) Particular Products, Application to
313Ak46 Health Care and Medical Products
313Ak46.2 k. Drugs in General. Most Cited Cases

**States 360 18.65**

360 States
360I Political Status and Relations
360I(B) Federal Supremacy; Preemption
360k18.65 k. Product Safety; Food and Drug Laws. Most Cited Cases
Although state law can require a manufacturer to seek Food and Drug Administration (FDA) approval for a new drug warning, it cannot require the addition of the warning without approval if there is a reasonable risk that the addition would lead to an FDA determination of misbranding. Federal Food, Drug, and Cosmetic Act, § 505(a), 21 U.S.C.A. § 355(a).

**[8] Products Liability 313A 46.2**

313A Products Liability
313AI Scope in General
313AI(B) Particular Products, Application to
313Ak46 Health Care and Medical Products
313Ak46.2 k. Drugs in General. Most Cited Cases

**States 360 18.65**

360 States
360I Political Status and Relations
360I(B) Federal Supremacy; Preemption
360k18.65 k. Product Safety; Food and Drug Laws. Most Cited Cases
State law may require a drug manufacturer to at least seek Food and Drug Administration (FDA) approval for the addition of a new warning where there has been no determination by the agency whether there is a link between the adverse health effect to be warned

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

against and the use of the drug. 21 C.F.R. 314.70(c).

***679** Brian P. McCafferty, Kenney Lennon & Egan, P.C., Plymouth Meeting, PA, Erin K. Corley, Fibich, Hampton & Leebron, LLP, Houston, TX, Francine A. Hochberg, Louis M. Bograd, Center for Constitutional Litigation, P.C., Leslie A. Brueckner, Trial Lawyers for Public Justice, P.C., Washington, DC, Larry M. Roth, The Law Offices of Larry M. Roth, P.A., Orlando, FL, for Andrea Perry, et al.
Joe G. Hollingsworth, Kirby T. Griffis, Spriggs & Hollingsworth, Sharon Swingle, U.S. Department of Justice, Washington, DC, Madeline M. Sherry, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C., for Novartis Pharmaceuticals Corporation, et al.
Shanin Specter, Kline & Specter, P.C., Philadelphia, PA, for Amicus Curiae Pennsylvania Trial Lawyers Association.

*MEMORANDUM*

DALZELL, District Judge.

This case arises from Andreas Perry's diagnosis of lymphoblastic lymphoma three years ago. Andreas' parents, plaintiffs in this action, allege that Andreas's use of Elidel [FN1], a prescription drug for the treatment***680** of atopic dermatitis [FN2], caused his lymphoma. Plaintiffs raise a number of claims against the makers of Elidel, including fraud, breach of warranty, and negligent failure to warn.

FN1. Elidel is the trade name under which Novartis markets the drug pimecrolimus.

FN2. Atopic dermatitis, also known as eczema, is a skin condition causing an itchy rash and dry, scaly skin. It is particularly common in infants and young children.

Defendants have moved to dismiss the failure to warn claims on the basis that the federal Food, Drug and Cosmetic Act (FDCA), 21 U.S.C. § 301 et seq., and the Food and Drug Administration regulations promulgated under that statute, impliedly preempt all such claims. Although we find that some failure to warn claims, particularly those where the FDA has made a specific determination regarding the danger, are indeed preempted, that preemption is not so broad as to foreclose the possibility that the Perrys can make out a claim for negligence consistent with the pleadings before us. Accordingly, defendants' motion must be denied.

*Factual Background*

On December 13, 2001, the FDA approved Novartis's [FN3] application to market Elidel for the treatment of atopic dermatitis. Novartis's application sought FDA approval to market Elidel for short-term or intermittent long-term use in non-immunocompromised patients at least two years of age. As part of the approval process, the FDA evaluated and approved the product labeling that Novartis submitted. That labeling noted no increase among the human clinical subjects in the incidence of lymphoma or other cancers, but did report an increase in lymphoma in animals given high doses of the drug. As a result of these animal studies, which were consistent with the clinical data for a similar drug, tacrolimus,[FN4] the FDA required Novartis to conduct ongoing studies to monitor the incidence of malignancies related to long-term use of Elidel.

FN3. Plaintiffs have sued four separate corporate entities: Novartis Pharmaceuticals Corporation, Novartis Corporation, Novartis Pharma GmbH, and Novartis AG. The first three entities are controlled, directly or indirectly, by Novartis AG. Because, for the purposes of this motion, the distinctions among the entities are not material, we will simply refer to all four defendants as Novartis.

FN4. Fujisawa Healthcare markets tacrolimus under the trade name Protopic. The FDA approved tacrolimus on September 8, 1999 for use in treating atopic dermatitis.

In October, 2003, the FDA's Pediatric Advisory Subcommittee to the Anti-Infective Drugs Advisory Committee met to discuss cancer rates among pediatric patients treated with calcineurin inhibitors.[FN5] Although some members expressed concerns-in particular that the labels for topical calcineurin inhibitors should be modified to specifically warn against their use in patients under the age of two-the Committee that month made no recommendation to the FDA on the question of pediatric use of calcineurin inhibitors.

FN5. Both pimecrolimus and tacrolimus belong to a class of drugs known as calcineurin inhibitors, so called because they reduce immune activity by inhibiting the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

activity of the enzyme calcineurin. Prior to the approval of Elidel and Protopic, calcineurin inhibitors were used as systemic immunosuppressants in organ transplant patients. Systemic use of calcineurin inhibitors has long been known to increase cancer risk and the drugs used in organ transplant patients are labeled accordingly. Because pimecrolimus and tacrolimus are applied topically, it was not known at the time of approval whether long-term use of those drugs posed the same risk.

On February 15, 2005, the Committee again met to discuss calcineurin inhibitors. ***681** In particular, reports of off-label use [FN6] of the drugs in children under two caused concern among the members of the Committee. At its February 15 meeting, the Committee voted to recommend a so-called "Black Box" warning about the possible increased risk of malignancies associated with the topical use of calcineurin inhibitors, and the lack of long-term safety data on the use of the drugs. On March 10, 2005, the FDA issued a public health advisory warning doctors and patients about the possible cancer risk. On January 19, 2006, the FDA approved modified labeling for Elidel including the "Black Box" warning.

FN6. "Off-label use" refers to those prescriptions of drugs for indications that are not described on the drug's approved label. Although drug manufacturers are forbidden from specifically encouraging off-label use, in many clinical areas it is, apparently, quite common.

On or about April 30, 2003, just after Andreas Perry's second birthday, his parents sought treatment for his eczema. The Perrys' pediatrician gave them samples of Elidel, which they used to treat Andreas. Six months later, in October, 2003, Andreas was diagnosed with lymphoblastic lymphoma.

*Jurisdiction and Legal Standard*

We have jurisdiction under 28 U.S.C. § 1332(a), as the plaintiffs are all citizens of Pennsylvania and the defendants are, variously, citizens of Delaware, New Jersey, New York, Germany, and Switzerland. Plaintiffs' second amended complaint added claims against two non-diverse defendants, Jae A. Sparks and Mary Gianstasio. In our Order of October 5, 2006, we dismissed without prejudice the claims against Sparks and Gianstasio under Fed.R.Civ.P. 21. Because complete diversity exists between the plaintiffs and the remaining defendants, and the amount in controversy exceeds $75,000, we have jurisdiction over the subject matter.

We may grant defendants' motion to dismiss only if, having taken all allegations in the complaint as true, "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Doe v. Delie,* 257 F.3d 309, 313 (3d Cir.2001).

*Review of the FDCA and FDA Regulations*

Because Novartis contends that plaintiffs' claims are preempted by the FDCA and the corresponding FDA regulations,[FN7] we first review the statute and those regulations in some detail.

FN7. The regulations regarding labeling of drugs were substantially revised in 2006. *See* Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products, 71 Fed.Reg. 3922 (Jan. 24, 2006). Because the relevant claims in this case deal with Novartis's alleged failure to provide adequate warnings in 2003, we examine the regulations as they existed then.

The FDCA requires that the FDA approve any drug before it is sold in interstate commerce. 21 U.S.C. § 355(a). In order to obtain approval for a new drug, a manufacturer [FN8] must submit to the FDA a portfolio of information including "full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use." *Id.* § 355(b)(1)(A). In addition, the manufacturer must provide the agency with proposed labeling to be included with the drug when it is distributed. *Id.* § 355(b)(1)(F).

FN8. Although we refer to manufacturers here, the regulations apply equally to companies that market, distribute and/or repackage drugs that an outside entity manufactures for them.

Manufacturers must update product labeling when new information becomes ***682** available. In particular, "[t]he labeling shall be revised to include a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved." 21 C.F.R. § 201.57(e) (2003).

In general, once the drug and its labeling are approved, a manufacturer must seek FDA approval before making any changes to its label and packaging. *Id.* § 314.70(b). Some changes are permissible without prior approval, so long as the manufacturer notifies the FDA when the change is made. In particular, the regulations allow changes to labeling to "add or strengthen a contraindication, warning, precaution, or adverse reaction," *id.* § 314.70(c)(2)(i), or to "add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the product," *id.* § 314.70(c)(2)(iii).[FN9] If any such change is made, "[t]he applicant shall promptly revise all promotional labeling and drug advertising to make it consistent with any change in the labeling." [FN10] *Id.* § 314.70(c). "This particular regulation was promulgated precisely to allow drug-makers to quickly strengthen label warnings when evidence of new side effects are [*sic* ] discovered." *Witczak v. Pfizer, Inc.*, 377 F.Supp.2d 726, 729 (D.Minn.2005).

FN9. Some have claimed that this provision is rarely invoked, *see, e.g.,* Richard M. Cooper, *Drug Labeling and Products Liability: The Role of the Food and Drug Administration,* 41 Food Drug Cosm. L.J. 233, 236 (1986), but as will become clear shortly, what matters in the preemption analysis is not whether, in practice, manufacturers perceive a potential conflict between federal and state law, but whether there is an actual and direct conflict. Thus, in the preemption analysis, what matters is whether Novartis could have, consistent with federal law, added a warning to its labeling materials.

FN10. In this context, "labeling" refers to the package insert, which is primarily directed at prescribing physicians. This is the reason for the distinction between "labeling" and "promotional labeling."

The FDCA also directly limits changes to a drug's labeling, stating that any "false or misleading" statement in the labeling will render the drug misbranded, making distribution of the drug unlawful. *See* 21 U.S.C. 352(a).

Any restrictions that the FDA may place on drug labeling do not prohibit manufacturers from disseminating evidence of a danger by other means. When it originally promulgated these regulations, the agency made clear that:

These labeling requirements do not prohibit a manufacturer, packer, relabeler, or distributor from warning health care professionals whenever possibly harmful adverse effects associated with the use of the drug are discovered. The addition to labeling and advertising of additional warnings, as well as contraindications, adverse reactions, and precautions regarding the drug, or the issuance of letters directed to health care professionals (e.g., "Dear Doctor" letters containing such information) is not prohibited by these regulations.

44 Fed.Reg. 37434, 37447 (June 26, 1979). Indeed, the FDA has promulgated particular regulations guiding the dissemination of information to health care professionals, *see* 21 C.F.R. § 200.5, making it clear that it expects such communication to take place.

*Deference to FDA*

Because the FDA has, at our request, filed an amicus brief in this case, before moving on to the preemption analysis itself, we must determine the degree of deference to afford the FDA's statements regarding the preemptive effect of its regulations.***683** Certainly, under *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), agency interpretations of statutes they administer receive great deference. *Chevron* deference is only warranted, however, when the agency speaks in the exercise of its authority "to make rules carrying the force of law." *United States v. Mead Corp.*, 533 U.S. 218, 226-227, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). Thus, to the degree that FDA regulations construe the FDCA, we should defer to the agency's construction. Further, if FDA regulations are ambiguous, agency statements resolving those ambiguities are worthy of our deference. *See Christensen v. Harris County*, 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). In the absence of "power to control," which would entitle it to deference under *Chevron,* however, the FDA's construction of its regulations is entitled to respect only inasmuch as it has the "power to persuade." *Mead,* 533 U.S. at 228, 121 S.Ct. 2164 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). To be sure,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

because of its expertise in the area, the FDA's construction of its own regulations is likely to carry great weight. But where an interpretation has changed frequently in significant respects, the persuasive force of the argument diminishes.

[1][2] Thus, to the degree that the FDA seeks to address ambiguities in the FDCA or in its own regulations, we will give that opinion great weight. Where, however, the agency attempts to "supply, on Congress's behalf, the clear legislative statement of intent required to overcome the presumption against preemption," no deference is warranted. *Desiano v. Warner-Lambert & Co.,* 467 F.3d 85, 97 n. 9 (2d Cir.2006). "Agencies may play the sorcerer's apprentice but not the sorcerer himself." *Alexander v. Sandoval,* 532 U.S. 275, 291, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001).

*The Preamble*

Much has been made, both in the briefs for this case and in opinions in recent similar cases, about the effect of the Preamble to the new labeling rules issued on January 24, 2006. In the Preamble, the FDA stakes out a strong position on the preemptive effect of its labeling requirements. *See* Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products, 71 Fed.Reg. at 3933-36. For a number of reasons, we find that the Preamble need not affect our analysis of the issues in this case.

As a preliminary matter, the Preamble is not a binding portion of the regulations, but is instead an advisory opinion. *See* 21 C.F.R. § 10.85(d)(1) (identifying as an advisory opinion "[a]ny portion of a Federal Register notice other than the text of a proposed or final regulation, e.g., a notice to manufacturers or a preamble to a proposed or final regulation"). While an advisory opinion "obligates the agency to follow it until it is amended or revoked," it can be changed at any time and a change does not require notice and comment. *Id.* § 10.85(e), (g).

It is by no means clear what effect an advisory opinion issued in 2006 could have on the obligations to which Novartis was subject in 2003. If, as the FDA contends in the Preamble, the statement represents merely an application of "existing preemption principles," 71 Fed.Reg. at 3934, then it produces no change in Novartis's rights or obligations and should not affect our analysis. If, on the other hand, the Preamble represents a change of policy, whether or not it has the force of law, we cannot apply it to this case. The FDA ***684** cannot retroactively absolve Novartis of a duty it may have owed the Perrys in 2003.

Finally, and most importantly, the Preamble deals chiefly with "specific warnings that FDA had specifically considered and rejected as scientifically unsubstantiated." *Id.* Although the Preamble does not purport to limit the situations in which state law causes of action are preempted, it lists six types of claims that, at a minimum, the agency believes should be preempted. The category most relevant to this case is "claims that a drug sponsor breached an obligation to warn by failing to include a statement in labeling or in advertising, *the substance of which had been proposed to FDA for inclusion in labeling,* if that statement was not required by FDA at the time plaintiff claims the sponsor had an obligation to warn." *Id.* at 3936 (emphasis added). Here, it is undisputed that no such proposal had been made to the FDA in 2003.

For all of these reasons, the Preamble is not entitled to any special consideration in our analysis.

*Preemption Analysis*

[3] "[F]ederal pre-emption of state law can occur in three types of situations: where Congress explicitly pre-empts state law, where pre-emption is implied because Congress has occupied the entire field and where pre-emption is implied because there is an actual conflict between federal and state law." *Pokorny v. Ford Motor Co.,* 902 F.2d 1116, 1120 (3d Cir.1990) (citing *Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988)). The parties agree that this case presents a question of implied preemption based on an actual conflict between federal and state law.

[4] A court will find an actual conflict "when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Id.* (quoting *Schneidewind,* 485 U.S. at 299-300, 108 S.Ct. 1145). Such a conclusion is not to be found lightly. "Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981). On the record presented here, the bar to a finding of preemption is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

raised even higher because the FDCA provides no remedy for an injured consumer. Thus, a finding of preemption here will foreclose a remedy that was traditionally available and for which federal law provides no substitute. Courts have (understandably) been particularly reluctant to find preemption in such cases without an unambiguous signal of Congressional intent. *See* Medtronic, Inc. v. Lohr, 518 U.S. 470, 487, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (plurality opinion) ("It is, to say the least, 'difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct.' ") (quoting Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 251, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984)); Bates v. Dow Agrosciences LLC, 544 U.S. 431, 449, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005) ("If Congress had intended to deprive injured parties of a long available form of compensation, it surely would have expressed that intent more clearly.").

[5] Courts should therefore not reach to find that FDA regulations preempt state law claims. There are, to be sure, situations in which preemption of state law claims is necessary to preserve the structure of the FDA regulatory scheme. The FDCA grants the FDA authority that it must use "to achieve a somewhat delicate balance of statutory objectives." ***685**Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 348, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001). Because the agency is concerned not solely with maximizing safety, but also with balancing a need for safety with a desire to encourage the widespread use of effective treatments, a specific determination by the FDA that a warning is not warranted is dispositive.[FN11]

> FN11. It should be obvious that this can only be true if the FDA scientists who made the specific determination had available to them all of the relevant data. If, for whatever reason, the manufacturer knew of additional data not available to the FDA linking the drug to a safety risk, the dispositive force of the agency's determination would be called into question. Because, in the case of Elidel, the FDA did not make a specific determination during the relevant time regarding the risk of pediatric cancers, we need not address that possibility here.

[6] Preemption is unwarranted in the absence of clear evidence that state law requiring an additional warning would either compel the manufacturer to violate the terms of the FDCA or the FDA regulations, or would somehow be disruptive of the statutory and regulatory scheme. This would generally limit preemption to cases where the FDA has made a particular determination regarding a proposed warning. The FDA advocates for a somewhat broader scope of preemption. The agency contends that "[a] court must ask whether the warning sought by the plaintiff would have rendered the drug misbranded in the agency's judgment at the relevant time, or if any new warnings proposed to be added to the warning label would have been rejected by the agency as unsubstantiated." FDA Amicus Br. at 11. We think this overstates the scope of preemption. Because the FDA must initiate an enforcement action in order to find a drug misbranded, *see* Witczak, 377 F.Supp.2d at 730 ("[T]he FDA has no authority to declare, *ipse dixit*, that a label is false and misleading. Rather, the government must initiate an enforcement action to establish that the drug is in fact misbranded.") (citing 21 U.S.C. § § 331-37, 352), it will often not be possible for a court to determine after the fact whether a particular warning would have resulted in such a finding.

[7][8] We believe it is more in keeping with the narrow scope of preemption to allow state law to require the addition of warnings so long as there has been no specific FDA determination as to the sufficiency of the scientific evidence to support a particular warning. Under the regulations applicable to this case, upon making a change to the labeling the manufacturer is required to submit "a full explanation of the basis for the change" to the FDA. 21 C.F.R. 314.70(c) (2003). This allows the agency to make a prompt determination of the scientific validity of the new warning. The new regulations contain a similar requirement. 21 C.F.R. 314.70(c)(6)(iii) (2006). These provisions allow a manufacturer to obtain a prompt determination from the FDA regarding the sufficiency of the link between the drug and the reported problem. Indeed, "manufacturers typically consult with FDA prior to adding risk information to labeling." 71 Fed.Reg. at 3934. We find, therefore, that state law may require a manufacturer to at least seek FDA approval for the addition of a new warning where there has been no determination by the agency whether there is a link between the adverse health effect to be warned against and the use of the drug.[FN12] Where, however, the FDA has ***686** made a conclusive determination, positive or negative, as to the existence of a link between the drug at issue and some adverse health consequence, state law cannot

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

mandate that a manufacturer include additional warnings beyond those that the FDA has determined to be appropriate to the risk.

FN12. It is an interesting question whether a manufacturer who has sought FDA approval for an additional warning could be held liable for a failure to warn during the pendency of that agency review. We think that state law cannot require a manufacturer to bear the risk of an adverse finding in an FDA enforcement action. Thus, although state law can require a manufacturer to seek FDA approval for a new warning, it cannot require the addition of the warning without approval if there is a reasonable risk that the addition would lead to an FDA determination of misbranding.

That was the case, for example, in *Colacicco v. Apotex, Inc.*, 432 F.Supp.2d 514 (E.D.Pa.2006). In that case, as here, plaintiff advanced a claim based on the defendant drug manufacturers' failure to provide adequate warnings of a known danger, specifically the link between use of Selective Serotonin Reuptake Inhibitors (SSRI's) and increased risk of suicide in adult patients. In *Colacicco,* however, the FDA had "specifically and repeatedly rejected claims that adult use of SSRI's was associated with increased suicidality." *Id.* at 527. Over a period of twelve years, in response to citizen complaints and internal findings, agency scientists repeatedly concluded that there was no credible evidence to support a link between SSRI use and increased suicidality in adults and that "the evidence was not strong enough to justify the suggestion of even the possibility of a causal linkage in the labeling." Brief of United States of America at 9, *Colacicco,* 432 F.Supp.2d 514 (No. 05-5500). Thus, in its amicus brief in *Colacicco,* the FDA argued that including a warning of that risk would render the drug misbranded. *Id.* at 14-15. Because this made it "impossible to comply with both state and federal law," *Pokorny,* 902 F.2d at 1120, a finding of preemption was warranted. [FN13]

FN13. Judge Baylson in *Colacicco* also found preemption on the grounds that Apotex, as the manufacturer of a generic drug, was not permitted to modify the labeling to reflect new warnings. *See* 21 U.S.C. § 355(j)(2)(A)(v) (prohibiting manufacturers of generic drugs from modifying the label approved for the branded drug). Again, given that plaintiff claimed that he was entitled to a warning, the fact that such a warning would have been a violation of federal law was sufficient for a finding of preemption.

It is worth noting that, even where FDA regulations or other federal law prevent a manufacturer from modifying the approved labeling, a modification of the label is not the only form that a warning could take. If, for example, a plaintiff claimed that a manufacturer was negligent in not sending a letter to prescribing physicians or other health care professionals, that might present a different case, even if modification of the approved labeling were prohibited. Because plaintiffs are not specific in the complaint as to the nature of the warning that Novartis should have provided,[FN14] even if we were to find that Novartis could not have modified the FDA-approved labeling of Elidel to include a warning about pediatric cancers, we would still be obliged to deny defendants' motion if a warning of some other type would have been permissible under the regulations. The FDA has made clear that warnings other than labeling changes, such as letters to health care professionals, are permissible and the labeling regulations do not bar them.[FN15] *See* 44 Fed.Reg. 37434, 37447 (quoted *supra* ).

FN14. This is, of course, not a defect in the complaint since Fed.R.Civ.P. 8(a) does not require at this stage that a plaintiff state precisely what form the warning should have taken.

FN15. We do not mean to suggest that letters to health care professionals are beyond the scope of regulations. As with all other communications from manufacturers, such statements must not be "false and misleading" or they will render the drug misbranded. They need not, however, meet the specific approval requirements of 21 C.F.R. Part 201.

***687** In this case, a state law requirement to provide an additional warning would not force Novartis to choose between violating state and federal law. At the time Elidel was prescribed for Andreas Perry, the FDA had made no finding regarding a link between use of topical calcineurin inhibitors and increased cancer risk in children [FN16] and no statute or regulation prevented Novartis from adding the warning. Because federal law was effectively silent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

on whether such a warning was warranted, state law was not barred from requiring it.

FN16. It appears from the materials before us that the October, 2003 meeting of the Pediatric Advisory Subcommittee was inconclusive and generated no recommendation to the FDA. It would seem, therefore, that this represents a middle ground between the Committee's subsequent determination to require a warning and the situation in *Colacicco* where the Committee specifically found that the evidence did not support a warning. This middle ground allows a manufacturer that is in possession of information not considered by FDA scientists, or one who desires to act in an abundance of caution, to take steps to include an additional warning pending the FDA's more conclusive determination. In any case, the meeting took place in October, 2003, well after Andreas Perry began taking Elidel.

Even where compliance with both federal and state law is possible, preemption may be found where the existence of state law tort suits would disrupt the statutory and regulatory scheme that Congress envisioned. Thus, in *Buckman,* the Court found that the FDA was "amply empower[ed]" to police the submissions of medical device manufacturers and that allowing individuals to bring state law "fraud-on-the-FDA" claims would skew the balance of statutory objectives that the FDA sought to preserve. 531 U.S. at 348, 121 S.Ct. 1012.

Requiring Novartis to add a warning to the Elidel label would not disturb the balance of the regulatory scheme since FDA regulations make specific accommodation for adding a warning in the situation the Perrys allege. Indeed, given the recent concerns about the effectiveness of the FDA's safety monitoring of recently approved drugs, *see, e.g.,* Gardiner Harris, *Study Condemns F.D.A.'s Handling of Drug Safety,* N.Y. Times, Sept. 23, 2006, at Al, the availability of state law tort suits provides an important backstop to the federal regulatory scheme.

If, at some future date, Congress determines that FDA monitoring is sufficiently effective on its own to warrant the elimination of state law incentives for manufacturers to provide adequate warnings, it also has the authority to declare that failure to warn suits, like the Perrys' action, are preempted. Until it does so, however, in the absence of a specific FDA safety determination, such suits can go forward.

Accordingly, we will deny Novartis's motion to dismiss.

ORDER

AND NOW, this 16th day of October, 2006, upon consideration of defendants' motion to dismiss on federal preemption grounds (docket entry # 58), plaintiffs' memorandum in opposition (docket entry # 67), the brief of the Pennsylvania Trial Lawyers Association as amicus curiae (docket entry # 72), the materials filed by the Food and Drug Administration as amicus curiae (docket entry # 75) and the parties' filings of supplemental authority (docket entries 70, 74, 77, and 80) and for the reasons articulated in the accompanying Memorandum of Law, it is hereby ORDERED that:

***688** 1. Defendants' motion to dismiss is DENIED; and

2. Defendants shall ANSWER plaintiffs' second amended complaint by October 30, 2006.

E.D.Pa.,2006.
Perry v. Novartis Pharma. Corp.
456 F.Supp.2d 678

Briefs and Other Related Documents (Back to top)

- 2006 WL 3725056 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Certification of Interlocutory Appeal and for a Stay Order (Nov. 20, 2006) Original Image of this Document (PDF)
- 2006 WL 3193468 (Trial Pleading) Answer and Affirmative Defenses of Defendant Novartis Pharmaceuticals Corporation to Plaintiffs' Second Amended Complaint (Oct. 30, 2006)
- 2006 WL 3024522 (Trial Motion, Memorandum and Affidavit) Defendant Novartis Pharmaceuticals Corporation's Reply to Response to Motion to Dismiss on Federal Preemption Grounds (Sep. 11, 2006) Original Image of this Document (PDF)
- 2006 WL 3024521 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Opposition to Defendant Novartis' Motion to Dismiss Plaintiffs' Failure-to-Warn Claims on Federal Preemption Grounds (Aug. 31, 2006)
- 2006 WL 3024520 (Trial Motion, Memorandum and Affidavit) Defendant Novartis Pharmaceuticals

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Corporation's Memorandum of Law in Support of Opposition to Plaintiffs' Motion to Dismiss for Lack of Jurisdiction (Aug. 28, 2006) Original Image of this Document (PDF)
• 2006 WL 2702062 (Trial Motion, Memorandum and Affidavit) Motion of Defendant Novartis Pharmeceuticals Corporation to Dismiss Plaintiffs' Failure to Warn Claims (Aug. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 2702061 (Trial Pleading) Plaintiffs' Second Amended Complaint (Aug. 2, 2006) Original Image of this Document (PDF)
• 2006 WL 3024519 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss Plaintiffs' Strict Liability Claim (Jul. 24, 2006) Original Image of this Document (PDF)
• 2006 WL 3025526 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Opposition to Defendant Novartis' Motion to Dismiss Plaintiffs' Failure-to-Warn Claims on Federal Preemption Grounds (Jul. 24, 2006)
• 2006 WL 3025525 (Trial Motion, Memorandum and Affidavit) Defendant Novartis' Memorandum of Law in Support of its Motion to Dismiss Plaintiffs' Claims on Federal Preemption Grounds (Jun. 7, 2006) Original Image of this Document (PDF)
• 2006 WL 1030955 (Trial Pleading) Answer and Affirmative Defenses of Defendant Novartis Pharmaceuticals Corporation (Mar. 7, 2006) Original Image of this Document (PDF)
• 2006 WL 3025524 (Trial Pleading) Answer and Affirmative Defenses of Defendant Novartis Pharmaceuticals Corporation (Mar. 7, 2006) Original Image of this Document (PDF)
• 2005 WL 4844055 (Trial Motion, Memorandum and Affidavit) Defendant Novartis Pharmaceuticals Corporation's Memorandum in Support of Its Motion to Dismiss (Dec. 16, 2005) Original Image of this Document (PDF)
• 2005 WL 2897370 (Trial Pleading) Plaintiffs' Original Complaint (Oct. 12, 2005)
• 2005 WL 4844534 (Trial Pleading) Plaintiffs' Original Complaint (Oct. 12, 2005) Original Image of this Document (PDF)
• 2:05cv05350 (Docket) (Oct. 12, 2005)
• 2005 WL 3135605 (Trial Pleading) Plaintiffs' Original Complaint (2005) Original Image of this Document (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

U.S. Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Ave., N.W., Rm: 7250
Washington, D.C. 20530

JCB:CFB:DNL:SSwingle
Sharon Swingle
Sharon.Swingle@usdoj.gov

Tel: (202) 353-2689
Fax: (202) 514-8151

September 21, 2006

RECEIVED
SEP 22 2006
LARRY M. ROTH, P.A.

Hon. Stewart Dalzell
United States District Court
Eastern District of Pennsylvania
Office of the Clerk of the Court
601 Market Street, Room 2609
Philadelphia, PA 19106-1797

Re: *Andrea Perry et al. v. Novartis Pharmaceuticals et al.*, Civ. No. 05-5350

Dear Judge Dalzell:

Thank you for your letter of August 8, 2006, inviting the Food and Drug Administration (FDA) to participate in this litigation as amicus curiae. FDA welcomes the opportunity to present its views on the question whether the Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301 *et seq.*, as implemented by FDA, preempts a state-law tort claim arising out of a pharmaceutical company's alleged failure to warn of the dangers associated with use of a prescription drug.

As the Court noted in its letter, FDA recently filed a brief as amicus curiae in *Colacicco v. Apotex, Inc.*, Civ. No. 05-5500 (E.D. Pa. 2005). In that brief, FDA explained that the Supremacy Clause bars a state tort claim premised on the defendants' failure to provide a warning that FDA had specifically considered and rejected as scientifically unsubstantiated during the relevant period. Had the manufacturers provided the warning that the plaintiff sought, their drug products would have been deemed misbranded in violation of federal law. The state-law failure-to-warn claim was thus preempted, because the claim conflicted with the agency's determination pursuant to the FDCA and implementing regulations that the warning in question should not be provided. The district court in *Colacicco* appropriately gave deference to FDA's views on conflict preemption in dismissing the relevant claim. *Colacicco v. Apotex, Inc.*, 432 F. Supp. 2d 514, 526-529, 537-538 (E.D. Pa. 2006).

As we next explain, the underlying principles of conflict preemption that must be applied in this case are the same. Congress in the FDCA has authorized FDA to apply its scientific and regulatory expertise to determine what warnings are appropriate for prescription drugs, and the

Supremacy Clause prohibits application of state tort law in a manner that would prevent or frustrate FDA's accomplishment of that objective. Thus, state tort law is preempted if it imposes liability for a company's failure to provide a warning that FDA has rejected, or would reject, as scientifically unsubstantiated, or for a company's conduct in providing a warning that FDA deems necessary for the safe and efficacious use of a prescription drug.

Application of these general principles to the failure-to-warn claim in this litigation requires an examination of agency action relating to Elidel, including FDA's specific determinations regarding what warnings were appropriate, as well as the content of the warning that the plaintiffs allege should have been given. This letter sets out the regulatory history for Elidel, including the statutory and regulatory framework in which the drug was approved and FDA's labeling decisions relating to the drug. As we explain in greater detail below, it is not possible at this stage of the litigation for FDA to determine whether the plaintiffs' failure-to-warn claim is preempted in its entirety, because the plaintiffs have not yet articulated with specificity the warning that they assert should have been provided. That said, FDA has concluded that certain types of failure-to-warn claims that could be advanced in this proceeding are preempted. A claim that the defendants should have warned that Elidel *causes* lymphoma would be barred under the doctrine of federal conflict preemption, because it conflicts with FDA's determination, as of January 2006, that causation has not yet been established. Similarly, a claim based on the defendants' failure to warn of risks that were not included on the approved label for Elidel would be preempted absent scientific evidence in support of such a claim.

1. Background.

A. Statutory and regulatory framework.

FDA is the expert federal agency authorized by Congress in the FDCA to regulate the approval of prescription drugs.[1] In particular, FDA has been charged by Congress with, among other things, ensuring that prescription drugs sold in the United States are safe and effective, 21 U.S.C. § 355(d) and § 393(b)(2)(B), and that they are not misbranded, 21 U.S.C. §§ 331(a), (b), and (k), 352, and 321(n).

Under federal law, FDA's evaluation of a drug's safety and efficacy is inextricably intertwined with the drug's labeling. A prescription drug label must provide physicians and pharmacists with sufficient information, including indications for use and "any relevant hazards, contraindications, side-effects, and precautions," to allow those medical professionals to "use the drug safely and for the purposes for which it is intended." 21 C.F.R. § 201.100(c)(1). If drug labeling is false or misleading, or does not provide adequate directions for use or warnings against

---

[1] FDA is a component of the United States Department of Health and Human Services (HHS). The FDCA vests regulatory and enforcement authority in the Secretary of Health and Human Services. The Secretary has delegated this authority to the Commissioner of Food and Drugs. *See* 21 U.S.C. § 393(d); FDA Staff Manual Guides, Vol. II, § 1410.10 (available at www.fda.gov/smg/1410_10.html).

any use dangerous to health, the drug is unlawfully misbranded. *See* 21 U.S.C. § 331(a), (b), and (k); *id.* § 352(a), (f), (j); *id.* § 321(n).

FDA seeks to ensure that prescription drug labels warn of all known risks based on reliable scientific evidence, while avoiding inadequately substantiated risks, the mention of which could improperly deter use of the drug.[2] Labels are required to describe all "clinically significant adverse reactions" and "other potential safety hazards" associated with use of the drug. 21 C.F.R. §§ 201.57(c)(6)(i). Before a particular hazard can be listed on the labeling, there must be "reasonable evidence of a causal association" with use of the drug. *See* 21 C.F.R. § 201.57(c)(6)(i).

In order for a prescription drug manufacturer to obtain FDA approval for a new drug, the manufacturer must provide full reports of investigations establishing that the drug is safe and effective for use under "the conditions prescribed, recommended, or suggested in the proposed labeling thereof." 21 U.S.C. § 355(d)(1). When FDA approves a new drug application, it also approves the precise final version of the drug labeling. *See* 21 C.F.R. § 314.50(e)(2)(ii).

A manufacturer may not deviate from FDA-approved product labeling except in limited circumstances. If the manufacturer of a non-generic prescription drug wishes to add or strengthen a warning, the manufacturer may provide FDA with a supplemental submission regarding the proposed labeling change, providing a full explanation of the basis for the proposed change. *See* 21 C.F.R. § 314.70(c)(1), (3), (6)(iii)(A). If FDA has not rejected the supplement within 30 days after its submission, the manufacturer may distribute the drug with the new proposed labeling. *See* 21 C.F.R. § 314.70(c)(7). Even after the drug has been distributed, FDA may choose to reject the proposed labeling change and may order the drug manufacturer to cease distributing drugs with the new label. *See* 21 C.F.R. § 314.70(c)(5).[3]

If a drug manufacturer has "reasonable evidence of a causal association" between the use of a drug and a "clinically significant hazard," the manufacturer has an obligation to seek FDA approval for a labeling change, in order to add a warning of the new potential hazard. *See* 21 C.F.R. § 201.57(c)(6)(i); *see also* 21 C.F.R. § 201.56(a)(2) (requiring manufacturer to seek FDA approval to update labeling "when new information becomes available that causes the labeling to become inaccurate, false, or misleading"). Drug manufacturers are also subject to continuing obligations to

---

[2] FDA undertakes a comprehensive scientific evaluation of a drug's risks and benefits when determining whether a prescription drug product is safe and effective. The approved labeling for a product "reflects thorough FDA review of the pertinent scientific evidence and communicates * * * the agency's formal, authoritative conclusions regarding the conditions under which the product can be used safely and effectively." 71 Fed. Reg. 3922, 3934 (2006). Disclosing additional risks that FDA did not require can erode the careful representation of benefits and risks in the approved labeling in a number of ways, including discouraging appropriate use of the drug if a risk is exaggerated and causing meaningful risk information to lose its significance. *See id.* at 3934-3935.

[3] A generic drug manufacturer is not permitted to modify the labeling for its drug without prior FDA approval. *See* 21 C.F.R. § 314.150(b)(10); 57 Fed. Reg. 17,950, 17,961 (1992).

report adverse events that occur in patients treated with a particular drug, whether or not considered drug-related, and to investigate any "serious and unexpected" adverse events associated with the use of a drug in humans. *See* 21 C.F.R. §§ 314.80(a), (c), 314.98(a).

B. Regulatory history.[4]

Elidel is a topical skin cream approved by FDA as a "second-line" treatment for atopic dermatitis in non-immunocompromised patients over the age of 2. *See* FDA, Center for Drug Evaluation and Research, Application No. 21-302, Approval Letter for Elidel (Exh. A), at 2. Atopic dermatitis is a chronic inflammatory disease of the skin that commonly presents in early childhood, and affects between 10-20% of all children and 1-3% of adults. *See* Pediatric Advisory Subcommittee to the Anti-Infective Drugs Advisory Committee, Open Meeting, Oct. 29-30, 2003, Overview (Exh. B), at 1. On December 13, 2001, FDA approved the application of Novartis Pharmaceuticals Corp. to market Elidel as a short-term or intermittent long-term treatment for atopic dermatitis in patients who cannot use conventional therapies because of potential risks, or for whom conventional therapies have been unsuccessful or poorly tolerated. *See* FDA Elidel Approval Letter (Exh. A), at 1.

The active ingredient of Elidel, pimecrolimus, works by suppressing the immune system response. *See* 2003 Pediatric Advisory Subcommittee Overview (Exh. B), at 1-2. Pimecrolimus and a similar drug also approved for marketing as a topical immunosuppressant, tacrolimus (sold under the brand name Protopic), make up the class of drugs known as calcineurin inhibitors. Prior to FDA approval of a topical form of tacrolimus, the drug was approved in an oral form for use as a systemic immunosuppressant for organ transplant recipients. *See id.* at 2. Oral treatment with tacrolimus as a systemic immunosupressant (which results in systemic levels of tacrolimus that are approximately 30-fold higher than the levels observed with topical use, *see* Protopic 2000 Label (Exh. C), at 2) is known to increase the risk of skin cancer and lymphoma. *See* 2003 Pediatric Advisory Subcommittee Overview (Exh. B), at 2.

Clinical studies involving the use of topical pimecrolimus in humans found no increase in lymphoma or other cancers. *See* Elidel 2001 Label (Exh. D), at 10. Animal studies of pimecrolimus, in which high doses of the drug (47 and 179-217 times the maximum recommended human doses) were administered topically to mice and rats, showed an increase in lymphoproliferative changes, including lymphoma, as well as a shortened latency period for lymphoma formation and for skin tumor formation upon exposure to UV radiation. *See* Elidel 2001 Label (Exh. D), at 11. In addition, animal studies involving oral use of high levels of pimecrolimus confirmed what was already known to FDA about the immunosuppressive use of tacrolimus, *i.e.,*, that pimecrolimus increased the risk

---

[4] This history of FDA's actions relating to Elidel is drawn from public documents available at FDA's web site at www.fda.gov/ohrms/dockets/ac/cder03.html#Anti-Infective, www.fda.gov/ohrms/dockets/ac/oc05.html, www.fda.gov/cder/drug/infopage/elidel/default.htm, and www.fda.gov/cder/drug/infopage/protopic/default.htm. We have also attached copies of the relevant documents in a separately bound addendum to this letter, for the convenience of the Court and the parties.

of lymphoma; an increase in the risk of follicular cell thyroid adenoma was also found. *See* FDA Elidel Approval Letter (Exh. A), at 2.

While the label approved by FDA for Elidel in 2001 thoroughly described the results of these studies and cautioned that patients using the drug should minimize or avoid exposure to sunlight, it did not contain any warning of an association between pimecrolimus and lymphoma. *See* Elidel 2001 label (Exh. D), at 10-11. Novartis did, however, make a commitment to FDA in its new drug application to conduct further studies to determine whether long-term intermittent use of Elidel in pediatric patients increased the risk of developing malignancies, and whether long-term intermittent use of Elidel in sun-exposed adult patients increased the risk of skin cancer. *See* FDA Elidel Approval Letter (Exh. A), at 2.[5]

In October 2003, FDA's Pediatric Advisory Subcommittee to the Anti-Infective Drugs Advisory Committee met to discuss monitoring of cancer rates in pediatric patients treated with calcineurin inhibitors for atopic dermatitis. *See* 2003 Pediatric Advisory Subcommittee Overview (Exh. B), at 1.[6] FDA scientists recognized at the meeting that lymphoma is associated with systemic exposure to a calcineurin inhibitor through oral treatment with the drug. *See* Pediatric Advisory Subcommittee to the Anti-Infective Drugs Advisory Committee, Open Meeting, Oct. 29-30, 2003, Slides: Questions (Exh. F), at 2. Because calcineurin inhibitors are absorbed through the skin, topical use of the drugs may cause low-level systemic exposure. *See id.* The amount of systemic exposure might be higher in children, who have a higher ratio of body surface to total body mass. *See id.* Any malignancy, however, might be discernible only through long-term exposure, especially if total systemic exposure is modest. *See id.* at 2-3. The question, therefore, was how to assess the clinical risk of malignancy, if any, resulting from the topical use of this class of drugs. *See id.*

Several FDA scientists presented information at the October 2003 meeting about animal studies and clinical trials of Elidel and Protopic conducted prior to those drugs' approval (information that, as noted above, was also summarized in the approved label for those drugs). One FDA scientist interpreted the animal studies to suggest that "systemic exposure from topical

---

[5] The manufacturer of Protopic Ointment, another topical immunosuppressant approved by FDA on December 18, 2000, for marketing as a treatment for atopic dermatitis, also made a commitment to conduct a study of the risk of malignancies in pediatric patients treated with Protopic on a long-term, intermittent basis, and to do an additional study to evaluate whether very young patients (ages 2-5) using Protopic had measurable blood levels of tacrolimus. *See* FDA, Center for Drug Evaluation and Research, Application No. 50-777, Approval Letter for Protopic (Exh. E), at 2.

[6] FDA utilizes advisory committees "to conduct public hearings on matters of importance that come before FDA, to review the issues involved, and to provide advice and recommendations to the Commissioner." 21 C.F.R. § 14.5(a). The role of the committees is purely advisory, and the Commissioner of Food and Drugs "has sole discretion concerning action to be taken and policy to be expressed on any matter considered by an advisory committee." *Id.* § 14.5(b); *see also* 5 U.S.C. Apx. 2 § 2(6).

calcineurin inhibitors over a course of time leading to a cumulative dose effect may lead to melanomas, non-melanoma skin cancers, Hodgkin's and Non-Hodgkin's lymphomas." Pediatric Advisory Subcommittee of the Anti-Infective Drugs Advisory Committee, Oct. 30, 2003, Transcript (Exh. G), at 21-22. Another FDA scientist similarly noted that "lymphome signals" had been found in dermal and oral mouse carcinogenicity studies conducted with tacrolimus, an oral mouse carcinogenicity study conducted with pimecrolimus, and a dermal mouse study conducted with an extremely high dose of pimecrolimus. 2003 Pediatric Advisory Subcommittee Transcript (Exh. G), at 32-33; Pediatric Advisory Subcommittee to the Anti-Infective Drugs Advisory Committee, Open Meeting, Oct. 29-30, 2003, Slides: Topical Immunosuppressants (Calcineurin Inhibitors) – Animal Toxicology (Exh. H), at 18.[7]

FDA scientists also presented post-marketing information about calcineurin inhibitors, *i.e.*, information obtained following FDA approval of the topical forms of the drugs. A pharmacist and safety evaluator reported that more than 3.2 million prescriptions for topical pimecrolimus and 2 million prescriptions for topical tacrolimus had been dispensed as of August 2003. 2003 Pediatric Advisory Subcommittee Transcript (Exh. G), at 35, 55-56. For patients treated with topical pimecrolimus, 79 adverse events had been reported to FDA, most of which involved side effects warned of in the labeling for the drug and 90% of which were skin-related. *Id.* at 36. As of that time, there were 2 reported instances of nonmalignant tumors and 7 cases of infection, as well as 4 hospitalizations, all involving pediatric patients. *Id.* at 37. Post-marketing reports for topical tacrolimus showed 183 adverse event reports, 95% of which were found in the product labeling and 50% of which involved a skin reaction. *Id.* at 38, 55-56. Among patients treated with topical tacrolimus, there were three reported cases of death, five malignancies in adults, and ten cases of pediatric infection, one of which ended in death. *Id.* at 39-41. Post-marketing data for both calcineurin inhibitors showed substantial "off-label" use in children under the age of 2, who represented 17% of the prescriptions written for pimecrolimus, and 22% of the adverse event reports for that drug. *Id.* at 41.[8]

The Pediatric Advisory Subcommittee did not make any recommendations to FDA about the specific topic of the October 2003 meeting — the monitoring of cancer rates in pediatric patients treated with calcineurin inhibitors. Individual committee members recognized that the long latency period for malignancies; the low incidence of those diseases, particularly in children; and the lack

---

[7] Also described were photo-toxicity studies involving tacrolimus and pimecrolimus, which sought to determine whether use of the drugs reduced the time to skin tumor formation in animals as a result of UV exposure. For tacrolimus, the study showed that the vehicle ointment itself had a photo-carcinogenic effect, and that tacrolimus had an additional small effect. For pimecrolimus, the study showed that the vehicle cream enhanced UV photo-carcinogenesis, but that pimecrolimus had no additional effect. 2003 Pediatric Advisory Subcommittee Slides: Topical Immunosuppressants (Exh. H), at 9-10.

[8] "Off-label" use of a drug product is the use of that product by a medical professional for a purpose other than the purpose for which it has been approved by FDA. *See Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 350 (2001).

of any centralized registry or reporting system for many forms of malignancies, all contributed to the difficulty in determining whether topical use of calcineurin inhibitors increases the risk for cancer. Numerous individual participants recommended the adoption of particular strategies to manage the potential risk for malignancies, with some committee members suggesting that the labels for calcineurin inhibitors should be modified to warn against use of the drugs in children under the age of 2. However, the Subcommittee did not make any formal decision or recommendation on the issue of labeling, which was not the topic on which the meeting had been convened.

On February 15, 2005, FDA's Pediatric Advisory Committee met again to discuss the potential cancer risk in children from use of topical immunosuppressants and methods of risk management. *See* 70 Fed. Reg. 1721 (2005); Pediatric Advisory Committee, FDA, 2/15/05 Draft Agenda (Exh. I). In calling the committee meeting, FDA was particularly concerned about off-label use of the drugs in infants. The Briefing Memorandum for the meeting explained that, although neither Elidel nor Protopic was approved or recommended for use in children under 2, approximately 500,000 prescriptions for the drugs had been dispensed for children in that age range between June 2003 and May 2004. FDA Feb. 7, 2005, Briefing Memo (Exh. J), at 2. Prior animal studies had raised a concern that "chronic, intermittent exposure * * * could lead to an increased incidence of Hodgkin and Non-Hodgkin lymphoma as well as melanoma and non-melanoma skin cancers," and the FDA had learned of a new study involving oral use of pimecrolimus in monkeys (albeit at a dose 30 times the maximum recommended human dose), which found that viral-associated lymphomas occurred in a dose-response manner. *Id.* at 2-3; FDA, Division of Pediatric Drug Development Recommendation (Exh. K), at 2. FDA had also received additional malignancy and other adverse event reports for Elidel and Protopic. FDA Briefing Memo (Exh. J), at 3-4.

FDA's Office of Pediatric Therapies and Division of Pediatric Drug Development both recommended to the Pediatric Advisory Committee that the labels for Elidel and Protopic be modified to reflect a potential risk of cancer, particular in young children treated with the drugs. *See* Briefing Memo (Exh. J), at 4, 5; Pediatric Drug Recommendation Memo (Exh. K), at 1. Although members of the Committee recognized that there was substantial scientific uncertainty about any association between the use of calcineurin inhibitors and the development of lymphoma or other malignancies, they also recognized that calcineurin inhibitors were commonly perceived as being far safer than alternative treatments, and agreed that there was a need to communicate more clearly the scientific uncertainty about potential risks of topical use of the drugs. *See* Pediatrics Advisory Committee, 2/15/05 Transcript (Exh. L), at 264-265, 273-274; *see also id.* at 280-294 (summarizing views).

The Pediatric Advisory Committee voted on February 15, 2005, to recommend a change in the labeling for the drugs to alert medical professionals of a potential association between calcineurin inhibitors and lymphoma and other malignancies. *See* Pediatrics Advisory Committee, 2/15/05 Transcript (Exh. L), at 298-299, 302. Specifically, the Committee recommended a boxed warning on the labels for Elidel and Protopic recognizing the "potential increased risk of cancer in humans, based on animal studies," while noting that "there is inadequate human data at this time to ascertain the cancer risk from the topical use of calcineurin inhibitors." Pediatric Advisory Committee, 2/15/05 Slides: Questions to Committee About Potential Cancer Risk with Use of Topical

Immunosuppressants (Exh. M), at 1; Pediatrics Advisory Committee, 2/15/05 Transcript (Exh. L), at 302, 318-321, 324, 328, 331-333. The Committee also recommended that the labels for Elidel and Protopic, which already noted that the drugs were not approved for use as a first-line therapy or in children under the age of 2, be modified to further emphasize these limitations. Pediatrics Advisory Committee, 2/15/05 Transcript (Exh. L), at 302, 318-321, 323-324. Finally, the Committee recommended a letter to health care providers containing this information. Pediatrics Advisory Committee, 2/15/05 Transcript (Exh. L), at 355-356.

On March 10, 2005, FDA issued a public health advisory "to inform healthcare providers and patients about a potential cancer risk from use" of Elidel and Protopic. FDA Public Health Advisory (Exh. N), at 1. The public health advisory explained that the concern was "based on information from animal studies, case reports in a small number of patients, and knowledge of how the drugs work," and further explained that human studies might take ten years or more "to determine if use of Elidel or Protopic is linked to cancer." *Id.* FDA recommended that providers, patients, and caregivers consider (i) using calcineurin inhibitors only as second-line agents to treat atopic dermatitis; (ii) avoiding use of the drugs in children under the age of 2, for whom the effects of the drug on developing immune systems is not known and in whom clinical studies have shown a higher rate of upper respiratory infections; (iii) using the drugs only for short periods rather than continuously; (iv) avoiding use of the drugs in patients with a weakened or compromised immune system; and (v) using the minimum amount of the drugs necessary to control symptoms. *See id.* FDA also indicated that, based on the advice of its Pediatric Advisory Committee, FDA would require labeling changes for the drugs, "including the placement of a boxed warning about the potential cancer risk," and would also work with the drugs' manufacturers to develop a medication guide to be given to patients or their caregivers by pharmacists filling each prescription. *Id.*

On January 19, 2006, FDA approved revised labeling for Elidel containing the following boxed warning:

**WARNING**

**Long-term Safety of Topical Calcineurin Inhibitors Has Not Been Established**

Although a causal relationship has not been established, rare cases of malignancy (e.g., skin and lymphoma) have been reported in patients treated with topical calcineurin inhibitors, including Elidel Cream.

Therefore:

- Continuous long-term use of topical calcineurin inhibitors, including Elidel Cream, in any age group should be avoided, and application limited to areas of involvement with atopic dermatitis.
- Elidel Cream is not indicated for use in children less than 2 years of age.

Elidel 2006 Label (Exh. O), at 8. The revised labeling explained that prolonged systemic use of calcineurin inhibitors in organ transplant patients and use of the drugs in animal studies had been associated with an increased risk of infections, lymphomas, and skin malignancies, and that those risks were tied to the intensity and duration of immunosuppression. *Id.* "Based on this information and the mechanism of action, there is a concern about a potential risk with the use of topical calcineurin inhibitors, including ELIDEL Cream." *Id.* Although the label explicitly stated that "a causal relationship has *not* been established," *id.* (emphasis added), it noted that rare cases of skin malignancy and lymphoma had been reported in patients treated with the drugs, *id.* The label accordingly warned against the use of Elidel in immunocompromised patients, and noted that the safety of Elidel has not been established beyond one year of non-continuous use. *Id.*

C. Factual and procedural background.

Andreas Perry is a minor child whose physician allegedly provided his mother with Elidel in late April 2003 to treat her son's eczema. Second Amended Complaint, ¶¶ 76-78.[9] Andreas was subsequently diagnosed with lymphoblastic lymphoma. *Id.* ¶ 79. Andreas and his parents allege that they were not given adequate warnings about the potential risks of Elidel, and that the defendants failed to give adequate warnings to their treating physician of the drug's potential risks, instead engaging in intentional misrepresentations about its safety and efficacy. The plaintiffs assert that this misconduct was the proximate cause of their infant son's treatment with Elidel, which is alleged to have caused his lymphoma. *Id.* ¶¶ 99, 112. The plaintiffs have brought claims against Novartis Pharmaceuticals Corporation, several Novartis affiliates, and two individual sales representatives for the company, for deceit, fraud, infliction of emotional distress, breach of warranty, and failure to warn.

The defendants moved to dismiss on federal preemption grounds the plaintiffs' failure-to-warn claim. On August 8, 2006, this Court invited FDA to submit a letter or a brief as amicus curiae setting out the agency's views on federal preemption and the application of that doctrine in this litigation.

2. Discussion.

A. Principles of federal preemption.

Under the Supremacy Clause (U.S. Const. art. VI, cl. 2), a state may not cause a drug manufacturer to choose between compliance with federal law and state tort liability. *See Geier v. American Honda Motor Co.*, 529 U.S. 861, 873 (2000). State law is also preempted if it would "prevent or frustrate the accomplishment of a federal objective." *Id.*; *see also Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *Jones v. Rath Packing Co.*, 430 U.S. 519, 526 (1977).

---

[9] As the Court is required to do at this stage of the pleadings, FDA assumes the truth of the allegations of the Second Amended Complaint for purposes of this letter.

In the context of drug labeling, Congress in the FDCA has authorized FDA to apply its scientific expertise to determine what warnings are appropriate and necessary for a particular drug. *See Henley v. FDA*, 77 F.3d 616, 621 (2d Cir. 1996); *Public Citizen Health Research Group v. Commissioner*, 740 F.2d 21, 28 (D.C. Cir. 1984). Where FDA has exercised its authority to determine that a particular warning is not adequately supported by the evidence, it would stymie the regulatory scheme established by Congress to impose liability under state tort law for the failure to provide such a warning. Conversely, where FDA has determined that a particular warning is necessary to ensure the safe and efficacious use of a drug, it would undermine federal regulatory objectives for a manufacturer to be found liable under state law for providing that warning. As FDA explained recently in the preamble to its prescription drug labeling regulation adopted under the FDCA, state tort law is preempted if it purports "to compel a firm to include in labeling or advertising a statement that FDA has considered and found scientifically unsubstantiated," or to "preclude a firm from including in labeling or advertising a statement that is included in prescription drug labeling." 71 Fed. Reg. 3922, 3935 (2006).[10] Even if compliance with both state and federal law in these circumstances would not be impossible, state tort liability would pose a sufficient threat to federal regulatory objectives to be preempted under the Supremacy Clause. *See, e.g., Geier*, 529 U.S. at 884-885; *Jones*, 430 U.S. at 543.

B. Application of federal preemption principles to plaintiffs' failure-to-warn claim.

Although the general principles of federal preemption applicable in this litigation are the same as in *Colacicco v. Apotex, Inc.*, C.A. No. 05-5500 (E.D. Pa. 2005), FDA's analysis in that litigation and the district court's legally correct dismissal of failure-to-warn claims involving paroxetene hydrochloride do not resolve the question presented here: whether federal preemption bars the plaintiffs' failure-to-warn claim relating to Elidel. A failure-to-warn claim is not preempted merely because it imposes liability for a manufacturer's failure to provide a warning that has not yet been required by FDA. Federal regulations explicitly recognize that manufacturers can, and in some limited instances must, modify their labels to add new warnings of hazards associated with the drug, without awaiting prior FDA approval. *See* 21 C.F.R. § 314.70(c)(7); 21 C.F.R. § 201.56. Where, in light of new scientific evidence or other changed circumstances, a drug label no longer ensures safe and effective use, FDA encourages drug manufacturers to work quickly and collaboratively with the agency to make necessary labeling changes. Of course, even in these instances, FDA retains ultimate responsibility to determine whether the proposed change is appropriate, and may reject a

---

[10] In referencing the preamble to the 2006 final regulations, FDA does not mean to suggest that the preamble itself establishes a federal rule of decision that preempts inconsistent state tort law. The basis for preemption in cases such as this one and *Colacicco v. Apotex, Inc.*, No. 05-CV-5500 (E.D. Pa.), is federal law requiring drug manufacturers to provide adequate directions for use, forbidding "misbranding" of a drug product, and requiring drug manufacturers to use the approved label for their product or, in limited circumstances, to seek FDA approval to change the label to warn of a potential hazard for which there is reasonable evidence of a causal association. Nevertheless, the 2006 preamble sets out FDA's understanding of the relevant preemption principles to be applied in a case such as this one, and is thus entitled to deferential consideration by this Court. *See, e.g., Geier*, 529 U.S. at 883; *Horn v. Thoratec Corp.*, 376 F.3d 163, 171, 176-177 & n.22 (3d Cir. 2004).

labeling change and order the drug manufacturer to cease distributing the product with the new label. *See* 21 C.F.R. § 314.70(c)(5).

To the extent, therefore, that the defendants argue that federal preemption bars *any* failure-to-warn claim premised on a drug manufacturer's failure to provide a warning not contained in the drug's approved labeling, the defendants are incorrect. FDA has not attempted to "occupy the field" of prescription drug labeling, and state tort liability for failure to warn does not necessarily prevent FDA from carrying out its regulatory goals. Federal regulations explicitly provide for labeling changes to be made to warn of new hazards or cautions relating to a drug without prior FDA approval. Under this regulatory scheme, preemptive conflict does not exist in every instance in which state tort law seeks to impose liability for the failure to provide a warning not affirmatively mandated by FDA.

That said, in some circumstances the imposition of state tort liability on a drug manufacturer for failure to warn would conflict with FDA's regulatory authority or interfere with the accomplishment of federal objectives. Because FDA has not occupied the field, such determinations require an analysis of the agency's actions and the actions that are alleged to give rise to liability. A court must ask whether the warning sought by the plaintiff would have rendered the drug misbranded in the agency's judgment at the relevant time, or if any new warnings proposed to be added to the warning label would have been rejected by the agency as unsubstantiated.

Application of those principles is difficult in this case, in large part because of the lack of specificity in plaintiffs' complaint about the factual basis on which they assert liability for failure to warn. Plaintiffs allege that defendants should have warned of "the risks of developing malignancies from the use and application of pimecrolimus" and also should have warned that those risks were "more severe" than the risks of other, more traditional treatments for eczema. Second Amended Complaint, ¶ 137. Plaintiffs do not clarify, however, what an appropriate warning would have said; what causal relationship, if any, should have been asserted for the development of malignancies; and what comparative claims of safety should have been made, and as to which drugs. Plaintiffs also do not explain *when* these warnings should have been given, which is a crucial factor in determining whether state tort liability would conflict with FDA labeling decisions. Even if FDA ultimately determines that a specific warning should be added to a label, a state-law failure-to-warn claim would still be preempted if it sought to impose liability for failure to provide the same warning at an earlier time when existing scientific evidence would not have supported it. Given these uncertainties, it is not possible to decide as a matter of law whether liability on the plaintiffs' failure-to-warn claim would prevent the accomplishment of federal regulatory objectives.

FDA can, however, provide some guidance about the types of failure-to-warn claims that would be preempted by federal law, in the hope that this analysis might assist the Court as the litigation progresses.

First, federal preemption bars any claim that defendants should have warned of a causal link between Elidel and lymphoma or other malignancies. Following approval of Elidel in 2001, FDA became aware of, and concerned about, widespread off-label use of the drug in patients under the

age of 2, as a first-line treatment for atopic dermatitis, and for long-term treatment of dermatitis. FDA was concerned that physicians and patients were using the drug without adequate information about the potential risks, and the scientific uncertainty about the effects, of long-term use of the drug or use of the drug in young children. FDA also became aware of adverse event reports involving the drug, which supported the theory that chronic exposure to the drug might increase the risk of developing malignancies. Even as of January 2006, however, FDA's determination was that available scientific evidence has not established the existence of a causal relationship between Elidel and the development of malignancies. *See* 2006 Elidel label, at 8; FDA Press Release, 1/19/06. at 1. The "black box" warning required by FDA specifically states that "a causal relationship has not been established" between Elidel and lymphoma and other malignancies. Elidel 2006 Label, at 8. Necessarily, therefore, no causal relationship had been established before that time and, had defendants attempted to claim such a relationship in their labeling, the drug would have been deemed misbranded by FDA.

Second, any claim premised on the defendants' failure to provide additional warnings about Elidel as of the drug's approval in 2001, premised on scientific information known to and considered by FDA as part of the approval process, would also be preempted. In December 2001, FDA determined, based on its evaluation of the scientific evidence regarding potential risks and side effects of pimecrolimus, that the label for Elidel should warn that the drug was not recommended for use in children younger than 2 and should also warn of side effects in children in that age group as well as the fact that "the "effects of Elidel Cream on the developing immune system in infants are unknown." 2001 Label, at 13. FDA also determined that the label should describe animal studies involving pimecrolimus, which showed a potential association between use of the drug in animals and an increase in lymphoma and other cancers, and should warn that patients using Elidel should minimize sunlight exposure in light of this potential risk. 2001 Label, at 11, 10. Federal preemption would bar state tort liability based on the defendants' provision of these warnings as of December 2001 in the form and substance approved by FDA.[11]

In conclusion, any warning added after Elidel's approval would need to have been supported by reasonable evidence of a causal association with the drug. *See* 21 C.F.R. § 201.57(c)(6)(i). As explained earlier, once FDA has approved a new drug application, an applicant generally may not deviate from the approved label without submitting a supplement to the application providing a full explanation of the basis for the change. *See* 21 C.F.R. § 314.70. The applicant must provide supporting information for the proposed change or advise FDA of where such information may be found. This evidence may include company-conducted or independent studies, published reports,

[11] FDA does not intend to suggest, however, that post-approval data about the use of Elidel or adverse event reports for the drug are irrelevant to the question whether the labeling was adequate to ensure safe and effective use. As noted above, FDA issued a public health advisory about calcineurin inhibitors in 2005, and approved new labeling for Elidel in 2006, to better communicate the scientific uncertainty about whether topical use of calcineurin inhibitors is associated with a risk of malignancies. FDA merely notes that federal preemption would bar a claim based on the defendants' alleged failure to provide additional warnings as of December 2001, based solely on scientific information known to and considered by FDA in approving the final labeling for Elidel.

and compilations of adverse events. After evaluating this evidence, FDA determines whether the labeling change is appropriate based on such factors as the frequency of the risk of a side effect or adverse outcome, the severity of the potential risk, and the potential benefits and risks associated with the proposed warning. The scientific evidence FDA was aware of in 2003 regarding use of Elidel and the potential risk of lymphoma or other cancers is the data submitted as part of the approval process for Elidel, Protopic, and the oral form of tacrolimus, and a small number of adverse event reports for Protopic involving malignancies.

* * * * *

On behalf of FDA, we thank the Court for the opportunity to present FDA's views on the question of federal preemption in this litigation.

Of Counsel:
DANIEL MERON
General Counsel
Department of Health and
Human Services

SHELDON T. BRADSHAW
Chief Counsel
ERIC M. BLUMBERG
Deputy Chief Counsel
SUSAN L. WILLIAMS
Associate Chief Counsel
Food and Drug Division
Department of Health and
Human Services
Office of General Counsel

PETER D. KEISLER
Assistant Attorney General

C. FREDERICK BECKNER III
Deputy Assistant Attorney General

PATRICK L. MEEHAN
United States Attorney

VIRGINIA A. GIBSON
Assistant United States Attorney
Chief, Civil Division

DOUGLAS N. LETTER
(202) 514-3602
SHARON SWINGLE
(202) 353-2689
Attorneys, Appellate Staff
Department of Justice
Civil Division
950 Pennsylvania Ave., N.W.
Washington, DC 20530-0001

cc: Hon. Stewart Dalzell
United States District Court
Eastern District of Pennsylvania
10613 United States Courthouse
601 Market Street
Philadelphia, PA 19106-1705 (w/ enclosure)

Scott J. Liotta
Law Offices of Larry M. Roth, P.A.
P.O. Box 547637
Orlando, FL 32854-7637 (w/ enclosure)

Madeline M. Sherry
Gibbons, Del Deo, Dolan,
Griffinger & Vecchione, P.C.
1700 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103-2769 (w/ enclosure)

Brian P. McCafferty
Provost Umphrey Law Firm LLP
1617 John Fitzgerald Kennedy Blvd.
Suite 640
Philadelphia, PA 19103 (w/out enclosure)

Erin K. Corley
Fibich, Hampton & Leebron, LLP
Five Houston Center
1401 McKinney, Suite 1800
Houston, TX 77010 (w/out enclosure)

Francine A. Hochberg
Louis M. Bograd
Center for Constitutional Litigation, P.C.
1050 31st Street, N.W.
Washington, DC 20007 (w/out enclosure)

Leslie Brueckner
Trial Lawyers for Public Justice PC
1717 Massachusetts Ave., N.W.
Suite 800
Washington, DC 20036-20001 (w/out enclosure)

Joe G. Hollingsworth
Kirby T. Griffis
Spriggs & Hollingsworth
1350 I Street NW
Washington, DC 20005 (w/out enclosure)

Shanin Specter
Kline & Specter, P.C.
1525 Locust Street
19th Floor
Philadelphia, PA 19102 (w/out enclosure)